# Exhibit B - Lif Deposition

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

```
 1              CERTIFICATE OF REPORTER
 2         I, Cynthia K. DuRivage, a Certified Court
 3    Reporter of the State of Nevada, do hereby certify:
 4              That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were duly sworn; that a record
 8    of the proceedings was made by me using machine
 9    shorthand which was thereafter transcribed under my
10    direction; that the foregoing transcript is a true
11    record of the testimony given.
12              I further certify I am neither financially
13    interested in the action nor a relative or employee
14    of any attorney or party to this action.
15              IN WITNESS WHEREOF, I have this date
16    subscribed my name.
17    Dated: April 15, 2019
18
19
20                        CYNTHIA K. DuRIVAGE
                          CCR No. 451
21
22
23
24
25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 1

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4

5   TRINITA FARMER, individually,  )
                                   )
6              Plaintiff,          )  Case No.
                                   )  2:18-cv-00860-GMN-VCF
7          vs.                     )
                                   )
8   LAS VEGAS METROPOLITAN POLICE  )
    DEPARTMENT, a subdivision of   )      CONDENSED
9   the STATE OF NEVADA; KENNETH   )
    LOPERA, individually; TRAVIS   )      TRANSCRIPT
10  CRUMRINE, individually;        )
    MICHAEL TRAN, individually;    )
11  MICHAEL FLORES, individually,  )
                                   )
12             Defendants.         )
    _____)
13

14

15      VIDEOTAPED DEPOSITION OF OFFICER ASHLEY LIF

16          Taken on Thursday, April 4, 2019

17                At 10:07 a.m.

18          3005 West Horizon Ridge Parkway

19                  Suite 241

20               Henderson, Nevada

21

22

23

24

25  Reported by:  Cynthia K. DuRivage, CCR No. 451

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

2  (Pages 2 to 5)

---

Page 2

1  APPEARANCES:
2  For the Plaintiff:
3      ANDRE M. LAGOMARSINO, ESQ.
       Lagomarsino Law
4      3005 West Horizon Ridge Parkway
       Suite 241
5      Henderson, Nevada 89052
       (702) 383-0065
6
7
   For the Las Vegas Metropolitan Police Department,
8  Travis Crumrine, Michael Tran, Michael Flores:
9      CRAIG R. ANDERSON, ESQ.
       Marquis Aurbach Coffing
10     10001 Park Run Drive
       Las Vegas, Nevada 89145
11     (702) 382-0711
12
13 For the Defendant Kenneth Lopera:
14     DANIEL R. McNUTT, ESQ.
       McNutt Law Firm, P.C.
15     625 South 8th Street
       Las Vegas, Nevada 89101
16     (702) 384-1170
17
18
19 Also Present:

20     Joshua L. Kincaid, Legal Videographer
21
22          * * * * *
23
24
25

---

Page 3

1           I N D E X
2  WITNESS: OFFICER ASHLEY LIF
3                                      PAGE
4  Examination by Mr. Lagomarsino          5
5  Examination by Mr. McNutt              76
6  Further Examination by Mr. Lagomarsino  148
7  Further Examination by Mr. McNutt      156
8  Further Examination by Mr. Lagomarsino  161
9
10
11         E X H I B I T S
12          (NONE MARKED.)
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 4

1      LAS VEGAS, NEVADA; THURSDAY, APRIL 4, 2019
2               10:07 A.M.
3               ---oOo---
4
5      THE VIDEOGRAPHER:  Good morning.  Today is
6  Thursday, April 4th, 2019.  The time is approximately
7  10:07 a.m.
8      This begins the video deposition of Ashley
9  Lif.
10     We are located at Lagomarsino Law,
11 3005 West Horizon Ridge Parkway, Suite 241,
12 Henderson, Nevada 89052.
13     My name is Joshua Kincaid, court
14 videographer with Las Vegas Legal Video.
15     This is United States District Court,
16 District of Nevada, Case No. 218-CV-00860-GMN-VCF, in
17 the matter of Trinita Farmer, plaintiff, versus
18 Las Vegas Metropolitan Police Department, et al.,
19 defendants.
20     This video deposition is requested by the
21 attorney for the plaintiff.
22     Will counsel and all present please state
23 your appearances for the record.
24     MR. LAGOMARSINO:  Andre Lagomarsino for the
25 plaintiff.

---

Page 5

1      MR. McNUTT:  Dan McNutt on behalf of
2  Officer Lopera.
3      MR. ANDERSON:  Craig Anderson on behalf of
4  defendants Las Vegas Metropolitan Police Department,
5  Travis Crumrine, Michael Flores, and Michael Tran.
6      THE VIDEOGRAPHER:  The deponent may now be
7  sworn in by Cindy DuRivage.
8
9      OFFICER ASHLEY LIF,
10 having been first duly sworn to testify to the truth,
11 the whole truth, and nothing but the truth, was
12 examined and testified as follows:
13
14         EXAMINATION
15 BY MR. LAGOMARSINO:
16     Q.  Could you please state your name and spell
17 your last name for the record.
18     A.  Ashley Lif, L-i-f.
19     Q.  Have you ever had your deposition taken
20 before?
21     A.  Yes.
22     Q.  On how many occasions?
23     A.  One.
24     Q.  And did that deposition involve this case?
25     A.  Yes.

## Officer Ashley Lif  ~   April 4, 2019
## * * * Videotaped Deposition * * *

Page 6

1    Q.  All right.  You understand you're under
2  oath today?
3    A.  Yes.
4    Q.  And it's very important that you understand
5  all the questions today.  If you don't understand a
6  question, please let me know, I'll be happy to
7  rephrase.
8    A.  Yes.
9    Q.  We have a videographer here today, but the
10  official record is that of the court reporter.
11  Excuse me.  It's very difficult for the court
12  reporter to take down two people talking at once, so
13  I'd ask that you allow me to finish my questions, and
14  I'll try my best to allow you to finish your answers.
15    Is that right?
16    A.  Yes.
17    Q.  If at some point, I say is that a "Yes" or
18  is that a "No," I'm not trying to be rude, I'm just
19  trying to make sure that we have a clear record.
20    Okay?
21    A.  Yes.
22    Q.  All right.  Do you know the difference
23  between an estimate and a guess?
24    A.  No.
25    Q.  Okay.  Sometimes it's different in real

Page 7

1  life, as it is in, I guess, the deposition world, but
2  you know, if I asked you to give me an estimate of
3  the length of this table, you could tell me; but if I
4  asked you to tell me how long my desk was in my
5  office, you haven't been in there, so you'd be
6  guessing.
7    So you're allowed to estimate, we just
8  don't want you to guess today.  Okay?
9    A.  Yes.
10    Q.  At the conclusion of this deposition,
11  you'll have an opportunity to review your testimony
12  and make any changes.
13    It is very common for people to make
14  changes to spelling and things of a minor nature, but
15  if you make a change to an important question and
16  answer, we'll have an opportunity to comment on your
17  credibility at time of trial.
18    Do you understand?
19    A.  Yes.
20    Q.  Do you have any questions for me before we
21  begin?
22    A.  No.
23    Q.  What is your current occupation?
24    A.  Police officer with Las Vegas Metropolitan
25  Police Department.

Page 8

1    Q.  When were you hired?
2    A.  July of 2015.
3    Q.  Were you in the military?
4    A.  Yes.
5    Q.  Are you still in the military?
6    A.  Yes.
7    Q.  Are you on a Reserve status?
8    A.  Yes.
9    Q.  Thank you for your service.
10    When did you first join the military?
11    A.  I believe it was August 2013.
12    Q.  And what branch?
13    A.  Army Reserve.
14    Q.  Can you briefly tell me the extent of your
15  education.
16    A.  I have a Bachelor's in criminal intel from
17  Mercer Hearst University in Erie, Pennsylvania, and I
18  have a Master's in intelligence analysis in
19  terrorism.
20    Q.  From the same university?
21    A.  From American Military University.  It's a
22  public university.
23    Q.  Where are you from originally?
24    A.  Cheyenne, Wyoming.
25    Q.  When did you move to Las Vegas?

Page 9

1    A.  2005.
2    Q.  And what brought you to Vegas?
3    A.  I ran track at UNLV.  I never graduated
4  from there, though.
5    Q.  Have you ever run cross country?
6    A.  Yes.
7    Q.  Were you involved in an incident with
8  Kenneth Lopera on or about May 14th, 2017 and Tashii
9  Farmer?
10    A.  Yes.
11    Q.  Do you remember giving a couple statements
12  in this case?
13    A.  Yes.
14    Q.  What was the first statement that you gave?
15    A.  I believe it was that night as a witness
16  officer for FIT.
17    Q.  And what is your understanding of what FIT
18  is?
19    A.  It's an acronym for the force investigation
20  team, to my understanding.  It's the branch of, I
21  believe, the office of internal oversight that
22  oversees like a criminal, I guess, aspect.
23    Q.  Do you remember where you gave the
24  statement?
25    A.  I believe it was just outside of the

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

4 (Pages 10 to 13)

Page 10

1  Venetian.
2      Q.  And were you in a vehicle?
3      A.  Yes.
4      Q.  And what kind of a vehicle were you in?
5      A.  I don't know.  I cannot recall.
6      Q.  Was it your vehicle or somebody else's?
7      A.  It was, I believe, an undercover.  It
8  wasn't a marked car.  I'm not sure whose vehicle it
9  was.
10     Q.  All right.  And who was in the vehicle with
11 you?
12     A.  I remember my union rep, Bryan Yant.  I
13 cannot remember the detective.
14     Q.  Does Detective Jex ring a bell?
15     A.  Possibly.  I cannot recall.
16     Q.  Were you in the back seat?
17     A.  I was in the front seat.
18     Q.  And where was the detective?
19     A.  He was in the driver's seat.
20     Q.  And then Detective Yant?
21     A.  Back seat.
22     Q.  Do you recall when you first saw Bryan Yant
23 at the scene?
24     A.  I cannot recall.  I believe it was
25 somewhere outside of that car.  It was the first time

Page 11

1  I've met him, first time I've seen him.
2      Q.  And how did you come to learn that he would
3  be your union rep?
4      A.  He had the PPA shirt on, and I believe he
5  said that he was going to be my rep.  I can't recall
6  exact.
7      Q.  Okay.  Was he selected for you, to your
8  knowledge?
9      A.  To my knowledge, yes.
10     Q.  And do you know who selected him for you?
11     A.  I have no idea.
12     Q.  Do you remember approximately what time the
13 incident with Mr. Farmer took place?
14     A.  I want to say somewhere after midnight.
15     Q.  The records we show, we understand it's
16 probably just an estimate, says about 12:56.
17         Does that sound about accurate to you?
18     A.  On or about, yeah.
19     Q.  And then, it looks like you gave a
20 statement at about 4:25.
21         Does that sound about right, fours hours
22 later?
23     A.  Didn't feel like that long, but...
24     Q.  Did you ever leave the scene?
25     A.  When I was released at the end of the day.

Page 12

1      Q.  And was that after you gave your statement?
2      A.  Yes.
3      Q.  Have you ever given a FIT statement on any
4  other occasion?
5      A.  For the October 1st shooting.
6      Q.  I understand you got an award for that as
7  well --
8      A.  Yes.
9      Q.  -- is that correct?
10     A.  (No audible response.)
11     Q.  How long had you been Kenneth Lopera's
12 partner at the time of the incident?
13     A.  I'd say a few months.  Earlier in 2017, I
14 was gone for military training.  I can't remember, I
15 think I came back somewhere around April.  I don't
16 remember the exact date.  So not too long.  A couple
17 weeks, months.  To be exact, I don't know.
18     Q.  If you could give an estimate as to how
19 many times you partnered up with him, like how many
20 nights before this incident.
21     A.  Maybe 10.  Confidently, I'm not a hundred
22 percent sure.
23     Q.  I saw somewhere in a statement that you
24 usually partner up with him on like Fridays and
25 Saturdays.

Page 13

1         Is that accurate?
2      A.  Yes.  We would change partners around a
3  lot, so even though we would be consistent partners,
4  it wasn't always steadfast that he and I were going
5  to be together, but predominantly, he and I were
6  partnered.
7      Q.  And what unit were you on together or
8  squad?
9      A.  Oh, it was a flex squad.
10     Q.  Can you describe what a flex squad is?
11     A.  It's a squad that can augment patrol and
12 still help with detectives.  Mostly a proactive
13 squad.  Handled little to no calls for service.
14     Q.  Would you ride around in a vehicle with
15 him?
16     A.  Yes.
17     Q.  Was most of your time riding around in a
18 vehicle or walking around?
19     A.  I'd say mostly vehicle unless it was on a
20 Friday or Saturday night on Safe Strip nights.  It
21 was an instruct duty foot patrol.
22     Q.  And how long were your shifts when you
23 would work with him?
24     A.  Our shifts would start at 20:00 hours and
25 end at 06.  So give or take, 10 hours.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

5 (Pages 14 to 17)

Page 14

1    Q.  So I'm assuming during those shifts, you'd
2  have an opportunity to talk with him?
3    A.  Yes.
4    Q.  And during those shifts, are you used to
5  arresting people all the time?
6    A.  Not all the time.
7    Q.  What is a typical shift?
8    A.  Being proactive, I would say stopping
9  people were in, you know, violation of Strip corridor
10  laws, for example, maybe like a glass bottle.
11     Specifically an arrest that he and I did, I
12  can't remember.  I remember we had one DUI, but to
13  the details of that, I'm not sure.
14    Q.  Did you get to know him as a person when
15  you worked with him?
16    A.  Yes, but a lot of it was mostly business.
17  Even though he and I were friends while we were at
18  work, we never associated with each other outside of
19  work.
20    Q.  Did he talk about what he liked to do in
21  his spare time?
22    A.  I can't recall.  I know that he was very
23  involved with his family, and I believe he had two
24  boys and a wife.  And we talked a lot about military,
25  like his prior experience, and since he was out and I

Page 15

1  was still in, you know, the Reserves.
2     Anything beyond that personal, that's all I
3  can recall.  And him previously being a CO, but that
4  was it.
5    Q.  Were you aware that he participated in
6  jujitsu?
7     MR. McNUTT:  Objection, form, lacks
8  foundation.
9  BY MR. LAGOMARSINO:
10    Q.  So sorry, I didn't give you that
11  instruction.  From time to time, these lawyers over
12  here may be objecting.  They're not doing it
13  presumably to be obstructive.  There's not a judge
14  here to rule on their objections, so if you
15  understand the question, please answer the question
16  after they have an opportunity to make the objection.
17    A.  Thanks.
18    Q.  Were you aware that he participated in
19  jujitsu?
20    A.  Vaguely.
21     MR. McNUTT:  Same objection.  Go ahead.
22  BY MR. LAGOMARSINO:
23    Q.  You can answer.
24    A.  Vaguely.  He and I didn't talk too much on
25  it, but I believe that he was only like a white belt.

Page 16

1    Q.  Were you aware that he competed?
2     MR. McNUTT:  Objection, form.
3  BY MR. LAGOMARSINO:
4    Q.  You can answer.  Yeah.
5    A.  Now that you mention, I remember him saying
6  that he did have one competition.  I don't know what
7  results of that were.
8    Q.  And what is your understanding of his
9  military service?
10    A.  I believe he was a scrolled Ranger.  Never
11  went through selection.  I can't remember what group.
12     I know he had at least one deployment.  I
13  can't remember where, if it was in Iraq or
14  Afghanistan.  I don't know what year or what his
15  occupation was.
16    Q.  Now, you've mentioned that that was the
17  first time that you met Bryan Yant, that night?
18    A.  Yes.
19    Q.  How many times have you spoken with Bryan
20  Yant, either in person or --
21    A.  In person since then?
22    Q.  Yeah.
23    A.  In a formal set or just in casual passing?
24    Q.  Let's say formal.
25    A.  For formal?

Page 17

1    Q.  Yes.
2    A.  Less than five.
3    Q.  And what were your interactions?  Where did
4  they take place?
5    A.  It was all revolving around this event.  I
6  remember he was my PPA rep for the CIRT interview.
7    Q.  And when you met with him, where would you
8  meet with him?
9    A.  It was at headquarters.
10    Q.  Who else would be present besides the two
11  of you?
12    A.  In the CIRT interview?
13    Q.  No, just when you met with him informally.
14    A.  The first time, I was with the FIT
15  detective.  The second time, I believe it was the
16  CIRT interview, and that was with a PEAP rep, Mike
17  Springer.
18     And then, do you want the next few?
19    Q.  Yes, please.
20    A.  Okay.  I believe the next time after that
21  was the Tactical Review Board, which was at
22  headquarters.  He was not my rep at that point.
23     And then, I can't recall specifics after
24  that.  That might actually be the only formal times
25  that we've -- that we've met.  Everything else was

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 18

1   informal.
2       Q.  Okay.  Informally, how would you meet him?
3       A.  Just in passing.
4       Q.  Like where would you pass him?
5       A.  At headquarters.  Whether he was there to
6   rep someone else or he was there for something that I
7   wasn't aware of.
8       Q.  Did you ever associate with him outside of
9   informal interactions at headquarters?
10      A.  Outside, not that I can recall.  I remember
11  before we went to the CIRT interview, we went to
12  breakfast because I was nervous about that, and it
13  was a way to calm me down, I guess.  We went to eat
14  prior.
15      Q.  Where did you guys go to eat?
16      A.  I can't remember.  I don't know.  I have no
17  idea what it's called.
18      Q.  Why did he stop representing you at the
19  Tactical Review Board?
20      A.  I felt like it was a conflict of interest
21  because he was repping other people involved in the
22  case.  And so, I requested a separate rep.
23      Q.  Who became your new representative?
24      A.  Tyler Todd.
25          MR. McNUTT:  I'm sorry.  What was that?

Page 19

1          THE WITNESS:  Tyler Todd.
2          MR. McNUTT:  Tyler Todd.
3   BY MR. LAGOMARSINO:
4       Q.  What was the outcome -- strike that.
5          Did you receive any discipline as a result
6   of this incident?
7       A.  Yes.
8       Q.  What discipline did you receive?
9       A.  It was a form of a contact that I violated
10  department policy, that I didn't give out radio
11  traffic that my partner and I were separated.
12      Q.  Just the no radio traffic issue?
13      A.  Yeah.
14      Q.  Was there any discipline related to the
15  body cams?
16      A.  No, not for me.
17      Q.  And when you say contact, what's that?
18      A.  A form of having, I guess, something
19  tangible as something that my supervisor and I had a
20  conversation about my shortcoming.
21      Q.  And at some point, is it your understanding
22  that that contact gets removed from your file?
23      A.  Yes.
24      Q.  Okay.  How long after the contact was
25  given?

Page 20

1       A.  I believe it's 12 months.
2       Q.  So tell me about the contact.  Did they
3   say, hey, we're going to give you a contact and you
4   should have initiated radio traffic, or is it --
5       A.  Yeah.
6       Q.  Is it formal, is it in writing?
7       A.  It was in writing.  It's my understanding
8   that a contact is not a formal, like an official form
9   of discipline.
10          I interpret it as discipline.  It is a
11  documented negative conversation that I had with my
12  supervisor on what I should have done or what I could
13  do better for, you know, next time.
14      Q.  The next time, okay.
15          Do you have an understanding of what
16  discipline was rendered in this case for any other
17  individuals?
18      A.  To my understanding, that Tran and Flores
19  had gotten a contact for their body camera.
20          Sergeant Crumrine had lost his stripes.
21          And then as far as what happened with
22  Lopera, I believe he retired before any contact --
23  or, any discipline was given by the department.
24      Q.  So it's your understanding that
25  Officer Lopera was not disciplined, correct?

Page 21

1          MR. McNUTT:  Objection to form.
2          MR. ANDERSON:  Objection, form.
3   BY MR. LAGOMARSINO:
4       Q.  You can answer.
5          MR. ANDERSON:  Yeah.
6   BY MR. LAGOMARSINO:
7       Q.  When they say, "form," they're saying they
8   don't like the form of my question.
9       A.  Okay.
10          MR. McNUTT:  Which encompasses a variety of
11  other objections.
12          THE WITNESS:  Because it confuses me.
13          MR. McNUTT:  But for simplicity, unless
14  your lawyer tells you not to answer, once we make an
15  objection, please answer his question.
16          THE WITNESS:  Okay.  Just so I understand,
17  you're asking if I know that he received any
18  discipline?
19  BY MR. LAGOMARSINO:
20      Q.  Correct.
21      A.  I believe he retired before any discipline
22  could have been given.
23      Q.  Okay.  And then, did he retire with his
24  benefits intact, to your knowledge?
25          MR. ANDERSON:  Objection, form.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 22

1    MR. McNUTT:  Objection, form.
2    MR. ANDERSON:  Go ahead.
3    THE WITNESS:  I believe so because he was
4  tenured from his CO experience he had, I think, five
5  years on.
6  BY MR. LAGOMARSINO:
7    Q.  Besides -- strike that.
8      Other than this situation, have you ever
9  received any discipline from Metro?
10    A.  Not that I can recall.
11    Q.  To your knowledge, had Officer Lopera ever
12  been disciplined?
13    A.  Not that I know of.
14    Q.  Had he ever described any incidents as a CO
15  where he had to utilize violence to subdue an inmate?
16    MR. McNUTT:  Objection, form --
17    MR. ANDERSON:  Objection as to form.
18    MR. McNUTT:  -- vague.
19    MR. ANDERSON:  Yeah.
20    THE WITNESS:  Do I still answer?
21    MR. ANDERSON:  Yeah, you can answer it.
22    THE WITNESS:  Not that I know of from when
23  he was a CO.
24      I remember him talking about doing an LVNR
25  on someone.  I wasn't there.  I was still in

Page 23

1  training.  But he would just mention it in passing.
2  That was the only thing.  I don't know if any
3  discipline came from that.
4  BY MR. LAGOMARSINO:
5    Q.  So he had done an LVNR -- he had said to
6  you in training he had done an LVNR to somebody at
7  some point?
8    A.  Yes.
9    Q.  And you sat next to him in training; is
10  that correct?
11    A.  Yes, based on our last names.
12    Q.  Okay.  I guess if I would have gone through
13  the academy, I would be around you guys too, but I
14  don't know that I would have been accepted.
15    A.  It would have been fine.
16    Q.  Did he describe the general circumstances
17  of that LVNR?
18    A.  Not that I can recall specifics.  I
19  remember him saying that he went into a house, I
20  can't remember what kind of call it was, if it was
21  another disturbance or domestic related, I'm not
22  sure.  I don't remember what area command or even
23  when it was.  But I recall him saying in order to
24  subdue someone, that's what he had to do.
25    Q.  Was it like a domestic call or something?

Page 24

1    A.  I don't know.
2    Q.  And just so we can get the timeline right
3  with counsel, was he talking about this when he
4  was -- I guess what general time period was he
5  talking about this would have happened?
6    A.  This was many, many months prior to the
7  incident that we're talking about today.  We were
8  still in training.
9    Q.  Okay.
10    A.  Still in the field training program.
11    Q.  Field training?
12    A.  Um-hum.
13    Q.  You were out of the academy?
14    A.  Yes.
15    Q.  Okay.  Have you spoken to him since this
16  incident?
17    A.  No.
18    Q.  Have you emailed or --
19    A.  No.
20    Q.  -- social media or anything like that?
21    A.  No.
22    Q.  I'm going to ask you some questions that
23  have been already asked of you, but counsel here
24  hasn't stipulated to using your deposition, so we
25  have to go through them.

Page 25

1    MR. ANDERSON:  Objection, form.
2  BY MR. LAGOMARSINO:
3    Q.  So what were you wearing that evening?
4    A.  Department-issued uniform.  It was like the
5  ODI green BDU top and bottom, Metro police patches on
6  both right and left shoulder with the zone badge area
7  command that I worked in and my last name.
8      My duty belt, I can go through that if you
9  would like.
10    Q.  Yes, please.
11    A.  Okay.  I believe -- let's go in a
12  counter -- or, clockwise.  My magazine pouch, my duty
13  weapon.  I believe my baton was right after that.
14  Two sets of handcuffs on my back.  I believe it was
15  my OC spray, TASER, and flashlight.  I believe that
16  was the order that I had it that night.  It's changed
17  since then, so.
18    Q.  Did you have like a radio with a belt on?
19    A.  Yes, and a radio.
20    Q.  And what is a BDU?
21    A.  Acronym, I don't know what it stands for.
22  It's more like a tactical uniform.
23    Q.  All right.  So before you went to the
24  Venetian that evening, where were you immediately
25  before then?

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

8 (Pages 26 to 29)

---

Page 26

1    A.  The Hawaiian market.
2        THE REPORTER:  The what market?
3        THE WITNESS:  Hawaiian.
4   BY MR. LAGOMARSINO:
5    Q.  Do you remember when you started your shift
6   that evening?
7    A.  Standard time, 2000 hours.
8    Q.  And approximately how long were you at the
9   Hawaiian market?
10    A.  Possibly an hour.  I can't recall.
11    Q.  So I think you had three call signs that
12   evening; is that correct?
13    A.  Yeah.  It was multiple.
14    Q.  Does a call sign basically explain the
15   location where you're at?
16    A.  For the Safe Strip evenings, yes.
17    Q.  So then, you guys go to the Venetian.
18   Where do you guys park?
19    A.  On the south side of the Venetian, there's
20   like an employee loading dock area.  I don't know how
21   to describe it.  It's kind of like a -- it's enclave
22   from one of the main roadways to get under the
23   Venetian, and that's where we parked.  That's usually
24   where we always park to go into like security or like
25   to an EDR.

---

Page 27

1    Q.  All right.  So then, you guys park, and
2   where do you go to?  What is your first destination?
3    A.  Walk into the doors.  We go past security,
4   go past like the EDR into the main casino area.
5      I remember he and I were talking about
6   getting coffee, so we, excuse me, walked around to
7   find somewhere to get coffee and ended up finding a
8   Coffee Bean.
9    Q.  And just for the record, when you say EDR,
10   that's employee dining room?
11    A.  Correct.
12    Q.  So we go get coffee, what kind of coffee do
13   you get?
14    A.  I think it was like an iced coffee because
15   I was sweating.  I was hot.
16    Q.  It was hot that day?
17    A.  I was hot, yeah.
18    Q.  And do you remember what he got?
19    A.  I think we got the same thing.
20    Q.  Was it free?
21    A.  No.
22    Q.  Do you remember who paid for it?
23    A.  I did.
24    Q.  Were there extra shots --
25    A.  I don't recall.

---

Page 28

1    Q.  -- of espresso?
2    A.  (No audible response.)
3    Q.  Sometimes people know each other's drinks.
4   I know we do around here.
5    A.  Oh, yeah.
6    Q.  Usually, the person who buys knows the
7   drink better than anyone else, so.
8      Did Officer Lopera ever describe any other
9   hobbies that he had, do you know, at any time?
10    A.  Not that I can recall.
11    Q.  Did he like to work out?
12    A.  I believe so, but specifics, I don't -- I
13   don't recall us talking about working out or
14   specific, I guess, workouts.
15    Q.  All right.  So you get your coffee, and how
16   far away are you from the Coffee Bean when Tashii
17   Farmer comes up to you?
18    A.  An estimate would be, oh, maybe 50,
19   60 feet.
20    Q.  Okay.
21    A.  I can't recall.  I haven't been there
22   since.  It's almost been two years since I've been
23   there.
24    Q.  Any reason why you haven't been there?
25    A.  I haven't needed to take calls for service.

---

Page 29

1   If I don't have to go there for a specific work
2   function, I would prefer not going there.
3    Q.  Why is that?
4    A.  Just the memories of this entire thing.
5    Q.  All right.  And I also didn't give you this
6   instruction, but if at any time you need a break
7   today, just let us know, we'll take a break.
8      Counsel, my plan is not to go super long
9   today.  We can take a lunch at any time if you want
10   or we can just plow through.  It's up to you.
11      It's up to you too.
12    A.  Yeah.  I have to -- I work graveyard now,
13   so I'm off to go to sleep after we do this.
14    Q.  All right.  Do you want to get deposed a
15   different time --
16    A.  No.
17    Q.  -- if you're tired?
18    A.  No.  I'd rather, please, let's get this
19   done.
20    Q.  We do have Red Bull here, as Craig knows.
21   He probably told you that.
22      MR. ANDERSON:  I didn't know you had
23   Red Bull.
24      THE WITNESS:  No.
25

---

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 30

BY MR. LAGOMARSINO:
    Q.  If you need something like that --
    A.  Thank you.
    Q.  -- we have that and that new drink Bang.
    MR. LAGOMARSINO:  One of these days, you'll get
that newfangled drink here, coffee.
    MR. LAGOMARSINO:  Yeah, we do have that.
    MR. McNUTT:  Oh, you do?
    MR. LAGOMARSINO:  Yeah.
    MR. McNUTT:  I didn't think so.
    MR. LAGOMARSINO:  We like to hand-make it,
it's a craft.
    MR. McNUTT:  Oh, oh.
    MR. LAGOMARSINO:  Yeah.
    MR. McNUTT:  That's too refined for my
pallet.
    MR. LAGOMARSINO:  I think you like gas
station coffee, right?
    MR. McNUTT:  I do.  Truck stop preferably.
    MR. LAGOMARSINO:  I get it.
BY MR. LAGOMARSINO:
    Q.  All right.  So you're leaving Coffee Bean,
and what is the next thing you recall about this
incident?
    A.  We were going to walk into an area, like

Page 31

where there was more foot traffic to show more
officer presence.  That's what we're instructed to do
during Safe Strip.
    Q.  So you're walking towards like a more
populated area, I guess?
    A.  Yes.
    Q.  And Tashii comes up to you guys?
    A.  Yes.
    Q.  And what does he say?
    A.  That he was being followed or chased and if
we knew where a drinking fountain or a water fountain
was.
    Q.  And did you guys know where one was?
    A.  We did not.  I remember we offered help to
assist him.
        I think he asked if we could take him down
or show him where valet was, and of course, we're
agreeable to help you.
    Q.  All right.  So it was your understanding
that you were going to take him to valet.  Is that
when you decided you were going to put the coffees
down?
    A.  He and Officer Lopera began talking.  I
think he was asking what was wrong.  He was sweating.
    Mr. Farmer had directed too much attention

Page 32

towards Officer Lopera.  And so, I took
Officer Lopera's coffee from him and walked away.
    Q.  Why did -- if you were going to walk him to
valet, why are you like putting the coffee down?
    A.  It's my opinion now, it's not professional
to walk around with a coffee if I'm going to be
assisting a citizen.
    Q.  And at that point, had you determined
whether Tashii had any weapons?
    A.  No.
    Q.  Did you believe he had any weapons?
    A.  No.
    Q.  Tashii told you he had run over to the
Venetian, correct?
    A.  Yes, that he ran across the boulevard.
    Q.  All right.  So you go to put down your
coffee, and do you see Officer Lopera and Tashii when
you turn around?
    A.  They're still talking, and I remember I --
there was like a corner, went to go sit down my
coffees and when I have my vest and belt on, I move
slow, especially when bending down.  There's just a
lot of equipment in the way, and I took my time.
    And I remember they were talking.  I don't
know what they were talking about.  There was just

Page 33

noise.
    And I think they ended up sort of walking
away, and there was a -- like a service hallway, and
there were a couple janitors or maintenance guys
there.
    And when I had started to stand up and turn
around, they were starting to walk away.  Then they
started to run down the hall.
    And I was -- I lost sight -- I looked down,
I remember looking down to negotiate the slippery
floor so I didn't, you know, fall, and then, they
were gone.
    Q.  All right.  And you were asked in your FIT
statement if it was a restricted area that they ran
into, and I'll just read it into the record.  I don't
have a copy here.  But it says:
        "I'm not aware because it was
        being cleaned at that time, so I'm
        not sure if those doors are closed
        during specific hours."
    A.  Yes.
    Q.  Is that accurate?
    A.  Now that I've been privy to more of the
investigation and seen, I guess, what would be some
security cameras, yes, it is a restricted.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 34

1      Q.  I'm aware -- I guess my question is
2  slightly different.
3         That evening, was it obvious to you that
4  that was a restricted area?
5      A.  At that time with the FIT statement, no.
6      Q.  And standing there with Tashii, was it
7  obvious to you -- I'm sure it didn't occur to you --
8  let me rephrase the question.
9         At that time, was it obvious to you that he
10  ran into a restricted area?
11      A.  At that time, no.  I don't recall even
12  having any mind down to that open hall.
13      Q.  All right.  Was it warm enough that evening
14  that you had to have air conditioning on constantly
15  in your car?
16      A.  Oh, yeah.
17      MR. LAGOMARSINO:  Yeah, we have
18  construction going on.
19      MR. ANDERSON:  You're holding children in
20  here somewhere?
21      MR. McNUTT:  You should hear it in here.
22      (Laughter.)
23  BY MR. LAGOMARSINO:
24      Q.  So you were asked by Bryan Yant that
25  evening if it was normal for people on the Strip to

Page 35

1  approach you and say they're being followed.
2      THE REPORTER:  Sorry, I didn't quite hear
3  you with the noise.
4      MR. LAGOMARSINO:  Sorry about that.
5  BY MR. LAGOMARSINO:
6      Q.  Is it normal for people -- strike that.
7         Before this incident, had anybody on the
8  Strip ever approached you to say they were being
9  followed?
10      A.  Not that I can recall.
11         I do know that citizens will come up and
12  ask us, you know, questions or like where a hotel is
13  or directionals.
14      Q.  Well, the transcript I have says from Bryan
15  Yant:
16         "Okay.  And is it normal for
17         people to approach you on the Strip
18         and say they're being followed and
19         chased by people?"
20         And then, your answer that evening was,
21  "It's happened before."
22      A.  Right now, I can't remember any specifics.
23  I don't want to say that that's not possible
24  specifically right now.  I can't say.
25      Q.  Okay.  That's fair enough.  All right.

Page 36

1         All right.  So about 11 days later, you
2  give your CIRT statement?
3      A.  Approximately, yes.
4      Q.  It looks like May 25th.
5         And you did that at Critical Incident
6  Review Team office.  Is that at headquarters?
7      A.  Yes.
8      MR. LAGOMARSINO:  I'm going to take a
9  break.  I'm going to go talk to them.
10      MR. ANDERSON:  Yell at people?
11      MR. LAGOMARSINO:  Yeah.  Be polite.
12      THE VIDEOGRAPHER:  The time is
13  approximately 10:45 a.m.  We are going off the
14  record.
15      (There was a brief discussion off
16      the record.)
17      MR. LAGOMARSINO:  Actually, can you keep
18  that video going, just to record the sound.
19      THE VIDEOGRAPHER:  Okay.
20      MR. LAGOMARSINO:  If you guys don't mind.
21  We have a landlord-tenant dispute here.
22      THE VIDEOGRAPHER:  I have it.  Andre,
23  honestly, I have it so you can't hear it.
24      (The attorneys and the witness
25      exited the room.)

Page 37

1      THE REPORTER:  Is that back on?
2      THE VIDEOGRAPHER:  Yeah, the camera is on.
3      (A recess was taken.)
4      THE VIDEOGRAPHER:  The time is
5  approximately 11:00 a.m.  We are going back on the
6  record.
7  BY MR. LAGOMARSINO:
8      Q.  So getting back to your CIRT statement, do
9  you remember who was in the room when you gave that
10  statement?
11      A.  I remember it was the sergeant.  I want to
12  say it was Kyle Ward.  Kasey Kirkegard, and Greg
13  Watkins.
14      Q.  Michael Springer, who was --
15      A.  And I'm sorry, and Mike Springer.
16      Q.  That's okay.  Nobody is expecting you to
17  have a photographic memory.
18         So Bryan Yant and Mike Springer were there.
19  They were both your reps?
20      A.  My rep was Bryan Yant, and then, from PEAP
21  was Mike Springer.  He didn't have any say in the
22  investigation.
23      Q.  Okay.  What does PEAP stand for?
24      A.  Oh.  Offhand, I don't know, but I can tell
25  you what they do.  It's more like for the mental

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 38

1  health of the officers.  It's like the -- I'm not
2  even going to guess.
3      Q.  Okay.  Just like they're in a support role
4  for you, basically?
5      A.  Yes.
6      Q.  All right.  So the allegations against you
7  were that prior to your arrival, you failed to
8  activate your body-worn camera.
9          Is that accurate?
10     A.  I can't recall, but...
11     Q.  Ahead of the interview, did you receive a
12  copy of Chapter 289 of the NRS?
13     A.  Yes.
14     Q.  What is that, to your understanding?
15     A.  I believe it's my rights as a police
16  officer.  I believe that's where Garrity comes in.
17     Q.  And what is your understanding of those
18  rights?
19     A.  That my administrative statement cannot be
20  used against me in a criminal aspect.
21     Q.  Any other rights that you're aware of?
22     A.  Not that I can recall.
23     Q.  And they mentioned that they sent it to
24  you -- excuse me -- to your email?
25     A.  Yes.

Page 39

1      Q.  Would that be your personal or your police?
2      A.  Department.
3      Q.  All right.  At the time, what was your
4  classification and assignment?
5      A.  I was a PO 1, still on probation, and I was
6  on the flex team.
7      Q.  All right.  And since this incident, have
8  you gone to a different team or a different unit?
9      A.  Yes.  From the flex team, I had switched
10  squads, still the same flex, I guess
11  responsibilities, different squad.  And then, after
12  that, I went to gangs, and now, I'm a field training
13  officer.
14     Q.  What are the boundaries of the Convention
15  Center area command?
16     A.  Anything east of the 15, south of Sahara,
17  west of Paradise and north of, I believe Russell.
18     Q.  Did you transfer to that squad from
19  north --
20     A.  Northwest.
21     Q.  -- west?
22     A.  Yes.
23     Q.  What is Northwest 11?
24     A.  The grave squad.  I can't remember.
25     Q.  All right.  That evening, I think you

Page 40

1  mentioned you were wearing a vest?
2      A.  Yes.
3      Q.  Is that a bullet-proof vest?
4      A.  Bullet resistant, yes.
5      Q.  Bullet resistant, okay.  All right.
6          Were you aware of whether Officer Lopera
7  was wearing a bullet resistant vest?
8      A.  I can presume.  It's the policy that we
9  wear it.
10     Q.  And what was your call sign that evening?
11     A.  I can't remember.
12     Q.  Okay.  There's a reference to a Mary or
13  8 Mary 62.
14          What does that mean?
15     A.  Okay.  The 8, I think it's just like an
16  identifier that we're not a -- like it calls for a
17  service squad.  I think it identifies our
18  capabilities for dispatch if they don't assign us
19  anything.
20          Mary is the sector that we're in, and 62 is
21  more of the beat.
22     Q.  And who was your supervisor that evening?
23     A.  Sergeant Crumrine.
24     Q.  And how long had you been working with him
25  at the time of the incident with Tashii?

Page 41

1      A.  Probably no more than, I'd say, a month
2  because I had transferred, and then, I believe that's
3  when I went to the training for the military, so I
4  was put on orders.
5      Q.  All right.  So it's my understanding that
6  the flex squad is a proactive unit?
7      A.  Yes.
8      Q.  Can you give us some examples of what it
9  means to be proactive in that unit?
10     A.  In that unit?
11     Q.  Yeah.
12     A.  Initiate car stops, enforce laws that are
13  specific to a Strip corridor.  Making the presence to
14  I guess tourists, show safety and that we're out and
15  maybe, I guess, discourage people from engaging in
16  nefarious activity.
17     Q.  What are chronic nuisance crimes on the
18  Strip?
19     A.  Repetitive crimes.  I believe it was more
20  like vagrancy, things that would, I guess,
21  deteriorate the integrity of the Strip and tourists.
22     Q.  You have mentioned in your statement a
23  priority 1 or zero.
24          What does that mean?
25     A.  It's urgent.  It needs to be, I guess,

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

12 (Pages 42 to 45)

---

Page 42

1  handled now or immediate.  There is maybe a threat to
2  safety.
3     Q.  Okay.  So is it accurate to describe that
4  it's self-initiated activity, proactive policing?
5     A.  I guess I don't understand your question.
6     Q.  Is that proactive policing, basically?
7     A.  Priority zeroes or 1s?
8     Q.  No.  Just what you were doing that evening.
9     A.  Yes.
10    Q.  It's my understanding that you would rotate
11 partners from time to time?
12    A.  Yes.
13    Q.  Who was your other partner that you would
14 rotate with at that time?
15    A.  At that time.  I believe I rode with Chris
16 Gibson as well, and I think I rode with Aaron Denson.
17    Q.  Can you spell that for the court reporter?
18    A.  His first name?  Two As.
19    Q.  Okay.  And then Denson, D-e-n-s-o-n?
20    A.  Yes.
21    Q.  All right.  And had Aaron or Chris ever
22 described using LVNRs to you before?
23    A.  No.
24    Q.  Have you ever seen anybody using an LVNR in
25 the field?

---

Page 43

1     A.  In the field, no.
2     Q.  What is the reason for rotating partners?
3     A.  Some people are going to have more
4  experience than others, whether it's prior law
5  enforcement or prior military or I guess comfort
6  level, better understanding of some NRSs, possibly it
7  will give each other a little bit more of a
8  well-rounded, I guess, learning experience.
9     Q.  One of the things that you mentioned in
10 your statement was that one reason for rotating is to
11 get familiarity with other people's strengths and
12 weaknesses?
13    A.  Yeah.
14    Q.  What were some of Officer Lopera's
15 strengths that you perceived?
16    A.  He was more proactive than I was.  He
17 would -- he operated very well with reasonable
18 suspicion, whereas, I felt more comfortable with
19 probable cause.
20        So it would kind of force me out of, I
21 guess, my comfort zone.  That's one of the big things
22 I remember.
23    Q.  Okay.  And what about his weaknesses?
24    A.  Communication.  I don't know how to
25 describe it.  Maybe not staying calm through, I

---

Page 44

1  guess, a stop.
2        I wouldn't call that discourtesy to the
3  public, but it was -- I remember he would get amped
4  up and loud.  Might make a citizen uncomfortable if
5  it was just a traffic stop.
6     Q.  Now, what you described in terms of his
7  strengths, the delineation between reasonable
8  suspicion and probable cause.  We're going to be
9  talking to a jury.
10        So can you describe what you mean in
11 layman's terms by that?
12    A.  So reasonable suspicion, if a crime has
13 been -- is being or is about to be committed.
14        Probable cause is more when the facts and
15 circumstances known to the officer would warrant man
16 to believe the crime has been committed and the
17 accused has committed it.
18    Q.  I'm gathering, but tell me if I'm wrong,
19 when you're saying maybe he was better than you on
20 some of those issues --
21    A.  Yes.
22    Q.  -- would you feel more so struck that
23 probable cause is a higher standard than reasonable
24 suspicion?
25    A.  It's an arrestable.  I can effect a lawful

---

Page 45

1  arrest with probable cause.
2     Q.  You cannot effect a lawful arrest with
3  reasonable suspicion?
4     A.  Correct.
5     Q.  You have to have reasonable suspicion to
6  get to probable cause, correct?
7     A.  Correct.
8     Q.  But you need reasonable suspicion for what,
9  just a stop?
10    A.  Yes, but under state law, you have
11 60 minutes.  Otherwise, it becomes de facto.
12    Q.  Okay.  All right.
13        Based on your interaction with Tashii that
14 evening, did you ever have reasonable suspicion
15 personally that he had committed a crime?
16    A.  No.  At that time, no.
17    Q.  What does contact cover mean?
18    A.  It can set up two officers into, I guess, a
19 tactical advantage.  I guess in case there was
20 possibly force that was going to be used or where the
21 cover officer can watch the contacts back if it's
22 something unrelated, like if a threat unrelated to
23 the stop comes up.
24    Q.  When you're on Safe Strip and you're
25 walking, as officers, do you approach citizens and

---

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

13 (Pages 46 to 49)

Page 46

1  initiate contact with them?
2     A.  We can.  Whether it's a consensual stop in
3  making, you know, small-talk conversation where we
4  don't have any legal justification to do it or it's
5  reasonable suspicion or probable cause, yes.
6     Q.  Was there any kind of chain of command
7  involved with you and Officer Lopera that evening?
8     A.  No.
9     Q.  Like was he like your supervisor --
10     A.  No.
11     Q.  -- or were you equals?
12     A.  No, we're the same.
13     Q.  Okay.  Prior to this incident, had you ever
14  handled any calls to the Venetian?
15     A.  Not that I can recall.  I believe so.  I
16  know I've been in the Venetian before, prior to this
17  incident.
18     Q.  Venetian and Palazzo are very large,
19  correct?
20     A.  Yes.
21     Q.  It's easy to get lost there?
22     A.  Very.
23     Q.  That evening, were you familiar with the
24  layout?
25     A.  No.

Page 47

1     Q.  You had mentioned that you knew where two
2  spots were at the Venetian, where the employee dining
3  room was and then where security holding was; is that
4  correct?
5     A.  Yes.
6     Q.  How many times had you been to the employee
7  dining room at the Venetian?
8     A.  Oh.  Five to ten, maybe.
9     Q.  Had you been there with Officer Lopera
10  before this evening?
11     A.  Yes.  We used to go as a squad, I remember.
12     Q.  How many people would go?
13     A.  Usually the whole squad, between give or
14  take if some people were off on vacation or sick, it
15  could be between six to ten, maybe.
16     Q.  Did you ever gauge why Tashii asked to be
17  taken to the valet?
18     A.  No.
19     Q.  All right.  So I'm going to get back to the
20  incident a little bit.
21        So you set the coffee down.  Where do you
22  set it, on the floor?
23     A.  Yes.
24     Q.  All right.  And at that point, was your
25  back turned?

Page 48

1     A.  Yes.
2     Q.  So you turn around, and then you see them
3  still talking.
4        And you're about how far away from them?
5     A.  Oh.  Maybe like 5 to 10 feet-ish.
6  Truthfully, I cannot remember.
7     Q.  Okay.  And so then, you're walking back
8  towards them; is that correct?
9     A.  They had started, I believe, to kind of
10  walk away.
11     Q.  Did you see them both go in that service
12  entrance?
13     A.  Yes.
14        MR. McNUTT:  Objection, form.
15  BY MR. LAGOMARSINO:
16     Q.  Okay.  All right.
17        And I wasn't clear based on reading your
18  statements.  Were you aware that evening that
19  Officer Lopera had slipped and fell on the ground?
20     A.  That evening, I don't recall it, but having
21  been through, I guess, the other boards and
22  everything, it did happen.  To this day, I can't
23  recall it.  And I also swear that two service doors
24  were open, and based on video, they were not.
25     Q.  Okay.  All right.

Page 49

1        So it was a Saturday night, correct?
2     A.  Yes.
3     Q.  And is your recollection that the next day
4  was Mother's Day?
5     A.  I didn't know it at that time, but...
6     Q.  Was it busy?
7     A.  I'd say it was fair and average, consistent
8  with a Saturday night on the Strip.
9     Q.  Are Saturday nights on the Strip busier
10  than Tuesday nights?
11     A.  Yes.
12     Q.  Is that usually the busiest night on the
13  Strip?
14     A.  Depending on what talent is in town, yes.
15     Q.  Was there a lot of foot traffic in the
16  Venetian?
17     A.  I recall yes.
18     Q.  That's a pretty popular casino?
19     A.  Yes.
20     Q.  Now, when you saw Tashii, you could tell he
21  was sweating; is that correct?
22     A.  Yes.
23     Q.  And you saw that there were beads of sweat
24  coming down his face?
25     A.  Yes.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 50

1    Q.  Did he seem a little paranoid to you?
2    A.  Nothing -- I guess it would be inconsistent
3  with him saying that he almost got hit by a car
4  running across the street.  To me, it didn't strike
5  as unusual.
6    Q.  Okay.
7        In your statement, you said, "He didn't say
8  it was directly across the street.  For all I know,
9  it was a distance."
10       I want to ask you if you can remember what
11  you thought that evening.  Did you take it to mean
12  that he had run a long distance to get where he had
13  been or?
14    A.  Even it was directly across the street, on
15  both east and west sides of the Strip, north and
16  southbound lanes, there's three lanes, not including
17  turning lanes or I guess turning lanes into a
18  property, which could potentially be four on each
19  side, so it would be total.
20       And then, there's the median that in some
21  places is going to have like a barrier.
22    Q.  So it's quite a distance, correct?
23    A.  Yeah.
24    Q.  At that time, did you feel like he
25  exhibited any signs of excited delirium?

Page 51

1    A.  At that time, it didn't strike me, no.
2    Q.  Did he seem out of breath to you?
3    A.  I can't recall.
4    Q.  And this is a normal question I ask in the
5  beginning of a depo, but I'll ask it now.
6        Did you review any documents before coming
7  in today to refresh your recollection?
8    A.  I briefly looked at the first 20 pages of
9  my CIRT statement and read through my last deposition
10  briefly, but nothing was, I guess, studied.
11    Q.  Did you review any video surveillance or
12  body cams?
13    A.  No.  I've made it a point to not watch
14  those.
15    Q.  Does it upset you to watch those?
16    A.  Yes.
17    Q.  Was this event shocking to you?
18    A.  Yes.
19    Q.  How so?
20       Do you want to take a break?
21    A.  It was shocking because of everything that
22  had happened, and it shouldn't have happened.
23    Q.  Just wait for your attorney to come back.
24       (Pause in proceedings.)
25

Page 52

1  BY MR. LAGOMARSINO:
2    Q.  Was this the first time as a law
3  enforcement officer you had been involved in a
4  situation where a citizen was killed?
5    A.  Yep.
6    Q.  In your military service, have you ever
7  been involved in a situation where somebody was been
8  killed?
9    A.  I haven't been deployed.
10    Q.  So you had mentioned that it was shocking
11  to you because of everything that happened and that
12  it shouldn't have happened.
13       Why shouldn't it have happened --
14    A.  It's my understanding --
15    Q.  -- in your opinion?
16    A.  -- we were at a consensual stop.
17       I don't know what conversation they had
18  when I was away.  I have no idea.  I was under the
19  presumption we were on consensual, which means I have
20  no legal justification to follow him or to do
21  anything within my legal capacity.
22       He asked for help.  We offered it.  I know
23  both Lopera and I would have been more than happy to
24  help him with whatever he needed, but even the
25  criteria for the 2000 at that time, you know, the

Page 53

1  brief interaction that I was there for, he didn't hit
2  any of the four criterias for me to legally hold him.
3    Q.  Are you trained at the academy on foot
4  pursuits?
5    A.  Yeah, they go over it.
6    Q.  Okay.  And it's my understanding that
7  different officers have different opinions on when to
8  follow through on a foot pursuit.
9    A.  Yes.
10    Q.  Is that your understanding?
11    A.  Yes.
12    Q.  I had an officer, and this is just a
13  preliminary comment to a question, who told me -- he
14  was a more experienced officer in Henderson and told
15  me that he was training somebody new, and somebody
16  saw them and started running away and that the newer
17  officer -- he told the new officer, don't worry,
18  we'll see him next week or whatever.  It's not worth
19  the danger that's involved.
20       Do you have a specific criteria of when to
21  initiate a foot pursuit?
22    A.  I don't think there's a steadfast criteria.
23  I think there's a lot of factors that will play
24  influence on it.
25       One of them that whenever I have been in a

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 54

1  foot pursuit, I know when it's put out over the radio
2  that the area supervisor is going to ask what the
3  crime was, and if there isn't a crime or if it's --
4  you know, let's say a jaywalking offense and it's a
5  busy night on the Strip, is my foot pursuit going to
6  cause that person to hurt somebody else or get hit by
7  a car.
8      If I instantly can think yeah, I'm not
9  doing it.
10     Q.  All right.  So at the point where you all
11 are speaking with Tashii, is that a consensual stop?
12     A.  My understanding, yes.  We didn't stop him,
13 he stopped us.
14     Q.  Okay.  Sorry, I didn't mean to phrase it
15 that way.
16         It was a consensual interaction?
17     A.  Yes.
18     Q.  At any time when you were able to hear
19 Tashii, did he ever make any kind of a threatening
20 remark or --
21     A.  No.  Not that I can recall, no.
22     Q.  And we do have some of the body cam footage
23 from Officer Lopera, but the first 30 seconds,
24 there's no sound.
25         Do you recall the extent of your

Page 55

1  conversations with him?  It's not that long of a
2  time, but what was said in that 30 seconds?
3      A.  Not that I can recall.
4         I know specifically he just asked for a
5  drinking fountain or to be taken down to valet and
6  that he ran across the street.  Other than that, I
7  can't recall.
8      Q.  I don't want to keep talking about the body
9  cam footage.  I understand it's upsetting to you, and
10 it's not my intent to do that.  But I do have a
11 question.
12         In the beginning of Officer Lopera's body
13 footage, it appears to me, but maybe it's just me,
14 that he's reaching out to grab Tashii.
15         Does it look like that to you?
16     A.  After I saw the video, I recall that.
17     Q.  Did you ever learn why he did that?
18     A.  No.
19     Q.  When you were at the scene outside after
20 you arrived, do you recall the extent of the
21 conversations that you had with Officer Lopera?
22     A.  After having, I guess, seen the body cam,
23 that's when he said that he used a rear naked choke.
24 I don't recall that conversation, but it happened,
25 it's on body camera.

Page 56

1      Q.  Okay.  When you would witness
2  Officer Lopera, you said earlier that sometimes he
3  could be maybe a little abrasive or rough on traffic
4  stops, not necessarily physically but just in the way
5  he interacted with citizens, did you ever ask him,
6  like hey, tone it down or --
7      A.  No.  It's --
8         MR. McNUTT:  Objection, form.
9         I need to get an objection in whenever he's
10 done, but you were cutting him off.
11        THE WITNESS:  Sorry.
12        MR. LAGOMARSINO:  Sure.  That's fine.  Let
13 me rephrase the question.  I'll withdraw it.
14 BY MR. LAGOMARSINO:
15     Q.  Did you ever have conversations with him
16 about the tone that he would use with citizens?
17        MR. McNUTT:  Objection, form,
18 mischaracterizes the testimony.
19        THE WITNESS:  Can I answer?
20        MR. ANDERSON:  Yeah.
21        THE WITNESS:  No.  Different officers have
22 different perceptions and I guess different
23 experiences that are going to lead to act a certain
24 way or not.
25        If it's somebody's, not specifically his,

Page 57

1  if it's someone's personality to be more abrasive or
2  direct, then that's their personality.
3         Are they doing anything wrong?  No.  Is it
4  how I would do it?  No.
5  BY MR. LAGOMARSINO:
6      Q.  All right.
7         During the investigation, did you ever come
8  to learn Bryan Yant's history as a police officer in
9  officer-involved shootings?
10     A.  I've heard about it.
11     Q.  Okay.  Did you know about that before this
12 incident?
13     A.  No.
14     Q.  When did you first learn about it?
15     A.  I can't remember who I was speaking with
16 who is more tenured on the department, and I guess a
17 conversation had came up about who my rep is, and I
18 said, "Bryan Yant."  And they said that is something
19 that he had been in multiple OISs, and I think it was
20 him that shot someone who was trying to destroy
21 evidence.
22     Q.  Okay.  Did you learn that while he was your
23 rep?
24     A.  I can't recall.
25     Q.  Was that part of the reason why you had him

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 58

1  changed out?
2      A.  No.  My specific reason for having him
3  changed out is I believed it was a conflict of
4  interest about him repping every person on that
5  incident.
6      Q.  Had anybody ever told you from the police
7  department that Bryan Yant should not even be on the
8  force based on what he did?
9      A.  I think I recall hearing that.  I remember
10  hearing that they put him at the PPA so he was off
11  the street.
12      Q.  When you were dealing with Tashii inside
13  the hotel, were you ever concerned for your safety?
14      A.  My safety, no.
15      Q.  Were you ever concerned for
16  Officer Lopera's safety?
17      A.  No.
18      Q.  You're a crisis intervention certified,
19  correct?
20      A.  Yes.
21      Q.  And was that in January 2016?
22      A.  Yes.
23      Q.  Is that something that you have to be
24  recertified in or --
25      A.  Yes.

Page 59

1      Q.  Have you been recertified in it?
2      A.  I believe so.  I can't remember what date.
3  I know that they end up sending a letter to your
4  supervisor, and you go to the class you're scheduled
5  to.
6      Q.  Did Officer Lopera ever tell you that he
7  had lapsed in some sort of occasions?
8      MR. McNUTT:  Objection, form, assumes facts
9  not in evidence.
10      THE WITNESS:  Not that I recall.
11  BY MR. LAGOMARSINO:
12      Q.  And you've been on crisis intervention team
13  related calls before, correct?
14      A.  Yes.
15      Q.  And had you ever been the primary officer
16  in such a situation where you were charged with
17  talking with a subject of --
18      A.  Yes.
19      Q.  -- somebody in crisis?
20      A.  Yes.
21      Q.  I believe you mentioned in your statement
22  about somebody, a female who was in a car?
23      A.  Um-hum.
24      Q.  Can you tell us about that situation?
25      A.  I can't remember what the call had come out

Page 60

1  as.
2      I believe her boyfriend or her husband had
3  called and said that she's going through a crisis, or
4  I can't remember the details, but when I had -- I was
5  the first arriving.
6      And I saw her in a car, and when my car had
7  pulled up, her getting out, and she was sweating.  It
8  was daytime, sun was up, it was summertime.  She was
9  sweating and inconsistent speech and yelling, not
10  making sense of her words.
11      And a couple of my other backups had showed
12  up, and we ended up putting her into custody for
13  safety reasons.
14      Q.  Is that what's referred to as like a legal
15  2000?
16      A.  Yes, I believe she was legaled.
17      Q.  Contrasting that with Tashii, was he able
18  to speak articulately, clearly?
19      A.  As I recall, yes.  It wasn't like the other
20  excited delirium, or ED, call that I had had.
21      Q.  Did you perceive him to be in mental crisis
22  at that time?
23      A.  Not that I can recall.
24      Q.  All right.  Sometimes with somebody who is
25  in crisis, is the way they're dressed can be an

Page 61

1  indicator to you or if they're dressed at all?
2      A.  Um-hum.
3      Q.  Can you explain that?
4      A.  He was appropriately dressed for the
5  weather.
6      Q.  Okay.
7      A.  I think I remember him having, I think like
8  a short-sleeve shirt on and jeans.
9      Q.  Is there anything that you -- strike that.
10      Can you recall him speaking abnormally or
11  normally?
12      A.  Not that I can recall.
13      Q.  I'm sorry, that was a terrible question.
14      Was there anything about the way that he
15  was talking that seemed abnormal to you?
16      A.  Not that I can recall.
17      Q.  Okay.
18      Did he appear to be mentally ill to you?
19      A.  Nothing that struck me, but even if he was,
20  it's not a crime.
21      Q.  Does Metro have a policy on dealing with
22  the mentally ill?
23      A.  To respect their rights.
24      Q.  Do they have the right to be left alone
25  unless they present a danger to themselves?

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

17 (Pages 62 to 65)

Page 62

1    A. Yes.
2    Q. Does mental illness alone require a special
3  police response?
4    A. I think if it's -- if it's requested. If
5  it's a call for service and they request CIT. I'm
6  not sure how the verbiage goes through the dispatcher
7  at the call center.
8    Q. Sometimes you'll see mentally ill people on
9  the street, correct?
10   A. Sure.
11   Q. If they're not doing anything wrong, does
12 that require a response?
13   A. No.
14   Q. Is it fair to say that they basically have
15 the right to be left alone as long as there's no
16 crime that's been committed?
17   A. Yes.
18   Q. When you saw him outside the coffee shop,
19 did you ever feel like you had to call medical for
20 him?
21   A. No.
22   Q. When was the first time that you perceived
23 that a foot pursuit had occurred?
24   A. I never thought a foot pursuit had started.
25 There was no radio traffic that had started. There

Page 63

1  was no radio traffic that I can recall.
2    Q. Did you believe that a crime -- strike
3  that.
4        In your dealings with Tashii, did you
5  believe that he had committed a crime at that time?
6    A. At that time, no.
7    Q. I was reading through some of your CIRT
8  statement, and you made a comment, I don't know if it
9  was a joke or if I'm just ignorant on police stances.
10       But it's that you're trained to have a
11 basic stance, and it says, "Mine is coffee."
12   A. Oh. No.
13   Q. Is that a joke?
14   A. I don't know if that was a mistype, but no.
15   Q. Okay.
16   A. Do you need me to explain what a basic
17 stance is?
18   Q. Sure. Well, no, you don't have to explain
19 it, but I didn't know if there was like a coffee
20 stance that I didn't know about.
21   A. Hum-um.
22   Q. All right. Did you follow the way that
23 Officer Lopera and Tashii went into the hallway?
24   A. I don't know what way they went. I had
25 walked down the same hall that I last saw them. I

Page 64

1  remember checking every door, there were locked
2  doors, open doors, locked doors behind those.
3        There was no vocals, no yelling, no
4  screaming.
5        I remember going back to where we had
6  started to see if it just looped around, and I tried
7  to find my own way out.
8    Q. Did you ever hear any noises from Tashii
9  other than --
10   A. I heard nothing.
11   Q. Sorry?
12   A. I heard nothing.
13   Q. At that time, did you believe that a foot
14 pursuit was a valid option?
15   A. No.
16   Q. Did you perceive at that time that Tashii
17 posed a threat to himself?
18   A. No.
19   Q. At that time, did you perceive that Tashii
20 presented a threat to others?
21   A. No. No.
22   Q. Did you ever give any verbal commands to
23 Tashii?
24   A. No.
25   Q. Did you ever hear Officer Lopera give any

Page 65

1  verbal commands to Tashii when you were there in
2  person?
3    A. No. When I had showed up, he was, he had
4  stepped away, and there were other officers who were
5  starting to give aid.
6    Q. When you went into where you perceived them
7  to go into that service area, can you describe that
8  area in terms of stairwells and doors and --
9    A. Oh. I guess the best way I could say it,
10 it was a spider web. It seemed like there were
11 different halls that led to other doors, and there
12 were locked doors into offices, and there was a
13 stairwell. I remember I saw, I think like a
14 maintenance guy or a linen, linen guy.
15       And then he directed me to an elevator. I
16 tried to find an elevator, asked for security. To
17 this day, I have no idea how I got out.
18   Q. Is it fair to say that once you went in
19 there, the sense of direction was gone?
20   A. It's gone.
21   Q. At some point, did you get into an
22 elevator?
23   A. Yeah.
24   Q. And what was the purpose, just to -- strike
25 that.

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1    A.  I had no idea where I was going.
2    Q.  At some point, did you get outside?
3    A.  Yes.
4    Q.  And how did you know where to go?
5    A.  When I had stepped out, there were a bunch
6  of police cars and lights on.
7    Q.  And so, did you run up to the scene?
8    A.  Yes.
9    Q.  When you ran track, what events or type of
10 track did you run, I guess?
11    A.  I trained in the heptathlon and the 800.  I
12 did cross country too.  There was distance in there.
13 I threw a little bit.  A little bit of everything.
14    Q.  At what point do you recall specifically
15 losing sight of Officer Lopera in the beginning?
16    A.  I think the last I saw them is when they
17 had turned the corner.  I don't know the distance.
18 That was the last time.
19        MR. McNUTT:  Andre, can I ask a question
20 right there?
21        MR. LAGOMARSINO:  Sure.
22        MR. McNUTT:  Where they turned what corner?
23 I'm unclear as to where you're at.
24        THE WITNESS:  I think there was -- and
25 please forgive me, it's been two years since I've

Page 67

1  been back there.
2        I think the angle of the hallway had
3  turned.  To what degree, I don't know.
4        MR. McNUTT:  So they were physically inside
5  the hallway when you're saying they turned a corner?
6        THE WITNESS:  Yes.
7        MR. McNUTT:  That was all.  Thank you.
8  BY MR. LAGOMARSINO:
9    Q.  How far of a distance outside did you run?
10    A.  I can't remember.  I was winded.
11    Q.  Okay.
12    A.  It was uphill, like a loading dock.
13    Q.  Do you think you were perspiring that night
14 outside?
15    A.  Oh, yeah.
16    Q.  When is the first time that you activated
17 your body cam?
18    A.  When I had stepped out and saw the police
19 cars.
20    Q.  What is the training of when you're
21 supposed to activate your body cam?
22    A.  When you engage into like a contact with a
23 citizen.
24        But it wasn't uncommon for the supervisor
25 or lieutenant on Safe Strip nights, if you're going

Page 68

1  to initiate a call and call it out where it's going
2  to actually be a call for service or an interaction
3  to initiate your body camera.  If it's a consensual,
4  I remember him saying don't call it out, don't jamb
5  up the radio because the radios are jammed as they
6  are.
7    Q.  Okay.  You had mentioned in your statement
8  that you had a 94.4 percent compliancy rating on the
9  body cam?
10    A.  Yes.
11    Q.  How is that measured?
12    A.  Calls that actually get activated, whether
13 it's a person stop or a vehicle stop, versus how many
14 videos you have that match when the call was created.
15    Q.  Oh, okay.  And how did you know that that
16 was your rating?
17    A.  I believe it's bimonthly, you will get an
18 email from the body cam detail saying your
19 compliancy.
20    Q.  And is there is a required level that you
21 have to have?
22    A.  Not that I can recall on policy.  A lot of
23 supervisors will say you're good if you're above
24 80 percent.
25    Q.  Okay.  In this particular incident, were

Page 69

1  there any issues with the operation of your body
2  camera not working?
3    A.  Not that I can recall.
4    Q.  And so, at the scene, you arrived at that
5  time, you perceived officers providing aid to Tashii;
6  is that correct?
7    A.  Yes.
8    Q.  Were you getting any direction from anybody
9  at the scene?
10    A.  No.
11    Q.  Was Sergeant Crumrine, to your knowledge,
12 giving any direction?
13    A.  No.  Not that I can recall, no.
14    Q.  Did anybody appear to you to be taking
15 charge of the scene?
16    A.  No.  Not that I can recall.
17    Q.  What does it mean when somebody says that
18 the scene is dynamic?
19    A.  That there's multiple things going on.
20 That not everyone's focus is going to be on the same
21 place.  There's going to be multiple things that
22 likely need to be updated through a radio dispatch.
23    Q.  At what point, to your recollection, do you
24 remember the scene not being dynamic anymore?
25    A.  After -- after like FIT and CIRT.  That's

Officer Ashley Lif  ~  April 4, 2019
* * * Videotaped Deposition * * *

19 (Pages 70 to 73)

Page 70

1   when I felt it hit a -- like a calmer state.
2       Q.   Was the scene still dynamic when Tashii was
3   taken away in the ambulance?
4       A.   I'd say so because it was still a crime
5   scene that needed to be cordoned off.
6       Q.   Do you recall anybody being assigned to
7   Officer Lopera to cordon him off?
8       A.   I think at first, I want to say Sergeant
9   Crumrine told us to be together, and then, somebody
10  else stepped in and said to separate us.  I don't
11  recall us talking about anything at all.  And then, I
12  was -- and then, I know we were separated the last I
13  saw him.
14      Q.   Did you have any like communication at all
15  with Sergeant Crumrine at the scene?
16      A.   They had put us together in a car, but we
17  didn't talk about the scene.
18      Q.   Okay.  And slightly different question.
19  Did you observe Sergeant Crumrine at the scene?
20      A.   I remember seeing him, I can't remember
21  when I initially saw him.  I remember the car that
22  was -- well, now that I saw the video, I guess it was
23  his car that was parked in the drive, that he got in
24  the car and I guess, I assume, ran Mr. Tashii's name
25  through the computer to see who he was.  I don't know

Page 71

1   why.
2       Q.   Okay.  What is your understanding of
3   Metro's policy with respect to when you have your
4   body camera activating it -- strike that.
5           With respect to the body camera, what is
6   your understanding of what the policy is as to when
7   to deactivate it?
8       A.   When you're talking about -- talking about
9   a call or maybe having a debrief about the call.
10      Q.   Do you know what the rationale is for that?
11      A.   No.  I think it's more just to allow the
12  officers to talk freely about what maybe crimes that
13  you have.  In a dynamic situation, you're supposed to
14  keep it on.  I remember them saying that.
15      Q.   So you saw Tashii on the ground, correct?
16      A.   Yes.
17      Q.   Do you remember seeing the officers around
18  him on the ground?
19      A.   Yes.
20      Q.   Do you remember seeing officers bending his
21  ankles back towards his buttocks when he was on the
22  ground?
23      A.   I don't recall that.
24          All I remember is them rendering aid, CPR,
25  and then, taking him out of handcuffs to, I guess,

Page 72

1   get him in the proper position to give aid.
2       Q.   Okay.  I'll just identify it for the
3   record, at page 65 of your CIRT statement, lines 10
4   and 11, you say -- I'll give you some context.  It
5   says, starting at line 5:
6           "Do you remember anything what the
7       officers around him were saying at
8       this point or doing?"
9           And your answer was:
10          "Umm, one was rubbing his stomach.
11      Another was rubbing his sternum.
12      They started, you know, giving CPR,
13      checking his pulse.  And they said
14      okay."
15          And then, you say:
16          "I remember someone was doing that
17      on his ankle and up on his neck."
18      A.   Now that you said it, yes, starting to rub,
19  like rubbing like where there's a lot of nerve
20  endings to see if there's a response.
21      Q.   Okay.  Do you remember what you meant when
22  you say, "I remember someone was doing that on his
23  ankle and up on his neck"?
24      A.   Maybe checking pulse.
25          I don't remember then what I was thinking,

Page 73

1   but now I would presume it would be pulse.
2       Q.   Okay.  But you're not sure at this point?
3       A.   At this point, no.  Sorry.
4       Q.   That's okay.
5           You put blue gloves on at that point?
6       A.   Yes.
7       Q.   Why did you do that?
8       A.   I know from training that giving CPR is
9   very exhausting, so I was ready to step in if someone
10  else needed to take a break for a second.
11      Q.   When you say CPR, are you saying
12  mouth-to-mouth resuscitation?
13      A.   Chest compressions.
14      Q.   Were you confused at the scene as to what
15  was going on?
16      A.   Yeah.
17      Q.   Do you know why?
18      A.   I didn't know what happened.
19      Q.   Several times in the body cam footage,
20  you're turning your camera on, then off, then on,
21  then off.
22          What is the reason for that?
23      A.   I can't remember a reason.
24          I still do it if I'm going to speak with
25  another officer.

Officer Ashley Lif  ~  April 4, 2019
* * * Videotaped Deposition * * *

Page 74

1      Q.  At that time, when you observed Tashii, did
2  you look at his pupils?
3      A.  I don't recall.
4      Q.  Did you remember feeling that he was under
5  the influence of narcotics when you first saw him?
6      A.  No, I don't recall that.
7      Q.  Prior to that time, had you ever arrested
8  anybody on the Strip for being under the influence of
9  a controlled substance?
10     A.  I believe so.  I can't remember specifics.
11     Q.  Were you in the Venetian itself or were you
12 in the plaza?
13     A.  Honestly, I know they connect, but I don't
14 know where the dividing line is.
15     Q.  Okay.
16     A.  I would presume the Venetian because of the
17 doors that we went in.
18     Q.  Did Officer Lopera ever communicate to you
19 that he was going to do a pat-down of Tashii?
20     A.  No.
21     Q.  I understand it's probably been a long time
22 since you reviewed the body cam footage, but I want
23 to ask you your perception.
24     Have you watched Officer Lopera's body cam
25 footage?

Page 75

1      A.  Just what was played on the news and then
2  the Review Board.
3      Q.  What is your understanding of how long it
4  takes to -- strike that.
5      Do you know what an LVNR is?
6      A.  A lateral vascular neck restraint.
7      Q.  How long is it supposed to be imposed
8  before it takes effect, to your knowledge?
9      A.  It's fairly quick.  I'd say within 10
10 seconds or less.
11     Q.  And when you say, "take effect," that means
12 like put them out?
13     A.  Correct.
14     Q.  Were you ever taught in the academy or at
15 Metro in any kind of training prior to this incident
16 the difference between a LVNR and a rear naked choke?
17     A.  Not that I recall.
18     They make sure you understand in detail the
19 LVNR and the purpose and how it takes effect.
20     Q.  Okay.  All right.
21     I don't have any further questions.
22     MR. McNUTT:  Why don't we take a quick
23 break and push through lunch?
24     MR. LAGOMARSINO:  Yeah.
25     MR. McNUTT:  It's fine with me.

Page 76

1  Craig, you --
2      MR. ANDERSON:  Yeah, it's fine with me and
3  the witness.
4      THE VIDEOGRAPHER:  The time is
5  approximately 11:58 a.m.  We are going off the
6  record.
7      (A recess was taken.)
8      THE VIDEOGRAPHER:  The time is
9  approximately -- wait till it changes -- the time is
10 approximately 12:11 p.m.  We are going back on the
11 record.
12
13     EXAMINATION
14 BY MR. McNUTT:
15     Q.  Officer Lif, my name is Dan McNutt.  We met
16 out in the hallway before and at your prior
17 deposition.
18     A.  Yes.
19     Q.  I represent Ken Lopera.  And just to avoid
20 any doubt, you're still under oath.
21     Do you understand that?
22     A.  Yes.
23     Q.  I've got just a few questions.  I don't
24 think we'll take too long.  I understand you're going
25 to a graveyard shift tonight.

Page 77

1      A.  Take your time.
2      Q.  Okay.  We'll try to be as efficient as
3  possible.
4      You testified earlier that you gave several
5  statements.  One was a FIT statement; is that right?
6      A.  Yes.
7      Q.  And that came before your CIRT statement,
8  correct?
9      A.  Correct.
10     Q.  And if I recall correctly, your FIT
11 statement occurred the night of the incident around
12 May 14th, 2017?
13     A.  Yes.
14     Q.  Do you recall that you identified Tashii
15 Farmer or at that time, as you referred to him, as a
16 BMA?
17     A.  Um-hum.
18     Q.  What is a BMA?
19     A.  Black male adult.
20     Q.  You identified the BMA as, quote, profusely
21 sweating?
22     A.  Yes.
23     Q.  Do you recall that?
24     A.  Yes.
25     Q.  And why did you identify him as or define

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 78

1  him as being profusely sweating?  What does that mean
2  to you?
3       A.  Visible beads of sweat, I'd say.  I should
4  have elaborated that, and I mean visible beads of
5  sweat.  Rolling sweat beads.
6       Q.  Okay.
7       A.  Maybe like you can see it through clothes.
8       Q.  And is that your definition just generally,
9  or is that the definition of what you saw on Tashii
10  Farmer?
11       A.  That's my definition generally.  That's if
12  I were to be sweating and there's rolling beads of
13  sweat and my clothes have sweat marks on them, to me,
14  that's profusely sweating.  To me.
15       Q.  So to your recollection -- you said that
16  Tashii Farmer was sweating profusely.  What did you
17  see?
18       A.  Rolling beads of sweat.
19       Q.  Okay.  And was his clothing physically
20  sweaty as well?
21       A.  Not that I can recall.  I --
22       Q.  Do you -- I'm sorry.
23       A.  Just not that I can recall right now, no.
24       Q.  Do you recall what he was wearing?
25       A.  I think it was like a black or dark color,

Page 79

1  like maybe dark navy T-shirt and jeans.
2       Q.  Would that have made it more difficult to
3  see sweat on his clothes or at least his shirt?
4       A.  Possibly.
5       Q.  You stated in your CIRT statement that
6  there were several -- there's a variety of factors to
7  use in identifying excited delirium, correct?
8       A.  Yes.
9       Q.  Do you know what they are?
10       A.  I guess excessive sweating, nudity,
11  irrational speech, random, I guess, sentences put
12  together.  That's all I can recall.
13       Q.  And in your CIRT statement, you identified
14  that he was showing two of those signs.
15          What were they?
16       A.  It was sweating and I guess not making
17  sense about maybe why he needed to go to valet or
18  asking to go to valet.
19       Q.  And was it also paranoia?
20       A.  Possibly, yes.
21       Q.  Is there a certain amount of elements that
22  you have to have in order to determine that someone
23  is under the -- suffering from excited delirium, or
24  is it simply a subjective test that you as an officer
25  make?

Page 80

1       A.  I'd say it would be more subjective.
2       Q.  So if somebody is not speaking at all but
3  completely naked in the middle of the Strip, you may
4  make a judgment that they are suffering --
5       A.  That's a good indicator, yes.
6          I'm sorry to interrupt you.
7       Q.  That's okay.
8          Or alternatively, it could be a variety of
9  factors that would draw you to that conclusion?
10       A.  Yes.
11       Q.  Are any of those things dispositive as a
12  patrol officer, or are they simply your perception at
13  the time?
14       A.  I guess I don't understand what you mean.
15       Q.  Well, you're not a psychiatrist or medical
16  doctor, correct?
17       A.  Correct.
18       Q.  So you're not technically qualified to
19  diagnose them?
20       A.  Correct.
21       Q.  So back to my question.
22          Your suspicions are not dispositive of
23  their condition, it's just what you perceive at the
24  time, correct?
25       A.  Correct.

Page 81

1       Q.  So sitting here today, can you say with
2  certainty that Tashii Farmer was not suffering from
3  excited delirium?
4       A.  Not with certainty.
5       Q.  And at the time, in fact that evening, you
6  thought her was in fact exhibiting certain signs of
7  excited delirium, correct?
8       A.  Correct.
9       Q.  When you and your partner, Ken Lopera,
10  first encountered Tashii Farmer, what was your
11  proximity from Officer Lopera?
12       A.  Probably within a few feet from each other.
13       Q.  So you were essentially walking together?
14       A.  Yes.
15       Q.  And I think you testified earlier that you
16  left the Coffee Bean and you were walking to some
17  area of the casino, correct?
18       A.  Correct.
19       Q.  And Tashii Farmer in fact approached the
20  two of you, correct?
21       A.  Correct.
22       Q.  But in your CIRT statement, you said that
23  he was primarily -- he being Tashii Farmer -- was
24  primarily directing his attention to Ken Lopera; is
25  that right?

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 82

1      A.  That's correct.
2      Q.  And you made a statement that you took that
3  as kind of an unconscious sign to let Ken take the
4  lead or be contact with Tashii Farmer; is that fair?
5      A.  Fair.
6      Q.  When you and Officer Lopera -- you had been
7  working together for several months prior to this
8  point?
9      A.  I would say several weeks, maybe not
10  several months at that point.
11      Q.  Okay.  Had you guys ever trained together?
12  I know you said you were in the academy together.
13      A.  I don't recall having training days while
14  he and I were on the same squad because I was gone on
15  orders, but yes, trained together through the
16  academy, yes.
17      Q.  So at least -- so let me just -- for the
18  several weeks prior to this incident, were you and
19  Officer Lopera partners every day?
20      A.  I can't say with certainty every day, but a
21  majority of the time, yes.
22      Q.  Okay.  And I know you testified earlier.
23  Is it typical for people to change partners on a
24  daily basis, or it just depends on what duties you
25  have?

Page 83

1      A.  On that squad, it wasn't uncommon for it to
2  happen.
3      Q.  But safe to say you had worked with Ken as
4  partners for at least several weeks, correct?
5      A.  Correct.
6      Q.  Did you and Ken Lopera have your own method
7  of operation in terms of where one was primarily the
8  driver, one was primarily not the driver or --
9      A.  He would primarily drive when we would be
10  driving.
11      Q.  So if he was the driver, was he also the
12  primary contact usually when you guys had
13  interactions with suspects?
14      A.  Yes.
15      Q.  And when he was the contact, what were your
16  responsibilities as his partner?
17      A.  Cover.
18      Q.  And tell me what cover means.
19      A.  Well, are you talking about like for a
20  vehicle stop or person stop or anything?
21      Q.  Well, let's start with a person stop.
22      A.  Okay.  If he's going to be primary contact
23  engaging in a conversation with someone, I would step
24  back at I guess what would be we could call it a
25  tactical advantage or a tactical L, and I would watch

Page 84

1  the area around him.  If there was someone trying to
2  walk up on his stop, I would stop it so he could
3  continue doing his investigation.
4      Q.  And then, since -- if Officer Lopera was
5  contact, then you would take subliminal cues from him
6  or hand signals from him or direct verbal words from
7  him as to what he wanted you to do, if necessary?
8      A.  If necessary.
9      Q.  Would you as cover also be the person
10  primarily responsible for radio communications?
11      A.  Yes.
12      Q.  And is that per Metro policy?  I mean, is
13  that how they train you?
14      A.  I can't recall specifically, but yes, it's
15  part of our training.  They're going to be giving
16  their attention to who they're speaking with, and
17  since I'm watching everything, I can give out the
18  radio traffic if it's necessary.
19      Q.  Okay.  So it was more than just the mode of
20  operation between you and Officer Lopera, that was
21  generally Metro policy that the person in contact is
22  not the primary communicator on the radio.
23          Is that fair?
24      A.  That's fair.
25      Q.  What aspects of Tashii Farmer's behavior

Page 85

1  would inform you that he had some degree of paranoia?
2      A.  I think it would be the -- saying that he
3  just ran across the Strip, and he also got hit by a
4  car, someone was following him.  It didn't make
5  sense, but it didn't arise like I guess a concern for
6  ED, excited delirium.
7      Q.  I know you're, I believe it's CIT,
8  crisis --
9      A.  Intervention.
10      Q.  Team or training?
11      A.  Team.
12      Q.  But to be on the team, you've had the
13  training, correct?
14      A.  Correct.
15      Q.  And what does that encompass, what types of
16  diseases or maladies does that entail?
17      A.  Various mental illnesses.
18          I guess they have telling traits like maybe
19  schizophrenia, you know, PTSD, you know, excited
20  delirium, they have anxiety.  It can be various
21  different factors.  Those are the ones I can think of
22  right now.
23      Q.  So crisis intervention, that specific
24  training is directed towards the paradigm of mental
25  illness.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 86

1          Is that fair?
2          A.  That's fair.
3          Q.  So it's not directed towards illegal
4    narcotics, the effects of those?
5          A.  Correct.  Yes.
6          Q.  But you hesitated, so I'm guessing that
7    sometimes illegal narcotics is a part of a mental
8    illness on occasion?
9          A.  On occasion, yes.
10          Q.  Can the effects of being under the
11    influence of a controlled substance be misinterpreted
12    as mental illness and vice versa?
13          A.  Yes, that's fair.
14          Q.  Is it a crime to be under the influence of
15    a controlled substance in the State of Nevada?
16          A.  Yes.
17          Q.  Is it a crime to trespass in the State of
18    Nevada?
19          A.  It is not a crime, no.  NRS 207.200.
20          Q.  What about NRS 202?
21          A.  I'm not aware of right now.
22          Q.  Is it a crime to carjack a vehicle in the
23    State of Nevada?
24          A.  Yes.
25          Q.  So when Officer Lopera handed you his

Page 87

1    coffee, what did that indicate to you was
2    Officer Lopera's intention, if any?
3          A.  I think he was just trying to give more --
4    stand at a more like a -- like a stance of what we
5    were trained, I guess, it's a basic ready stance
6    where, you know, he could be ready for anything if it
7    were to happen.
8          Q.  So if you're having an interaction with an
9    individual and you decide that you need both hands
10    available, is there something that's prompted you to
11    make that determination?
12          A.  It's just my training.
13          Q.  So Metro has a policy that says put down
14    your coffee when you're talking to a civilian?
15          A.  I don't think they have a policy for that
16    specifically.
17          It's what I revert to back to my training,
18    and I would only presume that he was doing the same.
19          Q.  So would it be fair to say that from your
20    perception -- I mean -- let me strike that.
21          If Ken would not have handed you your
22    coffee, would you have put your coffee down?
23          A.  Yes.  I try not to have anything in my
24    hands.  Even if it's a traffic stop with, you know,
25    just a, I guess a regular citizen, you know, whether

Page 88

1    there's no perceived threat, I'm going to have both
2    of my hands available.
3          Q.  Better situational awareness, better
4    capability?
5          A.  Yes.
6          Q.  Yes as to both?
7          A.  Yes.
8          Q.  How long from the time that Tashii Farmer
9    approached you and Officer Lopera until you lost
10    sight of them where you said it was around the
11    corner?  What was that rough timeline?
12          A.  Oh.  Maybe approximately like 30 seconds to
13    a minute.  I honestly can't recall.
14          Q.  Okay.  So that's just an estimate?  We all
15    understand it's been two years.
16          MR. LAGOMARSINO:  Dan, can I just take a
17    pretty quick break?
18          MR. McNUTT:  Sure.
19          MR. LAGOMARSINO:  I need to get up.  Just
20    give me two minutes.
21          MR. McNUTT:  Okay.
22          THE VIDEOGRAPHER:  The time is
23    approximately 12:24 p.m.  We are going off the
24    record.
25          (A brief recess was taken.)

Page 89

1          THE VIDEOGRAPHER:  The time is
2    approximately 12:25 p.m.  We are going back on the
3    record.
4    BY MR. McNUTT:
5          Q.  At the time of the incident, May 14th,
6    2017, had you ever arrested anybody that was under
7    the influence of a controlled substance?
8          A.  I can't recall any specifics, but I would
9    presume that I have.
10          Q.  If you said in your CIRT report that you
11    had not, would you go with that answer?
12          A.  Yes.
13          Q.  A little bit out of order, but when
14    Mr. Lagomarsino was questioning you, he asked you how
15    long it should take to subdue somebody or apprehend
16    somebody using a lateral vascular neck restraint.
17          Do you remember that?
18          A.  Yes.
19          Q.  And you said something less than
20    10 seconds, correct?
21          A.  Yes.
22          Q.  Is that based on your training?
23          A.  Yes.
24          Q.  And did they also tell you during your
25    training that if somebody was stronger than you or

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 90

1  better at ground fighting than you that it may take
2  longer?
3      A.  I don't recall that, but it would make
4  sense, yes.
5      Q.  So if somebody broke your grip around, then
6  would it take longer?
7      A.  Yes.
8      Q.  Is striking an officer a crime in the State
9  of Nevada?
10     A.  Yes.
11     Q.  Do you know what aggressive resistance is?
12     A.  I don't remember the definition verbatim, I
13 can't remember.
14         It's where their intent is to harm you.
15     Q.  And what about aggravated aggressive
16 resistance?
17     A.  Are you looking for the definition?
18     Q.  Or just tell me -- put them in order, which
19 is a lower threat versus a higher threat.
20     A.  Aggressive and then aggravated aggressive.
21     Q.  So aggravated aggressive is obviously
22 higher?
23     A.  Correct.  And that's post their intent to
24 do harm.
25     Q.  You testified that you had not searched

Page 91

1  Tashii Farmer for any weapons at any point during
2  your interaction with him, correct?
3      A.  That's correct.
4      Q.  Had Officer Lopera searched Tashii Farmer
5  for any weapons?
6      A.  Not that I can recall, no.
7      Q.  You testified that you visually looked at
8  Tashii Farmer and did not see any weapons, correct?
9      A.  Correct.
10     Q.  Is that a sufficient search for officer
11 safety to just simply visually search someone, or do
12 you need to go hands-on to verify?
13     A.  Well, we've been taught that in order to
14 search, it has to be a physical thing, I'm going to
15 search your pockets to see if you have anything.
16         But maybe the tell signs of if you have a
17 weapon, I can look at your immediate area, your
18 waistband or if you have a pocket knife that's, you
19 know, clipped to your pocket, then I can see it.
20     Q.  Right.  So you didn't see anything --
21     A.  Correct.
22     Q.  -- but you would not suggest at any point
23 that merely visually inspecting somebody can confirm
24 they don't have weapons?
25     A.  Correct.

Page 92

1      Q.  Are you trained to assume that somebody
2  you're interacting with could have a weapon on them,
3  and therefore, if there's going to be a stop that you
4  should for officer safety verify that they do not?
5      A.  Yes.  I can do a pat-down.  I need a
6  consent for search.
7      Q.  What did you do to prepare for your
8  deposition today?
9      A.  Briefly looked through my CIRT for the
10 first like 30-some-odd pages.  I stopped and briefly
11 ran over my deposition from the previous.
12     Q.  Okay.  Did you review any other depositions
13 of other officers --
14     A.  No.
15     Q.  -- or other members of Metro?
16     A.  No.
17     Q.  And I don't want to -- obviously, you met
18 with your lawyer --
19     A.  Yes.
20     Q.  -- in preparation for today or talked to
21 him, correct?
22     A.  Yes.
23     Q.  And I don't want to -- I don't want you to
24 tell me what he told you, but I do want to know
25 topically.  Don't tell me what he said about these

Page 93

1  things, but did he explain to you any of the
2  testimony that the other officers have given?
3      A.  No.
4      Q.  You said that you were not familiar with
5  the Venetian property, correct?
6      A.  Correct.
7      Q.  Was that the first time you had worked at
8  the Venetian on duty?
9      A.  That I can recall, yes.  I was -- I would
10 typically be at, you know, Planet Hollywood or the
11 Bellagio, but as far as familiarity with the
12 Venetian, my scope needs to be more along the lines
13 of where the security office is.
14     Q.  Do you know if Officer Lopera had ever
15 worked at the Venetian before?
16     A.  I'm not sure.
17     Q.  It's true that you guys were initially
18 assigned to the Hawaiian market that night, right?
19     A.  Right.
20     Q.  Why did you guys get redirected to the
21 Venetian, do you recall?
22     A.  I do not.
23     Q.  There's been some back-and-forth discussion
24 today about the employee-only area, the corridor, the
25 hallway.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 94

1          If I use any of those words, I'm talking
2   about the restricted area into which Tashii Farmer
3   ran.
4          Is that okay?
5      A.  Yes.
6      Q.  In your CIRT statement, you identified it
7   as an employee-only area.
8          Is that accurate?
9          MR. LAGOMARSINO:  Hold on a second, sorry.
10  I'm going to object to the form.
11         MR. McNUTT:  Okay.
12  BY MR. McNUTT:
13     Q.  Do you recall that testimony?
14     A.  Yes.
15     Q.  What informed you that it was an
16  employee-only area looking at it?
17     A.  At that time or now post --
18     Q.  If you can separate them, then at that
19  time, at the time of your statement, you said it was
20  an employee-only area.
21     A.  Because there were workers working on the
22  floors.
23     Q.  Did that hallway look physically different
24  to you than what's normally seen inside a casino
25  where patrons are allowed to go?

Page 95

1      A.  Yeah.  I believe the flooring was
2   different.
3      Q.  The flooring is different, the lighting is
4   different, all those types of things?
5      A.  I don't recall lighting.  Flooring, I'll
6   definitely say the flooring.
7      Q.  But pretty rare to have fluorescent
8   lighting inside a casino floor?
9          MR. LAGOMARSINO:  Objection, form.
10  BY MR. McNUTT:
11     Q.  Not quite the ambiance they're looking for,
12  correct?
13     A.  Um-hum.
14         MR. LAGOMARSINO:  Same objection.
15  BY MR. McNUTT:
16     Q.  On page 26 of your CIRT statement, you said
17  that, "We did have a custody plan."
18         What was your custody plan for Tashii
19  Farmer?
20     A.  Well, we had never discussed prior to
21  specifically that interaction with Mr. Farmer, and
22  honestly, I don't remember the custody plan --
23     Q.  Okay.
24     A.  -- that we had or talked about.
25     Q.  I'll just reference LVMPD 1745, page 26.

Page 96

1   AL is your initials on the CIRT statement, "We did
2   have --" the question is, "Does your custody plan
3   change at that point?"  Your answer was, quote, "We
4   did have a custody plan," end quote.
5          And it never really gets explained there,
6   so that's why I'm asking now.
7      A.  Okay.
8      Q.  Do you remember what your custody plan was?
9      A.  I do not.
10     Q.  You also identified that there were four
11  criteria for a legal 2000.
12         Do you recall what those are?
13         And please understand this is not a test,
14  but I'm entitled to your best understanding of what
15  those four criteria are.
16         I mean, here you were pretty confident, you
17  said there were four criteria, et cetera.  So please
18  tell me what they are.
19     A.  I guess show signs of self-mutilation,
20  threats to others or themselves.  I guess inability
21  to provide the basic needs of clothing, food, and
22  shelter.  And I can't remember the fourth one.
23     Q.  Okay.  And -- okay, fair enough.
24         If it comes back to you, let me know.
25     A.  Okay.

Page 97

1      Q.  Is it your testimony that an individual
2   showing signs of -- that's profusely sweating,
3   showing signing of paranoia that then runs into a
4   restricted area is not someone that should be further
5   interrogated by the police?
6          MR. LAGOMARSINO:  Objection, form.
7          THE WITNESS:  I'm afforded officer
8   discretion, especially on nights of Safe Strip where
9   I guess it would be more appropriate for me to have
10  my time available for someone who is going to be a
11  victim of a crime such as a battery or an assault.
12         So specifically, did he go in a restricted
13  area?  Sure.  After all the videos, I can see that,
14  yes.  But I have officer discretion whether to engage
15  or disengage into a foot pursuit or not and had it
16  was, how it would be.
17         I still don't think I was in a foot
18  pursuit.
19  BY MR. LAGOMARSINO:
20     Q.  So you have officer discretion.  Does
21  Officer Lopera have officer discretion?
22     A.  All officers do.
23     Q.  All officers do, correct?
24     A.  Yes.
25     Q.  So are you saying that Officer Lopera was

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 98

1  from a policy perspective or a legal perspective
2  wrong for following Tashii Farmer into that
3  restricted area?
4      A.  I don't think he was -- he was wrong, but
5  he had conversations with Mr. Farmer that I was not
6  privy to when I had stepped away, so I don't if there
7  was anything that had transpired beyond that that I
8  wasn't aware of.
9      Q.  And so, essentially then, he had more
10  information than you did, correct?
11      A.  Yes.
12      Q.  It's also a fact that you testified at your
13  CIRT statement that you've never seen -- and you said
14  that here today -- you never saw Tashii Farmer's
15  pupils?
16      A.  Yes --
17      Q.  Do you remember that?
18      A.  -- I don't recall seeing his pupils.
19      Q.  What would be important about seeing his
20  pupils?
21      A.  Like if they're dilated or if they're -- I
22  don't know what medical term.  If they're large or
23  small.
24      Q.  And what would that indicate -- would that
25  potentially indicate to you that the suspect was

Page 99

1  under the influence of a controlled substance?
2      A.  Yes.
3      Q.  That's one of the indicators, correct?
4      A.  Yes.
5      Q.  Which is a crime in the State of Nevada?
6      A.  Yes.
7      Q.  So you testified that you did not think
8  officer -- excuse me -- Tashii Farmer was a threat to
9  himself, correct?
10      A.  Correct.
11      Q.  And you did not -- you testified that you
12  did not think he was a threat to you, correct?
13      A.  Correct.
14      Q.  Did you think he was a threat to anyone?
15      A.  Not at that time, no.
16      Q.  Okay.  If you believed that he was under
17  the influence of a controlled substance when you saw
18  him run into a restricted area, would that cause you
19  to follow him?
20      A.  It could, but again, I have the discretion
21  not to.
22      Q.  Right, but it would also -- you could
23  articulate that that's reasonable suspicion to follow
24  him and to stop him, correct?
25      A.  Yes.

Page 100

1      Q.  If you believe somebody that was under the
2  influence of a controlled substance, you as an
3  officer have reasonable suspicion to stop him,
4  correct?
5      A.  Yes.
6      Q.  "Yes"?
7      A.  Yes.
8      Q.  If you as an officer see somebody running
9  through a restricted area inside a casino and you're
10  on Safe Strip, you have the discretion to stop that
11  individual, correct?
12      A.  Yes.
13      Q.  Meaning you have the reasonable suspicion
14  to do so, correct?
15      A.  Correct.
16      Q.  If Officer Lopera is the contact and you're
17  the cover, so you're manning the radios, what is
18  Metro's policy when you know your partner is in a
19  foot pursuit, is there a policy of what you're
20  supposed to do on the radio?
21      A.  The primary officer is responsible for
22  giving out the description of a crime, the direction
23  of travel.
24      Q.  Okay.  And so, but if you don't hear him
25  doing that, is there a policy for what the cover

Page 101

1  should do?
2      A.  Say that we're separated?
3      Q.  Okay.
4      A.  Yes.  But I don't know what direction they
5  went.  Maybe at best, the crime would be trespassing
6  from my perception.
7      Q.  No, I wasn't going to that.  I was asking
8  actually what you answered.
9          Is there some SOP, standard operating
10  procedure, where you say, hey, I'm separated from my
11  partner, we had, you know, an interaction with a
12  suspect, and I don't know what is going on.  I just
13  didn't know if there was a policy like that?
14      A.  Yes, that's what I got written up for
15  contact for, not getting out the radio traffic saying
16  that my partner and I were separated.
17      Q.  Okay.  Got you.  Thank you.
18          When we talked about that earlier, I
19  thought it was restricted to not turning on the
20  body-worn cam.
21          So it was two things?
22      A.  I guess I don't understand.  Two things for
23  what?  That I got a contact for?
24      Q.  Yeah, when you said you got written up --
25      A.  I got the contact for not leaving on the

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 102

1   radio traffic that my partner and I were separated.
2         And I understand that it was my
3   responsibility to say that I don't know what's going
4   on, he and I are separated.
5         Q.  Fair enough.
6         I was literally asking a higher level
7   question, but I appreciate the detail, thank you.
8         A.  Um-hum.
9         Q.  Page 31 of your CIRT statement, you
10  testified that Ken Lopera was a reasonable officer,
11  in your opinion working with him?
12        A.  Yes.
13        Q.  Do you recall ever hearing Officer Lopera
14  call a Code Red?
15        A.  That's the only radio traffic that I did
16  hear was he asked for a Code Red and that was it.
17        Q.  And do you remember when and where you were
18  at that point?
19        A.  Somewhere in the hallway.  I can't tell you
20  which hallway I was or where I was positioned at.  I
21  remember I was in a hallway.
22        Q.  And could you give me a timeline after the
23  interaction started, or after you -- or let me put it
24  this way -- after the last time you -- strike all
25  that.

Page 103

1         Was the Code Red called after the last time
2   you saw Tashii Farmer and Ken Lopera?
3         A.  After, yes.
4         Q.  Okay.  Can you give me an estimate of how
5   long after?
6         A.  Oh.  Honestly, I can't remember.  I can
7   ballpark it, but I can't marry up to a number.
8         Q.  What is your ballpark?
9         A.  It was maybe about like a minute.  It felt
10  like it was -- it was forever for me to be able to
11  get out of there.
12        Q.  Okay.  Let's go back and I'll be pretty
13  brief here because Andre went through a couple of
14  these things.
15        So Officer Lopera hands you his coffee?
16        A.  Yes.
17        Q.  You now have coffee in both hands?
18        A.  Yes.
19        Q.  You turn around to set the coffees down?
20        A.  Correct.
21        Q.  Are you guys in the middle of the hallway
22  and you have to walk to the edge?  How far away did
23  you --
24        A.  I stepped away.  My guess it would be five
25  feet plus that I stepped away from him.

Page 104

1         Q.  You set the coffees down on the floor?
2         A.  Correct.
3         Q.  You turned around, and what did you see
4   when you turned around?
5         A.  When I turned around, they were making
6   their way down the hall.  There were workers who were
7   working on the floor, and I was watching my footing.
8   At the time I looked up, they were gone through that
9   bend that we have previously talked about.
10        Q.  Okay.  And maybe it will be more clear once
11  we watch the video because it's a little confusing to
12  me when you talk about the hall whether you're out in
13  the general corridor or whether it's in the
14  restricted area.
15        A.  Sure.
16        Q.  So --
17        A.  My understanding is that it was where we
18  had gone through the Coffee Bean to walk into the
19  main part of the casino.  There was like a little, a
20  connecting passageway.
21        Q.  Where patrons and civilians were allowed to
22  be, correct?
23        A.  That's correct.
24        Q.  Because in your CIRT statement, that was a
25  little confusing to me because in your CIRT

Page 105

1   statement, you talk about Tashii Farmer and
2   Officer Lopera walking down the hallway, and when we
3   get to the body-worn cam, it's pretty apparent that
4   almost immediately Tashii Farmer is running down the
5   restricted area.  So that was a little confusion.
6         A.  Okay.
7         Q.  So when you're talking about walking down,
8   this is in the area where you first have contact with
9   Tashii Farmer in an area that he's authorized to be
10  in, correct?
11        A.  That I remember, yes.
12        MR. LAGOMARSINO:  Objection as to the
13  characterization of running.
14        MR. McNUTT:  Okay.
15  BY MR. McNUTT:
16        Q.  What training have you had through Metro
17  regarding use of force?
18        So I understand what the training is
19  through the academy, and although he hasn't been
20  deposed in this case, Officer Bland -- do you know
21  Sergeant Bland?
22        A.  I do not.
23        Q.  Sergeant Bland was disclosed as an expert
24  for Las Vegas Metro regarding defensive tactics and
25  things of that nature.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

28  (Pages  106 to 109)

Page 106

1          But tell me about your use-of-force
2    training that you've had in the academy and
3    subsequent to the academy.
4       A.   Through the academy, we go through all the
5    levels of a suspect's actions, if we deem him to be
6    compliant all the way through aggravated aggressive,
7    by policy what we are allowed to do, to fit the
8    use-of-force model.  And we have quarterly defensive
9    tactics that we need to complete.
10         I don't know what they are every quarter,
11   they change.
12         And then our training days.
13      Q.   And so, are you a defensive tactics
14   instructor?
15      A.   I am not.
16      Q.   Or are you any other sort of certified
17   instructor in use-of-force techniques?
18      A.   No.
19      Q.   So you participate in all the training, you
20   comply with all the training, et cetera?
21      A.   Yes.
22      Q.   But you don't have any special --
23         THE REPORTER:  Wait, wait.
24         MR. McNUTT:  I'm sorry.
25

Page 107

1    BY MR. McNUTT:
2       Q.   You don't have any specialized
3    certifications or training to teach or train others?
4       A.   No.
5       Q.   At a very high level, does the -- do the
6    use to form options become greater or smaller if you
7    have more officers present?
8          MR. LAGOMARSINO:  Form.
9          THE WITNESS:  I guess I don't understand.
10   I just want to -- before I answer, I want to make
11   sure I'm understanding it right.
12   BY MR. McNUTT:
13      Q.   Sure.  That may not have been a model of
14   clarity of a question.
15         If you have more officers present at a
16   stop, are there more options about how to handle the
17   suspect?
18      A.   Yes.
19      Q.   Is it possible for an officer who is alone
20   to have to use a different degree of force than an
21   officer that has his partner with him?
22      A.   Yes.
23      Q.   Or an officer acting alone versus an
24   officer with three people with him?
25      A.   Yes.

Page 108

1       Q.   So when talking about the foot pursuit
2    factors, you talked about safety of citizens, right?
3       A.   Yes.
4       Q.   And let's expand on that a little bit.
5          So is a foot pursuit authorized, in your
6    opinion, when you believe that a suspect has already
7    committed or is committing a crime --
8       A.   Yes.
9       Q.   -- and then --
10      A.   Yes.
11      Q.   I'm sorry, just let me finish.
12      A.   Sorry.
13      Q.   Because we're getting looks from the court
14   reporter.
15         MR. McNUTT:  Was that clear enough on that
16   one?
17         THE REPORTER:  Yes.
18         MR. McNUTT:  Thank you.
19   BY MR. McNUTT:
20      Q.   And it's also, I think your testimony was,
21   if there were officer safety concerns, then a foot
22   pursuit could also be authorized as well?
23      A.   Correct.
24      Q.   So if Ken Lopera's perception was that
25   Tashii Farmer was under the influence of a controlled

Page 109

1    substance and he perceived that Tashii Farmer fled
2    into a restricted area of a casino, you would agree
3    that he had reasonable suspicion to commence a foot
4    patrol to pursue that individual, correct?
5          MR. LAGOMARSINO:  Objection to form.
6          THE WITNESS:  Yes.
7    BY MR. McNUTT:
8       Q.   If your partner makes that decision and you
9    were there, would you yell at him and say, "Don't do
10   that," or would you back him up?
11      A.   I guess I'd back him up if I know there was
12   a foot crime that we were going for or chasing for.
13         I guess it could be fair to go either way.
14   Are you speaking specifically on this incident?
15      Q.   Well, I was starting generally.
16      A.   Okay.
17      Q.   And meaning -- because you've already
18   testified --
19      A.   Yes.
20      Q.   -- that different officers can have
21   different perceptions?
22      A.   Correct.
23      Q.   And that both of those can be articulated
24   as valid?
25      A.   Correct.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 110

1   Q.  And one officer having one set of
2  information can articulate reasonable suspicion,
3  initiate a foot pursuit, correct?
4   A.  Correct.
5   Q.  And another officer can say, well, what I
6  saw didn't amount to that?
7   A.  Correct.
8   Q.  And neither officer is incorrect?
9   MR. LAGOMARSINO:  Objection, misstates the
10  legal standard.
11   THE WITNESS:  Correct.
12  BY MR. McNUTT:
13   Q.  Did in any way I misstate your testimony?
14   A.  No, I think that's --
15   MR. LAGOMARSINO:  No.  I just said the
16  legal standard, not her testimony.
17   MR. McNUTT:  Okay.  Gotcha.  Thanks.
18   Did I misstate the legal standard, Craig?
19   MR. LAGOMARSINO:  It's an objective
20  officer, not a subjective officer.
21  BY MR. McNUTT:
22   Q.  So now to this incident.
23   So you put the coffee down.  Had you not
24  gotten disoriented, would you have continued to --
25  would you have been by Ken's side as he pursued

Page 111

1  Tashii Farmer?
2   That's all I'm asking or would --
3   MR. LAGOMARSINO:  Objection as to -- sorry.
4  BY MR. McNUTT:
5   Q.  -- or would you have physically restrained
6  Ken and said:  Let's not do this, let's not run?
7   MR. LAGOMARSINO:  Objection as to
8  disoriented.
9  BY MR. McNUTT:
10   Q.  I thought that was your testimony earlier,
11  that you were disoriented back in terms of where you
12  were, but whatever your testimony was, it is.
13   A.  Correct.  Can you restate the question.
14   Q.  Sure.  Without getting into any of the
15  reasons why you weren't, you know, on Ken's hip as he
16  pursued Tashii Farmer, once you saw your partner
17  initiate the foot pursuit, would you have -- even if
18  you didn't think it justified in your perception,
19  would you follow him and pursue him, pursue your
20  partner until the suspect was dealt with?
21   MR. LAGOMARSINO:  Form.
22   THE WITNESS:  I guess it -- if I was right
23  there and I saw enough to put out on the radio
24  traffic, I would, you know, handle the radio.  You
25  know, I guess I'd be with him.

Page 112

1  BY MR. McNUTT:
2   Q.  Okay.  And my question is:  You would not
3  try -- I said you wouldn't try to physically restrain
4  your partner and say no, no, no, we're not going to
5  chase this guy because I don't perceive him to be a
6  threat to others?
7   A.  That's correct.
8   Q.  You would not do that, correct?
9   A.  No.  He had a conversation with him that I
10  wasn't part of, maybe he got, you know, more
11  reasonable suspicion or probable cause to chase and
12  maybe he knew something that I didn't.
13   Q.  Correct, and you would give him the benefit
14  of the doubt --
15   A.  Correct.
16   Q.  -- in that split second that he's making
17  those decisions, correct?
18   A.  Correct.
19   Q.  And you would back him up?
20   A.  Correct.
21   Q.  But here today, we have a whole slew of
22  other information, correct?
23   A.  Correct.
24   Q.  And essentially, we're looking back at the
25  situation, and I know it's difficult for you.

Page 113

1   A.  Yes.
2   Q.  And I don't -- I don't want to make this
3  any harder, but it's an important series of questions
4  that must be answered.  And so, please bear with me.
5   Did you slip and fall in the wet area?
6   A.  I remember sliding.
7   Q.  You just slid --
8   A.  I remember --
9   Q.  -- and then caught your balance?
10   A.  -- sliding around.
11   Q.  And then, if I recall your testimony
12  correctly, you said you checked a series of doors,
13  some locked, some not locked, essentially.
14   I think in your CIRT statement, you refer
15  to it as an ATL?
16   A.  An attempt to locate.
17   Q.  Right.  So you identify the phrase, right?
18   A.  I remember.
19   Q.  So you were attempting to locate both, in
20  this instance, both Tashii Farmer and Ken Lopera?
21   A.  I was trying to find my partner, yes.
22   Q.  Did you try to find him on the radio?
23   A.  No.  It's when -- I know in back houses of
24  casinos, radio traffic is broken.  It doesn't always
25  get transmitted, whether I hear it or I end up

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 114

1   putting it out.
2        I didn't hear anything, I heard the Code
3   Red.
4        Policy says that once the Code Red is
5   started, it's for the officer who initiated it.  I
6   wasn't there to give out radio traffic, you know.
7        Q.  Right, so I think we're pretty clear on it,
8   but correct me if I'm wrong, once an officer calls
9   Code Red, everybody is supposed to stay off the
10  channel so he can talk?
11       A.  Unless it's pertinent to --
12       Q.  Him?
13       A.  Correct.
14       Q.  There's been testimony in this case by
15  Detective Kasey Kirkegard.
16       A.  Um-hum.
17       Q.  Do you know who she is?
18       A.  Just through CIRT.
19       Q.  She's a CIRT officer, right?
20       A.  Yes.
21       Q.  In fact, I think she participated in your
22  CIRT interview, correct?
23       A.  Yes.
24       Q.  And she testified that the radios did in
25  fact work in that area of the back of the house.

Page 115

1        Are you aware of that at all?
2        A.  I wasn't aware.
3        Q.  So my question is simply, if I didn't make
4   it clear earlier, did you attempt to contact Ken or
5   just because you were in the back house you didn't
6   even try?
7        A.  Yeah, I did not.  It was under the
8   presumption that they wouldn't work, but I never
9   attempted.
10       Q.  Okay.  You testified reasonable suspicion
11  for a stop, as an officer in Nevada, you can actually
12  detain somebody for up to 60 minutes, correct?
13       A.  Correct.
14       Q.  Without probable cause?
15       A.  Correct.
16       Q.  In response to a question was there any
17  reasonable suspicion that Tashii Farmer had committed
18  a crime, you said no.
19       Do you remember that?
20       A.  I guess with more of the context.
21       Q.  Let me ask you this:  Do you think there
22  was reasonable suspicion to believe that Tashii
23  Farmer had committed a crime?
24       A.  When he first approached us?
25       Q.  At any point during your interaction with

Page 116

1   him.
2        A.  During my interaction, no.  Maybe the use
3   of drugs if I saw his pupils, but the mental illness,
4   no.
5        Q.  Right, because that's not a crime?
6        A.  Correct.
7        Q.  But if your partner, Ken Lopera, who did --
8   well, it would appear that his body cam saw Tashii
9   Farmer's pupils, and you testified that you did not.
10       If he perceived that Tashii Farmer was
11  under the influence of a controlled substance, then
12  he would in fact have reasonable suspicion and
13  probable cause, correct?
14       MR. LAGOMARSINO:  Objection, form,
15  foundation.
16       THE WITNESS:  Yes.
17  BY MR. McNUTT:
18       Q.  Let me just break it down.
19       He would have reasonable suspicion to stop
20  Tashii Farmer, correct?
21       A.  Yes.
22       Q.  And he would have probable cause to arrest
23  Tashii Farmer, correct?
24       A.  For?
25       Q.  For being under the influence of a

Page 117

1   controlled substance.
2        A.  Correct.
3        Q.  You testified in response to
4   Mr. Lagomarsino's questioning that you did not
5   perceive Tashii Farmer to be mentally ill based on
6   your brief interaction with him.
7        Is that fair?
8        A.  That's fair.
9        Q.  Okay.  So if he wasn't -- sitting here
10  today, if he wasn't mentally ill, what would cause
11  him to be profusely sweating and erratic behavior and
12  act paranoid?
13       A.  The fact that he stated that he ran across
14  the boulevard and that someone was chasing him.
15       Q.  Does physical exertion give rise to
16  paranoia?
17       MR. LAGOMARSINO:  Form, foundation.
18       THE WITNESS:  I'm not completely familiar
19  with, I guess, the essentials of paranoia.  So
20  possibly, but I can't say for sure.  I'm not --
21  BY MR. McNUTT:
22       Q.  You testified in your CIRT statement that
23  he nailed two of the elements of excited delirium,
24  one was profusely sweating and one was paranoia?
25       A.  Yes.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

31  (Pages 118 to 121)

Page 118

1    Q.  So I think would that refresh your
2  recollection that you're at least passingly familiar
3  with paranoia?
4    A.  Passingly.
5    Q.  Okay.
6    A.  Yes.
7    Q.  So if he's not mentally ill and he's
8  exhibiting signs of paranoia and profusely sweating,
9  what would that cause you to believe was the issue?
10   A.  Maybe he's in a mental crisis, maybe.
11  Under the influence.
12   Q.  Under the influence of a controlled
13  substance?
14   A.  Yes.
15   Q.  "Yes"?
16   A.  Yes.
17   Q.  I mean, that's a reasonable conclusion,
18  correct?
19   A.  Yes.
20   Q.  For a patrol officer?
21   A.  Yes.
22     MR. LAGOMARSINO:  Form, foundation.
23  BY MR. McNUTT:
24   Q.  Does a patrol officer need to have
25  specialized training to determine that someone is

Page 119

1  under the influence of a controlled substance, or is
2  that the type of training that a normal patrol
3  officer has when they report on the street?
4    A.  I think it's training that's supported
5  through the academy.  I mean, different types.
6    Q.  Okay.  I've got a few more questions, but
7  we're going to watch a little bit of the body cam.
8    A.  Can I take a break before we do that?
9    Q.  Absolutely.
10   A.  Okay.
11     MR. LAGOMARSINO:  You need a restroom?
12     THE WITNESS:  Yes.
13     MR. LAGOMARSINO:  Okay.
14     THE VIDEOGRAPHER:  The time is
15  approximately 12:56 p.m.  We are going off the
16  record.
17     (A recess was taken.)
18     THE VIDEOGRAPHER:  The time is
19  approximately 1:03 p.m.  We are going back on the
20  record.
21  BY MR. McNUTT:
22   Q.  Officer Lif?
23   A.  Yes.
24   Q.  You're still under oath.
25   A.  Yes.

Page 120

1    Q.  I have a few questions, and we are going to
2  watch the body-worn camera of Ken Lopera.
3    A.  Okay.
4    Q.  And you have previously seen that; is that
5  correct?
6    A.  It's been a long time, but yes, I have seen
7  it.
8    Q.  In what context did you see it?  Because I
9  remember you mentioned like YouTube videos.
10   A.  I think the first time I saw it was at the
11  CIRT interview, and then the Tactical Review Board.
12   Q.  So you watched it --
13   A.  Yes.
14   Q.  -- in a formal context?
15   A.  Yes.
16   Q.  Okay.  How long ago has it been since
17  you've watched it?
18   A.  The Tactical Review Board, I want to say it
19  was like in August or September of that same year,
20  2017.
21   Q.  Okay.  And you haven't watched it since?
22   A.  Hum-um.
23   Q.  I'm going to show you a couple things.  I
24  just have a couple questions so that we can orient
25  some of your testimony to especially with respect to

Page 121

1  the hallway.
2    A.  Sure.
3    Q.  So we can understand that.
4      MR. McNUTT:  Madam Court Reporter, I will
5  be giving some timestamps on the body-worn camera as
6  it's been produced by the Metropolitan Police
7  Department.
8      So if I say we're at 30 seconds, that's
9  simply 30 seconds into the body-worn camera.
10     THE REPORTER:  You don't want me to take
11  down --
12     MR. McNUTT:  You do not have to transcribe
13  what is coming off the body-worn camera, only my
14  questions and Officer Lif's responses.
15     THE REPORTER:  Okay.
16     MR. McNUTT:  Thank you.
17     (Excerpts from Officer Lopera's
18     body-worn camera are shown.)
19  BY MR. McNUTT:
20   Q.  So we're here at 0000 on the timestamp in
21  the lower left-hand corner.
22     Do you see that?
23   A.  Yes.
24   Q.  And this is the body-worn camera that's
25  been produced by LVMPD in this case.

Officer Ashley Lif  ~   April 4, 2019
\* \* \* Videotaped Deposition \* \* \*

32  (Pages 122 to 125)

Page 122

1       Does this look like the one you've seen
2   before, at least this first frame?
3       A.  At least, yes.
4       Q.  Do you recognize Tashii Farmer in this
5   frame?
6       A.  That's him, yes.
7       Q.  That's him there on the center left of
8   Ken Lopera's body-worn camera?
9       A.  Yes.
10      Q.  And you understand that is
11  Ken Lopera's left hand holding a cup of coffee?
12      A.  Yes.
13      Q.  So my first question is:  The hallway that
14  you're in now with kind of the glossy floor, do you
15  see that?
16      A.  Um-hum.
17      Q.  Where Tashii Farmer and Ken Lopera are
18  standing.
19      At this point, is this where you said
20  you're maybe 2 to 3 feet to Ken Lopera's right?
21  I believe that was your testimony.
22      A.  I believe so, yes.  Yeah.
23      Q.  Okay.
24      A.  Makes sense.
25      Q.  I'm not trying to --

Page 123

1       A.  And that's the thing.  I don't recall this
2   area.
3       Q.  Okay.
4       A.  Doesn't ring any bells clearly.  You know,
5   he and I were there, that's his camera.
6       Q.  Okay.
7       A.  So I presume that I was on his right.
8       Q.  Fair enough.
9       And in this area, patrons and police
10  officers are authorized to be.  This is a public area
11  that's in the casino.  This is that connector you
12  talked about?
13      A.  Yes.
14      Q.  And of course, as we start to watch this,
15  there's no sound because your body-worn cameras don't
16  have sound until after 30 seconds, correct?
17      A.  Correct.
18      Q.  So do you remember any of that interaction
19  where Tashii Farmer approved Officer Lopera and you?
20      A.  I don't remember him double backing or
21  sidestepping.  I don't remember that.
22      Q.  Okay.  So let's watch a little further.
23      So Officer Lopera turns to his right, and
24  when he comes back, he doesn't have coffee in his
25  hands.

Page 124

1       So I presume that that's when he handed it
2   to you, correct?
3       A.  Yeah.  I remembered taking it while he was
4   talking to him, but...
5       Q.  Okay, but memories can be different.
6       A.  Sure.
7       Q.  Now, put into context the words you said
8   that you heard Tashii Farmer say with respect to, you
9   know, somebody was chasing him and he ran across the
10  street.
11      A.  What do you mean put it into context?
12      Q.  Time context.  So we've only watched
13  12 seconds of the video.
14      Do you know when those words were spoken or
15  at what part of the video you heard them?
16      A.  I don't remember.
17      What I remember standing there and what's shown on the
18  camera, I think, are completely different.
19      I remember standing there and watching them
20  while they were speaking.  I don't remember all this
21  movement.
22      Q.  Now, as the camera has turned, we've got
23  several yellow cones with a chain attaching them
24  that's cordoning off this employee hallway, correct?
25      A.  Um-hum.  Yes.

Page 125

1       Q.  Does that comport with your recollection?
2       A.  Yeah.  I don't remember it being that far
3   of a, I guess a distance from that main walkway, I
4   guess that employee hall.
5       Q.  Do you remember the cones and the chain
6   cordoning it off from the public?
7       A.  I remember the cones.  I don't remember the
8   chain.  I don't remember stepping over a chain.
9   Clearly, they're there.
10      Q.  And then, these are the doors, in this
11  frame we're at 12 seconds, and you mentioned earlier
12  when you were talking to Mr. Lagomarsino that your
13  memory was that both doors were open, but clearly,
14  they weren't, right?
15      A.  Yeah.
16      Q.  So at or around 12 seconds, that's where we
17  see Tashii Farmer stumble or run, however you want to
18  define it, through the cordoned-off area.
19      You would agree with me on that?
20      A.  Yes.
21      Q.  How would you define what he did going
22  through the blocked-off area?
23      A.  He went through the blocked-off area.  I
24  mean, he just walked through the chain.
25      Q.  Okay.  Did you see that on the night of the

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 126

1   incident?
2        I know you just saw it on the body-worn
3   camera.  Do you recall seeing that physically?
4        A.  No.
5        Q.  So that wasn't part of the erratic behavior
6   that you observed, but that's clearly some of the
7   erratic behavior that Officer Lopera observed,
8   correct?
9        A.  Yes.
10         MR. LAGOMARSINO:  Form, foundation.
11   BY MR. McNUTT:
12        Q.  Would you agree with me, and we'll back it
13   up if you want, that Officer Lopera had the ability
14   to view Tashii Farmer's pupils --
15         MR. LAGOMARSINO:  Form, foundation.
16   BY MR. McNUTT:
17        Q.  -- during this interaction?
18        A.  He was close.  Yes.
19        Q.  So "Yes" or "No" --
20        A.  Yes.
21        Q.  -- he could observe his pupils?
22        A.  Yes.
23         MR. LAGOMARSINO:  Same objection.  Sorry.
24   BY MR. McNUTT:
25        Q.  And that would inform Officer Lopera of a

Page 127

1   reasonable suspicion of whether or not a suspect was
2   under the influence of a controlled substance?
3        A.  Yes.
4        Q.  Officer Lopera reaches out with both hands
5   as Tashii Farmer stumbles through the cones and the
6   chains.
7        Did you see that?
8        A.  Not that I can recall, no.
9        Q.  I mean, did you see that on the video?
10        A.  On the video, yes.
11        Q.  Okay.  And you don't -- so you didn't see
12   this when it happened.
13        Do you recall hearing anything when this
14   happened?
15        A.  Not specifically.  It was -- I remember it
16   being loud.  There were many people.  There was music
17   playing.  There was a lot going on.
18        Q.  It's a casino, of course.  Lot of
19   background noise.
20        At this point, would you have any estimate
21   of maybe how far away you were or no?
22        A.  I can't remember.  It was probably quite a
23   distance now because I don't remember that hallway
24   being that far away from that main pedestrian
25   walkways.

Page 128

1        Q.  Again, not a test.  You don't have to know
2   it.  If you don't know, you don't know.
3        A.  I wish I could give you an answer.
4        Q.  "I don't know" is an answer --
5        A.  Okay.
6        Q.  -- and that's okay.
7        So at this point, Tashii Farmer, would you
8   agree with me that he's clearly in the employee-only
9   area hallway?
10        A.  Yes.
11        Q.  Now, when you testified earlier about the
12   last that you saw of your partner and Tashii Farmer
13   was when you said something like went around the bend
14   or went around the corner?
15        A.  Yes.
16        Q.  Do you remember that?
17        A.  Yes.
18        Q.  So has that already occurred?
19        A.  No.  I believe it's still further, further
20   up.
21        Q.  Okay.  So tell me -- I'm sorry.
22        A.  No.  That's fine.
23        Q.  So tell me when you see that.  That's my
24   next question.
25        A.  Okay.

Page 129

1        Q.  So we're now at 17 seconds in.
2        So at 20 seconds, 21 seconds,
3   Officer Lopera clearly wiped out on the slippery
4   floor?
5        A.  Yes.
6        Q.  He's up, he retrieves his flashlight?
7        A.  So right there, there's your bend.
8        Q.  Okay.  So that's a left-hand turn, a
9   90-degree angle, in this employee-only area hallway,
10   correct?
11        A.  Yes.
12        Q.  And that's the part where you testified
13   earlier that that's the last you saw of your partner,
14   right?
15        A.  Yes.
16        Q.  So tell me what you saw.
17        A.  That's just him running away.  I don't
18   recall it being a 90-degree.  I thought it was more
19   of like a softer angle, so...
20        Q.  And we're not here to argue degrees of
21   bends in the hall.
22        I'm just saying, so at that point, are you
23   in the hallway as well?
24        A.  I believe I'm in the hallway at the
25   slippery point.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 130

1    Q.  Okay.
2    A.  I can't remember exactly where.
3    Q.  And you're seeing the back of
4  Officer Lopera's uniform?
5    A.  Yes.
6    Q.  So now, he's taken the left and he's
7  continuing down this other hallway.
8        So we'll just stop it right there, and
9  we're stopped at 34 seconds.
10       What did you do after you saw the back of
11  his uniform?
12    A.  I don't know where they went.  So I don't
13  know how much further behind that I was.  I don't
14  know.
15       I didn't know there was a right-hand turn
16  after that.  I thought it immediately ran into a
17  stairwell.  So I tried to check doors and stuff to
18  see if they had gone into anywhere else.
19    Q.  Okay.  So let me break it down a little bit
20  based on your testimony.
21       You obviously went over the same very
22  slippery area?
23    A.  Correct.
24    Q.  I don't think I asked this.  Did you see
25  Ken fall?  In person, not on the video.

Page 131

1    A.  No, not that I remember.
2    Q.  Okay.
3    A.  I mean, clearly, it's happened.  It's in
4  every video that I've seen on this.
5    Q.  No question.  So the last time you saw your
6  partner, were you on that slippery area, were you
7  past that slippery area?  Can that put it in context?
8    A.  I don't remember if I was on or past it.  I
9  don't know.  I don't remember.
10    Q.  Okay.  So the last thing you saw was
11  Ken Lopera taking this left --
12    A.  Yes.
13    Q.  -- around the bend or around the corner, as
14  you've testified, right?
15    A.  Yes.
16    Q.  Did you follow down that hallway and go to
17  the left as well?
18    A.  Yes.  That's the last I saw them.
19    Q.  Okay.  And then, so when you got around the
20  bend, then what?
21    A.  From what I remember without seeing the
22  video that it turned right into the stairwell.  And
23  on the video, it clearly shows that there's another
24  right-hand turn.
25       But at some point, I started to check the

Page 132

1  doors and see if they had gone into anywhere else.
2    Q.  Okay.  I just backed it up to 23 which is
3  about where he fell, where he's getting back up from
4  falling.
5        So I want to watch it now that we've got
6  that testimony and so we can put it in context where
7  you last saw him, "him" being Ken Lopera.
8        So he takes a left.  You took that same
9  left?
10    A.  I'm going to say yes.
11    Q.  I'm sorry?
12    A.  I believe so, yes.
13    Q.  And there's a Pepsi machine on the right
14  and some more cones.  We're around 35 to 45 seconds
15  variously.
16        Do you recall seeing that part?
17    A.  I do not.
18    Q.  Okay.  Now Ken is going through a door, and
19  you don't recall --
20    A.  I don't recall.
21    Q.  -- any of this?
22    A.  No.
23    Q.  Okay.  So all of this, you've only seen
24  from --
25    A.  From his -- I don't recall I ever went to

Page 133

1  any stairs.  I could have.  I know, at some point, I
2  was in an elevator, and I don't remember how I got
3  there.
4    Q.  Okay.  So at 1:01, 1:02, he obviously calls
5  your name?
6    A.  Yes.
7    Q.  You never heard that?
8    A.  No.
9    Q.  Okay.  So you just heard Officer Lopera say
10  "Somebody running," correct?
11    A.  Um-hum.
12    Q.  And we know that he was saying that to a
13  Venetian security guard.
14        Have you heard that part?
15    A.  I didn't know that.  I know the security
16  guards are all down there.  I didn't know that was
17  who he was speaking to.
18    Q.  That's been made pretty clear.
19        So all of that part after you said you saw
20  him turn that left corner, by the time you got to
21  that corner or that bend, he was no more in your
22  purview --
23    A.  Yes.
24    Q.  -- and you never heard him call your name?
25    A.  Correct.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

35 (Pages 134 to 137)

Page 134

1    Q. Or you never heard him call your name?
2    A. Correct.
3    Q. Now, I'm just going to show just a few more
4 seconds to orient you on the area that Ken came out
5 in terms of that street.
6      Is this the area where you said you were --
7 do you remember where you -- wait. Strike all that.
8      Does seeing this at all refresh your
9 recollection about where you exited the Venetian?
10    A. No.
11    Q. Okay.
12    A. That entire drive is probably the better
13 part of 300-plus meters that looks exactly the same
14 with the crosses and the...
15    Q. Okay. Okay.
16      So a little hard to see, but take my word
17 for it, that's Tashii Farmer in the frame, correct?
18    A. Okay.
19    Q. You heard Ken's voice, "Stop, don't move"?
20    A. Yes.
21    Q. And we're at 1 minute 34, and we see the
22 white Toyota truck in the frame too, right?
23    A. Yes.
24    Q. Is Officer Lopera's command a lawful
25 command at that point?

Page 135

1    A. Yes.
2    Q. Tell me if Tashii Farmer complies with that
3 lawful command.
4      Is it per policy to warn somebody they're
5 going to get tased before they get tased?
6    A. I believe if it's reasonable.
7    Q. So meaning you don't have to if you don't
8 have time, correct?
9    A. I can't recall verbatim. In my
10 understanding, I believe if it's reasonable, you do
11 it.
12    Q. Okay. So at this point, from what you've
13 seen on the body cam and what you know from your
14 first-person experience up until you didn't have a
15 first-person experience, Tashii Farmer has never been
16 checked for weapons, correct?
17    A. Correct.
18    Q. So if Officer Lopera's perspective is that
19 this is an individual under the influence of a
20 controlled substance that fled down a restricted area
21 of a casino and was not listening to his lawful
22 command at that point, correct?
23    A. Correct.
24    Q. And Officer Lopera at this point also
25 doesn't know whether or not Tashii Farmer has any

Page 136

1 weapons, correct?
2    A. Correct.
3    Q. So Officer --
4      MR. LAGOMARSINO: Hold on.
5      I'm just going to lodge an ongoing
6 objection as to what her testimony is as to what
7 Officer Lopera thought or did or didn't do as a
8 result of what he may have thought.
9 BY MR. McNUTT:
10    Q. So at this point, one TASER strike has
11 occurred and Tashii Farmer is on his back, correct?
12    A. Yes.
13    Q. And Officer Lopera before the objection
14 just said, "Don't move," correct?
15    A. Yes.
16    Q. And if you want me to back it up, we can
17 replay that.
18    A. He said, "Don't move."
19    Q. That's a lawful command, correct?
20    A. Yes.
21    Q. Now, what is Tashii Farmer doing after
22 Ken Lopera said, "Don't move"?
23    A. He's trying to stand up.
24    Q. Is that complying with a lawful command?
25    A. No.

Page 137

1    Q. If you were that officer, would you cycle
2 the TASER again?
3    A. No.
4    Q. You wouldn't?
5    A. He's at a tactical advantage where he can
6 go hands on at that point.
7    Q. So you think Officer Lopera by himself
8 should have at this point dropped the TASER and gone
9 hands on with Tashii Farmer?
10    A. It was an option. He already cycled it one
11 time and it was rendered ineffective. It didn't get
12 the five seconds -- it didn't get the NMI or the
13 neuromuscular incapacitation.
14    Q. And so, you think that it's reasonable --
15 well, let me just ask you.
16      That's what would you have done, correct?
17    A. That's what I would have done.
18    Q. Is it unreasonable for another officer to
19 cycle the TASER again?
20    A. No.
21    Q. And it's still per policy you can do that,
22 right?
23    A. For three times, yes.
24    Q. Isn't it true that an officer alone can
25 actually cycle the TASER more if necessary?

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

36 (Pages 138 to 141)

Page 138

1     A.  I'm not aware of that policy.  I'm aware of
2  up to three times that it's deemed ineffective and
3  another force option shall be used.
4     Q.  Okay.  And if it's deemed ineffective after
5  the third time, what would the other force options
6  be?
7     A.  There are multiple ways.  You can go hands
8  on.  You can do, you know, the LVNR.  You can use OC
9  spray.
10        Hand distracts, baton strikes.
11     Q.  So all of those things --
12     A.  Yes.
13     Q.  -- could be used?
14     A.  Yes.
15     Q.  Which one would you have done since you
16  wouldn't have used the TASER again?
17     A.  I would have gone hands on.
18     Q.  Like physical --
19     A.  Yes.
20     Q.  -- hands?
21     A.  Yes.
22     Q.  You would have struck Tashii Farmer?
23     A.  Either that or try to use my body weight to
24  hold him down and get his hands.
25     Q.  Okay.  That also has risks, right --

Page 139

1     A.  Correct.
2     Q.  -- because you're putting your weapon belt
3  in close proximity to somebody, correct?
4     A.  Correct.
5     Q.  But suffice it to say that, at this point,
6  Tashii Farmer has disobeyed at least two lawful
7  commands, correct?
8     A.  Yes.
9     Q.  "Stop," "Don't move," and then, "Don't
10  move" again, correct?
11     A.  Yes.
12        MR. LAGOMARSINO:  Dan, can you do your best
13  to identify what time on the video you are referring
14  to when you're asking these questions.
15        MR. McNUTT:  Okay.  Sure.  I think I have
16  done my best, but I'll do better.
17        MR. LAGOMARSINO:  I appreciate that.
18  BY MR. McNUTT:
19     Q.  So at this point, Officer Lopera did cycle
20  the TASER again, correct?
21     A.  Yes.
22     Q.  Because, as you identified, Tashii Farmer
23  was attempting to stand up, right?
24     A.  Yes.
25     Q.  And we're at 1:45 on the tape.

Page 140

1        MR. LAGOMARSINO:  Noted.
2  BY MR. McNUTT:
3     Q.  So what just happened?  Tell me.
4     A.  He got the red.
5     Q.  Okay.
6     A.  He asked for the red.
7     Q.  And is that what you remember hearing?
8     A.  I remember him asking it, yes.
9     Q.  Now, sometimes when you watch things or the
10  more you deal with something, your memory is
11  refreshed.
12        Do you have any recollection as to where
13  you were when you heard that?
14     A.  I was in the hallway, but I have no idea
15  which hallway now.
16     Q.  I was going to say, you were in a hallway?
17     A.  I was in a hallway.
18     Q.  Inside of the casino?
19     A.  Inside of the casino.
20     Q.  Fair enough.
21        Sufficient for my purposes, this is not at
22  the point where you were outside running, correct?
23     A.  That's correct.
24     Q.  So Officer Lopera again, "Don't move"?
25     A.  Yes.

Page 141

1     Q.  Is Tashii Farmer complying?
2     A.  No.
3     Q.  So another TASER strike, right?
4     A.  Yes.
5     Q.  And that's within policy?
6     A.  Three, yes.
7     Q.  Correct?
8     A.  (No audible response.)
9     Q.  Now, you already said you would have gone
10  hands on at that point, right?
11     A.  Correct.
12     Q.  With maybe a baton or hand strikes, right?
13     A.  Yes.
14     Q.  But it's still reasonable for
15  Officer Lopera to do something different, correct?
16     A.  Yes.
17     Q.  Do you see officer -- excuse me.
18        Do you see Tashii Farmer's left hand?
19     A.  Yes.
20     Q.  We're at 1:56 in the tape.
21        What does it appear to be doing to you?
22     A.  Reaching behind his waist.
23     Q.  And could a reasonable officer perceive
24  that to be reaching for a weapon?
25     A.  Yes.  It's a common area people like to

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 142

1 carry weapons is in their waistband.
2     Q.  So in your training, when you hear somebody
3 say they will comply but they physically aren't
4 complying, so their mouth is doing something
5 different than their hands, what do you pay attention
6 to as an officer?
7     A.  Their hands.
8     Q.  It's what they're doing that matters more
9 than what they're saying, correct?
10     A.  Yes.
11     Q.  And you would agree with me that although
12 Tashii Farmer is saying that he will comply where he
13 says, "I will," he is in fact not complying, correct?
14     A.  Correct.
15     Q.  So at this point, Officer Lopera does go
16 hands on, correct?
17     A.  Yes.
18     Q.  And you can clearly see at 2:05 in the tape
19 that Officer Lopera's left hand is grabbing Tashii
20 Farmer, correct?
21     A.  Yes.
22     Q.  Grabbing, it looks like, his left arm.
23       Would you agree with me?
24     A.  Yes.
25     Q.  Did you hear that other voice?

Page 143

1     A.  I don't know what it said, but I did hear
2 another voice.
3     Q.  So in the police report, in the arrest
4 report, it says, "Okay, sir, okay, sir."  It
5 identified this timestamp around 2:05 to 2:08.  I
6 want to back it up and have you listen to it real
7 briefly again.  A little imprecise on this.  I want
8 you to listen for that "Okay, sir, okay, sir."
9       And my question is:  Is that Tashii Farmer,
10 is it Ken Lopera, or is it a third party?
11       MR. LAGOMARSINO:  Form, foundation.
12       THE WITNESS:  I think it was Mr. Farmer.
13 BY MR. McNUTT:
14     Q.  You think it's someone other -- it's not
15 Ken Lopera?
16     A.  No, it's not Ken.
17     Q.  Okay.  The Venetian security guard
18 testified that that was him.
19     A.  Okay.
20     Q.  So I just wanted to know if that was
21 something that you could tell.
22       MR. LAGOMARSINO:  Move to strike.
23 BY MR. McNUTT:
24     Q.  At this point, the body cam is getting a
25 little shaky, right?

Page 144

1     A.  Yes.
2     Q.  Why is that?
3     A.  The magnets to hold them on are weak at
4 best.
5     Q.  And because Tashii Farmer is in contact
6 with another human being?
7     A.  That's correct.
8     Q.  Okay.  Did you hear Officer Lopera say,
9 "Help me out"?
10     A.  Yes.
11     Q.  Have you ever asked a civilian for help in
12 a confrontation with a suspect?
13     A.  Not that I can recall, no.
14     Q.  Would that indicate to you that
15 Officer Lopera felt that he needed physical
16 assistance?
17     A.  Yes.
18     Q.  Do Metro officers lightly ask for
19 assistance from non-Metro officers or non-law
20 enforcement?
21     A.  No.
22     Q.  If you were at a stop and I was walking by
23 and you thought you needed help, would you ask a
24 lawyer in a suit to help you?
25     A.  If I needed it.

Page 145

1     Q.  If you absolutely needed it, right?
2     A.  Yes.
3     Q.  But you wouldn't make that request lightly,
4 correct?
5     A.  That's correct.
6     Q.  Would you say that you were in fear of
7 physical harm in order to make that request?
8     A.  Yes.
9     Q.  Do you think Ken Lopera was in fear of
10 physical harm at this point where he asked someone
11 else to help him?
12       MR. LAGOMARSINO:  Form, foundation.
13       THE WITNESS:  Yes.
14 BY MR. McNUTT:
15     Q.  So at this point, we're 2:22 on the tape,
16 and we see several other people around Tashii Farmer
17 and Ken Lopera, correct?
18     A.  Yes.
19     Q.  And we cannot see their faces.
20       And so, do you recognize their pants as
21 being Metro officer pants?
22     A.  No.
23     Q.  And we know from other depositions, there's
24 no secret here, that those are other Venetian
25 security guards.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

38 (Pages 146 to 149)

Page 146

1      MR. LAGOMARSINO:  Move to strike.
2  BY MR. McNUTT:
3      Q.  But for our purposes, it's sufficient that
4  you know -- or for your testimony, you would agree
5  with me those are not LVMPD officers?
6      A.  Correct.
7      Q.  At this point, 2:22, can you see, tell me
8  what physical position Tashii Farmer is in?
9      A.  He's sitting on the ground.
10     Q.  So he's sitting up, correct?
11     A.  Yes.
12     Q.  Does it appear to you that Ken Lopera has
13  got a couple feet between him or he's not in physical
14  contact at that point?
15     A.  That's correct.
16     Q.  Do you think Tashii Farmer is complying
17  with police orders at this point?
18     MR. LAGOMARSINO:  Form, foundation.
19     THE WITNESS:  I don't remember the last
20  order that he gave, so I don't know if he's --
21  BY MR. McNUTT:
22     Q.  Okay.  We'll watch a little further.
23     Hear that "Okay, sir, okay, sir" again?
24     A.  Yes.
25     Q.  Do you identify that as Officer Lopera?

Page 147

1  Just "Yes" or "No"?
2      A.  No.
3      Q.  Do you identify that as Tashii Farmer what
4  you've heard so far?
5      A.  Yes.
6      Q.  Now, as we watch this, I want you to tell
7  me if at any point you see or hear Tashii Farmer
8  strike Ken Lopera.
9      THE WITNESS:  Can you play that back again,
10  please.
11  BY MR. McNUTT:
12     Q.  So we're at 2:37 where I stopped it --
13     A.  Yes.
14     Q.  -- and I'll play it back to 2:24.
15     So tell me, on or about when you see or
16  hear Tashii Farmer strike Ken Lopera.
17     MR. LAGOMARSINO:  Form, foundation.
18     THE WITNESS:  Right there.
19  BY MR. McNUTT:
20     Q.  So around 2:34 on the tape, correct?
21     A.  Yes.
22     Q.  Is striking an officer a crime in the State
23  of Nevada?
24     A.  Yes.
25     Q.  Is striking an officer indicative of

Page 148

1  someone intending to comply with lawful commands?
2      A.  They're not going to comply.
3      Q.  Is it reasonable for your partner,
4  Ken Lopera, to put Tashii Farmer in a lateral
5  vascular neck restraint at this point?
6      A.  Yes.
7      MR. LAGOMARSINO:  Foundation.
8  BY MR. McNUTT:
9      Q.  Is it reasonable for Officer Lopera to use
10  hand strikes on Tashii Farmer at this point?
11     A.  Yes.
12     Q.  Would it be reasonable for Tashii -- excuse
13  me -- for Officer Lopera to use a baton to hit Tashii
14  Farmer at this point?
15     MR. LAGOMARSINO:  Form, foundation.
16     THE WITNESS:  Yes.
17     (End of excerpts from Officer
18     Lopera's body-worn camera.)
19     MR. McNUTT:  I have no further questions.
20  Thank you.
21     MR. LAGOMARSINO:  I've got some questions.
22
23     FURTHER EXAMINATION
24  BY MR. LAGOMARSINO:
25     Q.  Do you need a break?

Page 149

1      A.  (No audible response.)
2      Q.  If a police officer is violating a
3  citizen's rights by using excessive force, is the
4  citizen allowed to strike the officer in
5  self-defense?
6      MR. McNUTT:  Objection --
7      MR. ANDERSON:  Objection, form.
8      MR. McNUTT:  -- inflammatory,
9  argumentative.
10     THE WITNESS:  I'm not aware of that.
11  BY MR. LAGOMARSINO:
12     Q.  So have you ever been trained at Metro that
13  if an officer is violating a citizen's rights by
14  using excessive force that the citizen is allowed to
15  defend themselves by striking the officer?
16     A.  I don't recall.
17     Q.  I'm just going to jump around a little bit.
18     So you had a question about Tashii Farmer
19  reaching into the waistband and whether that could
20  possibly be a weapon.
21     Were the TASER prongs also in the area of
22  his waist?
23     A.  Yes.
24     Q.  So was it also possible that -- did you
25  interpret that to be Tashii trying to remove the

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

39 (Pages 150 to 153)

Page 150

1  TASER prongs from him, his waist?
2      A.  It's likely, but the way that I've been
3  trained that that's the immediate area, both front
4  and back, is common where weapons are placed.
5      Q.  Did you find -- strike that.
6          You heard Ken Lopera make many commands,
7  correct?
8      A.  Yes.
9      Q.  Would you make commands in that fashion?
10     A.  Yes.
11     Q.  Did you find his commands to be confusing?
12         MR. McNUTT:  Objection, form.
13         THE WITNESS:  Yes.  There wasn't -- I feel
14  like there wasn't enough time given for compliance.
15  BY MR. LAGOMARSINO:
16     Q.  When you looked in the beginning of the
17  interaction, did you see the doors that went into the
18  service area?
19     A.  Yes.
20     Q.  Did you see the big, bright red exit sign
21  lit up above that door?
22     A.  I don't recall in the video.
23     Q.  Would a big, bright exit sign indicate to
24  you that somebody can exit out that door?
25     A.  Yes.

Page 151

1      Q.  There was some testimony early about where
2  the people were who were cleaning.
3          Have you ever been in a casino and seen
4  employees cleaning in public areas?
5      A.  Yes.  At the casino floor, vacuuming or --
6  yes.
7      Q.  And the area where Officer Lopera was over
8  by looked like some coolers where some drinks were?
9      A.  Yes.
10     Q.  I'm not asking you based on your
11  recollection, I'm asking based on the video.
12     A.  On the video, yes.
13     Q.  And the cleaning equipment was actually in
14  a public area, correct?
15     A.  Yes.
16     Q.  You had some questions about whether you're
17  trained in the academy or not to recognize somebody
18  who is under the influence of intoxicants or
19  substances.
20         Is there a specific designation called drug
21  recognition expert for Metro?
22     A.  Yes.
23     Q.  Are you a drug recognition expert?
24     A.  No, sir, I am not.
25     Q.  Was Lopera, to your knowledge?

Page 152

1      A.  Not to my knowledge.
2      Q.  What certifications do you have?  I know
3  you said you're crisis intervention.  I guess let me
4  rephrase.
5      A.  There's a handful.
6      Q.  Relevant to this case, what certifications
7  do you have?
8      A.  None that come to mind other than the
9  crisis intervention.  But I haven't looked at my
10  training, I guess, completions.
11     Q.  Okay.  This is a question I'll ask, I'm not
12  sure if you know the answer or not.
13         If you're fired -- you made the
14  reference -- not you, sorry.
15         If an officer is fired, do they lose
16  certain benefits as opposed to retiring?
17         MR. McNUTT:  Objection, form, foundation.
18         THE WITNESS:  To my knowledge, yes.
19  BY MR. LAGOMARSINO:
20     Q.  And what do you base your knowledge on?
21     A.  Just from what I've heard what people do.
22     Q.  And you've heard that from Metro?
23     A.  I think just through, for lack of a better
24  term, the grapevine.
25     Q.  Okay.

Page 153

1          If you were in Officer Lopera's situation,
2  what would you have done differently?
3          MR. ANDERSON:  Objection, form.
4          MR. McNUTT:  Join.
5          THE WITNESS:  Called in sick or a vacation
6  day and not been to work.
7  BY MR. LAGOMARSINO:
8      Q.  Besides that.
9      A.  Okay.  Not follow it.  I would have used
10  discretion.
11     Q.  Do you feel like he abused his discretion?
12         MR. McNUTT:  Objection, form.
13         MR. ANDERSON:  Objection, form.
14         THE WITNESS:  I don't understand your
15  question.
16  BY MR. LAGOMARSINO:
17     Q.  Did you feel like Officer Lopera abused his
18  discretion by following --
19     A.  Oh, abused discretion.  I thought you said
20  abused the question.
21     Q.  Sorry.
22     A.  Oh, abused discretion?  I don't think
23  abused is the right word.  I think maybe there were
24  other appropriate options.
25     Q.  What did Officer Lopera do, in your view,

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 154

1  that was different from how you were trained to react
2  when the situation became an altercation?
3      A.  Control the hands.  That was my main --
4  that's why after the first cycle I said I would have
5  gone hands on is to control the hands.
6          You can have -- you can have a knife in
7  your ankle, you could be armed.  If I control your
8  hands, I'm going to be okay.
9      Q.  Okay.  Going back to the question about the
10  custody plan in the transcript.
11     A.  Yes.
12     Q.  In reference to a different question, you
13  said to me -- I'm not sure if the transcriptionist or
14  recorder got it right -- is it possible that when you
15  said, "We did it --" when it says on the paper, "We
16  did have a custody plan," that you said, "We didn't
17  have a custody plan"?
18     A.  It's possible.
19     Q.  Would you defer to the audio recording?
20         MR. McNUTT:  Objection, form.  Attempts to
21  misstate a clear record.
22         THE WITNESS:  I don't recall having --
23         MR. LAGOMARSINO:  Oh, you've never seen
24  somebody mess up a transcript before?
25         MR. McNUTT:  Only this one.

Page 155

1         MR. LAGOMARSINO:  Okay.
2         THE WITNESS:  I don't recall having a
3  custody plan predetermined as of today.
4  BY MR. LAGOMARSINO:
5      Q.  Now, there was a question, and I just want
6  to make sure the record is clear, about -- Mr. McNutt
7  asked what's he trying to do there, and you said,
8  "Stand up."
9          When he was asking you that question, the
10  video was paused, correct?
11     A.  Yes.
12     Q.  Farmer was not on his feet, correct?
13     A.  Correct.
14     Q.  It looked like he was sitting, correct?
15     A.  Correct.
16     Q.  If somebody is sweaty, does that mean
17  they're suffering from excited delirium?
18     A.  No.
19     Q.  If somebody is paranoid, does that mean
20  they're suffering from excited delirium?
21     A.  No.
22     Q.  If somebody is sweaty and paranoid, does
23  that mean that somebody is suffering from excited
24  delirium?
25     A.  It could be an indicator.

Page 156

1      Q.  It could not be an indicator, right?  I
2  mean, some people are just paranoid, right?
3      A.  Yes.
4      Q.  And if you had to arrest every person who
5  was publicly intoxicated, which is a crime in the
6  State of Nevada, correct, you would be arresting --
7  you wouldn't stop arresting people on the Strip,
8  correct?
9      A.  Correct.
10         MR. LAGOMARSINO:  I don't have any more
11  questions at this point.
12         MR. McNUTT:  Just a couple follow-ups.
13
14         FURTHER EXAMINATION
15  BY MR. McNUTT:
16     Q.  You said that there was not enough time for
17  compliance with Ken Lopera's orders?
18     A.  From my perception, but he might have had
19  another impression that I didn't know.  I mean,
20  that's just what I would have done.  That doesn't
21  mean it's right or wrong or indifferent.
22     Q.  So when Ken Lopera said, "Don't move"--
23     A.  And he moved.
24     Q.  -- and he moved, how long was Ken supposed
25  to wait to see if he was going to comply?

Page 157

1      A.  There's no set time.
2      Q.  So when you give somebody an order and they
3  immediately disobey it, you don't have to --
4      A.  That's correct.
5      Q.  -- wait, correct?
6      A.  Correct.
7      Q.  And if you told somebody to do a specific
8  thing and you waited three to five seconds and they
9  were disobeying that entire time, like between TASER
10  cycles, would that be enough time?
11     A.  Yes.
12     Q.  Have you ever seen anybody -- let's go back
13  to the question about -- when the video was paused,
14         When the video was paused, Tashii Farmer
15  prior to that was laying on his back, correct?
16     A.  Correct.
17     Q.  And you said it looked like he was trying
18  to stand up, correct?
19     A.  Correct.
20     Q.  Have you ever seen anyone not move through
21  a sitting position to get to standing up from their
22  back?
23     A.  No.
24     Q.  I mean, you have to have some intermediate
25  position when you go from lying on your back to

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

41 (Pages 158 to 161)

## Page 158

1  standing up, correct?
2     A.  Correct.
3     Q.  Would you like to watch the video again to
4  verify that you believe he was trying to stand up?
5     A.  No.
6     Q.  Out of the academy, is a Metro officer
7  trained to identify indicators that a person is on
8  drugs?
9     A.  Yes.
10    Q.  So you don't have to have any other
11 specialized training, a uniformed officer on patrol
12 is trained to identify somebody that's on drugs?
13    A.  Yes.
14    Q.  You said that the other options -- and you
15 earlier said that he could have used his OC spray, he
16 could have used his baton to strike someone, in this
17 case Tashii Farmer, he could have used baton strikes?
18    A.  Yes.
19    Q.  Could have used the LVNR.  All of those
20 things would have been authorized by policy, correct?
21    A.  Yes.
22    Q.  And you think all those things would have
23 been okay for Ken Lopera to do, correct?
24    A.  Yes.
25    Q.  Let's just get --

## Page 159

1        THE VIDEOGRAPHER:  Hold on, guys.  Sorry.
2  I just had an issue.
3        (Pause in proceedings.)
4        THE VIDEOGRAPHER:  We're back on the
5  record.
6        MR. McNUTT:  Okay.
7  BY MR. McNUTT:
8     Q.  We were talking about other options, right,
9  and you said control the hands, meaning do you -- is
10 it your opinion in response to Mr. Lagomarsino's
11 question that instead of cycling the TASER,
12 Ken Lopera should have attempted to control Tashii
13 Farmer's hands?
14    A.  He could have.
15    Q.  Okay, but it wasn't wrong for him to use
16 the TASER, again, that's just your perception?
17    A.  Correct.
18    Q.  How tall is Ken Lopera, do you know, would
19 you estimate?
20        Is he taller than you?
21    A.  No.  Maybe about the same.
22    Q.  Okay.  How tall are you?
23    A.  I'm 5-11.
24    Q.  And your partner was about the same
25 heighth?

## Page 160

1     A.  Yes.
2     Q.  Do you know how big, tall or weight-wise
3  Tashii Farmer --
4     A.  I don't recall exact.  I believe he was
5  taller than I was.
6     Q.  Okay.  And is it your testimony that
7  instead of using a TASER that would give you some
8  feet of standoff that you would routinely go hands on
9  with a male suspect that was taller and bigger than
10 you?
11    A.  I wouldn't say routinely, but the way that
12 his hands were placed, I felt like I could have had
13 an advantage to do so.
14    Q.  But again, one officer can do one thing,
15 one officer can do the other, they're both -- you can
16 articulate them as to why you did that, correct?
17    A.  Correct.
18    Q.  Neither one is wrong?
19    A.  Correct.
20    Q.  Do you know sitting here today whether or
21 not Tashii Farmer was under the influence of a
22 controlled substance?
23    A.  Now I know.  Yes, today, I do know.
24    Q.  So in fact, if Officer Lopera perceived
25 that Tashii Farmer was under the influence of a

## Page 161

1  controlled substance, it turns out he was right,
2  correct?
3        MR. LAGOMARSINO:  Objection, vague as to
4  controlled substance.
5  BY MR. McNUTT:
6     Q.  Correct?
7     A.  Correct.
8     Q.  Do you have any understanding that Tashii
9  Farmer was on illegal methamphetamines?
10    A.  I do understand that now.
11       MR. McNUTT:  Okay.  I have no further
12 questions.
13
14       FURTHER EXAMINATION
15 BY MR. LAGOMARSINO:
16    Q.  All right, just a couple follow-ups.
17       You were asked the question earlier would
18 you intervene to stop Ken Lopera from running after
19 Tashii.
20       Do you remember that generally?
21    A.  Yes.
22    Q.  If you saw Ken Lopera placing Tashii in an
23 LVNR for over a minute or even over 30 seconds and
24 Tashii wasn't moving, would you intervene to stop
25 that?

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

42 (Pages 162 to 165)

Page 162

1   A. Yes.
2       MR. McNUTT: Objection, form --
3       MR. ANDERSON: Objection.
4       MR. McNUTT: -- assumes facts not in
5   evidence.
6       MR. ANDERSON: Join.
7   BY MR. LAGOMARSINO:
8   Q. Does tasing cause people to move?
9   A. After the cycle, it can, but for that five
10  seconds, it's -- if there's a complete circuit to get
11  neuromuscular incapacitation, then they don't move.
12  Q. Does tasing people to have distorted
13  perception?
14      MR. McNUTT: Objection, form, vague.
15      MR. LAGOMARSINO: Let me rephrase.
16  BY MR. LAGOMARSINO:
17  Q. Does tasing hurt?
18  A. I believe --
19      MR. McNUTT: Objection, form.
20      THE WITNESS: Thankfully, I've never been
21  tased.
22  BY MR. LAGOMARSINO:
23  Q. Have you been trained that tasing causes
24  pain to its subjects?
25  A. Yes.

Page 163

1   Q. Is it unusual for someone to try to remove
2   prongs from them when they've been tased?
3   A. I've only seen it happen in a controlled
4   environment.
5   Q. Have you had any training, additional
6   training, as a result of this incident, either
7   department wide?
8   A. Use-of-force model has changed. You no
9   longer can use the LVNR in lower levels of force.
10      I don't recall anything specific that had
11  been put out for me.
12      I've made it more of a point to read
13  policy.
14      MR. LAGOMARSINO: Okay. All right. No
15  further questions. Thank you.
16      MR. McNUTT: No further questions.
17      MR. ANDERSON: I have nothing.
18      THE VIDEOGRAPHER: This concludes the video
19  deposition of Ashley Lif.
20      The original media of today's testimony
21  will remain in the custody of Las Vegas Legal Video.
22      The time is approximately 1:48 p.m. We are
23  going off the record.
24      (The following occurred off the
25  video record.)

Page 164

1       THE REPORTER: Mr. McNutt, did you need a
2   copy of the transcript?
3       MR. McNUTT: I do.
4       MR. ANDERSON: I do.
5       MR. McNUTT: PDF, please.
6       MR. ANDERSON: Yes, I will also take one.
7   (The deposition was concluded at
8   1:49 p.m.)
9
10      * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 165

CERTIFICATE OF DEPONENT
PAGE   LINE   CHANGE        REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, OFFICER ASHLEY LIF, deponent herein, do
hereby certify and declare the within and foregoing
transcription to be my deposition in said action;
that I have read, corrected and do hereby affix my
signature to said deposition.

_____
OFFICER ASHLEY LIF

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 166

1          CERTIFICATE OF REPORTER
2          I, Cynthia K. DuRivage, a Certified Court
3    Reporter of the State of Nevada, do hereby certify:
4          That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that any witnesses in the foregoing proceedings,
7    prior to testifying, were duly sworn; that a record
8    of the proceedings was made by me using machine
9    shorthand which was thereafter transcribed under my
10   direction; that the foregoing transcript is a true
11   record of the testimony given.
12         I further certify I am neither financially
13   interested in the action nor a relative or employee
14   of any attorney or party to this action.
15         IN WITNESS WHEREOF, I have this date
16   subscribed my name.
17   Dated: April 15, 2019
18
19
                    _____
20                  CYNTHIA K. DuRIVAGE
                    CCR No. 451
21
22
23
24
25