Exhibit G - Tran Deposition

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

```
1              CERTIFICATE OF REPORTER

2         I, the undersigned, a Certified Shorthand

3   Reporter of the State of Nevada, do hereby certify:

4         That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that any witnesses in the foregoing proceedings,

7   prior to testifying, were duly sworn; that a record

8   of the proceedings was made by me using machine

9   shorthand which was thereafter transcribed under my

10  direction; that the foregoing transcript is a true

11  record of the testimony given to the best of my

12  ability.

13         Further, that before completion of the

14  proceedings, review of the transcript [ X ] was

15  [  ] was not requested pursuant to NRCP 30(e).

16         I further certify I am neither financially

17  interested in the action, nor a relative or employee

18  of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated: December 27, 2018

23

24  _____
                        GALE SALERNO, RMR, CCR No. 542
25
```

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

1                UNITED STATES DISTRICT COURT

2                     DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,    )
                                      )
7         Plaintiff,                  )
                                      )  Case No.
8              vs.                    )  2:18-cv-00860-GMN-VCF
                                      )
9    LAS VEGAS METROPOLITAN POLICE    )
     DEPARTMENT, a political          )
10   subdivision of the State of      )      **CONDENSED**
     Nevada; KENNETH LOPERA,          )
11   individually; TRAVIS CRUMRINE,   )      **TRANSCRIPT**
     individually; MICHAEL TRAN,      )
12   individually; MICHAEL FLORES,    )
     individually,                    )
13                                    )
          Defendants.                 )
14   _____)

15

16

17

18    VIDEOTAPED DEPOSITION OF OFFICER MICHAEL TRAN

19        Taken on Tuesday, December 18, 2018

20               At 10:07 a.m.

21            Held at Lagomarsino Law

22   3005 West Horizon Ridge Parkway, Suite 241

23            Henderson, Nevada  89052

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

Page 2

```
1   APPEARANCES:
2   For the Plaintiff, Trinita Farmer:
3       ANDRE M. LAGOMARSINO, ESQ.
        Lagomarsino Law
        3005 West Horizon Ridge Parkway, Suite 241
4       Henderson, Nevada  89052
        (702) 383-2864
5       aml@lagomarsinolaw.com
6
7   For the Defendant, Kenneth Lopera:
8       DANIEL R. MCNUTT, ESQ.
        McNutt Law Firm, P.C.
9       625 South 8th Street
        Las Vegas, Nevada  89101
10      (702) 384-1170
        dm@mcnutlawfirm.com
11
12  For the Defendants, LVMPD, Crumrine, Tran and Flores:
13      CRAIG R. ANDERSON, ESQ.
        Marquis Aurbach Coffing
14      10001 Park Run Drive
        Las Vegas, Nevada  89145
15      (702) 942-2136
        canderson@maclaw.com
16
17
18  Also Present:
19      MR. SHANE GODFREY, Legal Videographer
20      MS. DENISE VALDIVIA, Paralegal
21      MS. TRINITA FARMER
22      MS. MARGIE DAY
        MS. STEPHANIE MOORE, Paralegal,
23          (Present Telephonically)
24
25
```

Page 3

```
1                    INDEX
2                                        Page
3   Examination by Mr. Lagomarsino          6
4   Examination by Mr. Anderson           131
5   Further Examination by Mr. Lagomarsino 135
6   Examination by Mr. McNutt             137
7   Further Examination by Mr. Lagomarsino 149
8   Further Examination by Mr. McNutt     154
9   Further Examination by Mr. Anderson   154
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                   EXHIBITS
2   Tran                         Marked
    Exhibit 1   Videotaped Deposition of       25
3               Officer Michael Tran, December
4               20, 2017
    Exhibit 2   Voluntary Statement, Bates     28
5               LVMPD 1587 to 1593
6
    Exhibit 3   Five Color Photographs         60
7
    Exhibit 4   Las Vegas Metropolitan Police  66
8               Department Employee Statement,
                Bates LVMPD 1937 to 2006
9
    Exhibit 5   Autopsy Report, Bates P000052  86
10
    Exhibit 6   Force Investigation Team Report 87
11              In-Custody Death
12  Exhibit 7   Las Vegas Review-Journal       89
                Article, September 21, 2014
13
    Exhibit 8   CPR Article                    96
14
    Exhibit 9   Test Questions, Bates LVMPD   103
15              0890 to 0891
16  Exhibit 10  Color Photographs             104
17  Exhibit 11  Two Pages of Color Photographs 112
18  Exhibit 12  DVD                           124
19  Exhibit 13  DVD                           127
20  Exhibit 14  DVD                           127
21  Exhibit 15  (NOT MARKED)
22  Exhibit 16  DVD                           128
23  Exhibit 17  (NOT MARKED)
24  Exhibit 18  (NOT MARKED)
25  Exhibit 19  Diagram                        25
```

Page 5

```
1   VIDEOTAPED DEPOSITION OF OFFICER MICHAEL TRAN
2              December 18, 2018
3                  -  -  -
4       THE VIDEOGRAPHER:  Good morning.  Today
5   is Tuesday, December 18th, 2018.  The time is
6   approximately 10:07 a.m.
7       This begins the video deposition of
8   Michael Tran.  We are located at Lagomarsino Law,
9   3005 Horizon Ridge Parkway, Suite 241, Henderson,
10  Nevada, 89052.
11      My name is Shane Godfrey, court
12  videographer with Las Vegas Legal Video.
13      This is United States District
14  Court, District of Nevada, case number
15  2:18-CV-00860-GMN-VCF, in the matter of
16  Trinita Farmer, individually, Plaintiff, versus
17  Las Vegas Metropolitan Police Department, et al.,
18  Defendants.
19      This deposition is noticed by the attorneys
20  for Plaintiff, Trinita Farmer.
21      Will counsel and all present please state
22  your appearances for the record.
23      MR. LAGOMARSINO:  We've got Andre
24  Lagomarsino, attorney for the Plaintiffs.  Present
25  also on the phone is Stephanie Moore, paralegal.
```

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 6

1  Also in person Denise Valdivia,
2  Trinita Farmer, and Margie Day.
3  MR. MCNUTT:  Dan McNutt, on behalf of
4  Ken Lopera.
5  MR. ANDERSON:  Craig Anderson, on behalf
6  of the Las Vegas Metropolitan Police Department,
7  Officer Michael Tran, Officer Travis Crumrine, and
8  Officer Flores.
9  THE VIDEOGRAPHER:  The witness may now be
10  sworn in by Gale Salerno with All-American Court
11  Reporters.
12  - - -
13  OFFICER MICHAEL TRAN,
14  having been first duly sworn, was
15  examined and testified as follows:
16  - - -
17
18  EXAMINATION
19  BY MR. LAGOMARSINO:
20  Q.  Can you please state your full name and
21  spell your last name for the record.
22  A.  Michael Tran.  Last name T-r-a-n.
23  Q.  And are you a police officer?
24  A.  Yes.
25  Q.  What is your P number?

Page 7

1  A.  15221.
2  Q.  Do you understand that today you're sworn
3  to tell the truth?
4  A.  Yes.
5  Q.  That although we are in an informal
6  conference room setting, it's the same oath that you
7  would take in a court of law?
8  A.  Yes.
9  Q.  That any material misrepresentation could
10  subject you to the pains and penalties of perjury.
11  Do you understand that?
12  A.  Yes.
13  Q.  It's not to suggest that you will commit
14  perjury, only to inform you of the consequences
15  thereof.
16  Everything is being taken down by a court
17  reporter today.  Although we have a videographer
18  here, the official record is the court reporter's
19  transcript.
20  I would ask that you allow me to finish my
21  question, and I will allow you to finish your answer
22  so that we have a clear record.  Do you understand?
23  A.  Yes.
24  Q.  At the end of this deposition, you'll have
25  an opportunity to make changes to your deposition.

Page 8

1  Any changes of an important nature could cause the
2  attorneys to comment on your credibility at the time
3  of trial.
4  Do you understand that?
5  A.  Yes.
6  Q.  If at any time you need a break, please let
7  us know.  Okay?
8  A.  Yes.
9  Q.  The attorneys here from time to time will
10  likely be making objections.  They're not doing that
11  to be obstructive.  There's not a judge here to rule
12  on them.  If you allow them to -- strike that.
13  Please allow them to finish their
14  objections, and then if you understand the question,
15  please answer it.  Okay?
16  A.  Yes.
17  Q.  In everyday conversation nods of the head
18  are perfectly acceptable.  "Uh-huhs" and "nuh-uhs"
19  are perfectly understandable.  However, it's
20  difficult to understand those on the transcript.
21  So from time to time I may say is that a
22  yes, is that a no?  I'm not trying to be rude.  I'm
23  just trying to make a clear record.
24  Do you understand that?
25  A.  Yes.

Page 9

1  Q.  We're going to be going for several hours
2  today.  From time to time I may mumble a question or
3  bumble it or I may speak too low.  If you don't
4  understand, please tell me and I'll be happy to
5  rephrase.  Okay?
6  A.  Yes.
7  Q.  What did you do to prepare for today's
8  deposition?
9  A.  I reviewed my statements from FIT and CIRT,
10  and previous deposition.
11  Q.  Your previous deposition?
12  A.  Correct.
13  Q.  Have you reviewed anybody else's FIT or
14  CIRT statements?
15  A.  Anybody else as in other officers?  No.
16  Q.  Have you reviewed any body cam footage?
17  A.  Not recently.
18  Q.  Have you ever reviewed any body cam
19  footage?
20  A.  Yes.
21  Q.  Which body cam footage did you review?
22  A.  Lopera's.  And then the Venetian security.
23  Q.  Have you reviewed any body cam footage from
24  any of the other officers?
25  A.  No.

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

4 (Pages 10 to 13)

### Page 10

1    Q.  Did you meet with anybody to prepare for
2 your deposition?
3    A.  Just Craig.
4    Q.  And when did you meet with him?
5    A.  It was a phone meeting Thursday or Friday,
6 something like that.
7    Q.  And without telling me what was said, how
8 long was that meeting?
9    A.  20 minutes, 30 minutes.
10   Q.  Have you ever met with Mr. Dan McNutt, this
11 attorney right here?
12   A.  No.
13   Q.  Have you ever -- when was the last time you
14 spoke with Kenneth Lopera?
15   A.  The night of the incident.  I haven't seen
16 him since.
17   Q.  Have you reviewed the CIRT report in this
18 case?
19   A.  My CIRT report?
20   Q.  Yes.
21   A.  Yes.
22       MR. MCNUTT:  Objection.  Form.
23       MR. ANDERSON:  I think it's a
24 misunderstanding.
25

### Page 11

1 BY MR. LAGOMARSINO:
2    Q.  When you say your CIRT report, when did you
3 receive that CIRT report?
4    A.  My CIRT statement?
5    Q.  Okay.  I understand you gave a statement to
6 CIRT, correct?
7    A.  Correct.
8    Q.  Do you know that CIRT issued a report?
9    A.  No.
10   Q.  Were you brought before the Use of Force
11 Board?
12   A.  The CIRT Review Board, yes.
13   Q.  And when you were brought before the CIRT
14 Review Board, were you given a report issued by CIRT?
15   A.  Not to my knowledge, no.
16   Q.  What documents were you given when you went
17 to the CIRT Review Board?
18   A.  I don't believe I got any documents from
19 them.
20   Q.  I want to go briefly through your
21 educational background.
22       Where did you go to high school?
23   A.  When or where?
24   Q.  Where.
25   A.  Las Vegas, Clark.

### Page 12

1    Q.  Clark?  And when did you graduate?
2    A.  2002.
3    Q.  Did you attend college after Clark?
4    A.  Yes.
5    Q.  Where did you attend college?
6    A.  UNLV.
7    Q.  What years did you attend UNLV?
8    A.  2002 to 2007.
9    Q.  And did you graduate?
10   A.  Yes.
11   Q.  What was your degree in?
12   A.  Kinesiology.
13   Q.  What is kinesiology?
14   A.  The study of exercise science, human
15 movement.
16   Q.  What was your first job after college?
17   A.  It was a personal trainer.
18   Q.  Were you independent, or did you work for a
19 company?
20   A.  I worked for a business, yes.
21   Q.  Who did you work for?
22   A.  Philippi, Mark Philippi Sports Institute.
23   Q.  And how many years did you work with
24 Mark Philippi?
25   A.  Seven.

### Page 13

1    Q.  What was your next position after working
2 with Mark Philippi?
3    A.  I went over to Lifetime Fitness as a
4 personal trainer still.
5    Q.  And how long were you at Lifetime Fitness?
6    A.  A year; six months to a year.
7    Q.  After Lifetime, where did you go?
8    A.  Metro.
9    Q.  Was that the first time you had applied to
10 work at Metro?
11   A.  I think it was my second time.
12   Q.  When did you first apply?
13   A.  2012.
14   Q.  And why didn't you go into Metro at that
15 time?
16   A.  I didn't pass the written the first time.
17   Q.  What's required to be selected to take --
18 to join Metro and go to the Academy?
19   A.  A written exam, physical, background check,
20 polygraph, psych test.
21   Q.  Were there, like, any boards?
22   A.  Oral board.
23   Q.  So we've got the written exam, the
24 physical, the polygraph, the psych evaluation or test
25 and oral board.  Anything else?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 14

1    A.  Did I say the physical?
2    Q.  Yes.
3    A.  That's all I can remember for now.
4    Q.  In terms of the -- do you know how close
5  you were to passing in 2012, or did they just tell
6  you pass or fail?
7    A.  I think I was a couple of points away.
8    Q.  And did you pass all the other areas, to
9  your knowledge, in 2012?
10   A.  No.  Because I didn't pass the written and
11 I didn't move to the next step.
12   Q.  The written was the first step?
13   A.  First step.
14   Q.  Okay.  When did you next apply with Metro?
15   A.  Somewhere around 2013 or 2014.
16   Q.  And you passed the written at that point?
17   A.  Correct.
18   Q.  What was done for you in terms of the
19 psychological evaluation, do you recall?
20   A.  There was a psych test or multiple choice
21 questionnaire, and you met with the psychologist and
22 he just went over it.
23   Q.  Do you recall how long the multiple choice
24 questionnaire was?
25   A.  It was pretty lengthy, but I don't know.

Page 15

1    Q.  Were you ever provided with any written
2  records pertaining to your psych test?
3    A.  No.
4    Q.  Do you believe they're in your file at
5  Metro?
6    A.  I assume so.  I don't know.
7    Q.  What's your current classification?
8    A.  Police officer.
9    Q.  Is it PO II?
10   A.  PO II, correct.
11   Q.  How long have you been a PO II?
12   A.  At least two years.
13   Q.  What are your duties as a PO II?
14   A.  Respond to calls for service.  Proactive
15 stops.  Daily duties of a police officer.  I don't
16 know.
17   Q.  Did your duties change when you went from
18 PO I to PO II?
19   A.  No.
20   Q.  Is it basically just a difference in pay?
21   A.  Correct.  I'm off probation from PO I to
22 PO II.
23   Q.  When was your first date of service with
24 Metro?
25   A.  You're referring to the Academy date or

Page 16

1  commission patrol date?
2    Q.  Thank you for clarifying.  First let's
3  start with the Academy.
4    A.  It was April 16th, 2015.
5    Q.  Okay.  And when was your service date --
6  commission date?  Sorry.
7    A.  October 22nd, 2015.
8    Q.  What command are you presently stationed
9  with?
10   A.  Convention Center Area Command.
11   Q.  How long have you been there?
12   A.  Two years.
13   Q.  Prior to Convention Center Area Command,
14 where were you?
15   A.  I was in field training, but I was
16 stationed at Northwest Area Command.
17   Q.  When did you stop field training?
18   A.  February 2016.
19   Q.  You understand the incident that we're here
20 for today involves Tashi Farmer?
21   A.  Yes.
22   Q.  Sometimes you may hear me to refer to
23 Tashi Farmer, Tashi Brown.
24        Do you know what the date of the incident
25 was with Tashi?

Page 17

1    A.  I don't.
2    Q.  Does May 14th, 2017 sound about right?
3    A.  Yes.
4    Q.  Mother's Day?
5    A.  Yes.
6    Q.  What time did you start working that night?
7    A.  On that night I would have started at 2000
8  hours.
9    Q.  8:00 o'clock?
10   A.  Correct.
11   Q.  And at the time, again, you were with the
12 Convention Center Area Command?
13   A.  Correct.
14   Q.  Who was your lieutenant that night?
15   A.  Lieutenant Summers.
16   Q.  Who was your acting sergeant that night?
17   A.  Officer Wandick.
18   Q.  Where was Sergeant Crumrine in your chain
19 of command?
20   A.  He's my sister squad sergeant.
21   Q.  Did he have authority over you that night?
22   A.  Yes.  He's the sergeant.
23   Q.  So can you briefly tell me what the
24 procedure is when you start your shift?  Is there
25 roll call?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

6 (Pages 18 to 21)

Page 18

1    A.  There's a briefing.
2    Q.  Where does that briefing take place?
3    A.  At the Convention Center Area Command, the
4  briefing room.
5    Q.  And who conducts the briefing?
6    A.  It would have been the acting sergeant
7  then.  I don't remember, but it's always a sergeant
8  that does it.
9    Q.  And what types of things are discussed at
10  the briefing?
11    A.  What we're planning on doing the night,
12  what stops we're going to do, what directed patrol
13  activity we're going to conduct that night.
14    Q.  Do you recall what the briefing was about
15  that night?
16    A.  I don't.
17    Q.  So after you first start around 8:00, how
18  long does that briefing usually take?
19    A.  15, 20 minutes.
20    Q.  And I forgot to give you an instruction
21  earlier in the deposition.  From time to time I'm
22  going to ask you to estimate.  I just don't want you
23  to guess.
24    And so I know you're not guessing right
25  now, but you know the difference between an estimate

Page 19

1  and a guess, correct?
2    A.  Correct.
3    Q.  So about 15 or 20 minutes.  And then after
4  you have that first briefing, what's the normal
5  procedure?
6    A.  We get our patrol cars ready and go out on
7  the street, log on, go out on the street.
8    Q.  Where in the process do you get food?
9    A.  So that night we were -- we were stationed
10  for Safe Strip, so we have Safe Strip briefing at
11  midnight.  So between 8:00 to midnight we would find
12  an hour to go get food.
13    Q.  When do you typically get your meal after
14  first clocking in?
15    A.  If you're referring to that night, between
16  8:00 and midnight.
17    Q.  Do you have a regular practice?  Like, do
18  you usually get a meal right after you start, or do
19  you wait?
20    A.  That night compared to now, I'm on a
21  different schedule.  I'm not -- but if you're
22  referring to that night, on Safe Strip nights, we
23  always eat between 8:00 to midnight, somewhere around
24  there.
25    Q.  And then so you have this Safe Strip

Page 20

1  briefing, correct?
2    A.  Yes.
3    Q.  Where is that conducted?
4    A.  At the Wells Fargo Center on Koval and
5  Flamingo -- I'm sorry, Howard Hughes and Flamingo, I
6  think.
7    Q.  Where in the Wells Fargo Center?
8    A.  In the parking lot.
9    Q.  How many people are usually present,
10  roughly?
11    A.  20, 30 officers, maybe.
12    Q.  Who conducts that briefing?
13    A.  Usually a lieutenant.
14    Q.  Do you remember who conducted it that
15  night?
16    A.  I believe it was Lieutenant Summers.
17    Q.  And what goes into that briefing -- strike
18  that question.
19    What is discussed during that briefing?
20    A.  Our posts, where officers are supposed to
21  be stationed, what type of activities we should be
22  focusing on.
23    Q.  Okay.  And so you were going to be posted
24  at The Link?
25    A.  Correct.

Page 21

1    Q.  Did you have like a call name?  Is it
2  Link 1?
3    A.  Correct.  It's a call sign.
4    Q.  What's Link 1 stand for?
5    A.  We usually got assigned a call sign to the
6  property we were on.
7    Q.  Was there a Link 2?
8    A.  No.
9    Q.  So does Link 1 apply to you and Officer
10  Flores?
11    A.  Correct.
12    Q.  Do you remember getting a call from
13  Venetian 1 that night?
14    A.  I remember hearing Venetian 1 on the radio.
15    Q.  What do you recall hearing?
16    A.  I heard them ask for a Code Red.
17    Q.  And what's a Code Red?
18    A.  Usually we say Code Red when we need the
19  channel locked down for the officer and an emergency.
20    Q.  Anything else besides Code Red that you can
21  remember?
22    A.  No.
23    Q.  So what did you do in response to that Code
24  Red?
25    A.  My partner and I were already in our patrol

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 22

1 vehicle. And when we heard the Code Red, we heard
2 Venetian 1. And as I said earlier, officers are
3 assigned to -- call signed to their property.
4 Venetian was just north of us. So we got in our
5 vehicle and started driving over to the Venetian
6 property.
7 Q. So you get the call. When you get the
8 call, are you in the car at that time? Or are you
9 out of the car?
10 A. We were inside the car still.
11 Q. And do you recall where you were when you
12 were inside the car? Were you like in the parking
13 garage?
14 A. I was in the parking garage, correct.
15 Q. So what do you do next?
16 A. When I -- where am I starting from?
17 Q. Yeah. So you're in the car in the parking
18 garage. You hear the call come through. What do you
19 do next?
20 A. We exit the parking garage, lights and
21 sirens. And we -- there's a back alley that connects
22 the Venetian and the Link, and we drive towards the
23 Venetian.
24 Q. Okay. How long does it take you to get
25 to -- strike that.

Page 23

1         Can you estimate how long it takes you to
2 get to the scene?
3 A. Thirty seconds. It's right next door.
4 Q. Where do you park your vehicle?
5 A. As I'm pulling up into their loading dock
6 area, I see a patrol car, and I park right north of
7 that, and I exit.
8 Q. Can I just have you draw a diagram of just
9 where you parked. I would like you to indicate the
10 barrier, your vehicle, I believe Sergeant Crumrine's
11 vehicle, and where Tashi was with Sergeant Crumrine
12 and Kenneth Lopera.
13 A. Okay. So I'm not quite an artist.
14         So this would be the -- Sergeant Crumrine's
15 vehicle, the "X." And then the "O" would be where I
16 parked my car.
17         This is the -- they're back of the house
18 that leads to the valet up front here. And they're
19 right here by this pony wall.
20 Q. Okay. All right. I'm sorry, you said a
21 pony wall?
22 A. Yeah. I don't know what they're called.
23 Q. Like a barrier?
24 A. Yeah.
25 Q. It could be called pony wall?

Page 24

1 A. Yeah. It's a big piece of concrete you can
2 move around. I don't know what they're called.
3 Q. Okay. And were you parked on the same side
4 as Sergeant Crumrine? Like, was the barrier
5 separating your vehicles, or were you on the same
6 side of the barrier?
7 A. We were on the same side.
8 Q. How far did you park away from where
9 Crumrine, Lopera and Tashi were?
10 A. I don't know, 10 yards.
11 Q. About 20 feet-ish?
12 A. Yeah, 20, 30 feet.
13 Q. And what vehicle were you driving that day?
14 A. A Ford Explorer.
15 Q. Were you driving or was Officer Flores
16 driving?
17 A. I was driving.
18 Q. So you park your vehicle. What do you do
19 as soon as you park your vehicle?
20 A. I exit the vehicle. I remember trying to
21 get on the radio to give out our location, and I run
22 straight towards the officers that I saw by the
23 barrier wall.
24 Q. All right. So when you first run up,
25 Crumrine was on Tashi's legs and feet, correct?

Page 25

1 A. He was near the legs and feet, correct.
2 Q. When you say "near," I mean, he had his
3 hands around Tashi's legs and feet, correct?
4 A. Well, I mean, he was near -- at the time
5 when I got out of the vehicle and ran up, he was near
6 the legs. I don't know if he was on top or if he was
7 holding, but he was near the legs and feet, correct.
8 Q. Okay. All right. Can you just please
9 write your name there.
10 A. Anywhere?
11 Q. Yeah, anywhere.
12 A. Okay.
13         (Exhibit 19 was marked for
14         identification.)
15         MR. LAGOMARSINO: I'll get you guys a copy
16 on the break.
17         MR. MCNUTT: One of us can get a copy when
18 we get the transcript. That's fine.
19         MR. LAGOMARSINO: All right.
20         (Exhibit 1 was marked for
21         identification.)
22 BY MR. LAGOMARSINO:
23 Q. You had your deposition taken in a
24 different case involving Tashi Farmer; is that
25 correct?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 26

1    A.  Yes.
2    Q.  And you said you reviewed that before
3 today's deposition?
4    A.  Yes.
5    Q.  Going to page 26 -- well, this is a mini
6 deposition, so there's four pages on one page. But
7 if you go to the page on the bottom that says 26 to
8 29. So at line 17 of page 26, at the top left-hand
9 corner.
10    A.  17?
11    Q.  Yeah. So, sorry, so you'll see pages.
12 They go kind of horizontal.
13    A.  Okay.
14    Q.  The question was at line 17: "Did you
15 recognize the two officers?"
16    And what was your answer at lines 18 to 20?
17    A.  "I recognized one" -- do you want me to
18 read it? Is that what you're asking me?
19    Q.  Yes, please.
20    A.  "I recognized one officer that was on the
21 unknown subject's feet, feet area, but I did not -- I
22 could not see the other officer."
23    Q.  So when you say he was on his feet area,
24 what did you mean by that?
25    A.  He was near the unknown subject's feet.

Page 27

1    Q.  Was he just --
2    A.  Or legs area.
3    Q.  Was he just standing there, or was he in
4 physical contact with them?
5    A.  He was crouched down.
6    Q.  Did it appear to you that he was holding
7 his legs down?
8    A.  At the time, I just knew he was by his
9 feet. I don't know what force he was using, or if
10 any physical force.
11    Q.  What was Lopera doing when you first ran
12 up?
13    A.  They were laying on the ground.
14    Q.  On his side?
15    A.  Yes.
16    Q.  And Lopera was where? That's a vague
17 question. I'll rephrase.
18    Lopera was behind Tashi, correct?
19    A.  I'm sorry, because I've seen the videos and
20 I'm trying to -- I'm trying to recall from what I
21 specifically saw that night.
22    Q.  Well, and I may differentiate that, but
23 what I'm asking you right now is based on you watched
24 Lopera's body cam. You were there, and you've seen
25 some Venetian footage.

Page 28

1    So I'm just asking you the facts right now,
2 not necessarily what you recall from that night or
3 what you watched on video. Okay?
4    So when you first ran up, where was
5 Officer Lopera?
6    A.  He was on his side.
7    Q.  And was he behind Tashi?
8    A.  They were -- yes. They were both on their
9 side. He was behind.
10    Q.  And at that time, Lopera was holding onto
11 Tashi, correct?
12    A.  Correct.
13    Q.  And how was he holding onto him?
14    A.  He was holding him.
15    Q.  Did he have his arm around his neck?
16    A.  At the time, I didn't observe that.
17    Q.  Okay. All right. Let's get Exhibit 2.
18    (Exhibit 2 was marked for
19    identification.)
20 BY MR. LAGOMARSINO:
21    Q.  What is Exhibit 2?
22    A.  It's my FIT statement.
23    Q.  And go ahead and flip through it.
24    So there are page numbers on the bottom.
25 This is produced by Metro. It says LVMPD 1587

Page 29

1 through 1593. Is that what you have in front of you?
2    A.  Yes.
3    Q.  Okay. All right. It looks like there's --
4 is that the last page you have, or is there a page
5 behind that?
6    A.  No. It's the last page.
7    Q.  All right. So does this appear to be a
8 true and correct copy of your FIT statement?
9    A.  Yes.
10    Q.  And when did you give your FIT statement?
11    A.  The night of the incident.
12    Q.  And do you believe that your recollection
13 was better the night of the incident or today?
14    A.  As in, do I believe I know the facts more
15 today or the night of?
16    Q.  Well, not -- I'll differentiate. Based on
17 your independent recollection of the incident, not
18 counting the video surveillance that you watched or
19 video camera footage, would your memory be better
20 today or the night of the incident?
21    MR. ANDERSON: Objection. Form.
22    Go ahead.
23    THE WITNESS: Probably today. I mean...
24 BY MR. LAGOMARSINO:
25    Q.  Well, when you gave your FIT statement, you

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 30

1  were asked at 1590 -- so JL stands for Detective J.
2  Leavitt.  Do you know who that is?
3      A.  I do not.
4      Q.  And MT is Michael Tran, I'll represent.
5      So you state, "But as I turned I saw the
6  patrol vehicle parked right before the entrance --
7  right before the entrance of the, uh, Venetian."
8      And then Detective Leavitt says, "Okay,
9  perfect.  Yeah, if you'll go on to what you saw and
10 what you do from that point then."
11     What was your answer on the night of the
12 incident?  You can just read the whole thing into the
13 record.
14     A.  "Okay.  So as I pulled up, I saw the
15 vehicle.  I saw a green uniformed officer.  I didn't
16 know who it was so I jumped out.  As I ran up to the
17 uniformed officer, I saw another officer, uh, holding
18 a suspect on the ground in what appeared to be an
19 LVNR.  I went to grab the suspect's hands to cuff
20 him, and there was a cuff on one of the wrists -- I
21 want to say the left one.  So we're trying to pull
22 his arm out to get him cuffed, but it seemed like it
23 was wedged between either the officer and the LVNR
24 and the suspect's own back.  So I was trying to
25 pretty much pull it out and couldn't.  So I looked at

Page 31

1  the suspect, and he appeared to be out, like
2  unconscious.  So I told the officer, hey, I think
3  he's out, you can loosen up a little.  So as he
4  loosened up, we were able to pull his right arm back,
5  and my partner put a second cuff on his right arm and
6  cuffed it to..."
7      Q.  And then, interrupted, said "It's all
8  right," and then can you continue, please.
9      A.  Cuffed it to the -- "cuff that was already
10 on his left wrist.  After that we rolled him up or
11 rolled him on his back.  I attempted to do sternal
12 rubs and see if he would wake up.  I tried looking
13 for a pulse, but I couldn't find one.  I didn't know
14 if it was just -- if my adrenaline was flying or
15 what, but I couldn't find one when I was trying to do
16 that.  I sat him up, gave him some lower back taps to
17 see if that would wake him up.  I wasn't getting
18 anything out of him so I called -- well, I called for
19 medical.  After that, I think somebody else already
20 called for him, but I called for medical, cleared the
21 red, and waited for medical.  While we were waiting,
22 another couple units -- I know an FTO and his trainee
23 showed up, and while they were there they checked for
24 a pulse and they couldn't find one either.  So that's
25 when we uncuffed him and he started doing chest

Page 32

1  compressions on the suspect and medical showed up
2  shortly after."
3      Q.  So going back a little bit in time.  You
4  did handcuff Tashi; is that correct?
5      A.  Correct.
6      Q.  And do you have any recollection of Tashi
7  struggling at all?
8      A.  No.
9      Q.  Tashi did not struggle when you put the
10 handcuffs on him; is that correct?
11     A.  Not to my recollection.
12     Q.  And let me just get a clearer record
13 because it was kind of a double negative question.
14     Did Tashi struggle when you put the
15 handcuffs on him?
16     MR. MCNUTT:  Objection.  Form.
17     THE WITNESS:  No.
18 BY MR. LAGOMARSINO:
19     Q.  How much time can you estimate elapsed from
20 the time that you exited your vehicle when you first
21 got there to the time that you said loosen up?
22     A.  40 seconds.
23     Q.  And you said loosen up because he appeared
24 to be out, correct?
25     A.  Correct.

Page 33

1      Q.  And by "out," what do you mean?
2      A.  He was unconscious.
3      Q.  How long did it take you to handcuff him?
4      A.  40 seconds.
5      Q.  And during that entire time, you did not
6  observe whether he was conscious, correct?
7      MR. ANDERSON:  Objection.  Form.
8      THE WITNESS:  While I was attempting to
9  handcuff him, no.
10 BY MR. LAGOMARSINO:
11     Q.  Did you check to see if he was conscious
12 while you were attempting to handcuff him?
13     A.  On that night, my recollection is still --
14 from that night, what I remember was we couldn't get
15 his arm free to handcuff him.  And I looked down and
16 saw he was unconscious, and I told him loosen up.
17 That's when he loosened up, and we were able to get
18 his arm free to handcuff him.
19     Q.  When you say loosen up or he loosened up,
20 "he" is Lopera, correct?
21     A.  Correct.
22     Q.  Did you ever have a conversation with
23 Flores that night about the incident?
24     A.  I don't recall.
25     Q.  Eventually you were separated as partners,

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

Page 34

1   correct?
2       A.  Yes.
3       Q.  Why were you separated as partners?
4       A.  We weren't -- I transferred off the squad.
5       Q.  Why did you transfer off the squad?
6       A.  June.
7       Q.  But why?
8       A.  Oh, it was a better shift.  I got off
9   graveyard.
10      Q.  And you say "better shift," how many shifts
11  are there?
12      A.  At least three.
13      Q.  And is graveyard viewed as the worst shift?
14      A.  For me it is.
15      Q.  At the Academy, or at any training since
16  you graduated the Academy, were you ever taught what
17  a rear naked choke is?
18      A.  Never taught that.
19      Q.  So is it fair to say that since you did
20  not -- strike that.
21      Since you were not taught what a rear naked
22  choke is, you're not able to tell the difference
23  between a rear naked choke and an LVNR?
24      MR. ANDERSON:  Objection.  Form.
25      MR. MCNUTT:  Join.

Page 35

1       THE WITNESS:  I know what both look
2   like.
3   BY MR. LAGOMARSINO:
4       Q.  And how do you know what both look like?
5       A.  When I see on -- when I'm watching UFC or
6   any fights, and what I've learned in the Academy.
7       Q.  So your knowledge in terms of a rear naked
8   choke comes from UFC?
9       Let me rephrase the question.
10      So your knowledge about what a rear naked
11  choke is comes from UFC, correct?
12      A.  Yes.
13      Q.  Sorry.  And based on your observation of
14  Lopera that evening, he appeared to you to be in an
15  LVNR, correct?
16      A.  Yes.
17      Q.  Having watched the Lopera video, is it your
18  understanding that Lopera tased Tashi more than three
19  times?
20      A.  Yes.
21      Q.  And that would violate Metro's policy; is
22  that correct?
23      MR. MCNUTT:  Objection.  Form.
24      THE WITNESS:  Yes.
25

Page 36

1   BY MR. LAGOMARSINO:
2       Q.  Now, is it fair to say that you're only
3   allowed to use the five-second cycle when you tase a
4   person?
5       A.  Yes.
6       MR. MCNUTT:  Objection.  Form.
7   BY MR. LAGOMARSINO:
8       Q.  And if Lopera used his taser for nine
9   seconds, that would violate Metro's policy; is that
10  correct?
11      MR. MCNUTT:  Objection.  Form.
12      THE WITNESS:  Yes.
13  BY MR. LAGOMARSINO:
14      Q.  In watching Lopera's video, did you see
15  Lopera striking Tashi 10 to 12 times?
16      MR. MCNUTT:  Objection.  Form.
17      THE WITNESS:  I saw the strikes.  I don't
18  know how many there were.
19  BY MR. LAGOMARSINO:
20      Q.  Based on what you saw in the video, would
21  Lopera's use of strikes violate Metro's policy?
22      MR. ANDERSON:  Objection.  Form.
23      Go ahead.
24      THE WITNESS:  Depending on the suspect's
25  level of resistance.

Page 37

1   BY MR. LAGOMARSINO:
2       Q.  So let's clarify that.  If a suspect is
3   demonstrating aggressive resistance, strikes are
4   allowed, correct?
5       A.  Correct.
6       Q.  Was Tashi showing the level of resistance
7   that would allow strikes based on your review of the
8   video?
9       A.  Are you referring to Officer Lopera's
10  video?
11      Q.  Yes.
12      A.  I mean, I haven't seen it in so long, but I
13  wasn't there, but based on the video, no.
14      Q.  "No" what?
15      A.  No, the strikes were not necessary.
16      Q.  Okay.  An officer striking somebody on the
17  head could be potentially deadly force; is that
18  correct?
19      MR. ANDERSON:  Objection.  Form.
20      THE WITNESS:  Potentially cause injury.
21  BY MR. LAGOMARSINO:
22      Q.  When is striking a suspect allowed, in a
23  general sense?  Let's not talk about Tashi just for
24  this question.  In a general sense, when does Metro
25  policy allow an officer to strike a suspect?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

11 (Pages 38 to 41)

Page 38

1    A. During aggressive resistance of the
2 suspect. If he shows an intent to do harm to the
3 officer or others.
4    Q. Have you seen anything in this case that
5 indicates that Tashi was trying to do harm to the
6 officer or to another person?
7    A. Are you asking, reference the video again?
8    Q. Yes.
9    A. I mean, hindsight is 20/20, but not in the
10 video I saw.
11    Q. Are you able to estimate how much training
12 you received on the LVNR in the Academy?
13    A. I would estimate 40 hours.
14    Q. And then since October 22nd of '15, how
15 many hours would you estimate you've received of
16 training on the LVNR?
17    A. We do quarterly defensive tactics, but ten
18 hours. I'm estimating right now.
19    Q. Okay. When you do the quarterly defensive
20 tactics training, does it include -- it only LVNR
21 that you're receiving?
22    A. No, it's not.
23    Q. So did you receive LVNR training every time
24 you received defensive tactics training since October
25 of '15?

Page 39

1    A. Are you asking if I've done it every time?
2    Q. Right. Have you received LVNR training
3 every quarter since October of '15?
4    A. Not every quarter.
5    Q. How many hours of LVNR training would you
6 estimate you've received -- and maybe I asked you
7 this already, so let me just ask it again for
8 context, and I'll start over.
9        How many hours of LVNR training do you
10 estimate you've received since October of 2015?
11    A. Ten hours.
12    Q. Is it your understanding, based on your
13 training with Metro, that once a person is rendered
14 unconscious by any type of a neck restraint,
15 including the LVNR, that the person using the
16 restraint must release the hold?
17        MR. MCNUTT: Objection. Form.
18        THE WITNESS: Yes.
19 BY MR. LAGOMARSINO:
20    Q. Is it your understanding that the failure
21 to discontinue a hold in that situation constitutes
22 excessive force, as you were trained?
23        MR. MCNUTT: Objection. Form.
24        MR. ANDERSON: Objection. Form.
25        THE WITNESS: Yes.

Page 40

1 BY MR. LAGOMARSINO:
2    Q. I'm not talking about the night of the
3 evening, but in a general sense, an officer like
4 yourself who may see a person unconscious and still
5 in the LVNR is required by training to intervene; is
6 that correct?
7    A. Yes.
8    Q. Based on your training, what does intervene
9 mean to you? Intervene or intercede, we'll use those
10 interchangeably.
11    A. If the officer observes a reasonable force,
12 when it's safe to do so, they will verbal or physical
13 intervention.
14    Q. During the time that you were handcuffing
15 Tashi, was Crumrine still by his feet?
16    A. Yes.
17    Q. Based on your recollection, when is the
18 first time that Crumrine left the feet area of
19 Tashi?
20    A. I don't know.
21    Q. Did you ever see him, in relation to Tashi,
22 anywhere else on Tashi's body?
23    A. No.
24    Q. So you said loosen up, and then Lopera
25 released the hold, right?

Page 41

1    A. Yes.
2    Q. What did you do next?
3    A. We -- I checked to see if he had a pulse.
4 He didn't. I conducted some sternal rubs to see if I
5 could get any reaction out of him. Did some lower
6 back taps. I called for medical immediately.
7    Q. When you did that, was it clear to you that
8 he wasn't breathing?
9    A. Was it clear?
10    Q. Yeah.
11    A. He didn't have a pulse, but I don't have a
12 medical background, but I wouldn't say it was clearly
13 apparent that he wasn't breathing. I couldn't find a
14 pulse, but I don't know.
15    Q. Well, it was clear to you that he didn't
16 have a pulse and he was unconscious, correct?
17    A. Correct.
18    Q. What's the purpose of doing pump strikes on
19 the lower back?
20    A. We were taught in the Academy it helps, I
21 guess, wake the person up if they're unconscious.
22    Q. And if they're not reviving as a result of
23 those maneuvers, what's the next required step?
24    A. Request medical.
25    Q. Were you trained in your LVNR training that

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

12 (Pages 42 to 45)

Page 42

1  you're supposed to constantly monitor somebody who
2  has had LVNR applied to them if they've gone
3  unconscious?
4      A.  Can you clarify "constantly monitor"?
5      Q.  Well, what is your — let me restate the
6  question.
7          What is your understanding of your
8  obligation pursuant to your training when somebody
9  has had an LVNR applied to them and they're not
10  reviving?
11      A.  Request medical.
12      Q.  At Metro, were you trained on chest
13  compressions?
14      A.  Yes.
15      Q.  Were you trained that chest compressions or
16  CPR should be used immediately if somebody is not
17  reviving after an LVNR?
18      A.  I don't recall that.
19      Q.  Are you saying you weren't trained that
20  way, or you just don't recall?
21      MR. ANDERSON:  Objection.  Form.
22      THE WITNESS:  I don't recall that being
23  said or -- or one of the trainings on the LVNR.
24  BY MR. LAGOMARSINO:
25      Q.  Did Lopera check to see if Tashi was

Page 43

1  conscious, based on your recollection?
2      MR. ANDERSON:  Objection.  Form.
3      THE WITNESS:  Did Lopera check?
4  BY MR. LAGOMARSINO:
5      Q.  Yeah.
6      A.  No.
7      Q.  Did you have a recollection of ever seeing
8  Lopera check to see if he had a pulse?
9      A.  Physically check?
10      Q.  Correct.
11      A.  No.
12      Q.  Who sat Tashi up and tapped him on his back
13  along with yourself?
14      A.  I don't recall that actually.
15      MR. LAGOMARSINO:  Let's take a quick
16  five-minute break.
17      THE VIDEOGRAPHER:  We're going off the
18  record at approximately 10:59 a.m.
19      (Ms. Farmer and Ms. Day left the
20      room.)
21      (A recess was taken from 10:59 a.m.
22      to 11:18 a.m.)
23      THE VIDEOGRAPHER:  We're going back on the
24  record.  The time is approximately 11:18 a.m.
25

Page 44

1  BY MR. LAGOMARSINO:
2      Q.  Officer Tran, do you understand you're
3  still under oath?
4      A.  Yes.
5      Q.  All right.  Did you ever see Crumrine take
6  a pulse?
7      A.  No.
8      Q.  Did you ever see Crumrine tap Tashi's back?
9      A.  No.
10      Q.  Did you ever see Crumrine do a sternal rub?
11      A.  No.
12      Q.  And to be clear, you didn't see Lopera do
13  any of those things either; is that correct?
14      A.  Correct.
15      Q.  After you determined that Tashi was
16  unresponsive, how long did it take you to call
17  medical?
18      A.  Immediately.
19      Q.  And how did you go about calling medical?
20      A.  Using my radio.
21      Q.  And where were you when you called medical?
22      A.  Still at the scene, or right next to Tashi.
23      Q.  If you could please turn to Exhibit -- go
24  to Exhibit 1, page 58.
25      MR. MCNUTT:  58?

Page 45

1      MR. LAGOMARSINO:  Yes.
2  BY MR. LAGOMARSINO:
3      Q.  So on the top of page 58, line 2, question:
4  "All right.  How long did it take to get an ambulance
5  there?"
6          Answer:  "I don't recall."
7          Question:  "Estimate."
8          Answer:  "Three minutes."
9          Question:  "Pretty fast."
10          Answer:  "Three to five.  I don't know."
11          Is it about three to five minutes it took
12  the ambulance to get there, based on an estimate?
13      A.  I believe so.
14      Q.  During the time that you were waiting for
15  the ambulance -- strike that.
16          Is it fair to say that after you did the
17  sternal rub, the taps on the back and checking for a
18  pulse and calling medical, that you didn't do
19  anything else with respect to Tashi?
20      A.  Correct.
21      Q.  Now, at some point after you called medical
22  and the time that medical arrived, another field
23  training officer arrived at the scene, correct?
24      A.  Correct.
25      Q.  And he performed chest compressions; is

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

---

**Page 46**

1  that correct?
2      A.  Correct.
3      Q.  How long between the time you called
4  medical and the time that that field training officer
5  arrived?
6      A.  A minute.
7      Q.  Just estimating?
8      A.  I'm just estimating.  I don't know.
9      Q.  Do you understand that to be Amburgey?
10     A.  Correct.
11     Q.  Do you know him personally?
12     A.  He was working out of my station.
13  Acquaintance, coworkers.
14     Q.  Did you ever talk to him about this
15  incident --
16     A.  No.
17     Q.  -- after the incident?
18     A.  I'm sorry.
19     Q.  The answer is no?
20     A.  No.
21     Q.  Watching the video from Lopera's body cam,
22  did you see any attempt made by Tashi to hijack the
23  truck?
24         MR. ANDERSON:  Objection.  Form.
25         THE WITNESS:  Based off the video, no.

---

**Page 47**

1  BY MR. LAGOMARSINO:
2      Q.  You've been asked in your other deposition
3  whether you've said the words, "Let him go, Ken."  Do
4  you recall that question?
5      A.  Yes.
6      Q.  And your answer is that that was not you,
7  correct?
8      A.  Correct.
9      Q.  Do you believe that to be Crumrine as you
10  sit here today?
11     A.  Yes.
12     Q.  Now, when that statement was said, you were
13  on the scene, correct?
14     A.  Are you referring to the video again?
15     Q.  Yeah.
16     A.  On the video I was not on scene.
17     Q.  Okay.  All right.  Did you ever talk to
18  Officer Flores about having heard on the tape
19  Officer Crumrine saying "Let him go"?
20     A.  No, I don't recall it.
21     Q.  How does the video differ from your memory?
22     A.  You're referring to Lopera's body-worn
23  camera?
24     Q.  Well, the video that you watched, correct,
25  the body-worn camera.

---

**Page 48**

1      A.  All the statements that were said, I was
2  not present during the -- when they were said.
3      Q.  Okay.
4      A.  I'm sorry, what's -- can you repeat the
5  question?
6      Q.  Sure.  So let's break it down a little bit.
7  So you watched two videos, right?
8      A.  The Venetian camera one, and Lopera's
9  body-worn camera, correct.
10     Q.  So the Venetian, just for the record, is
11  the overhead surveillance, correct?
12     A.  Yes.
13     Q.  And the Lopera body cam is his body camera?
14     A.  Yes.
15     Q.  Let's break it down a little bit.  How does
16  your memory of the events differ, if at all, from the
17  Venetian surveillance?
18     A.  In my FIT statement, I stated that I
19  couldn't get his arm free, and I looked down at
20  Lopera and Tashi, and I observed Farmer unconscious.
21  And I said, hey, let him go, he's -- or loosen up,
22  he's out, loosen up.
23         Now that I -- the night of, I recall -- I'm
24  sorry.  Let me step back.
25     Q.  As compared to the surveillance camera?

---

**Page 49**

1      A.  Yeah.  Now I know the surveillance camera.
2  I handcuffed him first, and then looked down and saw
3  that Tashi Farmer was unconscious.  And I stated
4  loosen up, loosen up, he's out.
5         So those are the two differences.
6      Q.  Between what you remember and the Venetian
7  surveillance?
8      A.  Correct.
9      Q.  Now, you've alluded to it before, but just
10  so we have a clear record for the Court, what's your
11  difference in memory from the body cam footage and
12  your -- strike that.
13         What's the difference between your memory
14  of the incident and the body cam footage from Lopera?
15     A.  The same as the Venetian one.
16     Q.  Okay.  Based on your recollection and
17  review of the video surveillance and the body cam,
18  after Officer Lopera released the hold on Tashi,
19  Officer Lopera didn't do anything else with respect
20  to Tashi; is that correct?
21     A.  What do you mean?  Physically?
22     Q.  Correct.
23     A.  Physically, no.
24     Q.  From the time that you got to the scene
25  with -- strike that.

---

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

Page 50

1   You got to the scene with Officer Flores,
2 correct?
3   A. Yes.
4   Q. You both exited the car at the same time.
5   A. Yes.
6   Q. From the time that you got to the scene
7 until the time that Lopera released the hold, did
8 Flores do anything whatsoever to intervene?
9   A. We were both focused on taking Farmer into
10 custody.
11   Q. So the answer is no?
12   MR. ANDERSON: Objection. Form.
13 BY MR. LAGOMARSINO:
14   Q. Let me rephrase.
15   So turn to page 77 in your deposition.
16 It's in the bottom right-hand corner.
17   And the question was, in line 17: "From
18 the time that you got there until the time that
19 Officer Lopera released the hold, did Flores do
20 anything whatsoever to intervene?"
21   And what was your answer at lines 20 and
22 21?
23   A. "No. We were trying to take him into
24 custody."
25   Q. Is that accurate?

Page 51

1   A. Yes.
2   Q. Now, going to the next page, from the time
3 that you got to the scene to the time that Lopera
4 released the hold, did you see Sergeant Crumrine do
5 anything to intervene in terms of getting Lopera to
6 release the LVNR?
7   A. From the time I got to the scene?
8   Q. To the time the hold was released.
9   A. Did Sergeant Crumrine ask to intervene?
10   Q. Yeah.
11   A. No.
12   Q. Can you please turn to page 82 of your
13 deposition. There is a question at line 4. It says,
14 "Okay. Did you ever have a conversation with Officer
15 Flores about whether or not the hold that Officer
16 Lopera had around the neck of Mr. Farmer-Brown was a
17 lateral vascular neck restraint or a rear naked choke
18 hold?"
19   And the answer, "We both agreed that we
20 didn't know what it was."
21   Where do you -- can you expand on that?
22 What are you trying to say there?
23   A. I forgot the lawyer's name, but he asked if
24 we discussed whether or not we knew it was an LVNR
25 rear naked choke, and we both, through our

Page 52

1 recollection, we couldn't determine if it was a rear
2 naked or LVNR. We saw encircling arm.
3   Q. When did you have that conversation with
4 Officer Flores?
5   A. I don't know.
6   Q. Can you estimate? Within a month after the
7 incident? Three months?
8   A. Just definitely it was after our CIRT
9 review.
10   Q. Okay. And at the time that you gave your
11 FIT statement, you did believe that it was an LVNR,
12 correct?
13   A. It appeared to be an LVNR.
14   Q. Have you ever had the LVNR applied to you?
15   A. Yes.
16   Q. In training?
17   A. Yes.
18   Q. At the Academy?
19   A. Yes.
20   Q. Post Academy, have you ever had it applied
21 to you?
22   A. Yes. During our quarterly.
23   Q. And as part of the training, does Metro
24 allow you guys to be rendered unconscious?
25   A. No.

Page 53

1   Q. And why?
2   A. I don't know how to answer that question.
3   Q. Do you believe because it's too dangerous?
4   MR. MCNUTT: Objection to form.
5   MR. ANDERSON: Join.
6   THE WITNESS: You're asking my opinion on
7 it?
8 BY MR. LAGOMARSINO:
9   Q. Just your opinion.
10   A. I don't believe it's too dangerous, no.
11   Q. Then why doesn't Metro allow you guys to be
12 rendered unconscious?
13   A. I don't believe it serves the purpose of
14 training.
15   Q. How long did you have it applied to you
16 for?
17   A. Like?
18   Q. You had the LVNR applied to you. Would it
19 be ten seconds? Five seconds? Twenty seconds?
20   A. However long it takes my partner to learn
21 the training movement.
22   Q. And what level of LVNR did you have applied
23 to you?
24   A. All three levels.
25   Q. And since this incident, there's been a

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

15 (Pages 54 to 57)

Page 54

```
1    change in the policy regarding the use of the LVNR;
2    is that correct?
3        A. Yes.
4        Q. What's the change?
5        A. They moved the LVNR level one from low
6    level control to intermediate force.
7        Q. And were you trained as to why?
8        A. Why the policy changed?
9        Q. Right.
10       A. No.
11       Q. How were you notified that the policy
12   changed?
13       A. We have — I don't know how to describe it.
14   We have online policy releases that we have to review
15   that are mandatory quarterly.
16       Q. Did you agree with the change?
17       A. Yes.
18       Q. Do you receive a certification as part of
19   your LVNR training?
20       A. I do not.
21       Q. Is there a certification available for
22   LVNR, to your knowledge?
23       A. I don't know.
24       Q. Fair to say you're not LVNR certified; is
25   that correct?
```

Page 55

```
1        A. I'm certified in LVNR through the Academy.
2    I didn't receive -- are you saying receive a physical
3    certification handed to me? I mean, I'm certified in
4    driving the SUV, but I didn't receive a certified
5    physical certification, if you will.
6        Q. Okay. That's fair.
7        Obviously, when you pass all your classes
8    at the Academy you're approved to be a police
9    officer, right?
10       A. Correct.
11       Q. Were there separate individual
12   certifications that you've received since the
13   Academy? Like are you crisis intervention trained
14   certified, CIT?
15       A. Yes. CIT certified.
16       Q. That's a special certification, right?
17       A. Yes.
18       Q. Do you have a special certification for the
19   LVNR like you have for CIT?
20       A. I'm LVNR certified.
21       Q. Okay. Is there a certificate that you get?
22       A. I didn't receive a certificate.
23       Q. How do you know you're LVNR certified?
24       A. Because we trained the LVNR in the Academy,
25   and we took a written exam on the LVNR, and I passed
```

Page 56

```
1    the exams.
2        Q. Under your training, when a subject is not
3    resisting, regardless of whether he's unconscious, an
4    LVNR should not be applied, correct? Do you want me
5    to rephrase it?
6        A. Are you referring to this specific? Or
7    I'm — can you rephrase it? I'm sorry.
8        Q. Yeah, let's talk in general. In general,
9    if a suspect is not resisting after the LVNR has been
10   applied —
11       A. After, okay.
12       Q. Okay? Regardless of whether he's conscious
13   or not, the LVNR has to be stopped, correct?
14       A. No.
15       Q. All right. Can you please turn to page 89
16   of your deposition.
17       A. 80 what? I'm sorry.
18       Q. I apologize. 89.
19       So at line 13, it says, "What training have
20   you received as to when to stop compression on a
21   subject's neck?"
22       What did you say?
23       A. "When the subject's resistance is over and
24   if he's unconscious."
25       Q. And then the next question was, "Okay. So
```

Page 57

```
1    either he's not resisting or he's unconscious, in
2    which case he's not resisting."
3        And what was your answer?
4        A. "Can be the same."
5        Q. What training had you received prior to May
6    of 2017 as to how to determine if a subject is
7    unconscious?
8        A. LVNR training.
9        Q. Okay. So if the subject's eyes are closed,
10   that's an indicator, correct?
11       A. Correct.
12       Q. What are some other indicators that the
13   person is unconscious?
14       A. He's not responding to verbal commands.
15   Resistance levels.
16       Q. Have you ever sued somebody before?
17       A. I have not.
18       Q. Have you ever been sued besides this case?
19       A. I have not.
20       Q. Are you aware of what your -- what facts
21   you're admitting, denying with respect to Plaintiff's
22   first amended complaint in the case?
23       A. I'm not — I don't understand the question.
24   I'm sorry.
25       Q. Do you know what an affirmative defense is?
```

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 58

1  A. No, I don't.
2  Q. So fair to say you don't know what your
3  affirmative defenses are in this case? If you don't
4  know what --
5  A. I don't know what the term means, no.
6  Q. Okay. In watching Lopera's tape, did you
7  hear him say the phrase or question, "Is he out yet?
8  Is he out yet?"
9  A. In watching the video?
10  Q. Yes.
11  A. Yes, I heard it.
12  Q. As an officer, what do you understand he's
13  trying to say?
14  MR. ANDERSON: Objection. Form.
15  THE WITNESS: If he put the -- if the
16  subject was unconscious.
17  BY MR. LAGOMARSINO:
18  Q. Since Tashi wasn't resisting when he was
19  being handcuffed, he should not have had a neck
20  restraint on him; is that correct?
21  MR. MCNUTT: Objection. Form.
22  THE WITNESS: Can you repeat that?
23  BY MR. LAGOMARSINO:
24  Q. Sure. Can you please turn to page 90 of
25  your deposition. So you were asked the question at

Page 59

1  line 21, "So" -- we'll start back at line 18 on
2  page 90: "Now, Mr. Farmer" --
3  MR. MCNUTT: 90 or 91? I'm sorry.
4  MR. LAGOMARSINO: Starting at page 90,
5  line 18.
6  BY MR. LAGOMARSINO:
7  Q. The question was, "Now, Mr. Farmer wasn't
8  resisting during any time that you were handcuffing
9  him, right?"
10  And your answer?
11  A. "No."
12  Q. Meaning that he was not resisting, correct?
13  A. I didn't feel any resistance, no.
14  Q. And at line 21, "So during the time you
15  were handcuffing him, he should not have been having
16  a neck restraint placed on his neck, right?"
17  And what was your answer to that question?
18  A. "I wasn't there. I don't know what
19  transpired prior to my arrival. But based on the
20  video, I believe -- I guess not."
21  Q. Based on your training at Metro, did you
22  know as of May 14 of 2017, that if the LVNR was not
23  properly applied, the risk of severe injury
24  increases?
25  MR. ANDERSON: Objection. Form.

Page 60

1  MR. MCNUTT: Join.
2  THE WITNESS: Yes.
3  BY MR. LAGOMARSINO:
4  Q. Do you agree that maintaining the hold,
5  meaning the LVNR, beyond the time the subject of the
6  LVNR loses consciousness can lead to physical
7  complications? For example, the person can die?
8  MR. ANDERSON: Objection. Form.
9  THE WITNESS: Yes.
10  (Exhibit 3 was marked for
11  identification.)
12  BY MR. LAGOMARSINO:
13  Q. I've handed you what's been marked as
14  Exhibit 3. It looks like it's one, two, three --
15  five photos.
16  Do you have those in front of you?
17  A. Yes.
18  Q. And who is depicted in the first photo?
19  A. Officer Lopera.
20  Q. Does that appear to truly and accurately
21  depict him from the night of the incident to you?
22  A. Yes.
23  Q. The second photo, does that also appear to
24  be Officer Lopera from the night of the incident?
25  A. Yes.

Page 61

1  Q. Truly and accurately depicts him?
2  A. Yes.
3  Q. Third photo, does that truly and accurately
4  depict Officer Lopera from the night of the incident?
5  A. Yes.
6  Q. Fourth photo, does that truly and
7  accurately depict Officer Lopera from the night of
8  the incident?
9  A. Yes.
10  Q. Going to the fifth photo, what's depicted
11  in the fifth photo?
12  A. The scene.
13  Q. Is that your vehicle in the right of the
14  photo?
15  A. This SUV to the right of it? No.
16  Q. Do you know whose that was?
17  A. I do not.
18  Q. And does that appear to be Sergeant
19  Crumrine's vehicle in the middle?
20  MR. ANDERSON: Objection. Form.
21  THE WITNESS: It was a vehicle -- it was a
22  vehicle that was there when I pulled up. I believe
23  it was Crumrine's, yes.
24  BY MR. LAGOMARSINO:
25  Q. Okay. Without respect -- strike that.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 62

1 Without respect to who was driving which
2 vehicle, does that appear to truly and accurately
3 reflect the scene of the incident after Tashi was
4 taken away?
5 A. Yes.
6 Q. Were you wearing the same uniform as
7 Officer Lopera that evening?
8 A. Yes.
9 Q. Based on your review of the photos, what
10 weapons and other tools does Officer Lopera have on
11 his belt? Let's start with the first page.
12 A. You just want me to name what I'm seeing?
13 Q. Yes, sir.
14 A. From midline to the left, handcuffs, OC
15 spray, his firearm. And then on the other side is
16 magazines for his gun and his taser.
17 Q. I'm going to the fourth page, what's
18 depicted there?
19 A. From left to right, his flashlight, his
20 radio, his med kit, tourniquet, gloves in his back
21 pocket, baton, firearm.
22 Q. Did you also have a med kit like that?
23 A. I did not.
24 Q. What's in the med kit?
25 A. That's his personal. I don't know.

Page 63

1 Q. Does Metro require you guys to carry med
2 kits?
3 A. No. Not on our person.
4 Q. Have you ever seen -- strike that.
5 Have you seen other officers' med kit?
6 A. With med kits? Yes.
7 Q. Based on your observation, what's contained
8 in those kits?
9 A. I don't know. If I had to guess, bandages,
10 blood clots and tourniquets, scissors.
11 Q. Would you typically carry, like,
12 antibacterial wipes on your person?
13 A. Yes.
14 Q. And just have those in your pocket?
15 A. Yes.
16 Q. Are you a defensive tactics instructor?
17 A. No.
18 Q. Are you CIT certified?
19 A. Yes.
20 Q. What was your call sign at the time of the
21 incident?
22 A. Link 1.
23 Q. Sorry. I asked you that already.
24 In your FIT statement you mention that you
25 rode code. What does that mean?

Page 64

1 A. You initiate the lights and sirens of the
2 patrol vehicle.
3 Q. Were you talking to Officer Flores on the
4 way to the incident?
5 A. Yes. I don't recall what.
6 Q. Do you recall if you guys were checking the
7 MDT?
8 A. I was driving.
9 Q. Do you know if he was checking it?
10 A. I believe so.
11 Q. Did he tell you what was being revealed?
12 A. No.
13 Q. Now, at the time of the incident, you did
14 not -- strike that.
15 When you first got the call and you started
16 to drive there, was it Metro's policy that you were
17 supposed to activate your body camera at that time?
18 A. Yes.
19 Q. You did not do that; is that correct?
20 A. Correct.
21 Q. If you would have activated the camera, you
22 would have been able to hear what you had discussed
23 after 30 seconds of recording, correct?
24 MR. ANDERSON: Objection. Form.
25 THE WITNESS: Yes.

Page 65

1 BY MR. LAGOMARSINO:
2 Q. And Officer Flores did not activate his
3 body camera, to your knowledge; is that correct?
4 A. Correct.
5 Q. Same question, if he would have activated
6 his body camera, then we would have been able to hear
7 what you guys were talking about after 30 seconds,
8 correct?
9 A. Yes.
10 Q. At any point that evening, did you activate
11 your body camera?
12 A. Yes.
13 Q. When did you activate it?
14 A. After Farmer was taken into custody, I
15 believe I turned it on.
16 Q. Was your body cam activated when you were
17 doing the back pats?
18 A. I don't recall.
19 Q. Do you regularly forget to turn on your
20 body camera when you're supposed to?
21 MR. ANDERSON: Objection.
22 THE WITNESS: No.
23 BY MR. LAGOMARSINO:
24 Q. To your knowledge, has Officer Flores
25 expressed to you that he regularly forgets to

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1  activate his body camera?
2      MR. ANDERSON: Objection. Form.
3      THE WITNESS: He's never expressed -- we've
4  never discussed that.
5  BY MR. LAGOMARSINO:
6      Q. It's never come up one way or the other,
7  correct?
8      A. Yes, correct. It's never come up.
9      Q. What's the protocol on when you could turn
10  off your body camera?
11     A. When the scene is static, we can -- or if
12  we're discussing with the other officers, we can
13  deactivate the camera.
14     Q. Why are you allowed to deactivate the
15  camera when you're discussing a matter with the other
16  officers?
17     A. We're discussing police procedures that
18  sometimes we don't -- we don't want the public to
19  know, I suppose.
20     Q. All right. We'll go to Exhibit 4.
21         (Exhibit 4 was marked for
22         identification.)
23  BY MR. LAGOMARSINO:
24     Q. Go ahead and just flip through Exhibit 4.
25  My copy starts at 1937 and ends at 2006. Is that

Page 67

1  what you have in front of you?
2      A. Yes.
3      Q. Does this appear to be a true and correct
4  copy of your CIRT statement?
5      A. Yes.
6      Q. It was alleged -- strike that.
7         Was it alleged against you that you failed
8  to intervene properly in Tashi's case?
9      A. Yes.
10     Q. And who alleged that?
11     A. CIRT.
12     Q. It was also alleged that you failed to
13  activate your body-worn camera, correct?
14     A. Yes.
15     Q. Do you know who was on the CIRT team that
16  was investigating you?
17     A. The officers on this statement.
18     Q. Okay. So Hughes, Bledsoe, Ward and Hamm?
19     A. Hamm was my representative. Kirkegard was
20  the interviewing officer.
21     Q. Okay. Do you remember who was on your
22  Use of Force Board?
23     A. I do not.
24     Q. Do you remember -- maybe you don't remember
25  by name, but do you remember by rank or title who was

Page 68

1  on your Use of Force Board?
2      A. Captain Pelletier, Assistant Sheriff Kelly.
3  It was a lot of people there.
4      Q. Okay. And the -- how long did your Use of
5  Force Board last?
6      A. Two hours, three hours.
7      Q. Were you in the room with everybody for
8  about two or three hours?
9      A. Yes.
10     Q. After you were in the room, did the Board
11  go to deliberate, to your knowledge?
12     A. Did they leave?
13     Q. To go meet about your case.
14     A. I don't recall.
15     Q. How were you presented with the Board's
16  findings?
17     A. PowerPoint.
18     Q. So just to be clear, was it CIRT that
19  presented the PowerPoint?
20     A. Yes.
21     Q. And who was presenting for CIRT?
22     A. Kasey Kirkegard.
23     Q. And who was sitting with you at the Board?
24     A. My union rep.
25     Q. Did you also have an attorney?

Page 69

1      A. No.
2      Q. At the Board, was your union rep Hamm?
3      A. It was not.
4      Q. Who was it?
5      A. I can't remember his name.
6      Q. Brian Yant?
7      A. Yes. Yes, Brian Yant.
8      Q. And did he make statements on your behalf?
9      A. I don't believe so. I don't recall.
10     Q. Now, in this statement it says you waived
11  48 hours notice. What's 48 hour notice, to your
12  knowledge?
13     A. I believe it's a time frame to allow me to
14  speak with a rep or a lawyer.
15     Q. And you attempted to be truthful in this
16  interview; is that correct?
17     A. Yes.
18     Q. Did you talk to anybody else involved in
19  the Tashi incident after the incident about the
20  incident?
21     A. I don't recall.
22     Q. Are you on any social media applications?
23     A. Yes.
24     Q. Which social media applications have you
25  been on since May 14th of 2017?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 70

1    A.  Facebook, Instagram.
2    Q.  Snapchat?
3    A.  Yeah.  I have it.
4    Q.  WhatsApp?
5    A.  No.
6    Q.  The date of your CIRT statement was
7  5/19/17, which is about five days after the incident,
8  correct?
9    A.  Yes.
10   Q.  All right.  Now, going to page 12 of your
11  CIRT statement, at lines 13 through 21, did you
12  describe to CIRT that you saw the officer laying on
13  top of the suspect, which is Tashi Farmer?
14      MR. MCNUTT:  Objection.  Form.
15      THE WITNESS:  Yes.
16  BY MR. LAGOMARSINO:
17   Q.  And going to page 13, you were asked did it
18  appear as though they were taking the subject into
19  custody.  And your answer was no, correct?
20   A.  Yes.
21   Q.  Starting at the end of page 12, last line,
22  starts with "While you were running."  It says, "When
23  you noticed that he was laying on top of the suspect,
24  was there any verbal commands being given?"  And what
25  was your answer?

Page 71

1    A.  "I don't recall."
2    Q.  As you sit here today, do you recall verbal
3  commands being given to Tashi after you arrived?
4    A.  No.
5    Q.  As a police officer, if you were trying to
6  get a suspect to do something, are verbal commands
7  the proper way to do that?
8    A.  Yes.
9    Q.  Was any kind of in-custody plan
10  communicated to you when you arrived on the scene by
11  Crumrine or Lopera or Flores?
12   A.  No.  It was too dynamic of a scene to
13  formulate a plan.
14   Q.  Now, there's been some discussion about
15  Tashi's arm being wedged between his body and Lopera.
16  I just want to make it clear, did it appear that he
17  was intentionally wedging his arm between him and
18  Lopera?
19   A.  When you say "he," Farmer?
20   Q.  Yeah.
21   A.  Intentionally?  I know it was wedged
22  between, I don't know if it was him wedging it.
23   Q.  Okay.  All right.  Going to page 18.  So
24  the question at line 6 from Kirkegard:  "Okay, and I
25  don't mean to -- we're gonna really break -- break

Page 72

1  this down.  So I apologize if we're taking baby
2  steps.  Um, when you first run up, where do you stand
3  compared to the officer, subject to the sergeant?"
4      What is your answer at line 9?
5    A.  "So they're laying against, like a -- like
6  a -- like a wall, a barrier wall."
7    Q.  So were they physically up against the wall
8  or near it?
9    A.  Both.  They were pretty close to it.
10   Q.  Okay.  So you went towards Tashi's torso,
11  correct?
12   A.  Correct.
13   Q.  Why did you go towards his torso?
14   A.  Because Sergeant Crumrine was by his feet
15  and Mr. Farmer's arms are mid torso.  It's where I
16  want to be to take him into custody.
17   Q.  Okay.  And you were asked at line -- at
18  page 19 of your CIRT statement.  It says, line 4,
19  "Um, did it appear as though the LVNR was around the
20  throat, as you're saying, was applied properly?"
21      And what was your answer?
22   A.  "I don't know."
23   Q.  At the time, did you assess whether he was
24  properly applying the LVNR?
25   A.  At the time I was on scene?

Page 73

1    Q.  Correct.
2    A.  No.
3    Q.  Have you ever gone back and looked at the
4  video to make an assessment as to whether he was
5  properly applying the LVNR?
6    A.  I was shown the video, but I wasn't -- no.
7    Q.  At any time after you got to the scene, do
8  you have any recollection of Tashi being conscious?
9    A.  No.
10   Q.  Did you observe Lopera make any adjustments
11  to his LVNR other than releasing the LVNR after you
12  said loosen up?
13   A.  No.
14   Q.  At page 22 you were asked, it says, "Um,
15  also into the body-worn camera of Lopera at the
16  timestamp of 4:08."  Sorry, I'll start over.
17      At line 14.
18   A.  Okay.
19   Q.  "Officer Flores?  Um, also into the
20  body-worn camera of Lopera at the timestamp of 4:08,
21  someone is heard saying 'Loosen up.  Loosen up.'
22  Was that you?"
23      And what was your answer?
24   A.  "Yes."
25   Q.  And you were asking to loosen up because

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 74

1   you observed him to be out, correct?
2       A.  Yes.
3       Q.  And then did you say "somebody grab his
4   left arm" or "grab his left arm"?
5       A.  Is that on a page you're asking me to refer
6   to?
7       Q.  Well, my notes say it is.  Let me see here.
8       All right.  I'm sorry.  So at line 9, it
9   says, "And also, then, review of Officer Lopera's
10  body-worn camera, it's also -- we can hear someone
11  state 'grab his left arm' giving direction.  Is that
12  you?"
13      And what was your answer?
14      A.  "Yes."
15      Q.  Who were you directing to grab his left
16  arm?
17      A.  Officer Flores.
18      Q.  Did Flores follow your direction?
19      A.  Yes.
20      Q.  After Farmer was cuffed, was he placed in a
21  face-down position?
22      A.  No.
23      Q.  Did he end up in a face-down position?
24      A.  I don't recall.
25      Q.  Do you recall somebody -- strike that.

Page 75

1       At any time do you recall Farmer being on
2   his stomach while in handcuffs?
3       A.  No, I don't recall.
4       Q.  Would it be proper if a suspect or a
5   subject was face down or stomach down in handcuffs
6   behind him to then push his legs up to where his
7   heels are going to hit near his buttocks?
8       MR. ANDERSON:  Objection.  Form.
9       THE WITNESS:  I'm sorry, if he's on his
10  stomach?
11  BY MR. LAGOMARSINO:
12      Q.  Right.
13      A.  In handcuffs, would it be reasonable to
14  push his legs to his buttocks?
15      Q.  Right.
16      A.  For what reason?
17      Q.  For any reason.
18      A.  If the subject is still resisting, we could
19  cross his legs and restrain him from fighting us.
20      Q.  And do you understand that that could
21  present a risk of positional affixation?
22      MR. ANDERSON:  Objection.  Form.
23      THE WITNESS:  I believe if there's officers
24  on top of his -- on top of the subject, correct.  But
25  if we're just restraining his legs and nothing else,

Page 76

1   then I don't believe so.
2   BY MR. LAGOMARSINO:
3       Q.  Okay.  You called for medical, correct?
4       A.  Yes.
5       Q.  But you did not expedite medical, correct?
6       MR. ANDERSON:  Objection.  Form.
7       THE WITNESS:  I believe I called for
8   medical, and when I realized the severity of the
9   incident, I had medical expedite.
10  BY MR. LAGOMARSINO:
11      Q.  All right.  Can you please turn to page 26
12  of your CIRT statement.
13      All right.  So we'll start at line 1.  I'll
14  do the KK and then you can be MT.
15      So "Did you call for medical over the
16  radio?"
17      A.  "I did."
18      Q.  "Do you recall if you asked for them to
19  expedite?"
20      A.  "Um, no, I don't -- I don't recall, but
21  I -- I didn't -- I don't think I did, no."
22      Q.  "Didn't?"
23      A.  "I did not."
24      Q.  "Ask for ex-"?
25      A.  "I did not ask for expedite, no."

Page 77

1       Q.  "Okay.  But you did ask for medical, just
2   not to expedite?"
3       A.  "Yes."
4       Q.  Do you recall anywhere else in your CIRT
5   statement where you said, as you just testified, that
6   you later asked to expedite?
7       MR. ANDERSON:  Objection.  Form.  Misstates
8   testimony.
9       Go ahead.
10      THE WITNESS:  I don't recall in this
11  statement.
12  BY MR. LAGOMARSINO:
13      Q.  To you, is there a difference between CPR
14  and chest compressions?
15      A.  To me?  No.
16      Q.  After you determined that Tashi didn't have
17  a pulse, did you observe others try to take his
18  pulse?
19      A.  Yes.
20      Q.  And did you ask Officer Rybacki if Tashi
21  had a pulse?
22      A.  Yes.
23      Q.  And what did Officer Rybacki tell you?
24      A.  He shook his head no.
25      Q.  As part of your kinesiology degree, did you

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 78

1  receive any medical training at all?
2      A. Nothing formal, no.
3      Q. Did you ever take a class involving trauma
4  and illness?
5      A. I believe so, yeah.
6      Q. Is that Kinesiology 150 at UNLV?
7      A. You had to be a sports injury or a basic
8  EMT.
9      Q. What triggered you to turn your body cam
10 on?
11     A. Since the scene was static, the first thing
12 I remembered was I needed to turn my body camera on.
13     Q. When did the scene become static to you?
14     A. After Mr. Farmer was placed into handcuffs.
15     Q. How long have you been using a body cam?
16 Let me strike that.
17        Before May of 2017, how long had you been
18 using a body cam?
19     A. Since November of 2014.
20     Q. Can you give an estimate as to the total
21 amount of hours you've had training on body cam?
22     A. I mean, since November until May. I mean,
23 I don't know how many months that is. Six months --
24 six months.
25     Q. Okay. Six months' worth of training on the

Page 79

1  body cam?
2      A. Of using the body cam.
3      Q. Prior to May of '17 you had used your
4  body cam in stressful situations before; is that
5  correct?
6      A. Yes.
7      Q. And you were trained on the policy to turn
8  on your body cam while you were driving code; is that
9  correct?
10     A. Yes.
11     Q. And I don't mean this to be offensive, I've
12 asked this of the other witness: Have you ever been
13 diagnosed with a hearing problem?
14     A. No.
15     Q. That night or morning with Tashi, did you
16 do anything by accident?
17     A. Accident?
18     Q. Let me rephrase.
19        Do you believe you knew what you were doing
20 at all times?
21        MR. ANDERSON: Objection. Form.
22        THE WITNESS: Maybe not -- I mean, checking
23 for a pulse, I don't believe I was an expert at
24 finding a pulse. I didn't know if it was adrenaline
25 or...

Page 80

1  BY MR. LAGOMARSINO:
2      Q. Did you take a pulse by accident? Like you
3  knew when you were placing your hand on his neck that
4  you were checking his pulse, correct?
5      A. Correct.
6      Q. Was there anything else that you did that
7  night by accident, or did you just act according to
8  your training?
9      A. It was according to training.
10     Q. Had you ever socialized with Lopera before
11 this incident?
12     A. No.
13     Q. When you got to the scene, it did not
14 appear to you that the officers were struggling; is
15 that correct?
16        MR. MCNUTT: Objection. Form.
17        THE WITNESS: No.
18 BY MR. LAGOMARSINO:
19     Q. It's not correct?
20     A. No, they were not -- no, there was no
21 struggle.
22     Q. Are you familiar with the phrase "shrimping
23 out"?
24     A. Yes.
25     Q. What does "shrimping out" mean?

Page 81

1      A. We were taught that in the Academy,
2  defensive tactics, that if there's a subject or
3  suspect on top of you, to scoot away or frame the
4  suspect away from you and scoot your hips out to
5  escape.
6      Q. Did you see anybody shrimping out that
7  night?
8      A. No.
9      Q. Are you able to give an estimate as to how
10 many seconds passed from the time you started
11 interacting with Tashi until the time you saw his
12 right arm?
13     A. So the time I arrived until I got his right
14 arm?
15     Q. Yeah.
16     A. 15, 20 seconds.
17     Q. As an officer, is there a policy, to your
18 knowledge, one way or the other of officers cursing
19 at suspects?
20     A. I know we're not supposed to. I don't know
21 if there's a specific policy.
22     Q. Why are you not supposed to?
23     A. Just not polite.
24     Q. Do you know what the word "animus" means?
25     A. No, I do not.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

22 (Pages 82 to 85)

---

Page 82

1  Q.  Had you ever trained with Lopera before?
2  A.  No.
3  Q.  All right.  Going to page 66 of your CIRT
4  statement.  So question at line 14: "Okay, looking
5  back on this incident, is there anything you would
6  have done differently?"  And what was your answer at
7  line 16?
8  A.  "I should've started a CPR."
9  Q.  And why did you say that?
10  A.  In hindsight, when I realized Farmer passed
11  away, I should have started CPR.
12  Q.  And was that right when you determined that
13  he had no pulse?
14  A.  Yes.
15  MR. LAGOMARSINO:  All right.  Take our
16  lunch break.  We'll go off the record.
17  THE VIDEOGRAPHER:  We're going off the
18  record at approximately 12:17 p.m.
19  (A recess was taken from 12:17 p.m.
20  to 1:18 p.m.)
21  THE VIDEOGRAPHER:  We're going back on the
22  record.  The time is approximately 1:18 p.m.
23  BY MR. LAGOMARSINO:
24  Q.  Do you understand you're still under oath?
25  A.  Yes.

---

Page 83

1  Q.  Before May 14 of 2017, you had been trained
2  on the duty to intervene, correct?
3  A.  Yes.
4  Q.  And you knew that if another officer was
5  violating the constitutional rights of a citizen,
6  that you had to intervene to stop that, correct?
7  A.  Yes.
8  Q.  And that would include even if there was an
9  officer that was senior in rank to you, you would
10  have a duty to intervene, correct?
11  A.  Yes.
12  Q.  Now, at the point that you observed Tashi
13  to be in LVNR, you did not know why Lopera put him in
14  an LVNR, correct?
15  A.  Correct.
16  Q.  Based on your knowledge, what level of
17  resistance would Tashi have had to have exhibited in
18  order to allow Officer Lopera to use the LVNR on him?
19  A.  Aggressive.
20  Q.  There are how many levels of the LVNR?
21  A.  Three.
22  Q.  Could you tell at that time what level
23  Lopera was using?
24  A.  No.
25  Q.  Even after watching the video, could you

---

Page 84

1  tell?
2  A.  No.
3  Q.  And you did not ask Lopera what level of
4  LVNR Tashi was in, correct?
5  A.  No.
6  Q.  That's correct, right?
7  A.  Correct.  I did not.
8  Q.  Sorry.
9  A.  Sorry.
10  Q.  How many times have you personally used the
11  LVNR in the field?
12  A.  I've never used it.
13  Q.  Have you had the opportunity to use it and
14  chose not to?
15  A.  No.
16  Q.  You're post certified, correct?
17  A.  Yes.
18  Q.  What was the outcome of your review board?
19  A.  I was sustained for not having -- turning
20  on my body camera.
21  Q.  And on the charge for failure to intervene,
22  what happened with that?
23  A.  They didn't find any violation of the duty
24  to intervene.
25  Q.  The board excused your conduct with respect

---

Page 85

1  to the intervening, correct?
2  A.  Correct.
3  Q.  How did you find out about the decision?
4  A.  At the review board.
5  Q.  Did they announce it verbally?
6  A.  I believe so, yeah.
7  Q.  Did anybody testify at the proceeding?
8  A.  As in answer questions?
9  Q.  Yes.
10  A.  I did.  Officer Crumrine, Officer Flores,
11  Officer Lift.
12  Q.  What's Lift's first name?
13  A.  Ashley.
14  Q.  Are there two Lifts, to your knowledge?
15  A.  I don't know.  No.
16  Q.  Do you know what documents were introduced
17  at the review board?
18  A.  I can't remember.  I don't recall.
19  Q.  There was a PowerPoint?
20  A.  Yes.
21  Q.  What were the consequences for the body
22  camera issue for you?
23  A.  Contact -- a written contact.
24  Q.  What does that mean?
25  A.  That your sergeant spoke to you about

---

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

23 (Pages 86 to 89)

Page 86

1  operating your body camera, or -- the policy I
2  violated basically.
3      Q.  And does that -- is that in writing or a
4  verbal?
5      A.  It's in writing.
6      Q.  And does that get removed from your file
7  after a certain amount of time?
8      A.  A year.
9      Q.  One year?
10      Do you wear corrective lenses?
11      A.  Correct, yes.
12      Q.  Were you wearing them that night?
13      A.  Yes.
14      (Exhibit 5 was marked for
15      identification.)
16  BY MR. LAGOMARSINO:
17      Q.  I'm handing you Exhibit 5, which is marked
18  P000052.  It's a page from the autopsy report,
19  Alane M. Olson, M.D.
20      It says, "Cause of death:  It is my opinion
21  that this 40-year-old black male, Tashii S. Brown,
22  died as a result of asphyxia due to police restraint
23  procedures."
24      Do you know of any reason -- strike that.
25      Do you disagree with that opinion?

Page 87

1      MR. ANDERSON:  Objection.  Form.
2      THE WITNESS:  I don't know enough to agree
3  or disagree.
4      (Exhibit 6 was marked for
5      identification.)
6  BY MR. LAGOMARSINO:
7      Q.  Have you ever seen Exhibit 6 before?
8      A.  No.
9      Q.  This is the force investigation team
10  report.  It is 35 pages.
11      I'm sorry, you said you may have?
12      A.  I have never seen this, no.
13      Q.  So I'll just ask a couple of questions
14  here.
15      Going to page 4 of 35.  You list persons
16  involved here:  Kenneth Lopera, Travis Crumrine,
17  Tashi Farmer.
18      You were also involved, correct?
19      A.  Correct.
20      Q.  Going to the next page, page 5 of 35.  I
21  see where it says Collective Bargaining Associations.
22      A.  Yes.
23      Q.  So it shows Officer Bryan Yant, correct?
24      A.  Yes.
25      Q.  As you mentioned before, he was your union

Page 88

1  rep with respect to this incident?
2      A.  He was at my Use of Force Board.  This
3  attorney was there the night of the incident.
4      Q.  Okay.  Did you talk to Bryan Yant before
5  the Use of Force Board?
6      A.  No.
7      Q.  Did you talk to him after?
8      A.  After the Use of Force, yes.
9      Q.  Okay.  Did he advise you on certain things?
10      A.  No.
11      Q.  What did you talk to him about?
12      A.  I don't recall.  I mean, we talked
13  afterwards.
14      Q.  And I don't want to misstate your
15  testimony, but did you state earlier that he spoke on
16  your behalf at the Use of Force Board?
17      A.  He spoke for me, no.
18      Q.  Did he speak about you?
19      A.  I don't recall.  I mean, he was my union
20  rep at the time.
21      Q.  Do you recall him speaking at all?
22      A.  Yes.
23      Q.  And do you recall what he spoke about?
24      A.  I don't, no.
25      Q.  Did he speak to the Board in your presence?

Page 89

1      A.  Yes.
2      (Exhibit 7 was marked for
3      identification.)
4  BY MR. LAGOMARSINO:
5      Q.  Did you know Bryan Yant's history with
6  officer-involved shootings?
7      A.  Yes.
8      Q.  I've handed you what's been marked as
9  Exhibit 7.  It's an article from the Las Vegas
10  Review-Journal, September 21st, 2014, titled
11  Las Vegas Cop Behind Controversial Killing Now
12  Influential Union Leader.
13      The first sentences reads:  "Detective
14  Bryan Yant was the face of incompetence at the
15  Metropolitan Police Department, a poster child for
16  wrongful shooting deaths and million-dollar payouts,
17  a driving force behind sweeping reforms to the
18  agency's deadly force policies."
19      Did you view him in that way?
20      A.  No.
21      MR. ANDERSON:  Object to the form.
22  BY MR. LAGOMARSINO:
23      Q.  Then it says:  "In other cities, an officer
24  who kills an unarmed man under suspicious
25  circumstances and is accused of lying to cover his

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

24 (Pages 90 to 93)

---

Page 90

1   tracks might be prosecuted. In Las Vegas, Yant kept
2   his job. And he's taken on a job that will make him
3   more influential at Metro."
4        It says, "Part of Yant's duties include
5   advising officers in police shootings."
6        Did Yant advise you at any time of
7   anything?
8        A.  Officer Yant was only at my Use of Force
9   Board. He was not there the night of the incident.
10       Q.  Did he ever advise you as to your rights at
11  the Use of Force Board or what to expect?
12       A.  He told me the process, yes.
13       Q.  It says, "He's a huge asset to the union,
14  Collins said. Bryan Yant lived through the hell of
15  being in a police shooting."
16       Then the next page it says, quote:  "When
17  he goes out in these situations, he can tell somebody
18  that's like biting a shit sandwich. You're not going
19  to like it, but you'll get through it."
20       Did he say something like that to you or
21  something to that effect?
22       A.  No.
23       Q.  It says, "Yant has more experience with
24  police shootings than just about everyone at Metro."
25       Is that your understanding?

---

Page 91

1        A.  I didn't -- no, I don't know anything about
2   that.
3        Q.  It says, "Most police officers never fire
4   their weapons, but Yant shot three people, killing
5   two men and wounding a third, in his first ten years
6   on the job."
7        At the time that he was with you at the Use
8   of Force Board, do you know his history in that
9   regard?
10       A.  No.
11       Q.  It says, "He shot and killed Richard Travis
12  Brown after a foot pursuit in 2001."
13       Did you know about that incident?
14       A.  Not at the time, no.
15       Q.  When did you first learn about that
16  incident?
17       A.  I didn't know Officer Yant's history until
18  way after the Use of Force. I don't know a time
19  frame. Months later.
20       Q.  Who told you about his history?
21       A.  To be frank, I don't know. It was just
22  brought up.
23       Q.  After you learned, did you learn that he
24  had killed Richard Travis Brown, who I think was also
25  called the Candy Bar Robber?

---

Page 92

1        A.  No.
2        Q.  It says, "Two years later, he shot and
3   wounded Melvin Gilchrist after mistaking a baseball
4   bat for a gun."
5        Did you know about that incident?
6        A.  No.
7        Q.  It says, "Both shootings had significant
8   problems, with Yant's version of the events failing
9   to match either evidence at the scene or witness
10  testimony."
11       And then the article goes into the shooting
12  of Trevon Cole.
13       Did you ever hear about the shooting of
14  Trevon Cole?
15       A.  Yes.
16       Q.  When did you first hear about that?
17       A.  Around the same time of Officer Yant's
18  officer-involved shootings.
19       Q.  Did you ask Officer Yant about his
20  officer-involved shootings?
21       A.  No.
22       Q.  Going back to the FIT report. So going to
23  page 10 of 35. So I think you are aware of this, but
24  I'll just make it clear for the record. The times
25  here are the times on Officer Lopera's body cam. If

---

Page 93

1   you could go to page 7.
2        I'll just read it. It says, "Officer
3   Lopera was wearing a body-worn camera at the time of
4   the incident. The camera was activated at 00:54:14
5   on 5/14/17. The camera was collected by Sergeant
6   MacDonald and secured. The video footage captured
7   was later viewed by detectives."
8        And then it says, "Officer Lopera's camera
9   footage depicted the following."
10       So that's going to be seconds to the right
11  of the colon and then minutes to the left of the
12  colon. Okay?
13       A.  Okay.
14       Q.  All right. So it says -- going back to
15  page 10, at 3 minutes 25 seconds in, it says:
16  "Officer Tran arrived and said, 'Let him go, Ken.'"
17       I know you've already stated that you did
18  not say "Let him go, Ken," but do you dispute that
19  that's the time that you arrived, or do you know?
20       A.  I didn't arrive at that time because I
21  never said, "Let him go, Ken."
22       Q.  Okay. And I'm aware of your testimony that
23  you said -- and I think Officer Crumrine said the
24  same thing, that he said, "Let him go, Ken."
25       My question is not whether you said it, but

---

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

25 (Pages 94 to 97)

Page 94

1  do you know if you were there when it was said?
2       A.  I don't recall hearing any of this
3  conversation when I arrived, so I don't believe I was
4  there.
5       Q.  Now, two seconds later, it says, "Officer
6  Lopera stated, 'Roll him to -- hold on.  Don't grab
7  my fucking legs.'"
8            You do have a recollection of that,
9  correct?
10      A.  Correct.  That I remember.
11      Q.  So at least as of two seconds after the
12 "Let him go, Ken," you were there, correct?
13      A.  I do recall him say, "Don't grab my fucking
14 legs."  So you're asking me, I was there at that
15 moment?
16      Q.  You were there when he said, "Don't grab my
17 fucking legs," right?
18      A.  Correct.
19      Q.  And then it says, "Officer Tran stated
20 'We're on top of him.'"
21           Did you say that, or do you know?
22      A.  I don't recall saying that.
23      Q.  And not to suggest -- I'm just trying to
24 make a clear record.  You don't recall saying it, or
25 you don't know if you said it, or you just deny

Page 95

1  saying it?
2       A.  More -- I'm leaning more towards I don't
3  recall, and I deny saying it as well.
4       Q.  Okay.  Can you please turn to page 25 of
5  35.  Go ahead and -- do you have a pen there still?
6       A.  Yes.
7       Q.  So there's a summary written by whoever
8  wrote this document of what you said in a recorded
9  statement.  We can probably go to the recorded
10 statement to verify, but what I would like to have
11 you do is read this to yourself, and then underline
12 anything that you feel is inaccurate under your name.
13      A.  So this paragraph?
14      Q.  Yes, sir.
15      A.  This appears accurate.
16           MR. ANDERSON:  Could I just clarify, Andre.
17 Are you asking him whether this is accurate as to
18 what he told FIT, or whether it's accurate as to his
19 memory today?  Does that make sense?
20           MR. LAGOMARSINO:  Correct.  Okay.  So let
21 me rephrase.
22      BY MR. LAGOMARSINO:
23      Q.  Is there anything inaccurate in this
24 paragraph as you recall the incident today?  Either
25 through your personal being there or through

Page 96

1  reviewing video footage?
2       A.  Well, the line, "When Officer Lopera
3  loosened up on the LVNR, Farmer was able to be placed
4  in handcuffs," to this day now, I realize he was
5  placed in handcuffs, and then I said loosen up.  And
6  I observed Farmer unconscious, and I said loosen up.
7       Q.  So when you placed him in the handcuffs, he
8  was still in the LVNR, and that's when you said
9  loosen up?
10      A.  Correct.  After I had the -- I placed the
11 handcuffs on Mr. Farmer.  I looked down and observed
12 he was unconscious.  I told Officer Lopera to loosen
13 up, and he released the hold.
14      Q.  Are you familiar with the term "rescue
15 breathing"?
16      A.  I'm not.
17           (Exhibit 8 was marked for
18            identification.)
19      BY MR. LAGOMARSINO:
20      Q.  Exhibit 8 is just an article that we
21 printed from online.  It looks like it's written by
22 somebody who says they're an EMT.
23           But I want to go ahead and ask you if you
24 agree or disagree with some of the statements in
25 here, okay?

Page 97

1            So it says:  "A study of CPR patients in
2  Arizona found that gasping breaths (often called
3  agonal respirations) are common soon after cardiac
4  arrest."
5            Do you know what gasping breaths are in
6  relation to agonal respirations?
7       A.  I'm assuming somebody struggling to
8  breathe, but I don't know the term.
9       Q.  So next thing it says, "When it doubt do
10 CPR."
11           It says, "If you're looking at a person who
12 can't wake up and aren't sure if he is breathing, he
13 probably isn't."
14           Do you agree with that?
15           MR. ANDERSON:  Objection.  Form.
16           THE WITNESS:  I'm not an EMT, but I'm not
17 sure if I agree or disagree.  I don't know.
18      BY MR. LAGOMARSINO:
19      Q.  It says, "When the heart stops pumping hard
20 enough to get blood all the way from the lungs to the
21 brain and back, we call it cardiac arrest."
22           Is that your understanding?
23           MR. ANDERSON:  Objection.  Form.
24           THE WITNESS:  Yes.
25

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

26 (Pages 98 to 101)

Page 98

BY MR. LAGOMARSINO:
Q.  "Trained rescuers recognize cardiac arrest by feeling the patient's carotid pulse (located on the side of the neck.)"
Do you agree with that?
MR. ANDERSON: Objection. Form.
THE WITNESS: Yes.
BY MR. LAGOMARSINO:
Q.  Are you a trained rescuer by Metro?
A.  I'm CPR certified, and I don't know the definition of trained rescuer.
Q.  You are CPR certified, correct?
A.  In the Academy I was, yes.
Q.  It says, "If there's enough blood flowing by on the way to the brain, there will be a pulse."
Is that your understanding?
A.  Yes.
Q.  Do you recall seeing Tashi gasping?
A.  I do not.
Q.  Are you able to recite the standard under the Fourth Amendment to the United States Constitution with respect to how much force a police officer can use in making an arrest?
A.  How much force?
Q.  Yes.

Page 99

A.  Objectively reasonable to the police officer.
Q.  At Metro, you were trained on how not to violate a suspect's constitutional rights, correct?
MR. ANDERSON: Objection. Form.
THE WITNESS: Correct.
BY MR. LAGOMARSINO:
Q.  As a police officer at the time, did you believe that a police officer could use the LVNR to kill somebody?
MR. ANDERSON: Objection. Form.
THE WITNESS: Could you repeat the question? I'm sorry.
BY MR. LAGOMARSINO:
Q.  Sure. Did you believe that, in general, a police officer can use the LVNR to kill somebody?
A.  The LVNR does fall under deadly force. Aggravated aggressive resistance.
Q.  So yes?
A.  Yes.
Q.  Did you believe at the time that Lopera was allowed to use the LVNR to kill Tashi?
MR. ANDERSON: Objection. Form.
THE WITNESS: Did I believe at the time Lopera had reasonable -- an objectively reasonable

Page 100

decision to use the LVNR?
BY MR. LAGOMARSINO:
Q.  To kill Tashi?
MR. ANDERSON: Objection. Form.
THE WITNESS: I don't understand the question.
BY MR. LAGOMARSINO:
Q.  What don't you understand about the question?
A.  You're asking me if I thought Lopera should have used LVNR to kill the person?
Q.  Right.
A.  I wasn't there at the time the force was used. I'm not sure what you're...
Q.  Yes or no?
MR. ANDERSON: Objection. Form.
MR. MCNUTT: Same.
THE WITNESS: I don't know how to answer the question. Can you repeat the question one more time, please?
BY MR. LAGOMARSINO:
Q.  Sure. No problem.
At the time, as an officer arriving on the scene, did you believe at that time that Lopera was authorized to use the LVNR for purposes of deadly

Page 101

force on Tashi?
MR. ANDERSON: Objection. Form.
THE WITNESS: I didn't know enough facts or circumstances at the time to determine that.
BY MR. LAGOMARSINO:
Q.  You never criticized Officer Lopera, correct?
MR. ANDERSON: Objection. Form.
MR. LAGOMARSINO: Strike that.
BY MR. LAGOMARSINO:
Q.  You never criticized Officer Lopera's conduct at the scene, correct?
A.  No.
Q.  Let me give you a hypothetical question. So if you're on patrol and -- let me start over. I'm just giving you these facts. If you want more clarification feel free to ask.
So you're on patrol. A person approaches you and says where's a drinking fountain, and then starts running away from you. Are you allowed to arrest the person based on those facts?
MR. ANDERSON: Objection. Form.
THE WITNESS: Arrest?
BY MR. LAGOMARSINO:
Q.  Right.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 102

1    A.  I don't believe there's enough for an
2  arrest.  I believe there's enough -- I mean, I would
3  have to see more, you know, what the body language,
4  what he was -- why he needed the water.  I mean,
5  people ask for me directions all the time, and before
6  I say anything they just start walking away.  I don't
7  think that's enough.  But body language, sweating,
8  bloodshot eyes, there's a lot more.
9    Q.  There's a lot of people with bloodshot eyes
10  on the Strip on the weekend, right?
11    A.  Yep, that's too.
12    Q.  And unless you see more, you're not
13  arresting them, correct?
14    A.  No.
15    Q.  Now, when you told Ken Lopera to stop, did
16  you tell him to stop because you believed that he was
17  violating Tashi's constitutional rights?
18    MR. MCNUTT:  Objection.  Form.
19    MR. ANDERSON:  Join.
20    THE WITNESS:  I told him loosen up because
21  I observed Mr. Farmer unconscious and was already
22  in custody, so there was no -- there's no need to
23  have the restraint on him.
24    BY MR. LAGOMARSINO:
25    Q.  Did you, I guess my question is -- I'll

Page 103

1  withdraw the question.
2    (Exhibit 9 was marked for
3    identification.)
4    BY MR. LAGOMARSINO:
5    Q.  So Exhibit 9 is an LVNR test.  The second
6  page is the answers.
7    Don't look at the answers.
8    MR. MCNUTT:  Do you want to make that 10?
9    MR. LAGOMARSINO:  We'll get to that.
10    BY MR. LAGOMARSINO:
11    Q.  So what I would ask you is to grab your
12  pen, and can you go ahead and write in what are the
13  four physiological factors that establish control for
14  the LVNR.
15    MR. MCNUTT:  I'll just object to this line
16  of questioning.  Depositions are not tests for
17  witnesses, but...
18    MR. ANDERSON:  Join.
19    BY MR. LAGOMARSINO:
20    Q.  You can go ahead and write it down.
21    MR. ANDERSON:  If he gets it right, he
22  better get a T-shirt.
23    THE WITNESS:  I don't know.
24    BY MR. LAGOMARSINO:
25    Q.  All right.  Going to number 2, what are the

Page 104

1  three levels of control for the LVNR?
2    Going to number 3, the use of the LVNR
3  impedes flood flow to and from the brain, true or
4  false?
5    Number 4, if rendered unconscious, then
6  subject is generally -- sorry.  If rendered
7  unconscious, the subjects generally revive in 5 to
8  20 seconds, true or false.
9    5, true or false, the neck brace principle
10  refers to the fact that the subject's neck is
11  prevented from moving forward or laterally when being
12  restrained by the LVNR, true or false?
13    And 6, the hand of the encircling arm must
14  be palm down, true or false.
15    Go ahead and just finish 7, 8, 9 and 10.
16    All right.  And then just under name, can
17  you write your name, please, at the top.
18    (Exhibit 10 was marked for
19    identification.)
20    BY MR. LAGOMARSINO:
21    Q.  So Exhibit 10 are going to be screenshots
22  from Lopera's body cam.  I'm going to just ask just a
23  couple of questions on whether you can identify
24  people in certain pictures.
25    So on the first page, are you able to --

Page 105

1    MR. MCNUTT:  Andre, just for clarification,
2  have these been produced, or are these screenshots
3  that you printed from the videos?
4    MR. LAGOMARSINO:  These are videos that
5  have been produced by Metro, and these are
6  screenshots printed from video.
7    MR. MCNUTT:  Okay.
8    BY MR. LAGOMARSINO:
9    Q.  All right.  Are you able to identify
10  anybody on the first page?
11    MR. MCNUTT:  Are these -- I have another
12  question.  Are these all from one body-worn camera,
13  or are they from various officers' body-worn cameras?
14    MR. LAGOMARSINO:  These are all from the
15  same body camera.  You'll see 468(35).
16    MR. MCNUTT:  So this whole exhibit is from
17  one body-worn camera, one officer's body-worn camera?
18    MR. LAGOMARSINO:  It's from Officer
19  Lopera's body-worn camera.
20    MR. MCNUTT:  Okay.
21    THE WITNESS:  I'm sorry, what am I doing
22  now?
23    BY MR. LAGOMARSINO:
24    Q.  We're going to go through and see if you
25  can identify some of these people for us.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 106

1 And then as we go through, if you don't
2 mind just writing down page numbers.
3 So we're on page 1. Do you recognize
4 anybody there?
5 A. I think that's Flores.
6 Q. Okay. So can you just go ahead -- you can
7 write on the exhibit.
8 A. Like circle them and then...
9 Q. Yeah.
10 A. (Witness complies.)
11 Q. And then just as we're going through, so we
12 have a clear record, if you can write the page
13 numbers. So that will be page 1.
14 A. Okay.
15 Q. Going to page 2, it looks like at 4:37 into
16 the camera, what have you written down?
17 A. Santana.
18 Q. That's the gentleman looking at the camera?
19 A. Yes.
20 Do I need to circle Flores again if I
21 already wrote that it was Flores?
22 Q. Yeah. I'm sorry, Flores.
23 A. (Witness complies.)
24 Q. Going to 4:37 again. So you've identified
25 Santana and Flores again?

Page 107

1 A. Yes.
2 Q. Does it look like you kind of bending over?
3 A. Yes.
4 Q. Are you able to tell without seeing the
5 actual video what's actually going on here?
6 A. They were checking him for pulse or -- no,
7 I can't tell.
8 Q. So going to 5:08, does that appear to be
9 Crumrine?
10 A. Yes. Do you want me to write Crumrine?
11 Can I just circle his name?
12 Q. Yes.
13 MR. MCNUTT: His name tag kind of gives it
14 away.
15 BY MR. LAGOMARSINO:
16 Q. Going to number 5. So Crumrine was on 4.
17 Going to 5 at 5:47. Are you able to tell who is who?
18 A. I can't.
19 Q. Okay. Going to 6 at 5:49, are you able to
20 tell who's who?
21 A. I think that's Flores again.
22 Q. Okay.
23 MR. MCNUTT: Which one is Flores? Can you
24 just point to it so I can see? Oh, on the right?
25 Okay.

Page 108

1 BY MR. LAGOMARSINO:
2 Q. Going to 7 at 6:08, does that appear to be
3 Rybacki in front of you?
4 A. Yes.
5 Q. Sorry, is that Rybacki in front of the
6 camera?
7 A. Yes.
8 Q. And then walking towards the camera is
9 Flores?
10 A. Correct.
11 Q. Are you able to tell who the female is on
12 the ground?
13 A. I cannot.
14 Q. At 6:23, it appears to be Flores in front
15 of the camera, correct?
16 A. Yes.
17 Q. All right. At 6:45, are you able to
18 identify anybody?
19 A. No.
20 Q. Are you able to -- does it appear that
21 Tashi Farmer is still handcuffed?
22 A. Yes.
23 Q. 6:46, page 10, it looks like we've got
24 Flores there, correct?
25 A. Are you asking? Yes. I'm sorry.

Page 109

1 Q. And then does it appear that you're in the
2 crosswalk there? Or is that not --
3 A. Yes. This is me right here.
4 Q. We've got the next page, Flores again.
5 A. Correct.
6 Q. And page 12, that's Lift?
7 A. Yes.
8 Q. And going on to page 13, are you able to
9 see the female officer holding onto Tashi Farmer's
10 head?
11 A. Yes. I make it out, yes.
12 Q. And this is at 7:13, correct? On the
13 camera?
14 A. Yes.
15 Q. Still by 7:13, there's no CPR or chest
16 compressions being performed, correct?
17 MR. ANDERSON: Objection. Form.
18 THE WITNESS: Yes.
19 BY MR. LAGOMARSINO:
20 Q. Going to 7:22. Again, do you see the
21 female officer holding the head that way?
22 A. Yes.
23 Q. Why is his head being held that way?
24 A. If I recall correctly, the officer behind
25 him is the one that starts chest compressions. But I

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 110

1    don't know what he's doing at this moment.
2        Q.  Okay.  Going to the next page, which is 15,
3    do you remember Lopera giving a thumbs up on this
4    body cam footage?
5        MR. MCNUTT:  Objection.  Form.
6        THE WITNESS:  I don't recall.
7    BY MR. LAGOMARSINO:
8        Q.  Going to page 16, now it's 7:25.  Is Tashi
9    still on his side being held by the female officer?
10       MR. MCNUTT:  Objection.  Form.
11       THE WITNESS:  Is she holding his head?  Is
12   that what you're asking?
13   BY MR. LAGOMARSINO:
14       Q.  Yes.
15       A.  Yes.
16       Q.  7:29, same question.  Is the female officer
17   holding his head on the side?
18       A.  Yes.
19       Q.  Same question at 7:36, is the female
20   officer holding his head on the side?
21       A.  No.  It looks like her hand is on the
22   floor.
23       Q.  Do you see Crumrine in that shot on
24   page 18?
25       A.  On page 18 or 19?  Yes.

Page 111

1        Q.  So -- I'm sorry, just for the record, on
2    page 18 -- I'm probably numbering them wrong on my
3    own page.
4        MR. MCNUTT:  Can you give a timestamp,
5    please?
6        MR. LAGOMARSINO:  Yeah.  Can you let me
7    finish?  I'm trying to get there.
8    BY MR. LAGOMARSINO:
9        Q.  I've got page 16 at 7:25.  Is that --
10       A.  Yeah.  I'm not there.
11       Q.  So we've got 16 at 7:25; 17 at 7:29; 18 at
12   7:36.
13       So at 18 you'll see Crumrine, correct?
14       A.  Yes.
15       Q.  And is that Flores to the left of Crumrine?
16       A.  Yes.
17       Q.  19 at 7:40 timestamp, it appears that
18   compressions still have not started, correct?
19       MR. ANDERSON:  Objection.  Form.
20       THE WITNESS:  Yes.
21   BY MR. LAGOMARSINO:
22       Q.  And are you basing that because
23   compressions don't start until he's out of his
24   handcuffs and on his back, correct?
25       A.  Correct.

Page 112

1        Q.  Skip the next, 20.  Going to page 21 at
2    9:06, still compressions have not started, correct?
3        A.  Correct.
4        Q.  And then at 22, 9:14 timestamp,
5    compressions have still not started, correct?
6        A.  Correct.
7        Q.  All right.  Do the pictures that we've
8    discussed appear to you to truly and accurately
9    depict stills of the video footage that you watch
10   from Officer Lopera's body cam?
11       MR. MCNUTT:  Objection.  Form.
12       MR. ANDERSON:  Objection.
13       THE WITNESS:  I've actually not watched
14   this portion of his body camera.  The only portion I
15   watched was when he was still on the ground with
16   Mr. Farmer.  I was never shown this.
17       MR. LAGOMARSINO:  Okay.  All right.  We'll
18   go to Exhibit 11.
19       (Exhibit 11 was marked for
20       identification.)
21   BY MR. LAGOMARSINO:
22       Q.  I've handed you two photos from a different
23   body cam.  Body cams that we received were not
24   identified by officer, so we were just referring to
25   them by number.  We'll send the interrogatory to

Page 113

1    counsel to identify whose is whose.
2        But this is from camera 468(13).  Can you
3    identify the person depicted in this shot?
4        A.  Yes.
5        Q.  Who is that?
6        A.  Officer Serrano.
7        Q.  Is he on your squad?
8        A.  Not currently.
9        Q.  Was he on your squad that night?
10       A.  I believe so.
11       Q.  And again, the next page we have Flores,
12   correct?
13       A.  Correct.
14       MR. LAGOMARSINO:  Okay.  All right.  We're
15   going to just take about a five-minute break, and
16   then we'll start to get into a few of the videos.
17       MR. MCNUTT:  Andre, so you don't know whose
18   body-worn camera this one was, right?
19       MR. LAGOMARSINO:  Correct.
20       MR. MCNUTT:  And no timestamps on the first
21   page?
22       MR. LAGOMARSINO:  Correct.
23       MR. MCNUTT:  Okay.
24       THE VIDEOGRAPHER:  We're going off the
25   record at approximately 2:05 p.m.

## Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

Page 114

1    (A recess was taken from 2:05 p.m.
2    to 2:13 p.m.)
3    THE VIDEOGRAPHER:  We're going back on the
4    record at approximately 2:13 p.m.
5    BY MR. LAGOMARSINO:
6    Q.  Do you understand you're still under oath?
7    A.  Yes.
8    Q.  Can I ask you some questions about some of
9    these videos.  You may or may not have seen portions,
10   as you've already testified to, but I'm going to see
11   if some of this refreshes your recollection, or if
12   you have any personal knowledge based on what's
13   represented there.  Okay?
14   So the first video record is 468(35).  And
15   I'll represent this is Lopera's body cam footage.  So
16   we're at 3:06 on the timestamp, so we'll go ahead and
17   press play.
18   (Playing video.)
19   BY MR. LAGOMARSINO:
20   Q.  So as we discussed already, there's
21   somebody that says, "Let him go, Ken."  He says, "Are
22   you sure," and then he says "Yeah."
23   And it's your testimony that's not you,
24   correct?
25   A.  Correct.

Page 115

1    MR. LAGOMARSINO:  All right.  Let's press
2    play.
3    (Playing video.)
4    BY MR. LAGOMARSINO:
5    Q.  So you were present for that, correct?
6    A.  Yes.
7    Q.  Having now watched the video, do you
8    believe you were present when he said, "Let him go,
9    Ken," two seconds earlier?
10   A.  So if you play it back, and you hear the
11   car radio say, "The rear of the Venetian," that's us
12   exiting the vehicle saying we're in the rear of the
13   Venetian.
14   Q.  Okay.
15   A.  So it happens simultaneous, so I don't
16   know.
17   Q.  Okay.  That's helpful.
18   All right.  So let's go back to 3:20.  So
19   before we press play, that siren and the car coming
20   and then the siren getting shut off is your car or
21   your vehicle, correct?
22   A.  Correct.
23   Q.  And then you said there was something about
24   being at the rear of the Venetian.  Is that your
25   voice or Flores?

Page 116

1    A.  I was trying to keep up at the same time,
2    but that was Flores' traffic.
3    Q.  All right.  Let's go through it.
4    (Playing video.)
5    MR. LAGOMARSINO:  Let's go back to 3:10.
6    (Playing video.)
7    MR. LAGOMARSINO:  Press pause.
8    BY MR. LAGOMARSINO:
9    Q.  So the siren ends at about 3:14, correct?
10   On the timestamp?
11   A.  Correct.
12   (Playing video.)
13   BY MR. LAGOMARSINO:
14   Q.  Based on the time that the sirens stopped
15   at about 3:13, I'm assuming you then just got out of
16   the vehicle and went to the scene.  Do you believe
17   that you were able to get to the scene within
18   10 seconds?
19   A.  Yes.
20   Q.  Okay.
21   (Playing video.)
22   BY MR. LAGOMARSINO:
23   Q.  We're at 4:14 for the record.
24   What's going on just before 4:14 that we
25   just watched?

Page 117

1    A.  It looks like we were putting handcuffs on
2    him.
3    Q.  Okay.
4    (Playing video.)
5    BY MR. LAGOMARSINO:
6    Q.  All right.  When he says, "Move, move,
7    thank you," what was going on there?  It appears,
8    just for the record, that it's at this point just
9    before 4:21 that Lopera disengages; is that correct?
10   A.  Correct.
11   Q.  So Lopera has released him at this point;
12   is that your understanding?
13   A.  Yes.
14   Q.  And then he steps away?
15   A.  And then he what?
16   Q.  And then he steps away, correct?
17   A.  Yes.
18   Q.  Is that the barrier you're talking about?
19   A.  Yes.
20   Q.  At 4:22.  Okay.
21   (Playing video.)
22   BY MR. LAGOMARSINO:
23   Q.  At 4:36, we looked at some stills that may
24   resemble this.  Is that Flores there in the green?
25   A.  Yes.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 118

1    Q.  And we can't see you or see you clearly at
2   this point, correct?
3    A.  No.
4    Q.  All right.
5        (Playing video.)
6   BY MR. LAGOMARSINO:
7    Q.  So a few seconds ago we heard "roll
8   medical." Was that Lopera?
9    A.  I believe so.
10   Q.  Okay.  All right.
11       (Playing video.)
12  BY MR. LAGOMARSINO:
13   Q.  At 5:45, does it appear that medical is
14  being rendered at this point?
15   A.  Not in the form of chest compressions.  I'm
16  not sure what they're doing.
17       (Playing video.)
18       MR. LAGOMARSINO:  I want to get Crumrine in
19  the shot with a frame by frame.  Frame by frame.
20       (Playing video.)
21  BY MR. LAGOMARSINO:
22   Q.  Does it appear that at 6:33 that's Crumrine
23  kind of near the crosswalk area?
24   A.  Yes.
25       (Playing video.)

Page 119

1   BY MR. LAGOMARSINO:
2    Q.  At 6:43, is that you standing next to
3   Crumrine?
4    A.  Yes.
5        (Playing video.)
6   BY MR. LAGOMARSINO:
7    Q.  We heard somebody say, "I think he's still
8   out." Does that appear to be Lopera to you?
9    A.  I actually missed that.  I didn't hear it.
10       MR. LAGOMARSINO:  Let's go back five
11  seconds.
12       (Playing video.)
13  BY MR. LAGOMARSINO:
14   Q.  "I think he's still out," does that appear
15  to be Lopera's voice to you?
16   A.  I believe so, yeah.  Can you play it one
17  more time?  I actually keep missing it.
18       MR. LAGOMARSINO:  Let's go to 6:40, Denise.
19       (Playing video.)
20       THE WITNESS:  Yeah, it sounds like Lopera's
21  voice.
22       (Playing video.)
23  BY MR. LAGOMARSINO:
24   Q.  Now, we have other videos, too, but do you
25  see yourself at this point just taking out the hand

Page 120

1   wipes and putting them on your hands?
2    A.  Yes.
3    Q.  Is that because at this point you feel like
4   your involvement in resuscitating him or rendering
5   aid to him is complete?
6    A.  The scene is static, and I was just making
7   sure my hands were -- there's nothing contagious on
8   my hands.
9    Q.  Right.  I mean, did you believe at that
10  point that you were going to get back involved?
11   A.  The scene is static.  I mean, we asked for
12  medical, we're waiting for medical to arrive.  There
13  was -- I'm not a medical practitioner, so I didn't
14  know what else to do.
15   Q.  Okay.
16       (Playing video.)
17       MR. LAGOMARSINO:  Going to the next video
18  on the same disc.  So for the record it's UOFLVNR2.
19  It's a three-minute video.
20       And this is not, I don't believe this is
21  Lopera's footage, but I want to ask you some
22  questions about it, okay?
23       (Playing video.)
24  BY MR. LAGOMARSINO:
25   Q.  Is that your body cam?

Page 121

1    A.  Yes.
2    Q.  So let's start from the beginning and watch
3   it all the way through.
4        So just for the record, can you drag that
5   video down a little bit so I can see the title.  So
6   it's UOFLVNR2.
7        But based on what we've seen it appears to
8   be your body cam, correct?
9    A.  Yes.
10       (Playing video.)
11  BY MR. LAGOMARSINO:
12   Q.  I hear you say, "I don't show any," but I
13  can't make out exactly what you're saying.
14   A.  I think I say, "I don't know, Bro.  I don't
15  feel a pulse," but I don't know.
16       (Playing video.)
17  BY MR. LAGOMARSINO:
18   Q.  So now we're at one minute in.  Have you
19  asked for medical yet?
20   A.  I already asked for medical.
21   Q.  Was that audible on the recording?  I don't
22  know, I didn't hear it.
23   A.  It was.
24   Q.  Okay.  Where did you -- let's go back and
25  start it at about 30 seconds.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 122

1      A.  It was before this.
2      Q.  Oh, okay.  You can't hear it on the video,
3  correct?
4      A.  Correct.
5      Q.  All right.
6          (Playing video.)
7  BY MR. LAGOMARSINO:
8      Q.  Who is saying "block that street?"  Is that
9  you?
10     A.  No.  That's Officer Young.
11     Q.  Then why do you go back to your car or your
12  vehicle?
13     A.  Because my vehicle is blocking an ingress
14  for FT.
15         (Playing video.)
16  BY MR. LAGOMARSINO:
17     Q.  So here at 1:55, there's just a search
18  going on, correct?
19     A.  Correct.
20         (Playing video.)
21  BY MR. LAGOMARSINO:
22     Q.  And it's at this point I think in the
23  screen at 2:04 you've got the anti-bacterials,
24  correct?
25     A.  Correct.

Page 123

1          (Playing video.)
2  BY MR. LAGOMARSINO:
3      Q.  Who is the individual in the green in
4  between the two officers?
5      MR. ANDERSON:  Officer Crevettes
6  (phonetic).
7  BY MR. LAGOMARSINO:
8      Q.  Do you know who the other two officers
9  are?
10     A.  The male officer is Officer Amburgey.  I
11  don't know the -- that's his field training trainee.
12         (Playing video.)
13  BY MR. LAGOMARSINO:
14     Q.  Do you know why it was the field training
15  officer that was the one to do the chest
16  compressions?
17     A.  I don't know.
18     Q.  Did you ever hear if he was using it as a
19  training exercise for the trainee?
20     MR. ANDERSON:  Object to the form.
21     THE WITNESS:  I don't know.  No.
22         (Playing video.)
23  BY MR. LAGOMARSINO:
24     Q.  So at least on your camera, over two
25  minutes passed after you said you don't feel

Page 124

1  anything, and still no chest compressions, correct?
2      MR. MCNUTT:  Objection.  Form.
3      MR. ANDERSON:  Join.
4      THE WITNESS:  Correct.  But I asked Officer
5  Crevettes if he found the pulse, and he nodded in the
6  camera, in the video.
7  BY MR. LAGOMARSINO:
8      Q.  Okay.  All right.  And based on your
9  training, you think just the pulse is enough to not
10  do any chest compressions or resuscitation, correct?
11     MR. ANDERSON:  Objection.  Form.
12     THE WITNESS:  Based on my training, I
13  believe so.
14     MR. LAGOMARSINO:  All right.  That was
15  Exhibit 12.  So just for the record, I know you guys
16  have these, but it's Exhibit 12 that has those two
17  videos.
18         (Exhibit 12 was marked for
19          identification.)
20     MR. LAGOMARSINO:  Let's go to Exhibit 13,
21  which is 468(13).
22     MR. MCNUTT:  And we don't know who this
23  is?
24     MR. LAGOMARSINO:  Just again, Counsel,
25  Metro produced this body camera footage videos.  They

Page 125

1  didn't identify which officer was which, but they
2  individually identified by number.  And so we're
3  going to be sending an interrogatory to Metro, and
4  they'll tell us whose this camera is.
5          (Playing video.)
6  BY MR. LAGOMARSINO:
7      Q.  I just want to be clear on something,
8  .  Mr. Tran.  Is it your testimony that Metro does not
9  train you to perform CPR on an individual who has an
10  LVNR applied to him if he's unresponsive?
11     MR. ANDERSON:  Objection.  Form.
12     THE WITNESS:  We're trained in the LVNR.
13  We're trained in CPR in the Academy.
14  BY MR. LAGOMARSINO:
15     Q.  Okay.
16     A.  If the subject is rendered unconscious, we
17  call for medical.
18     Q.  Okay.  So if the LVNR goes bad, you have to
19  wait until whenever medical comes to figure out
20  what's going to happen?
21     MR. ANDERSON:  Objection.  Form.
22     THE WITNESS:  I mean, there's no policy
23  that says we have to wait or we have to start
24  compressions.  I don't know.
25         (Playing video.)

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 126

1 BY MR. LAGOMARSINO:
2     Q. So let's back it up five seconds. So
3 there's a few conversations here. I want to ask you
4 who's talking right now right there.
5     So pause at 4:07. Who is that in the
6 screen?
7     A. Right there, right in front?
8     Q. Yes, sir.
9     A. Officer Serrano.
10     Q. Okay.
11     (Playing video.)
12 BY MR. LAGOMARSINO:
13     Q. Who is talking right now at 4:14?
14     A. Officer Flores.
15     Q. Okay. When he said, "Lopera, got him in a
16 lock," that's who you're saying is Flores?
17     A. Yes.
18     Q. All right. So let's go back again to like
19 4:09.
20     (Playing video.)
21 BY MR. LAGOMARSINO:
22     Q. I'll represent coming up somebody is going
23 to say -- it doesn't appear to be Flores, but it
24 could be -- "he was out when we got here." Okay? So
25 I want to see if you recognize that voice.

Page 127

1     (Playing video.)
2 BY MR. LAGOMARSINO:
3     Q. Did you hear somebody say he was already
4 out?
5     A. I didn't, no.
6     Q. Okay. Let's play is again.
7     (Playing video.)
8     THE WITNESS: I heard something in the
9 background. I don't know what was said.
10     (Playing video.)
11 BY MR. LAGOMARSINO:
12     Q. So he says "He was out, he was already
13 out." Who said that?
14     A. I don't know.
15     Q. Okay.
16     (Playing video.)
17     MR. LAGOMARSINO: So that was Exhibit 13.
18     (Exhibit 13 was marked for
19     identification.)
20 BY MR. LAGOMARSINO:
21     Q. Going to Exhibit 14, 468(20), two minutes.
22     (Exhibit 14 was marked for
23     identification.)
24 BY MR. LAGOMARSINO:
25     Q. There's a female at the end who is talking

Page 128

1 to somebody, and she says, "Turn your camera off." I
2 want to ask you if you recognize the voices at the
3 end of the video. So you can kind of go to the last
4 30 seconds.
5     (Playing video.)
6 BY MR. LAGOMARSINO:
7     Q. Who is that officer in the screen?
8     A. This officer in the screen?
9     Q. To the right, yeah.
10     A. That's Officer Stutzman.
11     Q. And do you know who is speaking when she
12 said "turn your camera off"?
13     A. I heard her say "we were inside," so if I
14 had to guess it would be Officer Lift.
15     (Playing video.)
16     MR. LAGOMARSINO: All right. So that was
17 15? Was that 15?
18     MS. VALDIVIA: That was 14.
19     MR. LAGOMARSINO: 14? Okay.
20     MR. MCNUTT: So we're marking this as 15 or
21 we're marking this as 16?
22     MR. LAGOMARSINO: 16. We're skipping 15.
23 15 is quite long. We can put it in if you would like
24 me to do that.
25     (Exhibit 16 was marked for

Page 129

1     identification.)
2     MR. LAGOMARSINO: So press play.
3     (Playing video.)
4     MR. LAGOMARSINO: Okay. At this point
5 pause it.
6 BY MR. LAGOMARSINO:
7     Q. This is the part where you're trying to get
8 Tashi to sit up, correct?
9     A. You would have to keep playing. I don't
10 know what we're doing here.
11     MR. LAGOMARSINO: All right.
12     So press play from the beginning.
13     (Playing video.)
14 BY MR. LAGOMARSINO:
15     Q. Do you see at, it looks like 10 seconds,
16 Tashi's feet are crossed and placed behind him?
17     A. Yes.
18     Q. Do you know why that is?
19     A. It's a tactic that we're taught to control
20 the subject from fighting or moving.
21     Q. Okay. All right.
22     (Playing video.)
23 BY MR. LAGOMARSINO:
24     Q. Is that you right there?
25     A. Yes.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

34 (Pages 130 to 133)

Page 130

1          MR. LAGOMARSINO: Pause.
2   BY MR. LAGOMARSINO:
3          Q.   At 39 seconds that's you checking vitals,
4   correct?
5          A.   Yes.
6             (Playing video.)
7   BY MR. LAGOMARSINO:
8          Q.   Do you believe this to be Flores' camera?
9          A.   Yes.
10             (Playing video.)
11   BY MR. LAGOMARSINO:
12          Q.   Is that where you called for medical?
13          A.   No.   We called for medical in the
14   beginning.
15          Q.   Okay.
16             (Playing video.)
17          MR. LAGOMARSINO:   Just for the record,
18   that was what video number?   That was 468(27)?   Okay.
19          All right.   Let's take a quick break, and I
20   think we'll have about 20 minutes left.
21          THE VIDEOGRAPHER:   We're going off the
22   record at approximately 2:51 p.m.
23             (A recess was taken from 2:51 p.m.
24             to 2:56 p.m.)
25          THE VIDEOGRAPHER:   We're back on the record

Page 131

1   at approximately 2:56 p.m.
2          MR. LAGOMARSINO:   I have no further
3   questions.
4
5          EXAMINATION
6   BY MR. ANDERSON:
7          Q.   Officer Tran, when you arrived on the
8   scene, what information did you have as to what had
9   occurred between --
10          THE VIDEOGRAPHER:   I'm sorry, Mr. Anderson,
11   could you please place your microphone on for me?
12          MR. ANDERSON:   I apologize.   We'll start
13   over.   Could you Take 2?
14          THE VIDEOGRAPHER:   Please.
15          MR. ANDERSON:   That was a test.
16          MR. MCNUTT:   That was a test.   You failed.
17          MR. ANDERSON:   I apologize.
18   BY MR. ANDERSON:
19          Q.   When you arrived, Officer Tran, what
20   information did you have as to what had occurred
21   prior to your arrival between Lopera and Farmer?
22          A.   Other than the Code Red, which means
23   officers in emergency, and a call sign saying he was
24   at Venetian, there was no other details.
25          Q.   When you arrived, did you have any facts or

Page 132

1   evidence that would have led you to believe that
2   Officer Lopera was using unreasonable force?
3          A.   No.
4          Q.   When you arrived, what was your initial
5   focus?
6          A.   I wanted to make the scene safe.   I placed
7   Mr. Farmer in handcuffs.   And just make the scene
8   safe and go from there.
9          Q.   When you arrived, could you tell how much
10   pressure, if any, Lopera was using on Mr. Farmer's
11   neck?
12          A.   No.
13          Q.   Could you tell what level the LVNR he was
14   in?
15          A.   No.
16          Q.   Is there any way you could have been able
17   to tell that?
18          A.   No.
19          Q.   Okay.   Would you ever check the pressure
20   being used by physically touching Lopera and Farmer
21   before Farmer was in handcuffs?
22          A.   No.
23          Q.   When you arrived, how long from the
24   moment you parked until you were engaged in the
25   struggle?

Page 133

1          A.   Ten seconds.
2          Q.   And you're aware of the duty to intervene?
3          A.   Yes.
4          Q.   In your opinion, how can an officer
5   intervene?
6          A.   When it's safe to do so, when an officer
7   observes unreasonable force, they can intervene by
8   verbal commands or physical intervention.
9          Q.   Now, we went through your deposition that
10   you gave in the prior lawsuit where you were referred
11   to page 70 – 77 of your deposition, which is
12   Exhibit 1.
13          And are you there?
14          A.   Yes.
15          Q.   The question was asked of you in the other
16   lawsuit:   "From the time that you got there until the
17   time that Officer Lopera released the hold, did
18   Flores do anything whatsoever to intervene?"
19          And your answer was, "No.   We were trying
20   to take him into custody."
21          Did I read that correctly?
22          A.   Yes.
23          Q.   Did you believe that you and Officer
24   Flores, based on the facts you knew, had a duty to be
25   intervening at that time?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

35 (Pages 134 to 137)

Page 134

1      A.  No.
2      Q.  Again, did you have any facts that led you
3  to believe that Officer Lopera was using unreasonable
4  force?
5      A.  No.
6      Q.  Do you believe that by attempting to
7  handcuff Farmer, that would be a form of
8  intervention?
9      A.  Yes.
10     Q.  And then as soon as the handcuffing was
11  complete, that's when you noticed that Farmer was
12  unconscious?
13     A.  Correct.
14     Q.  And what did you do when you noticed
15  that?
16     A.  I told Officer Lopera, "Loosen up, loosen
17  up, he's out."
18     Q.  There's been some testimony today about
19  when you called medical; is that correct?
20     A.  Correct.
21     Q.  Have you listened to the radio dispatch in
22  this case?
23     A.  Yes.
24     Q.  Okay.  On that dispatch, did you recognize
25  your voice?

Page 135

1      A.  Yes.
2      Q.  When did you request medical?
3      A.  As soon as Mr. Farmer was placed in
4  handcuffs, I said: "Venetian 1, we're Code 4.  Clear
5  the red, roll medical."
6      Q.  And did that occur before you turned on
7  your body cam?
8      A.  Yes.
9          MR. ANDERSON:  That is all I have.
10         MR. LAGOMARSINO:  Dan, let me just follow
11  up on a couple of them, if that's okay?
12
13         FURTHER EXAMINATION
14  BY MR. LAGOMARSINO:
15     Q.  The question was asked is there any way you
16  could have found out what level of LVNR Lopera had
17  him in.  Do you remember that question just a second
18  ago?
19     A.  Yes.
20     Q.  You could have asked him what level he was
21  in, correct?
22     A.  I could have, but that's -- this struggle,
23  the dynamic scene, I wouldn't -- it wouldn't have
24  been reasonable for me to pause to ask him what the
25  subject has done prior to my arrival.

Page 136

1      Q.  Well, no, but you could have said what
2  level LVNR are you in.  It takes about a second,
3  right?
4      A.  Correct.  But there was a supervisor on
5  scene, and we were there to assist in taking the
6  subject into custody.
7      Q.  Okay.  And there was a question that
8  Mr. Anderson asked you about when you called medical,
9  and I was looking at something when you said it.  So
10  was it right when you arrived on scene you said call
11  medical?
12     A.  No.  It was after we placed him into
13  handcuffs.  I got on the radio and said clear the
14  red, the Code Red, that was asked.  He's in custody.
15  Code 4.  Roll medical.
16     Q.  What's Code 4 mean?
17     A.  It means where everyone is okay.
18     Q.  And why did you feel it was necessary to
19  call medical at that time?
20     A.  Because after we placed him in handcuffs,
21  and I looked down and I saw Mr. Farmer was
22  unconscious, and the encircling arm on Mr. Farmer, it
23  was -- it's policy that we roll medical for use of
24  LVNR.
25     Q.  You knew he needed medical, right?

Page 137

1          MR. ANDERSON:  Objection.
2          MR. MCNUTT:  Objection.  Form.
3          THE WITNESS:  I didn't know if he needed
4  medical, but I wanted medical to come in case he did
5  need medical.
6          MR. LAGOMARSINO:  Okay.  I have no further
7  questions.
8
9          EXAMINATION
10  BY MR. MCNUTT:
11     Q.  Officer Tran, my name is Dan McNutt.  I
12  represent Mr. Lopera.
13         Is being under the influence of a
14  controlled substance a crime in the state of Nevada?
15     A.  Yes.
16     Q.  Is trespassing a crime in the state of
17  Nevada?
18     A.  Yes.
19     Q.  Is resisting arrest a crime in the state of
20  Nevada?
21     A.  Yes.
22     Q.  Is carjacking a crime in the state of
23  Nevada?
24     A.  Yes.
25     Q.  Are you aware whether or not Mr. Farmer was

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 138

1  under the influence of a controlled substance on the
2  night of this incident?
3      A.  Prior to my arrival, no.
4      Q.  But are you aware now?
5      A.  Yes.
6      Q.  Are you aware that Mr. Farmer could have
7  been charged with a crime for being under the
8  influence of a controlled substance?
9          MR. LAGOMARSINO: Calls for speculation.
10         THE WITNESS: Yes.
11  BY MR. MCNUTT:
12     Q.  What's your answer?
13     A.  Yes.
14     Q.  You testified that Tashi Farmer's left arm
15  was behind his back -- this is when you arrived.
16  Tashi Farmer's left arm was behind his back, but not
17  being held by Officer Lopera; is that correct?
18     A.  Correct.
19     Q.  Is it possible that Tashi Farmer was
20  grabbing for a weapon or something else on Officer
21  Lopera's belt?
22         MR. LAGOMARSINO: Calls for speculation.
23         THE WITNESS: It could be possible, yes.
24  BY MR. MCNUTT:
25     Q.  In fact, we looked at a photograph offered

Page 139

1  by the plaintiff earlier in which you identified the
2  gear that was being carried on Officer Lopera's belt,
3  correct?
4      A.  Correct.
5      Q.  Is it your recollection from that photo
6  that Officer Lopera's taser was on his left side?
7      A.  Yes.
8      Q.  Would you like to see the photo again to
9  refresh your recollection?
10     A.  I can look at it.  Left side.
11     Q.  Yep, okay.  So that's Plaintiff's Exhibit
12  or Deposition Exhibit 3, correct?
13     A.  Yes.
14     Q.  So if Officer Lopera was chest-to-back to
15  Tashi Farmer, and Tashi Farmer reached behind him,
16  then he would have access to Officer Lopera's taser?
17     A.  Correct.
18     Q.  You testified that you said words to the
19  effect of "loosen up" or "loosen up, Ken," something
20  like that, correct?
21     A.  Yes, "loosen up."
22     Q.  And did Officer Lopera comply with that?
23     A.  Yes.  Immediately.
24     Q.  There was some discussion about aggressive
25  resistance and some other types of resistance.

Page 140

1      Are those different levels that you are
2  taught or trained to identify with a suspect?
3      A.  Yes.
4      Q.  Can you tell me what the several levels
5  are?
6      A.  An aggressive resistance is suspect's
7  actions show an intent to do harm, causing potential
8  injury.  And an aggravated aggressive resistance, the
9  suspect is showing intent which could produce death
10  or substantial bodily harm.
11     Q.  And then what's below those two?
12     A.  It would be a low-level resistance; passive
13  or active resistance.
14     Q.  When you arrived, you had used the word
15  Officer Lopera's encircling arm.  Do you recall
16  talking about that?
17     A.  Correct.
18     Q.  Was Officer Lopera's elbow in line with
19  Tashi Farmer's chin?
20     A.  Yes.
21     Q.  Was it -- if you looked at just his
22  encircling arm, is that the proper position for an
23  LVNR the way you're trained in the Academy?
24     A.  Yes.
25     Q.  Could you see his other hand or not?

Page 141

1      A.  No.
2      Q.  So you couldn't tell from your perspective
3  whether Officer Lopera's hands were clasped together
4  or not?
5      A.  No, I couldn't see.
6      Q.  Okay.  Let's go back to a video.  And tell
7  me if you've seen this still shot that I'm going to
8  show you.
9      Do you recognize this is Officer Lopera's
10  body-worn cam?
11     A.  Yes.
12     Q.  This is the same one we watched earlier,
13  except I don't have it up on Counsel's screen.
14     So do you recognize Tashi Farmer here in
15  the frame?
16     A.  Yes.
17     Q.  And do you recognize this to be Officer
18  Lopera's left hand with his coffee?
19     A.  Yes.
20     Q.  So I'm going to start -- we'll start
21  watching this, and I'll ask you a couple of
22  questions, just like we did with Mr. Lagomarsino.
23     (Playing video.)
24  BY MR. MCNUTT:
25     Q.  Can you see this area behind the roped off

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 142

1  or chained off section?
2      A. Yes.
3      Q. What do you recognize that to be?
4      A. A roped off area that the public is not
5  allowed to pass.
6      Q. Okay.
7      A. Or permitted to go to.
8          (Playing video.)
9  BY MR. MCNUTT:
10     Q. Okay. So we're at 17 seconds and Tashi
11 Farmer is fleeing into the back of the house of the
12 casino, correct?
13     A. Correct.
14     Q. Should a Metro officer pursue a suspect
15 that flees into a restricted area?
16     A. Yes.
17         MR. LAGOMARSINO: Objection. Form.
18 BY MR. MCNUTT:
19     Q. Would you, based on what you just saw,
20 would you have pursued Tashi Farmer?
21     A. Yes. A reasonable person wouldn't enter
22 the back of the house of a property.
23     Q. And wouldn't that, in fact, be a crime in
24 the state of Nevada?
25     A. Yes. At least a trespass.

Page 143

1          (Playing video.)
2  BY MR. MCNUTT:
3      Q. So we're at the 30-second mark, and now we
4  have sound, correct?
5      A. Correct.
6      Q. Do you know where Officer Lift was at any
7  part during this pursuit?
8      A. No.
9      Q. Have you ever talked to her since
10 then?
11     A. Not regarding this, no.
12         (Playing video.)
13 BY MR. MCNUTT:
14     Q. So did you hear Officer Lopera say stop,
15 don't move?
16     A. Yes.
17     Q. Did Mr. Farmer comply?
18     A. No.
19         (Playing video.)
20 BY MR. MCNUTT:
21     Q. Is it policy to advise a suspect that they
22 may get tased if they don't comply?
23     A. We're advised to give verbal commands,
24 correct.
25         (Playing video.)

Page 144

1  BY MR. MCNUTT:
2      Q. So you heard him, Officer Lopera, say to
3  Tashi Farmer, "Don't move," correct?
4      A. Yes.
5      Q. And at 1:43 in the video, what is
6  Tashi Farmer doing?
7      A. He's sitting up. Looks like he's trying to
8  move away, get up or walk away.
9      Q. Does that indicate to you that he's
10 complying with Officer Lopera's commands?
11     A. No.
12     Q. Is it normal for someone after they've been
13 tased to not comply with the officer's commands?
14     A. I wouldn't say normal, but there are some
15 that don't comply.
16     Q. Is it possible that when someone is on
17 illegal methamphetamine that they don't
18 comply with --
19     A. Yes.
20     Q. -- the verbal commands of an officer?
21         MR. LAGOMARSINO: Form.
22 BY MR. MCNUTT:
23     Q. Is it also possible that when somebody is
24 under the influence of a controlled substance, that
25 the effects of a taser don't have the same effect as

Page 145

1  if you shot your attorney here with it today?
2      A. Yes.
3          (Playing video.)
4  BY MR. MCNUTT:
5      Q. So he said to get on his stomach, and Tashi
6  Farmer is saying, "I will," but is he, in fact,
7  getting on his stomach?
8          MR. LAGOMARSINO: Counsel, are you saying,
9  like, is he getting on his stomach while you have the
10 video paused? Or while it's running? Because it
11 seemed like you're pausing it, and then asking him if
12 he's doing something.
13         MR. MCNUTT: Is that really a question?
14         MR. LAGOMARSINO: I'm making an objection.
15         MR. MCNUTT: Well, why don't you come over
16 here and watch.
17         MR. LAGOMARSINO: Okay. Well, I don't hear
18 the sound, so I'm assuming it's paused.
19 BY MR. MCNUTT:
20     Q. Do you understand the question?
21     A. I'm sorry, can you repeat the question?
22     Q. Sure. Let's just back up a little bit.
23         (Playing video.)
24 BY MR. MCNUTT:
25     Q. So he says, "Get on your stomach" at 1:52.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 146

1    So in the four seconds, 1:52 to 1:56, did
2 he get on his stomach?
3    A. No. It looked like he was reaching into
4 his shoe.
5    (Playing video.)
6 BY MR. MCNUTT:
7    Q. You hear that, "Okay, okay, sir"?
8    A. Yes.
9    Q. Do you know who that was?
10    A. I believe it was Farmer.
11    (Playing video.)
12 BY MR. MCNUTT:
13    Q. Do you know who Officer Lopera is asking
14 for assistance from?
15    A. I believe it's Venetian security guards.
16    Q. So we're at 2:19 on Officer Lopera's
17 body-worn cam. How would you describe Tashi Farmer's
18 resistance level?
19    A. He's still in an active resistance.
20    Q. So he's not complying. What is the
21 definition, that he's not complying?
22    A. He's not complying to lawful orders, and
23 he's taking actions to not comply as in getting up
24 and fighting; it looked like he was trying to pull
25 the taser prongs off his back.

Page 147

1    Q. Okay. If at any point you see his
2 resistance level change up or down, let me know. If
3 you see him comply, let me know, okay?
4    A. Okay.
5    (Playing video.)
6 BY MR. MCNUTT:
7    Q. Is there any active aggressive resistive
8 there?
9    A. Not that I can see.
10    (Playing video.)
11 BY MR. MCNUTT:
12    Q. Is Mr. Farmer complying at any point up to
13 2:53 in the tape?
14    A. No.
15    Q. How can you tell?
16    A. Because they're trying -- they're trying to
17 put his hands behind his back, and he's pulling his
18 arms away from them.
19    Q. Not to mention that the video is pretty
20 shaky?
21    A. Correct.
22    Q. Showing that there's some --
23    A. Struggle.
24    Q. There's struggle at this point, correct?
25    A. Correct.

Page 148

1    MR. LAGOMARSINO: Leading.
2 BY MR. MCNUTT:
3    Q. I'll back it up to 2:30.
4    I want you to tell me whether or not you
5 can tell whether Mr. Lopera ever takes a swing at --
6 excuse me, Mr. Farmer takes a swing at Officer
7 Lopera.
8    (Playing video.)
9 BY MR. MCNUTT:
10    Q. Anywhere in there?
11    A. Can you play it again?
12    Q. I'm sorry, you want it replayed?
13    A. Yes.
14    Q. So we're back at 2:30.
15    (Playing video.)
16 BY MR. MCNUTT:
17    Q. Is that a punch?
18    A. It looked like something hit his -- hit him
19 in the shoulder in the camera.
20    Q. Can you hear it?
21    A. I heard the thump, yeah.
22    Q. What could that thump be?
23    MR. LAGOMARSINO: Form. Speculation.
24    THE WITNESS: Mr. Farmer striking Lopera.
25    (Playing video.)

Page 149

1 BY MR. MCNUTT:
2    Q. Is there any other explanation for that
3 thud that hits his body cam?
4    MR. LAGOMARSINO: Form. Foundation.
5    THE WITNESS: No.
6 BY MR. MCNUTT:
7    Q. Would that be -- what level of resistance
8 would that be at that point?
9    A. Aggressive.
10    MR. MCNUTT: I don't have any further
11 questions.
12    MR. LAGOMARSINO: Just some follow-ups.
13
14    FURTHER EXAMINATION
15 BY MR. LAGOMARSINO:
16    Q. So you were asked about a photo where there
17 was a taser on Lopera's belt. Do you remember those
18 questions?
19    A. Yes.
20    Q. And whether it was possible that Tashi
21 could have somehow reached out when he was in a choke
22 hold and gotten a taser.
23    Tasers have safeties, correct?
24    A. Yes.
25    Q. Were you aware of the fact that Lopera was

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 150

1   a competitive jutsitsu fighter?
2           MR. MCNUTT: Objection. Form.
3           THE WITNESS: At the night prior to that
4   incident, no.
5   BY MR. LAGOMARSINO:
6       Q.   When did you learn that he fought
7   competitively as a jutsitsu fighter?
8           MR. MCNUTT: Objection. Form. Foundation.
9           THE WITNESS: A couple of months later.
10  BY MR. LAGOMARSINO:
11      Q.   How did you learn that?
12      A.   At the station through coworkers.
13      Q.   You were asked a series of questions
14  about -- in the beginning of the video about Tashi
15  running through what's been referred to as the back
16  of the house, and then some questions about
17  trespassing.
18          Did you see any signs that said "back of
19  the house" in that video?
20      A.   No.
21      Q.   Did you see any "no trespassing" signs?
22      A.   I mean, based on the video, no. But there
23  could have been "employees only" signs off to the
24  side.
25      Q.   There could have been, there could not have

Page 151

1   been, right?
2       A.   But there was a chain-link, and then there
3   was the doors itself that leads -- doesn't say it
4   leads to any business that I know of.
5           To me, a reasonable person wouldn't go to
6   the back house, go down a bunch of stairs and run out
7   to the loading docks.
8       Q.   Right. The little chain thing with the
9   cone, that could have just as easily been something
10  that was roped off for a wet floor, correct?
11      A.   Correct.
12      Q.   And then you were asked about whether there
13  was restricted access. I mean, I didn't see any
14  signs that said "restricted access," did you?
15      A.   Not on the video, no.
16      Q.   You're crisis intervention certified,
17  correct?
18      A.   Correct.
19      Q.   Did you hear in any of the videos
20  Officer Lopera admit that he believed he saw the
21  early signs of ED on Lopera?
22      A.   On Lopera's body camera video did I hear
23  him say ED?
24      Q.   Yeah.
25      A.   I did not.

Page 152

1       Q.   What does ED mean?
2       A.   Excited delirium.
3       Q.   And did you see signs of excited delirium
4   in the videos that you watched?
5       A.   I mean, he's acting pretty erratic.
6       Q.   And how does excited delirium factor into a
7   use of force analysis?
8       A.   I know in the Academy, they said excited
9   delirium, the ECD would be the best option to control
10  a person with ED.
11      Q.   When you saw -- strike that.
12          When you took the pulse of Tashi and noted
13  that he was unresponsive, did you believe that he had
14  serious medical needs at that point?
15      A.   At the time, I couldn't find a pulse. I
16  didn't know if I was doing it wrong, if my adrenaline
17  was too high. I don't -- I can't say that Mr. Farmer
18  needed serious medical need at the moment. I didn't
19  even know if I did the pulse wrong.
20          But when I asked Officer Crevettes
21  (phonetic) if he found a pulse, he said he did, so...
22      Q.   Okay. So let's break it down. So Tashi's
23  unconscious, not moving, and you can't find a pulse,
24  and you're saying that he did not need serious
25  medical attention?

Page 153

1           MR. ANDERSON: Objection. Form.
2           THE WITNESS: I asked for medical.
3   BY MR. LAGOMARSINO:
4       Q.   Did you ask for medical because you
5   believed he needed -- because he had serious medical
6   attention?
7       A.   I asked for medical because Mr. Farmer was
8   placed in LVNR, and if we place somebody in LVNR,
9   we're supposed to ask for medical.
10      Q.   Would you have called medical if you didn't
11  think he needed medical?
12      A.   If he was placed in LVNR, I would have
13  called medical.
14      Q.   Looking now at the body cam footage and
15  knowing what you know now, did Tashi have serious
16  medical needs?
17          MR. ANDERSON: Objection. Form.
18          THE WITNESS: In hindsight, yes. Because
19  Mr. Farmer is deceased now. Yes, he had medical
20  needs.
21  BY MR. LAGOMARSINO:
22      Q.   And then when you tested his pulse and saw
23  that he was unconscious, you laid him back down and
24  walked away, right?
25          MR. ANDERSON: Objection. Form.

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

### Page 154

1  THE WITNESS: Yes.
2  MR. LAGOMARSINO: No further questions.
3
4  FURTHER EXAMINATION
5  BY MR. MCNUTT:
6  Q.  Do people that exhibit excited delirium, do
7  those symptoms often seem similar to people that are
8  under the influence of a controlled substance?
9  A.  Yes.
10  MR. MCNUTT: No further questions.
11  MR. ANDERSON: I'll just follow up real
12  quick.
13
14  FURTHER EXAMINATION
15  BY MR. ANDERSON:
16  Q.  On the medical issues, as a trained
17  officer, if you believe someone may possibly require
18  medical attention, what are you trained to do?
19  A.  Call for medical.
20  Q.  And are there officers that have more
21  medical skills than others?
22  A.  Possibly, yes.
23  Q.  Okay.  So your training and policy is that
24  if you believe someone may or may not need medical is
25  that you call medical?

### Page 155

1  A.  Correct.
2  MR. ANDERSON: Thank you.  Nothing further.
3  MR. LAGOMARSINO: Nothing further.
4  THE VIDEOGRAPHER: This concludes the
5  videotaped deposition of Officer Michael Tran taken
6  on December 18th, 2018.  The original media of
7  today's testimony will remain in the custody of LVLV.
8  We're going off the record at approximately
9  3:22 p.m.
10              - - -
11  (The videotaped deposition was
12  concluded at 3:22 p.m.)
13              - - -
14
15
16
17
18
19
20
21
22
23
24
25

### Page 156

1  CERTIFICATE OF DEPONENT
2  PAGE   LINE   CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18          * * * * *
19  I, MICHAEL TRAN, deponent herein, do hereby
20  certify and declare under penalty of perjury the
     within and foregoing transcription to be my
     deposition in said action; that I have read,
21  corrected and do hereby affix my signature to said
     deposition.
22
23  _____
     MICHAEL TRAN
     Deponent
24
25

### Page 157

1  CERTIFICATE OF REPORTER
2  I, the undersigned, a Certified Shorthand
3  Reporter of the State of Nevada, do hereby certify:
4  That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given to the best of my
12  ability.
13  Further, that before completion of the
14  proceedings, review of the transcript [ X ] was
15  [ ] was not requested pursuant to NRCP 30(e).
16  I further certify I am neither financially
17  interested in the action, nor a relative or employee
18  of any attorney or party to this action.
19  IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21
22  Dated: December 27, 2018
23
24  _____
     GALE SALERNO, RMR, CCR No. 542
25