# Exhibit I - Parker Deposition

Page 321

CERTIFICATE OF

CERTIFIED SHORTHAND REPORTER

1  I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER IN

2  AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

3  THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME

4  AT THE TIME AND PLACE THEREIN SET FORTH; THAT ANY

5  WITNESSES IN THE FOREGOING PROCEEDINGS, PRIOR TO

6  TESTIFYING, WERE DULY SWORN; THAT A RECORD OF THE

7  PROCEEDINGS WAS MADE BY ME USING MACHINE SHORTHAND,

8  WHICH WAS THEREAFTER TRANSCRIBED UNDER MY DIRECTION;

9  THAT THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

10  TESTIMONY GIVEN.  FURTHER, THAT IF THE FOREGOING

11  PERTAINS TO THE ORIGINAL TRANSCRIPT OF A DEPOSITION IN A

12  FEDERAL CASE, BEFORE COMPLETION OF THE PROCEEDINGS,

13  REVIEW OF THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.

14  I FURTHER CERTIFY THAT I AM A DISINTERESTED

15  PERSON AND AM IN NO WAY INTERESTED IN THE OUTCOME OF

16  SAID ACTION, OR CONNECTED WITH OR RELATED TO ANY OF THE

17  PARTIES IN SAID ACTION, OR TO THEIR RESPECTIVE COUNSEL.

18  THE DISMANTLING, UNSEALING OR UNBINDING OF THE

19  ORIGINAL TRANSCRIPT WILL RENDER THE REPORTER'S

20  CERTIFICATE NULL AND VOID.

21  IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON

22  THIS DATE:  October 19, 2019.

23

24

25  CSR NO. 2818

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

**Page 1**

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3

4    TRINITA FARMER,        )
     individually,          )
5                           )
         Plaintiff,         )
6                           )
         vs                 ) Case No. 2:18-cv-00860-GMN-VCF
7                           )
     LAS VEGAS METROPOLITAN )
8    POLICE DEPARTMENT, a   )
     political subdivision of)
9    the State of Nevada;   )
     KENNETH LOPERA,        )
10   individually; TRAVIS   )
     CRUMRINE, individually; )
11   MICHAEL TRAN,          )
     individually; MICHAEL  )
12   FLORES, individually,  )
                            )
13       Defendants.)
                            )
14

15

16

17

18       Deposition of THOMAS PARKER,

19   taken at 9:23 A.M., Friday, October 4, 2019, at

20   21 East Carrillo Street, Suite 190, Santa Barbara,

21   California, before Louise K. Mizota, CSR #2818.

22

23

24

25

**Page 2**

1    APPEARANCES OF COUNSEL:

2    For Plaintiff:  LAGOMARSINO LAW
                     BY: ANDRE M. LAGOMARSINO, ESQ.
3                    3005 West Horizon Ridge Parkway
                     Suite 241
4                    Henderson, Nevada 89052
                     (702) 383-2864
5                    aml@lagomarsinolaw.com

6

7    For Defendant Kenneth Lopera:

8                    MCNUTT LAW FIRM P.C.
                     BY: DANIEL R. McNUTT, ESQ.
9                    625 South Eighth Street
                     Las Vegas, Nevada 89101
10                   (702) 384-1170
                     mcw@mcnuttlawfirm.com

11

12   For Defendants Las Vegas Metropolitan Police Department,
     Travis Crumrine, Michael Tran and Michael Flores:
13
                     MARQUIS AURBACH COFFING
14                   BY: CRAIG R. ANDERSON, ESQ.
                     10001 Park Run Drive
15                   Las Vegas, Nevada 89145
                     (702) 382-0711
16                   canderson@maclaw.com

17

18

19

20

21

22

23

24

25

**Page 3**

1                    I N D E X

2    WITNESS        EXAMINATION        PAGE

3    THOMAS PARKER    BY MR. McNUTT       4, 313

4                     BY MR. ANDERSON      252

5

6                    E X H I B I T S

7    DEFENDANT'S        DESCRIPTION       PAGE

8    Exhibit 1  Thomas R. Parker Examples of Prior    14
                Expert Witness Engagements

9    Exhibit 2  Thomas R. Parker Examples of Expert    24
                Witness Engagements

10

11   Exhibit 3  Report of Thomas R. Parker June 20,    25
                2019

12   Exhibit 4  Thomas R. Parker Professional          26
                Qualifications

13   Exhibit 5  List of depositions and Defendant      26
                LVMPD's Documents

14   Exhibit 6  Published Articles by Thomas R.        26
                Parker

15

16   Exhibit 7  Exhibit B, Thomas R. Parker            43

17   Exhibit 8  Las Vegas Metropolitan Police         181
                Department Partners with the
18              Community (Manual 5-23-2013),
                LVMPD 0072

19   Exhibit 9  Las Vegas Metropolitan Police         194
                Department Partners with the
20              Community (Department Manual
                5-24-2017), LVMPD 0001 through
21              LVMPD 0018

22   Exhibit 10  Supplemental and Rebuttal Report     210
                 of Thomas R. Parker, September 20,
23               2019

24

25

**Page 4**

1              Santa Barbara, California

2                 October 4, 2019

3                   9:23 A.M.

4

5                THOMAS PARKER

6       Having been sworn, was examined and testified

7    as follows:

8

9                  EXAMINATION

10   BY MR. McNUTT:

11       Q.  Mr. Parker, good morning.  My name is Dan

12   McNutt and I represent Officer Ken Lopera.

13       A.  Okay.

14       MR. ANDERSON:  Craig Anderson.  I represent the

15   police department, Crumrine, Tran and Flores.

16       THE WITNESS:  Okay.

17       MR. LAGOMARSINO:  For the record, I'm Andre

18   Lagomarsino and I represent the plaintiff, Trinita

19   Farmer.

20       Q.  BY MR. McNUTT:  Mr. Parker, you've obviously

21   been doing expert work for something along the lines of

22   25 years or so?

23       A.  I have.

24       Q.  Correct?

25       A.  Yes.

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 5

1    Q.   You've done a few depositions in your time?
2    A.   A few.
3    Q.   Are you aware of the rules that govern
4    depositions?
5    A.   Pretty much so.  I -- I slip once in a while
6    and speak before I'm supposed to.
7    Q.   I think we probably all do that.  Occasionally
8    I'll ask a question that you won't understand, whether
9    truthfully or you just want to hear it again.  Either
10   way, ask me to restate it and I'll be happy to.
11   A.   Okay.
12   Q.   I do have one inquiry.  I know we're sitting
13   here without a video and you recently had shoulder
14   surgery and you mentioned that you're taking a pain
15   pill --
16   A.   I did.
17   Q.   -- this morning.
18   A.   Yeah.
19   Q.   Is that pain pill going to cause any issues?
20   A.   No.  It's -- it's Motrin.  It's an
21   over-the-counter pain pill.
22   Q.   Okay.  So is there any reason we can't go
23   forward --
24   A.   No.
25   Q.   -- with your deposition this morning --

Page 6

1    A.   Not at all.
2    Q.   -- and get your full and truthful testimony?
3    A.   Absolutely.
4    Q.   Okay.  Then I will dispense with the rest of
5    the admonitions and we'll get started.
6         And you received your check from Mr.
7    Lagomarsino?
8    A.   I -- I did.
9         Let me clarify.  I think there was a little
10   misunderstanding between he and I.  What I normally
11   require, and I can show you my rate sheet if you need
12   to, if we go into the afternoon I usually require
13   another check at the start of the afternoon.  In other
14   words, it's like I want the retainer up front.
15   Unfortunately, in this business, once in a while there
16   are attorneys out there that will take 60, 90, 120 days
17   to pay.
18   Q.   Well, I know you've dealt with Mr. Anderson
19   before, but not me.  The check came from my office.
20   We'll deal with the afternoon as we --
21   A.   That's fine.
22   Q.   -- get there.
23        MR. ANDERSON:  If we do, I can tell you I'll
24   have you a check by next week.
25        MR. LAGOMARSINO:  I would agree with that.

Page 7

1    They're pretty good about that.
2         THE WITNESS:  That's fine.
3         MR. McNUTT:  Nobody has been short on the cash
4    in this case on any side of the table as far as taking
5    care of their experts, from what I can see.
6    Q.   Mr. Parker, you're familiar with, because you
7    spoke about it at length in your report, a syndrome
8    called excited delirium?
9    A.   I am.
10   Q.   And I don't know if you refer to it as excited
11   delirium syndrome.  How do you prefer to discuss it?
12   A.   Both ways.
13   Q.   So if I refer to excited delirium, that's
14   sufficient.
15   A.   That's fine, yeah.  My understanding, the
16   syndrome is usually that aspect of it's progressed to
17   the point that death is either right at hand or about to
18   happen.  Otherwise, it's called excited delirium for the
19   action, so to speak, leading up to that.
20   Q.   Okay.  If an individual -- and I may refer to
21   individual, suspect, subject interchangeably throughout
22   this deposition.  Is that okay with you?
23   A.   Sure.
24   Q.   But if an individual is suffering from excited
25   delirium and that individual -- I mean, as it turns out,

Page 8

1    just as a matter he's suffering from that and he
2    attempts to carjack a vehicle, is use of a Taser
3    authorized by a police officer to stop that carjacking?
4    A.   Well, it's a pretty hypothetical situation
5    without more information around it.
6    Q.   Take what I've said as true, that he's
7    attempting to carjack a vehicle.
8    A.   Again, it would depend on the circumstances.
9    It would depend on what the -- what has led up to that,
10   what the danger is, if there is any, to the occupants of
11   the car.  It would depend on -- as is reflected in this
12   case, it would depend on how confident the officer was,
13   that it was an attempted carjacking.
14        I -- I can't give you a direct yes or no answer
15   on that.
16   Q.   Isn't a carjacking a felony in the State of
17   California?
18   A.   It is.
19   Q.   It is in the State of Nevada.
20   A.   Yeah.
21   Q.   Are you aware of that?
22   A.   I am.  I -- I worked in Nevada early in my
23   career, in Las Vegas.
24   Q.   Are you aware that carjackings are presumed to
25   be violent crimes?

Page 9

1    A.  I don't know about the presumption.  Most of
2  them are violent crimes.
3    Q.  By statute they're presumed to be.
4    A.  I -- I don't know that for sure.
5    Q.  So let's go back to the question.  Let me ask a
6  different one.  Is it your position that an individual
7  suffering from excited delirium can use that, whatever
8  you want to call it, syndrome, illness, as a defense to
9  committing a crime?
10    A.  I've never heard of it being used as a defense.
11    Q.  But I'm asking you whether you think that.
12        MR. LAGOMARSINO:  Objection.  Form.
13        THE WITNESS:  I -- you know, I don't know that
14  I could really answer that.  There are some medical
15  considerations there.  There's behavioral
16  considerations.  I don't mean to be ducking your
17  question, but it's -- it's one that I think is difficult
18  to answer as you presented it.
19    Q.  BY MR. McNUTT:  So how would I present it to
20  make it more clear?
21    A.  I don't know.  That's your issue.  It's not
22  mine.
23    Q.  So I'll ask a very direct question again.
24    A.  Sure.
25    Q.  In your professional expert opinion, can the

Page 10

1  presence of excited delirium in an individual act as a
2  legal defense to a crime?
3    A.  Again, as I said, I can't give you a yes or no
4  answer.  There's legal ramifications.  There's medical
5  issues involved there.  There's observational issues.
6  It -- it depends on all of that.
7    Q.  So have you made that opinion anywhere in your
8  report?  And when I say your report, I mean your fulsome
9  reports, including your supplemental --
10    A.  Uh-huh.
11    Q.  -- report.  Is that okay?
12    A.  Yes.
13    Q.  So if I say the report, it's not just your
14  initial report.  It includes any opinions in your
15  supplement.
16    A.  That's fine.
17    Q.  Fair?
18    A.  Fair.
19    Q.  I didn't know if we -- you answered before, I
20  think, I finished.
21    A.  Yeah.
22    Q.  So are you taking that position in your report
23  that excited delirium can act as a defense to a crime?
24    A.  I don't think I took that position in the
25  report.

Page 11

1    Q.  Okay.  Will you take that position at trial?
2    A.  I would doubt it, but I -- I don't know.  I
3  mean, it would depend on the question.  It would depend
4  on what are the circumstances, what other information is
5  presented.  I mean, it's -- it's a very general
6  hypothetical question.  I -- I can't answer it
7  truthfully.
8    Q.  Well, are there some facts that you don't
9  believe you have in your possession to articulate an
10  answer to the question?
11    A.  Every case is different and the facts are
12  different.  So the facts --
13    Q.  That's not --
14    A.  -- you presented to me, it's so general, sir, I
15  can't give you a yes or no answer.
16    Q.  Well --
17    A.  I would not think that without additional
18  information that anybody could give you a direct answer,
19  anybody that, you know, works as an expert in police
20  procedures.  Again, I'm not a medical expert.  And, you
21  know, I know there are provisions for mental deficiency
22  defenses.  I don't know whether it would qualify in this
23  case or not.
24        It would also depend on where -- I think where
25  the individual is in terms of the -- the onset of that

Page 12

1  excited delirium syndrome, if we want to refer to it
2  that way.
3        So you've asked me a very general hypothetical
4  question and I've given you an answer that I -- I can't
5  answer it based on what you've asked me.
6    Q.  Sir, that's a very prolix response to a
7  question I did not ask.  I asked whether or not you're
8  aware of any facts that are going to be presented to
9  you, facts, evidence, not hypothetical questions, at
10  trial that you don't have in your possession now that
11  are going to allow you to render that opinion at trial.
12    A.  Well, how can I answer that question?  If the
13  facts aren't in my possession, I don't know what they
14  are.
15    Q.  So I'll take it that you won't answer the
16  question.
17    A.  That what?
18    Q.  I'll take it that you will not answer the
19  question.
20    A.  I'm saying that I cannot answer the question.
21  It's certainly not by choice.  If you -- if I had more
22  facts, I would -- I would certainly do my best to
23  answer.  But it's a hypothetical.  It's very general.
24  There's not enough facts there for me to render an
25  opinion on.

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

| Page 13 | Page 15 |
|---|---|

**Page 13**

1  Q.  So if the evidence is presented that someone is
2  attempting a carjacking, which, as you stated, is a
3  felony in both California and Nevada.  Correct?
4  A.  In most states I think it's a felony.
5  Q.  And you're suggesting it's an open question
6  that maybe there's a defense to that crime if you're
7  suffering from excited delirium?
8  MR. LAGOMARSINO:  Objection.  Form.  Incomplete
9  hypothetical.
10  Q.  BY MR. McNUTT:  I'm just asking you whether
11  it's a --
12  A.  I would say --
13  Q.  -- possibility.
14  Let me finish the question.  I'm just asking if
15  it's a possibility.
16  A.  And I'm trying to answer that.  I guess there's
17  a possibility it could be a defense depending upon what
18  the surrounding facts and circumstances are.
19  Q.  Have you ever testified at trial regarding any
20  aspect of excited delirium being involved in one of your
21  cases?
22  A.  Not in a trial.  I've testified in depositions
23  to that effect, but not at a trial, that I -- that I can
24  recall.
25  Q.  And is that as an expert, or in your law

**Page 14**

1  enforcement career?
2  A.  No.  It would have been as an expert.
3  Q.  And what was the name of the case that you did
4  that?
5  A.  I don't remember.  It's been several times that
6  excited delirium has come up.
7  Q.  Can you remember the names of any of those
8  cases?
9  A.  Oh, boy.  You know, I've handled so many, I'd
10  have to see the list, but right now the name of the case
11  doesn't come to mind.  It's happened probably, oh, maybe
12  three or four times in recent years.  When I say recent
13  years, over the last ten years or so.
14  Q.  Okay.  Do you remember the jurisdiction in
15  which you provided that testimony?
16  A.  I think there's been one or two that were in
17  Nevada, either southern Nevada, Las Vegas, or I think
18  there was one up north, northern Nevada.
19  MR. McNUTT:  Okay.  We'll mark this as Exhibit
20  1.
21  (Defendant's Exhibit 1 was marked for
22  identification.)
23  Q.  BY MR. McNUTT:  Mr. Parker, take a minute and
24  review what we have marked as Exhibit 1.
25  A.  Okay.

**Page 15**

1  Q.  And let me know when you're ready.
2  A.  Well, the one -- it's the fourth one up from
3  the bottom on page 2, starts "Civil litigation over
4  in-custody death."  That was a case that excited
5  delirium symptoms presented themselves.
6  Q.  Sure.  What was the name of that case?
7  A.  I don't remember the name of it.
8  Q.  Because it's not identified here.
9  A.  I understand that.
10  Q.  Okay.  Do you need to -- are you continuing to
11  review, or not?
12  A.  I am.
13  Q.  Okay.
14  A.  Yeah.  I think that's the only one that's on
15  here that -- that I recognize.
16  Q.  So --
17  A.  I've done -- I've done a lot of expert witness
18  work over the last 25 years.  You know, this is not the
19  complete list of cases that I've been on.  As this says,
20  these are examples.
21  Q.  Well, this actually isn't a list of cases at
22  all, is it?  There are no case names on this document.
23  A.  No.
24  Q.  And why is that?
25  A.  Because my contracts with all of those

**Page 16**

1  basically are that I don't divulge the -- the name of
2  the case or the details of the case unless it's in a
3  court of law.
4  Q.  Even though they're public record?
5  A.  Pardon me?
6  Q.  Even though lawsuits are public record?
7  A.  Well, I don't know when it's a public record or
8  not.  You know, that's in my contract.  I try to adhere
9  to it.
10  Q.  And who put that in your contract?
11  A.  The lawyer that created that for me years ago.
12  Q.  And is that the same in your contract with Mr.
13  Lagomarsino?
14  A.  I would presume so.
15  I don't know if we actually had a signed
16  contract.  Did we?
17  MR. LAGOMARSINO:  I don't know.
18  THE WITNESS:  I don't remember.
19  Q.  BY MR. McNUTT:  Better make sure you get paid
20  if you don't have a signed contract.
21  A.  I don't --
22  Q.  If you'd like to put the terms on the record
23  today.
24  A.  I don't worry about getting paid.
25  Q.  Are you familiar with an expert's obligations

Thomas Parker                               Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 17

1  under Federal Rule of Civil Procedure --
2      A.  I think so.
3      Q.  -- 26?
4          Are you?
5      A.  I think so.
6      Q.  Okay.  What's your obligation to provide a list
7  of prior cases?
8      A.  I think it's provide a list.  I -- I've been in
9  this same situation before, and I don't remember exactly
10 which case it was.  It was probably five, six years ago,
11 where I had done exactly the same thing and the judge
12 was satisfied with it.
13     Q.  Okay.  So was that Judge Navarro?
14     A.  No.
15     Q.  Was it any Federal judge in Nevada?
16     A.  I don't think it was in Nevada.
17     Q.  So the requirement is, and I'll pull up the
18 rule, "a list of all other cases in which during the
19 previous four years the witness testified as an expert
20 at trial or by deposition."
21     A.  Uh-huh.
22     Q.  So what you've provided is a vague summary of
23 some cases that you've provided expert --
24     A.  Uh-huh.
25     Q.  -- testimony in.  That's not a list of the

Page 18

1  cases.
2      A.  Well, in my mind --
3      Q.  Do you understand --
4      A.  -- it is --
5      Q.  -- the distinction?
6      A.  -- a list of the cases.  That doesn't say what
7  has to be in that list, as I understand it.
8      Q.  Okay.
9      A.  And that was -- like I said, that particular
10 judge was satisfied with -- with the list.
11     Q.  But that wasn't a judge in Nevada?
12     A.  It was not.
13     Q.  Was it a Federal judge?
14     A.  I don't remember.
15     Q.  Was it a State Court judge?
16     A.  I don't remember.
17     Q.  Do you remember the name of the judge?
18     A.  I don't.
19     Q.  Do you remember the name of the case?
20     A.  As we sit here, I don't.
21         MR. McNUTT:  So, Andre, we're going to ask for
22 a list of cases by title, by name, the common
23 understanding of what a list of cases is.  I don't
24 expect you to respond to it.  I'm just letting you
25 know that's what we're going to ask for in discovery

Page 19

1  shortly after this deposition.
2      Q.  Of course, unless you're agreeing to provide it
3  now.
4      A.  I don't have it with me now.
5      Q.  No.  Meaning you're agreeing on the record to
6  provide that information.
7      A.  If -- if I'm instructed to do that by my
8  attorney, I -- I will do that.
9      Q.  Okay.  So let's look at Exhibit 1.  Can you
10 tell me any cases here where you were representing a
11 defendant?
12     A.  A defendant?  I will tell you up front that
13 probably 97 -- 95, 97 percent of my cases are usually
14 for plaintiffs.
15     Q.  Okay.
16     A.  I don't control who calls me, so -- but let me
17 take a look at them.
18     Q.  Have you ever turned down any defense cases?
19     A.  Have I ever turned any down?
20     Q.  Yeah.
21     A.  Yes, I have.  I -- I -- one thing I insist on
22 when I'm asked into a case is I want to know the details
23 of the case.  I don't want to take on a case where I'm
24 being asked to -- to look at something and I'm -- I'm
25 not convinced that I have anything, really, to add to

Page 20

1  the case as it stands.  And I -- I'm very hesitant to
2  get into a case that I don't agree with whatever the
3  defense position is.
4      Q.  So I appreciate the 98 percent.  You said 98
5  percent of prior cases are --
6      A.  I'm --
7      Q.  -- plaintiff?
8      A.  I'm -- I'm giving you ballpark figures.
9      Q.  You're going a little quick on the answer, I
10 think.
11     A.  I'm sorry.
12     Q.  I know you know my question.  I appreciate
13 that, but it's for her.
14     A.  I understand.
15     Q.  I'm trying to --
16     A.  I warned you in advance.
17     Q.  -- whip us both into shape early on for the
18 sake of the court reporter.
19     A.  95, 97, 98 percent is a -- is a rough estimate.
20     Q.  So I could not find any cases with these vague
21 summaries in which you represented a defendant, but take
22 a minute, and just a minute, and you tell me if that's
23 the case, unless you can't tell.
24     A.  Well, I will tell you that most of the death
25 penalty cases that are listed on here, and I do a lot of

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 21

1  them, those are all for the defendant in the case.
2  Sometimes they're a plaintiff in a lawsuit or they're
3  the -- the petitioner in an appellate process, but, you
4  know, they are for the defense.
5      Q.  Let me ask a better question.  Have you ever
6  represented a defendant in a civil litigation case
7  involving use of force?
8      A.  I represented a defendant in an actual criminal
9  case in Federal Court in Alabama.  I've represented a --
10 well, let me look at the list here.
11     The -- the second case on page 1 was up in the
12 far reaches of Northern California.  That was not in the
13 civil litigation case yet.  It was in the appellate
14 process.  I represented the defendant in that who was on
15 California's death row.
16     Q.  Is being on death row a civil case?
17     A.  It's a criminal case.  I don't know what --
18     Q.  I asked for civil cases.
19     A.  Okay.  Let me finish looking at the list, then.
20     So your question, again, is have I ever been --
21 use the term retained on a civil case, is that what
22 you're asking, where I was representing the defendant in
23 a criminal case who was now engaged in a civil action?
24     Q.  That's what I asked.
25     A.  That's what you asked.  Okay.

Page 22

1      Several of these would be, quite frankly.
2      Q.  Identify them.
3      A.  I'm trying to.
4      Q.  It would be easier if there were case names.
5      A.  I beg your pardon?
6      Q.  It would be easier to identify if there were
7  case names.
8      A.  I understand that, yeah.
9      Again, just about every single one of these
10 death penalty cases is a criminal defendant.
11     Q.  Sir, we keep going around the cat on this.  You
12 keep -- I keep asking you about civil cases and you keep
13 answering about criminal cases.
14     A.  These are criminal cases that are involved in
15 civil litigation either through the appellate process,
16 through the -- the clemency petition process --
17     Q.  Do you believe that criminal defendants, when
18 they're in the Federal Court on a clemency claim or a
19 habeas claim, that's civil litigation?
20     MR. LAGOMARSINO:  Hold on a second.  I would
21 just ask both of you to please let each other finish.  I
22 think counsel interrupted a couple times.  Tom, I think
23 your answer interrupted.  I think he was answering the
24 question and you interrupted him.  That's my view of it.
25     Q.  BY MR. McNUTT:  Please finish.

Page 23

1      A.  First of all, let me say I'm not a lawyer, but
2  my understanding is that some of these cases, when it is
3  in that process, my understanding, some of them are, in
4  fact, civil cases.  Okay?
5      Q.  So the -- are you done?  I'm sorry.
6      A.  I guess so.
7      Q.  Well, no.  I'm asking.  Are you done?
8      A.  I'm done with answering your question.  Yeah.
9      Q.  Okay.  So has your -- for the entire time
10 you've been an expert, has your contract always stated
11 as you suggested, that the name of the case is not to be
12 disclosed?
13     A.  That's not the specific wording.  It says that
14 my involvement in the case, the name of the case, the
15 details of the case are all confidential and I will not
16 divulge them.  And the only time it's not been in there,
17 because I go over that contract normally with the
18 attorneys if they said, "Look, we don't care," you know,
19 then I'll take it out.
20     Q.  And how long has that been the case for you,
21 that that's been in your contract?
22     A.  20, 25 years.
23     MR. McNUTT:  Okay.  So we'll mark -- what are
24 we on?  Exhibit --
25     THE REPORTER:  2.

Page 24

1      (Defendant's Exhibit 2 was marked for
2  identification.)
3      Q.  BY MR. McNUTT:  Take a minute and look at
4  Exhibit 2.
5      A.  Okay.  I recognize this.
6      Q.  You do recognize it?
7      A.  I recognize it as similar to ones I've used in
8  the past.  I recognize the cases on it.  I don't know
9  what case this was presented in or what the date of this
10 was.
11     Q.  Why is it that that list of prior cases used by
12 -- it was used by you as expert.  Correct?
13     A.  It would have been presented as an expert.
14     Q.  Okay.  And that's your list of cases under FRCP
15 26.  Correct?
16     A.  If that's the -- if that's the statute for it,
17 it would be.
18     Q.  You can trust me on that one.
19     A.  Okay.
20     Q.  Even your lawyer would object if I
21 misrepresented that one.
22     A.  Okay.
23     Q.  And so why are there case names with
24 specificity and case numbers on that list, which was
25 produced in the last ten years?

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 25

1    A.  Without knowing when this was presented and the
2   case that was presented and the circumstances
3   surrounding presenting it, it may have been a case where
4   I was told to -- by a judge or whoever -- whomever was
5   presiding to list the cases --
6    Q.  Okay.
7    A.  -- at which point I would have done that.
8    Q.  Do you recall a judge ever telling you or
9   telling your lawyer that you had to produce a case such
10  as Exhibit 2?
11   A.  I do recall that once or twice.  Yes.
12   Q.  Which jurisdiction was that in?
13   A.  I don't recall.
14   Q.  Do you remember the name of the judge?
15   A.  I don't remember the name of the judge.
16   Q.  Do you remember the name of the case?
17   A.  I don't.
18       MR. McNUTT:  So we're going to mark a few
19  documents which we'll then routinely use this morning.
20  So that's the next one.
21       (Defendant's Exhibit 3 was marked for
22  identification.)
23       MR. McNUTT:  Andre, that's just his report, not
24  his supplement.
25       We'll make that one next.

Page 26

1        (Defendant's Exhibits 4 and 5 were marked for
2   identification.)
3        MR. McNUTT:  And we may as well do one more.
4        (Defendant's Exhibit 6 was marked for
5   identification.)
6        THE WITNESS:  Okay.
7    Q.  BY MR. McNUTT:  Mr. Parker, we just premarked a
8   series of exhibits, but they are your initial report, a
9   set of published documents by you, the list of documents
10  you reviewed in this matter as well as your CV.  You're
11  free to look at those, but I can represent to you those
12  are the documents we're going to use for a lot of your
13  questioning today.  Is that fair?
14   A.  Yeah.  I recognize the documents.
15   Q.  Okay.  Let's go to your published list of
16  articles.  I just have a quick question for you.  Are
17  you looking at it?
18   A.  I am.
19   Q.  Okay.  Do you have copies of these articles?
20   A.  I think the only two that I still have copies
21  of are the bottom two, The Militarization of the Police,
22  Part 1, Part 2.
23   Q.  Can you obtain copies of them if you wanted to?
24   A.  Did what?
25   Q.  Can you obtain copies of all --

Page 27

1    A.  Of those two, I can.
2    Q.  No, no, no.  All of these articles.
3    A.  I probably could.  I mean, they've all been for
4   the California Attorneys for Criminal Justice and for
5   their -- their journal, The Forum.  I'm sure I could ask
6   them for question -- for copies of them.
7    Q.  Did any of these articles involve excited
8   delirium?
9    A.  I don't believe so.
10   Q.  Okay.  Have you ever written any article
11  involving excited delirium and the use of force?
12   A.  I don't believe so.
13   Q.  Is this a complete list of articles that you've
14  authored or co-authored?
15   A.  I don't know.  I on occasion wrote articles
16  back during my FBI days.  I've -- I've written articles,
17  you know, over the 25 years.  I think there's a time
18  requirement, isn't there, on the articles?
19   Q.  I'm just asking a simple question if these are
20  all the articles or not.
21   A.  No, they're not.
22   Q.  My hope was the answer was yes.
23   A.  Looking back 50 years, I don't think they are.
24  I don't think it is a complete list.
25   Q.  Take a look at the list of documents --

Page 28

1    A.  Yes.
2    Q.  -- that you said you reviewed for this matter.
3   Do you have it?
4    A.  I do.
5    Q.  I think it's Exhibit 5.  Right?
6    A.  I do have it.
7    Q.  Okay.  So let's turn to -- all of these
8   documents from the case were provided to you by your
9   lawyer.  Correct?  You did not independently obtain
10  them.  Correct?
11   A.  No.  That's -- that's not correct.  A large
12  number of the ones, starting from about --
13   Q.  Sir, let me cut you off.  I am cutting you off.
14  I said the documents from this case were provided by
15  your lawyer.
16   A.  Let me -- let me look at it.
17       MR. LAGOMARSINO:  Tom, what he's saying --
18       THE WITNESS:  No.  I understand.
19       MR. LAGOMARSINO:  Let me finish, please.
20       THE WITNESS:  Oh.  I'm sorry.
21       MR. LAGOMARSINO:  He's talking about any
22  documents from this case.
23       THE WITNESS:  Right.
24       MR. LAGOMARSINO:  Not from the list.  From this
25  case were provided to you.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

| Page 29 | Page 31 |
|---|---|

**Page 29**

1  THE WITNESS: All the documents from this case
2  were provided to me. Yes.
3  Q.  BY MR. McNUTT: By Mr. Lagomarsino?
4  A.  By his office. Yes.
5  Q.  Okay. That's all I was asking.
6  A.  Okay.
7  Q.  Okay. So on page, I guess, 4 where at the
8  bottom it says Media Videos and Articles, do you see
9  where I'm at?
10  A.  I do.
11  Q.  And on the next page it goes over and it starts
12  with document, or whatever, number 108.
13  A.  I see that.
14  Q.  Okay. So was this page, were these list of
15  media files and articles, were these also provided by
16  Mr. Lagomarsino, or did you independently obtain them?
17  A.  No. These were provided by -- by him and his
18  office.
19  Q.  Okay. Let's go to -- well, I don't have a page
20  number. Where it starts with item 272. Are you there?
21  A.  I am.
22  Q.  So it says Literature Reviewed.
23  A.  Right.
24  Q.  These documents, were they provided to you by
25  Mr. Lagomarsino?

**Page 30**

1  A.  No. These are documents that I either already
2  had in my office either from other cases or research
3  that I've done or seminars that I've attended and ones
4  that I have used rather extensively in my expert witness
5  work.
6  Q.  Okay. So those were documents that you rely on
7  as an expert in a variety of manners -- excuse me, in a
8  variety of matters?
9  A.  In general, yes, but they all would have had
10  applicable aspects to the books that -- that I would
11  take into account for this --
12  Q.  Okay.
13  A.  -- whether I used them directly or not.
14  Q.  So you didn't reference anything on this list
15  of documents that weren't, in your opinion, relevant to
16  this case?
17  A.  I believe I would have referred to -- let's
18  see. You're asking me if I -- if I referenced something
19  from these articles or books or -- what's your question
20  again?
21  Q.  That wasn't my question, but you can answer
22  that one if --
23  A.  Yeah.
24  Q.  We'll get to that one eventually.
25  A.  I -- I would say every one of them in one sense

**Page 31**

1  or another helped me form my opinions or helped me
2  analyze the facts of the case.
3  Q.  Okay. Item 271 is identified as an article
4  authored by you. Correct?
5  A.  That's correct.
6  Q.  But it's under the list you have where this
7  document was provided by Mr. Lagomarsino. Did he give
8  you that document, or is that just a typo?
9  A.  That may be a typo.
10  Q.  But the other articles, "Excited Delirium and
11  Dual Response Preventing In-Custody Death," item 267,
12  was that yours, or was that from -- meaning your
13  research, or was that from Mr. Lagomarsino? Item 267.
14  A.  Yeah. I -- I see it. I'm just looking at the
15  context of the other articles that are listed there.
16  I -- I think those are articles that I -- that
17  I either had because I recognize all of them from
18  roughly 261 forward.
19  Q.  So those just should have been on the list of
20  literature reviewed, meaning Mr. Lagomarsino didn't
21  provide it to you. That was from your own research.
22  Correct?
23  A.  Let me -- let me see what the heading is for
24  this list. Media articles, was it? Yeah.
25  It -- it definitely belonged in the category

**Page 32**

1  that it's in because there's no delineation on here
2  between what were my articles or what the articles were
3  provided to me by Mr. Lagomarsino's office. But I
4  recognize those as articles that I've had in my files.
5  Q.  Okay. And I think you said from 261 down to
6  271 were also from your files --
7  A.  Let me --
8  Q.  -- at a minimum. Correct?
9  A.  Let me take a little bit closer look here.
10  Well, it looks like Farmer or Brown, however we
11  refer to this, it looks like that's essentially the --
12  appears to be the end of the list of media articles that
13  was provided by Mr. Lagomarsino's office. 261, 262,
14  263.
15  It looks like from 261 on down to 290 are all
16  things from -- from my library, my research files.
17  Q.  Okay. Do you ever identify documents that
18  you've reviewed that don't support the positions you're
19  taking in the case, in any case?
20  A.  Do I identify them? I've identified here.
21  What are you referring to?
22  Q.  No. So do all these articles support the
23  positions you've presented in your report?
24  A.  For the most part, they contributed to
25  supporting the positions, yeah.

Page 33

1    Q. So I'll go back to my original question --
2    A. Okay.
3    Q. -- which maybe with that question makes it
4 clear to you.
5        Do you ever cite articles -- and if I'm talking
6 too loud, by the way, let me know.
7    A. No. You're -- you're doing just fine.
8    Q. I don't mean to be shouting at you.
9    A. I understand. Normally I ask people to speak
10 up.
11    Q. You said talk loud.
12    A. For his -- he and I -- I forgot your name.
13      MR. ANDERSON: Craig.
14      THE WITNESS: I think since Craig and I met
15 last, my hearing deteriorated tremendously and I wear
16 hearing aids now.
17    Q. BY MR. McNUTT: You have them in. Right?
18    A. I do have them in.
19    Q. Do you ever identify in a report or on a list
20 of documents for a report materials that do not support
21 your positions you take in a --
22    A. That do not support?
23    Q. That do not support.
24    A. Generally not.
25    Q. Okay. I just wanted to know.

Page 34

1    A. I understand.
2    Q. Do you believe that there is a standardized
3 definition for a dynamic situation in policing?
4    A. Say that again.
5    Q. So you've heard of the phrase it's a dynamic
6 situation. Correct?
7    A. Sure.
8    Q. In the context of police action?
9    A. Most police actions are dynamic situations.
10    Q. Fair enough. And my question to you is, is
11 there a standardized definition of what constitutes a
12 dynamic situation.
13    A. I -- I think the circumstances dictate that.
14 Circumstances are generally different in -- in --
15    Q. Okay.
16    A. -- the vast majority of cases.
17    Q. And I'm asking a follow-up question. Are there
18 any elements to the definition of dynamic that need to
19 be present for someone to say this is a dynamic
20 situation?
21    A. As far as whether there are any specific
22 articulable or recognizable aspects of that, I don't
23 think I've ever seen any, but having been in hundreds of
24 dynamic situations, I would say they are generally
25 situations that are ongoing, that some cases police have

Page 35

1 already responded, some cases they haven't. It depends
2 on the situation, you know.
3    Q. Okay.
4    A. Literally every -- I think every situation that
5 the police are normally involved in is a dynamic
6 situation, but, again, that definition is based on the
7 circumstances.
8    Q. Fair enough.
9        And did the FBI have a definition of dynamic
10 situation or elements, or was it more of a standard,
11 like you articulated just now?
12    A. I think every agent in the FBI recognizes a
13 dynamic situation. I don't remember ever being --
14 hearing that word used in the Academy, in any in-service
15 training or anything like that. It was -- we use the
16 term more it was ongoing, it was developing, fast
17 moving. You know, all of those can contribute to the
18 use of the word "dynamic." It was not a common word
19 that we -- we used.
20    Q. And is it fair to say it was not a common word
21 that you used in your FBI service, which ended in 1994.
22 Correct?
23    A. Correct.
24    Q. Is that a word that has come into vogue in
25 policing since then?

Page 36

1    A. I don't know whether it's come into vogue since
2 then. I was a police officer before my FBI days, and I
3 -- I can recall hearing the phrase on occasion. I don't
4 think it was a common term that was used back then.
5        As you've seen in my qualifications, I -- I'm a
6 Fire and Police Commissioner for the City. We oversee
7 the Police and Fire Departments. I've heard the terms
8 used there a number of times on specific cases or
9 situations are developing or reasons why something
10 happened the way it did, but --
11    Q. So --
12    A. -- but it wasn't a common term in the FBI.
13    Q. Okay. I may refer to the Las Vegas
14 Metropolitan Police Department today as LVMPD --
15    A. I understand that.
16    Q. -- Metro or the Department.
17    A. Yeah. From my time from Las Vegas I've heard
18 every one of those terms.
19    Q. So we're tracking on my terminology. Okay?
20    A. I think we are.
21    Q. Okay. Do you know if Metro has a definition of
22 what constitutes a dynamic situation?
23    A. Off the top of my head I don't know. Could I
24 have seen that word in some of the documents that I
25 reviewed that were provided by Metro through Mr.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 37

1  Lagomarsino?  It could have been there.  I don't
2  remember it.
3      Q.  So is it fair to say that in your expert
4  experience, just talking as an expert now, you have not
5  seen any standardized definition of dynamic situation or
6  the word "dynamic" amongst departments or the FBI?
7      A.  That would be a fair statement.  I don't recall
8  right now specifically ever seeing a description of
9  "dynamic."
10      Q.  I'm aware that you were involved in a shooting
11  as an officer in Santa Clara.  Correct?
12      A.  I was.
13      Q.  Was that a dynamic situation, in your opinion?
14      A.  It was very dynamic.
15      Q.  Let me finish.  I know you know the question,
16  but, please, for her sake.
17          So was your shooting when you were a Santa
18  Clara police officer a dynamic situation?
19      A.  That was your question and I said yes.
20          MR. McNUTT:  We can go off the record real
21  quick.
22      (Discussion held outside the record.)
23          MR. McNUTT:  We're back on the record.
24      Q.  Was that -- in your law enforcement career, was
25  that the only time you personally utilized lethal force

Page 38

1  was that one shooting when you were a Santa Clara police
2  officer?
3      A.  With a firearm.  That's correct.
4      Q.  Okay.  So you used lethal force in another
5  instance?
6      A.  I've -- I've never used any force which
7  resulted in the death of anyone, including that shooting
8  situation.
9      Q.  Well, but did you -- you seem to be making a
10  distinction between the shooting and an instance where
11  you applied lethal force but it did not result in death.
12      A.  Well, I -- I've been involved in other
13  situations where a shooting occurred, exchanges of -- of
14  shootings.  I've been in situations where there have
15  been physical altercations where death could have
16  occurred but did not.
17          I don't know if that answers your question or
18  not.
19      Q.  Well, I used the word "personally" in the
20  question.
21      A.  Well, I was involved personally in every one of
22  those.
23      Q.  But I said where you personally used lethal
24  force.  And the answer to that question is you've only
25  used lethal force one time?  Yes or no.

Page 39

1      A.  I've only used a fire arm one time.
2      Q.  Okay.  Have you ever used lethal force
3  personally any other times?
4      A.  Again, you're kind of splitting hairs here.
5      Q.  No, sir.  You're splitting hairs.
6      A.  Well, I'm trying to answer your question.  Your
7  questions are very, very general.  I don't want to get
8  into an argument with you, but -- but based on my
9  experience, which it appears you probably don't have
10  that experience, but the -- I would say any situation
11  where force is used, if the situation develops in a bad
12  way, some of them do, it could end up being a situation
13  where the force used ended up being lethal.  That's how
14  I'm trying to answer your question here.
15          So to use the term "force," that -- that kind
16  of opens the door very broadly to a lot of these
17  situations in terms of lethal force specifically.
18  Situations that I've been involved in that were
19  shoot-outs, you know, that was all lethal force.  In
20  those situations I was usually there as a manager.  I
21  didn't -- I didn't fire my weapon.  I've been in
22  situations where, you know, it's a -- a knock-down,
23  drag-out physical fight.  Those can end up lethally,
24  depending on how they develop.
25          So I -- I can't -- that's the way I would

Page 40

1  answer your question.  In all of those I was personally
2  involved in either as an agent or -- or a police officer
3  or as a supervisor or manager over the -- over the
4  situation.
5      Q.  So you're including in your, quote, experience,
6  end quote, the use of lethal force if someone else used
7  it but you were present?
8      A.  That's correct.
9      Q.  Okay.  Even if you were just a manager at a
10  headquarters?
11      A.  Well, as a -- in my role I was essentially the
12  chief operations officer for the Los Angeles Division,
13  second largest in the FBI, 750, 800 agents.  We -- we
14  had, if I use your term, dynamic situations happening
15  many times a day.  And most of those I -- it was a part
16  of my job to respond to it if it was a very serious
17  situation, provide on-scene management.
18      Q.  San Jose State, what's now San Jose State.
19  Correct?
20      A.  What's that?
21      Q.  San Jose State.  Is that your alma mater?
22      A.  That's my undergrad.  Yeah.
23      Q.  Different name back then?
24      A.  San Jose State College back then.
25      Q.  Got you.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 41

1    A. San Jose State University now.
2    Q. Master of arts in public safety and
3 administration, 1990?
4    A. That was not from San Jose State.
5    Q. Correct. I'm asking the question. Was it an
6 online course?
7    A. No. It was a class course.
8    Q. Who was that? Where was that?
9    A. At that time it was the College of St. Thomas.
10 It's now the University of St. Thomas. It's a large
11 Jesuit school in St. Paul, Minnesota.
12   Q. Is that while you were stationed up there with
13 the --
14   A. It was.
15   Q. -- FBI?
16   A. Yeah. I actually finished it. I had one class
17 left when I was promoted out of there back to FBI
18 headquarters. And I -- for the time I was at
19 headquarters on that time I didn't have the capability
20 to finish it. But when I came to Los Angeles, St.
21 Thomas had an off-campus program out here and I was able
22 to get the last course that I needed.
23   Q. So on --
24   A. Finished here in Los Angeles.
25   Q. On page 2 of your professional qualifications

Page 42

1 document, which we've referenced as Exhibit -- what did
2 we reference it as? Look at the front page. Exhibit 4.
3 You identify or state in the second paragraph, "During
4 his police and" -- did you narrate this in the third
5 person?
6    A. I wrote this.
7    Q. In the third person. Correct?
8    A. Yes.
9    Q. So where it says "his," that means you?
10   A. That's me.
11   Q. So that you had commanded -- let's see.
12 "Personally investigated, managed and/or commanded over
13 15,000 state and Federal criminal investigations." Do
14 you see that?
15   A. I do.
16   Q. Okay. So that 15,000 number includes
17 everything if you were -- as you noted, your last
18 assignment was as the Assistant Special Agent in Charge
19 of L.A. Right?
20   A. Right.
21   Q. So are you counting all of the investigations
22 that occurred at the L.A. FBI office during your tenure
23 there?
24   A. The ones that I had direct management or
25 supervisory authority over during that time. I counted

Page 43

1 those. That's correct.
2    Q. Okay. And so that was just -- this 15,000
3 number does not include any work as an expert. Correct?
4    A. No. Does not.
5    Q. Does it include any work as a private
6 investigator subsequent to retiring from the FBI?
7    A. No.
8    Q. Okay. Just to be clear, it's just all -- this
9 is your sworn law enforcement career, this 15,000.
10 Correct?
11   A. Correct.
12     (Defendant's Exhibit 7 was marked for
13 identification.)
14   Q. BY MR. McNUTT: Take a look at what we've
15 marked as Exhibit -- what was that one?
16     THE REPORTER: 7.
17   Q. BY MR. McNUTT: Do you recognize this as
18 another one of your CVs?
19   A. Yes.
20   Q. Look on --
21   A. This looks like an earlier one.
22   Q. Look on page -- they're not numbered, so please
23 go to the third page.
24   A. Mine are numbered. The upper left-hand corner.
25   Q. Oh, you're right. Go to page 3.

Page 44

1    A. And where on page 3?
2    Q. The fifth paragraph down.
3    A. Correct.
4    Q. Do you see "He has personally investigated
5 and/or managed in excess of 10,000 cases"?
6    A. Correct.
7    Q. So this is an earlier version of your CV.
8 Correct?
9    A. It's an earlier version, and somewhere between
10 there -- I remember the situation. I was with a group
11 of my former colleagues, Assistant Agents in Charge,
12 retired, and we got to talking about this because some
13 of them do expert witness work. And they challenged me
14 on the 10,000. They said, "My God, in L.A. you had a
15 lot more than that." So together we did some
16 refiguring, and that's when I changed it to 15,000,
17 which is a more accurate figure.
18   Q. How did you come up with that number?
19   A. Based on the average caseload of -- of the
20 agents, both working for me in L.A., working for me as a
21 supervisor or when I was a case agent and had agents
22 working for me in that category, what the average
23 caseloads were, what our caseloads were for the various
24 offices I was in, L.A. Huge office, second largest.
25 St. Paul, I know exactly what the average caseload was

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 45

1  at that time.  And just extrapolating those numbers, it
2  came much closer to the 15,000.
3      Q.  So you extrapolated numbers based upon average
4  amounts of cases of offices?
5      A.  I added up and multiplied numbers.  Okay?
6      Q.  But you --
7      A.  Based on the offices that I had been assigned
8  to, supervisory, management jobs I had, the number of
9  agents I had and what I knew the average caseloads were.
10     Q.  So average caseloads based upon your memory.
11 Correct?
12     A.  No.  Based on the statistics that I had to sign
13 off on every month as to what our caseloads were.
14     Q.  So when you made this change, which is a 50
15 percent increase of the amount of cases you claim to
16 have personally investigated --
17     A.  Correct.
18     Q.  -- and/or managed, you did not have access to
19 the FBI files at that time, did you?
20     A.  At the time I did these?
21     Q.  No.  At the time you made the change in your CV
22 from 2013 at 10,000 cases to your CV that you provided
23 in this case, 15,000 cases.
24     A.  No.  I did not have access.  I had to rely on
25 my memory.

Page 46

1      Q.  So can you remember the name of any of those
2  cases of those 5,000 you added?
3      A.  That's a ridiculous question, quite frankly.
4  No.  I don't remember any of those.  I know what -- I
5  know what the average caseloads were.  I knew for the
6  most part how many agents I had at any given time.
7  Those were figures that we kept very, very accurately.
8  They were reported regularly that entered into not only
9  our budget concerns but whether we were requesting
10 additional manpower, or whatever.  They -- they are
11 numbers that I was very, very comfortable with.
12     Q.  But you can't point to a list and validate that
13 number, 15,000, can you?
14     A.  I think I answered that.  I don't have access
15 to those records anymore.
16     Q.  And nor did you have it when you increased your
17 claimed experience by 50 percent.  Correct?
18     A.  Can you ask that again?
19     Q.  Nor did you have access to that database or
20 those reports when you increased your claimed experience
21 in your CV by 50 percent?
22     A.  I did not have access at that time, no.  I went
23 on memory.  I went on the shared experience of my fellow
24 Assistant Agents in Charge as we were discussing this.
25 And I'm fairly comfortable with the fact that I

Page 47

1  underestimated on the old one and that the new one is
2  much more accurate.
3      Q.  Well, why isn't it 14,000 or 15,500?
4      A.  Because it fell -- it figures higher than that.
5  The estimates were higher than that.
6      Q.  Were you ever --
7      A.  Let me say this.  I don't make those numbers
8  up.  Okay?  They -- they were based on memories.  They
9  were based on the shared experiences.  There was --
10 there was a colleague in this meeting who I replaced
11 when I came to Los Angeles.  It was a result of a -- a
12 number of different discussions and refiguring those
13 statistics.
14     Q.  Were you ever in your law enforcement career,
15 which, when I say law enforcement career I'm including
16 Santa Clara and your FBI time.  Okay?
17     A.  There's one more in there.  I was the first --
18     Q.  Park ranger.
19     A.  -- law enforcement park ranger in Yosemite.
20     Q.  So we'll include it all.  Okay?
21        So during your law enforcement career were you
22 ever an instructor for use of force?
23     A.  In a general sense, yes.
24     Q.  No.  In a specific sense where you had the
25 title or whatever your department called it.

Page 48

1      A.  The only part of use of force that I ever
2  taught was not the physical part of it.  I taught
3  management and supervisory concerns as they related to
4  use of force situations.  I was -- during my -- my agent
5  days before I got into management I was an FBI-certified
6  police instructor where I taught not only police
7  officers and agents but also sergeants, lieutenants,
8  captains about the managerial aspects of managing use of
9  force and use of force investigations.
10     Q.  So you never taught the physical aspect of it.
11 Correct?
12     A.  I didn't teach physical aspects, no.
13     Q.  Were you ever an instructor where you taught
14 the physical aspects of any sort of defensive tactics?
15     A.  Not that I recall, unless something came up in
16 one of those classes.  But, no, I didn't specifically
17 teach those.  I might answer a question if somebody had
18 one, but --
19     Q.  During your time at the FBI did the FBI teach
20 any sort of neck restraint procedure?
21     A.  No.
22     Q.  Do you know if the FBI teaches a neck restraint
23 procedure to its agents now?
24     A.  I don't know.  I've been -- I've been gone 25
25 years.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 49

1    Q.  Well, that's --
2    A.  I still have a lot of contact with FBI agents.
3  I don't know whether they're physically teaching that at
4  this time.  I don't know.
5        Defensive tactics training is -- is -- it's
6  pretty broad for the most part, trying to address the
7  situations that we end up in.  We don't normally get in
8  -- or we didn't get into the same type of day-to-day
9  things that I experienced when I was a police officer.
10  We planned for arrests.  We always took sufficient
11  numbers and most situations that agents would get into
12  were, you know, either just an occasional one-on-one
13  situation or -- or whatever.  But we -- we believe
14  strongly in strength in numbers and planning.
15    Q.  Are you done?
16    A.  I am.
17        MR. McNUTT:  Move to strike as vacuous and
18  nonresponsive.
19    Q.  During your time at Santa Clara, did Santa
20  Clara ever utilize or authorize any sort of neck
21  restraints?
22    A.  We did use neck restraints at times.  I don't
23  remember what instruction we might have had.  It might
24  have been on the job.  You know, that was back in the
25  '60s.  The -- the police environment was a heck of a lot

Page 50

1  different then than it is now.
2    Q.  You could shoot burglars back then.  Correct?
3    A.  Well, legally you could, but we didn't do it.
4    Q.  Well, you did.  Right?
5    A.  I shot at him.
6    Q.  Yeah.  Were you --
7    A.  There was a number of other dynamics involved
8  in that at the time.  He was fleeing.  He had assaulted
9  me and --
10    Q.  Was it a warning shot and you did not intend to
11  shoot him?
12    A.  No.  I intended to shoot him.
13    Q.  You just missed?
14    A.  I missed.  Yeah.
15    Q.  Were you a very good shot when you were --
16    A.  I was a pretty good shot, yeah, but it's
17  difficult to be extremely accurate when the subject is
18  running and I'm running.
19    Q.  He was running away from you?
20    A.  He was.
21    Q.  So you were trying to shoot him in the back?
22    A.  I didn't care where I hit him, quite frankly.
23    Q.  So tell me about the time that you disarmed a
24  skyjacker with a military-style automatic weapon.
25    A.  I didn't disarm him per se.  I was -- I went on

Page 51

1  that aircraft in an undercover capacity posing as a
2  co-pilot, and I had a number of responsibilities.
3  Number one was to try and -- and we also had a hostage
4  negotiator outside the plane while we were still on the
5  ground.  You know, I had the responsibility to try and
6  -- and do what I could to contain that situation, to get
7  more passengers released, if we could, to protect the
8  passengers and crew that were on the plane.  And that
9  was my responsibility.  I didn't go on there with a
10  specific purpose of physically disarming him.
11    Q.  So I'll read from your CV, page 4.  In --
12    A.  Which document are you referring to?
13    Q.  Your CV.
14    A.  You gave me two of them.
15    Q.  Well, the one you produced in this case,
16  although I acknowledge there is different language in
17  each of them, but --
18    A.  I don't -- I don't know that I would have
19  produced it.  Did I produce this in this case?
20    Q.  No.
21    A.  Or is it from a prior case?
22    Q.  That's from a prior case from 2013.
23    A.  Okay.  So you're not referring to this one.
24    Q.  I'm not referring to that one.
25    A.  Okay.  What page is it?

Page 52

1    Q.  Page 4.
2    A.  Okay.
3    Q.  Third paragraph down, second sentence, it says,
4  "In that role, he also posed undercover as a replacement
5  co-pilot of a skyjacked jet liner and boarded the
6  aircraft in order to obtain the release of passengers
7  being held hostage."
8        Are you following me?
9    A.  I am.
10    Q.  "And to incapacitate the skyjacker."
11        Did you incapacitate the skyjacker?
12    A.  No, I did not.
13    Q.  That's how it reads.  Do you see that?
14        MR. LAGOMARSINO:  Objection.  Form.
15        THE WITNESS:  That was -- that was part of my
16  purpose of going on, was to try to -- try to do that.
17    Q.  BY MR. McNUTT:  "Who was armed with a
18  military-style automatic weapon."
19    A.  Correct.
20    Q.  What is that?  What is a military-style
21  automatic weapon?
22    A.  It appeared to be an automatic weapon that
23  looked like it was military issue.
24    Q.  Break that down for me.  What does it look
25  like?  Like an AK-47?  Do you know what an AK-47 is?

Page 53

1   A. I do know what an AK-47 is. I would say it
2 would have been more along the lines of -- as I recall,
3 it was foreign made. It would have been closer to
4 something like an AR-15. It had the look of a
5 military-issue weapon, not a hunting-type weapon.
6   Q. AR-15s are foreign-made military weapons?
7   A. No. That's American made.
8   Q. Okay.
9   A. But there are a lot of weapons. I don't know
10 if you've been in the military, but there's a lot of
11 weapons from different countries that look somewhat the
12 same. Many of them follow the American style of weapon,
13 or German or Swedish, normal manufacturers of military
14 weapons.
15   Q. So it looked like an AR something or other. An
16 automatic rifle made in foreign --
17   A. It looked like an automatic military-style
18 weapon.
19   Q. So your "undercover presence in the cockpit
20 during the flight resulted in the capture and ultimate
21 conviction of the skyjacker."
22       See that?
23   A. That's correct.
24   Q. So you took custody of him?
25   A. Not during the flight I didn't, no, because he

Page 54

1 bailed out, but we were working towards that. But my --
2 I was the one who was able to identify him because I was
3 up close. I was -- from the cockpit i was able to feed
4 information to our agents on the ground. I was able to
5 feed information while we were still on the ground to
6 the agents that were considering an actual assault on
7 the plane. Basically, my work on the plane contributed
8 to his ultimate capture and his conviction. I testified
9 extensively at his trial.
10   Q. Did you identify yourself, reveal yourself to
11 be an undercover officer to him at any moment?
12   A. To him?
13   Q. Yes.
14   A. That would have been crazy.
15   Q. Okay. So the answer is no?
16   A. I never identified myself --
17   Q. Okay.
18   A. -- as an agent to him. I was there in an
19 undercover capacity.
20   Q. So you said he bailed out during the flight.
21 Is that correct?
22   A. He did.
23   Q. So if he didn't know you were an undercover
24 officer --
25   A. Uh-huh.

Page 55

1   Q. -- or, in your case, agent, what made your
2 presence make him bail out?
3   A. I'm not saying --
4       MR. LAGOMARSINO: Objection. Form.
5       THE WITNESS: I didn't say that my presence
6 made him bail out. I think he planned to bail out all
7 along. He had asked for parachutes. He asked for money
8 and a bag, all of that.
9   Q. BY MR. McNUTT: So you were part of a very
10 large team that dealt with this skyjacker. Correct?
11   A. I was on the plane by myself with the crew, but
12 there was a large team of FBI people on the ground in
13 support of that.
14   Q. What was the name of the company that you
15 founded after you -- the multinational security
16 consulting and investigative firm in Los Angeles after
17 you retired?
18   A. The Emerald Group was the operating name. I
19 think it was the Emerald International Security Group
20 was the full corporate name.
21   Q. And my understanding based upon your prose here
22 is that you provided investigative training to former
23 FBI agents, you utilized to provide investigative
24 training --
25   A. Can I ask what page you're on?

Page 56

1   Q. Page 5.
2   A. And where on page 5?
3   Q. Forth paragraph down.
4   A. Okay.
5   Q. Why don't you just tell me what kind of
6 training you provided and to who you provided it to.
7   A. To a lot of people. Provided training to -- to
8 a lot of corporate security people. Provided training
9 off and on for three years to Russian National Police in
10 Russia. We provided investigative training to some
11 small town police departments. There was a lot of
12 training across the board over that time.
13   Q. So including international locations in
14 addition to Russia, Australia, the UK, South Africa,
15 Germany. Correct? I'm reading your list.
16   A. Let me read the paragraph.
17       I don't see training in there anywhere. We did
18 provide that training that I just described, but I don't
19 think I represented that in that paragraph.
20   Q. So tell me what kind of -- you provided
21 investigative training to those entities, your clients?
22   A. Whatever the type of training was that they
23 asked for that we were comfortable with, and most of it
24 was in the investigative area. On the corporate side,
25 it had a lot to do with corporate security, with

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

**Page 57**

1  hardening the companies they worked for as targets of
2  foreign espionage or trade secrets or what have you.
3      Q.  The Secretary of State of the United States,
4  did they authorize you to export these skill sets of
5  training?
6      A.  I don't understand your question.
7      Q.  Did the Secretary of State of the United States
8  -- not the Secretary, but the department, the Secretary
9  of State authorize your company to provide, export that
10  training to foreign organizations?
11      A.  Why would that authorization have been needed?
12  It wasn't need.
13      Q.  Are you familiar with ITARS?
14      A.  With what?
15      Q.  Are you familiar with ITARS?
16      A.  ITAR.
17      Q.  ITARS.
18      A.  That was --
19      Q.  It's an acronym.
20      A.  It was interstate transportation arms
21  racketeering.
22      Q.  That's not what it means, but I'll --
23      A.  Why don't you explain to me what it means,
24  then.
25      Q.  So in order to provide certain training in

**Page 58**

1  investigative techniques to foreign agents, governments,
2  individuals, any sort of organization or individual has
3  to be approved by the Secretary of State to export that
4  training.
5      A.  Let me say that for the three years that we
6  worked in Russia, okay, that was under a State
7  Department grant.  They knew exactly what we were doing.
8  We were not required, and I think you're misinterpreting
9  that statute.  It does apply to certain things as far as
10  things that we considered national security matters in
11  the United States.  But this type of international
12  training happens all the time.  It always has, and it
13  still does.
14      Q.  Are you still the Police Commissioner, Police
15  and Fire Commission here in Santa Barbara?
16      A.  I am.  I was reappointed two years ago.
17      Q.  Is it a paid position?
18      A.  A what?
19      Q.  Is it a paid position?
20      A.  No.  It's an -- it's an appointed citizen
21  volunteer position.
22      Q.  What authority do you have in that role?
23      A.  What authority do we have?
24      Q.  Uh-huh.
25      A.  Well, we have -- we have subpoena power.  We

**Page 59**

1  have the authority to inquire of both the Police and
2  Fire Departments about their activities, the full range
3  of their operational concerns.  We have a voice in their
4  budgets.  We have a voice in the personnel strengths.
5  We have a voice in situations that fall outside of
6  normal operating procedures.  We report to the Mayor and
7  to the City Council.  We make recommendations.  And if
8  we don't get answers, we have the authority to issue
9  subpoenas.
10      Q.  Go back to your list of documents that you
11  reviewed in this matter and look at item 68.  It says
12  "Body Worn Camera Videos."  Do you see that?
13      A.  I do.
14      Q.  But it has no identification of which body worn
15  camera videos you reviewed.
16      A.  That is correct.
17      Q.  Can you tell me which body worn camera videos
18  to --
19      A.  It is only one.
20      Q.  -- to prepare your --
21          Let me finish.
22      A.  I'm sorry.
23      Q.  -- to prepare your report.
24      A.  I was having computer problems when I prepared
25  the first report.  I was unable to download the body

**Page 60**

1  worn camera stuff.  I have had a chance to see them
2  recently, and the ones that I have seen was the one worn
3  by Officer Lopera.  And I don't remember if Officer Lif
4  had -- had one.  I -- I've seen a couple of them.
5      Q.  Did you watch the one worn by Officer Rybacki?
6      A.  I don't know which one that would have been.  I
7  -- I saw a couple of them.  I don't know if I saw them
8  all or not.
9      Q.  Did you watch the one worn by Officer Crumrine?
10      A.  I -- I don't know.
11      Q.  Did you watch the one worn by Officer Tran?
12      A.  Again, I don't know.
13      Q.  Do you know who Officer Tran is?
14      A.  I do.
15      Q.  Who is he?
16      A.  He was the first officer after Sergeant
17  Crumrine had arrived on the scene about 25, 30 seconds
18  into the situation.
19      Q.  How about Officer Flores?
20      A.  Flores, I believe he was with him.  They
21  arrived together.  Flores did not come into the scene or
22  into the picture, whoever's body camera it was that we
23  see.  Or maybe it was the Venetian security camera.  But
24  Tran rushed over to the incident spot immediately.
25  Lopera followed maybe four, five seconds later.  Not

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 61

1  Lopera. Flores four or five seconds later.
2  Q. But you don't know whether you watched their
3  body worn cam?
4  A. Well, it wouldn't have been their body worn
5  cameras that were seen. That might have been a Venetian
6  security camera. I -- I don't know.
7  Q. Do you --
8  A. I don't remember right now.
9  Q. Do you know if all the officers wore body worn
10  cameras?
11  A. I don't know.
12  Q. Look at item 115. "Tulsa leaders urge peace
13  after cop acquitted in man's death." Do you see that?
14  A. I do.
15  Q. Do you recall reading that? Is it an article,
16  or was it a media file?
17  A. I don't remember at this point. I -- I would
18  think it was an article.
19  Q. Why is that listed here for this matter? Las
20  Vegas is not Tulsa, Oklahoma. You'd agree. Correct?
21  A. Because it was an article presented to me that
22  possibly had bearing on the case, and I took a look at
23  everything that was presented to me as best I could.
24  Q. Do you know how -- do you personally do your
25  billing in this matter?

Page 62

1  A. I do.
2  Q. And do you know how much time you've spent on
3  this case?
4  A. Up to the end of the last report, I do. Well,
5  it's in an invoice that I submitted to Mr. Lagomarsino's
6  office. I have not done those calculations as far as
7  the -- the billing, excluding that retainer, preparing
8  I haven't done those yet.
9  Q. So when you say the end of the last report,
10  it's not some reporting period like a month.
11  A. No.
12  Q. It was your initial report?
13  A. I -- I don't -- I don't issue my invoices based
14  on specific reporting periods in general.
15  Q. So it's based on the work you did?
16  A. Correct.
17  Q. And do you recall how much money you've charged
18  for your initial report?
19  A. Well, I operated on a -- with an initial $5,000
20  retainer from the start of the case and the -- I believe
21  the -- the billing, excluding that retainer, I believe
22  the billing from my work on that first report was in the
23  range of $22,000. Plus I -- in submitting the invoice I
24  applied the $5,000 retainer to it, as I recall, or
25  something in that -- in that range. I -- I don't have

Page 63

1  it in front of me right now, but --
2  Q. Is any aspect of your retention contingent upon
3  the outcome of this case?
4  A. No. That -- that's not allowed. You know
5  that.
6  Q. Well, I'm entitled to ask the question.
7  A. I -- I don't operate that way.
8  Q. You reference item 286, "The Self-Defense of
9  Kodokan Judo."
10  A. Just a minute.
11  Yes.
12  Q. And in your CV or somewhere you reference that
13  in college in the '60s you did some of this type of judo
14  training. Correct?
15  A. My first judo training was in college. I -- I
16  -- my first competition was in college. After that,
17  during the early years of my FBI career I -- I met a
18  number of people of approximately my age at one of the
19  junior colleges. I was not attending, but they had an
20  adult judo program there that I participated in. This
21  was in -- in St. Louis. I participated in that for
22  three or four years on a -- on a part-time basis. I
23  didn't have the time to do it the way some of them were
24  committed to it.
25  Q. Do you claim to be an expert in martial arts?

Page 64

1  A. I don't.
2  Q. Are you offering any expert opinions in the
3  martial arts in this matter?
4  A. No. I think the only thing that I've referred
5  to here, and I don't think I specifically referred to
6  any of that, but I -- I do recall -- I do --
7  specifically I do recall the chokeholds. When I was in
8  -- in college our -- our coach was Yoshio Ushida, who
9  was the Olympic coach, very -- 95 years old. He's still
10  alive.
11  But one of the things he required is that in
12  order to be familiar with the dangers of a chokehold and
13  what could happen, we had a requirement that each one of
14  us would go through a choke-out and it was done by a
15  member of the U.S. Olympic Team who happened to be a
16  student at San Jose State. So we experienced that. So
17  I remember the chokehold specifically.
18  Q. And did your coach train you in the lateral
19  vascular neck restraint?
20  A. It wasn't called that then. As I recall, it
21  was just chokeholds. And in fact, even today, my
22  recollection is that the -- the LVNR and what's called
23  the rear naked choke in judo were generally -- back then
24  were generally considered essentially the same choke. I
25  don't remember if there was a -- I -- I don't recall if

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 65

1  there was any specific restriction on which one you used
2  in competition, but they -- they were generally rarely
3  used.
4      Q.  Can you explain to me the difference between a
5  rear naked choke and a lateral vascular neck restraint,
6  if you think there is one?
7      A.  Yeah.
8      Q.  And, sir, let me qualify.  If you don't think
9  there is one, just so state.
10     A.  Well, there is a difference.
11     Q.  Okay.
12     A.  Specifically, the --
13     Q.  What's the difference?
14     A.  The difference is in -- technically in the way
15 they're applied.  In the LVNR it's -- it's a -- the
16 actual LVNR, it's done by -- once you've encircled the
17 neck and placed the elbow where it's supposed to be
18 placed, then to apply the pressure you're using the
19 other hand.  Generally the hands are clasped together or
20 you're using the judoki, grabbing the lapel or sleeve or
21 whatever to help accentuate that hold and hold it
22 tighter, be able to control the tightness of it.
23         In the rear naked you are doing it differently.
24 Instead of using the lapel of the gi or the sleeve, you
25 are placing the hand on the opposite arm and that free

Page 66

1  hand is then going on the -- call it the uki.  And --
2  and you have toris and ukis.  It goes on the head of the
3  person it's being applied to and you use that in terms
4  of tightening or increasing the pressure on it.  And
5  that's the one that gets very dangerous because you can
6  apply much more pressure that way than you can this way.
7         So that's the difference, as I understand it
8  and as I recall.
9      Q.  How did you learn -- is that from your own
10 training and experience in judo that you provide that
11 testimony, or did you talk to somebody about that today?
12     A.  I'm not --
13     Q.  Excuse me.  For purposes of this case.
14     A.  I'm not talking to anybody about it for
15 purposes of this case.  I've gone back and done some
16 research to refresh my memory.
17     Q.  So what --
18     A.  I remember the chokeholds.  When it came up in
19 here I remember, oh, okay, I remember that.
20     Q.  So how do you know how a lateral vascular neck
21 restraint is applied?
22     A.  Because I read information.  I read literature
23 on it.
24     Q.  The literature --
25     A.  And it -- I believe it was in that book, also.

Page 67

1  There was a book that I had.
2      Q.  The LVNR was referenced in "The Self-Defense of
3  Kodokan" --
4      A.  Chokeholds were referenced in there.
5      Q.  Sir, let me finish, please.
6      A.  All right.
7      Q.  I understand what you're saying, but it's the
8  court reporter.
9      A.  I understand.
10     Q.  So you're saying that the lateral vascular neck
11 restraint was referenced in the item number 68 which is
12 on your list of documents, "The Self-Defense of Kodokan
13 Judo"?
14     A.  As I recall, the chokeholds were discussed in
15 there and there were pictures of them.  I -- I've got a
16 number of books on judo, some from the old days, a
17 couple that I acquired to refresh my memory of -- of
18 what they were and to understand, how they were
19 applied in this case.  And the differences are
20 explained.
21         I also -- I also stumbled into some literature
22 from -- it was a national training center or something,
23 whoever -- there's a center out there that lays claim to
24 the LVNR.  I read some of their stuff online that helped
25 my memory too, and they specifically talked about the

Page 68

1  different holds, chokeholds.
2      Q.  In your law enforcement career did you ever run
3  into a gentleman named James Lindell?
4      A.  No.  I don't know the name.
5      Q.  Okay.  Physiologically -- well, let me -- are
6  there any physiological differences between the effects
7  that a rear naked choke has on an individual versus a
8  lateral vascular neck restraint?
9      A.  Well, let me say it's been a long, long time
10 since I've had any direct connection to it.  But, you
11 know, one of them takes out or applies pressure onto the
12 -- the arterial channels that blood goes to the brain
13 and the other one takes care of the air.  And both of
14 them can be deadly.  Both of them can be very, very
15 damaging to an individual.  Those are the main
16 differences.
17     Q.  And so to rephrase in layman's term, would you
18 characterize one as a blood choke whereas the other one
19 is an air choke?
20     A.  That would be correct.
21     MR. McNUTT:  I'm going to go into his report
22 next, Andre.  Do you want to take a break?
23     MR. LAGOMARSINO:  Yeah.
24     MR. McNUTT:  I can read your mind.
25     MR. LAGOMARSINO:  That's fine.

Thomas Parker                                        Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 69

1    (A recess was taken from 10:13 A.M. to 10:50
2  A.M.)
3       MR. McNUTT:  We're back on the record.
4    Q.  Mr. Parker, you're still under oath.
5    A.  Yes.
6    Q.  Do you know -- well, let me back up.
7       Do you know how long any pressure was applied
8  to Tashii Farmer's neck by Officer Lopera?
9    A.  I'm -- I'm aware and I've -- I've timed it
10 myself based on the -- the film that I saw and I've also
11 read that it was in excess of a minute, like a minute
12 10, minute 12, something like that, in total.
13   Q.  And so that's the time that Officer Lopera's
14 encircling arm was around Tashii Farmer's neck.
15 Correct?
16   A.  That's correct.
17   Q.  I'm just trying to --
18   A.  As I understand it.
19   Q.  I'm trying to make sure we have the start and
20 end parameters when I talk about it.
21      So Detective Kirkegard, do you know who she is?
22   A.  Yes, I do.
23   Q.  Who is she?
24   A.  She was involved in the investigation on behalf
25 of either the FIT Team or the CIRT Team.  I don't know

Page 70

1  which.
2    Q.  And we pretty much established that that
3  timestamp that you were talking about, the minute and
4  some change, was when Ken Lopera first attempted to
5  employ, we'll just call it a neck restraint, I don't
6  want to argue over which you think it is, but the neck
7  restraint and when he removed his encircling arm.  Is
8  that your understanding of what that time is as well?
9    A.  I -- I don't have an understanding in that
10 regard.  I have an understanding from what I saw and --
11 and what I read and what I saw when I timed it myself as
12 best I could.  Just with my watch, when I saw him come
13 around behind or kind of get behind Farmer and put his
14 arm around and did what looked to me like applying that
15 -- that neck hold, I started timing it, then up to the
16 point where he let go and rolled off.  And it was very
17 clear that he had let go at that point.  That was like a
18 minute 12, minute 14, something like that.
19   Q.  So we'll call that time when he removed his
20 encircling arm.  Is that okay with you?
21   A.  That's fine.
22   Q.  When you say rolled off, I'm just --
23   A.  Yeah.  I don't know specifically that's when it
24 was.  That's when it appeared to me that that was the
25 duration.

Page 71

1    Q.  When you said "I timed it," what were you
2  watching when you timed it?
3    A.  I was watching -- I don't know which camera it
4  was, but I was watching it on film and -- and it was
5  easy to determine that.
6    Q.  Was it a body worn cam, or was it the external
7  Venetian camera?
8    A.  I think it was probably an external Venetian
9  camera.  It was a little bit -- it was higher than --
10 than a person's height, but I -- I don't know
11 specifically right now which one it was.
12   Q.  So during that minute plus time frame when Ken
13 Lopera's encircling arm was around Tashii Farmer, do you
14 know how much pressure was applied to Tashii Farmer?
15   A.  I don't have any way of knowing that.  I could
16 see that his other arm was in that rear naked hold.  It
17 was up on top of the head or the back of the head.  I
18 could see that.
19   Q.  Or at least your definition of a rear naked
20 choke.  Right?
21   A.  Well, it fit the description of what I know as
22 the naked -- rear naked chokehold.
23   Q.  So isn't it fair to say that no one knows how
24 much pressure was applied then other than Ken Lopera and
25 the decedent, correct, meaning no one can look from a

Page 72

1  video and tell how much pressure was being applied
2  during that period?  That's all I'm asking.
3    A.  Well --
4       MR. LAGOMARSINO:  Hold on.  I'm going to object
5  as to form as to "how much pressure" being vague.
6       THE WITNESS:  I don't know if anyone knows.  It
7  was certainly enough to kill Tashii Farmer Brown.
8    Q.  BY MR. McNUTT:  Are you rendering -- are you
9  qualified to render any medical opinions in this case or
10 any case?
11   A.  No, I'm not.  But from my experience, you --
12 you can tell when someone is dead.  And from what I read
13 in the report, it was obvious that, you know, he died as
14 a result of that and, in fact, that the autopsy and the
15 doctor's report in the autopsy was -- was confirming of
16 that.
17   Q.  Do you intend to opine on the cause of death in
18 this case at trial?
19   A.  I don't.
20   Q.  How long do you -- do you have any
21 understanding of how long it can take for an LVNR to be
22 effective before a subject goes unconscious?
23   A.  Well, I -- I know that some of the studies have
24 shown that depending on the level -- I -- I'm not an
25 expert on LVNR.  Okay?

Page 73

1  Q.  That's all we need to get, then.
2  A.  Okay.  I'm not an expert on it.  I -- I have
3  some experience with it, I've done some study on it and
4  I know what I saw in the videos.
5  Q.  Are you an expert on the rear naked choke?
6  A.  I'm not an expert on either one, no.  Again, I
7  -- and I'm not -- I don't think I'm testifying to -- to
8  be an expert or -- or whatever.  I -- I know what it is.
9  I understand it.  I've had some experience with it, but
10  that's -- that's the extent of -- of my testimony.  And
11  I don't think I rendered an opinion on that, if I recall
12  correctly.
13  Q.  Are you -- do you understand what I mean if I
14  say there's been a violation of a department policy in
15  this case; Metro's policy?
16  A.  I understand that.  I know what policies are.
17  Q.  All right.  And depending on which one, of
18  course, is violation of a policy necessarily a crime, or
19  can it just be a violation of policy?
20  A.  It can be a crime depending on what -- what the
21  policy is and what's the reason behind it and whether it
22  marries up to a state or federal law.
23  Q.  But not every violation of policy is a crime.
24  Correct?
25  A.  That's true.

Page 74

1  Q.  Is a violation of a department policy, is it
2  the same answer for whether a violation of policy is a
3  violation of the Constitution, U.S. Constitution?
4  A.  It would be essentially the same answer.
5  Q.  But --
6  A.  There's a reason --
7  Q.  I'm sorry.  But it depends upon what the policy
8  violation was.  Correct?
9  A.  That would be part of what it's dependent upon,
10  sure.
11  Q.  What's the rest of it?
12  A.  Well, the circumstances of it, you know, what's
13  the basis for that policy.  Most policies arise from
14  either a prior problem or the law or an incident or --
15  or whatever.  When I was chief of strategic planning at
16  FBI headquarters, we wrote a lot of policies there and
17  -- and they were either based on -- on legal decisions
18  that came down, precedent, situations, what have you.
19  Q.  Are you familiar with the legal standard or
20  Constitutional standard that governs 14th Amendment
21  cases?
22  A.  I know in a very general sense what the 14th
23  Amendment is, but as far as, you know, what -- what went
24  into that, all of that, I -- I'm not an expert on that
25  at all.  I -- I have nothing more than a very general

Page 75

1  understanding.
2  Q.  So is it fair to say that you are not going to
3  offer any opinions at trial regarding what standard or
4  what Constitutional or legal standard should be applied
5  to the facts of this case?
6  A.  Well, I think there are legal experts for that.
7  You know, my -- my position would be more to testify in
8  terms of what the policy is and what the practices were.
9  Q.  So the answer is no, you're not going to
10  testify regarding what standard applies to the facts of
11  this case?
12  A.  I'm not aware of -- I have no plans to do that.
13  I don't know if I would be asked to do it.
14  Q.  Have you been asked to opine on that at all up
15  to today?
16  A.  To reply on --
17  Q.  To opine on it.
18  A.  Not specifically, no.  I mean, I've had some
19  discussions, obviously, with Mr. Lagomarsino about the
20  applicability of that, but not to the point of trying to
21  offer any kind of an expert opinion on it.
22  Q.  Because if you have, it's not in your -- you
23  would agree with me --
24  A.  Correct.
25  Q.  -- that's not in your report or your

Page 76

1  supplemental report.  Correct?
2  A.  That's why they're not in there.
3  Q.  Okay.  Tell me about your discussions with Mr.
4  Lagomarsino regarding the applicability of the legal
5  standard.
6  A.  Very, very general discussions to make sure
7  that I understood it.
8  Q.  To make sure you understood the legal standard,
9  or the case?  Which are you talking about?
10  A.  It would be a little bit of both.  I want to
11  make sure that I understood.  I haven't dealt with --
12  with those -- those particular amendments specifically
13  in -- in quite some time.  But in terms of confirming my
14  understanding and confirming how it applied to -- to
15  this case.
16  Q.  Other than in your judo experience or -- would
17  you call that a hobby, or what do you call that?
18  A.  It wasn't much more than a hobby.
19  Q.  And you were a brown belt.  Is that correct?
20  A.  I was.
21  Q.  Give me the lowest ranking belt in your type of
22  judo.
23  A.  Well, Kodokan judo, it's -- they're fairly
24  similar.  The colors are a little bit different, but it
25  starts as a white belt.  It's a rank amateur, a student

1  just -- just coming in.
2     Q.  So we're all white belts as -- well, at least
3  Andre and I are.  Correct?
4     MR. LAGOMARSINO:  You probably have some
5  martial art based on --
6     THE WITNESS:  Are you into martial art?
7     MR. McNUTT:  No, I'm not.
8     THE WITNESS:  It -- it starts as a white belt.
9     MR. LAGOMARSINO:  You didn't have defensive
10  tactics or any kind of martial arts in the military?
11     MR. McNUTT:  I don't know.  I don't recall.
12     MR. LAGOMARSINO:  Oh.
13     MR. McNUTT:  He already testified to my lack of
14  experience in that realm.
15     MR. LAGOMARSINO:  I think he just asked you --
16  he wasn't sure if you were in the military or not.  I
17  actually was a yellow belt in taekwondo.
18     MR. McNUTT:  I don't know what that is.
19     MR. LAGOMARSINO:  Next up after white.  After
20  that I was a --
21     Q.  BY MR. McNUTT:  So after the beginner white,
22  what's next in --
23     A.  It can be green or yellow.  It depends on the
24  -- the style.  There's some latitude that's given to
25  whoever the -- coach is, but generally it's -- it's

1  a yellow or a green.  In some areas there's a blue.
2  Those are all really the -- the real student type
3  levels.
4     Brown belt, there are three degrees of brown
5  belt.  And then you get -- from brown belt the next is
6  the black belt, and there's 13 degrees of black belt.
7     Q.  Which degree of black were you?
8     A.  I was first degree, ikkyu.
9     MR. LAGOMARSINO:  Of black, or brown?
10     MR. McNUTT:  Of brown.  Excuse me.
11     THE WITNESS:  Brown belt.  I'm sorry.
12     There's sankyu.  Trying to remember what the --
13  the term was.
14     Q.  BY MR. McNUTT:  I don't need those terms.
15     A.  Okay.
16     Q.  Do you think the average lay person walking
17  around understands the distinction between a rear naked
18  choke and a lateral vascular neck restraint?
19     A.  I doubt it.
20     Q.  When was the last time, barring your shoulder
21  injury here, when was the last time you participated in
22  any sort of martial arts training where you were
23  actively involved?
24     A.  Well, I've never participated in martial arts.
25  I consider the form of judo I was in as a sport.  I know

1  some consider it martial art.  The early days of Kodokan
2  were -- were more self-defense and whatever.  That goes
3  back a long ways.
4     My last involvement would have been late '70s.
5     Q.  So if I broaden it out to any type of martial
6  arts, is that your last interaction with any type of
7  martial arts?
8     A.  Well, in -- in the classic sense of -- of
9  either taking instruction or -- or going through
10  workouts or competing, yes, it would.
11     Now, whether you want to discuss defensive
12  tactics and some of those things, you know, obviously,
13  that popped up now and then through my whole career.
14     Q.  So since you retired in 1994, have you had any
15  personal experience with any sort of -- you personally,
16  not testifying as an expert, you personally
17  participating in classroom instruction or giving
18  classroom instruction regarding martial arts or
19  defensive tactics?
20     A.  No.
21     Q.  Okay.  Do you have an opinion as to whether the
22  Las Vegas Metropolitan Police Department violated the
23  Constitution by allowing its officers to employ the
24  lateral vascular neck restraint?  My question is just
25  whether you have an opinion on that.

1     MR. LAGOMARSINO:  Form.
2     Q.  BY MR. McNUTT:  Excuse me.  Or are offering an
3  opinion.
4     MR. LAGOMARSINO:  Form.
5     THE WITNESS:  I -- I think the way I would
6  answer that is in this case, going back to my own days
7  in Las Vegas with the FBI and one or two other cases
8  I've had with LVMPD, I think the opinion that I formed
9  is that they are lax in their enforcement of their
10  prohibitions in that sense.  I think they are lax in the
11  -- the enforcement of their training.  Any type of
12  training, you can't just -- my master's is technically
13  in curriculum and instruction, but it's public safety
14  management.  Basically, any type of training, any type
15  of education, you have to have -- to maintain currency
16  in it.  You have to have refresher training.  There has
17  to be reinforcement of that training.
18     In looking through the training records that I
19  have looked through, I -- I haven't seen a lot of that.
20     Q.  BY MR. McNUTT:  So I guess that's your answer
21  to what would have been my follow-up question.  I'm
22  going to ask my question again.
23     Are you providing an opinion in this case as to
24  whether Metro violated the Constitution by allowing its
25  officers to use the lateral vascular neck restraint?

Thomas Parker                     Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 81

1    MR. LAGOMARSINO: Form.
2    Q. BY MR. McNUTT: Yes or no. Just whether you're
3 offering --
4    A. Well, I'm thinking about whether it's a yes or
5 a no or somewhere in between.
6    Again, I'm not a constitutional lawyer. I
7 understand the basic concepts of what's constitutional,
8 what isn't constitutional in police work. But in -- in
9 terms of -- what my experience -- let me answer this
10 way. What my experience has been over these 25 years
11 and my law enforcement career before that is you have to
12 pay attention to what your people are doing, especially
13 your officers. You have to pay attention to how they're
14 trained. You have to pay attention to the reinforcement
15 of that training. You have to -- you have to pay
16 attention to enforcing your policies.
17    And my opinion is, and if asked I would render
18 an opinion based on this, that I think Las Vegas Metro
19 PD has been lax in that. I don't think they've done the
20 job that they should have done. They -- they've had a
21 number of problems over the years not only in their
22 shooting situations, but in other problems that they've
23 had going back to the days that I was in Las Vegas back
24 in the late '70s. There was a significant amount of
25 corruption within Metro. And I haven't seen any

Page 82

1 evidence that -- that there has been an elimination of
2 those problems.
3    Q. Do you believe that any police department
4 should allow its officers to use a neck restraint in a
5 low-level force situation?
6    A. No, I don't.
7    Q. Do you believe any department should authorize
8 its officers to use any type of neck restraint in an
9 intermediate level -- as an intermediate level use of
10 force option?
11    A. Let me answer this way. I think the use of any
12 neck restraint in law enforcement is -- is a bad idea,
13 and I think a lot of modern day departments are waking
14 up to that fact. I have seen information, I've seen
15 reports and I've heard of reports where some departments
16 are still allowing that. I've seen others where they've
17 disallowed it. I've seen situations, and I -- I -- it's
18 my understanding that Metro has changed the level of the
19 LVNR, that instead of a low level it's now either a
20 medium or it's one of the higher levels in the continuum
21 of -- of force.
22    But I -- I think that one of the problems is
23 that -- and this is -- I think one of the problems is
24 it's -- you know, some officers just disregard their
25 training, disregard what the policies are and they do

Page 83

1 damn well what they want to do. I think that's a
2 problem. And it's hard to recognize when that's going
3 to happen ahead of time. Departments are getting much
4 more sophisticated in the psychological analysis of
5 individuals they're hiring. People do slip through the
6 -- the process.
7    But I think in general, the use of any
8 chokeholds is a very dangerous proposition in today's
9 world.
10    Q. So given that opinion, do you believe that --
11 well, you've reviewed the training records for Las Vegas
12 Metropolitan Police Department. Correct?
13    A. I -- I have, as they apply to this case. In a
14 general sense I -- I looked at other individuals that
15 were listed in there, but my focus was on the people in
16 this case.
17    Q. Do you have an opinion as to whether Metro
18 provides adequate training to its officers regarding the
19 use of the lateral vascular neck restraint?
20    A. In terms of volume of training, it would appear
21 so, but I saw some things that were very disturbing.
22 For example, I believe in Lopera's case there was a -- I
23 forget what it was. It was a training class where he
24 attended three eight-hour trainings in one day. And I
25 don't know how that happened, whether it's a

Page 84

1 recordkeeping error or -- or whether they're fudging the
2 records or what. I don't have enough experience or
3 enough information to judge that.
4    But in terms of looking at their compliance
5 with POST standards and -- I -- I also am one that --
6 I'm a strong believer in the model policies that are put
7 out by the IACP that I'm a member, International
8 Association of Chiefs of Police. I would say that on
9 paper they appear to be in compliance with those.
10 Whether in practice they are, I -- I -- I don't really
11 know. I can only judge it by individual situations.
12    Obviously, in this case Mr. Lopero -- Lopera
13 had no compunction. He bragged about it afterwards in
14 using the rear naked chokehold. To me that's a
15 breakdown in training. That's a breakdown in -- in the
16 enforcement of policy. You know, I don't know much
17 about him other than what I read in the reports. And it
18 appears he has a very strong personality. I would
19 suspect that he's an individual that probably did pretty
20 much what he wanted to do. But the fact that he bragged
21 about using the rear naked in this particular case was
22 very disturbing.
23    Q. What evidence are you citing for your
24 suggestion that he, quote, bragged about it as opposed
25 to tried to make some sort of --

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 85

1    A.  It's -- it's right there in front.
2    Q.  Let me finish my question.
3    A.  It's right there on one of the videos, that I
4   recall.  And I also saw mention of it in the report,
5   that he -- he was bragging about he finally put him out
6   -- I'm paraphrasing this -- put him out with a rear
7   naked.
8    Q.  So where he said "I rear nakeded his ass"?  I
9   think that's the quote.
10    A.  I think that was the quote.
11    Q.  Okay.
12    A.  It's pretty clear.
13    Q.  And you view that as being braggadocious as
14   opposed to informative that he had employed some sort of
15   neck restraint?
16    A.  I think it was braggadocious.
17    Q.  Okay.  Would you at least agree with me that
18   the lateral vascular neck restraint does not exactly
19   roll off the tongue after you've been in a dynamic
20   situation?
21    A.  Well, LVNR is.  And I think if he had done an
22   LVNR and he was proud of that, I think he would have
23   said "I did an LVNR."
24    Q.  So "LVNR" does roll off the tongue?
25    A.  I think it can.

Page 86

1    Q.  You said "is."  I don't know what that referred
2   to.
3        What is your understanding of excited delirium?
4    A.  My understanding of it?
5    Q.  Yes.  You're not a doctor.  Right?
6    A.  I'm not a doctor.
7    Q.  You have no medical training.  Correct?
8    A.  Well, I've had --
9    Q.  I'm not talking about first aid and CPR.
10    A.  Yeah.  No.  I've not been trained as a doctor.
11    Q.  Okay.  So what's your understanding from
12   reading literature about excited delirium --
13    A.  My --
14    Q.  -- syndrome?
15    A.  My understanding is it's a physiological
16   condition that can develop.  In most cases it's one that
17   can be an aftermath of some meth or methamphetamine or
18   amphetamine or some drug use, not necessarily to the
19   point of being intoxicated.  But it's a -- a
20   physiological reaction to -- to physical stress.  It
21   usually evolves from there having been some type of an
22   altercation.  And I'm talking about ones that I've seen
23   or heard about or read about in law enforcement work.
24        And it results in the person -- usually the
25   first sign is -- is the profuse or intense sweating,

Page 87

1   thirst, rapid movements, kind of erratic movements,
2   hallucinations, delusions, feeling -- I don't know what
3   the correct word would be, but it goes with the
4   sweating, feeling extremely hot.  And if -- if it's not
5   treated when it gets to that point, if it's not treated,
6   it can very quickly result in death.
7    Q.  Is it true that methamphetamine, cocaine, PCP
8   and even bath salt intoxication are associated with
9   excited delirium?
10    A.  I don't know that I've heard all of those, but
11   I've heard it can be any number of drugs.
12    Q.  You've heard that methamphetamine is involved?
13    A.  Mostly definitely.
14    Q.  Would you agree that, quote, subjects may
15   demonstrate profound levels of strength, end quote?
16    A.  I've heard that also.
17    Q.  Do you agree with that, though?
18    A.  In some situations, yes.  I -- I would agree
19   with it.
20    Q.  And that subjects suffering from excited
21   delirium can, in fact, resist even painful stimuli.
22   Correct?
23    A.  I don't know about that.
24    Q.  You don't know, or you don't agree?
25    A.  I haven't heard about that or read about it.

Page 88

1    Q.  Well, these are all positions that are taken by
2   the authors of one of the articles you reference.  So
3   that's why I'm asking you about them.
4    A.  All right.
5    Q.  In particular, the article entitled "Excited
6   Delirium and the Dual Response" by Dr. Brian Roach, Dr.
7   Kelsey Echols and Dr. Aaron Burnett.  Are you familiar
8   with that?
9    A.  I -- I remember that article.  They're the
10   experts.  I'm not.
11    Q.  Okay.  And this was one of the articles that
12   you referenced.  And as you testified earlier, this is
13   one of the articles you believe supports your position.
14   Correct?
15    A.  Or parts of it did.
16    Q.  Yeah.  So is there any part of this article
17   that you don't agree with, that you recall?
18    A.  You'd have to show me the article.  As I sit
19   here I don't know there was any part that I'd agree with
20   -- disagree with.  Again, they're the expert.  I wasn't.
21        The other thing I do understand is all of those
22   symptoms don't show up in every case and it -- I've also
23   read and heard that -- and I've -- I've had a couple of
24   experiences with excited delirium back when I was a
25   police officer.  It wasn't known as that then, or at

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 89

1  least we didn't know about it by that -- that term.  But
2  the -- the symptoms vary depending on the situation, you
3  know, and at what stage you encounter the person.
4      Q.  Isn't it true that bizarre and erratic behavior
5  can also be attributed to being under the influence of
6  illegal narcotics?
7      A.  I've seen that in drug users.
8      Q.  So the answer is yes?
9      A.  Yes.
10     Q.  Isn't it true that profuse sweating can be
11 indicative of being under the influence of a controlled
12 substance?
13     A.  That, I don't know.
14     Q.  Isn't it true that demonstrating significant or
15 -- I don't want to say extra-human strength, but more
16 strength than normal can be indicative of an individual
17 being under the influence of a controlled substance?
18     A.  I don't know that either.
19     Q.  Okay.  Do you recall -- you identified, but do
20 you recall reviewing Metro's training policies for
21 dealing with excited delirium?
22     A.  As we sit here I couldn't recite them to you,
23 but I remember looking at them, yes.
24     Q.  Do you believe as an expert -- and how do you
25 define yourself as an expert?  As a use-of-force expert?

Page 90

1  As a police practices expert?  How would you define your
2  expertise?
3      A.  As a police practices expert and, of late, with
4  the types of cases I've had, more from a management or
5  supervisory perspective, but also where I've had
6  personal experiences with them, you know, as a topical
7  type expert depending on what it is.  I'm not a
8  use-of-force expert.
9      Q.  Okay.  And if I understand your career
10 correctly, you were a patrol -- well, I didn't ask that
11 question.  Were you a patrol officer for all four years
12 with Santa Clara, or what were your job descriptions
13 then?
14     A.  I was, but the type of patrol officer was that
15 I was changed.  The first couple of years that I was
16 there I drove a black and white car.  I was assigned a
17 beat.  I was on a routine patrol.  The last year and a
18 half or so I was there I was assigned to unmarked car
19 responsibilities, which is felony suppression.  We wore
20 uniforms, but we wore a civilian jacket over the
21 uniforms.  It was an unmarked car.  And so that was a
22 little bit different than straight patrol.
23     Q.  But you were still interacting with the public
24 at large in that role?
25     A.  To a lesser extent than a black and white.

Page 91

1      Q.  And when you were a park ranger, how would you
2  define -- were you a patrol officer?
3      A.  I was everything --
4      Q.  Okay.
5      A.  -- from a law enforcement perspective.
6      Q.  All right.  And when you became an FBI agent,
7  my understanding is you spent about the first ten years
8  as an active agent in investigations and things of that
9  nature.  Correct?
10     A.  Well, I was an active agent my entire career.
11     Q.  I understand.
12     A.  We were all special agents.  But ten years I
13 was -- I was a case agent.  I worked cases.
14     Q.  And then the last 14, so from approximately
15 1980 to 1994, your retirement, you defined it as being
16 in the management supervisory levels.  Correct?
17     A.  Correct.
18     Q.  Including being a speech writer for a couple of
19 years for Director Webster?
20     A.  The jobs at headquarters were not pure
21 investigative.  I did -- I did not manage cases per se
22 when I was at headquarters.  I was -- the first time I
23 was there I was in Congressional public affairs, which
24 is part of the Director's office, and my primary job was
25 handling public affairs matters, handling some

Page 92

1  Congressional affairs matters, and I was a speech
2  writer.
3      Q.  So when was the last time that you personally
4  were involved in arresting a suspect for something?
5  Would it have been before 1980, before you got into
6  those management roles?
7      A.  No.  I was present at a lot of arrests.
8      Q.  No, no.  Where you personally arrested someone.
9      A.  Personally arrested?  Within the few years
10 before I retired.  You know, I -- I still made arrests
11 on occasion.
12     Q.  What cases were those?
13     A.  I would have to look.  I don't know.  I mean,
14 we had so many cases, but there --
15     Q.  What would you look at to find a case that you
16 made an arrest in?
17     A.  I don't know if I could find it anymore, you
18 know.  I mean, it would depend on -- I have no rights at
19 this point beyond freedom of information type things.
20     Q.  When death occurs as a result of excited
21 delirium, it's usually cardiac in nature.  Correct?
22         MR. LAGOMARSINO:  Objection.  Form, foundation.
23         THE WITNESS:  Again, I'm not an expert.  I
24 mean, obviously, death occurs when the heart stops.
25 That's a cardiac situation.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 93

1   Q. BY MR. McNUTT: But isn't that what your
2   authors say in the various articles?
3   A. You'd have to let me see the article again.
4   Q. Well, I'm asking you whether you recall that.
5   Yes or no?
6   A. What's the question again?
7   Q. When death occurs as a result of excited
8   delirium, isn't it normally associated with a cardiac
9   event?
10  A. Well, again, my answer is a cardiac event is
11  involved in every death. Is it not?
12  Q. I don't know.
13  A. A death occurs when the heart stops.
14  Q. I'm --
15  A. It's a cardiac event.
16  Q. I'm not a doctor and I'm not offering medical
17  opinions in this case. Are you?
18  A. I'm not. I'm giving you the answer that I
19  know. I have not seen a death where the heart didn't
20  stop.
21  Q. You never heard of somebody being brain dead?
22  A. I've heard of that, yeah.
23  Q. Okay. Do you know whether or not Metro
24  authorizes its officers to utilize force to take an
25  individual into custody that is suffering from excited

Page 94

1   delirium?
2   A. I know that excited delirium, if an officer
3   encounters that, they certainly have a right to attend
4   to that person. And whether you want to classify it as
5   taking them into custody or whether it's a detention or
6   whatever it is, officers have the right to do what needs
7   to be done to try and help save that person's life.
8   Q. Up to and including using force. Correct?
9   A. Well, I think that gets into some real --
10  Q. I'm not asking your opinion. I'm asking
11  whether you know what Metro's policy is.
12  A. Most police departments, and from what I recall
13  -- I don't recall specifically what sections or
14  anything, in order to take someone into custody an
15  officer has a right to use reasonable force to take them
16  into custody.
17  Q. And I'm asking you whether you know what
18  Metro's policy is with regard to --
19  A. I would -- to the best of my recollection, it's
20  the same.
21  Q. Are you qualified to analyze Taser pulse logs?
22  A. I'm not. I understand what they are, but I'm
23  not -- I'm not an expert on that.
24  Q. Okay. So if I gave you a stack of Taser pulse
25  logs from Officer Lopera's Taser, you're not qualified

Page 95

1   to read and interpret those results?
2   A. Well, I -- I could do some interpretation. I'm
3   not a technological expert in that, but I know that
4   there are standards put out by the companies and -- and
5   put out by -- by various departments and policies in
6   terms of the number of triggering events, the -- the
7   time between events, the number of triggering events
8   that there should be.
9   Q. Well, that's reading the print-off of the data.
10  A. Can I finish my answer?
11  Q. I thought you were done.
12  A. No, I wasn't. I didn't stop speaking.
13  Q. You seemed to linger.
14  A. I -- I know also that there -- there is -- most
15  departments that I've seen have policies that after a
16  certain number of unsuccessful events their policy is
17  you stop and you resort to something else.
18  Q. That's the policy about the Taser. Let's stay
19  focused.
20      So you're not qualified to analyze and explain
21  to a jury, for example, what a Taser pulse log shows.
22  Correct?
23  A. Well, I think I could describe to a jury what
24  it is. To explain the technical aspects of it, no. I'm
25  not a -- I'm not an expert on that.

Page 96

1   Q. So you can't look at a Taser pulse log and tell
2   me whether the circuit was closed and any energy was
3   transferred to the subject?
4   A. I would expect that there's information there
5   that I could arrive at an answer on that. But able
6   to say as an expert that's exactly what happened, no.
7   I'd have to depend on what the records say.
8   Q. Okay. Now, you can look at a printout that
9   says the Taser was triggered at this certain time and it
10  went for five seconds and things of that nature.
11  Correct?
12  A. Correct. And I would hope, as in this case,
13  there would be some record of what the -- the subject's
14  reaction was to that. Did they go down? You know, and
15  that's -- that would be -- to me, that would be the
16  definitive thing as to whether it was effective or not.
17  Q. Have you read the deposition or reviewed the
18  deposition of Michael Bland in this case?
19      Let me ask. Do you know who Michael Bland is?
20  A. I know the name. I -- I can't sit here and
21  tell you who he is or what he does.
22  Q. He's Metro's use-of-force --
23  A. Okay.
24  Q. -- subject matter expert, I think they referred
25  to him as. He testified that an officer is authorized

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 97

1  to use the Taser more than policy states if certain
2  circumstances exist, such as the officer is acting alone
3  and doesn't know when his backup would arrive.
4      Would you agree with that statement or not
5  agree with that statement?
6      MR. LAGOMARSINO: Can the court reporter repeat
7  that question. Or if it's easier to restate it. It was
8  a long question. I wasn't sure. If you want to restate
9  it.
10     MR. McNUTT: I'm happy to restate it. Whatever
11 the court reporter prefers.
12     THE REPORTER: Please.
13     MR. LAGOMARSINO: I'm sorry.
14     MR. McNUTT: One question was does he know who
15 Michael Bland is. I presume that's not the question.
16     MR. LAGOMARSINO: The next one.
17     Q. BY MR. McNUTT: He was identified by Metro as a
18 subject matter expert.
19     A. Okay.
20     Q. And he testified that an officer can, with
21 certain facts, go outside of policy with respect to
22 utilization of the Taser. For example, Metro policy
23 says you can use the Taser three times and then you
24 should go to some other force option.
25     A. Uh-huh.

Page 98

1      Q. You're familiar with that?
2      A. Yes.
3      Q. Okay. And he said if an officer is operating
4  alone, doesn't know when their backup is going to
5  arrive, they would be authorized to utilize the Taser
6  more than policy otherwise states, meaning a fourth time
7  or a fifth time.
8      Now, I'm just asking you whether you agree with
9  his position that he's taken regarding Metro's policy.
10     A. Let me answer it this way. I would agree,
11 having been involved in policy making, that there are
12 exceptions to almost every policy in law enforcement
13 work, depending on the circumstances. If that is their
14 position and it is his position that there would be
15 exceptions to going beyond the three times, I wouldn't
16 argue with that.
17     Q. Do you know who Scott Dafoe is?
18     A. I do.
19     Q. Do you know him personally?
20     A. I don't.
21     Q. He's an expert that was retained by the
22 plaintiffs in what we refer to as the estate case. Do
23 you know what that is?
24     A. Yes.
25     Q. That's the case initially brought by this

Page 99

1  case was brought by the children.
2      A. Correct.
3      Q. That's your understanding?
4      A. Yes.
5      Q. Okay. So he was the use-of-force expert
6  identified and disclosed by plaintiffs. Do you know him
7  professionally?
8      A. I don't.
9      Q. Okay. Have you ever been involved in a case
10 where he was on your side or the other side?
11     A. Not that I'm aware of.
12     Q. Okay. Did you review his deposition from the
13 estate case?
14     A. No.
15     Q. Okay. Is it your opinion that Tashii Farmer
16 suffered from excited delirium?
17     A. I think he was in the early stages of suffering
18 from that when he encountered Lopera and Lif.
19     Q. Is it your opinion that Officer Lopera made a
20 mistake by identifying him as being under the influence
21 of a controlled substance versus identifying excited
22 delirium?
23     A. I think he made a mistake not recognizing that
24 excited delirium was a very strong possibility.
25     Q. And do you have any idea how long it takes to

Page 100

1  properly diagnose someone with excited delirium?
2      A. From a medical perspective? Is that what
3  you're asking?
4      Q. From any perspective.
5      A. Well, I think, you know, every person in law
6  enforcement makes decisions based upon their training
7  and their experience. And I think one of the purposes
8  of training is to understand what the various
9  possibilities are because you have to make, sometimes,
10 instantaneous decisions. And I -- I see -- I saw no
11 indication in those very early stages of the
12 encounter that he even considered excited delirium. I
13 saw where he said later on that he started questioning
14 whether he was under the influence of a controlled
15 substance. And he got the acronym wrong on that, which
16 kind of bothered me a little bit.
17     But in terms of -- of taking action to address
18 what the symptoms primarily indicated, in my opinion, I
19 -- I don't think he recognized those.
20     Q. So is it your opinion that an officer in, let's
21 say, the span of ten seconds or less is supposed to be
22 able to differentiate a subject between excited delirium
23 versus being under the influence of a controlled
24 subject?
25     MR. LAGOMARSINO: Substance?

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 101

1    THE WITNESS: It depends on the case.
2    MR. McNUTT: Substance.
3    THE WITNESS: It depends on what the
4    circumstances were.
5    In this particular case, from what I read, what
6    I've seen, I think the -- the indications were much
7    stronger that -- that an onset of excited delirium was
8    -- was in progress here versus a reaction to controlled
9    substances.
10   Q. BY MR. McNUTT: And how long did it take for
11   you to arrive at that opinion?
12   A. How long did it take me?
13   Q. Yeah.
14   A. The time it took me to read the facts as they
15   were presented in the reports. Matter of seconds to a
16   minute or so. I don't know. It should have been a very
17   easy, quick decision if he paid attention to his
18   training.
19   Q. So you agree with me that some of the
20   symptomology of excited delirium presents the same as
21   being under the influence of a controlled subject?
22   Substance.
23   A. No, not --
24   Q. You did agree with me earlier.
25   A. I don't agree with you on that, no.

Page 102

1    Q. Well, you agreed with me when I went through
2    the list earlier.
3    A. Well --
4    Q. Do you want to change --
5    A. I misunderstood your question.
6    Q. Would you like to change your opinion?
7    A. Would you like to ask the question again?
8    Q. Which one?
9    A. I don't know. Whichever one --
10   Q. I think when you read this transcript you're
11   going to want to change a lot.
12   MR. LAGOMARSINO: Objection.
13   THE WITNESS: What?
14   MR. LAGOMARSINO: Hold on. Move to strike.
15   Argumentative.
16   THE WITNESS: I'm not trying to change my
17   answer. Okay? What I'm trying to say is that both
18   situations should have been considered by him and they
19   should have been considered almost instantaneously if he
20   was properly trained and had the experience to make that
21   decision. And I think that -- I don't think he
22   recognized the symptoms that were presented to him as
23   being within the realm of possibility of excited
24   delirium.
25   Q. BY MR. McNUTT: Assuming, it's a big

Page 103

1    assumption, that Tashii Farmer was suffering from
2    excited delirium, as you believe, would Officer Lopera
3    have the right to follow him down the employee-only
4    hallway in the Venetian?
5    A. Again, it would depend on the circumstances.
6    Q. No. Those circumstances, sir, not a
7    hypothetical you want to make up. In the facts of this.
8    That's what I asked you.
9    A. Did he have the right to follow him down the
10   thing? Legally, I don't think he did, no.
11   Q. Why not?
12   A. Because he had done nothing wrong. It's not --
13   it's not a crime to be approaching the excited delirium.
14   It's a medical condition. Okay? And I don't think --
15   up to that point Tashii Farmer had not committed any
16   crime. And I -- I don't believe that -- if you look at
17   the toxicology report, and I'm not an expert on this at
18   all, but I understand that the level of methamphetamine
19   in his system was right on the borderline of whether he
20   could have been considered under the influence or not.
21   But when -- when you -- you put the suspicion
22   of drug use together with what the physical symptoms
23   were that were being presented, I'm saying that I don't
24   believe Officer Lopera even considered excited delirium.
25   And -- and --

Page 104

1    Q. Again, that wasn't the question I asked.
2    A. Well, that will be a little bit more to my
3    answer here.
4    If he had considered it, okay, I don't believe
5    he had the legal right to follow him, to -- to attack
6    him, to take him down on the ground, to apply the
7    chokehold or whatever. There was no legal basis for
8    that. He had not committed any crime. If someone is
9    ill, you don't treat them by tackling them, take them
10   down to the ground and applying a -- a chokehold to
11   them. That was -- that was totally improper.
12   Q. I appreciate that you would like to --
13   A. But if --
14   Q. I appreciate that you want to get your
15   narrative out, but save that for some other time.
16   I'm asking very specific questions. I asked
17   you nothing about tackling him, nothing about Tasing
18   him. I asked you exclusively about following him down
19   the hallway, which was a yes or no. And we've sat here
20   for about 90 seconds of my time, wasting it on answers
21   to questions I did not ask.
22   So I'd like to speed this deposition up. So
23   could you please just answer the questions I ask.
24   A. Let me respond to that. I think I have the
25   right, and I've got enough experience to know that I

Page 105

1  have a right to explain my answer, and that's exactly
2  what I'm doing. If you don't want me to do that, then
3  let's change the rules here and you do what you need to
4  do.
5      Q. Well, let's just go by the rules of civil
6  procedure, which apparently you are unfamiliar with,
7  sir.
8      A. No. I -- I think I'm familiar with the fact
9  that I have a right to explain my answer.
10     Q. No. You do not have a right to bloviate and
11 talk about an answer that has no relevance to the
12 question. So --
13     A. I take great offense to your term "bloviate."
14 I think that's improper, I think it's rude and I don't
15 think you have a right to do that.
16     Q. Then don't --
17     A. If you don't like my answer, tell me that.
18     Q. Then don't do it.
19     So let's break it down. Yes or no. Ken Lopera
20 had the right or even a duty to follow Tashii Farmer
21 into an employee-only area, whether he was exhibiting
22 signs of excited delirium or under the influence of a
23 controlled substance?
24     A. I think he has the right to follow an
25 individual anywhere that he wants to if it's in a public

Page 106

1  place.
2      Q. Okay. So -- are you done?
3      A. No, I'm not.
4      Q. Okay.
5      A. If he recognizes that as a medical situation
6  and Tashii Farmer is walking away and obviously is not
7  interested in that, I don't know that he has a right to
8  take any action. Legally I don't know that he does.
9      Q. So does Officer Lopera as a sworn officer with
10 Metro, does he have a duty to provide medical assistance
11 to an individual with excited delirium?
12     A. I think he can attempt to provide assistance.
13 If the person doesn't want it, I don't think he can
14 force the person to undergo it.
15     Q. I --
16     A. That's my answer to your question.
17     Q. I'm just asking whether it's Metro's policy
18 that he has a duty to do so. And if you don't know,
19 that's fine.
20     A. I don't know. I don't recall reading that
21 there's a policy that he can force a person to submit to
22 medical assistance.
23     Q. Not that he can force a person to submit to
24 medical assistance but whether or not the officers have
25 a duty and they're directed to provide medical

Page 107

1  assistance and/or take the individual into custody.
2      A. Well, I don't know that he can take the
3  individual into custody to provide medical assistance.
4  I don't know of any legal right to do that unless the
5  person is a danger to himself or others.
6      Q. If there's a Metro policy that says different,
7  will you change your opinion?
8      A. I'd have to read it and see.
9      Q. Or would you just not agree with the --
10     A. No. It depends what the policy says.
11     Q. So as it turns out -- and you've reviewed the
12 toxicology report. Correct?
13     A. Correct.
14     Q. And you reviewed the coroner's autopsy report?
15     A. I have.
16     Q. And both of them identify that Tashii Farmer
17 had significant levels of illegal methamphetamines in
18 his system. Correct?
19     A. I don't remember seeing the word "significant."
20 I remember that he had -- there were a number of
21 substances identified as in his system.
22     Q. One of which was methamphetamines.
23     A. Correct.
24     Q. And you would leave to the medical experts
25 whether that was a significant level or insubstantial

Page 108

1  level, or do you have an opinion on that?
2      A. That would -- that would be -- the expert
3  opinion would have to come from a medical person, you
4  know.
5      Q. So isn't it true that as it turns out, Ken
6  Lopera's street cop instincts were exactly correct and
7  Tashii Farmer was, in fact, under the influence of a
8  controlled substance?
9      MR. LAGOMARSINO: Objection. Form, foundation.
10     THE WITNESS: I can't answer whether he was
11 under the influence or not of a controlled substance. I
12 -- I -- I can testify that, based on my experience and
13 training, that the symptoms of excited delirium were
14 there. And if that's bloviating, I'm sorry, but that's
15 my answer.
16     Q. BY MR. McNUTT: Oh, I didn't think that was
17 bloviating. I just think it's wrong because the
18 question was whether, in fact, Ken Lopera was correct.
19 Tashii Farmer was under the influence of a controlled
20 substance as that phrase, USCS, is defined in statute.
21 Correct?
22     MR. LAGOMARSINO: Form.
23     THE WITNESS: I -- I can't answer that.
24     Q. BY MR. McNUTT: You can't. Why not?
25     A. I don't know specifically what the levels that

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 109

1  he had would be considered under the influence. Those
2  levels indicated that he had those in his system,
3  indicating that there was a certain quantity of it in
4  his systems, and whether that -- whether that falls on the
5  continuum of being under the influence or not, that's a
6  medical decision. I don't know.
7      Q.  It's a medical, not a legal decision as to
8  whether any amount of methamphetamine in Tashii Farmer's
9  system is okay?
10     A.  I -- I don't know the answer to that, to be
11 honest with you.
12     Q.  Can excited delirium cause paranoia?
13     A.  Yeah.
14     Q.  Can it cause aggressive behavior?
15     A.  Yes.
16     Q.  Can excited delirium impair one's judgment?
17     A.  Could it do what?
18     Q.  Impair one's judgment.
19     A.  Yes.
20     Q.  Has the American College of Emergency
21 Physicians recognized excited delirium?
22     A.  Yes.
23     Q.  Do you know?
24     A.  Yes.
25     Q.  Can it impair one's ability to understand

Page 110

1  verbal commands?
2      A.  Yes.
3      Q.  Is superhuman strength sometimes reported in
4  association with excited delirium?
5      A.  Yes.
6      Q.  Are you aware of any medical experts who have
7  concluded that Tashii Farmer suffered from excited
8  delirium?
9      A.  I don't recall any reference along those lines.
10 I do -- I do recall seeing that excited delirium played
11 a role in his death.
12     Q.  Where did you see that?
13     A.  The description of what the doctor wrote in
14 there, as I recall.  I don't remember whether they used
15 the exact words, but that -- do we have a copy of that
16 autopsy report here?
17     Q.  What doctor are you talking about?
18     A.  I don't remember the name.  I'd have to see the
19 report.  But where --
20     Q.  What report are you talking about?
21     A.  The autopsy report.  When they described the
22 cause of death --
23     Q.  Okay.
24     A.  -- they talked about the positional -- not
25 positional asphyxiation, but asphyxiation as a result of

Page 111

1  the neck restraint.  I don't know whether they used the
2  word "excited delirium" or not, but I read that as they
3  were saying that excited delirium was a possible part of
4  that.
5      Q.  You read that the coroner's report references
6  that he died as a result of the neck restraint, and
7  you're connecting that to excited delirium?
8      A.  Do you have a copy of that?
9      Q.  I do, but I'm asking you the question.
10     A.  My recollection in reading that was that they
11 were referring to excited delirium and the asphyxia that
12 -- that came from that.
13     Q.  Do you know what role, if any, metabolic
14 acidosis plays in excited delirium?
15     A.  I don't.
16     Q.  Do you know what role, if any, dopamine plays
17 in excited delirium?
18     A.  I know there were changes in the dopamine
19 levels in the body as a result of that.
20     Q.  And do they go up, or do they go down?
21     A.  I don't recall specifically.  I know there's
22 changes.
23     Q.  Do you know if there's a genetic susceptibility
24 to excited delirium?
25     A.  Is there a what?

Page 112

1      Q.  Genetic susceptibility to excited delirium.
2      A.  I don't know that.
3      Q.  Can it be determined whether a decedent had
4  excited delirium from a neurochemical examination of the
5  decedent's brain?
6      A.  I -- I don't know the answer to that.
7      Q.  If a vial of Tashii Farmer's postmortem blood
8  were still available, could any test be performed on the
9  blood that might indicate whether he had excited
10 delirium?
11     A.  I don't know.  Like I said, I'm not a medical
12 expert.
13     Q.  Do you know whether or not the quetiapine,
14 which is a medication that Tashii Farmer was taking at
15 the time of his death, would have reduced or increased
16 his susceptibility to excited delirium?
17     A.  I have no idea.
18     Q.  Would you agree with me that excited delirium
19 is a complex and not fully understood syndrome?
20     A.  I'm sorry.  Say that again.
21     Q.  Would you agree with me that excited delirium
22 is a complex and not fully understood syndrome?
23     A.  Complex and not fully understood?
24     Q.  Not fully understood.
25     A.  I would agree with that.

Thomas Parker                                Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

## Page 113

1    Q.  Do you know if excited delirium can cause
2  arrhythmias?
3    A.  Cause what?
4    Q.  Arrhythmias.
5    A.  I don't know that.
6    Q.  So you don't know whether, then, under
7  arrhythmias, whether it causes atrial versus ventricle
8  fibrillation?
9    A.  I'm not a medical expert, sir.
10    Q.  Can it cause pulmonary arrest?
11    A.  Pulmonary arrest?
12    Q.  Uh-huh.
13    A.  Well, it can cause death, and I presume
14  pulmonary arrest is cardiac arrest or -- or parts of
15  that.
16    Q.  Well, your assumptions are wrong.  Those are
17  two different things, pulmonary --
18    A.  I understand.
19    Q.  -- versus cardiac.
20    A.  I understand that, but both of those are part
21  of the dying process, too.
22    Q.  So you automatically have both when you die?
23    A.  I'm not saying automatically, but they occur.
24        MR. LAGOMARSINO:  I'm just going to object to
25  the line of questioning as beyond the scope of this

## Page 114

1  witness' designation.
2    Q.  BY MR. McNUTT:  In your opinion, is it a
3  violation of law for a patrol officer not to instantly
4  be able to diagnose a suspect in terms of the difference
5  between USCS and excited delirium?
6    A.  What's your question again?  Is it --
7    Q.  Is it a violation of law for an officer not to
8  properly diagnose someone with excited delirium and
9  mistake him for being USCS?
10    A.  I don't believe that's a violation of the law.
11    Q.  How much training should a department give its
12  officers to identify excited delirium?  Do you have an
13  opinion on that?
14    A.  I -- I think that is a factor that depends a
15  lot on -- on, you know, what their situation is.  Are
16  they having a lot of encounters with excited delirium
17  cases?  But from a perspective, I think there has to be
18  enough training that the officers understand what it is,
19  understand what the symptoms are and understand what
20  actions they can take or should take as an officer.
21    Q.  Do you have the experience and knowledge to
22  offer an opinion as to how much training departments
23  should provide on that topic?
24    A.  I think in a general sense I could, yes.
25    Q.  So you identified that Ken had one hour of

## Page 115

1  instruction on December 8, 2014 in your report.  Do you
2  recall that?
3    A.  I do.
4    Q.  Do you think that was an adequate amount of
5  training?
6    A.  I do not.
7    Q.  How much do you think in terms of hours --
8  since we have one hour, what is an adequate amount of
9  training?  If you were writing the policy for Metro, how
10  much training would you have them give each patrol
11  officer?
12    A.  I think it would be two or three times that.
13    Q.  So two to three hours?
14    A.  Two or three hours, for familiarization
15  purposes.
16    Q.  In your opinion, what should an officer who
17  encounters someone with excited delirium do?
18    A.  First thing they should do is -- is get medical
19  rolling, get medical on the way.  And I -- I think
20  that's it in terms of, I think, approaching the person
21  to -- try and verify the symptoms, if they can, to
22  determine are they willing to accept medical help.  I
23  don't think any officer has the right to force a person
24  to -- to submit themselves to medical help.
25    Q.  So since excited delirium can result in

## Page 116

1  violence, you don't believe that the person should be
2  taken into custody so they can be provided medical
3  assistance?
4    A.  Again, it would depend on the circumstances.  I
5  don't think an officer has the right to force a person
6  to submit to medical assistance.  Okay?
7    Q.  So Metro --
8    A.  And it's -- it's speculation as to whether that
9  person is going to engage in a violent act after that or
10  not.
11    Q.  So if Metro's policy says otherwise, you would
12  disagree with their policy?
13    A.  I'd have to see the policy.
14    Q.  So I believe you testified earlier, but correct
15  me if I'm wrong, you said Ken Lopera had the right to
16  follow Tashii Farmer down the employee hallway.
17  Correct?
18    A.  Correct.
19    Q.  Whether he believed he was under the influence
20  of a controlled substance or whether he was suffering
21  from excited delirium.  Is that true?
22    A.  Well, I don't know what the statute is.  You
23  know, from what I've seen, I do not believe that there
24  was sufficient probable cause to have taken him into
25  custody for being under the influence of a controlled

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

---

**Page 117**

1  substance. I think --
2      Q.  But I'm not asking about the statute.
3      A.  Well, I'm -- I'm trying to give you an answer.
4      I think he had the right to follow him down
5  that hallway. I think he should have been calling for
6  medical assistance right away and follow him enough to
7  make sure that he's not going to be a danger to somebody
8  else. I don't think that gives him the right to -- to
9  do what he did.
10     Q.  So one of the reasons that Officer Lopera or
11  any officer could follow Tashii Farmer would be to
12  provide some sort of containment to then get the medical
13  attention. Correct? Containment of the subject.
14     A.  Well, I --
15     MR. LAGOMARSINO: Objection. Form.
16     THE WITNESS: I think my answer to that is I
17  don't know that he has the right to contain the person
18  unless the person is obviously presenting a danger to --
19  to other people.
20     Q.  BY MR. McNUTT: So if Metro's policy says
21  differently, would you disagree with it, or not?
22     A.  I'd have to see the policy. I don't know.
23     Q.  So you've testified earlier you're not a
24  use-of-force expert. You're a police policies and
25  practices expert. Correct?

---

**Page 118**

1      A.  Correct.
2      Q.  So are you going to offer any opinions at trial
3  regarding the use of force employed in this case?
4      MR. LAGOMARSINO: Objection. Form.
5      THE WITNESS: From the perspective of the
6  policy and the practice, I would offer an opinion if so
7  asked.
8      Q.  BY MR. McNUTT: Please explain what that means.
9  What opinions would you offer, if asked?
10     A.  Well, going back to the very beginning, I don't
11  think that Officer Lopera had a right to -- to detain
12  Tashii Farmer. I don't think he had the right to take
13  him down to the ground the way he did. I don't think he
14  had the right to apply a chokehold to him to try and
15  take him into custody. I think all of those are outside
16  the bounds of what is proper for the situation.
17     Q.  And are those use-of-force opinions, or are
18  those police policy and procedure?
19     A.  They're both. You know, I -- in terms of -- of
20  what is practical and what is proper in a given
21  situation, based on my training and experience, I think
22  I -- I can form opinions on that and offer them. And I
23  think that he was totally out of bounds in terms of what
24  he did.
25     Q.  Are you aware that Metro had no problem with

---

**Page 119**

1  their officer, Ken Lopera, pursuing Tashii Farmer
2  through that employee-only area?
3      A.  I disagree with that.
4      MR. LAGOMARSINO: Form.
5      Q.  BY MR. McNUTT: No, no. I'm just saying are
6  you aware of that position.
7      MR. LAGOMARSINO: Objection. Mischaracterizes
8  testimony.
9      THE WITNESS: I'm aware that there was a
10  position in either the FIT or the CIRT report that he
11  had no cause to -- of taking the action that he took.
12     Q.  BY MR. McNUTT: Okay. So are you aware of any
13  other testimony by Metro, like Chief McGrath, who
14  testified that he had no problem with Ken Lopera and
15  believed he had reasonable suspicion to follow him
16  through the hallway?
17     A.  I don't remember specifically who it was.
18  There were other people that -- that felt he had no
19  problem with that, or they had no problem with that.
20     Q.  Okay. But you --
21     A.  But I -- I -- if I can answer the rest of it.
22  But I think the real answer to that solution in terms of
23  what Metro's position was is the action they took
24  against Officer Lopera.
25     Q.  Fair enough.

---

**Page 120**

1      So it's your position that a patrol officer who
2  believes someone that is under the influence of a
3  controlled suspect -- "subject" and "substance" are
4  tripping me up. Let me start over.
5      Is it your opinion that an officer who
6  encounters a suspect who he believes is under the
7  influence of a controlled substance who then flees into
8  a restricted area of a casino does not have reasonable
9  suspicion to pursue that individual?
10     A.  I disagree with what Officer Lopera did in that
11  situation.
12     MR. McNUTT: Nonresponsive. Strike.
13     MR. LAGOMARSINO: I'm going to -- sorry.
14  Before your next question, I'm going to object as an
15  incomplete hypothetical.
16     Q.  BY MR. McNUTT: I'm just asking you that same
17  question.
18     A.  Ask me again. I'm sorry.
19     Q.  So is it your opinion that a patrol officer
20  does not have reasonable suspicion to follow someone he
21  believes is under the influence of a controlled
22  substance --
23     MR. LAGOMARSINO: Same objection.
24     Q.  BY MR. McNUTT: -- and then flees into a
25  restricted area of the casino?

---

Thomas Parker                           Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 121

1      MR. LAGOMARSINO: Same objection.
2      THE WITNESS: As I said earlier, I think he has
3   the right to follow anybody in a public area that he
4   wants to -- to follow and observe perhaps to determine
5   whether they are, in fact, under the influence of a
6   controlled substance. In terms of -- I -- I don't
7   believe that that situation where he went into this area
8   beyond those plastic chains that were there, this
9   floating area that -- that the public was restricted
10  from, I -- I don't believe there was any criminal
11  violation involved with that that Lopera had a right to
12  do. They weren't in there to enforce the -- the
13  casino's or the resort's rules, as I understand it.
14  They were there to keep the peace and deal with any --
15  any criminal violations that came to their attention.
16      It's my opinion that what I've read, what I've
17  seen in the videos, that that did not rise to that
18  level.
19      Q.  BY MR. McNUTT: And so one of the things that
20  Metro would be there to enforce are laws regarding being
21  under the influence of a controlled substance. Correct?
22      A.  If there was a basis for -- for feeling that,
23  you know.
24      Q.  Have you ever encountered someone under the
25  influence of a controlled substance in your law

Page 122

1   enforcement career?
2      A.  I sure have.
3      Q.  And you were able to -- did you have a blood
4   test on site, or did you tell it from their physical
5   symptoms?
6      A.  I conducted enough of a discussion or you want
7   to use the term investigation to be able to form an
8   opinion that I could support. You have to be able to
9   support an arrest or a -- a detention leading to an
10  arrest.
11      I don't believe he had enough information to do
12  that. He certainly had enough information that there
13  was a potential medical condition there.
14      Q.  Did he have enough information to detain Tashii
15  Farmer?
16      A.  I don't believe so, no.
17      Q.  And you agree that detention is different than
18  arrest. Correct?
19      A.  Sure. It's a level below that. Yeah, I do.
20      Q.  And you don't even think that Ken Lopera had
21  enough reasonable suspicion to detain Tashii Farmer for
22  further inquiry. Is that your opinion?
23      A.  I do not.
24      Q.  Even though, as it turns out, Ken Lopera was
25  correct and he was absolutely high on meth?

Page 123

1      A.  I don't know that he was high on meth. I -- I
2   -- that I've been told. I don't know it to be a fact
3   that 950 nanograms of methamphetamine is right on the
4   line between being under the influence or not being
5   under the influence.
6      Q.  Are you aware of what Metro's policy is with
7   respect to levels of resistance in their use of force
8   continuum?
9      A.  I -- I recall seeing that. As we sit here
10  today I don't -- I know there's various levels there in
11  -- in terms of what action can be taken in terms of the
12  use of force.
13      I don't know if that's the question you're
14  asking, but -- are you talking about the use of force
15  continuum and their -- their policies surrounding that?
16      Q.  So in your report and in your supplemental
17  report you never mentioned, really, any aspect of the
18  fact that Tashii Farmer was utilizing methamphetamines
19  and had an enlarged heart at the time of this incident.
20  Why did you fail to mention that?
21      A.  I'm sorry. I'm not sure I understand your
22  question.
23      Q.  Do you think Tashii Farmer's enlarged heart had
24  any relation to his death?
25      A.  I have no idea.

Page 124

1      Q.  Because you're not a medical expert and you
2   can't offer medical opinions?
3      A.  That's correct.
4      Q.  What about the presence of methamphetamines in
5   his system? Does that have anything to do with his
6   death?
7      A.  I think it was probably a potential precursor
8   to the excited delirium. Whether it was sufficient to
9   contribute to his death separate from that, I -- I -- I
10  would doubt that, but again, I'm not a medical expert.
11      Q.  If Tashii Farmer wasn't on meth that night,
12  would he have survived the encounter exactly as it
13  occurred?
14      MR. LAGOMARSINO: Form, foundation.
15      THE WITNESS: It's a possibility. Sure.
16      You know, again, it -- it's the -- if I could
17  finish my answer to that.
18      Q.  BY MR. McNUTT: Sir, there was about a
19  60-second blank there. No one was cutting you off.
20      A.  Well, I was thinking. Okay?
21      If you don't want the rest of it, that's fine.
22      Q.  I really don't.
23      So in your report you discount essentially,
24  from what I can tell, everything that Ken Lopera said in
25  his CIRT statement. Is that accurate?

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 125

1    A.  I discount most of it.  Yeah.
2    Q.  And did you give credibility to anything Ken
3  Lopera said?
4    A.  Did what?
5    Q.  Did you give any credibility to anything Ken
6  Lopera said?
7    A.  Well, I think he certainly recognized that he
8  did a rear naked chokehold.  I think he did that.  I
9  take that as a credible statement on his part.  I think
10  a lot of the reasons that I read that he took the
11  actions that he took on Mr. Farmer, I don't believe
12  hardly any of those.  I think he made those up as he --
13  as he was required to after -- after realizing how this
14  situation ended up.
15    Q.  Did he make up the fact that Tashii Farmer was
16  under the influence of a controlled substance?
17      MR. LAGOMARSINO:  Objection.  Form.  Misstates.
18      THE WITNESS:  I don't know whether he made that
19  up or not.  I don't think there was enough objective
20  signs there at that point to reach that conclusion.
21    Q.  BY MR. McNUTT:  No.  I'm talking about the
22  factual record evidence of this case.  Ken Lopera said
23  days after this event, well before the toxicology report
24  was done, correct, that Tashii Farmer, he believed, was
25  under the influence of a controlled substance?

Page 126

1      MR. LAGOMARSINO:  Objection.  He did not say
2  that.
3    Q.  BY MR. McNUTT:  You can answer.
4    A.  I -- I -- I recall him discussing the fact that
5  that was one of the considerations, but he made those
6  statements well after the fact when he's in a position
7  of having to explain or felt he had to explain his --
8  his actions that he had taken that resulted in a death.
9    Q.  Are you done?
10    A.  I think so.
11    Q.  You took a really big breath, so I was making
12  sure there wasn't a pause.
13    A.  It was a pause.
14      MR. LAGOMARSINO:  I think, Counsel, you're
15  being kind of argumentative, a little harsh.
16    Q.  BY MR. McNUTT:  If Ken Lopera had a duty to
17  render assistance to Tashii Farmer because he was
18  suffering from excited delirium, and I'm asking a
19  hypothetical here, if Metro's policy is that Ken Lopera
20  should have contained Tashii Farmer because he was
21  suffering from excited delirium or anybody suffering
22  from excited delirium, does that change any aspect of
23  your answer about Ken Lopera's -- the propriety of him
24  following Tashii Farmer for containment purposes?
25    A.  I don't recall reading that policy.  I'd have

Page 127

1  to read it to know whether your -- your hypothetical
2  there is correct, if it is a hypothetical.  I do not
3  believe that law enforcement has the right to force a
4  person to submit to medical attention if they don't want
5  to submit to it or their actions indicate they don't
6  want to submit to it.
7    Q.  You referenced that Ken Lopera was wearing BDUs
8  at the time of the event.
9    A.  Yes.
10    Q.  Do you recall that?
11    A.  Yes, I do.
12    Q.  Do you have an understanding as to whether that
13  was his choice or whether that was directed by his
14  command?
15    A.  I do know that the sergeant has the authority
16  to direct or to authorize the wearing of BDUs.
17    Q.  So --
18    A.  Whether it's his personal choice or not, I
19  don't know the extent of -- of that authority.  I do
20  know that there was a specific purpose behind BDUs when
21  they were first introduced into police work.
22    Q.  I'm sorry.  Say that again.
23    A.  I said I know there was a specific purpose
24  behind BDUs becoming a -- a part of the uniform of
25  police officers.

Page 128

1    Q.  Do you know the specific purpose why Metro
2  introduced them into Metro's department?
3    A.  BDUs are normally for tactical purposes.  They
4  started with SWAT teams and teams like that.  I am aware
5  that a lot of departments give a lot of discretion to
6  officers to wear them.  I'm also aware there's a lot of
7  controversy surrounding that.
8      I don't know beyond the sergeant level.  I
9  don't recall reading anything that an individual officer
10  has the free choice to decide whether to wear that or
11  the standard police uniform.
12    Q.  You say on page 11 of your report, paragraph E,
13  and this is a parenthetical underneath paragraph 26,
14  which is talking about things that you would like to or
15  need to have accessible in order to conclude your expert
16  opinions.  Do you see where I'm at?  I actually went
17  back to page 10.
18    A.  Yeah.  Let me read that.
19    Q.  Paragraph 26.
20    A.  Okay.  I read that.  What's your question?
21    Q.  So my question is going to be, have you been
22  provided these materials that you identify in A, B, C,
23  the subparts of paragraph 26, at this point.
24    A.  I recall being provided some information, and
25  that's where I got the information about the -- the

Thomas Parker                     Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 129

1  sergeants having the authority to do it.
2      Q.  But I'm asking a more general question.
3      A.  Okay.
4      Q.  Are you waiting -- is there any opinion that
5  you cannot provide in this case today because you have
6  not gotten the information and you're telling your
7  lawyer, "Look, I need this information to either support
8  my positions or to come to a conclusion about my
9  opinions"?
10     A.  Well, I think question 26 indicates that there
11 are -- is this list A through L of items of information
12 that I would like to have to be able to render an
13 adequate opinion.  And as far as the BDUs, I recall
14 receiving some information on that.  As I said, that
15 indicates the sergeant has the authority to -- to grant
16 that.  I don't recall reading anything that the
17 individual officer has the right to do that.
18     So I don't know what I wasn't provided.  Okay?
19     Q.  Sir, I'm off the BDUs.
20     A.  Okay.
21     Q.  I'm asking a broader question about paragraph
22 26.
23     A.  Okay.
24     Q.  Is there any information that you've asked for
25 but have not yet received?

Page 130

1      A.  Yes.
2      Q.  What?
3      A.  Let me start with F, an unredacted version of
4  the CIRT, C-I-R-T, report.  It's got tremendous
5  redactions in it, the copy that I got.
6      Q.  Okay.
7      A.  Pages are blacked out.
8      Q.  But do you understand that that was pursuant to
9  a court order?
10     A.  I don't know what it was.
11     Q.  Okay.
12     A.  But I have to read the other ones here.  Let me
13 read it.
14     I haven't received Lopera's personnel records,
15 that I know of, and his background information, any --
16 any psychological assessments that were made.
17     I don't know that I've received all of the --
18 the LVMPD policies in terms of that particular
19 assignment they had on that team that they were on.
20     I haven't received any information, that I'm
21 aware of, about citizen complaints, especially as they
22 relate to the LVNR, the rear nakeds.  I've seen some
23 reports.  I -- I don't -- I don't -- I don't recall
24 there being any specific analysis or conclusions from
25 that.

Page 131

1  Citizen complaints on Tasers.
2      Most of those items in there, I would say I
3  have not received the vast majority of that.
4      Q.  Are you familiar with the phrase "SOP" or
5  "standard operating procedure"?
6      A.  I am.
7      Q.  And is it your understanding that partners, law
8  enforcement partners working in tandem often develop the
9  way, standardized way that they interact with citizenry?
10     A.  You say partners?
11     Q.  Yes.
12     A.  You have to define partners for me.
13     Q.  Two people working in tandem routinely.
14     A.  Okay.  They should develop standardized
15 procedures.  They should know how each other is going to
16 react.
17     Q.  Okay.  And so if you and I were partners --
18     A.  Uh-huh.
19     Q.  -- there would be things where you and I would
20 do the same things over and over and I wouldn't have to
21 tell you what I'm going to do and I wouldn't have to
22 tell you in relation to my action what your reaction
23 should be.  Correct?
24     A.  I don't know that's totally correct.  In my
25 experience, training and what I've seen in terms of --

Page 132

1  of policies and procedures, when partners first get
2  together, they usually start having discussions about,
3  okay, in a given situation I'm going to do this and I
4  expect you're going to do that.  They -- they work out a
5  working arrangement as to how they're going to do
6  things, and they should be in a position where they're
7  going to know how each other is generally going to react
8  in any given situation.
9      Q.  So in this case, in the CIRT report, Ken Lopera
10 talked about the fact of him being cover or, excuse me,
11 contact and Officer Lif being cover.
12     A.  Correct.
13     Q.  You recall that?
14     A.  I recall that.
15     Q.  Do you think that was inappropriate for any
16 reason for them to operate in that manner?
17     A.  If they actually operated in that manner, I
18 think it would be very appropriate.  I don't think they
19 did.  Officer Lif disagreed with the statements in that
20 regard.
21     Q.  No, no, no.  I'm asking just about whether it
22 was inappropriate for Ken to say that's how they
23 operated.
24     A.  If they didn't operate that way, it would be
25 inappropriate.

1 Q. And so who mans the radio, if you know, in a
2 cover and contact situation?
3 A. It depends on what each one is doing in the
4 situation. The -- the -- it would depend. Whoever --
5 who is closest to the radio? Who is the one that's
6 making the contact in the given situation? Who has the
7 freedom to use the radio?
8 Q. Well, closest to the radio isn't really an
9 issue anymore because they had radios on them. Correct?
10 A. That's fine.
11 Q. A little bit different than back in --
12 A. Yes.
13 Q. -- your patrol days in Santa Clara. Right?
14 A. Yes. Very different.
15 Q. Did you ever question the credibility of
16 Officer Lif's CIRT statement or her FIT statement?
17 A. I saw some inconsistencies in her statements
18 that -- that concerned me.
19 Q. Such as?
20 A. In -- in the beginning, as I recall, the
21 statements she made were supportive of the actions that
22 Lopera took. Later on, I don't remember whether it was
23 the FIT team or CIRT team, she offered much
24 different opinions that -- that his actions were
25 inappropriate. That caused me concern.

1 I think I made a statement in my report that in
2 making decisions in that regard you often have to look
3 at the personalities of the individuals, you have to
4 look at their past examples of how they work together.
5 And in this case, my opinion is that Officer Lopera did
6 not accurately represent what their real working
7 relationship was.
8 Q. So I may have asked not a very good question
9 there.
10 Did you have any issues with the actions that
11 Officer Lif did not take, such as why was she not on her
12 partner's hip, so to speak, throughout the pursuit of
13 Tashii Farmer? Did you render any opinions or have any
14 questions about that?
15 A. I don't think I rendered an opinion. In my
16 mind --
17 Q. I agree you didn't render an opinion. Do you
18 have any questions about that?
19 A. I question how she lost track of where they
20 went. I don't know the reasons for that. I think most
21 officers would have reacted differently. I know she
22 talked about --
23 Q. Excuse me. Than Officer Lif? You said "most
24 officers would have reacted differently" and I just want
25 to make sure --

1 A. Yeah. I think most officers in a situation
2 like that, when one officer takes off, they would have
3 been right there with them.
4 Q. Would you agree with me that had Officer Lif
5 been with Ken Lopera and stayed with him throughout the
6 pursuit that Officer Lopera would have had a wider range
7 of tools to utilize in either containing or detaining
8 Tashii Farmer, meaning because of the presence of his
9 partner?
10 A. I think a truthful answer to that would be that
11 that's a possibility. He might have also had somebody
12 there that would have said, "Ken, what the hell are you
13 doing here" and told him much sooner to let go.
14 What I started to say was the way I assessed
15 Officer Lif and Lopera in terms of their relationship,
16 and a lot of it depends on the way she described him as
17 being much a more boisterous, talking loud, more
18 aggressive individual, whereas she was kind of the more
19 calm, thoughtful type. My experience has been that in a
20 -- in a partnership where you have two officers together
21 like that, the one that is the calmer, more logical
22 thinker is usually the one that's going to prevail. I
23 don't know that that would have worked with Officer
24 Lopera.
25 Q. Do you think a calmer approach than the one Ken

1 Lopera identified where he was asking Tashii Farmer
2 about show me who's chasing you and things of that
3 nature, what could have been more calm about that? I'm
4 not talking about the pursuit. I'm talking about just
5 the words that were expressed by Ken Lopera that he
6 interfaced with with Tashii Farmer.
7 A. I think those were very appropriate questions
8 to ask. It was what he did afterwards that became
9 inappropriate.
10 Q. I don't agree with your distinction, but I
11 appreciate you for answering that question, making that
12 segregation.
13 A. Sure.
14 Q. Are you aware of how someone can get trespassed
15 off private property, trespassed in a criminal sense or
16 in a criminal situation?
17 A. In a general sense. I also reviewed the -- the
18 statute on that.
19 Q. NRS 207.200?
20 A. I don't know what the number was. I think that
21 was it.
22 Q. 207.200. You've got part of it, I believe, in
23 your report here on page 19.
24 Would you agree with me that in one instance a
25 person can be told, with respect to private property,

Page 137

1 that you are no longer welcome on this private property,
2 and that's kind of one precursor to trespass under the
3 statute?
4      A. It is if it comes from the appropriate person,
5 a manager or owner or someone given that authority to --
6 to do that.
7      Q. Do you believe that an officer, a law
8 enforcement officer cannot provide that warning?
9      A. I think without the other provisions of the --
10 the requirements of that statute, I -- I -- in a general
11 sense, I don't think an officer would just on the face
12 of it have the authority to declare someone trespassing.
13      Q. Is it your opinion that Tashii Farmer had the
14 right to run down that hallway in the Venetian?
15          MR. LAGOMARSINO: Form as to "right."
16          MR. McNUTT: I'll let the question stand.
17          THE WITNESS: Well, I think the thing you have
18 to remember, and I saw this on the video, right at the
19 beginning of that hallway that he ran down there's
20 people in the background. It's hard to delineate who
21 they are. There's a door off to the right. But there's
22 a great big red lit exit sign right there. And if
23 Tashii Farmer is thinking that he wants to get out of
24 there, he wants to leave, I would think that's probably
25 the main thing that he saw. And I think anybody could

Page 138

1 be confused by that. I don't recall seeing any signs or
2 reading anywhere that there was anything posted there
3 saying that that's prohibited to do that.
4      The -- the temporary plastic cones and chains
5 that are there, the impression that I have from seeing
6 that, and I've not read anything beyond this, that there
7 was mopping of the floor going on. I've seen those in
8 those situations many, many times. And the fact that
9 Tashii backed up into those obviously indicated that he
10 didn't know they were there, at least initially. And
11 I'm not even sure that he knew they were there when he
12 was kind of stumbling and recovered his footing and --
13 and took off running.
14      Like I said, in my opinion, based on the
15 evidence that I saw, that red exit sign and the fact
16 that there were people behind him, the only thought --
17 not the only thought, but I'm -- I would think that he
18 thought that was a way out.
19      Q. BY MR. McNUTT: You think that was a reasonable
20 belief on behalf of Tashii Farmer?
21      A. Based on what I've seen and read, I -- I think
22 it was reasonable for him to think that, yeah.
23      Q. If you stumbled or ran through a yellow chain
24 link fence with yellow cones cordoning off a hallway,
25 would you think it's reasonable to continue down that

Page 139

1 hallway?
2      A. It would depend on my reasons for wanting to --
3 to leave to go down that hallway. If I was in -- in
4 fear of my life, if I was afraid and I wanted to get out
5 of that building, if my approach to whoever I was
6 talking to didn't go the way that I hoped it would and I
7 felt some kind of threat, I -- I would have taken
8 whatever exit was the most available.
9      Q. Or if you're high on meth, that would look
10 good, too?
11      A. I've never been on meth, so I don't know.
12      Q. So page 20 of your report, under paragraph 48.
13 Are you there?
14      A. Yes.
15      Q. So paragraph 48, it looks like you've attempted
16 to quote from the CIRT statement.
17      A. I think I did quote from it. I don't think it
18 was an attempt.
19      Q. Okay. Well, not all of the italicized words
20 inside quotes in your report are accurate, meaning they
21 are not the complete quote. We'll presume that's maybe
22 some sort of typo, but that's why I say I think you're
23 attempting to quote it here.
24      A. Are you telling me that what I've quoted within
25 the quotes there is not accurate?

Page 140

1      Q. I'm saying that in places in your report that
2 is absolutely correct, but I'm not taking that position
3 with respect to this one because it's not relevant to my
4 question.
5      A. I would be -- I would be surprised with that
6 because I usually take great pains when I'm going to
7 make a quote and I put it within quotes to make sure
8 that it's accurate.
9      Q. I can point those out to you --
10      A. Okay.
11      Q. -- at some point.
12      So you reference Ken Lopera's statement that
13 "I'm not that kind of guy, to backtrack. He's
14 committing an offense." And I'm going to paraphrase
15 this. He's in an area he's not supposed to be, I feel
16 like it's my lawful duty. I wasn't going to stop
17 because I busted my butt.
18      This is right after him he was talking about
19 falling in that hallway on the soap, I guess.
20      A. Uh-huh.
21      Q. Do you recall that?
22      A. Yes.
23      Q. You say, "This is the best indication yet of
24 Officer Lopera's state of mind and intentions in this
25 matter." And you -- and I'll drop down a couple lines.

Thomas Parker                                     Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 141

1  You say, "No such legal basis existed in this situation,
2  and Farmer's attempts to leave the area where he
3  encountered Officers Lopera and Lif did not violate any
4  laws, and Lopera had no justifiable basis for his
5  actions."
6        See where I'm --
7     A.  I do.
8     Q.  And I skipped a few lines, but I'm trying to --
9     A.  Sure.  No.  I'm right with you.
10    Q.  Okay.  So you say no such legal basis exists.
11 Are you saying no such legal basis at all exists to
12 pursue Tashii Farmer?
13    A.  Yes.
14    Q.  Okay.  So even though Ken Lopera says he
15 believed that Tashii Farmer was under the influence of a
16 controlled substance and was trespassing, you disagree
17 with his statement of those two things that, in his
18 mind, constituted reasonable suspicion?
19    A.  I think this is a rationalization on his part.
20 He stated this after the fact.  He's trying to explain
21 the actions that he took.  Believe me, I've been in a
22 enough situations, personnel type situations, internal
23 investigations, what have you, that -- and I've seen
24 countless situations where officers and even FBI agents
25 try to justify an inappropriate action they took and

Page 142

1  they grasp at straws out there to try and do that.  I
2  think that's exactly what he was doing here.
3        What I say in number 48 up there, what I think
4  was an accurate quote, I've seen that attitude multiple
5  times in law enforcement.  It's part of that
6  braggadocious attitude.  It's part of him trying to seem
7  like he's a real tough guy, he's a real tough cop.  And
8  I think those -- as I said, I think it's -- it's a
9  fantastic indication of how he approaches police work
10 and what he was thinking that night.
11       I don't think it's accurate.  I don't think he
12 was thinking those thoughts that it's his lawful duty
13 unless he totally misunderstand his lawful duty.
14    Q.  So isn't it true that every officer, every
15 arrest report ever written is an after-the-fact
16 justification of the arrest?
17    A.  They are.  Most of them are -- are accurate and
18 reported properly, though.  It's -- to me it's unusual
19 to see that kind of language where he's "I'm not that
20 kind of guy, I'm not just going to sit back."  That's an
21 unusual statement.
22    Q.  Do you disagree with Officer Lopera's statement
23 that he -- well, do you think it was reasonable for
24 Officer Lopera, based on his discussion about what his
25 SOP with Officer Lif was, do you think it was

Page 143

1  unreasonable for him to expect Officer Lif to be the one
2  broadcasting their whereabouts on the radio?
3     A.  I don't know what their agreements were.
4  According to her, they didn't have an advance agreement
5  the way he described it.
6     Q.  Well, according --
7     A.  They didn't operate that way.
8     Q.  I'm sorry.  Go ahead.  Are you done?
9     A.  I'm done.
10    Q.  According to him in his CIRT statement, he did
11 say that he was contact, she was cover, you know, when
12 he was contacting, she was on the radio.  So I'm just
13 asking, I guess, two parts.  We'll start with the first.
14 One, do you have a problem if that's the way the two
15 operated?
16    A.  I have a prob -- well, let me take that back.
17       If they, in fact, operate that way and if, in
18 fact, there had been no disagreement between the two of
19 them as to what their standard operating procedure was,
20 I would not have a problem with it.  I don't -- I don't
21 think Officer Lopera accurately reflected what the
22 working arrangement was.
23       In this particular situation it's clear he
24 ended up as the contact agent.  In that case I would
25 have expected that if she had a radio, she would have

Page 144

1  tried to call it in.
2     Q.  So --
3     A.  I would have expected her to do that.
4     Q.  So if I'm right and that's what he said in his
5  CIRT statement, this is how we've been working --
6     A.  Uh-huh.
7     Q.  -- if he said something like we were a
8  well-oiled machine with respect to contact and cover, is
9  it reasonable for him to expect, when he approached
10 Tashii Farmer, that Officer Lif would get on the radio
11 and make whatever appropriate radio transmissions needed
12 to be made?
13    A.  Let me answer that this way.  If I had been in
14 that situation with Officer Lopera, number one, I would
15 not have chased after Farmer, but, number two, if I'm
16 the one leading the chase, I would have expected my
17 partner, who was in the back or behind, to try and call
18 it in.
19    Q.  Are you aware that Officer Lif also did not
20 activate her body worn cam?
21    A.  I'm aware of that.
22    Q.  Are you aware that was against Metro policy?
23    A.  I would think it would be.  I -- I don't recall
24 that specifically.
25    Q.  Isn't it true that you've rendered other

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 145

1 opinions where you've criticized officers' integrity
2 when they don't activate their body worn cam?
3     A. I have done that, and I would if there's a
4 reason for it. I know in my -- my Police Commissioner
5 job here we've dealt with a number of problems where
6 officers will activate or they turn it off in a given
7 situation. I think that's wrong.
8         I question why she didn't turn it on. She was
9 relatively new, but she had been on the street for a
10 while. She -- she knew what those cameras were for and,
11 I presume, in what situation they should be used in. So
12 I -- I -- I have some concern on that, yes.
13     Q. And haven't you previously taken the position
14 that officers that diligently turn on their body worn
15 cam have nothing to hide, these are --
16     A. That's the general rule. Yeah. General
17 practice.
18     Q. So let's go to page 22, paragraph 53. This is
19 where you're summarizing, in your words, the Venetian
20 security guard officer. And his last name is Guy,
21 G-u-y.
22     A. Can I take a minute and read this so I can pay
23 attention to your question?
24     Q. Yes. It's paragraph 53.
25     A. 53.

Page 146

1         Yes. I recall that.
2     Q. Okay. So this is where you recite that Officer
3 Guy changed his testimony that he gave.
4     A. Correct.
5     Q. Okay. And yet what he changed his testimony to
6 -- first off, as an investigator with your experience,
7 when someone starts changing their story admittedly, how
8 much credibility do you give to any part of their story?
9     A. Well, I -- I don't know that you can attach
10 credibility when that happens. You have to ask more
11 questions. You have to make more observations or
12 determine why did they change their story, what's the
13 reason for it.
14         In this particular case, based what I've read,
15 and that's -- that's all I've had access to here in
16 addition to having seen on the video exactly what
17 happened, I think the security officer, who are not
18 trained as adequately as police officers are, I think he
19 was trying to be supportive of Officer Lopera. I don't
20 know the form of the question that he was asked that led
21 to that answer, but I -- my impression in reading that
22 was he was trying to be supportive of Lopera's story but
23 then was either confronted with or realized that he was
24 treading the wrong path there and he better tell the
25 truth. And that's what he did.

Page 147

1     Q. Do you believe he was supporting Lopera because
2 he knew Lopera and was friends with him or just --
3     A. I have no idea. There's -- a lot of these
4 security officers want-to-be cops, but they -- for
5 one reason or another they couldn't make it or they
6 decided to go this route first. I don't know whether he
7 knew Lopera. I don't know whether he had any other
8 reason. But looking at what he had to say and the fact
9 that it matched Lopera's story when it was not true, my
10 assumption was, based on that and based on my
11 experience, was that he decided he better tell the
12 truth.
13     Q. Is it also possible that people have different
14 recollections based upon their direct perception, direct
15 visual perception of things versus when they have more
16 evidence available to make an opinion and that would be
17 an instance where them changing their story was not --
18 would not knock their credibility?
19     A. Sure. That's what happens. And that's
20 obviously one of the big concerns about eyewitness
21 testimony, is how unreliable it can be. I don't know
22 what his reason was for changing his story. I can only
23 reach an assumption based on what I've read and past
24 experience.
25     Q. So based on his physical positioning, he had

Page 148

1 one perception of the events as they were occurring
2 versus the stationary camera outside the Venetian has a
3 different angle of perspective on the events as they
4 were occurring. Correct?
5     A. I don't know where he was positioned.
6     Q. But he wasn't positioned behind the camera
7 outside the Venetian is what I'm saying.
8     A. I -- I don't know that.
9     Q. But suffice it to say that we agree, I think,
10 correct me if I'm wrong, that depending on where people
11 are positioned, they can have a different perception of
12 the exact same events. Correct?
13     A. They can have, yes.
14     Q. Based on their physical positioning
15 differences?
16     A. That's true. But also, if one of those people
17 changes their story, there's usually a reason that
18 they've changed their story, and we don't know what that
19 was here.
20     Q. It may be because he's a liar or it may be
21 because he got new information?
22     A. Could be either one of those.
23     Q. But without you knowing what that reason was,
24 you unilaterally gave him credibility and say that his
25 changed testimony refutes Lopera's assertions. Why is

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 149

```
1   that?
2       A.  I'm sorry.  Say that again.
3       Q.  Well, you don't know why he changed his
4   testimony.  You just said that.  You don't know the
5   reasons?
6       A.  I have a presumption as to why he changed.
7       Q.  Oh.  What's the presumption?
8       A.  That he was either confronted with the fact
9   that it was wrong or that he received additional
10  information that he was wrong and changed his story.
11      Q.  Well, those are just possibilities.  That's not
12  a presumption.
13      A.  They're -- they're all possibilities.  I don't
14  know.
15      Q.  Right.  So you don't know if he's a liar or not
16  or whether he got additional information.  That's what
17  I'm asking.
18      A.  I think what I said was what he started out
19  with was not true and my presumption from knowing and
20  having dealt with a lot of security officers over the
21  years, that he was trying to be supportive of Lopera but
22  then found out -- he either found out that he was wrong
23  or was confronted with the fact that he was not telling
24  the truth and changed his story.  I don't know.  That
25  was an assumption.
```

Page 150

```
1       Q.  And so, as you said, on the one hand he could
2   be a liar or on the other hand he could have gotten
3   additional information.
4       A.  Could be either one of those.
5       Q.  And you don't know which it is?
6       A.  I don't.
7       Q.  Okay.  Yet without knowing that, you give his
8   changed testimony priority over Ken Lopera's CIRT
9   statement.  Why?
10      A.  There's a number of reasons for that.  Number
11  one, the guy that was driving the truck refuted his
12  initial story, Pierce.
13          Number two, the videos refuted the story.  And
14  I don't know what -- this doesn't say at what point he
15  changed his story.  It does say that in his interview
16  with CIRT he changed his story.  So maybe the first part
17  about him running up to the truck, we don't know who he
18  gave that statement to.  But obviously, by the time he
19  was interviewed by CIRT, which I presume was later that
20  morning because most of those were --
21      Q.  Actually, you identified who he gave that
22  statement to.  He gave it to the FIT investigators that
23  night.
24      A.  Okay.  True.  I -- I missed that.
25          So, again, my answer is I don't know how he was
```

Page 151

```
1   asked for that -- that question that caused him to give
2   that initial supportive answer.  But when he was
3   interviewed by CIRT, he obviously changed it.
4       Q.  Isn't it true that you discount his changed
5   testimony because you want to mount up all the
6   information against Ken Lopera because you give Ken
7   Lopera no credibility?  Correct?
8       A.  I -- well, after going through this -- let me
9   back up.
10          I don't care who has the credibility in a case.
11  I want people to tell the truth.  And I look for the
12  truth and I think I've got a lot of experience to back
13  me up on being able to see the truth in most cases.
14          There's a reason that he told it the way he did
15  when it wasn't accurate.  I don't know what that reason
16  was.  There's a reason that he told the truth when later
17  on he was interviewed by CIRT and what caused him to
18  change that story.  Based on that and based on the fact
19  that his first story was definitely not true and was
20  somewhat supportive of the story that Lopera told, I --
21  I -- there was a reason for that.  I presume somebody
22  told him what he should say.  I can't prove that, but
23  again, I've had a ton of people lie to me over the years
24  in -- in situations like this.
25      Q.  Let's go to page 23 where you are talking about
```

Page 152

```
1   LVMPD policies regarding ECDs or Tasers.
2       A.  Is that in A?
3       Q.  Yes.
4       A.  Okay.
5       Q.  Now, if I say ECD or Taser, you understand what
6   I'm --
7       A.  I know.  Sure.
8       Q.  Okay.  You say the use of a Taser, per Metro
9   policy, is not approved for use against the subject when
10  the sole reason for the firing of the Taser is that the
11  subject is fleeing.  Correct?
12      A.  That's a policy in most police departments.
13  It's also a policy put out by the IACP.
14      Q.  But real simple, that's Metro's policy?
15      A.  You don't use it to stop a fleeing person.
16          MR. LAGOMARSINO:  Can we take a break?
17          MR. McNUTT:  Sure.  Let me just get through
18  this section.
19          MR. LAGOMARSINO:  No problem.
20          MR. McNUTT:  Unless it's like an emergency.
21          MR. LAGOMARSINO:  No.  It's not an emergency.
22          MR. McNUTT:  I would honor that.
23      Q.  So that's Metro's policy and most policies.
24  Correct?  That's what you testified to?
25      A.  It's one of -- I quoted the Metro policy
```

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 153

1  section here, so I presume that's accurate.  And it is
2  my experience that's the policy with most police
3  departments.
4      Q.  So similarly, shooting a suspect is not
5  justified when the sole reason is the suspect is
6  fleeing?
7      A.  That's correct.
8      Q.  Okay.  So --
9      A.  Well, let me qualify that.  Based on the
10  circumstances that existed at the time that he used it,
11  number one, it violated policy.  It didn't create an
12  exception to that policy.  There was no indication that
13  -- that Tashii had just committed a felony or was about
14  to commit a felony that perhaps would have justified
15  shooting an escaped felon, and the laws have changed
16  considerably on that where that's -- that's not allowed
17  in -- in many places now.
18      Q.  You mean since you shot at your suspect
19  fleeing?
20      A.  Yeah.  The law was a lot different back then.
21      Q.  Was the 14th Amendment different back then?
22      A.  I don't think so, but the interpretation of it
23  was a lot different.  The authority that police had in
24  terms of shooting incidents was a hell of a lot
25  different than what it is today.

Page 154

1      Q.  So if you would have shot at someone in the
2  back -- good thing you didn't connect.  Right?
3      A.  It was a justified shooting.  I got in no -- in
4  no trouble or no question over that at the time.
5      Q.  So if your bullet -- if you would have been a
6  better shot and you would have shot the gentleman in the
7  back and he would have died, you would have gotten in no
8  trouble over that?
9      A.  That's correct.
10      Q.  But today would you get in trouble over that?
11      A.  Yes.
12      Q.  So under Metro Taser policy, is it authorized
13  to utilize a Taser if the officer believes a carjacking
14  is occurring?
15      A.  Has occurred, or is occurring?
16      Q.  Is occurring.
17      A.  Again, it would depend on the circumstances.
18  It would certainly be much more in the realm of being
19  justified.  Again, I'd have to go back and read the
20  policies and what the training was.  I mentioned the
21  lesson plan there.  But, I mean, here I'm addressing the
22  -- the fact of a fleeing person.  You know, a person in
23  the midst committing a felony is a little bit different.
24      Q.  So I know you disagree with it, but the
25  question I'm about to ask is just what Ken Lopera's

Page 155

1  position was at this moment when he used the Taser.
2      So before Ken Lopera used the Taser, he
3  believed that Tashii Farmer had committed a crime,
4  however minor, of trespass, he believed that Tashii
5  Farmer was under the influence of a controlled substance
6  and he believed that Tashii Farmer was about to commit a
7  carjacking.  Correct?
8      A.  I don't know what Lopera believed.
9      Q.  Well, based on his CIRT statement, which you
10  have, that's what he said he believed at this point.
11  Correct?
12      A.  That's what he said.
13      Q.  I understand you disagree with it.  I'm just --
14      A.  Yes.
15      Q.  It's real hard if we have to --
16      A.  It's what he said.  Well, it's how you ask the
17  question.
18      Q.  No.  I'm just asking you if that's what he
19  factually said in his CIRT statement.  I'm not asking
20  you to agree with it.
21      A.  I don't know what he believed.
22      Q.  No.  I'm asking you what he said.
23      A.  That's what he said.
24      Q.  In his CIRT statement?
25      A.  Correct.

Page 156

1      Q.  Okay.  So taking the officer at face value, if
2  we did that, I'm not asking you to do that, then he
3  would be authorized to utilize his Taser in that
4  circumstance.  Correct?
5      A.  I would say it's much closer to being within
6  policy if it was a carjacking situation under way.
7  Yeah.
8      Q.  Are you aware that the driver of the white
9  Toyota pickup --
10      A.  Mr. Pierce.
11      Q.  -- Jonathan Pierce, the suspect -- or that
12  would have been the subject of the carjacking, are you
13  aware that he locked his doors out of, quote, fear?
14      A.  I'm aware that he did.  He had a female
15  passenger with him, and I think he said that -- that
16  that was his concern.  He wasn't sure.  But at that
17  point and as the videos gave evidence of, it was out of
18  being super cautious.
19      Q.  So isn't it true that when the driver of the
20  vehicle corroborate -- when he says "I locked my doors
21  out of fear" and we're talking about a potential
22  carjacking, does that corroborate Ken Lopera's -- I'm
23  not saying 100 percent corroborate or justify, but
24  doesn't that lean towards corroborating Ken Lopera's
25  position of what was going on?

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 157

1    A.  Not necessarily.  It corroborates what Pierce
2    was thinking at the time.  I don't know that he used the
3    word "fear."
4    Q.  He did use the word "fear" --
5    A.  Okay.
6    Q.  -- in the Las Vegas Metropolitan Police
7    Department FIT statement given that night --
8    A.  Okay.
9    Q.  -- over the phone.
10   A.  But he also stated that he didn't think that --
11   that Tashii was trying to get into his car.
12   Q.  So don't you find those two statements slightly
13   in conflict?
14   A.  No.  I mean, his first-blush reaction, and
15   we've all done that -- I've been in situations where I
16   was suspicious of somebody approaching the car and if my
17   wife was with me, I'd lock the doors.  I -- I don't see
18   anything suspicious in it.  And as the situation
19   unfolded, it's pretty clear that -- from what he stated
20   that he didn't realize that Tashii was not trying to
21   carjack him or get into his car.  And the video supports
22   that.
23   Q.  You reference that the hand-on -- I'm looking
24   at page 26 now.  You say, "The hand-on-head position" --
25   A.  What paragraph are you on?

Page 158

1    Q.  Very first line.
2        MR. LAGOMARSINO:  A good time for a break, or
3    are you still going?
4    Q.  BY MR. McNUTT:  "The hand-on-head position
5    Lopera described here is the typical 'free hand'
6    position" --
7    A.  Correct.
8    Q.  -- "one uses in a 'rear naked chokehold' to
9    apply pressure on the other arm encircling the subject's
10   neck and carotid artery."
11   A.  Yes.
12   Q.  What's your source for that opinion?
13   A.  Because that's the way it's instructed.  That's
14   the way I remember it, and that's the way that it's
15   applied in everything that I've seen.
16   Q.  Okay.  Other than Thomas Parker, what's the
17   source for this?
18   A.  The book that we mentioned, descriptions of it.
19   I think even in the -- some of the -- the Metro training
20   information I think it talks about how the LVNR is to be
21   applied and the difference between that and the rear
22   naked.
23   Q.  So this is -- when you say "This is how I was
24   taught and this is what the book references," that's the
25   judo book, the Kodokan judo?

Page 159

1    A.  That's correct.
2    Q.  Correct?
3    A.  Well, that's part of it.  Yeah.
4    Q.  Well, what else is there that supports this
5    position?  The hand on head specifically.
6    A.  That's my understanding based on not only my
7    experience but what I've read, that that is the
8    difference between the rear naked and the LVNR.
9    Q.  Okay.  But you don't have experience in the
10   LVNR.  Just what you read.  Correct?  You don't have
11   personal physical training experience?
12   A.  I remember back in my judo days that we were
13   taught -- you don't ask -- I see you're rolling your
14   eyes there, so to speak.  You don't ask me questions
15   that I --
16   Q.  I'm reaching over for water.
17   A.  But you rolled your eyes, too.  I'm trying --
18   you don't ask me a yes or no question that can be given
19   without an explanation of what my experience is.
20       The choke positions that I recall back from my
21   judo days and my college days a long, long time ago was
22   those are the different options in applying the -- the
23   neck restraint.  Okay?
24   Q.  Okay.
25   A.  And those were fortified by what I've read

Page 160

1    lately.
2    Q.  So Metro's subject matter expert is a
3    third-degree Brazilian jiu jitsu black belt.  Did you
4    ever hear of that?
5    A.  I don't know what that is.
6    Q.  Okay.
7    A.  I don't know that their expert is --
8    Q.  Would you say he has more expertise in a rear
9    naked choke than you?
10   A.  I would hope so.
11   Q.  I produced an expert in this case, Frank Mir,
12   who is a fourth-degree BJJ black belt.  Have you ever
13   heard of him?
14   A.  No.
15   Q.  Okay.  Well, both of those guys would dispute
16   your hand-on-head position with respect to the free hand
17   position in a rear naked choke.  So do they know about
18   this, or do you?
19   A.  I haven't seen what they had to say, so I -- I
20   don't know.  I would presume they know a lot more about
21   this than I do.  But that's my understanding of the
22   difference between the LVNR and the rear naked.
23   Q.  Do you have an understanding that Ken Lopera
24   had judo training?
25   A.  No.  He had Brazilian jiu jitsu training, but

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 161

1  it's almost identical to judo when it comes to these
2  types of things.
3      Q.  Okay.  With the exception that two experts in
4  Brazilian jiu jitsu judo who say --
5      A.  I don't know who those two experts are and I
6  don't know what they say.
7      Q.  I just told you.
8      A.  Well --
9          MR. McNUTT:  Let's take a break, Andre.
10         (A recess was taken from 12:40 P.M. to 12:51
11  P.M.)
12     Q.  BY MR. McNUTT:  Mr. Parker --
13     A.  Yes.
14     Q.  -- we are back on the record and you're still
15  under oath.  Do you understand that?
16     A.  I'm ready.
17     Q.  I think we left off on page 26.
18     A.  Uh-huh.
19     Q.  Are you still there?
20     A.  Uh-huh.
21     Q.  So under the paragraph you have some
22  subparentheticals here.  Not parentheticals, but
23  subparagraphs A through F.  Do you see where I'm at?
24     A.  They actually continue over the --
25     Q.  That's right.  They continue on to page 27,

Page 162

1  paragraph F.
2      A.  Yes.
3      Q.  This purports to be what you say, "I'm
4  providing the following brief synopsis of how one
5  applies this specific chokehold," being a rear naked
6  choke.  Correct?
7      A.  Correct.
8      Q.  And my question to you is what is the source of
9  this information, meaning did you take it out of a
10  textbook, or did you write this yourself?
11     A.  Well, I think it's paraphrased from what I got
12  out of the textbook and -- and some of the older
13  materials I had.
14     Q.  Okay.  In paragraph D you say that the specific
15  hold -- "This specific hold is derived from Brazilian
16  jiu jitsu, which Lopera is apparently a devotee."
17  That's just your supposition.  Correct?  You don't know
18  whether he's done it once or done it five times.
19  Correct?
20     A.  I don't know how many times he's done it.  I
21  did see where he competed in something as a white belt
22  and --
23     Q.  A white belt is the basic beginner level.
24  Correct?
25     A.  Correct.  Yes.

Page 163

1      Q.  In fact, I've never taken one Brazilian jiu
2  jitsu course in my life, but if I went, on day one I'd
3  be a white belt.  Correct?
4      A.  That's my understanding, yes.
5      Q.  So what source did you reference to write this
6  synopsis?
7      A.  Well, as -- as I just said, I think the -- the
8  book that's listed there was the -- the primary source.
9  I -- I had a couple of old books that go back many, many
10  years that I looked at that -- again, this is all
11  paraphrased.
12     Q.  Well, I don't think there's any book referenced
13  here.  That's why I'm asking you.  There's books
14  written --
15     A.  I might have -- I might have seen it online,
16  then.  But this was not knowledge that I independently
17  had at the time I wrote this based on my past -- past
18  history with Kodakan judo.
19     Q.  Okay.  And sitting here today, you don't recall
20  where you got it from?
21     A.  The fact that book is listed, I would say that
22  was a primary source of -- of the information.
23     Q.  And you mean the book that was listed in your
24  list of documents and --
25     A.  Correct.

Page 164

1      Q.  -- materials reviewed?
2      A.  Correct.
3      Q.  Okay.  But you agree with me that you don't do
4  a citation anywhere in here on page 26 or 27.  Correct?
5      A.  Well, I'd have to go back and look at that book
6  and compare it, but I do recall doing some research
7  online, looking at it.  I recall seeing some videos
8  online that -- that discussed it.
9      Q.  You reference several times that Officer
10  Lopera, quote, hooked, or some derivative of that word,
11  used hooks and he hooked his legs around Tashii Farmer.
12  Do you recall that?
13     A.  Yeah.  He had his legs wrapped around Tashii
14  Farmer.  I saw that.
15     Q.  Well, top of page 28, "He was able, however, to
16  hook his legs around Farmer's lower body."  First
17  sentence.
18     A.  Yeah.  I mean, that -- that's just the term.  I
19  could have said he wrapped his legs around.
20     Q.  I understand that.  You used the phrase
21  "hooked" several places and things like that.
22     A.  Uh-huh.
23     Q.  My question to you is, are you providing any
24  opinion as to what the proper technique is to use your
25  legs in --

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 165

1    A.  No.
2    Q.  So that was just -- you were trying to
3  factually state what Officer Lopera did without opining
4  whether it was correct or not?
5    A.  What I observed.  I'm also aware, again from my
6  old days, I don't remember if I -- I did -- I think I
7  did see this in the book or one of the -- the resources,
8  there are various leg holds that you can use.  In
9  addition to the throws that are done in judo, there's
10  also a whole part of the sport that is mat work.  And
11  there are leg holds that are -- that are -- that are
12  taught in that.
13    Q.  Are you aware of whether the lateral vascular
14  neck restraint as taught by Metro teaches an officer to
15  use their legs in -- when deploying the LVNR, or not?
16    A.  I don't know that, no.  I -- I don't see a
17  connection to it other than, you know, in the way it
18  happened here.  I mean, it -- I'm not saying that it was
19  inappropriate for him to put his legs around Farmer when
20  he's down on the ground, but I don't know that it has
21  any connection to the -- to the neck restraint.
22    Q.  Okay.  Page 28, just the line above paragraph
23  69 where it starts, the last sentence says, "The
24  ultimate death of Farmer by a choke-induced asphyxiation
25  as reported in the Farmer autopsy report."  Do you see

Page 166

1  that?
2    A.  I see that.
3    Q.  You were not in any way disagreeing with the
4  statements made by the coroner regarding the cause of
5  death.  Correct?
6    A.  No.  No.
7    Q.  So any quibbling I have with how this sentence
8  is phrased is inadvertent?
9    A.  I don't know if it's inadvertent or not.  I
10  mean, that's the way I read and understood that
11  statement or that representation in the coroner's
12  report.
13    Q.  But suffice it to say you'll accept what the
14  coroner or the medical experts say is the cause of death
15  and you are not trying to insert your own opinion on
16  that topic.  Correct?
17    MR. LAGOMARSINO:  Objection as to which medical
18  expert.
19    MR. McNUTT:  Any medical expert, Andre.
20    THE WITNESS:  I -- I don't disagree with the
21  call they made there.
22    MR. McNUTT:  I wasn't trying to get him to
23  agree with ours.  I'm just saying he's not trying to
24  overrule a medical opinion.
25    MR. LAGOMARSINO:  All right.

Page 167

1    THE WITNESS:  I'm not aware that that's an
2  incorrect statement, either.
3    Q.  BY MR. McNUTT:  You mentioned that you in your
4  training back in judo, you said -- you didn't exactly
5  say this, but it was implied, and I want to clarify.
6  Were you ever rendered unconscious while training with a
7  chokehold?
8    A.  Yes.  We were in the very beginning of the
9  instruction at San Jose State and -- and with the team
10  when we got to the point of starting to learn what some
11  of these chokeholds were, which basically is -- is mat
12  work, Coach Yoshida wanted each of us to know exactly
13  what it felt like, so we had to sign a consent form and
14  go through that and -- and, you know, experience going
15  out, you know.
16    Q.  Did anybody -- this may sound gratuitous.  It's
17  not.
18    A.  Uh-huh.
19    Q.  It's come up several places in dealing with
20  this topic of going unconscious.  Did anybody, including
21  you, during that training urinate themselves when they
22  went unconscious?
23    A.  I know I didn't.  I don't remember that
24  happening to anybody else.
25    Q.  Okay.  Like I said, it's come up --

Page 168

1    A.  Sure.
2    Q.  -- in some other context.
3    So do you recall the interaction between Ken
4  and Sergeant Crumrine with respect to the discussion Ken
5  was asking is he out yet?
6    A.  Yes.  I -- I do.
7    Q.  You nodded, but --
8    A.  I do remember that.  Yes.
9    Q.  Okay.  Do you think it was appropriate for --
10  do you think it's appropriate for an officer applying a
11  lateral vascular neck restraint or any neck restraint,
12  when he has another officer there, to ask that question
13  "Is he out yet" to ascertain the subject's state of
14  consciousness?
15    A.  I can't say that it was inappropriate in that
16  sense, but, again, in terms of the application, there's
17  a whole thing called situational awareness.  I mean, you
18  -- you have to have that innate ability to know that you
19  got the other person under control and you can let up on
20  whatever it is that you're doing, especially if it's a
21  dangerous tactic that you're using.
22    I have a lot of other disagreements with
23  that --
24    Q.  With Sergeant Crumrine?
25    A.  -- between the two of them.

Page 169

1    Q.  Okay.  Are you aware that when someone is being
2  rendered unconscious, whether it's in training or from
3  this type of neck restraint, either rear naked choke or
4  lateral vascular neck restraint -- granted, I'm not
5  arguing that point on this question.  Are you aware that
6  sometimes their body will tense so that the person
7  applying the choke or, excuse me, the neck restraint
8  will believe that they're continuing to resist?  Is that
9  any part of your knowledge base?
10    A.  I know that a body can go tense before dying.
11  It's -- it's kind of a resistance-type move.  Whether
12  it's normal in a situation like this, I have not
13  experienced it.  I've not heard of it.
14    Q.  But, again, you're not an expert in martial
15  arts.  Correct?
16    A.  I am not.  Not at all.
17    Q.  Doesn't that indicate to you that Ken Lopera
18  did have situational awareness inasmuch as he was
19  repeatedly verbalizing to his partner, or in this case
20  his sergeant, trying to understand exactly what Tashii
21  Farmer's status was?
22    A.  I think it's just the opposite of that.  I
23  think it indicates that he did not know what condition
24  Tashii Farmer was in, you know.  The normal situation,
25  when somebody goes unconscious they go limp.

Page 170

1    Q.  And I --
2    A.  That's my experience.
3    Q.  I'm sorry.  Go ahead.
4    A.  That's it.
5    Q.  I would agree with you that that's why he was
6  asking that question.  My question was apparently not
7  very good.  But I agree with you that he doesn't know
8  the status of Tashii Farmer and that's why he's asking
9  Sergeant Crumrine.
10    A.  Correct.
11    Q.  Okay.  Would that indicate to you that he still
12  feels some sort of resistance and that's why he doesn't
13  know the status of Tashii Farmer?
14    A.  I don't think it indicates that.  I mean, he
15  obviously -- as I said, he -- he did not have
16  situational awareness or he wouldn't have asked the
17  question.
18        The other thing is that he -- he would -- he
19  had to have been aware to some extent that he had had
20  that chokehold in place for more than the recommended
21  seven, eight, nine, ten seconds.  And I'm not sure that
22  he had that awareness, that -- that he should have had
23  it.
24    Q.  Are you aware of the fact that any choke will
25  not work within the four to seven or eight seconds,

Page 171

1  whatever you cite, if the choke is broken, meaning that
2  the carotid arteries can cease to be compressed?
3    A.  I know that if they have not gone beyond the
4  point of life and are dying or have died, that it
5  generally means the blood has no longer got to the brain
6  and you got -- you got death.
7        I'm coming back to the question here, though,
8  if I understand it correctly, is in this particular
9  situation I think the fact that Tashii -- his body was
10  limp when Lopera finally pulled away from him.  They
11  tried to sit him up as he went limp.  I think he felt
12  that or he should have felt that.
13    Q.  So I don't agree with you about the limp, but
14  whether I agree or disagree, when are you saying his
15  body went limp?  I understand, I think from the video, I
16  can think of a time when they tried to sit him up.  That
17  was well after Ken Lopera rolled away from him and they
18  were looking to do the sternal rubs and things like
19  that.  Right?  Is that what you're talking about?
20    A.  I wouldn't say it was well after.  I mean, Tran
21  and Flores were really the ones trying to sit him up, as
22  I recall, Tran especially, and his body was lump.  He
23  kept falling over.  His head was down.
24    Q.  Well, the time stamps on the videos will say
25  how long that was after, or not.

Page 172

1    A.  Yeah.
2    Q.  Do you have any evidence that Tashii Farmer was
3  limp at any point when Ken was in physical contact with
4  him?
5    A.  Well, I think there's -- there's periods of
6  time that you can see in the video that he is still
7  offering some resistance or trying to get out from under
8  the position that he's in, and there's a period of time
9  when that stops.  He's still on the ground.  Lopera is
10  -- is either on top of him or he's got him in that
11  chokehold or he's got his legs wrapped around him, so
12  it's hard to tell whether his body was totally limp or
13  not.
14        What I'm saying is after Lopera rolled off of
15  him, he certainly appeared to be limp, and that was --
16  that seemed to be validated when Tran tried to sit him
17  up.
18    Q.  On a scale of 1 to 10, 10 being credible --
19    A.  Uh-huh.
20    Q.  -- 1 being not credible, where do you put
21  Sergeant Crumrine's testimony?
22        MR. LAGOMARSINO:  Form.
23        THE WITNESS:  What aspect of it?
24    Q.  BY MR. McNUTT:  Well, the part he said that he
25  perceived when he told Ken to loosen up, Ken did loosen

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 173

1  up.
2       MR. LAGOMARSINO:  Form as to the scale.
3       THE WITNESS:  I don't know whether it's true or
4  not.  I have no -- no basis for that.  It does not
5  appear to me, from what I saw on the video, that -- that
6  Lopera had loosened up.  Again, the video is from a
7  little bit of a distance, not right there.
8       Q.  BY MR. McNUTT:  Do you know how far away that
9  camera was?
10      A.  It looked like it was probably -- had a
11 telephoto lens on it, which I think they do.  They can
12 zoom in and out.  I -- I don't know how far away it was.
13 I would say during most of the time that I was watching
14 it, it was probably at a distance of 75, 80, maybe 90
15 feet.  Something like that.  It was -- it was a fair
16 distance.
17      Q.  Do you know how far away Jonathan Pierce was
18 when Ken Lopera first employed the lateral vascular neck
19 restraint on Tashii Farmer?
20      A.  I don't know where he was when he applied that.
21      Q.  Well, when you looked at the video, do you
22 recall seeing his white pickup drive --
23      A.  I do recall seeing -- I wasn't paying a lot of
24 attention to the pickup beyond the point that Tashii
25 walked around the back of it and then kind of went off

Page 174

1  in the other direction there.
2       Q.  Do you recall Jonathan Pierce saying that he
3  watched the events in his left rear-view --
4       A.  I do recall that.
5       Q.  -- mirror?
6       A.  Yeah.  But where he was, I don't know.
7       Q.  Okay.  How well do you think you can see and
8  articulate precise events that are occurring while
9  looking -- while driving away from an event while
10 looking into a left rear-view mirror?
11      A.  I wouldn't have any idea.
12      MR. LAGOMARSINO:  Hold on.
13      THE WITNESS:  I'm sorry.
14      MR. LAGOMARSINO:  Form, foundation.
15      When you say "you" are you saying Tom, or just
16 in general?
17      MR. McNUTT:  I'm asking Tom.
18      MR. LAGOMARSINO:  You're asking Tom, but like
19 how Tom can see in the rear-view mirror?
20      MR. McNUTT:  No.  Can anyone see in a rear-view
21 mirror.
22      Q.  Would you give a lot of credibility to what
23 they claimed to have seen?
24      MR. LAGOMARSINO:  Form, foundation.
25      THE WITNESS:  I -- I would give him

Page 175

1  credibility.  He has no reason to say otherwise.  Why --
2  why would he say that he could see it and what he saw if
3  that wasn't true?
4       Q.  BY MR. McNUTT:  So at the first moment that Ken
5  attempted to put a neck restraint on Tashii Farmer, do
6  you know how far away Jonathan Pierce was?
7       A.  I have no idea.  If he saw it in his rear-view
8  mirror, he was obviously close enough to see it.
9       Q.  He was 30 yards away.
10      A.  Okay.
11      Q.  Expert testimony in this case, Jamie Borden
12 testified he went down there and measured it.  So he was
13 30 yards away and the camera was over 50 yards away.
14 Does that change your opinion about what can be --
15      A.  No.
16      Q.  -- reasonably observed?
17      A.  No.
18      Q.  You think Jonathan Pierce is a great, credible
19 witness?
20      A.  He seems like he is.
21      Q.  Okay.  And what do you think about Sergeant
22 Crumrine, who was face to face with Tashii Farmer and
23 Ken Lopera at the scene and he said that when he said
24 "Loosen up, Ken," he perceived that Ken Lopera did?
25      A.  I have no idea of his credibility on that.  It

Page 176

1  -- it did not appear unless it was just a -- a very
2  in-close loosening up, it did not appear that Lopera
3  loosened up until he flopped his arms up and rolled
4  away.
5       Q.  Have you ever used a Taser?
6       A.  I've used a Taser.  Yeah.
7       Q.  Have you ever used one similar to the one
8  identified that Metro officers carry?
9       A.  I -- I don't know.  The one I used -- and they
10 were very rudimentary.  I don't know what they are now.
11      Q.  I have a question about Tasers and police
12 policy and practice.  If a department has a policy that
13 says you as a patrol officer should not, not shall not
14 but should not, use a Taser more than three times --
15      A.  Uh-huh.
16      Q.  -- why does the Taser -- why is it able to be
17 cycled a fourth time?
18      A.  Because not every department is going to have
19 the same policy and not every situation is going to be
20 the same.  And I -- I -- that would be my only answer to
21 that.  It -- it allows for exceptions.
22      Q.  When Ken pulled the trigger on his Taser, does
23 the Taser discharge electricity for as long as he pulls
24 the trigger, or for a set amount of time?  Do you know?
25      A.  I don't know what they are today.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 177

1    Q. No. I'm asking what Ken's Taser did.
2    A. I don't know. I remember from the -- the --
3   the chart that I saw that each of the -- the
4   triggerings, I think, were about five seconds, if I'm
5   not mistaken. Five to seven seconds, somewhere in
6   there. And then there was about a six-second gap before
7   he pulled the -- the trigger again.
8    Q. And do you know whether that's how the Taser
9   was designed, or that Ken actually physically held it
10  for five seconds and then released the trigger?
11   A. I don't know.
12   Q. Because you're not an expert in Tasers?
13   A. I'm not an expert on Tasers.
14   Q. And don't intend to offer any expert opinions
15  on Tasers?
16   A. Nothing other than what I've talked about here
17  today.
18   Q. Other than whether it was appropriate to use
19  the Taser?
20   A. And -- and what -- what the analysis of the use
21  of a Taser as reflected in the reports show.
22   Q. What uniform do you think officers should wear?
23   A. In what situation?
24   Q. Any situation. Patrol officers in Las Vegas on
25  the Strip.

Page 178

1    A. I think whatever uniform they wear should be
2   one that the public can readily identify them as a law
3   enforcement officer.
4        I know we have rules here in Santa Barbara that
5   the standard black, dark blue uniform is what the
6   officers are required to wear. In the summertime
7   they're allowed to wear like a golf shirt or a --
8   Polo-type shirt that still has the badge replica and
9   whatever on it. But we don't have a policy that they
10  can just at their discretion or even at a sergeant's
11  discretion can okay them wearing the -- the BDUs. They
12  wear those certainly in tactical situations or out in
13  the field or if there's a situation where that uniform
14  would either not be appropriate or could be damaged.
15       I think your question back there, in the job
16  that they were in in terms of walking around these
17  casinos, to see and be seen, I think the BDU was very
18  inappropriate.
19   Q. Do you think if Ken Lopera was in what you
20  referred to as class A's, if his sergeant had directed
21  him to be in class A's, that Tashii Farmer would have
22  obeyed Ken Lopera's commands?
23   A. I think -- I -- I don't know what Tashii Farmer
24  was thinking at the time. I would think that there was
25  a greater chance that he would have recognized him as a

Page 179

1   police officer if he was in his class A uniform.
2    Q. Are you providing an expert opinion that Tashii
3   Farmer did not recognize the officers as being police
4   officers?
5    A. I don't have an expert opinion on that. I
6   don't have any expertise in that, but I -- I do know
7   that there is a very strong likelihood that he perhaps
8   did not recognize them as police officers.
9    Q. What's the strong likelihood that he did not
10  identify officers in a casino wearing guns and then have
11  badges that say Las Vegas Metropolitan Police
12  Department? What's your justification for that?
13   A. You really extended --
14        MR. LAGOMARSINO: Well, hold on.
15        THE WITNESS: -- that question.
16        MR. LAGOMARSINO: You're saying badge. I think
17  you should define badge.
18        MR. McNUTT: A police badge.
19        MR. LAGOMARSINO: Like a metal badge or sewn
20  into the uniform?
21        MR. McNUTT: Doesn't matter to me.
22        THE WITNESS: Most BDUs, they don't wear the --
23  the metal badge or the cloth patch. They have an
24  employer badge on there. I don't know what they had in
25  this case.

Page 180

1    Q. BY MR. McNUTT: Do you think that's a material
2   distinction?
3    A. I think the uniform is a material distinction.
4    Q. No. I'm saying are you really making the point
5   to me that a suspect sees an embroidered badge versus a
6   metal badge and they are going to have questions as to
7   whether that's an officer or not?
8    A. I think the metal badge carries a lot more
9   recognition and a lot more authority than a cloth badge
10  does, and that's why they are what they are.
11        MR. McNUTT: Andre -- I'm sorry. Let's go off
12  the record.
13        (A recess was taken from 1:14 P.M. to 2:06
14  P.M.)

Thomas Parker                                      Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 181

1          AFTERNOON SESSION
2              2:06 P.M.
3
4          THOMAS PARKER
5      Having been previously sworn, was examined and
6  testified further as follows:
7
8          EXAMINATION (continued)
9  BY MR. McNUTT:
10     Q.  Mr. Parker, you're still under oath.  Ready to
11  continue?
12     A.  Yes.
13     Q.  Any reason we cannot continue --
14     A.  No.
15     Q.  -- and finish your testimony or your deposition
16  today?
17     (Defendant's Exhibit 8 was marked for
18  identification.)
19     Q.  BY MR. McNUTT:  Mr. Parker, take a minute and
20  look at that document.
21     While you're looking, my first question is
22  going to be have you seen this document before.
23     A.  I don't specifically remember it.  If it -- if
24  it was on the list, it was one that I had, I -- I did
25  see it.

Page 182

1     Q.  I will represent, but you're welcome to verify.
2  In my best Doveryai no proveryai, you are free to trust
3  but verify --
4     A.  Yes.
5     Q.  -- you could look at your list, but I'll
6  represent to you that you did identify this.
7     A.  Yeah.  I trust you on that.
8     Q.  Post-lunch trust.  That's what I like to hear.
9     A.  Okay.  Now I remember this.  I remember this
10  section on excited delirium now.
11     Q.  So if you look on the second page of the
12  exhibit, LVMPD 00073 --
13     A.  Correct.  I got it.
14     Q.  -- and we get into the procedures, you agree
15  with me this represents Metro's policies for officers?
16     A.  Well, I don't know.  I haven't finished looking
17  at it.  Could I take a minute or two to look?
18     Q.  Sure.
19        MR. LAGOMARSINO:  What do you want him to focus
20  on, Dan?
21        MR. McNUTT:  I'd like him to focus on just the
22  procedures on this page 73.
23        THE WITNESS:  Yeah.  I got it.
24     Q.  BY MR. McNUTT:  I did not intend to ask you any
25  questions on the third page.

Page 183

1     A.  Okay.
2     Q.  So unless you feel you need to read it.
3     A.  Well, let me just take a quick look at it.  It
4  looks like there's one section here that's ED related.
5        What is DSD?
6     Q.  You'll have to ask Metro.
7        So my question --
8     A.  Okay.
9     Q.  -- is pertaining to, in the middle of page
10  0073, Responding Patrol Officer(s) Will.
11     A.  Uh-huh.
12     Q.  This is Metro's policy for patrol officers
13  dealing with excited delirium.  You agree with me?
14     A.  Uh-huh.
15     Q.  Okay.  And they say assess situation and confer
16  with other on-site responders.  And that's under
17  enumerated 5.
18     A.  I see that.  Yes.
19     Q.  Number 6, "If excited delirium is suspected,
20  request medical personnel."
21        Number 7, "Establish containment of the area."
22  See that?
23     A.  I see it.
24     Q.  And number 8, "Formulate a custody plan prior
25  to making physical contact with the subject.  The object

Page 184

1  of the plan is to deescalate the situation, calm the
2  individual and gain control of the person.  This can
3  include verbal communication, response of CIT trained
4  officers or other levels of the force continuum as are
5  reasonable to the situation."
6        See that?
7     A.  I see it.
8     Q.  So do you agree with me that a patrol officer
9  is directed to, at a minimum, establish a containment of
10  the area to deal with the individual suffering from or
11  they suspect is suffering from excited delirium?
12     A.  I agree that that's what the policy says.
13     Q.  Okay.  Do you disagree with that policy?
14     A.  Well, you know, again, I -- when it -- I don't
15  know what this term partners with the community actually
16  refers to.  I see a manual citation, which indicate to
17  me that this is, in fact, a policy of -- of the
18  department, but I've also seen things partners with the
19  community that are more agreements with the community
20  than they are directives to the officers.
21        I'll take your word for it that this is their
22  policy.
23     Q.  Don't take my word for it.
24     A.  Okay.
25     Q.  I mean, you identified this as a document you

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 185

1  reviewed I presume for purposes of identifying what the
2  policy was.
3      A.   After looking at it, I do recall reading this
4  now.
5      Q.   Okay.  So my next question -- we know that
6  that's what the policy is.  My next question is do you
7  agree with that policy directive that Metro is giving
8  their patrol officers.
9          MR. LAGOMARSINO:  The containment?
10         MR. McNUTT:  Yeah.
11         THE WITNESS:  I -- I can agree with -- if this
12  is their policy, it -- it makes sense.  You know, and
13  it's kind of along the lines of what I testified to
14  previously, what his actions should have been.  You
15  know, he -- he certainly could have followed the
16  subject.  Assess the situation, request medical
17  personnel.  He didn't do any of those.
18     Q.  BY MR. McNUTT:  Well, he did follow the
19  subject.  He did give verbal commands to the subject.
20  So we get to number 8, and you would agree with me that
21  7 and 8 are not mutually exclusive.  This is a variety
22  of steps that Metro is telling its officers to perform.
23  Correct?
24     A.  Yes.  It is.
25     Q.  Okay.  And so number 8 is to formulate the

Page 186

1  custody plan, to -- and now I'm saying this is to take
2  the person they suspect is suffering from excited
3  delirium into custody.
4      A.  Well, that's generally what the term "custody"
5  means.  You know, when they're talking about
6  deescalating the situation and whatever that -- that
7  normally is not a -- a custody situation.  You talk
8  about custody versus detention versus consentual
9  whatever.  I -- I don't know what they meant by that
10  word there.  It certainly doesn't say -- it says
11  formulate a custody plan.
12     Q.  So the last sentence of 8 says, "This can
13  include verbal communication, response of CIT trained
14  officers or other levels of the force continuum as are
15  reasonable to the situation."
16         Do you see where I'm reading?
17     A.  I do see that.
18     Q.  Okay.  So do you agree with me, you can argue
19  the policy, but do you agree with me that the policy is
20  that Metro is telling its officers that they can, in
21  fact, use reasonable levels of the force continuum to
22  deal with people suspected of excited delirium?
23     A.  Yes.  That's what it is.  But now, there are
24  various levels on that force continuum, too.
25     Q.  Of course.  My question for you is, do you

Page 187

1  disagree with this policy as it's written.
2          MR. LAGOMARSINO:  Which part of the policy?
3  The entire policy?
4          MR. McNUTT:  On the force continuum.
5      Q.  That it's appropriate to use any level of force
6  on the force continuum when dealing with suspects
7  believed to be suffering from excited delirium.
8      A.  Well, I would say the first two levels on the
9  force continuum would be appropriate in any of these
10  things, and that's the physical presence or the verbal
11  -- the verbal aspect of it.
12         In terms of escalating that up the -- up
13  the continuum, I would disagree with it if that's what
14  it's telling them to do.  But again, that's dependent on
15  the circumstances.
16     Q.  Okay.  So let's go down to 10.  "Once
17  sufficient officers are present and it has been
18  determined that physical force is necessary, the custody
19  plan must be executed quickly to prevent the escalation
20  of the excited physical state of the person and an
21  increase in distress."
22         And then go to 11, "Consider options available
23  to help calm the individual.  Such options include but
24  are not limited to:  Using two sets of handcuffs to
25  avoid discomfort; assisting subject in sitting upright

Page 188

1  or laying on side to facilitate breathing; calming the
2  subject verbally."
3          So when you read that they can utilize two sets
4  of handcuffs to avoid discomfort, would you understand
5  that they, at a minimum, have taken that person into
6  custody?
7      A.  Well, it's -- I -- I would agree that it
8  certainly indicates that a -- that a detention is
9  necessary.  You know, I'm presuming here in this case
10  that the handcuffs that were on there -- were being put
11  on the person would be more to keep the individual from
12  harming himself or harming other individuals.  I mean, a
13  lot of times in those early stages they're thrashing
14  about or, you know, jerky type reactions.  But I would
15  interpret it more in that sense than it is in terms of
16  an arrest as -- as an arrest of a person who has
17  committed a crime.
18     Q.  Have you in the course of your law enforcement
19  career or as an expert ever viewed training films for
20  excited delirium?
21     A.  I've seen one.
22     Q.  In which context?  As a law enforcement
23  officer, or as an expert?
24     A.  No.  It would be in the expert category.
25  Several years ago.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 189

1    Q.  Do you recall the length of the video, who made
2  the video, et cetera?
3    A.  Just vaguely, I think it was somewhere in the
4  range of 40 minutes to an hour, maximum.
5    Q.  There has been testimony in this case that one
6  of the videos that is shown in Metro's academy on
7  excited delirium has videos of people that they claim to
8  -- you know, the video says they're suffering from
9  excited delirium and they are taking their clothes off
10  apparently because they're either --
11    A.  Overheated or --
12    Q.  -- overheated, hallucinating or --
13    A.  Sure.
14    Q.  -- for some reason they're always appearing to
15  get into some sort of --
16    A.  It's kind of a common occurrence, too.
17    Q.  -- state of undress.
18        Do you have an understanding whether that's on
19  the extreme side of excited delirium, or do all people
20  suffering from excited delirium exhibit that?
21    A.  I wouldn't say that all people do.  It's hard
22  to say what's on the extreme side because so much can
23  happen in the middle of an excited delirium episode
24  and --
25    Q.  Let's go back to --

Page 190

1    A.  -- in a normal sense, you know, it -- that's
2  not a common occurrence.  I don't know how common it is
3  in excited delirium.  I've heard of it happening.
4    Q.  Okay.  Do you have the experience or the
5  knowledge to discuss the range of symptoms for the
6  excited delirium syndrome?
7    A.  I think I know what many, if not most, of the
8  indicators are.  I -- I don't know that there is any
9  established sequence that they happen in, from what I
10  understand.
11    Q.  So let's go to this case.  So Tashii Farmer was
12  not running around taking his clothes off.  Correct?
13    A.  No.  Correct.
14    Q.  Okay.  So he's somewhere short of that conduct
15  and that symptomology.  Correct?
16    A.  Correct.
17    Q.  Where would you put him, based upon these
18  observations that you've had the opportunity to review,
19  the various reports and things of that nature, where
20  would you put him on the scale of exhibiting signs of
21  excited delirium?  And, if I could, just on a scale of 1
22  to 10, with 10 being the most extreme example and 1
23  being the least extreme.
24    A.  Probably around --
25        MR. LAGOMARSINO:  Form.

Page 191

1        THE WITNESS:  -- 3, maybe 4 stage.  Somewhere
2  -- he's in the early stages of -- of it.
3    Q.  BY MR. McNUTT:  Okay.  And you would agree with
4  me that -- maybe I asked this, so if I did, just please
5  indulge me.  But you would agree with me that Metro
6  policy does allow for the use of force to deal with
7  individuals suspected of suffering from excited
8  delirium?
9    A.  It -- it allows them to use some degree of
10  force as depicted on the force continuum.  I would agree
11  with that.
12    Q.  Okay.  Well, with --
13    A.  I don't know what they mean by custody here.  I
14  mean, custody can be just taking control of the person.
15    Q.  I mean, obviously, if the person -- I mean the
16  force continuum does include up to lethal force.
17    A.  It does.  That's the upper end of the
18  continuum.
19    Q.  Right.  I mean, it's kind of the end of the
20  continuum.
21        So there's no limiting factor in there to what
22  you're suggesting to the first two categories of the use
23  of force continuum?
24    A.  No, but what's reasonable.  I mean, reasonable
25  is a whole big thing in these situations anyway.  And,

Page 192

1  you know, for an average case of a person in excited
2  delirium, as I understand them, as I've -- as I've come
3  to know about them, I think looking at lethal force or
4  really severe physical force, as we had in this case,
5  are -- are quite out of line.
6    Q.  Right.  I understand that's your talking point,
7  by my question was simply Metro does not limit the way
8  you're describing the use of force continuum in their
9  policy on -- I'm simply asking what the policy is.
10    A.  The -- the wording does not limit them other
11  than, I think, in having been involved in some policy
12  writing.  You have to look at the context.  You have to
13  look at the way the rest of that sentence is worded.
14  When it said this can include verbal communication,
15  response of CIT trained officers, those are very, very
16  low-level type normal things that you would do in a
17  situation like that, and to suddenly jump from that to
18  other levels of force continuum as are reasonable to the
19  situation, which I think are the operative words, I
20  don't think by any means that suggests you could
21  suddenly pull out your gun and kill the person.
22    Q.  No one is suggesting that.
23    A.  Well, what you're arguing is that wording could
24  -- could make that --
25    Q.  No.  I wasn't arguing that.  I was --

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 193

1     A.  It sure sounded like it.
2     Q.  You're mistaken.  I was simply saying that the
3  limitation you put on the policy is not what Metro's
4  policy is.
5     A.  Well, this policy is not worded very well.  Let
6  me put it that way.
7     Q.  That's fine, sir.  And you can take issue with
8  Craig Anderson on that policy issue later.
9     A.  Let me just finalize my response to your
10 questions here.
11    I think -- I don't think this suggests that any
12 level of the force continuum in any situation is
13 reasonable, and the way it's worded it could be
14 interpreted that way.
15    Q.  Nor is any level of the force continuum
16 eliminated by the wording of that policy?
17    A.  No, but common sense, I think, tells you.  When
18 they use the term "as are reasonable to the situation,"
19 I think any reasonable police manager is going to say
20 that -- as they have said in this case, that Lopera's
21 reactions were not reasonable.
22    Q.  Sure.  And if somebody with excited delirium
23 pulls out a knife and charges an officer, then it's
24 reasonable to use lethal force.
25    A.  Totally different situation.

Page 194

1     Q.  Correct?
2     A.  Absolutely.
3        MR. McNUTT:  Okay.  Let's mark this as the next
4  exhibit.
5        (Defendant's Exhibit 9 was marked for
6  identification.)
7     Q.  BY MR. McNUTT:  I've handed you what we've
8  marked as Exhibit 9, which is about 40 pages.  It's
9  Metro LVMPD 0001 through 0040.
10    A.  Yeah.  I've seen this before.
11    Q.  And you claim to have reviewed it before.  So I
12 do not intend to let you have time to review all 40
13 pages because I'm not going to ask you about all 40
14 pages.
15       So let's go to page 3, 003.
16    A.  Okay.
17    Q.  The definition of low level force, item 15,
18 "Low level force is a level of force or control that is
19 neither likely nor intended to cause injury."
20       Do you see that?
21    A.  Correct.
22    Q.  You agree with me that Metro at the time of
23 this incident had the LVNR identified as a low level
24 force option.  Correct?
25    A.  I do.

Page 195

1     Q.  Do you agree that it should have been a low
2  level force option?
3     A.  I do not.
4     Q.  Is that Ken Lopera's fault that it was
5  identified as a low level force option?
6     A.  It's not his fault that Metro designated it as
7  such, no.
8     Q.  Is that a failure of policy, or a failure of
9  application?
10    A.  It could be both.
11    Q.  Okay.
12    A.  I -- I don't know which, you know.
13    Q.  But certainly, in your mind, is it a failure of
14 policy?
15    A.  It's -- it's a -- in this case I would -- I
16 would say it's certainly a mistake in how they
17 designated it as a policy.
18    Q.  Okay.  How much -- we talked about this a
19 little bit earlier, about Ken Lopera's perceptions and
20 statements that he made in his CIRT statement, and you
21 have said in your report that you find these to be all
22 after-the-fact explanations that you do not find
23 credible.  In fact, at one point you refer to them as
24 vacuous.  Do you recall that?
25    A.  I do.

Page 196

1     Q.  So do you give any credibility whatsoever on a
2  scale of 1 to 10 to Officer Lopera's statements that he
3  made in his CIRT report?
4        MR. LAGOMARSINO:  Objection.  Form, and as to
5  ambiguity of the entire report, and objection as to the
6  scale.
7        THE WITNESS:  As I said before, and I -- I do
8  firmly believe this based on my experience and training,
9  that he made these up, as necessary, to explain the
10 actions that he had taken that were wrong, but to
11 explain them after the fact.
12    Q.  BY MR. McNUTT:  Well, doesn't the Supreme Court
13 prohibit us from looking at the officer's conduct with
14 20/20 hindsight?
15    A.  It does, but the job of an expert witness on
16 police practice is to look back with 20/20 hindsight.
17    Q.  So how do you square those two things?
18    A.  I -- again, I'm not a Supreme Court scholar or
19 constitutional law scholar, but I know that that is the
20 job.  Historically it's been the job of expert witnesses
21 to look back --
22    Q.  Do you --
23    A.  -- with educated 20/20 hindsight as best they
24 can.
25    Q.  And you have unlimited time and, for the most

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 197

1  part, you have all the resources available after the
2  fact with which to formulate your opinions in your
3  report.  Correct?
4      A.  Correct.
5      Q.  Not just the five- or seven-second window that
6  Ken Lopera had to interface with Tashii Farmer.
7  Correct?
8      A.  I didn't have five to seven seconds, no, but I
9  believe Mr. Lopera had plenty of time to come up with
10  the concoctions that he did as to why he did certain
11  things.
12      Q.  Okay.  Do you know whether Metro gives any --
13  when they look at the reasonable perceptions of an
14  officer, do they give any weight to the officer's
15  credibility or his statements?
16          MR. LAGOMARSINO:  Objection.  Form, foundation.
17      Q.  BY MR. McNUTT:  By policy, I'm just asking.  If
18  you don't know, you don't know.
19      A.  Well, I think initially, I know from my own
20  experience, the agencies I've been involved with in
21  doing this work now for so long, I think at the
22  beginning of the examination of whatever the incident
23  was, in trying to determine whether it complied with
24  policy or not, I think you do -- you do attach some
25  believability until you learn otherwise.  And in this

Page 198

1  case I think it became obvious otherwise.  And I think
2  Metro agrees with me on that.
3      Q.  Depends which Sheriff you talk to.
4      A.  I'm sorry?
5      Q.  Depends which Sheriff you talk to.  Sheriff
6  McGrath doesn't agree with that.
7      A.  There's always going to be differences of
8  opinion.  But I think the actions that were taken speak
9  for themselves.
10      Q.  I think you said something earlier this morning
11  along the lines of all force situations are dynamic.  Is
12  that accurate?
13      A.  That what?
14      Q.  We were briefly talking about your shooting and
15  you said -- I asked if that was a dynamic situation.
16  You said absolutely, and you said most or all force
17  situations are dynamic.  Correct?
18      A.  I think almost any action a police officer
19  takes is a dynamic situation.  That's -- that's the
20  purpose of their role, is to deal with these things that
21  are out of the norm for the general population.
22      Q.  And that are happening quickly and they have to
23  make decisions along the way.  Correct?
24      A.  They generally happen quickly, for the most
25  part, and you have to make decisions.  Most officers, if

Page 199

1  they're well trained, if they're -- if they adhere to
2  their training, if they adhere to the policies, you --
3  you soon develop through training and experience the
4  ability to make very quick decisions.  Your life depends
5  on it.
6      Q.  But, of course, not all situations present
7  precisely the same each and every time.  Correct?
8      A.  That's correct.
9      Q.  In your shooting, if I recall the facts
10  correctly, and correct me if I'm wrong --
11      A.  Uh-huh.
12      Q.  -- you were a patrol, graveyard shift in Santa
13  Clara.  Correct?
14      A.  Correct.
15      Q.  Marked vehicle?
16      A.  Marked vehicle.
17      Q.  Uniformed black and white?
18      A.  Yes.
19      Q.  Meaning you were in uniform?
20      A.  I was in uniform.  Right.
21      Q.  And you identified that the back of a car
22  dealership had a window broken out?
23      A.  That's correct.
24      Q.  Did you have a radio in your car?
25      A.  I did.

Page 200

1      Q.  Did you have a radio on your person?
2      A.  No.  We didn't carry them on our person then.
3      Q.  But you had a radio in your car?
4      A.  Correct.
5      Q.  Was it working?
6      A.  Yes.
7      Q.  Did you call that in, that there's a broken
8  window at this auto dealership?
9      A.  Not immediately.  I pulled up next to the
10  window and got out of the car to -- to look in, and
11  that's when I saw the individual in there and ordered
12  him out.  I -- I couldn't say, "Hey, wait there while I
13  call this in."  You know, I ordered him to come out.  I
14  backed off and at gunpoint brought him out, put him up
15  against the car.  And that's when he turned around and
16  clobbered me with his -- with his elbow and took off
17  running.  There had not been time to call it in.
18      Q.  Well, there was time to call it in before you
19  approached the window.  Correct?  You could have made
20  that call?
21      A.  Well, I mean, we're -- we're talking seconds,
22  you know.
23      Q.  Okay.
24      A.  You don't call in -- an officer generally does
25  not call in every suspicious thing that they see.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 201

1  They're going to do what seems to be reasonable to try
2  and verify whether that's a real problem or not.  Of
3  course today, with the portable radios, you could call
4  it in immediately.
5      Q.  Well, you could have called it in when you were
6  in your car, is what I'm saying.
7      A.  I could have, yeah.
8      Q.  But you didn't?
9      A.  I didn't, no.
10     Q.  And you critique Ken Lopera for not immediately
11 calling in Tashii Farmer?
12     A.  Ken Lopera had plenty of time to call it in.
13 Okay?  That's very clear.
14     Q.  Well, when should he have done that?
15     A.  When he's trying to catch up to -- to Farmer.
16     Q.  Before or after he fell?
17     A.  Technically, both before and after, but
18 predominantly after he fell.
19     Q.  And Officer L if definitely should have called
20 it in.  Right?
21     A.  I would have expected her to call it in.
22     Q.  And you already said that Ken had a right to
23 rely on his partner to make that phone call or that
24 telephone --
25     A.  That's essentially --

Page 202

1      Q.  -- that radio communication.
2      A.  That's essentially correct.
3      Q.  Okay.
4      A.  But at the same time, you know, if you -- if
5  you don't understand that she's calling it in -- I mean,
6  I know of plenty of situations where two or three
7  officers will call the same situation simultaneously.
8  That's not unusual, either, in police work.
9      Q.  So you were in the process of patting down the
10 individual when he, as you say, clobbered you?
11     A.  I was.
12     Q.  Had you searched his upper body?
13     A.  I patted him down.  It usually starts with the
14 upper body and comes down.
15     Q.  And had you searched his waistline?
16     A.  I was around his waistline when he came around
17 with the -- the elbow.
18     Q.  Okay.  And did you find any weapons?
19     A.  I didn't.
20     Q.  Was the officer -- was the individual ever
21 apprehended?
22     A.  Yeah.  We caught him about 15 minutes later in
23 a back yard.
24     Q.  Did he have any weapons on him?
25     A.  He didn't at that point.

Page 203

1      Q.  What did you do after -- before you shot at
2  him, what did you do after he clobbered you?  Did you --
3      A.  I -- I took off after him.
4      Q.  Did you give him verbal commands?
5      A.  Oh, I was yelling at him the whole time.
6      Q.  If he would have complied with those verbal
7  commands, would you have not tried to shoot him in the
8  back?
9      A.  If he complied with them, there would have been
10 no reason to shoot him.
11     Q.  If Tashii Farmer would have complied with Ken's
12 verbal commands, would any of these events have
13 occurred?
14     A.  I doubt it.
15     Q.  Do you know what level of resistance Tashii
16 Farmer was in during his interaction with Ken Lopera,
17 per Metro policy?
18     A.  Well, I'd have to look at that policy again,
19 but I would say he was at different levels of
20 resistance.  I mean, turning around and walking away and
21 then converting that to a run-away, that's -- that's one
22 level of a resistance that I think at that point was
23 perfectly legal for him to do.
24     Q.  Isn't it true that -- I'm sorry.  Were you
25 done?

Page 204

1      A.  No.  Go ahead.  I'm done.
2      Q.  Isn't it true that all interactions with
3  individuals, some cannot be deescalated if the
4  individual doesn't want them to be deescalated?
5          MR. LAGOMARSINO:  Say that again.
6      Q.  BY MR. McNUTT:  Do you understand the question?
7          MR. LAGOMARSINO:  I didn't.  I'm sorry.
8          THE WITNESS:  I understood the question.
9      Q.  BY MR. McNUTT:  Okay.  Why don't you answer the
10 question.
11     A.  Yeah.  You're correct.  There are situations
12 where it cannot be deescalated.  That's correct.
13     Q.  Okay.  I mean, at some level, law enforcement
14 is at the mercy of the actions of the individual they're
15 dealing with.  Correct?
16         MR. LAGOMARSINO:  Objection.  Form.
17         THE WITNESS:  I don't know if "mercy" is the
18 right word, but their actions generally are determined
19 by the actions of the person that they're dealing with
20 at the time.
21     Q.  BY MR. McNUTT:  And generally, law enforcement
22 is reacting to the suspect's actions.  Correct?
23     A.  In situations -- I'm sorry.
24         MR. LAGOMARSINO:  Objection.  Form.
25         THE WITNESS:  Generally, in situations like

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 205

1    that, it is reactive. That's correct.
2       Q. BY MR. McNUTT: Do you recall in any of the
3    videos, specifically Ken Lopera's body worn camera, him
4    giving verbal directions and commands to Tashii Farmer
5    asking Tashii Farmer to stop or he was going to Tase
6    him?
7       A. I do remember hearing some of those, yes.
8       Q. Okay. Do you believe that was in compliance
9    with Metro's policy regarding giving warnings to
10   suspects?
11      A. I -- let me answer it this way. I think it was
12   a normal thing for Lopera to be doing, to -- to giving
13   the verbal warnings. That's -- that's generally number
14   2 and part of number 3 on the continuum of -- of the use
15   of force.
16      Q. So it was proper for him to do so?
17      A. To give those verbal warnings?
18      Q. Yes, sir.
19      A. Yeah. It was.
20      Q. And he did, in fact --
21      A. Now, I'm not saying to warn that he was going
22   to Tase him because I think he was very incorrect in
23   what he did there.
24      Q. I'm just asking about the warnings, the
25   propriety of the warnings.

Page 206

1       A. I -- I think it was correct for him to give the
2    warnings.
3       Q. Okay. And Had Tashii Farmer complied, you
4    know, stopped and complied, we don't know what would
5    have happened.
6          MR. LAGOMARSINO: Objection. Form.
7       Q. BY MR. McNUTT: Correct?
8       A. Well, we know that he would have complied and
9    we know that there would have been no basis, continuing
10   basis at all for Lopera to think that he had to put him
11   into a chokehold.
12      Q. But Tashii Farmer did not stop when he was
13   directed to stop?
14      A. That's correct.
15      Q. And then we get to the next step in the use of
16   force?
17      A. Let me back up and clarify the answer that I
18   gave just a minute ago.
19      Q. On which topic?
20      A. Talking about his giving the verbal warnings
21   for use of the Taser.
22      Q. Okay.
23      A. It was not appropriate for him to -- to give
24   the warning that "I'm going to Tase you." It's very
25   proper for him to give the commands to stop.

Page 207

1       Q. Why is it not proper for him to give the
2    warning "Stop or I'm" --
3       A. Because the Taser was not appropriate in this
4    situation.
5       Q. But it's appropriate for an officer to warn the
6    suspect or to command the suspect and give him an idea
7    of what the consequences are?
8       A. You might say it was a bluff. Yeah.
9       Q. Well, I'm not talking about a bluff. In this
10   case Officer Lopera believed he had an individual that,
11   as it turns out was correct, was under the influence of
12   a controlled substance, methamphetamines. He also
13   believed that Tashii Farmer was going to carjack an
14   occupied vehicle. So by Metro's use of force, whether
15   you agree with it or not, use of the Taser was
16   authorized.
17         MR. LAGOMARSINO: Hold on a second. Objection.
18   That is not what the evidence reveals. So I object to
19   the foundation of that question in terms of what Ken
20   Lopera believed.
21         THE WITNESS: As I've said several times, I
22   don't know what he really believed in this case. I
23   think he was in a very reactive, almost a panic mode. I
24   -- I don't know what he believed. I don't think that
25   there was clear enough evidence that the -- that Tashii

Page 208

1    Farmer was under the influence of a controlled
2    substance. And I don't believe that any of the actions
3    that Lopera took were appropriate for what the evidence
4    shows the situation was.
5          I don't know if that's a good enough answer to
6    your question. If not, hit me with another question.
7       Q. BY MR. McNUTT: Well, I'm sure we can break it
8    down a little bit, but I doubt that you're going to move
9    off the point.
10         Whether or not you -- you seem to believe that
11   there is a difference when you can say I don't know what
12   Ken Lopera believed but then say in other instances this
13   is clearly what Ken Lopera believed or this is evidence
14   that that he believed is not true because you so state
15   in your report.
16         MR. LAGOMARSINO: Objection. Form. There's
17   not a question there.
18         THE WITNESS: I don't -- I don't know that I
19   stated in my --
20         MR. LAGOMARSINO: There's not a question
21   pending.
22         THE WITNESS: I'm sorry.
23      Q. BY MR. McNUTT: Well, finish what you were
24   going to say now.
25      A. If there's a question.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 209

1    Q.   No.  Finish what you were going to say.  That's
2 my question.
3       MR. LAGOMARSINO:  There's no question pending.
4       MR. McNUTT:  That's my question, what was he
5 going to say.
6       MR. LAGOMARSINO:  Okay.
7       THE WITNESS:  Right now I don't know what I was
8 going to say.  You interrupted my train of thought.
9    Q.   BY MR. McNUTT:  That's because that's what
10 happens after speaking objections from your lawyer that
11 imply that you should be quiet.
12       MR. LAGOMARSINO:  That's not what that was.
13       MR. McNUTT:  Sounded like it.
14       MR. LAGOMARSINO:  What?  That there's no
15 question pending?
16       MR. McNUTT:  That's called a clue to the
17 witness to shut up.
18       THE WITNESS:  I think what I was going to say,
19 if I could try and respond to your question --
20       MR. McNUTT:  Sure.
21       THE WITNESS:  -- after my memory has come back,
22 is that, number one, I don't know what Lopera --
23       MR. LAGOMARSINO:  Hold on a second.
24       THE WITNESS:  -- actually --
25       MR. LAGOMARSINO:  Can we go off the record?

Page 210

1       (Discussion held outside the record.)
2       MR. McNUTT:  We're back on the record.
3    Q.   And your own lawyer interrupted you in the
4 middle of your answer.  So continue.
5    A.   You're going to have to repeat the question.
6       MR. McNUTT:  Why don't we read back to him.
7 Can you read back?
8       (Record read.)
9       THE WITNESS:  I don't believe I said anywhere
10 in my report that I knew what Lopera believed, if that's
11 what you were -- you were implying.
12    Q.   BY MR. McNUTT:  Would you like me to point it
13 out to you?
14    A.   Sure.
15    Q.   We'll get to it in just a minute.
16       Let's mark your supplemental report.
17    A.   Are we done with this?
18    Q.   For now.
19       (Defendant's Exhibit 10 was marked for
20 identification.)
21    Q.   BY MR. McNUTT:  Let's go to page 10 of your
22 supplemental report.
23       Do you know Jack Ryan?
24    A.   I've met Mr. Ryan.  Yes.
25    Q.   You don't like Mr. Ryan very much.

Page 211

1    A.   I don't like Mr. Ryan at all.  No.
2    Q.   May I inquire as to why?
3    A.   Because I think he's probably the most corrupt
4 cop that I've come across in my career.
5    Q.   I appreciate your candor.  In terms of your
6 reasoning, I don't know any -- I've read your report
7 with respect to the allegations you make against Mr.
8 Ryan.  I'll leave those issues to be resolved between --
9    A.   Sure.
10    Q.   -- you and Mr. Anderson.
11       My question to you is a little bit in
12 contradistinction to Mr. Ryan.  Have you ever dealt with
13 my use-of-force expert, Jamie Borden, in a professional
14 capacity before?
15    A.   I've never heard of him before this.
16    Q.   Okay.  So you don't have any of the same --
17 well, you don't think Jamie Borden is corrupt, I guess?
18    A.   I have no reason to believe he's corrupt.
19    Q.   Okay.  So you don't have the same sort of ad
20 hominem type attacks against Jamie Borden as you're
21 making or alleging against Jack Ryan?
22       MR. LAGOMARSINO:  Object as to ad hominem.
23       MR. McNUTT:  Well, attacks.  I can --
24       THE WITNESS:  I don't know that they were ad
25 hominem at all.

Page 212

1       MR. LAGOMARSINO:  I object as to "attacks."
2       THE WITNESS:  I have no basis for any such
3 criticisms of Mr. Borden.
4    Q.   BY MR. McNUTT:  Okay.  So other than through
5 this case and reading his report, which you can
6 professionally disagree on, you have no issue with Jamie
7 Borden's career as a cop and things of that nature?
8       MR. LAGOMARSINO:  Objection as to "things of
9 that nature."
10       THE WITNESS:  I -- I think the -- the correct
11 answer to that is, as far as how I feel, I have no
12 question about his -- his service as a police officer.
13 I have not seen anything untoward in that.  I think I've
14 -- I've got some feelings about his -- his expertise in
15 some of the areas that he covered in his report.
16    Q.   BY MR. McNUTT:  Between your experience as --
17 if I say as a street officer or a street cop --
18    A.   Uh-huh.
19    Q.   -- do you understand what I mean?
20    A.   I sure do.
21    Q.   What I mean is the distinction between what
22 you've said in your CV between being, and I know you
23 were an agent, but being an active agent.
24    A.   Uh-huh.
25    Q.   I know you were always active, but being --

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 213

1    A.  Hands on.
2    Q.  -- a hands-on agent dealing with criminals on a
3  firsthand basis, making arrests versus the latter part
4  of your career, the balance of your career for 14 years
5  where you were in the more executive ranks, if you will,
6  supervisory and management.
7       So when we use the phrase "patrol officer" or
8  "street cop," does Mr. Borden have more experience in
9  that realm than you?
10    A.  I don't -- I don't know the extent of his
11  experience.
12       It's clear from what I read, or at least it was
13  clear in my mind that after, you know, his first -- I
14  don't know how many years he served as a -- as a street
15  cop.  You know, everybody starts, usually, in that
16  position.  But it does look like that he ultimately went
17  into a specialized area on use of force.  I don't know
18  whether he continued in that capacity performing normal
19  policing functions out on the street or whether that was
20  the primary focus of his work.  I have the impression
21  that that's all that he focused on.
22    Q.  Would you agree with me that he has an
23  extensive resume' when it comes to police use of force
24  training and experience?
25    A.  It sure read like it.  I wouldn't -- I wouldn't

Page 214

1  argue with that.
2    Q.  Okay.  You referenced two times, at least, in
3  your report, again cumulatively --
4    A.  What page?
5    Q.  Well, you referenced the word "malady" and one
6  time --
7    A.  I referenced the word what?
8    Q.  "Malady," m-a-l-a-d-y.
9    A.  I did.
10    Q.  One time you referenced it with respect to Jack
11  Ryan, and this is paragraph 16, that you experienced
12  firsthand corruption that exists within American
13  policing, and springing from that malady --
14    A.  Correct.
15    Q.  -- there are so-called, quote, expert
16  witnesses, end quote.  Do you see where I read?
17    A.  I do see that.
18    Q.  What is your evidence that there's a purported
19  malady within American policing?  And define that malady
20  for us.
21    A.  Well, there's two different types of maladies
22  here that I'm talking about.  One is, as I -- as I
23  indicated here and as we were just talking with Mr.
24  Ryan, his malady was corruption, dishonesty.  And I
25  think that continues today, as I said here.  I'm aware

Page 215

1  of some of the other work that he does as an expert
2  witness, as an instructor and whatever.  And I have
3  checked on some of those and found out that he does not
4  normally disclose the problems he had with corruption at
5  Providence and how close he came to being prosecuted
6  federally.
7       The malady I'm referring to as far as --
8  Borden, is it?  Mr. Border?
9    Q.  Jamie Borden.
10    A.  Yeah.  Which I've seen so much in my work, is
11  that so many use-of-force experts, especially those that
12  are still down at the patrol level or maybe a sergeant
13  level, they -- they tend to be very, very supportive of
14  whatever the officer said that they're -- they're
15  talking about.  They find a way to justify what -- what
16  type of force was used and the stated reasons for that,
17  often contrary to what the evidence shows.
18       And in this particular case I think both Mr.
19  Ryan and Mr. Borden, their statements were contrary to
20  what the evidence shows.  And what -- what I suspect
21  strongly because of Mr. Borden's emphasis also on all of
22  this human factors stuff, I think -- I think that
23  indicates further that -- that he's -- he's been a
24  victim of that malady.
25    Q.  Would it be fair to say that you suffer the

Page 216

1  malady of trying to dispute everything that an officer
2  says when they're involved in these types of situations,
3  given your admission that 98 percent of your work as an
4  expert is for the plaintiff?
5    A.  I don't think I suffer from that malady,
6  although I'm very careful in terms of the cases that I
7  select to -- to work on.  I don't like to be proven
8  wrong and I try to agree to work on cases where I've
9  gathered enough information to make a knowledgeable
10  decision about whether it's something that I want to --
11  want to work on.  I don't seek out cases to go against
12  another officer.
13    Q.  Do you -- I'm sorry.
14    A.  That's it.
15    Q.  Do you --
16    A.  So I would disagree with your description that
17  I suffer from that malady.
18    Q.  I didn't think you would agree with it, but --
19    A.  Uh-huh.
20    Q.  You state various places about the prohibited
21  time that the lateral vascular neck restraint or rear
22  naked choke can be employed.  Do you know how long Metro
23  allows an LVNR to be employed?
24    A.  I know what I've read in their policies of what
25  they --

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 217

1   Q.  What does it say?
2   A.  Well, we talked about some of it earlier, that
3   if it hasn't worked in three times, they should be
4   looking at other situations and you explained that
5   that's not a hard and fast policy.  Okay?
6   Q.  Well, sir, that's --
7   A.  We're talking about the Tasers now.  You're
8   right.  You're right.  I misunderstood.
9   Q.  Well, hang on.  My question was about the LVNR.
10  A.  I understand that.
11  Q.  You kind of started going to Taser.  So I want
12  to make clear what my question is about.
13  A.  Sure.  I apologize.
14  Q.  No problem.  That's a good-faith mistake.
15  A.  What was the question again?
16  Q.  So my question is do you know how long, if
17  Metro prescribes a limit that you can employ an LVNR for
18  X amount of time and then after that time has elapsed,
19  you can no longer try to employ an LVNR?
20  A.  I -- I don't recall reading a rule to that
21  effect.  I do recall reading some things about the
22  number of seconds, that a person can go unconscious in
23  seven, eight, nine, ten seconds if it's -- if it's kept
24  on that long.  I don't -- I don't recall reading any
25  prohibition about how many times they can do it.

Page 218

1   Q.  Okay.  So go to page 12 of your supplemental
2   report.
3   A.  Uh-huh.
4   Q.  This will be a little -- I did not highlight
5   yours, but if you want to go about --
6   A.  Tell me what the line starts with.
7   Q.  Two inches up.  The line starts with
8   "unauthorized chokehold."
9   A.  Yeah.
10  Q.  See where I'm at?
11  A.  I see it.
12  Q.  Let's back it up to the beginning of that
13  sentence.
14  A.  I see it.
15  Q.  Why don't you just read that.  Start with "The
16  fact that."
17  A.  Yeah.  "The fact that Lopera's chokehold on
18  Farmer was excessive timewise had to have been obvious
19  to Sergeant Crumrine and Officers Tran and Flores, since
20  the difference between seven seconds, or even ten to
21  fifteen seconds - of application of the unauthorized
22  chokehold - are far less than the prohibited time
23  duration exceeding one minute and fifteen-plus seconds
24  that it was actually held in place by Lopera."
25  Q.  So what's between what you're talking about

Page 219

1   here, seven seconds, ten, fifteen seconds and the one
2   minute fifteen seconds, what's the prohibited time when
3   Ken Lopera, per Metro policy, should have released the
4   LVNR?
5   A.  I think based on what I've seen, the -- the
6   seven to ten or fifteen seconds is -- is what they are
7   saying is the policy, is the practice.
8   Q.  Okay.  Do you know -- do you have any support
9   for that statement?
10  A.  I remember reading it in there.  I don't
11  remember specifically what document it was, but I
12  remember reading it in some of the Metro documents I was
13  given.
14  Q.  So what you read is that if the LVNR is
15  successful, that the subject could be rendered
16  unconscious within four to seven seconds?
17  A.  That's certainly one assumption.  Yes.
18  Q.  That's not an assumption.  That's what's in the
19  policy.
20  A.  That's what they say.
21  Q.  So with that clarification, are you aware of
22  any timeline in Metro policy that says after -- if it
23  hasn't been successful, whether or not it's been
24  successful or not, at 15 seconds the encircling arm must
25  be removed, at 25 seconds the encircling arm must be

Page 220

1   removed?
2   A.  I don't recall seeing anything with that
3   specificity to it.
4   Q.  Okay.  Should there be some timeline like that
5   in Metro policy?
6   A.  Well, again, I'm not an expert on those holds,
7   but common sense would tell me that as long as those
8   chokeholds have been around and have been used in -- in
9   police work and in sports, what have you, that people in
10  those fields, especially in police work, know that you
11  can put someone out very, very quickly if those holds
12  are applied properly.  And then if you hold it too long,
13  the likelihood is you're going to kill them because you
14  cut off the blood and you cut off the air flow.
15  Q.  I think you said something like it's obvious.
16  So there isn't a policy -- if there is not a policy, are
17  you suggesting that there should be that policy?
18  A.  I'm saying that police officers are expected to
19  use their common sense, and common sense tells you that.
20  There's not a policy to cover every single instance the
21  policy officer is going to run into.
22  Q.  Okay.  Let's read the next sentence.  Would you
23  read that for me?  It starts with "Added."
24  A.  "Added to that is the unmistakable fact that
25  Lopera repeatedly asked Crumrine and the others if

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 221

1 Farmer was 'out yet' - unmistakably inquiring if Farmer
2 had entered an unconscious state, and Lopera thereby
3 confirming his intent."
4    Q.  Now, here you claim to be able to read Ken
5 Lopera's mind by determining what his intent was.
6 Correct?
7    A.  What I'm saying is that his repeated asking of
8 those questions, his repeated holding of that chokehold
9 indicate that it was his intention to render Farmer
10 unconscious.
11    Q.  Isn't an alternative reasonable explanation of
12 that that he was asking a factual question to his law
13 enforcement partners to find out the status of the
14 subject so he could release the encircling arm?  I mean,
15 that's a fair alternative reading.  Correct?
16    A.  I guess some could interpret it that way.  I
17 think -- to me, it was very clear that he wanted to know
18 if he was unconscious yet, that he -- that he could not
19 tell if he was unconscious yet.  And we covered that
20 earlier.  He should have been able to tell whether he
21 was unconscious.
22    Q.  Officer Lopera was -- per the LVNR, that is one
23 of the acceptable outcomes per Metro policy, I mean,
24 that sometimes officers can employ an LVNR and the
25 subject becomes compliant and they don't have to be

Page 222

1 rendered unconscious, but isn't it true that Metro
2 allows the LVNR to be utilized up to and including
3 rendering the suspect unconscious?
4    A.  Up to and including that point.  Correct.
5    Q.  Okay.  So don't you believe it's a good thing
6 that Ken Lopera was asking the state of Tashii Farmer's
7 consciousness?  I mean, isn't that appropriate to do?
8    A.  I think it would have been a much better thing
9 for him to release that hold much earlier than he did.
10    Q.  Sure.  But that's not responsive.
11    A.  It is responsive.
12    Q.  That's not responsive.
13    A.  Well --
14    Q.  I'm asking you whether Ken Lopera's question to
15 Sergeant Crumrine "Is he out yet," that was appropriate
16 in that circumstance because he is on his back looking
17 at the back of Tashii Farmer's head.  He cannot
18 determine Tashii Farmer's consciousness.  Correct?
19       MR. LAGOMARSINO:  Objection.  Compound.
20    Q.  BY MR. McNUTT:  Correct?
21    A.  What you stated.  He was on his back most of
22 the time, from what I could see.  He had that chokehold
23 most of the time, from what I could see.  And if he had
24 paid attention to his training, he would have known
25 that, or should have known that this was going on for an

Page 223

1 excessive amount of time and that he should have -- he
2 should have let go of that.  But for him to keep asking
3 that showed me that his intention was he was going to
4 hold that until Farmer passed out, went unconscious.
5    Q.  That's your subjective interpretation.
6 Correct?
7    A.  I think it's based on what the evidence is.
8    Q.  Well, that's subjective.  That's your
9 interpretation.  Correct?
10    A.  I think it's very objective.
11    Q.  Of course you do.
12       MR. LAGOMARSINO:  Objection.  Move to strike.
13       THE WITNESS:  I don't know that I need to take
14 snide remarks like that, sir.
15    Q.  BY MR. McNUTT:  It's a factual statement.
16    A.  I don't care whether it's factual or not.  It's
17 an insult.
18    Q.  You say on page 13 that Farmer went unconscious
19 well before Lopera released the chokehold.
20    A.  Where are you at?
21    Q.  First paragraph, but just listen to me.
22    A.  Uh-huh.
23    Q.  You state that -- hang on.  Farmer "went
24 unconscious well before Lopera released the chokehold,
25 demonstrating significant lack of situational awareness

Page 224

1 by Lopera."
2    A.  I'm having trouble finding that.  What -- what
3 line are you on there?
4    Q.  Fourth line down.  It starts with "'get on your
5 stomach.'"
6    A.  Yeah.  I see that.
7    Q.  "And actually went unconscious."  See that?
8    A.  I see that.
9    Q.  Read through the end of that sentence.
10    A.  "Actually went unconscious well before Lopera
11 released the chokehold, demonstrating a significant lack
12 of situational awareness by Lopera."
13    Q.  What evidence do you have to support the theory
14 that you can pinpoint the specific time that Tashii
15 Farmer went unconscious?
16    A.  He stopped moving.
17    Q.  That's not compliance?  That's unconsciousness?
18    A.  I think it is because of the amount of time
19 that that -- that hold had been in place.  I think it's
20 pretty clear that he went unconscious.
21    Q.  And you can state that with 100 certainty?
22    A.  I'm stating that as a conclusion.
23    Q.  And so what will you point to as evidence to
24 support that?
25    A.  The fact that it happened the way it did.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 225

1    Q.   Which video?

2    A.   Not only the video, but the -- the verbal

3    recitations of what happened and what the other officers

4    saw and even what Lopera had to say afterwards. He

5    choked him out with a rear naked. It's pretty clear.

6    Q.   Words matter?

7    A.   Pardon me?

8    Q.   Words matter. Every word that a cop says after

9    an interaction, a dynamic situation matters?

10   A.   I think it absolutely matters.

11   Q.   Are you aware that Metro's policy would have

12   allowed every officer to turn off their body worn cam

13   well before that statement was ever made?

14   A.   I don't know what their policy is on turning

15   those off. It's -- I have seen -- both as a Police

16   Commissioner here and in my work I've seen a lot of

17   officers turn off their cameras when they didn't want

18   things to be recorded or they didn't want their

19   supervisors to know what happened.

20   Q.   You can ask Craig Anderson this, but Metro's

21   policy is that officers can turn their body worn cameras

22   off at their own discretion when the situation is no

23   longer dynamic.

24       MR. ANDERSON: Objection.

25       THE WITNESS: I don't -- I don't know that. I

Page 226

1    can't argue with that. I don't know whether it's true

2    or not. I would say that's a pretty weak policy if that

3    -- if that does, in fact, exist.

4    Q.   BY MR. McNUTT: Go to page 17. Paragraph 29,

5    you say, "Four facts are clear and indisputable."

6    A.   I see it.

7    Q.   "Farmer had committed no crime when he

8    approached Officers Lopera and Lif and was merely

9    seeking help."

10   A.   Correct.

11   Q.   That's your opinion. Correct?

12   A.   I think that's a very correct opinion based on

13   the evidence that existed at that point.

14   Q.   But it's true that Ken or, excuse me, true that

15   Tashii Farmer was, in fact, committing a felony by being

16   under the influence of a controlled substance. Correct?

17       MR. LAGOMARSINO: Objection. Form, foundation.

18       THE WITNESS: I don't think that's an accurate

19   statement. I don't think the evidence is clear that he

20   was under the influence. I think that was an excuse

21   that Lopera gave later on. But his -- Tashii Farmer's

22   actions at the time, what I saw in the video, I -- I

23   wasn't there, I didn't see it firsthand, but based on

24   what I saw, I think it's almost impossible to say

25   whether he was under the influence at the time.

Page 227

1    Q.   BY MR. McNUTT: So you dispute the toxicology

2    report?

3    A.   No. The toxicology report came afterwards.

4    I'm talking about what the physical evidence was at the

5    time he and Lopera were -- were face to face.

6    Q.   So, again, that's your subjective position

7    about whether he had or had not committed a crime. But

8    the objective evidence that we know now, since you're

9    sitting here after the fact, like you told me experts

10   do, we know that Tashii Farmer was, as a fact, under the

11   influence of methamphetamines.

12       MR. LAGOMARSINO: Objection. Form, foundation.

13       THE WITNESS: We don't know that he was under

14   the influence of methamphetamines. We know that he had

15   900 nanograms per milliliter in his system at the time

16   of autopsy. Okay? In terms of what he had at the time,

17   I don't know. I don't know if the delusion of

18   methamphetamine continues after death or whether it

19   remains static. I'm not a medical person. I don't know

20   that.

21   Q.   BY MR. McNUTT: Why do you know that it's not

22   150 milligrams?

23   A.   Because that's what the toxicology said.

24   Q.   Do you have any experience with how many --

25   A.   No, but I consulted with a medical doctor to

Page 228

1    find out if that would be considered a heavy level of --

2    of -- of methamphetamine, and I was told it would be

3    right on the borderline.

4    Q.   What medical doctor was this?

5    A.   What medical doctor was it?

6    Q.   Yes.

7    A.   It was an emergency room medical door.

8    Q.   What's his name, or her name?

9    A.   It was my son.

10   Q.   Oh. Your son. What's your son's name?

11   A.   My son's name?

12   Q.   Uh-huh.

13   A.   Tom Parker. Dr. Tom Parker.

14   Q.   And where does he practice?

15   A.   In the state of Virginia.

16   Q.   Why didn't you say, "I consulted with my son,

17   the medical doctor" as opposed to acting like this is

18   some third-party individual?

19       MR. LAGOMARSINO: Objection.

20       THE WITNESS: Because I saw no reason to drag

21   him into this. It was a very informal discussion.

22   I was curious as to what 950 nanograms was. I knew the

23   question would come up because it was in the report that

24   he was under the influence. I was not convinced that he

25   was, and I was looking for some confirmation that I was

Thomas Parker                               Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 229

1  either right or wrong.
2      Q.  BY MR. McNUTT:  Isn't that the kind of failure
3  to disclose you just accused Jack Ryan of doing as an
4  expert?
5      A.  It's got nothing -- there's no comparison there
6  at all.  It's apples and watermelons, as they say.
7      Q.  I don't know who says that, but I'll take your
8  word for it.
9          Under D, "While some of the symptoms of EDS,"
10 excited delirium syndrome.  Is that what you mean there?
11 EDS is --
12     A.  I see it.
13     Q.  -- excited delirium?  I'm asking --
14     A.  Excited delirium syndrome.
15     Q.  That was the question.
16         Sir, you're using EDS for excited delirium
17 syndrome.  Correct?
18     A.  I am.
19     Q.  Okay.  "Can sometimes be similar to drug
20 abuse."  So you admit -- I mean, earlier you quibbled
21 with me over that, but you now admit in your own report
22 that some of the symptoms of excited delirium can be
23 similar to those exhibited by drug use?
24         MR. LAGOMARSINO:  Objection.
25         THE WITNESS:  I don't --

Page 230

1          MR. LAGOMARSINO:  Form, misstates testimony.
2          THE WITNESS:  I don't think I drew a
3  differentiation between the two at all.  Yes.  Some of
4  the symptoms, the early symptoms of EDS can be similar
5  to drug abuse.  I don't think that -- the stage he was
6  at in this case I don't think rose to the level of
7  intoxication.
8      Q.  BY MR. McNUTT:  Do you think patrol officers
9  should be expected to read medical treatises and have
10 that degree of knowledge regarding the minor
11 distinctions between excited delirium and being under
12 the influence of a controlled substance, which Tashii
13 Farmer was at the time?
14     A.  I think a patrol --
15         MR. LAGOMARSINO:  Form.
16         THE WITNESS:  I'm sorry.
17         MR. LAGOMARSINO:  Form as to "which Tashii was
18 at the time."
19         What I'll do is I'm going to just lodge a
20 continuing objection to the foundational statement that
21 he was under the influence of a methamphetamine so I
22 don't have to keep interrupting.  To the extent that it
23 continues, please consider that lodged.
24         THE WITNESS:  I think a patrol officer is
25 certainly expected to be able to at least come to -- we

Page 231

1  use the term prima facie determination as to whether an
2  individual is under the influence or not of alcohol or
3  controlled substance, or whatever.  I think that is
4  expected of a patrol officer.  I don't think, from what
5  I've seen or read in this case, that that was a decision
6  that Lopera could reach based on the evidence that
7  confronted him at the time.
8      Q.  BY MR. McNUTT:  If a suspect is a danger to
9  himself or others, what is an officer's first obligation
10 to do?
11     A.  Well, number one, figure out whether, in fact,
12 he is a threat to himself or others, and that's usually
13 by verbal discourse, discussions based on the other
14 person's actions, what they're doing, based upon what
15 they say.  I mean, there's any number of objective
16 things that they can -- they can either inquire about or
17 observe.
18     Q.  Will you answer my question now?
19     A.  Pardon me?
20     Q.  Will you answer my question now that you got
21 that out?
22     A.  I thought I answered it.
23     Q.  You did not.
24     A.  What's your question?
25     Q.  I said if an officer observes somebody that

Page 232

1  they've decided exhibits signs of being a threat to
2  themselves or others --
3      A.  Uh-huh.
4      Q.  -- what is that officer's first responsibility
5  at that point?
6      A.  Is to try and, number one, deescalate the
7  situation.  And again, it depends on the circumstances.
8  If he thinks there is a threat, how serious is that
9  threat?  What is the capability of the person to exactly
10 -- to -- to carry out that threat, to actually commit
11 some act of violence or whatever it is that he thinks
12 they can do?
13     Q.  Put simply, isn't it to protect the public at
14 large at that point?
15     A.  That's the bottom line.
16     Q.  And hopefully protect that individual from
17 himself as well?
18     A.  Correct.
19     Q.  Okay.  So does it matter, since that's the
20 goal, does it really matter, whether or not the suspect
21 was exhibiting signs of being under the influence of
22 excited delirium or under the influence of a controlled
23 substance, the officer's obligation to society, if you
24 will, or the public remains the same, protect the public
25 and the suspect as well?

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 233

1    A. If there is --
2        MR. LAGOMARSINO: Form, incomplete
3    hypothetical.
4        THE WITNESS: If there is an objective basis
5    for making that decision, that would be correct. In the
6    absence of that, it would be an incorrect decision.
7        Q. BY MR. McNUTT: Page 18, paragraph 30. You
8    identify -- please confirm. You're taking A, B, C, D
9    through E, F and G on the next page from the Di Maios'
10   book?
11   A. Yes.
12   Q. Okay. And are you representing that these are
13   quotes from the Di Maios' book?
14   A. If they are italicized and they're within
15   quotes, those are direct quotes from their book.
16   Q. So look at A. You get down to "talk down" the
17   individual, and then there's an open parenthetical
18   "which may not be successful," close parenthetical, but
19   that is not inside of a quote. Can you tell me --
20   A. That's --
21   Q. -- is that you speaking?
22   A. That's me speaking at that point. It's not
23   italicized. It's not within quotes and it's in a
24   different set of parentheses.
25   Q. Okay. So that's you talking?

Page 234

1    A. That's me talking.
2    Q. Now, how about in 30 (A), "An individual,"
3    italicized, and then you have different parentheses.
4    A. That would be the same thing.
5    Q. Okay. But why are there different parentheses?
6    You have a bracket and then a parenthesis.
7    A. That's strictly a typo. They should have been
8    in the squared off parentheses.
9    Q. Some people say USCS and they mess that up and
10   some people get the wrong --
11   A. It's a difference --
12   Q. -- parentheses. Correct?
13   A. -- between the punctuation marks and words.
14   Q. It is, because you had a lot more time.
15   A. Yeah.
16   Q. Let's look at paragraph (B). Are you
17   suggesting that one of the officers in this case should
18   have used OC spray on Tashii Farmer?
19   A. That would be -- could be a next step in the
20   action that they would -- that they would take if they
21   elected to use force. And obviously, that implies that
22   there was a basis for them to use force.
23   Q. And so you think OC spray would have been
24   preferable to something that was done in this case?
25       MR. LAGOMARSINO: Objection. Form.

Page 235

1        THE WITNESS: I'm not saying that. I'm quoting
2    what they wrote in their book, that that's a -- that
3    that's a step that they're suggesting is within the
4    realm of something to be considered.
5        Q. BY MR. McNUTT: So that's for positional --
6    that's from excited delirium leading to positional
7    asphyxia. Correct?
8        A. That's what?
9        Q. That is related to positional asphyxia only, in
10   paragraph 30?
11   A. They're talking about positional asphyxia at
12   that point, yes, that pepper spray would be a suggested
13   option instead of taking the person to the point of
14   positional asphyxia.
15   Q. Do you know whether it's Metro policy to use OC
16   spray on someone that's believed to be under the
17   influence of a controlled substance?
18   A. I -- I don't recall right now whether it's
19   covered or not.
20   Q. Do you know whether it's Metro's policy to use
21   OC spray with somebody who is suspected of suffering
22   from excited delirium?
23       MR. LAGOMARSINO: Objection. Form.
24       THE WITNESS: I don't recall seeing that listed
25   as an option.

Page 236

1    Q. BY MR. McNUTT: So why did you include that?
2    A. Because that's what was said in the -- in the
3    Di Maio book.
4    Q. So you just --
5    A. It's one of the alternatives they suggest.
6    Q. Just block quotes?
7    A. They are known as having written one of the
8    seminal books on excited delirium. One is a medical
9    doctor. The other, I believe, is -- is another medical
10   person. I don't know if they're a Ph.D. or what. I
11   think it's a husband and wife team. It's considered a
12   -- the book is considered an authority on excited
13   delirium, and that's merely what I'm quoting here.
14   Q. So let's go to paragraph 32. Can you give me
15   example, one case name of these vague and ambiguous
16   alleged memories you have of your law enforcement career
17   in which you dealt with excited delirium?
18       MR. LAGOMARSINO: Objection. Form. Also vague
19   and ambiguous, "memories."
20       THE WITNESS: And also, I take offense at the
21   word "alleged." You know, I write what I believe based
22   on the evidence that I've seen. And if you want to
23   consider it alleged, you know, that's fine with me. But
24   I write what I see and the conclusion I came to based on
25   that.

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 237

1    Q. BY MR. McNUTT: Well, this isn't about Ken
2  Lopera. This is about your career I'm saying alleged
3  because you reference that approximately a dozen or more
4  incidents you've been involved with excited delirium.
5  You reference the street term "50-50," which is radio
6  code for --
7    A. Correct.
8    Q. -- bizarre manic behavior. You reference other
9  incidents. But I'm just asking you, can you give me one
10 example where you have a specific recollection of you
11 personally being involved not as a manager, but as a
12 street cop.
13   A. Obviously, the ones that happened when I was a
14 street cop were almost 50 years ago. I -- I don't
15 remember the individuals' names. In terms of the -- the
16 situations, I'd have to wrack my brain a little bit on
17 that. I do remember dealing with these 50-50 situations
18 that are now -- some of them are now known as excited
19 delirium.
20   Q. So let's go to page 20. Halfway through
21 paragraph 34, see where it starts "his braggadocious"?
22   A. Yes.
23   Q. Okay. That was just easy to find. The next
24 sentence down, "policy-prohibited." Go to the end of
25 that. You say, "His use of a Kodokan judo-style

Page 238

1  grappling technique of wrapping his legs around Farmer
2  to control Farmer's body and to hold him on the ground."
3    A. Correct.
4    Q. This reads as if you are saying Ken Lopera's
5  use of wrapping his legs around Farmer for control was
6  an inappropriate technique.
7    A. I'm not saying it was inappropriate. I don't
8  think the wording --
9    Q. So you're just saying that's what he factually
10 did?
11   A. They're saying -- let me read it again here.
12      MR. LAGOMARSINO: Any time, let's take a break.
13 Any time.
14      MR. McNUTT: I'm pretty close, so --
15      MR. ANDERSON: That's what you said at 10:00.
16      MR. LAGOMARSINO: Any time.
17      MR. McNUTT: Is it an emergency?
18      MR. LAGOMARSINO: No. I just it's warm in here.
19 It's close to an hour 15 now. I just need a break.
20      THE WITNESS: I -- I think that was
21 inappropriate for him to do. Yes.
22   Q. BY MR. McNUTT: Okay. So I want to be clear on
23 what you are saying. I just want to factually
24 understand what your position is. Are you saying it was
25 inappropriate -- I understand your position is Ken

Page 239

1  Lopera should not have applied a neck restraint.
2    A. Correct.
3    Q. And as part of that, he used his legs.
4    A. Correct.
5    Q. I understand that's your position. I'm asking
6  you whether or not you believe it was a violation of Ken
7  Lopera by Metro policy to use his legs when he's
8  employing a lateral vascular neck restraint.
9    A. I have not seen any policy that addresses the
10 use of legs like that. I think it was inappropriate
11 based on the circumstances leading up to that. I think
12 it was well beyond his authority to do that.
13   Q. But that's just your opinion to do anything.
14 And as to the policy question, if I show you Metro's
15 policy that directs a person using a back-lying LVNR to
16 hook their legs onto the suspect, you would agree with
17 me that Metro's policy allows that?
18   A. I wouldn't agree one way or the other without
19 seeing it.
20   Q. Okay. Well, I'll show it to you.
21   A. I don't recall ever seeing it.
22   Q. I'll show it to you.
23   A. Okay.
24   Q. You said you reviewed it.
25      Page 21, paragraph 35, last sentence you say,

Page 240

1  "Both of these techniques are common in Kodokan judo in
2  which Lopera was a white belt." Is that just --
3    A. Actually, his white belt was in the BJJ, the
4  Brazilian jiu jitsu. I use those terms almost
5  concurrently.
6    Q. You think they're the same?
7    A. They're very similar. They similar enough to
8  be -- I mean, one came out of the other. Okay?
9    Q. But having said that, your sentence as written
10 is incorrect.
11   A. It would have been more correct for me to say
12 Brazilian jiu jitsu in there, yes, because I don't think
13 he was into --
14   Q. There's no evidence that he did judo?
15   A. Exactly. And that's why I'm saying it would
16 have been clearer for me to use that. The techniques
17 are covered in both, though.
18   Q. So paragraph 35, where you talk about Lopera
19 ignoring policy regarding Taser. Did you just discount
20 Sergeant Bland's testimony regarding how an officer
21 acting alone could use the Taser more than Metro policy,
22 or did you not read Sergeant Bland's testimony?
23      MR. LAGOMARSINO: Sergeant Bland has not been
24 deposed in the case.
25      MR. McNUTT: You routinely asked other experts

**Page 241**

1 about whether they reviewed testimony from the estate
2 case.
3     THE WITNESS: I don't remember reading Bland's
4 testimony. I may have. If I did, I didn't find it all
5 that relevant. I think if I had read it, I -- I
6 probably would have commented on it.
7     But I think the important thing throughout all
8 of this is that this situation never should have
9 occurred and, as a result of that, none of the
10 techniques that Lopera applied here were appropriate.
11 Whether policy allowed them or not, the situation did
12 not allow them.
13    Q.  BY MR. McNUTT: Is the use of a Taser
14 considered deadly force by Metro policy?
15    A.  It's -- it's, I believe, at the fourth level.
16 I don't know that it's actually considered a deadly
17 force. I have heard of situations where it causes
18 cardiac arrest.
19    Q.  I'm asking about Metro policy, not what you
20 heard about.
21    A.  The only thing I remember at this point is it's
22 listed, I think, at the fourth level. It's below the
23 deadly force category. So I don't recall it being
24 listed as deadly force.
25    Q.  Are empty hand strikes identified as deadly

**Page 242**

1 force per Metro policy?
2    A.  Open hand strikes are down at, I think, the
3 second level.
4    Q.  Is that a no?
5      Is that a no?
6    A.  That's a no.
7    Q.  They are not considered deadly force?
8    A.  I -- I don't believe they are, according to the
9 written policy.
10    Q.  That's what I'm asking about.
11    A.  Okay.
12    Q.  Per Metro policy is the lateral vascular neck
13 restraint considered the use of deadly force?
14      MR. LAGOMARSINO: Now, or at the time?
15      MR. McNUTT: I'm going to get to both of them.
16      THE WITNESS: I'm sorry. What was the question
17 again?
18    Q.  BY MR. McNUTT: Per Metro policy, was the use
19 of the lateral vascular neck restraint at the time of
20 this incident considered deadly force?
21    A.  I don't believe it was listed as deadly force.
22 I think there's a recognition that it can be deadly.
23 Any of those chokeholds can. And most people in law
24 enforcement, especially at the supervisory or the
25 training level, certainly understand that.

**Page 243**

1    Q.  And now is it identified in Metro policy as
2 deadly force?
3    A.  No. I believe it's moved up to the kind of mid
4 level.
5    Q.  So it's true that it was low level force when
6 Ken Lopera employed it May of 2017. Correct?
7    A.  Correct.
8    Q.  Per Metro policy. Correct?
9    A.  That's my recollection.
10    Q.  And it's intermediate force now, per Metro
11 policy. Correct?
12    A.  That's my understanding.
13    Q.  And neither of those levels are deadly force.
14 Correct?
15    A.  That's my understanding. That does not make
16 them appropriate, though. I think that has to be made
17 clear.
18    Q.  I understand your opinion.
19    A.  Well, it's not my opinion. I think it's a
20 fact.
21    Q.  Sir, your opinions are not fact.
22      Let's go to paragraph 37.
23      MR. LAGOMARSINO: Move to strike.
24      MR. McNUTT: Paragraph 37? Stipulated.
25      THE WITNESS: I'm there.

**Page 244**

1      MR. LAGOMARSINO: You're stipulating to
2 paragraph 37?
3      MR. McNUTT: No. To strike it, as you
4 suggested.
5      MR. LAGOMARSINO: I moved to strike the
6 editorializing.
7      MR. McNUTT: Yours, or mine?
8      MR. LAGOMARSINO: Yours. I wasn't
9 editorializing.
10    Q.  BY MR. McNUTT: "Borden also contends in his
11 report that the use of a Taser, the use of empty hand
12 strikes and the use of a restraint hold are all
13 considered 'non-deadly' force." See that?
14    A.  That's what he contended. Right.
15    Q.  Okay. But isn't it factually true, per Metro
16 policy, that that is an accurate statement?
17    A.  That that is an accurate statement?
18    Q.  Correct, per Metro policy.
19    A.  I -- I believe that's correct. Yes.
20    Q.  Okay.
21    A.  He -- he doesn't say that specifically, but --
22 but that would be correct.
23      Well, he also contends that the use was an
24 approved force based upon -- yes. The answer would be
25 yes.

Thomas Parker                           Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

---

**Page 245**

1    Q.  Okay.  And so you're going to the second

2  sentence, "He also contends that the use of an LVNR was

3  an approved force tactic based upon Metro policy and was

4  listed as a low level force option"?

5    A.  That's correct.

6    Q.  And that's a factually correct statement?

7    A.  To my recollection, it is.

8    Q.  Okay.  So "The fallacy in this reasoning."

9  He's not reasoning anything there.  He's simply saying

10  what Metro's policy was in those first two statements.

11    A.  We might argue over the word "reasoning."

12  Obviously, reasoning goes into that for him to make that

13  comparison.

14    Q.  Well, we're obviously going to argue over the

15  word "reasonable" and what's a fact.  So what part of

16  these factually correct -- you just admitted there are

17  two factually correct sentences.  What part of that is

18  reasoning?

19    A.  I did say that.  And I say it takes reasoning

20  to come to those conclusions.

21    Q.  So paragraph or -- excuse me.  You say, "Farmer

22  was sweating profusely at that time" --

23    A.  Where are you at here?

24    Q.  Just listen.  "Farmer was sweating profusely at

25  that time, seemed a bit paranoid and hyperactive -- all

**Page 246**

1  symptoms of the possible onset of excited delirium."

2      Do you agree with your statement?

3    A.  Where is the statement?

4    Q.  I just read it.  Do you agree with --

5    A.  Tell me where it is.  I'd like to read it

6  myself.

7    Q.  Okay, sir.  Top of page 22.  I know your

8  opinions shift a little bit.

9    A.  My opinion hasn't shifted.

10    Q.  Let's go to the second sentence in the first

11  paragraph.

12      MR. LAGOMARSINO:  Hold on.  I'm just going to

13  -- Counsel, if there's going to continue to be comments

14  that are not in the question and answer form about the

15  witness, then I'm going to stop the deposition and move

16  for protective order.

17      MR. McNUTT:  Direct your witness to answer the

18  questions, please, then.

19      MR. LAGOMARSINO:  I've made my record.

20    Q.  BY MR. McNUTT:  Do you see where I read?

21    A.  Yeah.  I'm reading preceding that and I want to

22  see the whole context of that statement.

23      Correct.  That's -- that's what it says.

24    Q.  Okay.  And do you stand by that statement?

25    A.  I do.

**Page 247**

1    Q.  And do you also agree that profuse sweating,

2  paranoia and hyperactive are also all symptoms or can be

3  symptoms of someone suffering from being under the

4  influence of a controlled substance?

5    A.  It -- it can be, based on the circumstances and

6  what else is contributing to that opinion.

7    Q.  Do you take issue with Metro and their policies

8  behind Safe Strip?  You've heard the phrase "Safe

9  Strip"?

10    A.  I have.

11    Q.  I believe you referenced it.  Correct?

12    A.  Yes.

13    Q.  Do you take issue with Metro having a policy of

14  putting officers inside casinos for Safe Strip?

15    A.  I have no problem with that at all.  I think

16  it's a good move.

17    Q.  Did you have any issue with the fact that --

18  because you reference in your report that this was the

19  first time Officer Lopera had worked inside the

20  Venetian.

21    A.  I don't know that I said that I knew that it

22  was a -- a policy of doing that is only in effect for a

23  couple of months.  And I -- I -- you'd have to show me

24  where I said that.  It -- I would say that would have

25  been a logical conclusion on my part.

**Page 248**

1    Q.  So you're taking issue with the fact that Metro

2  put an officer inside a casino and he had never worked

3  there before?

4    A.  I think -- I don't know that I would state it

5  that way.  I would think that putting an officer into a

6  position like that where there's a -- it is outside the

7  normal patrol officer functions where they're driving a

8  car, which -- which I think Lopera had been doing.  This

9  was a new assignment.  It was a unique assignment.  I

10  think that the fact that he was put out there when he

11  was essentially a short-timer after coming out of the

12  correctional facility, I don't see any indication of

13  what additional training he was given to accomplish this

14  job.  I think he was put into that job without the

15  police experience that an officer should have being put

16  into something like that with a great deal of autonomy.

17      And I'll tell you, quite frankly, I don't think

18  Lopera should have been a police officer at all.

19    Q.  Why?

20    A.  Much less put into a special assignment like

21  that.

22    Q.  Why should Lopera never have been a police

23  officer?

24    A.  Pardon me?

25    Q.  Why should Lopera never have been a police

---

1  officer?
2     A.  Because I think he's -- I don't think he was
3  mentally fit for it.
4     Q.  What evidence do you have of that?
5     A.  This whole situation.
6     Q.  That's it?  You don't have any psych
7  evaluation?
8     A.  I -- I asked for evaluations.  I've not seen
9  those.  I've not been provided with those.  I'm also
10  basing it upon what Officer Lif said about his
11  personality, how he's handled situations where they've
12  been partners together she disagreed with, how she
13  described him as being much more outspoken, much more
14  aggressive, a much lower level of probable cause that he
15  used to make situations.  To me, those are indicative of
16  a personality that probably should never have been
17  selected to be a police office.  If they do, the
18  psychiatric evaluations which I think they do, that
19  should have been detected.
20     Q.  Since the parallels between your shooting the
21  runaway in the back, or shooting at him and this case
22  are very similar --
23     A.  They're totally different.
24     Q.  -- should you have never become a special agent
25  in the FBI?

1     A.  You're getting ridiculous now.
2     Q.  No.
3     A.  I'm going -- I'm going to -- on the record I'm
4  going to disagree with that.  They're totally different
5  situations.  The probable cause of both of them was
6  totally different.  The laws were totally different.
7  And for you to draw a comparison and say they're nearly
8  identical is totally incorrect.
9     Q.  I will draw comparisons very closely to your
10  personal situation because, in fact, you acknowledge
11  that under Tennessee v. Garner today your actions would
12  not be justified.  Correct?
13       MR. LAGOMARSINO:  Objection.  Form.
14       THE WITNESS:  It would not be justified.  That
15  doesn't make them similar or identical.  That makes them
16  -- they would not be as justified today as they were
17  back at that time.  But to say that they're identical,
18  they are not.
19     Q.  BY MR. McNUTT:  I never said identical.  I said
20  very similar.
21     A.  Well, very similar.  It's almost the same
22  thing.  They are not.
23     Q.  But identical and very similar are two
24  different things.  Correct?
25       MR. LAGOMARSINO:  Objection.  Argumentative.

1       THE WITNESS:  That's a thin line difference
2  between the two.
3     Q.  BY MR. McNUTT:  Well, words matter.  Right?
4     A.  Words do matter at times, yes.
5       MR. McNUTT:  Andre, I'm going --
6       THE WITNESS:  Actions also matter.
7     Q.  BY MR. McNUTT:  Well, since you want to talk
8  about actions, Ken Lopera did not shoot Tashii Farmer or
9  shoot at Tashii Farmer.  You did shoot at an unarmed
10  fleeing suspect who had not committed anything other
11  than burglary.  Correct?
12     A.  He committed an assault on a police officer.
13  He committed a burglary.
14     Q.  I mean, you say he committed --
15     A.  That's much different than what -- what this
16  situation is.
17     Q.  You say he committed assault on a police
18  officer.  Is there any objective evidence of that?
19     A.  He busted my nose, if you want to know the
20  difference.  Okay?  That's a lot different than what
21  this situation is.
22     Q.  Is there a medical report of that?
23     A.  There was a medical report back at the time.
24     Q.  Is there objective evidence of that?
25     A.  There was a medical report at the time.

1     Q.  Did anyone see that?
2     A.  What do you mean did anyone see it?
3     Q.  Did anyone see it?
4     A.  It was in the police record.  Okay?  It's in
5  the hospital records.  Are you saying that I'm lying
6  about that?
7     Q.  I don't know.  I'm asking you questions.
8     A.  Well, you're certainly implying that, and I
9  resent that, to be quite honest with you.
10     Q.  You can resent it all you want.
11     A.  Well, you can imply all you want, too, but I'm
12  going to disagree with it when you're totally wrong.
13       MR. McNUTT:  Andre, I'm going to pass this
14  witness to Craig.  I may have a couple follow-up
15  questions, but it will be quicker if I let him start and
16  I can look at my notes.  Agreed?
17       MR. LAGOMARSINO:  I agree.
18       MR. McNUTT:  And we can take that break.
19       (A recess was taken from 3:27 P.M. to 3:36
20  P.M.)
21       MR. ANDERSON:  Back on the record.
22
23             EXAMINATION
24  BY MR. ANDERSON:
25     Q.  Mr. Parker, you know you're still under oath?

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 253

1    A.  I do.
2    Q.  Okay.  As I've been introduced, my name is
3  Craig Anderson and I represent the police department,
4  Las Vegas Metropolitan Police Department, and then
5  Officers Crumrine, Tran and Flores.  So we're kind of
6  done talking about Lopera.  Okay?
7    A.  Yes.
8    Q.  As part of your consulting work do you ever
9  provide training for law enforcement organizations?
10    A.  I have not since I've been doing the consulting
11  work.
12    Q.  When was the last time you provided training to
13  a law enforcement organization?
14    A.  Would have been in Russia when I was working
15  under -- we had a State Department grant to teach the
16  Russian police in nine different cities about
17  professionalism, basically.
18    Q.  What year was that, roughly?
19    A.  That would have been from -- boy.  Roughly '99
20  or 2000, for about a three-year period.
21    Q.  And then does part of your consulting involve
22  the drafting of policies for police agencies?
23    A.  No.
24    Q.  In your consulting work and your expert witness
25  work have you ever done another case that involved a

Page 254

1  neck restraint and death?
2    A.  I don't believe so, but I'm not positive of
3  that.
4    Q.  Have you ever done another case as an expert
5  that involved the use of the LVNR?
6    A.  I don't believe so.
7    Q.  So is it fair that as you sit here today, and
8  of course you could supplement this answer later, this
9  is the only LVNR case that you've done?
10    A.  That I can readily recall, yes.
11    Q.  Okay.  Have you ever testified at trial
12  regarding the duty to intervene?
13    A.  I do believe so, yes.  The vast majority -- I'm
14  sorry.  I'm getting past.
15    Q.  Go ahead.
16    A.  The vast majority of work that I have seen that
17  I have fallen into in -- in this work has been in
18  homicide cases.  And I've talked about the duty of
19  management to intervene and where an investigation was
20  going, especially when things were going wrong, but only
21  in that sense, that I recall.
22    Q.  Have you ever testified in a trial that a
23  police officer properly intervened where that was an
24  issue in the case?
25    A.  One does not come to mind.  I can't say no for

Page 255

1  sure.
2    Q.  Now, as part of your consulting work do you
3  keep up to speed on Ninth Circuit case law and Supreme
4  Court case law involving police officers, 4th and 14th
5  Amendment issues?
6    A.  I try to, but it tends to be -- for the most
7  part, it tends to be more case specific if there's a
8  need to.  But I do -- I belong to organizations that
9  send out those decisions pretty routinely.  So I try to
10  stay on top of them.
11    Q.  What organizations do you belong to that send
12  out that information?
13    A.  I -- I've been involved with legal aid
14  foundations.  I -- the two specific organizations have
15  been California Attorneys for Criminal Justice, which
16  sends out a lot of things.  The National Association of
17  Criminal Defense Lawyers.  I belong to the Tactical
18  Officers Association.  I belong to the -- a couple of
19  homicide investigators associations.  I belong to a
20  number of policing and psychology -- police
21  psychologists.  I belong to those.  All of those send
22  out notices and literature on court decisions, what have
23  you.
24    Q.  Based upon your personal experience, your
25  subscription to journals and these organizations --

Page 256

1    A.  Uh-huh.
2    Q.  -- how would you define the duty to intervene?
3    A.  I think it's a critical part of a supervisor or
4  a manager's job, primarily.  I also think it's a duty of
5  any law enforcement officer that -- who sees something
6  that is improper, incorrect, dangerous.  I think they
7  have a duty to intervene.  But people in supervisory or
8  managerial jobs I think have -- it -- it goes beyond
9  just a duty.  That's a part of their job.
10    Q.  And do you have a definition for the duty to
11  intervene?  If you were drafting a policy, how would you
12  describe the duty to intervene?
13    A.  I'd have to sit down and think about it.  But
14  basically, it's -- the duty to intervene is to stop
15  something that's improper.  And improper could include
16  policy violations, law violations, standard police
17  practice violations; whatever.
18    Q.  Would you agree that for the duty to intervene
19  to be triggered the supervising or other officer would
20  first have to recognize something was wrong and, second,
21  they'd have to actually intervene?
22    A.  I believe those can be factors, yes.
23    Q.  Are there other factors you can think of?
24    A.  Well, the main thing I think of and -- and
25  basically, it's based on my own experiences and having

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 257

1    supervisors working for me. I had 27, 28 supervisors
2    working for me in L.A. By the time they get to that
3    point, they've got a lot of experience. And I think to
4    recognize -- for a supervisor or manager to notice that
5    something is improper I think happens really almost
6    instantaneously when they encounter that. In terms of
7    having time to intervene, obviously that depends on the
8    situation. But I think it's their duty to intervene as
9    soon as -- as humanly possible if it's -- if it's off
10   track.
11       Q.   Okay. But prior to intervening they would
12   first have to recognize that something was wrong. Is
13   that fair, just as a general statement?
14       A.   I think it's fair. Yes.
15       Q.   And then, second, they would have to have time
16   and opportunity to intervene. Correct?
17       A.   Basically, yes.
18       Q.   Can verbal commands be a form of intervention?
19       A.   It can be. And that's generally the first form
20   that intervention would take, is a verbal command to
21   stop.
22       Q.   And then you can also intervene by physically
23   going hands on. Is that fair?
24       A.   Correct.
25       Q.   So there can be verbal intervention and

Page 258

1    physical intervention?
2        A.   Correct.
3        Q.   And you understand that the primary claim in
4    this litigation against Crumrine, Tran and Flores is
5    that they did not intervene?
6        A.   Correct.
7        Q.   Is that how you understand it?
8        A.   Yes. I'm sorry. I'm getting ahead of you.
9        Q.   You're fine.
10           And you would agree that Crumrine was the first
11   of these officers to arrive on scene?
12       A.   Yes.
13       Q.   When he arrived on scene, based upon your
14   review of the record, what information did he know about
15   what was occurring?
16       A.   Well, I -- I don't know what he heard on the
17   radio. I know the code red had already gone out. That
18   was the primary reason he went there. He happened to be
19   close by.
20           But, again, looking at the videos and reading
21   the interviews and -- and basing it on experience, you
22   know, I mean, you're -- you're impacted by what you see
23   the minute you arrive. And as I recall, Farmer and
24   Lopera were already on the ground.
25       Q.   Okay. What is your understanding as to what a

Page 259

1    Code Red is?
2        A.   We used to call it Code 30 or Code 20 here in
3    California, but it's an officer needs help. And I don't
4    -- in terms of Las Vegas, I don't know what level --
5    usually there's a differentiation of a couple levels. I
6    presume a Code Red is probably the top one.
7        Q.   So when Crumrine arrived, all he knew was that
8    there was a Code Red, which meant his fellow officer was
9    in trouble. That's all he knew upon arriving, based
10   upon the record?
11       A.   I think that's essentially correct.
12       Q.   And do you agree that when Crumrine arrived,
13   all of the Tasing and punches had already occurred?
14       A.   I'd have to look at the tape again. My -- I --
15   I think that's correct.
16       Q.   And so when Crumrine arrived, all he saw was
17   Mr. Brown and Lopera on the ground fighting?
18       A.   Correct.
19       Q.   Would you agree that when Crumrine arrived, he
20   had very little information about what had occurred
21   prior?
22       A.   I would agree with that.
23       Q.   Would you agree that when Crumrine arrived, he
24   encountered a dynamic situation or what appeared to be a
25   dynamic situation? Let me strike that and start the

Page 260

1    question over.
2            Would you agree, from Officer Crumrine's
3    perspective, when he arrived he was encountering a
4    dynamic situation?
5        A.   Yes.
6        Q.   When an officer such as Sergeant Crumrine
7    arrives at such a dynamic situation, what should their
8    initial focus be?
9        A.   When he first arrived?
10       Q.   Yes. When he first got there, what should have
11   been his initial focus?
12       A.   Well, I think the initial focus is to figure
13   out what's going on, what's happening. And in a dynamic
14   situation, in most dynamic situations that has to be
15   done very, very quickly. And that's usually why they've
16   been made a sergeant. They have the experience to make
17   those decisions.
18       Q.   Now, you stated your opinions about Officer
19   Lopera's actions prior to Crumrine arriving, and I
20   understand you disagree with almost all of them. So my
21   question is, when Officer Crumrine arrived with the
22   knowledge he had, was he entitled as a police officer to
23   assume that Officer Lopera had acted constitutionally or
24   reasonably up to that point?
25       A.   I -- I think that was probably a fair

Page 261

1  assumption.
2    Q.  I mean, officers are allowed when they come
3  onto these scenes to assume their officers acted
4  reasonably up to that point.  Correct?
5    A.  Yes.
6    Q.  Would it be reasonable for an officer in
7  Officer Crumrine's situation to make the decision that
8  the first task would be to handcuff Mr. Farmer?
9    A.  I don't know that that would be the first
10 decision that he has to make.  I think the first
11 decision goes back to the -- the almost instantaneous
12 assessment that he's got to make and whatever his -- his
13 assumptions are, presumptions are at the time.  I -- I
14 think helping to subdue in this case Mr. Brown or Mr.
15 Farmer would -- based on what he saw, would probably be
16 in the realm of a fair assumption.
17   Q.  So I understand there's lots of things police
18 officers can do.  In this situation was it reasonable
19 for Officer Crumrine to first attempt to assist with
20 handcuffing?
21   A.  I don't know that handcuffing would have been
22 -- I mean, certainly that would have been in the upper
23 levels of his priorities.  But I -- I think the big
24 thing would be to get -- to get him under control.
25   Q.  Okay.  To get Mr. Farmer under control?

Page 262

1    A.  Correct.
2    Q.  Okay.  And so maybe I'm misunderstanding you.
3  So Crumrine's testimony is that when he arrived, the
4  first thing he thought is "I got to get this guy in
5  handcuffs."  Do you believe anything less than
6  handcuffing would have had Mr. Farmer under control?
7    A.  What I know now -- I -- I'm not real sure, to
8  be very honest with you.  You know, it's -- it's hard to
9  say what the level of resistance was of -- of Farmer on
10 the ground there.  It certainly would be a very logical
11 decision to make.  I wouldn't argue with that.
12   Q.  And would you agree with this statement:  The
13 primary focus of a later-arriving officer who doesn't
14 know what's occurred prior to his arrival is to make the
15 scene safe as soon as possible?
16   A.  Absolutely.
17   Q.  And handcuffing the suspect is the best way to
18 make a scene safe?
19   A.  It's the most sure way, usually.
20   Q.  Now, based upon your review of the video, when
21 Officer Crumrine arrived, did he immediately go hands on
22 to assist Officer Lopera?
23   A.  I believe that's what I saw.  Yes.
24   Q.  Did you see any delay where he stood off to the
25 side, watched or anything?

Page 263

1    A.  No.
2    Q.  So you would agree that the moment Officer
3  Crumrine arrived, he got physically involved in the
4  altercation?
5    A.  Yes.
6    Q.  And then 20 seconds after Officer Crumrine
7  arrived he gave Lopera the order to "Let him go, Ken"?
8    A.  Correct.  I -- I don't know exactly on the 20
9  seconds, but that's certainly the ballpark.
10   Q.  And Lopera said, "Are you sure," and Crumrine
11 said "Yeah."  Do you recall that?
12   A.  Yes.
13   Q.  Now, you testified you're not an expert in the
14 LVNR.  Is that correct?
15   A.  Correct.
16   Q.  But you're familiar with the LVNR?
17   A.  Yes.
18   Q.  Okay.  Are you aware that it's training with
19 the LVNR that if an officer is performing it and is told
20 to stop performing the LVNR but the suspect is not yet
21 in custody or handcuffed, that the officer releases the
22 pressure but maintains the restraining arm around the
23 neck?  Did you know that?
24   A.  Repeat the question.
25   Q.  Horrible question.  Too long.

Page 264

1      So the training of the LVNR is that until a
2  suspect is handcuffed or under control, the officer
3  performing the LVNR will maintain the encircling arm
4  even if they're not applying pressure.
5    A.  I'm aware of that.
6    Q.  Is there any way that an officer not performing
7  the LVNR can tell whether pressure, if any, is being
8  applied by just looking at the encircling arm?
9    A.  It's extremely difficult.  You got to look at
10 -- it's extremely difficult.
11   Q.  Now, Sergeant Crumrine, as Officer Lopera's
12 supervisor, is he entitled to assume that officers are
13 following his commands?
14   A.  I think he -- I think it's correct for him to
15 assume that they should be.
16   Q.  And so when he said "Let him go, Ken" and
17 Lopera says "Are you sure" and Crumrine responds "Yeah,"
18 is it reasonable for Crumrine to assume that Lopera
19 followed that command?
20   A.  It's reasonable to assume that he would follow
21 that.  Yeah.
22   Q.  And do you have an opinion in this case as to
23 whether Lopera was using an LVNR or a rear naked choke?
24   A.  The what?
25   Q.  Whether he was using an LVNR or a rear naked

Thomas Parker                                  Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 265

1  choke?
2      A.  From what I saw, it appears that he was using a
3  rear naked.
4      Q.  And do you also agree it would be difficult to
5  tell whether it was a rear naked choke or an LVNR?
6      A.  From the perspective I had from the tape, it's
7  difficult, yeah.  And as I said earlier, I based my
8  opinion on seeing Lopera's hand up on the head of -- of
9  Brown or Farmer.
10     Q.  And would you agree that if you were an
11 observer on the ground, like Crumrine, Tran and Flores,
12 would it be difficult to tell if it was an LVNR or a
13 rear naked choke?
14         MR. LAGOMARSINO:  Objection.  Form, foundation.
15         THE WITNESS:  It shouldn't have been.  I mean,
16 from what I saw of Crumrine and also Tran and Flores,
17 they were in -- they were right there on top.  They were
18 looking right down on it, within a matter of a foot or
19 two.  They should have been able to tell.  There's
20 enough distinction in the visibility.
21     Q.  BY MR. ANDERSON:  They should have been able to
22 tell which type of hold was being used?
23     A.  Yes.
24     Q.  But you would agree that it would be difficult
25 to tell how much pressure, if any, was being applied at

Page 266

1  any given moment?
2      A.  Very difficult.  Yes.
3         MR. LAGOMARSINO:  Objection.  Form, foundation.
4      Q.  BY MR. ANDERSON:  So you agree that once
5  Crumrine gave the order to "Let him go, Ken," he could
6  assume that Lopera followed that order?
7         MR. LAGOMARSINO:  Objection.  Form, foundation.
8         THE WITNESS:  Until he learned differently.
9  Correct.
10     Q.  BY MR. ANDERSON:  And I know you don't have the
11 video in front of you.  I have timestamps here.
12        Do you agree that for about 45 seconds Crumrine
13 was actively attempting to assist with handcuffing?
14        MR. LAGOMARSINO:  Objection.
15     Q.  BY MR. ANDERSON:  That's how long he was
16 physically involved?
17        MR. LAGOMARSINO:  Objection.  Form, foundation.
18        THE WITNESS:  I don't know the time frame.  I
19 -- I mean, this whole thing happened within a matter of
20 a couple minutes.  I -- I have some disagreement with --
21 with what he did there, but my answer would be that if
22 45 seconds is right, the whole time that I saw him he
23 was -- he was trying to help with the handcuffing.
24     Q.  BY MR. ANDERSON:  And prior to handcuffing
25 being completed, there's no evidence that Crumrine was

Page 267

1  not attempting to assist.  He wasn't standing around
2  passively.  Do you agree with that?
3      A.  No, he wasn't.
4      Q.  When you're involved in these dynamic
5  situations, is time difficult to quantify for a police
6  officer?
7         MR. LAGOMARSINO:  Objection.  Form, foundation.
8         THE WITNESS:  It -- it depends on the
9  situation.  You know, it depends on the threat the
10 police officer himself is feeling or herself is feeling.
11 There's an old saying that time does stand still in
12 those situations.  That's very true.  Not every
13 situation.  Usually the more experienced you are, the
14 more training you've had, it's -- it's -- it's not as
15 big a problem.
16     Q.  BY MR. ANDERSON:  I've had some officers say
17 that minutes pass very quickly and others say seconds
18 pass very slowly.  Did you have those type of
19 experiences as well?
20     A.  Early in my career, I think so.  Yeah.
21     Q.  But as you get more experience, you get better
22 at gauging time?
23     A.  Yeah.  Yes.  I'm sorry.
24     Q.  These situations that Officer Crumrine
25 encountered, can they be stressful?

Page 268

1      A.  Very stressful.
2      Q.  Do you believe that officers in these
3  situations are able to calmly count passing seconds?
4      A.  Able to what?
5      Q.  To calmly count passing seconds.
6      A.  Usually not.
7      Q.  But it's your opinion in this case that
8  Sergeant Crumrine failed to intervene.  Is that correct?
9  Failed to intervene.  That he did fail to intervene?
10     A.  He failed to intervene as I would expect a
11 sergeant to intervene.  Yes.
12     Q.  Do you believe that he fulfilled his duty to
13 intervene if he was just a police officer and not a
14 supervisor?
15        MR. LAGOMARSINO:  Form.  Foundation.
16        THE WITNESS:  I think there's still failure
17 there.
18        If I could make a little further explanation of
19 that, I have seen too many cases, both of police
20 officers becoming a sergeant.  I mean, once you're --
21 you take off -- it happens overnight.  It's the same
22 with FBI agents who become supervisors.  Many of them,
23 almost bordering on most of them, have extreme
24 difficulty making that transition quickly.
25        I do understand that Sergeant Crumrine was --

Thomas Parker

Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 269

1  was a -- a probationary or it was -- he had just been
2  put in that position. And I -- I would guess that he --
3  his first reaction, again based on experience of what I
4  saw there, that he reverted back to his street police
5  officer thinking and action and -- and jumped right in.
6  And I'm not saying that that was the wrong thing to do
7  at the time, especially when it was just he and Lopera
8  there.
9      When Tran and Flores stood up and they came in,
10  and Tran especially immediately got involved, at that
11  situation a supervisor would -- would normally take a
12  step back and let them handle it.
13     Q. BY MR. ANDERSON: Okay. And so correct me if
14  I'm wrong. You don't have any criticisms of Sergeant
15  Crumrine's actions until after Tran and Flores arrived?
16     MR. LAGOMARSINO: Objection. Form.
17     THE WITNESS: That's essentially correct.
18  Yeah.
19     Q. BY Mr. ANDERSON: And you would agree with me
20  that Crumrine did intervene in some form by going hands
21  on and attempting to assist with the handcuffing?
22     A. That's correct.
23     Q. And you would agree that he did attempt a form
24  of intervention by giving the verbal orders to Lopera?
25     A. That's correct. He just didn't go to the next

Page 270

1  step.
2      Q. And the next step, is that physically stopping
3  Lopera from performing the neck restraint?
4      A. I think that when Tran and Flores arrived and
5  started to participate in the thing, as I said, Crumrine
6  should have -- should have stood up and let them handle
7  it. At that point he should have tried again the verbal
8  thing to reinforce that. He -- the next thing that I
9  think he should have done is direct -- if Lopera is not
10  hearing it, that he should order Tran and Flores to --
11  to stop it. If they're not stopping it, then I think he
12  should step in and assist in -- in pulling them apart.
13     Q. Now, do you agree or disagree with this: When
14  handcuffing was completed on Mr. Farmer, all four
15  stopped within a couple of seconds?
16     A. Yes.
17     Q. And so when we're talking about physically
18  intervening and prying Lopera's arms off Mr. Farmer's
19  neck, would an officer ever do that before Farmer was
20  handcuffed?
21     MR. LAGOMARSINO: Objection. Form.
22     THE WITNESS: I'm sorry. Say that again.
23     MR. LAGOMARSINO: Objection. Form, incomplete
24  hypothetical.
25     Q. BY MR. ANDERSON: If officers are struggling

Page 271

1  with a suspect and an officer believes that a prolonged
2  neck restraint is being used, would the officer ever
3  physically intervene with the officer performing the
4  neck restraint before the suspect is handcuffed?
5      MR. LAGOMARSINO: Incomplete hypothetical.
6      THE WITNESS: Yes.
7      Q. BY MR. ANDERSON: And so you wouldn't have a
8  problem, if two officers were fighting, to stop another
9  officer before a suspect was actually handcuffed?
10     A. If they tried to stop the chokehold, you mean?
11     Q. I can maybe say this more simply.
12     I have not talked to anyone, this doesn't mean
13  anything, who has ever said that you would physically
14  stop Lopera from doing the chokehold before Farmer was
15  handcuffed.
16     A. Well, it would depend on what Farmer was
17  exhibiting at that time, you know. My recollection is
18  that most of the resistance had stopped at that point.
19  In fact, it -- I recall that Farmer's -- Crumrine, I
20  believe, did get a handcuff on -- or one of them got a
21  handcuff on one of his hands -- one of his arms, but
22  they couldn't do the other one because their bodies were
23  together and the one hand was kind of trapped between
24  the two. I don't recall there being much physical
25  resistance around that time.

Page 272

1      Q. And based upon your experience, if you arrived
2  on a scene such as this, when you first arrive, how long
3  would you think it would take to get this suspect into
4  handcuffs? There's three of you. He doesn't have any
5  visible weapons. I mean, typically how long would it
6  take to get someone into handcuffs?
7      A. It obviously depends on the situation. But
8  with -- with three people, and four especially, it
9  should have happened relatively quickly. There's
10  various techniques you can use to do that.
11     Q. And would you agree that an objectively
12  reasonable officer arriving at the same time as Tran and
13  Flores would have had that same thought, it shouldn't
14  take very long to get this guy into handcuffs?
15     A. I would think so.
16     Q. This kind of became a weird situation that it
17  took so long to get control of him? Unusual situation?
18     A. It was an unusual situation, not necessarily --
19  it was an unusual situation because of the way it had
20  started and the way it was being handled.
21     Q. And so before I get to Flores and Tran, just to
22  make sure I understand you, it's your opinion that
23  Sergeant Crumrine, when he arrived, acted appropriately
24  by intervening by giving verbal commands and attempting
25  to assist with handcuffing, but when the other two

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 273

1  officers arrive, he should have stepped back and took
2  better control of the situation?
3      A.  He should have taken control, you know, whether
4  -- when I say step back, that's kind of a philosophical
5  type -- type term here.  But he should have taken
6  control of the situation.
7      Q.  But you generally agree with my statement?
8      A.  Yes.
9      Q.  Okay.  So when Flores and Tran arrive, they're
10 kind of in the same situation as Crumrine, that they
11 don't have a lot of information as to what's occurred
12 prior to their arrival?
13     A.  Yes.
14     Q.  And when they arrive, all of the Tasing and
15 punches had already occurred?
16     A.  To my recollection.  I'm a little confused, you
17 know, without looking at the tape again.  But I could
18 vividly see the punches that Lopera was throwing.
19     Q.  Well, when they arrived, Mr. Farmer was already
20 in some form of neck restraint.  Is that fair?
21     A.  Yes, he was.
22     Q.  Okay.  And so he obviously wasn't using his
23 Taser and if his arms are encircling Mr. Farmer's head
24 and neck area, he was done punching?
25     A.  I think you're correct that those punches

Page 274

1  occurred before they arrived.
2      Q.  And when Officer Tran arrived --
3      A.  The reason I'm a little confused is there were
4  those hotel security guys there.  I'm trying to
5  differentiate between whey they were still there while
6  he was still -- I remember there were some bodies kind
7  of in front between him and the camera but directly
8  right at the incident itself.
9      Q.  And your recollection is the same as mine.  The
10 hotel security was present.  Crumrine, Tran and Flores
11 all arrived after the punches and Tasing.
12        Now, when Officer Tran arrived, he immediately
13 physically intervened, too, by assisting with the
14 handcuffing?
15     A.  Yes, he did.
16     Q.  And Flores was just seconds behind him?
17     A.  A few seconds.
18     Q.  And would you agree that when Tran and Flores
19 arrived, it could still be characterized as a dynamic
20 situation?
21     A.  Yeah.  Maybe on the borderline, but it was
22 still dynamic.
23     Q.  And Tran and Flores' attempts to assist with
24 handcuffing was a form of intervention?
25     A.  It was a form of intervention for what they

Page 275

1  obviously saw when they got there, without knowing all
2  the circumstances.  It would have been a form of
3  intervention to help get him into a -- a control
4  position.
5      Q.  And as we just talked about, a reasonable
6  officer in their situation would assume it would just
7  take seconds to get Mr. Farmer into cuffs with three
8  present?
9      A.  Seconds.  Yeah.
10     Q.  And did you see any period of time on the video
11 where Officer Tran stood around and did nothing prior to
12 handcuffing?
13     A.  No.
14     Q.  Okay.  Did you see anywhere on the video where
15 Officer Flores stood around and did nothing prior to
16 handcuffing?
17     A.  No.
18     Q.  Did you see any actions taken by Tran or Flores
19 before handcuffing that you would consider to be
20 passive?
21     A.  Flores was a little more passive than Tran was.
22 But, you know, broadly characterize it as passive?  I
23 wouldn't characterize it as that.
24     Q.  And the officers were hands on with Mr. Farmer
25 until handcuffing was complete.  Is that correct?

Page 276

1      A.  I -- I believe so, yes.
2      Q.  And would you agree that when Tran and Flores
3  arrived, although they could tell Officer Lopera had
4  some form of neck restraint, they could not tell how
5  much pressure, if any, was being applied?
6      A.  I think the earlier answer I gave would apply
7  here also.  I think it would be very difficult to tell.
8      Q.  And according to your review of the record,
9  Tran ordered Officer Lopera to loosen up once
10 handcuffing was complete?
11     A.  I believe that's correct.
12     Q.  And once Officer Tran gave that statement to
13 Officer Lopera, that's when he rolled off Mr. Farmer?
14     A.  Again, that -- that's what I recall.
15     Q.  And so do you agree that Officers Tran and
16 Flores physically intervened by assisting with the
17 handcuffing?
18     A.  It was a form of physical intervention.  My --
19 my -- my problem that I have with Crumrine and Tran and
20 -- and Flores is that they did not really try to extract
21 Lopera from that chokehold.
22     Q.  Okay.  And so it's your expert opinion that one
23 of the three officers or all three of the officers
24 should have left Farmer unsecured and attempted to pry
25 Lopera's arms off of Mr. Farmer's neck prior to

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 277

1  handcuffing?
2      MR. LAGOMARSINO:  Form.
3      THE WITNESS:  I don't know that I would go that
4  far.  I think -- and I'd have to go back and look at the
5  video again as to exactly what the resistance level was,
6  if any, from Farmer at that point.  But certainly if --
7  if things are accurate, which I have no reason to
8  disbelieve, that Farmer was, in fact, unconscious at
9  that one minute level or -- obviously, he would have
10  been unconscious before that if the other estimates and
11  whatever are correct.  I think there would have been an
12  opportunity there for them to extract Lopera from that
13  without incurring any additional danger from Farmer.
14     Q.  BY MR. ANDERSON:  Are you aware of any legal
15  precedent that says an officer has to physically
16  intervene in order to fulfill his duty to intervene?
17     MR. LAGOMARSINO:  Objection.  Form, foundation.
18     THE WITNESS:  A legal requirement to do so?
19     Q.  BY MR. ANDERSON:  Yes.  What is your opinion
20  that the officers should have physically stopped Lopera
21  from performing the neck restraint based upon?
22     A.  The fact that it continued too long.  And I --
23  I feel fairly safe in stating that Farmer was probably
24  unconscious at that point because we know that Lopera
25  continued that for a while.  And I -- I think there were

Page 278

1  opportunities there for them to have -- have stopped it.
2      Q.  I doubt you'll have a name, but are you aware
3  of any case law from the Ninth Circuit of the Supreme
4  Court that supports your opinion?
5      MR. LAGOMARSINO:  Objection.  Form, foundation.
6      THE WITNESS:  I'm not specifically aware of any
7  case law.  I would presume that it's probably been
8  addressed at some point at -- at the levels.  I -- I
9  don't know that for sure.  But I think some of this
10  comes back, too, to the whole concept of the difference
11  between the 4th and the 14th, what's reasonable and what
12  shocks the conscience.  I mean, it got to a point where
13  it -- it definitely was at a point of shocking the
14  conscience when Lopera, you know, was carrying that on
15  way too long, which all comes back to this deliberate
16  indifference concept.
17     Q.  BY MR. ANDERSON:  And in your expert opinion,
18  what's the point where it becomes conscience shocking?
19  When would you draw that line?
20     MR. LAGOMARSINO:  Objection.  Form.
21     THE WITNESS:  When it's obvious that it's
22  become excessive.
23     Q.  BY MR. ANDERSON:  And when is that in this
24  case?
25     A.  Well, I -- I think it's probably at the one

Page 279

1  minute mark for sure.  But it would certainly be at the
2  point where it's accomplished its purpose or at least
3  what Lopera's purpose seemed to be, which is to render
4  Farmer unconscious.
5      Q.  And you would agree --
6      A.  It's clear he was unconscious for a while
7  before separation occurred.
8      Q.  And you would agree that at the one minute mark
9  Mr. Farmer still was not handcuffed?
10     A.  I can't say specifically at one minute, but it
11  didn't happen until after he had gone unconscious.
12     Q.  But the fact the officers were still struggling
13  to handcuff Mr. Farmer at the one minute mark, you find
14  that behavior of the officers conscience shocking?
15     MR. LAGOMARSINO:  Objection.  Form, misstates
16  the evidence.
17     THE WITNESS:  I -- I don't know whether,
18  because of the -- the grappling-type hold that Lopera
19  had on him, I don't know if any of Farmer's actions or
20  perceived actions were a result of that because of -- of
21  Lopera's movements.  But if he had that rear naked on,
22  and he was certainly, as I said before, bragging about
23  it afterwards, Farmer was most likely unconscious at
24  that point.  And if the -- if the hold or the choke was
25  still in place, it shouldn't have been.

Page 280

1      I also do recall that there was some question
2  about the fact that his arm, Farmer's arm was caught
3  between his body and -- and Lopera's, which made
4  completing the handcuffing difficult, which may have
5  prolonged it.
6      Q.  BY MR. ANDERSON:  Now, in your report you use
7  terms like "conscience shocking," "deliberate
8  indifference," "gross negligence," "reckless."  In your
9  years as an expert have you ever been allowed to testify
10  as to what you believe to be deliberate indifference,
11  gross negligence or conscience shocking?
12     A.  Only in depositions.
13     Q.  You would agree that it's up to a jury to
14  decide whether those terms apply to the facts that you
15  give?
16     A.  Absolutely.
17     Q.  Are you aware that there is another case going
18  on involving Farmer's estate and his children?
19     A.  I am aware of that.  I don't know all the
20  details of it.
21     Q.  Did you know that Crumrine, Tran and Flores
22  have been dismissed from that lawsuit, having been found
23  to have properly intervened?
24     A.  I just learned that recently.
25     Q.  Did that surprise you?

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 281

1    A.  Again, I don't know --
2       MR. LAGOMARSINO:  Objection.  Form.
3       THE WITNESS:  -- if any of the facts were
4  different than -- than what I learned.  Like I say, I
5  think it's in -- my -- my disagreement is not with their
6  initial reactions to things.  It's the -- the failure to
7  physically intervene.
8    Q.  BY MR. ANDERSON:  Now, going to the police
9  department itself, let's just see what we agree on.
10      Are you offering any opinions that just the
11 written policies, not as they're applied, not as they're
12 trained, just the written policies in a binder, that any
13 of the written policies are unconstitutional or below
14 the standard?
15   A.  Let me put it this way.  I don't have any real
16 problem with the written policies.  I've done some
17 comparisons of those policies to the model policies put
18 out by the International Association of Chiefs of
19 Police, which is kind of the -- the guru on all of this.
20 I do think that, as -- as has been identified here today
21 and ran into, I think there's some policies that can go
22 a little bit further, that can be a little clearer.  But
23 in a general sense, I don't have any real -- any real
24 problems with the policies.
25   Q.  Is that IACP?  Do I have the acronym right?

Page 282

1    A.  International Association of Chiefs of Police.
2    Q.  Are you aware that Metro's policy, use of force
3  policy on the date of the Tashii Farmer incident is
4  cited by IACP as a model policy?
5    A.  I wasn't aware of that, but I -- I found all of
6  their policies in -- in basic compliance with the IACP
7  model policies.
8    Q.  And you would agree that your reports do not
9  offer any criticisms of the Las Vegas Metropolitan
10 Police Department's training of their officers.  Is that
11 fair?
12   A.  Well, I haven't looked at all of the training
13 lesson plans and all of that stuff.  Basically, what
14 I've seen is what training has been offered to the
15 officers.
16      The -- the -- I think the problem that I've got
17 with Metro is the fact that there's been such a long
18 history of violations of policy, both in shootings and
19 physical things like the case we're talking about here,
20 which leads me to believe, again, based on my
21 experience, and I've been writing and enforcing policies
22 both, you -- you have to reinforce those policies.
23 Violations, the officers doing them have to be held
24 accountable.  And, believe me, when there are violations
25 and there's no accountability, the other officers know

Page 283

1  that and that tends to really loosen the string at that
2  point.
3       So I think the problem I've got is that there
4  seems to be a lack of management attention to the
5  violations or enforcing those policies.  I couldn't tell
6  if there was refresher training or reinforcement-type
7  training.
8       The other question I had when we talked about
9  it this morning is I think some of the training was a
10 little too short, but I also recognize the problems in
11 giving longer training when you're short on manpower.
12   Q.  Okay.  I'm going to talk about everything that
13 you just brought up, but to go back, you understand as
14 an expert that any opinion you're going to offer at
15 trial needs to be in your expert report.  Is that fair?
16   A.  I -- I do understand that generally, yes,
17 though I've been asked to opine on things that weren't
18 in my report.
19   Q.  You would agree with me that there are no
20 criticisms of LVMPD's training in your written reports?
21   A.  I don't think I mentioned any of these that I
22 just -- that I just mentioned to you.
23   Q.  Well, you do mention what you just talked
24 about, and that's the culture.
25   A.  Right.

Page 284

1    Q.  So I'm going to talk about that next.  But you
2  would agree there's no specific criticisms of Metro's
3  training in your expert reports.  Is that fair?
4    A.  I believe that's correct.
5    Q.  Okay.  So now I want to talk to you about this
6  culture.
7       The culture that you're talking about is that
8  Metro has adequate written policies, adequate training,
9  but they do not enforce the training and the policies.
10 Is that what you just said?
11   A.  I see a lot of indications of that.  Yeah.
12   Q.  Okay.  Did I state your opinion fairly there?
13   A.  Yes.  I think so.
14   Q.  Okay.  What do you rely upon for this culture
15 argument you're making?
16   A.  Well, I've read these various reports that have
17 come out.  I don't remember right now whether ACLU.  I
18 think that they were involved.  There is this
19 collaborative project, that there's a number of
20 those situations.  I rely somewhat on my own three years
21 in Las Vegas.  It was the wild west back then.  But --
22 and I'm not saying that that hasn't changed.  I presume
23 that a good portion of it has.  But --
24   Q.  Well --
25   A.  I -- I think there would be a lessening of

Thomas Parker                           Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 285

1  these situations if there was enforcement and sufficient
2  refresher training.
3      Q.  And you were in Las Vegas in the 1970s?
4      A.  '77 to '80.
5      Q.  Okay.  And the collaborative report, the COPS
6  report you're talking about, that was dated 2012.
7  Correct?
8      A.  Correct.
9      Q.  Did you read the follow-up to the 2012 report?
10     A.  I've read some things where some things had
11  been implemented from the report, but I've also -- I
12  also understand there have been things that have not
13  been followed up on.  I couldn't tell you what those are
14  as we sit here.
15     Q.  And in this case you reviewed the CIRT report.
16  Correct?
17     A.  Correct.
18     Q.  The redacted CIRT report.  Correct?
19     A.  The what?
20     Q.  The redacted.
21     A.  The redacted.  Yes.
22     Q.  And you're aware of the discipline received by
23  the officers, that it was recommended that Officer
24  Lopera be terminated and that Sergeant Crumrine was
25  busted down to a patrol officer?

Page 286

1      A.  Correct.
2      Q.  Okay.  Do you agree with that discipline in
3  this case?
4      A.  In those two instances, I do.
5          I think the thing that I disagree with is, and
6  I realize there was some court decisions involved, is
7  Crumrine was given his stripes back.  I don't know if he
8  was sent back for retraining.  He should have been.  But
9  from that perspective, I think the initial actions that
10  were taken seem fair.
11     Q.  Crumrine did get his stripes back.  Are you
12  aware of the process of the Las Vegas Metropolitan
13  Police Department that allowed that?
14     A.  Not in any detail.  Maybe it wasn't court.
15  Maybe it was a -- a City personnel board or something
16  like that.  I'm not sure what it was.
17     Q.  It was a neutral arbitration.
18     A.  Okay.
19     Q.  What incidences in the past five years are you
20  relying upon, besides this one, that Metro has a policy
21  that allows officers to use excessive force?
22     A.  I -- I don't know that I could characterize it
23  as they have a policy that allows the use.  I think it's
24  a lack of enforcement of the policies.
25     Q.  What other incidences besides this one are you

Page 287

1  relying upon for that opinion?
2      A.  Well, I don't remember when the Gibson case
3  happened.  Is that 2012 or '13?  Somewhere.
4      Q.  2012.
5      A.  Okay.  There was obviously some breakdowns
6  there.  I don't know that I can name another specific
7  one.  I -- I'm kind of a news junky.  I follow the news
8  a lot.  I -- I've seen stories both online and in the
9  press of other incidents that have happened.
10     Q.  And in the Gibson shooting in 2012, the
11  shooter, Jesus Arrevela, was not terminated or
12  disciplined, was he?
13     A.  That's correct.
14     Q.  So it was different than this case, is that
15  correct, in the discipline field?
16     A.  It was.
17         I -- I will say, and I don't remember whether I
18  said it in my report, but I think in general, Metro is
19  to be commended for the actions they took.  In fact,
20  it's -- I would say overall in law enforcement those
21  were unusual actions, except maybe New York.
22     Q.  Did you view the factual findings of the CIRT
23  report to be accurate?
24     A.  For the most part, yeah.
25     Q.  Did you see anywhere in the CIRT report where

Page 288

1  you believe that Metro slanted the investigation in
2  favor of the officers?
3      A.  I'd have to go back and look at it.  Nothing
4  comes to mind.  Usually in -- the answer is that's a
5  report.  No.  Usually in situations like that there is
6  disagreement within the ranks, within the management
7  ranks.
8      Q.  And that's not unusual?
9      A.  That's not unusual.
10     Q.  And how do you feel about CALEA certifications?
11     A.  I don't know that I'm totally familiar with it.
12  That wasn't something we were involved with in the FBI.
13         What does CALEA stand for, again?
14     Q.  I could have told you ten minutes ago.  You do
15  not have the basis to render an opinion either way on
16  CALEA?
17     A.  Yeah.
18     Q.  Now, as an expert, you talked a lot about it
19  today with Mr. McNutt.  When you do your reports do you
20  make credibility determinations as to who is telling the
21  truth and who is not?
22     A.  I do.  And I try to do that very
23  dispassionately.
24     Q.  But you end up making opinions as to who is
25  lying and who is --

Thomas Parker                           Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 289

1    A. It's hard not to when you have experience.
2    Q. Okay. Now I want to talk to you about your
3  rebuttal report and your opinions on Mr. Jack Ryan.
4  Okay?
5    A. Okay.
6    Q. You would agree that there has never been any
7  finding of wrongdoing against Mr. Ryan based upon the
8  two decades-old allegations. Correct?
9    A. I don't know that I would agree with that the
10  way you stated it. He escaped prosecution by some very
11  cunning moves on his part, and his pension was withheld,
12  which he took to court and got back. But beside that,
13  I'm not aware of any other actions. He resigned to
14  avoid prosecution.
15    Q. When you say his cunning actions, what are you
16  referring to?
17    A. Well, there was a whole series of events that
18  I'm familiar with where not only the Providence Police
19  Department officers that were charged with investigating
20  what he had been involved with with the mayor and
21  others, along with the investigation by the FBI, that
22  there were numerous attempts to interview him and in
23  some cases appointments would be made and he wouldn't
24  keep them. The bottom line was he -- when those
25  attempts were being made he always -- he'd make an

Page 290

1  agreement but then duck showing up for that.
2         However, there was a point, again, that I'm
3  aware of, where it appeared that he became pretty aware
4  of the evidence about the -- the transgressions he
5  participated in, and he hired an attorney. They
6  prepared a proffer and he went in and started
7  cooperating with the FBI.
8    Q. What is your source of the information you just
9  relayed?
10    A. It comes from my acquaintance with the lead FBI
11  agent that was on that case. It was called Operation
12  Plunderdome. And there's been a lot of press. There's
13  been books written. I recently reacquired the -- "The
14  Prince of the City" I think was the name of the book
15  about the mayor, and Mr. Ryan is mentioned quite
16  prominently in there.
17    Q. What's the name of your source?
18    A. Dennis Aiken.
19       MR. McNUTT: How do you spell the last tame?
20       THE WITNESS: He's from where?
21       MR. McNUTT: How do you spell the last name?
22       THE WITNESS: A-i-k-e-n.
23    Q. BY MR. ANDERSON: Now, you mentioned a Santa
24  Barbara case where you were against -- is it Santa
25  Barbara where you were against Mr. Ryan?

Page 291

1    A. It was a Santa Barbara case. Right. A
2  shooting case.
3    Q. Was Mr. Ryan allowed to testify in that case?
4    A. I don't believe he ever testified in court. I
5  -- I sat in on his deposition.
6    Q. Oh, okay. The case never went to trial?
7    A. I think it was settled.
8    Q. Are you aware of any Court ever allowing
9  testimony or evidence regarding Operation Plunderdome to
10  be used against Mr. Ryan?
11       MR. LAGOMARSINO: Form, foundation.
12       THE WITNESS: I have no knowledge of any to say
13  that it didn't happen. I -- I couldn't go that far.
14    Q. BY MR. ANDERSON: Are you aware or have you
15  ever reviewed any of the numerous trial court orders
16  stating that there is no support for the allegations
17  against Mr. Ryan?
18       MR. LAGOMARSINO: Form, foundation.
19       THE WITNESS: I've never heard of nor seen
20  those.
21    Q. BY MR. ANDERSON: Would that surprise you?
22    A. It would surprise me.
23    Q. Okay. Has there ever been any finding of
24  wrongdoing against Mr. Ryan in any forum, including
25  administrative hearings, for his alleged role in

Page 292

1  Operation Plunderdome?
2    A. No, because I think he resigned before -- other
3  than withholding his retirement, I think he resigned
4  before all that really came to fruition.
5    Q. Do you have any supporting evidence that Mr.
6  Ryan was ever listed as a target or subject in the
7  Plunderdome investigation?
8    A. I do have knowledge of that.
9    Q. And what's that knowledge from? Is that from
10  Mr. Aiken?
11    A. Some of it's from Mr. Aiken. Some of it is
12  from reading some of the press. I talked to -- I don't
13  remember his name now, but I talked to a -- a City
14  official who was not involved in it but was mentioned in
15  the press in terms of being knowledgeable. And I called
16  and talked with him briefly. That was back on the Santa
17  Barbara case.
18    Q. What was his name?
19    A. I don't remember his name now. It seemed to me
20  it was an Italian name. I don't know who it was.
21    Q. Was Mr. Ryan listed as a government witness
22  during the trial of the Providence mayor?
23    A. I think it was intended for him to be a
24  witness, but I don't know whether it ever happened.
25    Q. Did you know that the government listed him as

Thomas Parker                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 293

1   a witness on their side for that trial?
2   A.  I don't know.
3   Q.  Would that surprise you?
4   A.  If the government would have listed him?
5   Q.  Yeah.  As their witness.
6   A.  The federal government, or the state
7   government?
8   Q.  Federal.
9   A.  Federal?
10  Q.  Yes.
11  A.  That wouldn't surprise me, no.  If -- if he
12  did, in fact, make this proffer and did work with the
13  FBI, I -- I don't know in what context they continued to
14  use him.
15  Q.  In your rebuttal report you reference the
16  $5,000 payment scheme to the son of a -- is it Cianci,
17  C-i-a-n-c-i, supporter?
18  A.  Cianci was the mayor at the time.  Yeah.
19  Q.  Who provided you that information?
20  A.  I saw it in a number of places.  I don't think
21  Aiken ever referred to that.  It's listed in the book,
22  and I also -- excuse me.
23  Q.  Do you need a break?  Are you okay?
24  A.  I'm all right.
25      I also at one point had access -- I never had

Page 294

1   copies, but I had access to some of the -- some of the
2   pages in a -- major city investigation that took
3   place of -- of that whole corrupt situation there.
4   Q.  And do those pages reference Mr. Ryan?
5   A.  Yes.
6   Q.  Who wrote the book that you refer to?
7   A.  I believe -- he was a well-known prize-winning
8   reporter there.  Sam something or other.  I don't
9   remember exactly what his name was.
10  Q.  In that paragraph you say, and I quote, "Ryan
11  was found," stop quote, to have committed misconduct.
12  Who found --
13  A.  I'm sorry.  I wasn't paying attention.  This is
14  the book, by the way.
15  Q.  Okay.  Good.  Yeah.  I've seen it.
16      When you say, and I quote, "Ryan was found,"
17  end quote, to have committed misconduct --
18  A.  Right.
19  Q.  -- who found that he committed misconduct?
20  A.  It was a combination of the FBI and the -- the
21  city and state investigators that investigated that
22  case.  It was kind of a task force put together, as I
23  recall.
24  Q.  Okay.  So where can I read that it was found
25  that he committed misconduct?  Where can I see that?

Page 295

1   A.  Well, there -- there was also an opinion
2   written by -- I think it was the State Attorney General,
3   if I'm not mistaken, that said Ryan had clearly
4   committed wrongdoing in the case.  And I think that's
5   part of what committed -- or that's part of what led to
6   his retirement and at least temporarily withheld.  There
7   is a document that states that.
8   Q.  And you put "I have been told by former FBI
9   colleagues familiar with the case that as Ryan was about
10  to be charged with various crimes associated with these
11  and other situations, he offered to cooperate."
12      Who are the former FBI colleagues that told you
13  that?
14  A.  Well, obviously, Mr. Aiken was.  He was the
15  primary one.
16  Q.  Now, your report states in paragraph 6 that Mr.
17  Ryan, and I quote, "prefers to give the impression that
18  he served honorably and also honorably retired from
19  police service," end quote.
20      Is that what you wrote?
21  A.  Correct.
22  Q.  You know that Mr. Brian has documentary
23  evidence that he was honorably discharged.  Do you know
24  that?
25  A.  I know that he resigned.  I don't know that it

Page 296

1   was classified as an honorable discharge.  I have not
2   seen paperwork to that effect.
3   Q.  Okay.  Are you aware that since his 2002
4   retirement he has always been found to have had an
5   honorable discharge?
6   A.  I don't know that.
7   Q.  Would that surprise you?
8   A.  Pardon me?
9   Q.  Would that surprise you?
10  A.  Depending on where it came from and depending
11  on how much knowledge they had.
12  Q.  And you are aware that he received a full
13  pension and benefits?
14  A.  I'm aware that he got it back.  It was taken
15  away and he appealed it, I believe, in court and got it
16  back.
17  Q.  In paragraph 6 B you state that Ryan admitted
18  to the FBI --
19  A.  What page are we on here?
20  Q.  I'm sorry.  It's on your rebuttal report.  So
21  it's going to be page 4.
22  A.  Page 4?
23  Q.  Yeah.  Just let me know when you're there.
24  A.  Where are we at on page 4?
25  Q.  I'm in paragraph 6 B.

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 297

1   A. 6 B?
2   Q. Yeah. If you want to read that paragraph.
3   It's rather short.
4   A. Do you want me to read it out loud or --
5   Q. No. Just read it to yourself.
6   A. 6 B, you're saying, or D, as in David?
7   Q. 6 B, as in boy.
8   A. Okay. Yes. What's the question?
9   Q. In that, you state that Ryan admitted to the
10  FBI he had been provided source data for the questions
11  to promotional exams.
12  A. That's correct.
13  Q. What is your basis for that statement?
14  A. I believe it's in the book. I believe it's in
15  -- the pages that I saw of that big task force
16  investigation related to Ryan and I believe it was
17  mentioned in -- in that as well. And I believe I was
18  told that by Dennis Aiken as well.
19  Q. And then --
20  A. And -- and I recall -- well, I recall reading
21  in some of that that Ryan had, in fact, admitted that.
22  Q. That he admitted it?
23  A. Yeah. I think part of it was in the proffer.
24  Q. Have you ever seen that proffer?
25  A. I have not seen it, no.

Page 298

1   Q. Okay. Would you agree that most of your
2   statements regarding Mr. Ryan are hearsay based?
3   A. Well, if you count reading some of these
4   official reports as being hearsay, yes. I have no
5   direct knowledge of any of his actions.
6   Q. And you're well versed in the allegations that
7   were levied, but you're not aware of any finding of
8   wrongdoing on Mr. Ryan's part by anybody. Is that
9   correct?
10  MR. LAGOMARSINO: Objection. Form.
11  THE WITNESS: Well, the thing we talked about,
12  whether it was the Attorney General or who it was that
13  wrote that his actions had definitely been wrong and
14  that was part of, I think, his retirement withholding, I
15  have not seen where he's been held criminally liable or
16  civilly liable.
17  Q. BY MR. ANDERSON: And you haven't seen that
18  statement you're referring to, either. Is that correct?
19  A. Which statement?
20  Q. The one you keep referring to, the Attorney
21  General's statement. Have you ever seen that statement?
22  A. It seems to me I did see that letter back at
23  the time. And I've seen other references to it since
24  then.
25  Q. Do you think it's reckless to make these

Page 299

1   allegations without the supporting information in your
2   possession?
3   A. Not at all.
4   Q. Okay. At the bottom of 6 C you write about
5   Ryan working out special deals with a local automobile
6   dealer.
7   A. Correct.
8   Q. What's that based upon?
9   A. I believe that's in the book, and I believe I
10  also saw that in -- in some of the reports of that -- of
11  that task force.
12  Q. And then in 6 D is when you talk about your FBI
13  colleagues where Ryan was a target in the investigation.
14  A. That's what I'm talking about. It was the U.S.
15  Attorney, not the Attorney General.
16  Q. Okay. U.S. Attorney.
17  A. Right.
18  Q. Who is the person that told you Mr. Ryan was a
19  target? Is that Mr. Aiken?
20  A. I think he confirmed it, that he was a target.
21  Q. Okay. Anybody else tell you that he was a
22  target besides Mr. Aiken?
23  A. Well, I -- I also -- it's obvious that I -- I
24  had -- I was given access to some pages of that -- that
25  police task force report that was investigating the

Page 300

1   corruption. And I -- I was -- I was put in touch with
2   one of the -- the key investigators in that who
3   indicated that Ryan was definitely a target of that.
4   Q. And who is that?
5   A. I don't remember his name. It's been --
6   whenever that was. Eight, nine, ten years ago.
7   Q. Okay. You put the term, and I quote,
8   "conveniently unavailable," end quote, in that paragraph
9   about him being available to be talked to. Do you see
10  that?
11  A. Which paragraph are we talking about now?
12  Q. Very top of page 5. I'm sorry. First
13  paragraph, first sentence. "When the investigators
14  tried to interview Ryan, he was always 'conveniently
15  unavailable.'"
16  A. Correct.
17  Q. Why did you put "conveniently unavailable" in
18  quotes?
19  A. Because he always had some excuse not to attend
20  interviews that had been demanded or requested or that
21  he had agreed to.
22  Q. Who told you that?
23  A. Pardon me?
24  Q. Who told you that?
25  A. I read it in some of the papers. That was

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 301

1  covered in that -- what I saw, that task force report.
2  I believe it's in the book.
3      Q.  Could you get copies of those papers?
4      A.  Could I get them now?
5      Q.  Uh-huh.
6      A.  I don't know.
7      Q.  Okay.  Are you aware that Mr. Ryan's office at
8  the time was located next to the Providence Police
9  Chief's office in the Providence Police Headquarters?
10     A.  I know that he was the Director of
11  Administration and was considered kind of the right-hand
12  man of Pergano or whatever the Chief's name was at the
13  time.
14     Q.  So he would have been right next door to the
15  people that were supposed to be trying to find him.  Do
16  you know that?
17     A.  I -- I don't know where the task force was
18  located.  The normal process, they would have been
19  located outside of the police department.  I don't know
20  where they were located, but I -- I think it's -- I
21  don't know that it was a question of them not trying to
22  find him, that he just was not to be found.
23     Q.  Okay.  In section G you claim that Mr. Ryan
24  made a $1,000 donation to the Cianci campaign.
25     A.  Yes.

Page 302

1      Q.  What evidence do you have of that?
2      A.  I was shown a check of his campaign donation
3  back in that last case.
4      Q.  Are you aware that Mayor Cianci had a driver
5  named John Ryan who was an active lieutenant on the
6  police department at that time?
7      A.  Another John Ryan?
8      Q.  Yeah, who was a lieutenant and a driver.
9      A.  I -- I don't recall ever knowing that.
10     Q.  Okay.  Are you aware that's the person that
11  wrote the check?
12     A.  I'm not.
13     Q.  What efforts did you make to determine that Mr.
14  Ryan made that donation before you put that in your
15  report?
16     A.  Nothing beyond seeing the check.
17     Q.  So you just assume that was the same John Ryan?
18     A.  I was not aware there was a second John Ryan.
19     Q.  You weren't aware that that John Ryan was the
20  driver for the mayor?
21     A.  I'm not aware of that.
22     Q.  And he was also a lieutenant in the police
23  department at that time.
24     A.  That what?
25     Q.  He was also a lieutenant in the police

Page 303

1  department.
2      A.  I'm not aware of that either.
3      Q.  Okay.  Now, in section H are you claiming that
4  Mr. Ryan's pension was actually revoked?
5      A.  That's -- that was what I was told, that it was
6  cancelled or withheld.
7      Q.  And who told you that?
8      A.  You know, at this point I don't remember.  I --
9  I do recall reading about it.  I don't know whether
10  Aiken told me about it or the -- the officer that I
11  talked to that was involved in that investigation.
12     Q.  Did you review Mr. Ragosta's, R-a-g-o-s-t-a,
13  stipulation on behalf of the City of Providence in which
14  he acknowledged that Mr. Ryan did not act for corrupt
15  purposes but, rather, to resolve a potential lawsuit?
16     A.  I'm sorry.  Did I say that?
17     Q.  No.  You don't mention it at all.  You don't
18  mention Mr. Ragosta's stipulation.
19     A.  Let me read that paragraph again here.
20     Q.  Okay.
21     A.  And what's the question again?
22     Q.  The question was, have you ever reviewed Mr.
23  Ragosta's stipulation on behalf of the City of
24  Providence in which he acknowledged that Mr. Ryan did
25  not act for corrupt purposes.

Page 304

1      A.  I have not seen that.
2      Q.  Would that be important to you?
3          MR. LAGOMARSINO:  Objection.  Form, foundation.
4          THE WITNESS:  I don't know whether it would be
5  important or not.  I -- I was -- I know what I learned
6  at the time and I know what I've read since then.  And I
7  don't know all the details of -- of the return of his
8  pension to him.
9      Q.  BY MR. ANDERSON:  Is it your opinion that the
10 United States Attorney's Office and the FBI have a
11 negative impression of Mr. Ryan?
12     A.  I think that's an accurate statement.
13     Q.  Are you aware that the United States Attorney's
14 Office has retained Mr. Ryan as an expert witness?
15     A.  I'm not aware of that.
16     Q.  Are you aware that the FBI hires Mr. Ryan to
17 perform training?
18     A.  I'm not aware of that either.
19     Q.  That surprise you?
20     A.  Was it the FBI in that area, or somewhere else
21 in the country?
22     Q.  Multiple FBI agencies have retained him to do
23 training.
24     A.  Around the country?
25     Q.  Yes.

Thomas Parker                     Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 305

1    A.  I'm not aware of that.  I would be a little
2  surprised at that.  We usually did a pretty good job of
3  checking out who we had come in to teach courses.
4    Q.  Exactly.  You don't think they do a good job
5  anymore?
6    A.  Is there evidence of that, or is it Mr. Ryan's
7  statements?
8    Q.  He'll testify to it under oath.
9    A.  Okay.  There's a big difference, though,
10  between -- is there documentation of that or --
11    Q.  There is documentation.
12    A.  There is?  I'd be surprised at that.
13        MR. ANDERSON:  I apologize.
14        MR. McNUTT:  Do you want to take a break?
15        MR. ANDERSON:  I don't have much longer.  If
16  you want to take a break, we can.
17    Q.  Paragraph J.
18        MR. McNUTT:  Do you want to take a break?
19        THE WITNESS:  I'm fine.
20        MR. ANDERSON:  I'm almost done.
21        THE WITNESS:  I'm just curious what time it
22  was.
23    Q.  BY MR. ANDERSON:  In Paragraph J you put, "I
24  have been further advised by a very reliable source,
25  with whose credibility I am very familiar, that Ryan was

Page 306

1  reportedly 'dumped' from the New Jersey State Police
2  Oversight Project described above.  The same reliable
3  source advised that Ryan was also reportedly," and I
4  quote, "'booted,'" b-o-o-t-e-d, end quote, "as a
5  use-of-force expert witness in South Portland, Maine in
6  late 2009 or early 2010, as well as from a couple of
7  other expert witness projects for which this source did
8  not know the specific locations or the details."
9    A.  That's correct.
10    Q.  Who is that source?
11    A.  That source was a -- I believe he was an -- he
12  was a mid-level officer in the New Jersey State Police
13  that I stumbled across at a meeting I was at.
14    Q.  What's his name?
15    A.  I don't remember his name.
16    Q.  But he's a very reliable source?
17    A.  I knew that Mr. Aiken knew him, said he was a
18  good guy, that they had worked together at some point in
19  time, that he -- they never had any information about
20  him being involved in the corruption, or what have you.
21  In my discussion with him that lasted probably 45
22  minutes to an hour, the information that he gave me
23  appeared to be right in line with what I already knew.
24  I -- I -- I had no reason for thinking anything other
25  than him being very reliable, part of that because of

Page 307

1  being with the New Jersey State Police and the position
2  he was in.  He was administrative rank.
3    Q.  So you spent 45 minutes with that person?
4    A.  That's correct.
5    Q.  And you put "whose credibility I am very
6  familiar with"?
7    A.  Based on what Mr. Aiken told me, yes, and my
8  own impressions of him.
9    Q.  Are you aware that information is wrong?
10    A.  That it's wrong?
11    Q.  Yeah.  I'm --
12    A.  I'm not aware it's wrong.  I wouldn't put it
13  there if I thought it was wrong.
14    Q.  Well, if you're interested, Mr. Ryan has only
15  been retained in one case in South Portland, Maine.  The
16  case is Parker versus Gerrish, G-e-r-r-i-s-h, which is a
17  published opinion citing Mr. Ryan's opinions as the
18  basis for the Court granting a summary judgment motion.
19    A.  I'm not aware of that.
20    Q.  Okay.  Who drafted the 59-page investigation
21  you reference in paragraph L in --
22    A.  That's that -- that's that task force.
23    Q.  Who signed it?
24    A.  I don't remember.  Like I say, I didn't see the
25  whole report.

Page 308

1    Q.  Would it surprise you that nobody signed it?
2    A.  That nobody signed it?
3    Q.  Uh-huh.
4    A.  Not necessarily.
5    Q.  Okay.  Moving on and we'll be done here.  I'm
6  almost done.
7        In your rebuttal opinions you criticize Mr.
8  Ryan's scope, that he did not address Lopera's actions.
9  Correct?
10    A.  That he what?
11    Q.  He never addresses Lopera's actions.  Correct?
12    A.  I still didn't get the last part.
13    Q.  You criticize Mr. Ryan for not addressing
14  Lopera's actions.
15    A.  Yes.
16    Q.  You've been an expert witness in thousands of
17  cases?
18    A.  Not thousands, no.
19    Q.  When you are retained as an expert witness,
20  does the attorney hiring you give you a scope of work
21  they want you to look at?
22    A.  In most cases, yes.
23    Q.  And in this case you're aware that Mr. Ryan was
24  just asked to look at the actions of Crumrine, Flores
25  and Tran.  Did you know that?

Thomas Parker                                Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 309

1   A. I don't know what he was asked to look at.
2   Q. Okay. If you were retained to render opinions
3   to specific officers, would you go out and render
4   opinions against officers who didn't retain you? Would
5   you render opinions against officers you were not
6   retained to look at their actions?
7   A. If there was a reason to, I would. I've done
8   that.
9   Q. In paragraph 8 of your rebuttal opinion, this
10  is about the officers --
11  A. Okay.
12  Q. -- it parrots kind of what you talked about
13  today. You label Crumrine's actions as significant
14  negligence-related liability. Is that correct?
15  A. Let me read this again.
16      I don't see. Where did I say that,
17  "significant"?
18  Q. Let me see.
19  A. I see it. It's at the top of page 8.
20  Q. I'm sorry. Did I get it wrong? The top of
21  page 8.
22      So you wrote that Officer Crumrine "bears
23  significant negligence-related liability for" Farmer's
24  death. Correct?
25  A. I think he was negligent in not physically

Page 310

1   intervening.
2   Q. You don't think it was intentional? That it
3   was negligent?
4       MR. LAGOMARSINO: Objection. Form, foundation.
5   Q. BY MR. ANDERSON: That's what your report says.
6   Correct?
7   A. I don't know whether it was intentional or not.
8   It was -- to me it was clearly negligent.
9   Q. Okay. And we already talked about this, but
10  you agree with Metro's investigation into the incident
11  and its results?
12  A. Where are you at there?
13  Q. I'm just asking you in general.
14  A. Oh. Say it again.
15  Q. You agree with Metro's investigation and its
16  findings in this matter?
17  A. I do.
18  Q. Now, you mention in paragraph 11 A, and I'll
19  let you look at it if you want to, but you state that
20  LVMPD hid information from the public and didn't
21  initiate any action against a fellow officer. So I want
22  you to read that paragraph, paragraph 11 A.
23  A. Okay. Okay. I read it. What -- what's
24  your --
25  Q. Well, all of your opinions in A kind of refer

Page 311

1   to the code of silence, the blue wall, whatever you want
2   to call it. Did you see any information that that
3   existed in this case?
4   A. I think they were -- they were definitely
5   present in this -- this situation. I do recall -- I
6   mean, I -- I read over 5,000 pages. I -- I do recall
7   that there were officers or personnel within Metro that
8   were defensive of what Lopera did, saw nothing wrong
9   with it. I know Ryan and Borden, was it? Is that your
10  expert?
11      MR. McNUTT: Jamie Borden is my expert.
12      THE WITNESS: Jamie Borden. They were both, I
13  think, very, very defensive of Lopera's position and saw
14  nothing wrong with -- with what he did. And I think
15  they -- they ignored the evidence there.
16      But in terms of your question with regard to
17  Metro, I -- I do recall seeing some statements in there
18  that were -- were in defense of Lopera's actions, saw
19  nothing wrong with them.
20  Q. BY MR. ANDERSON: Now, you just mentioned Ryan
21  was defensive of Lopera's actions, but in your report
22  you also state he didn't say anything about Lopera. Can
23  you show me in Ryan's report -- well, you probably don't
24  have Ryan's report. Where in Ryan's report --
25  A. No. I think he -- I think he did. I'd have to

Page 312

1   go back and look at it again, but I -- my recollection
2   is that he did talk about Lopera in there.
3       Am I wrong on that?
4   Q. I think so. And that's what your report
5   states, is that he doesn't mention Lopera.
6   A. I'd be -- I think he -- I think they ignored
7   the true -- not the true, but they -- they essentially
8   ignored the actions that were taken by Lopera and tended
9   to try to justify them.
10  Q. Your rebuttal report says that you were
11  surprised that Ryan never addressed Lopera's conduct.
12  A. Correct.
13  Q. Then later you say that you are shocked that
14  Ryan defended Lopera's conduct. Which is it? Did he
15  address it, or defend it?
16  A. I don't think he -- when I say he addressed it,
17  he really did not discuss it per se beyond saying that
18  there was nothing improper in what he did.
19  Q. And is it your opinion that there -- or is it
20  your recollection that there are opinions in Ryan's
21  report that defend Lopera?
22  A. I think what I read in his report was -- was a
23  defense of Lopera's actions. That's my recollection.
24  Q. Okay. Real quick, do you know what level one
25  of the LVNR is?

Thomas Parker                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 313

1   A. Level one?
2   Q. Yes.
3   A. Yeah. That's a very -- as I understand it,
4   it's a very mild -- it's not enough to by itself result
5   in a person going unconscious.
6        MR. ANDERSON: Okay. I have nothing further.
7        MR. McNUTT: Couple follow-ups.
8        MR. LAGOMARSINO: Let's just take a quick
9   break.
10       MR. McNUTT: Okay.
11       (A recess was taken from 4:50 P.M. to 4:58
12   P.M.)
13
14           FURTHER EXAMINATION
15  BY MR. McNUTT:
16   Q. Mr. Parker, I have just a couple follow-up
17  questions.
18   A. Okay
19       MR. ANDERSON: Just a few.
20   Q. BY MR. McNUTT: Did you physically type up your
21  reports?
22   A. I did.
23   Q. So you don't have a secretary or anything --
24   A. No.
25   Q. -- that helps you with that sort of thing?

Page 314

1   A. Well, my wife will help me out once in a while.
2   Q. Sure.
3   A. But I -- I generally type them up.
4   Q. Just curious. Craig asked you a few questions
5   before regarding whether you could or are allowed to
6   testify at trial regarding what standards apply in terms
7   of shocks to conscience, deliberate indifference. Do
8   you remember that question?
9   A. I do. And I've never testified at a trial for
10  any of that.
11   Q. Okay. And so if you know that you aren't going
12  to testify about it at trial, why do you put it in your
13  report?
14   A. Because it's a finding or conclusion that --
15  that I've come to. I've -- I've never been told or even
16  hinted at or ever thought about the fact that I should
17  not put anything in the report that I'm not going to
18  testify because I never know what I'm going to testify.
19  So I put my findings and conclusions and my observations
20  in every report that I write.
21   Q. So it won't surprise you if a Court in this
22  case doesn't allow you to testify about those legal
23  standards?
24       MR. LAGOMARSINO: Objection. Relevance.
25       THE WITNESS: I -- I have no basis to think one

Page 315

1   way or the other on that.
2   Q. BY MR. McNUTT: Is it your opinion that had
3   Sergeant Crumrine or Officers Tran and Flores, had they
4   intervened as you suggest they should have in this case,
5   would Tashii Farmer have survived?
6   A. Well, let -- let me say this. I may have -- I
7   don't know if I gave the wrong impression or not, but
8   they should have intervened -- I -- I use the term a
9   minute or a minute ten, whatever it was. They -- they
10  should have intervened much sooner than that. I mean, I
11  -- I know that Tran and Flores arrived from -- the video
12  I saw had time markings on it. It was about 20, 23
13  seconds, something like that. One of them should have
14  intervened at that point. And -- certainly, along
15  with that, when -- when Crumrine told him to let go,
16  when Tran told him to loosen up and he didn't do it,
17  whatever time those occurred, there should have been a
18  physical intervention at that point.
19   Q. Are you making any opinions that Tashii Farmer
20  would have survived if they would have done as you
21  suggest they should have?
22   A. There's a greater possibility that he would
23  have survived. I can't say for sure.
24   Q. During Officer Lopera's interaction with Tashii
25  Farmer, do you know whether or not he had ever checked

Page 316

1   him for weapons?
2   A. I don't know that he had. I know he said that
3   that was one of the reasons he reached for him in the
4   first place when -- when Tashii Farmer started to walk
5   away. I think that, again, is a disingenuous statement.
6   Q. Set aside what you think about his statement.
7   I'm just asking factually, the record in this case, had
8   any Metro officer determined whether or not Tashii
9   Farmer had any weapons?
10   A. I'm not aware of them doing that up to the
11  point where they finally handcuffed him. I don't know
12  whether they checked him at that point or not.
13   Q. Okay. Verbal commands can be a form of
14  deescalation. Correct?
15   A. If they're effective. I mean, they're nothing
16  if they're not effective.
17   Q. Per Metro policy, verbal commands are one of
18  the techniques they use for deescalation. Correct?
19   A. It's considered, I believe, the second level of
20  -- of their use of force policy and, thus, could be a
21  level of deescalation.
22   Q. So is that a yes, that per Metro policy, verbal
23  commands --
24   A. Yes.
25   Q. Thank you, despite the flack that we're getting

Page 317

1  from our co-counsel here about --
2       MR. LAGOMARSINO: Sorry.
3       MR. McNUTT: -- fashion and sunglasses, I
4  guess.
5       Q. As a law enforcement officer, when they give a
6  verbal command, how long should they take to assess
7  whether that command is being complied with?
8       A. Depends on the situation, depends whether it's
9  a life-and-death matter, depends what the command is
10 relating to. I know in situations I've been in I've
11 given those commands and I expected them to be acted on
12 immediately.
13      Q. And so in a situation where you expected your
14 command to be acted upon immediately, if then
15 immediately the subject or the suspect did not comply,
16 you then could take further action?
17      A. Are you talking about the suspect, or you're
18 talking about the -- what the officers were doing?
19      Q. So --
20      A. What Lopera ordered Farmer to do?
21      Q. Well, I was trying to -- you answered what you
22 would do.
23      A. Right.
24      Q. So I was trying to make that -- so since I've
25 appropriately mucked the record, you said that you have

Page 318

1  given commands where you expected your command to be
2  complied with immediately.
3       A. Correct.
4       Q. Okay. And so when you gave those types of
5  commands, if someone did not immediately comply, did you
6  have to wait any arbitrary amount of time to further
7  assess, or could you then take what you deem to be the
8  next reasonable use of force or escalation technique?
9       A. Totally depends on the situation and what the
10 command was and the reason for the command and what was
11 happening. It's hard to say. But whether it was with
12 my own troops or to an individual that I was ordering to
13 do something, I -- I expected that to be done right
14 then.
15      Q. Okay. So is it fair to say that depending on
16 the circumstance, you would -- in some circumstances
17 immediate compliance is required and in other
18 circumstances it could take seconds or maybe tens of
19 seconds to comply?
20      A. Again, it depends on the situation. Yeah. I
21 mean, there -- there's a full range of -- depending upon
22 what the situation was and what the order was in terms
23 of what we considered immediate compliance with that.
24 But, you know, if -- if I told an agent or a SWAT team
25 to stand down or stop something, I expected them to do

Page 319

1  it right then if that was humanly possible, feasible.
2       And if I gave that order to a suspect, you
3  know, depending on what it was, if it was a situation
4  where I suspected, you know, he had a firearm and -- and
5  I was concerned about what was in his hands, I would say
6  "Let me see your hands," I'd want to see that right now.
7       Q. If you told a suspect not to move -- if you
8  told a suspect that was prone on the ground not to
9  move --
10      A. Right.
11      Q. -- and the suspect started to get up --
12      A. Yeah.
13      Q. -- would that indicate to you the suspect was
14 not complying with your commands?
15      A. It would indicate that he was not complying.
16 What action I would take based on that would depend on
17 what that action was.
18      Q. Sure.
19      A. I might give it to him verbally again. If he
20 was considered dangerous, you know, I might move in and
21 take physical action on him, but it depends.
22      MR. McNUTT: Okay. I have no further
23 questions.
24      MR. LAGOMARSINO: Just for the record, what
25 time is it?

Page 320

1       THE REPORTER: 5:06.
2       MR. LAGOMARSINO: Can you please put that on
3  the record? 5:06.
4       (The deposition adjourned at 5:06 P.M.)
5       --oo0oo--
6
7       I declare, under penalty of perjury, under the
8  laws of the State of California, the foregoing testimony
9  is true and correct.
10
11      Dated this     day of
12 2019, at Santa Barbara, California.
13
14
15
16      THOMAS PARKER
17
18
19
20
21
22
23
24
25

Thomas Parker                          Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 321

1        CERTIFICATE OF

2        CERTIFIED SHORTHAND REPORTER

3    I, THE UNDERSIGNED CERTIFIED SHORTHAND REPORTER IN

4    AND FOR THE STATE OF CALIFORNIA, DO HEREBY CERTIFY:

5      THAT THE FOREGOING PROCEEDINGS WERE TAKEN BEFORE ME

6    AT THE TIME AND PLACE THEREIN SET FORTH; THAT ANY

7    WITNESSES IN THE FOREGOING PROCEEDINGS, PRIOR TO

8    TESTIFYING, WERE DULY SWORN; THAT A RECORD OF THE

9    PROCEEDINGS WAS MADE BY ME USING MACHINE SHORTHAND,

10   WHICH WAS THEREAFTER TRANSCRIBED UNDER MY DIRECTION;

11   THAT THE FOREGOING TRANSCRIPT IS A TRUE RECORD OF THE

12   TESTIMONY GIVEN.  FURTHER, THAT IF THE FOREGOING

13   PERTAINS TO THE ORIGINAL TRANSCRIPT OF A DEPOSITION IN A

14   FEDERAL CASE, BEFORE COMPLETION OF THE PROCEEDINGS,

15   REVIEW OF THE TRANSCRIPT [X] WAS [ ] WAS NOT REQUESTED.

16      I FURTHER CERTIFY THAT I AM A DISINTERESTED

17   PERSON AND AM IN NO WAY INTERESTED IN THE OUTCOME OF

18   SAID ACTION, OR CONNECTED WITH OR RELATED TO ANY OF THE

19   PARTIES IN SAID ACTION, OR TO THEIR RESPECTIVE COUNSEL.

20      THE DISMANTLING, UNSEALING OR UNBINDING OF THE

21   ORIGINAL TRANSCRIPT WILL RENDER THE REPORTER'S

22   CERTIFICATE NULL AND VOID.

23      IN WITNESS WHEREOF, I HAVE SUBSCRIBED MY NAME ON
     THIS DATE:  October 19, 2019.

24

25      CSR NO. 2818

Page 322

1      IN ACCORDANCE WITH RULE 30(e)

2      FEDERAL RULES OF CIVIL PROCEDURE

3    PAGE LINE    CHANGE REQUESTED        REASON THEREFOR

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**5.3(a)(vii) List of Due Diligence Documents**
**Sierra LLC**

<u>**Sierra LLC**</u>

| FirmEx Folder |
| --- |

11. Commercial & Industrial Opportunities
12. Revenue Breakdown
13. Top 30 Customers
14. Service Line
1. Employee Census
2. Organizational Chart
3. Equipment list
4. Workers Compensation
4. Workers Compensation
4. Workers Compensation
5. Litigation
5. Litigation
6. Equipment Manufactures & Suppliers
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
7. Company Leases
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2017 SLLC Monthly FS
2018 SLLC Monthly FS
2018 SLLC Monthly FS
2018 SLLC Monthly FS
2018 SLLC Monthly FS
2018 SLLC Monthly FS
2018 SLLC Monthly FS