# Exhibit J - Trevor Alsup Deposition

Page 182

REPORTER'S CERTIFICATE

1

2

3        I, Ellen A. Goldstein, a duly certified court
reporter in and for the County of Clark, State of Nevada,
4    do hereby certify:

5        That I reported the taking of the deposition of
TREVER ALSUP at the time and place aforesaid;

6

7        That prior to being examined, the witness was
by me duly sworn to testify to the truth, the whole truth
and nothing but the truth;

8

9        That I thereafter transcribed my shorthand
notes into typewriting and that the typed transcript of
said deposition is a complete, true and accurate
10   transcription of my shorthand notes taken down at the
proceedings.

11

12       I further certify that I am not a relative or
employee of an attorney or counsel of any of the parties,
nor a relative or employee of any attorney or counsel
13   involved in said action, nor a person financially
interested in the action.

14

15       IN WITNESS THEREOF, I have hereunto set my hand
in the County of Clark, State of Nevada, this 22 day
April 2019.

16

17       _____

     Ellen A. Goldstein, CCR No. 829

18

19

20

21

22

23

24

25

# Condensed Transcript

# **Trever Alsup**
## Volume I

**Date:** April 10, 2019

Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.
Case No. 2:18-cv-00860-GMN-VCF

Oasis Reporting Services, LLC
Phone:  702-476-4500
Fax:  888-529-5512
E-mail:  info@oasisreporting.com
Internet:  www.oasisreporting.com

## Page 1

```
 1               UNITED STATES DISTRICT COURT
 2                    DISTRICT OF NEVADA
 3
 4   TRINITA FARMER, individually,    )
                                      )
 5                      Plaintiff,    )
                                      )
 6        vs.                         )
                                      )   Case No.
 7                                    )   2:18-cv-00860-GMN-VCF
                                      )
 8   LAS VEGAS METROPOLITAN POLICE    )
     DEPARTMENT, a political          )
 9   subdivision of the State of      )
     Nevada; KENNETH LOPERA,          )
10   individually; TRAVIS CRUMRINE,   )
     individually; MICHAEL TRAN,      )
11   individually; MICHAEL FLORES,    )
     individually,                    )
12                                    )
                        Defendants.   )
13   _____)
14
15
16        VIDEOGRAPHED DEPOSITION OF TREVER ALSUP
17                       Volume I
18         Taken on Wednesday, April 10, 2019
              by a Certified Court Reporter
19                  At 10:07 a.m.
        Held at the offices of Oasis Reporting Services
20            400 South Seventh Street
                   Fourth floor
21                Las Vegas, Nevada
22
23
24
25   Reported by:  Ellen A. Goldstein, CCR 829
```

## Page 2

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:
 4       ANDRE LAGOMARSINO, ESQ.
         LAGOMARSINO LAW
 5       3005 West Horizon Ridge Parkway
         Suite 241
 6       Henderson, Nevada 89052
         Phone:  (702)383-2864
 7       Fax:  (702)383-0065
         aml@lagomarsinolaw.com
 8
 9   For the Defendant KENNETH LOPERA:
10       DANIEL R. MC NUTT, ESQ.
         MC NUTT LAW FIRM
11       625 South Eighth Street
         Las Vegas, Nevada 89101
12       Phone:  (702)384-1170
         Fax:  (702)384-5529
13       drm@mcnuttlawfirm.com
14
     For the Defendants LAS VEGAS METROPOLITAN POLICE
15   DEPARTMENT, TRAVIS CRUMRINE, MICHAEL TRAN,
     and MICHAEL FLORES:
16
         CRAIG R. ANDERSON, ESQ.
17       MARQUIS AURBACH COFFING
         10001 Park Run Drive
18       Las Vegas, Nevada 89145
         Phone:  (702)382-0711
19       Fax:  (702)382-5816
         canderson@maclaw.com
20
21   Also present:
22       Christopher Baugh, videographer
23
24
25
```

## Page 3

```
 1                    I N D E X
 2
 3   WITNESS                      PAGE
 4   TREVER ALSUP
 5      Examination by MR. MC NUTT        5
 6
 7
 8
 9             E X H I B I T S
10
11   NUMBER    DESCRIPTION        INTRODUCED
12    1    5-14-17 Arrest Report (PLTS       14
          INITIAL DISCLOSURES 000005 to
13        PLTS INITIAL DISCLOSURES
          000012)
14
     2    5-14-17 Autopsy Report        29
15        (LVMPD 1410 to LVMPD 1419)
16    3   NMS Labs Toxicology Report    49
          (LVMPD 2093 to LVMPD 2099)
17
     4    NMS Labs Supplemental Report  176
18        (PLT'S DOC PRODUCTION 000438
          to PLT's DOC PRODUCTION 000445)
19
20
21
22
23
24
25
```

## Page 4

```
 1        WEDNESDAY, APRIL 10, 2019 - LAS VEGAS, NEVADA
 2             10:07 A.M.
 3
 4        THE VIDEOGRAPHER:  Good morning.  Today is
 5   April 10th, 2019.  The time is approximately 10:07 a.m.
 6   This begins the video deposition of Trever Alsup.  We are
 7   located at Oasis Reporting Services, 400 South Seventh
 8   Street, Suite 400, Las Vegas, Nevada 89101.  My name is
 9   Christopher Baugh, court videographer with Las Vegas
10   Legal Video.  This is United States District Court,
11   District of Nevada, case No. 2:18-cv-00860-GMN-VCF in the
12   matter of "Trinita Farmer versus Las Vegas Metropolitan
13   Police Department, et al."  This video deposition is
14   requested by attorneys for the defendant.
15        Will counsel please state your appearances for
16   the record.
17        MR. ANDERSON:  Craig Anderson on behalf of the
18   Las Vegas Metropolitan Police Department, Officers
19   Crumrine, Tran and Flores.
20        MR. LAGOMARSINO:  Andre Lagomarsino for the
21   plaintiff.
22        MR. MC NUTT:  Dan McNutt on behalf of Officer
23   Lopera.
24        THE VIDEOGRAPHER:  The deponent may now be sworn in
25   by Ellen Goldstein with Oasis Court Reporters.
```

Electronically signed by Ellen Goldstein (001-341-678-7457)        e81df1ea-a423-447b-bc71-283869a46bcf

Page 5

1          TREVER ALSUP,
2  called as a witness by and on behalf of the Defendants,
3  was first duly sworn by the Certified Court Reporter
4  and testified as follows:
5
6          EXAMINATION
7  BY MR. MC NUTT:
8      Q   Good morning, Detective Alsup.  My name is Dan
9  McNutt.  I represent Officer Lopera.  Do you understand
10 that?
11     A   Yes, sir.
12     Q   Are you still a detective?
13     A   Yes, I am.
14     Q   If you recall, I participated in a deposition
15 with you regarding the same facts and circumstances about
16 June of 2018.  Do you remember that?
17     A   Yes, sir.
18     Q   That's why I didn't know if maybe you got a
19 promotion or something between then and now.
20     A   No.
21     Q   Okay.  So I'll try to refer to you as
22 Detective.  I might say Officer.  I don't think that's a
23 slight, is it?
24     A   No, sir.
25     Q   I know you've had a chance to prepare for today

Page 6

1  with your lawyer.  Is that correct?
2      A   Yes, sir.
3      Q   I heard you mention earlier that you'd been out
4  on a call earlier this evening.  If at any time -- or
5  last night I guess.  If at any time you need to take a
6  break, as long as there's no pending question, just let
7  me know.  I'll be happy to accommodate you if you want to
8  go get more water, coffee, what-have-you.
9      A   Thank you.
10     Q   Is there any reason we can't go forward today
11 with your deposition?
12     A   No, sir.
13     Q   You're doing a great job.  I know you've been
14 deposed a couple times before.  Let me finish my
15 question.  Even if I have an audible pause, I may have
16 something to conclude the question.  Just make sure I'm
17 done so we don't get dirty looks from the court reporter
18 at the end of the day, and I'll try to afford you the
19 same courtesy.
20     A   Yes, sir.
21     Q   And it's not so much a courtesy for us as it is
22 for the court reporter.
23         What I'm going to do, since you have been
24 deposed on this case before -- not this case but the same
25 facts and circumstances involving the Tashii

Page 7

1  Farmer incident -- I'm going to go through, and my
2  attempt is to shorten the time that you have to be here
3  today by reviewing your prior deposition testimony, much
4  of which I don't think is at dispute.  So I'll go through
5  those things.  If at any point you have -- you want to
6  change your answer with something that you said prior, we
7  can always look at your deposition transcript if you want
8  to refresh your recollection about that.  But otherwise
9  I'll assume you understood my question and you understood
10 the foundation for it and we'll get through that into
11 some of the more specific questions that I have for you
12 today about this case.  Do you understand that?
13     A   Yes, sir.
14     Q   My understanding, very briefly, is you started
15 with Las Vegas Metro in and about 1998?
16     A   That's correct.
17     Q   And you had some time in the United States Navy
18 as a corpsman prior to that?
19     A   That's correct.
20     Q   You had previously testified that you keep up
21 with your periodic continuing-education requirements or
22 courses on detective work in investigations for Metro?
23     A   Yes, sir.
24     Q   I think you testified that you've done about 40
25 to 60 courses specifically focused on investigations and

Page 8

1  detective work; correct?
2      A   Yes, sir.
3      Q   Is that still accurate?  Have you done more
4  since then?
5      A   There's been more since then.
6      Q   Okay.  So the current date, how would you
7  estimate the amount of time you spent on investigative
8  work or detective-type courses?
9      A   Another 80 to 140 hours.
10     Q   Okay.  Since the last time you were deposed in
11 June of 2018, another 80 to 140 hours?
12     A   I'm sorry, I didn't realize the time frame was
13 so short.
14         Probably a little less than that then.
15 Somewhere between 40 and 70.  It's --
16     Q   Do those courses or do those hours of
17 instruction -- do they include issues concerning how to
18 identify various voices that you may hear on recordings?
19     A   No, sir.
20     Q   How about discussions about eye-witness
21 testimony and credibility for eye witnesses?
22     A   Yes, sir.
23     Q   How much time do you think you spent on
24 credibility for eye-witness testimony?
25     A   To put a number on it, I really couldn't tell

Electronically signed by Ellen Goldstein (001-341-678-7457)          e81df1ea-a423-447b-bc71-283869a46bcf

Page 9

1  you.
2      Q   Let's do this:  Is it a significant portion of
3  the ongoing training within your field?
4      A   I wouldn't say significant.  It is discussed,
5  but I wouldn't say significant.
6      Q   And can you give me kind of the brief synopsis
7  of how you view eye-witness testimony in terms of what
8  makes it credible versus what, you know, would incline
9  you to believe it wasn't credible?
10     A   Typically on a case, if we have multiple eye
11  witnesses, just gather all of the testimony from the eye
12  witnesses and kind of see where the consistencies are and
13  where the inconsistencies are.
14     Q   And would the implication there be that if
15  there are more consistencies amongst -- let's say there's
16  five witnesses, and this is just a hypothetical.  Please
17  change it if you feel necessary.  It's just a general
18  question.  But if there are five witnesses and three
19  agree on a set of facts, you would find those more
20  credible than the other two who may have disparate views?
21     A   That's correct.
22     Q   What about the training and experience of the
23  eye witnesses, does that factor into your determination
24  of who is more credible or not credible?
25     A   It can.

Page 10

1      Q   Let's just make an obvious example.  If an eye
2  witness was somebody -- was Marc Colon, your partner,
3  versus myself involved, you know, viewing an incident and
4  we were both spectators, given your partner having
5  similar background and education and experience --
6  correct?
7      A   Yes.
8      Q   -- would you value his testimony more, not
9  because you know him but because of his background and
10  experience, than Dan McNutt the lawyer?
11     A   Probably.
12     Q   Let's briefly talk about your career.  As I
13  understood you testified about prior, you spent the first
14  four or five years of your career after the academy in
15  patrol and field-training units?
16     A   That's correct.
17     Q   Then I think you went to violent crime for
18  another four or five years?
19     A   Correct.
20     Q   Then you became a motor officer for two years?
21     A   Correct.
22     Q   And realized those things were going to kill
23  you and -- just like your mother said; right?
24     A   That's correct.
25     Q   And then you went back to violent crime, and I

Page 11

1  wasn't clear on how long you went back to violent crime
2  for.
3      A   It was somewhere between three and four years.
4      Q   Okay.  And then you went to the IOCP Bureau,
5  which -- give me the definition of that.  Constitutional
6  policing?
7      A   Internal Oversight of Constitutional Policing.
8      Q   And that includes your current unit, which is
9  the CIRT unit; correct -- I'm sorry, the FIT unit?
10     A   That's correct.
11     Q   But the IOCP includes both the CIRT and the FIT
12  unit?
13     A   That's correct.
14     Q   And would you briefly, just for our record
15  here, explain the difference between the CIRT unit and
16  the FIT unit.
17     A   The CIRT team, typically their investigation is
18  more of an administration function.  They focus on
19  tactics, training, policy, things like that, whereas for
20  the Force Investigation Team it's just the criminal
21  investigation into the use of force.
22     Q   And so with the FIT, an officer can choose to
23  give a statement or not; correct?
24     A   That's correct.
25     Q   But with CIRT they're compelled by your

Page 12

1  organization's rules to give a statement; correct?
2      A   That's correct.
3      Q   But the CIRT statement cannot be used in any
4  criminal prosecution?
5      A   Correct.
6      Q   But you as a FIT team member, are you allowed
7  to review the CIRT statement?
8      A   No, sir.
9      Q   So you've never reviewed the CIRT statement of
10  Officer Lopera?
11     A   No.
12     Q   Have you reviewed the CIRT statements of any of
13  the officers related to this incident?
14     A   No, sir.
15     Q   So as a matter of course, you've never
16  reviewed -- in your capacity as a FIT officer, you just
17  simply do not see the CIRT statements?
18     A   That's correct.
19     Q   You previously testified that you were the
20  primary investigator on this matter?
21     A   That's correct.
22     Q   But that doesn't mean you conducted every
23  aspect of the investigation; correct?
24     A   That's correct.
25     Q   So please give me an outline of who was on your

Page 13

1   team -- for example, Marc Colon, your partner -- and what
2   their respective duties were in the investigation.
3       A   So in this case Marc Colon was partner with me,
4   and our primary responsibility was the documentation of
5   the scene.  The other members of our team -- and I don't
6   remember exactly who was there that night, but they would
7   have been responsible for interviewing witnesses and
8   performing just other tasks that needed to be done.
9       Q   And as the lead investigator, do they all
10  report back to you or how does that process work?  If one
11  of your -- one of the people on the team went and did a
12  specific interview, would they report that back to you in
13  person or would it be in writing or how does that
14  information get back to you as the lead?
15      MR. LAGOMARSINO:  Objection; form, compound.
16  BY MR. MC NUTT:
17      Q   Do you understand the question?
18      A   I do.
19      Q   Okay.
20      A   Typically what would happen is if there was
21  something they felt was significant, they would come and
22  tell me right away, or what we do is, at the end of the
23  call, typically the next day after we've gone home and
24  slept for a couple hours, depending on the time frame, we
25  go into the office, listen to their interview again and

Page 14

1   summarize it, and then send that to me as part of the
2   case file.
3       Q   Okay.  And that all would be part of the case
4   file that you review in preparation -- what report is it
5   that you are looking to prepare out of all that
6   information?
7       A   Typically we complete what we call just our FIT
8   report, and it's just a document with all the details of
9   the investigation that is forwarded to the DA's office.
10      Q   And is that FIT report -- does it also go
11  internally for use in the taxable review board?
12      A   No, it's not.
13      Q   That's more the CIRT side?
14      A   Correct.
15      Q   I'm going to hand you what we're going to mark
16  as Exhibit 1.
17      (Defendants' Exhibit 1 was marked for
18  identification by the Certified Court Reporter.)
19  BY MR. MC NUTT:
20      Q   Detective Alsup, please take a minute and just
21  review the report.  I don't actually have any questions
22  for you.  Just take a look at it, make sure it's
23  complete, and I'll ask you a couple short questions.
24      A   (Witness complies.)
25      Q   Have you seen this document before?

Page 15

1       A   Yes, sir.
2       Q   What is it?
3       A   It's an Arrest Report that I typed.
4       Q   And your prior testimony was that you were the
5   sole author of this report; correct?
6       A   With information from other people, yes.
7       Q   Correct.  That was a fair clarification.  But
8   you physically typed the report?
9       A   Yes, sir.
10      Q   You're the author?
11      A   Yes, sir.
12      Q   So it's not like page 2 or 3 was written by
13  Marc Colon and you wrote the rest?
14      A   No, sir.
15      Q   When we go through the report in detail later,
16  I'll have questions for you about whether this was
17  something that you personally conducted the interview
18  for -- excuse me, the investigation for -- or whether it
19  came from one of your team members.
20      Has there ever been any subsequent Arrest
21  Report or is this the original and the only one in
22  existence?
23      A   This is the original and only one.
24      Q   Do Arrest Reports ever get amended or altered?
25      A   I suppose that they can.  I've never done that.

Page 16

1       Q   So you said that typically in the course of
2   your duties as a FIT officer, the information from the
3   investigation culminates in a FIT report.  Is that what
4   you said a little bit ago?
5       A   Yes, sir.
6       Q   But in this instance it culminated into an
7   Arrest Report; correct?
8       A   Correct.
9       Q   So there is no separate FIT report?
10      A   Correct.
11      Q   At what point did you determine -- well, let me
12  back up.
13      Was it your determination to decide whether to
14  do it into a FIT report or an Arrest Report?
15      A   It was a determination made by a number of
16  people, including representatives from the district
17  attorney's office.
18      Q   Okay.  And who are those people?
19      A   If I remember correctly, there was a meeting
20  that involved Robert Daskas and Mark Digiacomo.
21      Q   And they're from the DA's office?
22      A   Yes, sir.  And I couldn't tell you who else was
23  in that meeting.  I don't remember.
24      Q   So they were from the DA's office.  Do you
25  remember anybody else from your department?

Page 17

1   A   It would have been my sergeant, lieutenant,
2   probably my captain.
3   Q   Who was your sergeant?
4   A   The sergeant at the time was Jerry McDonald.
5   The lieutenant at the time was -- I believe it was -- it
6   would either have been Dennis O'Brien or Will Huddler.
7   I'm pretty sure it was Dennis O'Brien.
8   Q   Who was the captain?
9   A   We've had a lot of turnover.  I apologize.
10  Q   That's okay.  Was it Kelly?
11  A   I believe it was Kelly McMahill.
12  Q   Kelly McMahill.
13      And the Sergeant, Sergeant McDonald, is he
14  primarily assigned as a FIT sergeant?
15  A   He's retired.
16  Q   But I mean in his capacity when he was on
17  active duty.
18  A   He was the sergeant.  He was the supervisor of
19  our team.
20  Q   For FIT?
21  A   Yes, sir.
22  Q   So there was only one sergeant in FIT?
23  A   Yes, sir.
24  Q   And the same for the lieutenant?
25  A   Yes, sir.

Page 18

1   Q   Now, when you get to the captain level, did he
2   have other duties other than FIT?
3   A   The captain would have been for the whole
4   bureau; so it would have been FIT, CIRT and OIO, Office
5   of Internal --
6       MR. ANDERSON:  Oversight.
7       THE WITNESS:  Oversight.
8       MR. MC NUTT:  Nice assist.
9       THE WITNESS:  Thank you.
10      MR. MC NUTT:  As long as I agree with your answers,
11  you're more than welcome to assist.
12  Q   How long have you -- so you've been with IOCP
13  since what year?
14  A   Approximately 2013.
15  Q   So you've been there almost six years, five or
16  six years?
17  A   Correct.
18  Q   How many investigations have you conducted or
19  been a part of in that five or six years?
20  A   Have I been primary or just involved with?
21  Q   Give me the primary number.
22  A   Off the top of my head, I'd say probably 40.
23  Q   Are you always the primary?
24  A   No.  It's a rotation.
25  Q   Okay.  So amongst your team members, is it

Page 19

1   just, you know, kind of whoever is up next?
2   A   Correct.
3   Q   So you mentioned a call that you had last
4   night.  Were you the primary on it?
5   A   I was.
6   Q   So the next officer-involved shooting that your
7   team investigates, is it a foregone conclusion that you
8   will not be the primary on that one?
9   A   That's correct.
10  Q   How many investigations do you have --
11  obviously it varies, but how many investigations are you
12  the primary on right now?
13  A   That I'm currently working on?
14  Q   Currently.
15  A   Two.
16  Q   Is that about average?
17  A   Yes.
18  Q   Given your time with it.
19  A   As far as us getting assigned cases and closing
20  them out, I would say the average is probably two to
21  three.  It kind of depends on how many -- I mean we could
22  have a week period where we go through our rotation one
23  and a half times.  It all just depends.
24  Q   Okay, fair enough.
25      You testified previously that the LVNR -- which

Page 20

1   you understand to be the lateral vascular neck restraint;
2   correct?
3   A   Yes, sir.
4   Q   And a rear naked choke, you testified the last
5   time they are physiologically the same type of neck
6   restraint.
7   A   Correct.
8   Q   Do you remember that?
9   A   Yes, sir.
10  Q   Do you agree with that today?
11  A   Yes, sir.
12  Q   And when you said previously that they're
13  physiologically the same type of neck restraint, what did
14  you mean by that?
15  A   That it does not affect the airway.  It's more
16  of a compression of the arteries to restrict blood flow.
17  Q   So in layman's terms, they're both a blood
18  choke, not an air choke?
19  A   Correct.
20  Q   Other than your department training, do you
21  have any martial arts training or any other training
22  involving in neck restraints?
23  A   I do not.
24  Q   You previously testified that you never came to
25  a conclusion -- and now when I say "you" I mean the FIT

Page 21

1  team -- never came to a conclusion as to whether or not
2  it was an LVNR that was applied to Tashii Farmer versus a
3  rear naked choke; correct?
4      A  I believe my testimony was that I did not
5  believe it was our application of the LVNR based on hand
6  placement.
7      Q  Okay.  So let me clean up that question.
8         Is it fair to say that you never determined
9  that it was merely an incomplete or an inappropriately --
10  "inappropriately" wouldn't apply, but that the technique
11  that you're taught to apply the LVNR was not executed
12  with 100 percent perfection?
13      MR. LAGOMARSINO:  Objection to the form of the
14  question.
15  BY MR. MC NUTT:
16      Q  Is that a fair --
17      A  I would agree with that.
18      Q  I think your testimony the last time was that
19  that was primarily predicated upon the fact that the LVNR
20  requires the two hands to come together to form a lock;
21  is that right?
22      A  That's correct.
23      Q  And you were unable to see that that had
24  occurred with Officer Lopera and Tashii Farmer?
25      A  Correct.

Page 22

1      Q  As a hypothetical, if it was determined that
2  Officer Lopera had in fact employed a lateral vascular
3  neck restraint, would that change the nature of your
4  Arrest Report?
5      MR. LAGOMARSINO:  Form.
6      THE WITNESS:  Can you be a little more specific.
7  Would it have changed the fact that we completed the
8  Arrest Report and filed these charges?
9  BY MR. MC NUTT:
10      Q  Yes.
11      A  No, sir.
12      Q  Why not?
13      A  Because in our opinion the use of force was
14  excessive and -- well, it was excessive.
15      Q  Which use of force?  Which aspect of the use of
16  force?
17      A  The striking, the whatever we want to call the
18  hold, LVNR, rear naked choke.
19      Q  Let's just call it a neck restraint.
20      A  Okay.  Basically the striking, the neck
21  restraint.
22      Q  Okay.  Now --
23      A  And, if I can continue --
24      Q  Absolutely.
25      A  -- based on the limited walk-through that we

Page 23

1  were given by Officer Lopera and what he told us during
2  that limited walk-through, it was kind of our conclusion
3  that probably the first one or two applications of the
4  taser were appropriate.  After that it became excessive.
5      Q  And according to -- I think you actually have
6  it in your Arrest Report, but there's some other
7  documentation.  The walk-through that occurred that very
8  night was stopped by a lawyer on behalf of the union.  Is
9  that --
10      A  That's correct.
11      Q  And so is like a lawyer that shows up
12  whenever there's an officer-involved event?
13      A  Yes, sir.
14      Q  Does one show up every single time?
15      A  Not every single time.
16      Q  Do you recall that walk-through being stopped?
17      A  Yes, sir.
18      Q  You were personally there?
19      A  Yes, sir.
20      Q  And tell me what happened.
21      A  Basically we were told that the walk-through
22  would start from the time that Officer Lopera left the
23  hotel, and it was going to end at the point where he used
24  the taser.
25      Q  And what happened then?

Page 24

1      A  That was just the end of the walk-through.
2      Q  Well, you were told that it was going to start
3  when he exited the hotel.  Where did it get stopped?
4      A  That walk-through did start and they started
5  the walk-through from the point where he exited the hotel
6  to the point where the taser was employed, and at that
7  point all questions were stopped and the parties walked
8  away.
9      Q  All questions were stopped by the lawyer?
10      A  Correct.
11      Q  Do you remember the name of the lawyer?
12      A  I know I testified to it before.
13      Q  That's okay.  We can find it in your record.
14      A  I believe it was John Aldrich, but I could be
15  wrong.
16      Q  Okay.  Had you met John Aldrich before?
17      A  I've been on scenes with him before, yes.
18      Q  How did he stop?  I mean do you remember
19  anything that he specifically said?
20      A  I just remember specifically that when we were
21  talking about the walk-through before it started, he told
22  us where it was going to start and where it was going to
23  stop; and once we got to that point, he was not going to
24  answer any more questions or participate anymore.
25      Q  So you did go through -- so you did go through

Page 25

1  the walk-through that John Aldrich said you were going to
2  go through; is that correct?
3      A  Yes, sir.
4      Q  So it wasn't like he stopped it midstream?
5  That's my question.
6      A  No.
7      Q  He said, "We're going to do it from this point
8  to this point." You guys did in fact do the walk-through
9  from that point to that point, and then the walk-through
10  was concluded per his instructions?
11     A  Correct.
12     Q  Okay. There was some confusion because it was
13  my belief, and some others' belief, that the way your
14  prior testimony read, that you're doing a walk-through
15  and then the lawyer stopped it halfway through or
16  something; but that's not in fact what happened?
17     MR. LAGOMARSINO:  Objection as to form.
18     THE WITNESS:  No. The way that I recall it was that
19  we had a set parameter of what the walk-through was going
20  to include.
21  BY MR. MC NUTT:
22     Q  Why did the walk-through -- do you know why the
23  walk-through did not start where Officer Lopera and
24  Officer Lif first encountered Tashii Farmer?
25     A  I have no idea the answer to that question.

Page 26

1      Q  Would that have been important to you as a FIT
2  investigator?
3      A  Absolutely.
4      Q  Did you ask to have the walk-through start from
5  that point?
6      A  Yes, sir.
7      Q  And who did you ask?
8      A  That was asked to the association, the LVPPA.
9  John Aldrich was the attorney for that association for
10  the officer. So we always ask for a full walk-through,
11  and we were told by him the parameters of the
12  walk-through.
13     Q  So if you had your druthers, you would have
14  started up outside the Coffee Bean?
15     A  Absolutely.
16     Q  Okay. During the walk-through, did -- strike
17  that.
18         Did you speak to the coroner, Dr. Alane
19  Olson --
20     A  Yes, sir.
21     Q  -- about this matter?
22     A  Yes, sir.
23     Q  Tell me about your conversation with her.
24     A  We attended the autopsy, and as she conducted
25  the autopsy, it was her remark that -- and I believe the

Page 27

1  quote was, "Somebody choked the shit out of him." She
2  told us that there were bruising and other signs within
3  the esophagus that Tashii Farmer had in fact been choked.
4      Q  And the bruising was internal bruising, not
5  external bruising that you could see on a photo of his
6  skin; correct?
7      A  Correct. I think it was -- I think what she
8  said was bruising and bleeding, but -- I think that's
9  what she said.
10     Q  Okay. Maybe she used the word "hemorrhaging"?
11     A  I don't remember her specifically saying
12  "hemorrhaging."
13     Q  Okay.
14     A  I think it was bruising or bleeding.
15     Q  Okay. And she identified the cause of death.
16  "It is my opinion this 40-year-old black male," comma,
17  "Tashii S. Farmer," comma, "died as a result of asphyxia
18  due to police restraint procedures," period. "Other
19  significant conditions include methamphetamine
20  intoxication," comma, "cardiomegaly," or meg-al-y.
21     A  Yes, sir.
22     Q  I don't know how you pronounce that one,
23  c-a-r-d-i-o-m-e-g-a-l-y, period.
24         Did you discuss with the coroner the issues
25  related to Tashii Farmer being high on methamphetamine?

Page 28

1      A  At the time that we had her in the autopsy, we
2  did not have toxicology back.
3      Q  Have you at any point talked -- did you only
4  talk to the coroner at that one point?
5      A  Yes, sir.
6      Q  You never did a followup with her or asked
7  about the toxicology?
8      A  No. What happened was, once that report was
9  done, it was forwarded to us.
10     Q  Did you, when you -- do you remember reading
11  the part about the meth intoxication?
12     A  Yes, sir.
13     Q  Did you then have any followup with the coroner
14  or anybody on your team?
15     A  No, sir.
16     Q  Why not?
17     A  Because once we have the coroner's report,
18  that's their final report and that's what we use for our
19  case.
20     Q  And do you know what -- do you know how to
21  pronounce "cardiomegaly"?
22     A  I think you're doing a fine job.
23     Q  Because if you do, please enlighten me.
24         Do you know what that medical term means?
25     A  It's an enlarged heart.

Page 29

1    Q   Did you know that when you first read that or
2  did you have to look it up?
3    A   She told us during the autopsy that he had an
4  enlarged heart.
5    Q   Okay.  So during the autopsy you did know that
6  he had an enlarged heart?
7    A   Yes, sir.
8    Q   Did she opine to you about how that factored
9  into his death?
10    A   No, sir.
11    Q   Did you ask about whether that factored into
12  his death?
13    A   She told us, I believe — let me clarify that.
14        I believe she said that he had an enlarged
15  heart.  We asked her how she was going to rule as far as
16  the death, and she told us that once she had toxicology
17  back she would finalize that, but at that point in time,
18  it was going to be asphyxiation due to police restraint
19  procedures.
20    MR. MC NUTT:  Okay.  So let's go ahead and mark this
21  as Exhibit 2.
22        (Defendants' Exhibit 2 was marked for
23  identification by the Certified Court Reporter.)
24  BY MR. MC NUTT:
25    Q   Detective Alsup, take a minute and just review

Page 30

1  the document, and my question is going to be whether
2  you've seen it before.
3    A   Yes, sir.
4    Q   Is this the coroner report that you mentioned
5  for this matter?
6    A   Yes, sir.
7    Q   And you can see where I read on the front page
8  under the Opinion, cause of death; correct?
9    A   Yes, sir.
10    Q   And if you go above that it says, "Final
11  Pathologic Findings," and the Roman numeral II says
12  "methamphetamine intoxication (see separate Toxicology
13  Report)."
14    A   Yes, sir.
15    Q   Did you ever review that separate Toxicology
16  Report?
17    A   Yes, sir.
18    Q   And do you recall what the findings of the
19  separate tox report were?
20    A   Just by reading it on here.  I wouldn't — I
21  didn't remember off the top of my head.
22    Q   Okay.  So as an investigator for this matter,
23  how do you determine -- can you determine whether there
24  was a primary cause of death versus how these other
25  significant conditions, in her words, played into that

Page 31

1  cause of death?
2    MR. LAGOMARSINO:  Objection; form, foundation.
3    THE WITNESS:  We go on what the coroner tells us as
4  far as cause and manner of death, and that's what we go
5  with.  So although there are contributing factors, if she
6  tells us that the cause and manner of death is a homicide
7  and it's asphyxiation due to police restraint procedures,
8  then that's our cause and manner of death.
9  BY MR. MC NUTT:
10    Q   Okay.  Does that ever vary at all, meaning have
11  you ever seen a report where there were a combination of
12  factors that contributed to someone's death?
13    A   This one there's a combination of factors, but
14  it's how she rules the cause and manner, if that
15  clarifies it.
16    Q   And there's no -- so there's only ever one --
17  what I'm asking is, is there ever -- is there always ever
18  one cause of death and not, well, there were a variety of
19  things that were going on here?  Let's say an officer
20  shot an individual and he simultaneously got run over by
21  a truck.  How do you determine the cause of death?
22    MR. LAGOMARSINO:  Form, foundation.
23    THE WITNESS:  I have no idea.
24  BY MR. MC NUTT:
25    Q   Could be both; right?

Page 32

1    MR. LAGOMARSINO:  Form and foundation.
2    THE WITNESS:  That would be for the coroner to
3  decide.
4  BY MR. MC NUTT:
5    Q   Could be a combination thereof; correct?
6        So you don't have an opinion as to whether or
7  not Tashii Farmer being high on meth was a 40 percent
8  contributing factor or a 25 percent contributing factor?
9    A   No, sir.
10    MR. LAGOMARSINO:  Form, foundation, incomplete
11  hypothetical.
12  BY MR. MC NUTT:
13    Q   So at trial you're not going to offer any
14  opinion regarding cause of death other than what's in the
15  coroner's report; correct?
16    A   That's correct.
17    Q   At trial would you offer any opinion, other
18  than what you've expressed here today, regarding the type
19  of police restraint that Ken Lopera employed -- excuse
20  me -- well, actually, yes, the type of police restraint
21  that Ken Lopera employed?
22    A   No, sir.
23    Q   We talked a little bit about this at your prior
24  deposition, but I want to go over it here 'cause I think
25  it's important.

Page 33

1     Officers, law-enforcement officers, are tasked
2 with a difficult job; correct?
3     **A   Yes, sir.**
4     Q   I have seen nothing in Metro's policies,
5 tactics, procedures, any document that requires an
6 officer to execute recommended strategies or tactics with
7 perfection.  Did I miss something?
8     **A   No, sir.**
9     Q   So understanding you're not a defensive tactics
10 instructor; correct?
11     **A   Correct.**
12     Q   If an officer attempts to employ a lateral
13 vascular neck restraint but does not do it perfectly as
14 he was instructed and maybe even did so in training, how
15 do you determine whether that was -- he simply couldn't
16 do it because of his body position or because maybe he
17 wasn't good at employing the technique?
18     **A   I guess the only way that I can answer that is,**
19 **without -- absent testimony or a statement from the**
20 **officer, we have no idea what he was trying to do.**
21     Q   So you do have a FIT -- I'm sorry.  Strike
22 that.
23        How did you come to the conclusion in your
24 Arrest Report -- or maybe it's not a conclusion.  We'll
25 get to it later.

Page 34

1     The statements by Officer Lopera on the
2 body-worn cam that he, quote, "choked him out," do you
3 remember that?
4     **A   Yes, sir.**
5     Q   Did you imply that to mean that it was not a
6 lateral vascular neck restraint?
7     **A   Based upon that and also the statement of --**
8 **and I don't remember exactly what the quote was but, "I**
9 **rear-naked him" or something to that effect, along with**
10 **the hand placement, that was our determining factors that**
11 **it was not what the department teaches as the LVNR.**
12     Q   Do you know what the proper hand placement is
13 for a, quote, "rear naked choke"?
14     **A   No, sir.**
15     Q   So you couldn't testify as to whether or not
16 Ken Lopera's hand placement was in accordance with some
17 martial arts technique other than the LVNR?
18     MR. LAGOMARSINO:  Form.
19     THE WITNESS:  Repeat that one more time.
20 BY MR. MC NUTT:
21     Q   Fair.  If you don't understand it, by all means
22 I'll correct it.
23        You couldn't testify that -- assume that a rear
24 naked choke is a specific technique taught by some
25 martial arts discipline.  You could not testify, well

Page 35

1 his hand placement is consistent with that martial arts
2 discipline?
3     **A   Correct.**
4     Q   You simply don't know.  You simply know that
5 his hand placement was not in accordance with the LVNR?
6     **A   Correct.**
7     Q   Is it possible in your experience that an
8 officer could be placed in a situation, physically placed
9 in a body situation, where he could not get a perfect
10 employment of the LVNR?
11     **A   The LVNR is -- I guess the way that I would**
12 **answer is the LVNR is taught in a variety of different**
13 **ways where typically your elbows are -- your hands are**
14 **clasped and your elbows are out, but it is taught where**
15 **you can move an elbow in and still have the hand clasped**
16 **the correct way.  It's just the elbow is tucked into the**
17 **back to afford leniency as far as positioning of the**
18 **bodies.**
19     Q   So there is some leniency in terms of how to
20 employ the LVNR; correct?
21     **A   Yes.**
22     Q   Based upon body positioning and relative size
23 differential between the officer and the suspect?
24     **A   Correct.**
25     Q   Are you familiar with the part of LVNR policy

Page 36

1 that says what the reason for clasping the hands together
2 is?
3     **A   Not off the top of my head.**
4     Q   It's to exert maximum pressure around the blood
5 choke.  Does that refresh any recollection for you?
6     MR. LAGOMARSINO:  Objection; form.
7     THE WITNESS:  It does.
8 BY MR. MC NUTT:
9     Q   Okay.  So if an officer was employing the --
10 attempting to employ the lateral vascular neck restraint
11 and he was unable to clasp his hands together, would that
12 indicate to you that he would be exerting less pressure
13 on the throat of the suspect?
14     **A   Based on the definition of what you said, I**
15 **would agree with that.**
16     Q   Okay.  I believe there's been a lot of
17 testimony that you're taught -- people have said
18 different numbers.  Do you know what the timing is for
19 when a suspect could be rendered unconscious if an LVNR
20 is used appropriately?
21     **A   I couldn't quote exactly what it says as far as**
22 **defensive tactics manual, but I know it's seconds.**
23     Q   I've heard anything from 4 to 7 to 5 to 15
24 depending on the witness.  Is that in the ballpark?
25     **A   Yes, sir.**

Page 37

1    Q    And I asked Sergeant Bland -- do you know who
2  he is?
3    A    Yes, sir.
4    Q    -- to perform the lateral vascular neck
5  restraint on his lawyer, but he politely declined.
6         The question I have for you is, why the range?
7  Whatever the range is, why is there a range for when it's
8  affected?
9    A    I could not answer that question.
10   Q    Is it your understanding that there's a range
11  because of different suspects, physiological differences,
12  strength differential between the officer and the
13  suspect, it could simply take longer to take effect on
14  one individual versus the other?
15   A    Sounds reasonable to me.
16   Q    Is it your opinion -- do you have an opinion as
17  to whether or not when the suspect resists, that it could
18  take longer to affect the lateral vascular neck restraint
19  or any neck restraint?
20   A    I would say that sounds reasonable.
21   Q    Do you understand that from a medical
22  perspective, that if the hold, the encircling arm, loses
23  contact or the pressure is released, that it takes just a
24  very small amount of time for the blood to rush to the
25  head and that you're going to essentially have to start

Page 38

1  the hold all over again?  Is that part of your training?
2    A    I couldn't specifically quote that out of our
3  defensive tactics manual, but I would say it sounds
4  reasonable.
5    Q    Okay.  So, for example, if I got you to agree
6  with me to put the lateral vascular neck restraint on
7  your lawyer and he was not resisting and you put it on
8  for two or three or four seconds and then you released
9  it, you would have to start it all over again to get it
10  to become effective if you did not render him unconscious
11  in the first try?
12   A    I don't know that for a fact, but it sounds
13  reasonable.
14   Q    Okay.  So let's go to page -- it's marked on
15  the bottom right-hand corner with the Bates number
16  LVMPD 1417, and I'm looking at the section titled "Neck:
17  Injuries to the neck are present as described.  The bony
18  and cartilaginous structures are intact.  The airway is
19  patent."  Do you see that?
20   A    Yes, sir.
21   Q    Did you understand that there was any damage to
22  the airway -- excuse me.
23        Did you understand that there was not any
24  damage to the airway of Tashii Farmer?
25   A    Upon the initial conversation with the medical

Page 39

1  examiner during --
2    Q    Any conversation.
3    A    During autopsy, no.  Once we got the autopsy
4  report and reading that, yes.
5    Q    Okay.  What does that imply to you?
6    A    The neck injuries, is that what you're
7  referring to?
8    Q    Yeah.
9    A    That the only injuries are the hemorrhaging
10  that she found, but that there were no -- there's no
11  damage to the esophagus.
12   Q    Maybe I didn't ask a very good question, but
13  I like -- the answer you gave does in fact answer that
14  question.
15        Do you know whether there's the hemorrhaging --
16  I'll use the word hemorrhaging -- present when a lateral
17  vascular neck restraint is used versus other types of
18  neck restraint?
19   A    I don't know.
20   Q    And your testimony previously was that in your
21  discussions with the coroner, she didn't know -- she
22  essentially has no knowledge about lateral vascular neck
23  restraint versus other types of blood chokes and things
24  of that nature.  Is that correct?
25   A    Correct.

Page 40

1    Q    So she's not skilled or versed into the, quote,
2  LVNR technique; correct?
3    A    Not that I'm aware of.
4    Q    So when she says "police restraint procedure,"
5  she's essentially saying that a cop put a neck restraint
6  on a suspect?
7         MR. LAGOMARSINO:  Objection; form, foundation.
8  BY MR. MC NUTT:
9    Q    Is that your understanding?
10   A    I've seen police restraint procedure used
11  numerous times, and there's been times where it was a
12  subject that was handcuffed and left on his stomach.  So
13  does it necessarily refer to a neck restraint?  No.  It's
14  just the manner in which that person was restrained by
15  the officers.
16   Q    Is being under the influence of a controlled
17  substance a crime in the state of Nevada?
18   A    Yes.
19   Q    Is carjacking a crime in the state of Nevada?
20   A    Yes.
21   Q    Is trespassing into a restricted area a crime
22  in the state of Nevada?
23   A    Yes.
24   Q    What is your understanding of how Tashii Farmer
25  and Officer Lif came into contact with -- excuse me.

Page 41

1      What is your understanding of how Tashii Farmer
2  came into contact with Officer Ken Lopera and Officer
3  Ashley Lif?
4      A   That he had walked up to their location inside
5  the Venetian near the Coffee Bean and said that somebody
6  was chasing him or something to that effect, and that's
7  how everything started.
8      Q   Okay.  Do you remember any of the impressions
9  that either Officer Lif -- and Lif is L-i-f even though I
10  just spelled it with a "t" when I pronounced it, L-i-f --
11  or Officer Lopera perceived when they saw Tashii Farmer?
12     A   I was not privy to that information due to the
13  fact that Officer Lopera did not give us a statement.
14     Q   But Officer Lopera made statements on body-worn
15  cam that you reduced to writing in your Arrest Report;
16  correct?
17     A   Correct.
18     Q   You don't recall any of those --
19     A   Just that he was sweating and -- I'd have to
20  look through to see exactly what it was that he said,
21  but --
22     Q   That's fine.  We'll get to that in a minute.  I
23  just wondered if, sitting here today, you had any memory
24  of those events.
25          You're familiar with the standards obviously

Page 42

1  for reasonable suspicion and probable cause; correct?
2      A   Yes, sir.
3      Q   What is reasonable suspicion in your verbiage?
4      A   Reasonable suspicion is that you believe a
5  person is committing, about to commit, or has committed a
6  crime but it doesn't reach the level of probable cause in
7  which you can make an arrest.
8      Q   But under reasonable suspicion, can you detain
9  someone?
10     A   Yes, sir.
11     Q   For how long?
12     A   Sixty minutes.
13     Q   Is being under the influence of a controlled
14  substance a crime?
15     A   Yes.
16     Q   And so could you have reasonable suspicion to
17  stop and detain that person?
18     A   Yes.
19     MR. LAGOMARSINO:  Objection; form.
20  BY MR. MC NUTT:
21     Q   So someone that you believed was under the
22  influence of a controlled substance, you would have legal
23  reasonable suspicion to stop and interview that person;
24  correct?
25     A   Yes.

Page 43

1      Q   And if it turned out to be the case that that
2  person was in fact under the influence of a controlled
3  substance, arresting that person would be in furtherance
4  of a legitimate law-enforcement purpose; correct?
5      A   Yes.
6      Q   Is it reasonable for an officer assigned to the
7  Strip to pursue somebody that flees into the back of the
8  house of a casino?  Do you know what I mean by "the back
9  of the house"?
10     A   Yes, sir.
11     Q   Into an employee area only.  Is it reasonable
12  for that officer to pursue that person?
13     MR. LAGOMARSINO:  Are you talking in this case or
14  just in general?
15     MR. MC NUTT:  In general.
16     THE WITNESS:  Yes.
17  BY MR. MC NUTT:
18     Q   Why is it reasonable?
19     A   Obviously if it's a marked area for employees
20  only, it's not someplace that the general public has
21  access to.  However -- that would be my answer.
22     Q   So tell me what the "however" is.
23     A   In this case specifically, the doors that
24  Farmer went through were marked with an illuminated exit
25  sign.

Page 44

1      Q   Is it your testimony that Tashii Farmer
2  observed the exit sign and believed that was where he
3  should run?
4      A   No, sir.
5      Q   Okay.
6      A   I'm just -- it's just my testimony that it was
7  marked with an illuminated exit sign.
8      Q   Okay.  So if there's an exit sign, do you
9  believe that that's an indication that people should go
10  there in anything other than an emergency?
11     A   I guess that would depend on if it said it was
12  an emergency exit or just marked as an exit.  If it's
13  just marked as an exit, to me that would be reasonable
14  that any person could go out those doors to exit an
15  establishment.
16     Q   Do you have any evidence that you've seen on
17  the body-worn camera or anything else that Tashii Farmer
18  was reading exit signs as he --
19     A   No, sir.
20     Q   -- fled down that hallway?
21     A   No, sir.
22     Q   And isn't it true that he fled and stumbled
23  over and through yellow cones that were chaining -- you
24  know, roping off the area?
25     A   Yes, sir.

Page 45

1    A   Yes, sir.
2    Q   Isn't that -- aren't yellow cones with a chain
3  indicative to the public that they're not supposed to --
4    A   Yes, sir.
5    Q   -- trespass in that area?
6    A   Yes, sir.
7    Q   You would agree with me that an officer on Safe
8  Strip should not allow someone to run into what they know
9  to be an employee area only even if the suspect or the
10 civilian was mistaken; correct?
11     MR. LAGOMARSINO:  Objection; incomplete
12 hypothetical.
13     THE WITNESS:  Yes, sir.
14 BY MR. MC NUTT:
15     Q   So that would be a purpose -- so if you saw me
16 stumble through a blocked-off area in a casino and I'm
17 walking down or running down the employee area only,
18 would you pursue me?
19     MR. LAGOMARSINO:  Same objection.
20     THE WITNESS:  I would say that it depends; and if
21 you go by our policy, there's a number of things the
22 officer has to take into consideration -- available
23 resources, the crime at hand -- in whether or not you
24 pursue that person.
25  ///

Page 46

1  BY MR. MC NUTT:
2    Q   And isn't part of your policy also whether or
3  not you know the individual has or does not have weapons?
4    A   That factors into it.
5    Q   Because it's public safety; correct?
6    A   Correct.
7    Q   As well as officer safety?
8    A   Correct.
9    Q   So a reasonable scenario would be you could
10 follow somebody and say, "Hey, you're not allowed back in
11 here," and if they comply, no harm no foul; correct?
12     A   Correct.
13     Q   But if somebody continues to flee from you when
14 you're making a lawful command, that would give you
15 reasonable suspicion to pursue them; correct?
16     A   Correct.
17     Q   Isn't it true that Officer Lopera gave several
18 commands to Tashii Farmer that he did not comply with?
19 Correct?
20     MR. LAGOMARSINO:  Objection as to the time.
21     THE WITNESS:  At that point in the scenario or later
22 on throughout the --
23 BY MR. MC NUTT:
24     Q   So we don't -- at that point in the scenario we
25 don't have audio on the body-worn cam; correct?

Page 47

1    A   That's correct.
2    MR. LAGOMARSINO:  Objection; form.
3  BY MR. MC NUTT:
4    Q   So what we do know is what Officer Lopera has
5  said on the body-worn cam at a later time, and I'm asking
6  whether you remember that.
7    MR. LAGOMARSINO:  Objection; form.
8    THE WITNESS:  Correct.
9  BY MR. MC NUTT:
10     Q   And he testified -- well, he didn't testify,
11 but his voice is caught on various body-worn cams
12 discussing the fact that he was conversing with Tashii
13 Farmer about helping him get to the valet or whatever;
14 correct?
15     A   Correct.
16     Q   And do you recall if there were any commands
17 given at that point as relayed later on?
18     A   **Specifically off the top of my head, I think he
19 said something to the effect of, "I told him to come
20 here" or something to that effect.  I don't remember
21 verbatim.**
22     Q   And did Tashii Farmer in fact stop and listen
23 to the officer?
24     A   No.
25     Q   And in fact Tashii Farmer fled down that

Page 48

1  employee area only; correct?
2    A   Correct.
3    Q   You've been in Vegas since 1998; right?
4    A   I was born and raised here.
5    Q   Okay, even better.  But you've been an officer
6  in Las Vegas since 1998; right?
7    A   Correct.
8    Q   Would you say that the area -- the employee
9  area -- the employee-only area is decorated dramatically
10 different and lighted dramatically different than the
11 patron area of a casino?
12     A   Yes, sir.
13     Q   So if you found yourself in a casino and you
14 were in a brightly lit sparsely decorated hallway with
15 fluorescent lights, would you assume you're in an area
16 where you're supposed to be or not supposed to be as a
17 patron?
18     A   **I would assume that I'm in a different part of
19 the hotel than the general public is.**
20     Q   So sitting here today, with Officer Lopera's
21 perspective, and this is from the various body-worn cams
22 where his voice is captured where he said, "The guy, he
23 was on -- he was on something and he fled into the
24 employee-only area," did Officer Lopera, given those two
25 perspectives, have reasonable suspicion to pursue Tashii

Page 49

1  Farmer?
2      MR. LAGOMARSINO: Objection; form.
3      THE WITNESS: Yes.
4  BY MR. MC NUTT:
5      Q   And pursuing Tashii Farmer for purposes of
6  detaining him and questioning him and potentially
7  arresting him would have been in furtherance of a
8  legitimate law-enforcement purpose; correct?
9      A   Yes.
10     Q   You said you did look at the Toxicology Report
11 once you got it; correct?
12     A   Yes, sir.
13     Q   And you looked at that prior to doing the
14 Arrest Report?
15     A   I honestly don't remember if we had toxicology
16 back at that point or not.
17     MR. MC NUTT: Let's just -- let's mark this as
18 Exhibit 3.
19     (Defendants' Exhibit 3 was marked for
20 identification by the Certified Court Reporter.)
21 BY MR. MC NUTT:
22     Q   Detective Alsup, just take a minute and let me
23 know if you've seen this document before.
24     A   Yes, I have.
25     Q   Okay.  And this is from NMS Labs.  It says

Page 50

1  "Toxicology Report."  The date is 5-30-2017, patient name
2  Tashii Brown.  Do you see that at the top?
3      A   Yes, sir.
4      Q   Okay.  Do you understand this to be the
5  Toxicology Report referenced in the coroner's report?
6      A   Yes, sir.
7      Q   And you have seen this actual report before?
8      A   Yes, sir.
9      Q   Now, the date is May 30th, 2017.  Do you know
10 if you had reviewed this prior to drafting your Arrest
11 Report?
12     A   Sorry.  I'm looking for the date that the
13 Arrest Report was written.
14     Q   I have been too.  So let's come back to the
15 date on the Arrest Report.  You would agree with me that
16 there's no obvious date for when your Arrest Report was
17 prepared?
18     A   No.
19     Q   How -- if I let you leave here now, how could
20 you go find out when the Arrest Report was prepared?
21     A   By looking at the TCR.
22     Q   What is that?
23     A   The Temporary Custody Report.
24     Q   Of Ken Lopera?
25     A   Correct.

Page 51

1      Q   And what is that?  Explain the process.
2      A   Those two pieces of paper are turned in at the
3  same time at CCDC.
4      Q   And TCR has the --
5      A   The charges.
6      Q   And it is the same date as the Arrest Report?
7      A   Correct.
8      Q   And you generated both of those documents?
9      A   Yes, sir.
10     Q   Just out of curiosity, why does the Arrest
11 Report not have a date on it?
12     A   Wish I could give you that answer.
13     Q   Do other Arrest Reports have dates on them?
14     A   It's on the TCR -- the TCR and the Arrest
15 Report go together.  It's like hand in hand.  So on the
16 TCR you have the date and time of the arrest, so those
17 would coincide with the Arrest Report.
18     Q   Okay.
19         Craig, I'm going to -- you don't have to
20 respond to an oral discovery request, but I'm going to
21 ask you for the TCR.
22     MR. ANDERSON: I will get it for you.
23     MR. MC NUTT: Thank you.
24     Q   So let's go back to the Toxicology Report.
25 Identify for me where we understand that there's

Page 52

1  methamphetamine in Tashii Farmer's system.
2      A   Where it says "Positive Findings."
3      Q   Okay.  And it says, "methamphetamine."  The
4  result is 950 NG per milliliter; correct?
5      A   That's correct.
6      Q   Do you have an understanding of what that means
7  in layman's terms?
8      A   If you go to the back, there's usually a table
9  or graph or paragraph that explains the different levels
10 for the methamphetamine level; and in this one, if you go
11 to reference comment No. 8 —
12     Q   What's the page number?
13     A   It is LVMPD 2095, page 3 of 7.
14     -- it tells you what the methamphetamine is,
15 and then in the second paragraph it gives examples of the
16 responses or how a person may act with certain levels.
17     Q   Okay.  How would someone with 950 NG per
18 milliliter act?
19     MR. LAGOMARSINO: Objection; form, foundation.
20     THE WITNESS: Based on this, it says that blood
21 levels of 200 to 600 nanograms per milliliter have been
22 reported in methamphetamine abusers who exhibited violent
23 and irrational behavior.  High doses of methamphetamine
24 can also elicit restlessness, confusion, hallucinations,
25 circulatory collapse, and convulsions.

Page 53

```
 1  BY MR. MC NUTT:
 2     Q   Okay.  So do we agree that Tashii Farmer
 3  had 950 NG per milliliter --
 4     A   Yes, sir.
 5     Q   -- in his bloodstream?
 6         So he's well above the 200 to 600 that were
 7  reported in abusers who exhibited violent and irrational
 8  behavior; correct?
 9     A   Correct.
10     Q   Could violent and irrational behavior include
11  profuse sweating?
12     A   I would say yes.
13     Q   Could irrational behavior include the belief
14  that someone is chasing you?
15     A   Yes, sir.
16     Q   Were those issues that Tashii Farmer exhibited
17  to Ken Lopera and Officer Lif?
18     A   Based on statements on body cam, yes.
19     Q   Well, and based on statements that -- you've
20  certainly seen Officer Lif's FIT and CIRT report;
21  correct?
22     A   I've seen her statement to FIT investigators.
23     Q   I'm sorry.  Her statement to FIT investigators
24  but not her CIRT?
25     A   Correct.
```

Page 54

```
 1     Q   And she testified that he was -- that Tashii
 2  Farmer was profusely sweating; correct?
 3     A   I believe so.
 4     Q   And appeared -- I think she said something
 5  along the lines of appeared disoriented; correct?
 6     A   Yes.
 7     Q   And said someone had been chasing him and he
 8  had just run across the street; correct?
 9     A   Yes, sir.
10     Q   So independent from what Ken Lopera said --
11  captured on body-worn cam, Officer Lif testified to those
12  same things; correct?
13     A   Correct.  I believe -- sorry.
14     Q   Go ahead.
15     A   I believe she also said that she didn't -- she
16  heard parts of the conversation but not the whole
17  conversation, something to that effect.
18     Q   I agree with that, that she testified to that
19  in her deposition that there were -- she certainly
20  testified to those things, but there were other aspects
21  that she did not hear.
22     A   Correct.
23     Q   Or other parts of the conversation she didn't
24  hear.
25     A   Correct.
```

Page 55

```
 1     Q   But you would agree with me that she testified
 2  to those things that we just discussed?
 3     A   Yes, sir.
 4     Q   Did you disbelieve any aspect of Officer Lif's
 5  testimony?
 6     A   No, sir.
 7     Q   You found her to be a credible witness?
 8     A   Yes, sir.
 9     Q   Did you interview her?
10     A   I did not.
11     Q   Who on your team, if you recall, interviewed
12  her?
13     A   I don't know.
14     Q   Let's back up to one thing.
15         So we don't have the -- I was looking for the
16  date for the Arrest Report.  Let's go through the
17  issues -- not the issues but the documents and the events
18  that had been concluded prior to your issuance of the
19  Arrest Report.  So tell me what interviews had occurred
20  by the FIT team prior to you issuing the Arrest Report.
21     A   All of the interviews that were conducted.
22     Q   So let's -- so Officer Tran?
23     A   Yes, sir.
24     Q   Officer Flores?
25     A   Yes, sir.
```

Page 56

```
 1     Q   Sergeant Crumrine?
 2     A   Yes, sir.
 3     Q   Officer Lif?
 4     A   Yes, sir.
 5     Q   Any other Metro officers that you can think of?
 6  And let me qualify that.  I'm not concerned about an
 7  officer that may have participated in rendering aid after
 8  the fact.  I'm up through the point where handcuffs got
 9  put on Tashii Farmer.
10     A   That sounds like it's it, but without --
11     Q   That's fair.
12     A   -- without reviewing, I wouldn't know.
13     Q   And so you did those interviews and you had the
14  benefit of their FIT statements for purposes of the
15  Arrest Report; correct?
16     A   Yes, sir.
17     Q   And you had the coroner's report for purposes
18  of the Arrest Report?
19     A   Maybe.
20     Q   Depending on the date?
21     A   Correct.
22     Q   You had at least talked to the coroner?
23     A   Yes, sir.
24     Q   So you had an interview with the coroner.
25  We'll call it that.
```

Electronically signed by Ellen Goldstein (001-341-678-7457)                    10f2067d-6a01-4aae-a0af-3d96feb83a39

Page 57

1    A   A conversation.
2    Q   Okay.  What about Venetian security guards?
3    A   Yes, sir.
4    Q   "Yes" what?
5    A   They were interviewed.  Sorry.
6    Q   So Peter Infantino?
7    A   Yes, sir.
8    Q   Did you recall interviewing him?
9    A   I did not conduct any of the interviews.
10   Q   But one of your -- but somebody on your team
11   did?
12   A   Correct.
13   Q   What about the driver of the white pickup
14   truck, Jonathan Pierce?
15   A   He would have been interviewed before the
16   Arrest Report.
17   Q   And there was another, Marcelino Vibas from
18   Venetian security guard?
19   A   Yes, sir.
20   Q   Those two.  Anybody else from the Venetian were
21   interviewed that you recall?
22   A   I believe there was.
23   Q   Who?
24   A   I think there were three or four different
25   security officers.

Page 58

1    Q   So all of those interviews were conducted but
2    you did not conduct them personally?
3    A   That's correct.
4    Q   But you had the benefit of written reports from
5    your team members?
6    A   That's correct.
7    Q   Between the sworn Metro officers and the
8    Venetian security guards, did you give more or less
9    weight to anyone's credibility?
10   A   No.
11   Q   Does any of their testimony stick out to you,
12   as you sit here today, as being more favorable or less
13   favorable for the Arrest Report that you wrote?
14        MR. LAGOMARSINO:  Form, foundation.
15        THE WITNESS:  I believe in a couple of the
16   interviews for the security officers, they said that
17   Tashii Farmer was fighting with the officer or something
18   to that effect; but I wouldn't say that I gave less
19   weight to it, but we would compare it to body cam and
20   surveillance video to corroborate it and go from there
21   then.
22        MR. MC NUTT:  Okay.
23   Q   I don't recall in your Arrest Report that any
24   of the Venetian security guards were referenced or
25   provided quotes.  Do you recall if they did and I just

Page 59

1    missed it?
2    A   It may not be quoted in here, but it would
3    have -- their statements would have been part of the
4    package that was handed over for the DA's office.
5    Q   Okay.  So how do you determine what goes into
6    the Arrest Report in this narrative that you wrote?
7    A   For this we took -- as far as just the Arrest
8    Report, we took the body cam by Officer Lopera and
9    statements mainly from LVMPD officers that were involved
10   in it, and then along with -- for the case package was
11   included all the interviews that were conducted.
12   Q   So how did you decide to reference what the
13   driver of the white truck said but not reference what any
14   of the security guards said?
15   A   Well, the driver of the white truck, and based
16   on Officer Lopera's walk-through, believed that he was
17   the victim of a crime.  So we included his statements due
18   to the fact that Officer Lopera believed he was the
19   victim of a crime or was going to be the victim of a
20   crime.
21   Q   And you include statements from other officers
22   relative to their experience with Tashii Farmer, or you
23   at least summarize them in your Arrest Report, yet you
24   didn't put anything in there from either -- any of the
25   Venetian security guards where they were talking about

Page 60

1    that the entire time they saw Tashii Farmer, he was not
2    complying with Officer Lopera and he was resisting
3    arrest?
4        MR. LAGOMARSINO:  Objection; form, misstates
5    testimony.
6    BY MR. MC NUTT:
7    Q   Just is that factually correct that that's not
8    in your Arrest Report?
9    A   Correct.
10   Q   Why is it not in your Arrest Report?
11   A   Because the surveillance that we had in the
12   body-worn camera didn't corroborate some of those
13   statements.
14   Q   So you disbelieved those Venetian
15   security-guard officers?
16   A   I disbelieved certain parts of what they said.
17   Q   Did you believe that they were lying when they
18   said that Tashii Farmer was not complying with the verbal
19   commands of Ken Lopera?
20        MR. LAGOMARSINO:  Objection; form, foundation.
21        THE WITNESS:  I don't believe that they were lying.
22   I don't believe that their perception was a hundred
23   percent accurate.
24   BY MR. MC NUTT:
25   Q   So you made the determination to discount their

Page 61

1  testimony and not put it in this Arrest Report; correct?
2      MR. LAGOMARSINO: Objection; there's no testimony.
3      THE WITNESS: Correct.
4  BY MR. MC NUTT:
5      Q  And you made the determination to put in the
6  comment from Jonathan Pierce that he did not feel -- he
7  did not believe Farmer was a threat; correct?
8      A  Correct.
9      Q  And even though in his interview with the FIT
10 team, he said he locked his doors out of fear.  Do you
11 recall that?
12     A  I remember him saying that he locked his doors.
13 I don't remember the context that it was out of fear.
14     Q  I'll read you the quote in a minute.
15     A  Actually that does sound right.  I believe what
16 he said was he locked his doors out of the fear, but he
17 also didn't feel that Tashii Farmer was going to get into
18 his truck.  Is that pretty close to what he said?
19     Q  He said he locked his doors out of fear.  I
20 mean once you get to the part where you're fearful and
21 you lock your doors -- you know, if we're talking about
22 "How do I view credibility of a statement," once you say
23 you lock the doors out of fear, I mean I'm not sure what
24 more you need.
25     MR. LAGOMARSINO: Objection; form.

Page 62

1  BY MR. MC NUTT:
2      Q  Do you have a different read on that?
3      A  No.
4      Q  So you have a job.  Your job was to write this
5  Arrest Report.  It's true that when you wrote this Arrest
6  Report you were not including what we will call
7  exculpatory statements for Ken Lopera; correct?
8      A  Correct.
9      Q  I mean you knew what the charges were.  They're
10 listed on the very first page and you typed those;
11 correct?
12     A  Yes.
13     Q  So isn't it true that everything in these eight
14 pages were written with the idea of proving those
15 charges?  Correct?
16     A  To establish the probable cause for it, yes.
17     Q  Okay.  So there's nothing that you wrote in
18 this Arrest Report which was exculpatory of Ken Lopera's
19 actions?
20     A  It's not written in the report, no.
21     Q  Okay.  So let's look at the front page of your
22 report, second paragraph.  "Officers Lopera and Lif were
23 inside the Venetian getting a cup of coffee."  Do you see
24 that one?
25     A  Yes, sir.

Page 63

1      Q  "The officers were approached by a black adult
2  male, who was sweating profusely and stated he was being
3  chased"; correct?
4      A  Yes.
5      Q  And you know that from both comments made by
6  Officer Lopera captured on body-worn camera; right?
7      A  Yes, sir.
8      Q  And from Ashley Lif's direct testimony to your
9  FIT team; correct?
10     A  Yes, sir.
11     Q  And can you also tell that from watching the
12 body-worn cam?
13     A  That he said he was being chased?
14     Q  Well, not the chased part but sweating
15 profusely.  I'm asking whether you could observe that on
16 the BWC.
17     A  I recall seeing sweat on his forehead.
18     Q  It says, "Farmer then ran from the officers and
19 was chased by Officer Lopera."
20     A  Correct.
21     Q  Why do you not reference that Officer Lopera
22 believed that Tashii Farmer was under the influence of a
23 controlled substance, or he may not have said it that
24 formally but "on something"?
25     A  Because that was not a statement that he made

Page 64

1  to us.
2      Q  Well, he didn't make any statements to you, did
3  he?
4      A  No.
5      Q  Right.  So all of his statements that you've
6  attributed to him in here --
7      A  Let me rephrase that too.
8          This is -- this first part of this was
9  information that we were given by the sergeant during our
10 briefing.
11     Q  Abdal-Karim?
12     A  Correct.
13     Q  Okay.  And just because he gave that to you,
14 you -- I mean you didn't vet it for accuracy?
15     A  This first part is a synopsis of the event that
16 he gave us during the briefing.
17     Q  Right.  And it says, "Sergeant Abdal-Karim
18 related the following."  And I presume that because you
19 put it in an Arrest Report to be relied upon by the
20 district attorney, you believed it to be accurate.  Is
21 that not true?
22     A  This information is what he gave us during the
23 briefing, and then down below it says, "Detectives with
24 FIT then assumed investigative responsibility."  So these
25 first few paragraphs are just what Sergeant Abdal-Karim

Page 65

```
 1   told us during the briefing.
 2      Q   Okay.  But you wrote it; right?
 3      A   Yes, sir.
 4      Q   He didn't provide this written statement to
 5   you?
 6      A   No.  It was verbal.
 7      Q   Okay.  Did Sergeant Abdal-Karim not relate that
 8   Tashii Farmer ran into an employee-only area?
 9      A   No, sir.  This is what he told us during the
10   briefing.
11      Q   Verbatim?  There's a recording of this?
12      A   It's not a recording and it's maybe not
13   verbatim, but it's very close because, as he's giving the
14   briefing, I would write down what he was saying.
15      Q   And he never said anything about running into
16   an employee area?
17      A   No, sir.
18      Q   Okay.  So let's go to -- so you're saying then
19   that everything after "Detectives with FIT then assumed
20   investigative responsibility" on this first page and
21   everything on the second and subsequent pages is from
22   your investigation and is not relayed by someone else
23   other than your team members?
24      A   Correct.
25      Q   So if you look on page 2 of 8, which is
```

Page 66

```
 1   Plaintiff's Initial Disclosures, page 6 -- page 2 of the
 2   Arrest Report -- you see all the blacked-out marks?
 3      A   Yes, sir.
 4      Q   Do you know whose name was being blacked out
 5   for purposes of this Arrest Report?  Would you agree with
 6   me that it was the driver of the white Toyota pickup
 7   truck?
 8      A   Yes, sir.
 9      Q   His name, do you remember his name?
10      A   Not off the top of my head.
11      Q   Jonathan Pierce?
12      A   Yes, sir.
13      Q   Okay.  So take a minute and just confirm for me
14   that every place there's a blackout here, it would be --
15   if we inserted Jonathan Pierce, or there may be one spot
16   where it would be his girlfriend, that that's what's
17   missing in the police report.
18      A   I would say that's probably accurate.
19      Q   So when we go down to the second paragraph,
20   third line, "The following is a summary of the interview
21   and is not verbatim:  Pierce was stopped in traffic as he
22   approached the parking garage to the Venetian.  His
23   friend," presumably his female friend that he was in the
24   truck with, drew the attention running towards his truck
25   an officer -- "Officer Lopera running towards his truck
```

Page 67

```
 1   on the rear passenger's side.  He then noticed a black
 2   male [Farmer] near the rear driver's side of his door,
 3   who he, Pierce, believed Officer Lopera was chasing."  Do
 4   you see that?
 5      A   Yes, sir.
 6      Q   Did I read any part of that inaccurate even
 7   though it was not quite verbatim?
 8      A   No.
 9      Q   "Officer Lopera told Farmer, 'Stop or I'm going
10   to tase you."  See that?
11      A   Yes, sir.
12      Q   So would you agree with me that Officer Lopera
13   gave a series of verbal commands to Tashii Farmer that
14   Tashii Farmer did not comply with?
15      A   Yes.
16      Q   So, for example, if Tashii Farmer would have
17   stopped in his tracks after Ken Lopera yelled "Stop or
18   I'm going tase you," things would have taken a different
19   turn right there; correct?
20      A   Yes, sir.
21      Q   Now, in this part that you say that you wrote,
22   why did you not identify the fact that Jonathan Pierce
23   locked his doors out of fear of Tashii Farmer?
24         MR. LAGOMARSINO:  Objection; form, misstates.
25         THE WITNESS:  I don't know.
```

Page 68

```
 1   BY MR. MC NUTT:
 2      Q   Now, later on you say, "Farmer's erratic
 3   behavior made him nervous," in the next paragraph down,
 4   "so he locked his doors prior to observing Farmer being
 5   tased by Officer Lopera."  Do you see that?  It's in the
 6   fourth paragraph down on the page.
 7      A   Okay.
 8      Q   Why would you use the word "nervous," that
 9   Farmer's erratic behavior made him nervous, instead of
10   the actual quote or the statement that Pierce used that
11   he was fearful and that's why he locked his doors?
12         MR. LAGOMARSINO:  Objection; form.
13         THE WITNESS:  This is just information that I read
14   in a summary of one of the interviews.
15   BY MR. MC NUTT:
16      Q   Would you agree with me that when you say
17   you're afraid versus being nervous have two entirely
18   different meanings?
19         MR. LAGOMARSINO:  Objection; form.
20         THE WITNESS:  That verbiage was again obtained from
21   the detective who took the interview.  That was the
22   verbiage that they used and was relayed to me.
23   BY MR. MC NUTT:
24      Q   So it's the other detective's fault on that
25   front?  I mean he should have used the word "fear";
```

Page 69

1  correct?
2      MR. LAGOMARSINO:  Objection; form.
3  BY MR. MC NUTT:
4      Q   If that's what Jonathan Pierce said, then that
5  should have flowed through verbatim to this police
6  report; correct?
7      MR. LAGOMARSINO:  Objection; form.
8      THE WITNESS:  I wouldn't say that everything is
9  necessarily verbatim.
10  BY MR. MC NUTT:
11     Q   But that's a pretty significant distinction,
12  wouldn't you agree, nervous versus fearful?
13     MR. LAGOMARSINO:  Objection; form.
14  BY MR. MC NUTT:
15     Q   "Yes" or "no"?
16     A   It could be.
17     Q   Right.  Would you rather be nervous or fearful?
18     MR. LAGOMARSINO:  Objection; form.
19  BY MR. MC NUTT:
20     Q   You'd rather be merely nervous about something
21  than fearful; correct?
22     A   Correct.
23     Q   And in an Arrest Report words have meaning;
24  correct?
25     A   Yes.

Page 70

1      Q   And so you were writing this, and the fact --
2  wouldn't you agree that part of this would read
3  differently if you knew that a third party that Officer
4  Lopera said was the subject of being -- from his
5  perspective -- being carjacked, that that third party in
6  essence corroborated Officer Lopera because he said he
7  was fearful and locked his doors?
8      MR. LAGOMARSINO:  Objection; form.
9  BY MR. MC NUTT:
10     Q   Isn't that a fair read --
11     A   Yes.
12     Q   -- of the evidence?
13     A   Yes.
14     Q   But if you merely say that you are nervous, it
15  doesn't quite corroborate Officer Lopera's perspective as
16  much, does it?
17     MR. LAGOMARSINO:  Objection; form.
18  BY MR. MC NUTT:
19     Q   "Yes" or "no"?
20     A   I'm sorry.  Say that one more time.
21     Q   If you merely say that the driver of the
22  carjacked vehicle or the vehicle to be carjacked -- if
23  you merely say he was nervous, that doesn't go as far --
24  that doesn't go so far as to corroborate Officer Lopera's
25  perspective; correct?

Page 71

1      MR. LAGOMARSINO:  Objection; form, incomplete
2  hypothetical.
3      THE WITNESS:  I don't know that you could -- I don't
4  know that I could really answer that question.
5  BY MR. MC NUTT:
6      Q   Now, how did Jonathan Pierce, the driver of the
7  white vehicle -- how did he view these events that are
8  relayed in this Arrest Report?  Was he standing?  He was
9  sitting in his truck; correct?
10     A   Correct.
11     Q   And was he looking out the window at him or how
12  was he seeing these events, the interaction between
13  Lopera and Farmer?
14     MR. LAGOMARSINO:  Objection; form as to --
15     THE WITNESS:  I would assume that he's looking out
16  the window.
17  BY MR. MC NUTT:
18     Q   It says here that he was watching in the
19  rearview mirror as he drove away, okay?
20     A   Okay.
21     Q   Do you agree with me?
22     A   Yes, sir.
23     Q   Okay.  Paragraph 4, "As blank drove away, he
24  continued to watch Officer Lopera and Farmer in his
25  mirror."  Do you know what mirror he was watching them

Page 72

1  in?
2      A   No.
3      Q   I deposed him and he said the left side mirror
4  of his Toyota Tacoma pickup, okay?
5      A   Okay.
6      Q   Do objects in the mirror look closer or further
7  away?  Do you remember what your mirror says?
8      A   It says further.
9      Q   Do you know how far away Jonathan Pierce and
10  his white Toyota pickup truck were from Tashii Farmer and
11  Ken Lopera when they were in physical contact with each
12  other?
13     MR. LAGOMARSINO:  Form.
14     THE WITNESS:  No, sir.
15  BY MR. MC NUTT:
16     Q   Do you remember on the body-worn camera --
17  obviously after the first taser strike, Tashii Farmer
18  fell at or near the truck; correct?
19     A   Yes, sir.
20     Q   And then obviously he's talking about he
21  started to drive away.  Apparently he disobeyed Ken
22  Lopera's command too 'cause he told him to stop right
23  there; right?
24     A   Yes, sir.
25     Q   And so my question is, in case I didn't ask it

Page 73

1 clean -- we'll look at the video later, so this is not a
2 test. I just want to know what you know sitting here now
3 how far away -- when Tashii Farmer and Ken Lopera were in
4 physical contact, meaning beyond the taser strikes but
5 Ken was physically in contact with him, how far away that
6 truck was.
7 MR. LAGOMARSINO: Objection; form as to what point
8 in time.
9 THE WITNESS: The only answer I can give you is
10 based on the surveillance video, and I would approximate
11 it at somewhere between 20 and 30 yards.
12 MR. MC NUTT: Okay.
13 Q Very good. It's 33, and we'll go through that
14 again when we have the video, and that way we can -- it's
15 a fair objection what counsel has made in terms of the
16 time, and so we'll identify that when we look at the
17 video.
18 MR. LAGOMARSINO: Move to strike the editorializing
19 "very good."
20 MR. MC NUTT: That your objection was good?
21 MR. LAGOMARSINO: No, your comments that his answer
22 was very good.
23 MR. MC NUTT: I said your objection was good.
24 MR. LAGOMARSINO: No. You said that after. I'm not
25 objecting to that.

Page 74

1 MR. MC NUTT: Move to strike the complimentary
2 statement made by me about Andre Lagomarsino.
3 Q So you continue to restate that Farmer was on
4 the ground and Officer Lopera -- and you put in quotes --
5 quote, "mounted," unquote, "Farmer and aggressively
6 struck Farmer in the face." Do you see the "mounted" in
7 quotes?
8 A Yes, sir.
9 Q Why did you use "mounted" in quotes?
10 A Because that's the specific verbiage that he
11 used.
12 Q But yet you didn't use the specific verbiage
13 that he was fearful. Why?
14 MR. LAGOMARSINO: Objection; form.
15 THE WITNESS: I have no answer for that.
16 BY MR. MC NUTT:
17 Q Because you were drafting this Arrest Report to
18 support the thesis that Ken Lopera was guilty of
19 oppression under the color office involuntary
20 manslaughter; correct?
21 MR. LAGOMARSINO: Objection; form as to "thesis."
22 THE WITNESS: That was the term that he used, and he
23 had said that he had -- Pierce said that he had mixed
24 martial arts experience. So when he said "mounted," it
25 stuck out due to the fact that -- his martial arts

Page 75

1 experience. He said that Officer Lopera "mounted." I
2 used "mounted" in quotes.
3 Q Well, he didn't say that to you. He said that
4 to somebody else and you were reading a report; right?
5 A Correct.
6 Q So that quote made it through, but the fact
7 that he was fearful and locked his doors didn't make it
8 through to this Arrest Report; correct?
9 A Correct.
10 MR. LAGOMARSINO: Objection; form.
11 BY MR. MC NUTT:
12 Q "Prior to pulling into the garage, Pierce saw
13 that an officer had Farmer in a rear naked choke."
14 Now, at this point I'll represent to you -- and
15 we'll see it on the video -- my expert went out and
16 measured this, and at this point he's more than 35 yards
17 away and he's looking -- he testified he's looking in the
18 left rearview mirror of his Toyota pickup truck, which --
19 I don't know. How big is a Toyota Tacoma left rearview
20 mirror, three by four inches or something?
21 A I couldn't even give you a guestimate.
22 Q Why does he think it's a rear naked choke and
23 why does it say "rear naked choke" as opposed to "put him
24 in a chokehold"?
25 A That was the term that he used.

Page 76

1 Q And so that quote made it the whole way through
2 to the Arrest Report, but the fact that he was fearful
3 and locked his doors didn't make it through?
4 A Correct.
5 Q So Pierce was unsure if Officer Lopera was the
6 officer who was applying the rear naked choke but he
7 believed it was, 'cause obviously Pierce doesn't know Ken
8 Lopera from anybody else on Metro; right?
9 A Correct.
10 Q Is that the purpose of that statement?
11 A Yes.
12 Q "Pierce stated Farmer did not attempt to open
13 the tailgate of his truck or get into the truck bed."
14 What's the purpose of that statement?
15 A Because Officer Lopera stated that he observed
16 Farmer trying to get into the truck or open the tailgate.
17 Q So two different people from different vantage
18 points are allowed to have a different perspective;
19 correct?
20 A Absolutely.
21 MR. LAGOMARSINO: Objection; argumentative.
22 BY MR. MC NUTT:
23 Q And from Officer Lopera's perspective, much
24 different running up to the vehicle and seeing Tashii
25 Farmer on the other side of it. Maybe there's a

Page 77

1  depth-perception issue or anything else; correct?
2      A  **Absolutely.**
3      MR. LAGOMARSINO:  Form, foundation.
4  BY MR. MC NUTT:
5      Q  Do you take that statement to mean that Officer
6  Lopera's perception was wrong?
7      A  **No, sir.**
8      Q  So Officer Lopera could reasonably have
9  perceived that he believed that a carjacking was about to
10  take place; correct?
11      A  **Yes, sir.**
12      Q  And at some level the statement of the
13  individual in the vehicle that says he was fearful and
14  locked his doors corroborate's Officer Lopera's
15  perspective?
16      MR. LAGOMARSINO:  Form, calls for speculation.
17      THE WITNESS:  It could.
18  BY MR. MC NUTT:
19      Q  Was that a "yes"?
20      A  **Yes.**
21      Q  I couldn't hear because of the --
22      A  **It could.**
23      Q  Okay.  Thank you.
24      MR. LAGOMARSINO:  Can we take a break?
25      MR. MC NUTT:  Yeah, we'll take one in just a minute

Page 78

1  unless you need one right now.
2      Q  But even Pierce says that Officer Lopera gave
3  several verbal commands during the incident and Farmer
4  was not complying; correct?
5      A  **Correct.**
6      Q  And that it appeared he did not want to be
7  arrested; correct?
8      A  **Correct.**
9      Q  What does that imply to you?
10      A  **That he was resisting being taken into custody.**
11      Q  That he was physically resisting; correct?
12      A  **Yes.**
13      Q  Okay.  I mean what other kind of "he did not
14  want to be arrested" could there be?
15      A  **He was resisting.**
16      Q  Physically?
17      A  **Yes.**
18      MR. MC NUTT:  Okay.  Let's take a break, five, ten
19  minutes and come back.
20      THE VIDEOGRAPHER:  We are going off the record.  The
21  time is approximately 11:33 a.m.
22      (Brief recess taken.)
23      THE VIDEOGRAPHER:  The time is approximately
24  11:44 a.m.  We are back on the record.
25  ///

Page 79

1  BY MR. MC NUTT:
2      Q  Detective Alsup, during the break you had the
3  opportunity to discuss with your lawyer the document you
4  referred to as the TCR, the Temporary Custody Report; is
5  that correct?
6      A  **Yes, sir.**
7      Q  And that was the document you identified that
8  there would be a date on that document, which would
9  coincide and be the same date as the Arrest Report.  Is
10  that right?
11      A  **Yes, sir.**
12      Q  Tell me what the date of that TCR is.
13      A  **June 5th, 2017.**
14      Q  Okay.  So the Arrest Report would have been
15  drafted the same day of June 5th, 2017 or it would have
16  been filed the same day?
17      A  **It would have been submitted the same day.**
18      Q  Okay.  So it would have been drafted in the
19  days prior to?
20      A  **Correct.**
21      Q  Do you recall how long it took you to prepare
22  this Arrest Report?
23      A  **I would say one or two days.**
24      Q  Do you have a routine or habit --
25      A  **To compile and write it.  Sorry.**

Page 80

1      Q  And do you recall how far in advance of
2  June 5th, 2017 you did that?
3      A  **It would have been in the day or two prior.**
4      Q  Is that your -- kind of your course and habit
5  is to do it right immediately prior to submittal?
6      A  **Yes, sir.**
7      Q  And you drafted the TCR as well?
8      A  **I don't believe I wrote it.**
9      Q  Okay.
10      A  **Somebody else wrote it.**
11      Q  How does that process work?
12      A  **It's just a piece of paper with the charges and**
13  **the arrestee's name.  So it's just written down and then**
14  **I would have to sign it.**
15      Q  And then the -- my understanding of your
16  testimony is the police report and the TCR get submitted
17  to the DA's office simultaneously?
18      A  **Correct.**
19      Q  How do they get submitted; is it an electronic
20  filing system?
21      A  **Back then it was paper copies.**
22      Q  Okay.  So you or someone else hand-walked them
23  to the DA's office, or how does that work?
24      A  **To the jail.  It's turned in with the**
25  **booking — it's part of the booking package.**

Electronically signed by Ellen Goldstein (001-341-678-7457)                                      e81df1ea-a423-447b-bc71-283869a46bcf

Page 81

1    Q   Okay.
2    A   And then from there it goes to the DA's office.
3    Q   When in relation to June 5th, 2017 was Ken
4  Lopera physically arrested?
5       MR. LAGOMARSINO: Objection --
6       THE WITNESS: It was on June 5th.
7       MR. LAGOMARSINO: -- relevance.
8  BY MR. MC NUTT:
9    Q   And was the Arrest Report and the TCR submitted
10  after his arrest?
11   A   At the same time.
12   Q   Okay. So let's go back to page 2 of 8 of your
13  Arrest Report. So about the sixth paragraph down it
14  says, "At 04:25 hours Officer Lif was interviewed by
15  detectives." Do you see that?
16   A   Yes, sir.
17   Q   So this is -- you are drafting this, but this
18  is a summary of all of the information that was gleaned
19  by your investigative team from Officer Lif?
20   A   Yes, sir.
21   Q   So the next paragraph says, "Officer Lopera
22  then asked Farmer, 'Why are you sweating so badly?'
23  Farmer said that he had just run across the street
24  because people were following him."
25       Now, you did not get that from Officer Lopera's

Page 82

1  BWC, correct, because it was in that muted period?
2    A   Correct.
3    Q   Where did you get that information from?
4    A   That would have been from Officer Lif.
5    Q   Okay. "Farmer asked if the officers could
6  escort him down to the valet, and the officers agreed."
7  That was also from Lif?
8    A   Yes, sir.
9    Q   "Farmer then began to walk away, and Officer
10  Lopera attempted to get Farmer to come back and talk to
11  them." That's from Lif?
12   A   Yes, sir.
13   Q   And what was your understanding; was Officer
14  Lopera giving verbal commands at that point to get him to
15  come back?
16   A   I don't think that was specified during her
17  interview. I think she just said that he was trying to
18  get him to come back.
19   Q   Okay. Do you have a perception from the
20  body-worn cam that you watched?
21   A   No, sir.
22   Q   "Lopera handed his coffee to Lif and started
23  walking after Farmer. Farmer then began to run down a
24  hallway and Officer Lopera followed him."
25       So here you don't say that this is an employee

Page 83

1  area only; correct?
2    A   This is from Officer Lif's interview, so --
3    Q   What she said, you repeated?
4    A   Correct.
5    Q   And did she --
6    A   I'm sorry. The information I was given was
7  from the detective that conducted the interview.
8    Q   So in her FIT report -- or her FIT statement --
9  and as well as in her two depositions, she clearly
10  identified that hallway as employee only.
11   A   Okay.
12   Q   She didn't do that in -- to your understanding?
13       MR. LAGOMARSINO: Objection; form, misstates
14  testimony.
15       THE WITNESS: This information, again, was
16  summarized by the detective that did it and given to me.
17  BY MR. MC NUTT:
18   Q   Did you form an opinion as to how Officer Lif
19  lost track of Officer Lopera and Farmer?
20   A   I believe that what she said was that she went
21  to put the cups of coffee down, and when she turned back
22  around, she couldn't see them.
23   Q   Did you, during the course of your
24  investigation, go and retrace the route that Farmer
25  and/or Ken Lopera took? At least Ken Lopera because you

Page 84

1  have his body-worn camera. Presumably he followed the
2  path of --
3    A   I did not personally. Somebody on my team did.
4    Q   Okay. And did your team, other than what she
5  said, form an opinion as to how she could have lost track
6  of Farmer and Lopera in such a short span of time and
7  space?
8    A   No, sir.
9    Q   Why not?
10   A   I'm not sure I understand.
11       She told us that -- exactly what she told us.
12  I mean she had put the coffee down, she turned around,
13  and they were gone.
14   Q   So let's look at the last paragraph on the
15  page.
16       In -- later on in your Arrest Report you go
17  through the body-worn cam with a timeline based upon the
18  time stamp on the body-worn camera; right?
19   A   Correct.
20   Q   I'll represent to you, and I'm sure your lawyer
21  has told you, that at this point it's essentially
22  disproven that Tran, Officer Tran, told Ken Lopera to,
23  quote, "let go."
24   A   Correct.
25   Q   And that that statement has been attributed to

Page 85

1  Officer or Sergeant Crumrine.
2    **A  That's correct.**
3    Q  Is that your understanding?
4    **A  Yes, sir.**
5    Q  Do you agree with that or disagree with that,
6  meaning you stand by your report or --
7    **A  At this time I believe it was Sergeant Crumrine**
8  **that said that.**
9    Q  Okay. How is it that you came to put down on
10  the Arrest Report that -- and attribute that statement to
11  Tran? Was it you personally listening to the voices and
12  trying to match them up? I'm just trying to understand
13  the process.
14    **A  It was that and, during his statement, Officer**
15  **Tran also told us additionally that he told Officer**
16  **Lopera to let him go. So based on that statement along**
17  **with hearing it on the body cam, I attributed that to**
18  **Officer Tran. However, then listening and knowing**
19  **Sergeant Crumrine's voice after this was drafted, can**
20  **recognize that voice as Sergeant Crumrine's.**
21    Q  Okay. When is the last time you watched the
22  body-worn cameras?
23    **A  It's been a while.**
24    Q  Did you do it in the last month?
25    **A  No.**

Page 86

1    Q  Did you do it in preparation for today's
2  deposition?
3    **A  I intended to, but with our call-outs I never**
4  **had time.**
5    Q  Did you review any other documentation in
6  preparation -- or video or audio -- in preparation for
7  today?
8    **A  No, I did not. Every intention to, but --**
9    Q  So do you recall Sergeant Crumrine? Do you
10  remember him?
11    **A  Uh-huh.**
12    Q  He was the sergeant in charge of the scene at
13  least for when he was involved in the scene; correct?
14    **A  Yes, sir.**
15    Q  And do you remember that you testified
16  previously he was the first officer to arrive on the
17  scene after obviously Officer Lopera?
18    **A  Yes, sir.**
19    Q  And he testified that it was his sense that
20  when he told Officer Lopera to loosen up or let go,
21  whatever his language was -- and I think it was different
22  things in different times -- that it was his impression
23  that Ken Lopera did in fact release pressure on the hold;
24  correct?
25    MR. LAGOMARSINO: Objection; form.

Page 87

1  BY MR. MC NUTT:
2    Q  Is that your understanding and testimony today?
3    **A  Yes, sir.**
4    Q  Okay. And I want to be real careful when we
5  talk about phrases like "release the hold" or -- and I'm
6  going to make some real clear statements, because
7  obviously you can have the encircling arm in place with
8  pressure and without pressure; correct?
9    **A  Correct.**
10    Q  Would you agree with me that the only person
11  that could really tell you how much pressure was being
12  applied was the person applying the pressure?
13    MR. LAGOMARSINO: Objection; form.
14    THE WITNESS: Or the person that it was being
15  applied to.
16    MR. MC NUTT: Correct, those two people.
17    Q  But from the video you are unable to tell how
18  much, if any, pressure was being applied at any point
19  that Ken Lopera had his encircling arm around Tashii
20  Farmer?
21    MR. LAGOMARSINO: Objection; form.
22    THE WITNESS: Correct.
23  BY MR. MC NUTT:
24    Q  Do you think anybody can tell -- any observer
25  can tell -- from the video how much pressure, if any, was

Page 88

1  applied at any point?
2    MR. LAGOMARSINO: Objection; form, calls for
3  speculation.
4    THE WITNESS: I couldn't speculate to that.
5    MR. MC NUTT: Okay.
6    Q  Sergeant Bland, do you know him?
7    **A  Yes.**
8    Q  Are you aware what's his background?
9    **A  I know that he's a defensive tactics**
10  **instructor. I know he has a background in mixed martial**
11  **arts.**
12    Q  Okay. He testified previously that no one
13  looking at the video can tell how much pressure, if any,
14  was applied at any point in the video; correct?
15    MR. LAGOMARSINO: Objection; form.
16    MR. MC NUTT: Or I'm sorry.
17    Q  Do you understand that is his testimony?
18    **A  Yes, sir.**
19    Q  Would you agree with that testimony?
20    MR. LAGOMARSINO: Objection; form.
21    THE WITNESS: I would say that's very reasonable
22  based on his opinion.
23  BY MR. MC NUTT:
24    Q  And would you believe he has the experience to
25  render that opinion on behalf of Las Vegas Metropolitan

Electronically signed by Ellen Goldstein (001-341-678-7457)                     10f2067d-6a01-4aae-a0af-3d96feb83a39

Page 89

1   Police Department?
2       MR. LAGOMARSINO:  Objection; form.
3       THE WITNESS:  Yes, sir.
4   BY MR. MC NUTT:
5       Q   "The suspect appeared to be unresponsive and
6   Officer Tran was unable to find a pulse," and there's no
7   time stamp on that statement.  Do you see that at the
8   bottom of the paragraph on page 2?  Do you still believe
9   that to be accurate in that that was Tran getting a pulse
10  at that point?
11      A   **I have not specifically looked at the body cam**
12  **to confirm that statement.**
13      Q   Now let's go to page 3 of 8.  This says,
14  "During the subsequent investigation, I viewed the
15  footage uploaded from Officer Lopera's BWC."  Do you see
16  that?
17      A   **Yes, sir.**
18      Q   And so "I" is in fact you, Detective Alsup --
19      A   **Yes, sir.**
20      Q   -- correct?
21          So the descriptions that are written down here
22  on page 3 of 8 next to the time stamps, that was you
23  personally, not somebody on your team, that made those
24  descriptions.  Is that fair?
25      A   **Yes, sir.**

Page 90

1       Q   Okay.  Let's talk a little bit about Metro
2   policy.  I know -- you're not a policy expert; correct?
3       A   **No, sir.**
4       Q   But you're familiar with Metro's policy; right?
5       A   **Yes, sir.**
6       Q   Metro's -- who is more knowledgeable about
7   Metro's defensive-tactics policy, you or Sergeant Michael
8   Bland?
9       MR. LAGOMARSINO:  Form and foundation.
10      THE WITNESS:  Sergeant Bland.
11  BY MR. MC NUTT:
12      Q   Okay.  So if he said that in certain situations
13  it would be authorized to go outside of policy and use a
14  taser more than three times -- for example, if the
15  officer is by themselves without backup -- would you
16  agree with that?
17      A   **I would believe his testimony.**
18      Q   Okay.  Is doing something outside of policy a
19  crime?
20      A   **No, sir.**
21      Q   Is doing something --
22      A   **Not necessarily -- I'm sorry.  Not necessarily.**
23  **It could be, but it doesn't have to be.**
24      Q   Right.  It's not a de facto, "You're outside of
25  policy.  That's a violation of Nevada statutes"?

Page 91

1       A   **Correct.**
2       Q   Or the Constitution?
3       A   **Correct.**
4       MR. LAGOMARSINO:  Form.
5   BY MR. MC NUTT:
6       Q   If fact, isn't that one of the big delineations
7   between the CIRT side of the house and the FIT side of
8   the house?  Correct?
9       A   **Yes, sir.**
10      Q   You testified about that earlier --
11      A   **Yes.**
12      Q   -- right?
13          CIRT is looking at policy violations and
14  training techniques and how Metro can do things better,
15  and FIT, your side of the house, is only looking at the
16  criminal aspect of things; correct?
17      A   **Yes.**
18      Q   Do you as a FIT officer ever opine on changes
19  to the policy side of things based upon your
20  investigation?
21      A   **No.**
22      Q   So when Metro changed the use of the LVNR from
23  low-level to intermediate-level use of force, are you
24  familiar with that change?
25      A   **Yes, sir.**

Page 92

1       Q   And that occurred after this incident; right?
2       A   **Yes, sir.**
3       Q   Not necessarily because of this incident, but
4   it just happens to be it occurred after this incident;
5   correct?
6       A   **Yes, sir.**
7       Q   You weren't involved in any of those policy
8   discussions?
9       A   **No, I was not.**
10      Q   Okay.  You would agree with me that at the
11  time, using the LVNR, or attempting to use the LVNR --
12  I'm not trying to parse language -- was an appropriate
13  option for Ken Lopera at this time; correct?
14      MR. LAGOMARSINO:  Objection; form.
15  BY MR. MC NUTT:
16      Q   Meaning in a low-level-threat situation, he was
17  authorized to use it per policy?
18      MR. LAGOMARSINO:  Objection; form.
19      THE WITNESS:  I couldn't say that because he didn't
20  give us a statement, so I don't know where he felt he was
21  within the use-of-force policy.
22      MR. MC NUTT:  Okay, that's fair.
23      Q   And there were no statements captured on the
24  other body-worn cam that would inform you to the extent
25  you could answer that question?

## Page 93

1    A   No, not that I recall.
2    Q   When an officer is giving verbal commands to an
3  individual and the individual is verbally engaging him
4  back, is it more important to pay attention to what the
5  suspect says or what the suspect is doing?
6       MR. LAGOMARSINO: Form.
7       THE WITNESS: I would say both.
8  BY MR. MC NUTT:
9    Q   What if they conflict?  What if the suspect is
10  verbally saying he will comply but physically is not
11  complying?  Does the officer pay attention to -- you
12  know, believe in his words even though he physically sees
13  his hands or his body doing something that is
14  noncompliant?
15      MR. LAGOMARSINO: Form.
16      THE WITNESS: I would say you'd pay more attention
17  to what they are physically doing.
18  BY MR. MC NUTT:
19    Q   Because words can hurt you, but hands can kill
20  you; correct?
21    A   Yes, sir.
22    Q   So in your prior testimony you had some
23  discussion about reasonable timeline to allow Tashii
24  Farmer to comply with Ken Lopera's verbal commands.  Do
25  you remember that?

## Page 94

1    A   I do.
2    Q   Do you have an opinion as to -- just
3  generally -- as to what's a reasonable timeline to allow
4  someone to comply?
5    A   I would say probably different in every
6  situation.
7    Q   Right.  So and if there's immediate
8  noncompliance, do you have to wait until after you've
9  seen the noncompliance?
10      MR. LAGOMARSINO: Wait for what?
11      MR. MC NUTT: For compliance.
12    Q   So if you give a verbal command and immediately
13  the suspect does not comply, you don't have to wait any
14  further; correct?
15    A   No.
16    Q   And in certain circumstances maybe one or two
17  seconds is reasonable time, and in certain circumstances
18  maybe four or five seconds might be more reasonable; is
19  that your understanding or position?
20    A   Yes.
21    Q   You say that -- at 1:44 on page 3 of your
22  Arrest Report -- "Officer Lopera yelled, 'Get on your
23  stomach.'  Farmer sat up and attempted to put on his left
24  shoe, which had slipped off the heel."  Do you see that?
25    A   Yes, sir.

## Page 95

1    Q   Who told you to write that, or is that just
2  your observation of the body-worn cam?
3    A   That was my observation.
4    Q   Okay.  Other officers have observed that and
5  said that Officer Lopera -- excuse me -- Tashii Farmer
6  was attempting to stand up.  Is that -- is your
7  perception right and theirs wrong or vice versa?
8       MR. LAGOMARSINO: Objection; misstates.
9       THE WITNESS: Other Metro officers.
10      MR. MC NUTT: Other Metro officers.
11      MR. LAGOMARSINO: Objection; misstates.
12      THE WITNESS: Officer Lopera would have been the
13  only one that was there at that time.
14  BY MR. MC NUTT:
15    Q   Based on watching the body-worn cam just like
16  you, other officers just like you watched the body-worn
17  cam and came to a different conclusion that he in fact
18  was trying to stand up.
19      MR. LAGOMARSINO: Misstates.
20      THE WITNESS: I guess that would be their opinion.
21  This was mine.
22      MR. MC NUTT: Okay.
23    Q   And so two reasonable officers can come to
24  different conclusions about what they're seeing even
25  though it's the same videotape; correct?

## Page 96

1    A   Correct.
2    Q   And it's true that you have the cool comfort of
3  hindsight without any imminent threat by watching the
4  video; correct?
5    A   Absolutely.
6    Q   And isn't it true that when you're the officer
7  on the ground and these things are happening in realtime
8  after a chase, that those seconds are a little more
9  precious than what we're about to do here where we're
10  going to watch a video and back it up and go forward and
11  second-guess everything?
12    A   Yes.
13      MR. LAGOMARSINO: Form.
14  BY MR. MC NUTT:
15    Q   At any time up to the first taser strike, had
16  Officer Lopera or Officer Lif checked Tashii Farmer for
17  weapons?
18    A   No.
19    Q   And you know that based on the body-worn camera
20  of Officer Lopera; correct?
21    A   That's correct.
22    Q   Did Officer Lif tell you that in a FIT
23  statement, or tell your team that in a FIT statement, as
24  well?
25    A   Without reading her actual interview --

Electronically signed by Ellen Goldstein (001-341-678-7457)                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 97

1    Q   Okay. Let's go to page 4 of 8. When you
2  viewed at 1:56, "Farmer reached to his lower back," did
3  you have -- one, why did you write that down or make note
4  of that?
5    A   It was just an observation from the video. You
6  see him reach down towards his lower back.
7    Q   And is it your experience that some people
8  conceal weapons in the small of their back?
9    A   Yes.
10    Q   Did you perceive that that could have been a
11  possible threat that was perceived by Officer Lopera,
12  understanding you don't know what Officer Lopera
13  perceived, but I mean is that a reasonable thing?
14  Somebody reaches to the small of their back; you as an
15  officer, would you give them the benefit of the doubt or
16  would you be prepared for the potentiality they have a
17  weapon there?
18    A   Again this is me watching this video in 20/20
19  hindsight, but to me it was apparent to me that he was
20  reaching towards the area of a probe strike from the
21  taser.
22    Q   Okay. But is it also reasonable that another
23  officer might think he was potentially reaching for a
24  weapon?
25    MR. LAGOMARSINO: Objection; form.

Page 98

1    THE WITNESS: Yes.
2  BY MR. MC NUTT:
3    Q   And I say that because that was Officer Lif's
4  testimony, was that -- when we watched the video last
5  week at her deposition and she testified. I said, "What
6  is he doing?" I thought she was going to say, "Looks
7  like he's reaching for a probe," but she said, "He could
8  be reaching for a weapon."
9    MR. LAGOMARSINO: Misstates testimony. Move to
10  strike.
11  BY MR. MC NUTT:
12    Q   So again, two officers can look at the same
13  body-worn cam and come to different conclusions; correct?
14    MR. LAGOMARSINO: Form, foundation.
15    THE WITNESS: Correct.
16  BY MR. MC NUTT:
17    Q   Did you ever speak to any of these security
18  guards from the Venetian, you personally?
19    A   No, sir.
20    Q   Okay. So you never had an opportunity to hear
21  their voices?
22    A   No, sir.
23    Q   And I'm just going to tell you that I believe
24  that it's incorrect here at 2:07 where it says, "Farmer
25  replied, 'Okay okay okay, sir.'" Now, I have listened

Page 99

1  and deposed the other -- the Venetian security officers,
2  and so we'll get to that when we look at the video and
3  I'll ask you how you identified that voice, because I
4  understand your position. Tran and Crumrine both used
5  the same verbiage and said, "Let go." Pretty simple
6  error to make, and now with the hindsight of deposition
7  discovery, we can determine who actually said that. So
8  we'll get to that one when we get to the tape.
9    MR. LAGOMARSINO: Move to strike.
10  BY MR. MC NUTT:
11    Q   Did you -- have you ever investigated a use of
12  force by an officer where they asked a civilian or a
13  nonlaw-enforcement officer for help?
14    A   I don't believe so.
15    Q   Would your experience indicate to you that
16  that's a pretty rare event?
17    A   Yes, sir.
18    Q   Do officers -- would officers, in your
19  experience, ask for help from a civilian lightly?
20    MR. LAGOMARSINO: Form, foundation.
21    THE WITNESS: It would -- I think it would honestly
22  depend on who that civilian was. If it was a security
23  officer, I would say you would ask for that assistance
24  more readily than just the average person walking down
25  the street.

Page 100

1  BY MR. MC NUTT:
2    Q   But clearly this indicates that you're not in
3  command of the situation and you need help?
4    MR. LAGOMARSINO: Objection; form, foundation.
5    THE WITNESS: I would agree with the fact you need
6  help taking a person into custody. I wouldn't say
7  that -- I wouldn't agree with the fact that you're not in
8  control -- or command or control of the situation. It
9  would all depend.
10  BY MR. MC NUTT:
11    Q   So 2:22, "Security gave commands to stop, turn
12  around." And there's some discussion about conflicting
13  commands in your narrative later on in your Arrest
14  Report. Do you remember that?
15    A   Yes, sir.
16    Q   And you testified about that in your prior
17  deposition. Do you remember that?
18        You're not implying that Officer Lopera is
19  responsible for any conflicting commands that come from
20  the Venetian security guards; correct?
21    A   No.
22    Q   So at 2:22 you write, "Farmer replied" -- let's
23  back up. "Security gave commands to stop, turn around.
24  Farmer replied, 'I will,' and then Farmer then sat up."
25  See that?

Page 101

1     A   Yes, sir.
2     Q   Does that indicate to you, just based on that,
3  that Farmer at that instant was complying with any
4  commands?
5     A   **Right now I'd have to watch that in conjunction**
6  **with the tape to make that determination, but --**
7     Q   Okay.  But just based upon what you wrote, it
8  implies to me that he was not complying if he's sitting
9  up when the command was to stop.
10    MR. LAGOMARSINO:  Move to strike.
11    THE WITNESS:  I would agree.
12 BY MR. MC NUTT:
13    Q   Okay.  How would you define Tashii Farmer's
14 resistance level per Metro policy throughout the course
15 of what you watched on the body-worn cam?
16    MR. LAGOMARSINO:  Form as to time.
17    THE WITNESS:  I would say that -- I'd say it was
18 both passive and active.
19 BY MR. MC NUTT:
20    Q   So tell me what passive resistance is.
21    A   **Basically just not complying.  We call it a "no**
22 **person," not complying with the officer's commands.  Tell**
23 **you to turn around, you don't turn around; but you're not**
24 **displaying physical signs of a fight or anything like**
25 **that.**

Page 102

1     Q   And that would be the lowest level of
2  resistance?
3     A   **Yes.**
4     Q   And then what's the next level?
5     A   **Is where you're -- for instance, if an officer**
6  **is trying to put handcuffs on the subject and that**
7  **subject tenses up their arms to not be able to have the**
8  **handcuffs put on them.**
9     Q   And what's that called?
10    A   **Or somebody that's fleeing.**
11    Q   What's that called?
12    A   **Active.**
13    Q   What's above that?  What's the next level of
14 resistance?
15    A   **Oh, boy.**
16    Q   Active aggressive?
17    A   **Active aggressive.**
18    Q   Okay.  And what does that mean?
19    A   **That's basically a person that is trying to**
20 **cause harm to the officer.**
21    Q   By actively fighting back?
22    A   **Correct.**
23    Q   And that could be with weapons or hands or
24 kicks or punches?
25    A   **Correct.**

Page 103

1     Q   So at any point in your investigation or your
2  review -- do you need to take that?
3     A   **I'm okay.  Sorry.**
4     Q   That's all right.  If you need to take a break
5  for something like that, I'll certainly respect that.
6        At any point in your investigation, did you
7  make a determination as to what level of resistance
8  Tashii Farmer was displaying?
9     A   **It was my belief that it was passive and**
10 **active.**
11    Q   So but at no point did you come to the belief
12 it was aggressive active resistance or active aggressive
13 resistance?
14    A   **I did not.**
15    Q   Okay.  Do you have a different opinion sitting
16 here today?
17    A   **No, sir.**
18    Q   Let's look now -- we're still on -- let's go to
19 page 5 of 8.  So 3:01 Sergeant Crumrine arrives and
20 stated, "Put your F-ing hands behind your back."  See
21 that?  He's obviously talking to --
22    A   **Yes, sir.**
23    Q   -- Tashii Farmer.
24       Do you understand where Tashii Farmer's hands
25 are at this point?

Page 104

1     A   **It's hard to tell from the video.**
2     Q   Okay.  But clearly they weren't already behind
3  his back if that's where Crumrine wants them to be put?
4     MR. LAGOMARSINO:  Objection; form.
5     THE WITNESS:  I don't know.
6  BY MR. MC NUTT:
7     Q   Okay.  Let's go to 4:11.  You say, "Officer
8  Lopera released the hold on Farmer."  Do you see that?
9     A   **Yes, sir.**
10    Q   What do you mean by "released the hold"?
11    A   **I believe that was the point in which he**
12 **completely lets go of Farmer and stands up.**
13    Q   So to put it in the parlance of LVNR, he
14 removed his encircling arm from around the suspect's
15 neck?
16    A   **Correct.**
17    Q   Is that -- so when you wrote, "released the
18 hold on Farmer" -- I want to be real clear -- you were
19 not implying that pressure was held against Tashii
20 Farmer's throat up until this point?
21    MR. LAGOMARSINO:  Objection; form.
22    THE WITNESS:  Correct.
23 BY MR. MC NUTT:
24    Q   'Cause you don't know how much pressure was or
25 was not applied, if any, at any point during the when the

Electronically signed by Ellen Goldstein (001-341-678-7457)                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 105

1  encircling arm was around Tashii Farmer's neck?
2      A   That's correct.
3      Q   Okay.  And the reason I make a big deal about
4  that is because there have been misstatements in this
5  case and others that Ken Lopera choked Tashii Farmer
6  for -- pick the misstatement -- 75 seconds, 110, you
7  know, you name it.  Do you understand that?  So that's
8  why I'm asking for that important clarification.
9      A   By "release the hold," I meant that's the point
10 in which, like you said, the arms came away from Farmer
11 and he stood up.
12     Q   Okay.
13     MR. LAGOMARSINO:  Move to strike the question.
14 BY MR. MC NUTT:
15     Q   And we'll look at that on the tape and we'll
16 track it, and then you tell me again that's the point
17 where you see the encircling arm be removed, okay?
18         You testified earlier that the concept of
19 whether it was an inappropriately applied lateral
20 vascular neck restraint or whether it was some other neck
21 restraint really didn't factor into, to a great degree at
22 least, your synopsis in this police report -- or in this
23 Arrest Report.  Do you remember that?
24     A   Yes, sir.
25     Q   If so, why do you spend a lot of time reciting

Page 106

1  that -- you know, the verbiage about "I choked him out"
2  or "I rear-nakeded his ass" and things of that nature?
3      A   Just because of the fact that the rear naked
4  choke or that hold is not what the department is taught.
5  The department is taught LVNR and you're taught that
6  that's the only neck restraint that you will use.
7      Q   Isn't it true that initially you thought that
8  because there was no videotape evidence that it was a
9  perfect LVNR, that it was by default excessive force
10 because he used something other than the LVNR?  Isn't it
11 true that was your initial belief?
12     MR. LAGOMARSINO:  Asked and answered.
13     THE WITNESS:  I'm not sure I understand exactly
14 what -- you're asking if, just because it wasn't the
15 LVNR, if it was excessive?
16 BY MR. MC NUTT:
17     Q   Yes.  I'm asking if that was your perspective,
18 "yes" or "no."  I mean I'm not --
19     A   Not necessarily.  I understand it's not a
20 perfect world, and when you're trying to accomplish a
21 restraint on an individual, things can go wrong.  I do
22 understand that, but we are taught very specifically that
23 the only neck restraint to be used is the LVNR.  So I
24 wouldn't say that it would necessarily take it to a level
25 of excessive.  It would be a culmination of everything.

Page 107

1      Q   So it could have -- it could, at the lowest
2  level, just be a policy violation?
3      A   Correct.
4      Q   For example -- and we're making hypotheticals
5  here, we understand that -- you know, "Officer, you used
6  a nonLVMPD-approved choke.  You learned it in some other
7  place, and don't do that next time.  Here's your
8  reprimand" or whatever?
9      A   Correct.
10     Q   It could be as simple as that; right?
11     A   Correct.
12     Q   So if you had a statement from Ken Lopera,
13 which we don't, that says, "Yeah, you're right.  I said,
14 'I rear-nakeded his ass.'  I meant to say, 'I used the
15 lateral vascular neck restraint.'  I looked at the video
16 and I could never get my hand to connect.  I just
17 couldn't make them get to the right spot," would that
18 change your opinion about what was attempted to be used
19 or not used or would you go with based upon your own
20 interpretation of the video?
21     A   I think that anything that -- any statement
22 that he would have given could have swayed any part of
23 this case, but the fact that we didn't have a statement,
24 we have to rely on what we have on video.
25     Q   When you say that Lopera struck Farmer

Page 108

1  approximately 10 to 12 times down here around page 6
2  of 8, 56:40 or so, I think in your prior deposition you
3  said that you counted the strikes.  From what angle of
4  video did you count the strikes?
5      A   From the Venetian security video.
6      Q   From the overhead?
7      A   Yes, sir.
8      Q   So it wasn't from the body-worn cam?
9      A   Correct.
10     Q   Did you do any enhancement or anything like
11 that or can you see it from the native video that was
12 produced or subpoenaed by --
13     A   I only used the video that was provided by the
14 Venetian.
15     Q   Okay.  And we have that here, so we'll get a
16 chance to look at that.
17         So let's go to page 7 of 8.  Let's look at the
18 last paragraph.  So "Officer Lopera performed what he
19 described as a," quote, "'rear naked choke,'" end quote.
20 He didn't really ever say that; correct?
21     A   No.
22     Q   So that's a liberal use by you of the quotation
23 marks; correct?
24     A   That was --
25     MR. LAGOMARSINO:  Objection; form.

Electronically signed by Ellen Goldstein (001-341-678-7457)                                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 109

1   THE WITNESS: -- a mistake by me.
2   MR. MC NUTT: Okay.
3   Q   "This technique is not approved or taught by
4   the LVMPD. LVMPD employs the lateral vascular neck
5   restraint. The LVNR is a neck restraint which can render
6   a subject unconscious by stopping blood flow to the brain
7   by compressing the carotid arteries and does not restrict
8   a subject's air flow"; correct?
9   A   Correct.
10   Q   And you agree with me that there's no evidence
11   that Tashii Farmer's air flow was restricted; correct?
12   A   Correct.
13   Q   So whatever Ken Lopera did was an attempt to
14   restrict the carotid arteries; correct?
15   MR. LAGOMARSINO: Form.
16   THE WITNESS: I believe so.
17   BY MR. MC NUTT:
18   Q   "Officer Lopera held the," quote, "'rear naked
19   choke,'" end quote. That's another error of the
20   quotation marks; right?
21   A   Yes, sir.
22   Q   "For 1 minute and 13 seconds."
23       So would you clarify what you mean by holding
24   whatever the choke was for 1 minute and 13 seconds.
25   A   The encircling arm was around the neck for that

Page 110

1   long.
2   Q   And at no time are you -- whether at the time
3   you wrote this Arrest Report or at your prior deposition
4   or today -- are you stating or implying that pressure was
5   applied to Tashii Farmer's neck for 1 minute and 13
6   seconds?
7   MR. LAGOMARSINO: Form, foundation.
8   THE WITNESS: I'm merely stating that the arm was
9   around the neck for that long.
10   BY MR. MC NUTT:
11   Q   Okay. So knowing that when you write things,
12   sometimes things go wrong -- it's not a perfect world,
13   'cause I write things all the time -- would you rewrite
14   that today to be more specific to say that Officer Lopera
15   held his encircling arm around Tashii Farmer for 1 minute
16   and 13 seconds and clarify that it's unknown whether or
17   not there was any pressure applied for what part of that
18   time, if any?
19   A   I would definitely clarify. I don't know that
20   I would clarify the way you just stated.
21   Q   Please tell me how you would clarify.
22   A   Even if you -- you can have an encircling arm
23   with no pressure and technically it's still an LVNR. So
24   I would assume the same would be said for a rear naked
25   choke, that you could put your arms in that position,

Page 111

1   hold that position for a minute and 13 seconds without
2   pressure. It would still technically be that. So I
3   would say that a restraint was held for 1 minute and 13
4   seconds; however, the amount of pressure applied is
5   unknown.
6   Q   And that's -- and you would add -- so if you
7   were writing it today, that's what you would say, that
8   the amount of pressure applied is unknown?
9   A   Yes, sir.
10   Q   I mean that's an important distinction; you
11   would agree with me?
12   A   It is.
13   Q   Because that misstatement -- or that
14   statement -- has been mischaracterized and misconstrued
15   throughout two cases because it's been implied that you,
16   the arresting officer, made the definitive determination
17   that Ken Lopera applied pressure to Tashii Farmer's neck
18   for at least 1 minute and 13 seconds, and that's simply
19   not accurate, is it?
20   MR. LAGOMARSINO: Move to strike.
21   THE WITNESS: No, it's not.
22   BY MR. MC NUTT:
23   Q   What's your answer?
24   A   No.
25   Q   Thank you.

Page 112

1       So similarly, where you say, "Officer Lopera
2   also held the," quote, "'rear naked choke,'" end quote,
3   again liberal use of the quotes which is inaccurate;
4   correct?
5   A   Correct.
6   Q   "For 44 seconds after being told to let go by
7   Officer Tran." So let's unpack that.
8       We know that Ken did not say, "rear naked
9   choke," in quotes. We know it wasn't Officer Tran, it
10   was Officer Crumrine; correct?
11   A   Correct.
12   Q   I mean you would agree with me that that's the
13   same confusion we had earlier between Tran and Crumrine?
14   A   Correct.
15   Q   And so here you're also not saying that
16   pressure was applied to Tashii Farmer's neck for 44
17   seconds after he was told to let go, but rather, that Ken
18   Lopera's encircling arm was in place around Tashii
19   Farmer's neck for that period of time. Is that correct?
20   A   I would agree with that.
21   Q   So if you were rewriting that today, would you
22   make that clarification?
23   A   I would.
24   Q   Let's go to the next page. This is 8 of 8. It
25   says, "Due to the fact that Officer Lopera, who was on

Page 113

1  duty and acting in the official capacity of a police
2  officer, attempted to detain Farmer inside the Venetian
3  Hotel without sufficient legal authority for the
4  detention." Do you see that?
5      A  Yes, sir.
6      Q  You wrote that?
7      A  Yes.
8      Q  Now, you've testified today that being under
9  the influence of a controlled substance is a crime in the
10  state of Nevada; correct?
11      A  Correct.
12      Q  You testified that if an officer witnesses an
13  individual under the influence of a controlled substance,
14  that he's authorized to -- if he has reasonable
15  suspicion -- to detain that person for further inquiry;
16  correct?
17      A  Correct.
18      Q  And in fact if he believed that person was
19  under the influence of a controlled substance, he could
20  arrest that person for that crime; correct?
21      A  Correct.
22      Q  So why do you say here that Officer Lopera was
23  without sufficient legal authority for the detention?
24  We're not talking about the arrest at this point.  We're
25  just talking about a detention.

Page 114

1      A  Because at this point I still have not heard
2  any type of testimony from Officer Lopera.  We have his
3  statements on body cam and I understand that, but we
4  don't have a statement from Officer Lopera on why he
5  conducted the actions that he did.  In his body cam he
6  says he's sweating profusely, but he doesn't -- I don't
7  believe -- I'd have to look at it again.  I don't believe
8  you ever hear him say he was under the influence or that
9  at that point he believed he was under the influence of a
10  narcotic.
11      Q  Well, he didn't -- I agree with you he never
12  used the statement "under the influence of a controlled
13  substance."  I'm putting it into more formal verbiage
14  here today.
15      A  Right.
16      Q  But clearly on tape, him and Officer Rybacki
17  reference that the guy was, quote, "clearly on
18  something."  I mean does that indicate to you he wasn't
19  on -- what does being "on something" mean to you?
20      MR. LAGOMARSINO:  Objection; form as to time.
21      THE WITNESS:  And I'm not sure -- I'm not sure --
22  with Officer Rybacki's statement, I don't know who he's
23  referring to, and there's been a lot of confusion in
24  reference to that statement too.  And we've listened to
25  it numerous times to try to determine exactly who or what

Page 115

1  he's talking about, and I don't think it can be
2  definitively done.
3  BY MR. MC NUTT:
4      Q  So let's -- okay.  Let's set aside the UICS,
5  but you agree with me that if an officer has that
6  perception that someone is under the influence of a
7  controlled substance, he would have in fact had the
8  sufficient legal authority for a detention?
9      A  Yes.
10      Q  Okay.  So now let's go to what we absolutely
11  know happened, based upon your review of the body-worn
12  camera, is that Officer Lopera and Lif were on Operation
13  Safe Strip; correct?
14      A  Uh-huh.
15      Q  Tasked with -- what's that?
16      A  Sorry, yes.  I said, "uh-huh."
17      Q  Oh, thank you.
18          Tasked with keeping the Strip tourism corridor
19  free from crime, isn't that the task of Safe Strip?
20      A  Correct.
21      Q  And they've identified someone who is sweating
22  profusely, who then does not listen to police commands
23  and then flees down an employee-only corridor.  Would
24  that provide sufficient legal authority for a detention?
25      MR. LAGOMARSINO:  Objection; form.

Page 116

1      THE WITNESS:  I don't know that at the point -- at
2  the point where Farmer turns around and starts to walk
3  away or -- I don't know what the verbal commands were.  I
4  don't know why the verbal commands were given.  Without a
5  statement from Officer Lopera, the only thing that I can
6  go on is the body cam, which doesn't give a lot of those
7  details.
8  BY MR. MC NUTT:
9      Q  We do know Farmer said that he was being chased
10  by people and had just run across the street.
11      A  Uh-huh.
12      Q  And was looking for a water fountain; correct?
13      A  Correct.
14      Q  You were nodding.
15      A  Sorry.
16      Q  But we need to correct.
17          And so do you -- you have lots of patrol time
18  in your career; correct?
19      A  Not a lot.
20      Q  Well, eight, nine years or so, violent crimes,
21  and, you know, you're interacting with people; right?
22      A  Yes.
23      Q  Okay.  Does sweating profusely, being
24  disoriented, and asking for a water fountain -- what does
25  that indicate to you as a beat officer, as a patrol

Page 117

1  officer?
2      MR. LAGOMARSINO:  Objection as to "disoriented."
3      THE WITNESS:  I wasn't -- my testimony was that I
4  could see sweat on his forehead.  I don't know -- I can't
5  say that it was profusely.
6  BY MR. MC NUTT:
7      Q   Well, Ashley Lif did.
8      A   Okay.
9      Q   You actually have it in your report.
10     A   And then as far as being disoriented, I don't
11  know that we can definitively say that he was -- I can't
12  definitively say that he was disoriented.
13     Q   So if you were on Safe Strip and you interacted
14  with someone that was profusely sweating and then fled
15  from you, whether you said anything or not, down an
16  employee-only corridor, would you have sufficient legal
17  justification to simply detain that person and ask them
18  what was going on?
19     A   I would say that there's other -- I would say
20  that there's other factors that need to be met.
21     Q   Well, based on those factors that I've given
22  you --
23     A   Just sweating profusely and going down the
24  corridor?
25     Q   An employee-only corridor.  "Yes" or "no,"

Page 118

1  you'd let somebody run through the back of the house of a
2  casino --
3      A   Okay.
4      Q   -- that you haven't checked for weapons?  "Yes"
5  or "no," you'd let that happen or not?
6      MR. LAGOMARSINO:  Object as to form of the question
7  as to "employee-only corridor."
8      THE WITNESS:  The only thing that I can know for
9  sure is that Farmer went out a door that was illuminated
10  as an exit sign.  Whether or not he read exit sign,
11  whether or not he read that it was an employee-only area,
12  I have no idea.
13  BY MR. MC NUTT:
14     Q   Now, why are you giving Tashii Farmer the
15  benefit of his subjective perception even though you've
16  never talked to him?  The objective evidence --
17     A   Because you asked me that question earlier.
18     Q   The objective evidence, sir, is that Tashii
19  Farmer was profusely sweating, was shocked when he
20  realized he was talking to officers, and then fled
21  through an employee area only.
22     A   I don't have proof --
23     MR. LAGOMARSINO:  Objection.
24     THE WITNESS:  -- that he was shocked that he was
25  talking to officers.

Page 119

1  BY MR. MC NUTT:
2      Q   We'll get to that in a minute, but the
3  objective evidence is he fled down an employee-only area.
4      MR. LAGOMARSINO:  Objection.
5  BY MR. MC NUTT:
6      Q   And I'm asking you, you don't think that's
7  sufficient legal justification merely for a detention to
8  find out what's going on with this individual?
9      MR. LAGOMARSINO:  Objection.
10     THE WITNESS:  I didn't say that it's not.  I said
11  that --
12  BY MR. MC NUTT:
13     Q   But you won't answer the question, so I'm
14  asking you if that is or isn't.
15     MR. ANDERSON:  Objection; form.
16     THE WITNESS:  Based on sweating alone, no, I don't
17  think it is, but if you add other factors, then it could
18  be.
19  BY MR. MC NUTT:
20     Q   So sweating alone and fleeing into an
21  employee-only area, "yes" or "no" sufficient legal
22  justification?
23     MR. LAGOMARSINO:  Form, incomplete hypothetical.
24     THE WITNESS:  I think there still -- there still has
25  to be something built upon that.

Page 120

1  BY MR. MC NUTT:
2      Q   Like what?
3      A   We have no idea what Farmer's intent was.
4      Q   Of course not, but you testified it's a crime
5  to trespass.
6      A   But the problem is you're asking me to base a
7  decision that another officer made; and I don't have all
8  of the story for why he made the decision he did, so I
9  can't answer the question.  Based on what I see on the
10  body cam, I'm not sure that he has met that legal
11  justification for detention.
12     Q   So just to be clear, your position is that if
13  you encounter a suspect that's profusely sweating --
14  'cause you testified you could see that on the body-worn
15  cam --
16     A   I testified that I could see sweating, not
17  profuse sweating.
18     Q   Well, you have other officer testimony that
19  says profusely and you've got it in your report.
20     A   Okay.  But you just asked me if I observed
21  somebody profusely sweating, but that's not what I
22  observed.  I observed sweating.
23     Q   Okay.  So you observed sweating and you
24  observed Tashii Farmer fleeing into an employee-only
25  area; correct?  That's what you observed on the tape;

Page 121

1  right?
2      A   On the -- based on that tape, I don't see
3  anything that says it's an employee-only area.
4      Q   And so it's your testimony here -- but do you
5  know that it is or isn't?  We're all after the fact here,
6  so what do you know sitting right here?  Is that or is
7  that not an employee area only?
8      A   Off the top of my head, I don't recall what the
9  printing on the open door was, but I know that it was
10 marked with an illuminated exit sign.  That's what I can
11 tell you.  I don't remember exact verbiage on the door --
12     Q   All right.
13     A   -- that was propped open.
14     Q   We'll revisit this when we look at the tape.  I
15 understand you don't want to say yes he has sufficient
16 legal justification 'cause it completely changes your
17 Arrest Report.
18     A   That's not true.
19     MR. ANDERSON:  Objection; form.
20 BY MR. MC NUTT:
21     Q   How does it not change it?
22     A   I'm not telling you that I don't want to say
23 yes based on that because that's not true.
24     Q   Why don't you want to say yes?
25     MR. ANDERSON:  Objection; form.

Page 122

1      THE WITNESS:  Because I don't know that he had
2  sufficient legal justification at that point because he
3  never gave us a statement.  I don't know what his
4  perceptions were.  I don't know what was going through
5  his mind.  There's a lot that I don't know.  So based on
6  what I see and the evidence that I've been given and the
7  body cam, I don't -- me personally, I do not think that
8  at that point it was all there.
9  BY MR. MC NUTT:
10     Q   And you're saying that without Ken Lopera's
11 testimony -- I guess apparently as soon as an officer
12 says, "Well, I'm not going to give a statement out of
13 Fifth Amendment concerns," that the evidence goes against
14 them?
15     MR. ANDERSON:  Objection; form.
16     THE WITNESS:  That's absolutely untrue and unfair.
17 BY MR. MC NUTT:
18     Q   But that's what happened here.  I agree it's
19 untrue and unfair.
20     A   It happens all the time, and based on the
21 evidence that we have is how we make a decision.  I don't
22 remember an officer-involved shooting in quite some time,
23 with the exception of maybe four or five, where an
24 involved officer has given us a statement and -- but
25 you're inferring that if they don't give us a statement,

Page 123

1  we're going to be out to get them and arrest them.  Well,
2  that's not --
3      Q   I'm not saying you're out to get anybody.  I'm
4  saying that based upon the actual empirical evidence
5  you've testified you've seen on the body-worn cam, you
6  won't say today that you know for a fact that's an
7  employee-only area; and I don't know how you could have
8  performed an investigation and not come to that
9  realization.
10     MR. LAGOMARSINO:  That's argumentative.
11     MR. ANDERSON:  Object to form.
12     MR. LAGOMARSINO:  It's argumentative.
13     THE WITNESS:  Okay.  If you're in a building and
14 there's a fire and there's a sign that says, "Employees
15 only" but there's a marked illuminated exit sign,
16 wouldn't it be common sense that you can go out that exit
17 to go out of the building?
18 BY MR. MC NUTT:
19     Q   If there's a fire.  Not when I'm fleeing a cop.
20     A   At that point we have no proof that he was
21 fleeing the cop.
22     Q   But you're missing my point.  My point is,
23 sitting here today, do you know whether or not that's an
24 employee-only area?  Not what Ken Lopera thought, not
25 what Tashii Farmer thought; you sitting here today,

Page 124

1  having conducted this investigation for which charges
2  were brought against an officer.
3      A   It's not really fair for you to ask me that
4  because earlier you asked me if I thought that Tashii
5  Farmer had read that sign.
6      Q   That was a separate question.
7      A   I don't know any sign he read.
8      Q   That's a separate question and I'll stand on
9  that question; but I'm asking you, sitting here today at
10 the conclusion of your investigation, whether you know or
11 don't know whether that is in fact an employee-only area.
12     A   Again I know that it was marked with something
13 along the lines of "Employees beyond this point" or
14 something to that effect, but I don't remember the exact
15 verbiage.
16     Q   Is it relevant to you in your investigation
17 whether it was or was not employee-only area?
18     A   It could be with other factors built in.
19     Q   So it's one thing that you needed to know as
20 part of your investigation?
21     MR. LAGOMARSINO:  Objection; form.
22     THE WITNESS:  Well, I think it definitely would have
23 helped.
24 BY MR. MC NUTT:
25     Q   Well, you're the investigating officer.  Why

**Page 125**

1 didn't you go figure it out?
2   MR. ANDERSON: Objection; form.
3   THE WITNESS: What I'm saying is I think it would
4 have helped to know for our investigation what Officer
5 Lopera knew at the time and what he was thinking at the
6 time. So I think I missed -- I think I didn't exactly
7 answer your question the right way. Does it help if it's
8 marked an employee-only area?
9 BY MR. MC NUTT:
10   Q   No. I'm saying wouldn't it have helped your
11 investigation to know that simple fact as to whether it
12 was or was not an area that's allowed to be accessed by
13 the public?
14   A   Okay. And again, we did look at the sign and I
15 don't remember the exact verbiage on it, but I don't
16 believe it said "emergency exit." It was just marked
17 with the illuminated exit sign.
18   Q   And that's a distinction that's important to
19 you?
20   A   To me a marked illuminated exit sign means that
21 you can exit the building that way.
22   Q   So let's just be very clear.
23      Do you or do you not know, sitting here today,
24 whether that hallway through which Tashii Farmer fled
25 from Officer Lopera is or is not an employee-only area?

**Page 126**

1   MR. LAGOMARSINO: Asked and answered.
2 BY MR. MC NUTT:
3   Q   Yes or no?
4   MR. LAGOMARSINO: Asked and answered.
5   THE WITNESS: Like I said, I know that it's marked
6 with some --
7 BY MR. MC NUTT:
8   Q   No, sir.
9   A   I don't remember the exact verbiage.
10   Q   I'm just asking -- not what the verbiage is.
11 I'm asking, as you sit here today, do you know what the
12 truth of that question is? That's it.
13   A   If that's an employee-only area?
14   Q   Yes.
15   A   I guess my answer would be no because you have
16 a sign that says one thing but you also have an
17 illuminated exit sign.
18   Q   So you've never asked anybody whether it was or
19 was not an employee-only area; is that correct?
20   A   Well, I would think that you could ask somebody
21 from the hotel, an employee of the hotel, and they might
22 tell you one thing, but you could ask a member of the
23 public, "If you looked over at that door, would you think
24 you could have access to it?" I don't know that
25 there's --

**Page 127**

1   Q   Well, I'm asking a different question. I'm
2 asking you, as the investigating officer bringing charges
3 against a fellow police officer, whether or not you asked
4 the question of anyone in charge of the casino.
5   MR. LAGOMARSINO: Objection as to form.
6   THE WITNESS: We went off of what was on the door,
7 the verbiage on the door.
8 BY MR. MC NUTT:
9   Q   Okay. And so the fact that it was chained off,
10 brightly illuminated in fluorescent lights and doesn't
11 look like any other part of the casino where patrons are
12 allowed, all of that led you to believe that it was an
13 open question as to whether Tashii Farmer was allowed in
14 there?
15   MR. ANDERSON: Objection; form.
16   THE WITNESS: All I'm saying is that it was marked
17 with an illuminated exit sign. That's all I've -- that's
18 all I've said the whole time.
19 BY MR. MC NUTT:
20   Q   So if you were Ken Lopera and you saw somebody
21 sweating that approached you and then fled through a
22 roped-off area into that hallway, would you have pursued?
23   A   Correct me if I'm wrong -- and I'd like to --
24 but in that video, Tashii Farmer starts backing away, and
25 that's when Officer Lopera reaches out to put his hands

**Page 128**

1 on him. That's when he tumbles on the chain, turns
2 around and goes out the door. Is that fair?
3   Q   You see Officer Lopera's hands outstretched.
4 They're never in contact or even close. So you tell
5 me -- and by the way, one door was closed.
6   A   Okay.
7   Q   So "yes" or "no" you would pursue, or would you
8 let that guy just run?
9   A   I would not have started to close the distance
10 on him and try to go hands on.
11   Q   No, that's a different question.
12      Would you have pursued him down that hallway?
13   A   I don't think it's a different question because
14 if I don't initiate that contact, I think it changes --
15   Q   Well, then just say no.
16   A   No, I wouldn't.
17   Q   So you would have just let Tashii Farmer roam
18 down that hallway and do whatever?
19   A   I think that there were sufficient people in
20 the area, sufficient number of officers, that you could
21 have got on the radio, you could have contained the area,
22 and taken him into custody without a foot pursuit.
23   Q   What officers were in the area?
24   A   There was Safe Strip. There were a number of
25 officers that were assigned in that area.

Page 129

1    Q   Well, nobody was waiting for them when they got
2  outside.  I mean how long did it take Crumrine to get
3  there?
4    **A   I don't believe he ever broadcast that he was**
5  **in a foot pursuit until they were already outside and by**
6  **the vehicle.**
7    Q   And there's an open question about whether the
8  radios worked in the stairwells, according to Officer
9  Lif; correct?
10   **A   I don't know.**
11   Q   All right.
12       Craig, do you want to let me go over there so I
13 can show him the video?  You can obviously stand behind
14 me.
15       MR. ANDERSON:  Thank you.
16       MR. MC NUTT:  What's that?
17       MR. ANDERSON:  Thank you.
18 BY MR. MC NUTT:
19   Q   Okay.  Officer -- Detective Alsup, what I'm
20 showing you is the video that's been produced to us in
21 this -- excuse me -- this litigation that's been
22 represented to be Officer Lopera's body-worn cam.  We're
23 sitting here at zero minutes and zero seconds on the
24 screen, and before Andre reminds me, I will do my best to
25 make time-stamp annotations for anything that we discuss.

Page 130

1       So here sitting at 00:00, do you recognize this
2  first frame of the video?
3    **A   Yes.**
4    Q   And do you recognize the individual that's to
5  the left hand of the left hand?
6    **A   Yes.**
7    Q   And that is Tashii Farmer?
8    **A   Yes.**
9    Q   And do you recognize this to be Ken Lopera's
10 left hand holding up iced coffee?
11   **A   Yes.**
12   Q   Or some drink.
13   **A   Coffee, yes.**
14   Q   So do you see the yellow cone in the corner of
15 the video here?
16   **A   Yes, sir.**
17   Q   And we'll look at the corridor and we'll stop
18 it and we may have to back it up at some point.
19       And it's your understanding that all body-worn
20 cameras, after they are activated, are silent for the
21 first 30 seconds?
22   **A   Actually what it is, once the officer pushes**
23 **the button, it starts recording the audio, but it has**
24 **captured the video from the 30 seconds prior to that.  So**
25 **he actually hits his button to start recording once he's**

Page 131

1  **down the hallway, but it's captured the 30 seconds**
2  **before.**
3    Q   So are the body-worn cams running at all time
4  for a video?
5    **A   It's always on.**
6    Q   Okay.
7    **A   But once the officer presses the button, that's**
8  **when it starts recording the audio, and then it goes back**
9  **30 seconds and just has the video.**
10   Q   So you can't go back 60 seconds and see audio?
11   **A   No.**
12   Q   Okay.  So the button starts not just the -- it
13 kind of does two things.  It starts the audio but also
14 records the prior 30 seconds of video?
15   **A   Correct.**
16   Q   Okay, gotcha'.  But all of those are -- so Ken
17 Lopera's body-worn camera was functioning normally, is --
18   **A   Correct.**
19   Q   -- a more basic question.
20       Now, I'll just ask you, so Tashii Farmer just
21 approached.  It looks -- Ken Lopera's body-worn camera is
22 turning to the right.  Do you understand that to be the
23 part where he's handing his coffee to Officer Lif?
24   **A   I believe so.**
25   Q   Did you ever put together a timeline with Lif's

Page 132

1  statement in linking up the words that Lif told you were
2  said that she heard?  'Cause they're not in the police
3  report in terms of like, okay, up to six seconds did
4  Farmer say anything at that point.  Did she ever testify
5  to that?
6    **A   No.**
7    Q   Okay.  So we're at 12 seconds on the body-worn
8  cam.  Tell me what you see on this area.
9    **A   "Caution wet floor" cones that have a chain**
10 **between them.**
11   Q   Okay.  And do you see two -- or do you see
12 doors leading to a hallway?
13   **A   Yes.**
14   Q   Okay.  One door is closed, one door is open?
15   **A   Correct.**
16   Q   And which side of the chains is Tashii Farmer
17 on, the near side or the far side?
18   **A   The near side.**
19   Q   So Tashii Farmer has now stumbled through the
20 chains at 13 seconds?
21   **A   Correct.**
22   Q   Has anybody reached for him or grabbed for him
23 at this point?
24   **A   No.**
25   Q   So it's after he stumbled through the chains --

Page 133

1  we're now at 15 seconds -- that Officer Lopera reaches
2  out for him; correct?
3      A   Correct.
4      Q   Now, he could have been doing that in reaction
5  to the man almost falling; correct?
6      A   Could have.
7      Q   What's Tashii Farmer doing at this point?
8      A   Looks like he's trying to catch his balance.
9      Q   Okay.  His hands are up?
10     A   Yes.
11     Q   He appears to be moving away from Officer
12 Lopera?
13     A   Yes.
14     Q   And immediately now one second later he's
15 turned and he's running down the hallway; correct?
16     A   Correct.
17     Q   Or beginning to run down the hallway?
18     A   Correct.
19     Q   Now, as you look at this hallway, do you
20 believe that this hallway is open to the public or not?
21     A   It's an interior hallway of the hotel at this
22 point, just based on this video.
23     Q   And again sitting here today, you don't know.
24 You never asked?
25     A   Like I said, it's marked -- we never asked

Page 134

1  specifically.  It's marked with verbiage for the -- on
2  the sign.
3      Q   Now, how do you know it's marked?  What
4  verbiage on the sign?
5      A   On the one door there's a placard.
6      Q   And you didn't see that from the video; you saw
7  that by going physically inspecting it?
8      A   One of my team members did.
9      Q   Okay.  How come that wasn't in the Arrest
10 Report?
11     A   I don't know.
12     Q   Should it have been?
13     A   At the time I don't remember.  Whatever the
14 verbiage was, I don't remember.
15     Q   So the sound just came off at -- on at 30
16 seconds.  So you're telling me that's when an officer
17 would have pressed the button and it turns on the sound
18 and records back 30 seconds or saves the recording --
19     A   Correct.
20     Q   -- of the video for 30 seconds?
21     A   Correct.
22     Q   Do you have any idea where Officer Lif is at
23 this point?
24     A   No, sir.
25     Q   Did you go through that with her as to where

Page 135

1  she was at these various points?
2      A   Just during her audio interview.
3      Q   Okay.  Does it seem odd that she couldn't catch
4  up down this hallway?  I mean she knew they ran down this
5  hallway.
6      A   Does it seem odd?  I wouldn't say that it's
7  completely out of the ordinary.
8      Q   If you thought Tashii Farmer was mentally
9  ill -- you're the officer up there and you thought he was
10 mentally ill and he fled down this hallway -- would you
11 have pursued?
12     A   Me personally, I would have used other officers
13 to set up a perimeter and -- foot pursuit, no, I would
14 not have.
15     Q   So you would let somebody that was either under
16 the influence of a controlled substance or mentally ill
17 that hasn't been checked for weapons run into the back of
18 a casino and you would just contain them?
19     A   Contain them to find them, not just contain
20 them just to let them hang out, no, but --
21     Q   So you would agree with me that you would have
22 legal justification to detain them once you found them?
23     MR. LAGOMARSINO:  Objection; form, incomplete
24 hypothetical.
25 ///

Page 136

1  BY MR. MC NUTT:
2      Q   That's the purpose of a containment; right?
3      A   Yes.  However, again you still have to build
4  that reasonable suspicion and make sure that you have it
5  for the detention.
6      Q   Right.  But the detention could be 2 minutes or
7  the detention could be --
8      A   But just being --
9      Q   -- up to 60 minutes.
10     A   Somebody being mentally ill and you haven't
11 checked them for weapons isn't necessarily a reason to
12 detain them.
13     Q   It's not a reason but it can be a reason;
14 correct?
15     MR. LAGOMARSINO:  Form.
16     THE WITNESS:  It can be along with other factors.
17 BY MR. MC NUTT:
18     Q   So an officer could have legal justification to
19 detain a suspect in this situation?
20     MR. LAGOMARSINO:  Form.
21     THE WITNESS:  Could have, yes.
22 BY MR. MC NUTT:
23     Q   Did you walk this whole route?
24     A   Did I personally?  No.
25     Q   But one of your team members did?

Page 137

```
1    A  Yes.
2    Q  Did they try the radios in this area, do you
3  know?
4    A  No, but I know that that wasn't an attempt to
5  be broadcast over the radio.
6    Q  I'm sorry.  "No" they --
7    A  No, they did not try to --
8    Q  They did not try, okay.
9       You mean when he yells "Lif"?
10   A  Correct.
11   Q  I would agree with you that sounds to me like
12 he's just yelling out loud.
13   A  Okay.
14   Q  I wasn't trying to make that point.  I was just
15 trying to know whether you did or did not try to tell
16 whether the radios worked in that area, 'cause Lif
17 testified that she didn't use her radio 'cause she didn't
18 think they would work.
19   A  I don't know.
20   MR. LAGOMARSINO:  Move to strike.
21 BY MR. MC NUTT:
22   Q  Now, your understanding is who -- do you have
23 an understanding of who Officer Lopera was talking to
24 there?
25   A  Security officer.
```

Page 138

```
1    Q  From the Venetian?
2    A  Yes.
3    Q  And where did you get that understanding?
4    A  From an interview with that officer.
5    Q  I'm trying to get the truck to be in the frame.
6       Okay.  So we're at 1:31.  You agree with me
7  even though it's stopped at kind of a fuzzy angle, this
8  is where we start to see the white Toyota pickup truck
9  and Tashii Farmer is in the frame as well?
10   A  Uh-huh, yes.
11   Q  And this is the vehicle that was potentially
12 the subject of being carjacked, or that's the testimony;
13 correct?
14   A  Correct.
15   Q  Or the statements made I should say.
16      From this angle where Ken Lopera is on the
17 right side of the truck -- Tashii Farmer is on the left
18 side of the truck, you know, rounding the rear of it and
19 on the left side of the truck -- can Ken Lopera tell what
20 Tashii Farmer's -- how far he is away from the driver's
21 side or not?  Do you have a better video or did you watch
22 it --
23   MR. LAGOMARSINO:  Form, foundation.
24 BY MR. MC NUTT:
25   Q  -- to be able to tell that?
```

Page 139

```
1    A  I don't know what -- he stated his perception
2  was he tried to grab the truck bed.  That's just based on
3  what he told us.  Based off the video, I wouldn't say
4  it's very clear.
5    Q  Did you guys ever like do fingerprints and
6  things like on the truck to see if he ever grabbed it?
7    A  No, we didn't.
8    Q  Why not?
9    A  Based on the overhead video from the
10 surveillance from the Venetian -- there was one from the
11 parking garage that was real high -- it was pretty
12 apparent that he never touched the tailgate of the truck.
13   Q  What about the left side of the truck?
14   A  I believe that we were able to tell through
15 video that I don't think he --
16   Q  Okay.  So Ken Lopera says, "Stop.  Don't move."
17 You agree with that?
18   A  Uh-huh.
19   Q  We're at 1:33.  Tell me -- my question is going
20 to be, when I start the tape again, whether Tashii Farmer
21 complies or not.  So what did Tashii Farmer do in the two
22 seconds since Ken Lopera yelled, "Stop.  Don't move"?
23   A  Turned and started walking away.
24   Q  He's walking or running?
25   A  Fast walk, slow jog.
```

Page 140

```
1    Q  Okay.  Let's back -- let's back it up and watch
2  it again.
3       So walk, slow run or jog, whatever you said, is
4  that compliance when you tell someone to "Stop.  Don't
5  move"?
6    A  No.
7    Q  It's not compliance; correct?
8    A  No.
9    Q  And he just -- we're at 1:35 and he screamed,
10 "Stop or you're going to get tased"; correct?
11   A  Correct.
12   Q  And that's per policy, you're supposed to give
13 verbal commands prior to taser; correct?
14   A  Correct.
15   Q  So now we've got -- you heard the taser go?
16   A  Uh-huh, yes.
17   Q  We're at 1:36.  Okay, so Tashii Farmer is on
18 the ground at 1:40, 1:39 and Ken Lopera just said, "Don't
19 move"; correct?
20   A  Correct.
21   Q  Isn't it true that between 1:39 and 1:45 Tashii
22 Farmer had two verbal commands not to move but in fact he
23 began to sit up?
24   A  Yes.
25   Q  Is that compliance to you?
```

Page 141

1   **A   No.**
2      Q   Is six seconds at this distance in these
3   circumstances -- is that enough time to allow Tashii
4   Farmer to comply?
5      **A   Yes.**
6      Q   And in fact isn't it true, like your earlier
7   testimony, that when there's immediate noncompliance; you
8   don't have to wait any longer?  Correct?
9      **A   That's correct.**
10     Q   So is Ken Lopera justified at this point in
11  pulling the taser a second time?
12     **A   Yes.**
13     Q   Based on the noncompliance?
14     **A   Yes.**
15     Q   And he does do that and we see -- it looks like
16  he got NMI, or neuromuscular incapacitation, at that
17  point; correct?
18     **A   Correct.**
19     Q   How long does NMI last, if you know?
20     **A   If the cycle is complete, it will be a cycle of**
21  **the taser, so five seconds.**
22     Q   Okay.  And when you say, "if the cycle is
23  complete," what do you mean?
24     **A   If the probes have struck the subject and the**
25  **circuit between the two probes is active.**

Page 142

1      Q   Okay.  And so there could come a time where the
2   taser works the first time but not the second time or the
3   third time depending on whether that circuit is complete;
4   correct?
5      **A   Correct.**
6      MR. LAGOMARSINO:  Objection; form.
7   BY MR. MC NUTT:
8      Q   Did you make any determinations as to whether
9   or not NMI was achieved all of the taser strikes or the
10  taser triggers?
11     **A   We knew that -- from downloading the taser --**
12  **that not -- the current wasn't completed for some of the**
13  **trigger pulls --**
14     Q   Okay.
15     **A   -- on the taser.**
16     Q   Okay.  So between 1:46 and 1:51 that's where
17  there's a couple of random comments by Tashii Farmer
18  where he's saying, "I will, I will," but it doesn't seem
19  like it's in response to anything; correct?
20     MR. LAGOMARSINO:  Objection; form.
21     THE WITNESS:  Can you rewind?
22     MR. MC NUTT:  Sure.
23     Q   And at any point I'm happy to rewind it for
24  you.  I just can't promise to get it exactly back to
25  1:46.  So we're at 1:45.

Page 143

1      MR. LAGOMARSINO:  Objection; form.
2   BY MR. MC NUTT:
3      Q   So he says -- you agree Tashii Farmer is
4   saying, "I will, I will, I will"; right?
5         Ken Lopera is on the phone talking to control.
6   I think there's a word he says.
7      **A   Radio.**
8      Q   Yes.  What did I say?
9      **A   You said phone.**
10     Q   Oh sorry, on the radio.  Ken Lopera is on the
11  radio at this point.  Do you agree with me?
12     **A   Yes.**
13     Q   Thank you for the correction.
14        So 1:51 he says, "Don't move," and what is
15  Tashii Farmer doing?
16     **A   Looks like he's putting his shoe back on.**
17     Q   Okay.  But putting -- if that's what you're
18  interpreting, putting his shoe back on is not complying;
19  correct?
20     **A   Correct.**
21     Q   I mean when you tell somebody to not move, is
22  putting their shoe on authorized?
23     **A   It's not in compliance with the officer's**
24  **command.**
25     Q   Right.  Is it also possible that a suspect

Page 144

1   conceals a weapon in their shoe or in their ankle area?
2      **A   It's possible.**
3      Q   And at this point you would agree with me that
4   Tashii Farmer has not been searched for weapons; correct?
5      **A   Correct.**
6      Q   So based on just the body-worn cam, if Ken
7   Lopera does not know what the purpose of Tashii Farmer's
8   movement is, whether it's to get a weapon, to put his
9   shoe on, all he knows is that it's not compliance;
10  correct?
11     **A   Correct.**
12     MR. LAGOMARSINO:  Objection; form.
13  BY MR. MC NUTT:
14     Q   So at 1:55 Tashii Farmer had started to roll to
15  his right side; correct?
16     **A   Correct.**
17     Q   And this is where we see, if we remember from
18  the Arrest Report which is right here, Exhibit 1 -- you
19  can refer to it at any point -- where you had referenced
20  that Tashii Farmer begins to reach into the small of his
21  back; correct?
22     **A   Correct.**
23     Q   Your testimony is -- what did you believe he
24  was doing that for?
25     **A   To reach for the probe of the taser.**

Electronically signed by Ellen Goldstein (001-341-678-7457)                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 145

1    Q   Okay.  To remove the probes?  You don't -- if
2  you're removing the probes of a taser, is that compliance
3  with the police officer's commands?
4    **A   No.**
5    Q   Were all of Ken Lopera's commands lawful
6  commands that he was allowed to give a suspect at this
7  point?
8    **A   Yes.**
9    Q   Could he also be -- two people watching this
10 body-worn cam like us, could you also interpret it the
11 way Officer Lif did where he's reaching into the small of
12 his back and you have a concern about there potentially
13 being a weapon there?
14   MR. LAGOMARSINO:  Form, foundation, misstates
15 testimony.
16   THE WITNESS:  Yes.
17 BY MR. MC NUTT:
18   Q   So when Ken Lopera said, "Get on your stomach,"
19 did Tashii Farmer comply before Ken made contact with
20 him?
21   MR. LAGOMARSINO:  Objection as to time.
22 BY MR. MC NUTT:
23   Q   If you want me to walk it back, I will.  Yes?
24   **A   Yes, please.**
25   Q   So we're currently at 2:00 minutes.  I'll back

Page 146

1  it up to 1:56, which is actually I think where we were.
2  So tell me what Tashii Farmer is doing in relation to Ken
3  Lopera's commands.
4       So Tashii Farmer -- the command is, "Get on
5  your stomach."  Tashii Farmer says, "I will," but yet
6  he's reaching into the small of his back; correct?
7    **A   Correct.**
8    Q   Is that compliance?
9    **A   Can you let it replay for a second?**
10   Q   Sure.  Well, but just at this point as of 1:58,
11 is that compliance at this point?
12   MR. LAGOMARSINO:  Objection; form.
13   THE WITNESS:  Not according to the still shot on the
14 camera, but I think when you watch that shot, he's
15 reaching to his back and he's rolling simultaneously.
16 BY MR. MC NUTT:
17   Q   Okay.  We'll watch the whole thing.  This is
18 not a trick, but what I want to know is at this point
19 he's not complying.  He's reaching -- he's not getting on
20 his stomach, he's reaching into the small of his back;
21 correct?
22   **A   Correct.**
23   MR. LAGOMARSINO:  Objection as to "trick."
24 BY MR. MC NUTT:
25   Q   So at 1:59, 2:00 seconds, can you tell where he

Page 147

1  is at this point at least from the body-worn cam?  And
2  we're going to watch the overhead video too.
3    **A   It looks like he's rolled over to his stomach.**
4    Q   Okay.  I can't see that, but I think people can
5  make different opinions about what this clip shows, so
6  we'll go farther.  How about that?
7       So at 2:01 he's clearly not on his stomach;
8  right?
9    **A   Correct.**
10   Q   So it's my view of it, it doesn't look like he
11 ever got to his stomach as commanded and Ken Lopera has
12 now backed off from him because of the resistance.  You
13 would agree with that?
14   **A   I have no idea why he backed off.**
15   Q   Okay.  But you would agree with me that Tashii
16 Farmer is not complying with the commands?
17   MR. LAGOMARSINO:  I'm going to object to the line of
18 testimony in the sense that he keeps pausing it and not
19 playing the clips in completeness and it's misleading for
20 the record.
21   THE WITNESS:  He's not on his stomach like he was --
22 like Officer Lopera told him.
23 BY MR. MC NUTT:
24   Q   Do you think that at any point, what we've watched
25 so far, that other than the one caveat where you said it

Page 148

1  looks like he's going to his stomach, that he has
2  complied with any of Ken Lopera's commands?
3    MR. LAGOMARSINO:  Same objection.
4    THE WITNESS:  No.
5  BY MR. MC NUTT:
6    Q   So at 2:06 do you agree with me that Ken Lopera
7  is in contact with Tashii Farmer inasmuch as Ken Lopera's
8  left arm is grabbing Tashii Farmer's left arm?
9    **A   Yes.**
10   Q   And do we agree that there have been two taser
11 strikes at this point?
12   **A   Yes.**
13   Q   And do you know what drive stun is?
14   **A   Yes.**
15   Q   What is drive stun?
16   **A   It's when you use the taser itself to complete**
17 **the circuit by placing it on another part of the body.**
18   Q   Okay.  Did you hear that "Okay sir, okay sir"?
19   **A   I did.**
20   Q   Now, in your Arrest Report you attribute that
21 to Tashii Farmer, 2:07, "Okay sir, okay okay okay, sir."
22 I've had the benefit of hearing the security officer
23 Infantino's voice.  I'm simply -- I know you haven't.
24 I'm simply asking you, as we sit here having listened to
25 Tashii Farmer and listened to Ken Lopera, whether you

Page 149

1 still believe that that "okay" is coming from Farmer like
2 you put in your Arrest Report?
3    **A   Can you replay it.**
4    Q   Yes. So we're back at 2:04. We may have to --
5    **A   Can you play it one more time.**
6    Q   Sure.
7    **A   Can you play it from like 1:56 forward through.**
8    Q   How about 1:58?
9    **A   Sure.**
10    Q   Is that close enough? This is a little
11 imprecise on the mouse.
12    **A   One more time. There was something I was --**
13 **sorry, my brain is starting to melt down.**
14    Q   That's okay. Do you want to take a break?
15    **A   No. I want to go through it.**
16    MR. ANDERSON: I need to take a break in a minute.
17    MR. MC NUTT: Well, let's just get through this
18 piece.
19    MR. ANDERSON: That's fine.
20 BY MR. MC NUTT:
21    Q   So between the "okay okay, sir" and then the
22 "clear," obviously that was Tashii Farmer saying "I
23 will." Do you still believe that the "okay okay okay,
24 sir" is coming from Tashii Farmer or do you think it's
25 coming from a third source?

Page 150

1    **A   I don't know.**
2    Q   Okay. Do you want to take that break now?
3    **A   Sure.**
4    MR. ANDERSON: Yeah. I'll just take five minutes.
5    THE VIDEOGRAPHER: We are going off the record. The
6 time is approximately 1:03 p.m.
7        (Brief recess taken.)
8    THE VIDEOGRAPHER: The time is
9 approximately 1:11 p.m. We are back on the record.
10 BY MR. MC NUTT:
11    Q   Okay. So I think we -- the last question was
12 with respect to the 2:07 of your Arrest Report where you
13 have "okay okay okay, sir" and it says -- and my question
14 was whose voice was that; was it Tashii Farmer, as you
15 have written on your Arrest Report, or was it a third
16 source? And you -- after we looked at it a couple times,
17 you said you don't know?
18    **A   Correct.**
19    Q   Let me ask a slightly different question.
20       Listening to it again, do you have -- can you
21 affirmatively state that you're sure that it is Tashii
22 Farmer's?
23    **A   I believe it is, but I can't say with a hundred**
24 **percent certainty.**
25    Q   Okay. When you wrote the Arrest Report, did

Page 151

1 you have a hundred percent certainty?
2    **A   At that time I believed a hundred percent that**
3 **it was.**
4    Q   But after reviewing the video here today, you
5 now have questions as to who that actually is?
6    **A   Correct.**
7    Q   So I'm going to back it up to right around the
8 2:00-minute mark so we can get our orientation on the
9 video where we're at, or at least 2:05.
10       Okay. So during that sequence there's a lot of
11 movement of the body cam and it's a little bit jittery;
12 correct? And Tashii Farmer -- there's commands to get on
13 his stomach and you see that he's clearly on his back;
14 correct?
15    **A   Correct.**
16    Q   And you hear the taser being cycled, or at
17 least the trigger pulled. That's the "click click click
18 click click"; correct?
19    **A   Correct.**
20    Q   Were you able to determine, is this one of the
21 sequences in which there was not circuit closure and in
22 fact no electricity or energy was being transferred to
23 Tashii Farmer?
24    **A   I believe the term that was used was they**
25 **were — it was intermittent, and I believe that it was**

Page 152

1 from the third one on.
2    Q   Okay. And so isn't it true that had there been
3 complete circuit closure, that Tashii Farmer's body would
4 have went rigid with NMI just like it did the first two
5 times?
6    **A   That depends on several factors, including**
7 **spacing of the probes. So even if the circuit is**
8 **complete doesn't mean you're going to get complete NMI.**
9 **It depends on the spacing of the probes and other**
10 **factors.**
11    Q   Okay. But clearly here Tashii Farmer is not in
12 a situation where he has neuromuscular capacity --
13 neuromuscular incapacitation?
14    **A   Correct.**
15    Q   Because he's at least actively resisting Ken
16 Lopera; correct?
17    **A   Correct.**
18    Q   And we did hear Ken Lopera say "Help me out" to
19 security guards; right?
20    **A   Yes.**
21    Q   And we're at 2:21 and we now see a third party
22 enter the frame with a white shirt, blue or black pants
23 on. Do you know who that was?
24    **A   I know it's a Venetian security guard. I don't**
25 **know which one.**

Electronically signed by Ellen Goldstein (001-341-678-7457)                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 153

1    Q   Okay.  And he's now in contact with Tashii
2  Farmer; correct?
3    A   Yes.
4    Q   Did you hear that "okay, sir" again right
5  there?
6    A   I did.
7    Q   Now, on -- and we're at 2:28 and you have it
8  identified as 2:27, and maybe you were more accurate with
9  the transcription than I was with hitting pause.  Do you
10  believe that "okay, sir" is one of the security guards or
11  whether that's Tashii Farmer?
12    A   I believe it's Farmer.
13    Q   Okay.  I mean that's what you believed at the
14  Arrest Report time.  Hearing that now, do you still
15  believe that that's Farmer?
16    A   I do believe it.
17    Q   Would you like to hear it again?
18    A   Sure.
19    Q   So you heard the "Turn around."  That's clearly
20  not Farmer or Lopera.  Does that sound like the same
21  voice as the "okay, sir"?  I'll play it without stopping.
22    A   I'm not sure.
23    Q   Okay.  Reasonable minds can disagree on what
24  that evidence presents; correct?
25    A   Correct.

Page 154

1    Q   You at one point believed it was Tashii Farmer.
2  We'll -- I think we'll just have to depose the security
3  guards and get their opinion on it.
4        So we're now at 2:30 on the tape -- on the
5  body-worn cam of Ken Lopera.  So at any point have you
6  seen active aggressive resistance by Tashii Farmer?
7    A   No.
8    Q   You would agree with me that at minimum there's
9  active resistance; correct?
10    A   Correct.
11    Q   He's not complying with commands and he's
12  physically resisting arrest; correct?
13    A   Correct.
14    Q   And he's physically resisting arrest of a
15  law-enforcement officer in Ken Lopera and the assistance
16  of the Venetian security guards; correct?
17    A   Correct.
18    Q   On private property does Tashii Farmer have an
19  obligation under the law to listen to a command given to
20  him by the private-property security guard?
21        MR. LAGOMARSINO:  Form.
22        THE WITNESS:  I would believe so.
23  BY MR. MC NUTT:
24    Q   So Tashii Farmer is not complying with the
25  commands given by the security guard either at this

Page 155

1  point?
2    A   Correct.
3    Q   We're at 2:30.  We're going forward.  I want
4  you to tell me if at any point you see evidence of active
5  aggressive resistance as you defined Las Vegas Metro
6  policy.  I stopped the tape.  We went from 2:30 to 2:38.
7    A   Do I see active aggressive?
8    Q   Yes.
9    A   No, sir.
10    Q   Did you hear any strikes hit Officer Ken
11  Lopera?
12    A   Did I hear a strike hit Officer Lopera?
13    Q   Sure.  Did you hear any thumps or -- let's go
14  back to 2:30 and listen to it again.  So at 2:34 you're
15  going to hear a loud strike and I want you to tell me
16  what that is.
17        What made that noise?
18    A   I don't know.
19    Q   Do you think it was the wind?
20    A   Do I think it was the wind?
21    Q   Yes.
22    A   I don't think it was the wind.
23    Q   That's what Officer Kirkegard said it was.  Do
24  you know her?
25    A   I do.

Page 156

1    Q   You don't think that's the wind, do you?
2    A   I don't think it's the wind.
3    Q   Okay.  So let's go back.  So at this point
4  we're at 2:33, 2:34.  Ken Lopera has holstered his ECD;
5  correct?  And we saw at 2:33 -- where is Tashii Farmer's
6  right hand?  Did you see it?  Let me back it up.  Do you
7  see Tashii Farmer's right hand?  You can adjust this if
8  the light is bad.
9    A   I wouldn't be able to say which hand it is, but
10  I would assume that's one of his hands.
11    Q   Okay.  So we're at 2:33.  You see -- do you
12  recognize this to be a thumb with the right hand?  We
13  just saw Tashii Farmer is on his back and we're now
14  looking over the left shoulder of Officer Lopera.  Would
15  you agree with me that that's his right arm and hand?
16    A   Without watching the -- without watching the
17  video completely, just freezed on that one, I don't see
18  how you could say it's a right or left hand.
19    Q   Okay.  So you would agree that's one of Tashii
20  Farmer's arms?
21    A   Yes.
22    Q   We'll watch it through again.  Now I want you
23  to tell me whether or not you see a flash and/or hear a
24  strike hit Officer Lopera.
25        MR. LAGOMARSINO:  Form, foundation.

Electronically signed by Ellen Goldstein (001-341-678-7457)                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 157

1    THE WITNESS:  Do I see or hear a strike hit Officer
2  Lopera?
3    MR. MC NUTT:  Yes.
4    THE WITNESS:  I can't say that I do.
5  BY MR. MC NUTT:
6    Q    Okay.  So what was the cause of that loud thump
7  on Officer Lopera's body-worn cam?
8    MR. LAGOMARSINO:  Form.
9    THE WITNESS:  I have no idea.
10  BY MR. MC NUTT:
11    Q    No idea?  Could it be a strike?
12    MR. LAGOMARSINO:  Form.
13    THE WITNESS:  It could be a strike by anybody.
14  BY MR. MC NUTT:
15    Q    Well, do you think Ken Lopera was being struck
16  by Venetian security guards?
17    A    **In the video that I've watched, I don't believe**
18  **that I ever see Officer Lopera get struck.**
19    Q    Well, you're watching the video now and I'm
20  pointing something out.
21    A    **I don't see him get struck.**
22    Q    Look, there are other -- the more you look at
23  something, the more you investigate something, you learn
24  more things; correct?
25    A    **Correct.**

Page 158

1    Q    Okay.  So we'll watch it -- just like you
2  asked, we'll watch it the whole way through again.  So
3  you tell me whether you can identify it's a right or a
4  left arm.  But you would agree with me that at 2:33 one
5  of Tashii Farmer's arms is free and unrestrained;
6  correct?
7    MR. LAGOMARSINO:  Form.
8    THE WITNESS:  I don't think you can make that
9  determination out of this video because you don't see his
10  whole arm.  So it's possible that somebody is holding
11  onto his shoulder or pinning it against his arm, but I
12  don't think you can definitively say it's unrestrained.
13  BY MR. MC NUTT:
14    Q    You agree with me that Tashii Farmer is on his
15  back at this point?
16    A    **No.**
17    Q    What position do you think he's in?
18    A    **Can you rewind it.**
19    Q    Sure.
20    A    **At this point right here?**
21    Q    Well, I --
22    A    **Before he was on his back.  At this point I**
23  **believe he's on his stomach.**
24    Q    Okay.  Well, we're going to have to -- to use
25  Andre's objection, we'll have to back up and get some

Page 159

1  time stamps on that because we were talking about two
2  different times.
3    So at this point can you -- we're at 2:27.  Can
4  you tell me --
5    A    **He's on his back.**
6    Q    Okay.  Left side?  Right side?  On his back
7  something?  On his back.
8    A    **On his back.**
9    Q    That was a question.
10    A    **Sorry.**
11    Q    Okay.  So at this point what do you see in the
12  video with respect to Tashii Farmer's hands?
13    A    **He's got one hand over the other --**
14    Q    Okay.
15    A    **-- probably about his abdomen.**
16    Q    Does it look left hand over right hand as he's
17  on his back?
18    A    **Yes.**
19    Q    And the hand on the left that's holding Tashii
20  Farmer's right hand, that looks like Ken Lopera; correct?
21    A    **Yes.**
22    Q    And then this hand that's over here on the
23  right, do you know who that is shown at 2:29?
24    A    **I don't.**
25    Q    But presumed to be one of the Venetian security

Page 160

1  guards?
2    A    **Probably.**
3    Q    Okay.  So you just saw him roll over to his
4  right side; correct?
5    A    **Correct.**
6    Q    So we're at 2:32.  And there was nobody holding
7  his shoulder at that point; right?
8    A    **Correct.**
9    Q    Okay.  So at 2:32 his shoulder and arm are
10  free; correct?
11    A    **Correct.**
12    Q    And at 2:33 we just saw the flash of his arm up
13  there, the right arm; correct?
14    A    **Correct.**
15    Q    And now I want to know whether or not you think
16  there's a strike, that it's Officer Lopera?
17    MR. LAGOMARSINO:  Asked and answered.
18    THE WITNESS:  I don't believe so.
19  BY MR. MC NUTT:
20    Q    What do you think that was?
21    A    **I have no idea.**
22    Q    Okay.  But it's not the wind?
23    A    **I don't believe it's the wind.**
24    Q    Was it a windy night that night?
25    A    **I don't remember it being especially windy.**

Page 161

1    Q   Okay.  We've now opened up a separate video.
2   Do you recognize -- this has been produced by Metro in
3   this case as being the overhead CAM from outside the
4   Venetian.
5    A   Yes.
6    Q   Do you recognize this first frame to be that
7   case?
8    A   Yes, sir.
9    Q   And you viewed this in preparation for your
10  Arrest Report; correct?
11   A   Yes.
12   Q   So we're at 00:00.  Do you know what direction
13  we're looking?  I think this is an east-facing camera
14  along this service drive.
15   A   Correct.
16   Q   Okay.  And in the video we have a white car in
17  front next to -- do you understand those to be security
18  booths at that point?
19   **A   I believe they're like the either valet or**
20  **security booths.**
21   Q   Okay.  And when my expert went down there, he
22  said that they were security booths.
23   A   Okay.
24   Q   But whatever they are they are.
25       And do you see speed bumps along the way?

Page 162

1    A   It appears like there are.
2    Q   So we'll start this running.
3        And you've never seen this with audio; correct?
4    A   Correct.
5    Q   So did you ask anybody -- did this autofocus on
6   the action or was this somebody in the control room that
7   started to focus this camera and zoom in on the --
8    **A   My understanding is it was somebody that**
9   **manually moved the camera and zoomed it in.**
10   Q   Okay.  We'll get to the point where we can see
11  something 'cause I think it dips here in a minute.
12       So at approximately 27 seconds we now see the
13  white Toyota pickup truck in the left, Jonathan Pierce;
14  correct?
15   A   Correct.
16   Q   And we've got Officer Ken Lopera standing over
17  Tashii Farmer; correct?
18   A   Correct.
19   Q   And two other individuals around them; right?
20   A   Correct.
21   Q   And you testified you believe those to be
22  security guards?
23   A   Correct.
24   Q   Now, my expert says the distance between where
25  Ken Lopera and Tashii Farmer are and this speed bump is

Page 163

1   33 yards, and that comports with your estimate when you
2   said earlier about 28, 30 yards; correct?
3    A   Correct.
4    Q   Okay, so a little further.
5        So in particular I want to talk about where
6   Jonathan Pierce is when Ken Lopera goes into a
7   neck-restraint hold of any sort, okay?
8    A   Okay.
9    Q   So tell me when Ken Lopera goes into some sort
10  of neck-restraint hold.
11   A   Right there.
12   Q   Okay.  So at 54 seconds on this camera, we now
13  have Officer Crumrine appearing; correct?
14   A   Correct.
15   Q   So in fact Ken Lopera -- and he's just starting
16  to apply the hold here; correct?
17   A   It appears so.
18   Q   Okay.  So Officer Crumrine was actually
19  physically present for the entirety of the hold; right?
20   A   Correct.
21   Q   So we know that the white pickup truck has
22  passed the security-guard booth; correct?
23   A   Correct.
24   Q   So he's no closer than 33 yards if my expert
25  knows how to measure; right?

Page 164

1    A   Correct.
2    Q   Looking out the small side rearview mirror of
3   his Toyota Tacoma pickup truck?
4    **A   If that's what he said.**
5    Q   Yeah, that's what he said.
6    A   Okay.
7    Q   Do you think that his eye-witness testimony
8   regarding what's happening here is reliable based upon
9   that distance and the small aperture through which he was
10  viewing it?
11       MR. LAGOMARSINO:  Form, foundation.
12       THE WITNESS:  Do I think his testimony was correct
13  that Officer Lopera mounted --
14  BY MR. MC NUTT:
15   Q   Any aspect of it.
16   **A   I'd say it's fairly accurate.**
17   Q   Okay.  Based on what?
18   **A   Based on the video.**
19   Q   So you can see Officer Sergeant Crumrine in
20  this frame?
21   A   Correct.
22   Q   We're at :58.  What does he appear to be doing?
23   **A   Attempting to help take Farmer into custody.**
24   Q   And looks like he's grabbing an arm; right?
25   **A   Something.**

Page 165

1  Q  I'm asking. I'm not -- I'm asking what he's
2  doing.
3  A  I would assume it's an arm, but I —
4  Q  Does it appear to you that he's trying to pull
5  the arm out right before this?  Does it appear to you
6  that Tashii Farmer is resisting being handcuffed?
7  A  I don't think there's any way to tell from this
8  video and the angle.
9  Q  Okay.  So 1:03 what is Crumrine trying to do?
10  A  Looks like he had ahold of presumably an arm
11  and attempting to handcuff.
12  Q  Okay.  And then who is the second guy to show
13  up?
14  A  That vehicle should be Officer Tran and Flores.
15  Q  Right.  Do you recognize the guy who just ran
16  up?
17  A  That would be Officer Tran.
18  Q  Can you tell me, as we watch this, at what
19  point Officer -- excuse me -- Tashii Farmer is
20  handcuffed.
21  A  I don't think you can definitively say it, but
22  I'd say probably right about the time that Officer
23  Crumrine's encircling arm comes loose and they start to get
24  up.
25  Q  Okay.  So let's back it up and try to get a

Page 166

1  time stamp on that.  We're at 2:04, and so at 2:05 we
2  have Officer Lopera's arms come free.
3  MR. LAGOMARSINO: Sorry.  Just for the record, 2:04,
4  2:05 is referring to the time in --
5  MR. MC NUTT:  The video.
6  MR. LAGOMARSINO: -- on the Venetian surveillance,
7  not on the body cam.
8  MR. MC NUTT:  Correct.
9  MR. LAGOMARSINO: Just for the record.
10  BY MR. MC NUTT:
11  Q  And so let's just back up.
12  Your testimony was you can't definitively tell
13  'cause you can't see the hands, but you would presume
14  that he was handcuffed when Officer Lopera released --
15  A  Correct.
16  Q  -- his encircling arm?
17  And isn't it true that it's Metro policy for
18  the officer utilizing the LVNR to keep the encircling arm
19  in place until the suspect is in handcuffs?
20  A  I would have to read that policy specifically,
21  because I know that if you have somebody in LVNR and
22  another officer approaches and places him in the
23  handcuffs, then you would let him go.  However, I'm
24  pretty sure it also reads that if they go unconscious,
25  you release it and then complete the handcuffing.

Page 167

1  Q  Fair enough.  Of course assuming that you know
2  that they've gone unconscious; correct?
3  A  Correct.
4  Q  And you have identified in here several
5  spots -- 3:18, 3:19 -- on the Arrest Report where Ken
6  Lopera asks, "Is he out yet?  Is he out yet"?
7  A  Correct.
8  Q  And that indicates to you that Ken Lopera
9  clearly does not know the status of Tashii Farmer's
10  consciousness; correct?
11  A  Correct.
12  Q  And then 3:25 Officer Tran arrives, says, "Let
13  him go, Ken."  We now know that's Crumrine; right?
14  A  Yes.
15  Q  One second later Officer Lopera asks, "Are you
16  sure?"  Tran replies, "Yeah" -- Crumrine actually -- and
17  then -- have you reviewed Crumrine's testimony from any
18  of these cases, his actual deposition testimony?
19  A  No.
20  Q  Okay.  So are you aware of the fact, even if
21  your lawyer told you this -- 'cause a lawyer telling you
22  a fact, that's not a privileged communication -- that
23  Crumrine has testified that when he said, "Let him go,
24  Ken," Ken released any pressure that was there?
25  ///

Page 168

1  MR. LAGOMARSINO: Objection; form.
2  BY MR. MC NUTT:
3  Q  It was his perception that that occurred.
4  MR. LAGOMARSINO: Misstates.
5  BY MR. MC NUTT:
6  Q  Did you say --
7  A  No.
8  Q  -- "yes" or "no"?
9  A  No.
10  Q  And we already covered this, but at 4:11 where
11  you say, "Officer Lopera released the hold on Farmer,"
12  that simply means removed his encircling arm from
13  around --
14  A  Correct.
15  Q  -- from around Tashii Farmer?
16  A  Correct.
17  Q  So let's go to page 6 of 8.  11:25, "Officer
18  Rybacki approaches Officers Tran and Flores.  One of the
19  officers stated, 'He was out when we got here,' referring
20  to Farmer.  Officer Rybacki responded, 'Oh, he was
21  definitely on something.'"  Do you see that?
22  A  Yes, sir.
23  Q  Where did you get that from?
24  A  From Officer Rybacki's body-worn camera.
25  Q  And what was your understanding about what

Electronically signed by Ellen Goldstein (001-341-678-7457)      e81df1ea-a423-447b-bc71-283869a46bcf

Page 169

1 he -- who was he talking about "Oh, he"? Who is the "he"
2 in that sentence?
3   **A   I would have to watch it again, but based on**
4 **recollection, I'm not sure exactly what the reference to**
5 **on that was; and there's a reason why I say that, but I**
6 **would have to watch that clip again to -- it stands out**
7 **in my head, but I don't remember off the top of my head.**
8   Q   Isn't it reasonable to believe that Officer
9 Rybacki was talking -- the "he" was Tashii Farmer was
10 definitely on something, meaning like on drugs?
11   **A   I don't know that it was.**
12   Q   So on your analysis report for the taser at the
13 bottom of page 6 of 8, you identify the ECD was activated
14 by a trigger pull at 54 seconds -- well, whatever that
15 time stamp is. Is that a time stamp for the actual time
16 or what is that time stamp? Does the ECD have a time?
17   **A   That's the ECD time stamp.**
18   Q   Okay. For five seconds, then for five seconds,
19 for five seconds, for five seconds, for five seconds, for
20 five seconds, for nine seconds. "The ECD was rendered
21 safe at 55:10."
22       You've talked about the fact that there were,
23 at best, intermittent circuit closures on the
24 subsequent -- on taser strikes 3 through 7; correct?
25   **A   Correct.**

Page 170

1   Q   Why did you not identify that important fact in
2 this analysis of the taser?
3   MR. LAGOMARSINO: Objection; form.
4   THE WITNESS: In the analysis it doesn't talk about
5 any of the -- any of the circuits being complete or
6 incomplete because at the time of this we didn't have --
7 I don't believe that we had that detailed graph that
8 showed us which was intermittent and which wasn't.
9 That -- we did an initial download of the taser that gave
10 us the times and how many seconds, and then later on we
11 had the taser downloaded with a program from Axon that
12 actually shows you how the circuits were completed, and I
13 don't think we had it at this time.
14 BY MR. MC NUTT:
15   Q   So when you say "later on," that means after
16 June 5th of '17 when the Arrest Report was done?
17   **A   I mean that it was -- I believe it was**
18 **requested beforehand, but we didn't have the completed**
19 **report until afterwards.**
20   Q   Okay. Why didn't you wait to get that report?
21   **A   At that point I really didn't think that it was**
22 **applicable for the charges.**
23   Q   Okay. But I mean you've said that the taser
24 strikes were okay as long as they were within department
25 policy; correct?

Page 171

1   MR. LAGOMARSINO: Objection; form.
2   THE WITNESS: I said that I felt that the first two
3 taser strikes were appropriate.
4 BY MR. MC NUTT:
5   Q   And you would agree with me department policy
6 is three taser strikes and then you're supposed to look
7 for an alternative method?
8   **A   That's what it says.**
9   Q   Okay. So if there is three taser strikes,
10 let's just assume they were effective; you got NMI on all
11 three. It's a big difference between getting two NMI
12 events and getting seven neuromuscular-incapacitation
13 events; correct?
14   MR. LAGOMARSINO: Form as to "big difference."
15   THE WITNESS: There's a difference.
16 BY MR. MC NUTT:
17   Q   Okay. And when you had two NMI events but the
18 subsequent ones -- well, will you agree with me, based on
19 what we just watched, that strikes 3 through 7 did not
20 achieve neuromuscular incapacitation?
21   MR. LAGOMARSINO: Form.
22   THE WITNESS: I would agree.
23 BY MR. MC NUTT:
24   Q   So that's a big distinction between somebody
25 that has somebody in NMI seven distinct times versus

Page 172

1 someone that merely pulled the trigger that was
2 ineffective after two uses of the taser; correct?
3   MR. LAGOMARSINO: Form.
4   THE WITNESS: Well, there's -- yes, there's a
5 difference.
6 BY MR. MC NUTT:
7   Q   I mean it's not like Ken Lopera was pulling the
8 trigger because he wanted to cause anyone harm. He was
9 not getting the effect that the taser was supposed to
10 give him; correct?
11   MR. LAGOMARSINO: Form.
12   THE WITNESS: I have no idea. He didn't give me a
13 statement.
14 BY MR. MC NUTT:
15   Q   Okay. But what you watched on the video, the
16 taser did not perform as advertised after the second
17 strike; correct?
18   MR. LAGOMARSINO: Form.
19   THE WITNESS: There was no neuromuscular
20 incapacitation.
21 BY MR. MC NUTT:
22   Q   Correct. At any point after the second strike?
23   **A   I can't say that any point because we know at**
24 **some point the circuit was connected; it was**
25 **intermittent. So even if it was for a half a second,**

Electronically signed by Ellen Goldstein (001-341-678-7457)                    e81df1ea-a423-447b-bc71-283869a46bcf

Page 173

1 it's still going to cause the neuromuscular
2 incapacitation for that half-second before the circuit is
3 interrupted.
4    Q   But watching the video -- and you've watched it
5 many times; correct?
6    A   Correct.
7    Q   The body-worn camera, you could not tell at any
8 point that there was NMI after the first two strikes?
9    A   No.
10   Q   When you said that Ken had 10 to 12 strikes on
11 Tashii Farmer, were you going by arm movement or were
12 you -- did you have some video angle that you could tell
13 that the strikes actually connected?
14   A   That was going by the video and what appeared
15 to be punches towards Tashii Farmer.
16   Q   But you can't testify how many of those alleged
17 10 to 12 connected with any part of Tashii Farmer's body?
18   A   I would argue that all of them connected with
19 some part of his body --
20   Q   Okay.
21   A   -- based on the video.
22   Q   So it could have been connected with his hands
23 or his shoulder, not necessarily his head?
24   MR. LAGOMARSINO:  Can you repeat that question.
25   THE WITNESS:  When you watch the body-worn camera in

Page 174

1 conjunction with the Venetian video camera, it's --
2 sorry -- you can tell that strikes were directed towards
3 the head.
4 BY MR. MC NUTT:
5    Q   Security Guard Infantino testified at his
6 deposition that he was standing right there.  Do you
7 remember that?  He was one of the --
8    A   Correct.
9    Q   He testified that the blows were impacting
10 Tashii Farmer's arms and shoulder area, and I asked you
11 about that at your last deposition and you agreed with me
12 that he would have a good perspective on where those
13 blows landed.  Do you agree with that today?
14   A   If he's standing right there, yes.
15   Q   Would his viewpoint be more accurate than
16 watching these videos from afar?
17   A   Well, I think we have -- on that I think we
18 have conflicting with the coroner's report which states
19 that he had hemorrhaging and bruising on the scalp and
20 head.
21   Q   Which also could come from when they were
22 rolling around on the ground and Tashii Farmer's face was
23 in contact with the cement too?
24   A   I don't --
25   Q   You were looking at some -- the coroner's

Page 175

1 report?
2    A   I was just looking at the coroner's report --
3    Q   Okay.
4    A   -- to see where she had listed those.
5    Q   Did you find them?
6    A   I did, and it's pretty much all over the head.
7    Q   Okay.  You testified last time, page 107 of
8 your deposition, that it was reasonable for Ken Lopera to
9 maintain the LVNR -- I'm not trying to argue with the
10 LVNR -- to maintain the hold until he was either told to
11 let go or Tashii Farmer was in handcuffs.  Do you agree
12 with that?
13   MR. LAGOMARSINO:  Form.
14   THE WITNESS:  Yes.
15 BY MR. MC NUTT:
16   Q   Can I look at your exhibits here for a second?
17       From Exhibit 3, which is the Toxicology Report,
18 can you tell me whether or not the methamphetamine that
19 Tashii Farmer had in his system that night was of the
20 illegal variety or was from some other innocuous source?
21   MR. LAGOMARSINO:  Form, foundation.
22   THE WITNESS:  I don't know.
23 BY MR. MC NUTT:
24   Q   Okay.  Have you ever seen a subsequent
25 Toxicology Report that breaks the methamphetamine down

Page 176

1 between the different types, one of which is legal and
2 one of which is not legal -- or one of which is legal
3 when found in certain types of over-the-counter
4 medicines?
5    A   In reference to this case?
6    Q   Yes.
7    A   What was the date of that?
8    MR. MC NUTT:  So this is Exhibit 4.
9       (Defendants' Exhibit 4 was marked for
10 identification by the Certified Court Reporter.)
11 BY MR. MC NUTT:
12   Q   So what's been marked as Exhibit 4 is from the
13 exact same lab that did the initial Toxicology Report,
14 except this report, if you can see, was issued May 31 of
15 2018, almost a year after the events; and I'll represent
16 to you this was produced in another case and the lawyer
17 had Tashii Farmer's blood tested by the same lab to get
18 the specific breakdown of the D amphetamine versus
19 L amphetamine that you see on the front page here.
20       My first question is simply have you ever seen
21 this document?
22   A   I have not.
23   Q   Do you have any understanding about the
24 differences between D amphetamine versus L amphetamine?
25   A   I do not.

Page 177

1    Q   Okay. Is it your understanding from the
2  original Toxicology Report, Exhibit 3, that in fact
3  Tashii Farmer was under the influence of a controlled
4  substance, methamphetamine?
5    MR. LAGOMARSINO: Objection as to "under the
6  influence."
7    THE WITNESS: Yes.
8  BY MR. MC NUTT:
9    Q   Your answer is "yes"?
10   A   Yes.
11   Q   Okay. So I'm going to go ahead and hand it off
12  to Andre at this point. I will have a couple of
13  follow-up questions, but I don't want to waste any more
14  time getting organized for them. Just one or two
15  followups after he's done and then I'll be complete.
16  Thank you for your time.
17   MR. LAGOMARSINO: Are you passing?
18   MR. MC NUTT: For now, yeah. I will have one or two
19  followups of course, but --
20   MR. LAGOMARSINO: Well, I'm going to request
21  that we -- I'll stipulate to recess the deposition and
22  come back when he's fresh.
23   MR. ANDERSON: He says he's got about three hours.
24  I think we should come back.
25   THE WITNESS: Please.

Page 178

1    MR. MC NUTT: I don't have any problem with that as
2  long as we're not in any way suggesting that the
3  testimony you've given so far hasn't been accurate and
4  sentient.
5    MR. ANDERSON: You're the one that suggested that,
6  so --
7    MR. MC NUTT: Well, no, but I just want to make sure
8  that that's not what the implication is.
9    MR. ANDERSON: I talked to him before.
10   MR. LAGOMARSINO: All I can say is, based on his
11  comments and body language, that I believe it's
12  appropriate to recess the deposition and come back when
13  he's fresher.
14   MR. MC NUTT: Well, okay. You're causing me cause
15  for concern, Andre.
16   Q   Detective Alsup, are you capable of giving
17  accurate truthful testimony so far today?
18   A   Yes.
19   MR. MC NUTT: I have no qualms with recessing this
20  and coming back at a later date. I just don't want there
21  to be the argument made that the testimony he gave this
22  morning was because he was -- didn't have enough caffeine
23  in him or something like that.
24   MR. LAGOMARSINO: He said his brain was melting
25  down.

Page 179

1    MR. MC NUTT: Well, and I'm asking you on the record
2  whether or not that's an argument you're going to make.
3    MR. LAGOMARSINO: I'm going to reserve until we see
4  the transcript, but it's apparent to me that he's tired.
5  I'm not suggesting anything at this point with regard to
6  the accuracy or inaccuracy of his testimony. So me
7  simply suggesting to recess it is not meant to imply
8  that. I'm also not waiving any arguments, but I prefer
9  to have the witnesses fresh.
10   MR. MC NUTT: The problem there, Andre, is that
11  you're giving anyone that's listening to that cause for
12  concern that we're going to have to redo the entire
13  deposition.
14   MR. ANDERSON: Let's just say this: Andre will let
15  you know if he's objecting to any of the testimony given
16  before we take it again so you can go over that area
17  again.
18   MR. MC NUTT: Okay. And do you think that it's
19  appropriate to go over any of this area again because
20  your witness does not have his faculties?
21   MR. ANDERSON: No. I think he's been fine up to
22  this point.
23   MR. MC NUTT: Okay.
24   MR. ANDERSON: I think the questioning is
25  questionable, but he's answered just fine.

Page 180

1    MR. MC NUTT: Fair enough.
2    MR. LAGOMARSINO: So we'll recess and come back at a
3  time when everybody's fresh.
4    MR. ANDERSON: Good with me.
5    THE VIDEOGRAPHER: This concludes Volume I in the
6  video deposition of Trever Alsup. The original video of
7  today's testimony will remain in the custody of Las Vegas
8  Legal Video. The time is approximately 1:51 p.m. We are
9  going off the record.
10   THE REPORTER: And, gentlemen, do you need copies?
11   MR. ANDERSON: Yes.
12   MR. LAGOMARSINO: Yes, please.
13     (Deposition concluded at 1:51 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Electronically signed by Ellen Goldstein (001-341-678-7457)    10f2067d-6a01-4aae-a0af-3d96feb83a39

Page 181

1    CERTIFICATE OF DEPONENT
2
3  PAGE  LINE    CHANGE       REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13
14          * * * * *
15
16      I, TREVER ALSUP, deponent herein, do hereby
17  certify and declare under penalty of perjury the within
18  and foregoing transcription to be my deposition in said
19  action; that I have read, corrected and do hereby affix
20  my signature to said deposition.
21
22
23
24      _____
          TREVER ALSUP, Deponent
25

---

Page 182

1    REPORTER'S CERTIFICATE
2
3      I, Ellen A. Goldstein, a duly certified court
   reporter in and for the County of Clark, State of Nevada,
4  do hereby certify:
5      That I reported the taking of the deposition of
   TREVER ALSUP at the time and place aforesaid;
6
       That prior to being examined, the witness was
7  by me duly sworn to testify to the truth, the whole truth
   and nothing but the truth;
8
       That I thereafter transcribed my shorthand
9  notes into typewriting and that the typed transcript of
   said deposition is a complete, true and accurate
10 transcription of my shorthand notes taken down at the
   proceedings.
11
       I further certify that I am not a relative or
12 employee of an attorney or counsel of any of the parties,
   nor a relative or employee of any attorney or counsel
13 involved in said action, nor a person financially
   interested in the action.
14
       IN WITNESS THEREOF, I have hereunto set my hand
15 in the County of Clark, State of Nevada, this 22nd day of
   April 2019.
16
17      _____
          Ellen A. Goldstein, CCR No. 829
18
19
20
21
22
23
24
25

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

Page 183

1                UNITED STATES DISTRICT COURT

2                     DISTRICT OF NEVADA

3

4

5    TRINITA FARMER, individually, )
                                    )
6              Plaintiff,           )
                                    ) Case No.
7              vs.                  ) 2:18-cv-00860-GMN-VCF
                                    )
8    LAS VEGAS METROPOLITAN POLICE )
     DEPARTMENT, a subdivision of  )      CONDENSED
9    the STATE OF NEVADA; KENNETH   )
     LOPERA, individually; TRAVIS   )     TRANSCRIPT
10   CRUMRINE, individually;        )
     MICHAEL TRAN, individually;    )
11   MICHAEL FLORES, individually,  )
                                    )
12             Defendants.          )
     _____)
13

14

15

16       VIDEOTAPED DEPOSITION OF DETECTIVE TREVER ALSUP

17                       VOLUME II

18              Taken on Monday, July 1, 2019

19                    At 11:04 a.m.

20             3005 West Horizon Ridge Parkway

21                      Suite 241

22                   Henderson, Nevada

23

24

25   Reported by:  Cynthia K. DuRivage, CCR No. 451

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

## Page 184

APPEARANCES:

For the Plaintiff:
ANDRE M. LAGOMARSINO, ESQ.
CORY N. FORD, ESQ.
LAGOMARSINO LAW
3005 West Horizon Ridge Parkway
Suite 241
Henderson, Nevada 89052
(702) 383-0065

For the Defendant, Las Vegas Metropolitan Police Department,
Travis Crumrine, Michael Tran, Michael Flores:

CRAIG R. ANDERSON, ESQ.
MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711

For the Defendant, Kenneth Lopera:

DANIEL R. McNUTT, ESQ.
McNUTT LAW FIRM, P.C.
625 South 8th Street
Las Vegas, Nevada 89101
(702) 384-1170

Also Present:
Jesse James Mathis, Legal Videographer

* * * * *

## Page 185

INDEX

WITNESS: DETECTIVE TREVER ALSUP, VOL. II

|  | PAGE |
|---|---|
| Examination by Mr. Lagomarsino | 188,350 |
| Examination by Mr. Anderson | 288 |
| Examination by Mr. McNutt | 290 |

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Arrest Report (previously marked as Exhibit 1 but referred to herein) | 198 |
| 10 | Neck Restraint Research Through Major City Chiefs Association | 201 |
| 11 | Force Investigation Team Report In-Custody Death | 210 |
| 12 | Las Vegas Metropolitan Police Department Standardized Lesson Plan | 213 |
| 13 | Autopsy Report, Pathologic Examination On The Body Of Tashii S. Brown, Final Pathologic Findings | 228 |
| 14 | Diagram headed "Muscles of the neck" | 228 |
| 15 | Diagram of sternohyoid and omohyoid | 228 |
| 16 | Diagram of thyroid, larynx, and trachea | 228 |

## Page 186

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 17 | Police Fatality Public Fact-Finding Review | 287 |

## Page 187

LAS VEGAS, NEVADA; MONDAY, JULY 1, 2019
11:04 A.M.
---oOo---

THE VIDEOGRAPHER:  Good morning.  Today is July 1st, 2019.  The time is approximately 11:04 a.m.  This begins the video deposition of Trever Alsup, Volume 2.

We are located at Lagomarsino Law, 3005 West Horizon Ridge Parkway, No. 241, Henderson, Nevada 89052.

My name is Jesse James Mathis, court videographer with Las Vegas Legal Video.

This is United States District Court, District of Nevada, Case No. 2:18-cv-00860-GMN-VCF, in the matter of Trinita Farmer versus Las Vegas Metropolitan Police Department, et al., defendants.

This video deposition is requested by the attorneys for the plaintiff, Trinita Farmer.

And will counsel and all present please state your appearances for the record.

MR. LAGOMARSINO:  Andre Lagomarsino and Cory Ford for the plaintiff.

MR. McNUTT:  Dan McNutt on behalf of Officer Ken Lopera.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

3 (Pages 188 to 191)

Page 188

1    MR. ANDERSON: Craig Anderson on behalf of
2  defendants Las Vegas Metropolitan Police Department
3  and Officers Crumrine, Tran, and Flores.
4    THE VIDEOGRAPHER: Thank you.
5    The witness may now be sworn in by Cindy K.
6  DuRivage for All American Court Reporters.
7    MR. FORD: Do you have anybody on the
8  phone, Andre?
9    MR. LAGOMARSINO: No.
10    DETECTIVE TREVER ALSUP,
11  having been first duly sworn to testify to the truth,
12  the whole truth, and nothing but the truth, was
13  examined and testified as follows:
14
15    MR. LAGOMARSINO: So just off the record
16  really quick.
17    (There was a brief discussion off
18    the record.)
19    MR. LAGOMARSINO: Back on the record.
20
21    EXAMINATION
22  BY MR. LAGOMARSINO:
23    Q. Can you please state your name for the
24  record.
25    A. Trever Alsup.

Page 189

1    Q. What is your current occupation?
2    A. I'm a detective with the Las Vegas
3  Metropolitan Police Department.
4    Q. And you've testified regarding the matter
5  of Tashii Farmer on numerous occasions; is that
6  correct?
7    A. That's correct.
8    Q. Did you testify at the Grand Jury?
9    A. I did.
10    Q. Did you testify in the estate case with
11  Fred Sayre?
12    A. I did.
13    Q. And have you testified in Volume 1 in this
14  case?
15    A. I did.
16    Q. Okay. You also participated in a
17  presentation at the fact-finding review; is that
18  correct?
19    A. That's correct.
20    Q. Were you under oath or not in that
21  particular review?
22    A. No. No, I was not.
23    Q. Okay. Did you still endeavor to tell the
24  truth?
25    A. Yes.

Page 190

1    Q. Okay. All right.
2    Now, today, I'm going to be going over
3  questions that I believe require further examination
4  in this case that may have been vetted thoroughly in
5  the estate case but may not have been addressed in
6  the first volume of this deposition. So we're going
7  to try to keep it sequential, but we're just going to
8  jump around a little bit as well.
9    Is that okay?
10    A. Yes.
11    Q. All right.
12    With respect to your educational
13  background, when did you graduate high school?
14    A. 1991.
15    Q. And you went to high school here in
16  Las Vegas?
17    A. I did.
18    Q. Where did you go?
19    A. Bonanza High School.
20    Q. Did you go to high school with Frank Mir?
21    A. He was a little bit before me.
22    Q. Okay. After high school, did you enter the
23  military?
24    A. I did.
25    Q. What branch?

Page 191

1    A. The United States Navy.
2    Q. And how long were you in the Navy?
3    A. Four years.
4    Q. What was your discharge rank?
5    A. E-4, Petty Officer Third Class.
6    Q. And what was your military occupational
7  specialty?
8    A. I was in the medical field.
9    Q. Were you a paramedic?
10    A. The equivalent.
11    Q. Okay. And did you have to take classes?
12    A. I did.
13    Q. What kind of classes did you take for
14  training?
15    A. My first school was a six-month just basic
16  EMT type course, and then, from there, I did another
17  course in field medical services is what it's called,
18  and it's just advanced trauma life support for
19  gunshot wounds, things of that nature.
20    Q. Are you familiar with the human anatomy
21  from a medical perspective?
22    A. Yes.
23    Q. Now, did you go to college?
24    A. I have attended college, yes.
25    Q. Okay. And did you take studies in classes

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

4  (Pages  192  to  195)

Page 192

1  geared more towards biology in the medical field as
2  well?
3      A.  No.
4      Q.  When did you become employed by the
5  Las Vegas Metropolitan Police Department?
6      A.  1998.
7      Q.  And you went through the academy?
8      A.  I did.
9      Q.  What was your first assignment?
10     A.  After I graduated in the academy, you're
11  assigned as a trainee officer.  So it was just a
12  patrol trainee officer.
13     Q.  Okay.  And were you at the Southwest Area
14  Command?
15     A.  I started in the Downtown Area Command and
16  then went to the Southwest Area Command.
17     Q.  And how long were you in that particular
18  role?
19     A.  Patrol officer, approximately
20  three-and-a-half to four years.
21     Q.  What would be the next assignment after
22  that?
23     A.  It was called the problem solving unit.
24  It's kind of a step in between patrol and to being a
25  detective.

Page 193

1      Q.  And what were your responsibilities in the
2  problem solving unit?
3      A.  We just basically investigated any type of
4  crime that came in.  If it was a case that would we
5  could work before it got to the detective level, we
6  would try to solve it beforehand.
7      Q.  Were you still considered a patrol officer
8  at that point?
9      A.  Yes.
10     Q.  And how long were you in the problem
11  solving unit?
12     A.  Approximately a year-and-a-half to two
13  years.
14     Q.  After that, did you go to the community
15  oriented policing office?
16     A.  That was actually, I'm sorry, just prior to
17  the problem solving unit.
18     Q.  Okay.  And what were your responsibilities
19  in the community oriented policing office?
20     A.  Just working with different groups trying
21  to make, for instance, apartment complexes safer,
22  trying to coordinate neighborhood watch, things like
23  that.
24     Q.  When you were in the problem solving unit,
25  was that an investigative role?

Page 194

1      A.  Yes.
2      Q.  Did you receive any kind of training
3  besides what you received in the academy to perform
4  in the problem solving department?
5      A.  Various classes throughout that time and
6  throughout my career.
7      Q.  Do you consider yourself to have an
8  expertise in investigations?
9      A.  I would hope so.
10     Q.  Is it fair to say you've probably taken 40
11  to 60 classes concerning investigation-oriented
12  matters?
13     A.  I would say that's fair.
14     Q.  And that your career has substantially been
15  oriented towards investigation?
16     A.  Correct.
17     Q.  Were you ever a field training officer?
18     A.  I was.
19     Q.  And what did you do as a field training
20  officer?
21     A.  Whenever an officer comes out of the
22  academy, they ride with you to make sure that they
23  are proficient in handling the job of a patrol
24  officer.
25     Q.  And how long were you a field training

Page 195

1  officer?
2      A.  I think it was approximately nine months.
3      Q.  To your knowledge, does every Metro police
4  officer then become a field training officer?
5      A.  No.
6      Q.  What is required to become a field training
7  officer?
8      A.  There's a testing process, and then, you
9  have to go through a class for it.
10     Q.  Are you CIT certified?
11     A.  I am not.
12     Q.  Did you ever work in the violent crimes
13  section?
14     A.  I did.
15     Q.  When did you work in the violent crimes
16  section?
17     A.  I actually worked in the violent crimes
18  section two different times, and approximate dates
19  were 2008 to 2010, and then -- I think that was 2006
20  to 2008, and then from 2010 to 2014.
21     Q.  Can you give an estimate or approximation
22  as to the total number of years you worked in the
23  violent crimes section?
24     A.  Six to seven.
25     Q.  And is that where you were given the title

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

5 (Pages 196 to 199)

Page 196

1  of detective?
2      A.  Yes.
3      Q.  At some point, did you go to the IOCP
4  Bureau?
5      A.  I did.
6      Q.  What does IOCP stand for?
7      A.  Internal Oversight and Constitutional
8  Policing.
9      Q.  And when did you go there?
10      A.  That was in 2014.
11      Q.  Why did you decide to go there?
12      A.  I took a job with the, it's called CIRT,
13  the --
14      Q.  Critical --
15      A.  -- Critical Incident Review Team.
16      Q.  Okay.
17      A.  And I was there for approximately a
18  year-and-a-half before transferring over to the Force
19  Investigation Team.
20      Q.  So let's go back a little bit.
21          Did you volunteer to work at CIRT?
22      A.  I did.
23      Q.  Why?
24      A.  The mission of CIRT, I think, is a good
25  mission to develop better tactics, better training

Page 197

1  for the officers.  The mission to make the officers
2  safer appeal to me.  I thought it was a worthwhile
3  position.
4      Q.  And when you say make the officers safer,
5  safer for themselves and the community?
6      A.  Yes.
7      Q.  And then, you went over to Internal
8  Oversight and Constitutional Policing.
9          Why did you decide to go there?
10      A.  It's actually the same bureau.
11      Q.  Okay.
12      A.  CIRT is one section, and Force
13  Investigation Team or FIT is another section.
14      Q.  Okay.  So you went to FIT?
15      A.  Correct.
16      Q.  Why did you decide to go to FIT?
17      A.  I prefer the criminal investigation as
18  opposed to the administrative investigation.
19      Q.  Why is that?
20      A.  There's just a big difference between a
21  criminal investigation and administrative
22  investigation.
23          To give you a hard, definitive answer on
24  why, just the criminal investigation appeals to me
25  more than the administrative does.

Page 198

1      Q.  Now, in that bureau, were you called upon
2  to investigate instances where there were violent
3  encounters between the police and a citizen?
4      A.  Yes.
5      Q.  And that was in both CIRT and FIT, correct?
6      A.  Yes.
7          MR. LAGOMARSINO:  I don't remember where we
8  left off on the last depo, so we'll just start with 1
9  on this one.
10          MR. McNUTT:  Why don't we start with 10
11  because I know I didn't go past 10.  That way, we
12  don't have two No. 1s for him.
13          MR. LAGOMARSINO:  Okay.  Sounds good.
14  We'll start with 10.
15          THE VIDEOGRAPHER:  Mr. Alsup, when you
16  move, I think I'm getting your microphone rubbing
17  inside of your shirt.  Can you put it inside the
18  collar.
19          That's perfect, thank you.
20          (Exhibit 1 was marked for
21          identification by the reporter.)
22          MR. LAGOMARSINO:  Let's go off the record.
23          THE VIDEOGRAPHER:  The time is
24  approximately 11:18 a.m.  We are going off the
25  record.

Page 199

1          (There was a discussion off the
2          record.)
3          THE VIDEOGRAPHER:  The time is
4  approximately 11:21 a.m.  We are back on the record.
5  BY MR. LAGOMARSINO:
6      Q.  Detective, we've handed you Exhibit 1 that
7  you looked at in your prior deposition, correct?
8      A.  Correct.
9      Q.  And you authored this report?
10      A.  I did.
11      Q.  And you were assigned to conduct the
12  investigation regarding the death of Tashii Farmer,
13  correct?
14      A.  That's correct.
15      Q.  Prior to this investigation, can you
16  estimate how many times you've been called upon since
17  2014 to investigate something that related to an
18  investigation in FIT or in CIRT?
19      A.  Are we talking about how many times I've
20  been assigned to a case or how many times have I been
21  the lead on a case?
22      Q.  Fair.  How many times have you been
23  assigned the lead?
24      A.  In FIT, approximately eight to nine times
25  per year.  In CIRT, roughly the same.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

6  (Pages 200 to 203)

Page 200

1    Q.  Okay.  So what would be the approximate
2  total?
3    A.  32 to 40.
4    Q.  And not as a lead, how many times have you
5  participated in FIT and CIRT investigations combined,
6  approximately?
7    A.  2- to 300.
8    Q.  What type of training did you receive when
9  you went to the IOCP Bureau?
10    A.  Taken several courses on homicide
11  investigation, several classes through Force Science.
12  Off the top of my head, those are the ones that stick
13  out.
14    Q.  Did you become aware that Metro conducted
15  neck restraint research through the Major City Chiefs
16  Association?
17    A.  Yes.
18    Q.  How did you become aware of that?
19    A.  I believe that led to a policy change
20  for the department.
21    Q.  And do you know when that research was
22  conducted?
23    A.  I believe that it was after this incident.
24    MR. LAGOMARSINO:  All right.  We'll make
25  this 10.

Page 201

1    (Exhibit 10 was marked for
2    identification by the reporter.)
3    MR. McNUTT:  Did you say 10 for this one?
4    MR. LAGOMARSINO:  Yes.
5  BY MR. LAGOMARSINO:
6    Q.  I've just handed you what has been marked
7  as Exhibit 10.  Can you go ahead and flip through
8  that and review it.
9    Have you ever seen this document before?
10    A.  I have not.
11    Q.  How did you become aware that neck
12  restraint research was being conducted?
13    A.  I had just heard that through different
14  channels at the department.
15    Q.  Okay.  Did you ever participate or attend
16  any meetings regarding this research or its findings?
17    A.  I did not.
18    Q.  Have you ever reviewed any emails or other
19  documentation regarding the research or its findings?
20    A.  I have not.
21    Q.  Have you ever participated in any
22  discussion at any time in your career with Metro as
23  to whether the LVNR should be allowed as a low-level
24  or intermediate force option?
25    A.  I have not.

Page 202

1    Q.  Do you have an opinion as to whether the
2  LVNR should be used as a -- strike that.
3    Do you have an opinion as to whether the
4  LVNR should have been used as a low-level or
5  intermediate force option?
6    MR. ANDERSON:  Objection, form.
7    THE WITNESS:  I don't.
8  BY MR. LAGOMARSINO:
9    Q.  Have you been trained on neck restraints?
10    A.  On the LVNR.
11    Q.  Okay.  And if the LVNR is applied
12  incorrectly, is there a potential for significant
13  injury?
14    A.  Yes, there is.
15    Q.  Including death?
16    A.  I would assume so, yes.
17    Q.  Okay.  In all the investigations that
18  you've participated in in either a FIT role or CIRT
19  role, are you able to give an approximation as to how
20  many involved neck restraints, including the LVNR?
21    A.  I believe two that I can remember.
22    Q.  Two including this one?
23    A.  Correct.
24    Q.  Okay.  What was the other one?
25    A.  There was another one where I believe that

Page 203

1  an LVNR had been used.  However, it was unsuccessful,
2  and I want to say that there was a fight afterwards
3  that led to a significant injury of the officer.
4    Q.  Do you remember the officer's name?
5    A.  I don't.
6    Q.  Do you remember the suspect's name?
7    A.  I don't.
8    Q.  Do you remember approximately when this
9  occurred?
10    A.  I'd say either in 2014 or 2015.
11    Q.  Do you remember any other details of the
12  incident?
13    A.  Off the top of my head, no.
14    Q.  Did you assess the number of times that
15  Officer Lopera utilized his TASER with Tashii Farmer?
16    A.  I believe there were seven different
17  trigger pulls on the TASER.
18    Q.  Did you believe at some point the use of
19  the TASER became excessive?
20    MR. McNUTT:  Objection, form.
21    THE WITNESS:  Yes.
22  BY MR. LAGOMARSINO:
23    Q.  At which point do you believe it became
24  excessive?
25    A.  In my opinion, it would have been after the

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

Page 204

third trigger pull.
Q.  Were the first four trigger pulls successful?  Strike that.
Did the first four trigger pulls connect?
MR. McNUTT:  Objection, form.
THE WITNESS:  By the download of the TASER that would we got, you could tell that a circuit was completed on several of the TASERs or of the utilizations of the TASER.  However, several were intermittent.
But then, comparing that to body cam footage, you could tell that, at certain points, there was neuromuscular incapacitation.
BY MR. LAGOMARSINO:
Q.  What is neuromuscular incapacitation?
A.  It's when the circuit through the TASER connects or travels through the body, and it just basically, the easiest way to explain it is it locks the body up to where you're not able to control your muscle actions.
Q.  How long did that last with Tashii Farmer each time NMI was achieved?
A.  Well, a cycle on the TASER when you pull it is five seconds.  So for me to be able to say that it lasted for the full five seconds, according to a

Page 205

couple graphs, I think that happened twice.  But there are other ones that showed that it was intermittent.
Q.  In your police report, did you address your belief as to whether Officer Lopera gave Farmer a reasonable amount of time to comply with commands before cycling the ECD again?
A.  And what was your finding?
A.  That he did not.
Q.  Was it your belief that the verbal commands that Officer Lopera gave Farmer, such as "Don't move" and "Get on your stomach" were contradictory?
A.  Yes.
Q.  Did you believe it was unreasonable for Officer Lopera to expect compliance when he told Farmer to, "Don't move" but also to get on his stomach while cycling through the ECD?
A.  Yes.
MR. McNUTT:  Objection, form.
BY MR. LAGOMARSINO:
Q.  Going to page 7 of your report.
On the second highlighted paragraph -- do you have a highlighted copy there?
A.  I do.

Page 206

Q.  Did you write:
"LVMPD policy states, after the initial five-second cycle, the officer will evaluate the need to apply an additional five-second cycle after providing the subject a reasonable opportunity to comply"?
A.  Yes.
Q.  "Policy further states, after The subject has been exposed to three cycles, the ECD shall be deemed ineffective and another force option will be considered."
Did you write that?
A.  Yes.
Q.  So according to LVMPD policy, the officer needs time to evaluate whether to apply an additional five-second cycle, correct?
A.  Correct.
Q.  Other than the highlights that are present on this exhibit, does this exhibit appear to be a true and accurate copy of your report?
A.  Yes.
MR. ANDERSON:  In addition to the highlights, there's some handwritten stuff.  You

Page 207

included that as not part of his report too, right?
BY MR. LAGOMARSINO:
Q.  Okay.  I do note there's a handwritten copy on my copy -- a handwritten note on my copy.  That is not yours?
A.  That is not mine.
Q.  All right.  Under Metro policy, when is an officer allowed to deliver strikes to an individual's head?
A.  Basically, the easiest way to explain it is when the officer is in fear of harm to himself.
Q.  You wrote on page 7 that:
"Farmer did not appear to be displaying aggressive resistance."
At any time during your evaluation of this incident, did Farmer appear to be displaying aggressive resistance?
A.  Not in my opinion.
Q.  Did you assess that, basically, Farmer was trying to protect his face from being hit when Officer Lopera began to strike him?
MR. McNUTT:  Objection, form.
THE WITNESS:  I would say that's fair.
BY MR. LAGOMARSINO:
Q.  And did you believe it was unreasonable for

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

8  (Pages 208 to 211)

## Page 208

Officer Lopera to strike Mr. Farmer 10 to 12 times?
   A.  Yes.
      MR. McNUTT:  Objection, form.
BY MR. LAGOMARSINO:
   Q.  Going to page 8, you wrote:
      "Due to the fact that
      Officer Lopera, who was on duty and
      acting in the official capacity of a
      police officer, attempted to detain
      Farmer inside the Venetian Hotel
      without sufficient legal authority
      for the detention."
      What did you mean by saying that?
   A.  Basically that he was on duty, he was
performing his job as a police officer, and that the
initial encounter didn't rise to the level of
reasonable suspicion or probable cause to make a stop
or the arrest.
   Q.  Irrespective of whether the hold that
Lopera applied, it was a LVNR or a rear naked choke,
do you believe that either one would have been
excessive in this circumstance?
   A.  I do.
      MR. McNUTT:  Objection, form.

## Page 209

BY MR. LAGOMARSINO:
   Q.  Did you see any justification for applying
a lateral vascular neck restraint?
   A.  No.
   Q.  Or a rear naked choke?
   A.  No.
   Q.  Now, just to clarify a little bit, if
Lopera believed that he was in fear for his life,
would he have been justified in using -- strike that.
      If Lopera was in fear for his life, would
he have been justified in using a rear naked choke?
      MR. ANDERSON:  Objection, form.
      MR. McNUTT:  Objection.
      THE WITNESS:  Not according to department
policy.  Per department policy, the only neck
restraint that's allowed is the LVNR.
BY MR. LAGOMARSINO:
   Q.  How does active resistance differ from
passive resistance?
   A.  An attempt to harm the officer.
   Q.  Did you see any intent on the video, or any
video, to harm the officer on Farmer's part?
   A.  I did not.
   Q.  And how do people demonstrate intent?
   A.  Well, if you are throwing strikes or trying

## Page 210

to hit the officer or kick the officer, use a weapon
against the officer, that demonstrates the intent to
harm the officer.
      MR. LAGOMARSINO:  Dan, did you introduce
the FIT report last time?
      MR. McNUTT:  No.
      MR. LAGOMARSINO:  11.
      (Exhibit 11 was marked for
      identification by the reporter.)
BY MR. LAGOMARSINO:
   Q.  Did you author the FIT report in this
matter?
   A.  I did.
   Q.  Other than some redaction that's in there,
can you take a look at this and tell us if this
appears to be a true and accurate copy of the FIT
report that you authored?
   A.  It does.
   Q.  Now, obviously, you authored that pursuant
to your job duties?
   A.  Correct.
   Q.  All right.  Can you please turn to page 33.
      Does the section in the first half of the
page accurately describe what passive resistance is
as opposed to active and aggressive resistance?

## Page 211

   A.  According to our policy at the time, yes.
   Q.  Has it since changed?
   A.  Use of force policy has changed.
   Q.  Has it changed with respect to passive,
active, and aggressive resistance?
   A.  I do not believe so.
   Q.  Now, in item No. 2, you wrote:
      "During the subsequent ACD cycles,
      Farmer was displaying passive and
      active resistance.  Prior to and
      during the repeated strikes to
      Farmer's head, Farmer was displaying
      passive and active resistance."
      MR. McNUTT:  Andre, where are you reading
that from?
      MR. LAGOMARSINO:  Sorry, No. 2.
      MR. McNUTT:  But you switched pages?
      MR. LAGOMARSINO:  No.  Page 33.
      MR. McNUTT:  Oh, 2 at the bottom, sorry.
Gotcha.
BY MR. LAGOMARSINO:
   Q.  All right.  We'll start the question again.
      So under No. 2 on page 33, did you write
that:
      "During the subsequent ACD cycles,

Detective Trever Alsup - Vol. II - July 1, 2019
* * * Videotaped Deposition * * *

9 (Pages 212 to 215)

Page 212

1         Farmer was displaying passive and
2     active resistance"?
3        A.  Yes.
4        Q.  How was he displaying passive and active
5     resistance?
6        A.  He was actively trying to keep
7     Officer Lopera from taking him into custody.
8        Q.  By doing what?
9        A.  Either put his hands underneath him,
10    running away, actions where there didn't appear to be
11    a display to intent to harm the officer but prevent
12    being taken into custody.
13       Q.  Would trying to remove the probes be active
14    resistance?
15       A.  Yes.
16       Q.  And would you defer to the video -- strike
17    that.
18           After the first TASER strike, did Farmer
19    attempt to run away?
20       A.  After the first one?
21       Q.  Right.
22       A.  He was on the ground and sat up.
23       Q.  So he sat up, that's the --
24       A.  Well, without watching the video again, I
25    know that after the first one, he was on the ground.

Page 213

1     I believe that's when he tried to remove the probe
2     and I think put his shoe back on.
3           I don't remember if he actually made it to
4     a full sitting position or not.
5        Q.  After the very first TASER strike, did
6     Tashii go to the ground?
7        A.  Yes.
8        Q.  Did he ever get up off the ground again?
9           MR. McNUTT:  Objection, form.
10          THE WITNESS:  Standing to his feet?
11    BY MR. LAGOMARSINO:
12       Q.  Correct.
13       A.  No.
14          MR. LAGOMARSINO:  12.
15          (Exhibit 12 was marked for
16          identification by the reporter.)
17    BY MR. LAGOMARSINO:
18       Q.  I've handed you what has been marked as
19    Exhibit 12.  Go ahead and flip through that, and let
20    us know if you've ever seen this before.
21       A.  I have seen it before.  It's not a document
22    that I've read cover to cover or in its entirety.
23       Q.  Okay.  At least in terms of having seen it
24    before, does it appear to be a true and accurate copy
25    of the BDT01 introduction to DTs, basic ready, lag

Page 214

1     time pat-downs?
2           MR. ANDERSON:  Objection, form.
3           THE WITNESS:  Yes.
4           MR. ANDERSON:  Go ahead.
5     BY MR. LAGOMARSINO:
6        Q.  If an officer believes that a subject is
7     resisting attempts to handcuff him, what options does
8     the officer have to use in terms of force to attempt
9     to handcuff him?
10       A.  Well, basically, at that point, any of the
11    tools that are available on the officer's belt.  He
12    could use the baton to assist in handcuffing.
13          The pepper spray.  It just kind of depends
14    on how things -- in the officer's mind how things are
15    escalating and where he's at.
16       Q.  What are weaponless defense techniques?
17       A.  Oh, there's arm bars, there's distract
18    methods.  There's a lot.
19       Q.  Wrist locks?
20       A.  I'm sorry?
21       Q.  Wrist locks?
22       A.  Correct.
23       Q.  Is one method to disengage by pushing the
24    suspect forward?
25       A.  Yes.

Page 215

1        Q.  Is another method to step back and create
2     distance?
3        A.  Yes.
4        Q.  What is objectively reasonable force?
5        A.  What another officer -- basically, the
6     simple term is what another officer would believe to
7     be reasonable.
8        Q.  Okay.  And what is subject of reasonable
9     force?
10       A.  I'm sorry?
11       Q.  What is subject of reasonable force?
12          MR. ANDERSON:  Objection, form.
13          THE WITNESS:  I'm not exactly -- it's not a
14    term that I've ever heard.
15    BY MR. LAGOMARSINO:
16       Q.  Okay.  Do officers have to receive training
17    on resistance handcuffing?
18       A.  You mean handcuffing when a subject is
19    resisting them?
20       Q.  Yes.
21       A.  Yes.
22       Q.  And do officers have to take tests in that
23    regard?
24       A.  We have tests on defensive tactics.
25    Without knowing the exact training manual, how it's

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

10 (Pages 216 to 219)

Page 216

1  written, I would say that it's covered in DTs. I
2  don't know if it's something that is tested on.
3     Q.  Is it pass-fail or an honor system, or how
4  does it work?
5     A.  You conduct your quarterly DT training with
6  an instructor, and he monitors the progress
7  throughout the class.
8     Q.  Is there an actual test?
9     A.  Like a written test?
10    Q.  Right.
11    A.  We have tests on the use of force policy.
12    Q.  How about for DTs?
13    A.  That would be incorporated into the use of
14  force policy.
15    Q.  What are -- strikes that.
16       How would you define the term
17  "de-escalation techniques"?
18    A.  My own personal term would be it's to try
19  to find a way to slow the momentum, calm things down,
20  and find a peaceful resolution to a problem.
21    Q.  Did you observe Officer Lopera perform any
22  de-escalation techniques?
23    A.  I honestly can't answer that because he did
24  not give us a statement.
25       Uses of force can be a form of

Page 217

1  de-escalation, but without him giving me a statement,
2  I don't know what his opinion on that was.
3     Q.  So you're saying in terms of his intent,
4  it's hard to discern his intent if he hasn't spoken
5  to you; is that correct?
6     A.  Correct.
7     Q.  In terms of his actions, did you observe
8  de-escalation techniques?
9     A.  Not in my opinion.
10    Q.  Now, in this investigation --
11    A.  Let me -- can I --
12    Q.  Sure.
13    A.  -- clarify one thing real quick.
14    Q.  Sure.
15    A.  In the very limited walk-through that he
16  did give us, he stated that he thought that
17  Mr. Lopera was attempting to carjack the vehicle, at
18  which point he deployed his TASER.
19       At that point, you could argue that that
20  was a form of de-escalation.
21       Again, without a statement and what was
22  going through his mind, I have no idea.
23    Q.  You have previously testified whether you
24  believed that Farmer was attempting to carjack,
25  correct?

Page 218

1     A.  I'm sorry?
2     Q.  You've previously answered the question as
3  to whether you believe that Farmer was attempting to
4  carjack?
5     A.  Right.
6     Q.  And in this case, do you believe that
7  Farmer was attempting to carjack the vehicle?
8     A.  I do not.
9     Q.  Did Jonathan Pearce, the driver, believe
10  that he was trying to carjack the vehicle?
11    A.  Not in his statement.
12    Q.  Did Officer Colon -- am I pronouncing that
13  correct?
14    A.  Colon.
15    Q.  Colon.  Did he assist you in this
16  investigation?
17    A.  He did.
18    Q.  What was his role?
19    A.  He basically was with me for the
20  documentation of the scene and performing any tasks
21  that I might need to be done.
22    Q.  How long have you worked with
23  Officer Colon -- or, strike that -- Detective Colon?
24    A.  Since approximately 2006.
25    Q.  What is his first name?

Page 219

1     A.  Marc, with a C.
2     Q.  How many investigators did you have working
3  with you regarding this incident?  Let me rephrase
4  the question.
5       Oh, go ahead.  Strike that.
6       Let me restate the question.
7       How many investigators did you have working
8  with you on this investigation?
9     A.  For the Force Investigation Team?
10    Q.  Yes, sir.
11    A.  Five.  And a supervisor.
12    Q.  Is the supervisor the sergeant?
13    A.  Yes.
14    Q.  Is the case agent the same as the primary
15  investigator?
16    A.  Yes.
17    Q.  And that was you?
18    A.  Yes.
19    Q.  And you were assigned to that position?
20    A.  Yes.
21    Q.  Did Sergeant McDonald supervise everything
22  that you did?
23    A.  He was aware of what was going on
24  throughout the investigation.  To say that he was
25  standing over me the whole time, no.

Detective Trever Alsup - Vol. II - July 1, 2019
* * * Videotaped Deposition * * *

11 (Pages 220 to 223)

Page 220

1   Q. But in a general sense that he supervised
2   the investigation?
3       A. Yes.
4       Q. Who else was a member of the investigation
5   team?
6       A. That was on scene that night, it was
7   Detective Marc Colon, Detective Joe Patton, Detective
8   Blake Penny, and Detective Jason Leavitt.
9       Q. Who makes the determination as to how to
10  divide up the responsibilities for the investigation?
11      A. It's kind of a standardized thing that
12  we've developed, but it's up to the case agent.
13      Q. And so, you made a determination as to
14  which detectives would interview certain witnesses?
15      A. No. Basically what happens is we get a
16  list of people that need to be interviewed, and we'll
17  basically, if there's going to be three detectives
18  that handles interviews, they just go out and start
19  doing them. And there's no rhyme or reason for who
20  they take first, second, third as long as they all
21  get done.
22      Q. Were there also CSIs at the scene?
23      A. Yes.
24      Q. What does CSI stand for?
25      A. Crime scene investigator.

Page 221

1       Q. And what does a CSI do?
2       A. They also help document the crime scene,
3   they take photos of the crime scene, label evidence,
4   collect evidence, impound evidence.
5       Q. Do you know how many CSIs responded to this
6   one?
7       A. Off the top of my head, no.
8       Q. Do you know what, if anything, the CSIs
9   collected?
10      A. I know there were several photographs
11  taken.
12      Q. Were there chads?
13      A. Yes.
14      Q. What are chads?
15      A. Chads are little circular pieces of paper
16  that are deployed or expelled when the TASER is
17  deployed, and they identify the cartridge, the TASER
18  cartridge that they came from.
19          I believe there was also blood samples
20  taken.
21      Q. Who were blood samples taken from?
22      A. It was from blood that was found on the
23  ground at the scene.
24      Q. Were any blood samples taken from
25  Officer Lopera?

Page 222

1       A. No.
2       Q. Were any urine or drug samples taken from
3   Officer Lopera?
4       A. No.
5       Q. To your knowledge, does Metro have a policy
6   regarding whether officers can take
7   performance-enhancing drugs, such as steroids?
8       A. They cannot.
9       Q. Now, in terms of the case file, there's a
10  temporary custody of record, correct?
11      A. Correct.
12      Q. Declaration of arrest?
13      A. Correct.
14      Q. Arrest report?
15      A. Yes.
16      Q. Copies of all transcribed statements from
17  all the interviews?
18      A. Correct.
19      Q. The autopsy report?
20      A. Correct.
21      Q. The toxicology reports?
22      A. Correct.
23      Q. Are there documents provided by the Coroner
24  to you to support the autopsy report?
25      A. We just get a copy of the autopsy report.

Page 223

1       Q. There are also body-worn cameras, correct?
2       A. Correct.
3       Q. And surveillance video from the Venetian?
4       A. Yes.
5       Q. Did you notice in reviewing the body cam
6   footage that certain officers were turning on their
7   body cameras, and then turning them off when they
8   were talking about the incident?
9       A. Yes.
10      Q. Is that compliant with policy?
11      A. Yes.
12      Q. Why is that?
13      A. I don't know off the top of my head exactly
14  how the policy reads, but basically, once the call
15  comes to a conclusion, they are allowed to turn the
16  body cam off.
17          For instance, if an officer is on a
18  perimeter spot, he can intermittently turn the body
19  cam on and off. If somebody approaches him to ask
20  him a question, turn it back on.
21          Again, I am not an expert by any means in
22  that policy, but I do know that it is permitted to
23  turn the body cam off during a call.
24      Q. Okay. Let me just clarify that last
25  answer.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

12 (Pages 224 to 227)

Page 224

You stated that they're allowed to turn the
body camera off when the call is concluded, correct?
A. (No audible response.)
Q. All right. In your view -- I'm sorry. You
nodded "Yes"; is that correct?
A. Correct.
Q. When did the call conclude here?
A. I would argue that the call concluded when
medical was there, began their assessment of
Mr. Farmer and took over his care.
Q. And when you say medical, are you talking
about the EMTs?
A. Correct.
Q. Now, during the call, are the officers
permitted to turn their body cams off, per policy?
Strike that.
I know you're not speaking for Metro here,
but as to your understanding of the policy, were the
officers permitted to turn their body cams off during
the call?
A. Again, I'm going to have to say I don't
know.
I know that there are circumstances in the
policy where body cams are allowed to be turned off,
and I don't know exactly how the policy reads.

Page 225

Q. Now, going back to the police report, let
me get a page of the report.
Under the "Circumstances of Arrest" on
page 1, there's a reference to a Sergeant
Abdal-Karim; is that right?
A. Correct.
Q. Did Sergeant Abdal-Karim provide you with
information in this report?
A. He provided us a briefing when we arrived
as to what he knew of the call upon our arrival.
Q. And did you put that information in the
report?
A. Yes.
Q. And you understood, though, that he was not
a percipient witness, correct?
A. Correct.
Q. And do you know as you sit here today who
told him these facts?
A. I would just -- I would assume it was
various officers that were on the scene.
Q. Are you able to discern by looking at this
report which information Sergeant Abdal-Karim
provided to you and then where it ends?
A. Where it starts with, "Officers Lopera and
Lif were inside the Venetian" and goes through the

Page 226

paragraph where it says:
"Sergeant Abdal-Karim provided
detectives with names of several
witnesses to include LVMPD
officers."
Q. Then starting the bottom of the page,
"Detectives with FIT," who provided you with that
information? Or, strike that.
Did anybody provide you that information,
or is that from you?
A. No, there's from when we took over the
investigation.
Q. In the information provided by Sergeant
Abdal-Karim, there's a statement in the third
paragraph where it says:
"Farmer attempted to pull the ECD
probes out and attempted to grab the
ECD from Officer Lopera's hand."
In your review of the video surveillance or
body cams, did Farmer attempt to grab the ECD from
Officer Lopera's hand?
A. It appeared that he attempted to possibly
push it away. I don't know that he attempted to grab
it.
Q. Now, in the same paragraph, there's a

Page 227

reference that officer -- or, strike that -- Sergeant
Abdal-Karim stated that:
"Lopera observed Farmer approach
driver's door of the white truck and
believe Farmer was going to attempt
to take the vehicle by force."
And before that, there's a reference to
Lopera observing Farmer near a white truck and
believing that he attempted to open the tailgate of
the truck.
Do you see that?
A. Yes.
Q. All right. Did it appear to you that
Farmer was trying to open the tailgate of the truck?
A. It did not.
Q. And did it appear to you that Farmer was
trying to take the truck by force?
A. It did not.
Q. When you were watching the video of
Lopera's neck restraint on Farmer, do you see
Lopera's right arm on Farmer's head?
MR. McNUTT: Objection, form.
MR. LAGOMARSINO: Let me rephrase.
BY MR. LAGOMARSINO:
Q. Are you having trouble whether it's the

Detective Trever Alsup  - Vol. II -  July 1, 2019
\* \* \* Videotaped Deposition \* \* \*

13  (Pages 228 to 231)

Page 228

1 right or the left?
2 A. I am.
3 Q. Do you see one arm encircling Farmer's neck
4 and the other hand -- or the other arm on Farmer's
5 head?
6 A. It appears so.
7 Q. Is that consistent with the LVNR?
8 A. No, it's not.
9 Q. Did you review any documents before coming
10 in here today to refresh your recollection?
11 A. No, I did not.
12 MR. LAGOMARSINO: All right. Take a quick
13 break.
14 THE VIDEOGRAPHER: The time is
15 approximately 12:04 p.m. We are going off the
16 record.
17 (A recess was taken.)
18 (Exhibits 13 through 16 were marked
19 for identification by the reporter.)
20 THE VIDEOGRAPHER: The time is
21 approximately 12:17 p.m. We are back on the record.
22 BY MR. LAGOMARSINO:
23 Q. All right, Detective. You understand
24 you're still under oath?
25 A. I do.

Page 229

1 Q. Let me hand you Exhibit 13, which is a
2 compilation exhibit consisting of the autopsy report,
3 toxicology tests, and various photos from the
4 autopsy.
5 Exhibit 14 is the diagram entitled "Muscles
6 of the Neck," medical illustration.
7 Exhibit 15 is a medical illustration with
8 reference to the sternohyoid, if I'm saying that
9 right, and the omohyoid.
10 And then, Exhibit 16 is a medical
11 illustration with the thyroid, larynx, and trachea.
12 We'll kind of be comparing some of these
13 medical illustrations to some of the findings in the
14 report, so I just wanted to get your take on that.
15 Going to the first page of the report, it's
16 Bates LVMPD 1410, they are pathological findings.
17 Do you see that?
18 A. Yes.
19 Q. And what are the final pathological
20 findings?
21 A. All of them?
22 Q. Yes.
23 A. Multiple hemorrhages in the neck, status
24 post application of chokehold, methamphetamine
25 intoxication.

Page 230

1 Do you want the parentheses also?
2 Q. Yes, please.
3 A. "See separate toxicology report."
4 "Cardiomegaly. 490 grams.
5 Multiple subscalp hemorrhages,
6 contusions and abrasions of the body
7 surfaces, status post TASER strike
8 (barb punctures of the back), with
9 multiple cycles applied."
10 Q. Under the cause of death section, it states
11 that, quote:
12 "It is my opinion that this
13 40-year-old black male, Tashii S.
14 Brown, died as a result of asphyxia
15 due to police restraint procedures."
16 Is that what it says?
17 A. Yes.
18 Q. Now, it also states:
19 "Other significant conditions
20 include methamphetamine intoxication
21 and cardiomegaly."
22 Is that how you're saying it?
23 A. I believe that's the way that she
24 pronounced it.
25 Q. Now, nowhere in the autopsy report does it

Page 231

1 state that factors contributing to the death include
2 methamphetamine intoxication or cardiomegaly; is that
3 correct?
4 MR. McNUTT: Objection, form.
5 MR. ANDERSON: Join.
6 BY MR. LAGOMARSINO:
7 Q. I'm focusing on the word "contributing."
8 A. On this front page, no, it does not say
9 that. I'd have to look through the whole document to
10 remember exactly how everything was written.
11 Q. Okay. Going through the whole document,
12 starting at 1410 and going through 1418, do you see
13 anywhere where it says that methamphetamine
14 intoxication and cardiomegaly contributed to the
15 death, using that word?
16 MR. ANDERSON: I'll just note a running
17 objection that the document speaks for itself.
18 THE WITNESS: Not that I see.
19 BY MR. LAGOMARSINO:
20 Q. Does the report appear to be -- strike
21 that.
22 You've seen this report before, correct?
23 A. I have.
24 Q. And it was provided to you as part your
25 investigation; is that correct?

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

14  (Pages 232 to 235)

Page 232

A.  Correct.
Q.  Does this appear to be a true and correct copy of the autopsy report?
A.  Yes.
MR. ANDERSON:  Object to the form.
BY MR. LAGOMARSINO:
Q.  Going to the next page --
MR. McNUTT:  What page are you on?
MR. LAGOMARSINO:  Thank you. 1411.
BY MR. LAGOMARSINO:
Q.  In the identification section, "Tashii had a toe tag," correct?
A.  Correct.
MR. ANDERSON:  Can I just clarify.  Are you testifying from personal memory or based upon what the document says?
THE WITNESS:  For the toe tag, both.  I remember that there was a tag.
MR. ANDERSON:  I just want to clarify whether you're testifying from personal knowledge or just from reading the document.  Sorry.
BY MR. LAGOMARSINO:
Q.  Well, you were there, correct?
A.  I was.
Q.  To your knowledge, were you there for the

Page 233

entire autopsy?
A.  Yes.
Q.  And you recall there was a toe tag?
A.  Yes.
Q.  All right.  In terms of the external investigation, it states that:
    "Tashii was an adult black male, about 74 inches in length."
    So that's about six-two, correct?
A.  Yes.
Q.  And weighing 197 pounds, correct?
A.  Yes.
Q.  Do you know how much Ken Lopera weighed?
A.  I don't.
Q.  All right.  Going to page 1413, we're on the evidence of injury section.
A.  Okay.
Q.  Well, actually, going above that, do you see there's, "Identifying marks, scars, and tattoos"?
A.  Correct.
Q.  Do you see the quote, "Damn It Feels Good To Be A Gangsta"?
A.  Yes.
Q.  Do you know where that's from?
A.  Besides the tattoo on his stomach?

Page 234

Q.  Yes.
A.  It sounds familiar, but I don't.
Q.  Are you aware it's a song from Office Space?  No?
A.  No.
Q.  Were his tattoos relevant to your investigation?
A.  No.
Q.  Now, going to the evidence of injury, it says:
    "On the central nose is a stellate 1 centimeter laceration."
    All right.  If you could turn back into that exhibit, I don't think these are numbered, but can you identify the laceration on the central nose?
A.  I do see the wound on his nose.
Q.  Can you just circle that on the exhibit.
A.  (The witness complied.)
Q.  Do you have an opinion as to how that wound was caused?
A.  I couldn't say definitively.
Q.  On a more likely than not basis, do you have an opinion as to how that wound was caused?
MR. McNUTT:  Objection, form.
MR. ANDERSON:  Join.

Page 235

THE WITNESS:  All I would be able to say is it probably occurred sometime during the encounter between Tashii Farmer and Officer Lopera.
BY MR. LAGOMARSINO:
Q.  All right.  And then, the next sentence says:
    "On the upper lip to the right of the midline and towards the outer edge of the naris is a nearly horizontally oriented linear 8-millimeter laceration."
    Can you circle that for us as well.
MR. McNUTT:  Andre, how are you linking -- are you telling him what page to mark, or are you simply reading this and asking the witness to find it in the photos?
MR. LAGOMARSINO:  Yes.
MR. McNUTT:  The latter?
MR. LAGOMARSINO:  The latter.
THE WITNESS:  So it doesn't matter what picture it's on?
BY MR. LAGOMARSINO:
Q.  Correct.
A.  Okay.
Q.  The next sentence I'll read, if you want to

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

Page 236

1   just stay in the photos, it says:
2        "On the proximal right cheek
3        junction of the lower eyelid are
4        three generally horizontal
5        superficial abrasions and
6        lacerations.  These are no more than
7        8 millimeters each."
8        Are you able to circle those?
9    A.   (The witness complied.)
10       MR. McNUTT:  Detective Alsup, if you're
11   able to circle, would you identify -- I mean, I know
12   you just did, so would you identify the page that
13   you're marking.
14       MR. LAGOMARSINO:  Or just write your
15   initials, I guess, because I don't think there's a
16   Bates number on there, but for the record, I guess I
17   describe what's in the picture is what you're saying?
18       MR. McNUTT:  Well, give us some
19   identification, I mean, the number of pictures you're
20   in or something because some of these are a little
21   similar.
22       MR. LAGOMARSINO:  Okay.  I know after the
23   fact, we'll be able to look at the exhibit but just
24   for Mr. --
25       MR. McNUTT:  So there's no Bates number

Page 237

1   on --
2        MR. LAGOMARSINO:  The photos.
3        MR. McNUTT:  Okay.
4        THE WITNESS:  Would it be easier to go 1,
5    2, 3, 4, as according to how she has them in her
6    report or?
7        MR. McNUTT:  Whatever.  I guess we'll get
8    that copy afterwards.
9    BY MR. LAGOMARSINO:
10   Q.   Did I lose you?
11   A.   No, I'm going...
12   Q.   Okay.  Have you circled those?
13   A.   Um-hum.
14   Q.   It states:
15       "There appears to be a spectacle
16       hemorrhage on the right lower
17       eyelid, though this is difficult to
18       discern incident to dark
19       pigmentation of the skin."
20       Are you able to circle that?
21   A.   No.
22   Q.   "On the left upper cheek at its
23       Junction with the left lower eyelid
24       is an obliquely oriented
25       1 centimeter superficial abrasion

Page 238

1       laceration."
2       Are you able to discern that?
3       MR. McNUTT:  Objection, form.
4       THE WITNESS:  This pen isn't working.
5   BY MR. LAGOMARSINO:
6    Q.   Okay.  And then, there are some other
7   injuries.  The remaining are the section that are
8   indicated.
9       Is it your understanding and opinion that
10  the injuries noted in the head and neck section are
11  as a result of the alteration with Ken Lopera?
12      MR. McNUTT:  Objection, form.
13      MR. ANDERSON:  Join.
14      THE WITNESS:  I believe so.
15  BY MR. LAGOMARSINO:
16   Q.   All right.  Now going to page 1414.
17      I'm going to be referring to some of the
18  medical illustrations as well.  It says:
19      "Layer-wise, in --" I don't know
20      how to pronounce this word "-- situ
21      dissection of the neck reveals
22      hemorrhage as follows.  Superficial
23      subcutaneous within the right and
24      left lower neck."
25      And then, it states:

Page 239

1       "The right mid sternomastoid
2       muscle with anterior hemorrhage."
3       What does anterior mean, front or back?
4    A.   Behind.
5    Q.   Behind?
6    A.   Um-hum.
7    Q.   Are you sure, or is posterior better?
8    A.   If I remember correctly.
9    Q.   Okay.
10   A.   It's 26 years ago, so...
11   Q.   Do you feel comfortable going through these
12  medical illustrations, or would you leave that to the
13  doctors?
14   A.   I would leave that to the doctors.
15   Q.   All right.  Now, we've heard testimony
16  about methamphetamine being in Tashii Farmer's
17  system.
18      Is it your understanding based on the
19  toxicology reports that there was methamphetamine in
20  Tashii Farmer's system?
21   A.   Based on the toxicology reports, yes.
22   Q.   Now, having a drug in one's system is
23  different than being -- or, strike that -- can be
24  different than being under the influence, correct?
25      MR. McNUTT:  Objection, form.

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

16  (Pages 240 to 243)

Page 240

1   THE WITNESS:  Correct.
2   BY MR. LAGOMARSINO:
3     Q.  Is there anything in the police report that
4   you've authored, either the police report or the FIT
5   report, that is of the opinion that Tashii Farmer was
6   under the influence?
7     A.  No.
8     Q.  Okay.  Going to the next page, so it would
9   be after the autopsy report that's typed but the
10  autopsy report form here.
11    MR. McNUTT:  So Bates?
12    MR. LAGOMARSINO:  Thank you.  LVMPD 1419.
13  BY MR. LAGOMARSINO:
14    Q.  In terms of clothing, it says:
15      "He was wrapped in a white sheet."
16      Was he wrapped in a white sheet, to your
17  recollection?
18    A.  That was, he was wrapped in a sheet for
19  transport to the Coroner's office.
20    Q.  Okay.  Did you see him in the sheet?
21    A.  Yes.
22    Q.  It says:
23      "Hospital blankets and a blue
24      fitted sheet."
25      Did you also see that?

Page 241

1     A.  Yes.
2     Q.  "He was wearing white socks and
3       Black shoes."
4       Did you see that?
5     A.  Yes.
6     Q.  "He was lying atop a black short
7       Sleeve T-shirt, black boxer briefs,
8       and a pair of blue and camouflage
9       patch jeans."
10      Did you see that?
11    A.  Yes.
12    Q.  "His hands were bagged with
13      Evidence preservation bags."
14      What does that mean?
15    A.  They are bags that cover the hands and then
16  are tied around the wrist to preserve any evidence,
17  trace evidence, which could be fingernail scrapings.
18    Q.  It says:
19      "A TASER probe was stuck in the
20      back of the waistband of the
21      decedent's boxer briefs."
22      Did you see that?
23    A.  Yes.
24    Q.  "A piece of TASER wire was amongst
25      His clothing."

Page 242

1     Did you see that?
2     A.  Yes.
3     Q.  It also states, going in specific
4   photography, it says, "injuries, x-rays, personal
5   property," correct?  Is that correct?
6     A.  Yes.
7     Q.  It says:
8       "He had a TASER probe lodged in
9       the back of his upper back and an
10      apparent probe-like puncture in his
11      lower back slightly left of the
12      midline."
13    A.  Correct.
14    Q.  So is it your understanding that --
15    MR. McNUTT:  Hang on.  I've got to ask,
16  Craig's objection.
17    Are you answering correct that that's what
18  this says, or are you answering correct, you remember
19  these things?
20    THE WITNESS:  That that's what this is
21  saying.
22    MR. McNUTT:  Okay.
23  BY MR. LAGOMARSINO:
24    Q.  Based on what this states here, is it your
25  understanding that the puncture in the lower back

Page 243

1   would be from the probe that was stuck in the back of
2   the waistband of the decedent's boxer briefs?
3     MR. McNUTT:  Objection, form.
4     MR. ANDERSON:  Objection, form.
5     THE WITNESS:  Yes.
6   BY MR. LAGOMARSINO:
7     Q.  How many probes does that particular TASER
8   have?
9     A.  Two.
10    Q.  And one was still stuck in his back,
11  correct?
12    A.  Correct.
13    Q.  It says here -- I'm going to ask you what
14  it says, but then, I'm going to ask you if you
15  remember it.  It says:
16      "He had lacerations to his
17      exterior upper lip, multiple
18      lacerations and swelling around his
19      right eye, a laceration on the
20      bridge of his nose, a laceration
21      under his left eye and swelling
22      around his left eye and an abrasion
23      under his right ear."
24      Do you recall those injuries?
25    A.  I do remember multiple lacerations and

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

17 (Pages 244 to 247)

---

Page 244

1  injuries to his face.
2      Q.  It says:
3          "He had an abrasion on his inner
4      right knee, an abrasion on his left
5      bicep, and an abrasion on his back
6      left shoulder area."
7      Do you recall those?
8      A.  I remember abrasions.  Specifically where
9  they were located on the body, not off the top of my
10  head, but I remember multiple abrasions.
11      Q.  Okay.  It says:
12          "The decedent's personal property
13      spilled out of his cut clothing onto
14      the blankets and the body bag."
15      Do you remember seeing him in a body bag?
16      A.  I do.
17      Q.  And do you remember seeing personal
18  belongings spilled out?
19      A.  I do.
20      Q.  And is it your understanding that those
21  were the personal belongings in his possession?
22      A.  It is.
23      Q.  So he had 37 cents.  Do you remember seeing
24  some coins?
25      A.  I remember there being currency.  I don't

---

Page 245

1  remember exactly what the coins were or anything like
2  that.
3      Q.  A piece of candy, do you remember seeing
4  that?
5      A.  I don't remember the candy.
6      Q.  Two cigarette butts or pieces.  Do you
7  remember seeing that?
8      A.  I believe so.
9      Q.  And a pair of ear buds?
10      A.  I believe so.
11      Q.  Was there any cocaine in his system?
12      A.  I know there were several different lab
13  tests.  Are we talking about just the one that was
14  done during the autopsy or subsequent?
15      Q.  To your knowledge, at any time --
16      A.  Not that I remember.
17      Q.  I just want to get a clear answer to this,
18  so I apologize for reasking it.
19      To your knowledge, did you ever learn that
20  there was cocaine in his system?
21      MR. McNUTT:  Objection, form.
22      (Pause in proceedings.)
23      THE WITNESS:  There were metabolites, and
24  they also found lidocaine, which can be a cutting
25  agent for cocaine.

---

Page 246

1          So there were at least the precursors for
2  cocaine in his system.
3  BY MR. LAGOMARSINO:
4      Q.  Were you able to tell whether he had used
5  cocaine that evening or in the last week?
6      A.  Was I able to tell, or was the lab able to
7  tell?
8      Q.  Strike that.  Was the lab able to tell?
9      MR. McNUTT:  Objection to form.
10      THE WITNESS:  I'd have to read through
11  report to...
12  BY MR. LAGOMARSINO:
13      Q.  You would depend on the lab?
14      A.  Correct results, correct.
15      Q.  Have you ever worked with Sherry Kacinko?
16  She's referenced as the toxicologist here.
17      A.  No.
18      (There was a cellphone interruption.)
19  BY MR. LAGOMARSINO:
20      Q.  Do you need to take a break?
21      A.  No.  I'm sorry.
22      Q.  That's okay.
23      A.  Just making sure that it wasn't a work
24  call.
25      Q.  No problem.  Or family.  If you need to

---

Page 247

1  take a break at any time, just let us know.
2          All right.  Can you continue through the
3  reports to the very first photo in the exhibit.
4          What does the first photo depict?
5      MR. McNUTT:  Objection to form.
6      THE WITNESS:  It would be a laceration
7  under the left eye.
8  BY MR. LAGOMARSINO:
9      Q.  It appears to be somewhat fresh; is that
10  correct?
11      A.  It appears to be.
12      Q.  Is it your understanding that that
13  laceration occurred during the incident with
14  Ken Lopera?
15      A.  I believe so.
16      MR. McNUTT:  Objection, form, foundation.
17  BY MR. LAGOMARSINO:
18      Q.  Going to the next page, what does that
19  photo depict?  Strike that.
20      What injuries does that photo depict?
21      MR. McNUTT:  Objection to form.
22      THE WITNESS:  A laceration to the right of
23  the nose of the bridge.
24  BY MR. LAGOMARSINO:
25      Q.  Is there also swelling on his right eye?

---

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

18  (Pages  248  to  251)

Page 248

A. Yes.
Q. Is there also some swelling on his left eye?
A. It appears a little bit.
Q. Is it your understanding that that swelling occurred as of strikes rendered by Officer Lopera?
MR. McNUTT: Objection, form.
THE WITNESS: I would -- during the encounter with Officer Lopera, yes.
BY MR. LAGOMARSINO:
Q. Okay. What does the next picture depict?
A. It appears to be lacerations underneath the right eye.
Q. And do you believe those came from the altercation with Officer Lopera?
MR. McNUTT: Objection, form.
THE WITNESS: Yes.
BY MR. LAGOMARSINO:
Q. Going to the next page, there appears to be a measuring instrument on his forehead.
A. Correct.
Q. Do you know why it's placed there?
A. I believe just to show reference between the injuries on him and their size.
Q. Is there also a cut on his right upper lip?

Page 249

A. Yes.
Q. Or above his right upper lip?
A. Yes.
Q. And do you believe that that came from the altercation with Officer Lopera?
A. I do.
MR. McNUTT: Objection, form.
BY MR. LAGOMARSINO:
Q. Skipping to the next page with the instrument showing 5.
Skipping the next page.
Going to that cut above his right lip, is that -- would you describe that as superficial or more than superficial?
MR. ANDERSON: Objection, form.
MR. McNUTT: Objection, form.
THE WITNESS: How would I describe it or how would the doctor describe it?
BY MR. LAGOMARSINO:
Q. How would you describe it?
A. Maybe a little more than superficial.
Q. Going to the picture with the contusion on his left shoulder, do you see that?
A. I do.
Q. Is it your belief that that came from

Page 250

Officer Lopera striking him on the left shoulder?
MR. McNUTT: Objection, form, foundation.
THE WITNESS: I don't know.
BY MR. LAGOMARSINO:
Q. Flipping back to page 1414. Under "Torso," within the section of evidence of injury.
The bruise we just described is a contusion, correct?
A. Correct.
Q. It says:
"On the midback just to the left of center is a light metal barb which is embedded in the skin."
Going to the last page of that exhibit, is that the light metal barb -- strike that.
Is that the light metal barb?
A. Yes.
MR. McNUTT: Objection, form.
BY MR. LAGOMARSINO:
Q. And it says:
"The needle of the barb is bent."
In that picture, does it appear to be bent?
A. No.
Q. In your opinion, do the injuries -- strike that.

Page 251

Are the injuries described in the torso section as a result of the altercation with Lopera?
MR. McNUTT: Objection, form.
MR. ANDERSON: Join.
THE WITNESS: The punctures from the barb, yes. The one on his back, I have no idea.
BY MR. LAGOMARSINO:
Q. So there's a reference kind of in the middle of the big paragraph where it says:
"On the lower back centered approximately 5 centimeters to the left is a recent large caliber puncture."
Do you also believe that that's from the TASER?
MR. McNUTT: Objection, form.
THE WITNESS: I don't know what the doctor is referencing on that one.
BY MR. LAGOMARSINO:
Q. And how about, "Hemorrhage ran on the lateral chest, the right upper chest, and the left right medial chest," do you believe that's from the altercation?
MR. McNUTT: Objection, form.
THE WITNESS: I don't know.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

19 (Pages 252 to 255)

Page 252

BY MR. LAGOMARSINO:
Q.  Do you have any evidence in your
investigation that would indicate that these injuries
described here are from anything other than the
altercation with Officer Lopera?
MR. McNUTT:  Objection, form.
THE WITNESS:  I don't.
BY MR. LAGOMARSINO:
Q.  Going back to the scene for a moment,
Lopera did a walk-through with an attorney; is that
correct?
A.  That's correct.
Q.  Was it John Aldrich?
A.  Yes.
Q.  And did Aldrich stop Lopera from continuing
to say what happened?
A.  They came to a point where they said that
that was all that they would be talking about.
Q.  And so, you were never able to get his
statement as to why he tased Tashii seven times?
MR. McNUTT:  Objection, form.
THE WITNESS:  Correct.
BY MR. LAGOMARSINO:
Q.  And you were never able to get his
statement about why he struck him on the face or head

Page 253

or upper body 10 to 12 times?
A.  Correct.
MR. McNUTT:  Objection, form.
BY MR. LAGOMARSINO:
Q.  And you were never able to get his
statement about why he applied whatever neck hold or
neck restraint he applied?
A.  Correct.
Q.  In your report, did you conclude that if
Farmer had lived, he would not have been charged with
carjacking?
A.  Correct.
Q.  Did you watch a press briefing regarding
this incident given by McMahill?
A.  Depending on which one it was, I could have
been present at that press conference.
Q.  Have you ever heard anybody from Metro
saying that Farmer would not have been charged with a
crime?
A.  Yes.
Q.  Who did you hear say that?
A.  I'm pretty sure I heard the undersheriff,
Kevin McMahill, say that.
Q.  Now, it was Farmer that initiated the first
contact with Lopera and Lif, correct?

Page 254

A.  Correct.
Q.  Do you have any evidence, to your
knowledge, that after Farmer started walking,
running, or jogging away from Lopera that Lopera told
him to stop?
Let me make it more specific as to time.
The body cam doesn't record sound for the
first around 30 seconds, correct?
A.  Correct.
Q.  So from the time that Lopera -- strike
that.
From the time that Farmer starts to walk
away or leave the area where Lopera is, for the next
15 or 20 or 30 seconds, do you have any evidence
affirmatively to demonstrate that Lopera told Farmer
to stop?
A.  No.
Q.  And unless a citizen is being detained or
arrested, that citizen is free to leave the presence
of an officer if they wish, correct?
A.  Correct.
Q.  Have you been trained on excessive force
under the Fourth Amendment?  Strike that.
Have you been trained on what is excessive
force under the Fourth Amendment or what the standard

Page 255

is?
A.  To say that something is definitively
excessive force, it would depend a lot on the
circumstances, but trained as far in the -- where you
could get to excessive force, yes.
Q.  Okay.  You were asked by Sayre in your
deposition in the estate case certain questions about
the Fourth Amendment.
Do you recall?
A.  Not specifically.
Q.  Okay.  Do you recall generally?
A.  Yes.
Q.  In your view, was the use of a lateral
vascular neck restraint or a rear naked choke
excessive force under the Fourteenth Amendment -- or,
under the Fourth Amendment?
MR. ANDERSON:  Objection, form.
THE WITNESS:  I believe so.
BY MR. LAGOMARSINO:
Q.  Do you believe that the chokehold was
excessive force under the Fourth Amendment?
MR. ANDERSON:  Objection, form.
THE WITNESS:  I believe so.
MR. McNUTT:  Join.

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

20  (Pages 256 to 259)

Page 256

BY MR. LAGOMARSINO:
Q.   Now, let's take a five-minute break, and
I'm going to just show some video.
A.   Can we make it about ten so I can go take
care of something?
Q.   Sure.
THE VIDEOGRAPHER:  The time is
approximately 12:55 p.m.  We are going off the
record.
(A recess was taken.)
THE VIDEOGRAPHER:  The time is
approximately 1:05 p.m.  We are back on the record.
BY MR. LAGOMARSINO:
Q.   All right.  As part of your investigation,
did you review the video surveillance from the
Venetian?
A.   Yes.
Q.   Do you know if you've reviewed surveillance
that depicts Tashii Farmer from the moment he steps
on the property through and inclusive of his death?
MR. ANDERSON:  Can you restate?
BY MR. LAGOMARSINO:
Q.   Sure.  When is the first time you saw
Tashii on the surveillance that you reviewed?
A.   It was as he approached Officer Lopera and

Page 257

Officer Lif.
Q.   Okay.  So I'm going to show you some video
that we've secured via subpoena in this case that
depicts Tashii Farmer getting to the Venetian
property all the way up through the time he meets
Officer Lopera and Lif to the incident.
A.   Is that when he comes across the boulevard
and hops over the median barrier?
Q.   Yes.
A.   Okay. I did see that also.
Q.   Okay. All right.  So we're going to watch
this, and then, I'll ask you if you've seen this
video. Okay?
You can sit back if you want so you
don't...
MR. McNUTT:  Are we just going to watch it
from start to finish?
MR. LAGOMARSINO:  Yeah.
(A video was played.)
MR. McNUTT:  I'm just going to lodge a
running objection to the video.
MR. LAGOMARSINO:  Okay.
MR. McNUTT:  And specifically the
subtitles.
MR. LAGOMARSINO:  All right.

Page 258

BY MR. LAGOMARSINO:
Q.   I'll be making reference to the time on the
left at certain points here.  Okay.
At 1:30, do you see him coming down the
right side of the screen?
A.   Yes.
Q.   As we're watching this, is it your
understanding that the Venetian surveillance
department put together a composite of Tashii walking
through the property?
A.   Yes.
Q.   And here at around 2 minutes, does it
appear that Tashii holds the door for somebody to
walk through?
A.   Yes.
Q.   Other than walking past numerous
individuals in the video, did Tashii have any
interactions with any individuals while he was on the
property other than Officer Lopera and Officer Lif?
MR. McNUTT:  Objection, form.
MR. ANDERSON:  Join.
THE WITNESS:  It does not appear so.
BY MR. LAGOMARSINO:
Q.   At around 3:25, does Tashii appear to be in
the shops at Venetian or Palazzo?

Page 259

A.   Yes.
Q.   And are there other non-Venetian or Palazzo
employees in the area as well?
A.   Yes.
Q.   Growing up in Vegas, have you ever been to
the Venetian or Palazzo in instances not involving
this case?
A.   A couple times.
Q.   Is it quite large?
A.   Yes.
Q.   Have you had to ask directions?
A.   I don't believe so.
Q.   I'm going to pause because I have just a
quick question.
Now, at the point we're watching here,
Tashii appears to go to the back of the house into a
public area.
Does that appear to be the case?
MR. McNUTT:  Objection, form.
MR. ANDERSON:  Join.
THE WITNESS:  I think so.
BY MR. LAGOMARSINO:
Q.   I'll stop the video because I want to fast
forward a little bit here.
There's a time over here on the bottom

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

21 (Pages 260 to 263)

Page 260

1  where it says about 6:07.  Do you see that?  6:10.
2      A.  Yes, sir.
3      Q.  Now, in the upper part of the screen where
4  the arrow is pointing to the right of the three signs
5  and to the doorway, is it your understanding that
6  that's where the area of interaction was between
7  Lopera, Lif, and Farmer?
8          MR. McNUTT:  Objection, form.
9          THE WITNESS:  I believe so.
10 BY MR. LAGOMARSINO:
11     Q.  Now, it appears as we're watching it, the
12 clock is continuing to move but the image is paused.
13     Right about 7:27.
14     Did you watch the composite that we've
15 watched here today at a different time?
16     A.  There are parts of it that I have not seen
17 this view.
18     Q.  All right.  Now, I want to watch an edit
19 that we've done in part of our case here.
20     I understand --
21         MR. McNUTT:  Same objection to this video.
22         MR. LAGOMARSINO:  Okay.
23 BY MR. LAGOMARSINO:
24     Q.  So what I plan to do is, do you see here at
25 about 25 seconds, it appears to be Lopera and Lif?

Page 261

1      A.  Yes.
2          MR. LAGOMARSINO:  I'm just going to go off
3  the record for a second.
4          MR. McNUTT:  Andre, quick while we're on
5  the record, in that prior view, you weren't
6  suggesting that Officer Lif and Lopera were in
7  contact with Tashii Farmer?
8          MR. LAGOMARSINO:  I didn't ask that
9  question.  It appeared to me that they were but --
10 because I don't know that there's any evidence that
11 they were talking to anybody else.
12     But what I'd like to do, I'm having issues
13 pausing here, so I'm just going to go off the record
14 to get it proper.
15     So off the record.
16         THE VIDEOGRAPHER:  The time is
17 approximately 1:18 p.m.  We are going off the record.
18     (There was a discussion off the
19         record.)
20         MR. LAGOMARSINO:  All right.  We'll go back
21 on the record.
22         THE VIDEOGRAPHER:  The time is
23 approximately 1:19 p.m.  We are back on the record.
24 BY MR. LAGOMARSINO:
25     Q.  All right.  So in this clip, we're going to

Page 262

1  refer for reference purposes to the time up here.
2      Do you see that?
3      A.  Yes.
4      Q.  This is not the actual time but the time
5  into the clip.
6      (A video was played.)
7  BY MR. LAGOMARSINO:
8      Q.  All right.  Now, we're pausing at 1:28, and
9  prior to the cut to this clip, there was -- it
10 appeared to be an employee walking with some kind of
11 a cleaning mop.
12     Do you see that?
13     A.  Yes.
14     Q.  And it appears at this point, we are
15 hitting the body cam, and Farmer appears to be in the
16 vicinity, correct?
17     A.  Correct.
18     Q.  At 1:35, we're stopping, and that appears
19 to be Farmer in the clip, correct?
20     A.  Correct.
21     Q.  Now, at about 1:55 in this clip, we get
22 sound; is that right?
23     A.  Correct.
24     Q.  Now, from 1:55 to 2:25, approximately
25 30 seconds, we don't hear Lopera say, "Stop, police"

Page 263

1  or anything at all, correct?
2      A.  No.
3      Q.  No, I'm right or he didn't say anything?
4      A.  There's nothing said.
5      Q.  Lopera is wearing BDUs, correct?
6      A.  Correct.
7      Q.  BDUs stand for battle dress uniforms; is
8  that correct?
9      A.  Correct.
10     Q.  I noticed a lot in the questioning, there
11 was questioning regarding those uniforms.
12     Do you know why those particular officers
13 wear those uniforms?
14     A.  I don't.
15     Q.  Do Metro officers usually wear those
16 uniforms, or they wear the brown khakis?
17     A.  There's officers assigned to specialized
18 units that wear those uniforms.
19     Q.  Have you ever seen any studies that
20 indicate that those uniforms tend to project a more
21 combative image or something reflecting the Army?
22     A.  No, I haven't.
23     Q.  So at about 2:45, a little before then,
24 Lopera says to apparently a security guard, "Did you
25 see anybody running"; is that correct?

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

22  (Pages 264 to 267)

Page 264

1    A.  Correct.
2    Q.  Do know the name of that security guard
3  offhand as you sit here?
4    A.  I'd have to look back through.
5    Q.  There were a few of them, correct?
6    A.  Yes.
7    Q.  Okay.  So at 2:58 -- at 2:58, Lopera says,
8  "Stop, don't move," correct?
9    A.  Correct.
10    Q.  Then he says, "You're going to get tased,"
11  correct?
12    A.  Correct.
13    Q.  And after that, he tases Tashii and then
14  yells, "TASER, TASER, TASER," correct?
15    A.  Correct.
16    Q.  And Tashii falls to the ground?
17    A.  Correct.
18    Q.  At 3:03, Tashii's both hands are up,
19  correct?
20    A.  Correct.
21    Q.  And there appears to be a cellphone in his
22  hand?
23    A.  Correct.
24    Q.  So Lopera says, "Don't move," and Tashii
25  says, "Okay," correct?

Page 265

1    A.  Correct.
2    Q.  He says, "Don't move," and Tashii says
3  "Okay" again, correct?
4    A.  Correct.
5    Q.  And then, we'll play it, but Lopera says,
6  "Stop right there," and is it your understanding that
7  he was talking to the driver of the truck, Pearce?
8    A.  Correct.
9    Q.  So just before Lopera says, "Stop right
10  there, get on your stomach," Farmer appears to be
11  trying to get something out of his shoe, correct?
12    A.  Umm --
13    Q.  Or, strike that.  What does Farmer appear
14  to be doing?
15    A.  The way that I interpreted it was it had
16  slipped off his heel, and he was putting it back on.
17    Q.  At about 3:10, Lopera appears to achieve
18  NMI; is that correct?
19    A.  Correct.
20    MR. McNUTT:  Objection, form.
21  BY MR. LAGOMARSINO:
22    Q.  And do you hear Tashii apparently screaming
23  in pain?
24    A.  Yes.
25    MR. McNUTT:  Objection, form.

Page 266

1  BY MR. LAGOMARSINO:
2    Q.  As we're going through this, if you see any
3  subtitles that you believe are inaccurate, please let
4  us know.  Okay?
5    A.  (No audible response.)
6    Q.  At about just before 3:35, does Lopera
7  appear to use the TASER in stun mode, or do you know?
8    A.  At this point, I don't know.  Watching this
9  camera, I don't know.
10    Q.  Okay.  I'm just going to go back a little
11  bit to about 3:30.  And it appears that Tashii
12  screams out in pain.  I'm just trying to figure out
13  if you're able to discern from this camera what you
14  believe it is.
15    Are you able to tell why Tashii Farmer is
16  screaming out?
17    A.  The way it sounds on the video to me is he
18  screamed out, and then, you can hear the TASER
19  cycling.  So I'm not sure if the cycling started
20  before that or after.
21    Q.  Now we're at 4:05.  Have you seen Lopera
22  deliver strikes to Tashii Farmer?
23    A.  It appears so, yes.
24    Q.  So Crumrine arrives at the scene first,
25  correct?

Page 267

1    A.  Correct.
2    Q.  The question I'm going to ask you is:  Does
3  it appear, based on your review of the video that
4  Lopera goes into a chokehold in front of Crumrine,
5  correct?
6    MR. ANDERSON:  Objection, form.
7  BY MR. LAGOMARSINO:
8    Q.  I'll be asking that question.
9    So going to 4:11.
10    So we've paused at 4:22.  Does it appear
11  that Lopera goes into the chokehold or neck restraint
12  just as Crumrine arrives?
13    A.  Yes.
14    Q.  Crumrine told Farmer to get his hands
15  behind his back, correct?
16    A.  Correct.
17    Q.  Or get his fucking hands behind his back is
18  what he said, correct?
19    A.  Correct.
20    Q.  Based on your assessment, was it hard for
21  Farmer to get his hands behind his back because
22  Lopera was on his back?
23    MR. McNUTT:  Objection, form.
24    THE WITNESS:  It probably would have been.
25

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

23  (Pages 268 to 271)

Page 268

BY MR. LAGOMARSINO:
Q.  And we're at about 11 seconds into the chokehold, at least by our demonstrative assessment, and I'd like you to tell me -- I'm going to go back a little bit and ask you to assess how long Lopera is holding Tashii in that particular position where Lopera is on his right side behind Tashii.  So we're going to go back a little bit here.
All right.  So I paused at what we put down as 2 seconds.
So at about 11 seconds in, it appears that this is the first time that Crumrine says, "Dude, let him go, Ken," correct?
A.  I honestly don't remember.  I've listened to it quite a few times.  I don't remember "dude" in front of it, but I remember, "let him go, Ken."
Q.  Okay.  It looks like we've got an update, so I'll snooze it.
So at about 18 seconds in, Lopera says, "Is he out," correct?
A.  Correct.
Q.  And who arrives at 21 seconds?
A.  That should be Officer Tran.
Q.  And at 23 seconds, Lopera keeps saying, "Is he out yet," correct?

Page 269

A.  Correct.
Q.  And then, at 24 seconds, it appears Flores arrives?
A.  Correct.
Q.  And when I say 24 seconds, I'm saying 24 where it says, "chokehold 24.7," correct?
A.  Correct.
Q.  At 28 seconds, somebody says, "Go ahead and let him go, Ken."  And he says, "You sure," correct?
A.  Correct.
Q.  Now, we're at about 32 seconds where Lopera hasn't changed his position of being on his right side behind Farmer, correct?
A.  Correct.
Q.  And Crumrine at about 32 seconds, as we'll play it, says, "Bro, stop it, bro," correct?
A.  Correct.
Q.  So at 36 seconds is the first time that Lopera rolls over from being on his right side behind Farmer, correct?
A.  Correct.
Q.  Now, he switches over at 38 seconds to being on his left side and behind Farmer, correct?
A.  Correct.
Q.  And he continues to be in the same neck

Page 270

restraint that whole time, correct?
A.  It appears to be.
Q.  Now, we're at 53 seconds, and he's continuing to have him in the restraint hold, correct?
A.  Correct.
Q.  Do you know who Lopera is talking about when he says, "Tell him to stand by"?
A.  I don't.
Q.  Now, at 1:11, Tran says, "All right, loosen up, loosen up a little," correct?
Or, strike that.  At 1:11, either Tran or Flores or Crumrine says, "Loosen up, loosen up a little," correct?
A.  Correct.
Q.  Does that indicate to you that when somebody says, "Loosen up" that he's got a tight hold on Farmer?
MR. McNUTT:  Objection, form.
MR. ANDERSON:  Objection, form.
THE WITNESS:  I would assume that.
BY MR. LAGOMARSINO:
Q.  And at around 1:11, he releases his right arm, Lopera releases his right arm, correct?
A.  Correct.

Page 271

Q.  Is it your understanding that Lopera said, "He tried to carjack somebody," that's the first thing he said after he released the hold?
A.  Correct.
Q.  Now, if Crumrine wanted to, he was close enough where he could have tried to pull Lopera's arms out of the neck restraint, correct?
MR. McNUTT:  Objection, form.
THE WITNESS:  Could he have attempted to, yes.  Could he have, I don't know.
BY MR. LAGOMARSINO:
Q.  Okay.  And Tran was close enough when he was at the scene that he could have attempted to pull Lopera's arms out of the chokehold, correct?
MR. McNUTT:  Objection, form.
MR. ANDERSON:  Objection, form.
THE WITNESS:  I guess he could have attempted.
BY MR. LAGOMARSINO:
Q.  And the same goes for Flores, he could have attempted to, he was close enough to do that, correct?
A.  Yes.
Q.  But they did not attempt to; is that correct?

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

24  (Pages 272 to 275)

Page 272

1  A.  It does not appear.
2  Q.  Later on his body cam, Lopera says, "I
3  choked him out," correct?
4  A.  Correct.
5  Q.  Does it have any significance to you in
6  your investigation?
7  A.  It's just not a term that we use.
8  Q.  What term would you use if you were going
9  to put somebody in neck restraint, a proper neck
10  restraint?
11  A.  You would say that you applied the LVNR or
12  make reference to the LVNR.
13  Q.  Does choking somebody out have a legitimate
14  law enforcement objective?
15  MR. McNUTT:  Objection, form.
16  MR. ANDERSON:  Objection, form.
17  THE WITNESS:  Well --
18  BY MR. LAGOMARSINO:
19  Q.  Let me rephrase.
20  In this situation, does choking Tashii
21  Farmer out have a legitimate law enforcement
22  objective?
23  MR. McNUTT:  Same objection.
24  MR. ANDERSON:  Objection, form.
25  THE WITNESS:  I don't believe so.

Page 273

1  BY MR. LAGOMARSINO:
2  Q.  And later, Lopera says, "I started wailing
3  on the dude and then I rear-mounted and choked him
4  out."
5  Did he say that?
6  A.  According to the body cam, yes.
7  Q.  Would wailing on Tashii Farmer then rear
8  mounting and choking him out have a legitimate law
9  enforcement objective?
10  MR. McNUTT:  Objection, form.
11  BY MR. LAGOMARSINO:
12  Q.  In this case.
13  A.  I don't believe so.
14  Q.  Have you ever witnessed anybody apply an
15  LVNR outside of training?
16  A.  Yes.
17  Q.  And when did you witness that?
18  MR. McNUTT:  I'm sorry, would you repeat
19  that.
20  MR. LAGOMARSINO:  Sure.
21  BY MR. LAGOMARSINO:
22  Q.  Outside of training, had you ever watched
23  somebody apply an LVNR?
24  A.  Yes.
25  Q.  Approximately when did you see that?

Page 274

1  A.  Early 2000s.
2  Q.  And who was that?
3  A.  Just a suspect on a call.
4  Q.  And who applied the LVNR?
5  A.  One of the officers.
6  Q.  Were you one of the officers present at the
7  scene?
8  A.  I was.
9  Q.  Was it you?
10  A.  No.
11  Q.  What happened with that suspect?
12  A.  He -- both him and the officer went down to
13  a kneeling position, and he was taken into custody.
14  Q.  Any other occasions?
15  A.  Not that I can remember.
16  Q.  In training, have you witnessed videos of
17  officers applying LVNRs, either in this department or
18  others, to suspects?
19  A.  Yes.
20  Q.  Approximately how many?
21  A.  Over the course of 21 years, I couldn't
22  even give you a number.
23  Q.  More than a hundred?
24  A.  Between 50 and a hundred.
25  Q.  Okay.  Was this the worst application of a

Page 275

1  neck restraint you've ever seen, either on video or
2  live?
3  MR. McNUTT:  Objection, form.
4  MR. ANDERSON:  Objection, form.
5  THE WITNESS:  In my opinion, it was not a
6  good application of force.
7  BY MR. LAGOMARSINO:
8  Q.  Have you ever seen one that was worse?
9  MR. McNUTT:  Objection, form.
10  MR. LAGOMARSINO:  Strike that.
11  BY MR. LAGOMARSINO:
12  Q.  As you sit here today, can you recall one
13  that was worse?
14  A.  No.
15  Q.  Did you believe that Lopera was giving
16  conflicting commands to Farmer?
17  A.  Yes.
18  Q.  Throughout, did you believe that his
19  commands made it impossible for Farmer to
20  appropriately respond to the commands?
21  MR. ANDERSON:  Objection, form.
22  MR. McNUTT:  Join.
23  THE WITNESS:  Yes.
24  BY MR. LAGOMARSINO:
25  Q.  Were you tasked as part of the FIT

Detective Trever Alsup · Vol. II · July 1, 2019
* * * Videotaped Deposition * * *

25 (Pages 276 to 279)

Page 276

1  investigation to evaluate Crumrine, Tran, or Flores'
2  conduct?
3      A.  No.
4      Q.  How many times have you watched the video
5  of the incident?
6      A.  A lot.
7      Q.  Have you played and paused in the
8  frame-by-frame style many times?
9      A.  Yes.
10     Q.  And did you review the statements from the
11 involved officers in this case?
12     A.  I did.
13     Q.  Did you also review the SOPs, certain SOPs?
14     A.  Certain policies, yes.
15     Q.  Which policies did you review?
16     A.  Mainly use of force.
17     Q.  Even though you were not provided with
18 Lopera's statement, did you try to understand the
19 environment that he was facing during this event?
20     A.  Yes.
21     Q.  Did you believe that Lopera's actions were
22 appropriate in this case?
23     A.  No.
24         MR. McNUTT:  Objection, form.
25

Page 277

1
2  BY MR. LAGOMARSINO:
3      Q.  Do you believe that his actions were
4  judicious?
5      A.  No.
6      Q.  Do you believe that Lopera engaged in a
7  thoughtful and a well-reasoned response?
8         MR. McNUTT:  Objection, form.
9         MR. ANDERSON:  Objection to form.
10        THE WITNESS:  No.
11 BY MR. LAGOMARSINO:
12     Q.  Does Metro train that placing somebody in a
13 neck restraint for longer than 10 or 20 seconds can
14 cause death potentially?
15     A.  Well, Metro doesn't teach a neck restraint
16 besides the LVNR, and with the LVNR, it's that you
17 apply the LVNR until you gain compliance.
18     Q.  Metro teaches that if it's applied
19 improperly, it could cause death, correct?
20     A.  Correct.
21     Q.  Did you consider the use of the neck
22 restraint that was used in this case deadly force?
23        MR. McNUTT:  Objection, form.
24        MR. LAGOMARSINO:  Let me rephrase.
25        THE WITNESS:  I believe that the amount of
   time that the neck restraint was held was excessive.

Page 278

1  BY MR. LAGOMARSINO:
2      Q.  Did you ever assess, based on your review
3  of the video, that Lopera was ever in any danger of
4  losing his life?
5      A.  Not in my opinion.
6      Q.  Based on your review of the video of both
7  today and then the other times, did you ever believe
8  that Tashii Farmer posed a threat to the general
9  public, based on what you've seen?
10     A.  No.
11         MR. LAGOMARSINO:  All right.  I'm going to
12 just take five minutes, a restroom break, and then,
13 we'll be done by like 2:30, or at least my questions
14 will be done.
15         THE VIDEOGRAPHER:  The time is
16 approximately 1:45 p.m.  We are going off the record.
17         (A recess was taken.)
18         THE VIDEOGRAPHER:  The time is
19 approximately 1:54 p.m.  We are back on the record.
20 BY MR. LAGOMARSINO:
21     Q.  You understand, Detective, that you're
22 still under oath?
23     A.  I do.
24     Q.  Now, when Farmer ran away from Lopera, he
25 ran through a door that was clearly marked as an

Page 279

1  exit; is that correct?
2         MR. McNUTT:  Objection, form.
3         THE WITNESS:  Yes.
4  BY MR. LAGOMARSINO:
5      Q.  Does a tourist who appears -- strike that.
6         Does a sweating tourist who runs through an
7  exit door compel a police pursuit?
8      A.  It could.  In this case, I don't believe
9  so.
10     Q.  I believe in your prior deposition, you --
11 I'm not sure which one, but you testified that you
12 would have taken a different tact than Lopera?
13     A.  Correct.
14     Q.  Maybe more of a contain strategy; is that
15 correct?
16     A.  Correct.
17     Q.  How would you have done that?
18     A.  Utilize the police radio to try to gain
19 containment around the area where the person ran.
20     Q.  Is somebody saying they're being followed a
21 reason to detain that person?
22     A.  No.
23     Q.  Did Lopera's partner, Lif, feel that Farmer
24 should have been detained?
25         MR. ANDERSON:  Objection, form.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

26 (Pages 280 to 283)

Page 280

1    THE WITNESS: I don't remember her
2  statement exactly, but I don't believe so. I believe
3  she described it as a consensual encounter.
4  BY MR. LAGOMARSINO:
5    Q.  Factually, did Farmer actually fall to the
6  ground when he went through the cones, or did he
7  stumble?
8    A.  Stumbled.
9    Q.  Do you recall Officer Lif ever saying that
10  she believed at that time that Farmer was under the
11  influence of a controlled substance?
12    A.  I would have to look through her statement
13  again.
14    Q.  We have a lot of -- strike that.
15    We have a number of homeless people in
16  Las Vegas, correct?
17    A.  Correct.
18    Q.  And they are all over Las Vegas; is that
19  right?
20    A.  Correct.
21    Q.  Do officers have experience in dealing with
22  homeless individuals, as a general rule?
23    A.  I would assume they do.
24    Q.  Is being in mental crisis a reason to
25  arrest or detain an individual?

Page 281

1    A.  I would say that depends on the mental
2  crisis. If the person is in mental crisis and wants
3  to harm themselves, then technically, you can commit
4  that person to a hospital for evaluation.
5    Q.  Assuming in this case that Lopera believed
6  that Farmer might be in mental crisis, would that
7  have been a reason to detain him?
8    A.  I would say there would have to be more.
9    Q.  Does an individual being in mental crisis
10  give probable cause to arrest?
11    A.  Again, it depends.
12    And by arrest, I'm not saying necessarily
13  arrest where you book that person into jail, but
14  arrest is you're going to seize that person and
15  commit them to a hospital.
16    Q.  Right.  I'm talking about arrest for a
17  crime.
18    A.  For just being in mental crisis?
19    Q.  Correct.
20    A.  No.
21    Q.  Did you ever see any evidence or hear any
22  evidence of Lopera giving Farmer lawful commands to
23  stop while they were in the, quote-unquote, back of
24  the house?
25    MR. McNUTT: Objection, form.

Page 282

1    THE WITNESS: No.
2  BY MR. LAGOMARSINO:
3    Q.  Did you ever opine or believe that Farmer
4  attempted to make entry into Pearce's vehicle?
5    A.  I don't believe so.
6    Q.  Did you ever see Farmer act aggressively
7  towards Lopera or Lif in a general sense?
8    A.  It didn't appear so.
9    Q.  Is attacking somebody violently a potential
10  sign that that person is under the influence of
11  illegal drugs?
12    A.  Could be.
13    Q.  Is hallucinating and saying things that
14  didn't occur a potential sign of somebody being under
15  the influence of a controlled substance?
16    A.  Could be.
17    Q.  Is falling down a potential sign of
18  somebody being under the influence of a controlled
19  substance?
20    A.  Could be.
21    Q.  Are you familiar with the trespassing
22  statute 207.200?
23    A.  Yes.
24    Q.  In order for somebody to commit the crime
25  of trespassing, is one way to commit that crime being

Page 283

1  warned to stay off the property, then coming back?
2    A.  Yes.
3    Q.  Is another way to commit trespassing to go
4  onto a property that has clearly marked orange
5  writings in a certain distance of each other that
6  warns not to trespass on the property?
7    A.  I believe it also has to be marked with
8  NRS.
9    Q.  Do you have evidence of any of those two
10  things in this case?
11    A.  No.
12    Q.  Do you believe that Farmer would have been
13  charged with trespassing for going into the back of
14  the house?
15    A.  No.
16    Q.  At certain points when Farmer was on the
17  ground, did he stop resisting at certain points?
18    MR. ANDERSON: Objection, form.
19    MR. McNUTT: Objection, form.
20  BY MR. LAGOMARSINO:
21    Q.  Or was it continuous resistance all the way
22  through?
23    A.  With angles on the video, it's kind of hard
24  to answer that question.
25    Q.  Are you of the opinion that Officer Lopera

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

27 (Pages 284 to 287)

---

Page 284

1   remained at the proper level of force with Tashii
2   Farmer?
3       A.  No.
4       Q.  Are you of the opinion that Officer Lopera
5   showed compassion and care about Farmer's well-being?
6       MR. ANDERSON:  Objection, form.
7       MR. McNUTT:  Objection, form.
8       THE WITNESS:  No.
9   BY MR. LAGOMARSINO:
10      Q.  Did you ever assess how long it took for
11  the officers to start chest compressions on Farmer?
12      A.  I did initially at the time of the call.  I
13  don't remember exactly what it was.
14      Q.  Minutes, correct?
15      A.  No.  Once officers -- do you want me to
16  finish?
17      Q.  Yes.
18      A.  Once officers arrived, he was checked for a
19  pulse several times.  As soon as an officer noticed
20  that he had no pulse and wasn't breathing, that's
21  when CPR was begun.
22      Q.  Was it Tran or Flores, or do you know
23  which, that said that Farmer appeared to be
24  unconscious when they arrived at the scene?
25      A.  I'd have to go back through and look to

---

Page 285

1   remember.
2       Q.  One of them said that, correct?
3       A.  Something to that effect, yes.
4       Q.  When an officer uses an LVNR to the point
5   of making a subject pass out, is that low level of
6   force or intermediate level of force at that time?
7       A.  Intermediate.
8       Q.  When Tashii was on the ground with his
9   hands up, did you consider that substantial
10  resistance?
11      A.  No.
12      Q.  When a subject says, "Yes, sir" and "I
13  will" in response to commands, is that a sign of
14  compliance?
15      MR. ANDERSON:  Objection, form.
16      THE WITNESS:  It can be.
17  BY MR. LAGOMARSINO:
18      Q.  Going back to the TASER for a second, was
19  there evidence confirming that there was a
20  connection -- strike that.
21          Going back to the TASER, was there evidence
22  confirming that there was a solid and consistent
23  connection through probe placement?
24      MR. McNUTT:  Compound.
25      THE WITNESS:  There was a download of the

---

Page 286

1   TASER, which showed whether or not the circuit was
2   completed.
3   BY MR. LAGOMARSINO:
4       Q.  And was it completed to a consistent
5   connection?
6       A.  It was either two or three times that it
7   showed that it was a completed circuit, and the other
8   ones were intermittent.
9       Q.  Is NMI evidence of a consistent connection
10  to the probes?
11      A.  Yes.
12      Q.  Do you believe that Tashii Farmer would
13  have spontaneously died had he not had any
14  interaction with Ken Lopera?
15      MR. McNUTT:  Objection, form.
16      MR. ANDERSON:  Join.
17      THE WITNESS:  I don't think there's any way
18  that I can answer that.
19  BY MR. LAGOMARSINO:
20      Q.  Based on your review of the video, did
21  Tashii Farmer exhibit superhuman strength?
22      A.  No.
23      Q.  Did you undertake to download Tashii
24  Farmer's text messages?
25      A.  We did.

---

Page 287

1       Q.  Was there any relevance of those text
2   messages to your investigation?
3       A.  Nothing significant that I remember.
4           There may have been references to drugs but
5   nothing that stood out.
6       Q.  Did -- strike that.
7           If Tashii Farmer had a long history of drug
8   use, would that be relevant to your investigation of
9   Lopera's conduct?
10      A.  No.
11      Q.  As you sit here today, do you recall any
12  text messages from Tashii's phone that indicate that
13  he actually received drugs the night of the incident?
14      A.  Not off the top of my head.
15      Q.  Did you ever see any evidence that
16  Officer Lif actually slipped and fell?
17      A.  No.
18      Q.  Did you put together a PowerPoint for the
19  fact-finding review?
20      A.  I did.
21      (Exhibit 17 was marked for
22  identification by the reporter.)
23      MR. LAGOMARSINO:  Which exhibit is this?
24      THE REPORTER:  17.
25

---

Detective Trever Alsup  - Vol. II -  July 1, 2019
\* \* \* Videotaped Deposition \* \* \*

28  (Pages 288 to 291)

Page 288

BY MR. LAGOMARSINO:
 Q.  Do these slides appear to be copies from your PowerPoint?
 A.  Yes.
 Q.  Do they appear to be true and correct copies of slides from your PowerPoint?
 A.  Yes.
 MR. LAGOMARSINO:  I don't have any further questions.
 MR. ANDERSON:  Do you want me to go first?
 MR. McNUTT:  What's that?
 MR. ANDERSON:  Do you want me to go first?
 MR. McNUTT:  Sure.  Whatever.

 EXAMINATION
BY MR. ANDERSON:
 Q.  Okay, I just have a couple questions.
 Based upon your investigation, when Tran, Flores, and Crumrine arrived, what information did they have, if any, as to what had occurred prior to their arrival?
 A.  None.
 Q.  When an officer arrives under the situation that you investigated with no information, what is their first objective?

Page 289

 A.  To help take a person into custody.
 Q.  And what would their training tell them would be their first objective in this case, to do what with Mr. Farmer or Officer Lopera?
 A.  To help take Farmer into custody and place him in handcuffs.
 Q.  You answered questions where you stated that Crumrine, Tran, and Flores were all in a position where they could have physically removed Lopera's arms from Farmer's neck, correct?
 A.  No.
 Q.  Would an officer ever physically remove the arms from a suspect's neck prior to handcuffing?
 A.  No.
 Q.  And why is that?
 A.  Because your first -- once you arrive, your first duty is to help that officer gain compliance of the situation, get somebody into custody, make it a safe environment.
 Q.  So with respect to Tran, Flores, and Crumrine, was attempting to assist with handcuffing a legitimate law enforcement objective?
 A.  Yes.
 Q.  Would Officers Tran, Flores, or Crumrine have been able to tell how much pressure, if any, was

Page 290

being applied by Officer Lopera to Mr. Farmer's neck?
 A.  No.
 MR. LAGOMARSINO:  Form, foundation.
 MR. ANDERSON:  Nothing further.

 EXAMINATION
BY MR. McNUTT:
 Q.  Detective Alsup, we've met on a couple of occasions.
 A.  Yes.
 Q.  Was getting Tashii Farmer into custody a legitimate law enforcement objective?
 A.  For whom?
 Q.  For Ken Lopera.
 A.  Without a statement from him or reasoning why the event began in the first place, I can't really answer that question.
 Q.  Well, you're aware, because you've testified to it, that Tashii Farmer was under the influence of a controlled substance, specifically methamphetamines, correct?
 A.  Correct.
 MR. LAGOMARSINO:  Objection, form.
BY MR. McNUTT:
 Q.  So is arresting or detaining or seizing

Page 291

Tashii Farmer when he's under the influence of illegal methamphetamines, is that a legitimate law enforcement objective?
 A.  I don't know that that is something that Officer Lopera was able to determine at the onset of the investigation, and without a statement from him as to why things went the way they did, there's no way that I can answer that question.
 Q.  I'm not asking the question of what Officer Lopera knew.  I'm asking you --
 A.  That's what my investigation is based on is what was available to him.  So without a statement from him, I have no way to tell what his justification or reasoning for things were.
 Q.  And so, you discounted all the other people, namely -- not all the other people, but namely, Officer Lif who testified regarding his condition and his state of mental confusion, and potentially being under the influence of something?
 MR. LAGOMARSINO:  Form, misstates.
BY MR. McNUTT:
 Q.  Did you discount that?
 A.  That doesn't -- in my opinion, that doesn't raise to the level of reasonable suspicion at that point.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

29  (Pages 292 to 295)

Page 292

Q.  Why not?
A.  To prove to be under the influence of a controlled substance, you would have to be able to have enough to obtain a search warrant to get that person's blood or urine to prove that they were under the influence, and from what I saw, based on the beginning of that circumstance, I don't believe that you would have enough probable cause to obtain a search warrant from a judge.
Q.  But you don't know that because Officer Lopera never gave a statement, is that your position?
A.  Correct.
Q.  So if that was his position, would that have been enough, in your mind, to stop Tashii Farmer?
A.  I think that if he would have given us a statement, explained what his reasonable suspicion or probable cause was, then yes.
Q.  Can a consensual encounter turn into a nonconsensual encounter?
A.  It can.
Q.  So if an individual approaches a Metro officer to ask for directions or where the water fountain is and a Metro officer believes that that

Page 293

individual was under the influence of a controlled substance, it's no longer a consensual encounter, is it?
A.  I guess it would be up to that officer to determine that.
Q.  So it's their discretion, correct?
A.  Yes.
Q.  Had Tashii Farmer survived, could he have been charged with a crime?
A.  I don't know.  I don't know if Officer Lopera would have had enough for a crime or not.
Q.  I didn't say would he, I said could he.
So sitting here today, you're aware of the fact that he was under the influence of illegal methamphetamines, correct?
A.  Yes.
Q.  So that's a crime in the State Of Nevada, correct?
A.  But I don't know if Officer Lopera had the reasonable suspicion or the probable cause to make that arrest.
Q.  I didn't ask that.  I'm asking you a specific question.
Could he have been charged with a crime?

Page 294

A.  Possibly.
Q.  No, it's "Yes" or "No," not possibly.
Could he have been charged with a crime?
A.  I can't answer that question --
MR. ANDERSON:  Hang on a second.
BY MR. McNUTT:
Q.  Why?
MR. LAGOMARSINO:  Objection.
BY MR. McNUTT:
Q.  I don't understand why you can't answer.
MR. ANDERSON:  Objection. Go ahead.
THE WITNESS:  Because I have no idea of what was going through Officer Lopera's mind at that time, and I can't build his reasonable suspicion or his probable cause for him.
BY MR. McNUTT:
Q.  So the question remains --
A.  And I wasn't there, so I have no idea if the reasonable suspicion or probably cause existed either.
Q.  Of course not.
A.  So you can't ask me if I could because I don't know.
Q.  I didn't ask you if you could.
Could Officer Lopera have written an arrest

Page 295

report and charged Tashii Farmer with a crime?
A.  I don't know.
Q.  What do you mean you don't know?
A.  Again, I don't know if he had developed reasonable suspicion or probable cause to make that arrest.  There's no way that I can answer that question for you.
Q.  But you know that Tashii Farmer was committing a crime by being under the influence of a controlled substance, correct?
A.  Based on an autopsy that was conducted after the fact.
Q.  So I don't want to -- I want to be very careful on this line of questioning because I'm not asking would somebody or should somebody have charged Tashii Farmer.  It's simply -- isn't it within the discretion of the arresting officer whether to charge someone with a crime?
A.  Yes, in certain circumstances.
Q.  So in this circumstance, the arresting officer would have been Ken Lopera, correct?
A.  Correct.
Q.  So Ken Lopera would have had the discretion to write an arrest report and charge Tashii Farmer with a crime, correct?

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

Page 296

1   A.  If he had developed a reasonable suspicion
2   or probable cause for that arrest, yes.
3   Q.  Well, that would have been up to him to
4   develop in an arrest report like you claimed to have
5   done, correct?
6   A.  Correct.
7   Q.  So there's nothing that would have
8   prohibited Ken Lopera from charging Tashii Farmer
9   with a crime, correct?
10   A.  As long as he had the reasonable suspicion
11   or probable cause, correct.
12   Q.  You said you didn't know how tall
13   Ken Lopera was, right?
14   A.  I said I didn't know how much he weighed.
15   Q.  Height or weight.
16   Okay.  So let's go to Exhibit 1 of the
17   arrest report.
18   A.  Okay.
19   Q.  And you may have said you didn't remember.
20   Does looking at that document refresh your
21   recollection as to the height and weight of
22   Ken Lopera?
23   A.  That would have been based on information
24   that's contained in a file from whenever he filled
25   that out.  So what his exact weight at that time was,

Page 297

1   I have no idea.
2   Q.  But what does it say on his arrest report?
3   A.  175 pounds.
4   Q.  You're an expert investigator, correct?
5   A.  I'm an investigator.
6   Q.  Well, you said you're an expert.
7   MR. ANDERSON:  Objection, form.
8   BY MR. McNUTT:
9   Q.  At the beginning of this deposition, you
10   said you would -- in fact, your exact words were "I
11   would hope so."
12   A.  Okay.
13   Q.  Because Mr. Lagomarsino asked you a
14   question and said are you an expert in
15   investigations, and you said:  At this point, I hope
16   so.
17   A.  Okay.
18   Q.  Do you recall that?
19   A.  I do.
20   Q.  So this is your arrest report, Exhibit 1,
21   correct?
22   A.  Correct.
23   Q.  You previously testified twice in the
24   estate case and in Volume 1 of this deposition that
25   you wrote -- you completed this report.  Not all the

Page 298

1   words in the report are your words because you carved
2   out some of the statements from Sergeant Abdul,
3   Abdal?
4   A.  Correct.
5   Q.  But you authored this report, correct?
6   A.  Correct.
7   Q.  So are you saying to me that it may or may
8   not be accurate what some basic information, like
9   Ken Lopera's height and weight is?
10   MR. LAGOMARSINO:  Objection, asked and
11   answered.
12   THE WITNESS:  I'm going off information
13   that I was given.  I did not personally put him on a
14   scale.
15   BY MR. McNUTT:
16   Q.  Okay.  So your arrest report says that he's
17   five-nine, 175-pounds, correct?
18   A.  Correct.
19   Q.  Have you ever met Ken Lopera?
20   A.  I have.
21   Q.  How many times?
22   A.  Twice.
23   Q.  When were those events?
24   A.  Once the night of the incident, and the
25   second time was at Clark County Detention Center.

Page 299

1   Q.  Okay.  Would it appear to you that
2   Officer Lopera is five-nine and 175 pounds at those
3   times?
4   A.  I would say he's probably a little shorter
5   than five-nine.  As far as weight, I have no idea.
6   Q.  Okay.  And you testified regarding the
7   autopsy report earlier.  If you look at Exhibit 2,
8   page 2, it's LVMPD 1411.  And it says there, "General
9   External Examination," and you testified that, yes,
10   this says that he was an adult black male measuring
11   74 inches, which the question was, that's about
12   six-two, correct?
13   A.  Correct.
14   Q.  And weighing about 197 pounds, correct?
15   A.  Correct.
16   Q.  Do you accept that at face value that the
17   Coroner got that correct?
18   A.  I would trust that he did.
19   Q.  So if these two documents are accurate,
20   then Ken Lopera was how much shorter than Tashii
21   Farmer?
22   A.  Five inches.
23   Q.  And how much lighter was Ken Lopera?
24   A.  22 pounds.
25   Q.  So is that a significant size differential

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

31 (Pages 300 to 303)

Page 300

1  between an officer and a suspect, in your opinion?
2      A.  It's a difference.  I don't know
3  significant.  It's definitely there's a difference in
4  size, but to make it significant...
5      Q.  Would you want to fight someone that's five
6  inches taller and 20 pounds heavier than you?
7      A.  I don't really want to fight anybody, but
8  no.
9      Q.  You testified regarding the data from the
10  TASER download.
11      Do you recall that?
12      A.  Yes.
13      Q.  Did you have the download -- do you have a
14  name for that report?
15      A.  There is.
16      Q.  If I'm referring to it as the data down --
17  the TASER download, is that sufficient?
18      A.  Yes.
19      Q.  Is there only one report?
20      A.  As far as I'm aware, yes.
21      Q.  Did you have that report prior to authoring
22  the arrest report?
23      A.  I believe so, but I would have to look at
24  the data report to make sure.
25      Q.  Well, we went through this before, and I

Page 301

1  don't want to belabor it.
2      There is no date on this arrest report,
3  correct?
4      A.  No, I'm sorry, the date of the TASER
5  download report.
6      Q.  Okay.  Do you remember the date -- we did
7  go through, there is no date on this report, correct?
8      A.  Correct.
9      Q.  And you said this report, the arrest report
10  would have been done at the same date as the TCR,
11  correct?
12      A.  Correct.
13      Q.  Which stands for?
14      A.  Temporary custody record.
15      Q.  But sitting here today, you have no memory
16  either way whether you had the TASER data prior to
17  authoring this report?
18      A.  I don't remember.
19      Q.  You testified that some of the activations
20  of the TASER were, quote, intermittent?
21      A.  Correct.
22      Q.  Do you remember that?
23      A.  Yes.
24      Q.  What do you mean by intermittent?
25      A.  That the cycle wasn't completed enough to

Page 302

1  cause neuromuscular -- neuromuscular incapacitation.
2      Q.  And it's really a circuit, correct?
3      A.  Correct.
4      Q.  And that's what you meant by cycle?
5      A.  Correct.
6      Q.  Because we've said cycle the TASER, and I
7  want to make sure we're using distinct words.
8      Can you explain to me what the circuit
9  closure means and what is required?
10      A.  To get into a technical aspect, no, but --
11      Q.  Layman's terms are fine.
12      A.  The probes have to be spread enough for the
13  electricity to flow through the body to affect all
14  the muscles and cause contractions to where you can't
15  move.
16      Q.  So when you say intermittent is -- I'm just
17  trying to understand.  Does that mean that during the
18  cycle of the TASER, there was an intermittent
19  transfer of energy from the TASER to the suspect, or
20  what does the word intermittent mean?
21      MR. LAGOMARSINO:  Objection, form as to
22  which cycle.
23      THE WITNESS:  That for brief periods of
24  time, and we're only talking about a five-second --
25  the cycle on the TASER is five seconds.  So for a

Page 303

1  very brief moment of time, there was enough
2  electricity flowing through the body to cause that
3  incapacitation, a there there wasn't.  So something
4  was breaking that circuit.
5  BY MR. McNUTT:
6      Q.  And do you have an idea of what broke the
7  circuit?
8      A.  I don't know.
9      Q.  Did you -- do you have the investigative
10  skills to look at the placement of the probes on a
11  suspect to determine whether or not they're
12  appropriately spaced in order to affect the cycle --
13  or, excuse me, to complete the circuit?
14      A.  I would refer that to an expert on the
15  TASER.
16      Q.  Okay.  But is that something you have ever
17  done -- and when I say do you have the background to
18  do that, I'm asking is that a specialty, or is that
19  something that you encounter as an investigator?
20      A.  There's the master TASER instructors in the
21  department, and I'm sure they can give you the exact
22  placement.
23      From my layman's terms of the TASER is
24  there's a minimal spread that needs to be achieved in
25  order for the electrical current to be completed.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

Page 304

1  Off the top of my head, I don't know what that is.
2      Q.  So when we saw the initial tase, tase
3  No. 1, it was pretty obvious that there was some
4  manner of neuromuscular incapacitation because Tashii
5  Farmer did the classic muscle freeze, correct?
6      A.  Correct.
7      Q.  Is that the evidence that we would look for
8  in the video for each successive cycling of the TASER
9  to determine if there was neuromuscular
10  incapacitation?
11      A.  I would not rely on the video, I'd rely
12  more on the data that can be pulled from the TASER.
13      Q.  So if the data from the TASER said the
14  circuit was closed, you would rely on that more than
15  the video, if the data for the TASER said for this
16  trigger pull of the ECD, there was no circuit
17  closure, you would rely on that?
18      A.  Well, I think you would use both of them in
19  conjunction with each other, and if the data from the
20  TASER said there was a completed circuit and you can
21  observe the person in neuromuscular incapacitation,
22  you use those with each other and...
23      Q.  Would having the ECD or the TASER print out
24  the data be important for your investigation prior to
25  drafting the arrest report?

Page 305

1      A.  No, because if you're referring to the end
2  where I talk about how many times the TASER was
3  deployed?
4      Q.  I wasn't referring to that but I will.
5      A.  Per our policy at the time, it said that
6  after a third time, it should be considered
7  ineffective and other force options considered.
8          And through my investigation and my opinion
9  in the beginning of this that seven times was
10  excessive.
11      Q.  So let's talk about that.
12          Just assume as a hypothetical that there
13  were three trigger pulls on the ECD.
14          Is it your position that if the fourth --
15  if the trigger was pulled a fourth time but there was
16  no circuit closure and no electricity was transferred
17  to the suspect that that's a violation of policy just
18  because you tried?
19      A.  I would say that the way the policy read at
20  the time that it could be considered a violation of
21  policy.
22      Q.  So that's a violation of policy.  Is that a
23  crime?
24      A.  No.
25      Q.  Would it be important for a trier of fact

Page 306

1  to know how many times the TASER was effective?
2          MR. LAGOMARSINO:  Objection, form.
3          THE WITNESS:  I think it's helpful.
4  BY MR. McNUTT:
5      Q.  You testified earlier that you prefer doing
6  criminal investigations over administrative
7  investigations, correct?
8      A.  Correct.
9      Q.  So in the criminal context, wouldn't it be
10  very important for you to understand exactly how many
11  times the circuit was closed and energy was
12  transferred to the suspect?
13      A.  I don't think it necessarily -- when you
14  look at the totality of the whole case, I don't think
15  that that comes into play a whole lot.
16          If you're dealing -- this was kind of a
17  weird case because you had to mix criminal law and
18  our policy, which usually doesn't happen in a
19  criminal case.  But in this one where you're using
20  policy that tells you you're not allowed to do this,
21  you are allowed to do this, and you're coming into
22  this case, you have to blend that.
23      Q.  So I don't understand your answer, and I'll
24  tell you why.
25          Why did you have to mix policy and criminal

Page 307

1  law in this case?  I mean, what -- it was my
2  understanding, prior to you saying that in the last
3  60 seconds was that CIRT looked at policy and you as
4  FIT looked at criminal?
5      A.  What I'm saying is that obviously, and it's
6  referenced in our arrest report, that we took policy
7  into consideration for the charges because when you
8  build the totality of the circumstances for the whole
9  case, there were policy violations that created --
10  helped prove the case of excessive force.
11      Q.  So even though you say violation of policy
12  is not a crime, in effect, it really is, correct, or
13  could be?
14          MR. LAGOMARSINO:  Objection, form,
15  incomplete hypothetical.
16          THE WITNESS:  No.
17  BY MR. McNUTT:
18      Q.  No?
19      A.  We didn't charge him with violating policy.
20  We charged him with a criminal code, but I had to
21  rely on policy to show that it was a continuation of
22  things that built up to that charge.
23      Q.  So do you know who Sergeant Bland is?
24      A.  I do.
25      Q.  We've talked about him before, right?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

33 (Pages 308 to 311)

### Page 308

1    A.  Correct.
2    Q.  And he was identified as the subject matter
3  expert for LVMPD, correct, on use of force?
4    A.  Correct.
5    Q.  Are you aware of that?
6    A.  Yes.
7    Q.  Sergeant Bland testified that you can go
8  beyond the policy with the TASER if, and his example
9  was, an officer alone that didn't know if or when
10  backup was going to arrive, he said it would not be a
11  violation of policy to use the TASER more than three
12  times.
13    Do agree with that?
14    A.  I guess it would depend on the
15  circumstances.
16    Q.  So do you agree with his circumstances that
17  I just repeated to you?
18    A.  I think that that would be something that
19  the officer himself would have to decide at that
20  moment.
21    Q.  Okay.  So you don't disagree with
22  Sergeant Bland when he said that it is not outside of
23  policy in certain circumstances to use the TASER more
24  than three times?
25    A.  I wouldn't disagree with him.  He's a

### Page 309

1  subject matter expert.
2    However, I referred to the way policy read,
3  which was after three times, another force option
4  should be considered.
5    Q.  Did you consider the fact that Ken Lopera
6  was by himself and did not know when backup would
7  arrive?
8    A.  I believe that -- I believe that
9  reasonably, he should have known that backup would be
10  pretty close.
11    Q.  How would he know that?
12    A.  Because they were on a special detail that
13  was saturating the Strip with numerous officers in
14  the area.  They had had a briefing beforehand.  He
15  knew the amount of resources that were in the area.
16    Q.  What if the resources were tied up
17  elsewhere, did he know that?
18    A.  If you hear somebody in a foot pursuit or a
19  fight and it's another officer when you hear that
20  over the radio, as long as you don't technically --
21  as long as you don't have somebody in custody or
22  you're doing something where you can't leave, you're
23  going to go help that officer.
24    Q.  But nonetheless, the truth of the matter is
25  that the entire time Ken Lopera was dealing with

### Page 310

1  Tashii Farmer with the TASER situation, there were no
2  other Metro officers there, correct?
3    A.  No.
4    Q.  In fact, the entire time he was either
5  using the TASER or using hand strikes, there were no
6  other Metro officers there, correct?
7    MR. LAGOMARSINO:  Objection, form,
8  misstates.
9    THE WITNESS:  I believe he used a couple
10  hand strikes after the arrival of Sergeant Crumrine.
11  BY MR. McNUTT:
12    Q.  Okay.  But for the entire time up to that
13  point, he was by himself, correct?
14    MR. LAGOMARSINO:  Objection --
15    THE WITNESS:  Yes.
16  BY MR. McNUTT:
17    Q.  And he was --
18    MR. LAGOMARSINO:  Strike that.  You mean by
19  himself without officers, not by himself, correct?
20    MR. McNUTT:  Without officers.  Fair
21  enough.
22    MR. LAGOMARSINO:  Okay.
23  BY MR. McNUTT:
24    Q.  And he was outsized by five inches and 22
25  pounds at least, correct?

### Page 311

1    A.  According to the information that I had,
2  yes.
3    Q.  So this scenario actually would fit into
4  Sergeant Bland's hypothetical that he gave to
5  Fred Sayre in the estate case, wouldn't it?
6    A.  It could.
7    Q.  When you watch the video, do you have any
8  way of determining how many of the attempted strikes
9  landed on Tashii Farmer's body?
10    A.  No.
11    Q.  So when you say in your arrest report that
12  there were 10 to 12 strikes, how did you count those?
13    A.  Those were strikes that we observed that
14  Officer Lopera was attempting to punch Tashii Farmer.
15    Q.  So security guard Infantino, one of the
16  security guards from the Venetian, he testified that
17  he believed -- he was standing there, he was one of
18  the guys that was standing right there, and he
19  testified that most of the blows landed in the
20  shoulder area.
21    Do you dispute that?
22    A.  It's hard to tell.  I'm not going to
23  dispute what he says if that was his perception.
24    Q.  Right, that's my question.  Do you dispute
25  what his testimony is?

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

34  (Pages 312 to 315)

Page 312

1    A.  No.
2    Q.  You gave some testimony earlier where
3  you -- Mr. Lagomarsino would read you a statement
4  written by the Coroner, and then, you would go to the
5  various photographs in the Coroner's report.
6    Do you remember that?
7    A.  Yes.
8    Q.  Had you ever seen Tashii Farmer other than
9  for this investigation?
10    A.  No.
11    Q.  Now, you testified that you weren't able to
12  determine or couldn't give any testimony regarding
13  the contusion or the bruise on his back left
14  shoulder.
15    Do you remember that?
16    A.  Yes.
17    Q.  How is it that you're able to testify
18  regarding the injuries to Tashii Farmer's face?
19    A.  When you stop the body cam for
20  Officer Lopera, towards the beginning of this
21  incident, there's a shot of his face, and you don't
22  see any injuries.
23    Q.  So it's just from the body-worn cam on
24  Officer Lopera that you can tell the status of Tashii
25  Farmer's face?

Page 313

1    A.  I said it appeared there weren't any
2  injuries.
3    Q.  No, but I mean, that's the evidence that
4  you used in your investigation.  Let me rephrase it.
5    You don't have some other photo of Tashii
6  Farmer where you were comparing it to?
7    A.  From that night?
8    Q.  From that night.
9    A.  Officer Lopera's body cam was the best
10  image that we had before the incident.
11    Q.  That's the evidence that you used or that's
12  the thing that you referred to in your investigation?
13    A.  Yes.
14    Q.  How long does it take for bruising to show
15  up, do you know?
16    A.  Hours to days.
17    Q.  Are you aware of any job or hobbies that
18  Tashii Farmer engaged in?
19    A.  Boxing, I believe.
20    Q.  And isn't it true that you learned that
21  probably from his text messages?
22    A.  Correct.
23    Q.  And what was he doing in the boxing world?
24    A.  I think he was coaching somebody.
25    Q.  And he was a trainer, correct, or he held

Page 314

1  himself out to be a trainer?
2    A.  Correct.
3    Q.  Is it possible that Tashii Farmer had been
4  engaged in boxing activities in which he was punched
5  in the face --
6    MR. LAGOMARSINO:  Objection to form.
7  BY MR. McNUTT:
8    Q.  -- prior to this event?
9    MR. LAGOMARSINO:  Objection to form.
10    THE WITNESS:  It's possible.
11  BY MR. McNUTT:
12    Q.  Did you consider that?
13    A.  Again, based on the evidence I had?
14    Q.  No.  Did you consider that, "Yes" or "No"?
15    A.  No.
16    Q.  Because you didn't think you needed it?
17    A.  No, because based on the evidence we had
18  and the evidence from Officer Lopera's body-worn
19  camera, it didn't appear to be any injuries.
20    Q.  Did you ask anybody -- did you investigate
21  any of the recipients or senders of the text messages
22  in the hours preceding this event?
23    A.  No.
24    Q.  You didn't call any of them?
25    A.  No.

Page 315

1    Q.  Did you -- did any -- and when I say you, I
2  mean anybody on your team, your investigative team.
3    A.  Not that I'm aware of.
4    Q.  Okay.  Why not?
5    A.  It didn't bear to this criminal case.
6    Q.  Okay.  So you're attributing every injury
7  on this boxer's face to Ken Lopera --
8    MR. LAGOMARSINO:  Objection --
9  BY MR. McNUTT:
10    Q.  -- is that correct?
11    A.  I believe my answers during the testimony
12  were it would -- I don't think I positively
13  identified it to that.  I think I said it was
14  possible or probable.  I'm pretty sure I didn't say
15  absolutely that's where they came from.
16    Q.  You reviewed the toxicology report,
17  correct?
18    A.  Correct.
19    Q.  Did you have that toxicology report prior
20  to authoring the arrest report?
21    A.  Based on the dates on the reports, yes.
22    And which toxicology report?  The initial
23  one?
24    Q.  Yes.
25    A.  Based on the dates on the report, yes.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

35 (Pages 316 to 319)

---

Page 316

1    Q.  Do you know the date of your -- I can pull
2  it.
3       Do you know the date of the arrest report?
4    A.  Does anybody have a copy of the TCR?
5    Q.  I do have a copy of the TCR, just not in
6  hard form.
7       I believe, but I'll check, that it was
8  June 5th.
9    A.  Sounds about right.
10   Q.  2017.
11      And I'll show what's previously been
12  marked -- we'll get to that in a minute.
13      Have you ever been trained by Las Vegas
14  Metro, and I mean at any point in your career,
15  academy through becoming an expert investigator with
16  FIT, have you ever been trained in how to write an
17  arrest report?
18   A.  Yes.
19   Q.  How have you been trained?
20   A.  There were classes in the academy.  It's
21  something that you continue to do as you work
22  through.  Could be on-job training, reviewing other
23  arrest reports.
24   Q.  Is there a manual, a guideline, a policy?
25   A.  There's a report writing guide.

---

Page 317

1    Q.  There's a Las Vegas Metro report writing
2  guide?
3    A.  Well, there was when I went through the
4  academy.
5    Q.  Okay.  And do you recall any of the lessons
6  that were given in that report writing guide?
7    A.  No.
8    Q.  Do you still comply with Metro's policy
9  when you write reports?
10   A.  I believe so.
11   Q.  Including arrest reports?
12   A.  I believe so.
13   Q.  Do you include exculpatory evidence in
14  arrest reports?
15   A.  Yes.
16   Q.  When?
17   A.  I know that on our last deposition, we
18  pointed out something that wasn't included.
19   Q.  I'm not asking specifically about this
20  case.  I'm asking:  Is the policy of writing an
21  arrest report, do you include all facts?
22   A.  I couldn't tell you exactly what the policy
23  reads off the top of my head.
24   Q.  Now I'll ask what you do.  Do you include
25  all facts?

---

Page 318

1    A.  I include the probable cause for my arrest,
2  and if there's something glaring that negates my
3  probable cause, I'm probably not making that arrest.
4    Q.  But that's your discretion, correct, as to
5  whether you include that exculpatory fact?
6    A.  I don't think that's really discretion.  I
7  think that's something that pretty much everybody
8  should adhere to that if there's anything that proves
9  or disproves your probable cause, you have to take
10  that into account.
11   Q.  So if you had the ECD data prior to
12  authoring this arrest report, why didn't you go into
13  detail about the fact that all seven trigger pulls of
14  the ECD did not transfer energy into the suspect?
15      MR. LAGOMARSINO:  Objection, form.
16      THE WITNESS:  Because when I'm going back
17  and I'm comparing an officer's actions to policy, it
18  doesn't say three, if they're all complete in cycle.
19  It just says after three, you'll consider other force
20  options.
21  BY MR. McNUTT:
22   Q.  And again, an arrest report is not supposed
23  to be about policy, correct?
24      MR. LAGOMARSINO:  Objection.
25      THE WITNESS:  Well, I think policy built

---

Page 319

1  into the criminal case on this one.
2  BY MR. McNUTT:
3    Q.  We'll get to that more.
4       Are verbal commands a de-escalation
5  technique?
6    A.  Yes.
7    Q.  Did you ever hear Ken Lopera give verbal
8  commands to Tashii Farmer?
9    A.  Yes.
10   Q.  Can you recall some of those verbal
11  commands?
12   A.  Stop, get on your stomach, don't move.
13   Q.  All of those commands are legitimate
14  de-escalation techniques, correct?
15   A.  They can be.
16   Q.  So does that change your testimony when you
17  earlier said that Ken Lopera did not employ any
18  de-escalation techniques?
19   A.  I don't believe that I said that.  I think
20  I even said that his use of the TASER could be
21  considered de-escalation.
22   Q.  Actually, at one point, you said no.
23  Mr. Lagomarsino asked you if Ken Lopera employed any
24  de-escalation techniques, and you gave a one-word
25  answer and it was no.

---

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

Page 320

1       A.  And then, I think I clarified afterwards
2   and I said that use of the TASER or any other use of
3   force option could technically be a de-escalation
4   technique.
5       Q.  So Ken Lopera -- thank you.  Ken Lopera
6   used at least two different types of de-escalation
7   techniques, correct?
8           MR. LAGOMARSINO:  Objection, form.
9           THE WITNESS:  I don't know.
10  BY MR. McNUTT:
11      Q.  Well, verbal commands are a de-escalation
12  technique, correct?
13      A.  Again, you're asking me to get into
14  Ken Lopera's mind, and I have no idea what was going
15  through his mind at the time.
16      Q.  No, sir.  I'm asking you to interpret as an
17  expert investigator for me the objective evidence
18  that you reviewed multiple times on the audio and
19  videotapes.  That's what I'm asking.
20      A.  Did I -- did I see de-escalation techniques
21  in the video?  It didn't appear to me to be.
22      Q.  So a verbal command is not a de-escalation
23  technique.  "Yes" or "No"?
24          MR. LAGOMARSINO:  In general or here?
25          MR. McNUTT:  He's already said it generally

Page 321

1   is a de-escalation technique.
2           THE WITNESS:  Yes, it is.
3   BY MR. McNUTT:
4       Q.  Okay --
5       A.  But you're giving conflicting --
6       Q.  So if Tashii Farmer had complied --
7       A.  You're giving conflicting -- when you're
8   telling somebody to get on their stomach and don't
9   move, get on your stomach, don't move, and it's
10  back-to-back within a few seconds, it's really not a
11  de-escalation because you're not giving a person an
12  opportunity to comply.
13      Q.  Well, you obviously don't remember your
14  testimony on two prior occasions because on those two
15  prior occasions -- and we can do it here today too --
16  we went through the video, and you said that when
17  there's immediate noncompliance, the officer has to
18  wait no further, to assess no further, to give
19  another command.
20          And so, would you like to go back through
21  those, or does that at all refresh your recollection
22  about your prior testimony?
23          MR. LAGOMARSINO:  Objection, move to strike
24  the editorializing.
25          THE WITNESS:  If I tell somebody to put

Page 322

1   their hands behind their back and they don't do it,
2   I'm going to tell them to put their hands behind
3   their back again.  If they don't do it, I'm going to
4   tell them put their hands behind their back.
5           If a person is on his stomach, I'm not
6   going to tell him to get on his stomach or don't
7   move.
8   BY MR. McNUTT:
9       Q.  So let's go back to the first one, before
10  the first stop, don't move.  Tashii Farmer runs away.
11          Is that compliance?
12      A.  The first stop, move is after the first
13  tasing or --
14      Q.  Actually, it's not.
15      A.  I'm sorry.  As he's running around the
16  pickup.
17      Q.  And Tashii Farmer did not comply, correct?
18      A.  Correct.
19      Q.  And then, he said or you're going to get
20  tased or words to that effect, correct?
21      A.  Correct.
22      Q.  And there was more seconds in between,
23  correct?  How long does it take for someone to stop
24  running?
25      A.  I guess it depends on their speed.  A

Page 323

1   couple seconds, maybe before they stop.
2       Q.  Was he running at a full spring at that
3   point, to your recollection?
4       A.  No.
5       Q.  So how long did it take someone to --
6       A.  I don't know.
7       Q.  Are you familiar with the tooler drill?
8   Did you ever hear that phrase?
9       A.  No.
10      Q.  No?
11          How fast can an average person move
12  21 feet?
13      A.  Seconds.
14      Q.  One-and-a-half seconds?
15      A.  Okay.
16      Q.  Isn't your academy firearm standards
17  predicated upon how fast an officer can get something
18  out of the holster and on target?
19      A.  Yes.
20      Q.  Okay.  How fast can someone move in 21
21  seconds -- excuse me.  How far can someone move in
22  21 seconds?
23      A.  I've never heard it broken down into
24  seconds.  It's always just 21 feet.
25      Q.  Did the tox report look at whether or not

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

37 (Pages 324 to 327)

Page 324

1  Tashii Farmer had steroids in his system?
2      A.  I don't believe so.
3      Q.  Why not?
4      A.  I didn't see any mention of it.
5      Q.  No.  I mean why was that not something that
6  was screened for?
7      A.  I don't know think part of the Coroner's
8  standard screening on an autopsy.  That would be a
9  question for the Coroner.
10     Q.  Does Metro have any ability to request that
11  the Coroner do certain types of tox reports, or is
12  that purely the Coroner's protocol?
13     A.  It's the Coroner's protocol.
14     Q.  Do you know what a rear naked choke is?
15     A.  Basically in layman's terms, yes.
16     Q.  And what is it in layman's terms?
17     A.  Physiologically it's the same as LVNR.
18  It's a carotid compression that restricts blood flow
19  to the brain.
20     Q.  And you testified before that Ken Lopera's
21  encircling arm was in the proper position for either
22  a rear naked choke or a lateral vascular neck
23  restraint, correct?
24     A.  It appeared so.
25     Q.  It was merely his right hand that you said

Page 325

1  was not in the correct position for a lateral
2  vascular neck restraint, correct?
3      A.  Whichever hand it was, the hands weren't
4  clasped but were in the right position.
5      Q.  The nonencircling hand?
6      A.  Correct.
7      Q.  And for the LVNR, the nonencircling hand
8  should have been clasped with the encircling hand,
9  correct?
10     A.  Correct.
11     Q.  And that was not the case here?
12     A.  Correct.
13     Q.  Where was his nonencircling hand?
14     A.  It appeared to be on the head of Tashii
15  Farmer.
16     Q.  If the hands are not clasped, can you exert
17  more or less pressure than if they are on the neck if
18  they are clasped?
19     A.  The pressure is caused by a combination of
20  pressure against the head, the pressure of the
21  forearm against the carotid.
22     Q.  So you can obtain more or less pressure on
23  the carotids if your hands are clasped together than
24  if they aren't?
25     A.  Right.

Page 326

1      Q.  Do you know what Metro policy says on that
2  front?
3      A.  I don't off the top of my head.
4      Q.  Do you know what Metro policy says the
5  reason for the hands to be clasped is?
6      A.  I believe it's something to help ensure
7  that hand placement or arm placement is correct.
8      Q.  No, it's so that you can exert, quote,
9  maximum pressure, end quote?
10     A.  Okay.
11     Q.  Does that refresh your recollection?
12     A.  Sounds vaguely familiar.
13     Q.  Are you current on your defensive tactics
14  this quarter?
15     A.  I am.
16     Q.  Did you do the LVNR training this quarter?
17     A.  I didn't.
18     Q.  At any point in your investigation, were
19  you able to determine what type of LVNR was used?
20         MR. ANDERSON:  Objection, form.  Can you
21  restate that?
22  BY MR. McNUTT:
23     Q.  Are you familiar with the fact that there
24  are different levels of LVNR?
25     A.  Yes.

Page 327

1      Q.  And what are they called, LVNR 1, 2, and 3,
2  correct?
3      A.  Correct.
4      Q.  So at any point in your investigation of
5  this event, did you determine that it was an LVNR 1,
6  2, or 3?
7      A.  It was my determination this was not an
8  LVNR.
9      Q.  Okay.  So what makes -- let's go back.
10         What is the distinction between an LVNR 1,
11  2, and 3?
12     A.  It's the angle of the arms.
13     Q.  Which arm?
14     A.  It's the -- well, when you're enclasped,
15  it's the raising of the arms together and angled.
16     Q.  So as far as the encircling arm, were you
17  ever able to determine whether or not that was in the
18  position for an LVNR 1, 2, or 3?
19     A.  There's no way to tell.
20     Q.  Why not?
21     A.  From the angle of the officer's back is to
22  us, you can't tell exactly where his arm is.  There's
23  not enough video evidence to prove where arms were or
24  what was going on.
25     Q.  Okay.  Let's talk about pressure applied to

Detective Trever Alsup   - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

38  (Pages 328 to 331)

Page 328

Tashii Farmer's neck, if any.  Okay?
A.  Okay.
Q.  At any point in your investigation, were
you able to determine how much, if any, pressure was
applied to Tashii Farmer's neck and for how long?
And that was a compound question, so if you
want me to break it down, I will, but if you
understood it, then go ahead and answer.
A.  The information we had as far as pressure
on the neck came from the Coroner during the autopsy.
That was the information that we relied on.
As far as how long the pressure was held on
the neck, no.
Q.  So when you see -- at your last deposition,
you testified that you would have clarified how you
described the -- how long the neck restraint was
held, and you said it would have been an appropriate
clarification to identify that merely when the hold
was held, that simply the encircling arm was around
the neck.
Do you recall that?
A.  Yes.
Q.  So because different case, different depo
but the same topic, would you agree with that -- that
clarification is appropriate in this case, meaning

Page 329

that the encircling arm was around Tashii Farmer's
neck for X amount of time that we see on the video,
correct?
A.  Correct.
Q.  But you cannot tell how much pressure was
applied during that time frame, correct?
A.  Correct.
Q.  You testified when Mr. Lagomarsino was
asking you regarding how long a neck restraint could
be kept in place or held, correct?
A.  Correct.
Q.  Do you remember that?
A.  (No audible response.)
Q.  Do you remember that testimony?
A.  Yes.
Q.  And he asked you what Metro's policy was
about how long was too long, and you said there is no
definitive end for how long you can hold a neck
restraint, it's simply that you need -- until you
gain compliance, correct?
A.  Correct.
Q.  Are you aware from your own training and/or
policy that when a victim -- excuse me -- when a
suspect is struggling that that can prolong how --
the efforts to take him into custody affect the LVNR

Page 330

or the neck restraint?
A.  Yes.
Q.  There was some questions when Ken Lopera
was running through the back of the house, and the
question was, at no point in time did you hear
Ken Lopera yell, give any verbal commands to Tashii
Farmer.
Do you recall that?
A.  Yes.
Q.  Tashii Farmer was not in view at any point
in the back of the house video, correct?
A.  No.
Q.  Was Ken Lopera supposed to be yelling while
he was in a foot pursuit when he couldn't see anyone?
A.  I don't know.
Q.  It's not a policy violation to not yell
when you don't see one, correct?
A.  No.
Q.  When you don't see someone, correct?
A.  Correct.
Q.  You testified about -- I don't know if you
were on patrol, but you personally experienced
another officer using the LVNR, correct?
A.  Correct.
Q.  What were the events that led up to the

Page 331

application of that force?
A.  Honestly, I don't -- I don't remember
specifically.  That was 19 years ago, approximately.
I don't remember the details of what led up to it.  I
just remember that it happened.
Q.  If a suspect grabs an officer's TASER, what
type of resistance is that?
A.  It could be between aggravated and -- I'm
sorry -- between aggressive and aggravated
aggressive.
Q.  Between aggressive and aggravated
aggressive?
A.  Um-hum.
Q.  Why did you not evaluate Crumrine, Tran, or
Flores in your investigation?
You testified that you didn't, and I'm just
asking why.
A.  It wasn't their actions that we were
investigating.  They arrived, they helped take him
into custody, and as soon as he was into custody,
they began checking Mr. Farmer for vital signs and
performing the duties they were supposed to.
Q.  So I guess let me ask a more general
question.
How do you get your orders in terms of, you

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

Page 332

1  know -- you work in the chain of command. How do you
2  get determined that, hey, you need to conduct this
3  following investigation? Who tells you to do that?
4      A.  We go by policy and what is detailed in
5  policy.
6      Q.  Okay. So what was the policy under which
7  you decided -- I mean, was it your decision -- I'm
8  asking very general questions here.
9      A.  So --
10     Q.  How do you decide who to investigate?
11     A.  We know -- we know -- well, it's the
12  officer that's involved in the use of force that
13  leads to a death.
14     Q.  Well, I mean, there's more than one officer
15  that was involved at varying degrees in this case.
16  And I'm not ascribing any fault to anyone, understand
17  that.
18         I'm just saying that there were at least
19  four officers that were physically in contact with
20  Tashii Farmer during the handcuffing and getting him
21  into custody, correct?
22     A.  I think it's pretty clear by the video
23  evidence that there's one officer involved in the use
24  of force. Use of force can be handcuffing, and the
25  other officers did help him handcuff, but I don't

Page 333

1  think that any of their force attributed to this
2  death.
3      Q.  That's fine. So when this event occurred
4  and you were called to the scene, how do you
5  determine then -- do you start gathering the video
6  and you said, okay, I'm going to focus my
7  investigation on just the one officer?
8         That's my question.
9      A.  I don't think it was -- I mean, every
10  officer was part of our investigation. They all got
11  interviewed to see what their actions were, and we
12  reviewed it with the body cam and other video and it
13  corroborated their statements.
14     Q.  Okay. Mr. Lagomarsino asked you if in the
15  course of your investigation if you investigated
16  Officers Crumrine, Tran, and Flores, and you said no.
17  That's why I'm asking the follow-up.
18     A.  They were part of the investigation in this
19  incident. I believe that the line of questioning we
20  were going on had something to do with -- I thought
21  it involved training or something. So I did not look
22  into any of their training.
23     Q.  Maybe I misunderstood the line of
24  questioning and the answer.
25         Could Ken Lopera have charged Tashii Farmer

Page 334

1  with carjacking?
2         MR. LAGOMARSINO: Asked and answered.
3         MR. McNUTT: No. I asked him about the
4  USCS.
5         MR. LAGOMARSINO: No, that's not what I was
6  referring to.
7         THE WITNESS: If in his mind he felt that
8  he had the probable cause to make that arrest, yes,
9  he could have.
10  BY MR. McNUTT:
11     Q.  When you viewed Tashii Farmer, where were
12  the TASER probes?
13     A.  He had --
14     Q.  Let me ask, where was he when you did this?
15     A.  Both at the scene and then at the Coroner's
16  office.
17     Q.  So at the scene --
18     A.  Hold on. Let me rephrase that. Let me
19  think.
20         I believe he -- he was at the Coroner's
21  office.
22     Q.  So you only viewed Tashii Farmer at the
23  Coroner's office?
24     A.  Yes.
25     Q.  So tell me what the status of the scene was

Page 335

1  when you arrived at the Venetian.
2      A.  He had already been transported to the
3  hospital. So we just had the physical scene that was
4  on the ground.
5      Q.  Okay. So again, the only time you saw
6  Tashii Farmer was at the Coroner's office?
7      A.  Correct.
8      Q.  How long after your investigation started
9  was that?
10     A.  Right before the autopsy started. So the
11  date of her autopsy was --
12     Q.  Still May 14th, 2017, so --
13     A.  Okay.
14     Q.  Which is the date of the incident.
15         Well, actually, look at the autopsy report
16  if you would.
17     A.  Okay.
18     Q.  There's a date at the top left that says
19  May 14th, 2017, and then, Alane Olson, at least
20  there's a signature that says Alane Olson, and she's
21  authenticated it --
22     A.  5-31-17.
23     Q.  It says 5-31-17.
24         Do you see that?
25     A.  The actual autopsy would have been the

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

40 (Pages 336 to 339)

Page 336

1  14th, and then, she signed the report on the 31st.
2     Q.  Once the report is complete?
3     A.  Correct.
4     Q.  You don't have anything to do with drafting
5  the autopsy report, correct?
6     A.  No.
7     Q.  So you saw Tashii Farmer later that
8  morning?
9     A.  Correct.
10    Q.  If you will.  Was it daylight, sunlight?
11 Was it later that day?
12    A.  Inside a business.  It was in the morning.
13    Q.  And where were the probes from the TASER?
14    A.  There was one that was still stuck in the
15 waistband of the boxers, and there was one that was
16 still stuck in the skin.
17    Q.  So describe what you mean by stuck in the
18 waistband of the boxers.
19        Meaning, was it as if it had been fired and
20 it was attempting to go through the waistband of the
21 boxers?
22    A.  It was -- so if the waistband of the boxers
23 are this piece of paper, the probe had gone through,
24 and where it flares out, that was up against the
25 waistband of the boxers.

Page 337

1     Q.  Okay.  Had that probe broken Tashii
2  Farmer's skin?
3     A.  It appeared so.
4     Q.  But it was not stuck, for lack of a more
5  scientific --
6     A.  In the skin?
7     Q.  Correct.
8     A.  Correct.
9     Q.  And the second probe was?
10    A.  Correct.
11    Q.  Could that cause intermittent transfer of
12 energy to Tashii Farmer, the fact that the first
13 probe was not embedded in his body?
14    A.  I suppose.
15        MR. LAGOMARSINO:  Are you talking about at
16 the Coroner's office?
17        MR. McNUTT:  No.
18        MR. LAGOMARSINO:  So you're assuming that
19 they were not --
20        MR. McNUTT:  I'm not assuming anything.
21 I'm just asking.
22        THE WITNESS:  There was a puncture mark in
23 the skin.  I have no idea at what point the barb came
24 out.  If the barb was out, could that cause the
25 intermittent circuit?  Yes.

Page 338

1  BY MR. McNUTT:
2     Q.  Do you know how effective TASERs are with
3  respect to getting through clothing?
4     A.  I know the thicker the clothing, the more
5  problem they have.
6     Q.  So getting through a T-shirt would be no
7  problem, correct?
8     A.  It shouldn't be.
9     Q.  Generally.
10        What about getting through like the T-shirt
11 and dress shirt and sport jacket that you have, are
12 they --
13    A.  I don't know specifics.
14    Q.  Well, what does Metro train you as far as
15 that goes?
16    A.  That thicker clothing can prevent a problem
17 for it.
18    Q.  Okay.  So since the first probe was -- you
19 said it was stuck in his boxers, correct?
20    A.  Correct.
21    Q.  Were his pants on at that point when you
22 saw him?
23    A.  I was there from the time that they
24 unzipped the body bag and cleaned the body through
25 the autopsy.

Page 339

1        So we noticed the probe as they were
2  preparing him for the autopsy.
3     Q.  So did it appear to you that it went
4  through -- or, you know, probe No. 1 that did not
5  embed in his body, did it hit his pants at all, his
6  blue jeans?
7     A.  There was -- there was a puncture mark
8  around the waistline where it appeared the probe
9  caused a perversion of the skin.
10    Q.  Okay, but what I'm asking, is it your
11 perception that it would have passed through his blue
12 jeans as well?
13    A.  I don't believe so.
14    Q.  So it went over the top of his blue jeans
15 into his boxers, is that --
16    A.  Or his pants could have been down and the
17 waistband on the boxers was above the waistline of
18 the pants.
19    Q.  That's what I mean.
20    A.  I don't know exactly.  I wouldn't even
21 presume a guess on that.
22    Q.  At any point when you watched the video,
23 did you believe that Tashii Farmer was reaching to
24 the small of his back?
25    A.  Yes.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

41  (Pages 340 to 343)

Page 340

1  Q.  And do you know -- do you have an opinion
2  as to why he was doing that?
3  A.  Probably trying to remove the TASER prong.
4  Q.  Would it be your opinion that he was
5  successful in removing at least one of them?
6  A.  I know that one came out and I know that he
7  was reaching, so I could guess that he was or it
8  could have come out at some other point.
9  Q.  So expert investigator, what is your
10  conclusion?
11  MR. ANDERSON:  Objection, form.
12  THE WITNESS:  There's no way I can --
13  there's no way I can give you an answer on when the
14  probe came out.  It could have been out -- came out
15  when they cut off -- when they cut his boxers.
16  BY MR. McNUTT:
17  Q.  Well, don't you have other information with
18  which to make this conclusion?  Don't you have the
19  TASER data report?
20  A.  We do.
21  Q.  So let's just -- let's add up the evidence.
22  So you've got a video showing him reaching,
23  in your words, to remove a probe, correct?
24  A.  That's what it appeared.
25  Q.  You've got a download from the ECD that

Page 341

1  demonstrates that not all -- not all trigger pulls of
2  the TASER had a closed circuit, and at best, only
3  intermittent energy was transferred, correct?
4  A.  Correct.
5  Q.  So does that indicate to you that Tashii
6  Farmer was engaged in removing at least one prong?
7  A.  Probably.
8  Q.  Is removing an ECD prong, what kind of
9  force is that or resistance?
10  A.  I'd say it's -- it's passive.
11  Q.  It's passive?
12  A.  There's no intent to hurt the officer.
13  Q.  So it's not even active?
14  A.  I guess it would depend because passive --
15  passive is defined -- it can be defined as trying to
16  prevent someone from taking you into custody.  So
17  walking away is passive.  Removing his TASER prong, I
18  could see how that could be passive.
19  Q.  So what you just described is active.
20  If you want to look at page LVMPD 2170,
21  active resistance is, quote:
22  "The subject's verbal or physical
23  actions are intended to prevent an
24  officer from placing the subject in
25  custody and taking control but are

Page 342

1  not directed at harming the
2  officer," period, end quote.
3  MR. LAGOMARSINO:  Objection. It misstates.
4  MR. McNUTT:  Well, no, I read it correctly.
5  That's actually a quote.
6  MR. LAGOMARSINO:  I'm sorry.  Objection,
7  misstates the standard.
8  BY MR. McNUTT:
9  Q.  So I'm just asking.  You said it was
10  passive, but what you described was active.
11  A.  I'm sorry, you're correct.  I should have
12  you said active.
13  Q.  Okay.  Fair enough.
14  So the record is clear, marginally --
15  A.  Active.
16  Q.  -- so removing a prong from a TASER is
17  active resistance by Metro's use of force policy?
18  A.  I would say so.
19  Q.  Now, striking an officer in any form,
20  punch, kick, strike, slap, whatever, that is what
21  type of resistance?
22  A.  Aggressive to aggravated aggressive.
23  Q.  Aggressive to aggravated aggressive, okay.
24  We talked about this at the last depo, and
25  I just want to see if at this one maybe we have any

Page 343

1  better luck with unpacking this because I don't know
2  the answer to this question.
3  In your FIT report, in the arrest report,
4  there's a quote:
5  "Officer Rybacki responded 'He was
6  definitely on something.'"
7  "He was definitely on something" is in
8  quotes.
9  Do you recall that at all?
10  A.  I do.
11  Q.  Can you explain that to me, how that
12  comment was made or captured?  And I'm looking at
13  LVMPD 2148.
14  A.  It was on body cam.
15  Q.  So it says, "At 11:25," and this is
16  identified under Rybacki's -- I'll wait till you get
17  there.  It's LVMPD 2148.
18  So a third of the way down the page in
19  bold, it says, "Officer James Rybacki, P No. 14907."
20  Do you see that?
21  A.  Um-hum.
22  Q.  Does that indicate that you're about to
23  identify things that came from Rybacki's body-worn
24  camera?
25  A.  Correct.

Detective Trever Alsup  - Vol. II -  July 1, 2019
* * * Videotaped Deposition * * *

42 (Pages 344 to 347)

Page 344

1  Q.  In this FIT report, correct?
2  A.  Correct.
3  Q.  So when it says 11:25, that's 11:25 after
4  Rybacki activated his BWC, correct?
5  A.  Correct.
6  Q.  BWC being body-worn cam.
7  It says:
8  "Also, Rybacki approached Officers
9  Flores and Tran.  One of the
10  officers said, 'He was out when we
11  got here,'" quote, that statement is
12  in quotes, "and Officer Rybacki
13  responded," quote, 'He was
14  definitely on something,'" end
15  quote.
16  Do you see that?
17  A.  Correct.
18  Q.  Okay.  So this doesn't indicate to me which
19  one of the officers said "He was out when we got
20  here," correct?
21  A.  Correct.
22  Q.  Does it indicate something different to
23  you?
24  A.  No.
25  Q.  Okay.

Page 345

1  A.  It's a statement that was heard on the body
2  cam.
3  Q.  That was heard on the body cam, but you're
4  confident that it was Officer Rybacki responding, "He
5  was definitely on something"?
6  A.  At the time that I wrote this, yes.
7  Q.  Okay.  Do have any different perception
8  sitting here?
9  A.  No.
10  MR. McNUTT:  Okay.  I'll take five minutes,
11  and then, you know, clean up but I think I'm pretty
12  close to done.
13  MR. LAGOMARSINO:  Okay.
14  THE VIDEOGRAPHER:  The time is
15  approximately 3:09 p.m.  We are going off the record.
16  (A recess was taken.)
17  THE VIDEOGRAPHER:  The time is
18  approximately 3:19 p.m.  We are back on the record.
19  BY MR. McNUTT:
20  Q.  Detective Alsup, you testified earlier that
21  after three uses of the TASER, Ken Lopera should have
22  gone to another use of force option; is that correct?
23  A.  Correct.
24  Q.  In your opinion, what use of force option
25  should he have employed?

Page 346

1  A.  That's hard for me to say based on the fact
2  that I wasn't there and I had no idea what was going
3  through his mind at the time, but I think other
4  options that were available was there were other
5  resources in the area, he could have created distance
6  to wait for those officers to get there.
7  Q.  Officer Lif -- I asked her that question.
8  Officer Lif said that she would have used a baton to
9  commence baton strikes.
10  Would that have been okay?
11  A.  If Officer Lopera could have justified
12  that, that would have been on him.
13  Q.  So she wasn't there either, correct?
14  A.  Correct.
15  Q.  And she watched the video, and she said she
16  would have used baton strikes.
17  Is that a reasonable thing that another
18  officer could have decided to employ?
19  A.  I don't believe so.
20  Q.  So that's your opinion.  Her opinion is
21  different.  And obviously, Ken Lopera's opinion was
22  different because he didn't do that.
23  Are all three of those opinions legitimate?
24  MR. LAGOMARSINO:  Objection, misstates her
25  opinion.

Page 347

1  THE WITNESS:  Yes, I believe so.
2  BY MR. McNUTT:
3  Q.  Because different officers can use
4  different types of force in different circumstances
5  based on their perception, correct?
6  A.  Correct.
7  Q.  You testified in your prior deposition that
8  you never -- and this is in the estate case -- that
9  you never spoke with the Venetian security guards,
10  and I'm presuming when that question was asked, that
11  was anybody on your team, correct?
12  A.  No.
13  Q.  Okay.
14  A.  That was me personally.
15  Q.  That was you personally.
16  Did you personally review the transcribed
17  statements they gave Metro?
18  A.  Yes.
19  Q.  So just it was you personally, and those
20  were done by members of your FIT team, correct?
21  A.  Correct.
22  Q.  And you have no problem with the use of
23  force through the first three cycling of the TASER,
24  correct?
25  MR. LAGOMARSINO:  Objection to form.

Detective Trever Alsup - Vol. II - July 1, 2019
* * * Videotaped Deposition * * *

43 (Pages 348 to 351)

Page 348

THE WITNESS: Correct.
BY MR. McNUTT:
Q. So if one finds themselves in that situation where -- well, tell me what you would have done more specifically than create space or wait for backup. What would you have done in that instance?
I mean, what would you teach somebody to do?
A. Well, I think that in that instance, it was actually kind of a perfect scenario where you could have created space and you could have waited for backup because there were a lot of resources in that area that night. And it wasn't going to take, in my opinion, very long for another officer or a team of officers to get there.
I think that the security guards could have been directed a little better as far as to help out. I know their training is probably limited, but I'm sure you could have given instructions to them to help you a little more than what was done.
Q. Now, in all of that that you just described, while maybe true, that's all 20/20 hindsight, correct?
A. Correct.
Q. When you say, "create space," so in your

Page 349

opinion, after the third TASER strike, Ken Lopera should have done what with the TASER, just let it fall and hang and let Tashii Farmer run away?
I don't want to put words in your mouth, but I want to understand what that means to you.
A. No, you never just drop something and let it go because you don't want that object to be used against you.
He could have reholstered it and just left it like it was.
Q. So how does that work practically? There's wires running from the ECD to Tashii Farmer, correct?
A. Correct.
Q. So can you physically get the TASER in your holster when there's wires protruding from the front end of it?
A. Yes.
Q. And then, what happens if the suspect would run?
A. The wire would break.
Q. How do you know that?
A. The tensile strength on the wire isn't very much. They'll break fairly easily.
Q. So that's what I'm saying.
You would have let him run away and

Page 350

attempted to contain him within the area or whatever?
A. That's an option.
MR. McNUTT: Okay. I have nothing further. I may have one or two follow-ups, but I doubt it.
MR. LAGOMARSINO: Okay.

FURTHER EXAMINATION
BY MR. LAGOMARSINO:
Q. Under questioning from Mr. McNutt, you were talking about the blending of policy and criminal code here. So I'd like to give an example.
So for example, if an officer has no reason to strike a suspect, that could be a criminal code violation, but if the officer has a legitimate law enforcement objective in striking that person, it could be within policy and not a criminal code violation, correct?
A. Correct.
Q. Is using the TASER in the stun mode a pain compliance tool, or is it a method of pain compliance?
A. If you're using -- if you touch another part of the person's body, if you have one probe in, let's say in the shoulder, and you touch that person's leg with the other end of the TASER, which

Page 351

would be what is called a touch stun, that's completing the circuit, and you're going to get neuromuscular incapacitation.
If the prongs aren't deployed and you're just taking the end of it and sticking it up against somebody and pulling the trigger, now it's pain compliance.
Q. Okay. What is OC spray?
A. Pepper spray.
Q. And that would have been an option for Lopera to use; is that correct?
A. Correct.
Q. Now, when you say under questioning that you had no problem with the first three TASER strikes being used, is that assuming that Lopera had reasonable suspicion to detain?
A. Yes.
Q. If he did not have reasonable suspicion to detain, would you have no problem with the first three TASER strikes?
A. If there's -- if there's no reasonable suspicion, then yes, that would be a problem.
Q. There was testimony regarding Farmer being a boxer or a trainer.
Do you know if he was boxing or training?

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

Page 352

1    A.  I believe through his text messages, he was
2  training.
3    Q.  Now, Officer Lopera had injuries to his
4  hands, correct?
5    A.  Correct.
6    Q.  And they were abrasions?
7    A.  Correct.
8    Q.  Do you have an opinion as to where those
9  came from?
10    A.  My opinion would be that they occurred
11  during the altercation with Mr. Farmer.
12    Q.  There were questions about what Infantino
13  did or didn't see in terms of where Lopera struck
14  Farmer.
15        Infantino was not in the autopsy and did
16  not have access to the autopsy report, correct?
17    A.  No.
18    Q.  When you say that Lopera -- strike that.
19        Lopera could have assumed that -- strike
20  that.
21        Lopera should have assumed that backup
22  officers were coming because there was a saturation
23  team but also because he called for a Code Red,
24  correct?
25        MR. McNUTT:  Objection, form.

Page 353

1        THE WITNESS:  Yes, but mainly just because
2  the amount of officers he knew that were in the area
3  as far as what their response time would be.
4  BY MR. LAGOMARSINO:
5    Q.  Okay.  There was hemorrhaging all over
6  Tashii Farmer's neck, correct?
7        MR. McNUTT:  Objection, form.
8        THE WITNESS:  According to the autopsy,
9  yes, or according to the doctor, yes.
10  BY MR. LAGOMARSINO:
11    Q.  Does that indicate to you that there was
12  pressure put on his neck?
13    A.  Yes.
14    Q.  There was testimony about whether verbal
15  commands could be de-escalation.
16        Are giving verbal commands while you're --
17  strike that.
18        Was Tashii Farmer -- strike that.
19        Lopera was giving verbal commands to Tashii
20  Farmer while he was punching him, correct?
21        MR. McNUTT:  Objection, form.
22        THE WITNESS:  Yes.
23  BY MR. LAGOMARSINO:
24    Q.  And while he was tasing him, correct?
25    A.  Yes.

Page 354

1    Q.  Did you consider that to be de-escalation?
2    A.  No.
3    Q.  Was there evidence that Tashii ran 21 feet
4  in one-half to two seconds after being told to stop?
5    A.  No.
6    Q.  In fact, he took a couple of steps and then
7  stopped, correct?
8        MR. McNUTT:  Objection, form.
9        THE WITNESS:  Yes.
10  BY MR. LAGOMARSINO:
11    Q.  Did you learn that Lopera was involved in
12  jujitsu at any point during the investigation?
13    A.  I had heard that.  I don't remember where
14  it came from.
15    Q.  Did you observe Lopera to be muscular?
16        MR. McNUTT:  Objection, form.
17        THE WITNESS:  I would say he was around
18  average build.
19  BY MR. LAGOMARSINO:
20    Q.  You were talking about removing a prong,
21  whether it's active resistance or passive resistance.
22        Is it also possible that Farmer was
23  removing his prong because it was embedded in his
24  body and shooting electrical current in his back?
25    A.  It's possible.

Page 355

1    Q.  There were questions as to whether Lopera
2  could have charged with -- Farmer with this or that.
3        An officer could theoretically charge a
4  suspect with anything, correct?
5    A.  If he has reasonable suspicion or probable
6  cause.
7    Q.  Well, you're talking about more of a
8  should.
9        There are officers who sometimes
10  overcharge, correct?
11    A.  I would say yes.
12    Q.  So in theory, an officer could charge
13  somebody with anything.  That's just a fact, correct?
14    A.  Correct.
15    Q.  Frank Mir gave an opinion in this case that
16  people keep moving after they pass out.
17        Is that your understanding?
18        MR. McNUTT:  Objection, form, misstates his
19  testimony.
20        THE WITNESS:  I would leave that up to some
21  kind of an expert.
22  BY MR. LAGOMARSINO:
23    Q.  After Tashii was taken away by emergency
24  medical personnel, where was he taken?
25    A.  To the hospital.

Detective Trever Alsup  - Vol. II -   July 1, 2019
* * * Videotaped Deposition * * *

45  (Pages  356  to  358)

**Page 356**

1    Q.  Is it possible that the lower probe could
2  have been removed while he was at the hospital or
3  under the care of the emergency medical personnel?
4    A.  I would say it's not impossible.
5    Q.  And Rybacki wasn't at the scene during the
6  incident in question until afterwards, correct?
7    A.  I would have to review his body cam to see
8  exactly when he arrived. I don't recall off the top
9  of my head.
10    MR. LAGOMARSINO:  All right. No further
11  questions.
12    MR. McNUTT:  Nothing.
13    MR. ANDERSON:  Nothing further.
14    THE VIDEOGRAPHER:  This concludes the video
15  deposition of Trever Alsup, Volume 2.
16    The original media of today's testimony
17  will remain in the custody of Las Vegas Legal Video.
18    The time is approximately 3:31 p.m., and we
19  are going off the record.
20    (The following occurred off the video record.)
21    MR. ANDERSON:  I want to order a copy.
22    THE REPORTER:  Mr. McNutt, do you need a
23  copy of this one?
24    MR. McNUTT:  Yes, I will.
25    (The deposition concluded at 3:31 p.m.)

**Page 357**



1
2  PAGE   LINE   CHANGE      REASON

**Page 358**

1    CERTIFICATE OF REPORTER
2    I, Cynthia K. DuRivage, a Certified Court
3  Reporter of the State of Nevada, do hereby certify:
4    That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given.
12    I further certify I am neither financially
13  interested in the action nor a relative or employee
14  of any attorney or party to this action.
15    Reading and signing by the witness was
16  requested.
17    IN WITNESS WHEREOF, I have this date
18  subscribed my name.
19  Dated: July 16, 2019
20
21
22    _____
      CYNTHIA K. DuRIVAGE
23    CCR No. 451
24
25

All-American Court Reporters (702) 240-4393
www.aacrlv.com