# Exhibit L - Kasey Kirkegard Deposition

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 247

```
 1                CERTIFICATE OF REPORTER
 2              I, the undersigned, a Certified Shorthand
 3    Reporter of the State of Nevada, do hereby certify:
 4              That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were duly sworn; that a record
 8    of the proceedings was made by me using machine
 9    shorthand which was thereafter transcribed under my
10    direction; that the foregoing transcript is a true
11    record of the testimony given to the best of my
12    ability.
13              Further, that before completion of the
14    proceedings, review of the transcript [ X ] was
15    [   ] was not requested pursuant to NRCP 30(e).
16              I further certify I am neither financially
17    interested in the action, nor a relative or employee
18    of any attorney or party to this action.
19              IN WITNESS WHEREOF, I have this date
20    subscribed my name.
21
22    Dated: February 12, 2019
23
24                          GALE SALERNO, RMR, CCR #542
25
```

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,   )
                                      )
7         Plaintiff,                  )
                                      ) Case No.
8              vs.                    ) 2:18-cv-00860-GMN-VCF
                                      )
9    LAS VEGAS METROPOLITAN POLICE    )
     DEPARTMENT, a political          )  **CONDENSED**
10   subdivision of the State of      )
     Nevada; KENNETH LOPERA,          )  **TRANSCRIPT**
11   individually; TRAVIS CRUMRINE,   )
     individually; MICHAEL TRAN,      )
12   individually; MICHAEL FLORES,    )
     individually,                    )
13                                    )
14        Defendants.                 )
     _____)

15

16

17        VIDEOTAPED DEPOSITION OF DETECTIVE KASEY KIRKEGARD

18             Taken on Wednesday, February 6, 2019

19                      At 10:13 a.m.

20              Held at Lagomarsino Law

21        3005 West Horizon Ridge Parkway, Suite 241

22               Henderson, Nevada  89052

23

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

2  (Pages 2 to 5)

## Page 2

APPEARANCES:
For the Plaintiff, Trinita Farmer:
   ANDRE M. LAGOMARSINO, ESQ.
   Lagomarsino Law
   3005 West Horizon Ridge Parkway
   Suite 241
   Henderson, Nevada 89052
   (702) 383-2864

For the Defendant, Kenneth Lopera:
   DANIEL R. MCNUTT, ESQ.
   McNutt Law Firm, P.C.
   625 South 8th Street
   Las Vegas, Nevada 89101
   (702) 384-1170

For the Defendants, LVMPD, Crumrine, Tran and Flores:
   CRAIG R. ANDERSON, ESQ.
   Marquis Aurbach Coffing
   10001 Park Run Drive
   Las Vegas, Nevada 89145
   (702) 942-2136

Also Present:

   JESSE JAMES MATHIS, Legal Videographer

   ELIZABETH VINSON, Legal Assistant

   STEPHANIE MOORE, Paralegal (Present Telephonically)

## Page 3

### INDEX
                Page

Examination by Mr. Lagomarsino    5
Examination by Mr. Anderson    172
Examination by Mr. McNutt    179
Further Examination by Mr. Lagomarsino    226
Further Examination by Mr. McNutt    243

### EXHIBITS
Exhibit                Page

Exhibit 1    Excerpts From CIRT Statement   82
Exhibit 2    Excerpts From CIRT Statement of   86
          Officer Michael Flores

Exhibit 3    LVMPD, Critical Incident Review   91
          Process, Pages 400 to 406
Exhibit 4    CIRT Statement of Officer   114
          Ashley Lif

Exhibit 5    Excerpt from CIRT of Officer   117
          Michael Amburgey
Exhibit 6    Excerpts from CIRT of Sergeant   118
          Travis Crumrine

Exhibit 7    Deposition of Detective Kasey   133
          Kirkegard, July 20, 2018
Exhibit 8    LVMPD Arrest Report   245

## Page 4

VIDEOTAPED DEPOSITION OF DETECTIVE KASEY KIRKEGARD

February 6, 2019

- - -

THE VIDEOGRAPHER:  Good morning.  Today is February 6th, 2019.  The time is approximately 10:13 a.m.

This begins the video deposition of Kasey Kirkegard.  We are located at Lagomarsino Law, 3005 West Horizon Ridge Parkway, Suite 241, Henderson, Nevada, 89052.

My name is Jesse James Mathis, court videographer with Las Vegas Legal Video.

This is United States District Court, District of Nevada, case number 2:18-cv-00860-GMN-VCF, in the matter of Trinita Farmer versus Las Vegas Metropolitan Police Department, et al., defendants.

This video deposition is requested by the attorneys for the plaintiff.

And will counsel and all present please state your appearances for the record.

MR. LAGOMARSINO:  So for the plaintiffs we have Andre Lagomarsino representing plaintiff.  Elizabeth Vinson and also on the telephone Stephanie Moore.

## Page 5

MR. McNUTT:  Daniel McNutt on behalf of Kenneth Lopera.

MR. ANDERSON:  Craig Anderson on behalf of the Las Vegas Metropolitan Police Department, Officers Crumrine, Tran, and Flores.

THE VIDEOGRAPHER:  And the witness may now be sworn in by Gale Salerno for All-American Court Reporters.

DETECTIVE KASEY KIRKEGARD, having been first duly sworn, was examined and testified as follows:

- - -

EXAMINATION
BY MR. LAGOMARSINO:

Q.  Can you please state your full name.

A.  It's Kasey Kirkegard.

Q.  Have you ever given your deposition before?

A.  Yes.

Q.  On how many occasions?

A.  One.

Q.  And was that in this case?

A.  Yes.

Q.  Let me rephrase that.  There are two cases arising out of the death of Tashi Farmer; is that

Detective Kasey Kirkegard ~  February 6, 2019
* * * Videotaped Deposition * * *

3 (Pages 6 to 9)

Page 6

1  your understanding?
2      A.  Correct.  Yes.
3      Q.  Was the other one your deposition in the
4  case brought by the children?
5      A.  Yes, it was.
6      Q.  Have you ever given your deposition on any
7  other occasion in your life?
8      A.  No.
9      Q.  You understand that you've been placed
10  under oath?
11      A.  Yes.
12      Q.  Have you ever testified in a courtroom?
13      A.  Yes.
14      Q.  How many occasions?
15      A.  Over my 11-year career with Metro, probably
16  50, 60.
17      Q.  So the oath that you took today is the same
18  oath that you would take in a court of law.  Do you
19  understand that?
20      A.  Yes.
21      Q.  Everything that's being said today is being
22  taken down by the court reporter.  We do have a
23  videographer here but the official record is that of
24  the court reporter.
25          It's very difficult for the court reporter

Page 7

1  to take down two people talking at once.  So even
2  though it's perfectly acceptable to somehow
3  anticipate a question in real life, I would ask that
4  you allow me to finish my question and I will allow
5  you to finish your answer.  Is that okay?
6      A.  Yes.
7      Q.  After the deposition is completed, you'll
8  have an opportunity to make changes to your
9  deposition transcript.  It's very common to make
10  changes of spelling of a minor nature.  However, if
11  you make a change of a major nature or anything
12  substantive, we'll have an opportunity to comment on
13  that at the time of trial.  Do you understand?
14      A.  Yes.
15      Q.  I'm sure you understand the difference
16  between a guess and an estimate?
17      A.  Yes, I do.
18      Q.  We just want you to give -- you're allowed
19  to give estimates today but no guesses.  Okay?
20      A.  Yes, sir.
21      Q.  From time to time, you may give an answer
22  that's indicated by body language or "uh-huh" or
23  "huh-uh."  If I ask you, "Is that a yes" or "is that
24  a no," I'm not trying to be rude.  I'm just trying to
25  make sure we have a clear record.  Do you understand?

Page 8

1      A.  Yes.
2      Q.  We're going to be going for some time
3  today.  I have a lot of questions and I guarantee I'm
4  going to flub up some questions or mix up the words
5  or ask a question that maybe not be understandable.
6          If you don't understand a question, please
7  tell me and I'll be happy to rephrase it.  Okay?
8      A.  Okay.
9      Q.  From time to time, the lawyers in the room
10  are going to be making objections.  They are not
11  doing that to be obstructive.  It's usually just
12  because they don't like the question.  It's just a
13  joke.
14          But usually they're finding a fault with
15  the question and there's not a judge here to rule on
16  it.  So allow them to make the objection and if you
17  understand the question, go ahead and answer it.
18  Okay?
19      A.  Okay.
20      Q.  What have you done to prepare yourself for
21  today's deposition?
22      A.  I've met with Craig Anderson and gone over
23  my last deposition that I gave.  Went over the facts
24  of this case and just kind of went over what I knew,
25  part of my investigation of this case.

Page 9

1      Q.  When did you meet with Mr. Anderson?
2      A.  It was actually over the phone.
3      Q.  And approximately how long did that
4  conversation take?
5      A.  About 20 minutes.
6      Q.  What did you do to go over the facts of
7  this case?
8      A.  Went over -- had a copy of my deposition
9  that I gave from the last time.  Went over that.
10  Went over my case file for this entire case.
11      Q.  Did you watch the video?
12      A.  No, I did not.
13      Q.  Did you watch any video?
14      A.  Are you referring to Lopera body-worn
15  camera?
16      Q.  Lopera or any other officer.
17      A.  No, I have not.
18      Q.  During your investigation, did you watch
19  all the body cam footage?
20      A.  Yes, I did.
21      Q.  So I've also received a copy of your
22  deposition transcript from the other case.  I'm going
23  to ask some questions today I believe I know the
24  answer to but I just want to make sure we have a
25  record for this case.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

4  (Pages 10 to 13)

Page 10

1    A.  Okay.
2    Q.  I understand you went to Centennial?
3    A.  High school, yes, sir.
4    Q.  And what year did you graduate?
5    A.  2003.
6    Q.  After going to Centennial, did you continue
7  your education?
8    A.  Yes, I did.
9    Q.  What year did you continue your education?
10    A.  On the following year, following semester,
11  I went to Northern California for soccer and came
12  back and went to UNLV.
13    Q.  Was the school in northern California?
14    A.  Say that again?
15    Q.  What was the name of the school?
16    A.  The name of the school was Lassen College
17  up in Northern California.
18    Q.  Just for the record, could you please spell
19  that?
20    A.  L-a-s-s-e-n.
21    Q.  And what years were you at Lassen?
22    A.  I was there from 2000 -- I guess the fall
23  of 2003 into spring of 2004.  So for one year.
24    Q.  Did you have a major while you were there?
25    A.  Yes.

Page 11

1    Q.  What was it?
2    A.  I don't recall.
3    Q.  I had a few majors during my time at
4  school.  Some undeclared.
5       So you came back to UNLV?
6    A.  Yes, sir.
7    Q.  And did you start back at UNLV in the fall
8  of 2004?
9    A.  Yes.
10    Q.  Did you play soccer for UNLV?
11    A.  No, I did not.
12    Q.  Did you have a major at UNLV?
13    A.  Yes, I did.
14    Q.  What was your major?
15    A.  Psychology.  Or liberal arts, but
16  psychology was underlying.
17    Q.  Spent a lot of time in the humanities
18  building?
19    A.  Yes.
20    Q.  What year did you graduate from UNLV?
21    A.  2014.
22    Q.  Did you take some time off during school?
23    A.  I did.
24    Q.  Okay.  When you first started at UNLV in
25  the fall of 2004, to the time that you first took a

Page 12

1  break, what period of time was that?
2    A.  It was -- let's see.  I started at the
3  academy in 2007.  So I think right up until 2007 I
4  started the academy, I had just a few credits left.
5  And then in 2014 I finished it up.  So maybe that gap
6  between 2007 to 2014.
7    Q.  Why did you want to go into psychology?
8    A.  It had -- I had an interest in it.  And
9  some of the classes I took were very interesting to
10  me and the fact that I wanted to go into law
11  enforcement, so it kind of ran side by side.
12    Q.  Did you want to be like a profiler?
13    A.  Actually, forensic psychology was what
14  really interested me.
15    Q.  Okay.  So you received your degree in 2014?
16    A.  Yes, sir.
17    Q.  Do you have a postgraduate degree?
18    A.  No, I do not.
19    Q.  You went to the police academy in 2007?
20    A.  Uh-huh, yes, sir.
21    Q.  And when did you first become commissioned
22  as a police officer?
23    A.  Well, if I understand you correctly, in
24  2007 we were in the academy.  And then I graduated in
25  May of 2008.

Page 13

1    Q.  What jobs did you hold prior to becoming a
2  police officer after high school?  I've got skydiving
3  here.
4    A.  While I was in college at Lassen, I worked
5  at a daycare facility helping with kids.  And that
6  was to help to pay off part of the scholarship
7  because I had a partial scholarship.
8       When I came back home to Las Vegas to
9  attend UNLV, I worked at -- in Boulder City at
10  Skydive Las Vegas.
11    Q.  Any other jobs?
12    A.  I don't remember.  It might have been
13  something little in between.  But nothing...
14    Q.  You were a ground school instructor?
15    A.  Yes.
16    Q.  What is that?
17    A.  Prior to someone coming in to do a tandem
18  jump, which is two people jumping with an instructor,
19  an instructor and another person, we go over some
20  ground rules, per se.  We explain the proper body
21  position to take, what to expect, what not to expect,
22  things to do, what not to do.
23       And just kind of walk them through the
24  process of the actual skydive experience itself.
25    Q.  When you graduated from the police academy,

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

5 (Pages 14 to 17)

---

**Page 14**

1   what was your first assignment?
2       A.  I was assigned to the Bolden Area Command
3   as a police officer.
4       Q.  That's PO I?
5       A.  Yes, sir.
6       Q.  How long did you remain as a PO I?
7       A.  I believe it's 18 months.  But I could be
8   wrong.
9       Q.  So you were a patrol officer in the Bolden
10  Area Command for three years?
11      A.  Yes, sir.
12      Q.  After that command, what was your next
13  assignment?
14      A.  I believe it was either PSU, which is a
15  problem-solving unit, or I went to air support.  I
16  can't remember.  I believe it was PSU first and then
17  I went into air support.
18      Q.  What's a problem-solving unit?
19      A.  So what that is is like what we consider to
20  be a junior step to becoming a detective.  You would
21  take problems within that area command, that being
22  violent robberies, drug crimes, drugs, everything but
23  homicide or attempted murders.
24      Q.  And what kind of problems would you solve?
25      A.  Narcotics, violent crimes.  Problem areas

---

**Page 15**

1   that were reoccurring.
2       Q.  So if I'm interpreting that correctly, if
3   there was a particular type of crime that was
4   occurring more than normal, you would take a look at
5   maybe why that was happening and try to take steps to
6   prevent that?
7       A.  Yes, sir.
8       Q.  Make recommendations?
9       A.  Yes, sir.
10      Q.  How long were you with the PSU?
11      A.  I believe it was -- excuse me -- two years.
12      Q.  Did you solve any problems?
13      A.  Sure.
14      Q.  What did you solve?
15      A.  I apologize, my voice.
16      Q.  That's okay.  Do you want some water?
17      A.  I've got some, thank you.
18          A lot of narcotics sales where I was at.  A
19  lot of gun crimes, gang crimes.  We worked with our
20  gang unit quite a bit, our narcotics unit quite a
21  bit.
22          A couple shootings we had.  Things of those
23  nature.
24      Q.  What was the -- what were the boundaries of
25  that command?

---

**Page 16**

1       A.  At the time, it has since changed, but it
2   was the north boundary would have been Cheyenne,
3   south boundary would have been DI.  East boundary
4   would have been I-15 and west would have been Jones.
5       Q.  So as part of your job responsibilities in
6   that PSU unit, you would offer search warrants; is
7   that correct?
8       A.  Yes, sir.
9       Q.  And you would help to execute search
10  warrants?
11      A.  Yes, sir.
12      Q.  Would that command have encompassed Bonanza
13  and Eastern?
14      A.  No.
15      Q.  After you were in the PSU unit, what was
16  your next assignment?
17      A.  It would have been air support.
18      Q.  And what did you do in air support?
19      A.  I was what's called a TFO, or tactical
20  flight observer for the helicopter.
21      Q.  And what were your job responsibilities in
22  that regard?
23      A.  Assist patrol.
24      Q.  So you would sit in the copilot seat and
25  assist ground units?

---

**Page 17**

1       A.  Yes, sir.
2       Q.  Were you also a pilot?
3       A.  Not at that time, no.
4       Q.  Were you ever a pilot while you were in
5   that tactical air support unit?
6       A.  No.  And I'm sorry, can you clarify that?
7       Q.  Did you fly and operate the helicopters at
8   any time?
9       A.  Yes.  I was trained on landing procedures,
10  but as an actual pilot in command, no, I was never a
11  pilot in command.
12      Q.  You were the second in command, SIC?
13      A.  It doesn't exist, but technically.
14      Q.  I got a pilot case going now.
15          MR. McNUTT:  When there's only two, yeah,
16  you're second.
17          MR. LAGOMARSINO:  Well, she said she
18  wasn't.
19          THE WITNESS:  Not first.
20          MR. McNUTT:  Because it doesn't exist.
21          MR. LAGOMARSINO:  Okay.  I'm guessing Dan
22  has more flight experience than I do.
23          MR. McNUTT:  I'm baggage that talks.
24  BY MR. LAGOMARSINO:
25      Q.  Did you do that for about six months?

---

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

6 (Pages 18 to 21)

Page 18

1    A.  Yeah.  The -- excuse me -- the TDY up there
2  was 90 days.
3    Q.  And then you went back to Bolden?
4    A.  Yes, sir.
5    Q.  How long were you there?
6    A.  Until I got pulled up to Office of Internal
7  Oversight in 2014.
8    Q.  Did you apply for that position in the
9  Office of Internal Oversight?
10   A.  Yes.  How it came about was we were putting
11 together a class for the whole department.  It was
12 part of the recommendations from DOJ and the CNA
13 report.  With that, because I had -- one of my old
14 sergeants was up there, she asked for me to come up
15 and help with this class, which I did.  And after
16 that, they asked if I could come up and continue the
17 same work that I was doing with the CNA process.
18   Q.  Okay.
19   A.  So I put an informal letter of interest in.
20   Q.  Did somebody approach you first or did you
21 approach somebody first?
22   A.  I actually had approached and then went to
23 inquire what it was all about.
24   Q.  Who did you approach?
25   A.  I was approached by two officers I used to

Page 19

1  work with at Bolden Area Command about this class.
2    Q.  Who were they?
3    A.  It was Patrick Bert and Patrick Hughes.
4    Q.  And which class?
5    A.  It was a class called fair and impartial
6  policing and procedural justice.
7    Q.  Who taught that class or those classes?
8    A.  I did, along with a pool of instructors.
9  We had about 30 instructors.  And I'm not going to be
10 able to name them all.
11   Q.  You referred to DOJ or CNA report.
12   A.  Yes, sir.
13   Q.  Can you expand on that for the record what
14 that is?
15   A.  So in 2010, we had our highest number of
16 officer-involved shootings, which was 25 for the
17 year.  We knew the DOJ was coming down on our
18 department and so Sheriff Gillespie at the time went
19 to the DOJ and said, "Look, I know you guys are
20 looking at our department.  What is it that I can do
21 to help reduce the number of officer-involved
22 shootings?"
23       So they came up with this collaborative
24 reform called the CNA process.  And together they
25 sent down some members of the DOJ that came and took

Page 20

1  a look at our department to change procedures,
2  policies and training.
3    Q.  And then after they looked at the policies,
4  procedures and training, a report was issued;
5  correct?
6    A.  Yes.  There was several reports.  There was
7  a six-month report, a yearly report and then after
8  that I believe every five years we do a public report
9  that shows what our policies and procedures are.
10   Q.  So just for information-gathering purposes,
11 you turn in the initial report.  And then the report
12 makes some recommendations and some findings.  Six
13 months later an evaluation is done to see what the
14 progress is.  And then after five years from that six
15 months, another report is issued by Metro; is that
16 correct?
17   A.  Yeah.  We do -- I don't know -- the
18 five-year report, I -- I don't author it.  I don't
19 know much about it, I'll be honest with you, but I
20 know we had the six-month report with the CNA process
21 and the year report for the CNA process, and I was
22 heavily involved in both those two reports.
23   Q.  Have you ever actually seen the five-year
24 report that was done?
25   A.  It's public information, I believe, on our

Page 21

1  public website.
2    Q.  Do you know if it was issued?
3    A.  I do not.
4    Q.  Do you know who was supposed to issue it?
5    A.  I do not know.
6    Q.  How long were you with the Office of
7  Internal Oversight?
8    A.  I was with them for approximately a year
9  and a half to two years.
10   Q.  And what were all your titles with that
11 office?
12   A.  Titles or?
13   Q.  I guess roles.
14   A.  Roles?  So we had a lot of roles.  We were
15 kind of -- with the CNA report, we had to follow up
16 on the recommendations, make sure those
17 recommendations were being done.  If not, we would
18 have to type up a memo that would go up our chain of
19 command as to why it wasn't feasible for our
20 department to do it, and there was two
21 recommendations that we did not do.
22       At the completion of the CNA report we
23 continued to oversee these policies and procedures
24 and training to make sure they are still being
25 followed properly.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

7 (Pages 22 to 25)

Page 22

1   We also worked with our CIRT team and our
2 FIT team. Any recommendations that came out of the
3 tactical review board after a certain investigation,
4 we had to ensure that those policies, training,
5 procedures were all implemented as recommendations
6 from the chairperson.
7   Any training issues that we saw on the
8 onset of an OIS, or officer-involved shooting, or
9 critical incident, we were responsible for pushing
10 the training in a memo form. We pushed out any
11 search and seizure recommendations, any use of forces
12 that we saw that we could always get better on our
13 training.
14   We read all use of force reports. We did a
15 lot of training within the department, getting fair
16 and impartial policing, procedural justice. Make
17 sure the whole department was trained up on that
18 including our corrections officers and all of our
19 civilians, including the academy, so any new officers
20 that were hired.
21   And there's a lot more.
22   Q. If I wanted to request a document or
23 information from the department about what your roles
24 were during that time, what would I ask for?
25   A. I believe we have like an internal manual.

Page 23

1   Q. You had mentioned that the -- there were
2 two recommendations that you could not implement from
3 the CNA?
4   A. Uh-huh.
5   Q. Which were those?
6   A. The first of which was during
7 officer-involved shootings and we would take an
8 audio-recorded statement. They also wanted a
9 videotape, but we said we were not going to do that.
10   And another one had something to do with
11 body cameras, and I don't recall the specifics of it.
12   Q. Do you know why the decision was made not
13 to video?
14   A. I do not.
15   Q. I may have asked you this so I apologize.
16 Do you know who writes that five-year report?
17   A. It's going to fall under the Office of
18 Constitutional Policing. And I don't know who would
19 write it. I know when they did the one year, it was
20 kind of farmed out to someone from training would
21 write on there and search and seizure would write up
22 on their end and we would put it together.
23   But it also included any use of forces from
24 the different types of use of forces that officers
25 were involved in. Also did a quick of all of our

Page 24

1 critical incidents with use of deadly force. So that
2 includes a low lethality shotgun within five yards;
3 PIT, which is the vehicle under the speeds of
4 40 miles an hour; any intentional discharge or
5 accidental; and then officer-involved shootings.
6   Q. Do you know what incident caused the
7 shotgun policy to be revised?
8   A. Which policy? Because it's changed a
9 couple of times.
10   Q. Well, do you remember the Stanley Gibson
11 case?
12   A. Yes.
13   Q. Did that case have anything to do with that
14 policy being changed?
15   A. I don't know. I wasn't up there at that
16 time.
17   Q. And I think you referenced the pin
18 maneuvers?
19   A. PIT, P-I-T.
20   Q. P-I-T, I apologize. How did the policy
21 change there?
22   A. I believe the speeds had changed from 45 to
23 40. And there was different times when you could use
24 it and couldn't use it, depending on the crime.
25   Q. Are there any types of use of force at all

Page 25

1 that have been banned by Metro, to your knowledge?
2   A. I don't want to say banned, but they've
3 been modified.
4   Q. And which ones have been modified?
5   A. Our low lethality shotgun was modified.
6 LVNR has changed.
7   Our use of force policy has changed, I
8 guess, in total. K-9, and that includes K-9 bites
9 have changed. And that's all I can think of right
10 now.
11   Q. Did the LVNR policy change after the Tashi
12 Farmer incident?
13   A. Yes.
14   Q. Do you know of any other changes that were
15 made to the LVNR policy prior to the Tashi Farmer
16 incident?
17   A. Yes. But I don't -- so we have a use of
18 force model that we abide by that's within policy,
19 and that has changed a number of times since I've
20 been with Metro.
21   Q. I understand that the use of force model
22 has changed for a variety of reasons. And so that
23 may have some application to the LVNR. But I'm
24 asking a little bit more of a specific question.
25   Do you know if the LVNR policy itself had

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

8  (Pages 26 to 29)

## Page 26

1  ever been changed prior to the Tashi Farmer incident?
2      A.  I don't know.
3      Q.  If you wanted to find out, where would you
4  check?
5      A.  Office of Internal Oversight, the
6  constitutional policing or within training.
7      Q.  Let's get back on track.  So then after
8  Office of Internal Oversight, what was your next
9  position?
10      A.  I was pulled over to CIRT, which is our
11  Critical Incident Review Team.
12      Q.  When did you start with CIRT?
13      A.  August 2016.
14      Q.  And have you been with CIRT since August of
15  2016?
16      A.  In September of 2018 I moved over to sexual
17  assault.
18      Q.  So again, I'm generalizing a little bit,
19  but you were with CIRT, which focuses more on
20  internal processes.  And then after you left CIRT,
21  you went back to kind of a traditional police
22  function in the sexual assault unit?
23      A.  Criminal investigations, yes.
24      Q.  Why you did leave CIRT?
25      A.  I wanted to expand my career in the

## Page 27

1  criminal investigations.
2      Q.  What training did you receive to work with
3  CIRT?
4      A.  We, for CIRT --
5      Q.  Let me rephrase that.  I apologize, I
6  interrupted you there.
7      I understand that you always apply all your
8  training that you received since the time you
9  graduated the academy.  But aside from all of it, was
10  there any specific training that you received to be
11  part of CIRT?
12      A.  We did our like internal training.  So we
13  had experienced -- I don't want to say experienced,
14  but tenured CIRT detectives who would go over Garity.
15  Different interview interrogation techniques.  We
16  would train with our PPA, PMSA, and our PPACE.
17      We would learn -- we'd also work closely
18  with FIT because they did the criminal
19  investigations.  Learned what they needed from us on
20  scene and vice-versa.
21      Some more of the workings of CIRT is what
22  we got trained up on.
23      Q.  And how long did that training take?
24      A.  We trained every Monday.  We would do
25  coffee with the named detective who would go over

## Page 28

1  different aspects of CIRT and that could include
2  PowerPoint, report writing, interviews, things of
3  that nature.
4      Q.  Were there written materials that were
5  utilized in your training for CIRT?
6      A.  Are you talking about like a lesson plan?
7      Q.  Yeah.  Lesson plan.
8      A.  No.
9      Q.  Were there any other written materials
10  besides lesson plans like guidelines?
11      A.  Yeah.  We would have a grammar cheat
12  sheet, if that's what you're asking, things to help
13  us out through our investigation.  Different reports
14  for the different conclusions that we would have for
15  the report.
16      Q.  Would they give you examples of reports
17  like a boilerplate to use in different situations?
18      A.  Yes.  But it was with the understanding
19  that every report is going to be different.  Not
20  everything is going to be the same.  But -- so not
21  the verbiage, the verbiage will not be the same in
22  every report but kind of guidelines.  And we also
23  round-tabled a lot of our conclusions as well.
24      Q.  Would you use templates?
25      A.  Yes, what we call our admin report or

## Page 29

1  administrative report or AR.
2      Q.  And how long did your training last before
3  you started actually working in CIRT?
4      A.  It was kind of ran concurrent.  So we
5  would -- the first case I had, I actually sat down
6  with, like I said, a tenured detective.  Went over a
7  fairly simple report.  It was -- by simple, I mean it
8  was one officer involved in the shooting.  And
9  together we worked through that report.
10      I was taught what I was -- after the
11  interviews, what we're looking for, the reasons we
12  ask certain questions in the interviews to include
13  the witness officers, any supervision and how to put
14  together the report.
15      But because I did my work with an OIO, I
16  read a lot of the CIRT reports to put together so I
17  knew how they worked.  I knew the order that they
18  were in.
19      Q.  Okay.  In terms of an organization tree or
20  chain of command, I guess, so to speak, was Office of
21  Internal Oversight over CIRT or was CIRT over Office
22  of Internal Oversight or were they kind of parallel?
23      A.  Parallel.  They had a separate sergeant.
24      Q.  Who was your sergeant in CIRT during this
25  case, the Farmer case?

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

9  (Pages 30 to 33)

Page 30

1    A.   It would have been, I believe, Sergeant
2  Kyle Ward.
3    Q.   Did he have participation, to your
4  knowledge, in this Farmer case?
5    A.   As far as depositions?
6    Q.   Just participating in interviews or helping
7  you through presentation or --
8    A.   Yes, he did.
9    Q.   Kyle Ward? Okay.
10       What's your current rank?
11   A.   PO II detective.
12   Q.   To become a detective, did you have to take
13  a written test?
14   A.   No.
15   Q.   Did you have to go like through an oral
16  board?
17   A.   Yes, sir.
18   Q.   Tell me about the oral board process.
19   A.   Once you submit your resume to the desired
20  bureau that you would like to go to, they set you up
21  with an oral board. And you go in front of
22  three -- I believe it's two sergeants and an outside
23  sergeant, so outside the bureau that you're testing
24  for. And they run you through seven questions. A
25  lot of -- you know, tell us about your training and

Page 31

1  experience, what you've done to prepare for this.
2       Then they give you I believe it was
3  anywhere from three to four scenario-based questions
4  and how you would respond to the case.
5    Q.   Are any of those seven questions provided
6  to you before you go into the oral board?
7    A.   No.
8    Q.   And how about the scenarios?
9    A.   No.
10   Q.   Do you recall any of your scenarios that
11  you were asked about?
12   A.   From?
13   Q.   The oral board.
14   A.   From the CIRT oral board or from?
15   Q.   That's a good question. From the CIRT oral
16  board. We'll start there.
17   A.   So the CIRT oral board was a little bit
18  different, and the reason being we do a lot of
19  presentations in front of the sheriff and the
20  executive staff.
21       So part of that process was you were given
22  a piece of paper with some notes on it which was
23  mocking a case. You would read through it and then
24  you would have about 15 minutes to stand up and give
25  a quick presentation about some of the issues -- not

Page 32

1  issues, but some of the things that stuck out to you
2  during the -- during your presentation.
3    Q.   Okay. How long did that oral board last
4  for CIRT?
5    A.   They could last anywhere from probably 20
6  minutes to 30 minutes.
7    Q.   You said -- so there was a different oral
8  board that you took. What was that for?
9    A.   It was for sex assault.
10   Q.   Okay. So was this CIRT oral board the
11  first time you took any oral board with Metro?
12   A.   No.
13   Q.   What was the one before that?
14   A.   It would have been one to go into PSU,
15  which is more of an informal interview, so I probably
16  wouldn't even categorize that as an oral board. But
17  the one before that would have been air support.
18   Q.   Okay. Do you remember who was on your oral
19  board for CIRT?
20   A.   No. And I want to correct that. That oral
21  board I didn't have to go through because I was with
22  the Office of Internal Oversight. I was pulled over
23  by the lieutenant at the time, which was Kelly
24  McMahill.
25   Q.   Did you do an oral board to get on to the

Page 33

1  Office of Internal Oversight?
2    A.   It was an informal interview with then
3  Sergeant Jamie Prossor.
4    Q.   So just for the record, no?
5    A.   No.
6    Q.   Were you ever assigned to the FIT team?
7    A.   No.
8    Q.   Have you ever conducted a FIT interview?
9    A.   Yes.
10   Q.   And if you weren't assigned to the FIT
11  team, why would you be doing a FIT interview?
12   A.   Because we had a 12-year-old juvenile that
13  was a witness in an OIS. And the FIT detective at
14  the time was forensically certified to do a child
15  interview and he needed a female to sit in. And
16  because I was not the CIRT case agent for that
17  particular OIS or office involved shooting, I sat in
18  that interview with him.
19   Q.   Were you certified to conduct a child
20  interview?
21   A.   Not at that time, no.
22   Q.   So you did just slightly over two years
23  with CIRT?
24   A.   Yes, sir.
25   Q.   How many cases had you handled with CIRT

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 34

1  prior to the Tashi Farmer case?
2      A.  Let's see.  He was May of 2017?
3      Q.  Yes.
4      A.  Probably four -- between three and five, I
5  want to say.
6      Q.  Okay.  In the -- I'll say Farmer or Brown
7  or use them interchangeably today, but what was your
8  role in that case?
9      A.  For the Lopera case?
10      Q.  Yes.
11      A.  I was the CIRT case agent for that.
12      Q.  How many case agents were there for that?
13      A.  I was the main case agent.  And then I had
14  a partner who would help me write -- excuse me, not
15  write, but help me with PowerPoint.
16      Q.  Who was your partner?
17      A.  Greg Watkins.
18      Q.  Prior to the Lopera case, how many times
19  had you been the main case agent in a CIRT case?
20      A.  The three to four times -- three to five
21  times that I previously told you.
22      Q.  Do you remember which officers those cases
23  involved?
24      A.  Yes.
25      Q.  Who are they?

Page 35

1      A.  The first case I had was McGill and Moore.
2      Q.  McGill and Moore?
3      A.  Yes.  Two different officers.
4      Q.  What were their first names?
5      A.  Solomon McGill and I believe it's Brian
6  Moore, but I'm not 100 percent on that.
7      Q.  How about the next ones?
8      A.  Sergeant William Matchko.
9          Pete Biesanszky.
10      Q.  Okay.
11      A.  I don't know -- Hatten.  I don't know if he
12  was before or after.  And then Spiotto, I don't know
13  if he was before or after.  I think he was after.
14      Q.  What was Hatten's first name?
15      A.  Mark Hatten.
16      Q.  And then can you spell the name of the
17  last -- last name of the person?  Spiotto you said?
18      A.  Yes, Lance Spiotto.
19      Q.  Can you spell his last name?
20      A.  S-p-i-o-t-t-o.
21      Q.  What did the McGill and Moore case involve
22  generally?
23      A.  They were doing a followup on a -- I
24  believe it was a robbery that occurred down the
25  street.  And they drove by the residence and saw the

Page 36

1  vehicle parked in the driveway.  As -- as they came
2  by the residence, their intention was to do a
3  drive-by and get resources to the area.
4          However, as they drove by, three people got
5  out of the vehicle.  They challenged the vehicle,
6  challenged the people.  They all were proned out and
7  the father who was inside the residence came out with
8  a gun to see what was going on.
9          And with the gun in his hand, officers gave
10  him verbal commands to drop the gun.  He raised the
11  gun in their direction and Officer McGill fired I
12  believe four to five times, but I'm not 100 percent
13  on that.
14          Father goes back inside.  There was small
15  children so I had to end up calling 911 saying that
16  their dad had just been shot.  Two and two together,
17  realized it was the police that were outside.  They
18  make entry, go in and find, I believe, the father was
19  deceased.
20      Q.  Were the Officers McGill and Moore who did
21  the drive-by, were they uniformed?
22      A.  Yes, they were.
23      Q.  And were they in a black-and-white vehicle?
24      A.  Yes, they were.
25      Q.  And was there any discipline that was

Page 37

1  levied as a result of that incident?
2      A.  That I don't know.  We don't handle
3  discipline on the CIRT side.
4      Q.  Did you make any recommendations for
5  discipline?
6      A.  We don't make recommendations for
7  discipline at all.  We have nothing to do with
8  discipline.
9      Q.  You're just looking at policies and
10  training?
11      A.  We're looking at the facts, yeah.
12      Q.  Did you ever hear if there was any
13  discipline that arose out of that?
14      A.  We're not privy to that.  And the reason
15  being is they don't want us to have a biased opinion
16  when it comes to recommendations.
17      Q.  In that CIRT process, is discipline usually
18  levied first, or -- is it usually levied before the
19  CIRT report is issued or after?
20      A.  After.  Because it's the recommendations
21  from the chairperson and the sheriff when they talk.
22      Q.  So does discipline come out of the Use of
23  Force Board?
24      A.  So how it works is when we do the Use of
25  Force Board, they roll right into our tactical

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

11  (Pages 38 to 41)

Page 38

1  review, which is our conclusions.  The board goes and
2  votes on those conclusions.  They can either
3  validate, modify or overturn.
4       If there is a recommendation that a policy
5  was broken, such as for instance, body-worn camera,
6  if the body-worn camera was not activated within
7  policy, that will be validated.  And then the chair
8  and the sheriff go and meet on recommendations for
9  discipline and they go to labor relations and we
10  have -- we never see that memo.
11       Q.  Okay.  Did you find any policy violations
12  in that incident?
13       A.  On that one, no.
14       Q.  Okay.  The next one I'm having trouble
15  reading my handwriting, was Sergeant Matchko?
16       A.  Matchko.
17       Q.  What happened in that case?
18       A.  He was responding to an area where a
19  gentleman had a gun and was kind of wandering the
20  neighborhood.  When he got there he gave him verbal
21  commands to drop the gun.  This went on for about --
22  I believe he was in verbal communication for
23  about 15 minutes, 10 to 15 minutes.  And again, I
24  don't know that exact time.
25       He had one of his officers move over, I

Page 39

1  believe to the west side of the suspect to create a
2  tactical L.  As that suspect moved -- I'm sorry.  As
3  the officer moved, the suspect raised a gun in that
4  officer's direction and Sergeant Matchko fired one
5  round striking the subject in the chest.
6       Q.  Did the subject die?
7       A.  No.  It was a nonfatal.
8       Q.  Did you find any policy violations in that
9  case?
10       A.  No.
11       Q.  The next one was Pete Biesanszky?
12       A.  Biesanszky.
13       Q.  What happened in that case?
14       A.  He was a resident officer.  He was
15  responding to Gold Strike out in Jean, Nevada, where
16  a subject was naked running around the parking lot
17  armed with a knife and he had -- he was covered in
18  blood.
19       Officer Biesanszky, being a resident
20  officer, was the only officer that could respond.
21  And he gets to the parking lot and the subject
22  charges him with a knife.
23       He tries to de-escalate by using his low
24  lethality shotgun.  He fires, I believe, either two
25  or four of the rounds, four rounds, and they strike

Page 40

1  the subject and the subject continues to charge at
2  him.  And at that point he transitions into his
3  firearm and fires two rounds.
4       Q.  Any policy violations in that --
5       A.  Yes, the low lethality shotgun.
6       Q.  How was it a policy violation?
7       A.  Our policy states you have to have two
8  officers present to utilize that.  However, because
9  he was a resident officer, he had -- in his
10  articulation to us he had no choice.  He didn't want
11  to go right to handgun.
12       Q.  From time to time, do officers in the field
13  encounter individuals with Tasers?
14       A.  With Tasers?
15       Q.  Yeah.
16       A.  Like the subject having their personal
17  Taser?
18       Q.  Yeah.
19       A.  I have never had a case where a subject has
20  had their personal Taser.
21       Q.  All right.  The next case was Hatten?
22       A.  Yes.
23       Q.  What did that involve?
24       A.  A naked male armed with a handgun that was
25  sitting outside of a church.  Officers arrive and

Page 41

1  attempt to get containment on the area.  The air unit
2  arrives and another vehicle arrives, a patrol
3  vehicle, and they're able to issue verbal commands to
4  the subject to drop the gun, which he does.
5       They direct the subject to walk away from
6  the firearm, which is in a northbound direction
7  toward what we call an arrest team or a group of
8  officers.  And within that arrest team we had a K-9
9  officer.
10       As he's walking back, he stops, he's
11  approximately, I believe it was about ten yards from
12  the officers, turns around and sprints right back
13  towards the gun.  Officer Hatten, who was armed with
14  a rifle at that time, steps out and fires a round
15  striking the subject.
16       Q.  Okay.  Nonlethal?
17       A.  I believe that was nonlethal, yeah.
18       Q.  And any policy violations in that case?
19       A.  Yes.
20       Q.  What were the policy violations?
21       A.  There was quite a few of them.  I'm not
22  going to remember them all.  One of the main one was
23  with the K-9 officer giving verbal commands versus
24  him controlling his K-9 dog.  The fact that some body
25  cameras were not activated.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

12  (Pages 42 to 45)

## Page 42

1        And there was an overall question about the
2   use of force.  At that time Officer Hatten had
3   articulated his use of force.  And then -- but prior
4   to his interview, there was some concern about his
5   use of force.
6        Q.  Why?
7        A.  Because at the time that he fired, the
8   subject was not armed with the handgun.  Had not
9   picked up the firearm.
10       Q.  Do you know if Mr. -- or Officer Hatten is
11  still on the force today?
12       A.  Yes, he is.
13       Q.  And the last case was Spiotto?
14       A.  I believe that happened after Lopera.
15       Q.  Generally, what did that involve?
16       A.  Off-duty officer was at an animal shelter
17  when a subject came in to rob -- came in to rob that
18  front desk and he was armed with a handgun and
19  Officer Spiotto stepped in.
20       Q.  And what did he do?
21       A.  He pulled out his personal firearm.
22  Confronted the subject.  They got into a wrestling
23  match over the gun and the gun went off twice inside
24  the animal shelter before the subject ran off and was
25  taken into custody at a later date at a later

## Page 43

1   location -- or a different location.
2        Q.  Were there any policy violations in that
3   case?
4        A.  Yeah.
5        Q.  What were they?
6        A.  Detective Spiotto was under the influence
7   of alcohol at the time.
8        Q.  Any others?
9        A.  CIRT had decided that based upon his
10  intoxication level, that he should not have
11  intervened.  He should not have been armed with a
12  firearm.
13       Q.  What was his intoxication level?
14       A.  At the time six hours later that we got his
15  blood drawn, it was still at a .17.
16       Q.  Is Spiotto still on the force?
17       A.  No.
18       MR. LAGOMARSINO:  I usually go longer than
19  an hour but I think we're at a good time to take a
20  quick break.
21       THE VIDEOGRAPHER:  The time is
22  approximately 11:02 a.m.  We are going off the
23  record.
24       (A recess was taken from 11:02 a.m.
25       to 11:14 a.m.)

## Page 44

1        THE VIDEOGRAPHER:  The time is
2   approximately 11:14 a.m.  We are back on the record.
3   BY MR. LAGOMARSINO:
4        Q.  Okay.  You understand you're still under
5   oath?
6        A.  I'm sorry, what?
7        Q.  You're still under oath?
8        A.  Yes.
9        Q.  You're aware that there was an incident on
10  May 14th of 2017 in which Tashi Farmer was killed?
11       A.  Yes.
12       Q.  And you were the case agent on that?
13       A.  Yes.
14       Q.  Did you interview witnesses as part of your
15  role in that investigation?
16       A.  Yes, I did.
17       Q.  Which witnesses did you interview?
18       A.  We had Officer Tran, Flores, Officer Lif,
19  Sergeant Crumrine.
20       Q.  Lopera?
21       A.  Yes.  He would be considered involved in
22  the CIRT world.  Not necessarily a witness.
23       Q.  Okay.
24       A.  We had also Officer Amburgey and I believe
25  Officer Kravetz.

## Page 45

1        Q.  When did you start conducting interviews in
2   that case?
3        A.  Officer Lopera was the first interview that
4   we conducted, and I believe his was within 48 hours
5   of the incident.
6        Q.  Where did that take place?
7        A.  In our CIRT conference room at
8   headquarters.
9        Q.  Who was present?
10       A.  Myself, my partner Patrick Hughes.  Kyle
11  Ward, Sergeant Kyle Ward.  Lieutenant Dan Bledsoe and
12  then Officer Kenneth Lopera, and his representative
13  from PPA, Bryan Yant.
14       Q.  Bryan Yant, Y-a-n-t?
15       A.  Yes.
16       Q.  Did Officer Lopera have any counsel there?
17  Any attorneys?
18       A.  No.
19       Q.  Did Officer Lopera waive his Fifth
20  Amendment right in that interview?
21       A.  He has to.  He's under Garity.  He would
22  have to talk with us.
23       Q.  And just for the record, explain what
24  Garity is.
25       A.  It's an admonishment we read our officers

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

13  (Pages 46 to 49)

Page 46

1 in an internal investigation that more or less reads
2 that they have to cooperate with the investigation or
3 they will face discipline.
4    Q.  How long did that interview take?
5    A.  I believe on record it was -- on tape,
6 because it was tape recorded, I believe about four
7 hours.  But all in all I believe it was about six
8 hours.  We took a break with lunch.
9    Q.  Did you have any conversations with Officer
10 Lopera about the incident off the record?
11    A.  No.
12    Q.  Did anybody have any conversations with him
13 off the record?
14    A.  I don't know.
15    Q.  And why did you do an interview of Officer
16 Lopera?
17    A.  Because he was an involved officer.
18    Q.  And maybe I asked you this, but
19 approximately how long after the incident did the
20 interview take place?
21    A.  We have within 48 hours by NRS 289.
22    Q.  Why is it important to interview within
23 48 hours?
24    A.  Well, we have to abide by the NRS Chapter
25 289, which is the rights of peace officers in

Page 47

1 internal investigation.
2    Q.  During your interview of Officer Lopera,
3 are you making credibility assessments?
4    A.  There's a fine line, I think, between
5 credibility and truthfulness.  We're asking questions
6 about the incident and his perceptions of the
7 incident.  We go through all of our grand recon and
8 our elements of deadly force.
9       And with that we take what he says and go
10 through what is determined to be truthful and not
11 truthful.
12    Q.  And did you make any determinations as to
13 what you believe was truthful or not truthful?
14    A.  Yes.
15    Q.  And what determinations did you make that
16 he was truthful?
17    A.  One of the conclusions that we had in our
18 report was that he was being untruthful when -- for
19 the head strikes and the LVNR, or the use of
20 LVNR.
21    Q.  Which determinations did you make that he
22 was being truthful?
23    A.  That he was being truthful?
24    Q.  Yeah.
25    A.  About the incident, his initial contact

Page 48

1 with the decedent, his reasons for foot pursuit.  His
2 perception of an attempt carjacking.  The use -- the
3 first use of the ECD, electronic control device.
4    Q.  Did you make a determination that he was
5 being untruthful as to the remainder of the use of
6 the electronic control device?
7    A.  It was not necessarily a truthfulness.  It
8 was just outside the policy, his use of the ECD.
9    Q.  And what about what he said caused you to
10 believe that he was being untruthful about the head
11 strikes?
12    A.  The fact that he doesn't remember the
13 amount of strikes.
14    Q.  And what about the use of the LVNR causes
15 you to believe that he was being untruthful?
16    A.  Parts of his interview he started out by
17 saying he never meant to render the decedent
18 unconscious.  However, as the interview progressed,
19 he later stated that the use of the LVNR is to
20 incapacitate a subject.
21    Q.  As you sit here today, can you recall
22 anything else about his interview that you perceived
23 to be untruthful?
24    A.  Not without looking at it.
25    Q.  What is the difference between a

Page 49

1 credibility assessment and a truthfulness assessment?
2    A.  Well, with credibility we take the
3 officer's perception and we can't necessarily take
4 away an officer's perception to say I don't believe
5 you because I see it differently.  Whereas
6 truthfulness if we can -- it's almost being caught in
7 a lie or something that's factual that we can prove
8 that did not happen or did happen.
9       So credibility falls, for me falls more on
10 the perception of things.  I can't take away an
11 officer's perception of what they saw.
12    Q.  In your CIRT investigations, do you ever
13 call into question when an officer says they
14 perceived?
15    A.  We take a -- we take a look at it.  But
16 we've never taken away an officer's perception.
17    Q.  In other words, if an officer says to you I
18 perceived X, you always take that as true if they say
19 that's what they perceived, correct?
20    A.  Yes.
21    Q.  So with respect to Officers Tran -- strike
22 that.
23       With respect to Officers Tran, Flores and
24 Sergeant Crumrine at the time, you did not discount
25 anything that they said in terms of if they said that

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

Page 50

1   they perceived it?  That's a terrible question.  Let
2   me rephrase.
3          If Officers Tran, Flores and Sergeant
4   Crumrine stated that they perceived certain acts of
5   the individuals involved, did you ever discount their
6   credibility?
7      A.  No.
8      Q.  Is that just as a matter of policy?
9      A.  That is not necessarily written in policy.
10  But we ask these officers these questions, again, to
11  get their perception of what they saw, what they
12  observed and why they reacted the way they did.
13     Q.  So it may not be a policy but it's a
14  practice or a custom?
15     A.  Sure.
16     Q.  Is the investigation that you're conducting
17  focused on whether an officer is being credible?
18     A.  No.  It's based on the facts.
19     Q.  And a better way maybe to say it from my
20  questioning standpoint is you're assuming everything
21  the officer is saying is true if they're saying it's
22  based on their perception?
23     A.  Correct.
24     Q.  Prior to investigating this incident, had
25  you ever been trained on the LVNR?

Page 51

1      A.  Yes.
2      Q.  Prior to investigating this incident, had
3   you ever investigated another incident from an
4   internal standpoint involving the use of the LVNR?
5      A.  No.
6      Q.  When you started investigating this
7   incident -- strike that.
8          After you started investigating this
9   incident, did you have to brush up on your training
10  on the LVNR?
11     A.  What do you mean by "brush up"?
12     Q.  Well, I think you were asked questions in
13  the other deposition about whether -- when somebody
14  is supposed to become unconscious and when you're
15  supposed to release the hold in terms of time.
16         Would you have known that when you were
17  conducting this investigation?
18     A.  Yes.  Because we would have the policies in
19  front of us.
20     Q.  But if you didn't have the policy in front
21  of you, would you have known that?
22     A.  Yes.
23     Q.  Did the other officers know those policies
24  completely offhand when you interviewed them?
25     A.  My partner, Patrick Hughes, yes.

Page 52

1      Q.  And that's a vague question.
2          Did the officers that you interviewed that
3   were involved in the incident know the LVNR policies
4   offhand?
5      A.  I don't know.
6      Q.  Did you ask them?
7      A.  I believe we went through the LVNR policy
8   with them.
9      Q.  And did you receive any indication that
10  they didn't know it without looking at the policy?
11     A.  I don't recall.  I don't think so.
12     Q.  Were you able to tell by looking at the
13  videotape if the LVNR was properly applied?
14     A.  I don't know.
15     Q.  You don't know if you were able to tell?
16     A.  I wouldn't be able to -- I don't know if
17  the placement of the LVNR was proper.
18     Q.  So as you sit here today, you don't know if
19  it was proper?
20     A.  I don't know.
21     Q.  What policies did Lopera violate in this
22  incident?
23     A.  The electronic -- the ECD, the electronic
24  control device was a policy violation.  And that
25  being that after three times it's deemed ineffective.

Page 53

1   However, Officer Lopera from the download of his
2   Taser had used it seven times, pulled the trigger
3   seven times.
4      Q.  Okay.
5      A.  The head strikes, the threat assessment and
6   the LVNR, which was a -- truthfulness.
7      Q.  So was Lopera -- strike that.
8          Did you find the policy violation against
9   Lopera for the actual use of the LVNR or the lying
10  about the LVNR?
11     A.  For -- I think it was -- it was a
12  truthfulness --
13         MR. McNUTT:  Objection.  Form.
14         THE WITNESS:  It was a truthfulness for the
15  LVNR.
16  BY MR. LAGOMARSINO:
17     Q.  Okay.
18     A.  About the use of the LVNR.
19     Q.  Okay.  So standing alone, his use of the
20  LVNR did not violate policy in your view; is that
21  correct?
22     A.  I believe it had his threat perception
23  about the application of the LVNR and then the
24  truthfulness leading up to the LVNR is what the
25  conclusion was based on, but I don't remember

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

15 (Pages 54 to 57)

Page 54

1  verbatim how I worded it in the report.
2      Q.  Okay.  What report are you talking about?
3      A.  We, at the conclusion of our investigation,
4  we put all our facts together in an AR, or admin
5  report.
6      Q.  And where does that go?
7      A.  That is -- it goes to our people who sit on
8  the board.  And when we present the facts through a
9  PowerPoint, they're able to read along in that report
10 with our PowerPoint.  If they have any questions or
11 concerns, they can direct them at me.  Or if they
12 have questions for Officer Lopera or any of the
13 involved officers or witness officers, they can
14 answer them as well.
15     Q.  And as I understand your testimony, you
16 find the policy violation for the necessity or the
17 use of the LVNR, correct?
18     A.  Not necessarily the necessity.  We look at
19 the assessment of the use of force.  And with that,
20 because of the types of use of force that Officer
21 Lopera used, we questioned him on those as to why he
22 used those or why he decided to use those.
23     Q.  Did you find a policy violation in the
24 actual application of the restraint/LVNR?
25     A.  Based on the perception on the threat

Page 55

1  perception, yes.
2      Q.  And I think maybe I'm asking a different
3  question than you're answering.  And it's probably
4  the question's -- probably the questioner's fault.
5          Let's assume that the threat hypothetically
6  justified the use of an LVNR.  Okay?
7          If he used the LVNR that was depicted on
8  the tape, did you find any violation in the way he
9  actually applied the LVNR?
10     A.  There was some question about the hand.  I
11 believe it was his right hand, where the hand
12 placement of that was, because that was not what
13 was trained with the use of the LVNR with our
14 department.
15     Q.  And I understand there was a question about
16 it.  But was there a finding or conclusion made that
17 he misapplied the LVNR?
18     A.  That was based and kind of rolled into the
19 truthfulness conclusion.
20     Q.  The best way to probably get the exact
21 conclusion would be to review the report, correct?
22     A.  Yes, sir.
23     Q.  Okay.  What about the threat assessment was
24 a violation of policy?
25     A.  The strikes -- Officer Lopera in his

Page 56

1  statement to us had stated that the decedent was
2  fighting him.  In review of --
3          MR. McNUTT:  Objection.  Form.  I will
4  instruct the witness not to repeat anything that
5  Officer Lopera told you during this process.
6          MR. ANDERSON:  Join.  Anything that he told
7  you.
8          THE WITNESS:  Okay.
9          MR. LAGOMARSINO:  What's the basis for
10 that?  Just so we have a record.
11         MR. ANDERSON:  We have a pending motion --
12 you filed a motion to compel in these issues on his
13 statement.  So once that's decided, we will let the
14 judge decide whether Lopera's statement is relevant
15 or can be used in this case.
16         MR. LAGOMARSINO:  Okay.
17 BY MR. LAGOMARSINO:
18     Q.  So was Tashi Farmer fighting back?
19     A.  From what we could see on the video
20 surveillance and a little bit of Officer Lopera's
21 body camera, it did not look to be what Officer
22 Lopera had articulated to us.
23     Q.  What about the use of the head strikes was
24 a violation of policy?
25     A.  It would have been excessive use of force

Page 57

1  based on the threat perception.
2          MR. LAGOMARSINO:  All right.  I'll reserve
3  the right to come back with the witness based on the
4  court's ruling on anything with respect to what
5  Officer Lopera described to her in the CIRT
6  statement.
7          MR. ANDERSON:  Understood.
8  BY MR. LAGOMARSINO:
9      Q.  Do you use LVNR and chokehold
10 interchangeably?
11     A.  No.
12     Q.  I think you were asked in the other
13 deposition whether -- a slightly different question.
14 Let me rephrase.
15         In the other deposition you were asked is
16 an LVNR and a rear naked choke the same?
17     A.  I was asked that in the deposition?
18     Q.  Yeah.
19     A.  Is that your question, are they the same?
20     Q.  Yes.
21     A.  No.
22         MR. ANDERSON:  Okay, that got confusing.
23 Was the question, were you asked that question in a
24 prior deposition, or is there a difference between an
25 LVNR and a chokehold?

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

16 (Pages 58 to 61)

Page 58

1          MR. LAGOMARSINO:  Okay.  I'll refine the
2    question.
3    BY MR. LAGOMARSINO:
4       Q.  Rather than go off my notes, what I'll do
5    is I'll bring the transcript back for the next
6    session.
7          Is the rear naked choke the same as the
8    LVNR?
9       A.  No.
10      Q.  In the rear naked choke, the encircling arm
11   is used the same way as you would have in an LVNR,
12   correct?
13      A.  I'm sorry, could you say that again?
14      Q.  Sure.  When you compare the rear naked
15   choke and the LVNR, the encircling arm is the same?
16      A.  I believe so, yes.
17      Q.  And it's in the same position, correct?
18      A.  Yes.
19      Q.  What's the difference, as you sit here
20   today, between the LVNR and a rear naked choke?
21      A.  I believe it's the hand placement of the
22   non-encircling arm.
23      Q.  And in the LVNR, the hand placement is
24   permitted on the back of the head, correct?
25      A.  I'm sorry, say that one more time.

Page 59

1       Q.  In which hold is the hand placement on the
2    back of the neck applied, the rear naked choke or the
3    LVNR?
4       A.  Rear naked choke.
5       Q.  And why is the hand placed in the back of
6    the head?
7       A.  I believe it's to apply pressure to the
8    back of the head forward into the encircling arm, but
9    I'm not 100 percent sure.
10      Q.  And is that to avoid the person backing
11   their head into --
12      A.  I don't know.
13      Q.  I've seen a training video in this case.
14   Do you know why that training video on the LVNR was
15   created?
16      A.  If you're referencing the one to the
17   department?
18      Q.  Yes.
19      A.  I believe it was to talk about the
20   differences between the LVNR and the chokehold or the
21   rear naked choke.
22      Q.  Have you ever seen any training videos on
23   the LVNR besides that one?
24      A.  I believe when we first got trained on in
25   the academy, they had a video, but I'm not -- I don't

Page 60

1    remember.
2       Q.  Okay.  Do you know if that video was shown
3    to all the officers in Metro?
4       A.  I don't know.
5       Q.  Does Metro train you in how long it takes
6    to render somebody unconscious when you impose the
7    LVNR?
8       A.  Yes, they do.
9       Q.  And how long is that?
10      A.  I believe it's four to seven seconds.
11      Q.  Four to seven seconds?
12      A.  I believe so.
13      Q.  Are you sure?
14      A.  No.
15      Q.  Would you have to see the policy?
16      A.  I would have to see the lesson plan, yes,
17   sir.
18      Q.  To your knowledge, was Officer Lopera ever
19   interviewed by anyone at Metro besides in the CIRT
20   statement?
21      A.  Not -- I believe his -- his interview with
22   us was the only interview that was conducted in
23   reference to this investigation.
24      Q.  Reference to the CIRT investigation?
25      A.  Correct.

Page 61

1       Q.  Do you know of any other interviews he's
2    given?
3       A.  Oh, I don't know.
4       Q.  Did he give a public safety statement?
5       A.  He started to, and then it was stopped.
6       Q.  Who stopped it?
7       A.  His attorney John Eldridge I believe is who
8    arrived on scene.  Or the PPA attorney, not his
9    attorney.  I apologize.
10      Q.  When you're going to present your findings
11   to a board, is that the CIRT board?
12      A.  Yes.  We have two boards.  Well, it's a
13   CIRP process.  The first board is the Use of Force
14   Review Board, and then we roll right into what's
15   called the TRB or Tactical Review Board.  And the
16   conclusions are presented at the Tactical Review
17   Board.
18      Q.  So we've got two boards; Use of Force and
19   Tactical Review.  Is there an actual -- what is the
20   CIRP proceeding where you go in and present your
21   case?
22      A.  It's the CIRP process, the critical
23   incident review process, and that's the two boards
24   that run.
25      Q.  So are the two boards part of the CIRP

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

17 (Pages 62 to 65)

Page 62

1  process?
2      A.  Yes.
3      Q.  Who was on that board for this case?
4      A.  Our chairperson was Sheriff Tim Kelly,
5  Assistant Sheriff Tim Kelly.  Followed by Deputy
6  Chief John McGrath.
7          Bureau Commander for Lopera, Lif, Tran,
8  Flores was Captain Pelletier.
9          For Sergeant Crumrine, because at the time
10 of the board he was over in Enterprise Area Command,
11 I believe it would have been Captain Roxanne McDaris.
12 It's Burke now.  I apologize.
13         Moving into our tactical expert which would
14 have been Ryan Evans, Sergeant Ryan Evans.  We had a
15 peer officer who was Travis -- what's his name?  I
16 can't remember his name.
17         And then we had a peer sergeant, which I
18 believe was Noe Esparza, but I'm not a hundred
19 percent sure on the two peer officers.  It's
20 Travis -- I can't remember his name.
21     Q.  Okay.
22     A.  And then we had four citizens that sat on
23 the board.
24     Q.  So four citizens and how many Metro
25 officers, six or seven?

Page 63

1      A.  For -- we have one peer officer for all
2  officers and one peer sergeant for Sergeant Crumrine.
3  And then everyone that was on the board was Officer
4  Lopera, Officer Lif, Tran, Flores, Sergeant Crumrine,
5  and I believe that's all that was invited to the
6  board.
7      Q.  Were all the peer officers the same for all
8  the officers involved?
9      A.  Yes.
10     Q.  So on the -- and then a vote is taken,
11 correct?
12     A.  On the use of force, yes.
13     Q.  How many votes are there?
14     A.  So all -- everyone on the Use of Force
15 votes, including the citizens, except for the
16 chairperson.  He is not a voting member on the Use of
17 Force Board.
18     Q.  Okay.  So what's the number?  How many
19 votes are there?
20     A.  Total, I don't remember who -- I don't
21 remember how many votes.  Everyone that I said except
22 for the chairperson votes, but I don't remember how
23 many votes -- how many voting sheets are actually
24 there.
25     Q.  Are there more Metro votes than citizen

Page 64

1  votes?
2      A.  Citizens will actually outvote us on the
3  Use of Force Board.
4      Q.  What about with respect to whether policy
5  violations occurred?
6      A.  That happens in the Tactical Review Board
7  and our citizens do not vote on that.  And the reason
8  being is because they're not privy to our tactics and
9  training, but they're welcome to stay for the board.
10     Q.  And then with respect to policy
11 recommendations that come out of this process, who
12 makes those?
13     A.  That would be a meeting between the
14 chairperson and the sheriff.  But they are discussed
15 in what we call deliberations which are not video or
16 audio recorded and there's no notes taken.
17     Q.  So who participates in the discussion as to
18 whether policy is going to change as a result of this
19 process?
20     A.  Everyone on the board can participate and
21 that's again in deliberations.  But any formal
22 recommendations is going to be a memo between the
23 sheriff and the chairperson.
24     Q.  Who makes the recommendations to the
25 sheriff or the chairperson?

Page 65

1      A.  So it's a board that convenes during the
2  deliberations.  They talk about -- they talk about it
3  and then whatever -- the chairperson will present the
4  concerns to the sheriff.  In between those two, they
5  came up with discipline, policy changes or any other
6  recommendations that could help the department.
7      Q.  And are citizens a part of that process
8  with respect to policy changes?
9      A.  Yes.  They can voice concerns but they're
10 not voting on the board.
11     Q.  Do you know which citizens were on the
12 board?
13     A.  I don't.
14     Q.  Do you know how they're selected?
15     A.  It's a process that they -- I believe we
16 have like advertisements in like the newspaper.  Word
17 of mouth.  They just can't have any affiliation to
18 the department.  Can't be married to anyone in the
19 department.  Can't be a former officer.  And so
20 they -- they come through a training of just what the
21 process is, what's expected of them.
22         And I believe that class is -- it might be
23 like a -- I don't know how long the class is but they
24 come to a class and we get an opportunity to meet
25 them as well as because we have conversations with

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1  them.
2      Q.  Okay.  So they go through either some kind
3  of PowerPoint or written training on how to be on
4  that board?
5      A.  Yes.
6      Q.  Have you seen those training materials
7  before?
8      A.  Yes.
9      Q.  Have you instructed?
10      A.  No.
11      Q.  So if we wanted to request those, we could
12  get those?
13      A.  Yeah.
14          MR. ANDERSON:  Objection.  Form.
15          MR. LAGOMARSINO:  Assuming there was no
16  objection to producing those, correct?
17  BY MR. LAGOMARSINO:
18      Q.  But if the judge ordered those produced, we
19  could get those produced, right?
20      A.  I'm sure you could.
21      Q.  And so on the Lopera, Crumrine, Flores and
22  Tran case, that occurred September '17?
23      A.  I believe so.
24      Q.  And you were present?
25      A.  Yes, I was.

Page 67

1      Q.  What portion of that process were you
2  present for?
3      A.  The entire thing.
4      Q.  Were you present during deliberations?
5      A.  No.
6      Q.  Where does the board deliberate?
7      A.  There's a couple of different locations on
8  this particular board.  I don't recall where they
9  went but there's a conference room on the second and
10  third floor that they all go into and convene.  And
11  again, on this particular board, I don't recall where
12  they went.
13      Q.  And who presented the incident to the
14  board?
15      A.  I did.
16      Q.  Did anybody else help you?
17      A.  No.
18      Q.  What did your presentation consist of?
19      A.  It was a PowerPoint that over -- that went
20  through several sections which included persons
21  involved, chronology, incident documentation, the
22  medical response to include a new supervisor
23  response, and any training policies and procedures.
24      Q.  How long was your presentation?
25      A.  It was long.  I believe the Use of Force

Page 68

1  Board presentation was just under maybe two and a
2  half, three hours.
3      Q.  And was the presentation divided up into
4  segments per officer or was it just all together?
5      A.  All together.
6      Q.  Okay.  And it's my understanding that that
7  presentation is audio recorded?
8      A.  Yes, it is.
9      Q.  And is your presentation factual?
10      A.  Yes.
11      Q.  Does your presentation consist of policy
12  recommendations for changes?
13      A.  It's going to be in the TRB.  But for the
14  use of force, it's just the facts.
15      Q.  So the answer was "no"?
16      A.  No.
17      Q.  Was there testimony presented at that
18  board?
19      A.  As far as?
20      Q.  Witness testimony or did independent
21  witnesses testify about the incident?
22      A.  It's not really -- they don't really
23  testify.  I apologize if I'm getting confused.  But
24  during the board we have clips from the officers'
25  statements that we will actually put into the board.

Page 69

1      Q.  Okay.
2      A.  Into the PowerPoint so they can read along
3  and they can also hear it.  If that's what you're
4  talking about, then yes, we do have that.
5      Q.  All right.
6      A.  But the officers do have a chance to talk
7  after the presentation.  At the conclusion of the
8  presentation they have an opportunity to answer
9  questions or add any additional comments.
10      Q.  Was that video of the difference between a
11  rear naked choke and an LVNR played during your
12  presentation?
13      A.  It was.  And it wasn't the video in the
14  academy.  It was one that was put together for the
15  purposes of the board.
16      Q.  Thank you for clarifying that.
17          Do you know if the citizens are paid?
18      A.  It's all volunteer.
19      Q.  Do you know with respect to the vote, is it
20  a majority vote that determines or is it 60 percent
21  or...
22      A.  That's a good question.  I think it's a
23  majority vote.  About 90 percent of our boards have
24  been unanimous but I believe there has been like, for
25  instance, a six to one vote.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

19 (Pages 70 to 73)

Page 70

1   Q.  Do you know what the vote was in this case?
2   A.  I don't.  I believe it was unanimous, but
3   I'm not 100 percent.
4   Q.  And when a decision is made, is there a
5   memo that's presented to the sheriff?
6   A.  Yes.  And I believe the timeline is two
7   weeks by policy.
8   Q.  Sheriff Lombardo was the sheriff at the
9   time?
10  A.  Yes.
11  Q.  Have you ever seen that memo?
12  A.  No.
13  Q.  Does the Office of Internal Oversight get
14  to review the memo?
15  A.  Yes, they do.
16  Q.  Had you read similar memos when you were in
17  the Office of Internal Oversight?
18  A.  I did.
19  Q.  Is there a typical format?  Was it two or
20  three pages, a page?  It could be voluminous?
21  A.  It just depends on the board and the
22  recommendations that came out of the board.
23  Q.  And so what kind of recommendations would
24  you see on memos when you would be in the Office of
25  Internal Oversight?

Page 71

1   A.  We had recommendations for new trauma kits
2   that was implemented.  Recommendation for shields,
3   tactical vehicles which are now also implemented
4   throughout the area commands.
5   We would have recommendations for
6   discipline, whether if it would be a written, which
7   we would have to receive from the involved officer's
8   supervisor.  Training recommendations that we would
9   have to keep up on once we got the -- once we got the
10  memo from the sheriff, we would look at the
11  recommendations and then disperse it out to the
12  appropriate bureau that would be handling that
13  recommendation.  And they would give them a timeline
14  and then stay up to date with it, making sure they're
15  doing what they should be doing.
16  Q.  What was Esmeralda Boveda's title?
17  A.  She was the sergeant of the Office of
18  Internal Oversight.
19  Q.  So she would have been the sergeant in
20  charge of that board for this incident?
21  A.  Yes.  For -- yeah.
22  Q.  For Lopera?
23  A.  Yeah.  She wouldn't be in charge of the
24  board but she would be in charge of the
25  recommendations that would come out of the board.

Page 72

1   Q.  What would you do with those memos when
2   they came up when you were in the Office of Internal
3   Oversight?
4   A.  What do you mean what would we do with
5   them?
6   Q.  Well, you would get the memo.  What would
7   be the next steps?
8   A.  The next step would be to look through the
9   recommendations and see what bureau it needs to go
10  to.  If it is going to training, go to training.  We
11  would put it in a different memo and say per CIRP
12  board 2017, whatever, it's recommended by the sheriff
13  that this training be limited, get pushed out.  You
14  have 90 days, 60 days, whatever it is per policy,
15  search and seizure.
16  It just depended on what we needed.  Trauma
17  kits that went through office of -- went through our
18  financial office.  And then our health and safety to
19  make sure that we could actually use what was in the
20  trauma kit if we're trained up to use it, if it was
21  going to be a liability, if it wasn't going to be a
22  liability.  So it just depends on what the
23  recommendation was.
24  Q.  Would there be occasions when
25  recommendations would not be implemented that would

Page 73

1   come from the CIRP process?
2   A.  Every recommendation that we had was
3   implemented unless it was something to do -- yeah,
4   there was actually one.  And it was reference SWAT
5   and snipers getting their gear because it was budget
6   issues paying for scopes and rifles and...
7   Q.  Were there other officers who worked in the
8   Office of Internal Oversight that would have access
9   to that memo?
10  A.  Yes.
11  Q.  Was it possibly Lucas Abbott or Brian
12  Kreoning?
13  A.  Yes.
14  Q.  Now, when you would receive the memo from
15  the CIRP process, would the Office of Internal
16  Oversight take that memo and create a new memo?
17  A.  Yes.
18  Q.  And where would that new memo go?
19  A.  That would go to the designated bureau that
20  would be handling that recommendation.
21  Q.  So is it possible there would be multiple
22  new memos that would come out of that Office of
23  Internal Oversight?
24  A.  Yes.
25  Q.  And in this case, since you weren't in the

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

20  (Pages 74 to 77)

Page 74

1  Office of Internal Oversight, you don't know if there
2  were one or more?
3    A.  Correct.  I have no idea what were the
4  recommendations.
5    Q.  Where were those memos being maintained?
6    A.  Sergeant Boveda would maintain those.
7    Q.  And would you use an Excel spreadsheet to
8  track when the recommendations were being implemented
9  and so forth?
10    A.  Yes.  And for the Lopera case, I'm not sure
11  if they used the matrix or not.
12    Q.  If we wanted to find out the names of the
13  citizens on the board, I'm assuming Metro keeps a
14  record of their names?
15    A.  Yes, they do.
16    Q.  Did you watch the press conference of
17  Captain McMahill regarding this incident?
18    A.  Which one?
19    Q.  Any of them.
20    A.  Yes.
21    Q.  Did you see the one where he said that
22  Tashi Farmer would not have been charged with a
23  crime?
24    A.  I don't recall.
25    Q.  Does Metro, to your knowledge, maintain

Page 75

1  news clips or media records about stories involving
2  its officers?
3    A.  I don't know.  I'm assuming they would, but
4  I don't know.
5    Q.  Does the sheriff receive regular reports
6  regarding media on Metro?
7    A.  I don't know.
8    Q.  I guess I would have to ask the sheriff,
9  right?  Okay.  Or whoever is presenting with those,
10  correct?
11    A.  Yeah.  Public information officer, PIO
12  might know.
13    Q.  Do you know why the body cameras don't have
14  sound for the first 30 seconds?
15    A.  I don't.  I believe it's a mechanism,
16  something to do with the actual internal workings of
17  the body camera, and I don't know.
18    Q.  Have you ever heard of body cameras that do
19  record sound for all the time that they're activated?
20    A.  I haven't, no.  Do you mean the time
21  it's turned on?
22    Q.  Yes.
23    A.  No.  I don't know.
24    Q.  Do you know if Officer Tran received
25  discipline for failure to use a body cam?

Page 76

1    A.  I don't know.
2    Q.  Did he violate a policy with respect to the
3  body cam?
4    A.  Yes, he did.
5    Q.  What did he violate?
6    A.  The fact that the policy states that the
7  body camera is to be turned on as soon as possible
8  once initiated on a call or dispatched to a call or
9  self-initiated.
10    Q.  Tell me a little bit about the process of
11  determining what potential policy violations you were
12  going to be investigating at the outset of the
13  investigation?
14    A.  We look at the overall incident.  We sit
15  down in roundtable.  Things that we see that can be,
16  again, it can be a body-worn camera; rolling code
17  three, which is lights and sirens, to an incident.
18  Officers approach, their tactical decision-making.
19  So we kind of look at everything.
20      And then go over the policies to make sure,
21  okay, for instance, Officer Tran, he didn't have it
22  on.  The policy states this.  Okay, that's going to
23  be a policy violation that will be introduced to the
24  Tactical Review Board.
25    Q.  When you started interviewing Officer Tran,

Page 77

1  Officer Flores, and I believe Sergeant Crumrine, you
2  had made a statement that it's being alleged or that
3  they've failed to intervene.
4      What information did you utilize to
5  investigate that potential policy violation?
6    A.  When we looked -- because of the amount of
7  time Officer Lopera had the decedent in the LVNR or
8  chokehold, at that time, what we knew was that was an
9  extended amount of time beyond policy.  And so we
10  threw in there the duty to intervene and asked them
11  specifically about that policy.
12    Q.  Let me just ask a general question about
13  the duty to intervene.
14      If -- and again, I'm talking generally.
15  I'm not talking necessarily about this specific
16  incident.
17    A.  Okay.
18    Q.  Okay?  Let's say an officer -- there are
19  two officers on the scene.  The first officer places
20  an individual in the LVNR for an extended period of
21  time.  The second officer arrives on the scene and
22  observes the first officer applying the LVNR for a
23  period of time longer than policy.
24      The second officer says, hey, stop, hey,
25  release.  Verbal commands.  And the first officer

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

21 (Pages 78 to 81)

Page 78

1 doesn't release the LVNR. Has the second officer
2 complied with the policy to intervene?
3          MR. ANDERSON: Objection. Form.
4          THE WITNESS: It depends on what the
5 subject's actions are at the time. The officers are
6 trained to make the situation safe. That was --
7 that's what we're trained to do first, is to make
8 that safe. Once that scene is safe, then an officer
9 is expected to intervene if that hold is held for
10 longer.
11 BY MR. LAGOMARSINO:
12     Q.   So I'll add those additional facts just so
13 we have a cleaner record.
14          Same hypothetical situation but we're going
15 to add facts, okay?
16          First officer places subject into LVNR for
17 an extended period of time.
18          Second officer arrives. Observes first
19 officer placing subject -- or keeping subject in
20 LVNR. Subject is not a threat, is not punching, and
21 second officer says verbally release LVNR.
22          First officer doesn't release LVNR.
23          Does the second officer have a duty then,
24 at that point, to physically intervene and remove the
25 LVNR hold or attempt to remove the LVNR hold from the

Page 79

1 subject?
2          MR. ANDERSON: Objection. Form.
3          MR. McNUTT: Join.
4          THE WITNESS: Again, it depends on the
5 perception of that officer. We're trained to take
6 that person into custody, put him in handcuffs, make
7 that situation, that scene safe before the LVNR would
8 be released.
9 BY MR. LAGOMARSINO:
10     Q.   If the situation was safe, would the
11 second officer have a duty to physically remove the
12 hold?
13          MR. ANDERSON: What do you mean by "safe"?
14 Objection. Form.
15          MR. LAGOMARSINO: Well, I'm just using her
16 word.
17 BY MR. LAGOMARSINO:
18     Q.   So if it's safe?
19     A.   If it's deemed safe by the officer, if that
20 person is in handcuffs, is no longer a threat to any
21 officer on scene, not just the perceiving officer who
22 is perceiving that there's no movement, once that --
23 again, once it is safe by all officers, then yes, the
24 officer would have a duty to intervene.
25     Q.   Does the subject have to be in handcuffs to

Page 80

1 physically intervene?
2     A.   I'm sorry, say that again.
3     Q.   In your last answer you said -- you added
4 that the subject would have to be in handcuffs. So I
5 want to ask a new question.
6          There's different types of interventions so
7 let me kind of back it up a little bit and then we'll
8 go to lunch, but not together.
9          So you can verbally intervene, correct?
10     A.   Yes.
11     Q.   But if the situation requires physical
12 intervention, then physical intervention is required,
13 correct?
14     A.   Yes.
15          MR. ANDERSON: Objection. Form.
16 BY MR. LAGOMARSINO:
17     Q.   If the situation requires physical
18 intervention, then verbal intervention is not enough
19 to satisfy the duty to intervene, correct?
20          MR. ANDERSON: Objection. Form.
21          THE WITNESS: It could, yeah.
22 BY MR. LAGOMARSINO:
23     Q.   I just need a slightly clearer record, so
24 I'll ask the same question.
25          If a situation requires physical

Page 81

1 intervention, then verbal intervention is not enough,
2 correct?
3          MR. ANDERSON: Objection. Form.
4          THE WITNESS: It depends, yeah. I mean, if
5 an officer would have to go -- if he's not -- I don't
6 know. I don't know how to answer that.
7          MR. LAGOMARSINO: Okay. All right. Take a
8 lunch break.
9          I don't know if you want to come back like
10 1:15?
11          MR. ANDERSON: You have a phone call?
12          MR. LAGOMARSINO: Yeah, but it should start
13 at 1:00.
14          MR. ANDERSON: Okay.
15          THE VIDEOGRAPHER: The time is
16 approximately 12:04 p.m. We are going off the
17 record.
18          (A recess was taken from 12:04 p.m.
19           to 1:29 p.m.)
20          THE VIDEOGRAPHER: The time is
21 approximately 1:29 p.m. We are back on the record.
22 BY MR. LAGOMARSINO:
23     Q.   You understand you're still under oath?
24     A.   Yes, I do.
25     Q.   All right.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

22  (Pages 82 to 85)

Page 82

1          (Exhibit 1 was marked for
2          identification.)
3  BY MR. LAGOMARSINO:
4      Q.  Exhibit 1 are excerpts from the CIRT
5  statements that were provided by Metro in this case.
6      A.  Okay.
7      Q.  They're not the complete statements.  Just
8  parts.
9      A.  Okay.
10     Q.  We'll be identifying the documents by Bates
11  number, which is on the bottom right-hand side.
12          MR. McNUTT:  More maintenance on the
13  building?
14          MR. LAGOMARSINO:  No.  They're totally
15  remodeling.
16  BY MR. LAGOMARSINO:
17     Q.  So you were present at this statement,
18  correct?
19     A.  Yes, I was.
20     Q.  All right.  And PH is indicated here as --
21  is that Patrick Hughes?
22     A.  Yes, it is.
23     Q.  Okay.  Who is Patrick Hughes?
24     A.  He was a detective with me in CIRT.
25     Q.  Did Patrick Hughes say to Michael Tran,

Page 83

1  prior to your arrival you failed to activate your
2  body-worn camera and also you failed to intervene
3  while the application of the LVNR was applied on the
4  subject?
5      A.  Yes, he did.
6      Q.  Going to the next page, which is jumping
7  ahead to 1956, you asked at line 6:  "Okay.  There
8  was no resistance from the subject when you arrived?"
9          Were you basically saying -- asking there
10  was no resistance from Tashi Farmer when Michael Tran
11  arrived on the scene?
12     A.  Yes.
13     Q.  And what did Michael Tran say?
14     A.  On line 7 he says "Nope."
15     Q.  Do you take that to mean that there was no
16  resistance when Michael Tran arrived?
17     A.  From Michael Tran's perception, yeah, he
18  did not see resistance.
19     Q.  Did anybody tell you that Tashi Farmer was
20  resisting when Michael Tran arrived on the scene?
21     A.  I believe in another statement from Officer
22  Flores and Sergeant Crumrine, when they arrived there
23  was resistance.
24     Q.  Going to 1961, the question at line 3 is
25  from you:  "Did Officer Lopera ever tell you he said

Page 84

1  the subject," and Michael Tran's answer was "No."
2  Correct?
3      A.  Yes.
4      Q.  Did Officer Lopera have a recollection
5  during his interview of the number of times that he
6  tased Tashi Farmer?
7      A.  No.  He did not.  He did not know how many
8  times he pulled the trigger.
9      Q.  Going at line 8, you're asking about,
10  during that section, palm reviving techniques.  Were
11  you trained on reviving techniques at the Academy?
12     A.  Yes, I was.
13     Q.  And did you examine in this case or
14  investigate whether proper CPR was given by Tran,
15  Flores or Crumrine after the incident?
16          MR. ANDERSON:  Objection.  Form.
17          THE WITNESS:  CPR, no.
18  BY MR. LAGOMARSINO:
19     Q.  Why didn't you investigate that?
20     A.  That's not one of the things that we look
21  at or examine.  What we look at is medical attention
22  and whether medical -- whether or not they had asked
23  for medical, paramedics or AMR or FD to arrive on the
24  scene to do their medical training -- or to do their
25  medical techniques.

Page 85

1      Q.  So if a subject is not reviving after 10,
2  20 seconds of being let go of the LVNR, and after
3  palm reviving techniques and other techniques are
4  used, is it department policy to utilize CPR from the
5  officers to try to revive that subject?
6      A.  Not in policy, no.
7      Q.  How about in training?
8      A.  Not in training either, no.
9      Q.  Did you examine in your investigation all
10  the training regarding reviving an individual who had
11  an LVNR applied to them?
12     A.  I don't understand the question.
13     Q.  Okay.  Did you look at training in your
14  investigation to see if the officers at the scene
15  complied with their training in reviving the
16  individual?
17     A.  Yes.
18     Q.  And you looked at all the training,
19  correct?
20     A.  Yes.
21     Q.  Going to the last page, LVMPD2002, you
22  asked --
23          MR. McNUTT:  I'm sorry, did you say the
24  last page?
25          MR. LAGOMARSINO:  2002, the last page.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

23 (Pages 86 to 89)

Page 86

1   BY MR. LAGOMARSINO:
2       Q.  "Looking back on this incident, is there
3   anything else you would have done differently" is
4   what you asked Officer Tran, correct?
5       A.  Yes.
6       Q.  And what was his response?
7       A.  On line 16 he says, "Um, I should have
8   started CPR."
9       Q.  Did you agree with him?
10      A.  So these are the questions that we ask at
11  the end of interview and they are kind of hindsight
12  questions.  And it's kind of reflections on the
13  officers as far as what they would do differently,
14  nothing that we would necessarily hold for a CIRT
15  board.
16          (Exhibit 2 was marked for
17          identification.)
18  BY MR. LAGOMARSINO:
19      Q.  Exhibit 2 are excerpts from the CIRT
20  statement of Officer Michael Flores.
21          Do you have that in front of you?
22      A.  Yes, I do.
23      Q.  And I'm sorry, just to go back to Exhibit 1
24  for a moment.
25      A.  Okay.

Page 87

1       Q.  Do the pages that I've shown you appear to
2   you to be a true and correct copy of the pages from
3   the CIRT statement?
4       A.  Yes.
5       Q.  So going to Exhibit 2, the Flores excerpt.
6   So who is GW?
7       A.  That is Greg Watkins or Gregory Watkins.
8       Q.  He's on the CIRT team?
9       A.  Yes, sir.
10      Q.  Did Gregory Watkins say to Officer Michael
11  Flores, number one, "Prior to your arrival you failed
12  to activate your body-worn camera," and number two,
13  "You failed to intervene while the application of the
14  LVNR was applied to the subject"?
15      A.  Yes.
16      Q.  Going to page 1874 from the statement at
17  line 5, it says, "Did you and Officer Tran conduct
18  any preplanning of any incident rehearsal while en
19  route to the location?"
20          You asked that question, correct?
21      A.  Yes, I did.
22      Q.  And Mr. Flores's answer was "no," correct?
23      A.  Yes.
24      Q.  Is preplanning on the way to an incident
25  part of Metro policy and training?

Page 88

1       A.  It's not necessarily policy, but it's
2   trainings and tactics and part of decision making.
3       Q.  And the next question, although it's not
4   highlighted, is at line 8.  It says, "En route to
5   Venetian, any reason why you did not activate your
6   body camera while rolling code?"
7           I would ask you is it policy and training
8   of Metro to activate body cameras while rolling code?
9       A.  Yes, it is.
10      Q.  Do you have an understanding of what the
11  punishment or discipline is for not activating body
12  camera?
13      A.  I don't.  I don't know what the discipline
14  matrix would be on this.  Or what would fall within
15  the matrix, I should say.
16      Q.  And going to LVMPD1886, which is page 28 of
17  the CIRT statement, the question -- it says at line
18  5, middle, it says, "And you said you folded his legs
19  to gain compliance.  Is there a technique that's
20  taught in the Academy?"
21          Is it your understanding that if the
22  subject has their torso down on the pavement, that
23  it's within Metro policy and training to fold an
24  individual's legs back up to their buttocks?
25      A.  It is an option that officers have.

Page 89

1       Q.  So yes?
2       A.  Yes.  But it depends on the scenario as
3   well.  It's not something you have to use.  It's not
4   a policy that you must use.  It's an option for
5   officers to use.
6       Q.  Was Tashi Farmer resisting when they folded
7   his legs up to gain compliance?
8       A.  I would have to read his whole statement to
9   recall.
10      Q.  Fair enough.
11          Was Tashi Farmer in medical crisis after he
12  was released from the LVNR?
13      A.  I don't know.
14      Q.  Do you have an opinion or an estimate as to
15  when Sergeant Crumrine took charge of the scene, if
16  at all?
17      A.  I believe in the CIRT report we came up
18  with, I believe it was about ten minutes after the
19  decedent was taken into custody.
20      Q.  Going to the last page, 1934, which is
21  page 76 of the statement, asking the question I
22  believe about what could have been done.  There's a
23  statement, line 8, it says, "But I feel as if the
24  communication could have been better."
25          Did you make any conclusions in your

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 90

1  presentation about the communication being better?
2      A.  Yes, we did.
3      Q.  What were your conclusions?
4      A.  The conclusions was Officer Lopera had a
5  negative conclusion reference radio traffic.  Also I
6  believe there was a conclusion on contacting cover.
7      Q.  Can you explain in layman's terms what a
8  negative conclusion regarding radio traffic means?
9      A.  Sure.  For this particular incident, it was
10  a lack of radio traffic.  And by policy, within the
11  foot pursuit policy, you must provide certain radio
12  traffic.  That was not provided by Officer Lopera.
13      Q.  And then there was also a conclusion
14  regarding contacting cover.  What was that
15  specifically?
16      A.  Verbatim I don't recall.  But contacting
17  cover, one officer is the contact officer while the
18  other officer, witness officer would be cover
19  officers.  And I don't remember specifically how it
20  was worded for the Lopera conclusion.
21      Q.  Okay.  Thank you.  Does this appear to
22  be -- strike that.
23          Do these pages appear to be true and
24  correct excerpts from the CIRT statement?
25      A.  Yes.

Page 91

1          (Exhibit 3 was marked for
2          identification.)
3  BY MR. LAGOMARSINO:
4      Q.  Exhibit 3 are documents that were attached
5  by Metro to a recent filing before the District
6  Court.  And it was document, for the record, 40.  And
7  this appears to be Exhibit 2 to document 40, pages
8  400 through and inclusive of 406.
9          Do you recognize what this document is?
10      A.  Yes, I do.
11      Q.  What does it appear to be?
12      A.  It looks like within our policy manual,
13  what specifically the Critical Incident Review
14  Process or the CIRP process is.
15      Q.  And does this appear to be a true and
16  correct copy of the critical incident review process
17  that was in effect for the Tashi Farmer case?
18      A.  Assuming it's the same one referenced.
19  This has been updated since, but I don't recall what
20  the updates were, but yes.
21      Q.  When you say since, it's been updated since
22  the Tashi Farmer case?
23      A.  Yeah.  Our policy gets updated quite
24  frequently.
25      Q.  Does this appear to be a true and correct

Page 92

1  copy of the policy that would apply to the Tashi
2  Farmer case?
3      A.  Yes.
4      Q.  So you were -- let's go through the
5  definitions that are highlighted here on page 400.
6          Were you the case investigator?
7      A.  Yes, I was.
8      Q.  And I believe you testified on this before,
9  but just for context, who was the CIRP chairperson?
10      A.  For this case the chairperson would have
11  been Assistant Sheriff Tim Kelly.
12      Q.  And who was the secretary, the CIRP
13  secretary?  Or was there one?
14      A.  There was one.  It would have been either
15  Anna Chavez or Natalie Quinteros.
16      Q.  I want to go through this and try to get a
17  better understanding from my viewpoint of what the
18  total universe of documents we have are that are
19  generated in this process.
20      A.  Okay.
21      Q.  Going into the Use of Force Board and the
22  Tactical Review Board, that's all one hearing, right?
23      A.  Yes.  It's technically two hearings but
24  they are back to back so it's one board.
25      Q.  And that's the same day that the board is

Page 93

1  there and people make their presentations and the
2  officers are there?
3      A.  Yes.
4      Q.  And that's the same proceeding where then
5  all the information is now there's a use of force and my
6  understanding is now there's a use of force vote and
7  the citizens vote on that?
8      A.  Correct.
9      Q.  As well as the officers, correct?
10      A.  Yes.
11      Q.  And then there's a tactical review board
12  that only the officers vote on?
13      A.  Correct.
14      Q.  Correct?
15          And then what happens?  Is there another
16  deliberation besides those two?
17      A.  So there's two deliberations, one that
18  occurs within the Use of Force Board.  So I present
19  my facts, they go deliberate, and they come back with
20  a vote and go to the Tactical Review Board.  I
21  present conclusions.  They deliberate and then come
22  up -- come back with their vote on the conclusions.
23      Q.  Is there another presentation or just those
24  two?
25      A.  Just those two.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

25 (Pages 94 to 97)

Page 94

1    Q.  And then I want to make sure I'm using the
2  right lingo here.
3       So before that, let's just call it that
4  collective hearing, okay?
5    A.  Okay.
6    Q.  You issue some sort of a report or
7  memorandum in advance of that hearing to the board?
8  Is it called a CIRT report?
9    A.  It's the CIRT report.  It's our AR.  So
10  once that report is completed, we give it to our
11  chain of command so that they can proofread and go
12  through everything.  Once that is finalized, it will
13  go out to our SMEs and SMEs will review that, which
14  are subject matter experts.
15    Q.  Okay.  So they review that and then it goes
16  to the board?
17    A.  Correct.
18    Q.  Are the officers allowed either before or
19  during the hearing, or their representatives, to
20  review the CIRT report?
21    A.  Yes.  And that includes the PowerPoint as
22  well.
23    Q.  Are they allowed to retain a copy of the
24  CIRT report and PowerPoint?
25    A.  No.

Page 95

1    Q.  What's the difference?
2    A.  The PowerPoint is a streamlined version of
3  the report.  We use that to be like a visual
4  representation of the report.
5    Q.  And what's the difference in your
6  understanding of why officers and/or their
7  representatives are allowed to review the CIRT report
8  but not allowed to retain it?
9    A.  A lot of the times for legality reasons if
10  there's a criminal that fits, a case is still open,
11  we don't want that stuff to get out into the public
12  and possibly cause a biased jury if it's still going
13  through.  So we retain what we have and we actually
14  won't even release it to the public until all sides
15  of the investigation are closed, both internal and
16  criminal.
17    Q.  Okay.  So you then have the Use of Force
18  Board comes back and it issues dispositions?
19    A.  Correct.
20    Q.  Are those dispositions in writing?
21    A.  It's on a voting sheet.
22    Q.  Okay.
23    A.  And so it's actually kind of in the same
24  format here.  And there's check boxes next to the
25  four dispositions and they go through and actually

Page 96

1  check a box, each voting member.  They're collected
2  by the chair and the chairperson will tally up the
3  votes.
4    Q.  Okay.  So at least there's some
5  documentation of the disposition, correct?
6    A.  Right.  Yes.
7    Q.  Similar to like in civil cases, there's
8  like a jury verdict form, maybe pretty simple, but at
9  least it delineates the decision?
10    A.  Yeah.  Correct.
11    Q.  To your knowledge -- it says here at
12  the bottom of 401, "The Use of Force Review Board
13  will be convened once FIT submits their case to the
14  office of the District Attorney."
15       Do you know in this case if the Use of
16  Force Review Board was convened after the FIT
17  submitted the case to the DA?
18    A.  I believe so.
19    Q.  So going to page 403.
20    A.  403.
21    Q.  I apologize, 402.
22    A.  Okay.
23    Q.  So under citizen Use of Force Review Board
24  members it states, "A chairperson will in conjunction
25  with the sheriff and the citizens, CIRT board,

Page 97

1  co-chairs develop criteria for the identification,
2  recruitment, selection and training of citizens to
3  serve as members of the Use of Force Review Board."
4       Is that criteria in writing, to your
5  knowledge?
6    A.  I don't know.
7    Q.  And then when we were talking about
8  citizens receiving training before, is it the CIRP
9  training program which you were referring to?
10    A.  Yes.
11    Q.  And the Use of Force Review Board and
12  Tactical Review Board are also required to review the
13  CIRT investigative file, correct?
14    A.  Correct, yeah.
15    Q.  Do they review the entire CIRT
16  investigative file?
17    A.  Yes.  They get access to all the
18  statements, any CSA diagrams, crime scene diagrams,
19  all interviews that were done by CIRT and FIT, and
20  they also have -- were also privy to FIT's total
21  investigation, complete investigation.
22    Q.  And I understand that they have access to
23  it.  Do you know of any mechanism in place to verify
24  that they have reviewed the entire file?
25    A.  They have to come up to our office and

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

26 (Pages 98 to 101)

Page 98

1  physically check out a binder or a case file.
2      Q.  And then how do you verify that they've
3  actually read it?  I mean to me -- let me withdraw
4  that question.
5          This is a big CIRT file, right?
6      A.  It's -- I believe I have three binders for
7  this case, yes.
8      Q.  How do you verify that they've actually
9  read that file?
10      A.  I mean, we don't do pop quizzes or anything
11  with them.  But when they come to the board, they're
12  expected to have read the material so we're not
13  asking the same questions over and over again.
14      Q.  All right.  Going to 403.
15      A.  Okay.
16      Q.  States "The CIRP chairperson will," and
17  then it lists some items there 1 through 6.
18          Going to the 4B, it says, "The TRB will
19  vote on CIRT conclusions based on the majority vote,
20  either validating, overturning, modifying each of the
21  conclusions presented by CIRT."
22          So you present conclusions, correct?
23      A.  Yes.
24      Q.  Did you present approximately 20?
25      A.  Yeah.  There's quite a few, yes, sir.

Page 99

1      Q.  Do you remember many of them as you sit
2  here today?
3      A.  Probably the majority of them, I would say.
4      Q.  Can you take us through the conclusions.  I
5  understand, but just for the record, that you're not
6  expected to recite them word by word.
7      A.  Okay.
8      Q.  But just generally can you tell us what
9  they are?
10      A.  Uh-huh.  The first one would have been
11  radio traffic communication.  And there was two
12  negatives, one for Officer Lopera and one for
13  Officer Lif.  And it was both the fact that they did
14  not utilize their radio and provide radio traffic.
15          The third conclusion would have been for
16  communications bureau which encompasses our call
17  takers and dispatchers, and that was a positive
18  conclusion saying that they acted in accordance with
19  their policies and training.
20          The next conclusion -- sorry, format has
21  changed.  Our next one would have been the foot
22  pursuit policy which Officer Lopera violated.
23      Q.  How did he violate that?
24      A.  There's eight indicators in policy for when
25  a foot pursuit should be continued and that was to

Page 100

1  include that he did not have -- his radio traffic he
2  didn't provide.  He lost sight of the subject.  He
3  was by himself.
4          And there's a fourth one there I can't
5  recall off the top of my head, but that all
6  encompassed into one conclusion of the violation of
7  the foot pursuit policy.
8      Q.  Was a determination made that he would have
9  probable cause to --
10      A.  Yeah.  He had -- when we spoke with our
11  SMEs, he had reasonable suspicion.
12      Q.  All right.  So we have the radio traffic,
13  two findings.  Dispatcher, conclusion.  The foot
14  pursuit.  What's the next one?
15      A.  The next one would have been the use of the
16  ECD, electronic control device.  After the first use,
17  it was -- it should have been deemed ineffective.
18  However, he continued to use it and that was a
19  violation of our policy.  And the duration of each
20  trigger pull.
21          MR. McNUTT:  I'm sorry, did you say after
22  the first use?
23          THE WITNESS:  Correct.
24  BY MR. LAGOMARSINO:
25      Q.  And then the duration, how did he violate

Page 101

1  the duration?
2      A.  By policy it's when you pull the trigger
3  it's got a five-second spark display.  However, I
4  believe in the last trigger pull, he held it down for
5  approximately nine seconds.
6      Q.  Okay.  What was the next one?
7      A.  I believe it was empty hand strikes.
8      Q.  And that was for Lopera?
9      A.  Yes.
10      Q.  Also negative conclusion?
11      A.  Negative conclusion.
12      Q.  And why was it negative?
13      A.  It was excessive.
14      Q.  Okay.
15      A.  Next one was LVNR, which we previously
16  stated had --
17      Q.  Let me interrupt you.  Sorry.
18          How many strikes did he use, approximately?
19      A.  Approximately, I believe it was -- in the
20  report I put 13, 12 or 13 strikes, approximately.
21      Q.  And were they all excessive or were they
22  excessive only after a certain number?
23      A.  All excessive.
24      Q.  Okay.  All right.  So I'm sorry, the next
25  one was LVNR?

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

27 (Pages 102 to 105)

Page 102

1  A.  LVNR, and that was rolled into a
2  truthfulness.  So it was a completely separate
3  conclusion.  So it was the excessive hand strikes,
4  and then LVNR and hand strikes moved into a
5  truthfulness conclusion.
6  Q.  Okay.
7  A.  Next one would have been medical
8  intervention which was positive for the officers who
9  arrived on the scene.  And that was to include the
10  request to expedite medical several times.
11  We had two negative conclusions for
12  supervision and that would be for Sergeant Crumrine.
13  Q.  Okay.  And can you tell me about those?
14  A.  Neglect of duty.  And that was for failure
15  to take command and control of a critical incident.
16  Q.  And what else?
17  A.  And this one they rolled -- this is the one
18  that they modified, I think, in the voting and I
19  can't remember how it was modified.  There was two.
20  Q.  So there were two supervision-based
21  conclusions.  One was a neglect of duty for failure
22  to establish command and control at the scene?
23  A.  Yes.
24  Q.  And what was the other?
25  A.  I can't remember what it was.

Page 103

1  Q.  Okay.  Probably look at the documentation
2  to find out, right?
3  A.  Yeah.  I would have to.
4  Q.  Okay.  What's the next one?
5  A.  Did we get medical intervention already?
6  Q.  We do.  Because they expedited.
7  A.  There's a negative for body-worn cameras.
8  Q.  Is it like multiple negatives for each
9  officer or --
10  A.  Yeah.  This one, what we did was put it
11  under a general conclusion and stated that multiple
12  officers failed to activate their body camera.  And
13  that would have encompassed Tran, Flores, Crumrine,
14  and I believe Officer Lif was in that as well because
15  she didn't activate hers.
16  Q.  Okay.
17  A.  There were no negative for policy failures.
18  No negative for training.
19  Q.  One moment, please.
20  A.  Yep.
21  Q.  So since there was no negative for policy
22  failures, what policies does that cover?
23  A.  So what that means for us is that there
24  were no policies that failed the officers, I guess is
25  the best way to say it.  The best way I can explain

Page 104

1  it is when we had that resident officer that violated
2  the policy for low lethal, in that conclusion we said
3  that there was a policy failure on the department
4  because it failed our resident officer from utilizing
5  a low lethal option instead of going right to
6  handgun.  So in this case there were no policies that
7  were restrictive on the officers.
8  Q.  So is it fair to say, and please don't
9  hesitate to disagree with me, but unless you
10  otherwise noted that a policy was violated,
11  everything else was according to policy, correct?
12  A.  No.  Yeah, this is kind of a tough one to
13  explain.  It's -- we look at our policies.  Do we
14  need to change any of our policies because they were
15  too restrictive on an officer.
16  So it's not necessarily were any policies
17  violated because obviously we have negative
18  conclusions that policies were violated.  This is
19  looking at do we need to change a policy altogether
20  to make our department better.
21  Q.  Okay.  So no negative policy.  I get that
22  with the explanation.  So what was the next one?
23  A.  It would have been training.  And this is
24  where we see all of our involved officers and witness
25  officers were within their compliance of our

Page 105

1  training.  So did they attend AOST, advanced officer
2  safety training; RBT, reality-based training; were
3  they qualified on their firearms.
4  So with that there was no negative.
5  Everyone was compliant with their training.
6  Q.  So on that particular one, it's not an
7  assessment whether they acted within their training,
8  it's more were they current on their training on the
9  day of the incident?
10  A.  Correct.
11  Q.  Okay.  So far I've got roughly 13.
12  A.  There might have been two actually for
13  medical, because the request for -- to expedite
14  medical.  And then we had two officers, I believe
15  it's Kravetz and Amburgey, that performed CPR.  We
16  gave them a positive conclusion for jumping in and
17  doing that.
18  Q.  If they're not required to do CPR, then why
19  would it be part of the assessment?
20  A.  Because they went above and beyond.
21  Q.  There was no finding of above and beyond
22  for Tran, Flores or Crumrine, correct?
23  A.  Correct.
24  Q.  All right.
25  A.  We said body cam, right?

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

28  (Pages 106 to 109)

Page 106

1    Q.  Yes.
2    A.  Preplanning.  There was no preplanning.
3    Q.  So that would be a negative conclusion?
4    A.  Yes.  And that would have been for Flores,
5  Tran.  There was no communication between Officer
6  Lopera and Lif at the start of the incident.
7    Q.  Okay.
8    A.  That would have been a negative conclusion,
9  I believe, under contact and cover.
10        There's a couple more I know I'm
11  forgetting.  I just can't remember.
12    Q.  Okay.  Which subject matter experts did you
13  consult as part of this investigation?
14    A.  We had a search and -- we had two search
15  and seizure SMEs.  We had a use of force SME and an
16  LVNR SME.
17    Q.  Who was the search and seizure?
18    A.  We had Sergeant Don Fielesman.  We also
19  had -- what was his name?  They are a part of our
20  search and seizure.  I can go back and find out who
21  it was, but I remember working with Fielesman quite a
22  bit on this one.
23    Q.  Bland was LVNR?
24    A.  Yes.
25    Q.  And who was the use of force?

Page 107

1    A.  Use of force would have been -- oh, we had
2  an ECD, SME, which would have been Carlson, Eric
3  Carlson.
4    Q.  K-a-r-l-s-o-n?
5    A.  I think it's C-a-r; C-a-r-l-s-o-n.
6    Q.  All right.  And?
7    A.  And Nick Rinella.
8    Q.  For the use of force?
9    A.  It would have been Marla Stevens I believe
10  was one of them, and then Eric Carlson as well.
11    Q.  Okay.  So we have ECD, LVNR, use of force,
12  and search and seizure?
13    A.  Yeah.
14    Q.  Okay.
15    A.  And we have body cam, too, to help us -- we
16  have people who work in body cam and review body cam
17  with us and give us compliancy and all that stuff.
18    Q.  Okay.  So going back to the exhibit.  When
19  the TRB issues their vote validated, overturning,
20  modifying, is that on a document?
21    A.  Yes.  It's like a voting sheet with the Use
22  of Force Board.
23    Q.  Okay.  All right.  Then it says under
24  Number 6, "Provide a written summary of Use of Force
25  Review Board and tactical review of recommendations

Page 108

1  in a memo to the sheriff."
2        Was that done in this case?
3    A.  Yes, it was.  And apparently has to be done
4  within three working days, if not two weeks.
5    Q.  Now, going to the section under CIRP
6  secretary, it says Number 3, there's a notice of
7  investigation.
8        Was that done in this case?
9    A.  Yes, it was.
10    Q.  And that's on a document as well?
11    A.  Yes.
12    Q.  And then Number 6, "Prepare disposition
13  forms for all board members."
14        Was that done in this case?
15    A.  Yes, it was.
16    Q.  I think we already asked you about there
17  was a full recording under Number 8, correct?
18    A.  Yes, there is.
19    Q.  And Garity admonishment forms that were
20  provided to the members, correct?
21    A.  Yes.
22    Q.  It says Number 10, "Complete all completed
23  forms following the UFRB hearing."
24        What are the completed forms that are being
25  referenced there?

Page 109

1    A.  Prior to the board -- once the board
2  begins, the sheriff will admonish each of the
3  involved and witness officers and they actually have
4  to physically sign on record that they understand the
5  Garity and the notice of the investigation.
6        And I believe the secretary collects that
7  and makes sure that it is actually filled out and
8  signed.
9    Q.  And then did the subject matter experts
10  ever draft or draft part of any of the CIRT report?
11    A.  No.  Not draft, no.
12    Q.  Did they ever give you content for the
13  report?
14    A.  We discussed, yeah.  We had discussions.
15    Q.  Do they give that to you in writing?
16    A.  No.  Just verbal.
17    Q.  Now, it says under Number 12, "The
18  secretary will assist the chairperson preparing
19  written summaries of the UFRB dispositions and RPB
20  recommendations memo to sheriff."
21        Are those two different -- are those
22  summaries different than the summary that's under
23  Number 6 under the chairperson?
24    A.  Yes.  Those are different, yes.  Well, I'm
25  sorry.  Let me -- the TRB recommendations memo and

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

29 (Pages 110 to 113)

Page 110

1  the Use of Force memo are two separate documents and
2  then the disposition forms are a third separate
3  document which she is in charge of all three.
4      Q.  Then it says, "File the written summary of
5  dispositions.  Send a copy."  I'm thinking that's the
6  internal oversight?
7      A.  Constitutional police.
8      Q.  Thanks.  Then under number 15 it says,
9  "Document vote and appropriate comments on the Use of
10  Force Review Board disposition report."
11      What does that mean?
12      A.  So she actually sits with the chair when he
13  meets with the sheriff and that is because he can't
14  remember everything that happens.  So she kind of
15  fills in as a secondary to him.  She is a secretary
16  of the board and she does sit in in deliberations.
17      Q.  Does she take notes of what's being said in
18  those deliberations?
19      A.  I don't know.  I'm not privy to anything in
20  deliberations.
21      Q.  Well, it's either going to be off her
22  memory or notes?
23      A.  Either of those two, right.
24      Q.  Under number 4 it says, "Ensure the
25  physical evidence, photograph, enlargements, diagrams

Page 111

1  and other essential items are available at UFRB
2  meeting."
3      What physical evidence was used in that
4  meeting, the UFRB?  I'll ask a better question.
5      Was there physical evidence used during the
6  UFRB meeting?
7      A.  For this particular Lopera case, I don't
8  think there was any physical evidence other than the
9  LVNR video.  But in previous, we have used stop
10  sticks.  Load without a shotgun just to kind of
11  educate our citizens what it is when we refer to
12  certain terms.
13      Q.  What about photographic enlargements, were
14  any used in this case?
15      A.  Any crime scene documentation or if we have
16  body camera stills or stills from the Venetian
17  security, if we need to enlarge that, we will.
18      Q.  Was that done in this case, do you know?
19      A.  I believe it was.
20      Q.  Were diagrams created?
21      A.  Yes.  Crime scene diagrams.
22      Q.  And were there any other essential items
23  that you can recall at this time that were used in
24  this case?
25      A.  Yeah.  We had different policies, training,

Page 112

1  lesson plans that were utilized.
2      Q.  Going to page 404.  What is an involved
3  member?
4      A.  So our definition of involved member is the
5  person who influenced the force, whether that be the
6  trigger puller, per se, person driving the vehicle,
7  could be a supervisor who directs a use of force that
8  can be involved.
9      Q.  So Lopera, Crumrine, Tran and Flores would
10  be classified as involved persons?
11      A.  In this case, no.  Technically for you,
12  yes, they were all involved.  However, the way we see
13  it in the internal was they were subject officers
14  because there was policy violations and that's just
15  an internal term that we use.
16      Q.  All right.  Under Number 3 it says, "Be
17  authorized to access their own individual statements,
18  communication, audio, video, diagrams related to
19  movement at the scene.  The FIT officer's report and
20  the CIRT administrative report prior to the hearing."
21      So who was authorized to access all of this
22  information in this case?
23      A.  So this is part of the binder that they
24  come up and we do -- we run it through the PowerPoint
25  and at this time is where they have the opportunity

Page 113

1  to go through the binder and see the statements, the
2  written visual statements.  They get to see all the
3  audio, video, anything related to their
4  investigation.  They get to see that but they can't
5  take that with them.
6      Q.  All right.  And then the next document
7  says -- strike that.
8      The next sentence says, "Bureau commander
9  of the involved member will document the vote and
10  appropriate comments on the UFRB disposition report."
11      Have you ever seen one of those UFRB
12  disposition reports?
13      A.  I have not.  We are not privy to that.
14      Q.  Is it your understanding when someone says
15  document the vote that it's documented?
16      A.  Yes.
17      Q.  Going to the next section, what is the
18  LVMPD181 Use of Force Review Board disposition
19  report?
20      A.  That's just the voting sheet.  I don't know
21  what -- yeah, I believe that's the voting sheet.
22      Q.  Going to page 405, please, at the bottom
23  states "CIRT will complete its review and report on
24  its findings at the Use of Force Review Board."
25      Is that a different document than what

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

30 (Pages 114 to 117)

---

Page 114

1  we've been talking about so far today?
2      A.  No.  The report is an AR, administrative
3  report.
4      Q.  Okay.
5          (Exhibit 4 was marked for
6          identification.)
7  BY MR. LAGOMARSINO:
8      Q.  This is the CIRT statement of Ashley Lif,
9  again excerpts.  Do you see that?
10     A.  Yes.
11     Q.  And "KK" on the first page is you, correct?
12     A.  That is me, yes.
13     Q.  And did you tell Ashley Lif prior to your
14  arrival that you failed to activate your body-worn
15  camera.  When a foot -- a foot pursuit was initiated,
16  you failed to employ the tactics as outlined in the
17  foot pursuit?
18     A.  Yes.
19     Q.  Going to 1744, next page.  Did Lif tell you
20  "I did not interpret a foot pursuit had ensued" at
21  line 13?
22     A.  Yes, she did.
23     Q.  Is that consistent with the video footage?
24     A.  Yes.
25     Q.  And how is that consistent?

---

Page 115

1      A.  The way she had articulated to us is that
2  she was handed -- Officer Lopera handed her coffee,
3  she turned around to set it down.  She's out of view
4  from surveillance inside the Venetian for ten
5  seconds, and by that time Officer Lopera and Farmer
6  had already exited into a hallway.  And by the time
7  she had turned around.  You see her coming -- walking
8  kind of looking for everyone.  So assuming.
9      Q.  Where did they get coffee from?
10     A.  There was a Coffee Bean located just
11  adjacent to that hallway.
12         MR. ANDERSON:  Do you want to take a break
13  whenever you come to a spot?
14         MR. LAGOMARSINO:  Sure.
15         MR. ANDERSON:  You don't have to do it
16  right now.  I'm just saying in the next five or ten
17  minutes.
18         THE VIDEOGRAPHER:  The time is
19  approximately 2:13 p.m.  We are going off the record.
20         (A recess was taken from 2:13 p.m.
21          to 2:25 p.m.)
22         THE VIDEOGRAPHER:  The time is
23  approximately 2:25 p.m.  We are back on the record.
24  BY MR. LAGOMARSINO:
25     Q.  Officer Lif's CIRT statement was --

---

Page 116

1          MR. ANDERSON:  Hey, Andre, before we get
2  started, what are you thinking on timeline?
3          MR. LAGOMARSINO:  Probably going to go for
4  a while, until at least 4:00.
5          MR. McNUTT:  Okay.
6          MR. LAGOMARSINO:  I want to leave some time
7  for you guys to ask questions.
8          MR. McNUTT:  Craig has got a lot.
9  BY MR. LAGOMARSINO:
10     Q.  So was Yant present?
11     A.  Yes, he was.
12     Q.  And what does PEAP stand for?
13     A.  It's our equivalent to -- it's -- I'm
14  totally drawing a blank.  We have officers that are
15  peer officers that come out and talk to you if
16  they're having a hard time.  I just can't remember
17  what the acronym stands for.
18     Q.  And is Bryan Yant writing things down?
19     A.  Excuse me?
20     Q.  When he's in those meetings, is he writing
21  things down or was he writing things down?
22     A.  And this one I don't remember, but normally
23  he would, yeah.
24     Q.  And he's not a lawyer, correct?
25     A.  No.

---

Page 117

1          Police Employee Assistance Program.
2      Q.  Got it.
3          Going to page 1749 of Lif's statement.
4      A.  Okay.
5      Q.  She says, "He didn't pose a threat in my
6  perception to himself or others.  Granted, he did go
7  down the service hallway but that's not a threat.  He
8  wanted to get away."
9          Did you agree with Officer Lif?
10     A.  On her perception of what she saw, yes.
11     Q.  All right.  Does this appear to be a true
12  and correct copy of excerpts from Ashley Lif's
13  statement?
14     A.  Yes.
15          (Exhibit 5 was marked for
16          identification.)
17  BY MR. LAGOMARSINO:
18     Q.  All right.  This is an excerpt from
19  Amburgey's statement as noted on the top.
20     A.  Okay.
21     Q.  So there's a question from apparently you
22  at line 19.  It says, "Okay, and why was he laid on
23  his side, Farmer?"
24          And then his answer was, "I laid him on his
25  side because we're taught when someone is in our

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

31 (Pages 118 to 121)

Page 118

1 custody we don't leave them either on their back or
2 on their stomach because of the face asphyxiation
3 position."
4          What is he referring to there?  Is he
5 saying when somebody is on their back or their
6 stomach, it's the asphyxiation position?
7          A.  What he's -- it's called the recovery
8 position.  It's what we're taught along with the palm
9 reviving strikes, is not to leave someone on their
10 chest but to prop them up on the side to help that
11 airway, help that breathing.
12          Q.  And was Farmer in the asphyxiation position
13 before Amburgey arrived at the scene?
14          MR. ANDERSON:  Object to the form.
15          THE WITNESS:  I don't recall.
16 BY MR. LAGOMARSINO:
17          Q.  Next one.
18          (Exhibit 6 was marked for
19               identification.)
20 BY MR. LAGOMARSINO:
21          Q.  So this is excerpts from the statement of
22 Sergeant Crumrine.
23          A.  Okay.
24          Q.  Before we get to this, were you able to
25 remember during the break or any other time today

Page 119

1 what the last name was of the other Travis?
2          A.  No.
3          Q.  All right.  So at 1620, KK is you, correct?
4          A.  Yes.
5          Q.  And you said to Sergeant Crumrine at lines
6 28 through 31, "Prior to your arrival, you failed to
7 activate your body-worn camera.  You failed to
8 intervene while the application of the LVNR was
9 applied on the subject and you failed to take command
10 and control of the scene and ensure medical was
11 expedited in an appropriate amount of time."
12          A.  I don't have that page.
13          Q.  Oh.  I gave you a different one.
14          So I'll just repeat the question for the
15 record.
16          So apparently we've got page 1620, correct?
17          A.  Yes, I've got it now.
18          Q.  And did you say the words to Sergeant
19 Crumrine prior to your arrival, "You failed to
20 activate your body-worn camera.  You failed to
21 intervene while the application of the LVNR was
22 applied on the subject, and you failed to take
23 command and control of the scene and ensure medical
24 was expedited in an appropriate amount of time"?
25          A.  Yes.

Page 120

1          Q.  Going to 1636.  There's a question about
2 using the MDT, so I think that's -- was it mobile
3 data terminal?
4          A.  Yes.
5          Q.  Is it policy to use mobile -- a mobile data
6 terminal on the way to an incident to try to gather
7 information about the incident?
8          A.  Is it a policy?
9          Q.  Yeah.
10          A.  I think it's more of a training and tactic.
11 I don't know if it's necessarily a policy.
12          Q.  Going all the way back to 1647.
13          A.  Okay.
14          Q.  At lines 6 through 7, I think you're
15 referring to Crumrine saying "Get your..." -- strike
16 that.
17          PH is Patrick Hughes, correct?
18          A.  Yes, it is.
19          Q.  So Patrick Hughes is quoting Crumrine
20 saying, quote, "Get your fucking hands behind your
21 back."
22          Is it policy to curse at subjects?
23          MR. McNUTT:  Objection.  Form.
24          THE WITNESS:  There's no policy against
25 cursing.

Page 121

1 BY MR. LAGOMARSINO:
2          Q.  Is -- does cursing and yelling at a subject
3 escalate the situation?
4          MR. ANDERSON:  Objection.  Form.
5          THE WITNESS:  Or it can de-escalate the
6 situation.
7 BY MR. LAGOMARSINO:
8          Q.  It can be either/or?
9          A.  Yes, sir.
10          Q.  Was there any discussion regarding the use
11 of profanity during your investigation?
12          A.  No, there was not.
13          Q.  I'm going back to 1655, please.  So there's
14 a question from Patrick Hughes.  It says, "As a
15 sergeant on a dynamic scene where officers are doing
16 potentially CPR or managing that subject that's in
17 custody, why would you take the initiative to go to
18 your car to use the MDT to run the subject?"
19          Why was that question asked?
20          A.  The reason being is because this had fallen
21 in line with the fact that Sergeant Crumrine had
22 failed to act and take control of a dynamic scene.
23 He took it upon himself to go take the decedent's ID
24 and go run him, which he could have easily passed off
25 to another officer and continue to focus on his

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

32 (Pages 122 to 125)

Page 122

1   responsibilities as a supervisor.
2       Q.  And was that a conscious decision by
3   Crumrine to do that?
4           MR. ANDERSON:  Objection.  Form.
5           THE WITNESS:  Yeah.  Apparently.
6   BY MR. LAGOMARSINO:
7       Q.  And he admitted there were enough officers
8   there that he could have given -- passed the ID off,
9   correct?
10      A.  Yes.
11      Q.  There's some discussion at page 1656 about
12  the crime of resisting a police officer, lines 18
13  through 22.
14          Do you see that?
15      A.  Yes.
16      Q.  Is it a crime to resist a police officer if
17  a subject's constitutional rights are being violated?
18          MR. ANDERSON:  Objection.  Form.
19          THE WITNESS:  In this case, Sergeant
20  Crumrine perceived that the decedent was resisting
21  Officer Lopera.
22  BY MR. LAGOMARSINO:
23      Q.  Let me ask the question just in general.
24      A.  Okay.
25      Q.  Is it a crime of resisting a police officer

Page 123

1   if -- strike that.
2           Is it a crime for somebody to resist a
3   police officer if their constitutional rights are
4   being violated?
5           MR. ANDERSON:  Objection.  Form.
6           THE WITNESS:  Again, it depends on --
7   generally speaking, it would depend on the totality
8   of the circumstances.
9   BY MR. LAGOMARSINO:
10      Q.  So if somebody's constitutional rights are
11  being violated, it still could be a crime to resist a
12  police officer?
13          MR. ANDERSON:  Objection.  Form.
14          THE WITNESS:  Again, without knowing all
15  the facts.
16  BY MR. LAGOMARSINO:
17      Q.  1683, please.  There's a question from
18  Patrick Hughes.  It says, "Did you start to think his
19  LV application of the LVNR is what caused the subject
20  to be rendered unconscious?"
21          And Crumrine said "yes," correct?
22      A.  Yes.
23      Q.  Do you agree with Sergeant Crumrine's
24  perception, that the LVNR is what caused Tashi Farmer
25  to be rendered unconscious?

Page 124

1           MR. ANDERSON:  Objection.  Form.
2           THE WITNESS:  I believe with the perception
3   that he saw, that could have possibly been the reason
4   why Tashi Farmer was rendered unconscious.
5   BY MR. LAGOMARSINO:
6       Q.  In watching all the body cams, I noticed
7   that there were a number of officers who would tell
8   other officers to shut their body cams off when they
9   were talking about the incident.
10          Is that within policy to shut your body
11  camera off when you're talking about the incident?
12      A.  I believe that policy was changed.  At the
13  time I believe the policy stated when the scene is
14  static or if you're going to have a debrief of the
15  incident, that you are to turn off your body camera.
16          In this particular instance, I believe it
17  was Officer Lif that had turned her body camera off
18  and on several times.  And when asked about it, she
19  had stated that it was -- that she was talking to
20  Officer Lopera and Sergeant Crumrine about what was
21  going on and what her perception was of everything,
22  so she turned off her body camera.
23      Q.  Was it within policy to do that?
24      A.  At the time, yes.
25      Q.  Has it changed since that time?

Page 125

1       A.  Yes, it has.
2       Q.  Has it changed because of this case?
3       A.  I don't know if it's because of this case
4   or just in general.
5       Q.  Is it fair to say that having somebody's
6   recorded recollection of an incident literally at the
7   time of the incident can be evidence of what occurred
8   in an incident?
9           MR. ANDERSON:  Objection.  Form.
10          MR. McNUTT:  Form.
11          THE WITNESS:  Yes.
12  BY MR. LAGOMARSINO:
13      Q.  If you're shutting off the camera, then
14  you're potentially suppressing valuable evidence?
15          MR. ANDERSON:  Objection.  Form.
16          MR. McNUTT:  Objection.  Form.
17          THE WITNESS:  It could be seen that way,
18  yes.
19  BY MR. LAGOMARSINO:
20      Q.  Going to 1703.  Patrick Hughes asked Travis
21  Crumrine, "Do you feel any time that he's applying
22  the LVNR you could have interceded to stop Officer
23  Lopera's application?"
24          Crumrine said, "I could have, yes."
25          Next question, "Do you believe you should

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

33 (Pages 126 to 129)

Page 126

1  have?"
2       Crumrine, "No."
3       So based on your investigation, could
4  Crumrine have interceded to stop the application of
5  the LVNR?
6       A.  In our investigation, he did.
7       Q.  And based on what?
8       A.  The fact that he gave verbal commands.  He
9  attempted to help Officer Lopera, Lif and Flores take
10 the decedent into custody at the time.
11      Q.  Did any officer ever try to remove Officer
12 Lopera's arms from Tashi Farmer's neck?
13      A.  Physically, no.  I don't think so.
14      Q.  There's a question -- there's a question on
15 page 95 that says, "Okay.  In hindsight, do you think
16 the incident could have been approached in a way that
17 presented less risk to yourself or others?"
18      Answer, "Yes."
19      Going to the next page at 1715, at line 2,
20 Crumrine says, "Well, I -- my -- the Officer Lopera
21 could have -- could have more appropriately chosen
22 his force options."
23      Do you agree as an investigator Lopera
24 could have more appropriately chosen his force
25 options?

Page 127

1       MR. ANDERSON:  Objection.  Form.
2       THE WITNESS:  Yes.  We had a conclusion of
3  excessive use of force.
4  BY MR. LAGOMARSINO:
5       Q.  Which options should he have chosen?
6       MR. ANDERSON:  Objection.  Form.
7       THE WITNESS:  Ones that fall within the --
8  his threat assessment.
9  BY MR. LAGOMARSINO:
10      Q.  Which ones would those have been?
11      A.  He could have used empty hand tactics to
12 take him into custody.
13      Q.  Any others?
14      A.  I would have to look at the model to take a
15 look at what all options were available at the time.
16      Q.  Did you write in the report what
17 alternative force options he could have used?
18      A.  No.
19      Q.  Do you have knowledge of Officer Lif asking
20 officers other than Lopera to shut off their body
21 cameras?
22      MR. McNUTT:  I'm sorry, other than --
23 actually, just repeat it -- or read it back, please.
24      MR. LAGOMARSINO:  I am -- I can rephrase
25 it.

Page 128

1  BY MR. LAGOMARSINO:
2       Q.  Officer Lif asked certain officers to turn
3  off their body cameras, correct?
4       A.  Yes.
5       Q.  Which officers do you have knowledge of
6  Officer Lif asking to shut off their body cameras?
7       A.  I know it was -- I don't recall.  It was
8  either -- I don't recall.  There was another officer.
9       Q.  Okay.
10      To your knowledge, who are all the
11 individuals that received your CIRT report?
12      A.  If you mean received, they've never -- they
13 got an opportunity to read it while they were in the
14 office but they never were allowed to leave with it.
15 The only person that would have a copy would be
16 Assistant Chief Tim Kelly because he is a chairperson
17 of the board.
18      Q.  Did you send the report through your chain
19 of command?
20      A.  Yes, I did.
21      Q.  Did you send it to a sergeant?
22      A.  Yes, I did.
23      Q.  Who was that?
24      A.  That would be Sergeant Kyle Ward.
25      Q.  Did you send it to your lieutenant?

Page 129

1       A.  Yes.
2       Q.  Who was that?
3       A.  Lieutenant Dan Bledsoe.
4       Q.  And to your knowledge, was that sent to the
5  sheriff?
6       A.  I don't know.
7       Q.  And do you still have a copy of that
8  report?
9       A.  It is housed in what we call an IPRO, which
10 is our internal organization for reports and CIRT
11 case files.
12      Q.  Did you draw a conclusion as to whether or
13 not Lopera used the LVNR or a rear naked choke?
14      A.  I believe in the conclusion, if I remember,
15 he referred to it as a chokehold.  I can't remember
16 the verbiage I used in the report.
17      Q.  Well, LVNR is authorized, correct?
18      A.  LVNR is authorized by the department.
19      Q.  And rear naked is not, right?
20      A.  Yes.
21      Q.  Did you draw a conclusion as to whether he
22 used an authorized chokehold or not authorized
23 chokehold?
24      A.  I don't remember verbatim what was in the
25 report.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

34  (Pages 130 to 133)

Page 130

1    Q.  Would you have presented to the board on
2  that issue?
3    A.  Yes.  I believe it was an improper hand
4  placement.  I can't remember.
5    Q.  Were your conclusions on whether Crumrine,
6  Tran or Flores failed to intervene based on -- strike
7  that.
8         Was your conclusion that Tran, Flores and
9  Crumrine failed -- it's getting late for me, too.
10  I'm getting tired.
11         You came to the conclusion that Crumrine,
12  Tran and Flores intervened, correct?
13    A.  Yes.
14    Q.  And you came to that conclusion based on
15  their statement of what they perceived, correct?
16    A.  Perceived, and the actions that they took
17  during.
18    Q.  Okay.  Now, if excessive force is being
19  used by an officer, in general, surrounding officers
20  have a duty to intervene, correct?
21        MR. ANDERSON:  Objection.  Form.
22        THE WITNESS:  In theory, yes.
23  BY MR. LAGOMARSINO:
24    Q.  So if a rear naked choke was being applied,
25  which is an unauthorized technique, then Tran, Flores

Page 131

1  and Crumrine should have intervened, correct?
2        MR. ANDERSON:  Objection.  Form.
3        THE WITNESS:  In this scenario, we asked
4  about the hand placement.  And because they were
5  taking action, taking Farmer into custody, they
6  cannot recall the hand placement.  And so to the best
7  of their knowledge they knew Officer Lopera was using
8  an LVNR.
9  BY MR. LAGOMARSINO:
10    Q.  That's fair.  I'll give you a hypothetical
11  situation.
12         If they determined that a rear naked choke
13  was being used as opposed to LVNR, they would have
14  had a duty to intervene?
15        MR. ANDERSON:  Objection.  Form.
16        THE WITNESS:  Hypothetically, once the
17  decedent was taken into custody, hypothetically, yes,
18  they would have a duty to intervene if that LVNR or
19  chokehold were being -- continued being used.
20  BY MR. LAGOMARSINO:
21    Q.  So you define custody as two handcuffs on
22  both wrists?
23    A.  Yes.
24    Q.  So in your view, that if a rear naked choke
25  was being applied before the handcuffs were being

Page 132

1  used, there would be no duty to intervene, correct?
2    A.  At that point, the officers would make the
3  scene safe, which would be taking the decedent into
4  custody with two handcuffs around the wrists.
5    Q.  So if there were no handcuffs, there would
6  be no duty to intervene?
7    A.  Depending on their perception and what they
8  saw at the time.
9    Q.  Okay.  So let's assume that they saw that
10  he wasn't handcuffed with both wrists and he was in a
11  rear naked choke, assuming they saw that, that's a
12  hypothetical, they would have had a duty to
13  intervene?
14        MR. ANDERSON:  Objection.  Form.
15        THE WITNESS:  They would have a duty to
16  take the decedent into custody and ensure that the
17  rear naked choke was released.
18  BY MR. LAGOMARSINO:
19    Q.  You were asked the question in your prior
20  deposition, "Okay.  And if there was a rear naked
21  choke, he should have stopped it?"
22         And your answer was, "Had he recognized
23  there was a rear naked choke or an LV, had he
24  recognized the rear naked choke, yes."
25         Do you agree with that?

Page 133

1    A.  Once the scene was safe and the decedent
2  was taken into custody, yes.
3    Q.  You didn't say that in your prior
4  deposition; is that correct?
5    A.  I don't say it in front of me.
6         (Exhibit 7 was marked for
7          identification.)
8  BY MR. LAGOMARSINO:
9    Q.  So going to page 58, line 18.  The question
10  is, "Okay.  And if there was a rear naked choke, he
11  should have stopped it.  Objection.  Form.
12  Objection.  Form.  Go ahead."
13         And then the witness says:  "Had he
14  recognized there was a rear naked choke or an LV, had
15  he recognized the rear naked choke, yes."
16         Did you testify that way in your prior
17  deposition?
18    A.  I believe it was, yeah, by policy.  He
19  should have stopped it.
20    Q.  And then going to page 59, you were asked,
21  "And if Officer Tran had known there was a rear naked
22  choke being applied, he should have stopped it,
23  intervened.  Objection.  Form."
24         And then what was your answer?
25    A.  "Yes."

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

35  (Pages 134 to 137)

Page 134

1    Q.  And then the next question says, "And if
2  Officer Flores knew a rear naked choke was being
3  applied, he should have intervened.  Same objection."
4       And then what was your answer?
5    A.  "Yes."
6    Q.  Now, we've talked a little bit about just
7  accepting an officer's statement as true when they
8  say it's based on their perception.
9       Do you recall that testimony?
10   A.  Yes, I do.
11   Q.  And I'm assuming they don't provide mind
12  reading training at Metro yet, correct?
13      MR. ANDERSON:  Objection.  Form.
14      THE WITNESS:  No.
15  BY MR. LAGOMARSINO:
16   Q.  So if an officer is telling you that
17  something was done based on their perception but
18  they're lying, and you don't know they're lying, then
19  you just have to accept it as the truth, correct?
20   A.  Yes.
21   Q.  And that's pursuant to policy, correct?
22      MR. ANDERSON:  Objection.  Form.
23      THE WITNESS:  Yeah.
24  BY MR. LAGOMARSINO:
25   Q.  Going to page 69.  I apologize, going to

Page 135

1  page 68.  It says -- line 6, it says, "Okay.  Turn
2  over to the next page, please.  It says Officer
3  Lopera told Officer Flores in the ride back what
4  happened.  During the conversation he stated I
5  started wailing on the dude, then I rear mounted and
6  choked him out."
7       And do you take that as it could be either
8  LVNR or a rear naked choke, that particular quote?
9    A.  Yes.
10   Q.  When Lopera said apparently at 9:34 the
11  body camera and it's referred to here in the
12  transcript, that "I started punching him rear
13  naked -- rear naked at his ass.  He went out."
14      Do you take that to mean a rear naked
15  choke?
16   A.  Yes.
17   Q.  Who helped you formulate your conclusions
18  in your report?
19   A.  We -- the CIRT team, and then our meeting
20  with SMEs.
21   Q.  Did you initially ever have a conclusion
22  that Crumrine, Tran or Flores did not properly
23  intervene?
24   A.  No.
25   Q.  Did anybody tell you to make that

Page 136

1  conclusion?
2    A.  No.
3    Q.  Did Officer Bland ever tell you whether he
4  had the opinion that an LVNR was used or a rear naked
5  choke?
6    A.  Based on the hand placement, I believe it
7  was a -- he believed it to be a rear naked choke of
8  that non-encircling arm.
9    Q.  He told you that?
10   A.  It was, yeah, part of the discussion that
11  we had with everyone.
12   Q.  Do witnesses to an incident change their
13  story from time to time?  Let me rephrase.
14      Did witnesses in this case change their
15  story about what happened?
16   A.  No.
17   Q.  Did you ever undertake an assessment to
18  determine whether people were giving inconsistent
19  statements?
20   A.  No.  I don't know how I would do that.
21   Q.  Or did you compare prior statements to
22  current statements?
23   A.  Some of the witness officers had gave FIT
24  statements which we reviewed.
25   Q.  Did you make any comparisons between what

Page 137

1  they were telling you in the FIT and what they were
2  telling you in the CIRT?
3    A.  We looked over their FIT report.  And if we
4  had questions, we would clarify in our interview.
5    Q.  And after that interview did you compare
6  the statements of both?  Or let me ask a better
7  question.
8       Did you comment on any inconsistent
9  statements in the report that you submitted to CIRT?
10   A.  One we had with Officer Lif, I believe in
11  her FIT statement she had said something in reference
12  of foot pursuit, and then we clarified that in CIRT.
13  And that's when she stated she did not perceive a
14  foot pursuit had occurred.
15   Q.  If a subject is in a LVNR not handcuffed
16  but they're not moving or resisting, are you supposed
17  to release the LVNR?
18   A.  You can release it, but it's a controlling
19  technique to leave the arm encircling.  That will
20  assist with your arriving officer to help take that
21  person into custody or put two cuffs around their
22  wrists.
23   Q.  Did Tran ever see Farmer move or resist?
24   A.  In his statement he provided to us, I don't
25  believe he did.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

36  (Pages 138 to 141)

## Page 138

1    Q.  As part of your investigation, did you make
2  an assessment as to when Tashi first became
3  unconscious?
4    A.  No, because I don't know when he first
5  became unconscious.
6    Q.  As part of your investigation, did you make
7  an assessment as to what role the Taser may have
8  played in causing his cardiac arrest?
9    A.  That would be something that FIT would
10  follow up with the coroner's office.
11    Q.  Are you generally aware of Bryan Yant's
12  history in terms of officer-involved shootings?
13    A.  I am.
14    Q.  And what are you aware of?
15    A.  He was involved in a shooting where he shot
16  an individual in the bathroom.
17    Q.  Do you know of any other shootings?
18    A.  No.
19    Q.  Were you aware that he was involved in two
20  prior shootings of unarmed individuals?
21    A.  I know he was involved in a prior shooting.
22  I didn't know how many.
23    Q.  And the prior shooting you're referring to
24  is the Trevon Cole case?
25    A.  Yeah.  With the bathtub, yeah.

## Page 139

1    Q.  Do you know him personally?
2    A.  No.  Well, I take that back.  He comes in
3  to rep the officers quite a bit so I know him on a
4  personal level where I could recognize him and say
5  hi, but outside of work I don't know him.
6    Q.  Okay, fair enough.  Are you on any -- I
7  won't ask you your handles, but are you on any social
8  media applications?
9    A.  I am not.
10    Q.  Do you know what policy changes resulted as
11  a result of your investigation?
12    Q.  For Lopera?
13    Q.  Yes.
14    A.  We had the LVNR change, the body-worn
15  camera policy change.  I want to say something with
16  the radios because there was analysis that was done
17  with officers having communication problems with --
18  being within a large hotel.
19    Q.  Okay.
20    A.  I want to say they did some kind of -- I
21  want to say they put more routers in.  It wasn't
22  necessarily a policy change but something we looked
23  at.
24    Q.  Okay.
25    A.  That's all I can recall right now.

## Page 140

1    Q.  Were you ever promised by anybody that your
2  investigation in this case would remain completely
3  confidential?
4    A.  Completely confidential?
5    Q.  Yeah.
6    A.  No.
7    Q.  Did you ever promise any witnesses that
8  their statements would be completely confidential?
9    A.  No, because in Garity it tells them that
10  their witness statements can be used against Officer
11  Lopera in the court.
12    Q.  Okay.  Were you part of the deliberation
13  process by the board as to whether any policies were
14  violated?
15    A.  No.  I was not.
16    Q.  Have you ever heard of something called the
17  deliberative -- deliberate process privilege?
18    A.  No.
19    Q.  Did you make a conclusion that Tashi was
20  trying to carjack a passing vehicle?
21    A.  Did I make a conclusion?
22    Q.  Yeah.
23    A.  No.  That was part of Officer Lopera's
24  perception and the reason he engaged -- or I'm
25  sorry -- the reason that he decided to deploy his

## Page 141

1  ECD.
2    Q.  But did you make a positive or negative
3  conclusion on that issue?
4    A.  Oh, no.
5    Q.  Is there any difference in your view of a
6  neck restraint and a chokehold, the two terms?
7    A.  Hand placement and what the training with
8  LVMPD has taught us.
9    Q.  Did all the officers stop using force the
10  moment the handcuffing was complete?
11    A.  Yes.
12    Q.  I know we had some discussion about CPR,
13  but was CPR done in this case?
14    A.  Yes, it was.
15    Q.  By who?
16    A.  I want to say it was Officer Kravetz and
17  possibly his train -- his trainee, which was a female
18  officer.  I can't remember her name, Vontagen
19  possibly.  And then another officer started CPR, so I
20  think maybe three or four total.  They kind of
21  switched off.
22    Q.  And your definition of CPR, does that
23  include mouth-to-mouth resuscitation?
24    A.  Yes and no.  It's an option, but I believe
25  that we are actually trained not to do mouth to mouth

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

37 (Pages 142 to 145)

Page 142

1  or touch any subjects while on the course of a duty.
2      Q.  You're trained not to do it?
3      A.  Not necessarily trained because we're not
4  trained on CPR, but it's kind of a stance that most
5  officers take.
6      Q.  Was mouth to mouth used in this case?
7      A.  I don't believe it was.
8      Q.  Okay.  Did you draw any conclusions as to
9  the cause of death?
10     A.  No, I did not.
11     Q.  Did you present any autopsy photos at all
12 to the CIRT board?
13     A.  We presented one that showed the swelling
14 under the decedent's -- one of his eyes.  I don't
15 remember which one it was.
16     Q.  When you were working in the CIRT -- is it
17 a department or --
18     A.  Bureau.
19     Q.  Bureau.  You were a full-time employee,
20 correct?
21     A.  Yes.
22     Q.  And did you dedicate all your time to
23 working on CIRT at the time?
24     A.  Yes.
25     Q.  Did you personally provide recommendations

Page 143

1  for policy changes?
2      A.  No.  That was part of a group discussion.
3  But I was part of those discussions.
4      Q.  In your report that you gave to the board,
5  did you personally provide recommendations for policy
6  changes ahead of the hearing?
7      A.  Oh, no.
8      Q.  In your view, what's the purpose of CIRT?
9      A.  It's to make our department safer.
10 Maximize safety.  Minimize the risk.
11     Q.  What's the purpose of a public safety
12 statement?
13     A.  That is to help FIT start to gather
14 evidence if we have -- so if we know how many rounds
15 were fired, we can start looking to see if there's
16 any other -- potential other victims, where we need
17 to start closing in our crime scene.  Just the very
18 general idea of what we're looking at.
19     Q.  Okay.  Do you know when CIRT was first
20 notified of this incident?
21     A.  I wasn't a communicator because I wasn't an
22 OIS.  I want to say this occurred -- I believe it was
23 within 45 minutes, I believe.
24     Q.  Of?
25     A.  Of the -- I'm trying to think if it was

Page 144

1  when they got notification that he was being
2  transported over to UMC -- did he even go to UMC?  I
3  think he went to UMC.
4      Q.  To the hospital?
5      A.  Yeah.  To the hospital.  I'll have to look
6  at my report but I remember when the -- he was in
7  critical, I believe that's when we got the
8  notification.
9      Q.  Did anybody from CIRT go to the scene of
10 the incident?
11     A.  Yes.  I believe it was Greg Watkins, Kyle
12 Ward, Lieutenant Dan Bledsoe and someone else.  I
13 can't remember.
14     Q.  Was there an initial briefing that occurred
15 after the incident with respect to CIRT?
16     A.  On scene?
17     Q.  Anywhere.
18     A.  There was one on scene.  I was not a part
19 of that one.  But afterwards, we all got together.  I
20 believe it was the next working day we all got
21 together and discussed, okay, this is what we have
22 and went over body cam and surveillance.
23     Q.  Did anybody from CIRT do a walk-through of
24 the scene, to your knowledge?
25     A.  No.  Because the -- the attorney had

Page 145

1  stopped the questioning, the PSS with Officer Lopera.
2  And I believe -- I believe actually Greg Watkins did
3  a quick walk-through but not a full walk-through of
4  each time and -- each movement of Officer Lopera.
5  Just kind of a stand back and just see the crime
6  scene.
7      Q.  Do you know why FIT walk-throughs are not
8  recorded?
9      A.  It has something to do with the criminal
10 investigation because they're voluntary at the time,
11 I believe.
12     Q.  And CIRT did not participate in the same
13 walk-through procedure that FIT did, correct?
14     A.  Correct.  It's a different procedure.
15     Q.  In your report to the CIRT board, did you
16 perform an evaluation of -- strike that.
17         Did you evaluate the application of
18 training?
19     A.  As far as?
20     Q.  Lopera's actions.
21     A.  Whether they're within training?
22     Q.  Yeah.
23     A.  Yeah, that's -- yes.  And we had a named
24 inclusion for excessive use of force that was outside
25 training and policy.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

38 (Pages 146 to 149)

Page 146

1  Q. And did you make any recommendation in the
2  CIRT report as to what internal rules or practices
3  would be required?
4  A. No. I'm sorry, I don't know if I fully
5  understand that question.
6  Q. I'll skip it.
7  A. Okay.
8  Q. Lopera, did he give a FIT statement?
9  A. He did not.
10 Q. Does CIRT share their witness statements
11 with FIT?
12 A. No, unless they're requested through the
13 District Attorney's office.
14 Q. So if the DA asks for the CIRT statements,
15 they are provided to the DA?
16 A. Yeah. There's a process they go through,
17 but in the long run, yes.
18 Q. Were you ever guaranteed by anybody that
19 the CIRT report would not be disseminated?
20 A. No.
21 Q. I'm assuming you've been, based on your
22 testimony today, you've been trained on various
23 constitutional amendments, correct?
24 A. Yeah.
25 Q. Have you ever been trained on the 14th

Page 147

1  Amendment, due process right to familial relations?
2  A. No.
3  Q. Have you ever been trained on supervisor
4  liability in the constitutional rights context?
5  A. Not in constitutional, no.
6  Q. Have you ever heard of a Monell claim?
7  A. No.
8  Q. Is it your understanding that Lopera was
9  allowed to retire?
10 MR. McNUTT: Objection. Form.
11 THE WITNESS: It was my understanding it
12 was a medical retirement.
13 BY MR. LAGOMARSINO:
14 Q. And do you have an understanding of what
15 his medical condition was that he was allowed to
16 retire from?
17 A. I do not.
18 Q. Is it fair to say that the deliberations
19 arising out of this incident took place after you
20 issued the CIRT report?
21 A. Yes.
22 Q. Do you know whether this CIRT report has
23 been released in this case?
24 A. I don't believe it has, but I don't know.
25 Q. Okay. If it ultimately gets approved to be

Page 148

1  released by the judge, would you continue to be
2  honest and independent in your discussion in future
3  cases if you're the subject of a CIRT investigation?
4  A. Yes.
5  Q. If you later, through some unfortunate
6  event become the subject of a CIRT team
7  investigation, would you be irreparably damaged by
8  releasing the report in this case?
9  MR. ANDERSON: Objection. Form.
10 THE WITNESS: No.
11 MR. LAGOMARSINO: All right. I think I'm
12 going to have about another half hour. Why don't we
13 take a quick break and it will help me go through
14 some of my questions and eliminate them. So let's
15 take ten minutes or five minutes.
16 THE VIDEOGRAPHER: The time is
17 approximately 3:14 p.m. We're going off the record.
18 (A recess was taken from 3:14 to
19 3:20 p.m.)
20 THE VIDEOGRAPHER: The time is
21 approximately 3:20 p.m. We are back on the record.
22 BY MR. LAGOMARSINO:
23 Q. All right. Did Lopera ever express, to
24 your knowledge, that he was scared of Tashi Farmer?
25 MR. McNUTT: Objection. Form. If that was

Page 149

1  a statement made during the CIRT process, I'll
2  instruct the witness not to answer.
3  THE WITNESS: It was.
4  MR. LAGOMARSINO: Okay. Did -- so we'll
5  follow the same procedure. I'm assuming if the judge
6  orders the transcript to be produced, that will
7  probably answer itself.
8  MR. ANDERSON: You don't need to ask her
9  yet. You'll have the answer.
10 MR. McNUTT: You don't need to ask her.
11 BY MR. LAGOMARSINO:
12 Q. Did Flores ever express that he was scared
13 of Tashi Farmer?
14 A. I don't think so, but I don't recall. It
15 was in his statement.
16 Q. Did Tran ever express that he was scared of
17 Tashi Farmer?
18 A. I don't believe so.
19 Q. Did Crumrine ever express that he was
20 scared of Tashi Farmer?
21 A. Again, with Officer Flores, I don't recall.
22 Q. Other than what's contained in the reports,
23 do you have any independent recollection of them
24 expressing that they were scared of Tashi Farmer?
25 A. No.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

39 (Pages 150 to 153)

## Page 150

1   Q.  Did you ever draw a conclusion based on
2  your review of all the evidence that Lopera was
3  scared of Tashi Farmer?
4       MR. ANDERSON:  Objection.  Form.
5       THE WITNESS:  No conclusion.
6  BY MR. LAGOMARSINO:
7   Q.  Same question with regard to Flores, Tran
8  or Crumrine, did you draw a conclusion that they were
9  scared of Tashi Farmer?
10       MR. ANDERSON:  Objection.  Form.
11       THE WITNESS:  No.
12  BY MR. LAGOMARSINO:
13   Q.  Did you draw a conclusion that Lopera
14  expressed that he was in fear for his life?
15   A.  Not a conclusion, no.
16   Q.  Did Lopera express that he was in fear for
17  his life?
18       MR. McNUTT:  Objection.  I'll instruct the
19  witness not to answer.
20  BY MR. LAGOMARSINO:
21   Q.  Did Flores, Tran or Crumrine ever express
22  that they were in fear for their own lives?
23   A.  Not to my recollection, no.
24   Q.  Did Lopera ever say that he overreacted?
25       MR. McNUTT:  Objection.  Form.  I'll

## Page 151

1  instruct the witness not to answer if that was a
2  statement made by Officer Lopera in the CIRT process.
3       MR. LAGOMARSINO:  I think that instruction
4  has to come from --
5       MR. McNUTT:  It's my privilege.
6       MR. LAGOMARSINO:  That's a privilege, but
7  it's up for debate.
8  BY MR. LAGOMARSINO:
9   Q.  Did Metro ever make a finding that Lopera
10  overreacted?
11   A.  Not that he overreacted but it was
12  excessive use of force.
13   Q.  Did Metro ever make a finding that Tran,
14  Crumrine or Flores overreacted?
15   A.  No.
16   Q.  Do you have any knowledge of any Metro
17  officers ever arresting innocent people?
18       MR. ANDERSON:  Are you saying without,
19  like, probable cause or arrest innocent people?
20       MR. LAGOMARSINO:  That's not what I asked.
21  BY MR. LAGOMARSINO:
22   Q.  So my question is do you ever have any
23  knowledge of any Metro officer ever arresting
24  somebody who turned out to be innocent?
25   A.  That turned out to be innocent?

## Page 152

1   Q.  Yes.
2   A.  Yes.
3   Q.  How many times?
4   A.  Just a handful.
5   Q.  Have you ever personally had a
6  life-threatening encounter with a citizen?
7   A.  In the course of my duties as an officer?
8   Q.  Yes.
9   A.  Yes.
10   Q.  How many occasions?
11   A.  Once.
12   Q.  Tell me about that incident.
13   A.  It was a road rage incident where a suspect
14  was armed with a handgun.  We ended up locating that
15  suspect outside of a house and he had the handgun
16  behind his back.
17   Q.  Did he ever point the handgun at you?
18   A.  Not at me, no.
19   Q.  Did you see the autopsy photos?
20   A.  Yes.
21   Q.  Did you see all of them?
22   A.  Yes.
23   Q.  After he was killed, Tashi Farmer's organs
24  were removed, correct?
25   A.  Oh, I don't know.

## Page 153

1   Q.  Did you see pictures of his brain?
2   A.  No.
3   Q.  Did you see pictures of his skin peeled
4  back?
5   A.  For his head?
6   Q.  Yes.
7   A.  No.
8   Q.  And his skin peeled back?
9   A.  No.
10   Q.  Do you believe that such pictures exist or
11  do you not know?
12   A.  I don't know.
13   Q.  As part of your investigation, did you
14  interview any family members of Tashi?
15   A.  No.
16   Q.  As part of your investigation, did you
17  secure the contents of his telephone?
18   A.  No.
19   Q.  Do you know if Metro secured the contents
20  of his telephone?
21   A.  I don't know.
22   Q.  Would the contents of his telephone be
23  relevant to your investigation?
24   A.  Possibly to FIT's investigation and
25  potentially mine.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Page 154

1    Q.  And how so?
2    A.  I think there was a question about him
3  being chased across the boulevard.
4    Q.  Besides that?
5    A.  No.
6    Q.  Do the victims have any say in your
7  investigation?
8    A.  "Victims" meaning?
9    Q.  Tashi's relatives.
10   A.  No.
11   Q.  Do they have any say in the FIT
12  investigation?
13   A.  No.
14   Q.  Are either the FIT or the CIRT
15  investigations, to your knowledge, conducted for the
16  purpose of delivering justice to the family members?
17      MR. ANDERSON:  Objection.  Form.
18      THE WITNESS:  I'm sorry, can you say that
19  one more time?
20  BY MR. LAGOMARSINO:
21   Q.  Sure.  Was your investigation conducted for
22  the purpose of delivering justice to the family
23  members?
24   A.  My -- no.  My investigation was not.
25

Page 155

1    Q.  Your investigation was conducted for the
2  purpose of Metro's interests, correct?
3    A.  Betterment of the department, yes.
4    Q.  Did CIRT ever do an investigation of the
5  psychological profiles generated during the hiring
6  process of the officers involved?
7    A.  Do they do a psych -- psych eval on the
8  officers?
9    Q.  No.  When you're hired, does a psych eval
10  happen?
11   A.  I believe so.  It still does, yeah.
12   Q.  And did you look at the psych evals of the
13  officers?
14   A.  No.
15   Q.  And CIRT doesn't do a psych eval, correct?
16   A.  No.  We do not.
17   Q.  Did you become aware during your
18  investigation that Lopera was a competitive jiu jitsu
19  fighter?
20      MR. McNUTT:  Objection.  Form.
21      THE WITNESS:  Yes, in my investigation I
22  did learn that.
23  BY MR. LAGOMARSINO:
24   Q.  How did you learn that?
25   A.  It was when we interviewed him.

Page 156

1    Q.  Okay.  Do you have any role in the hiring
2  process?
3    A.  No.
4    Q.  Have you ever had any role?
5    A.  No.
6    Q.  Were there standard safety practices that
7  were not applied in this case?
8    A.  I don't recall.
9    Q.  Was Lopera attempting to arrest Farmer?
10   A.  In his statement to us?
11      MR. McNUTT:  I'm sorry, say again.  Are you
12  asking about Lopera's statement?
13      MR. LAGOMARSINO:  I said, "Was Lopera
14  attempting to arrest Farmer?"
15      THE WITNESS:  And that was something that
16  was based off of his statement.
17      MR. McNUTT:  In her opinion or --
18  BY MR. LAGOMARSINO:
19   Q.  Did you draw a conclusion that Lopera was
20  trying to arrest Farmer?
21   A.  Yes.
22   Q.  And did you draw a conclusion as to what
23  Lopera was trying to arrest Farmer for?
24   A.  Again, that was in his statement.
25   Q.  So was the only basis for any conclusion

Page 157

1  you might have based on his statement?
2    A.  On his perception.
3      MR. McNUTT:  And if the answer is yes, then
4  I'll instruct you not to answer.
5      But just to be clear, if you have other
6  information, I have no objection.
7      THE WITNESS:  It was all based off of
8  Officer Lopera's statement to CIRT.
9  BY MR. LAGOMARSINO:
10   Q.  Did Officer Lopera make any statements
11  other than CIRT as to why he was trying to apprehend
12  Farmer?
13   A.  I believe in one body camera clip from
14  Officer Lopera he is explaining to someone.
15   Q.  Would you agree that Farmer was essentially
16  unarmed?
17   A.  Yes.
18   Q.  And that Farmer was basically powerless in
19  this situation?
20      MR. ANDERSON:  Objection.  Form.
21      MR. McNUTT:  Form.
22      THE WITNESS:  Do I believe that he was
23  powerless in this situation?
24  BY MR. LAGOMARSINO:
25   Q.  Yeah.  Well, after he was placed in the

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

41 (Pages 158 to 161)

Page 158

1 LVNR, was Farmer powerless?
2     MR. McNUTT: Objection. Form.
3     THE WITNESS: I think to the point he was
4 rendered unconscious, he was powerless.
5 BY MR. LAGOMARSINO:
6     Q. What power did he have?
7     A. Well, again not being there, based on the
8 officer's perception that he was -- Sergeant Crumrine
9 had tried to put his arm in a handcuff but he pulled
10 away. Again, some of this is captured on video
11 surveillance, some on body camera, but I was not
12 there.
13     Q. So basically the power to pull away?
14     A. Pull away. Fight. Again, I wasn't there.
15     Q. Was he fighting?
16     A. I don't know.
17     Q. Did you draw a conclusion as to whether
18 Farmer's constitutional rights were violated?
19     A. No.
20     Q. You made a conclusion that they weren't or
21 that you just didn't make any conclusion?
22     A. There's no conclusion on his constitutional
23 rights.
24     Q. Did you undertake any investigation to
25 determine whether LVNRs -- strike that.

Page 159

1     Did you make any assessment as to whether
2 Metro's LVNR policy is constitutional?
3     A. Did I make the assessment, no.
4     Q. Have you heard if an assessment has been
5 made?
6     A. As a result of this case, I believe they
7 went back and reviewed some of the tactics and
8 policies on it, but I don't know.
9     Q. Were you aware of other cases before this
10 case where people were injured after having LVNR
11 applied to them?
12     A. Yes, but I don't remember specifically
13 which cases.
14     Q. Lopera didn't have a warrant to arrest
15 Farmer, correct?
16     A. No.
17     Q. A training could be implemented to prevent
18 this from happening again?
19     MR. ANDERSON: Objection. Form.
20     MR. McNUTT: Form.
21     THE WITNESS: Could a training be
22 implemented?
23 BY MR. LAGOMARSINO:
24     Q. Yeah.
25     A. Yeah. There was some training that was put

Page 160

1 out across the department in reference the use of
2 LVNR.
3     Q. Anything else?
4     A. For defense tactics, which we go through
5 every quarter, it was a refresher on the LVNR. And
6 it was very specific on the use of the LVNR, the
7 application of the LVNR and reviving techniques.
8     Q. And what reviving techniques were
9 implemented as a result?
10     A. The palm strikes, and then placing the
11 subject in a seated position or on a side position,
12 recovery position so that they're able to breathe.
13     Q. Did that exist before this incident?
14     A. It did, yes.
15     Q. Were there any new --
16     A. Oh, no. Just the policy of the LVNR have
17 now been moved into our use of force model.
18     Q. Do you have any other suggestions on
19 training that's not currently in place?
20     A. No.
21     Q. Are you familiar with the concept of
22 education enforcement to prevent wrongdoing?
23     A. I'm not familiar with that, no.
24     Q. How many times was Tashi tasered?
25     A. Officer Lopera's countdown revealed seven

Page 161

1 times the trigger was pulled.
2     Q. And how many times was he struck in the
3 head?
4     A. Struck in the head?
5     Q. Yes.
6     A. Talking about hand strikes?
7     Q. Yes.
8     A. I believe it was approximately 12 to 15
9 times.
10     Q. And after that, Lopera put him in an LVNR,
11 correct?
12     A. Yes.
13     Q. Or some kind of neck restraint, correct?
14     A. Correct.
15     Q. How long was he in that hold?
16     A. I believe it was a minute and 14 seconds.
17     Q. After he was released from the LVNR, did
18 you witness officers walking around and not showing
19 any concern about Tashi?
20     MR. ANDERSON: Objection. Form.
21     THE WITNESS: No. There was officers who
22 were on the scene trying to set up ingress and egress
23 for medical. I had officers start with CPR
24 immediately. They went to the scene of security and
25 they asked for a defibrillator knowing that there's

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

42 (Pages 162 to 165)

| Page 162 |
|---|

1   one on property.  And they started to get the scene
2   shut down.
3   BY MR. LAGOMARSINO:
4       Q.  How do you define "immediately"?
5       A.  As soon as officers got up on scene, Tran,
6   Officer Tran, once he was taken into custody,
7   immediately sets up Farmer, does reviving palm
8   strikes, checks his pulse several times.  They take
9   him out of handcuffs to help with breathing.  And
10  that's when I believe CPR was started, when Officer
11  Kravetz, Amburgey and Vontagen...
12      Q.  When you say immediately, are you saying
13  like within five seconds?
14      A.  For Officer Tran, when he set up Farmer, it
15  was almost immediate.  They saw that he was at that
16  time -- I believe his statement says that his eyes
17  were closed and they sat him up in a seated position
18  and delivered palm strikes.
19      Q.  Did you witness police officers on the
20  scene in the body cam footage making jokes?
21      A.  No jokes.
22      Q.  Did you witness officers in the body cam
23  footage laughing?
24      A.  No, not laughing.
25      Q.  Would laughing and joking around the scene

| Page 163 |
|---|

1   of an incident like this be proper police routine?
2           MR. ANDERSON:  Objection.  Form.
3           THE WITNESS:  No.
4   BY MR. LAGOMARSINO:
5       Q.  Did Crumrine, Tran or Flores in their
6   statements express remorse?
7           MR. ANDERSON:  Objection.  Form.
8           THE WITNESS:  I don't recall.
9   BY MR. LAGOMARSINO:
10      Q.  Did Lopera express remorse?
11          MR. McNUTT:  Objection.  Instruct the
12  witness not to answer if it came from the CIRT
13  process.
14  BY MR. LAGOMARSINO:
15      Q.  Have you seen anything from any officer in
16  this case expressing even a twinge of guilt about
17  what happened?
18          MR. ANDERSON:  Objection.  Form.
19          THE WITNESS:  Yes.
20  BY MR. LAGOMARSINO:
21      Q.  Who?
22      A.  All the officers involved.
23      Q.  And are you saying that's in their
24  statements?
25      A.  No.  Just the questions that they had after

| Page 164 |
|---|

1   the fact.  Off record conversations with the -- with
2   the witness officers.
3       Q.  Do you recall specifically what they said?
4       A.  They asked about how he -- how Tashi had
5   died.  They asked about the process of CIRT, and we
6   told them that we're going -- obviously we're going
7   to break down everything critically and look at this.
8           They wanted to know -- I think one actually
9   asked if he had kids.  I don't remember which one.  I
10  think it was Tran, I believe, that actually asked
11  that.  But it was not recorded in their statements.
12  This is all offline conversations.
13      Q.  Okay.  Has, to your knowledge, any single
14  person from Metro offered as much as an apology to
15  anybody from Tashi's family?
16      A.  I don't know.  I believe FIT had a very
17  close -- was in contact with, I believe, his wife or
18  his mother, I want to say, after the incident.  And I
19  know they did some interviews with the family,
20  reference their part of the investigation.  And
21  that's normally where they get their kind of idea of
22  who Tashi Farmer is.
23      Q.  But you don't know if they offered an
24  apology?
25      A.  I don't know.

| Page 165 |
|---|

1       Q.  To your knowledge, was Tran, Crumrine or
2   Flores disciplined?
3       A.  I don't know.  I'm not privy to the
4   discipline process.
5           I take that back.  I know Crumrine was
6   because I'm going through a separate...
7       Q.  How do you know Crumrine was?
8       A.  Because I have been called as a witness in
9   a separate civil investigation.
10      Q.  Have you ever heard of any Metro officer
11  in any situation ever being punished for lying in
12  court?
13      A.  For lying in court?
14      Q.  Yes.
15      A.  Yes.
16      Q.  Who was that?
17      A.  I can't -- I can't remember the officer.  I
18  believe it was Officer George Smith, I want to say.
19      Q.  Okay.  And what was that situation?
20      A.  I don't know -- I don't know the ins and
21  outs or the details of the case, just that he had
22  lied on the stand and he was placed on some -- I
23  believe it's called a Brady list.
24      Q.  Was he fired?
25      A.  No.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

43 (Pages 166 to 169)

Page 166

1  Q.  Have you ever heard of the word
2  "test-a-lying"?
3  A.  I don't know.
4  Q.  In your opinion, based on all the evidence
5  you've reviewed, whose life did Tashi Farmer threaten
6  in this entire situation?
7  A.  I don't know.
8  Q.  In your view, is there any injustice in the
9  killing of Tashi Farmer?
10  MR. ANDERSON:  Objection. Form.
11  THE WITNESS:  Is there any justice?
12  BY MR. LAGOMARSINO:
13  Q.  Injustice.
14  A.  We have the conclusion of excessive use of
15  force.
16  Q.  Personally, was Lopera's conduct shocking
17  to you personally?
18  MR. ANDERSON:  Objection. Form.
19  MR. McNUTT:  Join.
20  MR. ANDERSON:  Go ahead.
21  THE WITNESS:  In the form of shock of
22  conscience?
23  BY MR. LAGOMARSINO:
24  Q.  Yeah.
25  A.  No, but it was egregious.

Page 167

1  Q.  So you're not shocked?
2  A.  I mean, I deal with officer-involved
3  shootings.
4  Q.  Is that because you're desensitized?
5  A.  Probably.
6  Q.  What happens with respect to discipline at
7  Metro when the police restrain an unarmed man so
8  another officer can choke him to death?
9  MR. ANDERSON:  Objection. Form.
10  THE WITNESS:  What's --
11  BY MR. LAGOMARSINO:
12  Q.  Well, let's rephrase.
13  Tashi was unarmed.
14  A.  Uh-huh.
15  Q.  And he was restrained by Lopera -- or
16  strike that.
17  Tashi was restrained by Crumrine, Tran and
18  Flores, correct?
19  MR. ANDERSON:  Objection. Form.
20  THE WITNESS:  Yes.
21  BY MR. LAGOMARSINO:
22  Q.  And he was choked to death, right?
23  MR. ANDERSON:  Objection. Form.
24  THE WITNESS:  Actually, as far as I know,
25  there's been four coroners ruling and two have said

Page 168

1  that he died of asphyxia and two have said that he
2  died of a heart attack.
3  BY MR. LAGOMARSINO:
4  Q.  How is a heart attack caused, in your view?
5  A.  I have no idea. I'm sorry.  One said
6  asphyxia, three said heart attack, I believe.
7  Q.  And that was the coroner, in your view?
8  A.  The -- our Clark County coroner ruled Tashi
9  had died of police asphyxia and then three separate
10  coroners did investigations.
11  Q.  And who were those coroners?
12  A.  I don't know.
13  Q.  Are you talking about Force Science?
14  A.  No.
15  Q.  Okay.  Where did you learn that?
16  A.  Through the FIT investigation and then kind
17  of through this process as well.
18  Q.  Were they Nevada coroners?
19  A.  I don't know.  Or the Clark County was the
20  Nevada one, but the other three I don't know.
21  Q.  Did Crumrine, Tran or Flores ever provide
22  to you any kind of moral justification for their
23  conduct?
24  MR. ANDERSON:  Objection. Form.
25  THE WITNESS:  I believe Sergeant

Page 169

1  Crumrine -- actually he might --
2  In their after-action questions that we
3  asked, Sergeant Crumrine, I believe, had made a
4  statement that he essentially kept saying, "I messed
5  up, I messed up."
6  BY MR. LAGOMARSINO:
7  Q.  But did he justify his conduct morally?
8  A.  I don't recall.
9  Q.  Have you ever heard at Metro -- I'm just
10  talking in general and talking about some culture
11  here now -- any officers in your entire history with
12  Metro say, well, if he wasn't guilty of doing this
13  crime, he was guilty of doing something else?
14  A.  No.
15  Q.  Have you ever heard Metro officers refer to
16  it being a war out there?
17  A.  Yes.  And that was during the 1 October
18  when we had to do our investigation into that.
19  Q.  Any other incidences?
20  A.  No.  If you're talking in general working
21  day to day, no.
22  Q.  In your experience with the Justice
23  Department and cops, is it fair to say that Metro has
24  a history of killing unarmed citizens?
25  MR. ANDERSON:  Objection. Form.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

44 (Pages 170 to 173)

Page 170

1    THE WITNESS: Actually, from the years 2011
2  through 2014, we had no mistake of fact shootings,
3  every subject was armed.
4  BY MR. LAGOMARSINO:
5    Q.  I'm not talking about just shootings.
6  Killings?
7    A.  I don't know.
8    Q.  Has a Metro officer ever killed anybody in
9  jail since 2010?
10   A.  Yes.
11   Q.  How many do you know about?
12   A.  I know about three or four of them.
13   Q.  And were any of those choke cases?
14   A.  I believe two of them were, yes.
15   Q.  And who did those involve?
16   A.  I don't know.
17   Q.  And just for foundational purposes, Metro
18  officers are employed in jails, correct?
19   A.  Yes.
20   Q.  At the CCSD?
21   A.  Metro employees encompasses corrections
22  officers and patrol officers.
23   Q.  Are Metro officers trained that everybody
24  could be a potential threat?
25   A.  Part of our fair and impartial policing

Page 171

1  course that we put together, officers are taught to
2  approach every incident with an open mind.
3    Q.  And in that open mind, could every person
4  be a potential threat?
5    A.  Potential.
6    Q.  And that would include potentially a little
7  old lady knitting a scarf on a bench, she could
8  potentially have a gun underneath that scarf?
9    A.  She could very well.
10   Q.  Is it important in general when policing to
11  have a people-friendly culture?
12   A.  Yes.
13   Q.  What aggression did Tashi Farmer display,
14  if any?
15   A.  Resistance being taken into custody.
16   Q.  What actions could Lopera have taken to
17  de-escalate the situation?
18   MR. ANDERSON: Objection. Form.
19   THE WITNESS: He could have got on the
20  radio, got more resources to his location. He could
21  have attempted verbally to de-escalate the situation.
22  Could have recognized the fact -- I mean, again,
23  based on what he had told us, he could have
24  recognized some Fourth Amendment.
25

Page 172

1  BY MR. LAGOMARSINO:
2    Q.  In your training, does Metro ever use
3  psychodrama or role-playing?
4    A.  We do scenario-based training, if that's
5  the same.
6    Q.  Is that role reversal training, or do you
7  know?
8    A.  I don't think it's role reversal, no.
9    Q.  Did you conclude in your evaluation that
10  Lopera was prone to aggression?
11   A.  No.
12   MR. LAGOMARSINO: I don't have any other
13  questions.
14   MR. ANDERSON: Do you want me to go?
15   MR. McNUTT: Doesn't matter.
16   MR. ANDERSON: I'll be quick.
17
18   EXAMINATION
19  BY MR. ANDERSON:
20   Q.  Hi, Detective Kirkegard. Does CIRT
21  investigate whether Las Vegas Metropolitan Police
22  Department policy and training was breached?
23   A.  Yes.
24   Q.  It does not make any opinions on whether --
25  any legal conclusions; is that fair?

Page 173

1    A.  Yes.
2    Q.  So any conclusions or findings you may have
3  are based solely upon the police department's policy
4  and training?
5    A.  Correct.
6    Q.  Now, you testified earlier and established
7  that an LVNR is the only neck restraint taught by the
8  police department, correct?
9    A.  Yes.
10   Q.  So if a neck restraint is used that is not
11  the LVNR, that would be outside of policy?
12   A.  Yes.
13   Q.  And an officer could be disciplined for
14  that action?
15   A.  Yes.
16   Q.  Is it possible that if someone used a neck
17  restraint that was not an LVNR, it could still be
18  reasonable under the circumstances?
19   A.  Yes. By policy.
20   Q.  So it could be reasonable under the law but
21  violating policy?
22   A.  Right.
23   Q.  Is that what you were kind of explaining
24  with Biesanszky, that he acted reasonably but that it
25  was outside the policy?

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

45 (Pages 174 to 177)

Page 174

1   A.  Correct.
2   Q.  Now, you were given a hypothetical in the
3   morning session of this deposition about the duty to
4   intervene.
5       When the officers arrived, did Sergeant
6   Crumrine give an order to Lopera to let him go?
7   A.  Yes.
8   Q.  In your training and experience, was
9   Officer Crumrine -- would it be reasonable for
10  Officer Crumrine to believe that Lopera had followed
11  that command, his order?
12  A.  I don't know.
13  Q.  Okay.  Is there any way that Crumrine could
14  tell, based upon your training and experience,
15  whether Lopera released pressure while keeping the
16  encircling arm around the neck?
17  A.  I don't know.
18  Q.  Have you ever been witness to an LVNR?
19  A.  Yes.
20  Q.  Can you tell how much pressure is being
21  applied?
22  A.  No.
23  Q.  If an officer ceases using an LVNR, is it
24  policy that they maintain the encircling arm until
25  handcuffing is effectuated?

Page 175

1   A.  It's a control technique that's used.
2   Q.  And it's your understanding or based upon
3   your investigation of this incident, that while
4   Officer Lopera had Mr. Farmer in some form of neck
5   restraint or his arms around the neck, that the other
6   three officers, Crumrine, Tran and Flores were
7   attempting to handcuff Farmer; is that correct?
8   A.  Yes.
9   Q.  And you've been asked questions about
10  whether the officers could have or should have
11  physically pried Lopera's arms off Farmer's neck,
12  correct?
13  A.  Yes.
14  Q.  Can you think of any scenario where an
15  officer would stop handcuffing an individual before
16  they're handcuffed to physically pull the arms off
17  someone's neck?
18  A.  No.  It's not what's trained.
19  Q.  They're trained that they would not
20  physically intervene until the handcuffing is
21  complete?
22  A.  Correct.
23  Q.  But despite that understanding, the
24  officers were giving Lopera verbal commands about his
25  use of the neck restraint?

Page 176

1   A.  Yes.
2   Q.  Are verbal commands a form of intervention?
3   A.  Yes.
4   Q.  And are officers entitled to believe that
5   other officers will follow their commands?
6   A.  I'm sorry, are they entitled?
7   Q.  Is it reasonable for an officer to assume
8   that their command is being followed?
9   A.  Yes.
10  Q.  Now, you -- there was a question posed to
11  you that the three -- this is just barely -- that the
12  three officers were restraining Farmer while Lopera
13  choked him out.
14      Do you remember that question?
15  A.  Yes.
16  Q.  For purposes of police work, when is
17  someone restrained?
18  A.  When they're placed in handcuffs.
19  Q.  Okay.  So would it be more accurate to say
20  that Tran, Crumrine and Flores were attempting to
21  restrain Farmer while the neck restraint was being
22  applied?
23  A.  Yes.
24  Q.  And again, you would not physically
25  intervene in a neck restraint until handcuffing was

Page 177

1   complete; is that fair?
2   A.  Correct.
3   Q.  Now, Crumrine, Tran and Flores were
4   investigated for failing to intervene?
5   A.  Yes, they were.
6   Q.  Okay.  And they were -- it was found that
7   they did, in fact, intervene?
8   A.  Yes.
9   Q.  And is that verbally and physically?
10  A.  Yes.
11  Q.  Attempting to handcuff a suspect, is that a
12  form of intervention of forces being used?
13  A.  Yes.
14  Q.  Okay.  Because the first thing you would
15  want to do is get the suspect handcuffed upon
16  arrival?
17  A.  Yes.
18  Q.  And that's basic police training?
19  A.  Yes.
20  Q.  Now, you were read into the -- into the
21  record the CIRT statement introductions of Crumrine,
22  Flores, Tran -- and Crumrine.  Crumrine, Flores,
23  Tran, their CIRT statement introductions were read,
24  correct?
25  A.  Yes.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

46 (Pages 178 to 181)

Page 178

1    Q.  And you were selectively read the portions
2  that you failed to activate your body-worn camera and
3  you failed to intervene while the application of the
4  LVNR was applied on the subject, correct?
5    A.  Yes.
6    Q.  Will you read the sentence preceding that.
7    A.  "It's alleged that you have violated the
8  following within LVMPD policies."
9    Q.  Okay.  So is -- what the -- the statement
10 that was read in by plaintiff's counsel was just
11 referring to the charges against them?
12   A.  Correct.
13   Q.  It was not a finding?
14   A.  No, it was not a finding.  Usually the
15 questions that we're going to ask them during their
16 interview.
17   Q.  So that was to put them on notice as to
18 what they were being investigated for?
19   A.  Correct.  And that's per NRS 289.
20   Q.  Now, all of Sergeant Crumrine's findings
21 that he fell below policy in training, they were
22 about his actions after Farmer was taken into
23 custody?
24   A.  Correct.
25   Q.  Okay.  So they were found that he didn't

Page 179

1  properly set up an incident command system?
2    A.  Yes.
3    Q.  And he didn't adequately manage the system?
4    A.  Correct.
5    Q.  But all that was post use of force?
6    A.  Yes.
7    Q.  Now, if -- if he had properly performed
8  those functions, would Mr. Farmer's outcome have been
9  different?
10   A.  No.
11   Q.  If the officers had turned on their
12 body-worn cameras, would the outcome have been
13 different?
14   A.  No.
15   Q.  Are you aware of any constitutional right
16 to have a body-worn camera?
17   A.  No.  Not constitutional.
18   Q.  That is all I have.  Thank you very much.
19
20       EXAMINATION
21 BY MR. McNUTT:
22   Q.  Detective Kirkegard, my name is Dan McNutt.
23 How are you?
24   A.  Good.  How are you?
25   Q.  Are you hearing me okay?

Page 180

1    A.  I am.
2    Q.  I've never -- I don't think I've ever asked
3  that in a deposition, no one ever has a problem, but
4  I'm a little -- I'm a little hoarse today.  I
5  apologize.
6    A.  No worries.
7    Q.  Is being under the influence of a
8  controlled substance a crime in the state of Nevada?
9    A.  Yes, it is.
10   Q.  Is resisting arrest a crime in the state of
11 Nevada?
12   A.  Yes, it is.
13   Q.  Is trespassing a crime in the state of
14 Nevada?
15   A.  Yes.
16   Q.  Is striking an officer a crime in the state
17 of Nevada?
18   A.  Yes.
19   Q.  Is carjacking a crime in the state of
20 Nevada?
21   A.  Yes.
22   Q.  Are you aware as to whether or not Tashi
23 Farmer was under the influence of a controlled
24 substance?
25   A.  Not until after the coroner autopsy

Page 181

1  toxicology came back.
2    Q.  Correct.  As you sit here today, are you
3  aware that Tashi Farmer was under the influence of a
4  controlled substance?
5    A.  Yes, I do.
6    Q.  Is it your opinion or do you have an
7  opinion as to whether or not being under the
8  influence of a controlled substance, being high on
9  drugs can be confused by someone interacting with
10 that individual with being mentally ill?
11   A.  Yes.
12   Q.  I'm sorry?
13   A.  Yes.
14   Q.  So if Officer Lopera perceived that Tashi
15 Farmer was under the influence of a controlled
16 substance, and Officer Lif perceived that Tashi
17 Farmer was mentally ill, those are just two different
18 perceptions, correct?
19   A.  Yes.
20   Q.  But in this case, Officer Lopera was
21 correct, wasn't he?
22   A.  Yes.
23       MR. LAGOMARSINO:  Objection.  If you're
24 going to be asking about what he said to her, then I
25 think you're opening --

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 182

1    MR. McNUTT: I'm not asking her what he
2 said.
3    MR. LAGOMARSINO: Okay.
4    MR. McNUTT: I'm asking her what the
5 factual --
6    MR. LAGOMARSINO: So you're asking
7 hypothetically if Officer Lopera thought this, is
8 what you're saying? I think the last question is if
9 Officer Lopera thought that or said this.
10    MR. McNUTT: That's not what I said. If
11 you would like me to ask that question, I will. But
12 that's not what I asked.
13    MR. LAGOMARSINO: No. So if you want to
14 open the door, sure, go ahead and ask the question,
15 but I believe you asked that question. Go ahead.
16    MR. McNUTT: Do you have any real
17 objections?
18    MR. LAGOMARSINO: Yeah. I just lodged
19 them.
20    MR. McNUTT: Okay. Then keep them to form.
21    MR. LAGOMARSINO: Like you have been the
22 whole deposition?
23    MR. McNUTT: I haven't made any objections
24 other than instructing the witness not to answer for
25 something that's under court order.

Page 183

1 BY MR. McNUTT:
2    Q.   Since being under the influence of a
3 controlled substance, resisting arrest, trespass,
4 striking an officer and carjacking are all crimes in
5 the state of Nevada, isn't it true that Tashi Farmer
6 could, in fact, have been charged with a crime after
7 this event?
8    A.   Yes.
9    Q.   Is it per Metro policy when you deploy the
10 LVNR to keep the encircling arm in place until
11 handcuffing is complete?
12    A.   The control technique?
13    Q.   Yes.
14    A.   Yes.
15    Q.   Even if there's no pressure being applied,
16 it's proper to have the encircling arm, which is
17 around the neck, in place, correct?
18    A.   Yes.
19    Q.   And isn't it true that as part of your
20 investigation, there was no determination as to
21 whether or not the technique employed by Officer
22 Lopera was a lateral vascular neck restraint or
23 anything else, correct?
24    A.   Correct.
25    Q.   Would your opinion regarding the technique

Page 184

1 employed by Officer Lopera be more informed on the
2 lateral vascular neck restraint than Sergeant
3 Michael Bland?
4    A.   Would my opinion be --
5    Q.   Yes.
6    A.   No.  Michael Bland would be the expert in
7 this.
8    Q.   Because he is the subject matter expert?
9    A.   Yes.
10    Q.   So you would defer to his testimony
11 regarding the technique employed by Officer Lopera?
12    A.   Yes.
13    Q.   Where did you get your information that
14 you've testified here today regarding how many cycles
15 of the ECD occurred?
16    A.   We have a -- an ECD download, which is
17 batteries plugged into a computer, that does the
18 download for us, and it will show how many times the
19 trigger was pulled to include the duration of each
20 cycle.
21    Q.   And does that report -- and did you
22 actually review the report?
23    A.   Yes, I did.
24    Q.   So you -- you're qualified to review the
25 raw data of that report and interpret it?

Page 185

1    A.   Not -- well, qualified.  I can look at it,
2 yes.  But we refer to our ECD as -- Carlson and Nick,
3 Nicholas Rinella, for their expert opinion on how to
4 read it.
5    Q.   What was his name?
6    A.   Rinella, R-i-n-e-l-l-a.
7    Q.   Okay.  Nicholas?
8    A.   Yes.  It's -- yeah.
9    Q.   When the ECD is triggered, as you say, does
10 that automatically mean that there was a transfer of
11 electrical charge into the suspect?
12    A.   Not into the suspect, no.
13    Q.   So just because the trigger of an ECD was
14 deployed, doesn't mean that the suspect or the
15 subject receives any physical shock?
16    MR. LAGOMARSINO: Objection. Form.
17 Incomplete hypothetical.
18    THE WITNESS: Correct.
19 BY MR. McNUTT:
20    Q.   Let alone achieve neuromuscular
21 incapacitation?
22    MR. LAGOMARSINO: Same objection.
23    THE WITNESS: Correct.
24 BY MR. McNUTT:
25    Q.   When you testified regarding the hand

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

48  (Pages 186 to 189)

### Page 186

1 strikes, the amount of hand strikes that you were
2 discussing with Mr. Lagomarsino, how did you come to
3 the conclusion about how many hand strikes?
4     A.  It was review off both the surveillance
5 video of Venetian and then Officer Lopera's body
6 camera, and that was intermittent body camera.
7     Q.  And that was you personally and you counted
8 them?
9     A.  Correct.  It was me, and then we had --
10 that video was shown to our discussion of SMEs when
11 we had roundtabled the incident.
12     Q.  So assuming for a minute that the -- the
13 count of the hand strikes were accurate, do you know
14 whether -- with how much force any of them landed on
15 Mr. Farmer?
16     A.  No.
17     Q.  Do you know if they landed at all on
18 Mr. Farmer?
19     A.  Looking through the video, it appeared he
20 made contact.  But whether, like you're saying, the
21 pressure where the actual target was, I don't know.
22     Q.  Did Mr. Farmer cease resisting when the
23 hand strikes were thrown?
24     A.  In some portions of Officer Lopera's
25 body-worn camera, it appears as though Farmer's hands

### Page 187

1 are up in a defensive deflecting.
2     Q.  Have you reviewed the deposition testimony
3 or did you interview as part of your investigation
4 the security guard from the Venetian's testimony or
5 did you interview them directly?
6     A.  Yes.  Both I reviewed their statements that
7 they provided to FIT, and then we actually went back
8 out a few weeks later and conducted our own
9 investigation -- or interview.
10     Q.  Do you recall a gentleman named -- Security
11 Guard Infantino?
12     A.  Yes.
13     Q.  And do you recall his testimony being that
14 Tashi Farmer was demonstrating extraordinary strength
15 in resisting Officer Lopera?
16     A.  Yes.
17     Q.  And in fact, that he tried to grab Officer
18 Lopera -- excuse me.  The fact that Infantino tried
19 to grab Tashi Farmer's arm, and he felt personally
20 the significant strength Tashi Farmer exhibited?
21     A.  Yes.
22     Q.  Do you also remember the part of his
23 testimony where he talked about the fact that the
24 punches were having no effect on Tashi Farmer?
25     A.  I don't recall that specifically, but I

### Page 188

1 remember we talked about the strikes.
2     Q.  You were asked a question, what could have
3 been done to deescalate this situation.  Do you
4 recall that?
5     A.  Yes, I do.
6     Q.  What could Tashi Farmer have done to
7 deescalate the situation?
8     A.  Well, looking at it, cameras and
9 everything, he could have listened to Officer Lopera.
10     Q.  So he could have followed the verbal
11 commands of a Metropolitan police officer?
12     A.  Yes.
13     Q.  If he would have followed the verbal
14 commands of Officer Lopera, what would have happened?
15     A.  I don't know.
16     Q.  If Officer Lopera said stop, don't move,
17 what would have happened?
18     A.  I don't know.
19     Q.  Would there have been the chance for
20 further inquiry with Tashi Farmer?
21     A.  I don't know.  Probably not.
22     Q.  With respect to the communications and some
23 of the policy violations that were discussed and you
24 were talking about covering contact, in this scenario
25 with respect to Officer Lopera and Officer Lif, who

### Page 189

1 was covering whose contact in the interaction with
2 Tashi Farmer?
3     A.  In Officer Lif's statement, it would have
4 been Officer Lopera who was the contact, and she
5 would have been the cover officer.  And then Officer
6 Lopera had also told us something similar in his
7 statement.
8     Q.  And I'm not asking you about Officer
9 Lopera.
10     So with respect to making the verbal
11 communications over the radio -- because you were
12 testifying regarding Metro's policies regarding foot
13 pursuits and making communications over the radio, do
14 you remember that?
15     A.  Yes.
16     Q.  Whose obligation would that have been?
17 Would that have been Officer Lopera or Officer Lif's
18 as the contact?
19     A.  First on -- the first initial when Officer
20 Lopera approached the decedent, Officer Lif could
21 have gotten on the radio and stated their location,
22 the stop, for a person stop.
23     However, when Officer Lopera engaged in a
24 foot pursuit, it's incumbent upon that officer to
25 provide that radio traffic and his actions to include

Page 190

1  that he is in a foot pursuit.
2      Q.  And again, I'm never going to ask you about
3  Officer Lopera's statements in this.
4      A.  Okay.
5      Q.  So don't take it that way.
6          But do you know whether or not Officer
7  Lopera did -- attempted to make those communications
8  or not?
9      A.  He did not.
10     Q.  Because part of the pursuit was through the
11 back of the house of the casino and then through a
12 concrete stairwell and things of that nature, right?
13     A.  Yes.
14     Q.  I think we've all probably been in a
15 parking garage or one of those areas and we don't
16 have much cell phone service.  So is there a way that
17 you can tell by radio transmissions or can you tell
18 that his mic was keyed or not keyed?
19     A.  Right.  So we did.  We did a radio analysis
20 on both him and Officer Lif.  And we even utilized
21 our radios that are assigned to us and went through
22 and checked to see if you were able to communicate.
23         We did a test run with our dispatcher and
24 then, like I said, we did an analysis on Lif and
25 Lopera's radio.

Page 191

1      Q.  Okay.  And you did have signal, is what
2  you're saying?
3      A.  Yes.
4      Q.  In the stairwell and everything else?
5      A.  Yes.
6      Q.  You made a statement that Officer Lopera
7  could have used empty hand tactics to take Tashi
8  Farmer into custody; do you remember that?
9      A.  Yes, I do.
10     Q.  Isn't that what he did?
11     A.  Well, hand strikes are not considered empty
12 hand tactics.
13     Q.  What are considered empty hand tactics?
14     A.  Those are going to be certain takedowns
15 that we use; reverse wrist lock, arm bar takedowns,
16 things that have -- that will less likely result in
17 injury.
18     Q.  Do you think given the circumstances once
19 the ECD was ineffective, and once Tashi Farmer was
20 resisting in personal contact with Officer Lopera,
21 that those techniques would have been effective?
22     A.  Given the body position of the two,
23 probably not, but...
24     Q.  Is that a judgment call the officer has to
25 make on the scene?

Page 192

1      A.  Yes, it is.
2      Q.  Would you defer to the officer on the scene
3  in that regard?
4      A.  For their perception, yes.
5      Q.  And what they believe is reasonable,
6  and isn't it true -- I'm sorry, go ahead and answer
7  that.
8      A.  Yes.
9      Q.  And isn't it true that each officer, some
10 have more skills in one technique than other
11 techniques and it's a little bit dependent upon what
12 they're best suited to deploy?
13     A.  Yes.
14     Q.  What is the policy regarding when you can
15 turn off a body-worn camera after an event?
16     A.  I believe it's at the debrief once the
17 scene is considered static.  And when, again, when
18 they're starting to debrief within, and that's to
19 protect any policies and procedures, things of that
20 nature.
21     Q.  Can you identify any point in this event
22 when you know this situation was deemed static and it
23 would have been okay for the officers to turn off
24 their body-worn camera?
25     A.  Probably at the point where they have the

Page 193

1  scene secure, medical has arrived and now it's just
2  waiting on what's next.
3      Q.  Do they -- do officers have to receive an
4  approval or an order from their superior, their
5  sergeant or commanding officer to turn off their
6  body-worn camera?
7      A.  No.
8      Q.  So they can do it on their own?
9      A.  Correct.
10     Q.  It's true that Officer Lopera properly
11 turned on his body-worn cam, right?
12     A.  Yes.
13     Q.  And he never turned off his body-worn cam
14 until after it was static, correct?
15     A.  Correct.
16     Q.  So he was in complete compliance with the
17 body-worn cam policy of Metro, right?
18     A.  I wouldn't say complete.  There's a policy
19 for officers that were involved in a critical
20 incident that as soon as they're removed from the
21 scene, they are to turn off their body camera.  But
22 in this particular incident, Sergeant Crumrine failed
23 at removing Officer Lopera from the crime scene and
24 having him deactivate his body cam.
25     Q.  So in effect, if there was any policy

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

50 (Pages 194 to 197)

Page 194

1   violation, he was over-inclusive in the evidence
2   preserved on his body-worn camera?
3        A.   Right.
4        Q.   There was some discussion about what you
5   termed -- or what the term was in -- strike that.
6             Are you familiar with Operation Safe Strip?
7        A.   Yes.
8        Q.   Or is it Project Safe Strip?
9        A.   It's -- I believe -- I just know it as
10  Safe Strip.
11       Q.   I've heard of it as -- different officers
12  have said different things.
13       A.   Right.  I know Safe Strip.
14       Q.   What is it?
15       A.   It's -- well, actually, I don't know what
16  it is anymore.  It used to be we have a proactive
17  squad that would go around to the hot spots around in
18  Convention Center Area Command, which is essentially
19  the Strip, Las Vegas Boulevard, and they would
20  address certain issues.
21       Q.   And are you aware that Officer Lopera was
22  assigned to Safe Strip the night of this incident?
23       A.   Yes.
24       Q.   And is the -- would someone approaching an
25  officer on Operation Safe Strip that was under the

Page 195

1   influence of a controlled substance, would that be
2   someone that the officer should investigate?
3        MR. LAGOMARSINO:  Objection.  Form.
4   Foundation.  Incomplete hypothetical.
5        THE WITNESS:  It depends.  And this is --
6   Safe Strip officers probably deal with that on a
7   99 percent basis.  But yes.
8   BY MR. McNUTT:
9        Q.   What about when someone that they believe
10  is under the influence of a controlled substance runs
11  into a restricted area of a casino; is that something
12  that would require investigation?
13       A.   Yes.
14       Q.   Is that reasonable suspicion to stop
15  someone?
16       A.   Yes.
17       Q.   Is that probable cause to pursue someone?
18       A.   Reasonable suspicion.
19       Q.   Do you think Officer Lopera had reasonable
20  suspicion and was justified in following Tashi
21  Farmer?
22       A.   Yes.
23       Q.   Under the policies in effect at the time of
24  this event, isn't it true that Officer Lopera's use
25  of the LVNR was authorized under the former use of

Page 196

1   force structure?
2        A.   Level I was, yes.
3        Q.   Correct.  And there's never been a
4   determination by you or anyone else that Officer
5   Lopera used any specific level of LVNR, correct?
6        A.   Yeah, he did.  Yes.
7        Q.   I'm correct?
8        A.   You're correct, yes.  Without going into a
9   statement, yes.
10       Q.   Well, Sergeant Bland testified that no one
11  could tell by reviewing the video whether or not
12  there was LVNR 1, 2 or 3, whether there was any
13  pressure applied at any point or for how long.  Are
14  you -- are you aware of that?
15       A.   Yes.
16       Q.   Do you agree with Sergeant Bland's
17  testimony in that regard?
18       A.   I do.
19       Q.   You testified that there was a lawyer that
20  stopped the walk-through and you referred to that
21  lawyer by name.  Do you recall that individual?
22       A.   John Eldridge.
23       Q.   John Eldridge?
24       A.   I believe it was.
25       Q.   And who was he the lawyer for?

Page 197

1        A.   So he's one of the -- he's either PPA or
2   PMSA reps, lawyers that come out along with David
3   Roger and Jay Roberts who would come out and -- out
4   on scene whenever a critical incident happens to
5   represent involved officers or witness officers.
6        Q.   Were you present when he was there?
7        A.   No, I was not.
8        Q.   Were you present at any point at this scene
9   or you -- CIRT comes in, like, sometime later?
10       A.   Right.  I was at the office.  My partner
11  actually went down to the scene, but I did not go
12  down.
13       Q.   And what was your understanding about the
14  lawyers stopping the walk-through?
15       A.   I believe they got through the first four
16  questions up until the -- I believe it was the foot
17  pursuit and the perceived carjacking.  And then at
18  that point, when it went into the actual use of force
19  used by Lopera, all questions stopped.
20       Q.   And who stopped it?
21       A.   The -- I believe Eldridge.
22       Q.   So you're not aware of the fact that
23  Mr. Eldridge's statement is he never stopped the
24  walk-through?
25       A.   I -- I believe he physically said, "We're

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

51 (Pages 198 to 201)

Page 198

1 not answering any more questions," and at that time
2 all questions stopped.
3      Q.   The LVNR can be a -- is a physical
4 restraint through which an officer is allowed to
5 control a suspect, correct?
6      A.   Yes.
7      Q.   And that can include rendering a subject
8 unconscious, correct?
9      A.   Yes.
10      Q.   And in fact, you've deployed an LVNR?
11      A.   Yes.
12      Q.   And in your instance, you did not have to
13 render the suspect unconscious, correct?
14      A.   Correct.
15      Q.   So it's just a different force continuum
16 depending on what happens, correct?
17      A.   Correct.
18      Q.   Have you ever been trained about how long
19 you can employ the LVNR?
20      A.   On -- for training -- or I'm sorry, for
21 controlling techniques, as long as once you get that
22 subject into custody and there's no time frame,
23 there's nothing black and white that says you have a
24 minute, two minutes, three minutes.  It's based on
25 the situation at hand.

Page 199

1      Q.   So for sure you need to release it after
2 they're in handcuffs?  I mean that's kind of a
3 bright-line rule, correct?
4      A.   Yes.
5      Q.   And Metro training is that the LVNR could
6 render a suspect unconscious in four to seven, four
7 to twelve seconds, correct?
8      A.   Yeah.  I don't remember what lesson plan it
9 states but...
10      Q.   Right.  And Sergeant Bland testified that
11 of course that all depends on the proficiency with
12 which the LVNR is employed and how much the suspect
13 is struggling.  Would you agree with that?
14      A.   Yeah.
15      Q.   So there is no bright-line rule about how
16 long an LVNR can be used; it's really when it has to
17 be released once the suspect is -- control has been
18 gained over the suspect?
19      A.   Yes.
20      Q.   Is that correct?
21      A.   Yes.  In custody.  Handcuffs.
22      Q.   So literally if you're down on the ground
23 rolling around and trying to put an LVNR on someone
24 for a minute, that is not, per se, incorrect.
25           Would you agree with that?

Page 200

1      A.   Per se, yeah.
2      Q.   And it could be 90 seconds, but the -- but
3 the second that the cuffs go on the person, then the
4 LVNR for sure has to be released, right?
5      A.   Yes.
6      Q.   You talked about the ECD being deployed one
7 time during the event where Officer Lopera perceived
8 that there was a carjacking?
9      A.   Yes.
10      Q.   Are you okay with that deployment of the
11 ECD?
12      A.   Yes.
13      Q.   Why?
14      A.   Because of the perception of the attempt,
15 the alleged carjacking and the severity of the crime
16 at hand which would fall under aggressive, and our
17 use of force model which involves an officer to
18 deploy that ECD based on the perception of Officer
19 Lopera.
20      Q.   And if the suspect after the initial ECD
21 deployment, if the suspect did not comply with the
22 verbal demands being given by the officer, would it
23 not be within LVMPD policy to deploy the Taser again?
24      A.   You can deploy the Taser again, yes.
25 However, there's some considerations that need to be

Page 201

1 taken.
2      Q.   What are those considerations?
3      A.   You have to give the subject time to
4 comply.  So with that, you can't just tase, wait two
5 seconds, tase again.  There has to be a clear order
6 to give -- or a clear time to give the subject to
7 comply with those commands.
8      Q.   And how long do you think the clear amount
9 of time is to comply?
10      A.   It depends on the situation and the body
11 position of the subject.
12      Q.   So we're talking about seconds, though,
13 we're not talking about minutes, correct?
14      A.   Correct.
15      Q.   Isn't it true that all of the evidence that
16 you reviewed indicated that -- and I base this on
17 your prior testimony, I believe it was page 111 of
18 your prior deposition, which I don't have for you,
19 but when I was preparing for it.
20           You testified that the evidence you
21 reviewed indicated that Officer Lopera, in fact,
22 loosened up any grip or any LVNR pressure when he was
23 told to, correct?
24      A.   Yes.
25      Q.   By the way, I'm going from memory so if

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 202

1   it's not 111, I apologize.
2       A.  Good memory.
3       Q.  So that's correct?
4       A.  That is correct, yes.
5       Q.  So you have no evidence that Officer Lopera
6   disobeyed anybody's orders to loosen up?
7       A.  No.
8       Q.  And when we were talking -- we talked about
9   this earlier.  But when you -- it's absolutely
10  permissible to loosen the pressure but keep the
11  encircling arm in place until the suspect has been
12  handcuffed?
13      A.  As a controlling technique, yes.
14      Q.  Do you recall that that's what happened,
15  meaning that Officer Lopera's encircling arm was
16  removed when Tashi Farmer was handcuffed?
17      A.  Yes.
18      Q.  You do remember that?
19      A.  Yes.
20      Q.  Okay.  And you -- we can see that if we
21  look at the video?
22      A.  Correct.
23      Q.  So when -- to go back to something, when
24  Officer Lif says he didn't pose a threat in my
25  perception to himself or others, granted he did go

Page 203

1   down the service hallway but that's not a threat.  He
2   wanted to get away.  That's simply her perception,
3   correct?
4       A.  Yes.
5       Q.  And that does not trump Officer Lopera's
6   perception?
7       A.  Correct.  Because she -- he had -- she
8   turned around to go place coffee down.  So whatever
9   the conversation between Officer Lopera and Farmer,
10  she does not know.
11      Q.  Okay.
12      A.  Or what his reasonable suspicion was at
13  that time.
14      Q.  But even taking that out of it, one officer
15  can see a suspect flee into a restricted area of a
16  casino and believe that that's improper and wrong and
17  pursue that person, correct?
18      A.  Yes.
19      Q.  Even if his partner is standing right there
20  and says, "Well, I thought he was mentally ill and he
21  wasn't posing a threat"?
22      A.  Yes.
23      Q.  And in this case, the empirical evidence
24  indicates that Officer Lopera was correct and
25  procedure was correct inasmuch as his suspicion that

Page 204

1   Officer -- that Tashi Farmer was under the influence
2   of a controlled substance was, in fact, true?
3           MR. LAGOMARSINO:  Objection.  Empirical.
4           THE WITNESS:  Yes.
5           MR. McNUTT:  All right.  Craig, do you want
6   to switch seats?
7           (A discussion was held off the record.)
8   BY MR. McNUTT:
9       Q.  So we've got a screen frame -- a screen
10  grab here, the start of the video of what's been
11  produced in this case as Officer Lopera's body-worn
12  camera.
13          Have you seen this -- we're about to start
14  watching it as a video.  Have you seen this before?
15      A.  Yes.
16          MR. LAGOMARSINO:  Counsel, do you have like
17  a time stamp on there?
18          MR. McNUTT:  There will be a time stamp
19  once we start playing it.
20          MR. LAGOMARSINO:  Okay.
21  BY MR. McNUTT:
22      Q.  Do you recognize Tashi Farmer in this
23  frame?
24      A.  Yes, I do.
25      Q.  And you recognize Officer Lopera's left

Page 205

1   hand holding his coffee?
2       A.  Yes.
3       Q.  Okay.  So I have a few questions here and
4   I'll stop and start the video as we go.
5           MR. McNUTT:  Andre, see at the bottom here?
6           MR. LAGOMARSINO:  Just identify for the
7   record.  It's very small.
8           MR. McNUTT:  The video starts at zero.
9           MR. LAGOMARSINO:  When you start asking
10  questions, can you just identify it for the record?
11          MR. McNUTT:  Yes, sir.
12          MR. LAGOMARSINO:  Thank you.
13  BY MR. McNUTT:
14      Q.  So by the way, when does the audio start on
15  the body-worn camera?
16      A.  30 seconds.
17      Q.  Okay.  And is there a reason for that, or
18  is that Metro policy that's just the one they bought?
19      A.  I believe it's just the one they bought.  I
20  don't know the internal.
21      Q.  By the way, why don't the body-worn cameras
22  run at all times?
23      A.  I don't know.
24      Q.  Okay.
25      A.  But I mean, if you want to use the

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

53 (Pages 206 to 209)

### Page 206

1  restroom, do you want your body cam running?
2      Q.  Good question.
3          MR. LAGOMARSINO:  I think there's some
4  restroom activity in this case.
5          MR. ANDERSON:  In every case.
6  BY MR. McNUTT:
7      Q.  Do you see this roped-off area?
8      A.  Yes.
9      Q.  Does that indicate to you that that's a
10  restricted area of the casino?
11      A.  Yes.
12          MR. LAGOMARSINO:  What's the time stamp on
13  that?
14          MR. McNUTT:  Ten seconds.
15          (Playing video.)
16  BY MR. McNUTT:
17      Q.  Do you see Tashi Farmer running through
18  those chains?
19      A.  Yes.
20      Q.  And running down through the restricted
21  area?
22      A.  Yes.
23      Q.  And you tested the radios all through this
24  restricted area and had -- and you had conductivity?
25      A.  Yes.  We tested it with our dispatchers

### Page 207

1  through this whole -- we did this whole walkway or
2  this whole --
3          (Playing video.)
4  BY MR. McNUTT:
5      Q.  So I'm going to speed it up here because we
6  don't need to watch the run.
7          So let me back up here.
8          (Playing video.)
9  BY MR. McNUTT:
10      Q.  So now we're outside?
11      A.  Yes, we are.
12          (Playing video.)
13  BY MR. McNUTT:
14      Q.  So per policy, Officer Lopera verbally
15  warned, commanded the suspect stop, don't move or
16  you're going to get tased, correct?
17      A.  Yes.
18      Q.  And that's what an officer should have done
19  in that situation, correct?
20      A.  Yes.
21      Q.  Because Metro policy is such that they're
22  supposed to give the suspect a warning, correct?
23      A.  When feasible, yes.
24      Q.  And do you think his warning was correct?
25      A.  Yes.

### Page 208

1          (Playing video.)
2  BY MR. McNUTT:
3      Q.  So that's the first Taser.  We're at 1:37.
4      A.  Uh-huh.
5      Q.  And it appears -- or we'll forget what it
6  appears.  Do you believe that neuromuscular
7  incapacitation was achieved in that first ECD strike?
8      A.  I do, based on the way he fell.
9          (Playing video.)
10  BY MR. McNUTT:
11      Q.  So Officer Lopera has said, "Don't move.
12  Don't move" in the six seconds since the MNI was
13  achieved, correct?
14      A.  Yes.
15      Q.  Now, what is Tashi Farmer doing at 1:42 in
16  the video, six seconds later?
17      A.  It looks like he is rolled up on his right
18  arm.
19      Q.  Is that complying with the officer's
20  command?
21      A.  Of "stop," no.
22      Q.  Or "don't move"?
23      A.  "Don't move."
24          (Playing video.)
25

### Page 209

1  BY MR. McNUTT:
2      Q.  What's he doing now?
3      A.  It looks like he's adjusting his shoe.
4      Q.  Wasn't he sitting up?
5      A.  Yeah.  He's sitting up adjusting his shoe.
6      Q.  Is that not moving?
7      A.  That's moving.
8      Q.  I mean if -- so if you told me stop, don't
9  move, and I'm laying on my back and I sit up, would
10  you think I'm complying with your commands?
11      A.  No.
12      Q.  Now, do you think that 1:36 to 1:44, that's
13  eight seconds, do you think that's enough time for
14  Tashi Farmer to comply?
15      A.  Yes, it is.
16      Q.  And he's not complying, correct?
17      A.  Correct.
18      Q.  So isn't it fair to say that it's
19  authorized to give him a second ECD strike at this
20  point?
21      A.  Yes.
22      Q.  So why did you just say that it wasn't
23  authorized to give him a second ECD strike?
24      A.  For the first three second -- I'm sorry,
25  for the first three Taser pulls until it's deemed

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

54 (Pages 210 to 213)

### Page 210

1  ineffective by policy.
2      Q.  So you're okay with the first three ECD
3  strikes?
4      A.  Right.  Until it's -- yes, until it's
5  deemed ineffective by policy, and then that's when
6  Officer Lopera decides to move in and attempt
7  touchstones.
8      Q.  So your position is it's okay for Officer
9  Lopera to use the first three Taser strikes?
10     Q.  So each time, by policy, each time that the
11  trigger is pulled, he has to articulate the threat,
12  which without going into his statement, he was asked,
13  and based on his --
14     Q.  And I'm asking your position.  I'm not
15  asking anything in his statement or anything else.
16  You've said that with this 8 seconds he's not
17  complying, it's justified to give a second Taser
18  strike?
19     A.  Based on my articulation.
20     Q.  That's what you just said?
21     A.  Based on -- yes.  So what we did with
22  Officer Lopera was we asked him those questions.
23     Q.  But we're not going into what he said.  I'm
24  asking your perception.  You're the investigating
25  officer.  You reviewed this videotape as much as

### Page 211

1  anyone, correct?
2      A.  Uh-huh.
3      Q.  So I'm asking you to sit here.  You earlier
4  testified that the amount of seconds --
5      A.  In between.
6      Q.  Right, for someone to comply, it's a matter
7  of seconds and it's a matter of distance and a matter
8  of what's going on.  So we've got --
9      A.  At this point in time Farmer is active
10  resistance.  And with that, ECD does not fall within
11  that.  He needs to be in an aggressive or aggravated
12  aggressive resistance per our use of force model.
13  And here he is only active.  So for this
14  second or third trigger pulls, no, they're not within
15  our policy.  The first one, yes, because of the
16  allegation or the perception that he's about to
17  carjack someone.
18     Q.  So what should Officer Lopera have done
19  here after the first ECD strike and Tashi Farmer is
20  not complying with his verbal commands?
21     A.  He should have gotten on the radio, let
22  everyone know where he is at, assemble the resources,
23  which is another way to deescalate the situation.
24     Q.  Which hand should he have used for his
25  radio?

### Page 212

1      A.  He could use his left or right.
2      Q.  And do you think that's reasonable when
3  you're engaged within ten feet of somebody that
4  has -- that you believe is under the influence of a
5  controlled substance, has run down a hallway, is
6  trespassing through a casino, and now you believe was
7  carjacking?
8      A.  Is it feasible?  Yes, I believe it is
9  feasible to get on the radio --
10     Q.  I said, "Is it reasonable?"
11     A.  Oh, reasonable.  I'm sorry.  Yes, I do.
12         (Playing video.)
13  BY MR. McNUTT:
14     Q.  There's the second pull, right?
15     A.  Is that the second or third?  Yeah.
16     Q.  That was the second pull.
17     A.  Okay.
18         MR. LAGOMARSINO:  What time?
19         THE WITNESS:  1:46.
20         (Playing video.)
21  BY MR. McNUTT:
22     Q.  Okay.  So again, he's telling him not to
23  move, correct?
24     A.  Yes.
25     Q.  And after he said "don't move," Tashi

### Page 213

1  Farmer pulled his knees up as if he's going to get up
2  again, correct?
3      A.  Yes.
4         MR. LAGOMARSINO:  Objection.  Form.
5  BY MR. McNUTT:
6      Q.  Is that complying with his commands not to
7  move?
8      A.  No.
9      Q.  Have you ever deployed an ECD on a suspect?
10     A.  No.
11     Q.  Have you ever had an ECD deployed on you in
12  training?
13     A.  Not in training, no.  Or anywhere else, no.
14         (Playing video.)
15  BY MR. McNUTT:
16     Q.  So now at 1:57 we've got Tashi Farmer
17  reaching behind his back where the probes are,
18  correct?
19     A.  Yes.
20     Q.  Do you believe that he's reaching around to
21  the probes?
22     A.  I do.
23     Q.  Do you believe that in that last seven or
24  eight-second window Tashi Farmer was complying with
25  the commands not to move?

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

55 (Pages 214 to 217)

Page 214

1    A.  Not complying, no.
2        (Playing video.)
3    BY MR. McNUTT:
4    Q.  So at this point we're at 2:08, but about
5    two seconds ago, you saw Officer Lopera hand contact
6    Tashi Farmer's hand, correct?
7    A.  Yes.
8    Q.  Do you want me to back it up?
9    A.  No.  You're good.
10   Q.  So Officer Lopera is in physical contact
11   with Tashi Farmer at this point, correct?
12   A.  Yes.
13       (Playing video.)
14   BY MR. McNUTT:
15   Q.  Okay.  So I want to ask you questions about
16   the amount of movement you're seeing here on the body
17   cam and whether or not you believe Tashi Farmer is
18   resisting being taken into custody.
19       (Playing video.)
20   BY MR. McNUTT:
21   Q.  So did you hear the "help me out"?
22   A.  Yes.
23   Q.  Is that Officer Lopera?
24   A.  Yes.
25   Q.  And do you know who he's asking help from?

Page 215

1    A.  I believe he's asking for help from the
2    security, the Venetian security officers.
3    Q.  Is it your opinion that officer -- Metro
4    officers ask for help from civilians when they don't
5    actually need it?
6        MR. LAGOMARSINO:  Objection.  Form.
7        THE WITNESS:  It depends.  I personally
8    wouldn't.
9    BY MR. McNUTT:
10   Q.  Ever?
11   A.  It would really just depend.  It would have
12   to be a very dire situation to involve a citizen into
13   a use of force for me, but that's me.
14   Q.  Sure.  So if it's a dire situation, you
15   would ask for help?
16   A.  Very dire, yes.
17   Q.  And whether it's dire to one person versus
18   another person is a matter of opinion, correct?
19   A.  Yes, it is.
20   Q.  Okay.  There's at least three people around
21   him at this point, right?
22   A.  Yes.
23   Q.  The man at the top, we see a white shirt,
24   and do you recognize that as being a Venetian
25   security guard?

Page 216

1    A.  Yes.
2        (Playing video.)
3    BY MR. McNUTT:
4    Q.  So we've got multiple commands being given
5    here, but not all of them by Officer Lopera, correct?
6    A.  Correct.
7    Q.  You've got "turn around," "give me your
8    arm," things of that nature, correct?
9    A.  Yes.
10   Q.  And so can you delineate or have you ever
11   delineated whether all of those were from Officer
12   Lopera?
13   A.  We did ask him and we were able to --
14   Q.  Don't tell me what Officer Lopera said, but
15   I'm asking your perception as listening to the
16   different voices.
17   A.  Yes.
18   Q.  It's clear to you that there are different
19   voices, correct?
20   A.  Yes.
21   Q.  I mean, some of us listening to Officer
22   Lopera for a couple -- for a few seconds can tell
23   different pitch of a voice, right?
24   A.  Yes.
25       (Playing video.)

Page 217

1    BY MR. McNUTT:
2    Q.  Did you hear that "okay, sir"?
3    A.  Yes.
4    Q.  Do you think that was from Officer Lopera?
5    A.  No.
6    Q.  Do you think that was from Tashi Farmer?
7    A.  Yes.
8        (Playing video.)
9    BY MR. McNUTT:
10   Q.  Did you hear that?
11   A.  "On your stomach"?
12   Q.  No.
13       MR. LAGOMARSINO:  Form.
14   BY MR. McNUTT:
15   Q.  The punch that hit Officer Lopera's
16   body-worn camera?
17       MR. LAGOMARSINO:  Form.
18       (Playing video.)
19   BY MR. McNUTT:
20   Q.  Right there.
21   A.  I don't know what that is.  That could be
22   the wind or the force of Officer Lopera coming down.
23   I don't know.
24   Q.  The wind?
25   A.  Yeah.  Coming from -- coming in, yes.

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

56  (Pages 218 to 221)

Page 218

1  Q.  Was it a windy night?
2  A.  I have no idea.  I don't know.  I wasn't
3  down on the scene.
4  Q.  That loud thud was the wind?
5  A.  I can't confirm for certain that was a
6  strike by Tashi.
7  Q.  In the other case, the plaintiff's use of
8  force expert acknowledged that was Tashi Farmer
9  striking Ken Lopera.
10  MR. LAGOMARSINO:  Objection.  Form,
11  foundation, incomplete hypothetical.
12  THE WITNESS:  Okay.
13  BY MR. McNUTT:
14  Q.  Do you disagree with that?
15  A.  I don't know.  I -- from here you can't
16  tell if that was a strike from Tashi Farmer or not.
17  Q.  Well, you can hear an audible thud hit
18  Ken Lopera, correct?
19  A.  You can hear something.
20  Q.  Let's watch it again.
21  MR. LAGOMARSINO:  I'm sorry, Counsel.
22  Before you hit play, can you just indicate the time
23  for the record.
24  (Playing video.)
25

Page 219

1  BY MR. McNUTT:
2  Q.  We're at 2:30.  You would agree with me
3  that Tashi Farmer is resisting?
4  A.  I believe that he's swatting -- yes, I
5  believe he's swatting away the ECD from the
6  touchstones.
7  Q.  He's pulled his hand away from people,
8  correct?
9  A.  Sure.
10  Q.  He's resisting, he's rolling around,
11  correct?
12  A.  Uh-huh.
13  Q.  He's not complying with verbal commands,
14  correct?
15  A.  Yes.
16  Q.  You would agree with all those statements?
17  A.  Yes.
18  Q.  Now, let's listen to the, quote, wind.
19  (Playing video.)
20  BY MR. McNUTT:
21  Q.  You don't think that's a strike?
22  A.  I don't see a strike.  I can't confirm
23  whether it is or not.
24  Q.  So we're going to go to -- I'll tell you in
25  just a second.

Page 220

1  (Playing video.)
2  MR. McNUTT:  I was trying to stop it but I
3  didn't.
4  BY MR. McNUTT:
5  Q.  Okay.  Do you see Tashi Farmer's hand?
6  A.  Yeah.
7  Q.  I wanted to get it to -- to --
8  (Playing video.)
9  BY MR. McNUTT:
10  Q.  So are Tashi Farmer's hands restrained here
11  at 2:30?
12  A.  It appears as though his right wrist is
13  restrained.
14  Q.  By what?
15  A.  It looks like Officer Lopera's left hand.
16  It's pinned against his stomach, Tashi's stomach.
17  Q.  But there's no handcuffs on it, correct?
18  A.  No, no handcuffs.
19  Q.  Now, is his hand coming free?
20  A.  It looks like Officer Lopera has at least
21  his fingers or his knuckles in his grip.
22  Q.  But he has less of a grip than before?
23  A.  Yes.
24  Q.  Meaning the hand is coming free, correct?
25  A.  Uh-huh.  Yes.

Page 221

1  Q.  Okay.  It's the frame right before that.
2  (Playing video.)
3  BY MR. McNUTT:
4  Q.  The question is do you ever see -- we'll
5  watch it at that speed.  Do you ever see his hands
6  come free?  Tashi Farmer's?
7  A.  Yes.
8  Q.  You do?
9  A.  See his hands come free?
10  Q.  Yes.  His hands come free and slip this
11  grip.  That's the question.  And I want you to watch
12  it.
13  A.  Okay.
14  (Playing video.)
15  BY MR. McNUTT:
16  Q.  So did you see his hands that are free
17  there now because Ken Lopera's hands are up putting
18  away his ECD?
19  A.  Looks like he's standing up, yes.  He's
20  disengaged --
21  Q.  So Tashi Farmer's hands are free at this
22  point, correct?
23  A.  Assuming.  I don't know if the security
24  officers have it.
25  Q.  Did you see his hands free right up there?

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

57 (Pages 222 to 225)

## Page 222

1    A.  Yes.  It looked like his left arm maybe.
2         (Playing video.)
3   BY MR. McNUTT:
4    Q.  And then you heard the wind there smack
5   Officer Lopera and the body-worn camera?
6    A.  I heard the wind from Officer Lopera
7   possibly coming down just like he was in foot pursuit
8   prior to running up the ramp.  The body camera caught
9   all that wind.
10   Q.  How exactly does the wind make that
11  sound?
12   A.  When you're having force come through.
13   Q.  So where would the force be coming from?
14   A.  Officer Lopera's motion down.
15        (Playing video.)
16  BY MR. McNUTT:
17   Q.  So Officer Lopera is now still trying to
18  obtain control over Tashi Farmer at 2:39, correct?
19   A.  Yes.
20   Q.  Does he have control of Tashi Farmer?
21   A.  No.
22   Q.  Is Tashi Farmer complying with Officer
23  Lopera's verbal commands?
24   A.  No.
25        (Playing video.)

## Page 223

1   BY MR. McNUTT:
2    Q.  So we hear the siren coming up and we now
3   know that that was Sergeant Crumrine, correct?
4    A.  Yes.
5    Q.  We're at 2:50.  And does it appear to you
6   that Officer -- or excuse me, Tashi Farmer is still
7   resisting?
8    A.  He's not -- yeah, Officer Lopera does not
9   have control over him.
10   Q.  And Tashi Farmer is not complying with his
11  verbal commands, correct?
12   A.  Not complying with his verbal commands,
13  correct.
14        (Playing video.)
15  BY MR. McNUTT:
16   Q.  And then we're at 2:59.  And then from
17  this vantage point, it kind of goes black because
18  Officer Lopera's body-worn camera is up against
19  Tashi Farmer, correct?  And we know from the other
20  events that this is when Sergeant Crumrine appears,
21  correct?
22   A.  Yes.
23   Q.  Now, going back to around the 2:34 mark,
24  the question I posed to you was whether or not you
25  saw or heard force or a strike hit Officer Lopera?

## Page 224

1    Your position is that that was potentially
2   wind.
3        MR. LAGOMARSINO:  Objection.  Form.
4   Misstates.
5   BY MR. McNUTT:
6    Q.  If you agree with my position, and the
7   position of at least one other expert in the case and
8   another case, plaintiff's expert, if you agree with
9   me that that's a strike by Tashi Farmer against Ken
10  Lopera, doesn't that elevate the level of Tashi
11  Farmer's resistance?
12        MR. LAGOMARSINO:  Objection.  Form,
13  foundation.
14        THE WITNESS:  By policy, yes.  However, I
15  don't necessarily agree with that stance.
16  BY MR. McNUTT:
17   Q.  So what would be the policy of elevation of
18  the force?
19   A.  Well, hypothetically, the elevation of
20  force had Tashi struck Officer Lopera would be an
21  aggressive resistance.
22   Q.  Now, irrespective of which level of
23  resistance it was, at the time of this incident,
24  utilizing a lateral vascular neck restraint was
25  authorized, correct?

## Page 225

1    A.  Yes.  Excuse me.  Yes.
2        MR. McNUTT:  I have no further questions.
3        MR. LAGOMARSINO:  I have some questions.
4   How long have we been on the record,
5   Mr. Videographer?
6        THE VIDEOGRAPHER:  Total?
7        MR. LAGOMARSINO:  Just for this last
8   segment.
9        THE VIDEOGRAPHER:  Since 3:20, so about an
10  hour and 20 minutes.
11        MR. LAGOMARSINO:  Okay.  I just want to
12  take a very quick five-minute break and organize the
13  questions and follow up.
14        THE VIDEOGRAPHER:  The time is
15  approximately 4:39 p.m.  We are going off the record.
16        (A recess was taken from 4:39 p.m.
17        to 4:55 p.m.)
18        THE VIDEOGRAPHER:  The time is
19  approximately 4:55 p.m.  We are back on the record.
20        MR. LAGOMARSINO:  Okay.  Just before we
21  start questioning, I'm going to object to the last
22  line of questioning only to the extent that there
23  were questions about information on the video with no
24  reference to timestamps.  There were some references
25  to timestamps, but not a lot of them.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

58 (Pages 226 to 229)

Page 226

1          FURTHER EXAMINATION
2   BY MR. LAGOMARSINO:
3       Q. So you heard --
4          MR. McNUTT: I'll make note that you
5   watched the entire video.
6   BY MR. LAGOMARSINO:
7       Q. You heard various questions about whether
8   Tashi was compliant or not, correct?
9       A. Yes.
10      Q. And in answer to a lot of those questions,
11  you stated that he wasn't compliant, correct?
12      A. Yes.
13      Q. Are you aware of police reports that
14  indicate that after review of the video and the
15  evidence, that in many instances, Tashi was not given
16  enough time to comply?
17      A. Am I aware?
18      Q. Yeah.
19      A. I'm sorry, can you rephrase that? Sorry.
20      Q. Are you aware of other police reports in
21  this case, either from FIT or other officers, that
22  indicate after review of the timeline, that Tashi was
23  not given enough time to comply with Officer Lopera's
24  commands?
25      A. I'm not aware.

Page 227

1       Q. Are you aware of police reports that
2   indicate that Tashi was given confusing commands by
3   Officer Lopera?
4          MR. McNUTT: Objection. Form.
5          THE WITNESS: And are you asking other than
6   my report or other reports?
7   BY MR. LAGOMARSINO:
8       Q. Yes, other than your report.
9       A. I don't know.
10      Q. After three rounds of tases were given,
11  what were options that -- what were all the options
12  that were available to Officer Lopera?
13      A. What were all the options available?
14      Q. Yes, since he was supposed to stop tasing
15  after three rounds.
16      A. Well, he's supposed to deem the ECD
17  ineffective and re-holster and transition to another
18  tool that he could use based on his perception.
19      Q. You're trained on the ECD, correct?
20      A. Yes.
21      Q. And you're trained that the ECD is painful
22  to people who receive those probes, correct?
23      A. Yes.
24      Q. And you heard, in fact, Tashi screaming or
25  wailing in the video after being struck with those

Page 228

1   ECDs, correct?
2          MR. McNUTT: Objection. Form.
3          THE WITNESS: Yes.
4   BY MR. LAGOMARSINO:
5       Q. And you're trained that a natural reaction
6   from being tased with probes is to try to remove
7   those probes, correct?
8       A. I don't know if it's a natural reaction.
9       Q. Are you trained that it's a common reaction
10  that people try to remove those probes?
11      A. Yes.
12      Q. If you were tased with probes, would you
13  attempt to remove those from your body?
14         MR. ANDERSON: Objection. Form.
15         THE WITNESS: I would probably just stay
16  still.
17  BY MR. LAGOMARSINO:
18      Q. But you've never been tased, correct?
19      A. Correct.
20      Q. Now, in the beginning of the video, you
21  were asked about whether there were certain
22  indicators as to whether Tashi was going into a
23  restricted area, correct?
24      ·A. Yes.
25      Q. And those were slip and fall cones,

Page 229

1   correct?
2       A. Yes. The yellow cones, yeah, yellow cones.
3       Q. And that was -- anything on the yellow
4   cones or the yellow tape indicate that it was a,
5   quote, unquote, restricted area?
6       A. No.
7       Q. And then Mr. McNutt made reference to some
8   chains that Tashi ran through.
9          Did you see any chains in the video?
10      A. Yes. They connected the yellow cones in
11  front of the door.
12      Q. And they were actual metal chains?
13      A. No, they were just plastic chains.
14      Q. Have you reviewed -- Mr. McNutt made
15  reference to alleged opinions and testimony from
16  different experts in a different case. And then you
17  answered some of those questions.
18         Have you ever used the testimony or
19  opinions from the experts in the other case?
20      A. No.
21      Q. So you're relying on what those experts
22  said based on what Mr. McNutt said they said,
23  correct?
24      A. Yes.
25      Q. You heard some questions about whether

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

59 (Pages 230 to 233)

Page 230

1   Tashi should have deescalated.
2         Do you remember that question?
3      A.  Yes.
4      Q.  Was Lopera, to your knowledge, in the
5   department long enough to be trained about
6   deescalation?
7      A.  Yes.
8      Q.  In your experience with regular citizens,
9   are they trained to deescalate?
10     A.  Are citizens trained to deescalate?
11     Q.  Right.
12     A.  No.  Not that I know of.
13     Q.  In reviewing the beginning of the video,
14  Tashi starts running from Lopera, correct?
15     A.  Yes.
16     Q.  And that's because Lopera reaches out to
17  grab Tashi, correct?
18     A.  I don't know why Tashi ran from Officer
19  Lopera.
20     Q.  Did you see Lopera reach out to grab Tashi
21  before Tashi started running?
22     A.  Yes.
23     Q.  Are officers permitted -- strike that.
24        At the point where Officer Lopera went to
25  grab Tashi, was there anything that you saw on the

Page 231

1   video, at least without the benefit of sound, that
2   indicated that Lopera had the right to grab Tashi?
3         MR. McNUTT:  Objection.  Form.
4         THE WITNESS:  I don't know.  And that's
5   what -- some of the questions we had for
6   Officer Lopera.
7   BY MR. LAGOMARSINO:
8      Q.  Are you aware -- I asked this before but
9   it's been a long day.
10        So were you part of the process of pulling
11  Tashi's cell records?
12     A.  No, I was not.
13     Q.  Okay.  Did anyone pull Officer Lopera's
14  cell records, to your knowledge?
15     A.  I believe so.  But I don't know.  I believe
16  it's the FIT team.
17     Q.  Do you know if they downloaded Officer
18  Lopera's data from his cell phone?
19     A.  I have no idea.
20     Q.  Lopera turned off his camera while being
21  questioned about the incident, correct?
22        MR. McNUTT:  Objection.  Form.
23        THE WITNESS:  Later on in the incident,
24  yes.
25

Page 232

1   BY MR. LAGOMARSINO:
2      Q.  Does the sole fact of a citizen running
3   away from an officer mean that the citizen is on
4   drugs?
5      A.  No.
6      Q.  You made a comment, I think, in response to
7   a misleading question, in my view, as to whether
8   Tashi could have been arrested for carjacking.
9         Do you believe that based on your review of
10  the video of the overhead surveillance and the body
11  cam footage, that Tashi should have been arrested for
12  carjacking?
13     A.  In my belief, what I put in the report was
14  the two views and what they depicted, along with
15  Officer Lopera's perception.  And that's what I put
16  in my report.
17     Q.  And did you believe that he could have been
18  arrested for carjacking based on all that?
19     A.  I would leave that up to the FIT team to
20  make that determination.
21     Q.  Sitting here today, do you believe --
22  strike that.
23        Sitting here today, would you have arrested
24  him for carjacking?
25     A.  Would I?

Page 233

1      Q.  Right.
2      A.  No.
3      Q.  You made a comment regarding 99 percent of
4   citizens and I didn't get the whole thing.  You used
5   the word -- the number 99 percent.  What was that in
6   reference to?
7      A.  I believe the -- it was just an estimate,
8   but on the weekends, the officers will come in
9   contact with someone who is under the influence of
10  alcohol, narcotics here in Vegas.
11     Q.  And maybe it was like a little bit of
12  hyperbole, but a lot of people --
13     A.  A lot of people.
14     Q.  -- are under the influence, right?
15     A.  Yes.
16     Q.  And was Lopera a drug recognition expert?
17     A.  I would have to look at his training
18  records, but I don't believe so.
19     Q.  And does the simple fact that somebody is
20  sweating on a May night mean that they're under the
21  influence and can be arrested for being under the
22  influence?
23     A.  No.
24     Q.  And if somebody has some glassy eyes and is
25  approaching an officer about possibly being chased by

Page 234

1  somebody mean that the officer can detain that
2  person?
3      A.  No.
4      Q.  If officers arrested everybody that
5  appeared to be under the influence on the Strip,
6  there wouldn't be a lot of tourists coming to Vegas
7  anymore, correct?
8      A.  I don't know.  Probably not.
9      Q.  Now, you were asked some questions about
10  whether and when Officer Lopera loosened his grip on
11  Tashi.
12      And I want to kind of get a definition of
13  "loosened."  Are you defining loosen as releasing the
14  grip?
15      A.  Releasing the pressure.
16      Q.  Okay.  And that's releasing his arm
17  completely?
18      A.  No.  It's releasing the pressure that's
19  between his bicep and forearm, the pressure that goes
20  along the carotid artery.
21      Q.  And when did that take place in the
22  timeline that Lopera released or loosened his grip on
23  Tashi in that manner?
24      A.  I don't know when.
25      Q.  For the crime of resisting a police

Page 235

1  officer, you have to have what's known as a predicate
2  crime, correct?
3      A.  You know, that's a good question.  I don't
4  know, actually.
5      Q.  In other words, if -- can a police officer
6  with no basis walk up to a citizen, arrest the
7  citizen, and then charges -- if the citizen resists,
8  charge that citizen with resisting?
9      A.  No.
10      Q.  You heard questions from Mr. McNutt about
11  Tashi not being hit that hard kind of in the
12  beginning of his questioning.
13      Do you remember those -- that line of
14  questioning?
15      A.  Yes.
16      Q.  Was Tashi being caressed?
17      MR. McNUTT:  Objection.  Form.
18      THE WITNESS:  I don't know.
19  BY MR. LAGOMARSINO:
20      Q.  By Lopera in the video?
21      A.  Was he being caressed?
22      Q.  If it wasn't hard, was it soft?
23      A.  I don't know.
24      Q.  Was Lopera softly tapping him?
25      A.  I wouldn't call it tapping.

Page 236

1      Q.  Was Lopera being soft and gentle with
2  Tashi?
3      A.  No.
4      Q.  Is it a natural reaction based on your
5  training of somebody who is getting punched in the
6  face and the head to lift their hands if they're
7  getting hit?
8      A.  Yes.
9      Q.  Do you expect citizens to comply with
10  officers if they're getting hit in the face for no
11  reason?
12      A.  No.
13      MR. LAGOMARSINO:  I have to go pull the
14  record that -- I don't know if the witness can
15  remember.  I want to try to refresh her recollection
16  so it will just take me two minutes about the
17  confusing and inconsistent command line of
18  questioning.  Just take a quick break.
19      THE VIDEOGRAPHER:  The time is
20  approximately 5:08 p.m.  We are going off the record.
21      (A recess was taken from 5:08 p.m.
22      to 5:20 p.m.)
23      THE VIDEOGRAPHER:  The time is
24  approximately 5:20 p.m.  We are back on the record.
25

Page 237

1  BY MR. LAGOMARSINO:
2      Q.  So we're placing in front of you a document
3  that just for the record is online at the Las Vegas
4  Review-Journal's website through Scribd, S-c-r-i-b-d,
5  after the incident.
6      And it's redacted.  It's my understanding
7  that Mr. Anderson will produce this document.
8      Have you ever seen this document before?
9      A.  I don't believe I have.
10      Q.  Let's go through it briefly.
11      A.  Okay.
12      Q.  Have you seen the timeline on page 3
13  before?
14      A.  Yes.
15      Q.  Where have you seen this timeline before?
16      A.  So this timeline may have came from the FIT
17  report that's produced.
18      Q.  So at 1:39, Officer Lopera yelled, "Don't
19  move."  And Farmer replied, "Okay."
20      Does that -- somebody saying "okay" to a
21  command indicate to you that they're complying?
22      A.  It doesn't necessarily mean they're
23  complying.  I think they're acknowledging the verbal
24  command.
25      Q.  At 1:45 it says, "Officer Lopera yelled get

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

61 (Pages 238 to 241)

Page 238

1  on your stomach. Farmer replied I will, I will,
2  please. And then Farmer fell backward to the
3  ground."
4       Does somebody saying, "I will, I will,
5  please" indicate to you that somebody is complying
6  with an order?
7       A.   Again, I don't know if he's complying, but
8  it sounds like he's acknowledging the verbal command.
9       Q.   Okay. It says here at 1:57, Officer
10  Lopera, so this is one minute and 57 seconds into the
11  body cam. Officer Lopera yelled, "Get on your
12  stomach." And then at two minutes Farmer rolled onto
13  his stomach, then to his back.
14       Does that indicate to you that he was
15  trying to comply?
16       A.   That he was trying to comply?
17       Q.   Yes.
18       A.   He rolled on his stomach and rolled back
19  on -- then rolled to his back.
20       Q.   He had Taser probes on him, right?
21       A.   Yes.
22       Q.   So does that indicate to you he's
23  complying, not complying or indeterminate?
24       MR. McNUTT: Object to this line of
25  questioning inasmuch as you're asking the witness to

Page 239

1  interpret someone's interpretation of the actual
2  video.
3  BY MR. LAGOMARSINO:
4       Q.   All right. So let's do some foundational
5  questions.
6       You're the lead investigator on the case,
7  right?
8       A.   Yes.
9       Q.   And you're reviewing all the
10  interpretations from all the witnesses, correct?
11       A.   Yes.
12       Q.   That's part of your job, right?
13       A.   Yes.
14       Q.   So as part of your job, you make
15  recommendations based on what people have interpreted
16  from the videos, correct?
17       A.   If you're referencing FIT being a witness,
18  I don't consider them a witness. They did an
19  independent investigation.
20       Q.   Was this timeline used in the CIRT report?
21       A.   No. We have our own timeline.
22       Q.   Was the FIT report provided to the CIRT
23  board?
24       A.   The FIT report was -- yes, it was.
25       Q.   So basically at 1:57, again Lopera says,

Page 240

1  "Get on your stomach." At 2:04, seven seconds later,
2  Farmer rolls to his stomach, right?
3       A.   Yes. Per this timeline, yes.
4       Q.   And does that indicate compliance to you?
5       A.   Yes.
6       Q.   And three seconds later, Farmer says,
7  "Okay, okay, okay, sir."
8       Does that indicate compliance to you?
9       A.   Again, I don't know what his actions are at
10  this time.
11       Q.   Okay. Then at 2:20 it says security
12  arrived. They give Farmer verbal commands and a
13  guard grabbed onto Farmer's arms. Farmer said, "I
14  will."
15       Do you believe it could be confusing to
16  somebody who is getting multiple commands from
17  multiple people?
18       A.   Yes.
19       Q.   Now, security is giving commands to say
20  stop, turn around, correct? At 2:22?
21       A.   Per this timeline, that's what it says,
22  yeah.
23       Q.   And that command was not given to Farmer
24  from Lopera, correct?
25       A.   According to this timeline, it says

Page 241

1  security gave that.
2       Q.   But prior to this, according to the
3  timeline, Lopera didn't say, "Stop, turn around,"
4  correct?
5       A.   No.
6       Q.   That's incorrect?
7       A.   No. Yeah. Officer Lopera did not say,
8  "Stop, turn around."
9       Q.   So that's a different command, correct?
10       A.   Yes.
11       Q.   Okay. So then at 2:33, Lopera holsters his
12  ECD and says, "Hands behind your back."
13       Farmer replied, "I'm trying to." Right?
14  Does that indicate compliance?
15       A.   Possible indication.
16       Q.   You reviewed the videos probably multiple
17  times, correct?
18       A.   Yes.
19       Q.   How many times would you say you reviewed
20  Lopera's body cam video by way of an estimate?
21       A.   Probably 40 times, 50 times.
22       Q.   And you never came to the conclusion that
23  Farmer struck Lopera, correct?
24       A.   Correct.
25       Q.   And there's nothing -- there's no

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

62  (Pages 242 to 245)

### Page 242

1  conclusion in here that Farmer struck Lopera,
2  correct?
3  　　A.  I haven't read this all the way through.
4  　　Q.  And there's some timelines here.  So going
5  to page 7.
6  　　　　The third paragraph says, "As Officer
7  Lopera began to chase Farmer, he had no reasonable
8  suspicion or probable cause to believe that Farmer
9  had been involved in any criminal conduct."
10  　　　　Do you disagree, agree, or have no opinion
11  on that statement?
12  　　A.  I have no opinion.
13  　　Q.  So then it says, "Officer Lopera began
14  issuing verbal commands to Farmer; however, the
15  longest time between cycles of the ECD was six
16  seconds."
17  　　　　Do you agree with that statement?  Or do
18  you not know without looking at the report?
19  　　A.  Not without looking at my report in
20  comparison.
21  　　Q.  It says, "Officer Lopera told Farmer to get
22  on his stomach several times, but never gave Farmer a
23  reasonable opportunity to comply with commands before
24  cycling the ECD again."
25  　　　　Do you agree, disagree, or have no opinion?

### Page 243

1  　　A.  I agree.
2  　　Q.  And then it says, "Officer Lopera's verbal
3  commands also contradicted each other telling Farmer
4  don't move, followed by a command to get on your
5  stomach."
6  　　　　Do you agree, disagree or no opinion on
7  that statement?
8  　　A.  Agree.
9  　　　　MR. LAGOMARSINO:  No further questions.
10  　　　　MR. McNUTT:  I have a few follow-up.
11
12  　　　　FURTHER EXAMINATION
13  BY MR. McNUTT:
14  　　Q.  You testified that per Metro policy you
15  could use a Taser three times, correct?
16  　　A.  Yes.
17  　　Q.  Are you aware that there are instances
18  where you can use it in certain circumstances more
19  than three times?
20  　　A.  I believe by policy it states that you
21  would have to articulate those reasons why and be in
22  extreme circumstances.
23  　　Q.  Right.  So if an officer -- Sergeant Bland
24  said if an officer is alone, they could use it more
25  than three times, correct?

### Page 244

1  　　A.  If the officer can articulate that, yeah.
2  　　Q.  Okay.  Was the restricted area that Tashi
3  Farmer ran down, do you think that was an obvious
4  restricted area?
5  　　A.  Yes.
6  　　Q.  I'm not going to -- I don't want to know
7  what you discussed with your lawyer.  Mr. Lagomarsino
8  asked you whether or not you had read the other
9  expert's report from the other case that I referenced
10  when I was asking you the questions about the punch
11  to Ken Lopera.  Do you remember that?
12  　　A.  Yes, I do.
13  　　Q.  Did you discuss with your lawyer the fact
14  of the other expert's testimony?
15  　　A.  The facts, no.
16  　　Q.  Did Officer Lopera have a legitimate law
17  enforcement purpose in pursuing Tashi Farmer?
18  　　A.  Yes.
19  　　Q.  Isn't it true that someone can say they are
20  complying with an officer's commands but physically
21  not be complying with an officer's commands?
22  　　A.  Yes.
23  　　Q.  Are you trained to focus on what the
24  suspect is physically doing or what they are telling
25  you verbally?

### Page 245

1  　　A.  Physical movements and then obviously both,
2  but physical.
3  　　Q.  But physical trumps, correct?
4  　　A.  Yes.
5  　　Q.  Because hands can kill you but words can't,
6  correct?
7  　　A.  Yes.
8  　　　　MR. McNUTT:  No further questions.
9  　　　　MR. ANDERSON:  I have nothing.
10  　　　　MR. LAGOMARSINO:  No questions.
11  　　　　THE VIDEOGRAPHER:  This concludes the video
12  deposition of Kasey Kirkegard.
13  　　　　The original media of today's testimony
14  will remain in the custody of Las Vegas Legal Video.
15  　　　　The time is approximately 5:32 p.m., and we
16  are going off the record.
17  　　　　(Exhibit 8 was marked for identification.)
18  　　　　　　　　-  -  -
19  　　　　　　(The videotaped deposition was
20  　　　　　　concluded at 5:32 p.m.)
21  　　　　　　　　-  -  -
22
23
24
25

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

63  (Pages 246 to 247)

Page 246

CERTIFICATE OF DEPONENT

PAGE   LINE   CHANGE            REASON

* * * * *

I, DETECTIVE KASEY KIRKEGARD, deponent herein,
do hereby certify and declare under penalty of perjury
the within and foregoing transcription to be my
deposition in said action; that I have read,
corrected and do hereby affix my signature to said
deposition.

_____
DETECTIVE KASEY KIRKEGARD
Deponent

Page 247

CERTIFICATE OF REPORTER

I, the undersigned, a Certified Shorthand
Reporter of the State of Nevada, do hereby certify:
That the foregoing proceedings were taken
before me at the time and place herein set forth;
that any witnesses in the foregoing proceedings,
prior to testifying, were duly sworn; that a record
of the proceedings was made by me using machine
shorthand which was thereafter transcribed under my
direction; that the foregoing transcript is a true
record of the testimony given to the best of my
ability.

Further, that before completion of the
proceedings, review of the transcript [ X ] was
[  ] was not requested pursuant to NRCP 30(e).

I further certify I am neither financially
interested in the action, nor a relative or employee
of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date
subscribed my name.

Dated: February 12, 2019

_____
GALE SALERNO, RMR, CCR #542

All-American Court Reporters (702) 240-4393
www.aacrlv.com