# Exhibit M - Jamie Frost Deposition

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 75

```
 1                    CERTIFICATE OF REPORTER

 2
     STATE OF NEVADA )
 3                   ) ss:
     COUNTY OF CLARK )

 4

 5          I, Sarah Safier, CCR No. 808, do thereby
     certify:  That I reported the deposition of JAMIE
 6   FROST, ESQUIRE, commencing on Tuesday,
     November 12, 2019, at 10:05 a.m.
 7          That prior to being deposed, the witness was
     duly sworn by me to testify to the truth.  That I
 8   thereafter transcribed my said shorthand notes into
     typewriting and that the typewritten transcript is a
 9   complete, true, and accurate transcription of my said
     shorthand notes.  That prior to the conclusion of the
10   proceedings, pursuant to NRCP 30(e), the reading and
     signing of the transcript was requested by the
11   witness or a party.
            I further certify that I am not a relative
12   or employee of counsel of any of the parties, nor a
     relative or employee of the parties involved in said
13   action, nor a person financially interested in the
     action.
14          IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Clark, State of Nevada, this
15   21st day of November, 2019.

16

17                       _____

18                       Sarah Safier, CCR No. 808

19

20

21

22

23

24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Page 1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3                 * * * * *

4  TRINITA FARMER,              )
   individually,                )  Case No.
5                               )  2:18-cv-00860-GMN-VCF
             Plaintiff,         )
6                               )
                                )
7     vs.                       )
                                )
   LAS VEGAS METROPOLITAN       )
8  POLICE DEPARTMENT, a         )
   political subdivision of     )      CONDENSED
9  the State of Nevada;         )
   KENNETH LOPERA,              )      TRANSCRIPT
10 individually; TRAVIS         )
   CRUMRINE, individually;      )
11 MICHAEL TRAN, individually;  )
   MICHAEL FLORES,              )
12 individually,                )
                                )
13          Defendants.         )
   _____)
14

15

        VIDEOTAPED DEPOSITION OF JAMIE FROST, ESQUIRE
16
   30(b)(6) REPRESENTATIVE OF LAS VEGAS METROPOLITAN
17                 POLICE DEPARTMENT

18       Taken on Tuesday, November 12, 2019

19                At 10:05 a.m.

20           Taken at Lagomarsino Law

21       3005 West Horizon Ridge Parkway

22                 Suite 241

23           Henderson, Nevada 89052

24

25 Reported by:  Sarah Safier, CCR No. 808

Page 2

1  VIDEOTAPED DEPOSITION OF JAMIE FROST, ESQUIRE,
2  30(b)(6) Representative of Las Vegas Metropolitan
3  Police Department, taken at Lagomarsino Law, 3005
4  West Horizon Ridge Parkway, Henderson, Nevada, on
5  Tuesday, November 12, 2019, at 10:05 a.m., before
6  Sarah Safier, Certified Court Reporter, in and for
7  the State of Nevada.
8  APPEARANCES:
9  For the Plaintiff:
10    ANDRE LAGOMARSINO, ESQ.
      TYUS SHEPPARD
11    Lagomarsino Law
      3005 West Horizon Ridge Parkway
12    Suite 241
      Henderson, Nevada 89052
13
   For the Defendant Kenneth Lopera:
14
      DANIEL R. MCNUTT, ESQ.
15    McNutt Law Firm, P.C.
      625 South Eighth Street
16    Las Vegas, Nevada 89101
17 For the Defendants Las Vegas Metropolitan Police
   Department, Travis Crumrine, Michael Tran, Michael
18 Flores and Deponent:
19    CRAIG R. ANDERSON, ESQ.
      Marquis Aurbach Coffing
20    10001 Park Run Drive
      Las Vegas, Nevada 89145
21
   Also Present:
22
      CHRISTOPHER BAUGH, Videographer
23
24
25

Page 3

1           I N D E X
2  Witness: JAMIE FROST, ESQUIRE
3        Examination  Further Examination
   By Mr. Lagomarsino    5       71
4  By Mr. McNutt        63
5        E X H I B I T S
6  EXHIBIT                              PAGE
7  1 - 9/30/17 Memo to Lopera/Notice of     15
       Pre-Termination Hearing, Adjudication
8      of Complaint/Lopera 5/14/17
9  1A - Plaintiff's First Amended Notice of  6
       Videotaped Deposition
10
11 2 - Employment Separation Notice         11
12 9 - Cases Involving the Neck             8
13 10 - 11/27/14 Adjudication of Complaint  38
14 11 - 10/8/13 Adjudication of Complaint   40
15 12 - 10/31/14 Adjudication of Complaint  41
16 13 - 1/12/15 Adjudication of Complaint   44
17 14 - 6/29/14 Adjudication of Complaint   47
18 15 - 2/11/16 Adjudication of Complaint   48
19 16 - 1/28/15 Adjudication of Complaint   48
20 17 - 8/24/17 Memo to Sheriff Lombardo,   13
       Subject: Tactical Review Board
21 21 - Use of Force Complaints 2012-2017   51
22 22 - LVNR Statistics 2012 - 2017         57
23      INFORMATION TO BE PROVIDED
24          Page    Line
25          72       25

Page 4

1           THE VIDEOGRAPHER: Good morning. Today is
2  November 12, 2019. The time is approximately
3  10:05 a.m. This begins the video deposition of
4  Jamie Frost.
5           We are located at Lagomarsino Law, 3005 West
6  Horizon Ridge Parkway, Suite 241, Henderson, Nevada
7  89052.
8           My name is Christopher Baugh, court
9  videographer with Las Vegas Legal Video.
10          This is United States District Court,
11 District of Nevada, Case No. 2:18-cv-00860-GMN-VCF,
12 in the matter of Trinita Farmer versus Las Vegas
13 Metropolitan Police Department, et al.
14          This video deposition is requested by
15 attorneys for the plaintiff.
16          Will counsel please state your appearances
17 for the record.
18          MR. LAGOMARSINO: Andre Lagomarsino for
19 plaintiff, Trinita Farmer. Also present today is
20 Tyus Sheppard shadowing.
21          MR. MCNUTT: Dan McNutt on behalf of Officer
22 Ken Lopera.
23          MR. ANDERSON: Craig Anderson on behalf of
24 Las Vegas Metropolitan Police Department, Officers
25 Crumrine, Tran and Flores and the witness.

Page 5

1           THE VIDEOGRAPHER: Thank you, Counsel.
2  The deponent may now be sworn in by Sarah
3  Safier with All-American Court Reporters.
4  Whereupon --
5           JAMIE FROST, ESQUIRE
6  being first duly sworn to tell the truth, the whole
7  truth, and nothing but the truth, was examined and
8  testified as follows:
9           EXAMINATION
10 BY MR. LAGOMARSINO:
11    Q  Can you please state your name and spell
12 your last name for the record.
13    A  Jamie Frost, F-R-O-S-T.
14    Q  Have you ever had your deposition taken
15 before?
16    A  Yes.
17    Q  On how many occasions?
18    A  I think two that I can recall.
19    Q  Okay. Were they in a similar 30(b)(6)
20 capacity?
21    A  One was. I think the other one might have
22 been -- it was me in my position at Metro, but I
23 can't remember if I was actually a 30(b)(6) or not.
24    Q  You understand that today you have been
25 designated as a 30(b)(6) witness?

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 6

1    A   Yes.
2    Q   And in that regard, you have an obligation
3  to tell the truth?
4    A   Yes.
5    Q   I'm going to hand you -- we'll mark this as
6  Exhibit 1A, because I have a different 1.
7        (Deposition Exhibit No. 1A was
8        marked for identification.)
9  BY MR. LAGOMARSINO:
10   Q   Have you seen Exhibit 1A before?
11   A   Yes, I believe so.
12   Q   All right.  And what is your understanding
13  of which topics you are here to testify about?  And
14  it may be easier if I just go through them and ask
15  you if you're here to testify about certain topics.
16       So are you here to testify about Topic
17  No. 9?
18   A   Yes.
19   Q   And that is, just for the record:  "The
20  separation process between LVMPD and Defendant
21  Lopera, including all facts, documents, e-mails and
22  other information regarding the separation.  Any
23  claim of privilege should be accompanied by a
24  privilege log."
25       Are you here to talk about Topics 17, 18, 19

Page 7

1  and 20?
2    A   Yes.
3    Q   So 17 is:  "An explanation of documentation
4  produced by LVMPD in this case concerning all LVNR
5  reported incidents."
6        18 is:  "The discipline LVMPD police
7  officers have received for using an improper neck
8  restraint in the five years prior to the incident and
9  involving Tashi Farmer."
10       19 is:  "The discipline LVMPD police
11  officer" -- it should say police officers -- "have
12  received using an LVNR in the five years prior to
13  the incident and involving Tashi Farmer."
14       And then 20 is:  "The discipline Defendant
15  Lopera received from his actions on the May 14, 2017,
16  incident involving Tashi Farmer."
17       What did you do to prepare yourself to
18  testify today?
19   A   I reviewed the documents that I believe were
20  produced to you guys, the comparable discipline,
21  which -- regarding the LVNR incidents.
22   Q   Okay.  Any other documents?
23   A   No, I don't believe so.
24   Q   Did you review in preparation for your
25  deposition any video footage of the incident?

Page 8

1    A   No.
2    Q   Have you ever reviewed video footage of the
3  incident?
4    A   Yes.
5    Q   Without getting into privilege or work
6  product information, are you working on this case
7  from Metro's perspective internally?
8    A   No.
9        (Deposition Exhibit No. 9 was
10       marked for identification.)
11  BY MR. LAGOMARSINO:
12   Q   Did you review Exhibit 9 in preparation for
13  your deposition?
14   A   Yes.
15   Q   And then is it your understanding that some
16  time after Exhibit 9 was produced in this case, a
17  subsequent request to produce was done or served for
18  individual records relating to those incidents in
19  Exhibit 9?
20   A   I believe so, yes.
21   Q   And did you review that documentation as
22  well?
23   A   The Adjudication of Complaint?
24   Q   Yes.
25   A   Yes.  I paged through them.

Page 9

1    Q   Okay.  So if I have specific questions, we
2  can kind of go through those, correct?
3    A   Yes.  I'll do my best to answer them.
4    Q   Okay.  Now, if you don't know the answer to
5  a question today, I'd ask that you just tell me you
6  don't know.  We don't want you to guess.
7        You understand that?
8    A   Yes.
9    Q   And when were you first -- what is your --
10  strike that.
11       What is your occupation?
12   A   I'm labor relations counsel for Las Vegas
13  Metropolitan Police Department.
14   Q   Okay.  And when were you first hired by
15  Metro?
16   A   In April 2015.
17   Q   When -- are you an attorney?
18   A   Yes.
19   Q   When did you receive your license in Nevada?
20   A   In October 2009-ish.
21   Q   Are you licensed in any other states?
22   A   No.
23   Q   Okay.  After getting your license, where was
24  your first job as an attorney?
25   A   I worked for Judge Glass at the Eighth

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

4  (Pages 10 to 13)

---

Page 10

1  Judicial District Court.
2      Q   Okay.  And you were a law clerk?
3      A   Yes.
4      Q   All right.  And a year, two years or --
5      A   One year.
6      Q   After working for Judge Glass, where did you
7  work?
8      A   Marquis Aurbach Coffing.
9      Q   And what was your position there?
10     A   I was an attorney associate.
11     Q   Okay.  And did you work in litigation?
12     A   Yes.
13     Q   And you took numerous depositions, I'm
14  assuming?
15     A   Yes.
16     Q   And you also not only defended but were the
17  questioning attorney, correct?
18     A   That's correct.
19     Q   So do you feel comfortable moving forward
20  without all the normal admonitions in terms of
21  understanding the question and so forth?
22     A   I do.
23     Q   Okay.  All right.  In fact, we have sat in
24  depositions before, correct?
25     A   Yes, we have.

---

Page 11

1      Q   And as you probably know, I can stutter,
2  mumble, be a little bit of a low talker, so if you
3  don't understand the question, please let me know.
4      A   Will do.
5      Q   All right.  Other than the adjudications and
6  this table that we have as Exhibit 9, have you
7  reviewed any other documents in preparation for your
8  deposition?
9      A   I don't recall reviewing anything else.
10     Q   Okay.  I would like to move forward right
11  now with Topic No. 9, the separation process between
12  LVMPD and Defendant Lopera.
13         (Deposition Exhibit No. 2 was
14          marked for identification.)
15  BY MR. LAGOMARSINO:
16     Q   What is Exhibit 2?
17     A   It's a separation notice.
18     Q   For the record, it's Bates LVMPD 4187.
19         Is this a Metropolitan Police Department
20  form?
21     A   Yes.
22     Q   And is this the separation notice for Ken
23  Lopera?
24     A   Yes.
25     Q   Have you ever seen this document before at

---

Page 12

1  any time?
2      A   All separation notices are sent to me at the
3  time that they separate.  I don't remember if I
4  actually double-clicked and looked at the attachment
5  or not in this particular one.
6      Q   Okay.  Does it appear to you to be a true
7  and correct copy of Ken Lopera's separation notice?
8      A   Yes, it does.
9      Q   And what was the last date that is noted as
10  Mr. Lopera having worked?
11     A   It says here September 22, 2017, but I don't
12  have personal knowledge of that.
13     Q   Okay.  Now, the incident involving Officer
14  Lopera and Tashi Farmer occurred May 14, 2017, or
15  thereabouts.  Is that your understanding?
16     A   Yes.
17     Q   Typically, what happens with officers when
18  they're involved in an incident that results in the
19  death of a citizen?
20     A   They are investigated by our Critical
21  Incident Review Team, and they're generally placed on
22  relief of duty, administrative relief of duty.
23     Q   Do you know if he was relieved of duty with
24  pay pending the investigation?
25     A   Yes, he was.

---

Page 13

1      Q   And is that possibly the reason why his last
2  day of work could be September 22, 2017?
3      A   Yes.
4      Q   Okay.  All right.  It says here that Ken
5  Lopera -- strike that.
6         Do you know why the box "Voluntary
7  Retirement" is checked?
8      A   Yes, because that's how he retired.  That's
9  how he separated, voluntarily.
10     Q   And why is "Disability PERS" checked?
11     A   He must have sought a disability retirement
12  through PERS, but that's all done through PERS.
13     Q   Okay.  Do you know what his disability was?
14     A   No.
15     Q   Were you involved in any discussions or
16  negotiations with Officer Lopera or his counsel about
17  separation of employment from Metro?
18     A   No.  And I'm not aware of any negotiations
19  that occurred.
20     Q   Okay.
21         (Deposition Exhibit No. 17 was
22          marked for identification.)
23  BY MR. LAGOMARSINO:
24     Q   Have you ever seen Exhibit 17 before?
25     A   Yes.

---

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

5  (Pages 14 to 17)

---

Page 14

1   Q   What is Exhibit 17?
2   A   It is the memo that the board chair writes
3   in conjunction with the CIRT team after the Use of
4   Force Review Board and Tactical Review Board.  It has
5   the findings of the board, for both the Use of Force
6   Review Board and Tactical Review Board, and the
7   recommendations on how to proceed handling each
8   employee.
9   Q   And is the chair of the board Assistant
10   Sheriff Tim Kelly?  If you could turn to the last
11   page.
12   A   Yes, that's correct.
13   Q   And in reference to the employees involved,
14   Crumrine, Tran, Flores and Lopera and Lif,
15   recommendations were made regarding personnel action
16   in this memo, correct?
17   A   That's correct.
18   Q   And in this memo, with respect to Officer
19   Lopera, the recommendation is stated to review the
20   Adjudication of Complaint.  That's on Page 377.  Is
21   that accurate?
22   A   Yes, that's accurate.
23   Q   Do you know why they would reference the
24   Adjudication of Complaint?
25   A   That's how they do it when they're issuing

---

Page 15

1   discipline.  They -- I say "they" because the board
2   chair rotates depending on who's handling which
3   board.
4   Q   Okay.
5   A   We're given a recommendation, labor
6   relations, and we draft it up, attach that to -- I
7   believe they attach it; I've never seen it happen.
8   But I believe they attached it to this memo that goes
9   up to the sheriff, and then he can review the actual
10   Adjudication of Complaint versus just the
11   recommendation of how to handle.
12   Q   And were Adjudications of Complaint
13   completed with respect to Crumrine, Tran and Flores?
14   A   At the time, no.
15   Q   Okay.  Have they ever been completed?
16   A   I knew that was going to be your next
17   question.  I have to think about it.  Definitely not
18   for Flores or Tran.  I have to think about it for
19   Crumrine.
20   Q   Okay.
21   A   And I can get back to you on that.
22   Q   Okay.
23      (Deposition Exhibit No. 1 was
24   marked for identification.)
25      ///

---

Page 16

1   BY MR. LAGOMARSINO:
2   Q   Exhibit 1 is comprised of two documents, it
3   appears.  First is a memorandum dated September 20,
4   2017, to Officer Lopera.  Is it from the sheriff?
5   A   The memo?
6   Q   Yes.
7   A   Yes.  I mean, his designee signs it, which
8   is either myself or Lisa Lichtenberger, in this
9   particular case, the manager of labor relations.
10   Q   So did Lisa Lichtenberger sign this one?
11   A   That's correct.
12   Q   Okay.  And does this appear to be a true and
13   correct copy of the memorandum issued to Ken Lopera?
14   A   Yes.
15   Q   And it appears that attached to this memo is
16   the Adjudication of Complaint, correct?
17   A   That's correct.
18   Q   And when it's provided to Officer Lopera, is
19   it provided as the memo and the attached complaint?
20   A   Not always, but it looks like it was done in
21   this particular case.
22   Q   Okay.  And does that appear to be a true and
23   correct copy of the Adjudication of Complaint with
24   respect to Officer Lopera?
25   A   Yes.

---

Page 17

1      MR. ANDERSON:  Are those your highlights in
2   there, though, Andre?
3      MR. LAGOMARSINO:  Oh, yes.  Sorry.
4   BY MR. LAGOMARSINO:
5   Q   Throughout the day, we may have highlights.
6   When I'm asking if they're true and correct copies, I
7   mean to say that not including the highlights.
8   A   Okay.
9   Q   So same answer?
10   A   Yes.
11   Q   Okay.  All right.  Now, the recommendation
12   from -- strike that.
13      Who makes the recommendation as to
14   disciplinary action with respect to Officer Lopera,
15   or who made that?
16   A   Sheriff Tim Kelly.
17   Q   Okay.  And was the recommendation that
18   Officer Lopera be terminated?
19   A   That's correct.
20   Q   Do you know why Officer Lopera was allowed
21   to retire on disability?
22      MR. MCNUTT:  Objection.  Form.
23      THE WITNESS:  So we can't prevent that.  He
24   would go to PERS and seek a medical disability, and
25   that whole process is done through PERS without the

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

6 (Pages 18 to 21)

Page 18

1   department's input, necessarily.  I think there's one
2   form that's filled out by a supervisor or someone,
3   depends on the case.  I'm not well-versed in how
4   medical disability works.
5        But we don't have any say over whether
6   somebody gets a medical disability or not.  We would
7   proceed with our normal process like we did in this
8   case; we'd schedule a pre-term hearing, because the
9   Adjudication of Complaint termination is just a
10  recommendation.  It has to go to a pre-term board
11  before they're terminated.  And as you can see here,
12  it's about 28 days before that gets scheduled.  Then
13  the sheriff has to approve the recommendation for the
14  pre-term board.
15       But if they do anything in between that time
16  period, resign, resign through PERS disability,
17  that's their call.
18  BY MR. LAGOMARSINO:
19       Q   So in terms of the timing, Officer Lopera,
20  it appears, was notified on September 20, 2017.  The
21  recommendation was that he be terminated, correct?
22       A   He signed it on the 21st.
23       Q   Okay.  The 21st.
24          And it appears that he submitted his
25  separation the next day on September 22nd?

Page 19

1       A   That's correct.
2       Q   Okay.  Is there any vetting process to
3   determine whether Officer Lopera was, in fact,
4   disabled?
5       A   PERS has a doctor that reviews their medical
6   documents from their doctor, and then they make the
7   determination.  And the department doesn't have a say
8   over that.
9       Q   Who is that doctor?
10      A   I have no idea.  And those are documents
11  that I believe would be housed with PERS.
12      Q   Are you aware of any other cases, either
13  while you've been with the department or before the
14  department, where officers had termination
15  recommended and then they were allowed to voluntarily
16  retire?
17      A   Absolutely.  It happens all the time.  They
18  don't want to go through the termination proceedings
19  and end up with a termination on their record, so
20  they resign prior to.
21      Q   Okay.  Are you aware of a document called
22  the "Disciplinary Decision Guide"?
23      A   Yes.
24      Q   What is that?
25      A   It is a document that's negotiated by the

Page 20

1   department with the associations.  There are two
2   different ones now:  One for PMSA, the supervisors;
3   and one for PPACE, civilian; and PPA, the first-line
4   officers.  And it determines our level of discipline.
5       Q   Are those available online?
6       A   I don't believe so, no.  It's available
7   internally online or intranet, but I don't believe
8   it's public record for the public to view.
9       Q   In this case, what would that guide have to be
10  consulted prior to a recommendation being made?
11      A   Yes, although when you have a truthfulness
12  or gross insubordination, everyone knows those are
13  automatic term cases.
14      Q   Okay.
15      A   And I'm not sure, I'd have to look back,
16  what his use of force was called.  But -- yeah,
17  that's also gross inappropriate use of force.  That's
18  also a terminable offense.
19      Q   So I'm going to kind of call for a narrative
20  answer.  Can you explain the process that Officer --
21  well, strike that.
22          Can you describe the process that Officer
23  Lopera went through in terms of his separation from
24  Metro, starting from the incident itself involving
25  Tashi Farmer through and inclusive of his retirement?

Page 21

1       A   So basically the night of he gets relieved
2   of duty.  Again, it's administrative relief of duty
3   at that point.  There's a CIRT investigation that
4   takes place and a FIT investigation that takes place.
5          At some point, those -- CIRT comes up with
6   their recommended findings, and they schedule a
7   hearing with the board.  That would be a Use of Force
8   Review Board and a Tactical Review Board.  The Use of
9   Force is just for the officer who actually used
10  force; the Tactical Review Board are any other
11  officers that might have been involved, which is why
12  you see more names on that memo.
13          They go to the Use of Force Review Board and
14  Tactical Review Board.  The Use of Force is first,
15  Tactical Review Board is second.  The Use of Force
16  Review Board includes citizens, civilians from
17  outside of Metro that vote on the determination.  And
18  then the TRB, Tactical Review Board, includes just
19  internal members.
20          The findings that you see on this document,
21  the Exhibit 17, would be what came out of that board
22  on all of the officers and the subject employees.
23          At that point, for Officer Lopera, a
24  conversation is had between the chain, the chair of
25  the board and labor relations to determine what the

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 22

1  appropriate level of discipline being.  Labor
2  relations looks at the Disciplinary Decision Guide
3  and comparable discipline to make a termination
4  recommendation.
5       Like I said, in this particular case, there
6  were three different policy violations that result in
7  automatic termination.  There isn't discretion for
8  the chain or anybody else to determine.
9       So at that point, labor relations would
10 draft the Adjudication of Complaint with approval
11 from, in this particular case, Assistant Sheriff Tim
12 Kelly.  Once he approves it, he sends everything up
13 to the sheriff.  Once the sheriff approves everything
14 from that process, then the Adjudication of Complaint
15 is signed with the recommendation of termination.
16 That gets signed by the assistant sheriff and the
17 undersheriff.
18      Once it comes back to labor relations, we
19 then work on scheduling a pre-termination hearing.
20 Had he not resigned prior to the pre-termination
21 hearing, we would have proceeded with that.  The
22 pre-term board would have made their determination on
23 whether they were going to uphold the termination
24 recommendation.
25      From there, their recommendation goes to the

Page 23

1  sheriff for final approval, whether he is going to
2  agree with the board or not.
3       In this particular case, he resigned prior
4  to the pre-term hearing as we discussed the PERS
5  medical disability retirement, and so we never had
6  the pre-termination hearing.
7    Q   Are you aware of whether Officer Lopera had
8  a disability prior to the incident involving Tashi
9  Farmer?
10   A   I am not aware one way or the other.
11   Q   What were the bases for justifying
12 termination of Officer Lopera?
13   A   The three line items, per se, would be
14 truthfulness, gross insubordination and gross
15 inappropriate use of force.
16   Q   And you mentioned that there's no discretion
17 on certain line items in terms of termination being
18 recommended.  Is there discretion on the gross
19 inappropriate use of force?
20   A   No.
21   Q   What are the levels of -- well, strike that.
22      What is grossly inappropriate use of force?
23   A   We don't have a definition of that.  So what
24 happens is whoever the investigating body is, whether
25 it's the Critical Incident Review Team or IAB, they

Page 24

1  make the determination on whether the use of force
2  violates the use of force policy or not.  That's it.
3       Then it's the chain who makes the
4  determination on whether it's a gross inappropriate
5  use of force or just a bad use of force.
6    Q   Okay.
7    A   And chains have considered all different
8  types of things when considering that.  But we
9  have --
10      MR. MCNUTT:  I'm sorry, who considered all
11 types of things.
12      THE WITNESS:  The chain.
13      MR. MCNUTT:  The chain?
14      THE WITNESS:  Yeah.  So the chain of
15 command.
16      MR. MCNUTT:  The chain of command.
17      THE WITNESS:  In this particular case, it
18 would be Assistant Sheriff Tim Kelly.  Whoever is
19 determining discipline are the ones that would
20 determine whether it's gross inappropriate use of
21 force or not.  And, again, there's no definition.
22 BY MR. LAGOMARSINO:
23   Q   So if there's use of force that is a policy
24 violation, is it basically when you say "bad use of
25 force," is that basically what it's called, "bad use

Page 25

1  of force"?
2    A   No.  That's just my name.  It could be
3  "inappropriate," "unnecessary."  It just -- basically
4  it would say in the -- in the memo or in the
5  investigative report for the IAB side that it was a
6  violation of the use of force policy.  Sometimes they
7  put a word before it, sometimes they don't.
8    Q   Okay.  So the words you have seen, and
9  correct me if I'm wrong, are "inappropriate use of
10 force," correct?
11   A   Uh-huh.  I've seen "inappropriate" and I've
12 seen "unnecessary."
13   Q   Okay.  And then "grossly inappropriate" is
14 what's here, correct?
15   A   Right.  But that's not a determination made
16 by the investigating body.  It's a determination made
17 by the chain that's adjudicating the case.
18   Q   Okay.  In this case, who would be part of
19 the chain that adjudicated Lopera's case?
20   A   Assistant Sheriff Tim Kelly, he might have
21 consulted the lower parts of the chain, but on TRBs
22 and use of force, it's the chair that handles the
23 discipline.
24   Q   Okay.  Have you seen the term "grossly
25 inappropriate use of force" used in other cases

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

8  (Pages 26 to 29)

---

Page 26

1  involving officers?
2      A   Yes.
3      Q   Which officers do you recall?
4      A   Am I allowed to say that, Craig?
5          MR. ANDERSON:  The civilians?
6          THE WITNESS:  No, the names of officers that
7  have also been sustained for gross inappropriate use
8  of force.
9          MR. ANDERSON:  Yeah, I don't think we're
10  allowed to say that because of privacy issues.
11  BY MR. LAGOMARSINO:
12      Q   Okay.  Well, then let's use numbers and then
13  talk about the types of cases that they were.  So
14  let's say under Number 1, what's the first example
15  that you can recall?
16      A   So I can only think of two.  I could be
17  wrong, because I didn't look that up, but I can only
18  think of two.  It is rare.  And that's two in my five
19  years of being at the department.  There might have
20  been more prior to me.
21      The one I can think of -- maybe he didn't
22  get that designation.  I know we were going back and
23  forth on it with the chain.  I'm not going to
24  confirm, because I'm not 100 percent certain that we
25  actually ended up calling it that.

Page 27

1      He was terminated also for truthfulness.  I
2  can't remember if he was terminated on the gross
3  inappropriate use of force as well or not, but it was
4  certainly something we were considering.
5      The second one --
6      Q   Well, before I move on, so generally, what
7  was that case about?
8      A   A use of force that occurred in a hotel, and
9  it did not result in a death.
10      Q   Okay.  Was it a shooting?
11      A   No.
12      Q   Was it a choke hold or neck restraint?
13      A   Actually, I believe it might have been, yes.
14      Yes.  Something with a neck restraint.  I
15  don't want to call it an LVNR, because I'm not
16  well-versed on that to say that, but yes.
17      Q   Which -- which P-number are you referring to
18  here?
19      A   9661.  It's LVMPD 1387.
20      Q   Okay.  And just for the record, that's on
21  Bates 1387.
22      A   And I -- I don't believe that we actually
23  ended up -- the chain ended up going with a gross
24  inappropriate use of force.  I think it was just the
25  truthfulness that caused termination.  And as you can

Page 28

1  see there, it was overturned.
2      Q   So was it recommended that he be terminated
3  but ultimately it resulted in a 40-hour suspension?
4      A   No.  It actually went through full
5  termination.  So it was recommended, went to the
6  pre-term board, that upheld the termination, the
7  sheriff upheld the termination.  This employee was
8  actually terminated.
9      And then through the contract, they have
10  grievance rights; he requested arbitration.  And that
11  was held, and the arbitrator overturned the
12  termination.
13      Q   Okay.  Was another punishment levied as a
14  result of the arbitrator's decision?
15      A   Yes.  They issued a 40-hour suspension --
16      Q   Okay.
17      A   -- which is our next highest level of
18  discipline.
19      Q   Who was the arbitrator?  If you don't
20  remember the name --
21      A   I feel like it was Arbitrator Whalen, Katie
22  Whalen --
23      Q   Okay.
24      A   -- but I could be mistaken.  I could look
25  that up for you.

Page 29

1      Q   Do you know where Metro and the unions find
2  these arbitrators?
3      A   No.  Actually, I just looked that up the
4  other day.  It doesn't say in the contract what the
5  qualifications are, but we have a panel of, for the
6  PPA, five.  Two are picked by the association, two
7  are picked by the department, and one is picked by
8  both.
9      Q   Okay.
10      A   And then they just rotate depending on the
11  proceedings that we have, so we just cycle through
12  them continuously.
13      Q   So you're not sure on that particular case?
14      A   I don't think it actually was a gross
15  inappropriate use of force termination because of
16  what I remember from the arbitrator's overturning.
17      Q   Okay.  So the determination was
18  inappropriate?  Is that what you recall?
19      A   Yeah, inappropriate.  It looks like it was
20  "inappropriate" and "excessive" is the words that are
21  used here, probably the words that were used
22  somewhere in the adjudication.
23      Q   Okay.  Are those words contained in a
24  collective bargaining agreement?  I mean, do they
25  have -- are they of significance in terms of the

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Page 30

1 punishment that should be received?
2 A No. There's two categories for force.
3 There's use of force, which would be that it violates
4 the policy of actual use of force, and then there's
5 gross inappropriate use of force.
6 Q Okay. And then what was the second case
7 that you can recall?
8 A The second case I can recall, it -- I'm
9 trying to see if I can see. I don't know if it's on
10 here or not.
11 Yes. It is LVMPD 1388.
12 Q Okay. And that is with P-number 9845?
13 A Yes. And, again, I don't see it on here, so
14 I can't tell you I'm 100 percent sure. I know gross
15 inappropriate use of force was discussed on this
16 particular case.
17 Q Yeah. I think it's -- sorry, I gave you the
18 highlighted version, but I think it's -- I think one,
19 two, three, four, five, six, seven -- seventh one
20 there.
21 A Oh, okay. Yes, I see that there, yes. Yes,
22 so it was.
23 Q Okay. Do you know in this particular case
24 if the officer was allowed to retire?
25 A He did not seek retirement. In fact, he

Page 31

1 fought this case all the way through to an
2 arbitration.
3 Q Okay. And what was the outcome of the
4 arbitration?
5 A The termination was upheld.
6 Q What was the basis for Ken Lopera's --
7 strike that.
8 What was the basis for the determination
9 that Ken Lopera was grossly insubordinate?
10 MR. MCNUTT: Objection. Form.
11 THE WITNESS: I didn't have any
12 conversations with the assistant sheriff, so I would
13 go with anything that's written in this board memo
14 that would make that call.
15 BY MR. LAGOMARSINO:
16 Q Okay. All right.
17 A And it's in the Adjudication of Complaint.
18 That would explain that as well.
19 Q These were recently produced in this case,
20 the board memo. Do you know why certain parts of the
21 memo are redacted?
22 A No.
23 Q Did you produce these to Marquis Aurbach to
24 produce in this case?
25 MR. ANDERSON: I can tell you why. You

Page 32

1 requested the ones that were produced in the other
2 lawsuit which did not have Ken Lopera's CIRT
3 statement. So the redactions are Ken Lopera's CIRT
4 statements. I can give you one that's not redacted,
5 because you have the CIRT statement, but because you
6 requested that one, I gave you what I gave them. So
7 does that make sense?
8 MR. LAGOMARSINO: Okay. Yes.
9 MR. ANDERSON: So anything that's redacted
10 is something Ken Lopera's said in his CIRT statement.
11 MR. LAGOMARSINO: Okay. Would it be
12 possible to ask Sheri to send that? I'm not going to
13 use it today, but...
14 MR. LAGOMARSINO: It seemed like whoever was
15 MR. ANDERSON: It seemed like whoever was
16 redacting was very angry.
17 MR. ANDERSON: It was me. I'm just very bad
18 at it.
19 MR. LAGOMARSINO: All right.
20 BY MR. LAGOMARSINO:
21 Q Okay. Now, in terms of the process, I know
22 it didn't apply to Officer Lopera, but just in
23 general, when there's the pre-termination hearing,
24 who participates in that hearing?
25 A So either myself or Lisa Lichtenberger will

Page 33

1 do it, make the representation on behalf of the
2 department, along with the chain. And typically it's
3 a bureau commander, depending on if it's from IAB.
4 But in Use of Force Review Board, it would
5 be the assistant sheriff, the chair, so in this case
6 Assistant Sheriff Tim Kelly, and then on the other
7 side it would be Officer Lopera, whoever he brings
8 for his representative or representatives. And then
9 the board members are -- there's a panel. There's
10 the top board members and then there's alternates.
11 It's a deputy chief, bureau commander captain and a
12 civilian bureau commander. So it just depends on
13 what the scheduling looks like and who gets picked
14 for that.
15 Q How many people are on that particular
16 panel?
17 A Three.
18 Q And is that a majority decision or
19 unanimous?
20 A Majority.
21 Q After the determination is made, then it's
22 sent to the sheriff?
23 A That's correct.
24 Q And the sheriff either upholds or declines
25 to uphold; is that correct?

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 34

1    A   Yeah.
2    Q   If the sheriff upholds it, is that when it
3 goes to arbitration if there's an appeal?
4    A   Yeah.  So if they uphold the recommendation
5 for termination, if it's a termination recommendation
6 and the sheriff upholds it, that's the date they're
7 officially terminated.  They leave the department,
8 and they have the opportunity to file their request
9 for arbitration.
10    Q   When is the last possible point an officer
11 can voluntarily retire during this process?
12    A   When you say "voluntarily retire," going
13 back to Exhibit 1A, are you meaning without having
14 the designation -- okay.
15    Q   Sorry, Exhibit 2, yeah.
16    A   Exhibit 2, sorry.
17    Q   Yeah, yeah.
18    A   Do you mean -- there's voluntary
19 resignation, voluntary retirement and voluntary
20 termination.  Are you saying when would we
21 involuntary terminate them?
22    Q   Let me rephrase the question.  So in this
23 case, Officer Lopera took a voluntary retirement.
24 During this general process that we have described,
25 boards, Use of Force Board, Tactical Board, pre-term

Page 35

1 hearing, sheriff, arbitration, when is the last
2 possible point somebody can take a voluntary
3 retirement as is noted on Exhibit 2?
4    A   Okay.  So the reason why I'm getting held up
5 is because there's actual check boxes underneath
6 those "voluntary retirement," "voluntary
7 resignation."  The only time we would check
8 "involuntary termination" is if we actually
9 terminated them.
10    Q   Okay.
11    A   Underneath the boxes there's "in lieu of
12 non-confirmation" or "in lieu of pre-term hearing."
13 We have an agreement with PPA that if they resign --
14 I believe this is for all cases -- it's either a week
15 or two weeks, I'm not sure off the top of my head,
16 prior to the pre-term hearing, then we call it a
17 "voluntary."  But there have been other cases -- not
18 this one, because we didn't even have a date set for
19 this one -- but there have been other cases where
20 we've allowed it to be closer to because it is in --
21 obviously to our benefit as well to not have to spend
22 the money on an arbitration and all of those things
23 and the risk that sometimes we get these officers
24 sent back.
25        So there are times when we allow that box to

Page 36

1 be checked, knowing that their complete file would be
2 seen by anyone who gets access to the personnel file
3 through the waiver process that we have.  So...
4    Q   Okay.  I understand that.  What -- just
5 generally speaking, what is your knowledge as to the
6 benefits an officer would receive under PERS or
7 dis-- if they file under disability PERS?
8    A   Generally what my personal knowledge is is
9 that they get to start receiving their PERS right
10 away versus having to wait until they have age or
11 years.  I don't know what that amount looks like and
12 how much they get.  I know it's a reduced amount, but
13 I have no knowledge as to that.
14    Q   Okay.  In this case, Officer Lopera had
15 Bryan Yant as his union representative from the
16 LVPPA.  What contact does Metro have with the union
17 representative during this process?
18    A   That's a very broad question.  So just
19 generally speaking --
20    Q   Yes.
21    A   -- they receive copies of the notice.  And I
22 say "they" because it's generally PPA.  We don't
23 always know who's going to be their specific rep
24 until they show up on the day of their interview.  So
25 then the interview would occur in CIRT, and I would

Page 37

1 guess he would be present.  Again, I can't tell you
2 whether Bryan Yant was present at that interview or
3 not or if he was only -- somebody else was and he was
4 present at the TRB, we also provide them the notice
5 of the TRB and the Use of Force Review Board.
6        Then the next time we'd have contact with
7 them -- again, we might have contact in between
8 because of the array of questions that come up.  But
9 just per our procedure would be if they reach out to
10 us and tell us they're representing them at the
11 pre-term hearing, then we would work with them on
12 getting them documents for the pre-term hearing.  But
13 typically speaking, it wouldn't be Bryan Yant that
14 represented at the pre-term hearing; it would be Dave
15 Roger or Kelly Sweeney at that point.
16    Q   Okay.  And those are two lawyers?
17    A   Not Kelly, but Dave is.
18    Q   Okay.  And are you communicating with the
19 PPA via e-mail as well as over the phone?
20    A   I don't recall any communications with them
21 on this particular case.
22        The notices -- I don't know, because they
23 didn't come from my office.  They come from either
24 the investigating body's office, so in this case,
25 CIRT.  They might e-mail, they might fax.  I don't

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

11 (Pages 38 to 41)

Page 38

1  know.  But I don't know if there's any additional
2  communication besides sending that notice to them of
3  the interview and of the board.  Yeah, I don't know.
4      Q   All right.  I'm going to move on to 16 -- or
5  17, excuse me.  So 17 is an explanation of
6  documentation produced by LVMPD in this case
7  concerning all LVNR reported incidents.
8      So I'd like you to -- you still have
9  Exhibit 9 there, which is the table, correct?
10     A   Yes.
11     Q   And I submitted a request to produce the
12 Adjudication of Complaints or other documentation
13 concerning some of the -- well, concerning the
14 incidents in that table.  And it appears that maybe
15 one or two were apparently inadvertently left off,
16 but I wanted to go through those with you and just
17 verify that.  Okay?
18     A   Okay.
19     Q   So I'm going to hand you a series of
20 exhibits.  Well, maybe we can just do it one at a
21 time, make it easier.  So I'm going to hand you
22 Exhibit 10.
23     (Deposition Exhibit No. 10 was marked
24      for identification.)
25     ///

Page 39

1  BY MR. LAGOMARSINO:
2      Q   So Exhibit 10 appears to be, when you
3  reference the table, the incident involving P-number
4  8862; is that correct?
5      A   That's what it looks like.
6      Q   And does Exhibit 10 appear to be a true and
7  correct copy of the Adjudication of Complaint with
8  the exception of the redactions?
9      A   Yes.
10     Q   William Teel on Exhibit 10, is that the area
11 commander, or who is that?
12     A   That's the bureau commander at the jail.
13     Q   Okay.  And who is Charles Hank?
14     A   It was the assistant sheriff over the jail
15 at the time.
16     Q   And Lieutenant Fred Meyer?
17     A   Immediate supervisor.
18     Q   All right.
19     A   So this case would have come out of Internal
20 Affairs, which is why it's adjudicated differently.
21     Q   Is the Disciplinary Decision Guide a
22 document that's drafted by the department or the
23 union or both?
24     A   Literally drafted, yes, by the department,
25 but it's a negotiated document.  So each and every of

Page 40

1  those line and applicable disciplines is agreed upon
2  with the associations.
3      (Deposition Exhibit No. 11 was marked
4       for identification.)
5  BY MR. LAGOMARSINO:
6      Q   Does 11 -- strike that.
7      Does Exhibit 11 appear to be the
8  Adjudication of Complaint relative to P-number 6876?
9      A   Yes.  It does appear that way.
10     Q   Okay.  And for the record, the prior
11 Adjudication of Complaint that's Exhibit 10 is 0177,
12 Exhibit 11 is 0178, produced by Metro.
13     Does Exhibit 11, with the exception of any
14 highlights or redactions, appear to be a true and
15 correct copy of the Adjudication of Complaint?
16     A   Yes.
17     Q   Who are -- strike that.
18     Who does Sergeant Steve Williams oversee?
19     A   The employee, subject employee.
20     Q   And Zolman?
21     A   Would be the next level of supervision, I'm
22 assuming a lieutenant.
23     Q   Okay.  And then so I guess it's kind of been
24 the chain of command essentially, right?
25     A   Yes.

Page 41

1      Q   Sergeant, Lieutenant Zolman, Captain Baker;
2  is that right?
3      A   Yeah.  I don't know who that is.
4      Q   And then Division Commander Fasulo?
5      A   Chief at the time.
6      Q   Chief.  Okay.
7      A   And you'll see when you get to later dates,
8  this changes.  We stopped having below a bureau
9  commander participate in the adjudication process,
10 through negotiations with the associations.  So some
11 of the adjudications might look different depending
12 on the years.
13     Q   Okay.  All right.  So then going to
14 Exhibit 12.
15     (Deposition Exhibit No. 12 was marked
16      for identification.)
17 BY MR. LAGOMARSINO:
18     Q   So I'm skipping on the table for now
19 P-number 7980 and going to P-number 9661.  Does it
20 appear that Exhibit 12 relates to P-number 9661?
21     A   Yes.  And I stand corrected.  That was gross
22 inappropriate use of force, based on the
23 adjudication.
24     Q   Okay.  Thank you for clarifying.
25     Does Exhibit 12 appear to be a true and

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

### Page 42

1  correct copy of the Adjudication of Complaint?
2      A    The Adjudication of Complaint after the
3  arbitration, yes.
4      Q    Okay.  Who is Gary Schofield?
5      A    He was the deputy chief at the time.  When
6  cases come back from an arbitrator and there's no
7  decision-making that goes into place, we just have
8  one person in the chain sign off on the final
9  adjudication.
10      Q    So on the bottom of Exhibit 12, it appears
11  that there's writing that says "Use" -- is it "purge
12  date of" --
13      A    "1/31/15."
14      Q    I apologize.  For the record, at the bottom
15  of the first page.  What is a purge date, at least in
16  reference to this document?
17      A    So that's the start purge date.  So for
18  40 hours, it would mean that this would purge from
19  the personnel file on January 31, 2020.
20      Q    And can you explain the policy and/or law on
21  purging of disciplinary documents from officers'
22  files?
23      A    So it is, again, a negotiated item.  It's
24  mandatory collective bargaining.  For reprimands,
25  they purge at 18 months; minor discipline, which

### Page 43

1  could be suspension to disciplinary transfer, purge
2  at three years; and major, a purge at five years.
3          The calculation of the purge date depends on
4  the type of case, but generally speaking, it's either
5  the date they sign the adjudication or three months
6  after the case is open, whichever is earlier.
7          There's some nuances depending on if there's
8  stays in the case or if it's an expedited.
9          Once they purge, they're out of their
10  personnel file, so that the department can't use it
11  against them as far as escalating future discipline
12  or withholding transfers or promotions.  It can't be
13  used against them, but we do keep them in response to
14  Brady requests.
15      Q    Okay.  And how about contact reports?  When
16  are they purged?  Are those even placed in the file?
17      A    Not in the personnel file, no.  They're
18  placed in the supervisor employee personnel file
19  that's housed with just the supervisor.  Our policy
20  is one year they purge.
21      Q    Are those kept for Brady requests?
22      A    No.  It's not discipline.
23      Q    What is a contact report?
24      A    It is a counseling -- a documentation of a
25  counseling, good, bad or indifferent.  It could be

### Page 44

1  anything.
2      Q    Okay.  I may have asked you this, but I
3  apologize.  So Exhibit 12, is that a true and correct
4  copy?
5      A    Yes, it appears so.  Again, after the
6  arbitrator's decision, so there would have been one
7  prior to this, but this is the final adjudication
8  based on the decision of the arbitration.
9      Q    Are you aware of any contact reports that
10  Ken Lopera had in his career at Metro?
11      A    I'm not aware one way or the other.
12      Q    Okay.
13          (Deposition Exhibit No. 13 was marked
14          for identification.)
15  BY MR. LAGOMARSINO:
16      Q    So I will ask you to look at LVMPD 1388 on
17  Exhibit 9, and let me know if this adjudication
18  complaint references the use of force incident.
19      A    Yes, it does.
20      Q    And that's with P-number 9845?
21      A    Yes.
22      Q    Okay.  And does this appear to be a true and
23  correct copy of the Adjudication of Complaint?
24      A    Yes, it does.
25          MR. MCNUTT:  Can I ask her a question?

### Page 45

1          MR. LAGOMARSINO:  Sure.
2          MR. MCNUTT:  Ms. Frost, what are you looking
3  at on the Adjudication of Complaint form, whichever
4  exhibit you care to look at, and then
5  cross-referencing it with Exhibit 9 to verify that
6  we're talking about the same one?
7          THE WITNESS:  The facts of the case.  This
8  one in particular, I know well, so this one I could
9  tell you 100 percent it matches.
10          But, yes, I'm looking at the facts as
11  outlined in the Adjudication of Complaint and the
12  facts in the comp chart.  The comp chart is a summary
13  of the Adjudication of Complaint.
14          MR. MCNUTT:  Okay.  If you weren't familiar
15  with the facts of the case, how would you link these
16  two up?
17          THE WITNESS:  So, like, in the first two
18  that Mr. Lagomarsino presented to me, I just looked
19  at the facts as outlined in the Adjudication of
20  Complaint and matched them to the facts in the comp
21  summary.
22          MR. MCNUTT:  Okay.  But there's no -- you
23  would agree with me that there's no numerical
24  reference or non- -- you know, some sort of
25  administrative way that you've tagged these?  It's

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 46

1   just reading the facts of the complaint to marry them
2   up, correct?
3        THE WITNESS:  Are you asking how we produce
4   them or how am I answering these questions today?
5        MR. MCNUTT:  Well, I have no qualms with how
6   you're answering the questions.  I'm just asking if
7   we've got a whole different set of documents how I
8   would do it independently if I didn't have your
9   knowledge.
10       THE WITNESS:  You would just have to look at
11  the facts in the comp and marry them to the
12  Adjudication of Complaint facts.
13       MR. MCNUTT:  Thank you.
14  BY MR. LAGOMARSINO:
15    Q   And just to clarify an answer that you just
16  gave, Metro was provided discovery requests asking
17  for documentation pertaining to the chart that's
18  Exhibit 9, correct?
19    A   Yes.
20    Q   And Exhibit 9, is that a chart that was
21  drafted for purposes of this litigation in response
22  to a discovery request?
23    A   The way it looks, yes.  We keep a master
24  chart in our files, in our H drive of everything.  So
25  we pulled out the ones that were relevant to the

Page 47

1   discovery request.  And we have the names, obviously,
2   not redacted on our version, and, again, on the
3   Adjudication of Complaint, the names and P-number are
4   not redacted.  So that's how we are sure we marry
5   them up.  But here today I'm just looking at the
6   facts.
7        MR. ANDERSON:  If I could do it over, I
8   would not redact the P-numbers on the Adjudication of
9   Complaint, because it would have been easier.
10       MR. MCNUTT:  Right.  That's what I was
11  getting at.  Thanks.
12       MR. ANDERSON:  Yeah.  But I did check them.
13       MR. LAGOMARSINO:  The redactions did seem
14  more calculated in these ones compared to the other
15  one.
16       MR. ANDERSON:  I have professional duties.
17       MR. LAGOMARSINO:  Can't tell how hard you're
18  pressing that key word.
19       All right.  So Exhibit 14.
20       (Deposition Exhibit No. 14 was marked
21       for identification.)
22  BY MR. LAGOMARSINO:
23    Q   Does Exhibit 14 appear to relate to the
24  incident involving P-number 13142?
25    A   Yes.

Page 48

1     Q   And does Exhibit 14 appear to be a true and
2   correct copy of the Adjudication of Complaint?
3     A   Yes.  Well, I don't know why it's not
4   signed.  But the complaint -- the way it's written
5   and everything looks accurate based on how we do
6   things, but I don't know why this one is not signed.
7     Q   So I guess a better question, does it appear
8   to be a true and correct copy of the unsigned
9   Adjudication of Complaint?
10    A   Yes.
11    Q   Okay.  All right.  And then Exhibit 15.
12       (Deposition Exhibit No. 15 was marked
13       for identification.)
14  BY MR. LAGOMARSINO:
15    Q   Does Exhibit 15 appear to relate to P-number
16  6908 on --
17    A   Yes, it does.
18    Q   Okay.  And does Exhibit 15 appear to be a
19  true and correct copy of the Adjudication of
20  Complaint?
21    A   Yes, it does.
22    Q   Okay.
23       (Deposition Exhibit No. 16 was marked
24       for identification.)
25       ///

Page 49

1   BY MR. LAGOMARSINO:
2     Q   Does Exhibit 16 appear to relate to P-number
3   4991 on LVMPD 1390?
4     A   Yes.
5     Q   And did this take place before you were
6   hired over at Metro?
7     A   The incident, yes.  I came to Metro on
8   April 5, 2015.  So it looks like this individual
9   retired right when I got here.
10    Q   Okay.  Are you familiar with this incident
11  at all?
12    A   No.  I don't have any personal knowledge of
13  this incident.
14    Q   Okay.  All right.  Does it appear to be a
15  true and correct copy of the Adjudication of
16  Complaint?
17    A   Yes.
18    Q   So with respect to P-number 8577 on LVMPD
19  1390, would there have been an Adjudication of
20  Complaint in that case?
21    A   There should have been, yes.
22    Q   And would there have been an Adjudication of
23  Complaint for -- on the first page of Exhibit 9,
24  7980, P-number 7980?
25    A   Yes.  There should have been.

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

---

Page 50

1    Q   Were you part of the process in producing
2  the Adjudication of Complaint relative to this draft?
3    A   An analyst in my office produced them.  So
4  I'm not sure what happened between looking at this
5  chart and producing them.  I'm not sure where the
6  error came in, but we can get those to you.
7    Q   All right.  Now, with respect to Exhibit 9,
8  which is the table, what is your understanding of
9  what that chart represents?
10    A   This represents our comparable discipline.
11  So like I said, we have a master table that we keep
12  of all discipline with all policy violations.  When
13  we're asked to produce the comps for a specific case,
14  we produce the comps relating to that policy
15  violation.  And they're created after the
16  Adjudication of Complaint comes in.  They are created
17  by analysts in my office at the time.  And everything
18  on here is completed, and then the summary is done
19  based on the facts in the Adjudication of Complaint.
20    Q   Okay.  So where it says "Cases involving the
21  neck," was that just for this particular case?
22    A   Yes.  So when we pull out the part of the
23  comp chart that we're working with, we'll generally
24  identify what it is that we pulled the chart out,
25  what the reasoning for that was.

---

Page 51

1    Q   Okay.  So continuing on Exhibit 17 -- strike
2  that.
3       Topic 17.  I'll hand you what's being marked
4  as Exhibit 21.
5       (Deposition Exhibit No. 21 was marked
6       for identification.)
7  BY MR. LAGOMARSINO:
8    Q   What is Exhibit 21?
9    A   This is part of a document created by, I
10  believe, CIRT.  I'm not 100 percent sure.  It says
11  "LVMPD Internal Affairs Bureau."  You know what?  I
12  can't answer that.  I'm not 100 percent sure.
13    Q   Okay.  Well, irrespective of who creates it,
14  Metro creates it, correct?
15    A   That's correct.
16    Q   Have you ever seen this chart before?
17    A   I don't know that I've seen this exact one.
18  I've seen something like it.
19    Q   Does this at least appear to be a true and
20  correct copy of the use of force complaints for 2012
21  through 2017, year to date?  It appears that's
22  July 27, 2017.
23       MR. MCNUTT:  Objection.  Form.  Sorry, were
24  you done?
25       MR. LAGOMARSINO:  Yeah.  Sorry.

---

Page 52

1  BY MR. LAGOMARSINO,
2    Q   The bottom of the page it says "07/27/17,"
3  correct, bottom right?
4       MR. MCNUTT:  Objection.  Form.
5       THE WITNESS:  Yes.  I see that that says
6  that.
7       MR. LAGOMARSINO:  Okay.  All right.
8       THE WITNESS:  I --
9       MR. LAGOMARSINO:  Am I saying something
10  wrong?  Like, if I have a chance to correct the form
11  of the question, I want to -- I'm not accusing you of
12  a bad objection, I just want to...
13       MR. MCNUTT:  No.  It was unclear to me
14  whether she, as the 30(b)(6), has the ability to
15  authenticate this document.  That's all.
16       MR. LAGOMARSINO:  Oh, okay.
17       MR. MCNUTT:  I don't know if she does or
18  doesn't.  I...
19       MR. LAGOMARSINO:  Okay.  That's what I'm
20  going to clear up.
21       THE WITNESS:  I really don't have knowledge
22  of this document to tell you one way or another
23  whether this looks -- these numbers are accurate or
24  this document is accurate.  I mean, it appears to be
25  based on what I see here, but I don't have

---

Page 53

1  independent knowledge of this document.
2  BY MR. LAGOMARSINO:
3    Q   Okay.  Have you ever seen a document like
4  this?  I guess let me retract that question.
5       Are you able to explain what these findings
6  mean?
7    A   Yeah.
8    Q   So let's go through.  Do you have personal
9  knowledge, at least, on what some of these findings
10  might mean?
11    A   Yes.
12       MR. ANDERSON:  Andre, I'll stipulate it's a
13  true and authentic copy of what it purports to be.
14       MR. LAGOMARSINO:  Okay.  Thank you.
15  BY MR. LAGOMARSINO:
16    Q   What does -- so here you have complaints and
17  allegations for the entire department.  Is it fair to
18  say that a complaint can contain more than one
19  allegation?
20    A   Yes, and more than one for this employee.
21    Q   Okay.  So what is a complaint?
22    A   A complaint would be anything -- so I guess
23  it doesn't include CIRT complaints, it doesn't look
24  like.  So this just would be complaints that come
25  into Internal Affairs Bureau either through internal

---

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 54

1  mechanisms, somebody files it internal, sergeant
2  against the officer, or somebody from outside of
3  Metro comes in and says, "Somebody used bad force on
4  me," or they go to the Citizen Review Board and file
5  their complaint. And, again, that would be a citizen
6  outside of Metro that would file the complaint with
7  the Citizen Review Board.
8      Q   Is there any other mechanism that a citizen
9  can use besides Citizen Review Board to report a
10 complaint?
11     A   Yeah, Internal Affairs Bureau. They can
12 come directly to Metro and file a complaint.
13     Q   Okay. So if they go to Metro, they'll be
14 directed to IAB?
15     A   Yes.
16     Q   So does it appear that this document
17 reflects the -- all the complaints received by Metro
18 in the years delineated from citizens?
19     A   Yes.
20     Q   Okay. What are allegations?
21     A   What are allegations?
22     Q   Yes.
23     A   Would be -- again, I don't know how they got
24 this document. I'm assuming because it's just use of
25 force complaints, that this is just use of force

Page 55

1  allegations, but maybe it includes other allegations.
2  So sometimes, you know, it's against Officer Smith
3  and the complaint is "He was rude to me," so
4  interaction with the public, and "He used bad force
5  on me." That would be two allegations. Or it could
6  be both Officer Smith and Officer Jones used bad
7  force; two subject employees, one complaint, two
8  allegations.
9      Q   Do you know if this document compiles, like,
10 "He was rude to me" complaints?
11     A   I don't know. I'm not sure how they got
12 this. I mean, it says just use of force complaints,
13 but I don't know if in the complaint they looked at
14 other allegations that can come along with it.
15     Q   Fair enough. So what you're saying is these
16 are use of force complaints, but the use of force
17 complaints could contain other non force-related
18 allegations?
19     A   In the complaint world, yes. I don't know
20 if this document is talking about.
21     Q   What is DSD staff?
22     A   Detention Services Division.
23     Q   What does it mean if a finding is
24 exonerated?
25     A   Well, there's "exonerated" and "unfounded,"

Page 56

1  and I always confuse these two. One is that
2  allegations alleged did not occur, and the other one
3  is the allegations did occur but they weren't a
4  policy violation. And I can never remember which one
5  is which.
6      Q   Okay. "Investigation dismissed," what does
7  that mean?
8      A   I don't know. Obviously it's rare, one
9  time. I don't know what that means.
10     Q   Okay. "No policy violation," is that
11 basically an investigation was completed and it was
12 found that there was no policy violation?
13     A   If there's no policy violation, it is a
14 prelim investigation. It's closed out on the front
15 end. So they can review the jail video, body worn
16 cam and clearly see what occurred, or it was a
17 completely untruthful complaint, which we get at
18 times, so they close it out on the front end.
19         If it's a full investigation, you would see
20 those findings "exonerated," "not sustained," "SI
21 sustained," "unfounded."
22     Q   What does SI mean?
23     A   Supervisor intervention. It's a contact
24 report. That can be done on the front end or the
25 back end. It's very low here, as you can see,

Page 57

1  because use of force is typically disciplinary if
2  it's an inappropriate or bad violation of our policy.
3      Q   Okay.
4          (Deposition Exhibit No. 22 was marked
5          for identification.)
6  BY MR. LAGOMARSINO:
7      Q   Is it your understanding that all incidents
8  where an LVNR was used are to be reported?
9      A   I believe that's reportable use of force,
10 but I'm not the expert on that.
11         MR. ANDERSON: Andre, this isn't Bates
12 stamped. Did we produce this? I mean, I should
13 have. I'm just wondering if we did.
14         MR. LAGOMARSINO: I'm assuming you did.
15         MR. ANDERSON: Yeah. I don't have a problem
16 with it, I just...
17         MR. LAGOMARSINO: I mean --
18         MR. MCNUTT: I did not produce it.
19         MR. ANDERSON: You're fine. I was just
20 wondering.
21         MR. LAGOMARSINO: And I guess I'm just going
22 on the topic of explanation of documentation
23 produced. So I will take a look.
24         MR. ANDERSON: No, I know we produced it at
25 some point, so...

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

16 (Pages 58 to 61)

Page 58

BY MR. LAGOMARSINO:
Q   Have you ever seen this documentation?
A   No.
MR. LAGOMARSINO:  Maybe we'll just -- maybe we can agree to save this for Bland, because I'm trying to get into what's effective, what's not effective, just explaining this stuff.
MR. ANDERSON:  Yeah.  But I will stipulate this is what it purports to be.
MR. LAGOMARSINO:  Okay.  And stipulate it's a true and correct copy?
MR. ANDERSON:  Yes.
MR. LAGOMARSINO:  Okay.
MR. ANDERSON:  Yeah, I had Bland look at this.
MR. LAGOMARSINO:  Okay.
BY MR. LAGOMARSINO:
Q   Is Exhibit 9 -- sorry, moving on to Topic 18, which is the discipline police officers have received for improper neck restraints, is that what Exhibit 9 is?
A   Yes.
Q   And the other Adjudication of Complaints?
A   Yes.
Q   And the same thing with respect to 19?

Page 59

Topic 19 is the discipline for using an LVNR?
A   Yes.
Q   Yeah, sorry, one is neck restraint, one is --
A   Yeah.  We try to be overly broad, so some might not quite qualify for what you're looking for.  But we try to be overly broad with the request.
MR. LAGOMARSINO:  Okay.  All right.  I know I have about five more minutes' worth of questions by the time -- let's take a quick break.
And then I'm just coming back to discipline for Lopera.  It's pretty much been covered.
THE VIDEOGRAPHER:  We are going off the record.  The time is approximately 11:24 a.m.
(Off the record.)
THE VIDEOGRAPHER:  The time is approximately 11:32 a.m.  We are back on the record.
BY MR. LAGOMARSINO:
Q   All right.  Just a few more questions from me.  So please go back to Exhibit 2.  Is a voluntary retirement considered discipline?
A   No.
Q   Is a voluntary retirement on disability considered discipline?
A   No.

Page 60

Q   In this case, Officer Lopera had a recommendation of termination, but he wasn't terminated, correct?
A   That's correct.
Q   And he would have had an opportunity to try to convince the panel at the pre-termination hearing to go against the recommendation?
A   That's correct.
Q   Have you ever seen in your career the panel at the pre-termination hearing not go with the recommendation?
A   Yes.
Q   Is it totally uncommon, common?
A   It's not common.
MR. MCNUTT:  Objection.  Form.
THE WITNESS:  It's not common.  I can think of, I would say, less than five.  I don't know.  That doesn't really give you a number, because I can't tell you how many terms we've had.  But it's not common.  I wouldn't say it's rare, but --
BY MR. LAGOMARSINO:
Q   Would you say --
A   -- it's not even half the time.
Q   Okay.  I was going to say, so you'd say a majority of the time the pre-termination panel will

Page 61

go with the recommendation?
A   Yes.
MR. MCNUTT:  Objection.  Form.
BY MR. LAGOMARSINO:
Q   But would you say anywhere from -- and this is anecdotal evidence a little bit from your experience, correct?
A   Correct.
Q   Have you run any statistics to see how often the panel at the pre-term hearing goes against the recommendation?
A   I have not.  I've had them, but I don't have that off the top of my head.
Q   Okay.  But it happens, correct?
A   It does happen.
Q   Okay.  And then if the pre-termination panel decides to go with the recommendation and recommend termination to the sheriff, have you seen the sheriff decline to go with the recommendation of termination?
A   Not the sheriff, no.  And the sheriff can also overrule the pre-term decision to not terminate.
Q   Okay.  All right.  Have you seen them do that?
A   Not the sheriff.
Q   Okay.  Have you been employed at Metro under

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

Page 62

1   a different sheriff?
2       A   No, I have not.
3       Q   Okay.  Are you aware of what other sheriffs
4   have done?
5       A   I'm aware of one instance where the sheriff
6   did not agree with the pre-term board's
7   recommendation.
8       Q   Was that Sheriff Gillespie?
9       A   Yes.
10      Q   And was that a publicized case?
11      A   I believe so.  I don't know if the internal
12  portion of it was, but I believe that the incidents
13  that caused the investigation were.
14      Q   And then if the officer is not satisfied
15  with the decision of the pre-term panel or the
16  sheriff, that officer then also has the opportunity
17  to arbitrate?
18      A   That's correct.  Or there's -- if it's less
19  than termination, they can go through the other
20  grievance process.
21      Q   And what is that?
22      A   So, for example, a case right now went to
23  the pre-term board.  The pre-term board did not
24  terminate; they recommended hours instead.  So that
25  grievance process goes to, I think, the bureau

Page 63

1   commander, generally speaking.  Sometimes it's the
2   deputy chief, depending on how it's adjudicated, and
3   then from there it would go to four PPA, our labor
4   management board.
5       Q   Okay.
6       A   Our labor management board is comprised of a
7   randomly selected PPA board member, a randomly
8   selected PPA member, a randomly selected lieutenant
9   and a randomly selected deputy chief or captain and
10  then an arbitrator.
11      MR. LAGOMARSINO:  Okay.  All right.  I have
12  no further questions.
13          EXAMINATION
14  BY MR. MCNUTT:
15      Q   Ms. Frost, my name is Dan McNutt.  I
16  represent Ken Lopera.  I have a few questions for
17  you.
18      Would you look at Exhibit 2.
19      A   Yes.
20      Q   I apologize.  Exhibit 21.  It's this one.
21  Are you the person most knowledgeable about this
22  document?
23      A   No.
24      Q   Any question where Mr. Lagomarsino asked
25  about your career, your career with Metro has been

Page 64

1   four years, correct?
2       A   Five.
3       Q   Five.  Since --
4       A   April --
5       Q   -- October of -- well, I'm sorry.  When?
6       A   Since April of 2015.
7       Q   Okay.  So --
8       A   Almost.
9       Q   Almost five?
10      A   Yeah.
11      Q   Five next year?
12      A   Yes.
13      Q   Okay.  So any answer you gave, as he said in
14  a follow-up, is somewhat anecdotal because you would
15  only be familiar with the cases that you dealt with
16  in those last four and a half years, correct?
17      MR. LAGOMARSINO:  Form.
18      THE WITNESS:  Not any answer I gave.  But on
19  the ones where I said "In my experience," those would
20  be based on the time that I was at Metro or maybe
21  sometime before, depending on the answer.  Because
22  when I was an attorney at Marquis Aurbach Coffing, I
23  represented the department, Las Vegas Metropolitan
24  Police Department, in disciplinary appeals.
25          ///

Page 65

1   BY MR. MCNUTT:
2       Q   That wasn't my question.  My question was in
3   any question that Andre asked where he referenced
4   your career, not where you referred to your
5   experience.  So when he -- did you understand that
6   when he said "your career," he was talking about the
7   four and a half years you've been with Metro?  Is
8   that how you were answering the question?
9       A   I believe so, yes, if that's how the
10  question was asked.
11      Q   Okay.  So with respect to when you gave the
12  very nice narrative answer that he asked for earlier
13  on regarding the process by which an officer can be
14  separated from Metro and you laid it out and we
15  talked -- you referred to it as a pre-term board or
16  pre-termination hearing and then the termination
17  board and then an arbitration, correct?  Are those
18  kind of the three big steps?
19      A   Just a pre-termination hearing.
20      Q   Okay.
21      A   Then the sheriff would either agree or not
22  agree with the recommendation of the pre-term
23  hearing.  And then only if the employee then appeals
24  that would it go to arbitration.
25      Q   So at the pre-term hearing, would an officer

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1 have the opportunity to present evidence on his
2 behalf or through an attorney or a representative?
3    A  Absolutely.  It's their time to explain why
4 they should not be terminated.
5    Q  Okay.  Do you have any statistics regarding
6 how often an officer prevails at that stage?
7    A  I have them in my office somewhere, but I do
8 not have them off the top of my head.  I can think of
9 less than -- I can think of, like, three off the top
10 of my head.
11    Q  And that's three in the last four and a half
12 years?
13    A  That's correct.
14    Q  Now, are you exclusively the lawyer in
15 charge or the employee of Metro in charge of this
16 area, so would there be other people that have your
17 similar job title and you split the duties or --
18    A  No.  I'm -- I'm in charge of our bureau that
19 handles the discipline and grievances for officers
20 and civilians.
21    Q  So are you aware of all of the cases in the
22 last four and a half years, is what I'm asking?
23    A  Yes.
24    Q  Okay.
25    A  But I could be missing someone.  I'm

Page 67

1 thinking off the top of my head.  That's why I'm
2 saying I can think of less than five.
3    Q  And if an officer lost in the termination
4 phase, he could then proceed with the arbitration
5 that you discussed, correct?
6    A  Correct.  So if the officer was terminated,
7 then they could file an appeal for arbitration.
8    Q  And the officer would, himself or through a
9 representative, also have another opportunity to
10 present evidence to overturn the prior decision,
11 correct?
12    A  That's correct.
13    Q  And if the arbitrator or the arbitration
14 panel rules in the officer's favor, can the sheriff
15 overrule that then or is he bound to that?
16    A  He is bound by that, unless we file an
17 appeal to the district court -- and as you know, that
18 standard is very high, so we do not do that very
19 often -- and the decision of the arbitrator stands.
20    Q  Okay.  So now looking at Exhibit 2, the
21 Employment Separation Notice, so by virtue of the
22 fact that the "voluntary retirement" box is checked
23 as well as the subset of that, which is the
24 "disability (PERS)" box is checked, you really can't
25 infer anything other than what the face of this

Page 68

1 document says regarding the separation of Ken Lopera
2 from Metro, correct?
3       MR. ANDERSON:  Objection.  Form.
4       THE WITNESS:  Yeah.  Your question is a
5 little bit confusing, but what I can tell from this
6 document is he voluntarily retired with a medical
7 disability.
8 BY MR. MCNUTT:
9    Q  Correct.  And you couldn't offer any
10 testimony to suggest or speculate what would have
11 happened had Ken Lopera not exercised his rights to
12 separate from Metro the way he did, correct?
13    A  I can only tell you the process.
14    Q  Why is there no definition of gross
15 insubordination?
16    A  I don't know the answer to that question.
17    Q  Would it be your recommendation to the
18 sheriff that there should be a definition of gross
19 insubordination so officers know what the standard
20 is?
21       MR. ANDERSON:  Objection to form.
22       THE WITNESS:  It would make my job easier if
23 there was a definition, but I think the trouble is
24 that it's a really fact-intensive determination and
25 to try to define it is very difficult.  It really

Page 69

1 depends on the facts and circumstances of each
2 particular case.
3 BY MR. MCNUTT:
4    Q  I don't recall your answer to
5 Mr. Lagomarsino earlier on as to whether you have
6 ever testified as a 30(b)(6) witness before.  Have
7 you?
8    A  I believe -- well, I know I have in one
9 case.  I can't remember the second case if I was
10 30(b)(6) or they just identified my name personally.
11    Q  In this case, what documents did you review
12 to prepare for your deposition?
13    A  The Comparable Discipline Chart and
14 Adjudication of Complaints.
15    Q  And did you -- without telling me any
16 discussions, did you prepare or were you assisted in
17 preparation for this deposition by anyone?
18    A  I did meet with Craig.
19    Q  Your counsel?
20    A  Yes.
21    Q  Or Metro's counsel?
22    A  Yes.
23    Q  Okay.  Now, as a practicing lawyer, prior to
24 your career with Metro, you're aware of the fact that
25 some things -- if a 30(b)(6) witness is prepared, the

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD  ~   November 12, 2019
* * * Videotaped Deposition * * *

19 (Pages 70 to 73)

---

Page 70

1   facts that were presented to the 30(b)(6) witness are
2   not privileged?  Are you aware of that?
3       A   Sounds right to me.
4       Q   Okay.  So my question, then, is did Craig
5   provide any facts to you to prepare you for this
6   deposition?
7       A   He told me generally about this case, but
8   that was it.
9       Q   Okay.  And what did he generally tell you
10  about this case?
11      A   That there were two lawsuits going on:  one
12  for the children, one for the mom, I think.  And I
13  think that's really it.  It was very brief.
14      Q   So with respect to the documents that you
15  reviewed in preparing for the deposition, is it your
16  testimony you didn't need anybody's help in
17  understanding what those documents stand for?
18      A   No.  Those are documents created by my
19  office.
20      Q   Okay.  And so those are documents you deal
21  with routinely every day?
22      A   Yes.
23      MR. MCNUTT:  I have no further questions.
24      ///
25      ///

---

Page 71

1               FURTHER EXAMINATION
2   BY MR. LAGOMARSINO:
3       Q   Just a follow-up.  In your career with
4   Metro, how many pre-termination hearings can you
5   estimate there have been?
6       A   I really can't estimate that.  I would be
7   way off, or I could be way off.  I'd be totally
8   guessing if I gave you a number.
9       Q   Okay.  Is it every day there's a
10  pre-termination hearing?
11      A   No.
12      Q   All right.  Would you say 25 or less?
13      MR. MCNUTT:  Objection.  Form.
14      THE WITNESS:  In my four and a half years?
15  BY MR. LAGOMARSINO:
16      Q   Yeah.
17      A   I would say that sounds about right, less --
18  25 or less.  But, again, I'm guessing.  I'm just
19  going off what I -- what I -- my feeling is on those.
20      Q   Okay.  We could look at the statistics to
21  see how many there have been, correct?
22      A   Absolutely.
23      Q   Okay.
24      A   We have those numbers.
25      Q   If we leave a blank in the deposition for

---

Page 72

1   you to fill in how many pre-termination hearings
2   there have been and how many have -- would you able
3   to fill that in?
4       MR. MCNUTT:  Objection.  Form.
5       THE WITNESS:  Assuming my counsel said it's
6   the right thing to do, yes, I can.  I have that
7   information.
8   BY MR. LAGOMARSINO:
9       Q   All right.  And if I asked to fill in the
10  blank as to how many pre-termination hearing
11  panels -- is that the right word, "panels"?
12      A   Board is what we call it.
13      Q   Board.
14      -- how many pre-termination hearing boards
15  did not go with the recommendation, would you be able
16  to fill in that blank?
17      A   I would have that information, yes.
18      Q   So I would ask at this point, unless counsel
19  advises you otherwise, to kindly fill in those
20  blanks.  We'll leave blanks here in the deposition.
21      A   And you want just from my tenure or...
22      Q   Just from your tenure.
23      MR. MCNUTT:  I'll object to that discovery
24  request.  We can deal with it.
25      (The following information to be

---

Page 73

1       supplied by the Deponent:
2   _____
3   _____
4   _____.)
5       MR. LAGOMARSINO:  Okay.  All right.
6       THE VIDEOGRAPHER:  Excuse me, Counsel.
7   Would you like a copy of the video?
8       MR. ANDERSON:  No.
9       MR. LAGOMARSINO:  No more questions, sorry.
10      THE VIDEOGRAPHER:  This concludes the video
11  deposition of Jamie Frost, Esquire.
12      The original media of today's testimony will
13  remain in the custody of Las Vegas Legal Video.
14      The time is approximately 11:47 a.m.  We are
15  going off the record.
16      (Thereupon, the videotaped deposition
17      was concluded at 11:47 a.m.)
18
19              * * * * *
20
21
22
23
24
25

---

Jamie Frost, Esq. ~ 30(b)(6) Rep. of LVMPD ~   November 12, 2019
* * * Videotaped Deposition * * *

20  (Pages 74 to 75)

Page 74

1          CERTIFICATE OF DEPONENT
2   PAGE  LINE  CHANGE          REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14          * * * * *
15
16      I, JAMIE FROST, ESQUIRE, deponent herein, do
17  hereby certify and declare that the within and
18  foregoing transcription to be my deposition in said
19  action; that I have read, corrected, and do hereby
20  affix my signature to said deposition.
21
22
23      _____
        JAMIE FROST, ESQUIRE
24
25

Page 75

1          CERTIFICATE OF REPORTER
2
3   STATE OF NEVADA )
                    ) ss:
    COUNTY OF CLARK )
4
5       I, Sarah Safier, CCR No. 808, do thereby
    certify:  That I reported the deposition of JAMIE
6   FROST, ESQUIRE, commencing on Tuesday,
    November 12, 2019, at 10:05 a.m.
7       That prior to being deposed, the witness was
    duly sworn by me to testify to the truth.  That I
8   thereafter transcribed my said shorthand notes into
    typewriting and that the typewritten transcript is a
9   complete, true, and accurate transcription of my said
    shorthand notes.  That prior to the conclusion of the
10  proceedings, pursuant to NRCP 30(e), the reading and
    signing of the transcript was requested by the
11  witness or a party.
        I further certify that I am not a relative
12  or employee of counsel of any of the parties, nor a
    relative or employee of the parties involved in said
13  action, nor a person financially interested in the
    action.
14      IN WITNESS WHEREOF, I have set my hand in my
    office in the County of Clark, State of Nevada, this
15  21st day of November, 2019.
16
17
18      _____
        Sarah Safier, CCR No. 808
19
20
21
22
23
24
25

All-American Court Reporters (702) 240-4393
www.aacrlv.com