# Exhibit S – LVMPD Office of Internal Oversight Use of Force Statistical Analysis 2012-2016

# Internal Oversight and Constitutional Policing
## Office of Internal Oversight



# Use of Force Statistical Analysis 2012-2016
## Deadly and Non-deadly Use of Force

## Las Vegas Metropolitan Police Department
Joseph Lombardo, Sheriff

LVMPD 1236

# Contents

Introduction ............................................................................................................................... 3

Executive Summary .................................................................................................................... 4

Deadly Use of Force Overview .................................................................................................. 6

Types of Dispatched Events ....................................................................................................... 7

Settings and Outcomes of OIS Incidents ................................................................................. 8

Officer Involvement .................................................................................................................... 8

Time on Scene Prior to Initial Shots Fired ................................................................................ 9

On-Scene Supervision .............................................................................................................. 10

Officer Characteristics Age/Race/Ethnicity/Gender ............................................................. 10

Officer Tenure ........................................................................................................................... 11

Officer Duty Assignments ........................................................................................................ 11

Classifications of Officers (Rank) ............................................................................................ 12

Firearms Employed by Officers ............................................................................................... 12

Summary of Shots Fired by Officers ........................................................................................ 13

Distance of Initial Shots Fired by Officers .............................................................................. 13

Foot Pursuits ............................................................................................................................. 14

Less Lethality Force .................................................................................................................. 14

Subject Characteristics Age/Race/Ethnicity/Gender ............................................................ 14

Criminal Backgrounds of Subjects .......................................................................................... 15

Condition of Subjects (Drugs/Alcohol) ................................................................................... 15

Mental State of Subjects .......................................................................................................... 16

Subject Weapon ........................................................................................................................ 17

Summary of Shots Fired by Subjects ....................................................................................... 18

Time Intervals between Person-Oriented OIS Incidents ........................................................ 18

Month, Day of Week, and Time of Day of OIS Incidents ....................................................... 18

Locations of OIS Incidents ....................................................................................................... 19

Non-Shooting Deadly Force Events ......................................................................................... 23

Use of Deadly Force on Animals .............................................................................................. 23

Critical Incident Review Process ............................................................................................. 23

Non-Deadly Use of Force Overview ........................................................................................ 25

Body Worn Cameras ................................................................................................................. 27

Calls for Service .................................................................................................................... 27

Area of Assignment ............................................................................................................... 27

Force Type Used .................................................................................................................... 28

Injuries ................................................................................................................................... 28

Assessment and Actions of Subject ...................................................................................... 28

Allegations of Excessive Force ............................................................................................. 29

Appendix A ............................................................................................................................ 30

## Introduction

The Las Vegas Metropolitan Police Department (LVMPD) is committed to being transparent and accountable in all aspects of use of force. The force investigation model used by LVMPD is one of continuous, critical self-analysis that results in adjustments to training, policy, and education within the agency. As a result of this process, in 2016, LVMPD had 10 incidents of deadly force by officers, the lowest number of officer-involved shootings (OIS) in 20 years.

As part of our commitment to the community we serve, we recognize our obligation to document, analyze, and publicly report data on police use of force incidents. The Internal Oversight and Constitutional Policing Bureau's Use of Force Statistical Analysis report reflects the Department's continued willingness and responsibility to build community trust and enhance overall police service.

The purpose of the analysis within this report is to further refine police responses in the field with the hope of preventing harm to both citizens and officers. Assessing the factors surrounding a deadly force encounter is an important step toward ensuring the safest possible outcome for all involved. This report contains summary data intended to track, evaluate, and respond with improvements in police training and practices as it relates to both deadly and non-deadly use of force. The body of this report identifies demographics, categorizes interactions, and describes the circumstances surrounding the incidents, as well as the collective profiles of the individuals involved.

The information in this report provides tremendous value by informing the agency of emerging trends and identifying training needs. The end goal is to identify areas of improvement for the individual officer's performance and overall agency policy, practices, and training. Ultimately, officers are to resort to deadly force only after tremendous restraint and consideration of all reasonable alternatives. LVMPD police officers are taught to respect the sanctity of human life above all else.

## Executive Summary

The sixth annual Use of Force Statistical Analysis prepared by the bureau of Internal Oversight and Constitutional Policing examines five years of OISs for the period of 2012-2016. The Executive Summary is intended to highlight the most significant findings, trends, patterns, or issues documented in the body of the report. Where appropriate, explanations are provided regarding measures introduced by the Department to address, and in some cases, mitigate identified matters of concern.

- There were a total of 66 person-oriented OISs during 2012-2016. In 2016, there were 10 OISs which was 6 less than the previous year. The number of OISs in 2016 was the lowest in the past five years.  The average number of OISs between 2012 and 2016 was 13. OISs ranged from a low of 10 (2016) to a high of 16 (2014, 2015). (See Deadly Use of Force Overview, p. 6)

- The number of OISs that began as citizen Calls-for-Service (CFS), particularly violent calls, has increased over the past five years, while the number of OISs that began as officer-initiated calls has declined significantly. In 2016, 90% of OISs began as a citizen CFS and 89% were violent in nature. "Person with a Gun" and "Assault/Battery with a Gun" CFS resulted in the most OISs in 2016. (See Types of Dispatched Events, p. 7)

- During the past five years, 80% of person-oriented OISs occurred outdoors while 20% occurred indoors.  The year 2016 was consistent with this trend with 90% of OISs occurring outdoors. (See Settings and Outcomes of OIS Incidents, p. 8)

- Approximately 56% of OISs involved one officer. During 2016, 70% involved one officer and 30% involved two or more officers, compared to 44% involving one officer, and 56% involving two or more officers in 2015. (Officer Involvement, p. 8)

- Officers used their handgun in 78% of the OISs during the past five years. Involved officers used their handgun in 89% of the OISs in 2016, which is an increase from the previous years. (See Firearms Employed by Officers, p. 12)

- The actual number of shots fired by individual officers in 2016 ranged from 1 to 18. The eighteen shots fired by the involved officer was the fifth highest number of shots fired during the reporting period. In 2013, an involved officer fired thirty-three shots. (See Summary of Shots Fired by Officers, p. 13)

- Overall, the majority of subjects were in their 20's. In 4% of OISs, subjects were under the age of 20. In 2016, the majority of the subjects (60%) were in their 20's and 30's. The predominant race of OIS subjects during the past five years was white (45%). In 2016, only 10% of the subjects were white which was a significant decrease from 2014 (71%) and 2015 (50%).   Black subjects accounted for 40% of the 2016 OISs, a slight increase from the overall trend (30%) for the reporting period. Males comprised 90% of OISs subjects during this reporting period. (See Subject Characteristics Age/Race/Ethnicity/Gender, p. 14)

- The number of subjects whose mental state was classified as being mentally unstable, agitated, suicidal, or expressed "suicide by cop" intentions has increased since 2011. In 2016, there was a

deviation in this trend in which 80% of the subjects appeared normal.  (See Mental State of Subjects, p. 16)

- Subjects were armed in 91% of the OISs in the five year reporting period. In 2016, all subjects were armed. Subjects armed with a long gun (rifle, shotgun) have increased since 2013. However, there was only one OIS incident where the subject was armed with a long gun in 2016. Firearm usage has increased steadily from 65% in 2012 to 90% in 2016. (See Subject Weapon, p. 17)

- The number of subjects who shot at officers during the OIS incident has fluctuated during the five year period. The incident rate of subjects who shot at officers peaked in 2013 (38%) and has gradually declined from 35% in 2014 to 30% in 2016. Subjects shot 153 rounds at officers from 2012-2016. Twelve officers were injured or killed from shots fired at them during the five year reporting period. (See Summary of Shots Fired by Subjects, p. 18)

- During 2012-2016, deadly force was used on 25 animals. There were no animal shoots in 2016. The number of use of force incidents involving an animal has decreased 55% since 2012. (See Use of Deadly Force on Animals, p. 23)

- The Department's non-deadly use of force incidents have decreased by 8% over the past five years. Non-deadly force incidents have decreased by 42% from 1,345 in 2008, a ten-year high, to 775 in 2016, a ten-year low. This decrease occurred despite an increase in the number of commissioned personnel from 3,190 to 3,491 during the same period (See Non-Deadly Use of Force Overview, p. 25)

- A significant portion (66%) of non-deadly use of force incidents occurred in area commands.  This is primarily due to the number of citizen contacts associated with the area commands in comparison to other police bureaus (16%) and the detention center (18%). Six area commands displayed a downward trend in the number of use of force incidents. (See Area of Assignment, p. 27)

- The number of officer injuries resulting from a use of force incident increased by twenty-eight from 2015 (173) to 2016 (201). The number of officers seeking treatment at a hospital for an injury resulting from a non-deadly use of force incident increased by eleven. (See Injuries, p. 28)

## Deadly Use of Force Overview

There were a total of 66 person-oriented OISs during 2012-2016. In 2016, there were 10 OISs which was 6 less than the previous year. The number of OISs in 2016 was the lowest in the past five years.  The average number of OISs between 2012 and 2016 was 13. OISs ranged from a low of 10 (2016) to a high of 16 (2014, 2015) (Figure 1).

**2012-2016 Person-Oriented OIS Incidents and Outcomes**



Figure 1. 2012-2016 Number of Person-Oriented OISs and Outcomes

The number of criminal homicides and aggravated assaults occurring in Clark County, Nevada may be a good indicator to predict the number of OISs that will occur in a year. The rate of aggravated assaults reported by LVMPD showed a slight positive correlation to the number of OISs that occurred from 2012-2015, meaning as aggravated assaults increased, the number of OISs had marginally increased. Conversely, in 2016, as the rate of aggravated assaults increased, the number of OISs decreased to 10, a ten-year low. Neither aggravated assaults nor criminal homicides appeared to be a predictor for OISs in 2016 as previously seen from 2012-2015 (Figure 2). Criminal homicides increased 19% and aggravated assaults increased roughly 18% in 2016.



Figure 2. 2012-2016 Person-Oriented OISs. Comparison of Aggravated Assaults, Criminal Homicides, and OISs.

## Types of Dispatched Events

The 400 codes assigned to events loosely identify the types of situations police officers may encounter when responding to CFS. These codes can be categorized into two types: officer-initiated/proactive policing and citizen-initiated calls, known as CFS. Citizen CFS can be further categorized into violent calls and non-violent calls.  The number of OISs that began as citizen CFS, particularly violent calls, has increased over the past five years, while the number of OISs that began as officer-initiated calls has declined significantly. In 2016, 90% of OISs began as a citizen CFS and 89% were violent in nature (Figure 3). "Person with a Gun" and "Assault/Battery with a Gun" CFS resulted in the most OISs in 2016.

During 2013-2015, LVMPD required commissioned personnel to complete *Procedural Justice through Non-Biased Based Policing* training in addition to the annual Advanced Officer Skills Training (AOST) and Reality Based Training (RBT).  This training continues to be mandatory for all new commissioned personnel during the police academy.



Figure 3. 2012-2016 Person-Oriented OISs and Rate of Dispatched Event Types Comparison of Citizen CFS, Officer-Initiated Codes and Violent Codes

## Settings and Outcomes of OIS Incidents

During the past five years, 80% of person-oriented OISs occurred outdoors while 20% occurred indoors. The year 2016 was consistent with this trend with 90% of OISs occurring outdoors.

Where the OIS setting occurs does not appear to affect the outcome lethality. Overall, 46% of OISs that occurred indoors and 42% of OISs that occurred outdoors resulted in a fatality. For 2016, there was one indoor OIS and that resulted in a non-fatal outcome. The shorter distances separating officers and subjects, and the confining nature of most indoor spaces may have contributed to deadlier indoor encounters. The fatal number of outdoor OISs significantly decreased from 69% in 2015 to 33% in 2016. This decrease may be attributed to not having any Special Weapons and Tactics (SWAT) OISs in 2016. In 2015, there were four SWAT OISs.

## Officer Involvement

Approximately 56% of OISs involved one officer. During 2016, 70% involved one officer and 30% involved two or more officers, compared to 44% and 56%, respectively, in 2015 (Figure 4).

The majority of 2016 OISs involved one officer. One OIS involved two officers and two OISs involved four officers. In 2015, SWAT was involved in 45% of OISs where multiple officers were involved, whereas there were no SWAT officers involved in any OIS in 2016. The frequency of 2016 OISs that involved two or more officers had a similar low rate in 2014.

Roughly 22% of the officers who discharged their weapon during the past five years have had a previous OIS over the course of their career with the Department (25 of 112 officers).



Figure 4. 2012-2016 Person-Oriented OIS Incidents. Comparison of Number of Involved Officers and Rate of Single-Officer Incidents

## Time on Scene Prior to Initial Shots Fired

The trend toward longer times on scene prior to the OIS continued from 2014. Typically, 67% of OISs occurred after officers had been on 6 minutes or more. In 2016, 80% of OISs occurred after officers had been there for over 6 minutes. The increase can be explained by a few OISs in 2014 and 2015 that were 120 minutes or longer, involving barricaded subjects and SWAT. Most OISs (26%) occurred within 16-60 minutes of officers arriving on scene. In 2016, the trend continued with 50% of the OISs occurring within that time frame.

As reported in previous Deadly Force reports, it is appropriate to assume the fatality rate increases substantially when the incidents are not resolved quickly. OISs in which the initial shots were fired within the first five minutes were less likely to result in a fatality. In the last five years, the fatality rate of OISs that were shorter in duration was 27%. The fatality rate of OISs that were longer in duration (six or more minutes) was 52%.

## On-Scene Supervision

Police supervisors arrived on scene prior to deadly force being used on an average of 32% of the OISs during the five year reporting period. The presence of a supervisor on scene prior to the use of deadly force increased in 2014-2015 compared to 2012-2013. In 2016, a supervisor arrived prior to the use of deadly force on 30% of the OISs, a decrease from 38% in 2015.

The OISs in which supervisors were on scene tended to be lengthy (more than 30 minutes, on average). Generally, fatal OIS outcomes are more likely when officers involved have time to organize and prepare themselves in response to dangerous situations. This is to be expected. Higher lethality rates are typically associated with OISs that are not resolved quickly.

Caution is advised before drawing conclusions regarding the value of supervisors to manage as well as defuse volatile situations. The scope of this study does not extend beyond examining an extremely limited number of incidents that rise to the level of an OIS.

## Officer Characteristics Age/Race/Ethnicity/Gender

The average age of involved officers has decreased slightly during the five year reporting period. The average age of the involved officers in 2016 (37 years) was slightly higher than the average age of all involved officers during 2012-2014 (36 years) but lower than the average age in 2015 (38 years). Separating into age groupings, the largest number of officers were in their 30's (43%), followed by officers in their 40's (27%), 20's (24%), and 50's (6%). In 2016, the proportion of officers in their 30's was higher (59%) compared to the overall trend (43%) in 2012-2016.

The predominant race of involved officers during the past five years was white (80%). In 2016, 77% of the involved officers were white, which is consistent with the five year trend. The racial makeup of involved officers was fairly consistent with the racial makeup of officers employed by the Department.

The predominant gender of involved officers was male (95%), with female officers comprising only 5% of the person-oriented OISs. The largest proportion of female officers involved (3) in the past five years occurred in 2014. In both 2015 and 2016, person-oriented OISs involved only male officers. The proportion of female officers involved in OISs in 2016 did not reflect the proportion of female commissioned personnel on the Department (Figure 5).



Figure 5. Involved Officer Gender and Race Compared to LVMPD Commissioned Personnel Demographics

## Officer Tenure

The average tenure of officers involved in OISs during 2012-2016 has remained consistent, varying by three years (between 7 and 10 years). The average tenure remained the same in 2016 at 10 years. The tenure of those involved officers ranged from a low of 1 year to a high of 24 years with LVMPD.

The tenure of the involved officers mirrored the tenure characteristics of the patrol officers stationed at area commands. The years of service profile of commissioned personnel at area commands continued to reflect the number of new police officers hired by the Department between 2005 and 2010. Recently the Department began hiring new officers and the average tenure of involved officers is expected to decrease in the next couple of years.

## Officer Duty Assignments

The proportion of involved officers assigned to area commands increased in 2016 (76%), compared to 2015 (64%). Typically, 74% of involved officers are assigned to an area command. The increase of area command OISs was due to a decrease of SWAT OISs. Eight SWAT officers were involved in OISs in 2015, compared to zero SWAT officers in 2016. Usually, 26% of involved officers come from Specialized Units/Bureaus. In 2016, the Traffic Bureau had two officers and the Homicide Sex Crimes Bureau had one officer. Aside from area commands, officers assigned to the Criminal Apprehension Team (CAT), SWAT and K-9 were most likely to be involved in an OIS during the five year reporting period.

## Classifications of Officers (Rank)

The majority of officers who were involved in OISs were classified as PO-II's (87%) at the time of the shootings. PO-II's are officers with more than one year of service beyond Field Training. PO-II's were involved in 82% of OISs in 2016. PO-I's were involved in 6% of the OISs in 2016, whereas PO-I's were involved in 21% of the OISs in 2015. The rate of sergeants involved in OISs was 7% during the past five years.

## Firearms Employed by Officers

The predominant firearm used by officers in an OIS is their handgun. Officers used their handgun in 78% of the OISs during the past five years. Involved officers used their handgun in 89% of the OISs in 2016, which is an increase from previous years (Figure 6). Department policy dictates that officers may deploy their rifle based on distance, available cover, and the tactical situation presented. The use of rifles by officers involved in OISs steadily increased over the past years to 32% in 2015. Those involved officers, all assigned to SWAT, shot subjects at long distances. In 2016, the use of a rifle occurred in only one OIS where the patrol officer was responding to a violent CFS. The subject was armed with a rifle and was shooting at arriving officers.



Figure 6. 2012-2016 Person-Oriented OISs. Comparison of the Rate of Weapons Used by the Involved Officers

## Summary of Shots Fired by Officers

There were a total of 112 officers who fired shots in the five year reporting period. The average number of shots fired per officer did not vary greatly. Seventeen police officers, directly involved in OISs during 2016, fired 125 rounds, which is an average of seven rounds per officer and thirteen rounds per incident. The overall average remained relatively consistent at 5-7 shots per officer. In 2016, the average number of rounds fired per incident was 13 rounds. This is the largest average number of rounds fired per incident in the five year reporting period. The smallest average number of rounds fired per incident (8 rounds) occurred in 2014 and 2015 (Figure 7).



Figure 7. 2012-2016 Person-Oriented OISs, Shots Fired Per Officer and OIS

The actual number of shots fired by individual officers in 2016 ranged from 1 to 18. The eighteen shots fired by the involved officer was the fifth highest number of shots fired during the reporting period. In 2013, an involved officer fired thirty-three shots. Typically, 86% of involved officers fired between 1-9 rounds and 14% of involved officers fired 10 or more rounds.

## Distance of Initial Shots Fired by Officers

The largest average distance of initial shots fired by involved officers with their handgun occurred in 2016. The average distance with a handgun increased from 22 feet in 2015 to 40 feet in 2016. The longest distance of initial shots fired by an officer with a handgun occurred in 2016 at 132 feet, the longest since 2014 at 108 feet. During the past five years, when the subject was armed with a firearm, the majority of officers shot their handgun from 11 to 25 feet. When the subject was armed with a knife, the majority of involved officers shot their handgun from 1 to 10 feet.

The largest average distance of initial shots fired by involved officers with their long gun occurred in 2015. The average distance with a long gun decreased from 183 feet in 2015 to 128 feet in 2016. The longest distance of initial shots fired by an officer with a long gun occurred in 2014 at 333 feet. During the past five years, when the subject was armed with a firearm, the majority of officers shot their long gun at distances over 101 feet. When the subject was armed with a knife (one incident in 2013), the involved officer shot their long gun at distances less than 10 feet.

## Foot Pursuits

A foot pursuit preceded 18% of OISs during the past five years. The largest proportion of OISs preceded by a foot pursuit occurred in 2014 (25%) and the smallest proportion occurred in 2016 (10%). When a foot pursuit preceded the OIS, there were three fatal OISs in 2015, the most in the five year period. In 2013 and 2016, there were zero fatalities when a foot pursuit preceded the OIS.

## Less Lethality Force

The Department's guidelines for deploying less lethal tools are based on the level of threat the subject poses to the public and officers. Typically, less than 14% of OISs involved the engagement of less lethal tools. In 2014, 25% of the involved officers deployed less lethal tools in their OIS which deviated from the trend. During the past five years, the Electronic Control Device (ECD) was the most commonly used less lethal tool (36%), followed by the less-than-lethal (beanbag) shotgun, Vehicle Strikes, and Stationary Vehicle Immobilization Technique (pinching). K9 and vehicle techniques such as low speed Precision Intervention Technique (PIT) maneuvers were deployed marginally during the reporting period. In 2016, less lethal tools were deployed but none were applied in an OIS.

In the five year reporting period, less lethality tools were most likely to be used when the subject was armed with a firearm (73%), followed by a knife or sharp object (27%). When the subject was armed with a knife, a less-than-lethal (beanbag) shotgun was the tool of choice. When encountering a subject armed with a firearm, officers chose ECDs more often.

## Subject Characteristics Age/Race/Ethnicity/Gender

The average age of the OIS subject ranged between 33 and 37 years during the reporting period. The average age of subjects associated with 2016 OISs (33 years) was the same as in 2013. The subject's age ranged from the low of 18 years (two OISs, 2015 and 2016) to the high of 58 years in 2014. Overall, the majority of subjects were in their 20's. In 4% of OISs, subjects were under the age of 20. In 2016, the majority of subjects (60%) were in their 20's and 30's.

The predominant race of OIS subjects during the past five years was white (45%). In 2016, only 10% of the subjects were white, which was a significant decrease from 2014 (71%) and 2015 (50%).   Black subjects accounted for 40% of the 2016 OISs, a slight increase from the overall trend (30%) for the reporting period. The 2016 break down of the subject's race is not consistent with the racial demographics of Clark County, Nevada in that black subjects were overrepresented and white subjects were underrepresented. This is a

stark contrast when compared to the three previous years where the majority of OIS subjects were white. In 2016, Hispanic subjects accounted for 30% of the OISs, a slight increase from the overall trend (21%), but consistent in representing the racial demographics for Clark County, Nevada.

OIS subjects were predominantly male. Males comprised 90% of OIS subjects during this reporting period. The gender distribution of person-oriented OISs does not mirror the gender distribution of the population of Clark County, Nevada, which is approximately 50% male and 50% female (Figure 8). Female subjects were involved in 10% of OISs over the past five years. Since 2013, the proportion of female subjects has increased. Female subjects comprised rates as high as 18% in 2014 and 13% in 2015. There were no female subjects involved in an OIS in 2016.



Figure 8: 2012-2016 Person-Oriented OISs, Subject Gender and Race Compared to Clark County, Nevada Population Demographics

## Criminal Backgrounds of Subjects

The majority (88%) of subjects associated with an OIS had a previous criminal history, ranging from misdemeanor to felony arrests. Subjects involved in 2016 OISs with prior criminal history (90%) were above the trend. Of those with arrest records during the past five years, more than half were convicted of violent crimes (67%).

## Condition of Subjects (Drugs/Alcohol)

While the information regarding drugs and alcohol can provide a useful measure of the subjects' judgment when confronting the police, it should be noted it is subjective related to these statistics. Drugs and alcohol determinations were based on observation, self-admission, and toxicological testing during autopsies for fatalities only.

Nearly 27% of OIS subjects during the past five years were believed to have been under the influence of drugs and/or alcohol at the time of their deadly force encounters with the police. The most common drugs associated with OIS subjects during this reporting period were methamphetamine, prescription medications, marijuana, and cocaine. The percentage of subjects under the influence of drugs and/or alcohol at the time of the OIS in 2016 was at 30%, with methamphetamine and prescription medications the most common drugs found in their system.

## Mental State of Subjects

A certain amount of subjectivity is required in order to classify the mental state of OIS subjects at the time of their deadly force encounters with police. Determinations regarding mental state are largely based on the observations of on-scene officers and information obtained by detectives during follow-up investigations.

The number of subjects whose mental state was classified as being Mentally Unstable, Agitated, Suicidal, or expressed Suicide by Cop intentions has increased since 2011. In 2016, there was a deviation in this trend in which 80% of the subjects appeared normal. The proportion of subjects who expressed Suicide by Cop intentions (24%) has remained relatively consistent during the reporting period except in 2016. There was one Suicide by Cop incident. The number of suicidal subjects has declined from 18% in 2014 to 10% in 2016 (Figure 9).



Figure 9. 2012-2016 Person-Oriented OISs. Comparison of the Mental State of the Subjects

## Subject Weapon

Subjects were armed in 91% of the OISs in the five year reporting period. In 2016, all subjects were armed. Firearms, predominantly pistols, were the weapon of choice used by subjects. Subjects armed with a long gun (rifle, shotgun) have increased since 2013. However, there was only one OIS incident where the subject was armed with a long gun in 2016. Firearm usage has increased steadily from 65% in 2012 to 90% in 2016.

OIS incidents involving a subject armed with a knife have been on the decline. Typically, 14% of OISs involve a subject armed with a knife. The rates have fallen from a high of 24% in 2014 to 0% in 2016 (Figure 10). In 2016, a subject attempted to run over an officer with a vehicle. This is the only OIS incident in the reporting period where a vehicle was used as a weapon.

The effect of RBT, AOST, and the *Procedural Justice through Non-Biased Based Policing* training introduced to officers in 2013 and 2014, may have contributed to the reduction of the number of OISs involving unarmed subjects. During 2012-2013, OISs involving unarmed subjects were between 18% and 23%. From 2014-2016, only one OIS incident out of 42 OISs involved an unarmed subject.

Armed subjects are much more likely to be killed by officers than unarmed subjects. During the past five years, 48% of armed subjects died as a result of the OIS, compared to 17% of unarmed subjects. Typically, 37% of subjects armed with a firearm resulted in a fatality and 38% were nonfatal. Subjects armed with knives, or sharp objects had a similar fatality rate when comparing fatal (6%) and nonfatal (7%) OISs. Subjects were armed with a firearm in 90% of the 2016 OISs and 33% of those subjects died as a result of the OIS.



Figure 10. 2012-2016 Person-Oriented OISs, Comparison of the Weapons Employed by the Subject

## Summary of Shots Fired by Subjects

The number of subjects who shot at officers during the OIS incident has fluctuated during the five year period. The incident rate of subjects who shot at officers peaked in 2013 (38%) and has gradually declined from 35% in 2014 to 30% in 2016. Subjects shot 153 rounds at officers from 2012-2016.

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Officer - Killed | 0 | 0 | 2 | 0 | 0 |
| Officer - Wounded | 1 | 0 | 2 | 2 | 2 |
| On-Scene Officer - Wounded | 1 | 0 | 0 | 2 | 0 |

Twelve officers were injured or killed from shots fired at them during the five year reporting period. In 2014, two officers were ambushed, who were unable to return fire, and were killed. In 2015, there were four incidents where officers were ambushed resulting in three officer injuries. There were no ambushes in 2016; however, two officers sustained injuries in their OIS.

## Time Intervals between Person-Oriented OIS Incidents

The time between OISs in 2016 was unlike previous years. Time intervals of 0-15 days, 16-30 days, and 31-45 days were evenly spread at 30% each. In 2012 and 2014-2015, the majority of OISs occurred within 0-15 days of one another. This differs from 2013, when 61% of OISs occurred within 16-30 days of one another.

The longest time between OISs in 2016 was 159 days. This is the Department's longest period of time in the past 10 years in which no OIS occurred. The second longest interval was in 2014, a 117-day period.

## Month, Day of Week, and Time of Day of OIS Incidents

January and December had the highest number of OIS incidents in 2016. Historically, December has had the highest number of occurrence (17%) throughout 2012-2016, followed by March and August with 11% each. Only one OIS occurred during these months in 2016. There has been only one OIS for all Septembers in the five year reporting period.

The majority of OIS incidents (60%) occurred on Mondays and Tuesdays in 2016. This is representative of the past five years where Mondays, Tuesdays, and Fridays were the more common days of the week for an OIS to occur.

Historically, about 33% of OISs occurred between 1800-2359 hours, and approximately one-quarter of OISs occurred between 0000-0559 hours and 1200-1759 hours. Over 60% of the 2016 OISs occurred between 1800-2359 hours. In comparison, the majority of the 2015 OISs occurred between 0600-1159 hours. In 2016, less than 10% occurred during that same time frame.

The most common days of the week and time of day for an OIS to occur during this reporting period were Mondays between 1200-1759 hours and 1800-2359 hours, Tuesdays between 1200-1759 hours, and Fridays between 1800-2359 hours. The least likely days of the week and time of day for an OIS to occur were Mondays and Saturdays between 0600-1159 hours, Wednesdays between 1200-1759 hours, and Thursdays between 1800-2359 hours.

## Locations of OIS Incidents

LVMPD's jurisdiction is divided into area commands and resident areas. Nine area commands cover the Las Vegas valley, surrounded by resident areas. Since 2012, Northeast Area Command (NEAC), Southeast Area Command (SEAC), and Enterprise Area Command (EAC) had the largest rates of OISs but, in 2016, the rate of OISs that occurred in SEAC dropped to 0%. An OIS incident has occurred in Bolden Area Command (BAC) every year since 2012 but in 2016, there were no OISs. The rate of OISs in Northwest Area Command (NWAC) increased from 13% in 2015 to 30% in 2016.  Convention Center Area Command (CCAC) had one OIS incident in 2016. Typically, only 3% of all OISs have occurred in CCAC for the reporting period. About 10% of all OISs have occurred in South Central Area Command (SCAC) and Downtown Area Command (DTAC). In 2016, SCAC and DTAC each had an OIS. Spring Valley Area Command (SVAC), which opened on August 27, 2016, did not have an OIS incident.

Interstate Highway 15 geographically divides the Las Vegas Valley into East and West areas. Area command boundaries also follow this alignment where the East comprises CCAC, DTAC, NEAC, SCAC and SEAC. The West comprises BAC, EAC, NWAC, and SVAC. Historically, a greater number of OISs (61%) have occurred on the East (Figure 11). In 2016, OISs occurred equally in the East and West.

Two OISs occurred in 2014 in LVMPD's resident areas. No OISs occurred in LVMPD's resident areas in any of the other four years (Figure 12).

In the past five years, OISs were denser on the northwest side of the valley, with most OISs occurring in the area bordered by Westcliff Drive to Alta Drive and S. Buffalo Drive to S. Rainbow Boulevard. There were four OISs that occurred in this area during 2016 (Figure 13).



**Officer Involved Shootings - Area Commands**
*2012-2016*

Las Vegas Metropolitan Police Department

Figure 11. 2012-2016 Person-Oriented OISs - Area Commands. Pin Map



**Officer Involved Shootings - Residential Areas**
*2012-2016*

Figure 17. 2012-2016 Person-Oriented OISs - Resident Areas. Pin Map



**Officer Involved Shootings**
*2012-2016*

Las Vegas Metropolitan Police Department

Figure 13. 2012-2016 Person-Oriented OISs. Hotspot Map

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

## Non-Shooting Deadly Force Events

LVMPD policy categorizes certain uses of force as deadly force. Nine person-oriented deadly force incidents other than OISs occurred during 2012-2016. Police vehicles served as weapons in eight incidents, either to strike an armed subject, or to ram a fleeing vehicle. In one incident, the subject took an officer's ECD and aimed it toward the officer during the physical altercation. The involved officer used a baton on the subject who sustained a dislocated shoulder.

Eight of the nine incidents were nonfatal. In the 2014 fatal incident, a PIT maneuver was applied at low speeds in which one of the three subjects inside the vehicle was impaled.

## Use of Deadly Force on Animals

During 2012-2016, deadly force was used on 25 animals. There were no animal shoots in 2016. Dogs (81%) were the majority of the animals involved. The remaining animals included two coyotes, one chimpanzee, and one cat. In what turned out to be a very unusual set of occurrences, all three of the non-domesticated animals were shot within a few months of one another during 2012. The involved officers used a firearm in all but one incident, in which the involved officer used a vehicle to strike an attacking dog. The outcome for the majority of the incidents was fatal (60%), followed by uninjured (28%) and non-fatal but injured (12%).

The majority of incidents began as a citizen CFS. As expected, the most common call code associated with the application of deadly force on an animal was an animal complaint. Most commonly in 2015, officers encountered the animal attacking either the officer, citizen, or an attack was imminent, in which the animal charged at the involved officers before being shot.

Aggressive dogs were involved in the majority of the animal-type deadly force incidents. In only one incident, the owner of a severely injured dog requested an officer humanely shoot his dog to end the animal's suffering. The most common breed of dog shot was Pit Bull/Pit Bull mix (64%), followed by unknown breeds (16%). Other breeds of dogs include: German Shepherd mix, Belgian Malinois, Boxer, and Mastiff with one incident each. The majority of the dogs involved weighed more than 65 pounds.

LVMPD introduced a new mandatory online training class, *Police and Dog Encounters*, beginning in 2014. Officers were trained on the best tactics to ensure public and officer safety through diffusing dog encounters. In addition, the dog poles were purchased by the Department. Training was provided to all supervisors who carried dog poles in their vehicles. As a result, the number of use of force incidents involving an animal has decreased 55% since 2012.

## Critical Incident Review Process

It is the policy of this Department to provide both the LVMPD and the community with a thorough review process of incidents wherein deadly force was used by Department members. This process, the Critical Incident Review Process (CIRP), includes the participation of citizen Board members who reside within the LVMPD jurisdiction who are not personally affiliated with the Department, who have not had prior law enforcement experience, or are related to any of its members.

CIRP is comprised of two separate but related Boards whose combined purpose is to conduct a thorough review of all aspects of incidents involving the use of deadly force by Department members. CIRP is a two-part process which analyzes the actual use of force employed by officers as well as tactics utilized by the members, decision-making, Department policy and procedure compliance, training and supervision.

The Board votes during this process and must render one of the following dispositions:

- *Administrative Approval:* Objectively reasonable force was used under the circumstances based on the information available to the officer at the time. This finding acknowledges that the use of force was justified and within departmental policy. There are no concerns surrounding the tactics employed, and there are no policy violations including those not relating to the application of force. Within policy/good to excellent performance.

- *Tactics/Decision-Making:* This finding considers that, even though the use of deadly force was lawful and within policy, the tactics and/or decision-making employed were flawed and worked to limit alternatives that may have otherwise been available to the officer. A different approach may have reduced or eliminated the need for the officer to employ deadly force.

- *Policy/Training Failure:* A deadly force outcome was undesirable but did not stem from a violation of policy or failure to follow current training protocols. A Department policy and/or specific training protocol is inadequate, ineffective, or deficient; the officer followed existing policy and/or training or there is no existing policy and/or training protocol that addresses the action taken or performance demonstrated. Global policy or training deficiencies.

- *Administrative Disapproval:* The UFRB has concluded through this finding that the force used was not justified under the circumstances and violated Department policy. This outcome is reserved for the most serious failures in adherence to policy, decision-making and/or performance. A violation of the use of force policy.

In 2015, there were a total of sixteen OISs, of those cases, one had an outcome of Tactics/Decision-Making while the remaining 15 had an outcome of Administrative Approval. At the time of this writing, three of the ten OISs from 2016 have yet to be presented to the Board. However, of the seven OISs that were presented to the Board, 88% had an outcome of Administrative Approval and 12% had an outcome of Tactics/Decision-Making.

For a complete reporting related to accountability in administrative matters for each OIS, refer to: www.lvmpd.com - Internal Oversight and Constitutional Policing

# Non-Deadly Use of Force Overview

















LAS VEGAS METROPOLITAN POLICE DEPARTMENT

LVMPD 1260









Figure 14. Ten-year non-deadly Use of Force overview

The Department's non-deadly use of force incidents have decreased by 8% over the past five years. Non-deadly force incidents have decreased by 42% from 1,345 in 2008, a ten-year high, to 775 in 2016, a ten-year low. This decrease occurred despite an increase in the number of commissioned personnel from 3,190 to 3,491 during the same period (Figure 14 and Figure 15). Of the 775 incidents in 2016, 22% were documented as "Complaint of Injury Only" which means there was no visible injury, but the subject said they were injured.



Figure 15. Five-year non-deadly Use of Force overview

The ratio of non-deadly use of force incidents per officer reached a five year high in 2011, with 0.32 uses of force per officer.  This ratio has decreased to 0.22 uses of force per officer in 2016.

## Body Worn Cameras

LVMPD's continued decrease in use of force incidents is attributed to numerous changes made since 2012, when LVMPD requested assistance from the Department of Justice. The most recent change has been the implementation of the COPS Office recommendation to outfit officers with body worn cameras (BWC).

Studies have shown that both actual officer use of force and citizen allegations of use of force decrease when body cameras are used (Final Report of the President's Task Force on 21st Century Policing). Citizen complaints may decline because of body cameras. As a result, an increase of Department suits filing for false complaints may occur. The Department began outfitting officers in 2014, and as of today 1,666 officers wear cameras. This is an increase of 1,072 cameras (180%) in 2016.

## Calls for Service

LVMPD is able to gauge the number of incidents that may result in an officer having to use force by monitoring the demands for police services. The number of officers increased by 6% in 2016. Citizen initiated CFS decreased by 15% in 2016 after having steadily increased since 2010. As with the previous five years, "Calls-for-Service" (citizen initiated) account for the majority of our police related non-deadly use of force incidents. Officer initiated CFS have decreased by 83,336 (-15%) since 2012; however, they have increased 18% since 2015. "Pedestrian Stops" and "Vehicle Stops" (both officer initiated calls) also account for a sizable portion of police related non-deadly use of force incidents.

Analysis indicates officers applied force in less than one percent of all 2016 police calls for service. The 2016 rate of non-deadly use of force per 10,000 CFS, where a citizen had contact with police, was .147.

## Area of Assignment

A significant portion (66%) of non-deadly use of force incidents occurred in area commands.  This is primarily due to the number of citizen contacts associated with the area commands in comparison to other police bureaus (16%) and the detention center (18%). Six area commands displayed a downward trend in the number of use of force incidents (Figure 16). These decreases range from one in DTAC, to twenty-three in CCAC. Two area commands, SCAC and SEAC, had increases in 2016, with an increase of two and eighteen, respectively. SVAC was excluded from trend assessment as there is no comparison data.



Figure 16. Non-deadly Use of Force, Area of Assignment

LAS VEGAS METROPOLITAN POLICE DEPARTMENT

LVMPD 1262

## Force Type Used

When use of force is needed, officers must assess each incident to determine, based on policy, training and experience, which use of force option would best bring the incident under control in a safe and prudent manner. Officers use reasonable and sound judgment when force is to be deployed.

Use of force reports reflected Empty Hand/Takedown techniques are the predominate tool used to gain compliance from subjects. This is especially true as uses of other tools have declined and the Department has trained de-escalation. Officers used the less lethal shotgun 12 times in 2016 to subdue armed subjects without resorting to deadly force options. A "Canine" policy change was also implemented in January 2014 from "Bark and Hold" to "Bite and Hold," at which time an increased utilization of canine by other details was seen (ie. The Criminal Apprehension Team and SWAT).

## Injuries

With the use of Empty Hand/Takedown techniques rising, the number of officer injuries may increase accordingly. The number of officer injuries resulting from use of force incidents increased by twenty-eight from 2015 (173) to 2016 (201). The number of officers seeking treatment at a hospital for an injury resulting from a non-deadly use of force incident increased by eleven. The number of subjects claiming injury from non-deadly use of force incidents increased by two, from 2015 (626) to 2016 (628). The number of subjects seeking hospital treatment decreased by one, from 2015 (189) to 2016 (188). However, there were instances where the subject requested hospital treatment and the cause was not always due to the force used. Some were transported for Legal 2000's, pre-existing conditions, and other miscellaneous medical issues. The numbers can be misleading without analyzing each individual report.

## Assessment and Actions of Subject

When officers first arrive on a call, they make a quick observation of the subject's mental state. This evaluation considers mental health, drugs or alcohol use, or any other unknown factor. In 18% of the incidents, the officer believed the subject was under the influence of drugs or alcohol. In 13% of the incidents, officers believed the subject was experiencing a mental crisis.

The three most frequently reported subject actions during a non-deadly use of force incident in 2016 were Fighting, Assault on Officer, and Attempt to Flee. Both Fighting and Assault on Officer place the subject in the aggressive resistance category. Attempt to Flee may also warrant an intermediate level of force (Figure 17) from the officer if the severity of the crime and subject poses an immediate threat to the safety of officers or others.

The classification of the subject's weapon in the initial observation has historically been low. The presence of a firearm was the most frequently reported subject weapon in 2016. This was followed by the presence of an edged weapon or knife.



Each bold force option within the Levels of Control represents the highest level of force option available; however, other force options should be considered to help de-escalate the situation.

Figure 17. Use of Force Model

## Allegations of Excessive Force

The LVMPD Internal Affairs Bureau received 165 force related allegations in 2016, compared to 219 in 2015, a decrease of 54 (Figure 18). Of these, three of the allegations against Police Officers, and five allegations against Corrections Officers were sustained. One allegation was modified and one the officer's performance was monitored. With the BWC becoming more prevalent, the number of allegations against officers in the future may decrease substantially.



### 2012-2016 Non-deadly Use of Force Allegations of Excessive Force

Figure 18. Non-deadly Use of Force, Allegations of Excessive Force

## Appendix A

| Statistical Summary For Officer-Involved Shootings | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Number of OISs | 11 | 13 | 16 | 16 | 10 |
| Fatal OISs | 4 | 3 | 8 | 11 | 3 |
| Non-fatal OISs | 7 | 10 | 8 | 5 | 7 |
| Longest Interval Between OISs (Days) | 104 | 80 | 117 | 72 | 159 |
| Number of Directly Involved Police Officers | 23 | 19 | 25 | 28 | 17 |
| Average Number of Police Officers per OIS | 2.1 | 1.5 | 1.6 | 1.8 | 1.7 |
| Average Minutes On Scene Until Initial Shots Fired | 7 | 131 | 42 | 59 | 28 |
| Number of Shots Fired by Police Officers | 113 | 112 | 122 | 130 | 125 |
| Average Number of Shots Fired per Police Officer | 5 | 6 | 5 | 5 | 7 |
| Average Number of Shots Fired per OIS | 11 | 9 | 8 | 8 | 13 |
| Number of Subjects | 11 | 13 | 17 | 16 | 10 |
| Percentage of Subjects Who Used a Firearm as a Weapon | 64% | 62% | 76% | 88% | 90% |
| Percentage of Subjects Who Used a Knife as a Weapon | 18% | 15% | 24% | 6% | 0% |
| Number of Subjects Who Shot at Police Officers | 3 | 5 | 6 | 5 | 3 |
| Number of Shots Fired By Subjects | 13 | 31 | 47 | 35 | 42 |