# Exhibit V – Chief John McGrath's Deposition

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

```
 1                    CERTIFICATE OF REPORTER

 2            I, the undersigned, a Certified Shorthand

 3     Reporter of the State of Nevada, do hereby certify:

 4            That the foregoing proceedings were taken

 5     before me at the time and place herein set forth;

 6     that any witnesses in the foregoing proceedings,

 7     prior to testifying, were duly sworn; that a record

 8     of the proceedings was made by me using machine

 9     shorthand which was thereafter transcribed under my

10     direction; that the foregoing transcript is a true

11     record of the testimony given to the best of my

12     ability.

13            Further, that before completion of the

14     proceedings, review of the transcript [X] was

15     [  ] was not requested pursuant to NRCP 30(e).

16            I further certify I am neither financially

17     interested in the action, nor a relative or employee

18     of any attorney or party to this action.

19            IN WITNESS WHEREOF, I have this date

20     subscribed my name.

21

22     Dated:  August 13, 2019

23

24                                 _____
                                   GALE SALERNO, RMR, CCR #542
25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

Page 1

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,   )
                                      ) Case No.
7         Plaintiff,                  ) 2:18-cv-00860-GMN-VCF
                                      )
8         vs.                         )
                                      )
9    LAS VEGAS METROPOLITAN POLICE    )
     DEPARTMENT, a political          )
10   Subdivision of the State of      )
     Nevada; KENNETH LOPERA,          )
11   individually; TRAVIS CRUMRINE,   )
     individually; MICHAEL TRAN,      )
12   individually; MICHAEL FLORES,    )
     individually,                    )
13                                    )
          Defendants.                 )
14   _____)

15

16

17            VIDEOTAPED DEPOSITION OF

18          DEPUTY CHIEF JOHN MCGRATH

19       Taken on Wednesday, July 31, 2019

20              At 9:38 a.m.

21          Held at Lagomarsino Law

22   3005 West Horizon Ridge Parkway, Suite 241

23          Henderson, Nevada  89052

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

CONDENSED
TRANSCRIPT

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

2  (Pages 2 to 5)

## Page 2

1
2   APPEARANCES:
3   For the Plaintiff, Trinita Farmer:
        ANDRE M. LAGOMARSINO, ESQ.
        Lagomarsino Law
4       3005 West Horizon Ridge Parkway, Suite 241
        Henderson, Nevada 89052
5       (702) 383-2864
6
7   For the Defendant, Kenneth Lopera:
8       DANIEL R. MCNUTT, ESQ.
        McNutt Law Firm, P.C.
9       625 South 8th Street
        Las Vegas, Nevada 89101
10      (702) 384-1170
11
12
13  For the Defendants, LVMPD, Crumrine, Tran and Flores:
14      CRAIG R. ANDERSON, ESQ.
        Marquis Aurbach Coffing
15      10001 Park Run Drive
        Las Vegas, Nevada 89145
16      (702) 384-1170
17
18
    Also Present:
19
        JESSE JAMES MATHIS, Videographer
20
        STEPHANIE ANDERSON, Paralegal
21
22
23
24
25

## Page 3

1
2                    INDEX
                            Page
3   Examination by Mr. Lagomarsino          6
4   Examination by Mr. McNutt              80
5   Examination by Mr. Anderson           167
6   Further Examination by Mr. Lagomarsino  171
7   Further Examination by Mr. McNutt      183
8   Further Examination by Mr. Anderson    187
9   Further Examination by Mr. Lagomarsino  189
10
11
12
13           PLAINTIFF'S EXHIBITS
14  EXHIBIT                         Marked
15  Exhibit 1    Neck Restraint Research through  26
                 Major City Chiefs Association,
16               Bates LVMPD 1362 to 1384
17  Exhibit 8    Defendant's First Supplement to  31
                 Responses to Plaintiff's First
18               Set of Requests for Production
                 of Documents
19
20  Exhibit 9    Defendants' Fifth Supplement to  76
                 Initial Rule 26(a)(1)(a)
21               Disclosure of Witnesses and
                 Exhibits
22  Exhibit 10   Crime Scene Color Photos, Bates  171
                 LVMPD 2254 to 2273
23
24  Exhibit 11   Color Photos, Bates LVMPD 2311,  172
25               2310, 2309

## Page 4

1                  DEFENDANTS' EXHIBITS
2   EXHIBIT                         Marked
3   Exhibit A    Article, Las Vegas          105
                 Review-Journal, July 29, 2019
4
    Exhibit B    Arrest Report, Bates P002368 to  111
5                2375
6   Exhibit C    LVMPD Use of Force Procedure,   130
                 Bates LVMPD 0007 to 0009
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 5

1   VIDEOTAPED DEPOSITION OF DEPUTY CHIEF JOHN MCGRATH
2            July 31, 2019
3              -  -  -
4        THE VIDEOGRAPHER:  Good morning.  Today is
5   July 31st, 2019.  The time is approximately 9:38 a.m.
6        This begins the video deposition of
7   Deputy Chief John McGrath.
8        We are located at Lagomarsino Law,
9   3005 West Horizon Ridge Parkway, Suite 241,
10  Henderson, Nevada, 89052.
11       My name is Jesse James Mathis, court
12  videographer with Las Vegas Legal Video.
13       This is United States District Court,
14  District of Nevada, Case Number
15  2:18-cv-00860-GMN-VCF, in the matter of Trinita
16  Farmer versus Las Vegas Metropolitan Police
17  Department, et al., Defendants.
18       This video deposition is requested by the
19  attorneys for the Plaintiff.
20       And will counsel and all present please
21  state your appearances for the record.
22       MR. LAGOMARSINO:  Andre Lagomarsino and
23  Stephanie Anderson for the Plaintiff.
24       MR. MCNUTT:  Dan McNutt on behalf of
25  Ken Lopera.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 6

1   MR. ANDERSON:  Craig Anderson on behalf of
2  Las Vegas Metropolitan Police Department, Officers
3  Crumrine, Tran and Flores.
4   THE VIDEOGRAPHER:  Thank you.
5   And the witness may now be sworn in by
6  Gale Salerno for All-American Court Reporters.
7    - - -
8   DEPUTY CHIEF JOHN MCGRATH,
9  having been first duly sworn, was
10  examined and testified as follows:
11    - - -
12
13   EXAMINATION
14  BY MR. LAGOMARSINO:
15   Q.  Good morning.  Could you please state your
16  name for the record.
17   A.  John McGrath, M-c-G-r-a-t-h.
18   Q.  Have you ever had your deposition taken
19  before?
20   A.  Yes.
21   Q.  On how many occasions?
22   A.  I don't recall, but at least once for this
23  case.
24   Q.  Are you familiar with the instructions and
25  admonitions that go along with depositions?

Page 7

1   A.  Yes.
2   Q.  Basically you understand you're under oath?
3   A.  Yes.
4   Q.  So we'll skip those today.
5   Could you please tell me your current job
6  position?
7   A.  I'm a Deputy Chief with Las Vegas
8  Metropolitan Police Department over the Professional
9  Standards Division, which includes Human Resources
10  and Organizational Development, which is all of
11  training.
12   Q.  How long have you been in that position?
13   A.  About two and a half years.
14   Q.  Prior to that, what was your position with
15  Metro?
16   A.  I was a captain.
17   Q.  And what were your job duties and
18  responsibilities as a captain?
19   A.  As a captain I had several different
20  assignments, including Northwest Area Command,
21  Internal Affairs, Criminal Intelligence, and Internal
22  Oversight in Constitutional Policing.  Different
23  bureaus within the agency.
24   Q.  And how long were you a captain with those
25  responsibilities?

Page 8

1   A.  Approximately five years.
2   Q.  What were your specific job
3  responsibilities with respect to constitutional
4  policing?
5   A.  Yeah, I was only there for three months,
6  but in constitutional policing, that captain is part
7  of executive staff.  So you're the only person that's
8  not appointed by the sheriff to be part of executive
9  staff and the only captain that's on executive staff.
10   Secondly, there's three parts of
11  constitutional policing:  FIT, which is the Force
12  Investigation Team, which investigates use of force
13  and criminal allegations, and makes a report to the
14  district attorney's office, and submits that to them
15  and they decide whether there's any criminal charges.
16   The Critical Incident Review Team, which
17  looks at the tactics the officers employed or the
18  supervisors, to see if there's anything that they
19  could have done better or any policies that need to
20  be changed related to that incident.
21   And then OIO, which is a section that
22  basically is looking out for the officers involved in
23  critical incidents, their welfare.  And also they're
24  responsible for putting out awareness reports, which
25  is something that immediately we want to let the

Page 9

1  department know that we have an issue or a problem
2  with this incident and we want to change their
3  behavior immediately.
4   Q.  Is OIO Office of Internal Oversight?
5   A.  Yes.
6   Q.  When you stated that it's the only captain
7  not appointed by the sheriff, what does that mean?
8   A.  So members of an executive staff, deputy
9  chiefs and above, are chosen by the sheriff.  You
10  don't test for those positions.  And so he appoints
11  you to that position, and then you become an
12  appointed person, a part of the department.
13   Q.  What difference does it make if you're not
14  appointed?  Is it a merit-based type of --
15   A.  It's merit-based, but you don't have to
16  test, so you're just chosen.  So he gets to pick
17  who's on executive staff, but you can be also
18  unappointed and put back to your previous rank of
19  captain.
20   Q.  And were you appointed?
21   A.  Yes.
22   Q.  Who appointed you?
23   A.  The sheriff.
24   Q.  Which sheriff?
25   A.  Lombardo.  Sorry.

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

4 (Pages 10 to 13)

Page 10

1    Q.  That's okay.
2        So prior to being a captain, what position
3  did you hold?
4    A.  Lieutenant.
5    Q.  And what were your job responsibilities as
6  lieutenant?
7    A.  I was a patrol lieutenant at Enterprise
8  Area Command, and then I was admin lieutenant on the
9  Strip at Convention Center Area Command.  And then I
10  was in the gang unit for the majority of my time as a
11  lieutenant.
12    Q.  And how long were you a lieutenant?
13    A.  I think about five years.
14    Q.  And how long did you work at the Convention
15  Center Area Command?
16    A.  I think about a year.
17    Q.  This incident with Tashii Farmer occurred
18  in the Convention Center Area Command; is that
19  correct?
20    A.  That's correct.
21    Q.  Prior to being a lieutenant, what was your
22  position?
23    A.  I was a sergeant.  And I'll go through
24  those assignments, because I guess that's what you're
25  looking for.

Page 11

1    Q.  Sure.
2    A.  I was a patrol sergeant, a field training
3  sergeant.  PSU sergeant, which is problem solving
4  unit, which is a plainclothes unit assigned to
5  patrol.
6        And then I was in property crimes, which is
7  a detective sergeant position.
8        And then I was in auto theft, and also a
9  viper, which is an auto theft task force, which is
10  undercover.
11    Q.  How long as a sergeant?
12    A.  Seven or eight years.  I hope this all adds
13  up to 27.
14    Q.  Maybe it will be more and you can retire
15  early.
16    A.  The longer you're on, you start to forget
17  some of the numbers of years you're in certain
18  assignments.
19    Q.  I bet you remember what your first day was
20  though, right?
21    A.  Yeah.
22    Q.  What was that?
23    A.  That was at Downtown Area Command in field
24  training.  I got a stolen car my first shift.
25    Q.  Say that again.

Page 12

1    A.  I recovered a stolen vehicle my first shift
2  of my first day, so I won't forget it.
3    MR. MCNUTT:  Is that like a Model T or
4  what?
5    THE WITNESS:  No.  It wasn't the first car
6  made.  It was the first car I saw when I started to
7  go to work and two guys were pushing it down Fremont
8  Street.
9  BY MR. LAGOMARSINO:
10    Q.  That's the kind of stuff that happens
11  downtown.
12    A.  It is the kind of stuff that happens
13  downtown.  And they don't teach you how to do a
14  felony car stop of two guys pushing a car either.
15    Q.  So prior to the sergeant you were patrol?
16    A.  Yes.
17    Q.  And approximately how long were you in
18  patrol before you became a sergeant?
19    A.  I think about seven years.
20    Q.  When you started working with Metro, had
21  you just moved to Las Vegas?
22    A.  Yes.
23    Q.  What brought you to Las Vegas?
24    A.  The job.  I was going to college and I
25  tested to come out here, and then when I graduated I

Page 13

1  just started the Academy a couple of months later.
2    Q.  You went to the University of Massachusetts
3  Lowell?
4    A.  Yeah.
5    Q.  Graduated in '92 with a degree in criminal
6  justice?
7    A.  Right.
8    Q.  Graduated high school in '78?
9    A.  Yep.
10    Q.  Had you ever been in the military?
11    A.  Yes.  I was in the Army.
12    Q.  How long were you in the Army?
13    A.  Four years, '85 to '89.
14    Q.  I'm assuming you were honorably discharged?
15    A.  Yes.
16    Q.  When you referenced your responsibilities
17  over professional standards, what does that entail?
18    A.  So there's two different bureaus.  And just
19  to note that that's different from my last deposition
20  because I had project management and video bureau at
21  that time.  And since then we've hired a chief
22  technology officer, and they restructured some
23  bureaus and moved that away from me so I don't have
24  that anymore.
25        But at the time that was why I was more

Deputy Chief John McGrath  ~  July 31, 2019
\* \* \* Videotaped Deposition \* \* \*

## Page 14

1  involved in policymaking and the issues we had with
2  different department policies. And so I don't have
3  that anymore.
4      So currently, I have Organizational
5  Development Bureau, which is -- includes the police
6  academy, field training, critical incident -- the
7  crisis intervention team, sorry, CIT. And then all
8  of training which is range, driver's training, which
9  we call EVOC, reality-based training, advanced
10 officer skill training, and MACTEC.
11     And then on the human resources side,
12 there's a selection and classification, which is
13 basically the hiring of officers, background
14 investigations on new employees and recruiting.
15     Q. Do you have direct reports?
16     A. Yes.
17     Q. Who are your direct reports?
18     A. Dennis O'Brien is the captain over
19 organizational development. And Joe Sobrio is a
20 director who is over human resources currently.
21     Q. And who are their direct reports, to your
22 knowledge?
23     A. Director Sobrio has Lieutenant Terry
24 Bernard and two managers on the selection and
25 classification side, Teresa Turtletaub,

## Page 15

1  T-u-r-t-l-e-t-a-u-b, and Adam Markwell, common
2  spelling.
3      And then on the organizational development
4  side, their direct reports, Captain O'Brien's reports
5  are Misty Pence is the lieutenant over the Academy,
6  Andy Hendrickson is the lieutenant over most of
7  training. And just last week we got Chris Holmes.
8  He's a lieutenant over advanced training, which I
9  didn't mention before. But that's -- all the
10 training officers take and which includes supervisor
11 training.
12     Q. Do you sit on any committees at Metro?
13     A. So I have a lot of additional duties. So I
14 guess that's what you're asking me for.
15     Q. Yes, sir.
16     A. Hopefully, I'll remember them all. Maybe
17 I'll have to look at my calendar.
18     So I'm the chairman of the pre-termination
19 board, so that's a board that does what I guess you
20 call Loudermill hearings, where it gives the employee
21 the opportunity to say why they should stay on the
22 department.
23     Then I have to write a recommendation to
24 the sheriff to say whether we recommend the person be
25 terminated or not or change his discipline.

## Page 16

1      I'm the head of the commendations board,
2  which hears all the commendations on the department.
3      I am the uniform committee. There's no one
4  else on it but me, because the sheriff doesn't want a
5  lot of changes to the uniforms. So if there's a
6  change, I just meet with him and he says whether or
7  not he approves it.
8      Q. Okay.
9      A. I'm on the employee health and welfare
10 trust as a management representative.
11     I sit on the use of force board, which a
12 few -- two or three or four a month of those boards.
13     Q. Do you sit on any budgeting boards?
14     A. No. Thank God.
15     Q. In terms of the uniform committee, there's
16 been some discussion in this case about BDUs.
17     A. Yes.
18     Q. Are you familiar with what a BDU is?
19     A. Yes.
20     Q. What does that stand for?
21     A. Well, it's a military term for battle dress
22 uniform, but for us it means greens, which is a green
23 uniform that basically I think they're just 511s, if
24 you know what those are. They're a plain uniform
25 with square pockets that the buttons are covered.

## Page 17

1      Q. What's the criteria to determine whether
2  somebody wears the tan uniform like you're wearing
3  today or the BDU?
4      A. So the bureau commander can determine what
5  the uniform is for different squads within his
6  bureau.
7      Q. And is there a set of written criteria as
8  to how to make that determination?
9      A. Yes and no. It's really up to the bureau
10 commander. But you can't put everyone in BDUs. They
11 have most BSU and flex teams on -- all the area
12 commands have the option of wearing the green
13 uniforms or at the bureau commander's discretion
14 plainclothes, depending on their assignment.
15     But the convention center is a little
16 different because they have additional officers that
17 they have specific jobs for that they put them in the
18 green uniforms.
19     Now, if you're going to ask me what they
20 are, I don't know exactly. But I know that they have
21 the flexibility to put more officers in the green
22 BDUs.
23     Q. Have you or do you know of anybody that has
24 considered research as to whether wearing BDUs
25 creates kind of a militarized awareness for the

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

6  (Pages 18 to 21)

---

Page 18

1  officer?
2      A.  I don't think so.  It's more for ease of --
3  well, first of all, these uniforms are more
4  expensive.  Those uniforms are a little bit more
5  durable for officers that are doing different kinds
6  of assignments.  Like we have our community-oriented
7  policing officers who are dealing with the homeless.
8  They're getting dirty all the time.  Those uniforms
9  are washable.  These ones are -- have to be
10  dry-cleaned.
11          So there's different reasons why.  They
12  just have to be justified to the bureau commander,
13  then he has to authorize it.
14      Q.  Do you know who the bureau commander was
15  for the convention center area command at the time of
16  Tashii Farmer --
17      A.  I think it was Captain Pelletier, but I'm
18  not 100 percent.  And he's the bureau commander right
19  now.
20      Q.  Are you CIT certified?
21      A.  If I am, it was over 15 years ago.  And I'm
22  not currently certified.  So you have to keep your
23  certification up, and I'm not.
24      Q.  I recall something in your prior deposition
25  of you saying once you get to a certain level of

---

Page 19

1  rank, you don't have to maintain certain
2  certifications; is that right?
3      A.  Right, per POST.  And the, you know, it's
4  really -- I'm not dealing with day-to-day people that
5  are -- have mental health issues, so there's no
6  reason to keep my certification up.
7      Q.  Okay.  Any time you need a break today,
8  just let us know.  We're happy to accommodate you.  I
9  anticipate today going about anywhere from two to
10  three hours.  So just let us know.  Okay?
11      A.  Okay.  I don't know if I have two to three
12  hours' worth of information, but you can ask me.
13      Q.  Have you ever been involved personally in a
14  deadly force incident?
15      A.  I haven't used deadly force, but I was
16  involved in an in-custody death a long time ago.
17      Q.  And what do you recall about that
18  incident?
19      A.  Sure.  It was a subject with a gun that I
20  was trying to get to put the gun down.  And he
21  refused.  He had the gun in his hand, and there was a
22  language issue.  He spoke Spanish and was highly
23  intoxicated and wasn't understanding what I was
24  telling him to do.
25          So I got close enough to get my hands on

---

Page 20

1  him.  Even though he had a gun in his hand, I threw
2  him on the ground.  And as I was holstering my
3  weapon, a security guard who was trying to assist me
4  shot him.
5      Q.  Was that security guard with a hotel or
6  casino?
7      A.  It was on Fremont Street.  Some private
8  security.
9      Q.  When you were sergeant, did you ever have
10  to come onto the scene after one of your patrol
11  officers had used deadly force?
12      A.  Yes.
13      Q.  On how many occasions?
14      A.  How many what?
15      Q.  On how many occasions, approximately?
16      A.  I don't recall.
17      Q.  More or less than five?
18      A.  Probably less than five.  And the
19  procedures for officer-involved shooting weren't the
20  same then that they are now.
21          MR. MCNUTT:  Weren't, like were not?
22          THE WITNESS:  Were not the same.  They were
23  a lot more.  This is what we do, this is how the
24  investigation is going to go.  I mean, back then it
25  was investigated by homicide.

---

Page 21

1  BY MR. LAGOMARSINO:
2      Q.  Have you ever gone to the scene as either a
3  sergeant or a lieutenant for a death that arose out
4  of some kind of a neck restraint?
5      A.  I don't recall any.
6      Q.  As you sit here, do you recall any deaths
7  in your career -- strike that.
8          While employed at Metro, do you recall any
9  deaths caused by any Metro officer as a result of any
10  kind of a neck restraint?
11      A.  So I know of several cases that were
12  brought to my attention in the last deposition that I
13  was asked questions about.  And I'm aware of those
14  cases, but I wasn't involved and don't know the
15  details of how exactly it was determined the person
16  died because was it the neck restraint, was it the
17  intoxication of their either alcohol or drugs in
18  their system, and was there other things that
19  happened, or was it a physical issue that the person
20  had.
21          So I know that the person ended up
22  deceased, but I don't know the exact determination of
23  how that happened.
24      Q.  Okay.  And how many of those do you recall?
25      A.  I think there was two or three.

---

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

7 (Pages 22 to 25)

Page 22

1   Q.  And those -- and we'll get to those later
2  in the deposition today.
3   A.  Okay.
4   Q.  Independently, do you recall any others?
5   A.  No.  I think I remember the one that
6  happened before I joined the department, Charles Bush
7  maybe.
8   Q.  What do you recall about that?
9   A.  Vice officers put a neck restraint on
10  someone who was fighting with them and the person
11  ended up dying.  And so I don't know, was that
12  improperly applied neck restraint or were there other
13  issues involved, but that was a common one that was
14  talked about on the agency.
15   Q.  In terms of your responsibilities of
16  overseeing training, are there prior neck restraint
17  incidents that are used as part of the training
18  process now?
19   A.  I don't think that we generally talk about
20  specific incidents in training going back 20 or more
21  years.
22   Q.  Okay.
23   A.  And I certainly -- I don't think that
24  that's how we train.  We don't train about, you know,
25  specific incidents that if you do this, because of

Page 23

1  this incident, this will happen.
2   Q.  Okay.  Have you ever applied an LVNR?
3   A.  Only in training.
4   Q.  Tell me about that.
5   A.  Well, as an officer, you are trained to use
6  the LVNR throughout the academy, and then you're
7  recertified every year how to do the LVNR and then
8  different ways and circumstances to use it.
9   I just never found the time appropriate in
10  my use of force to use that.  Most of the people that
11  I use force against decided to run and not fight.
12   Q.  In terms of your responsibilities with the
13  IOCP.
14   A.  Uh-huh.
15   Q.  How did you get assigned to that?  Did you
16  volunteer for that?
17   A.  No.  I guess they -- the sheriff asked me
18  to go there.  So I guess somebody recommended me to
19  go there.
20   Q.  Did you want to go there?
21   A.  Well, yes.  It's a -- it's kind of a
22  promotion, I guess.  So but it's an important
23  assignment.  You know, but all the assignments I had
24  outside of patrol I was asked to go to, too.  You
25  know, internal affairs is not the assignment most

Page 24

1  people want to go to.  But when they ask you to go
2  there, you kind of have to take that assignment.
3   And it's actually you learn a lot in
4  internal affairs.  Criminal intelligence is more
5  about knowing how to understand and give confidential
6  briefings to the sheriff and being trusted with
7  confidential investigations.  And so I think that
8  based on that assignment, that's why I was asked to
9  do the next assignment.
10   So it's more of a career progression of
11  looking at what you're good at and what the sheriff
12  trusts you with.
13   Q.  Okay.  Are you familiar with the Department
14  of Justice COPS assessment that was performed
15  approximately 2012?
16   A.  Yes.
17   Q.  Did you have participation in that process?
18   A.  Yes.
19   Q.  Generally what was your participation?
20   A.  I just participated in different groups,
21  giving feedback on use of force and use of force
22  policy.  I wasn't one of the main instructors or
23  anything like that.  But certainly was involved in
24  ensuring that that process was done correctly.
25   Q.  Did you interact with individuals from the

Page 25

1  Department of Justice?
2   A.  Yes.  I participated in interviews and
3  things like that.
4   Q.  And who came out from the DOJ?  Was it
5  attorneys or agents?
6   A.  My recollection would be people from the
7  COPS office were different -- they were all
8  civilians, but I think that some of them did have
9  legal training or legal background.
10   But some of the interviews were like this
11  where you would have different people asking you
12  questions, and I couldn't tell you what all their
13  backgrounds were.
14   Q.  Okay.  Do you know how many assessments
15  COPS performed on Metro?  I mean written assessments
16  they provided, I guess?
17   A.  I don't recall the exact number, but there
18  was a lot.
19   Q.  So I'm familiar, there was the first report
20  that came out that had a lot of recommendations and
21  assessments.  And then there was, like, a six-month
22  follow-up that came out after that.
23   Were you familiar with additional ones that
24  were provided to Metro?
25   A.  I may have read additional follow-ups, but

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

Page 26

1   I know that all the recommendations that we were
2   tasked with were done other than the ones that we
3   decided were not -- didn't apply to our agency.
4      Q.  Without having the benefit of having those
5   in front of you, do you recall which ones or any of
6   them that you decided were not going to be applied?
7      A.  I used to know.  But I don't recall right
8   off the top of my head.  And they were decided by the
9   sheriff that, okay, this is something that we're not
10  going to follow.  And there was only a couple of
11  those.
12     Q.  That was Sheriff Gillespie at the time?
13     A.  I believe so, yes.
14        (Exhibit 1 was marked for
15        identification.)
16  BY MR. LAGOMARSINO:
17     Q.  I've provided you with Exhibit 1.  This is
18  a document that's been produced by Metro in this
19  case.
20        I can tell you it was our office that
21  placed the highlighting on here.
22     A.  Okay.
23     Q.  Go ahead and just -- I understand there's
24  quite a few pages here.  Have you seen Exhibit 1
25  before?

Page 27

1      A.  No.  I don't think so.
2      Q.  Well, let me ask you generally, are you
3   aware that Metro conducted research after the Farmer
4   incident regarding whether -- strike that --
5   assessing other agencies who may have allowed the use
6   of the LVNR?
7      A.  Yes.
8      Q.  How did you become aware of that?
9      A.  So when the sheriff said, hey, we need to
10  look at LVNR, and part of that included serving other
11  agencies, and then looking at our policy and seeing
12  if we need to make any changes in policy.
13        As part of training -- training is involved
14  in that, the use of force committee which looks at
15  the changes at the use of force.
16        And then because of how high profile this
17  case was, that I became involved in that.
18        So in other words, I wasn't involved in
19  creating the questions or -- but I did see this now
20  that I look at it.  But I didn't review every one.
21  It was more of the summary of what the agencies
22  produced that I was aware of.
23     Q.  Okay.  What is the Major City Chiefs
24  Association?
25     A.  I think it's just what it says.  Major

Page 28

1   cities within the United States above a certain
2   number of population or officers are involved in the
3   major city chiefs.
4      Q.  Were you ever part of any discussions
5   internally in a meeting type of a setting where the
6   topic was whether to allow the use of the LVNR at
7   all?
8      A.  Yes.
9      Q.  How many do you recall?
10     A.  I think that -- I would say a couple.  But
11  not more than three.  But it was more of a discussion
12  about, okay, these are the changes we're
13  recommending, and there was a give and take of why
14  are you saying we should keep it versus change it to
15  a lesser -- a lesser part of the policy where we
16  reduced it from you can't use it in these
17  circumstances but you can use it and how to simplify it.
18        So it was an overall discussion about are
19  we going to keep it, and if we are going to keep it,
20  are we going to change policy at all.
21     Q.  And how does that work in terms of the
22  recommendation and -- like, who makes a
23  recommendation and who makes the decision?
24     A.  So I think that it was tasked to IOCP to
25  make the changes in the use of force.  But I think

Page 29

1   that it was also involving the use of force committee
2   which involves people from outside IOCP to be
3   involved, too.  Which includes a lot of training.
4        The actual trainers who were teaching LVNR
5   and then the trainers wouldn't be involved in the
6   survey, but they would just be reading the survey and
7   looking at the results of the survey and policies
8   from other agencies that they would look at and maybe
9   change some of the wording because someone may have
10  better wording than we have.  So we're always trying
11  to get to the best policy that we can.
12     Q.  What is your personal opinion on the use of
13  the LVNR as a use of force option at Metro?
14        MR. ANDERSON:  Objection.  Form.
15        Go ahead and answer.
16        THE WITNESS:  I think that there are times
17  when it's appropriate to use and the ease of it makes
18  it better for the officers to use the least amount of
19  force as possible to make someone comply with their
20  direction.
21        And there are officers that are better at
22  it than others and feel more comfortable with it.
23  But that's no different than some of our other tools
24  that we use.
25        Some officers like the Taser.  Some

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

---

Page 30

1  officers like to go hands-on.  Some feel more
2  comfortable with LVNR.
3          And I think that was one of the reasons why
4  we didn't take it away is there are situations where
5  someone is facing away from you that an officer can
6  use the LVNR that's the best tool for that situation
7  in that scenario, and we didn't want to take that
8  away from officers.
9  BY MR. LAGOMARSINO:
10      Q.  Okay.  Now, you had mentioned earlier in
11  your testimony that after the Farmer incident, the
12  policy was changed to where there were certain
13  circumstances where the LVNR could be used before but
14  could now not be used.
15      A.  Right.
16      Q.  And I'm assuming that has to do with
17  intermediate level of force options and those type of
18  things?
19      A.  Right.
20      Q.  Are you able to, without having the policy
21  in front of you -- and understanding you probably
22  don't have a photographic memory -- able to
23  articulate the differences in the policies at this
24  point?
25      A.  So the basics of it is, is you could use

---

Page 31

1  the LVNR as a restraining hold and now you can't.
2  Someone has to be aggressively resisting you to be
3  able to use the LVNR.
4          MR. LAGOMARSINO:  Counsel, we've premarked
5  these so we're going to go a little out of order.
6          This is going to be Exhibit 8.
7          (Exhibit 8 was marked for
8           identification.)
9  BY MR. LAGOMARSINO:
10      Q.  I've handed you Exhibit 8, which is a
11  compilation type of an exhibit.
12          The first page for the record is Defendant
13  Las Vegas Metropolitan Police Department's First
14  Supplement to Responses to Plaintiff's First Set of
15  Requests for Production of Documents.
16          And going to page 12, the plaintiff asked
17  for copies of all use of force reports filed by
18  members of Las Vegas Metropolitan Police Department
19  from 2004 to the present.  Metro initially objected.
20  The parties went through a process of meeting and
21  conferring and narrowing that time period, and then
22  produced certain statistics.  So I want to ask you
23  about those statistics here.
24          So if you would go -- this goes all the way
25  to page 24.  If you go to the next page after

---

Page 32

1  page 24, it's going to be -- it was Exhibit C that
2  was attached to the responses.  And then after that
3  there are some pages that Metro produced with
4  statistics and data.
5          Do you have those in front of you?
6      A.  Yes.
7      Q.  Have you ever seen these statistics before?
8      A.  Yes.
9      Q.  And in what context have you seen these
10  statistics?
11      A.  So I would say that officer of internal
12  oversight, constitutional policing produces a report
13  of use of force yearly, and then they also produced
14  five year reports that I've seen.
15      Q.  Do you know when that started?
16      A.  No.
17      Q.  So kind of going through the bullets here
18  on the first page, it says, "The following statistics
19  include LVNR data from 2012 year to date 2017."  It
20  says:  "92 percent of LVNRs are performed by police
21  officers, 8 by correction officers."
22          Next bullet says:  "On average, the LVNR
23  was effective 68 percent of the time.  Thus far in
24  2017 the technique has been effective 57 percent of
25  the time."  And this was year-to-date through May 15

---

Page 33

1  of 2017, which was I believe just prior to the
2  incident in this case.
3          What does it mean -- what does the word
4  "effective" mean in this context when they say it's
5  68 percent effective?
6      A.  I believe it means the subject -- the
7  technique was effective.  The subject was taken into
8  custody without any other technique or tool having to
9  be used.
10      Q.  Do you know if that term -- obviously
11  effective is a fairly --
12      A.  Broad.
13      Q.  -- broad term, correct.  Thank you.
14          Do you know if that term is defined
15  anywhere if it's effective in this context?
16      A.  I don't know where it's defined, but I'm
17  sure there had to be a definition of it to be able to
18  come up with that statistic.
19          But you're right, it is broad, and that
20  what could be effective to me might not be effective
21  to someone else.  Because to me an LVNR that's
22  effective means that the subject stopped resisting,
23  and I was able to take him into custody.
24          But if it didn't work and I had to go to a
25  different tool, does that mean it's effective or

---

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

10 (Pages 34 to 37)

Page 34

1 ineffective? It might just mean that it was easier
2 to use something else. Or another officer arrived
3 and we're able to use hands-on to take that subject
4 into custody. So it's really hard to determine
5 effectiveness.
6    Q. With respect to these statistics, it looks
7 like at least they were generated starting in 2012
8 based on this document.
9       Is that your understanding, at least from
10 2012?
11    A. Yes. And I think that might have to do
12 with this COPS intervention.
13    Q. And then would these statistics be
14 considered on a yearly basis when they're generated
15 by Metro?
16    A. Yes.
17    Q. And you mentioned they would do five-year
18 data as well?
19    A. Yes.
20    Q. So if this is a five-year data report,
21 would you have seen this particular document?
22    A. So I've seen five-year reports, but I can't
23 say specifically. I saw 2012 to 2017. But I know I
24 just reviewed the 2018 report; and so in other words,
25 five-year reports continue on.

Page 35

1    Q. I see what you're saying. So they will go
2 2013 to '18?
3    A. Yes.
4    Q. '14 to '19?
5    A. Right.
6    Q. Do documents that are attached here appear
7 to be true and correct copies of the documents
8 generated by Metro with respect to LVNR statistics?
9    A. Yes.
10    Q. Are other use of force options evaluated
11 for effectiveness the same way that the LVNR is
12 evaluated?
13    A. I believe so. But I'm not sure where the
14 effective number comes from. Because it might come
15 from the officer's opinion, is it effective? Or I
16 don't know if it's evaluated in other ways. So I
17 wish I did know. I could tell you.
18    Q. I'm going to ask you a hypothetical
19 question here. There's a difference of opinion in
20 this case, as I'm sure you've heard, as to whether it
21 was a rear-naked choke that was applied or an LVNR
22 that was applied.
23       Assuming hypothetically that it was an LVNR
24 that was applied, would you consider the use of that
25 technique effective in this case?

Page 36

1    MR. ANDERSON: Objection. Form.
2 Go ahead.
3    THE WITNESS: Well, based -- I mean, I
4 can't recall exactly all the things that were used in
5 use of force on this case because I know there were
6 strikes, there was Taser and there was LVNR.
7 BY MR. LAGOMARSINO:
8    Q. Right.
9    A. So to me, the effectiveness of all of those
10 together I would say the subject was taken into
11 custody and handcuffed, but some of those techniques
12 were ineffective, and that's why they went to other
13 techniques.
14       Now, overall, I would say that use of force
15 was not effective. Obviously because -- and most use
16 of forces appear -- don't appear like they do in
17 training.
18       But I would say that the LVNR in this case
19 was probably not effective.
20    Q. Do you receive reports either on a daily,
21 weekly, monthly or other regular basis that summarize
22 media reports that could be perceived as negative
23 towards Metro?
24    A. As part of staff, PIO does a report that
25 tells us any time Metro is in the media. So not just

Page 37

1 use of force.
2    Q. So even if it was, like, a car accident and
3 somebody is interviewed on the scene from Metro?
4    A. I'm not aware of any car accidents, and I
5 wouldn't review that one because I don't have
6 relation to that.
7       But the example is the one that was in the
8 media, just I think it was yesterday or the day
9 before, from LVNR that was applied to a water seller
10 on the Strip. And that was from 2013. And it wasn't
11 immediately apparent that it was from 2013 when they
12 put it in the media. It looked like it just
13 happened. But it was from five years ago and the
14 technique was applied correctly. Whether or not the
15 water seller needed to be LVNR'd, I don't know. But
16 the technique worked and it was applied
17 appropriately.
18       You know, the question is whether we need
19 to have someone who's conducting a misdemeanor crime
20 LVNR'd. That's separate from was the technique
21 applied correctly and did it work, to me.
22    Q. Right. I saw the video. And it seemed
23 like it was a pretty good angle to see what occurred
24 and you can see the positioning of the --
25    A. Right.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 38

Q. -- hands and so forth. And of course, the
events leading up to the application were not
recorded. So as you say, it's hard to say whether it
was necessary or not.
A. And we didn't have body cameras at that
time so you couldn't see the interaction between the
officers and the person.
Q. In this video, did the subject pass out?
A. I think he did. But I sort of dismissed it
when I heard it was in 2013.
So I'm aware of it and I saw the technique
was applied correctly, but I didn't get really that
deep into it. But that's an example of stuff that is
sent out by the PIO to us to say, hey, this is in the
media. So you're aware of it.
Q. And what do you do with that? Or is it
just more of an awareness thing?
A. Yes. More of an awareness thing. But I
was told by someone else, I don't remember who, but
that the LVNR was done right, and I looked at it and
I was like okay, and I was just not that concerned
with it.
Q. Do you know if there was a lawsuit in that
case?
A. I think there was. And I think it was

Page 39

dismissed. But like I said, when I heard it was
2013, it didn't just happen, then I wasn't as
concerned with it as I would be if it happened a
month or a year ago.
Q. Okay. Getting to back to the research that
we're talking about, about other cities, whether they
allow the use of the LVNR or not, do you know how
that research was conducted?
A. I can tell you generally how they conduct
research in OIO, which is they send e-mails out to
agencies, hey, I think it was a quick survey, a few
questions, hey, could you answer these questions for
us. And some agencies respond and some don't.
Q. Do you -- strike that.
Does Metro ever get those types of e-mails
from other agencies as well to your knowledge?
A. Yes.
Q. And does Metro respond to those?
A. Yes. And sometimes I get those and I ask
people to respond to them based on who sent it and
then who would be the best person to respond for our
agency.
Q. Have you, knowing that Metro -- strike
that.
Let me get a clean question here. Knowing

Page 40

that Metro sent out questions regarding the LVNR to
other agencies, have you ever received e-mails from
other agencies about the use of the LVNR?
A. I'm sure we have, but I can't recall a
specific agency or time. But it's very common for
police agencies to share information on use of force
or other policies that we use and what is the best
wording or techniques to be used throughout policing.
Q. Okay. I want to speak a little bit in
generalities for the next question. So if I'm wrong
on the language or the terms of art, please let me
know.
But it's my general understanding that if
an officer is facing a situation where he or she is
faced with deadly force being used against them,
there really is no type of force that they're
precluded from using to save their own life or defend
themselves; is that correct?
A. I'm sorry, that was a long question. I
think it was correct.
Q. It's like one of those Robert Mueller
questions, right?
So is there any use of force option that's
taken off the table for an officer if that officer is
facing a situation where their life is in danger?

Page 41

A. No.
Q. Other than that specific situation that we
just discussed, an officer facing a life or death
situation, were there any opinions that you recall in
Metro that the LVNR should be banned except for that
situation?
MR. MCNUTT: Objection. Form.
THE WITNESS: I think there are
restrictions in policy of when you can use certain
techniques. And I think that we don't want officers
to use the LVNR on subjects that have been cap
stunned.
I can't recall exactly what the other
restrictions are. But there certainly are times when
we restrict officers from using certain uses of
force.
BY MR. LAGOMARSINO:
Q. Were there any restrictions on the LVNR
being used prior to the Tashii Farmer incident?
A. Well, just appropriate use of force based
on the circumstances of that call. So in other
words, every use of force has to be justified by the
officer.
Q. Did you have an opinion as to whether
Officer Lopera appropriately applied force to Tashii

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 42

1    Farmer?
2         MR. MCNUTT: Objection. Form.
3         MR. ANDERSON: Join.
4         THE WITNESS: So when you're looking at
5    other people's use of force, it's a different
6    standard. You have to -- the officers have to
7    articulate why they used force and why the amount of
8    force was necessary in that case.
9         We didn't really get that from Officer
10   Lopera. So you're looking at it just based on your
11   opinion and not what Officer Lopera articulated.
12        So my opinion was, and I think I stated it
13   in a prior deposition, was that based on the
14   circumstances, most officers would have chased
15   Mr. Farmer. If he walked away and didn't want to
16   talk to you, you would let him walk away.
17        But when he runs away and goes to a part of
18   the casino that most people don't have access to, it
19   makes you think there's something wrong or there's
20   something going on that would make your curiosity
21   pique to the point where you would want to find out
22   what's going on with Mr. Farmer.
23        So I would have no problem with most
24   officers, most officers probably would chase someone
25   who runs away from them.

Page 43

1         The question is when you catch up to them,
2    what do you do and how much force should you or do
3    you use, and that's based on what crime you
4    articulate that Mr. Farmer has committed. And we
5    didn't get that. So I'm putting myself in that place
6    of Mr. Lopera, Officer Lopera.
7         So I think that -- I think that when you
8    use force, you should use force. In other words, we
9    don't put our hands on someone unless we're using an
10   approved technique because most people don't like
11   when people put their hands on you.
12        So when you make that decision to put your
13   hands on someone, you should put your hands on
14   someone and use a technique to take them to the
15   ground and to put handcuffs on them if you can
16   articulate the justification for an arrest.
17        Because now when you put your hands on
18   someone and you use force, you should have a charge
19   to take them to jail.
20        So I can't get in Officer Lopera's mind to
21   say what he was doing. But I would say that I would
22   not have done it the way that Officer Lopera did.
23   Just me as going back to the way I was trained and
24   the decisions that I would make that night.
25        Now, would I let Mr. Farmer go and be like

Page 44

1    oh, there he goes? No. I wouldn't do that either.
2    I would want to find out what was going on with
3    Mr. Farmer because now any good officer would want to
4    know why he was acting the way he was and why he was
5    going through that part of the casino.
6    BY MR. LAGOMARSINO:
7         Q. You're familiar, I'm sure, with the laws of
8    trespass, correct?
9         A. Yes.
10        Q. There was -- to your knowledge, are there
11   bright orange letters painted every 50 or 200 yards
12   on the Venetian Hotel that say "no trespassing"?
13        A. No.
14        Q. And to your knowledge, had anybody from the
15   Venetian Palazzo requested Mr. Farmer to leave the
16   premises?
17        A. No.
18        Q. Do you believe that based on the
19   information that you've received in your
20   participation in this case on the use of force board,
21   and that was presented to you, that there was
22   probable cause to arrest Mr. Farmer for trespassing?
23        MR. ANDERSON: Objection. Form.
24        Go ahead.
25        THE WITNESS: When Mr. Farmer was in the

Page 45

1    coffee shop or wherever he was, there was no probable
2    cause to arrest him for trespassing.
3         When he went through the casino into the
4    back under that -- whatever they call it of the
5    casino, where he probably wasn't supposed to be and
6    wasn't allowed to go, could we have talked to
7    Venetian and say was he supposed to be there, is this
8    an area that you would consider that he was
9    trespassing if he went to, that would take a more
10   thorough investigation for me to find out if I had
11   probable cause to arrest him for trespassing.
12        But based on what I know, I don't think
13   Officer Lopera had enough to arrest him for
14   trespassing.
15   BY MR. LAGOMARSINO:
16        Q. There was -- are you familiar that there
17   was a bright red sign that said "exit" above the
18   doors he went out?
19        A. I don't recall. But I would believe that
20   if you said there was one.
21        MR. LAGOMARSINO: I think we'll just take a
22   quick five-minute break and come back.
23        THE VIDEOGRAPHER: The time is
24   approximately 10:36 a.m. We are going off the
25   record.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

13 (Pages 46 to 49)

Page 46

1      (A recess was taken from 10:36 a.m.
2      to 10:48 a.m.)
3      THE VIDEOGRAPHER:  The time is
4  approximately 10:48 a.m.  We are back on the record.
5  BY MR. LAGOMARSINO:
6      Q.  As part of training, does Metro bring in
7  sometimes outside speakers or experts to provide
8  training to the officers?
9      A.  Yes.
10     Q.  Are you familiar with the names of any of
11  those experts that Metro may bring in?
12     A.  It depends.  So the question is kind of
13  broad, but -- we bring in training for all different
14  kinds of classes.  Usually use of force is done by
15  our own trainers.
16     Q.  Are you familiar with an individual named
17  Dr. William Smock?
18     A.  No.
19     Q.  Do you know if he's been hired by Metro to
20  provide training?
21     A.  I'm not aware of his name or if he's been
22  hired.
23     Q.  You have been trained on neck restraints;
24  is that correct?
25     A.  Yes.

Page 47

1      Q.  If the LVNR is applied incorrectly, do you
2  agree that there's a potential for significant injury
3  or death to the subject?
4      A.  Yes.
5      Q.  What is the Organization Development
6  Bureau?
7      A.  What is that?
8      Q.  Yes.
9      A.  It's the bureau that works for me that
10  basically is over training.
11     Q.  What's field training?
12     A.  Field training is when an officer graduates
13  the Academy, he goes through field training for a
14  period of time until he graduates training.
15     Q.  And is field training basically shadowing,
16  or what exactly is it?
17     A.  No.  There's three phases of field
18  training, and in each phase the officer gets more and
19  more freedom to become a police officer until at the
20  last phase, where he is shadowed and we call solo
21  beat status.  So the officer is allowed to -- is
22  graded, and then when he graduates he's supposed to
23  be able to handle calls by himself.
24     Q.  Does field training address LVNRs?
25     A.  So LVNR is basically addressed in training

Page 48

1  and then in defensive tactics, and then there are
2  scenarios in field training where officers may use
3  force which includes LVNR.  And what happens when --
4  during training when officers use force a field
5  training officer would discuss with the trainee,
6  okay, what about this technique or that technique,
7  which may include LVNR.
8      But there's no time when a field trainer
9  would say, "LVNR him."
10     Q.  Okay.
11     A.  It's kind of up to you to use the force
12  that you think is the best for that scenario.
13     But after the scenario, the trainee -- the
14  trainer would say you could have LVNR'd him in that
15  case.
16     Q.  Okay.
17     A.  That would have been the most appropriate
18  case in that circumstance.
19     Q.  And it's fair to say that before the shift,
20  that the field training officer is not going to say,
21  hey, let's go out and look for an LVNR situation
22  tonight?
23     A.  Yeah, no.  Absolutely not.  That would
24  never happen.
25     Q.  When you say LVNR is in training, are you

Page 49

1  talking about the police academy?
2      A.  Yes.
3      Q.  And then after the police academy, then
4  there is a series of certification or recertification
5  that has to occur with the LVNR?
6      A.  That is correct.
7      Q.  What is reality-based training?
8      A.  Reality-based training is training officers
9  are required to do where we put them in scenarios
10  where they have to use -- make decisions about what
11  kind of force they should use to resolve that
12  scenario.
13     Q.  And is that done on, like, a computer or --
14     A.  No.
15     Q.  -- or is it live?
16     A.  It's hands-on live where we have role
17  players and they go through a scenario.  And then
18  they use force or not use force.  Or they go
19  hands-on, or they might have to use their gun where
20  they pull their gun out, and then they don't shoot
21  their gun, but where they would decide what kind of
22  force is necessary to resolve that situation.  And
23  then they get feedback on how they performed and what
24  they could do differently.
25     Q.  Are you familiar with Michael Glen?

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

---

Page 50

1  A. Yes.
2  Q. I forget his rank, is it officer?
3  A. He got promoted to sergeant now.
4  Q. And is he a subject matter expert in the
5  LVNR?
6  A. Yes.
7  Q. After this incident, did he create a
8  training video describing what the LVNR was?
9  A. I'm not sure when he created the video. So
10 yes, he created a video. But I thought there was
11 some videos that he did before this incident, talk
12 about training, but it could have been after.
13 Q. Are those videos considered reality-based
14 training?
15 A. No. They were in addition to reality-based
16 training.
17 Q. Are you familiar specifically with what
18 reality-based training exists with respect just to
19 the LVNR?
20 A. No.
21 Q. Do you know if there is?
22 A. I don't think so.
23 Q. Now, part of your job responsibilities
24 relate to human resources you alluded to.
25 A. Yes.

---

Page 51

1  Q. And are you the ultimate decision-maker as
2  to whether somebody is going to be terminated or not?
3  A. So the human resources part is separate
4  from my additional duty which is pretermination board
5  chairman.
6  So you've kind of conflated those two. But
7  there's a board that meets. And it is myself as
8  deputy chief, a commissioned captain and a civilian
9  director. And each board is -- could be different
10 people on it.
11 And then the ultimate decision is the
12 sheriff. But what happens is I write a memo to him
13 based on what the board finds and recommend to the
14 sheriff whatever we recommend. And then he's the
15 ultimate decision-maker.
16 And most of the time he agrees with me, but
17 not all of the time.
18 Q. Okay. With Officer Lopera, was he allowed
19 to retire in lieu of being terminated?
20 MR. MCNUTT: Objection. Form.
21 MR. ANDERSON: Join.
22 THE WITNESS: I'm not sure what his -- the
23 disposition was for him.
24 BY MR. LAGOMARSINO:
25 Q. Are you familiar with that process where an

---

Page 52

1  officer may be facing termination and they are
2  allowed to retire to retain their benefits?
3  A. So I am familiar with all the different
4  processes. We have -- we also have a
5  non-confirmation hearing, which I've done some of
6  those, and that would apply to people that are on
7  probation.
8  And if they resign prior to being
9  non-confirmed, we say that they resigned.
10 We allow people to resign prior to
11 non-confirmation hearing. Like, at any time someone
12 could resign. They could retire.
13 But if they resign pending discipline or
14 non-confirmation, we do note that in labor relations.
15 Q. So for example, Sergeant Crumrine was not
16 confirmed, correct? Well, the story continued after
17 he was not confirmed, correct?
18 A. That's correct.
19 Q. So Sergeant Crumrine was on probation as a
20 sergeant at that time, correct?
21 A. Right.
22 Q. And then the decision was made at Metro to
23 not confirm him?
24 A. That's correct.
25 Q. And then he disputed that; is that correct?

---

Page 53

1  A. He went to arbitration.
2  Q. Who was the arbitrator?
3  A. I don't recall. And I wasn't involved in
4  the arbitration for that. That was Sheriff Kelly.
5  Q. Who participates in that arbitration, do
6  you know? Maybe not that specific one but in general
7  the arbitration process?
8  A. So I represent the department in a lot of
9  arbitrations because I am on the pretermination
10 board. And they keep calling me in to ask what my
11 recommendation was and why in the cases I'm involved
12 in.
13 So what happens in an arbitration is the
14 department presents their case to the arbitrator, and
15 the employee presents his case and the arbitrator
16 makes a decision. And that applies to all the people
17 that we terminate.
18 Q. How is the arbitrator selected?
19 A. I believe there's a list that the
20 department submits a number of arbitrators and the
21 union submits a number of arbitrators and I think
22 they alternate who chooses. But I'm not exactly
23 sure.
24 Q. Okay.
25 A. I just show up and testify.

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

15 (Pages 54 to 57)

---

Page 54

1  Q.  Okay.  Ultimately, what happened with
2  Sergeant Crumrine in the arbitration?
3  A.  The arbitrator ruled that he did enough to
4  keep his job.
5  Q.  So is he now back to being a sergeant?
6  A.  He's back to being a sergeant.
7  Q.  Did you write the recommendation letter for
8  non-confirmation to Sheriff Lombardo?
9  A.  No.  That was Sheriff Kelly.
10  Q.  And Sheriff Kelly wrote a letter, to your
11  knowledge, to Sheriff --
12  A.  He writes a memo to recommend
13  non-confirmation and the sheriff agreed with him.
14  Q.  What about with respect to Officers Tran
15  and Flores?
16  A.  They weren't on probation, and I don't
17  think that they received any discipline in this case.
18  Q.  Have you ever heard of an officer being
19  terminated for improperly using an LVNR?
20  A.  I don't think so.
21  Q.  You testified earlier that some of the
22  technology part of your responsibilities has been
23  shifted over.  Does that include body cameras?
24  A.  Yes.
25  Q.  Were you in charge of oversight of body

---

Page 55

1  cameras in May of 2017?
2  A.  Yes.
3  Q.  What's the general purpose of having the
4  body camera being activated?
5  A.  So the officers' actions can be captured
6  not only for the department but for the public to be
7  able to see how officers interacted during this call.
8  Q.  Have you ever reviewed body camera footage in
9  this case?
10  A.  Yes.
11  Q.  When would you feel it would be appropriate
12  for an officer who was involved in this case to turn
13  off the body camera?  And let me lay some foundation
14  there.
15     So you had Officers Tran, Flores and Lopera
16  and Sergeant Crumrine involved with Tashii Farmer,
17  correct?
18  A.  Yes.
19  Q.  And then a whole host of other officers
20  showed up at the scene including some that ultimately
21  attempted chest compressions, correct?
22  A.  Yes.
23  Q.  And then at some point emergency personnel
24  arrived and Tashii Farmer was taken away, correct?
25  A.  Yes.

---

Page 56

1  Q.  When would you feel that it was appropriate
2  pursuant to Metro policy for any officer who was on
3  the scene to shut off their body camera?
4  A.  So officers are required to keep the body
5  camera on while they're involved with a suspect.
6  When the incident is over, they can turn the body
7  camera off or when they're involved in discussions
8  with their sergeant about what happened.
9  Q.  They're allowed to turn it off?
10  A.  Yes.
11  Q.  Are they allowed to turn -- strike that.
12     Are officers allowed to turn their body
13  camera off when they're having discussions with other
14  officers about what happened?
15  A.  Yes.
16  Q.  Why is that?
17  A.  Because -- do you mean why are they allowed
18  to turn it off?
19  Q.  Right.
20  A.  So the body camera policy, although it was
21  written before I was involved, is meant to capture
22  what happened during that incident and not to
23  infringe on the officer's rights about to discuss why
24  they did what they did.
25  Q.  You're on the use of force board, right?

---

Page 57

1  A.  Yes.
2  Q.  Is that the same thing as a tactical review
3  board?
4  A.  So I'll explain the use of force board.  So
5  there is, the use of force board involves civilians.
6  There's four civilians involved in every use of force
7  board.  And it is their job to determine, along with
8  three members of the department, whether the use of
9  force was justified or not.
10     And there's four dispositions that we use.
11  I guess I could try to remember them if I can.
12  Q.  Sure.
13  A.  Administrative approval, tactics
14  decision-making, policy training failure or
15  administrative disapproval.
16     And so what we're trying to determine is
17  was the use of force justified by law and within
18  policy.  And then after that part's over, that's the
19  use of force board, the tactics decision -- the
20  tactics are then reviewed in the tactics review
21  board.
22  Q.  And is there a disposition from the tactics
23  review board?
24  A.  What happens in the tactics review board is
25  each officer's actions and supervisor's actions are

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 58

1  looked at separately. So yes, there's a disposition
2  where they look at a lot of different factors within
3  the tactics review board, and we agree with CIRT or
4  disagree with CIRT or modified their findings during
5  the use of -- during the tactics review board.
6          And so there's -- I could guess, maybe 10
7  or 12 different areas that they look at, maybe 15,
8  I'm not sure. And it's anywhere from the radio
9  traffic to the communications. In other words,
10  dispatchers and how that's done.
11          Whether there was deescalation, what the
12  use of force was, is it deadly force or other force.
13  Was the supervisor's role done correctly. Was the
14  POST use of force things done correctly. Was the
15  training up to date.
16          And I'm sure I'm missing some, but there's
17  a lot of different things that we look at during the
18  tactical review board that are part of standard
19  procedure.
20  Q. Okay. At the use of force board, is there
21  a presentation made by CIRT?
22  A. Yes.
23  Q. Where physically in the building is it
24  made?
25  A. In headquarters there's an actual room,

Page 59

1  there's a room that we use for it. It's called the
2  action room. It's the LVMPD conference center, but
3  it's generally referred to as the action room.
4  Q. So who is present during that presentation?
5  You have the seven people on the board?
6  A. Yes.
7  Q. And then who else?
8  A. So the -- in addition to the use of force
9  board, we go into the tactical review board. The
10  officers chain of command is there, which is usually
11  represented by the bureau commander.
12          And then we have a tactical expert, a peer
13  member for each officer involved.
14          So if it's an officer, it's a peer officer.
15  If it's a sergeant, it's a peer sergeant.
16  Lieutenant, peer lieutenant.
17          And each person votes based on that person
18  involved. In other words, if there's an officer
19  involved, the peer is allowed to vote. If there's a
20  sergeant, the peer sergeant votes and the chain of
21  command. And then myself and the assistant sheriff
22  are involved in it. And we have a vote and give
23  feedback and ask questions and we deliberate. It's
24  just a regular board. I don't know how else to
25  explain it.

Page 60

1  Q. I'm trying to put it together here. So
2  there's basically one big presentation.
3  A. Yep.
4  Q. And you've got use of force board is
5  present.
6  A. And we take a break and we vote on that.
7  And then there's another presentation on the tactics.
8  Q. So a separate presentation?
9  A. Yes.
10  Q. Are tactics -- strike that.
11          Are members of the tactics board present
12  for the use of force board presentation?
13  A. No. The assistant sheriff is there, but
14  he's not a voting member of the use of force board.
15  Q. And I'm assuming during that presentation,
16  the officers there, the subject officer is present
17  for the presentation, correct?
18  A. Yes.
19  Q. And is his or her union representative
20  there with them?
21  A. They're there during the presentation, but
22  not during the voting or the deliberations.
23  Q. So they leave the room basically?
24  A. Yes.
25  Q. Are these recorded or with a recording

Page 61

1  device or a court reporter?
2  A. The recording is done by the board and by
3  the union. So there's usually two recordings.
4  Q. So were you on Lopera's use of force board?
5  A. Yes.
6  Q. And who else was with you on that board?
7  At least the non-civilians.
8  A. Yeah, I don't recall. I know Sheriff Kelly
9  was on there. And I believe it was Captain
10  Pelletier. And then I don't remember who was the
11  peer member. And there was a tactical expert, too.
12  And I don't remember who that was either.
13          It wasn't much of a board because Lopera
14  didn't testify.
15  Q. After he didn't testify, were there
16  deliberations on the use of force board?
17  A. We still continued with the board for
18  Officer Tran, Officer Flores, Sergeant Crumrine.
19  Q. Was there a disposition for Lopera out of
20  that board?
21  A. Yes.
22  Q. Do you recall specifically what it was?
23  A. No, I don't. And I do have a problem
24  deciding, remembering the dispositions. Because what
25  happens in the board is Sheriff Kelly, we have the

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

17 (Pages 62 to 65)

Page 62

1  board, and then Sheriff Kelly writes a memo to the
2  sheriff.  And so he's more involved in the
3  dispositions of what happens to the people involved.
4      In other words, training or some kind of
5  discipline or for Sergeant Crumrine, he was the
6  non-confirmation recommendation was made to the
7  sheriff.  But that's all done confidentially between
8  Sheriff Kelly and the sheriff.  So I don't get to see
9  that.
10     Q.  So do you know what the dispositions were
11 for those four individuals?
12     A.  I only know that Crumrine was recommended
13 that he be non-confirmed as a probationary sergeant.
14 And I don't know the other ones.  Although we did
15 discuss it.
16     Q.  And are the deliberations recorded?
17     A.  No.
18     Q.  So then going to the tactical review board
19 aspect of it, is CIRT also making a presentation in
20 that setting as well?
21     A.  So what happens is CIRT makes their
22 presentation for the use of force board.  And then we
23 vote on the use of force.  And then they come back
24 and do another presentation related to the tactics,
25 tactical review board.

Page 63

1      So it's separate.
2      Q.  Okay.  Were there any findings that you can
3  recall from the tactical review board that you can
4  share?
5      A.  I don't recall.  I'm sorry.
6      Q.  That's okay.
7      Specifically let me just ask you your
8  opinion.  Did Lopera utilize deescalation techniques?
9      A.  I don't recall any deescalation that I saw
10 him use.
11     Q.  And did he lack deadly force?
12     MR. ANDERSON:  Objection.  Form.
13     MR. MCNUTT:  Objection.  Form.
14     THE WITNESS:  I did not see him use deadly
15 force.
16 BY MR. LAGOMARSINO:
17     Q.  Were there any training issues that you had
18 issues with?
19     A.  I'm sure there were.  I don't recall
20 specifics.  And more concerning Sergeant Crumrine
21 than the officers.
22     Q.  You testified in your prior deposition
23 about Sergeant Crumrine not doing enough to
24 intervene; is that correct?
25     A.  Yes.

Page 64

1      Q.  And is it your opinion that Sergeant
2  Crumrine did not do enough to intervene?
3      A.  It's still my opinion, even though the
4  arbitrator didn't agree with me.
5      Q.  Do you know how the citizens are selected
6  to be on those boards?
7      A.  I don't know how the process works.
8      Q.  Do you recall any of the names of the
9  citizens on the Lopera, Crumrine, Tran, Flores board?
10     A.  I don't recall.  There's been too many
11 boards since then.  I know that it's spelled out in
12 the policy of how long they can be on the board and
13 they do, I think they serve a two-year term or
14 three-year term.  I don't know.
15     Q.  To your knowledge, do they -- do they apply
16 to be on the board?
17     A.  Yes.
18     Q.  And are they compensated?
19     A.  No.
20     Q.  Do they have voting rights?
21     A.  Voting rights?
22     Q.  As to a determination of the disposition in
23 the --
24     A.  Yes.  That's the whole purpose.  There's
25 more citizens voting than department members.  So

Page 65

1  they have four votes and we have three.
2      But generally, the votes are pretty
3  unanimous.  Not always, but I run the use of force
4  board just -- it's kind of the way the policy works.
5  The assistant sheriff runs the board, but when it
6  comes to the deliberations, he doesn't vote and I run
7  the board and explain the dispositions to everyone on
8  the board before we vote.
9      And we discuss and deliberate just like any
10 other group.
11     Q.  Do you recall whether or not the duty to
12 intervene was evaluated with respect to Tran and
13 Flores?
14     A.  It was evaluated -- this is all part of the
15 tactics review board not the use of force
16 disposition -- use of force board.  Yes, it certainly
17 was discussed.
18     Q.  And did the review board, the tactics
19 review board, determine that Tran and Flores
20 satisfied their duty to intervene?
21     A.  I don't know exactly what the disposition
22 was for Tran and Flores.  That was -- so it's not
23 100 percent one way or the other.  But that would be
24 written by Sheriff Kelly.
25     I can expand on that if you would like.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1   Q.  Yes, please.
2   A.  So it was our opinion that Tran and Flores
3  are dealing with Farmer, and the duty to intervene
4  would be more on Sergeant Crumrine because he was
5  standing up overlooking the whole scene.  Because if
6  you're trying to handcuff someone, your focus is on
7  that.  And one who is standing above that would have
8  a better view of who is doing what and how or what
9  to do to intervene.
10      In other words, Sergeant -- and that's what
11  I meant earlier when I said that Sergeant Crumrine
12  didn't understand his role in overseeing this use of
13  force.
14   Q.  We've had a number of witnesses address the
15  duty to intervene so I'm going to go through it
16  pretty quickly here.
17   A.  Okay.
18   Q.  The duty to intervene isn't just saying
19  "stop."  It doesn't end there, correct?
20      MR. ANDERSON:  Objection.  Form.
21      THE WITNESS:  I agree with you.  It's more
22  than just saying "that's enough" or "stop."
23  BY MR. LAGOMARSINO:
24   Q.  In other words, if the duty to intervene
25  requires the use of a physical act such as,

Page 67

1  hypothetically, removing somebody's hand from an
2  LVNR, that could be required in any given situation?
3      MR. ANDERSON:  Objection.  Form.
4      MR. LAGOMARSINO:  That is a bad question.
5  BY MR. LAGOMARSINO:
6   Q.  Talk to me about your understanding of how
7  the duty to intervene can be satisfied by using
8  physical acts.
9      MR. ANDERSON:  Objection.  Form.
10      THE WITNESS:  Sure.  I think that a duty to
11  intervene is more than just saying "stop."  It may
12  mean using hands, your hands, or directing someone to
13  stop the action that's inappropriate.
14  BY MR. LAGOMARSINO:
15   Q.  In terms of training Metro officers, are
16  they trained that a citizen has the right to use
17  reasonable force in self-defense against an officer
18  who is using excessive force against that citizen?
19      MR. ANDERSON:  Objection.  Form.
20      MR. MCNUTT:  Join.
21      THE WITNESS:  I don't believe that we train
22  that.
23  BY MR. LAGOMARSINO:
24   Q.  Is your understanding that if a citizen is
25  having excessive force used against them or him or

Page 68

1  her by a police officer who is trying to effect a
2  lawful arrest, that the citizen has a right to use
3  force against the officer to defend themselves?
4      MR. ANDERSON:  Objection.  Form.
5      THE WITNESS:  I'm not sure if you're asking
6  me is it my opinion or do we train that way.
7  BY MR. LAGOMARSINO:
8   Q.  Do you train on that?
9   A.  I don't believe we train on what citizens
10  can or can't do when officers are using inappropriate
11  or excessive force.  No, we don't train that.
12   Q.  Does Metro utilize POST training, Peace
13  Officer Standards and Training?
14   A.  Yes.  Since you brought that up, I'm on the
15  state POST board appointed by the governor.  So
16  that's another duty I forgot since you reminded me,
17  though.
18   Q.  Are you familiar with Detective Alsup and
19  Detective Colon?
20   A.  Yes.
21   Q.  They performed the FIT investigation in
22  this case?
23   A.  That's correct.
24   Q.  Have you had experience interacting with
25  them in the past?

Page 69

1   A.  Yes.
2   Q.  Also did you have experience interacting
3  with Sergeant McDonald?
4   A.  Yes.
5   Q.  Did Sergeant McDonald oversee -- strike
6  that.
7      Did Sergeant McDonald oversee Detective
8  Alsup and Detective Colon?
9   A.  Yes.
10   Q.  Do you have any criticism of their
11  investigation in this case?
12   A.  No.
13   Q.  Have you ever had any criticism of them?
14   A.  I think I answered this before in the last
15  deposition.  That I don't know about criticism,
16  because criticism is kind of a broad term.
17      So, yes, I've given them feedback on their
18  performance and things that they could do better.
19  But I think they're excellent detectives.  And
20  Sergeant McDonald has worked for me here and also
21  worked for me in convention center.  He's a good
22  sergeant.
23   Q.  Did you have any criticism or feedback for
24  them in this particular case?
25   A.  I don't recall any.

Deputy Chief John McGrath ~ July 31, 2019
*** Videotaped Deposition ***

## Page 70

1    Q. You were asked the following question in
2 your last deposition so I want to see if you still
3 have the same position.
4    Hypothetically, a sergeant of an officer
5 tells his officer to release a hold twice, does that
6 sergeant have a duty thereafter, having asked him
7 twice to release the hold, to check and make sure
8 that he's released the hold?
9    MR. ANDERSON: Objection. Form.
10    THE WITNESS: Yes. I think he should.
11 BY MR. LAGOMARSINO:
12    Q. Did you have an opinion as to whether
13 Lopera's use of the Taser was excessive on
14 Mr. Farmer?
15    MR. MCNUTT: Objection. Form.
16    THE WITNESS: It was excessive.
17 BY MR. LAGOMARSINO:
18    Q. And did you have an opinion as to whether
19 Lopera striking Mr. Farmer was excessive?
20    MR. MCNUTT: Objection. Form.
21    THE WITNESS: That was a little bit harder
22 to determine because I think that the use of the word
23 "strike" is something that's hard to determine
24 because they said 10 to 12 strikes, and it was hard
25 to say whether, how many times Officer Lopera struck

## Page 71

1 Mr. Farmer. He certainly threw a lot of punches, but
2 I don't know how many actually struck him.
3 BY MR. LAGOMARSINO:
4    Q. Can you talk in general, as you did at the
5 last deposition, about how Metro changes policies
6 specifically with respect to the use of force?
7    A. Sure. We're always trying to get better
8 with our policies and make them simple and easy for
9 officers to understand. And usually use of force
10 policies are changed by IOCP as part of their job.
11 In other words, they're the ones that oversee use of
12 force for the agency. But they're not always the
13 ones that have ideas about changing the policy.
14    But it would flow through them. And in
15 general, use of force policies changed as a result of
16 a critical incident.
17    Policies in general are -- the wording has
18 changed. The recommendation has changed to make it
19 better either through OIO or through the use of force
20 committee. The policy has changed. It goes out for
21 review. The people give feedback on what the
22 policy -- if it's better or more effective. And then
23 that feedback is taken in and the policy goes back
24 out for a chain of command review through OIO or
25 IOCP.

## Page 72

1    And then through that chain of command all
2 the way up to the under sheriff and then it would be
3 approved.
4    Q. What was your opinion on the use of force
5 policy that was in effect at the time of the Tashii
6 Farmer incident?
7    MR. ANDERSON: Objection. Form.
8 BY MR. LAGOMARSINO:
9    Q. In terms of being simple or hard to
10 understand or somewhere in between?
11    A. So I didn't have a problem with the policy
12 at the time. But during the review when they made --
13 recommended changes, I agreed with those changes that
14 it was simpler and easier to understand for the
15 officers and it was probably a better policy.
16    But it's my opinion on all the times we
17 make changes, we make changes to make the policy
18 better and to make it easier to understand.
19    MR. LAGOMARSINO: Do you want to take
20 another five-minute break? Normally we take a lunch,
21 but I'm only going to have about probably another
22 half hour left. So do you want to just power through
23 instead of taking a long lunch? It's up to you.
24    MR. ANDERSON: It's up to you.
25    THE WITNESS: It's up to me?

## Page 73

1    MR. MCNUTT: I'm going to have an hour
2 after he's done. I mean, it may not take an hour,
3 but I mean, I want you to -- let's budget an hour, so
4 to factor in your decision.
5    THE WITNESS: Well, I would rather have
6 lunch than go another hour and a half, two hours,
7 whatever.
8    MR. LAGOMARSINO: Why don't we take an
9 early lunch. That will give me a chance to pare down
10 my questions even more.
11    THE WITNESS: Okay.
12    MR. LAGOMARSINO: What time do you want to
13 come back? It's 11:30. Do you want to say 12:45?
14    MR. ANDERSON: That's good.
15    THE VIDEOGRAPHER: The time is
16 approximately 11:33 a.m. We are going off the
17 record.
18    (A recess was taken from 11:33 a.m.
19    to 12:54 p.m.)
20    THE VIDEOGRAPHER: The time is
21 approximately 12:54 p.m. We are back on the record.
22 BY MR. LAGOMARSINO:
23    Q. I had an opportunity to pare down a lot of
24 my questions so it would be fairly brief --
25    A. Thank you. I meant that as a compliment.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 74

1    Craig is going to -- go ahead.
2        Q.  All right.  In this case, are you aware
3    that Brian Yant was the union representative for
4    Kenneth Lopera?
5        A.  Yes.
6        Q.  Based on your employment with the
7    Department since 1992, were you aware of Brian Yant's
8    involvement in three controversial officer-involved
9    shootings?
10       MR. ANDERSON:  Objection.  Form.
11       THE WITNESS:  No.  I was aware of one of
12   them.  I don't know -- I might -- if I was reminded I
13   would probably know the other ones.  But I know the
14   main one.
15   BY MR. LAGOMARSINO:
16       Q.  Okay.  Well, I'll ask and I'll rephrase the
17   question because I think the counsel probably had an
18   issue with the word "controversial."  So I'll
19   rephrase.
20       Were you aware that Brian Yant was involved
21   in three officer-involved shootings?
22       A.  No.
23       Q.  You had referenced in answer to your
24   earlier question about a shooting.  Did that shooting
25   involve Trevon Cole?

Page 75

1        A.  Yes.
2        Q.  And that was the gentleman who was flushing
3    marijuana down the toilet, and Brian Yant shot him
4    with an AR15 and killed him, correct?
5        A.  Yes.
6        Q.  Did you have any involvement at all in that
7    investigation, administratively or otherwise?
8        A.  No.  Nothing.
9        Q.  And was it your understanding that Trevon
10   Cole was unarmed?
11       A.  Yes.
12       Q.  Were you -- if -- I'll try to remind you
13   and see if you can recall.  There was an incident
14   with an individual who they referred to as the candy
15   bar robber.  And it was alleged that he had stolen
16   some candy from a convenience store.  Brian Yant was
17   chasing him and shot him in the back.
18       Were you aware of that particular incident?
19       A.  No.  I wasn't.
20       Q.  And then there was another incident before
21   that where there was an individual some distance
22   away, 20 yards or so, who had a baseball bat in his
23   hand, and Brian Yant shot him.
24       Were you aware of that one?
25       A.  No, I'm not.

Page 76

1        Q.  You had no involvement of that from an HR
2    perspective or any other perspective?
3        A.  No.
4        Q.  I asked you earlier in the deposition about
5    whether your opinion was that the use of the Taser
6    was excessive and whether the striking was excessive,
7    so I'm not going to reask you those questions.
8        Do you have an opinion as to whether the
9    use of the neck restraint by Officer Lopera was
10   excessive in this case?
11       MR. MCNUTT:  Objection.  Form.
12       THE WITNESS:  I think the use of the
13   LVNR -- so I'm sorry, can you just rephrase the
14   question?
15   BY MR. LAGOMARSINO:
16       Q.  So I'm going to generally use the term
17   "neck restraint" as opposed to "LVNR" or "rear-naked
18   choke."
19       Regardless of which of those it was, do you
20   believe that Officer Lopera's use of that restraint
21   for the period of time that he utilized it was
22   excessive in this situation?
23       A.  Yes.
24           (Exhibit 9 was marked for
25           identification.)

Page 77

1    BY MR. LAGOMARSINO:
2        Q.  Earlier in the deposition, I asked you some
3    questions about whether a citizen has a right to use
4    force against an officer to defend him or herself.
5    And I believe it was your testimony that you said
6    that Metro doesn't train on it.  So I want to ask you
7    a follow-up to that question.
8        So I've placed in front of you a document
9    that's been produced in this case by Metro, Crumrine,
10   Tran and Flores in the fifth supplement to their
11   initial Rule 26(A)(1)(A) disclosure of witnesses and
12   exhibits.
13       We've produced a number of documents, but
14   I've only handed you the one that I have questions on
15   here.
16       So if you turn to page 14 of the document.
17   Under number 8, it's been identified, some documents
18   produced as LVMPD, Ethical Use of Force Course, LVMPD
19   420 through 719.
20       A.  I see that.
21       Q.  So we've attached some of those pages here.
22       MR. ANDERSON:  Just for the record, Andre,
23   I would say this was produced in our initial
24   disclosures, not the fifth.  I don't care but...
25       MR. LAGOMARSINO:  No, thank you.  Sorry.

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

21 (Pages 78 to 81)

Page 78

1  BY MR. LAGOMARSINO:
2      Q.  In the attachment, do you see the bottom
3  has something called Bates numbers where it says --
4      A.  Yep, I see it.
5      Q.  So if you go to LVMPD 420, 0420.
6      A.  Okay.
7      Q.  It appears to be a cover page.  And it
8  says: "POST Commission, Peace Officers' Standards
9  and Training, Ethical Use of Force."
10     Do you have that in front of you?
11     A.  Yes.
12     Q.  And it says that 2015 on the bottom
13  left-hand corner.
14     Does this appear to be a cover page that's
15  commonly used in training for Metro?
16     A.  No.
17     Q.  Have you ever seen this before?
18     A.  I don't recall ever seeing it.
19     Q.  All right.  And then are you aware if Metro
20  has a course called POST ethical use of force?
21     A.  I don't believe so.  But that doesn't
22  mean we do or don't.  I've never heard of it, but it
23  could be called something slightly different.  When
24  POST has these courses, we generally meet their
25  criteria, but we could call it a different name.

Page 79

1      Q.  Okay.  All right.
2      A.  And it might be just included with our use
3  of force training, and ethical use of force might be
4  a section.  I'm more than guessing but I don't know
5  for sure.
6      Q.  No, I understand.  And just for the record,
7  we still have a deposition ahead of us where we're
8  going to have Metro designate certain individuals on
9  certain training.  So my understanding, this is just
10  based on your personal knowledge.
11     A.  Right.
12     Q.  So going to LVMPD 433.  And under number
13  14, it says: "A person has a right to use
14  self-defense against an officer's excessive force.  A
15  person has the right to use reasonable force only in
16  self-defense against an officer who is using
17  excessive force during a lawful arrest."
18     Is it your understanding still after
19  reading that that based on your own personal
20  knowledge, Metro does not train on this?
21     A.  I'm not aware of any training that we use
22  for that that contains that language.
23     Q.  Okay.  All right.
24     MR. LAGOMARSINO:  I have no further
25  questions.

Page 80

1          EXAMINATION
2  BY MR. MCNUTT:
3      Q.  Sheriff McGrath, my name is Dan McNutt.  We
4  met earlier.  I represent Ken Lopera.  I've got a few
5  questions for you.
6      A.  Thanks.  Chief McGrath.
7      Q.  I sorry, Chief McGrath.
8      A.  I just didn't want you to keep going with
9  the sheriff for your questions.
10     Q.  I don't -- even if I did, I don't think we
11  could write you in on the ballot.
12     A.  No.
13     Q.  Is being under the influence of a
14  controlled substance a crime in the state of Nevada?
15     A.  Yes.
16     Q.  Is carjacking a crime in the state of
17  Nevada?
18     A.  Yes.
19     Q.  Is trespassing a crime in the state of
20  Nevada?
21     A.  Yes.
22     Q.  Striking a police officer a crime in the
23  state of Nevada?
24     A.  Yes.
25     Q.  If so then, why did Kelly McMahill say that

Page 81

1  had Tashii Farmer survived this event, that he would
2  not have faced any criminal charges?
3      A.  I think I would rather have her answer.  If
4  that's a hypothetical, I guess I could answer because
5  I don't know her exact reasons for saying that.
6      Q.  Fair enough.
7      MR. ANDERSON:  Just for the record, it was
8  Kevin McMahill.
9  BY MR. MCNUTT:
10     Q.  My apologies, Kevin McMahill.
11     Does that change your answer?
12     A.  No, it doesn't.
13     Q.  Other than from her to him?
14     A.  No.  It doesn't change your answer.
15     Q.  Is it fair to say that since those are
16  crimes, Officer Lopera, had Tashii Farmer survived,
17  could have, in fact, charged Tashii Farmer with a
18  crime?
19     MR. LAGOMARSINO:  Form.
20     THE WITNESS:  That would be up to him to
21  articulate.  And if he could do that, then yes.
22     You named a lot of things, a lot of
23  possible crimes, some of which are easier to
24  articulate based on what I know of the case than
25  others.

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

Page 82

1        Certainly -- well, I'll just leave it at
2   that.
3   BY MR. MCNUTT:
4        Q.  In your role -- in your employment with
5   Metro, have you reviewed Officer Lopera's CIRT
6   statement?
7        A.  Yes.
8        Q.  And are you aware that Officer Lopera
9   stated myriad times through the CIRT statement that
10  his impression or belief was that Tashii Farmer was
11  under the influence of a controlled substance?
12       A.  Yes.
13       Q.  So if that was his perspective, would that
14  provide reasonable suspicion to detain Tashii Farmer?
15       MR. LAGOMARSINO:  Form.
16  BY MR. MCNUTT:
17       Q.  You can answer.
18       A.  Yes.
19       Q.  And from that point on, are you aware at
20  any point since the event to now that Tashii Farmer
21  was, in fact, under the influence of illegal
22  methamphetamines?
23       MR. LAGOMARSINO:  Form.
24       THE WITNESS:  Yes.  It was in the
25  autopsy.

Page 83

1   BY MR. MCNUTT:
2        Q.  So, in fact, Ken Lopera's perception was
3   correct, that Tashii Farmer was under the influence
4   of a controlled substance, correct?
5        A.  Yes.
6        Q.  And that would have justified arresting
7   Tashii Farmer and taking him to jail; isn't that
8   true?
9        A.  As long as he could articulate it and get a
10  search warrant for his blood for being under the
11  influence of a controlled substance, yes.
12       So it's not quite as simple as it used to
13  be to arrest someone for being under the influence of
14  a drug.  When I was an officer, I could just arrest
15  you and articulate it and that would be it.
16       Now you have to get a blood draw, and then
17  the DA won't call in the charges until the blood
18  comes back.
19       So yes, it's all possible.  I'm not sure if
20  he has the ability to do a telephonic search warrant.
21  Not every officer does.  It takes some training.
22       Q.  But it's true that Tashii Farmer could have
23  been detained for that entire period of time in
24  handcuffs at least awaiting that search warrant for
25  his blood, correct?

Page 84

1        A.  Yes.  More likely he would arrest him for
2   trespassing if he could get that on, and then wait on
3   the blood later on.
4        Q.  We'll get to the trespass in a minute.
5        A.  Sorry.
6        Q.  Are you aware that in Ken Lopera's CIRT
7   statement he testified that he believed that
8   Tashii Farmer was going to carjack a vehicle outside
9   the Venetian?
10       A.  Yes.
11       Q.  And irrespective of 20/20 hindsight, is it
12  reasonable to accept Ken Lopera's perception of those
13  events happening very quickly to justify detaining
14  Tashii Farmer at that point?
15       MR. LAGOMARSINO:  Objection.  Form.
16       THE WITNESS:  Yes.  For questioning under
17  reasonable suspicion manner, yes.
18  BY MR. MCNUTT:
19       Q.  What are examples of deescalation
20  techniques?
21       A.  The first one would be getting more
22  resources there.  In other words, if you're by
23  yourself, getting more officers there.  Because
24  someone would probably fight with you one on one
25  versus you see two or three officers.  So we found if

Page 85

1   we get more officers there, that helps to deescalate.
2        Talking is deescalation.  Backing off from
3   using force until you get more officers there is
4   another form of deescalation.  And deescalation could
5   also be using tools so you don't have to use deadly
6   force.
7        Now, in this case there was no weapons
8   involved in Tashii Farmer, but what generally we talk
9   about with deescalation is using less lethal tools so
10  we don't have to use lethal force.  So the Taser, the
11  bean bag, 40-millimeter cap stun.  All those things
12  are deescalation if you're trying to prevent the use
13  of lethal force.
14       Q.  When an officer broadcasts a Code Red, does
15  that indicate to other officers that they should
16  respond to that, or is that merely a communications
17  technique to open up the channel?
18       A.  Well, so there's no yes or no answer to
19  that.  It's both.  It does shut the channel down so
20  that everyone knows there's an emergency there.  And
21  automatically officers would go to that call.
22       Q.  Are you aware that Officer Lopera did, in
23  fact, call for a Code Red over the radio?
24       A.  Yes.  And a foot pursuit.
25       Q.  So that would constitute one mechanism of

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

Page 86

1  deescalation technique, correct?
2      A.  Yes.
3      Q.  He's seeking to have other officers there,
4  correct?
5      A.  He would have to answer that for me.  But
6  it's certainly a way to clear the channel and let
7  people know that there was something going on where
8  he needed help.
9      Q.  Do you recall Officer Lopera giving verbal
10 commands to Tashii Farmer?
11     A.  Yes.
12     Q.  Do you recall at any point that Tashii
13 Farmer complied with those verbal commands?
14     A.  I didn't see any, that he complied.
15     Q.  You said in a question, in response to a
16 question from Mr. Lagomarsino, that the use of the
17 LVNR or neck restraint, whatever the exact question
18 was, he asked you if it was excessive in your opinion
19 and you said yes.
20         Do you recall that?
21     A.  Yes.
22     Q.  Why do you think it was excessive?
23     A.  So his question also included based on the
24 length of time that the LVNR or whatever neck
25 restraint was applied was on there, and that's what I

Page 87

1  thought was excessive.  On the video it appears like
2  after he was unconscious, the LVNR or whatever
3  restraint hold, was still on there too long.
4      Q.  Can you tell from the video how long Ken
5  Lopera had pressure applied to Tashii Farmer's neck?
6      A.  No.  You can't tell.
7      Q.  Can you tell from the video how long -- or
8  excuse me, what angle or application the LVNR 1, 2,
9  or 3 Ken Lopera was attempting to utilize?
10     A.  You can't tell because they're both moving
11 around, and the camera angle doesn't show you that.
12     Q.  Is it fair to say that at various points
13 when Ken's encircling arm is around Tashii Farmer's
14 neck that no pressure was applied because you simply
15 don't know, correct?
16     A.  You can't -- you're right.  You can't tell
17 how much pressure was applied throughout the time.
18     Q.  So do you think it would be accurate to say
19 that a neck restraint or an LVNR or a rear-naked
20 choke was applied to Tashii Farmer for the entirety
21 of the time that his encircling arm was around Tashii
22 Farmer?
23     A.  Definitely not.
24     Q.  Because you cannot tell whether any
25 pressure was applied, correct?

Page 88

1      A.  You're right.  And for how long it was
2  applied.
3      Q.  And do you know what caused Tashii Farmer
4  to go unconscious, i.e., whether it was from the neck
5  restraint or whether it was from exhaustion or
6  whether it was from the use of illegal narcotics?
7      A.  No.  I don't know.
8      Q.  Is it possible that Tashii Farmer went
9  unconscious because he was under the influence of
10 illegal methamphetamine?
11         MR. LAGOMARSINO:  Form.  Foundation.
12         THE WITNESS:  I would say I don't know
13 that.  I've never seen anyone go unconscious from
14 using meth.
15 BY MR. MCNUTT:
16     Q.  You said that the use of the Taser was
17 excessive.
18     A.  Yes.
19     Q.  Is that because Officer Lopera used it more
20 than three times?
21     A.  Yes.  Outside of policy.
22     Q.  Right.  And so Metro policy -- just correct
23 me if I'm wrong.  Metro policy is that an officer can
24 use an ECD device up to three times, correct?
25     A.  That's correct.

Page 89

1      Q.  And then at that point they should use some
2  other control technique, correct?
3      A.  They should determine that the use of Taser
4  is ineffective and switch to another.
5      Q.  Isn't it also true that Metro policy allows
6  an officer to deviate from that policy if certain
7  circumstances exist such as the officer is undersized
8  compared to the suspect or the officer is alone?
9      A.  Deviate from the policy of?
10     Q.  That you cannot use the ECD more than three
11 times?
12     A.  I would have to review the policy.  I can't
13 remember if it says that.
14     Q.  So you testified earlier that you know who
15 Sergeant Bland is, and he's been identified --
16     A.  Yes.
17     Q.  -- in the estate case as a subject matter
18 expert?
19     A.  Yes.
20     Q.  He testified to that fact.  He testified
21 that an officer alone could absolutely use an ECD
22 device more than three times if that was the best
23 opportunity, especially if the officer was undersized
24 compared to the suspect.
25         MR. LAGOMARSINO:  Objection.  Misstates.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

24 (Pages 90 to 93)

Page 90

1  BY MR. MCNUTT:
2      Q.  Do you disagree with his opinion?
3      A.  No.  Here's what I would say.  That
4  officer, every officer that uses force, has to
5  justify the force they use.  So if they go outside of
6  policy, they have to explain that and that may or may
7  not be justified.
8      Q.  And so had Ken Lopera explained that to
9  you, you may have said something different, then
10 okay, that use of the ECD device was okay or within
11 policy?
12     A.  Well, I guess it's a little different in
13 this case because there was punches, there was Taser
14 and there was LVNR.  So you can't just take one part
15 of that and say that's excessive or this is not
16 within policy or that.
17         It's a use of force that in that incident
18 all is included together.
19         So he would have to articulate I did this
20 and this wasn't effective, so I moved to this.  And
21 then this wasn't effective, I went to that.  And if
22 he did that correctly, even though some of the things
23 might be outside of policy, doesn't say how many
24 times you can strike someone.  Because how many
25 strikes you did, you can't really tell.  But we all

Page 91

1  know if you -- if he was to connect with all those
2  punches to Tashii Farmer's head that would have been
3  excessive.
4         But we didn't say that that was excessive
5  because we couldn't tell how many punches actually
6  hit him and what kind of damage or reaction it had to
7  change Tashii Farmer's behavior.  His behavior didn't
8  change.
9      Q.  So on the strikes, Metro has no opinion as
10 to whether those were excessive because of that fact
11 that you don't know how many connected?
12     A.  Well --
13         MR. LAGOMARSINO:  Objection.  Hold on.
14 Sorry.
15         Objection to the extent you're asking for
16 Metro's opinion.  It's not a 30(b)(6) witness.
17         You can answer.
18         THE WITNESS:  And I guess my opinion, not
19 Metro's opinion, which I'm a little bit -- I mean, I
20 know I'm here to testify for that, but I believe that
21 when someone is on the ground, we shouldn't be
22 striking them at all.  That's my opinion because
23 you -- it looks worse than it's effective.
24         So my problem is more with effectiveness
25 than excessive use of force.  And especially with

Page 92

1  this all being videotaped, it looks terrible.
2         And so that to me, I believe CIRT said it
3  was excessive.  But, you know, to me I'm more
4  concerned with the Taser use and the LVNR than I am
5  with the strikes because I know some of the strikes
6  did not hit him.
7  BY MR. MCNUTT:
8      Q.  Now, let's go back to the chain of command.
9  The CIRT, the Critical Incident Review Team, do they
10 report to you?
11     A.  No.
12     Q.  Who do they report to?
13     A.  The captain of IOCP, which at the time was
14 Kevin McMahill.
15     Q.  Now, you sat on Officer Lopera's use of
16 force board, correct?
17     A.  Yes.
18     Q.  Let's go back to the ECD for a minute with
19 respect to it can be used three times and then the
20 officer should look to some other use of force.
21         If you pull the ECD trigger a fourth time,
22 but it has no connection and does not complete the
23 circuit, so, therefore, transfers no energy to the
24 suspect, is that a violation of policy because you
25 pulled the trigger on the ECD but it didn't transfer

Page 93

1  any energy?
2      A.  So here's what I would say.  Yes, it's a
3  violation of policy, but that doesn't mean that
4  person did something wrong.
5         So in other words, if you do it more than
6  three times, a supervisor has to investigate why did
7  you do it more, and was it -- was it actually
8  attached, was it effective.  And so that's part of
9  the investigation the supervisor would do.
10     Q.  Are you aware of whether or not all of the
11 cyclings of the ECD in this case were -- had complete
12 circuit closure such that the device could transfer
13 energy to Tashii Farmer?
14     A.  I am not aware of that.  I just don't know.
15     Q.  Okay.  If Sergeant Bland is designated as a
16 subject matter expert on defensive tactics, neck
17 restraint and things of that nature in this case,
18 would you defer to his opinion regarding some of
19 these questions that I asked you on those topics?
20         MR. LAGOMARSINO:  Objection.  Form.
21         THE WITNESS:  Yes.
22 BY MR. MCNUTT:
23     Q.  You said earlier that you didn't have an
24 opportunity to get this info from Officer Lopera.
25         Do you recall that, generally?

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 94

1    A.  Yes.
2    Q.  When Mr. Lagomarsino was questioning you
3  about the use of force board, you said it wasn't much
4  of a board because Officer Lopera did not show up and
5  testify.
6    A.  Right.
7    Q.  As per his right, correct?
8    A.  Well, not per department policy.  But
9  that's his -- I guess his right.
10    Q.  It's his option?
11    A.  Yes.
12    Q.  There's consequences to that option?
13    A.  Yes.
14    Q.  But you have, in fact, received some of
15  this information about Officer Lopera's perceptions
16  and beliefs and actions and the justification for his
17  conduct because you've read his CIRT report, correct?
18    A.  Yes.  You're right.
19    Q.  Okay.  So does that inform you that -- did
20  you find his CIRT report to be unavailing, or did you
21  want to hear it from him personally as -- what's the
22  disjunct there?
23    A.  Yes.  You're right.  And that's what I was
24  trying to get at.  And I did read his statement and
25  read the CIRT report.  But that did still lead me to

Page 95

1  questions I wanted to ask the use of force board.
2  Like I could do to Sergeant Crumrine whose answers
3  were probably the reasons why he was recommended for
4  a non-confirmation.
5    So in that board, the answers you give and
6  your attitude and the way you answer the questions
7  does have a play in your credibility.
8    Q.  So if Officer Lopera had testified at the
9  use of force board, is there a chance in your mind
10  that you would have found his actions to be
11  justified?
12    A.  Is there a chance?
13    Q.  Yes.
14    A.  I don't think so.
15    Q.  Why?
16    A.  Because I thought the CIRT report and his
17  answers, he didn't justify his actions.
18    Q.  Is that the purpose of a CIRT report?
19    A.  CIRT report, you mean --
20    MR. LAGOMARSINO:  Sorry, let me interrupt
21  you, sir.
22    When you say a CIRT report, there's a
23  report issued by Metro and the statement.  So I just
24  want to make sure the record is clear.
25    MR. MCNUTT:  The statement.

Page 96

1    THE WITNESS:  Well, the statement is to
2  find out from the officer why he used force and for
3  him to justify it.  And part of that is to determine
4  what kind of follow-up we as an agency need to do.
5    Now, in the majority of cases, officers
6  need some sort of training to fix any deficiencies we
7  find or any issues in his statements that don't match
8  what he should be saying per policy.
9    In other words, people who make mistakes
10  don't understand our use of force policy.  People
11  that understand our use of force policy make the
12  better decisions and we very rarely see them making
13  bad decisions.
14    So I would say that based on the decisions
15  Officer Lopera made, it would be very difficult for
16  him to convince me that he was justified in his
17  actions.
18  BY MR. MCNUTT:
19    Q.  So you testified earlier that you believe
20  most officers encountering Tashii Farmer, watching
21  him flee into what I'll call the back of the house or
22  an employee area only of the casino, would pursue
23  Tashii Farmer, correct?
24    A.  Yes.
25    Q.  And do you think that officers have at that

Page 97

1  point probable cause to detain that suspect?
2    A.  So reasonable suspicion?
3    Q.  Yes.  I'm sorry.
4    A.  Yes.
5    Q.  Okay.  Now, at what point did Ken Lopera
6  know Tashii Farmer had no weapons on him?
7    A.  I don't know because I don't think he ever
8  got to the point where he patted him down.  So I
9  don't think he ever knew for sure until after he was
10  handcuffed and someone else probably checked him for
11  weapons, I believe.
12    Q.  Right.  So inside the casino, we know from
13  Ken Lopera's CIRT transcript that he believed that
14  Tashii Farmer was under the influence of a controlled
15  substance, correct?
16    A.  I think he said or mentally ill.
17    Q.  Actually, so he actually said that he was
18  under the influence of a controlled substance on
19  seven occasions.  And he mentioned mentally ill on
20  one occasion.
21    MR. LAGOMARSINO:  Objection.  Form.
22    THE WITNESS:  Okay.  I --
23    MR. LAGOMARSINO:  Misstates.
24    THE WITNESS:  I remember something about
25  mentally ill.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

Page 98

BY MR. MCNUTT:
    Q.   And so we have -- from his perception, we have Tashii Farmer, he believes he's under the influence of a controlled substance and he's now fled into a restricted area of the casino, correct?
    A.   Yes.
    Q.   He pursues and you don't have any problem with the pursuit, correct?
    A.   No.
    Q.   And if he would have caught up to him at that point and Tashii Farmer would have complied, would you have had any problem with Ken Lopera putting him in handcuffs?
    A.   He would have to articulate why he's putting him in handcuffs, but it's certainly enough to stop him -- yes.  I would prefer that he stopped him and tried to pat him down and talked to him.  Now, if he runs like that, generally we put them in handcuffs right away.
    Q.   Once they get outside, do you recall hearing on the video Ken Lopera giving verbal commands to -- asking Tashii Farmer to stop?
    A.   Yes.
    Q.   And is that a lawful command?
    A.   Yes.

Page 99

    Q.   And did Tashii Farmer comply with that?
    A.   No.
    Q.   And Ken Lopera articulated in his CIRT statement that he believed that Tashii Farmer was going to carjack a white Toyota pickup truck outside the Venetian.
         Do you recall that?
    A.   Yes.
    Q.   At that point, that's not a misdemeanor, correct?  Carjacking an occupied vehicle is a felony, correct?
    A.   Yes.
    Q.   Is Ken Lopera justified in using a Taser at that point?
    A.   Well, his -- so you're putting me in the position to justify his actions, which when I watch the video, I don't see an attempted carjacking.  Now, he sees it differently than me.  He was there, I wasn't there.
         So I didn't feel like his answers in the CIRT interview articulated a carjacking either.
         Now, I don't know -- I now have hindsight to know that the victim didn't feel like he was going to be carjacked.  So that -- it kind of undermines what, you know, what Lopera said.

Page 100

    Q.   If the victim didn't feel like he was going to be carjacked, why did he say he locked his car doors out of fear?
         MR. LAGOMARSINO:  Objection.  Form.  Calls for speculation.
         THE WITNESS:  I don't know.
BY MR. MCNUTT:
    Q.   That's a quote.  And that was a quote given to Metro.  He told Metro in a recorded interview later on, once they tracked down the license plate and found him, he said that he locked his doors, quote, out of fear, I guess.
         Does that corroborate Ken Lopera's perception of what was going on, or does that undercut it?
         MR. LAGOMARSINO:  Form.  Misstates.  Argumentative.  Calls for hearsay.
         THE WITNESS:  So to me all it means is he was scared of Tashii Farmer.  It doesn't articulate that Tashii Farmer was going to steal his vehicle.
         So I understand what you're saying that the guy was scared of him, and I think Tashii Farmer running and acting the way he was probably was scary.
         But that doesn't -- to me, I'm looking for probable cause to say carjacking.  I'm looking for

Page 101

him taking him, moving him out of the way, going into the car, taking his keys, using a weapon, threatening him.  Those are the carjacking cases I'm familiar with.
BY MR. MCNUTT:
    Q.   So -- I'm sorry, go ahead.
    A.   So I understand what he said.  But I don't see it when I look at the video.  I wasn't there.  I just don't see it.
    Q.   You would agree with me these events happened pretty quick, correct?
    A.   Yes.
    Q.   And is it your opinion that Ken Lopera should have waited until Tashii Farmer committed some further act against the occupant of the vehicle before he took action?
         MR. LAGOMARSINO:  Objection.  Form.  Vague.
BY MR. MCNUTT:
    Q.   Meaning at what point should Ken Lopera have used that ounce of prevention versus the pound of cure?
         MR. LAGOMARSINO:  Objection.  Form.
         THE WITNESS:  It's hard for me to go back and say what he should have done.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 102

1  BY MR. MCNUTT:
2      Q.  But it's subjective, isn't it?
3      A.  Yes.  I guess that's what I'm trying to
4  say, subjective.
5      Q.  So two reasonable officers could come to a
6  different conclusion about how to act in that
7  circumstance?
8      MR. LAGOMARSINO:  Objection.  Form.
9      THE WITNESS:  I guess two reasonable
10  officers could disagree on what Tashii Farmer was
11  doing.
12  BY MR. MCNUTT:
13      Q.  And based on that disagreement, of course,
14  taking different actions towards Tashii Farmer,
15  correct?
16      MR. LAGOMARSINO:  Objection.  Form.
17      THE WITNESS:  Yes, I mean, like I said, we
18  rely on officers to justify their use of force.  And
19  if it's not justified, then it's wrong.
20  BY MR. MCNUTT:
21      Q.  In this case it wasn't justified because
22  Ken Lopera did not testify at the use of force board?
23      MR. LAGOMARSINO:  Objection.  Form.
24      THE WITNESS:  That's only part of it.  He
25  did give a CIRT statement, and he did say that he

Page 103

1  thought the subject was trying to carjack whatever
2  his name was.
3  BY MR. MCNUTT:
4      Q.  Did the use --
5      A.  When we looked at it, we just didn't see
6  that part, and I didn't see it when I watched the
7  video or read it.
8      Q.  Okay.  Did the use of force board consider
9  the CIRT statement?
10      A.  Yes.
11      Q.  Why?
12      A.  Well, we consider the whole case.
13      Q.  Okay.  So the CIRT statement --
14      A.  You couldn't do the case against everyone
15  else without considering Lopera's statement and what
16  he did.
17      Q.  Okay.  And the reason I ask -- it's not a
18  trick question.  I think I didn't understand
19  something.
20      I thought the CIRT statement stayed purely
21  on the policy side, and it seems the use of force
22  board is -- I guess maybe it's more on the policy
23  side, but it is also on the policy side?
24      A.  Right.  So you're getting into a little
25  area that one of the dispositions on the use of force

Page 104

1  site is tactics decision-making.  And so sometimes in
2  that disposition, there is some bleed-over.
3      In other words, the tactics employed,
4  because they were so bad, cause the use of force?
5      Now, in this case, this wasn't -- that
6  wasn't an option so we didn't have to consider that.
7      But there was no one else we were looking
8  at during the use of force board other than Lopera.
9  Because he's the one that used force.  The other
10  officers and all the other statements are using the
11  tactical review board side.
12      So although it's one case, they are
13  separate.
14      Q.  Okay.  Now, at the time of this event, May
15  of 2017, the LVNR was authorized to be used in a low
16  level of force situation, correct?
17      A.  Yes.
18      Q.  So the LVNR was a tool that Ken Lopera
19  could have used in this circumstance, correct?
20      A.  Yes.
21      Q.  And shortly thereafter, there was a policy
22  change to where it was only allowed to be used in
23  intermediate levels or higher, correct?
24      A.  You're correct.
25      Q.  And Mr. Lagomarsino got into that a little

Page 105

1  bit earlier.  In a nutshell, why was that?
2      A.  In a nutshell, we didn't want officers to
3  go to LVNR and low level usage.  And then secondly,
4  we wanted to simplify the policy to ensure that
5  everyone understood when they could and couldn't use
6  the LVNR.
7      Q.  And when you say simplify the policy,
8  exactly what has been simplified?
9      A.  Well, when you have a technique that can be
10  used over low level, intermediate and deadly force,
11  then it was too broad for that technique.
12      Q.  So give me an example of low level versus
13  intermediate force.
14      A.  Low level is verbal resistance.  Not
15  following commands.
16      Q.  So previously, prior to 2017, you could use
17  LVNR for things like -- for misdemeanors, correct?
18      A.  Yes.
19      Q.  Such as selling water?
20      A.  Yes.
21      Q.  And just recently in the example that you
22  testified about a little bit earlier where the
23  officer was showing -- was employing -- we'll mark
24  that exhibit...
25      (Exhibit A was marked for

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 106

1      identification.)
2  BY MR. MCNUTT:
3      Q.  Take a minute and look at that article.
4      Have you seen that screenshot before?
5      A.  Have I seen it before?
6      Q.  Today.
7      A.  Monday?  Yes.
8      Q.  And so this is an article -- we printed
9  this off yesterday from the Las Vegas Review-Journal.
10  And what's interesting to me is that Metro, in their
11  statement, the LVMPD PIO -- do you see at the bottom
12  of the first page?  What is PIO?
13      A.  Public information officer.
14      Q.  "The LVMPD PIO has received a number of
15  requests reference a video circulating on social
16  media of a water seller being taken into custody,
17  said a statement released Monday by Metro."
18      And then quote, "The video is from an
19  incident in July 2013 which was fully investigated by
20  LVMPD Internal Affairs.  The investigation showed no
21  policy violations occurred.  In addition, a lawsuit
22  filed by the individual in the video was dismissed by
23  the courts."
24      And that comports with your testimony
25  earlier, correct?

Page 107

1      A.  Good.
2      Q.  And then Metro says, in the statement,
3  quote, "Please note per Clark County code 6.04.130 it
4  is illegal to sell any merchandise, goods, items,
5  wares or services on any portion of public
6  right-of-way."
7      A.  Right.
8      Q.  Did you read that or do you just take my
9  word for it that I read it accurately?
10      A.  I read it quickly.
11      Q.  So per Metro policy, it's okay to employ
12  the LVNR, lateral vascular neck restraint, on
13  somebody allegedly committing the misdemeanor crime
14  of selling water in the desert, and but yet Metro on
15  the other hand has held that someone that is believed
16  to be under the influence of a controlled substance
17  and, in fact, was under the influence of a controlled
18  substance, fled irrationally into an employee area
19  only, and was believed to be carjacking someone, that
20  that use of force with the LVNR was excessive?
21      MR. LAGOMARSINO:  Objection.  Form.
22  BY MR. MCNUTT:
23      Q.  Is that the position?
24      A.  The position I've had and I've tried to
25  make it clear is the individual techniques used may

Page 108

1  or may not be excessive but certainly all of the
2  techniques used to me were combined to make it
3  excessive use of force.
4      Q.  So if Tashii Farmer had, as Ken Lopera
5  hoped for, proned out -- that's what he said in his
6  CIRT statement -- that after he achieved
7  neuromuscular incapacitation with the first Taser
8  strike, he expected Tashii Farmer to prone out and he
9  was going to wait for his captain to show up is what
10  he said.
11      Do you recall that?
12      A.  I don't remember the part about the
13  captain.  But I do remember saying he was hoping the
14  Taser would work and he would be proned out and that
15  would be the end of it.
16      Q.  Had that occurred, had Tashii Farmer
17  complied with his commands to not move after he had
18  been tased, what would have happened at that point,
19  do you have any idea?
20      A.  No.  I mean, Officer Lopera would have
21  completed an arrest report, use of force
22  documentation.  That would have been reviewed by a
23  supervisor.  And I assume if that's all that
24  happened, that that would be fine.
25      Q.  And Officer Lopera would not have been

Page 109

1  penalized in any way by Metro?
2      A.  Right.
3      Q.  But Tashii Farmer didn't comply and didn't
4  stay prone on the ground, correct?
5      MR. LAGOMARSINO:  Form.
6      THE WITNESS:  Correct.
7  BY MR. MCNUTT:
8      Q.  And so additional uses of force were
9  warranted, correct?
10      A.  Yes.
11      Q.  Because when a suspect doesn't comply with
12  lawful commands and some force has already been used,
13  additional force is warranted, correct?
14      MR. LAGOMARSINO:  Form.
15      THE WITNESS:  Yes.  And different
16  techniques.
17  BY MR. MCNUTT:
18      Q.  And different techniques.
19      Officer Lif said after one or two Taser
20  strikes, she would have went hands on with Tashii
21  Farmer.  Is that a reasonable alternative?
22      A.  Yes.
23      Q.  She also said she would have used her baton
24  on Tashii Farmer.  Is that a reasonable alternative?
25      A.  Yeah.  That's another tool.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

29 (Pages 110 to 113)

Page 110

1  Q.  Does that video well?
2  A.  No.  None of those really video well.
3  Q.  So if Officer Lif had been there, the video
4  would have been of a six-foot woman swinging a steel
5  baton at Tashii Farmer, correct?
6  A.  Yes.
7  Q.  And Tashii Farmer is about six foot so
8  they're about even height.
9  A.  Okay.
10  Q.  So that doesn't look good either, right?
11  A.  Most use of force don't look good on video.
12  Q.  That's true.  Because in this case, when
13  you're dealing with a criminal committing criminal
14  acts, it's difficult to control him, isn't it?
15  MR. LAGOMARSINO:  Objection.  Form.  Move
16  to strike.
17  THE WITNESS:  That's part of it.  But the
18  other part is you don't see what happened there.
19  You don't usually hear the audio.  So there's more
20  things that go into it than that.
21  So just a clip like this, for example,
22  doesn't look very good.  Although this is a properly
23  applied LVNR to someone who was not cooperating and
24  committed a crime.
25  But that's why we had to put a statement

Page 111

1  out.
2  BY MR. MCNUTT:
3  Q.  Right.  And because policing is a difficult
4  job, correct?
5  A.  Yes.
6  (Exhibit B was marked for
7  identification.)
8  BY MR. MCNUTT:
9  Q.  Take a minute and review Exhibit B.  Let me
10  know if you've seen this document before.
11  A.  I have.  But it's been a while.
12  Q.  And you recognize this as the arrest report
13  of Ken Lopera, correct?
14  A.  Yes.
15  Q.  When an officer issues a verbal command,
16  how long does he have to wait to determine whether
17  the suspect is going to comply with that command?
18  A.  There is no set time.
19  Q.  Situational dependent, correct?
20  A.  Yes.
21  Q.  If you give someone a lawful command and
22  they immediately don't comply with that, then you can
23  immediately do something else, correct?  Meaning you
24  don't have to wait five or six or seven seconds,
25  correct?

Page 112

1  A.  I'm a little confused.  Are you saying if
2  they don't comply with your first verbal order?
3  Q.  Yes.  For example, if you tell somebody to
4  stay on the ground and they immediately sit up, you
5  can then either give them another verbal command or
6  use some other control technique, correct?  Meaning
7  you don't have to continue to give them leeway to,
8  well, maybe he was going to sit up and then lay back
9  down, correct?
10  A.  Yeah.  Normally we would give multiple
11  verbal commands, and then I would prefer that people
12  would then say, okay, I got an uncooperative subject,
13  whatever.
14  You want to do something to get more people
15  there at that point before it gets into a fight.
16  Q.  Understood.  And isn't it true that Officer
17  Lopera thought his partner was going to be right
18  behind him, correct?
19  A.  He thought that.
20  Q.  Unfortunately, he was wrong.
21  A.  Right.
22  Q.  And no one knows why, correct?
23  MR. LAGOMARSINO:  Objection.  Form.
24  THE WITNESS:  Well, I guess part of the
25  reason why is he didn't tell Officer Lif what he was

Page 113

1  doing.
2  BY MR. MCNUTT:
3  Q.  Officer Lif was at his elbow during the
4  initial contact, correct?
5  A.  She did not know why he took off or what
6  was going on.  So to me, I would have preferred that
7  he make sure that she knew where he was going and
8  what he was doing.
9  But part of the issue was no communication
10  between those two.  He assumed that she was coming.
11  Q.  What should she have done?
12  A.  What should she have done?
13  Q.  Yes.  Let's take it as you say.  Ken
14  Lopera, there was miscommunication, no communication,
15  whatever.
16  If your partner pursues a suspect down an
17  employee-only area of a casino, what should you do as
18  the partner?
19  A.  Go with him.
20  Q.  And that didn't happen.
21  A.  No.
22  Q.  And do you know why?
23  A.  No, I don't know why.
24  Q.  If you tell someone to stay on the ground,
25  lie flat on the ground, and you give them five or six

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

### Page 114

1  seconds to comply, is that long enough to determine
2  whether or not they're going to comply?
3      A.  I think that's actually longer than I would
4  wait before I would start giving more or different
5  verbal commands.  You're just giving commands until
6  it's clear that -- in other words, until that person
7  stood up, if they're just going toward to
8  sitting up, I'm not as concerned if they go from
9  laying to sitting up because someone sitting up is
10  not a danger to me.
11      Q.  Of course it depends how quickly they're
12  doing it because you don't know how quickly --
13      A.  You're right.
14      Q.  -- the movement between --
15      A.  Yes.  It can happen quickly, but I'm just
16  trying to go with your scenario.  And, you know,
17  there's no set time or, you know, number of seconds.
18  Every situation is different.
19      Q.  Let's look at page 7 of 8 or P002374,
20  whichever one you prefer to look at.
21          And I'm going to start with the second
22  paragraph from the bottom that starts: "After
23  cycling the ECD seven times."
24          Do you see that, sir?
25      A.  Yes.

### Page 115

1      Q.  So it says: "Officer Lopera holstered his
2  ECD with Farmer lying on his stomach.  Officer Lopera
3  straddled Farmer's back and struck him approximately
4  10 to 12 times in the head while giving Farmer verbal
5  commands."
6          Do you see that?
7      A.  Yes.
8      Q.  So it says that Lopera struck Farmer 10 to
9  12 times in the head, correct?
10      A.  Yes.
11      Q.  And you testified today that it's unclear
12  whether any -- how many of the punches connected with
13  Tashii Farmer, correct?
14      A.  Yes.
15      Q.  So do you think that should be worded a
16  little more carefully to make clear to the reader
17  that's unclear how many punches struck Tashii Farmer?
18      A.  Yes.
19      Q.  So if you go to the fourth paragraph up,
20  that starts: "Officer Lopera began issuing verbal
21  commands."
22          Do you see that?
23      A.  Yes.
24      Q.  "Officer Lopera began issuing verbal
25  commands to Farmer.  However, the longest time

### Page 116

1  between cycles of the ECD was six seconds.  Officer
2  Lopera told Farmer to get on his stomach but never
3  gave Farmer a reasonable opportunity to comply with
4  commands."
5          Do you see that?
6      A.  Yes.
7      Q.  Now, do you agree with that statement that
8  six seconds is not enough time for Tashii Farmer to
9  comply?
10      A.  Well, like I said before, every situation
11  is different.  And he was not complying.  However, he
12  was not actively resisting or aggressively resisting,
13  I guess is my point.
14          And people who are either drunk or under
15  the influence of narcotics do not immediately comply,
16  rarely do they comply at all.
17      Q.  Okay.  But that's a little -- I appreciate
18  that answer.  But that's a little different than my
19  question.
20      A.  Okay.  Sorry.
21      Q.  You've testified a couple of times now that
22  five or six seconds, in one answer, you said would be
23  longer than you would give somebody to comply.  And
24  I'm simply asking you whether you agree with this
25  statement that Lopera giving Farmer six seconds was

### Page 117

1  not a, quote, "Reasonable opportunity to comply with
2  commands."
3          Do you agree with that statement?
4          MR. LAGOMARSINO:  Objection.  Asked and
5  answered.
6          THE WITNESS:  So there's no way to answer
7  that without watching the video.
8  BY MR. MCNUTT:
9      Q.  We're going to.
10      A.  Because giving someone -- I never timed --
11  I just watched the video.  I didn't count the number
12  of seconds in between.  And when you watch the video,
13  and he -- you have to give clear direction of what
14  you want.  And it appeared like -- and I'm going off
15  some memory here, but there was some conflicting
16  directions given while you're tasing someone, and
17  which led to the confusion of him not complying.
18          So it's really hard to justify now.
19      Q.  Do you know who wrote this arrest report?
20      A.  Yeah.  I'm sure it was either Alsup -- I
21  think it was Alsup.
22      Q.  It was Detective Alsup.  He testified that
23  he wrote every word of it.
24      A.  Yeah.
25      Q.  And even though Mr. Colon, or I think it's

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

31 (Pages 118 to 121)

Page 118

1   Mark Colon is on here, he testified that Alsup --
2       A. He's a lead detective.
3       Q. Right. And you said he's a good detective
4   and does good work, correct?
5       A. Yes.
6       Q. Now, do you think that this at a minimum
7   should have been reworded to be a little more
8   accurate that six seconds could, in fact, be enough
9   time to gain compliance or shouldn't be enough time
10  to gain compliance?
11          MR. LAGOMARSINO: Objection. Form.
12          THE WITNESS: Yes.
13  BY MR. MCNUTT:
14      Q. So it could have been written a little
15  better, correct?
16      A. Yes.
17      Q. Because in your opinion, six seconds,
18  situation dependent, is more than enough time for
19  compliance, correct?
20          MR. LAGOMARSINO: Misstates.
21  BY MR. MCNUTT:
22      Q. Yes or no?
23      A. Yes.
24      Q. So let's go to the fifth paragraph up. And
25  this is where we're getting into the carjacking. And

Page 119

1   the middle of the paragraph there's a statement that
2   says -- or a sentence that says: "The driver of the
3   white truck stated he did not believe Farmer was a
4   threat."
5          Do you see that?
6       A. Yes.
7       Q. Now, the driver in the same interview, the
8   driver of the white truck, Jonathan Pierce, told
9   Metro officers, members of the FIT team, that he
10  locked his doors out of fear of Tashii Farmer.
11          MR. LAGOMARSINO: Objection. Misstates.
12  BY MR. MCNUTT:
13      Q. We talked about that earlier, correct?
14      A. Yes.
15      Q. I mean, is that not probative information
16  regarding what was going on at that moment?
17      A. Yes.
18      Q. Okay. And so the reader of this report
19  could get two different opinions about what was going
20  on if they only read that the driver of the white
21  truck stated he did not believe Farmer was a threat,
22  period. Versus the driver of the white truck stated
23  he did not believe Farmer a threat, comma, but he
24  locked his doors out of fear.
25          Two different interpretations, correct?

Page 120

1       A. Yes.
2       Q. Should that other quote from Jonathan
3   Pierce have been included in this arrest report?
4       A. Yes.
5       Q. Why was it not?
6       A. I don't know.
7       Q. So knowing now, if you were the supervisor
8   of Detective Alsup and we're sitting here going
9   through this, would you kick this arrest report back
10  to him and make him correct those three errors we've
11  gone over?
12          MR. LAGOMARSINO: Objection to the extent
13  he caught the errors.
14          THE WITNESS: If I knew about the errors,
15  then they would be sent back for correction.
16  BY MR. MCNUTT:
17      Q. Of course.
18      A. Normally that would be the sergeant's job
19  or the lieutenant's job before it got to anywhere
20  else.
21          So yes, that's a review that supervisors
22  should be doing of these reports.
23      Q. And either that didn't happen or it was
24  missed, correct?
25      A. Yes.

Page 121

1       Q. It starts with Detective Alsup inasmuch as
2   he missed getting this completely accurate, correct?
3          MR. LAGOMARSINO: Objection. Form.
4          THE WITNESS: Yes.
5   BY MR. MCNUTT:
6       Q. Because he testified that he had access to
7   all of his team's information, which included
8   Jonathan Pierce's statement about locking his doors
9   out of fear.
10          Now, Mr. Lagomarsino asked you earlier a
11  few questions about body-worn camera policy. And if
12  I recall your testimony correctly, you said that the
13  officers involved in the use of force needed to have
14  their -- per policy had to have their cameras
15  running. They couldn't turn them off until the use
16  of force was over; is that accurate?
17      A. Yes.
18      Q. And so in this case, would an acceptable
19  time to turn the cameras off been when Tashii Farmer
20  was in handcuffs, or is it before that or is it after
21  that?
22      A. Usually when the subject is placed in
23  handcuffs is what we would consider the end of that
24  use of force incident.
25      Q. Okay. And obviously we have plenty of

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 122

1   body-worn cam footage video that goes well after
2   Tashii Farmer was placed in handcuffs, correct?
3      A.  Yes.
4      Q.  Is there a policy or protocol for Metro
5   officers that somebody says -- you know, broadcasts a
6   radio command or something, all clear, suspect has
7   been detained, everybody can turn off their body-worn
8   cams?  Meaning is it formalized like that or are
9   officers allowed to do it on their own?
10     A.  It's not formalized whereas something would
11  come over the radio to turn off your body cameras.
12        However, when an officer is involved in a
13  critical incident, use of force that's deadly, a
14  supervisor should isolate them and have them turn off
15  their body camera.  And that's one of the things that
16  Sergeant Crumrine did not do for Officer Lopera.
17     Q.  So at this point, you've said that when
18  Tashii Farmer was in handcuffs, it would have been --
19  now, I'm asking a question.  It's acceptable or would
20  have been acceptable for everyone's body-worn cam to
21  have been turned off at that point or just Officer
22  Lopera's?
23     A.  I would say Officer Lopera, because we do
24  want to capture -- if this was a normal use of force
25  and he was handcuffed and there was no injuries, it

Page 123

1   would be fine.  But since there was a medical issue
2   and then some other things happened with trying to
3   render aid, we wouldn't want to capture that on body
4   camera.  So it's not, okay, handcuffs are on, all
5   body cameras are off.
6        What we are concerned about is the officer
7   who has been in a foot pursuit and a fight and his
8   adrenaline is pumping that his camera is off so he
9   doesn't talk too much.
10     Q.  And in this case, maybe there was too much
11  talk?
12     A.  There was.  And that's one of the reasons
13  why we isolate people and put them in a car by
14  themselves until they get to talk to a
15  representative.
16     Q.  So in this case, Ken Lopera is heard on
17  tape saying, as he said in his CIRT statement, using
18  shorthand layman's terms, I forget exactly how he
19  said it but I can pull it up here, that he rear-naked
20  Tashii Farmer.  And much was made that Ken Lopera did
21  not use the proper approved lateral vascular neck
22  restraint.
23        Are you aware of that disjunct in this
24  case?
25     A.  Yes.

Page 124

1      Q.  Now, do you put much stock in the fact that
2   after this foot pursuit and this fight, and with his
3   adrenaline running and everything else, that Ken
4   Lopera did not say when asked immediately following
5   this that he, quote, used the lateral vascular neck
6   restraint, which I'll admit does not exactly flow off
7   the tongue.
8        Did you put much stock in what he said
9   versus what he did on the tape?
10     A.  So the only issue I had with what he said
11  was that choke is not what we train.  Now, from a
12  training point of view, I need for officers to use
13  training the way we train them.
14        So that's my concern with that.  Not the
15  difference between an LVNR and a rear-naked choke.
16  You don't train people on the rear-naked choke.
17     Q.  Correct.  Although both are -- are you
18  aware that both are a blood choke and not an air
19  choke?  Meaning both the rear-naked choke -- let me
20  put it this way.  The LVNR and the rear-naked choke
21  are both neck restraints that seek to --
22     A.  Yes.
23     Q.  -- control the blood flow not the airflow?
24     A.  Yes.
25     Q.  Do you know why Metro made the

Page 125

1   determination in this arrest report that Ken Lopera
2   did not use an LVNR and they thought that he did use
3   a rear-naked choke?  Do you know why?
4      A.  I don't know why.
5      Q.  Okay.  Do you have an opinion as to whether
6   it was an LVNR versus something else?
7      A.  Do I have an opinion of why that's in the
8   report?
9      Q.  No.  As to whether or not -- strike that.
10        Let me ask a better question.  Do you have
11  an opinion as to whether Ken Lopera used a neck
12  restraint other than the lateral vascular neck
13  restraint, or if he merely did not properly apply the
14  lateral vascular neck restraint?
15     A.  So I can't tell.  Your question is valid,
16  and that's what we looked at was what happened?  And
17  did he not apply the LVNR correctly.  Did he use a
18  different technique?  Did he not do anything that we
19  taught him?
20        And it looks like he tried to apply the
21  LVNR.  The subject was moving around.  He moved to a
22  different chokehold.  But you can't tell that off the
23  video.  There's not enough video to show the arm
24  angle and the heads and all that.
25     Q.  Not as nice as --

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

33 (Pages 126 to 129)

Page 126

1    A.  No.
2    Q.  -- the exhibit we looked at earlier where
3  it's a direct front-on, correct?
4    A.  Right.
5    Q.  So Ken Lopera in his CIRT statement said:
6  "While I had the LVNR applied, I was attempting to,
7  due to the fact that he was on his side, his
8  movement, I had full encirclement but I wasn't able
9  to get the full grip.  I was still trying to embrace
10  that neck brace principle."
11      Do you know what the neck brace principle
12  is?
13    A.  That's you're head to head.
14    Q.  It's where you're controlling the suspect's
15  neck to protect their airway?
16    A.  Okay.
17    Q.  I mean, that's a phrase out of Metro's
18  training: "While applying pressure to his carotid
19  artery."
20      Sounds like an LVNR, correct?
21    A.  Yes.
22    Q.  "Due to the way my body was positioned to
23  my right side," and then another sentence, "I did not
24  have that luxury due to him already being on my
25  back."

Page 127

1      So he articulates that he couldn't apply
2  the LVNR properly.  And yet Detective Alsup found
3  that he absolutely did not use an LVNR.
4      Do you think that's accurate?
5    A.  Well, Detective Alsup didn't have his
6  statement.
7    Q.  But do you think -- that's a fair point.
8  And because we've used -- talked about the statement
9  on both sides, and I'm glad to hear you say that
10  actually.  It affirms somewhat my belief in the
11  system.
12      So do you think anybody watching the video
13  could definitively tell that Ken Lopera was not
14  applying the LVNR accurately or was intentionally
15  using a non-approved technique?
16    A.  You couldn't tell and our experts couldn't
17  tell either.
18    Q.  So do you think it's fair for
19  Detective Alsup to come to that definitive
20  conclusion?
21    A.  I think it's a little too definitive.  But
22  it's not wrong 100 percent.  I don't know how to --
23  he could have worded it better.
24    Q.  You talked about levels of resistance just
25  in passing in one of your answers.  This is not a

Page 128

1  test, but do you know the different levels of
2  resistance that Metro teaches that suspects undergo
3  or utilize?  We have compliant.
4    A.  Compliant.
5    Q.  Passive resistance.
6    A.  Passive and active resistant, aggressive --
7    Q.  Resistance, and aggravated aggressive
8  resistance.
9    A.  Yeah.
10    Q.  Do you have an opinion as to -- and if you
11  don't, that's fine -- what Tashii Farmer was
12  demonstrating in this incident?
13    A.  I thought it was active resistance.  It
14  looked to me like he didn't want to be handcuffed.
15    Q.  And I'll read active resistance, and this
16  is from LVMPD 0007:  "The subject's verbal or
17  physical actions are intended to prevent an officer
18  from placing the suspect in custody and taking
19  control, but are not directed at harming the officer.
20  Examples, walking or running away, breaking the
21  officer's grip."
22      Does that comport with your memory?
23    A.  Yes.
24    Q.  And then aggressive resistance so we know
25  what the distinction is:  "The subject displays the

Page 129

1  intent to harm the officer, themselves or another
2  person" -- let me know if I'm going too fast -- "and
3  prevent an officer from placing the subject in
4  custody and taking control.  The aggression may
5  manifest itself through a subject taking a fighting
6  stance, punching, kicking, striking, attacks with
7  weapons or actions which present an imminent
8  threat of physical harm to the officer or another."
9      Comport with your --
10    A.  Yes.
11    Q.  And then obviously aggravated aggressive is
12  actions significant resulting in death or serious
13  bodily harm.
14      If I reach for your sidearm or if you're
15  carrying one on the other side, your Taser, is
16  that -- what level of resistance is that?
17    A.  That's aggravated -- not aggravated.
18    Q.  Is it aggressive resistance?
19    A.  Aggressive resistance, I'm sorry.
20    Q.  So your choices are active or aggressive
21  resistance?
22    A.  Yes.
23    Q.  Yes?  I said your choices are active
24  resistance or aggressive resistance.
25    A.  It depends how you articulated that I

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 130

1  reached for your Taser or your gun.
2    Q.  I tried to grab your Taser off your belt.
3    A.  So you get your hands on my Taser?
4    Q.  Sure.
5    A.  That's -- that's aggravated aggressive,
6  whatever it is.
7    Q.  I have a list.  Let's do this.
8    A.  I don't have that.  So it's more than
9  active aggressive.
10           (Exhibit C was marked for
11        identification.)
12    THE WITNESS:  It's more than active
13  resistance.  It's aggressive resistance.
14  BY MR. MCNUTT:
15    Q.  And that's fine.  I should have given you
16  that earlier.  I wasn't try to trick you.  Just
17  trying to speed the process.
18         So if a suspect grabs at an officer's
19  weapon or any of the weapons on his belt, that would
20  be aggressive resistance, correct?
21    A.  Yes.
22    Q.  If an officer punched, struck or kicked --
23  the suspect punched, struck or kicked the officer,
24  that would be aggressive resistance --
25    A.  Yes.

Page 131

1    Q.  -- correct?
2         And if the suspect is demonstrating
3  aggressive resistance, what level of force can the
4  officer use?  Low?  Intermediate?
5    A.  Intermediate.
6    MR. LAGOMARSINO:  Any time you want to take
7  a break.
8  BY MR. MCNUTT:
9    Q.  Are you good?
10    A.  I'm good.
11    MR. MCNUTT:  Do you need one?
12    MR. LAGOMARSINO:  Yeah.  I just don't want
13  to keep going.  I'm requesting a break at some point.
14    MR. MCNUTT:  No problem, Andre.
15  BY MR. MCNUTT:
16    Q.  When does a -- do you know the definition
17  of a consensual encounter?
18    A.  Well, it depends.  Who am I giving it to?
19  I had a lawyer tell me that any time a police officer
20  talks to you it's a consensual encounter.
21    Q.  LVMPD 1180 says:  "A consensual encounter
22  is a completely voluntary police interaction with
23  members of the public requiring no legal
24  justification for the interaction where a reasonable
25  person would feel free to disregard the police and go

Page 132

1  about their business."
2    A.  Yes.
3    Q.  Was Ken Lopera's interaction with Tashii
4  Farmer a consensual encounter to begin with?
5    A.  Yes.
6    Q.  Did it remain a consensual encounter once
7  Tashii Farmer fled into the employee-area only?
8    A.  Based on the other articulation that
9  Officer Lopera said that it changed from a consensual
10  to probably a reasonable suspicion to stop.
11    MR. MCNUTT:  We'll take that break now.
12    THE VIDEOGRAPHER:  The time is
13  approximately 2:06 p.m.  We are going off the record.
14           (A recess was taken from 2:06 p.m.
15        to 2:14 p.m.)
16    THE VIDEOGRAPHER:  The time is
17  approximately 2:14 p.m.  We're back on the record.
18  BY MR. MCNUTT:
19    Q.  Chief, we're back on the record.  You
20  testified earlier that you have previously watched
21  Ken Lopera's body-worn camera, correct?
22    A.  Yes.
23    Q.  How long ago was that?
24    A.  Before the use of force board --
25    Q.  So it's been over a year?

Page 133

1    A.  -- and during the use of force board.
2    Q.  So you didn't rereview it --
3    A.  No.
4    Q.  -- prior to this deposition?
5         One other question I forgot to ask you, are
6  you familiar with Safe Strip?
7    A.  Yes.
8    Q.  Is it Operation Safe Strip or what do they
9  technically call it?
10    A.  Safe Strip is just what they call it.
11    Q.  What is the mission statement of Safe
12  Strip?
13    A.  It's to -- well, it's changed over the
14  years, but the basic premise is to put more officers
15  on the Strip to be closer to anything that happened,
16  they respond to any calls that happen immediately.
17    Q.  Because of the mass congregation of people
18  on the Strip?
19    A.  Yes.  And the value of the Strip to
20  Las Vegas.
21    Q.  Okay.  So I've got the computer here with
22  the initial still.  We're going to watch the video of
23  Ken Lopera's body-worn cam.  I'll represent to you
24  this has been produced by Metro as being Ken Lopera's
25  authentic body-worn cam video.

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

Page 134

1      Do you recognize this still shot as we look
2  at it?
3      A.  Yes.
4      Q.  And if you want me to adjust the screen up
5  or down just for light, let me know.
6      A.  That's fine.
7      Q.  Do you recognize Tashii Farmer in the left
8  corner or left side of the screen?
9      A.  Yes.  I guess.
10     Q.  And Officer Ken Lopera's hand there holding
11  a Slurpee or something?
12     A.  Coffee drink.
13     Q.  Coffee drink.  Okay.
14         Once I start playing, there will be some --
15  we'll see a timeline running along the bottom of the
16  screen, and I will try to annotate some of those
17  timelines.
18     A.  Okay.
19     Q.  So I'm just going to start playing it and
20  you, of course, know at that time body-worn cams
21  don't have any audio for the first 30 seconds,
22  correct?
23     A.  Right.
24     Q.  So essentially what's happened is Ken
25  Lopera has -- when he activates his body-worn cam, it

Page 135

1  records the prior 30 seconds without audio; is that
2  right?
3      A.  Yes.
4      Q.  Is there a reason Metro went with that
5  version?  Just out of curiosity, why don't they
6  record everything?
7      A.  I don't know.  I thought that was how the
8  body camera worked.
9      Q.  Well, I think it is how the body camera
10  worked.  I just wondered why does it work that way is
11  my question?
12     A.  I don't know.  I think that's the way it
13  came from Taser, but it could be some reason they
14  requested it.  But that was all before I was involved
15  with body cameras so I don't know for sure.
16     Q.  So I'm going to hit play, and you'll see
17  the 0000 here on the left.
18     A.  Okay.
19         (Playing Video)
20  BY MR. MCNUTT:
21     Q.  Now, we see Tashii Farmer approach Ken
22  Lopera.  And behind him, do you see the doorway area?
23     A.  Yes.
24     Q.  And do you see the yellow cone where Tashii
25  Farmer is?

Page 136

1      A.  Right.
2      Q.  And then you'll see in a little bit when
3  we're at two seconds, you'll see some chains-link
4  between those accounts.
5         (Playing Video)
6  BY MR. MCNUTT:
7      Q.  Do you see this doorway area where the two
8  yellow cones with the chain-link are between them?
9      A.  Yes.
10     Q.  Do you believe that to be an area that can
11  be accessed or allowed to be accessed by patrons or
12  civilians?
13         MR. LAGOMARSINO:  Form.  Foundation.
14         THE WITNESS:  It looks like it's trying to
15  prevent people from going down that hallway.
16  BY MR. MCNUTT:
17     Q.  Now, at this point would you call this a
18  consensual encounter?  Or would you even call it an
19  encounter?
20     A.  I would have to hear the audio because if
21  he's talking to him, that's a consensual encounter.
22  But it looks -- there's no audio like he's watching
23  him.
24     Q.  Right.  Of course, the CIRT statement fills
25  that gap in a little bit and says that he's talking

Page 137

1  to him, and we can read that in a minute.
2      A.  If it's talking to him, that's a consensual
3  stop.
4         (Playing Video)
5  BY MR. MCNUTT:
6      Q.  Now we're at 16 seconds.  At this point,
7  Tashii Farmer has crashed through the little -- the
8  yellow barricade, correct?
9         MR. LAGOMARSINO:  Form.
10         THE WITNESS:  Yes.
11  BY MR. ANDERSON:
12     Q.  And is now starting to run down the
13  employee-only hallway, correct?
14     A.  Yes.
15     Q.  And he was almost within arm's reach of
16  Ken Lopera at this point, correct?
17     A.  Yes.
18     Q.  And at least from Ken Lopera's body-worn
19  cam, Ken Lopera got a direct look into Tashii
20  Farmer's face and pupils, correct?
21     A.  Yes.
22         MR. LAGOMARSINO:  Form.
23         (Playing Video)
24         MR. LAGOMARSINO:  Hold on a second.  Are
25  you saying the camera reflects where Lopera's eyes

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

Page 138

1   were?
2          MR. MCNUTT:  That's not what I said, no.
3   BY MR. MCNUTT:
4      Q.   At this point you have no problem with
5   Officer Lopera or any officer pursuing Tashii Farmer
6   down this hallway, correct?
7      A.   Correct.
8          (Playing Video)
9   BY MR. MCNUTT:
10     Q.   So we're at 30 seconds.  We now have audio.
11         Any idea where Officer Lif is or how she at
12   this point isn't right next to Ken Lopera.
13     A.   Well, I can only go by her statement which
14   said that she didn't see him run down the hallway.
15         (Playing Video)
16   BY MR. MCNUTT:
17     Q.   Do you know if when Officer Lopera yelled
18   Lif's name there, whether he was saying it into his
19   radio or not?
20     A.   I don't know for sure.  But it doesn't --
21   it wouldn't be how we would talk to other officers on
22   the radio.
23     Q.   How would he have done that on the radio?
24     A.   Either call her by her call sign -- that's
25   normally the way we would do it.  Not by first name

Page 139

1   or last name.
2          (Playing Video)
3   BY MR. MCNUTT:
4      Q.   So we're at 1:33.  Ken Lopera has given a
5   command, "Stop, don't move."  Correct?
6      A.   Yes.
7      Q.   Is that a lawful command that he's giving
8   at that point?
9      A.   Yes.
10     Q.   Now, my next question is tell me whether
11   Tashii Farmer complies.
12         (Playing Video)
13   BY MR. MCNUTT:
14     Q.   Did Tashii Farmer comply?
15     A.   No.
16     Q.   Now, Ken Lopera said in his CIRT statement
17   at this point that he believed Tashii Farmer was
18   going to carjack the white Toyota pickup truck.  Was
19   use of the -- if that was correct and that's his
20   perception, was use of the Taser authorized at this
21   point?
22     A.   Well, it's going to be more than his
23   perception.  But I'll go ahead and say yes.
24         (Playing Video)
25

Page 140

1   BY MR. MCNUTT:
2      Q.   So he said, "Stop.  Don't move.  You're
3   going to get tased."
4          That's per policy to give that warning,
5   correct?
6      A.   You should if possible give that warning.
7      Q.   But you don't have to, correct?
8      A.   No.
9      Q.   So Tashii Farmer at 1:38 appears that he's
10   on his back and it does appear that the ECD device
11   worked and achieved neuromuscular incapacitation,
12   correct?
13     A.   He went directly to the ground, so yes.
14         (Playing Video)
15   BY MR. MCNUTT:
16     Q.   So at 1:40 Ken Lopera says, "Don't move,"
17   to Tashii Farmer, correct?
18     A.   Yes.
19     Q.   That's a lawful command, right?
20     A.   Yes.
21     Q.   Tashii Farmer is on his back when he says
22   that, correct?
23     A.   Yes.
24         (Playing Video)
25

Page 141

1   BY MR. MCNUTT:
2      Q.   What's Tashii Farmer done between 1:40 and
3   1:44?
4      A.   It looks like he's moving, trying to sit
5   up.
6      Q.   And reaching towards his shoe, correct?
7      A.   Yes.
8      Q.   Is it possible that he has a weapon in his
9   shoe?
10     A.   Possible.
11     Q.   And Ken Lopera hasn't checked him for
12   weapons at this point, correct?
13     A.   Correct.
14     Q.   Has Tashii Farmer complied with Ken
15   Lopera's directive to not move?
16     A.   No.
17     Q.   Is four seconds enough for Ken Lopera to
18   have assessed what Tashii Farmer -- whether he was
19   complying or not?
20     A.   He's definitely not complying, so yes.
21     Q.   So the statement earlier by Alsup that he
22   only gave him six seconds, that's not accurate in
23   your view, because here four seconds was enough to
24   know that Tashii Farmer wasn't complying, correct?
25     A.   Yes.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

37 (Pages 142 to 145)

Page 142

1    Q. So, in fact, Ken Lopera did give Tashii
2  Farmer enough time to comply with his lawful command,
3  correct?
4    A. Well, you have to watch the whole video.
5    Q. We're going to. But just this part.
6    A. I'm saying when you stop it like that and
7  do each time it's different than -- like, even one of
8  the commands was to the guy in the truck.
9    Q. So should Detective Alsup not have done
10  that in the arrest report?
11   A. Yes, I already --
12   Q. Because that's what he did in the arrest
13  report.
14   A. I already agreed that he should have worded
15  it better in the arrest report.
16   Q. I didn't even ask you those questions.
17  That's exactly what Alsup did. Alsup broke this down
18  just like I'm breaking it down. So should he not
19  have done that?
20      MR. LAGOMARSINO: Objection. Form.
21      THE WITNESS: Everybody that looks at video
22  looks at the whole thing, and then they break it down
23  by seconds.
24  BY MR. MCNUTT:
25   Q. That's what we're going to do here.

Page 143

1       From this 1:40 to 1:44, Ken Lopera gave a
2  lawful command, and Tashii Farmer did not comply with
3  it, correct?
4    A. Yes.
5    Q. And in your opinion, was that four seconds
6  reasonable for Ken Lopera to have given?
7    A. Yes.
8    Q. Okay. Thank you.
9       (Playing Video)
10  BY MR. MCNUTT:
11   Q. So because there was no compliance, Ken
12  Lopera gave him another cycle of the ECD, correct?
13   A. Yes.
14   Q. And Tashii Farmer goes to his back,
15  correct?
16   A. Yes.
17   Q. Was that use of the Taser authorized per
18  Metro policy?
19   A. Yes. But he also said, "Get on your
20  stomach," at the same time he tased him. Which is
21  not possible to do.
22   Q. Okay. Sure. And sometimes --
23   A. Earlier that's what I said. Some of the
24  commands were conflicting. And so you can't say,
25  okay, he told him not to move five times and that's

Page 144

1  enough.
2    Q. True. And so after, you know, running for
3  60 seconds, chasing the suspect, Ken Lopera did not
4  say everything perfectly like we would have liked him
5  to, correct?
6    A. Right.
7    Q. Is that a violation of policy?
8    A. Not a violation. And not unusual.
9    Q. It's just a mistake?
10   A. Yes.
11      (Playing Video)
12  BY MR. MCNUTT:
13   Q. So we're now at 1:52 after the second ECD
14  strike. Ken Lopera said don't move, correct?
15   A. Yes.
16   Q. And Tashii Farmer then drew his knees up to
17  his waist, correct?
18   A. Yes.
19   Q. Is that not moving?
20   A. That's moving.
21   Q. Is that complying with his lawful
22  command?
23   A. Yes. I mean, no, it's not complying.
24  Sorry.
25      (Playing Video)

Page 145

1  BY MR. MCNUTT:
2    Q. So he then -- so we're now at 1:56. Ken
3  Lopera says, "Get on your stomach," correct? And
4  cycled the ECD?
5    A. Yes.
6    Q. Now, do you have a problem with that?
7    A. I would have preferred the time between the
8  commands and the cycling to be longer apart.
9    Q. In this instance?
10   A. Yes, in this instance.
11   Q. Okay.
12   A. So that's what you're asking me, I thought.
13   Q. Yes.
14   A. Yes. I would prefer that there's some time
15  between the commands and the Taser cycling.
16   Q. So it is appropriate to break this down,
17  because in the first three commands, we saw that Ken
18  Lopera did give a reasonable time for compliance and
19  Tashii Farmer did not comply, but you're saying in
20  this one instance that he did not?
21      MR. LAGOMARSINO: Objection. Misstates.
22  BY MR. MCNUTT:
23   Q. Is that fair?
24   A. Yes.
25      (Playing video)

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

38 (Pages 146 to 149)

Page 146

1   BY MR. MCNUTT:
2       Q.  So he cycles the ECD at 1:56-ish, and
3   Tashii Farmer is taking his left hand and putting it
4   in his lower back.
5           Do you see that?
6       A.  Yes.
7       Q.  Do you have any idea about what he's doing
8   there?
9       A.  Based off the video, it looks like he's
10  just got his hand in his back, but now we know that
11  he was trying to pull the probes out.
12      Q.  And Officer Lif said she thought maybe --
13  when she reviewed the video, she said she thought
14  maybe he was reaching for a weapon.
15          MR. LAGOMARSINO:  Form.
16          THE WITNESS:  It could be.  That's her
17  perception.
18  BY MR. MCNUTT:
19      Q.  So different officer, different reasonable
20  officers can have different perceptions of the same
21  events occurring?
22      A.  Yes.
23      Q.  So this is, Ken Lopera at 1:58 says, "Get
24  on your stomach."  And Tashii Farmer says, "I will."
25          Tell me if he does do that.

Page 147

1           (Playing Video)
2   BY MR. MCNUTT:
3       Q.  At 1 -- excuse me, at 2:02 where is
4   Tashii Farmer?
5       A.  He rolled across his stomach onto his back
6   again.
7       Q.  Is that complying?
8       A.  No.
9       Q.  So Ken Lopera at 2:05 is now in physical
10  contact with Tashii Farmer, correct?
11      A.  Yes.
12      Q.  And do you see his left hand grabbing
13  Tashii Farmer's left wrist area?
14      A.  Yes.
15      Q.  Do you have any problem with Ken Lopera
16  being in physical contact with Tashii Farmer?
17      A.  So I would prefer based on the way we train
18  people, is before you go hands-on, you have another
19  officer there.
20      Q.  Okay.  But is Ken --
21      A.  This is what we call a hands-on by grabbing
22  his wrist.
23      Q.  Fair.  Is Ken Lopera out of policy by doing
24  this?
25      A.  No.

Page 148

1       Q.  It's just you would prefer that --
2       A.  Best practice would be to have another
3   officer there.  Because he's not complying with your
4   commands.  And if you go hands-on, you're probably
5   going to be in an altercation.
6       Q.  But he's already in an altercation, right?
7       A.  A physical altercation.
8       Q.  So he's now cycled the ECD three times.
9   And there's no other officers there.  And you don't
10  want him to go hands-on even though per policy he's
11  allowed to.
12          What would -- wouldn't in your scenario he
13  have had to cycle the ECD another time?
14          MR. LAGOMARSINO:  Form.
15  BY MR. MCNUTT:
16      Q.  Unless Tashii Farmer immediately complied?
17          MR. LAGOMARSINO:  Form.
18          THE WITNESS:  We don't teach people to go
19  hands-on with one hand and do the Taser with your
20  other hand.  So would he have to?  No.  I would think
21  he should holster his Taser and go hands-on with both
22  hands.
23  BY MR. MCNUTT:
24      Q.  So that's a little different than what you
25  said.  You're saying he should have holstered up the

Page 149

1   ECD already and then it's okay to go hands-on, in
2   your opinion?
3       A.  Well, he's gone hands-on, but I think he
4   still has his Taser in his other hand.  Because you
5   stopped the video I can't see it, but that's what I
6   think he does.
7       Q.  I think you're right.
8       A.  You probably know the video better than me.
9           So I'm trying to -- is this -- that's not
10  how we prefer people to do it.  It's not a violation
11  of policy.
12      Q.  Understood.  So my question, let's back up.
13  If he had not gone hands-on, he's already cycled the
14  Taser three times, so -- and there's no other
15  officers there to help him at this point.
16      A.  Right.
17      Q.  In fact, we're still probably 30 seconds
18  away from any officers showing up.  Which is a long
19  time in a fight, correct?
20      A.  Yes.
21      Q.  Can be an eternity in a fight, correct?
22      A.  Yes.
23      Q.  So if he would not have gone hands-on,
24  wouldn't his only other option have been to cycle the
25  Taser a fourth time?

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 150

1    A.  No.  There's other options.
2    Q.  Such as?
3    A.  Cap stun, baton.  None of these are going
4  to look good, but there's other options.
5    Q.  But, now, cap stun is not an option now, is
6  it?  Because you cannot per policy use cap stun and
7  ECD on the same suspect, can you?
8    A.  Well, you shouldn't.
9    Q.  Well, are we going to say that you are
10  going to recommend to this officer that he should?
11    A.  Well, I can't stop looking at his hand on
12  his wrist where he has his Taser in his other hand --
13    Q.  Okay.
14    A.  So that's not how we teach people.
15    Q.  Okay.  So if Ken did this and it wasn't
16  perfect, but it wasn't out of policy, would you have
17  preferred he did this or would you have preferred he
18  pull out his baton and start baton strikes?
19    A.  But the mistakes that Officer Lopera made
20  earlier led to this.  Now, by that I mean he didn't
21  let his partner know where he was going.  He didn't
22  get on the radio until he was already on the ground
23  and already had tased him and asked for a Code Red.
24    So what I would prefer to see him do would
25  be to call out he was in a foot pursuit on the radio

Page 151

1  and ask for a Code Red.  I don't know how much time
2  it took for him to catch up to him, but that could be
3  the 30 seconds we're looking for to get another
4  officer there.
5    So each mistake could be small, but when it
6  adds up it could be this is a better way to do this?
7  Is he outside of policy?  No.
8    Q.  These are the types of things that you hot
9  wash after the fact to make your officers better,
10  correct?
11    A.  Yes.  Exactly.
12    MR. LAGOMARSINO:  Form.
13  BY MR. MCNUTT:
14    Q.  But it doesn't mean they're liable for the
15  mistake, correct?
16    MR. LAGOMARSINO:  Form.
17    THE WITNESS:  Well, we don't determine
18  liability.
19  BY MR. MCNUTT:
20    Q.  But in this case, he's not -- up to this
21  point, 2:05, he's not even out of policy, correct?
22    MR. LAGOMARSINO:  Form.
23    THE WITNESS:  I haven't seen anything right
24  there.  He says that there was an attempted
25  carjacking.  The video certainly doesn't show that

Page 152

1  because to even see any interaction you have to see
2  the Venetian video with the truck and Tashii Farmer
3  and the driver.
4    So this catches up while he's already
5  backed away from the truck, Tashii Farmer.  Correct?
6  BY MR. MCNUTT:
7    Q.  I think -- we're a slightly different
8  interpretation, but I don't want to argue that
9  point.
10    A.  But my issue is the use of the Taser.  His
11  justification is an attempted carjacking, and I don't
12  see that.
13    Q.  Okay.
14    A.  So after that, if that is justified, based
15  on there is an attempted carjacking, then I have no
16  problems right now.
17    Q.  And Ken Lopera did see that.  Can you give
18  the benefit of the doubt to your officer?
19    MR. LAGOMARSINO:  Form.
20    THE WITNESS:  That's not what we do.
21  BY MR. MCNUTT:
22    Q.  Okay.  That's unfortunate.
23    MR. LAGOMARSINO:  Move to strike.
24    (Playing video.)
25

Page 153

1  BY MR. MCNUTT:
2    Q.  Do you hear that, "Okay.  Okay, sir"?
3    A.  Yes.
4    Q.  Okay.  Does that sound like Ken Lopera or
5  Tashii Farmer?
6    A.  I can't tell.
7    (Playing Video)
8    THE WITNESS:  I think he said "I will."
9  BY MR. MCNUTT:
10    Q.  I was just going to ask you about that.
11    So he said get on your stomach, and then
12  Tashii Farmer clearly said, "I will."
13    Going back to that, "Okay.  Okay, sir."  Do
14  you think that was Tashii?
15    A.  I think that was Tashii Farmer now.
16    Q.  You do?  Okay.  I'm going to play that
17  again because I don't think it is but you're
18  answering the question.
19    (Playing Video)
20    THE WITNESS:  He said, "I will.  I will."
21  BY MR. MCNUTT:
22    Q.  Is that "Okay, sir" --
23    A.  I think that's him.
24    Q.  Okay.  Fair enough.
25    (Playing Video)

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 154

BY MR. MCNUTT:
    Q.  Now, let's play it a little bit more.
       Now, you hear the tick, tick, tick, tick,
tick of the Taser, correct?  And the various phrases,
you understand it to be drive stun or is he still
cycling it?  What would you call that?
    A.  I think it sounds like he's cycling it
again.
    Q.  Now, did Tashii Farmer prone out in NMI,
neuromuscular incapacitation?
    A.  He didn't prone out, but it looked like he
was shaking.
    Q.  It looked like Tashii Farmer was shaking?
    A.  Yeah.  That's what it looked like to me.
    Q.  I'm not following you in terms of he was
shaking.  What does that...
    A.  When I watch the video --
    Q.  The whole thing is shaking.
    A.  When he was cycling it, he did not go to
the --
    Q.  The NMI?
    A.  The NMI that we're looking for, but it
looked like it was affecting him somewhat is my
point.
    Q.  I understand your answer now.  I didn't

Page 155

understand it prior to that.
       (Playing Video)
BY MR. MCNUTT:
    Q.  So did you hear the "help me out" that Ken
said?
    A.  Yes.
    Q.  And then we're going to start to see, see
the legs in the left side of the screen here?
    A.  Yes.
    Q.  And then you'll see other -- these officers
have testified that they're Venetian officers that
approach--
    A.  Venetian security?
    Q.  Yes, sir.  So we still don't have any Metro
officers.
    A.  Right.
    Q.  And Ken calls out for them to help.
       Do you think, is it common for law
enforcement officers to ask civilian security guards
for assistance?
    A.  Sure.
    Q.  In this circumstance where they're coming
from the Venetian?
    A.  Yes.
    Q.  So it was okay for Ken to ask for their

Page 156

assistance?
    A.  Sure.
    Q.  Now, is Ken on the hook for any of the
commands that they, the security guards, gave Tashii
that conflicted with his commands?
       MR. LAGOMARSINO:  Form.
       THE WITNESS:  Is he responsible for what
they say?
       MR. LAGOMARSINO:  Form.
BY MR. MCNUTT:
    Q.  Yes.
    A.  Well, he asked them for help, okay?  If you
ask someone for help, you need to tell them exactly
what you want them to do.  Which he didn't, that I
remember, communicate very well.
       And so that led to the conflicting
commands.
    Q.  So in the middle --
    A.  I think we're going to hear.
    Q.  In the middle of the fight, Ken didn't
supervise the Venetian security guards very well.
    A.  Well, "Help me.  Can you give me a hand?
Can you give me some help?"  Right?
    Q.  I think he said give me a hand here or
something like that.

Page 157

    A.  Whatever he said, you know, obviously,
we're looking back now, but I would prefer, hey, we
need to get cuffs on this guy.  Something to give
some kind of direction.
    Q.  But nothing he did was out of policy at
this point?
    A.  No.
       (Playing Video)
BY MR. MCNUTT:
    Q.  Now, at this point Ken Lopera is not in
physical contact, but one of the officers, the
security officers were, correct?
       MR. LAGOMARSINO:  Objection.  Form.
       THE WITNESS:  Correct.
BY MR. MCNUTT:
    Q.  And we're at 2:23?
       MR. LAGOMARSINO:  Form.
       THE WITNESS:  It sounds like he's cycling
again.
BY MR. MCNUTT:
    Q.  Can you tell from that -- and I can back it
up at any point and watch --
    A.  It doesn't look like the probes are working
like they were earlier.
       MR. LAGOMARSINO:  I'm just going to make an

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

Page 158

1  objection that at the point where it stopped, there's
2  no depiction of physical contact between the security
3  officer and Tashii Farmer.
4      MR. ANDERSON: That's correct. At the
5  point where it was stopped. The question was just
6  prior to that.
7      (Playing Video)
8  BY MR. MCNUTT:
9      Q. Do you hear that, "Okay, sir. Okay, sir"?
10     A. Yes.
11     Q. Who is that from?
12     A. I thought that was Tashii Farmer again.
13     Q. Okay.
14     (Playing Video)
15  BY MR. MCNUTT:
16     Q. So we're at 2:32.
17         And this is about the point where we
18  know -- well, according to Detective Alsup, this is
19  where he's holstering up the ECD. So I'm going to
20  back it up so you can see.
21         Let me ask you if you can see that. We're
22  at 2:24.
23         Tell me when he holsters up the ECD.
24     (Playing Video)
25

Page 159

1  BY MR. MCNUTT:
2      Q. So I just stopped it at 2:31. Can you see
3  Tashii Farmer's hands?
4      A. Yes.
5      Q. What are his hands doing?
6      A. They're moving around behind his back.
7      Q. Are his hands being restrained?
8      A. No.
9      Q. And is that -- are they behind his back or
10  in front of him?
11     A. I don't know. It's kind of blurry right
12  there, but it looks like they were behind his back
13  and they've moved now to the side. I don't know.
14     Q. Now, tell me if at any point -- how would
15  you describe this resistance?
16     A. To me that's still active because this is
17  common for people that don't want to be handcuffed.
18  He just doesn't want to get the handcuffs on, and
19  he's moving his hands so you can't handcuff him.
20     (Playing Video)
21  BY MR. MCNUTT:
22     Q. Do you see Tashii Farmer's hand in the
23  video?
24     A. No. Right now where you've got it stopped
25  I don't see it.

Page 160

1      Q. It's 2:33, and I'm going to point it over
2  Ken Lopera's collar.
3      A. Okay.
4      Q. Do you see that? And do you see his thumb?
5  So this is clearly his right hand, correct?
6      A. Okay.
7      (Playing Video)
8  BY MR. MCNUTT:
9      Q. Did you hear that strike?
10         MR. LAGOMARSINO: Objection. Form.
11         THE WITNESS: I heard something that
12  sounded like a strike, but I didn't see it on the
13  video.
14  BY MR. MCNUTT:
15     Q. What do you think it was?
16         MR. LAGOMARSINO: Objection. Form.
17         THE WITNESS: I don't know.
18  BY MR. MCNUTT:
19     Q. What do you think could have made that
20  sound?
21         MR. LAGOMARSINO: Same objection.
22         THE WITNESS: I don't know. I'm guessing.
23  BY MR. MCNUTT:
24     Q. Do you know who Detective Casey Kirkegard
25  is?

Page 161

1      A. Yes. From CIRT.
2      Q. Yeah. I asked her that question. She said
3  it was the wind. That's what she said.
4      A. Well, I don't think it was the wind.
5      Q. Do you think it would have been Tashii
6  Farmer punching Ken Lopera?
7         MR. LAGOMARSINO: Form.
8         THE WITNESS: It could have been. But it
9  could have been Ken Lopera or one of the security
10  guards punching someone.
11  BY MR. MCNUTT:
12     Q. Okay.
13     A. It sounds like something hitting clothing.
14     Q. And something hitting clothing that the
15  body-worn cam mic picked up, correct?
16     A. Yes.
17     Q. So were you ever a detective?
18     A. Yes.
19     Q. So would that imply to you that the strike
20  landed near the body-worn cam mic?
21         MR. LAGOMARSINO: Form.
22         THE WITNESS: No, you can't tell.
23  BY MR. MCNUTT:
24     Q. But we know Tashii Farmer's right hand was
25  free in those seconds.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

---

Page 162

1          MR. LAGOMARSINO: Objection. Form.
2  BY MR. MCNUTT:
3       Q.  Isn't that true?
4       A.  Well, we saw it on video that it was free,
5  but it doesn't show it coming towards Lopera or
6  any -- I mean, I can't evaluate just the noise.
7       Q.  But don't we always evaluate partial
8  evidence?  Isn't that what we call circumstantial
9  evidence?
10         MR. LAGOMARSINO: Form.
11  BY MR. MCNUTT:
12      Q.  I grant you that we don't have a freeze
13  frame of Tashii Farmer punching Ken Lopera, but we
14  see his hand free and then we hear a strike hit Ken
15  Lopera's body-worn cam.
16      A.  I can't go that far and guess that.
17         (Playing Video)
18  BY MR. MCNUTT:
19      Q.  So do you see how the body -- the camera is
20  very shaky and moving around?
21      A.  Yes.
22      Q.  Does that imply to you that Tashii Farmer
23  is complying with Ken Lopera's commands to get on his
24  stomach and stay still?
25      A.  The only thing it implies to me is Ken

---

Page 163

1  Lopera is moving his arm.
2       Q.  Okay.  Why his arm?  What do you mean?
3       A.  Because his body camera is attached to his
4  lapel on his shoulder.
5       Q.  How many officers participated in
6  handcuffing Tashii Farmer?
7       A.  I believe four.
8       Q.  Based upon that fact alone, do you think
9  Tashii Farmer was resisting throughout the
10  handcuffing process?
11      A.  Was he resisting being handcuffed?  Yes.
12      Q.  Is it possible that what we saw at around
13  2:34 was a strike by Tashii Farmer?
14      A.  Is it possible?
15      Q.  Yes.
16      A.  Yes.
17      Q.  And if so, wouldn't that mean that it
18  was aggravated aggressive resistance, per the
19  definition?
20      A.  Yeah.  I guess if that is what he's
21  saying.
22      Q.  And coupled with the fact that Ken Lopera
23  said in his CIRT statement that Tashii Farmer was
24  reaching to grab his Taser out of his holster?
25      A.  Well, I definitely can't see that.

---

Page 164

1       Q.  I didn't ask you if you could see it.  I
2  just said coupled with the fact that that's what Ken
3  said in his CIRT statement.
4       A.  Yeah.  I can only go by what I see.  And
5  that was, you know, this is all things that we looked
6  at and talked about.
7         You know, the officer has a perception and
8  he reports what he saw and what he did for use of
9  force and it has to be justified.
10         Now, what I see is someone that doesn't
11  want to be handcuffed.  He may or may not have thrown
12  one punch, but he still is resisting his hands being
13  placed behind his back, which is not to me aggressive
14  resistance.  It's someone who doesn't want to be
15  handcuffed, which we see almost all the time.
16      Q.  So let's go with one hypothetical that
17  there was no aggressive resistance whatsoever.
18  There's just active resistance, correct?
19      A.  Right.
20      Q.  Was -- all of Ken's use of force up to this
21  point was within policy, correct?
22         MR. LAGOMARSINO: Objection.  Form.
23         THE WITNESS:  If you also agree that the
24  Taser was justified -- first of all, no.  Because the
25  Taser cycles were too many compared to the three it

---

Page 165

1  should have been.  He should have holstered his Taser
2  and went completely hands-on with both hands.
3  BY MR. MCNUTT:
4       Q.  But --
5       A.  Instead of continued to use the Taser,
6  which for the most part the extra cycles appeared
7  like it didn't work like the first three.
8         So why would he keep doing it?
9       Q.  He was in the heat of the moment and --
10      A.  Right.
11      Q.  -- and sympathetic response --
12      A.  Right.  If that was all that happened, then
13  he would get some retraining.
14      Q.  So assuming we're just in active resistance
15  here, and Ken Lopera is about to employ the LVNR or
16  some form of a neck restraint, correct?  The LVNR is
17  authorized in this low level use of force for active
18  resistance, correct?  At that time?
19      A.  At that time, yes.
20      Q.  Do you know the policy, if it's per Metro
21  policy, for the officer employing the LVNR to keep
22  the encircling arm in place until the suspect is
23  handcuffed?
24      A.  Yes.
25      Q.  So if Ken Lopera in the video has his

---

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

43 (Pages 166 to 169)

Page 166

1  encircling arm around Tashii Farmer's neck, and as
2  you testified earlier, we don't know how much, if
3  any, pressure was being applied, but he's authorized
4  and per Metro policy to keep that in place until
5  Tashii Farmer is in handcuffs, correct?
6      A.  That's what policy says.
7      Q.  Okay.  And do you know if he did that in
8  this case?
9      A.  Did he do that or did he get handcuffed?
10     Q.  No.  Did Ken Lopera keep his encircling arm
11 in place until Tashii Farmer was handcuffed?
12     A.  Yes.
13         MR. MCNUTT:  Andre, let me look at my
14 notes, but I'll turn you over to him for any
15 follow-up, and then I may have one or two to finish
16 out.
17         MR. ANDERSON:  I have about ten minutes.
18 I'll go before Andre.
19         MR. MCNUTT:  Thank you for your time.
20         THE WITNESS:  No problem.
21         THE VIDEOGRAPHER:  The time is
22 approximately 2:48 p.m.  We are going off the
23 record.
24         (A recess was taken from 2:48 p.m.
25          to 2:50 p.m.)

Page 167

1          THE VIDEOGRAPHER:  The time is
2  approximately 2:50 p.m.  We're back on the record.
3
4          EXAMINATION
5  BY MR. ANDERSON:
6      Q.  Chief McGrath, I just want to follow up on
7  some testimony that you just gave to Mr. McNutt.
8          You stated that it's policy that when an
9  LVNR or neck restraint is being performed that it's
10 policy to keep the encircling arm in place until
11 handcuffing is complete, correct?
12     A.  Yes.
13     Q.  You also testified earlier that from your
14 watching of the video, you could not tell at any time
15 how much pressure, if any, Lopera was applying to
16 Mr. Farmer's neck; is that correct?
17     A.  Correct.
18     Q.  Based upon your training and experience and
19 your review of this case, when Officer Crumrine first
20 arrived, would he have been able to tell how much
21 pressure, if any, Officer Lopera was applying to
22 Mr. Farmer's neck?
23         MR. LAGOMARSINO:  Form.
24         THE WITNESS:  No.  He could not.  I could
25 not tell.

Page 168

1  BY MR. ANDERSON:
2      Q.  In your experience as an officer, should
3  Crumrine have been able to tell how much pressure was
4  being applied to the neck?
5      A.  If it was applied correctly, he should be
6  able to tell.
7      Q.  Is it possible that the encircling arm was
8  just in the area of the neck and not applying any
9  pressure?
10     A.  Yes.
11     Q.  When Sergeant Crumrine arrived, what should
12 have been his initial focus?  What should have been
13 his first goal with respect to Mr. Farmer?
14     A.  The -- he should be ensuring the tactics
15 used by the officers are effective.  And if not,
16 change tactics.
17     Q.  And you've talked about Metro has a policy
18 with respect to duty to intervene, correct?
19     A.  Yes.
20     Q.  Is giving verbal commands a form of
21 intervention?
22     A.  Yes.
23     Q.  Is going hands-on to assist with
24 handcuffing a form of intervention?
25     A.  Yes.

Page 169

1      Q.  Did Sergeant Crumrine give verbal commands?
2      A.  I'm sorry, I was moving.
3      Q.  You're fine.  Did Sergeant Crumrine give
4  verbal commands to Officer Lopera?
5      A.  Yes.
6      Q.  Did Sergeant Crumrine go hands-on and
7  attempt to facilitate handcuffing?
8      A.  Yes.
9      Q.  Do you agree in this case that Sergeant
10 Crumrine actually intervened?
11     A.  He did some intervention.  I wish he would
12 have done more.
13     Q.  Why do you wish he would have done more?
14     A.  Because we expect more of our supervisors.
15     Q.  Were you holding Sergeant Crumrine to a
16 higher standard than, say, Officer Tran and Flores?
17     A.  Yes.
18     Q.  And is that based upon Las Vegas
19 Metropolitan Police Department's policies?
20     A.  Well, it's based on several things.  First
21 of all, Officer Tran and Flores were on different
22 parts of Officer Farmer (sic), and they're focused
23 on what they're doing to get him in custody.  And
24 Officer -- Sergeant Crumrine is seeing the overall
25 use of force, and so he should take charge of

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

44 (Pages 170 to 173)

Page 170

1  that scene and start directing people of what to
2  do.
3      Q.  So your criticisms of Sergeant Crumrine are
4  based upon his actions as a supervisor and not as a
5  regular officer?
6      A.  That's correct.
7      Q.  If you were evaluating him as a regular
8  officer, would you believe that he intervened in this
9  case?
10     A.  Yes.
11     Q.  And did you believe that Tran and Flores
12 intervened by facilitating handcuffing?
13     A.  Yes.
14     Q.  Then you were asked a question earlier by
15 Mr. Lagomarsino where you said at some point you
16 would like to -- you would like to see an officer
17 physically pry the arms off the neck of the suspect;
18 is that fair?
19     A.  Yes.
20     Q.  Okay.  Would an officer ever pry the arms
21 off the neck of a suspect before handcuffing was
22 complete?
23     A.  On an LVNR?
24     Q.  On an LVNR, yes.
25     A.  Probably not.

Page 171

1      Q.  Would you want the suspect to be handcuffed
2  before you took any physical intervention against
3  another officer?
4      A.  Yes.
5      Q.  In your review of the evidence in this case
6  in your role in the use of force or in tactical
7  board, when Sergeant Crumrine arrived, did he have
8  any information that would have led him to believe
9  that excessive force was being used based upon what
10 he perceived?
11     A.  No.
12     Q.  When Sergeant Crumrine and Officers Flores
13 and Tran arrived, would they have been justified in
14 believing that Ken Lopera was using reasonable
15 force?
16     A.  Yes.
17     Q.  So it's reasonable for an officer to assume
18 that other officers have acted reasonably prior to
19 their arrival?
20     A.  Yes.
21     MR. ANDERSON:  I have nothing further.
22     THE WITNESS:  Very efficient.
23     MR. ANDERSON:  Thank you.
24     (Exhibit 10 was marked for
25     identification.)

Page 172

1              FURTHER EXAMINATION
2  BY MR. LAGOMARSINO:
3      Q.  These are crime scene photos that were
4  taken by Metro after the fact, starting with LVMPD
5  2254 and going all the way through and inclusive of
6  2273.
7         These pictures appear to be mostly from the
8  back of the house but around the Coffee Bean & Tea
9  Leaf where the initial interaction occurred; is that
10 correct?
11     A.  Yes.
12     Q.  Do you see anywhere in these almost 20
13 pictures where it says that that's a restricted area
14 or that it's employee only?
15     A.  No.
16     (Exhibit 11 was marked for
17     identification.)
18 BY MR. LAGOMARSINO:
19     Q.  I'm handing you some photos that were taken
20 after the fact of Officer Lopera's Taser.  They're
21 Bates for the record 2309, 2310 and 2311.
22        I'll have you look at 2310.  What does 2310
23 depict?
24     A.  The sticker that's on the Taser.
25     Q.  And it has a warning in capital letters

Page 173

1  with an exclamation point in orange and yellow,
2  correct?
3      A.  Yes.
4      Q.  And is one of the warnings that the Taser
5  can cause death or serious injury?
6      A.  No.  Unless I'm missing it.
7      Q.  Go to the second bullet down.  So I'll
8  reask the question.
9      A.  Under warning?
10     Q.  Under warning does it say that --
11     A.  Oh, there it is.
12     Q.  -- it can cause death --
13     A.  It can cause death or serious injury.
14     Q.  It says that on the warning, correct?
15     A.  Yes.
16     Q.  Do you believe that warning to be false?
17     MR. ANDERSON:  Objection.  Form.
18     THE WITNESS:  Do I believe it to be false?
19 No.
20 BY MR. LAGOMARSINO:
21     Q.  So in certain situations, the use of a
22 Taser apparently can be considered deadly force?  Let
23 me rephrase.
24        I'm not saying how Metro characterizes or
25 classifies deadly force.  I'm just saying in everyday

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

Page 174

1  terms, can a Taser kill somebody?
2      A.  With other factors, yes.
3      Q.  So let's talk about those.  So if somebody
4  is perceived to be high on illegal drugs, could that
5  enhance the risk of death?
6      A.  I would think so.  I don't know for sure.
7      Q.  There was some discussion earlier about
8  what Lopera may or may not have perceived in terms of
9  Farmer being allegedly under the influence, was the
10  words he used.
11         Does using the LVNR on somebody who is
12  under the influence of drugs present a heightened
13  risk of death or serious injury?
14      A.  Not that I'm aware of.
15      Q.  Now, even though Metro does not classify
16  the LVNR as a deadly force option, if used
17  incorrectly, the incorrect use of an LVNR can kill
18  somebody, correct?
19         MR. ANDERSON:  Objection.  Form.
20         THE WITNESS:  Yeah, I'm not sure if Taser
21  has been responsible for those deaths, but people who
22  have been tased have died.
23  BY MR. LAGOMARSINO:
24      Q.  And let me rephrase the question.
25         Let's talk about the LVNR.

Page 175

1      A.  Okay.
2      Q.  An LVNR can kill somebody if it's applied
3  incorrectly, correct?
4         MR. ANDERSON:  Objection.  Form.
5         THE WITNESS:  That's correct.  But then
6  it's not an LVNR.
7  BY MR. LAGOMARSINO:
8      Q.  Well, I mean, even if you correctly
9  applied -- strike that.
10         Even if you apply an LVNR in the proper
11  position with the hands locked, if that LVNR is held
12  too long, that could kill somebody, correct?
13      A.  I'm not aware of that.  But when someone's
14  rendered unconscious, they should be released from
15  that hold.
16      Q.  And to that point, you're getting a lot of
17  questions today from all the lawyers admittedly in a
18  vacuum, right?
19      A.  Yes.
20      Q.  You've got to look at the entire case.  So
21  the question was asked, do you release the LVNR
22  before you handcuff, right?  But there wasn't a fact
23  thrown in there so let me ask you this question:  If
24  you've got somebody in a restraint or an LVNR for
25  over a minute and they appear to be unconscious, do

Page 176

1  you release them even though they're not handcuffed?
2      A.  So the only factor you're leaving out is
3  the other officers that are there at that point.
4  Someone should say whether that person is
5  unconscious.  And if they are unconscious, it should
6  be very easy to handcuff them.
7         So yes, if people are unconscious, you can
8  release that hold and handcuff them.
9         However, multiple -- we do train that the
10  second or third officer does the handcuffing while
11  the first officer is in the LVNR.
12      Q.  Right.  And you were presented with various
13  clips today.  But you have not done, recently at
14  least or in your memory, an analysis of what the
15  officers there said to Lopera in terms of him being
16  out -- when I say him, Tashii Farmer, being out or
17  unconscious.  You haven't done that analysis today,
18  correct?
19      A.  No.
20      Q.  So if they're saying about a minute in he's
21  out, let him go, that would appear to you to mean
22  that he's out and he should be let go, correct?
23      A.  Yes.
24      Q.  Today you were asked questions about
25  methamphetamine being in Tashii Farmer's system, and

Page 177

1  the only phrase that I heard being used was under the
2  influence.  But let's just talk about under the
3  influence.
4         Are you equating under the influence with
5  in his system, or are you saying that he was drunk on
6  meth basically?
7      A.  It's hard for me to answer your question
8  without putting this whole case in perspective
9  because Lopera said he thought he was under the
10  influence.  Now we know it was under meth because
11  we've got the toxicology back.
12         So it's up to that officer to articulate
13  why he thought he was under the influence.
14      Q.  Okay.
15      A.  So we are somewhat now knowing that it was
16  meth.  So it's like cheating.
17      Q.  But are you saying he was under the
18  influence or it was in his system?
19         MR. MCNUTT:  Objection.  Form.
20         THE WITNESS:  Yeah, I don't know what the
21  difference is.  If it's in his system, he's under the
22  influence.  The amount would cause a greater evidence
23  that you could tell, but there are drugs that stay in
24  your system for a long time.
25

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 178

BY MR. LAGOMARSINO:
Q. Just so we get our bearings, if somebody has a beer and alcohol is in their system, do you consider them to be under the influence?
A. They're yes, under the influence, but there's nothing that you could say -- in other words, you're under the influence but you haven't reached the illegal point for your driving.
Q. Now, there was some testimony about Officer Lopera talking to CIRT and giving a statement and then not speaking at the use of force board.
Did Officer Lopera, to your understanding, invoke his Fifth Amendment right against self-incrimination by not testifying at the use of force board?
A. I don't know his reason for not testifying. And I wasn't involved in those discussions. But I assume that's it because the criminal case was still ongoing.
Q. Okay. Officer Lopera and his lawyers have hired an expert that characterized Officer Lopera's conduct as compassionate.
Do you characterize Officer Lopera's conduct as compassionate?
MR. MCNUTT: Objection. Form.

Page 179

THE WITNESS: No.
BY MR. LAGOMARSINO:
Q. Now, you've heard a number of questions about was there a right to detain him and did he comply and could he have chased him. I'm not going to ask about that. I'm going to ask some very simple questions.
Does the right to detain a suspect equate to the right to inflict excessive force on that suspect?
MR. MCNUTT: Objection. Form.
THE WITNESS: There's no right to inflict excessive force for any reason.
BY MR. LAGOMARSINO:
Q. There were some questions before you watched the video earlier in Mr. McNutt's questioning where it was asked of you on the body cam video did Lopera say "stop." I just want to make sure we're clear for the record. And you said yes. I just want to make sure you're talking about he used the word "stop" out in the driving area, not in the stairwell or in the Venetian, that we can tell?
A. Yes. You're right. I didn't see it anywhere until he got through -- out of the Venetian building.

Page 180

Q. Based probably -- well, based on the evidence that we have in front of us, you've never heard any testimony or seen any evidence that Officer Lopera said stop to Tashii Farmer before they got to the driving area; is that correct?
A. That's correct.
Q. And the mere fact that a suspect may not be complying with a command does not necessarily equate to a use of force greater than what's allowed under the use of force continuum; is that correct?
A. That's correct.
Q. Does a suspect who is being tased who is saying, "okay, I will," and "okay, sir," indicate compliance to you?
A. Well, verbally he's saying that he's going to comply. And I believe that's what CIRT meant when they said they didn't give him enough opportunity to comply.
Q. Because I think your testimony was Lopera's commands taken as a whole and not in two-second clips were very confusing, correct?
MR. MCNUTT: Objection. Form.
THE WITNESS: So there were some confusing commands and there was some quick cycles of the ECD that not only I thought, but the rest of the board

Page 181

who reviewed the case thought was excessive.
BY MR. LAGOMARSINO:
Q. I wanted to clarify on the issue of the strikes. Were you saying that it was unclear that the 10 to 12 strikes completely missed Farmer, or that you're just not clear on where they hit Farmer?
A. I'm not clear the definition of a strike. Is a strike a punch thrown or a punch connecting? So if you're saying there was 10 to 12 punches thrown, I agree. If you're saying 10 to 12 strikes, I don't see it on the video. I can't tell how many hit and how many missed.
Q. Have you -- strike that.
Detective Alsup testified that he did a frame-by-frame review of the video to assess the number of strikes. Did you do a frame-by-frame review of the video?
A. I did not, but CIRT presented it frame by frame. But when I watched the video realtime, I don't see that many strikes hitting him.
Q. Okay. Did you, as part of your review, assess the autopsy photos that would show bruising on different parts of Tashii Farmer's body?
A. Yes.
Q. I'll give you a hypothetical, all right?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

47 (Pages 182 to 185)

Page 182

1    If you have a suspect who is observed to be
2  unconscious after a period of time in the LVNR, and
3  the officer is not releasing the LVNR despite being
4  told to do so, does it satisfy the duty to intervene
5  by simply saying "stop" and not doing anything else?
6    MR. MCNUTT: Objection. Form.
7    MR. ANDERSON: Objection. Form.
8    THE WITNESS: So we would prefer that
9  officers stopped when they were told to. And if they
10  don't stop and the use of force is excessive, we
11  expect officers to intervene physically to stop them.
12  And not just on the LVNR. If someone was punching
13  someone and they didn't stop, you wouldn't just let
14  them keep punching them. You would grab them.
15  BY MR. LAGOMARSINO:
16    Q. Now, there was some testimony about whether
17  you could tell if Lopera was rear-naked choking or
18  LVNRing. Okay?
19    However, on the body-worn camera, Lopera
20  used both terms. He said that he choked him out,
21  correct?
22    A. Yes.
23    Q. And he also said that, "I rear-naked his
24  ass," correct?
25    A. Yes.

Page 183

1    Q. And that's part of all the evidence that
2  you have to consider, correct?
3    A. Yes.
4    Q. And if a suspect is passed out or
5  unconscious, does that indicate that there was
6  pressure being applied to his neck?
7    MR. ANDERSON: Objection. Form.
8  BY MR. LAGOMARSINO:
9    Q. To you?
10    A. While someone's applying the LVNR?
11    Q. Or the restraint, either one, yeah.
12    A. Yes.
13    MR. LAGOMARSINO: No further questions.
14    MR. MCNUTT: I just have a couple of
15  questions.
16
17    FURTHER EXAMINATION
18  BY MR. MCNUTT:
19    Q. You gave another deposition about these
20  same events in the case we referred to as the
21  Estate of Tashii Farmer versus Las Vegas Metro,
22  correct?
23    A. Yes.
24    Q. And that deposition was December 27th,
25  2017, correct?

Page 184

1    A. Yes.
2    Q. Did you have a chance to review the
3  transcript of that deposition after you gave the
4  deposition?
5    A. Yes. This morning.
6    Q. You reviewed it again this morning?
7    A. Yes.
8    Q. Do you have any changes that you would make
9  to that deposition transcript?
10    A. Nothing other than what I talked about
11  today, which was I don't have a bureau that was
12  assigned to me that was assigned then.
13    Q. Understood.
14    Do you have any data which indicates that
15  civilians are confused that officers that wear the
16  green uniforms don't recognize those individuals to
17  be law enforcement officers?
18    A. No.
19    Q. When you watched Ken Lopera's body-worn cam
20  at any time and after Tashii Farmer fled down the
21  employee-area hallway, did you see any other patrons
22  in those hallways?
23    A. No.
24    Q. Was Tashii Farmer in view when Ken Lopera
25  was running through the hallways and the stairwells?

Page 185

1    A. No. He lost view of him.
2    Q. Right. So there was a question about did
3  Ken Lopera give a command for Tashii Farmer to stop.
4  Do you typically yell for someone to stop when you
5  can't see them?
6    A. Not typically.
7    Q. With respect to a suspect's hands versus
8  what they're saying, which matters more to you, what
9  they're doing with their hands or what they're saying
10  with their mouth in terms of compliance?
11    A. What they're doing.
12    Q. With their hands, correct?
13    A. Yes.
14    Q. What's the definition of "excessive force"?
15    MR. ANDERSON: Objection. Form.
16  BY MR. MCNUTT:
17    Q. Roughly. Paraphrasing.
18    A. Excessive force is the force applied that
19  is outside of policy in excess of what is required
20  to gain compliance. That's off the top of my head.
21    Q. Sounds good. At what point in these
22  events did Las Vegas Metro gain compliance of
23  Tashii Farmer?
24    A. At what point did we gain compliance?
25    Q. From Tashii Farmer.

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

48  (Pages 186 to 189)

---

Page 186

1    A.  At some point when he was on the ground
2  being LVNR'd.
3    Q.  Okay.  I don't know that we marked it, but
4  it was the arrest report.  Is that Exhibit B?  Could
5  you please -- and turn to page 5 of 8.
6    A.  Yes.
7    Q.  Do you see where, what you recognize the
8  numbers along the side to be the timestamp from the
9  body-worn cam.  That's what Detective Alsup testified
10  to, correct?  Or do you know that?
11    A.  I'm sorry, can you --
12    Q.  Detective Alsup said --
13    A.  I was reading your --
14    Q.  That's okay.  Detective Alsup put the
15  timestamps from the body-worn cam down the left side
16  in the column.
17    A.  I see it.
18    Q.  So if you go down to three minutes and one
19  second, Sergeant Crumrine arrived and said, "Put your
20  hands behind your back."
21    Do you see that?
22    A.  Yes.
23    Q.  3:13 Officer Lopera says, "Is he out yet?"
24  3:15 Farmer gasps.  3:18 Lopera asked, "Is he out
25  yet?"  3:19 Officer Lopera asked, "Is he out yet?"

---

Page 187

1    At any point up to 3:19, and take a minute
2  and review the prior pages if you want, has Officer
3  Lopera been told by any other Metro officer to
4  release the hold or do anything different to
5  Tashii Farmer?
6    A.  No.
7    Q.  Where is the first time Ken Lopera is given
8  a command to do something different?
9    A.  Well, at 3:25 Officer Tran says, "Let him
10  go."
11    Q.  And we now understand that that actually
12  wasn't Officer Tran, that was Officer Crumrine.
13  That's been their testimony.
14    And then one second later Lopera says,
15  "Are you sure?"  And Tran or Crumrine replies,
16  "Yeah."
17    Do you see that?
18    A.  Yes.
19    Q.  Do you think that one second, assuming
20  that's accurate, is too long of a delay for Ken
21  Lopera to respond to the command to let him go?
22    A.  Do I think one second is too long?  No.
23    MR. MCNUTT:  No further questions.
24    MR. ANDERSON:  I just have about three.
25  I'll be quick.

---

Page 188

1    FURTHER EXAMINATION
2  BY MR. ANDERSON:
3    Q.  Chief McGrath, do you agree that once
4  handcuffing was completed, all force stopped by all
5  the officers?
6    A.  Yes.
7    Q.  So if an officer during the handcuffing
8  process were to issue a command to loosen up or to
9  let him go to Officer Lopera, you would expect -- or
10  you would hope Officer Lopera would follow that
11  command, correct?
12    A.  Yes.
13    Q.  Would it be reasonable for that officer to
14  assume while they're still intending to handcuff the
15  suspect that Officer Lopera did hear the command and
16  did, quote, loosen up or, quote, let him go by
17  releasing the pressure but not releasing the
18  encircling arm?
19    A.  Yes.
20    Q.  In fact, it would be policy that he would
21  keep the encircling arm around the neck, correct?
22    A.  Yes.
23    Q.  So it's justifiable for an officer who
24  gives a command to loosen up or let go to
25  assume that Officer Lopera followed that command,

---

Page 189

1  despite the fact his encircling arm was still on the
2  neck?
3    A.  Yes.
4    MR. ANDERSON:  Okay.  Thank you.  No
5  further questions.
6
7    FURTHER EXAMINATION
8  BY MR. LAGOMARSINO:
9    Q.  Just a couple more.
10    The question was asked did Officer Lopera
11  see Farmer in the context of calling out for him to
12  stop.
13    Do you remember that?
14    A.  Yes.
15    MR. MCNUTT:  In the hallway.
16    MR. LAGOMARSINO:  In the hallway.
17  BY MR. LAGOMARSINO:
18    Q.  Did you -- did you see Officer Lif present
19  in the hallway --
20    A.  No.
21    Q.  -- when he yelled out for Officer Lif?
22    A.  No.  Officer Lif didn't follow him in the
23  hallway.
24    Q.  In terms of what's written here on the page
25  about who said what --

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

49 (Pages 190 to 193)

Page 190

1    A.  Yes.
2    Q.  -- would you defer to the video, an
3  analysis of the video, or would you defer to the
4  page?
5    A.  Well, I would hope that this page reflects
6  what's in the video.
7    Q.  But if the video depicts other statements
8  that are made, and they happened not to be here,
9  would you defer to the video?
10    MR. McNUTT:  Objection.  Form.
11    THE WITNESS:  Yes.
12  BY MR. LAGOMARSINO:
13    Q.  If somebody has been placed in an LVNR or
14  neck restraint and they're released, and they're
15  unconscious, and they're not reviving, would you
16  expect your officers to immediately start providing
17  medical attention?
18    MR. McNUTT:  Objection.  Form.
19    MR. ANDERSON:  Join.
20    THE WITNESS:  They should attempt to render
21  medical aid.  But they are required to call for
22  medical.
23    MR. LAGOMARSINO:  No further questions.
24    THE VIDEOGRAPHER:  This concludes the video
25  deposition of Deputy Chief John McGrath.

Page 191

1    The original media of today's testimony
2  will remain in the custody of Las Vegas Legal
3  Video.
4    The time is approximately 3:21 p.m. and we
5  are going off the record.
6    -  -  -
7    (The videotaped deposition was
8  concluded at 3:21 p.m.)
9    -  -  -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 192

1    CERTIFICATE OF DEPONENT
2  PAGE   LINE   CHANGE        REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18    * * * * *
19    I, DEPUTY CHIEF JOHN MCGRATH, deponent herein,
   do hereby certify and declare under penalty of
20  perjury the within and foregoing transcription to be
   my deposition in said action; that I have read,
21  corrected and do hereby affix my signature to said
   deposition.
22
23    _____
   DEPUTY CHIEF JOHN MCGRATH
   Deponent
24
25

Page 193

1    CERTIFICATE OF REPORTER
2    I, the undersigned, a Certified Shorthand
3  Reporter of the State of Nevada, do hereby certify:
4    That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given to the best of my
12  ability.
13    Further, that before completion of the
14  proceedings, review of the transcript [X] was
15  [  ] was not requested pursuant to NRCP 30(e).
16    I further certify I am neither financially
17  interested in the action, nor a relative or employee
18  of any attorney or party to this action.
19    IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21
22    Dated:  August 13, 2019
23
24    _____
25    GALE SALERNO, RMR, CCR #542

All-American Court Reporters (702) 240-4393
www.aacrlv.com