# EXHIBIT 2
# Excerpts from Ashley Lif Deposition, Vol. II, 4/4/19

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 1

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3

4

5    TRINITA FARMER, individually, )
                                   )
6              Plaintiff,          ) Case No.
                                   ) 2:18-cv-00860-GMN-VCF
7          vs.                     )
                                   )
8    LAS VEGAS METROPOLITAN POLICE )
     DEPARTMENT, a subdivision of  )      **CONDENSED**
9    the STATE OF NEVADA; KENNETH  )      **TRANSCRIPT**
     LOPERA, individually; TRAVIS  )
10   CRUMRINE, individually;       )
     MICHAEL TRAN, individually;   )
11   MICHAEL FLORES, individually, )
                                   )
12             Defendants.         )
     _____)
13

14

15     VIDEOTAPED DEPOSITION OF OFFICER ASHLEY LIF

16        Taken on Thursday, April 4, 2019

17              At 10:07 a.m.

18        3005 West Horizon Ridge Parkway

19                Suite 241

20             Henderson, Nevada

21

22

23

24

25   Reported by:  Cynthia K. DuRivage, CCR No. 451

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 6

1     Q.  All right.  You understand you're under
2  oath today?
3     A.  Yes.
4     Q.  And it's very important that you understand
5  all the questions today.  If you don't understand a
6  question, please let me know, I'll be happy to
7  rephrase.
8     A.  Yes.
9     Q.  We have a videographer here today, but the
10  official record is that of the court reporter.
11  Excuse me.  It's very difficult for the court
12  reporter to take down two people talking at once, so
13  I'd ask that you allow me to finish my questions, and
14  I'll try my best to allow you to finish your answers.
15     Is that right?
16     A.  Yes.
17     Q.  If at some point, I say is that a "Yes" or
18  is that a "No," I'm not trying to be rude, I'm just
19  trying to make sure that we have a clear record.
20     Okay?
21     A.  Yes.
22     Q.  All right.  Do you know the difference
23  between an estimate and a guess?
24     A.  No.
25     Q.  Okay.  Sometimes it's different in real

Page 7

1  life, as it is in, I guess, the deposition world, but
2  you know, if I asked you to give me an estimate of
3  the length of this table, you could tell me; but if I
4  asked you to tell me how long my desk was in my
5  office, you haven't been in there, so you'd be
6  guessing.
7     So you're allowed to estimate, we just
8  don't want you to guess today.  Okay?
9     A.  Yes.
10     Q.  At the conclusion of this deposition,
11  you'll have an opportunity to review your testimony
12  and make any changes.
13     It is very common for people to make
14  changes to spelling and things of a minor nature, but
15  if you make a change to an important question and
16  answer, we'll have an opportunity to comment on your
17  credibility at time of trial.
18     Do you understand?
19     A.  Yes.
20     Q.  Do you have any questions for me before we
21  begin?
22     A.  No.
23     Q.  What is your current occupation?
24     A.  Police officer with Las Vegas Metropolitan
25  Police Department.

Page 8

1     Q.  When were you hired?
2     A.  July of 2015.
3     Q.  Were you in the military?
4     A.  Yes.
5     Q.  Are you still in the military?
6     A.  Yes.
7     Q.  Are you on a Reserve status?
8     A.  Yes.
9     Q.  Thank you for your service.
10     When did you first join the military?
11     A.  I believe it was August 2013.
12     Q.  And what branch?
13     A.  Army Reserve.
14     Q.  Can you briefly tell me the extent of your
15  education.
16     A.  I have a Bachelor's in criminal intel from
17  Mercer Hearst University in Erie, Pennsylvania, and I
18  have a Master's in intelligence analysis in
19  terrorism.
20     Q.  From the same university?
21     A.  From American Military University.  It's a
22  public university.
23     Q.  Where are you from originally?
24     A.  Cheyenne, Wyoming.
25     Q.  When did you move to Las Vegas?

Page 9

1     A.  2005.
2     Q.  And what brought you to Vegas?
3     A.  I ran track at UNLV.  I never graduated
4  from there, though.
5     Q.  Have you ever run cross country?
6     A.  Yes.
7     Q.  Were you involved in an incident with
8  Kenneth Lopera on or about May 14th, 2017 and Tashii
9  Farmer?
10     A.  Yes.
11     Q.  Do you remember giving a couple statements
12  in this case?
13     A.  Yes.
14     Q.  What was the first statement that you gave?
15     A.  I believe it was that night as a witness
16  officer for FIT.
17     Q.  And what is your understanding of what FIT
18  is?
19     A.  It's an acronym for the force investigation
20  team, to my understanding.  It's the branch of, I
21  believe, the office of internal oversight that
22  oversees like a criminal, I guess, aspect.
23     Q.  Do you remember where you gave the
24  statement?
25     A.  I believe it was just outside of the

# Officer Ashley Lif ~ April 4, 2019
## * * * Videotaped Deposition * * *

Page 10

1  Venetian.
2  Q. And were you in a vehicle?
3  A. Yes.
4  Q. And what kind of a vehicle were you in?
5  A. I don't know. I cannot recall.
6  Q. Was it your vehicle or somebody else's?
7  A. It was, I believe, an undercover. It
8  wasn't a marked car. I'm not sure whose vehicle it
9  was.
10  Q. All right. And who was in the vehicle with
11  you?
12  A. I remember my union rep, Bryan Yant. I
13  cannot remember the detective.
14  Q. Does Detective Jex ring a bell?
15  A. Possibly. I cannot recall.
16  Q. Were you in the back seat?
17  A. I was in the front seat.
18  Q. And where was the detective?
19  A. He was in the driver's seat.
20  Q. And then Detective Yant?
21  A. Back seat.
22  Q. Do you recall when you first saw Bryan Yant
23  at the scene?
24  A. I cannot recall. I believe it was
25  somewhere outside of that car. It was the first time

Page 11

1  I've met him, first time I've seen him.
2  Q. And how did you come to learn that he would
3  be your union rep?
4  A. He had the PPA shirt on, and I believe he
5  said that he was going to be my rep. I can't recall
6  exact.
7  Q. Okay. Was he selected for you, to your
8  knowledge?
9  A. To my knowledge, yes.
10  Q. And do you know who selected him for you?
11  A. I have no idea.
12  Q. Do you remember approximately what time the
13  incident with Mr. Farmer took place?
14  A. I want to say somewhere after midnight.
15  Q. The records we show, we understand it's
16  probably just an estimate, says about 12:56.
17  Does that sound about accurate to you?
18  A. On or about, yeah.
19  Q. And then, it looks like you gave a
20  statement at about 4:25.
21  Does that sound about right, fours hours
22  later?
23  A. Didn't feel like that long, but...
24  Q. Did you ever leave the scene?
25  A. When I was released at the end of the day.

Page 12

1  Q. And was that after you gave your statement?
2  A. Yes.
3  Q. Have you ever given a FIT statement on any
4  other occasion?
5  A. For the October 1st shooting.
6  Q. I understand you got an award for that as
7  well --
8  A. Yes.
9  Q. -- is that correct?
10  A. (No audible response.)
11  Q. How long had you been Kenneth Lopera's
12  partner at the time of the incident?
13  A. I'd say a few months. Earlier in 2017, I
14  was gone for military training. I can't remember, I
15  think I came back somewhere around April. I don't
16  remember the exact date. So not too long. A couple
17  weeks, months. To be exact, I don't know.
18  Q. If you could give an estimate as to how
19  many times you partnered up with him, like how many
20  nights before this incident.
21  A. Maybe 10. Confidently, I'm not a hundred
22  percent sure.
23  Q. I saw somewhere in a statement that you
24  usually partner up with him on like Fridays and
25  Saturdays.

Page 13

1  Is that accurate?
2  A. Yes. We would change partners around a
3  lot, so even though we would be consistent partners,
4  it wasn't always steadfast that he and I were going
5  to be together, but predominantly, he and I were
6  partnered.
7  Q. And what unit were you on together or
8  squad?
9  A. Oh, it was a flex squad.
10  Q. Can you describe what a flex squad is?
11  A. It's a squad that can augment patrol and
12  still help with detectives. Mostly a proactive
13  squad. Handled little to no calls for service.
14  Q. Would you ride around in a vehicle with
15  him?
16  A. Yes.
17  Q. Was most of your time riding around in a
18  vehicle or walking around?
19  A. I'd say mostly vehicle unless it was on a
20  Friday or Saturday night on Safe Strip nights. It
21  was an instruct duty foot patrol.
22  Q. And how long were your shifts when you
23  would work with him?
24  A. Our shifts would start at 20:00 hours and
25  end at 06. So give or take, 10 hours.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 14

1      Q.  So I'm assuming during those shifts, you'd
2  have an opportunity to talk with him?
3      A.  Yes.
4      Q.  And during those shifts, are you used to
5  arresting people all the time?
6      A.  Not all the time.
7      Q.  What is a typical shift?
8      A.  Being proactive, I would say stopping
9  people were in, you know, violation of Strip corridor
10  laws, for example, maybe like a glass bottle.
11      Specifically an arrest that he and I did, I
12  can't remember.  I remember we had one DUI, but to
13  the details of that, I'm not sure.
14      Q.  Did you get to know him as a person when
15  you worked with him?
16      A.  Yes, but a lot of it was mostly business.
17  Even though he and I were friends while we were at
18  work, we never associated with each other outside of
19  work.
20      Q.  Did he talk about what he liked to do in
21  his spare time?
22      A.  I can't recall.  I know that he was very
23  involved with his family, and I believe he had two
24  boys and a wife.  And we talked a lot about military,
25  like his prior experience, and since he was out and I

Page 15

1  was still in, you know, the Reserves.
2      Anything beyond that personal, that's all I
3  can recall.  And him previously being a CO, but that
4  was it.
5      Q.  Were you aware that he participated in
6  jujitsu?
7      MR. McNUTT:  Objection, form, lacks
8  foundation.
9  BY MR. LAGOMARSINO:
10      Q.  So sorry, I didn't give you that
11  instruction.  From time to time, these lawyers over
12  here may be objecting.  They're not doing it
13  presumably to be obstructive.  There's not a judge
14  here to rule on their objections, so if you
15  understand the question, please answer the question
16  after they have an opportunity to make the objection.
17      A.  Thanks.
18      Q.  Were you aware that he participated in
19  jujitsu?
20      A.  Vaguely.
21      MR. McNUTT:  Same objection.  Go ahead.
22  BY MR. LAGOMARSINO:
23      Q.  You can answer.
24      A.  Vaguely.  He and I didn't talk too much on
25  it, but I believe that he was only like a white belt.

Page 16

1      Q.  Were you aware that he competed?
2      MR. McNUTT:  Objection, form.
3  BY MR. LAGOMARSINO:
4      Q.  You can answer.  Yeah.
5      A.  Now that you mention, I remember him saying
6  that he did have one competition.  I don't know what
7  results of that were.
8      Q.  And what is your understanding of his
9  military service?
10      A.  I believe he was a scrolled Ranger.  Never
11  went through selection.  I can't remember what group.
12      I know he had at least one deployment.  I
13  can't remember where, if it was in Iraq or
14  Afghanistan.  I don't know what year or what his
15  occupation was.
16      Q.  Now, you've mentioned that was the
17  first time that you met Bryan Yant, that night?
18      A.  Yes.
19      Q.  How many times have you spoken with Bryan
20  Yant, either in person or --
21      A.  In person since then?
22      Q.  Yeah.
23      A.  In a formal sent or just in casual passing?
24      Q.  Let's say formal.
25      A.  For formal?

Page 17

1      Q.  Yes.
2      A.  Less than five.
3      Q.  And what were your interactions?  Where did
4  they take place?
5      A.  It was all revolving around this event.  I
6  remember he was my PPA rep for the CIRT interview.
7      Q.  And when you met with him, where would you
8  meet with him?
9      A.  It was at headquarters.
10      Q.  Who else would be present besides the two
11  of you?
12      A.  In the CIRT interview?
13      Q.  No, just when you met with him informally.
14      A.  The first time, I was with the FIT
15  detective.  The second time, I believe it was the
16  CIRT interview, and that was with a PEAP rep, Mike
17  Springer.
18      And then, do you want the next few?
19      Q.  Yes, please.
20      A.  Okay.  I believe the next time after that
21  was the Tactical Review Board, which was at
22  headquarters.  He was not my rep at that point.
23      And then, I can't recall specifics after
24  that.  That might actually be the only formal times
25  that we've -- that we've met.  Everything else was

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

**Page 18**

1  informal.
2  Q.  Okay.  Informally, how would you meet him?
3  A.  Just in passing.
4  Q.  Like where would you pass him?
5  A.  At headquarters.  Whether he was there to
6  rep someone else or he was there for something that I
7  wasn't aware of.
8  Q.  Did you ever associate with him outside of
9  informal interactions at headquarters?
10  A.  Outside, not that I can recall.  I remember
11  before we went to the CIRT interview, we went to
12  breakfast because I was nervous about that, and it
13  was a way to calm me down, I guess.  We went to eat
14  prior.
15  Q.  Where did you guys go to eat?
16  A.  I can't remember.  I don't know.  I have no
17  idea what it's called.
18  Q.  Why did he stop representing you at the
19  Tactical Review Board?
20  A.  I felt like it was a conflict of interest
21  because he was repping other people involved in the
22  case.  And so, I requested a separate rep.
23  Q.  Who became your new representative?
24  A.  Tyler Todd.
25      MR. McNUTT:  I'm sorry.  What was that?

**Page 19**

1      THE WITNESS:  Tyler Todd.
2      MR. McNUTT:  Tyler Todd.
3  BY MR. LAGOMARSINO:
4  Q.  What was the outcome -- strike that.
5      Did you receive any discipline as a result
6  of this incident?
7  A.  Yes.
8  Q.  What discipline did you receive?
9  A.  It was a form of a contact that I violated
10  department policy, that I didn't give out radio
11  traffic that my partner and I were separated.
12  Q.  Just the no radio traffic issue?
13  A.  Yeah.
14  Q.  Was there any discipline related to the
15  body cams?
16  A.  No, not for me.
17  Q.  And when you say contact, what's that?
18  A.  A form of having, I guess, something
19  tangible as something that my supervisor and I had a
20  conversation about my shortcoming.
21  Q.  And at some point, is it your understanding
22  that that contact gets removed from your file?
23  A.  Yes.
24  Q.  Okay.  How long after the contact was
25  given?

**Page 20**

1  A.  I believe it's 12 months.
2  Q.  So tell me about the contact.  Did they
3  say, hey, we're going to give you a contact and you
4  should have initiated radio traffic, or is it --
5  A.  Yeah.
6  Q.  Is it formal, is it in writing?
7  A.  It was in writing.  It's my understanding
8  that a contact is not a formal, like an official form
9  of discipline.
10      I interpret it as discipline.  It is a
11  documented negative conversation that I had with my
12  supervisor on what I should have done or what I could
13  do better for, you know, next time.
14  Q.  The next time, okay.
15      Do you have an understanding of what
16  discipline was rendered in this case for any other
17  individuals?
18  A.  To my understanding, that Tran and Flores
19  had gotten a contact for their body camera.
20      Sergeant Crumrine had lost his stripes.
21      And then as far as what happened with
22  Lopera, I believe he retired before any contact --
23  or, any discipline was given by the department.
24  Q.  So it's your understanding that
25  Officer Lopera was not disciplined, correct?

**Page 21**

1      MR. McNUTT:  Objection to form.
2      MR. ANDERSON:  Objection, form.
3  BY MR. LAGOMARSINO:
4  Q.  You can answer.
5      MR. ANDERSON:  Yeah.
6  BY MR. LAGOMARSINO:
7  Q.  When they say, "form," they're saying they
8  don't like the form of my question.
9  A.  Okay.
10      MR. McNUTT:  Which encompasses a variety of
11  other objections.
12      THE WITNESS:  Because it confuses me.
13      MR. McNUTT:  But for simplicity, unless
14  your lawyer tells you not to answer, once we make an
15  objection, please answer his question.
16      THE WITNESS:  Okay.  Just so I understand,
17  you're asking if I know that he received any
18  discipline?
19  BY MR. LAGOMARSINO:
20  Q.  Correct.
21  A.  I believe he retired before any discipline
22  could have been given.
23  Q.  Okay.  And then, did he retire with his
24  benefits intact, to your knowledge?
25      MR. ANDERSON:  Objection, form.

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

Page 22

1    MR. McNUTT: Objection, form.
2    MR. ANDERSON: Go ahead.
3    THE WITNESS: I believe so because he was
4  tenured from his CO experience he had, I think, five
5  years on.
6  BY MR. LAGOMARSINO:
7    Q.  Besides -- strike that.
8    Other than this situation, have you ever
9  received any discipline from Metro?
10    A.  Not that I can recall.
11    Q.  To your knowledge, had Officer Lopera ever
12  been disciplined?
13    A.  Not that I know of.
14    Q.  Had he ever described any incidents as a CO
15  where he had to utilize violence to subdue an inmate?
16    MR. McNUTT: Objection, form --
17    MR. ANDERSON: Objection as to form.
18    MR. McNUTT: -- vague.
19    MR. ANDERSON: Yeah.
20    THE WITNESS: Do I still answer?
21    MR. ANDERSON: Yeah, you can answer it.
22    THE WITNESS: Not that I know of from when
23  he was a CO.
24    I remember him talking about doing an LVNR
25  on someone. I wasn't there. I was still in

Page 23

1  training. But he would just mention it in passing.
2  That was the only thing. I don't know if any
3  discipline came from that.
4  BY MR. LAGOMARSINO:
5    Q.  So he had done an LVNR -- he had said to
6  you in training he had done an LVNR to somebody at
7  some point?
8    A.  Yes.
9    Q.  And you sat next to him in training; is
10  that correct?
11    A.  Yes, based on our last names.
12    Q.  Okay. I guess if I would have gone through
13  the academy, I would be around you guys too, but I
14  don't know that I would have been accepted.
15    A.  It would have been fine.
16    Q.  Did he describe the general circumstances
17  of that LVNR?
18    A.  Not that I can recall specifics. I
19  remember him saying that he went into a house, I
20  can't remember what kind of call it was, if it was
21  another disturbance or domestic related, I'm not
22  sure. I don't remember what area command or even
23  when it was. But I recall him saying in order to
24  subdue someone, that's what he had to do.
25    Q.  Was it like a domestic call or something?

Page 24

1    A.  I don't know.
2    Q.  And just so we can get the timeline right
3  with counsel, was he talking about this when he
4  was -- I guess what general time period was he
5  talking about this would have happened?
6    A.  This was many, many months prior to the
7  incident that we're talking about today. We were
8  still in training.
9    Q.  Okay.
10    A.  Still in the field training program.
11    Q.  Field training?
12    A.  Um-hum.
13    Q.  You were out of the academy?
14    A.  Yes.
15    Q.  Okay. Have you spoken to him since this
16  incident?
17    A.  No.
18    Q.  Have you emailed or --
19    A.  No.
20    Q.  -- social media or anything like that?
21    A.  No.
22    Q.  I'm going to ask you some questions that
23  have been already asked of you, but counsel here
24  hasn't stipulated to using your deposition, so we
25  have to go through them.

Page 25

1    MR. ANDERSON: Objection, form.
2  BY MR. LAGOMARSINO:
3    Q.  So what were you wearing that evening?
4    A.  Department-issued uniform. It was like the
5  ODI green BDU top and bottom, Metro police patches on
6  both right and left shoulder with the zone badge area
7  command that I worked in and my last name.
8    My duty belt, I can go through that if you
9  would like.
10    Q.  Yes, please.
11    A.  Okay. I believe -- let's go in a
12  counter -- or, clockwise. My magazine pouch, my duty
13  weapon. I believe my baton was right after that.
14  Two sets of handcuffs on my back. I believe it was
15  my OC spray, TASER, and flashlight. I believe that
16  was the order that I had it that night. It's changed
17  since then, so.
18    Q.  Did you have like a radio with a belt on?
19    A.  Yes, and a radio.
20    Q.  And what is a BDU?
21    A.  Acronym, I don't know what it stands for.
22  It's more like a tactical uniform.
23    Q.  All right. So before you went to the
24  Venetian that evening, where were you immediately
25  before then?

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 26

1      A.  The Hawaiian market.
2          THE REPORTER:  The what market?
3          THE WITNESS:  Hawaiian.
4   BY MR. LAGOMARSINO:
5      Q.  Do you remember when you started your shift
6   that evening?
7      A.  Standard time, 2000 hours.
8      Q.  And approximately how long were you at the
9   Hawaiian market?
10     A.  Possibly an hour.  I can't recall.
11     Q.  So I think you had three call signs that
12  evening; is that correct?
13     A.  Yeah.  It was multiple.
14     Q.  Does a call sign basically explain the
15  location where you're at?
16     A.  For the Safe Strip evenings, yes.
17     Q.  So then, you guys go to the Venetian.
18  Where do you guys park?
19     A.  On the south side of the Venetian, there's
20  like an employee loading dock area.  I don't know how
21  to describe it.  It's kind of like a -- it's enclave
22  from one of the main roadways to get under the
23  Venetian, and that's where we parked.  That's usually
24  where we always park to go into like security or like
25  to an EDR.

Page 27

1      Q.  All right.  So then, you guys park, and
2   where do you go to?  What is your first destination?
3      A.  Walk into the doors.  We go past security,
4   go past like the EDR into the main casino area.
5      I remember he and I were talking about
6   getting coffee, so we, excuse me, walked around to
7   find somewhere to get coffee and ended up finding a
8   Coffee Bean.
9      Q.  And just for the record, when you say EDR,
10  that's employee dining room?
11     A.  Correct.
12     Q.  So we go get coffee, what kind of coffee do
13  you get?
14     A.  I think it was like an iced coffee because
15  I was sweating.  I was hot.
16     Q.  It was hot that day?
17     A.  I was hot, yeah.
18     Q.  And do you remember what he got?
19     A.  I think we got the same thing.
20     Q.  Was it free?
21     A.  No.
22     Q.  Do you remember who paid for it?
23     A.  I did.
24     Q.  Were there extra shots --
25     A.  I don't recall.

Page 28

1      Q.  -- of espresso?
2      A.  (No audible response.)
3      Q.  Sometimes people know each other's drinks.
4   I know we do around here.
5      A.  Oh, yeah.
6      Q.  Usually, the person who buys knows the
7   drink better than anyone else, so.
8          Did Officer Lopera ever describe any other
9   hobbies that he had, do you know, at any time?
10     A.  Not that I can recall.
11     Q.  Did he like to work out?
12     A.  I believe so, but specifics, I don't -- I
13  don't recall us talking about working out or
14  specific, I guess, workouts.
15     Q.  All right.  So you get your coffee, and how
16  far away are you from the Coffee Bean when Tashii
17  Farmer comes up to you?
18     A.  An estimate would be, oh, maybe 50,
19  60 feet.
20     Q.  Okay.
21     A.  I can't recall.  I haven't been there
22  since.  It's almost been two years since I've been
23  there.
24     Q.  Any reason why you haven't been there?
25     A.  I haven't needed to take calls for service.

Page 29

1   If I don't have to go there for a specific work
2   function, I would prefer not going there.
3      Q.  Why is that?
4      A.  Just the memories of this entire thing.
5      Q.  All right.  And I also didn't give you this
6   instruction, but if at any time you need a break
7   today, just let us know, we'll take a break.
8          Counsel, my plan is not to go super long
9   today.  We can take a lunch at any time if you want
10  or we can just plow through.  It's up to you.
11         It's up to you too.
12     A.  Yeah.  I have to -- I work graveyard now,
13  so I'm off to go to sleep after we do this.
14     Q.  All right.  Do you want to get deposed a
15  different time --
16     A.  No.
17     Q.  -- if you're tired?
18     A.  No.  I'd rather, please, let's get this
19  done.
20     Q.  We do have Red Bull here, as Craig knows.
21  He probably told you that.
22         MR. ANDERSON:  I didn't know you had
23  Red Bull.
24         THE WITNESS:  No.
25

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

---

Page 30

1   BY MR. LAGOMARSINO:
2       Q.  If you need something like that --
3       A.  Thank you.
4       Q.  -- we have that and that new drink Bang.
5           MR. McNUTT:  One of these days, you'll get
6   that newfangled drink here, coffee.
7           MR. LAGOMARSINO:  Yeah, we do have that.
8           MR. McNUTT:  Oh, you do?
9           MR. LAGOMARSINO:  Yeah.
10          MR. McNUTT:  I didn't think so.
11          MR. LAGOMARSINO:  We like to hand-make it,
12  it's a craft.
13          MR. McNUTT:  Oh, oh.
14          MR. LAGOMARSINO:  Yeah.
15          MR. McNUTT:  That's too refined for my
16  pallet.
17          MR. LAGOMARSINO:  I think you like gas
18  station coffee, right?
19          MR. McNUTT:  I do.  Truck stop preferably.
20          MR. LAGOMARSINO:  I get it.
21  BY MR. LAGOMARSINO:
22      Q.  All right.  So you're leaving Coffee Bean,
23  and what is the next thing you recall about this
24  incident?
25      A.  We were going to walk into an area to, like

---

Page 31

1   where there was more foot traffic to show more
2   officer presence.  That's what we're instructed to do
3   during Safe Strip.
4       Q.  So you're walking towards like a more
5   populated area, I guess?
6       A.  Yes.
7       Q.  And Tashii comes up to you guys?
8       A.  Yes.
9       Q.  And what does he say?
10      A.  That he was being followed or chased and if
11  we knew where a drinking fountain or a water fountain
12  was.
13      Q.  And did you guys know where one was?
14      A.  We did not.  I remember we offered help to
15  assist him.
16          I think he asked if we could take him down
17  or show him where valet was, and of course, we're
18  agreeable to help you.
19      Q.  All right.  So it was your understanding
20  that you were going to take him to valet.  Is that
21  when you decided you were going to put the coffees
22  down?
23      A.  He and Officer Lopera began talking.  I
24  think he was asking what was wrong.  He was sweating.
25          Mr. Farmer had directed too much attention

---

Page 32

1   towards Officer Lopera.  And so, I took
2   Officer Lopera's coffee from him and walked away.
3       Q.  Why did -- if you were going to walk him to
4   valet, why are you like putting the coffee down?
5       A.  It's my opinion now, it's not professional
6   to walk around with a coffee if I'm going to be
7   assisting a citizen.
8       Q.  And at that point, had you determined
9   whether Tashii had any weapons?
10      A.  No.
11      Q.  Did you believe he had any weapons?
12      A.  No.
13      Q.  Tashii told you he had run over to the
14  Venetian, correct?
15      A.  Yes, that he ran across the boulevard.
16      Q.  All right.  So you go to put down your
17  coffee, and do you see Officer Lopera and Tashii when
18  you turn around?
19      A.  They're still talking, and I remember I --
20  there was like a corner, went to go sit down my
21  coffees and when I have my vest and belt on, I move
22  slow, especially when bending down.  There's just a
23  lot of equipment in the way, and I took my time.
24          And I remember they were talking.  I don't
25  know what they were talking about.  There was just

---

Page 33

1   noise.
2           And I think they ended up sort of walking
3   away, and there was a -- like a service hallway, and
4   there were a couple janitors or maintenance guys
5   there.
6           And when I had started to stand up and turn
7   around, they were starting to walk away.  Then they
8   started to run down the hall.
9           And I was -- I lost sight -- I looked down,
10  I remember looking down to negotiate the slippery
11  floor so I didn't, you know, fall, and then, they
12  were gone.
13      Q.  All right.  And you were asked in your FIT
14  statement if it was a restricted area that they ran
15  into, and I'll just read it into the record.  I don't
16  have a copy here.  But it says:
17          "I'm not aware because it was
18          being cleaned at that time, so I'm
19          not sure if those doors are closed
20          during specific hours."
21      A.  Yes.
22      Q.  Is that accurate?
23      A.  Now that I've been privy to more of the
24  investigation and seen, I guess, what would be some
25  security cameras, yes, it is a restricted.

---

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 34

1    Q.  I'm aware -- I guess my question is
2  slightly different.
3         That evening, was it obvious to you that
4  that was a restricted area?
5    A.  At that time with the FIT statement, no.
6    Q.  And standing there with Tashii, was it
7  obvious to you -- I'm sure it didn't occur to you --
8  let me rephrase the question.
9         At that time, was it obvious to you that he
10  ran into a restricted area?
11    A.  At that time, no.  I don't recall even
12  having any mind down to that open hall.
13    Q.  All right.  Was it warm enough that evening
14  that you had to have air conditioning on constantly
15  in your car?
16    A.  Oh, yeah.
17    MR. LAGOMARSINO:  Yeah, we have
18  construction going on.
19    MR. ANDERSON:  You're holding children in
20  here somewhere?
21    MR. McNUTT:  You should hear it in here.
22    (Laughter.)
23  BY MR. LAGOMARSINO:
24    Q.  So you were asked by Bryan Yant that
25  evening if it was normal for people on the Strip to

Page 35

1  approach you and say they're being followed.
2    THE REPORTER:  Sorry, I didn't quite hear
3  you with the noise.
4    MR. LAGOMARSINO:  Sorry about that.
5  BY MR. LAGOMARSINO:
6    Q.  Is it normal for people -- strike that.
7         Before this incident, had anybody on the
8  Strip ever approached you to say they were being
9  followed?
10    A.  Not that I can recall.
11         I do know that citizens will come up and
12  ask us, you know, questions or like where a hotel is
13  or directionals.
14    Q.  Well, the transcript I have says from Bryan
15  Yant:
16         "Okay.  And is it normal for
17         people to approach you on the Strip
18         and say they're being followed and
19         chased by people?"
20         And then, your answer that evening was,
21  "It's happened before."
22    A.  Right now, I can't remember any specifics.
23  I don't want to say that that's not possible
24  specifically right now.  I can't say.
25    Q.  Okay.  That's fair enough.  All right.

Page 36

1         All right.  So about 11 days later, you
2  give your CIRT statement?
3    A.  Approximately, yes.
4    Q.  It looks like May 25th.
5         And you did that at Critical Incident
6  Review Team office.  Is that at headquarters?
7    A.  Yes.
8    MR. LAGOMARSINO:  I'm going to take a
9  break.  I'm going to go talk to them.
10    MR. ANDERSON:  Yell at people?
11    MR. LAGOMARSINO:  Yeah.  Be polite.
12    THE VIDEOGRAPHER:  The time is
13  approximately 10:45 a.m.  We are going off the
14  record.
15    (There was a brief discussion off
16    the record.)
17    MR. LAGOMARSINO:  Actually, can you keep
18  that video going, just to record the sound.
19    THE VIDEOGRAPHER:  Okay.
20    MR. LAGOMARSINO:  If you guys don't mind.
21  We have a landlord-tenant dispute here.
22    THE VIDEOGRAPHER:  I have it.  Andre,
23  honestly, I have it so you can't hear it.
24    (The attorneys and the witness
25    exited the room.)

Page 37

1    THE REPORTER:  Is that back on?
2    THE VIDEOGRAPHER:  Yeah, the camera is on.
3    (A recess was taken.)
4    THE VIDEOGRAPHER:  The time is
5  approximately 11:00 a.m.  We are going back on the
6  record.
7  BY MR. LAGOMARSINO:
8    Q.  So getting back to your CIRT statement, do
9  you remember who was in the room when you gave that
10  statement?
11    A.  I remember it was the sergeant.  I want to
12  say it was Kyle Ward.  Kasey Kirkegard, and Greg
13  Watkins.
14    Q.  Michael Springer, who was --
15    A.  And I'm sorry, and Mike Springer.
16    Q.  That's okay.  Nobody is expecting you to
17  have a photographic memory.
18         So Bryan Yant and Mike Springer were there.
19  They were both your reps?
20    A.  My rep was Bryan Yant, and then, from PEAP
21  was Mike Springer.  He didn't have any say in the
22  investigation.
23    Q.  Okay.  What does PEAP stand for?
24    A.  Oh.  Offhand, I don't know, but I can tell
25  you what they do.  It's more like for the mental

Officer Ashley Lif  ~  April 4, 2019
* * * Videotaped Deposition * * *

11 (Pages 38 to 41)

Page 38

1    health of the officers. It's like the -- I'm not
2    even going to guess.
3        Q. Okay. Just like they're in a support role
4    for you, basically?
5        A. Yes.
6        Q. All right. So the allegations against you
7    were that prior to your arrival, you failed to
8    activate your body-worn camera.
9        Is that accurate?
10       A. I can't recall, but...
11       Q. Ahead of the interview, did you receive a
12   copy of Chapter 289 of the NRS?
13       A. Yes.
14       Q. What is that, to your understanding?
15       A. I believe it's my rights as a police
16   officer. I believe that's where Garrity comes in.
17       Q. And what is your understanding of those
18   rights?
19       A. That my administrative statement cannot be
20   used against me in a criminal aspect.
21       Q. Any other rights that you're aware of?
22       A. Not that I can recall.
23       Q. And they mentioned that they sent it to
24   you -- excuse me -- to your email?
25       A. Yes.

Page 39

1        Q. Would that be your personal or your police?
2        A. Department.
3        Q. All right. At the time, what was your
4    classification and assignment?
5        A. I was a PO 1, still on probation, and I was
6    on the flex team.
7        Q. All right. And since this incident, have
8    you gone to a different team or a different unit?
9        A. Yes. From the flex team, I had switched
10   squads, still the same flex, I guess
11   responsibilities, different squad. And then, after
12   that, I went to gangs, and now, I'm a field training
13   officer.
14       Q. What are the boundaries of the Convention
15   Center area command?
16       A. Anything east of the 15, south of Sahara,
17   west of Paradise and north of, I believe Russell.
18       Q. Did you transfer to that squad from
19   north --
20       A. Northwest.
21       Q. -- west?
22       A. Yes.
23       Q. What is Northwest 11?
24       A. The grave squad. I can't remember.
25       Q. All right. That evening, I think you

Page 40

1    mentioned you were wearing a vest?
2        A. Yes.
3        Q. Is that a bullet-proof vest?
4        A. Bullet resistant, yes.
5        Q. Bullet resistant, okay. All right.
6        Were you aware of whether Officer Lopera
7    was wearing a bullet resistant vest?
8        A. I can presume. It's the policy that we
9    wear it.
10       Q. And what was your call sign that evening?
11       A. I can't remember.
12       Q. Okay. There's a reference to a Mary or
13   8 Mary 62.
14       What does that mean?
15       A. Okay. The 8, I think it's just like an
16   identifier that we're not a -- like it calls for a
17   service squad. I think it identifies our
18   capabilities for dispatch if they don't assign us
19   anything.
20       Mary is the sector that we're in, and 62 is
21   more of the beat.
22       Q. And who was your supervisor that evening?
23       A. Sergeant Crumrine.
24       Q. And how long had you been working with him
25   at the time of the incident with Tashii?

Page 41

1        A. Probably no more than, I'd say, a month
2    because I had transferred, and then, I believe that's
3    when I went to the training for the military, so I
4    was put on orders.
5        Q. All right. So it's my understanding that
6    the flex squad is a proactive unit?
7        A. Yes.
8        Q. Can you give us some examples of what it
9    means to be proactive in that unit?
10       A. In that unit?
11       Q. Yeah.
12       A. Initiate car stops, enforce laws that are
13   specific to a Strip corridor. Making the presence to
14   I guess tourists, show safety and that we're out and
15   maybe, I guess, discourage people from engaging in
16   nefarious activity.
17       Q. What are chronic nuisance crimes on the
18   Strip?
19       A. Repetitive crimes. I believe it was more
20   like vagrancy, things that would, I guess,
21   deteriorate the integrity of the Strip and tourists.
22       Q. You have mentioned in your statement a
23   priority 1 or zero.
24       What does that mean?
25       A. It's urgent. It needs to be, I guess,

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 42

1   handled now or immediate.  There is maybe a threat to
2   safety.
3       Q.  Okay.  So is it accurate to describe that
4   it's self-initiated activity, proactive policing?
5       A.  I guess I don't understand your question.
6       Q.  Is that proactive policing, basically?
7       A.  Priority zeroes or 1s?
8       Q.  No.  Just what you were doing that evening.
9       A.  Yes.
10      Q.  It's my understanding that you would rotate
11  partners from time to time?
12      A.  Yes.
13      Q.  Who was your other partner that you would
14  rotate with at that time?
15      A.  At that time.  I believe I rode with Chris
16  Gibson as well, and I think I rode with Aaron Denson.
17      Q.  Can you spell that for the court reporter?
18      A.  His first name?  Two As.
19      Q.  Okay.  And then Denson, D-e-n-s-o-n?
20      A.  Yes.
21      Q.  All right.  And had Aaron or Chris ever
22  described using LVNRs to you before?
23      A.  No.
24      Q.  Have you ever seen anybody using an LVNR in
25  the field?

Page 43

1       A.  In the field, no.
2       Q.  What is the reason for rotating partners?
3       A.  Some people are going to have more
4   experience than others, whether it's prior law
5   enforcement or prior military or I guess comfort
6   level, better understanding of some NRSs, possibly it
7   will give each other a little bit more of a
8   well-rounded, I guess, learning experience.
9       Q.  One of the things that you mentioned in
10  your statement was that one reason for rotating is to
11  get familiarity with other people's strengths and
12  weaknesses?
13      A.  Yeah.
14      Q.  What were some of Officer Lopera's
15  strengths that you perceived?
16      A.  He was more proactive than I was.  He
17  would -- he operated very well with reasonable
18  suspicion, whereas, I felt more comfortable with
19  probable cause.
20          So it would kind of force me out of, I
21  guess, my comfort zone.  That's one of the big things
22  I remember.
23      Q.  Okay.  And what about his weaknesses?
24      A.  Communication.  I don't know how to
25  describe it.  Maybe not staying calm through, I

Page 44

1   guess, a stop.
2           I wouldn't call that discourtesy to the
3   public, but it was -- I remember he would get amped
4   up and loud.  Might make a citizen uncomfortable if
5   it was just a traffic stop.
6       Q.  Now, what you described in terms of his
7   strengths, the delineation between reasonable
8   suspicion and probable cause.  We're going to be
9   talking to a jury.
10          So can you describe what you mean in
11  layman's terms by that?
12      A.  So reasonable suspicion, if a crime has
13  been -- is being or is about to be committed.
14          Probable cause is more when the facts and
15  circumstances known to the officer would warrant man
16  to believe the crime has been committed and the
17  accused has committed it.
18      Q.  I'm gathering, but tell me if I'm wrong,
19  when you're saying maybe he was better than you on
20  some of those issues --
21      A.  Yes.
22      Q.  -- would you feel more so struck that
23  probable cause is a higher standard than reasonable
24  suspicion?
25      A.  It's an arrestable.  I can effect a lawful

Page 45

1   arrest with probable cause.
2       Q.  You cannot effect a lawful arrest with
3   reasonable suspicion?
4       A.  Correct.
5       Q.  You have to have reasonable suspicion to
6   get to probable cause, correct?
7       A.  Correct.
8       Q.  But you need reasonable suspicion for what,
9   just a stop?
10      A.  Yes, but under state law, you have
11  60 minutes.  Otherwise, it becomes de facto.
12      Q.  Okay.  All right.
13          Based on your interaction with Tashii that
14  evening, did you ever have reasonable suspicion
15  personally that he had committed a crime?
16      A.  No.  At that time, no.
17      Q.  What does contact cover mean?
18      A.  It can set up two officers into, I guess, a
19  tactical advantage.  I guess in case there was
20  possibly force that was going to be used or where the
21  cover officer can watch the contacts back if it's
22  something unrelated, like if a threat unrelated to
23  the stop comes up.
24      Q.  When you're on Safe Strip and you're
25  walking, as officers, do you approach citizens and

Officer Ashley Lif  ~  April 4, 2019
* * * Videotaped Deposition * * *

Page 46

1    initiate contact with them?
2       A.  We can.  Whether it's a consensual stop in
3    making, you know, small-talk conversation where we
4    don't have any legal justification to do it or it's
5    reasonable suspicion or probable cause, yes.
6       Q.  Was there any kind of chain of command
7    involved with you and Officer Lopera that evening?
8       A.  No.
9       Q.  Like was he like your supervisor --
10      A.  No.
11      Q.  -- or were you equals?
12      A.  No, we're the same.
13      Q.  Okay.  Prior to this incident, had you ever
14    handled any calls to the Venetian?
15      A.  Not that I can recall.  I believe so.  I
16    know I've been in the Venetian before, prior to this
17    incident.
18      Q.  Venetian and Palazzo are very large,
19    correct?
20      A.  Yes.
21      Q.  It's easy to get lost there?
22      A.  Very.
23      Q.  That evening, were you familiar with the
24    layout?
25      A.  No.

Page 47

1      Q.  You had mentioned that you knew where two
2    spots were at the Venetian, where the employee dining
3    room was and then where security holding was; is that
4    correct?
5      A.  Yes.
6      Q.  How many times had you been to the employee
7    dining room at the Venetian?
8      A.  Oh.  Five to ten, maybe.
9      Q.  Had you been there with Officer Lopera
10    before this evening?
11      A.  Yes.  We used to go as a squad, I remember.
12      Q.  How many people would go?
13      A.  Usually the whole squad, between give or
14    take if some people were off on vacation or sick, it
15    could be between six to ten, maybe.
16      Q.  Did you ever gauge why Tashii asked to be
17    taken to the valet?
18      A.  No.
19      Q.  All right.  So I'm going to get back to the
20    incident a little bit.
21      So you set the coffee down.  Where do you
22    set it, on the floor?
23      A.  Yes.
24      Q.  All right.  And at that point, was your
25    back turned?

Page 48

1      A.  Yes.
2      Q.  So you turn around, and then you see them
3    still talking.
4      And you're about how far away from them?
5      A.  Oh.  Maybe like 5 to 10 feet-ish.
6    Truthfully, I cannot remember.
7      Q.  Okay.  And so then, you're walking back
8    towards them; is that correct?
9      A.  They had started, I believe, to kind of
10    walk away.
11      Q.  Did you see them both go in that service
12    entrance?
13      A.  Yes.
14      MR. McNUTT:  Objection, form.
15    BY MR. LAGOMARSINO:
16      Q.  Okay.  All right.
17      And I wasn't clear based on reading your
18    statements.  Were you aware that evening that
19    Officer Lopera had slipped and fell on the ground?
20      A.  That evening, I don't recall it, but having
21    been through, I guess, the other boards and
22    everything, it did happen.  To this day, I can't
23    recall it.  And I also swear that two service doors
24    were open, and based on video, they were not.
25      Q.  Okay.  All right.

Page 49

1    So it was a Saturday night, correct?
2      A.  Yes.
3      Q.  And is your recollection that the next day
4    was Mother's Day?
5      A.  I didn't know it at that time, but...
6      Q.  Was it busy?
7      A.  I'd say it was fair and average, consistent
8    with a Saturday night on the Strip.
9      Q.  Are Saturday nights on the Strip busier
10    than Tuesday nights?
11      A.  Yes.
12      Q.  Is that usually the busiest night on the
13    Strip?
14      A.  Depending on what talent is in town, yes.
15      Q.  Was there a lot of foot traffic in the
16    Venetian?
17      A.  I recall yes.
18      Q.  That's a pretty popular casino?
19      A.  Yes.
20      Q.  Now, when you saw Tashii, you could tell he
21    was sweating; is that correct?
22      A.  Yes.
23      Q.  And you saw that there were beads of sweat
24    coming down his face?
25      A.  Yes.

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 50

1    Q.  Did he seem a little paranoid to you?
2    A.  Nothing -- I guess it would be inconsistent
3  with him saying that he almost got hit by a car
4  running across the street.  To me, it didn't strike
5  as unusual.
6    Q.  Okay.
7      In your statement, you said, "He didn't say
8  it was directly across the street.  For all I know,
9  it was a distance."
10      I want to ask you if you can remember what
11  you thought that evening.  Did you take it to mean
12  that he had run a long distance to get where he had
13  been or?
14    A.  Even it was directly across the street, on
15  both east and west sides of the Strip, north and
16  southbound lanes, there's three lanes, not including
17  turning lanes or I guess turning lanes into a
18  property, which could potentially be four on each
19  side, so it would be total.
20      And then, there's the median that in some
21  places is going to have like a barrier.
22    Q.  So it's quite a distance, correct?
23    A.  Yeah.
24    Q.  At that time, did you feel like he
25  exhibited any signs of excited delirium?

Page 51

1    A.  At that time, it didn't strike me, no.
2    Q.  Did he seem out of breath to you?
3    A.  I can't recall.
4    Q.  And this is a normal question I ask in the
5  beginning of a depo, but I'll ask it now.
6      Did you review any documents before coming
7  in today to refresh your recollection?
8    A.  I briefly looked at the first 20 pages of
9  my CIRT statement and read through my last deposition
10  briefly, but nothing was, I guess, studied.
11    Q.  Did you review any video surveillance or
12  body cams?
13    A.  No.  I've made it a point to not watch
14  those.
15    Q.  Does it upset you to watch those?
16    A.  Yes.
17    Q.  Was this event shocking to you?
18    A.  Yes.
19    Q.  How so?
20      Do you want to take a break?
21    A.  It was shocking because of everything that
22  had happened, and it shouldn't have happened.
23    Q.  Just wait for your attorney to come back.
24      (Pause in proceedings.)
25

Page 52

1  BY MR. LAGOMARSINO:
2    Q.  Was this the first time as a law
3  enforcement officer you had been involved in a
4  situation where a citizen was killed?
5    A.  Yep.
6    Q.  In your military service, have you ever
7  been involved in a situation where somebody was been
8  killed?
9    A.  I haven't been deployed.
10    Q.  So you had mentioned that it was shocking
11  to you because of everything that happened and that
12  it shouldn't have happened.
13      Why shouldn't it have happened --
14    A.  It's my understanding --
15    Q.  -- in your opinion?
16    A.  -- we were at a consensual stop.
17      I don't know what conversation they had
18  when I was away.  I have no idea.  I was under the
19  presumption we were on consensual, which means I have
20  no legal justification to follow him or to do
21  anything within my legal capacity.
22      He asked for help.  We offered it.  I know
23  both Lopera and I would have been more than happy to
24  help him with whatever he needed, but even the
25  criteria for the 2000 at that time, you know, the

Page 53

1  brief interaction that I was there for, he didn't hit
2  any of the four criterias for me to legally hold him.
3    Q.  Are you trained at the academy on foot
4  pursuits?
5    A.  Yeah, they go over it.
6    Q.  Okay.  And it's my understanding that
7  different officers have different opinions on when to
8  follow through on a foot pursuit.
9    A.  Yes.
10    Q.  Is that your understanding?
11    A.  Yes.
12    Q.  I had an officer, and this is just a
13  preliminary comment to a question, who told me -- he
14  was a more experienced officer in Henderson and told
15  me that he was training somebody new, and somebody
16  saw them and started running away and that the newer
17  officer -- he told the new officer, don't worry,
18  we'll see him next week or whatever.  It's not worth
19  the danger that's involved.
20      Do you have a specific criteria of when to
21  initiate a foot pursuit?
22    A.  I don't think there's a steadfast criteria.
23  I think there's a lot of factors that will play
24  influence on it.
25      One of them that whenever I have been in a

Officer Ashley Lif ~ April 4, 2019
* * * Videotaped Deposition * * *

Page 54

1  foot pursuit, I know when it's put out over the radio
2  that the area supervisor is going to ask what the
3  crime was, and if there isn't a crime or if it's --
4  you know, let's say a jaywalking offense and it's a
5  busy night on the Strip, is my foot pursuit going to
6  cause that person to hurt somebody else or get hit by
7  a car.
8        If I instantly can think yeah, I'm not
9  doing it.
10       Q.  All right.  So at the point where you all
11  are speaking with Tashii, is that a consensual stop?
12       A.  My understanding, yes.  We didn't stop him,
13  he stopped us.
14       Q.  Okay.  Sorry, I didn't mean to phrase it
15  that way.
16       It was a consensual interaction?
17       A.  Yes.
18       Q.  At any time when you were able to hear
19  Tashii, did he ever make any kind of a threatening
20  remark or --
21       A.  No.  Not that I can recall, no.
22       Q.  And we do have some of the body cam footage
23  from Officer Lopera, but the first 30 seconds,
24  there's no sound.
25       Do you recall the extent of your

Page 55

1  conversations with him?  It's not that long of a
2  time, but what was said in that 30 seconds?
3       A.  Not that I can recall.
4       I know specifically he just asked for a
5  drinking fountain or to be taken down to valet and
6  that he ran across the street.  Other than that, I
7  can't recall.
8       Q.  I don't want to keep talking about the body
9  cam footage.  I understand it's upsetting to you, and
10  it's not my intent to do that.  But I do have a
11  question.
12       In the beginning of Officer Lopera's body
13  footage, it appears to me, but maybe it's just me,
14  that he's reaching out to grab Tashii.
15       Does it look like that to you?
16       A.  After I saw the video, I recall that.
17       Q.  Did you ever learn why he did that?
18       A.  No.
19       Q.  When you were at the scene outside after
20  you arrived, do you recall the extent of the
21  conversations that you had with Officer Lopera?
22       A.  After having, I guess, seen the body cam,
23  that's when he said that he used a rear naked choke.
24  I don't recall that conversation, but it happened,
25  it's on body camera.

Page 56

1       Q.  Okay.  When you would witness
2  Officer Lopera, you said earlier that sometimes he
3  could be maybe a little abrasive or rough on traffic
4  stops, not necessarily physically but just in the way
5  he interacted with citizens, did you ever ask him,
6  like hey, tone it down or --
7       A.  No.  It's --
8       MR. McNUTT:  Objection, form.
9       I need to get an objection in whenever he's
10  done, but you were cutting him off.
11       THE WITNESS:  Sorry.
12       MR. LAGOMARSINO:  Sure.  That's fine.  Let
13  me rephrase the question.  I'll withdraw it.
14  BY MR. LAGOMARSINO:
15       Q.  Did you ever have conversations with him
16  about the tone that he would use with citizens?
17       MR. McNUTT:  Objection, form,
18  mischaracterizes the testimony.
19       THE WITNESS:  Can I answer?
20       MR. ANDERSON:  Yeah.
21       THE WITNESS:  No.  Different officers have
22  different perceptions and I guess different
23  experiences that are going to lead to act a certain
24  way or not.
25       If it's somebody's, not specifically his,

Page 57

1  if it's someone's personality to be more abrasive or
2  direct, then that's their personality.
3       Are they doing anything wrong?  No.  Is it
4  how I would do it?  No.
5  BY MR. LAGOMARSINO:
6       Q.  All right.
7       During the investigation, did you ever come
8  to learn Bryan Yant's history as a police officer in
9  officer-involved shootings?
10       A.  I've heard about it.
11       Q.  Okay.  Did you know about that before this
12  incident?
13       A.  No.
14       Q.  When did you first learn about it?
15       A.  I can't remember who I was speaking with
16  who is more tenured on the department, and I guess a
17  conversation had came up about who my rep is, and I
18  said, "Bryan Yant."  And they said that is something
19  that he had been in multiple OISs, and I think it was
20  him that shot someone who was trying to destroy
21  evidence.
22       Q.  Okay.  Did you learn that while he was your
23  rep?
24       A.  I can't recall.
25       Q.  Was that part of the reason why you had him

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 58

1 changed out?
2    A.  No.  My specific reason for having him
3 changed out is I believed it was a conflict of
4 interest about him repping every person on that
5 incident.
6    Q.  Had anybody ever told you from the police
7 department that Bryan Yant should not even be on the
8 force based on what he did?
9    A.  I think I recall hearing that.  I remember
10 hearing that they put him at the PPA so he was off
11 the street.
12    Q.  When you were dealing with Tashii inside
13 the hotel, were you ever concerned for your safety?
14    A.  My safety, no.
15    Q.  Were you ever concerned for
16 Officer Lopera's safety?
17    A.  No.
18    Q.  You're a crisis intervention certified,
19 correct?
20    A.  Yes.
21    Q.  And was that in January 2016?
22    A.  Yes.
23    Q.  Is that something that you have to be
24 recertified in or --
25    A.  Yes.

Page 59

1    Q.  Have you been recertified in it?
2    A.  I believe so.  I can't remember what date.
3 I know that they end up sending a letter to your
4 supervisor, and you go to the class you're scheduled
5 to.
6    Q.  Did Officer Lopera ever tell you that he
7 had lapsed in some sort of occasions?
8       MR. McNUTT:  Objection, form, assumes facts
9 not in evidence.
10      THE WITNESS:  Not that I recall.
11 BY MR. LAGOMARSINO:
12    Q.  And you've been on crisis intervention team
13 related calls before, correct?
14    A.  Yes.
15    Q.  And had you ever been the primary officer
16 in such a situation where you were charged with
17 talking with a subject of --
18    A.  Yes.
19    Q.  -- somebody in crisis?
20    A.  Yes.
21    Q.  I believe you mentioned in your statement
22 about somebody, a female who was in a car?
23    A.  Um-hum.
24    Q.  Can you tell us about that situation?
25    A.  I can't remember what the call had come out

Page 60

1 as.
2       I believe her boyfriend or her husband had
3 called and said that she's going through a crisis, or
4 I can't remember the details, but when I had -- I was
5 the first arriving.
6       And I saw her in a car, and when my car had
7 pulled up, her getting out, and she was sweating.  It
8 was daytime, sun was up, it was summertime.  She was
9 sweating and inconsistent speech and yelling, not
10 making sense of her words.
11      And a couple of my other backups had showed
12 up, and we ended up putting her into custody for
13 safety reasons.
14    Q.  Is that what's referred to as like a legal
15 2000?
16    A.  Yes, I believe she was legaled.
17    Q.  Contrasting that with Tashii, was he able
18 to speak articulately, clearly?
19    A.  As I recall, yes.  It wasn't like the other
20 excited delirium, or ED, call that I had had.
21    Q.  Did you perceive him to be in mental crisis
22 at that time?
23    A.  Not that I can recall.
24    Q.  All right.  Sometimes with somebody who is
25 in crisis, is the way they're dressed can be an

Page 61

1 indicator to you or if they're dressed at all?
2    A.  Um-hum.
3    Q.  Can you explain that?
4    A.  He was appropriately dressed for the
5 weather.
6    Q.  Okay.
7    A.  I think I remember him having, I think like
8 a short-sleeve shirt on and jeans.
9    Q.  Is there anything that you -- strike that.
10      Can you recall him speaking abnormally or
11 normally?
12    A.  Not that I can recall.
13    Q.  I'm sorry, that was a terrible question.
14      Was there anything about the way that he
15 was talking that seemed abnormal to you?
16    A.  Not that I can recall.
17    Q.  Okay.
18      Did he appear to be mentally ill to you?
19    A.  Nothing that struck me, but even if he was,
20 it's not a crime.
21    Q.  Does Metro have a policy on dealing with
22 the mentally ill?
23    A.  To respect their rights.
24    Q.  Do they have the right to be left alone
25 unless they present a danger to themselves?

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 62

1    A.  Yes.
2    Q.  Does mental illness alone require a special
3 police response?
4    A.  I think if it's -- if it's requested.  If
5 it's a call for service and they request CIT.  I'm
6 not sure how the verbiage goes through the dispatcher
7 at the call center.
8    Q.  Sometimes you'll see mentally ill people on
9 the street, correct?
10    A.  Sure.
11    Q.  If they're not doing anything wrong, does
12 that require a response?
13    A.  No.
14    Q.  Is it fair to say that they basically have
15 the right to be left alone as long as there's no
16 crime that's been committed?
17    A.  Yes.
18    Q.  When you saw him outside the coffee shop,
19 did you ever feel like you had to call medical for
20 him?
21    A.  No.
22    Q.  When was the first time that you perceived
23 that a foot pursuit had occurred?
24    A.  I never thought a foot pursuit had started.
25 There was no radio traffic that had started.  There

Page 63

1 was no radio traffic that I can recall.
2    Q.  Did you believe that a crime -- strike
3 that.
4       In your dealings with Tashii, did you
5 believe that he had committed a crime at that time?
6    A.  At that time, no.
7    Q.  I was reading through some of your CIRT
8 statement, and you made a comment, I don't know if it
9 was a joke or if I'm just ignorant on police stances.
10       But it's that you're trained to have a
11 basic stance, and it says, "Mine is coffee."
12    A.  Oh. No.
13    Q.  Is that a joke?
14    A.  I don't know if that was a mistype, but no.
15    Q.  Okay.
16    A.  Do you need me to explain what a basic
17 stance is?
18    Q.  Sure.  Well, no, you don't have to explain
19 it, but I didn't know if there was like a coffee
20 stance that I didn't know about.
21    A.  Hum-um.
22    Q.  All right.  Did you follow the way that
23 Officer Lopera and Tashii went into the hallway?
24    A.  I don't know what way they went.  I had
25 walked down the same hall that I last saw them.  I

Page 64

1 remember checking every door, there were locked
2 doors, open doors, locked doors behind those.
3       There was no vocals, no yelling, no
4 screaming.
5       I remember going back to where we had
6 started to see if it just looped around, and I tried
7 to find my own way out.
8    Q.  Did you ever hear any noises from Tashii
9 other than --
10    A.  I heard nothing.
11    Q.  Sorry?
12    A.  I heard nothing.
13    Q.  At that time, did you believe that a foot
14 pursuit was a valid option?
15    A.  No.
16    Q.  Did you perceive at that time that Tashii
17 posed a threat to himself?
18    A.  No.
19    Q.  At that time, did you perceive that Tashii
20 presented a threat to others?
21    A.  No.  No.
22    Q.  Did you ever give any verbal commands to
23 Tashii?
24    A.  No.
25    Q.  Did you ever hear Officer Lopera give any

Page 65

1 verbal commands to Tashii when you were there in
2 person?
3    A.  No.  When I had showed up, he was, he had
4 stepped away, and there were other officers who were
5 starting to give aid.
6    Q.  When you went into where you perceived them
7 to go into that service area, can you describe that
8 area in terms of stairwells and doors and --
9    A.  Oh.  I guess the best way I could say it,
10 it was a spider web.  It seemed like there were
11 different halls that led to other doors, and there
12 were locked doors into offices, and there was a
13 stairwell.  I remember I saw, I think like a
14 maintenance guy or a linen, linen guy.
15       And then he directed me to an elevator.  I
16 tried to find an elevator, asked for security.  To
17 this day, I have no idea how I got out.
18    Q.  Is it fair to say that once you went in
19 there, the sense of direction was gone?
20    A.  It's gone.
21    Q.  At some point, did you get into an
22 elevator?
23    A.  Yeah.
24    Q.  And what was the purpose, just to -- strike
25 that.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 66

1    A.  I had no idea where I was going.
2    Q.  At some point, did you get outside?
3    A.  Yes.
4    Q.  And how did you know where to go?
5    A.  When I had stepped out, there were a bunch
6  of police cars and lights on.
7    Q.  And so, did you run up to the scene?
8    A.  Yes.
9    Q.  When you ran track, what events or type of
10  track did you run, I guess?
11    A.  I trained in the heptathlon and the 800.  I
12  did cross country too.  There was distance in there.
13  I threw a little bit.  A little bit of everything.
14    Q.  At what point do you recall specifically
15  losing sight of Officer Lopera in the beginning?
16    A.  I think the last I saw them is when they
17  had turned the corner.  I don't know the distance.
18  That was the last time.
19    MR. McNUTT:  Andre, can I ask a question
20  right there?
21    MR. LAGOMARSINO:  Sure.
22    MR. McNUTT:  Where they turned what corner?
23  I'm unclear as to where you're at.
24    THE WITNESS:  I think there was -- and
25  please forgive me, it's been two years since I've

Page 67

1  been back there.
2    I think the angle of the hallway had
3  turned.  To what degree, I don't know.
4    MR. McNUTT:  So they were physically inside
5  the hallway when you're saying they turned a corner?
6    THE WITNESS:  Yes.
7    MR. McNUTT:  That was all.  Thank you.
8  BY MR. LAGOMARSINO:
9    Q.  How far of a distance outside did you run?
10    A.  I can't remember.  I was winded.
11    Q.  Okay.
12    A.  It was uphill, like a loading dock.
13    Q.  Do you think you were perspiring that night
14  outside?
15    A.  Oh, yeah.
16    Q.  When is the first time that you activated
17  your body cam?
18    A.  When I had stepped out and saw the police
19  cars.
20    Q.  What is the training of when you're
21  supposed to activate your body cam?
22    A.  When you engage into like a contact with a
23  citizen.
24    But it wasn't uncommon for the supervisor
25  or lieutenant on Safe Strip nights, if you're going

Page 68

1  to initiate a call and call it out where it's going
2  to actually be a call for service or an interaction
3  to initiate your body camera.  If it's a consensual,
4  I remember him saying don't call it out, don't jamb
5  up the radio because the radios are jammed as they
6  are.
7    Q.  Okay.  You had mentioned in your statement
8  that you had a 94.4 percent compliancy rating on the
9  body cam?
10    A.  Yes.
11    Q.  How is that measured?
12    A.  Calls that actually get activated, whether
13  it's a person stop or a vehicle stop, versus how many
14  videos you have that match when the call was created.
15    Q.  Oh, okay.  And how did you know that
16  was your rating?
17    A.  I believe it's bimonthly, you will get an
18  email from the body cam detail saying your
19  compliancy.
20    Q.  And is there a required level that you
21  have to have?
22    A.  Not that I can recall on policy.  A lot of
23  supervisors will say you're good if you're above
24  80 percent.
25    Q.  Okay.  In this particular incident, were

Page 69

1  there any issues with the operation of your body
2  camera not working?
3    A.  Not that I can recall.
4    Q.  And so, at the scene, you arrived at that
5  time, you perceived officers providing aid to Tashii;
6  is that correct?
7    A.  Yes.
8    Q.  Were you getting any direction from anybody
9  at the scene?
10    A.  No.
11    Q.  Was Sergeant Crumrine, to your knowledge,
12  giving any direction?
13    A.  No.  Not that I can recall, no.
14    Q.  Did anybody appear to you to be taking
15  charge of the scene?
16    A.  No.  Not that I can recall.
17    Q.  What does it mean when somebody says that
18  the scene is dynamic?
19    A.  That there's multiple things going on.
20  That not everyone's focus is going to be on the same
21  place.  There's going to be multiple things that
22  likely need to be updated through a radio dispatch.
23    Q.  At what point, to your recollection, do you
24  remember the scene not being dynamic anymore?
25    A.  After -- after like FIT and CIRT.  That's

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 74

1        Q.  At that time, when you observed Tashii, did
2    you look at his pupils?
3        A.  I don't recall.
4        Q.  Did you remember feeling that he was under
5    the influence of narcotics when you first saw him?
6        A.  No, I don't recall that.
7        Q.  Prior to that time, had you ever arrested
8    anybody on the Strip for being under the influence of
9    a controlled substance?
10       A.  I believe so.  I can't remember specifics.
11       Q.  Were you in the Venetian itself or were you
12   in the plaza?
13       A.  Honestly, I know they connect, but I don't
14   know where the dividing line is.
15       Q.  Okay.
16       A.  I would presume the Venetian because of the
17   doors that we went in.
18       Q.  Did Officer Lopera ever communicate to you
19   that he was going to do a pat-down of Tashii?
20       A.  No.
21       Q.  I understand it's probably been a long time
22   since you reviewed the body cam footage, but I want
23   to ask you your perception.
24         Have you watched Officer Lopera's body cam
25   footage?

Page 75

1        A.  Just what was played on the news and then
2    the Review Board.
3        Q.  What is your understanding of how long it
4    takes to -- strike that.
5          Do you know what an LVNR is?
6        A.  A lateral vascular neck restraint.
7        Q.  How long is it supposed to be imposed
8    before it takes effect, to your knowledge?
9        A.  It's fairly quick.  I'd say within 10
10   seconds or less.
11       Q.  And when you say, "take effect," that means
12   like put them out?
13       A.  Correct.
14       Q.  Were you ever taught in the academy or at
15   Metro in any kind of training prior to this incident
16   the difference between a LVNR and a rear naked choke?
17       A.  Not that I recall.
18         They make sure you understand in detail the
19   LVNR and the purpose and how it takes effect.
20       Q.  Okay.  All right.
21         I don't have any further questions.
22       MR. McNUTT:  Why don't we take a quick
23   break and push through lunch?
24       MR. LAGOMARSINO:  Yeah.
25       MR. McNUTT:  It's fine with me.

Page 76

1        Craig, you --
2        MR. ANDERSON:  Yeah, it's fine with me and
3    the witness.
4        THE VIDEOGRAPHER:  The time is
5    approximately 11:58 a.m.  We are going off the
6    record.
7          (A recess was taken.)
8        THE VIDEOGRAPHER:  The time is
9    approximately -- wait till it changes -- the time is
10   approximately 12:11 p.m.  We are going back on the
11   record.
12
13         EXAMINATION
14   BY MR. McNUTT:
15       Q.  Officer Lif, my name is Dan McNutt.  We met
16   out in the hallway before and at your prior
17   deposition.
18       A.  Yes.
19       Q.  I represent Ken Lopera.  And just to avoid
20   any doubt, you're still under oath.
21         Do you understand that?
22       A.  Yes.
23       Q.  I've got just a few questions.  I don't
24   think we'll take too long.  I understand you're going
25   to a graveyard shift tonight.

Page 77

1        A.  Take your time.
2        Q.  Okay.  We'll try to be as efficient as
3    possible.
4          You testified earlier that you gave several
5    statements.  One was a FIT statement; is that right?
6        A.  Yes.
7        Q.  And that came before your CIRT statement,
8    correct?
9        A.  Correct.
10       Q.  And if I recall correctly, your FIT
11   statement occurred the night of the incident around
12   May 14th, 2017?
13       A.  Yes.
14       Q.  Do you recall that you identified Tashii
15   Farmer or at that time, as you referred to him, as a
16   BMA?
17       A.  Um-hum.
18       Q.  What is a BMA?
19       A.  Black male adult.
20       Q.  You identified the BMA as, quote, profusely
21   sweating?
22       A.  Yes.
23       Q.  Do you recall that?
24       A.  Yes.
25       Q.  And why did you identify him as or define

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

21 (Pages 78 to 81)

## Page 78

1   him as being profusely sweating?  What does that mean
2   to you?
3        A.  Visible beads of sweat, I'd say.  I should
4   have elaborated that, and I mean visible beads of
5   sweat.  Rolling sweat beads.
6        Q.  Okay.
7        A.  Maybe like you can see it through clothes.
8        Q.  And is that your definition just generally,
9   or is that the definition of what you saw on Tashii
10  Farmer?
11       A.  That's my definition generally.  That's if
12  I were to be sweating and there's rolling beads of
13  sweat and my clothes have sweat marks on them, to me,
14  that's profusely sweating.  To me.
15       Q.  So to your recollection -- you said that
16  Tashii Farmer was sweating profusely.  What did you
17  see?
18       A.  Rolling beads of sweat.
19       Q.  Okay.  And was his clothing physically
20  sweaty as well?
21       A.  Not that I can recall.  I --
22       Q.  Do you -- I'm sorry.
23       A.  Just not that I can recall right now, no.
24       Q.  Do you recall what he was wearing?
25       A.  I think it was like a black or dark color,

## Page 79

1   like maybe dark navy T-shirt and jeans.
2        Q.  Would that have made it more difficult to
3   see sweat on his clothes or at least his shirt?
4        A.  Possibly.
5        Q.  You stated in your CIRT statement that
6   there were several -- there's a variety of factors to
7   use in identifying excited delirium, correct?
8        A.  Yes.
9        Q.  Do you know what they are?
10       A.  I guess excessive sweating, nudity,
11  irrational speech, random, I guess, sentences put
12  together.  That's all I can recall.
13       Q.  And in your CIRT statement, you identified
14  that he was showing two of those signs.
15       What were they?
16       A.  It was sweating and I guess not making
17  sense about maybe why he needed to go to valet or
18  asking to go to valet.
19       Q.  And was it also paranoia?
20       A.  Possibly, yes.
21       Q.  Is there a certain amount of elements that
22  you have to have in order to determine that someone
23  is under the -- suffering from excited delirium, or
24  is it simply a subjective test that you as an officer
25  make?

## Page 80

1        A.  I'd say it would be more subjective.
2        Q.  So if somebody is not speaking at all but
3   completely naked in the middle of the Strip, you may
4   make a judgment that they are suffering --
5        A.  That's a good indicator, yes.
6        I'm sorry to interrupt you.
7        Q.  That's okay.
8        Or alternatively, it could be a variety of
9   factors that would draw you to that conclusion?
10       A.  Yes.
11       Q.  Are any of those things dispositive as a
12  patrol officer, or are they simply your perception at
13  the time?
14       A.  I guess I don't understand what you mean.
15       Q.  Well, you're not a psychiatrist or medical
16  doctor, correct?
17       A.  Correct.
18       Q.  So you're not technically qualified to
19  diagnose them?
20       A.  Correct.
21       Q.  So back to my question.
22       Your suspicions are not dispositive of
23  their condition, it's just what you perceive at the
24  time, correct?
25       A.  Correct.

## Page 81

1        Q.  So sitting here today, can you say with
2   certainty that Tashii Farmer was not suffering from
3   excited delirium?
4        A.  Not with certainty.
5        Q.  And at the time, in fact that evening, you
6   thought her was in fact exhibiting certain signs of
7   excited delirium, correct?
8        A.  Correct.
9        Q.  When you and your partner, Ken Lopera,
10  first encountered Tashii Farmer, what was your
11  proximity from Officer Lopera?
12       A.  Probably within a few feet from each other.
13       Q.  So you were essentially walking together?
14       A.  Yes.
15       Q.  And I think you testified earlier that you
16  left the Coffee Bean and you were walking to some
17  area of the casino, correct?
18       A.  Correct.
19       Q.  And Tashii Farmer in fact approached the
20  two of you, correct?
21       A.  Correct.
22       Q.  But in your CIRT statement, you said that
23  he was primarily -- he being Tashii Farmer -- was
24  primarily directing his attention to Ken Lopera; is
25  that right?

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

23 (Pages 86 to 89)

Page 86

1        Is that fair?
2        A.  That's fair.
3        Q.  So it's not directed towards illegal
4   narcotics, the effects of those?
5        A.  Correct.  Yes.
6        Q.  But you hesitated, so I'm guessing that
7   sometimes illegal narcotics is a part of a mental
8   illness on occasion?
9        A.  On occasion, yes.
10       Q.  Can the effects of being under the
11   influence of a controlled substance be misinterpreted
12   as mental illness and vice versa?
13       A.  Yes, that's fair.
14       Q.  Is it a crime to be under the influence of
15   a controlled substance in the State of Nevada?
16       A.  Yes.
17       Q.  Is it a crime to trespass in the State of
18   Nevada?
19       A.  It is not a crime, no.  NRS 207.200.
20       Q.  What about NRS 202?
21       A.  I'm not aware of right now.
22       Q.  Is it a crime to carjack a vehicle in the
23   State of Nevada?
24       A.  Yes.
25       Q.  So when Officer Lopera handed you his

Page 87

1   coffee, what did that indicate to you was
2   Officer Lopera's intention, if any?
3        A.  I think he was just trying to give more --
4   stand at a more like a -- like a stance of what we
5   were trained, I guess, it's a basic ready stance
6   where, you know, he could be ready for anything if it
7   were to happen.
8        Q.  So if you're having an interaction with an
9   individual and you decide that you need both hands
10   available, is there something that's prompted you to
11   make that determination?
12       A.  It's just my training.
13       Q.  So Metro has a policy that says put down
14   your coffee when you're talking to a civilian?
15       A.  I don't think they have a policy for that
16   specifically.
17          It's what I revert to back to my training,
18   and I would only presume that he was doing the same.
19       Q.  So would it be fair to say that from your
20   perception -- I mean -- let me strike that.
21          If Ken would not have handed you your
22   coffee, would you have put your coffee down?
23       A.  Yes.  I try not to have anything in my
24   hands.  Even if it's a traffic stop with, you know,
25   just a, I guess a regular citizen, you know, whether

Page 88

1   there's no perceived threat, I'm going to have both
2   of my hands available.
3        Q.  Better situational awareness, better
4   capability?
5        A.  Yes.
6        Q.  Yes as to both?
7        A.  Yes.
8        Q.  How long from the time that Tashii Farmer
9   approached you and Officer Lopera until you lost
10   sight of them where you said it was around the
11   corner?  What was that rough timeline?
12       A.  Oh.  Maybe approximately like 30 seconds to
13   a minute.  I honestly can't recall.
14       Q.  Okay.  So that's just an estimate?  We all
15   understand it's been two years.
16          MR. LAGOMARSINO:  Dan, can I just take a
17   pretty quick break?
18          MR. McNUTT:  Sure.
19          MR. LAGOMARSINO:  I need to get up.  Just
20   give me two minutes.
21          MR. McNUTT:  Okay.
22          THE VIDEOGRAPHER:  The time is
23   approximately 12:24 p.m.  We are going off the
24   record.
25          (A brief recess was taken.)

Page 89

1          THE VIDEOGRAPHER:  The time is
2   approximately 12:25 p.m.  We are going back on the
3   record.
4   BY MR. McNUTT:
5        Q.  At the time of the incident, May 14th,
6   2017, had you ever arrested anybody that was under
7   the influence of a controlled substance?
8        A.  I can't recall any specifics, but I would
9   presume that I have.
10       Q.  If you said in your CIRT report that you
11   had not, would you go with that answer?
12       A.  Yes.
13       Q.  A little bit out of order, but when
14   Mr. Lagomarsino was questioning you, he asked you how
15   long it should take to subdue somebody or apprehend
16   somebody using a lateral vascular neck restraint.
17          Do you remember that?
18       A.  Yes.
19       Q.  And you said something less than
20   10 seconds, correct?
21       A.  Yes.
22       Q.  Is that based on your training?
23       A.  Yes.
24       Q.  And did they also tell you during your
25   training that if somebody was stronger than you or

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 94

1      If I use any of those words, I'm talking
2  about the restricted area into which Tashii Farmer
3  ran.
4      Is that okay?
5      A.  Yes.
6      Q.  In your CIRT statement, you identified it
7  as an employee-only area.
8      Is that accurate?
9      MR. LAGOMARSINO:  Hold on a second, sorry.
10  I'm going to object to the form.
11      MR. McNUTT:  Okay.
12  BY MR. McNUTT:
13      Q.  Do you recall that testimony?
14      A.  Yes.
15      Q.  What informed you that it was an
16  employee-only area looking at it?
17      A.  At that time or now post --
18      Q.  If you can separate them, then at that
19  time, at the time of your statement, you said it was
20  an employee-only area.
21      A.  Because there were workers working on the
22  floors.
23      Q.  Did that hallway look physically different
24  to you than what's normally seen inside a casino
25  where patrons are allowed to go?

Page 95

1      A.  Yeah.  I believe the flooring was
2  different.
3      Q.  The flooring is different, the lighting is
4  different, all those types of things?
5      A.  I don't recall lighting.  Flooring, I'll
6  definitely say the flooring.
7      Q.  But pretty rare to have fluorescent
8  lighting inside a casino floor?
9      MR. LAGOMARSINO:  Objection, form.
10  BY MR. McNUTT:
11      Q.  Not quite the ambiance they're looking for,
12  correct?
13      A.  Um-hum.
14      MR. LAGOMARSINO:  Same objection.
15  BY MR. McNUTT:
16      Q.  On page 26 of your CIRT statement, you said
17  that, "We did have a custody plan."
18      What was your custody plan for Tashii
19  Farmer?
20      A.  Well, we had never discussed prior to
21  specifically that interaction with Mr. Farmer, and
22  honestly, I don't remember the custody plan --
23      Q.  Okay.
24      A.  -- that we had or talked about.
25      Q.  I'll just reference LVMPD 1745, page 26.

Page 96

1  AL is your initials on the CIRT statement, "We did
2  have --" the question is, "Does your custody plan
3  change at that point?"  Your answer was, quote, "We
4  did have a custody plan," end quote.
5      And it never really gets explained there,
6  so that's why I'm asking now.
7      A.  Okay.
8      Q.  Do you remember what your custody plan was?
9      A.  I do not.
10      Q.  You also identified that there were four
11  criteria for a legal 2000.
12      Do you recall what those are?
13      And please understand this is not a test,
14  but I'm entitled to your best understanding of what
15  those four criteria are.
16      I mean, here you were pretty confident, you
17  said there were four criteria, et cetera.  So please
18  tell me what they are.
19      A.  I guess show signs of self-mutilation,
20  threats to others or themselves.  I guess inability
21  to provide the basic needs of clothing, food, and
22  shelter.  And I can't remember the fourth one.
23      Q.  Okay.  And -- okay, fair enough.
24      If it comes back to you, let me know.
25      A.  Okay.

Page 97

1      Q.  Is it your testimony that an individual
2  showing signs of -- that's profusely sweating,
3  showing signing of paranoia that then runs into a
4  restricted area is not someone that should be further
5  interrogated by the police?
6      MR. LAGOMARSINO:  Objection, form.
7      THE WITNESS:  I'm afforded officer
8  discretion, especially on nights of Safe Strip where
9  I guess it would be more appropriate for me to have
10  my time available for someone who is going to be a
11  victim of a crime such as a battery or an assault.
12      So specifically, did he go in a restricted
13  area?  Sure.  After all the videos, I can see that,
14  yes.  But I have officer discretion whether to engage
15  or disengage into a foot pursuit or not and had it
16  was, how it would be.
17      I still don't think I was in a foot
18  pursuit.
19  BY MR. LAGOMARSINO:
20      Q.  So you have officer discretion.  Does
21  Officer Lopera have officer discretion?
22      A.  All officers do.
23      Q.  All officers do, correct?
24      A.  Yes.
25      Q.  So are you saying that Officer Lopera was

# Officer Ashley Lif ~ April 4, 2019
## * * * Videotaped Deposition * * *

### Page 98

1 from a policy perspective or a legal perspective
2 wrong for following Tashii Farmer into that
3 restricted area?
4    A.  I don't think he was -- he was wrong, but
5 he had conversations with Mr. Farmer that I was not
6 privy to when I had stepped away, so I don't if there
7 was anything that had transpired beyond that that I
8 wasn't aware of.
9    Q.  And so, essentially then, he had more
10 information than you did, correct?
11    A.  Yes.
12    Q.  It's also a fact that you testified at your
13 CIRT statement that you've never seen -- and you said
14 that here today -- you never saw Tashii Farmer's
15 pupils?
16    A.  Yes --
17    Q.  Do you remember that?
18    A.  -- I don't recall seeing his pupils.
19    Q.  What would be important about seeing his
20 pupils?
21    A.  Like if they're dilated or if they're -- I
22 don't know what medical term.  If they're large or
23 small.
24    Q.  And what would that indicate -- would that
25 potentially indicate to you that the suspect was

### Page 99

1 under the influence of a controlled substance?
2    A.  Yes.
3    Q.  That's one of the indicators, correct?
4    A.  Yes.
5    Q.  Which is a crime in the State of Nevada?
6    A.  Yes.
7    Q.  So you testified that you did not think
8 officer -- excuse me -- Tashii Farmer was a threat to
9 himself, correct?
10    A.  Correct.
11    Q.  And you did not -- you testified that you
12 did not think he was a threat to you, correct?
13    A.  Correct.
14    Q.  Did you think he was a threat to anyone?
15    A.  Not at that time, no.
16    Q.  Okay.  If you believed that he was under
17 the influence of a controlled substance when you saw
18 him run into a restricted area, would that cause you
19 to follow him?
20    A.  It could, but again, I have the discretion
21 not to.
22    Q.  Right, but it would also -- you could
23 articulate that that's reasonable suspicion to follow
24 him and to stop him, correct?
25    A.  Yes.

### Page 100

1    Q.  If you believe somebody that was under the
2 influence of a controlled substance, you as an
3 officer have reasonable suspicion to stop him,
4 correct?
5    A.  Yes.
6    Q.  "Yes"?
7    A.  Yes.
8    Q.  If you as an officer see somebody running
9 through a restricted area inside a casino and you're
10 on Safe Strip, you have the discretion to stop that
11 individual, correct?
12    A.  Yes.
13    Q.  Meaning you have the reasonable suspicion
14 to do so, correct?
15    A.  Correct.
16    Q.  If Officer Lopera is the contact and you're
17 the cover, so you're manning the radios, what is
18 Metro's policy when you know your partner is in a
19 foot pursuit, is there a policy of what you're
20 supposed to do on the radio?
21    A.  The primary officer is responsible for
22 giving out the description of a crime, the direction
23 of travel.
24    Q.  Okay.  And so, but if you don't hear him
25 doing that, is there a policy for what the cover

### Page 101

1 should do?
2    A.  Say that we're separated?
3    Q.  Okay.
4    A.  Yes.  But I don't know what direction they
5 went.  Maybe at best, the crime would be trespassing
6 from my perception.
7    Q.  No, I wasn't going to that.  I was asking
8 actually what you answered.
9       Is there some SOP, standard operating
10 procedure, where you say, hey, I'm separated from my
11 partner, we had, you know, an interaction with a
12 suspect, and I don't know what is going on.  I just
13 didn't know if there was a policy like that?
14    A.  Yes, that's what I got written up for
15 contact for, not getting out the radio traffic saying
16 that my partner and I were separated.
17    Q.  Okay.  Got you.  Thank you.
18       When we talked about that earlier, I
19 thought it was restricted to not turning on the
20 body-worn cam.
21       So it was two things?
22    A.  I guess I don't understand.  Two things for
23 what?  That I got a contact for?
24    Q.  Yeah, when you said you got written up --
25    A.  I got the contact for not leaving on the

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

30  (Pages 114 to 117)

---

Page 114

1  putting it out.
2      I didn't hear anything, I heard the Code
3  Red.
4      Policy says that once the Code Red is
5  started, it's for the officer who initiated it.  I
6  wasn't there to give out radio traffic, you know.
7      Q.  Right, so I think we're pretty clear on it,
8  but correct me if I'm wrong, once an officer calls
9  Code Red, everybody is supposed to stay off the
10  channel so he can talk?
11     A.  Unless it's pertinent to --
12     Q.  Him?
13     A.  Correct.
14     Q.  There's been testimony in this case by
15  Detective Kasey Kirkegard.
16     A.  Um-hum.
17     Q.  Do you know who she is?
18     A.  Just through CIRT.
19     Q.  She's a CIRT officer, right?
20     A.  Yes.
21     Q.  In fact, I think she participated in your
22  CIRT interview, correct?
23     A.  Yes.
24     Q.  And she testified that the radios did in
25  fact work in that area of the back of the house.

---

Page 115

1      Are you aware of that at all?
2      A.  I wasn't aware.
3      Q.  So my question is simply, if I didn't make
4  it clear earlier, did you attempt to contact Ken or
5  just because you were in the back house you didn't
6  even try?
7      A.  Yeah, I did not.  It was under the
8  presumption that they wouldn't work, but I never
9  attempted.
10     Q.  Okay.  You testified reasonable suspicion
11  for a stop, as an officer in Nevada, you can actually
12  detain somebody for up to 60 minutes, correct?
13     A.  Correct.
14     Q.  Without probable cause?
15     A.  Correct.
16     Q.  In response to a question was there any
17  reasonable suspicion that Tashii Farmer had committed
18  a crime, you said no.
19     Do you remember that?
20     A.  I guess with more of the context.
21     Q.  Let me ask you this:  Do you think there
22  was reasonable suspicion to believe that Tashii
23  Farmer had committed a crime?
24     A.  When he first approached us?
25     Q.  At any point during your interaction with

---

Page 116

1  him.
2      A.  During my interaction, no.  Maybe the use
3  of drugs if I saw his pupils, but the mental illness,
4  no.
5      Q.  Right, because that's not a crime?
6      A.  Correct.
7      Q.  But if your partner, Ken Lopera, who did --
8  well, it would appear that his body cam saw Tashii
9  Farmer's pupils, and you testified that you did not.
10     If he perceived that Tashii Farmer was
11  under the influence of a controlled substance, then
12  he would in fact have reasonable suspicion and
13  probable cause, correct?
14     MR. LAGOMARSINO:  Objection, form,
15  foundation.
16     THE WITNESS:  Yes.
17  BY MR. McNUTT:
18     Q.  Let me just break it down.
19     He would have reasonable suspicion to stop
20  Tashii Farmer, correct?
21     A.  Yes.
22     Q.  And he would have probable cause to arrest
23  Tashii Farmer, correct?
24     A.  For?
25     Q.  For being under the influence of a

---

Page 117

1  controlled substance.
2      A.  Correct.
3      Q.  You testified in response to
4  Mr. Lagomarsino's questioning that you did not
5  perceive Tashii Farmer to be mentally ill based on
6  your brief interaction with him.
7      Is that fair?
8      A.  That's fair.
9      Q.  Okay.  So if he wasn't -- sitting here
10  today, if he wasn't mentally ill, what would cause
11  him to be profusely sweating and erratic behavior and
12  act paranoid?
13     A.  The fact that he stated that he ran across
14  the boulevard and that someone was chasing him.
15     Q.  Does physical exertion give rise to
16  paranoia?
17     MR. LAGOMARSINO:  Form, foundation.
18     THE WITNESS:  I'm not completely familiar
19  with, I guess, the essentials of paranoia.  So
20  possibly, but I can't say for sure.  I'm not --
21  BY MR. McNUTT:
22     Q.  You testified in your CIRT statement that
23  he nailed two of the elements of excited delirium,
24  one was profusely sweating and one was paranoia?
25     A.  Yes.

---

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

34 (Pages 130 to 133)

Page 130

1    Q.  Okay.
2    A.  I can't remember exactly where.
3    Q.  And you're seeing the back of
4  Officer Lopera's uniform?
5    A.  Yes.
6    Q.  So now, he's taken the left and he's
7  continuing down this other hallway.
8        So we'll just stop it right there, and
9  we're stopped at 34 seconds.
10       What did you do after you saw the back of
11  his uniform?
12   A.  I don't know where they went.  So I don't
13  know how much further behind that I was.  I don't
14  know.
15       I didn't know there was a right-hand turn
16  after that.  I thought it immediately ran into a
17  stairwell.  So I tried to check doors and stuff to
18  see if they had gone into anywhere else.
19   Q.  Okay.  So let me break it down a little bit
20  based on your testimony.
21       You obviously went over the same very
22  slippery area?
23   A.  Correct.
24   Q.  I don't think I asked this.  Did you see
25  Ken fall?  In person, not on the video.

Page 131

1    A.  No, not that I remember.
2    Q.  Okay.
3    A.  I mean, clearly, it's happened.  It's in
4  every video that I've seen on this.
5    Q.  No question.  So the last time you saw your
6  partner, were you on that slippery area, were you
7  past that slippery area?  Can that put it in context?
8    A.  I don't remember if I was on or past it.  I
9  don't know.  I don't remember.
10   Q.  Okay.  So the last thing you saw was
11  Ken Lopera taking this left --
12   A.  Yes.
13   Q.  -- around the bend or around the corner, as
14  you've testified, right?
15   A.  Yes.
16   Q.  Did you follow down that hallway and go to
17  the left as well?
18   A.  Yes.  That's the last I saw them.
19   Q.  Okay.  And then, so when you got around the
20  bend, then what?
21   A.  From what I remember without seeing the
22  video that it turned right into the stairwell.  And
23  on the video, it clearly shows that there's another
24  right-hand turn.
25       But at some point, I started to check the

Page 132

1  doors and see if they had gone into anywhere else.
2    Q.  Okay.  I just backed it up to 23 which is
3  about where he fell, where he's getting back up from
4  falling.
5        So I want to watch it now that we've got
6  that testimony and so we can put it in context where
7  you last saw him, "him" being Ken Lopera.
8        So he takes a left.  You took that same
9  left?
10   A.  I'm going to say yes.
11   Q.  I'm sorry?
12   A.  I believe so, yes.
13   Q.  And there's a Pepsi machine on the right
14  and some more cones.  We're around 35 to 45 seconds
15  variously.
16       Do you recall seeing that part?
17   A.  I do not.
18   Q.  Okay.  Now Ken is going through a door, and
19  you don't recall --
20   A.  I don't recall.
21   Q.  -- any of this?
22   A.  No.
23   Q.  Okay.  So all of this, you've only seen
24  from --
25   A.  From his -- I don't recall I ever went to

Page 133

1  any stairs.  I could have.  I know, at some point, I
2  was in an elevator, and I don't remember how I got
3  there.
4    Q.  Okay.  So at 1:01, 1:02, he obviously calls
5  your name?
6    A.  Yes.
7    Q.  You never heard that?
8    A.  No.
9    Q.  Okay.  So you just heard Officer Lopera say
10  "Somebody running," correct?
11   A.  Um-hum.
12   Q.  And we know that he was saying that to a
13  Venetian security guard.
14       Have you heard that part?
15   A.  I didn't know that.  I know the security
16  guards are all down there.  I didn't know that was
17  who he was speaking to.
18   Q.  That's been made pretty clear.
19       So all of that part after you said you saw
20  him turn that left corner, by the time you got to
21  that corner or that bend, he was no more in your
22  purview --
23   A.  Yes.
24   Q.  -- and you never heard him call your name?
25   A.  Correct.

Officer Ashley Lif  ~   April 4, 2019
\* \* \* Videotaped Deposition \* \* \*

Page 134

1    Q.   Or you never heard him call your name?
2    A.   Correct.
3    Q.   Now, I'm just going to show just a few more
4  seconds to orient you on the area that Ken came out
5  in terms of that street.
6         Is this the area where you said you were --
7  do you remember where you -- wait.  Strike all that.
8         Does seeing this at all refresh your
9  recollection about where you exited the Venetian?
10    A.   No.
11    Q.   Okay.
12    A.   That entire drive is probably the better
13  part of 300-plus meters that looks exactly the same
14  with the crosses and the...
15    Q.   Okay.  Okay.
16         So a little hard to see, but take my word
17  for it, that's Tashii Farmer in the frame, correct?
18    A.   Okay.
19    Q.   You heard Ken's voice, "Stop, don't move"?
20    A.   Yes.
21    Q.   And we're at 1 minute 34, and we see the
22  white Toyota truck in the frame too, right?
23    A.   Yes.
24    Q.   Is Officer Lopera's command a lawful
25  command at that point?

Page 135

1    A.   Yes.
2    Q.   Tell me if Tashii Farmer complies with that
3  lawful command.
4         Is it per policy to warn somebody they're
5  going to get tased before they get tased?
6    A.   I believe if it's reasonable.
7    Q.   So meaning you don't have to if you don't
8  have time, correct?
9    A.   I can't recall verbatim.  In my
10  understanding, I believe if it's reasonable, you do
11  it.
12    Q.   Okay.  So at this point, from what you've
13  seen on the body cam and what you know from your
14  first-person experience up until you didn't have a
15  first-person experience, Tashii Farmer has never been
16  checked for weapons, correct?
17    A.   Correct.
18    Q.   So if Officer Lopera's perspective is that
19  this is an individual under the influence of a
20  controlled substance that fled down a restricted area
21  of a casino and was not listening to his lawful
22  command at that point, correct?
23    A.   Correct.
24    Q.   And Officer Lopera at this point also
25  doesn't know whether or not Tashii Farmer has any

Page 136

1  weapons, correct?
2    A.   Correct.
3    Q.   So Officer --
4         MR. LAGOMARSINO:  Hold on.
5         I'm just going to lodge an ongoing
6  objection as to what her testimony is as to what
7  Officer Lopera thought or did or didn't do as a
8  result of what he may have thought.
9  BY MR. McNUTT:
10    Q.   So at this point, one TASER strike has
11  occurred and Tashii Farmer is on his back, correct?
12    A.   Yes.
13    Q.   And Officer Lopera before the objection
14  just said, "Don't move," correct?
15    A.   Yes.
16    Q.   And if you want me to back it up, we can
17  replay that.
18    A.   He said, "Don't move."
19    Q.   That's a lawful command, correct?
20    A.   Yes.
21    Q.   Now, what is Tashii Farmer doing after
22  Ken Lopera said, "Don't move"?
23    A.   He's trying to stand up.
24    Q.   Is that complying with a lawful command?
25    A.   No.

Page 137

1    Q.   If you were that officer, would you cycle
2  the TASER again?
3    A.   No.
4    Q.   You wouldn't?
5    A.   He's at a tactical advantage where he can
6  go hands on at that point.
7    Q.   So you think Officer Lopera by himself
8  should have at this point dropped the TASER and gone
9  hands on with Tashii Farmer?
10    A.   It was an option.  He already cycled it one
11  time and it was rendered ineffective.  It didn't get
12  the five seconds -- it didn't get the NMI or the
13  neuromuscular incapacitation.
14    Q.   And so, you think that it's reasonable --
15  well, let me just ask you.
16         That's what would you have done, correct?
17    A.   That's what I would have done.
18    Q.   Is it unreasonable for another officer to
19  cycle the TASER again?
20    A.   No.
21    Q.   And it's still per policy you can do that,
22  right?
23    A.   For three times, yes.
24    Q.   Isn't it true that an officer alone can
25  actually cycle the TASER more if necessary?

Officer Ashley Lif  ~  April 4, 2019
* * * Videotaped Deposition * * *

Page 142

1  carry weapons is in their waistband.
2      Q.  So in your training, when you hear somebody
3  say they will comply but they physically aren't
4  complying, so their mouth is doing something
5  different than their hands, what do you pay attention
6  to as an officer?
7      A.  Their hands.
8      Q.  It's what they're doing that matters more
9  than what they're saying, correct?
10     A.  Yes.
11     Q.  And you would agree with me that although
12  Tashii Farmer is saying that he will comply where he
13  says, "I will," he is in fact not complying, correct?
14     A.  Correct.
15     Q.  So at this point, Officer Lopera does go
16  hands on, correct?
17     A.  Yes.
18     Q.  And you can clearly see at 2:05 in the tape
19  that Officer Lopera's left hand is grabbing Tashii
20  Farmer, correct?
21     A.  Yes.
22     Q.  Grabbing, it looks like, his left arm.
23  Would you agree with me?
24     A.  Yes.
25     Q.  Did you hear that other voice?

Page 143

1      A.  I don't know what it said, but I did hear
2  another voice.
3      Q.  So in the police report, in the arrest
4  report, it says, "Okay, sir, okay, sir."  It
5  identified this timestamp around 2:05 to 2:08.  I
6  want to back it up and have you listen to it real
7  briefly again.  A little imprecise on this.  I want
8  you to listen for that "Okay, sir, okay, sir."
9      And my question is:  Is that Tashii Farmer,
10  is it Ken Lopera, or is it a third party?
11     MR. LAGOMARSINO:  Form, foundation.
12     THE WITNESS:  I think it was Mr. Farmer.
13  BY MR. McNUTT:
14     Q.  You think it's someone other -- it's not
15  Ken Lopera?
16     A.  No, it's not Ken.
17     Q.  Okay.  The Venetian security guard
18  testified that that was him.
19     A.  Okay.
20     Q.  So I just wanted to know if that was
21  something that you could tell.
22     MR. LAGOMARSINO:  Move to strike.
23  BY MR. McNUTT:
24     Q.  At this point, the body cam is getting a
25  little shaky, right?

Page 144

1      A.  Yes.
2      Q.  Why is that?
3      A.  The magnets to hold them on are weak at
4  best.
5      Q.  And because Tashii Farmer is in contact
6  with another human being?
7      A.  That's correct.
8      Q.  Okay.  Did you hear Officer Lopera say,
9  "Help me out"?
10     A.  Yes.
11     Q.  Have you ever asked a civilian for help in
12  a confrontation with a suspect?
13     A.  Not that I can recall, no.
14     Q.  Would that indicate to you that
15  Officer Lopera felt that he needed physical
16  assistance?
17     A.  Yes.
18     Q.  Do Metro officers lightly ask for
19  assistance from non-Metro officers or non-law
20  enforcement?
21     A.  No.
22     Q.  If you were at a stop and I was walking by
23  and you thought you needed help, would you ask a
24  lawyer in a suit to help you?
25     A.  If I needed it.

Page 145

1      Q.  If you absolutely needed it, right?
2      A.  Yes.
3      Q.  But you wouldn't make that request lightly,
4  correct?
5      A.  That's correct.
6      Q.  Would you say that you were in fear of
7  physical harm in order to make that request?
8      A.  Yes.
9      Q.  Do you think Ken Lopera was in fear of
10  physical harm at this point where he asked someone
11  else to help him?
12     MR. LAGOMARSINO:  Form, foundation.
13     THE WITNESS:  Yes.
14  BY MR. McNUTT:
15     Q.  So at this point, we're 2:22 on the tape,
16  and we see several other people around Tashii Farmer
17  and Ken Lopera, correct?
18     A.  Yes.
19     Q.  And we cannot see their faces.
20  And so, do you recognize their pants as
21  being Metro officer pants?
22     A.  No.
23     Q.  And we know from other depositions, there's
24  no secret here, that those are other Venetian
25  security guards.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 146

1          MR. LAGOMARSINO: Move to strike.
2    BY MR. McNUTT:
3      Q.  But for our purposes, it's sufficient that
4    you know -- or for your testimony, you would agree
5    with me those are not LVMPD officers?
6      A.  Correct.
7      Q.  At this point, 2:22, can you see, tell me
8    what physical position Tashii Farmer is in?
9      A.  He's sitting on the ground.
10     Q.  So he's sitting up, correct?
11     A.  Yes.
12     Q.  Does it appear to you that Ken Lopera has
13   got a couple feet between him or he's not in physical
14   contact at that point?
15     A.  That's correct.
16     Q.  Do you think Tashii Farmer is complying
17   with police orders at this point?
18         MR. LAGOMARSINO:  Form, foundation.
19         THE WITNESS:  I don't remember the last
20   order that he gave, so I don't know if he's --
21   BY MR. McNUTT:
22     Q.  Okay.  We'll watch a little further.
23         Hear that "Okay, sir, okay, sir" again?
24     A.  Yes.
25     Q.  Do you identify that as Officer Lopera?

Page 147

1    Just "Yes" or "No"?
2      A.  No.
3      Q.  Do you identify that as Tashii Farmer what
4    you've heard so far?
5      A.  Yes.
6      Q.  Now, as we watch this, I want you to tell
7    me if at any point you see or hear Tashii Farmer
8    strike Ken Lopera.
9          THE WITNESS:  Can you play that back again,
10   please.
11   BY MR. McNUTT:
12     Q.  So we're at 2:37 where I stopped it --
13     A.  Yes.
14     Q.  -- and I'll play it back to 2:24.
15         So tell me, on or about when you see or
16   hear Tashii Farmer strike Ken Lopera.
17         MR. LAGOMARSINO:  Form, foundation.
18         THE WITNESS:  Right there.
19   BY MR. McNUTT:
20     Q.  So around 2:34 on the tape, correct?
21     A.  Yes.
22     Q.  Is striking an officer a crime in the State
23   of Nevada?
24     A.  Yes.
25     Q.  Is striking an officer indicative of

Page 148

1    someone intending to comply with lawful commands?
2      A.  They're not going to comply.
3      Q.  Is it reasonable for your partner,
4    Ken Lopera, to put Tashii Farmer in a lateral
5    vascular neck restraint at this point?
6      A.  Yes.
7          MR. LAGOMARSINO:  Foundation.
8    BY MR. McNUTT:
9      Q.  Is it reasonable for Officer Lopera to use
10   hand strikes on Tashii Farmer at this point?
11     A.  Yes.
12     Q.  Would it be reasonable for Tashii -- excuse
13   me -- for Officer Lopera to use a baton to hit Tashii
14   Farmer at this point?
15         MR. LAGOMARSINO:  Form, foundation.
16         THE WITNESS:  Yes.
17         (End of excerpts from Officer
18         Lopera's body-worn camera.)
19         MR. McNUTT:  I have no further questions.
20   Thank you.
21         MR. LAGOMARSINO:  I've got some questions.
22
23         FURTHER EXAMINATION
24   BY MR. LAGOMARSINO:
25     Q.  Do you need a break?

Page 149

1      A.  (No audible response.)
2      Q.  If a police officer is violating a
3    citizen's rights by using excessive force, is the
4    citizen allowed to strike the officer in
5    self-defense?
6          MR. McNUTT:  Objection --
7          MR. ANDERSON:  Objection, form.
8          MR. McNUTT:  -- inflammatory,
9    argumentative.
10         THE WITNESS:  I'm not aware of that.
11   BY MR. LAGOMARSINO:
12     Q.  So have you ever been trained at Metro that
13   if an officer is violating a citizen's rights by
14   using excessive force that the citizen is allowed to
15   defend themselves by striking the officer?
16     A.  I don't recall.
17     Q.  I'm just going to jump around a little bit.
18         So you had a question about Tashii Farmer
19   reaching into the waistband and whether that could
20   possibly be a weapon.
21         Were the TASER prongs also in the area of
22   his waist?
23     A.  Yes.
24     Q.  So was it also possible that -- did you
25   interpret that to be Tashii trying to remove the

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

---

Page 150

1   TASER prongs from him, his waist?
2       A.  It's likely, but the way that I've been
3   trained that that's the immediate area, both front
4   and back, is common where weapons are placed.
5       Q.  Did you find -- strike that.
6           You heard Ken Lopera make many commands,
7   correct?
8       A.  Yes.
9       Q.  Would you make commands in that fashion?
10      A.  Yes.
11      Q.  Did you find his commands to be confusing?
12          MR. McNUTT:  Objection, form.
13          THE WITNESS:  Yes.  There wasn't -- I feel
14  like there wasn't enough time given for compliance.
15  BY MR. LAGOMARSINO:
16      Q.  When you looked in the beginning of the
17  interaction, did you see the doors that went into the
18  service area?
19      A.  Yes.
20      Q.  Did you see the big, bright red exit sign
21  lit up above that door?
22      A.  I don't recall in the video.
23      Q.  Would a big, bright exit sign indicate to
24  you that somebody can exit out that door?
25      A.  Yes.

---

Page 151

1       Q.  There was some testimony early about where
2   the people were who were cleaning.
3           Have you ever been in a casino and seen
4   employees cleaning in public areas?
5       A.  Yes.  At the casino floor, vacuuming or --
6   yes.
7       Q.  And the area where Officer Lopera was over
8   by looked like some coolers where some drinks were?
9       A.  Yes.
10      Q.  I'm not asking you based on your
11  recollection, I'm asking based on the video.
12      A.  On the video, yes.
13      Q.  And the cleaning equipment was actually in
14  a public area, correct?
15      A.  Yes.
16      Q.  You had some questions about whether you're
17  trained in the academy or not to recognize somebody
18  who is under the influence of intoxicants or
19  substances.
20          Is there a specific designation called drug
21  recognition expert for Metro?
22      A.  Yes.
23      Q.  Are you a drug recognition expert?
24      A.  No, sir, I am not.
25      Q.  Was Lopera, to your knowledge?

---

Page 152

1       A.  Not to my knowledge.
2       Q.  What certifications do you have?  I know
3   you said you're crisis intervention.  I guess let me
4   rephrase.
5       A.  There's a handful.
6       Q.  Relevant to this case, what certifications
7   do you have?
8       A.  None that come to mind other than the
9   crisis intervention.  But I haven't looked at my
10  training, I guess, completions.
11      Q.  Okay.  This is a question I'll ask, I'm not
12  sure if you know the answer or not.
13          If you're fired -- you made the
14  reference -- not you, sorry.
15          If an officer is fired, do they lose
16  certain benefits as opposed to retiring?
17          MR. McNUTT:  Objection, form, foundation.
18          THE WITNESS:  To my knowledge, yes.
19  BY MR. LAGOMARSINO:
20      Q.  And what do you base your knowledge on?
21      A.  Just from what I've heard what people do.
22      Q.  And you've heard that from Metro?
23      A.  I think just through, for lack of a better
24  term, the grapevine.
25      Q.  Okay.

---

Page 153

1           If you were in Officer Lopera's situation,
2   what would you have done differently?
3           MR. ANDERSON:  Objection, form.
4           MR. McNUTT:  Join.
5           THE WITNESS:  Called in sick or a vacation
6   day and not been to work.
7   BY MR. LAGOMARSINO:
8       Q.  Besides that.
9       A.  Okay.  Not follow it.  I would have used
10  discretion.
11      Q.  Do you feel like he abused his discretion?
12          MR. McNUTT:  Objection, form.
13          MR. ANDERSON:  Objection, form.
14          THE WITNESS:  I don't understand your
15  question.
16  BY MR. LAGOMARSINO:
17      Q.  Did you feel like Officer Lopera abused his
18  discretion by following --
19      A.  Oh, abused discretion.  I thought you said
20  abused the question.
21      Q.  Sorry.
22      A.  Oh, abused discretion?  I don't think
23  abused is the right word.  I think maybe there were
24  other appropriate options.
25      Q.  What did Officer Lopera do, in your view,

---

Officer Ashley Lif  ~  April 4, 2019
* * * Videotaped Deposition * * *

Page 154

1  that was different from how you were trained to react
2  when the situation became an altercation?
3  A. Control the hands. That was my main --
4  that's why after the first cycle I said I would have
5  gone hands on is to control the hands.
6  You can have -- you can have a knife in
7  your ankle, you could be armed. If I control your
8  hands, I'm going to be okay.
9  Q. Okay. Going back to the question about the
10  custody plan in the transcript.
11  A. Yes.
12  Q. In reference to a different question, you
13  said to me -- I'm not sure if the transcriptionist or
14  recorder got it right -- is it possible that when you
15  said, "We did it --" when it says on the paper, "We
16  did have a custody plan," that you said, "We didn't
17  have a custody plan"?
18  A. It's possible.
19  Q. Would you defer to the audio recording?
20  MR. McNUTT: Objection, form. Attempts to
21  misstate a clear record.
22  THE WITNESS: I don't recall having --
23  MR. LAGOMARSINO: Oh, you've never seen
24  somebody mess up a transcript before?
25  MR. McNUTT: Only this one.

Page 155

1  MR. LAGOMARSINO: Okay.
2  THE WITNESS: I don't recall having a
3  custody plan predetermined as of today.
4  BY MR. LAGOMARSINO:
5  Q. Now, there was a question, and I just want
6  to make sure the record is clear, about -- Mr. McNutt
7  asked what's he trying to do there, and you said,
8  "Stand up."
9  When he was asking you that question, the
10  video was paused, correct?
11  A. Yes.
12  Q. Farmer was not on his feet, correct?
13  A. Correct.
14  Q. It looked like he was sitting, correct?
15  A. Correct.
16  Q. If somebody is sweaty, does that mean
17  they're suffering from excited delirium?
18  A. No.
19  Q. If somebody is paranoid, does that mean
20  they're suffering from excited delirium?
21  A. No.
22  Q. If somebody is sweaty and paranoid, does
23  that mean that somebody is suffering from excited
24  delirium?
25  A. It could be an indicator.

Page 156

1  Q. It could not be an indicator, right? I
2  mean, some people are just paranoid, right?
3  A. Yes.
4  Q. And if you had to arrest every person who
5  was publicly intoxicated, which is a crime in the
6  State of Nevada, correct, you would be arresting --
7  you wouldn't stop arresting people on the Strip,
8  correct?
9  A. Correct.
10  MR. LAGOMARSINO: I don't have any more
11  questions at this point.
12  MR. McNUTT: Just a couple follow-ups.
13
14  FURTHER EXAMINATION
15  BY MR. McNUTT:
16  Q. You said that there was not enough time for
17  compliance with Ken Lopera's orders?
18  A. From my perception, but he might have had
19  another impression that I didn't know. I mean,
20  that's just what I would have done. That doesn't
21  mean it's right or wrong or indifferent.
22  Q. So when Ken Lopera said, "Don't move"--
23  A. And he moved.
24  Q. -- and he moved, how long was Ken supposed
25  to wait to see if he was going to comply?

Page 157

1  A. There's no set time.
2  Q. So when you give somebody an order and they
3  immediately disobey it, you don't have to --
4  A. That's correct.
5  Q. -- wait, correct?
6  A. Correct.
7  Q. And if you told somebody to do a specific
8  thing and you waited three to five seconds and they
9  were disobeying that entire time, like between TASER
10  cycles, would that be enough time?
11  A. Yes.
12  Q. Have you ever seen anybody -- let's go back
13  to the question about -- when the video was paused.
14  When the video was paused, Tashii Farmer
15  prior to that was laying on his back, correct?
16  A. Correct.
17  Q. And you said it looked like he was trying
18  to stand up, correct?
19  A. Correct.
20  Q. Have you ever seen anyone not move through
21  a sitting position to get to standing up from their
22  back?
23  A. No.
24  Q. I mean, you have to have some intermediate
25  position when you go from lying on your back to

Officer Ashley Lif  ~   April 4, 2019
* * * Videotaped Deposition * * *

Page 158

1    standing up, correct?
2        A.  Correct.
3        Q.  Would you like to watch the video again to
4    verify that you believe he was trying to stand up?
5        A.  No.
6        Q.  Out of the academy, is a Metro officer
7    trained to identify indicators that a person is on
8    drugs?
9        A.  Yes.
10       Q.  So you don't have to have any other
11   specialized training, a uniformed officer on patrol
12   is trained to identify somebody that's on drugs?
13       A.  Yes.
14       Q.  You said that the other options -- and you
15   earlier said that he could have used his OC spray, he
16   could have used his baton to strike someone, in this
17   case Tashii Farmer, he could have used hand strikes?
18       A.  Yes.
19       Q.  Could have used the LVNR.  All of those
20   things would have been authorized by policy, correct?
21       A.  Yes.
22       Q.  And you think all those things would have
23   been okay for Ken Lopera to do, correct?
24       A.  Yes.
25       Q.  Let's just get --

Page 159

1            THE VIDEOGRAPHER:  Hold on, guys.  Sorry.
2    I just had an issue.
3            (Pause in proceedings.)
4            THE VIDEOGRAPHER:  We're back on the
5    record.
6            MR. McNUTT:  Okay.
7    BY MR. McNUTT:
8        Q.  We were talking about other options, right,
9    and you said control the hands, meaning do you -- is
10   it your opinion in response to Mr. Lagomarsino's
11   question that instead of cycling the TASER,
12   Ken Lopera should have attempted to control Tashii
13   Farmer's hands?
14       A.  He could have.
15       Q.  Okay, but it wasn't wrong for him to use
16   the TASER, again, that's just your perception?
17       A.  Correct.
18       Q.  How tall is Ken Lopera, do you know, would
19   you estimate?
20           Is he taller than you?
21       A.  No.  Maybe about the same.
22       Q.  Okay.  How tall are you?
23       A.  I'm 5-11.
24       Q.  And your partner was about the same
25   heighth?

Page 160

1        A.  Yes.
2        Q.  Do you know how big, tall or weight-wise
3    Tashii Farmer --
4        A.  I don't recall exact.  I believe he was
5    taller than I was.
6        Q.  Okay.  And is it your testimony that
7    instead of using a TASER that would give you some
8    feet of standoff that you would routinely go hands on
9    with a male suspect that was taller and bigger than
10   you?
11       A.  I wouldn't say routinely, but the way that
12   his hands were placed, I felt like I could have had
13   an advantage to do so.
14       Q.  But again, one officer can do one thing,
15   one officer can do the other, they're both -- you can
16   articulate them as to why you did that, correct?
17       A.  Correct.
18       A.  Neither one is wrong?
19       A.  Correct.
20       Q.  Do you know sitting here today whether or
21   not Tashii Farmer was under the influence of a
22   controlled substance?
23       A.  Now I know.  Yes, today, I do know.
24       Q.  So in fact, if Officer Lopera perceived
25   that Tashii Farmer was under the influence of a

Page 161

1    controlled substance, it turns out he was right,
2    correct?
3            MR. LAGOMARSINO:  Objection, vague as to
4    controlled substance.
5    BY MR. McNUTT:
6        Q.  Correct?
7        A.  Correct.
8        Q.  Do you have any understanding that Tashii
9    Farmer was on illegal methamphetamines?
10       A.  I do understand that now.
11           MR. McNUTT:  Okay.  I have no further
12   questions.
13
14           FURTHER EXAMINATION
15   BY MR. LAGOMARSINO:
16       Q.  All right, just a couple follow-ups.
17           You were asked the question earlier would
18   you intervene to stop Ken Lopera from running after
19   Tashii.
20           Do you remember that generally?
21       A.  Yes.
22       Q.  If you saw Ken Lopera placing Tashii in an
23   LVNR for over a minute or even over 30 seconds and
24   Tashii wasn't moving, would you intervene to stop
25   that?

Officer Ashley Lif ~   April 4, 2019
* * * Videotaped Deposition * * *

42  (Pages 162 to 165)

Page 162

1      A.  Yes.
2          MR. McNUTT:  Objection, form --
3          MR. ANDERSON:  Objection.
4          MR. McNUTT:  -- assumes facts not in
5   evidence.
6          MR. ANDERSON:  Join.
7   BY MR. LAGOMARSINO:
8      Q.  Does tasing cause people to move?
9      A.  After the cycle, it can, but for that five
10  seconds, it's -- if there's a complete circuit to get
11  neuromuscular incapacitation, then they don't move.
12     Q.  Does tasing people to have distorted
13  perception?
14         MR. McNUTT:  Objection, form, vague.
15         MR. LAGOMARSINO:  Let me rephrase.
16  BY MR. LAGOMARSINO:
17     Q.  Does tasing hurt?
18     A.  I believe --
19         MR. McNUTT:  Objection, form.
20         THE WITNESS:  Thankfully, I've never been
21  tased.
22  BY MR. LAGOMARSINO:
23     Q.  Have you been trained that tasing causes
24  pain to its subjects?
25     A.  Yes.

Page 163

1      Q.  Is it unusual for someone to try to remove
2   prongs from them when they've been tased?
3      A.  I've only seen it happen in a controlled
4   environment.
5      Q.  Have you had any training, additional
6   training, as a result of this incident, either
7   department wide?
8      A.  Use-of-force model has changed.  You no
9   longer can use the LVNR in lower levels of force.
10         I don't recall anything specific that had
11  been put out for me.
12         I've made it more of a point to read
13  policy.
14         MR. LAGOMARSINO:  Okay.  All right.  No
15  further questions.  Thank you.
16         MR. McNUTT:  No further questions.
17         MR. ANDERSON:  I have nothing.
18         THE VIDEOGRAPHER:  This concludes the video
19  deposition of Ashley Lif.
20         The original media of today's testimony
21  will remain in the custody of Las Vegas Legal Video.
22         The time is approximately 1:48 p.m.  We are
23  going off the record.
24         (The following occurred off the
25  video record.)

Page 164

1          THE REPORTER:  Mr. McNutt, did you need a
2   copy of the transcript?
3          MR. McNUTT:  I do.
4          MR. ANDERSON:  I do.
5          MR. McNUTT:  PDF, please.
6          MR. ANDERSON:  Yes, I will also take one.
7          (The deposition was concluded at
8   1:49 p.m.)
9
10         *  *  *  *  *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 165

1                CERTIFICATE OF DEPONENT
2   PAGE   LINE  CHANGE        REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17
18         I, OFFICER ASHLEY LIF, deponent herein, do
    hereby certify and declare the within and foregoing
19  transcription to be my deposition in said action;
    that I have read, corrected and do hereby affix my
20  signature to said deposition.
21
22         _____
23                OFFICER ASHLEY LIF
24
25

Officer Ashley Lif ~  April 4, 2019
* * * Videotaped Deposition * * *

```
 1              CERTIFICATE OF REPORTER

 2              I, Cynthia K. DuRivage, a Certified Court

 3  Reporter of the State of Nevada, do hereby certify:

 4              That the foregoing proceedings were taken

 5  before me at the time and place herein set forth;

 6  that any witnesses in the foregoing proceedings,

 7  prior to testifying, were duly sworn; that a record

 8  of the proceedings was made by me using machine

 9  shorthand which was thereafter transcribed under my

10  direction; that the foregoing transcript is a true

11  record of the testimony given.

12              I further certify I am neither financially

13  interested in the action nor a relative or employee

14  of any attorney or party to this action.

15              IN WITNESS WHEREOF, I have this date

16  subscribed my name.

17  Dated: April 15, 2019

18

19

20              CYNTHIA K. DuRIVAGE
                CCR No. 451

21

22

23

24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com