# EXHIBIT 7
# Excerpts from John McGrath Deposition, Vol. II, 7/31/19

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

Page 1

1                UNITED STATES DISTRICT COURT

2                     DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,   )
                                      ) Case No.
7         Plaintiff,                  ) 2:18-cv-00860-GMN-VCF
                                      )
8              vs.                    )
                                      )
9    LAS VEGAS METROPOLITAN POLICE    )
     DEPARTMENT, a political          )
10   Subdivision of the State of      )
     Nevada; KENNETH LOPERA,          )
11   individually; TRAVIS CRUMRINE,   )
     individually; MICHAEL TRAN,      )
12   individually; MICHAEL FLORES,    )
     individually,                    )
13                                    )
          Defendants.                 )
14   _____)

15

16

17              VIDEOTAPED DEPOSITION OF

18          DEPUTY CHIEF JOHN MCGRATH

19      Taken on Wednesday, July 31, 2019

20              At 9:38 a.m.

21          Held at Lagomarsino Law

22   3005 West Horizon Ridge Parkway, Suite 241

23          Henderson, Nevada  89052

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

CONDENSED TRANSCRIPT

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ∼   July 31, 2019
* * * Videotaped Deposition * * *

Page 6

1    MR. ANDERSON:  Craig Anderson on behalf of
2 Las Vegas Metropolitan Police Department, Officers
3 Crumrine, Tran and Flores.
4    THE VIDEOGRAPHER:  Thank you.
5    And the witness may now be sworn in by
6 Gale Salerno for All-American Court Reporters.
7    -  -  -
8    DEPUTY CHIEF JOHN MCGRATH,
9    having been first duly sworn, was
10    examined and testified as follows:
11    -  -  -
12
13    EXAMINATION
14 BY MR. LAGOMARSINO:
15    Q.  Good morning.  Could you please state your
16 name for the record.
17    A.  John McGrath, M-c-G-r-a-t-h.
18    Q.  Have you ever had your deposition taken
19 before?
20    A.  Yes.
21    Q.  On how many occasions?
22    A.  I don't recall, but at least once for this
23 case.
24    Q.  Are you familiar with the instructions and
25 admonitions that go along with depositions?

Page 7

1    A.  Yes.
2    Q.  Basically you understand you're under oath?
3    A.  Yes.
4    Q.  So we'll skip those today.
5    Could you please tell me your current job
6 position?
7    A.  I'm a Deputy Chief with Las Vegas
8 Metropolitan Police Department over the Professional
9 Standards Division, which includes Human Resources
10 and Organizational Development, which is all of
11 training.
12    Q.  How long have you been in that position?
13    A.  About two and a half years.
14    Q.  Prior to that, what was your position with
15 Metro?
16    A.  I was a captain.
17    Q.  And what were your job duties and
18 responsibilities as a captain?
19    A.  As a captain I had several different
20 assignments, including Northwest Area Command,
21 Internal Affairs, Criminal Intelligence, and Internal
22 Oversight in Constitutional Policing.  Different
23 bureaus within the agency.
24    Q.  And how long were you a captain with those
25 responsibilities?

Page 8

1    A.  Approximately five years.
2    Q.  What were your specific job
3 responsibilities with respect to constitutional
4 policing?
5    A.  Yeah, I was only there for three months,
6 but in constitutional policing, that captain is part
7 of executive staff.  So you're the only person that's
8 not appointed by the sheriff to be part of executive
9 staff and the only captain that's on executive staff.
10    Secondly, there's three parts of
11 constitutional policing:  FIT, which is the Force
12 Investigation Team, which investigates use of force
13 and criminal allegations, and makes a report to the
14 district attorney's office, and submits that to them
15 and they decide whether there's any criminal charges.
16    The Critical Incident Review Team, which
17 looks at the tactics the officers employed or the
18 supervisors, to see if there's anything that they
19 could have done better or any policies that need to
20 be changed related to that incident.
21    And then OIO, which is a section that
22 basically is looking out for the officers involved in
23 critical incidents, their welfare.  And also they're
24 responsible for putting out awareness reports, which
25 is something that immediately we want to let the

Page 9

1 department know that we have an issue or a problem
2 with this incident and we want to change their
3 behavior immediately.
4    Q.  Is OIO Office of Internal Oversight?
5    A.  Yes.
6    Q.  When you stated that it's the only captain
7 not appointed by the sheriff, what does that mean?
8    A.  So members of an executive staff, deputy
9 chiefs and above, are chosen by the sheriff.  You
10 don't test for those positions.  And so he appoints
11 you to that position, and then you become an
12 appointed person, a part of the department.
13    Q.  What difference does it make if you're not
14 appointed?  Is it a merit-based type of --
15    A.  It's merit-based, but you don't have to
16 test, so you're just chosen.  So he gets to pick
17 who's on executive staff, but you can be also
18 unappointed and put back to your previous rank of
19 captain.
20    Q.  And were you appointed?
21    A.  Yes.
22    Q.  Who appointed you?
23    A.  The sheriff.
24    Q.  Which sheriff?
25    A.  Lombardo.  Sorry.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 18

1 officer?
2    A.  I don't think so.  It's more for ease of --
3 well, first of all, these uniforms are more
4 expensive.  Those uniforms are a little bit more
5 durable for officers that are doing different kinds
6 of assignments.  Like we have our community-oriented
7 policing officers who are dealing with the homeless.
8 They're getting dirty all the time.  Those uniforms
9 are washable.  These ones are -- have to be
10 dry-cleaned.
11       So there's different reasons why.  They
12 just have to be justified to the bureau commander,
13 then he has to authorize it.
14    Q.  Do you know who the bureau commander was
15 for the convention center area command at the time of
16 Tashii Farmer --
17    A.  I think it was Captain Pelletier, but I'm
18 not 100 percent.  And he's the bureau commander right
19 now.
20    Q.  Are you CIT certified?
21    A.  If I am, it was over 15 years ago.  And I'm
22 not currently certified.  So you have to keep your
23 certification up, and I'm not.
24    Q.  I recall something in your prior deposition
25 of you saying once you get to a certain level of

Page 19

1 rank, you don't have to maintain certain
2 certifications; is that right?
3    A.  Right, per POST.  And the, you know, it's
4 really -- I'm not dealing with day-to-day people that
5 are -- have mental health issues, so there's no
6 reason to keep my certification up.
7    Q.  Okay.  Any time you need a break today,
8 just let us know.  We're happy to accommodate you.  I
9 anticipate today going about anywhere from two to
10 three hours.  So just let us know.  Okay?
11    A.  Okay.  I don't know if I have two to three
12 hours' worth of information, but you can ask me.
13    Q.  Have you ever been involved personally in a
14 deadly force incident?
15    A.  I haven't used deadly force, but I was
16 involved in an in-custody death a long time ago.
17    Q.  And what do you recall about that
18 incident?
19    A.  Sure.  It was a subject with a gun that I
20 was trying to get to put the gun down.  And he
21 refused.  He had the gun in his hand, and there was a
22 language issue.  He spoke Spanish and was highly
23 intoxicated and wasn't understanding what I was
24 telling him to do.
25       So I got close enough to get my hands on

Page 20

1 him.  Even though he had a gun in his hand, I threw
2 him on the ground.  And as I was holstering my
3 weapon, a security guard who was trying to assist me
4 shot him.
5    Q.  Was that security guard with a hotel or
6 casino?
7    A.  It was on Fremont Street.  Some private
8 security.
9    Q.  When you were sergeant, did you ever have
10 to come onto the scene after one of your patrol
11 officers had used deadly force?
12    A.  Yes.
13    Q.  On how many occasions?
14    A.  How many what?
15    Q.  On how many occasions, approximately?
16    A.  I don't recall.
17    Q.  More or less than five?
18    A.  Probably less than five.  And the
19 procedures for officer-involved shooting weren't the
20 same then that they are now.
21       MR. MCNUTT:  Weren't, like were not?
22       THE WITNESS:  Were not the same.  They were
23 a lot more.  This is what we do, this is how the
24 investigation is going to go.  I mean, back then it
25 was investigated by homicide.

Page 21

1 BY MR. LAGOMARSINO:
2    Q.  Have you ever gone to the scene as either a
3 sergeant or a lieutenant for a death that arose out
4 of some kind of a neck restraint?
5    A.  I don't recall any.
6    Q.  As you sit here, do you recall any deaths
7 in your career -- strike that.
8       While employed at Metro, do you recall any
9 deaths caused by any Metro officer as a result of any
10 kind of a neck restraint?
11    A.  So I know of several cases that were
12 brought to my attention in the last deposition that I
13 was asked questions about.  And I'm aware of those
14 cases, but I wasn't involved and don't know the
15 details of how exactly it was determined the person
16 died because was it the neck restraint, was it the
17 intoxication of their either alcohol or drugs in
18 their system, and was there other things that
19 happened, or was it a physical issue that the person
20 had.
21       So I know that the person ended up
22 deceased, but I don't know the exact determination of
23 how that happened.
24    Q.  Okay.  And how many of those do you recall?
25    A.  I think there was two or three.

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

7 (Pages 22 to 25)

Page 22

1    Q.  And those -- and we'll get to those later
2  in the deposition today.
3    A.  Okay.
4    Q.  Independently, do you recall any others?
5    A.  No.  I think I remember the one that
6  happened before I joined the department, Charles Bush
7  maybe.
8    Q.  What do you recall about that?
9    A.  Vice officers put a neck restraint on
10  someone who was fighting with them and the person
11  ended up dying.  And so I don't know, was that
12  improperly applied neck restraint or were there other
13  issues involved, but that was a common one that was
14  talked about on the agency.
15    Q.  In terms of your responsibilities of
16  overseeing training, are there prior neck restraint
17  incidents that are used as part of the training
18  process now?
19    A.  I don't think that we generally talk about
20  specific incidents in training going back 20 or more
21  years.
22    Q.  Okay.
23    A.  And I certainly -- I don't think that
24  that's how we train.  We don't train about, you know,
25  specific incidents if you do this, because of

Page 23

1  this incident, this will happen.
2    Q.  Okay.  Have you ever applied an LVNR?
3    A.  Only in training.
4    Q.  Tell me about that.
5    A.  Well, as an officer, you are trained to use
6  the LVNR throughout the academy, and then you're
7  recertified every year how to do the LVNR and then
8  different ways and circumstances to use it.
9    I just never found the time appropriate in
10  my use of force to use that.  Most of the people that
11  I use force against decided to run and not fight.
12    Q.  In terms of your responsibilities with the
13  IOCP.
14    A.  Uh-huh.
15    Q.  How did you get assigned to that?  Did you
16  volunteer for that?
17    A.  No.  I guess they -- the sheriff asked me
18  to go there.  So I guess somebody recommended me to
19  go there.
20    Q.  Did you want to go there?
21    A.  Well, yes.  It's a -- it's kind of a
22  promotion, I guess.  So but it's an important
23  assignment.  You know, but all the assignments I had
24  outside of patrol I was asked to go to, too.  You
25  know, internal affairs is not the assignment most

Page 24

1  people want to go to.  But when they ask you to go
2  there, you kind of have to take that assignment.
3    And it's actually you learn a lot in
4  internal affairs.  Criminal intelligence is more
5  about knowing how to understand and give confidential
6  briefings to the sheriff and being trusted with
7  confidential investigations.  And so I think that
8  based on that assignment, that's why I was asked to
9  do the next assignment.
10    So it's more of a career progression of
11  looking at what you're good at and what the sheriff
12  trusts you with.
13    Q.  Okay.  Are you familiar with the Department
14  of Justice COPS assessment that was performed
15  approximately 2012?
16    A.  Yes.
17    Q.  Did you have participation in that process?
18    A.  Yes.
19    Q.  Generally what was your participation?
20    A.  I just participated in different groups,
21  giving feedback on use of force and use of force
22  policy.  I wasn't one of the main instructors or
23  anything like that.  But certainly was involved in
24  ensuring that that process was done correctly.
25    Q.  Did you interact with individuals from the

Page 25

1  Department of Justice?
2    A.  Yes.  I participated in interviews and
3  things like that.
4    Q.  And who came out from the DOJ?  Was it
5  attorneys or agents?
6    A.  My recollection would be people from the
7  COPS office were different -- they were all
8  civilians, but I think that some of them did have
9  legal training or legal background.
10    But some of the interviews were like this
11  where you would have different people asking you
12  questions, and I couldn't tell you what all their
13  backgrounds were.
14    Q.  Okay.  Do you know how many assessments
15  COPS performed on Metro?  I mean written assessments
16  they provided, I guess?
17    A.  I don't recall the exact number, but there
18  was a lot.
19    Q.  So I'm familiar, there was the first report
20  that came out that had a lot of recommendations and
21  assessments.  And then there was, like, a six-month
22  follow-up that came out after that.
23    Were you familiar with additional ones that
24  were provided to Metro?
25    A.  I may have read additional follow-ups, but

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

8  (Pages 26 to 29)

Page 26

1  I know that all the recommendations that we were
2  tasked with were done other than the ones that we
3  decided were not -- didn't apply to our agency.
4      Q.  Without having the benefit of having those
5  in front of you, do you recall which ones or any of
6  them that you decided were not going to be applied?
7      A.  I used to know.  But I don't recall right
8  off the top of my head.  And they were decided by the
9  sheriff that, okay, this is something that we're not
10  going to follow.  And there was only a couple of
11  those.
12      Q.  That was Sheriff Gillespie at the time?
13      A.  I believe so, yes.
14          (Exhibit 1 was marked for
15          identification.)
16  BY MR. LAGOMARSINO:
17      Q.  I've provided you with Exhibit 1.  This is
18  a document that's been produced by Metro in this
19  case.
20          I can tell you it was our office that
21  placed the highlighting on here.
22      A.  Okay.
23      Q.  Go ahead and just -- I understand there's
24  quite a few pages here.  Have you seen Exhibit 1
25  before?

Page 27

1      A.  No.  I don't think so.
2      Q.  Well, let me ask you generally, are you
3  aware that Metro conducted research after the Farmer
4  incident regarding whether -- strike that --
5  assessing other agencies who may have allowed the use
6  of the LVNR?
7      A.  Yes.
8      Q.  How did you become aware of that?
9      A.  So when the sheriff said, hey, we need to
10  look at LVNR, and part of that included serving other
11  agencies, and then looking at our policy and seeing
12  if we need to make any changes in policy.
13          As part of training -- training is involved
14  in that, the use of force committee which looks at
15  the changes at the use of force.
16          And then because of how high profile this
17  case was, that I became involved in that.
18          So in other words, I wasn't involved in
19  creating the questions or -- but I did see this now
20  that I look at it.  But I didn't review every one.
21  It was more of the summary of what the agencies
22  produced that I was aware of.
23      Q.  Okay.  What is the Major City Chiefs
24  Association?
25      A.  I think it's just what it says.  Major

Page 28

1  cities within the United States above a certain
2  number of population or officers are involved in the
3  major city chiefs.
4      Q.  Were you ever part of any discussions
5  internally in a meeting type of a setting where the
6  topic was whether to allow the use of the LVNR at
7  all?
8      A.  Yes.
9      Q.  How many do you recall?
10      A.  I think that -- I would say a couple.  But
11  not more than three.  But it was more of a discussion
12  about, okay, these are the changes we're
13  recommending, and there was a give and take of why
14  are you saying we should keep it versus change it to
15  a lesser -- a lesser part of the policy where we
16  reduced it from you can't use it in these
17  circumstances but you can and how to simplify it.
18          So it was an overall discussion about are
19  we going to keep it, and if we are going to keep it,
20  are we going to change policy at all.
21      Q.  And how does that work in terms of the
22  recommendation and -- like, who makes a
23  recommendation and who makes the decision?
24      A.  So I think that it was tasked to IOCP to
25  make the changes in the use of force.  But I think

Page 29

1  that it was also involving the use of force committee
2  which involves people from outside IOCP to be
3  involved, too.  Which includes a lot of training.
4          The actual trainers who were teaching LVNR
5  and then the trainers wouldn't be involved in the
6  survey, but they would just be reading the survey and
7  looking at the results of the survey and policies
8  from other agencies that they would look at and maybe
9  change some of the wording because someone may have
10  better wording than we have.  So we're always trying
11  to get to the best policy that we can.
12      Q.  What is your personal opinion on the use of
13  the LVNR as a use of force option at Metro?
14          MR. ANDERSON:  Objection.  Form.
15          Go ahead and answer.
16          THE WITNESS:  I think that there are times
17  when it's appropriate to use and the ease of it makes
18  it better for the officers to use the least amount of
19  force as possible to make someone comply with their
20  direction.
21          And there are officers that are better at
22  it than others and feel more comfortable with it.
23  But that's no different than some of our other tools
24  that we use.
25          Some officers like the Taser.  Some

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

9 (Pages 30 to 33)

Page 30

1  officers like to go hands-on.  Some feel more
2  comfortable with LVNR.
3          And I think that was one of the reasons why
4  we didn't take it away is there are situations where
5  someone is facing away from you that an officer can
6  use the LVNR that's the best tool for that situation
7  in that scenario, and we didn't want to take that
8  away from officers.
9  BY MR. LAGOMARSINO:
10     Q.  Okay.  Now, you had mentioned earlier in
11  your testimony that after the Farmer incident, the
12  policy was changed to where there were certain
13  circumstances where the LVNR could be used before but
14  could now not be used.
15     A.  Right.
16     Q.  And I'm assuming that has to do with
17  intermediate level of force options and those type of
18  things?
19     A.  Right.
20     Q.  Are you able to, without having the policy
21  in front of you -- and understanding you probably
22  don't have a photographic memory -- able to
23  articulate the differences in the policies at this
24  point?
25     A.  So the basics of it is, is you could use

Page 31

1  the LVNR as a restraining hold and now you can't.
2  Someone has to be aggressively resisting you to be
3  able to use the LVNR.
4          MR. LAGOMARSINO:  Counsel, we've premarked
5  these so we're going to go a little out of order.
6          This is going to be Exhibit 8.
7          (Exhibit 8 was marked for
8          identification.)
9  BY MR. LAGOMARSINO:
10     Q.  I've handed you Exhibit 8, which is a
11  compilation type of an exhibit.
12          The first page for the record is Defendant
13  Las Vegas Metropolitan Police Department's First
14  Supplement to Responses to Plaintiff's First Set of
15  Requests for Production of Documents.
16          And going to page 12, the plaintiff asked
17  for copies of all use of force reports filed by
18  members of Las Vegas Metropolitan Police Department
19  from 2004 to the present.  Metro initially objected.
20  The parties went through a process of meeting and
21  conferring and narrowing that time period, and then
22  produced certain statistics.  So I want to ask you
23  about those statistics here.
24          So if you would go -- this goes all the way
25  to page 24.  If you go to the next page after

Page 32

1  page 24, it's going to be -- it was Exhibit C that
2  was attached to the responses.  And then after that
3  there are some pages that Metro produced with
4  statistics and data.
5          Do you have those in front of you?
6     A.  Yes.
7     Q.  Have you ever seen these statistics before?
8     A.  Yes.
9     Q.  And in what context have you seen these
10  statistics?
11     A.  So I would say that officer of internal
12  oversight, constitutional policing produces a report
13  of use of force yearly, and then they also produced
14  five year reports that I've seen.
15     Q.  Do you know when that started?
16     A.  No.
17     Q.  So kind of going through the bullets here
18  on the first page, it says, "The following statistics
19  include LVNR data from 2012 year to date 2017."  It
20  says:  "92 percent of LVNRs are performed by police
21  officers, 8 by correction officers."
22          Next bullet says:  "On average, the LVNR
23  was effective 68 percent of the time.  Thus far in
24  2017 the technique has been effective 57 percent of
25  the time."  And this was year-to-date through May 15

Page 33

1  of 2017, which was I believe just prior to the
2  incident in this case.
3          What does it mean -- what does the word
4  "effective" mean in this context when they say it's
5  68 percent effective?
6     A.  I believe it means the subject -- the
7  technique was effective.  The subject was taken into
8  custody without any other technique or tool having to
9  be used.
10     Q.  Do you know if that term -- obviously
11  effective is a fairly --
12     A.  Broad.
13     Q.  -- broad term, correct.  Thank you.
14          Do you know if that term is defined
15  anywhere if it's effective in this context?
16     A.  I don't know where it's defined, but I'm
17  sure there had to be a definition of it to be able to
18  come up with that statistic.
19          But you're right, it is broad, and that
20  what could be effective to me might not be effective
21  to someone else.  Because to me an LVNR that's
22  effective means that the subject stopped resisting,
23  and I was able to take him into custody.
24          But if it didn't work and I had to go to a
25  different tool, does that mean it's effective or

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 34

1  ineffective?  It might just mean that it was easier
2  to use something else.  Or another officer arrived
3  and we're able to use hands-on to take that subject
4  into custody.  So it's really hard to determine
5  effectiveness.
6      Q.  With respect to these statistics, it looks
7  like at least they were generated starting in 2012
8  based on this document.
9      Is that your understanding, at least from
10  2012?
11      A.  Yes.  And I think that might have to do
12  with this COPS intervention.
13      Q.  And then would these statistics be
14  considered on a yearly basis when they're generated
15  by Metro?
16      A.  Yes.
17      Q.  And you mentioned they would do five-year
18  data as well?
19      A.  Yes.
20      Q.  So if this is a five-year data report,
21  would you have seen this particular document?
22      A.  So I've seen five-year reports, but I can't
23  say specifically.  I saw 2012 to 2017.  But I know I
24  just reviewed the 2018 report; and so in other words,
25  five-year reports continue on.

Page 35

1      Q.  I see what you're saying.  So they will go
2  2013 to '18?
3      A.  Yes.
4      Q.  '14 to '19?
5      A.  Right.
6      Q.  Do documents that are attached here appear
7  to be true and correct copies of the documents
8  generated by Metro with respect to LVNR statistics?
9      A.  Yes.
10      Q.  Are other use of force options evaluated
11  for effectiveness the same way that the LVNR is
12  evaluated?
13      A.  I believe so.  But I'm not sure where the
14  effective number comes from.  Because it might come
15  from the officer's opinion, is it effective?  Or I
16  don't know if it's evaluated in other ways.  So I
17  wish I did know.  I could tell you.
18      Q.  I'm going to ask you a hypothetical
19  question here.  There's a difference of opinion in
20  this case, as I'm sure you've heard, as to whether it
21  was a rear-naked choke that was applied or an LVNR
22  that was applied.
23      Assuming hypothetically that it was an LVNR
24  that was applied, would you consider the use of that
25  technique effective in this case?

Page 36

1      MR. ANDERSON:  Objection.  Form.
2      Go ahead.
3      THE WITNESS:  Well, based -- I mean, I
4  can't recall exactly all the things that were used in
5  use of force on this case because I know there were
6  strikes, there was Taser and there was LVNR.
7  BY MR. LAGOMARSINO:
8      Q.  Right.
9      A.  So to me, the effectiveness of all of those
10  together I would say the subject was taken into
11  custody and handcuffed, but some of those techniques
12  were ineffective, and that's why they went to other
13  techniques.
14      Now, overall, I would say that use of force
15  was not effective.  Obviously because -- and most use
16  of forces appear -- don't appear like they do in
17  training.
18      But I would say that the LVNR in this case
19  was probably not effective.
20      Q.  Do you receive reports either on a daily,
21  weekly, monthly or other regular basis that summarize
22  media reports that could be perceived as negative
23  towards Metro?
24      A.  As part of staff, PIO does a report that
25  tells us any time Metro is in the media.  So not just

Page 37

1  use of force.
2      Q.  So even if it was, like, a car accident and
3  somebody is interviewed on the scene from Metro?
4      A.  I'm not aware of any car accidents, and I
5  wouldn't review that one because I don't have
6  relation to that.
7      But the example is the one that was in the
8  media, just I think it was yesterday or the day
9  before, from LVNR that was applied to a water seller
10  on the Strip.  And that was from 2013.  And it wasn't
11  immediately apparent that it was from 2013 when they
12  put it in the media.  It looked like it just
13  happened.  But it was from five years ago and the
14  technique was applied correctly.  Whether or not the
15  water seller needed to be LVNR'd, I don't know.  But
16  the technique worked and it was applied
17  appropriately.
18      You know, the question is whether we need
19  to have someone who's conducting a misdemeanor crime
20  LVNR'd.  That's separate from was the technique
21  applied correctly and did it work, to me.
22      Q.  Right.  I saw the video.  And it seemed
23  like it was a pretty good angle to see what occurred
24  and you can see the positioning of the --
25      A.  Right.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

11 (Pages 38 to 41)

Page 38

1    Q. -- hands and so forth. And of course, the
2  events leading up to the application were not
3  recorded. So as you say, it's hard to say whether it
4  was necessary or not.
5    A. And we didn't have body cameras at that
6  time so you couldn't see the interaction between the
7  officers and the person.
8    Q. In this video, did the subject pass out?
9    A. I think he did. But I sort of dismissed it
10  when I heard it was in 2013.
11    So I'm aware of it and I saw the technique
12  was applied correctly, but I didn't get really that
13  deep into it. But that's an example of stuff that is
14  sent out by the PIO to us to say, hey, this is in the
15  media. So you're aware of it.
16    Q. And what do you do with that? Or is it
17  just more of an awareness thing?
18    A. Yes. More of an awareness thing. But I
19  was told by someone else, I don't remember who, but
20  that the LVNR was done right, and I looked at it and
21  I was like okay, and I was just not that concerned
22  with it.
23    Q. Do you know if there was a lawsuit in that
24  case?
25    A. I think there was. And I think it was

Page 39

1  dismissed. But like I said, when I heard it was
2  2013, it didn't just happen, then I wasn't as
3  concerned with it as I would be if it happened a
4  month or a year ago.
5    Q. Okay. Getting to back to the research that
6  we're talking about, about other cities, whether they
7  allow the use of the LVNR or not, do you know how
8  that research was conducted?
9    A. I can tell you generally how they conduct
10  research in OIO, which is they send e-mails out to
11  agencies, hey, I think it was a quick survey, a few
12  questions, hey, could you answer these questions for
13  us. And some agencies respond and some don't.
14    Q. Do you -- strike that.
15    Does Metro ever get those types of e-mails
16  from other agencies as well to your knowledge?
17    A. Yes.
18    Q. And does Metro respond to those?
19    A. Yes. And sometimes I get those and I ask
20  people to respond to them based on who sent it and
21  then who would be the best person to respond for our
22  agency.
23    Q. Have you, knowing that Metro -- strike
24  that.
25    Let me get a clean question here. Knowing

Page 40

1  that Metro sent out questions regarding the LVNR to
2  other agencies, have you ever received e-mails from
3  other agencies about the use of the LVNR?
4    A. I'm sure we have, but I can't recall a
5  specific agency or time. But it's very common for
6  police agencies to share information on use of force
7  or other policies that we use and what is the best
8  wording or techniques to be used throughout policing.
9    Q. Okay. I want to speak a little bit in
10  generalities for the next question. So if I'm wrong
11  on the language or the terms of art, please let me
12  know.
13    But it's my general understanding that if
14  an officer is facing a situation where he or she is
15  faced with deadly force being used against them,
16  there really is no type of force that they're
17  precluded from using to save their own life or defend
18  themselves; is that correct?
19    A. I'm sorry, that was a long question. I
20  think it was correct.
21    Q. It's like one of those Robert Mueller
22  questions, right?
23    So is there any use of force option that's
24  taken off the table for an officer if that officer is
25  facing a situation where their life is in danger?

Page 41

1    A. No.
2    Q. Other than that specific situation that we
3  just discussed, an officer facing a life or death
4  situation, were there any opinions that you recall in
5  Metro that the LVNR should be banned except for that
6  situation?
7    MR. MCNUTT: Objection. Form.
8    THE WITNESS: I think there are
9  restrictions in policy of when you can use certain
10  techniques. And I think that we don't want officers
11  to use the LVNR on subjects that have been cap
12  stunned.
13    I can't recall exactly what the other
14  restrictions are. But there certainly are times when
15  we restrict officers from using certain uses of
16  force.
17  BY MR. LAGOMARSINO:
18    Q. Were there any restrictions on the LVNR
19  being used prior to the Tashii Farmer incident?
20    A. Well, just appropriate use of force based
21  on the circumstances of that call. So in other
22  words, every use of force has to be justified by the
23  officer.
24    Q. Did you have an opinion as to whether
25  Officer Lopera appropriately applied force to Tashii

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

12 (Pages 42 to 45)

Page 42

1  Farmer?
2       MR. MCNUTT: Objection. Form.
3       MR. ANDERSON: Join.
4       THE WITNESS: So when you're looking at
5  other people's use of force, it's a different
6  standard. You have to -- the officers have to
7  articulate why they used force and why the amount of
8  force was necessary in that case.
9       We didn't really get that from Officer
10  Lopera. So you're looking at it just based on your
11  opinion and not what Officer Lopera articulated.
12       So my opinion was, and I think I stated it
13  in a prior deposition, was that based on the
14  circumstances, most officers would have chased
15  Mr. Farmer. If he walked away and didn't want to
16  talk to you, you would let him walk away.
17       But when he runs away and goes to a part of
18  the casino that most people don't have access to, it
19  makes you think there's something wrong or there's
20  something going on that would make your curiosity
21  pique to the point where you would want to find out
22  what's going on with Mr. Farmer.
23       So I would have no problem with most
24  officers, most officers probably would chase someone
25  who runs away from them.

Page 43

1       The question is when you catch up to them,
2  what do you do and how much force should you or do
3  you use, and that's based on what crime you
4  articulate that Mr. Farmer has committed. And we
5  didn't get that. So I'm putting myself in that place
6  of Mr. Lopera, Officer Lopera.
7       So I think that -- I think that when you
8  use force, you should use force. In other words, we
9  don't put our hands on someone unless we're using an
10  approved technique because most people don't like
11  when people put their hands on you.
12       So when you make that decision to put your
13  hands on someone, you should put your hands on
14  someone and use a technique to take them to the
15  ground and to put handcuffs on them if you can
16  articulate the justification for an arrest.
17       Because now when you put your hands on
18  someone and you use force, you should have a charge
19  to take them to jail.
20       So I can't get in Officer Lopera's mind to
21  say what he was doing. But I would say that I would
22  not have done it the way that Officer Lopera did.
23  Just me as going back to the way I was trained and
24  the decisions that I would make that night.
25       Now, would I let Mr. Farmer go and be like

Page 44

1  oh, there he goes? No. I wouldn't do that either.
2  I would want to find out what was going on with
3  Mr. Farmer because now any good officer would want to
4  know why he was acting the way he was and why he was
5  going through that part of the casino.
6  BY MR. LAGOMARSINO:
7       Q.  You're familiar, I'm sure, with the laws of
8  trespass, correct?
9       A.  Yes.
10       Q.  There was -- to your knowledge, are there
11  bright orange letters painted every 50 or 200 yards
12  on the Venetian Hotel that say "no trespassing"?
13       A.  No.
14       Q.  And to your knowledge, had anybody from the
15  Venetian Palazzo requested Mr. Farmer to leave the
16  premises?
17       A.  No.
18       Q.  Do you believe that based on the
19  information that you've received in your
20  participation in this case on the use of force board,
21  and that was presented to you, that there was
22  probable cause to arrest Mr. Farmer for trespassing?
23       MR. ANDERSON: Objection. Form.
24       Go ahead.
25       THE WITNESS: When Mr. Farmer was in the

Page 45

1  coffee shop or wherever he was, there was no probable
2  cause to arrest him for trespassing.
3       When he went through the casino into the
4  back under that -- whatever they call it of the
5  casino, where he probably wasn't supposed to be and
6  wasn't allowed to go, could we have talked to
7  Venetian and say was he supposed to be there, is this
8  an area that you would consider that he was
9  trespassing if he went to, that would take a more
10  thorough investigation for me to find out if I had
11  probable cause to arrest him for trespassing.
12       But based on what I know, I don't think
13  Officer Lopera had enough to arrest him for
14  trespassing.
15  BY MR. LAGOMARSINO:
16       Q.  There was -- are you familiar that there
17  was a bright red sign that said "exit" above the
18  doors he went out?
19       A.  I don't recall. But I would believe that
20  if you said there was one.
21       MR. LAGOMARSINO: I think we'll just take a
22  quick five-minute break and come back.
23       THE VIDEOGRAPHER: The time is
24  approximately 10:36 a.m. We are going off the
25  record.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

13 (Pages 46 to 49)

Page 46

1          (A recess was taken from 10:36 a.m.
2      to 10:48 a.m.)
3          THE VIDEOGRAPHER:  The time is
4      approximately 10:48 a.m.  We are back on the record.
5      BY MR. LAGOMARSINO:
6          Q.  As part of training, does Metro bring in
7      sometimes outside speakers or experts to provide
8      training to the officers?
9          A.  Yes.
10         Q.  Are you familiar with the names of any of
11     those experts that Metro may bring in?
12         A.  It depends.  So the question is kind of
13     broad, but -- we bring in training for all different
14     kinds of classes.  Usually use of force is done by
15     our own trainers.
16         Q.  Are you familiar with an individual named
17     Dr. William Smock?
18         A.  No.
19         Q.  Do you know if he's been hired by Metro to
20     provide training?
21         A.  I'm not aware of his name or if he's been
22     hired.
23         Q.  You have been trained on neck restraints;
24     is that correct?
25         A.  Yes.

Page 47

1          Q.  If the LVNR is applied incorrectly, do you
2      agree that there's a potential for significant injury
3      or death to the subject?
4          A.  Yes.
5          Q.  What is the Organization Development
6      Bureau?
7          A.  What is that?
8          Q.  Yes.
9          A.  It's the bureau that works for me that
10     basically is over training.
11         Q.  What's field training?
12         A.  Field training is when an officer graduates
13     the Academy, he goes through field training for a
14     period of time until he graduates training.
15         Q.  And is field training basically shadowing,
16     or what exactly is it?
17         A.  No.  There's three phases of field
18     training, and in each phase the officer gets more and
19     more freedom to become a police officer until at the
20     last phase, where he is shadowed and we call solo
21     beat status.  So the officer is allowed to -- is
22     graded, and then when he graduates he's supposed to
23     be able to handle calls by himself.
24         Q.  Does field training address LVNRs?
25         A.  So LVNR is basically addressed in training

Page 48

1      and then in defensive tactics, and then there are
2      scenarios in field training where officers may use
3      force which includes LVNR.  And what happens when --
4      during training when officers use force a field
5      training officer would discuss with the trainee,
6      okay, what about this technique or that technique,
7      which may include LVNR.
8          But there's no time when a field trainer
9      would say, "LVNR him."
10         Q.  Okay.
11         A.  It's kind of up to you to use the force
12     that you think is the best for that scenario.
13         But after the scenario, the trainee -- the
14     trainer would say you could have LVNR'd him in that
15     case.
16         Q.  Okay.
17         A.  That would have been the most appropriate
18     case in that circumstance.
19         Q.  And it's fair to say that before the shift,
20     that the field training officer is not going to say,
21     hey, let's go out and look for an LVNR situation
22     tonight?
23         A.  Yeah, no.  Absolutely not.  That would
24     never happen.
25         Q.  When you say LVNR is in training, are you

Page 49

1      talking about the police academy?
2          A.  Yes.
3          Q.  And then after the police academy, then
4      there is a series of certification or recertification
5      that has to occur with the LVNR?
6          A.  That is correct.
7          Q.  What is reality-based training?
8          A.  Reality-based training is training officers
9      are required to do where we put them in scenarios
10     where they have to use -- make decisions about what
11     kind of force they should use to resolve that
12     scenario.
13         Q.  And is that done on, like, a computer or --
14         A.  No.
15         Q.  -- or is it live?
16         A.  It's hands-on live where we have role
17     players and they go through a scenario.  And then
18     they use force or not use force.  Or they go
19     hands-on, or they might have to use their gun where
20     they pull their gun out, and then they don't shoot
21     their gun, but where they would decide what kind of
22     force is necessary to resolve that situation.  And
23     then they get feedback on how they performed and what
24     they could do differently.
25         Q.  Are you familiar with Michael Glen?

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

Page 50

1    A.  Yes.
2    Q.  I forget his rank, is it officer?
3    A.  He got promoted to sergeant now.
4    Q.  And is he a subject matter expert in the
5  LVNR?
6    A.  Yes.
7    Q.  After this incident, did he create a
8  training video describing what the LVNR was?
9    A.  I'm not sure when he created the video.  So
10  yes, he created a video.  But I thought there was
11  some videos that he did before this incident, talk
12  about training, but it could have been after.
13    Q.  Are those videos considered reality-based
14  training?
15    A.  No.  They were in addition to reality-based
16  training.
17    Q.  Are you familiar specifically with what
18  reality-based training exists with respect just to
19  the LVNR?
20    A.  No.
21    Q.  Do you know if there is?
22    A.  I don't think so.
23    Q.  Now, part of your job responsibilities
24  relate to human resources you alluded to.
25    A.  Yes.

Page 51

1    Q.  And are you the ultimate decision-maker as
2  to whether somebody is going to be terminated or not?
3    A.  So the human resources part is separate
4  from my additional duty which is pretermination board
5  chairman.
6       So you've kind of conflated those two.  But
7  there's a board that meets.  And it is myself as
8  deputy chief, a commissioned captain and a civilian
9  director.  And each board is -- could be different
10  people on it.
11       And then the ultimate decision is the
12  sheriff.  But what happens is I write a memo to him
13  based on what the board finds and recommend to the
14  sheriff whatever we recommend.  And then he's the
15  ultimate decision-maker.
16       And most of the time he agrees with me, but
17  not all of the time.
18    Q.  Okay.  With Officer Lopera, was he allowed
19  to retire in lieu of being terminated?
20    MR. MCNUTT:  Objection.  Form.
21    MR. ANDERSON:  Join.
22    THE WITNESS:  I'm not sure what his -- the
23  disposition was for him.
24  BY MR. LAGOMARSINO:
25    Q.  Are you familiar with that process where an

Page 52

1  officer may be facing termination and they are
2  allowed to retire to retain their benefits?
3    A.  So I am familiar with all the different
4  processes.  We have -- we also have a
5  non-confirmation hearing, which I've done some of
6  those, and that would apply to people that are on
7  probation.
8       And if they resign prior to being
9  non-confirmed, we say that they resigned.
10       We allow people to resign prior to
11  non-confirmation hearing.  Like, at any time someone
12  could resign.  They could retire.
13       But if they resign pending discipline or
14  non-confirmation, we do note that in labor relations.
15    Q.  So for example, Sergeant Crumrine was not
16  confirmed, correct?  Well, the story continued after
17  he was not confirmed, correct?
18    A.  That's correct.
19    Q.  So Sergeant Crumrine was on probation as a
20  sergeant at that time, correct?
21    A.  Right.
22    Q.  And then the decision was made at Metro to
23  not confirm him?
24    A.  That's correct.
25    Q.  And then he disputed that; is that correct?

Page 53

1    A.  He went to arbitration.
2    Q.  Who was the arbitrator?
3    A.  I don't recall.  And I wasn't involved in
4  the arbitration for that.  That was Sheriff Kelly.
5    Q.  Who participates in that arbitration, do
6  you know?  Maybe not that specific one but in general
7  the arbitration process?
8    A.  So I represent the department in a lot of
9  arbitrations because I am on the pretermination
10  board.  And they keep calling me in to ask what my
11  recommendation was and why in the cases I'm involved
12  in.
13       So what happens in an arbitration is the
14  department presents their case to the arbitrator, and
15  the employee presents his case and the arbitrator
16  makes a decision.  And that applies to all the people
17  that we terminate.
18    Q.  How is the arbitrator selected?
19    A.  I believe there's a list that the
20  department submits a number of arbitrators and the
21  union submits a number of arbitrators and I think
22  they alternate who chooses.  But I'm not exactly
23  sure.
24    Q.  Okay.
25    A.  I just show up and testify.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

---

Page 54

1   Q.  Okay.  Ultimately, what happened with
2   Sergeant Crumrine in the arbitration?
3       A.  The arbitrator ruled that he did enough to
4   keep his job.
5       Q.  So is he now back to being a sergeant?
6       A.  He's back to being a sergeant.
7       Q.  Did you write the recommendation letter for
8   non-confirmation to Sheriff Lombardo?
9       A.  No.  That was Sheriff Kelly.
10      Q.  And Sheriff Kelly wrote a letter, to your
11  knowledge, to Sheriff --
12      A.  He writes a memo to recommend
13  non-confirmation and the sheriff agreed with him.
14      Q.  What about with respect to Officers Tran
15  and Flores?
16      A.  They weren't on probation, and I don't
17  think that they received any discipline in this case.
18      Q.  Have you ever heard of an officer being
19  terminated for improperly using an LVNR?
20      A.  I don't think so.
21      Q.  You testified earlier that some of the
22  technology part of your responsibilities has been
23  shifted over.  Does that include body cameras?
24      A.  Yes.
25      Q.  Were you in charge of oversight of body

---

Page 55

1   cameras in May of 2017?
2       A.  Yes.
3       Q.  What's the general purpose of having the
4   body camera being activated?
5       A.  So the officers' actions can be captured
6   not only for the department but for the public to be
7   able to see how officers interacted during this call.
8       Q.  Have you reviewed body camera footage in
9   this case?
10      A.  Yes.
11      Q.  When would you feel it would be appropriate
12  for an officer who was involved in this case to turn
13  off the body camera?  And let me lay some foundation
14  there.
15          So you had Officers Tran, Flores and Lopera
16  and Sergeant Crumrine involved with Tashii Farmer,
17  correct?
18      A.  Yes.
19      Q.  And then a whole host of other officers
20  showed up at the scene including some that ultimately
21  attempted chest compressions, correct?
22      A.  Yes.
23      Q.  And then at some point emergency personnel
24  arrived and Tashii Farmer was taken away, correct?
25      A.  Yes.

---

Page 56

1   Q.  When would you feel that it was appropriate
2   pursuant to Metro policy for any officer who was on
3   the scene to shut off their body camera?
4       A.  So officers are required to keep the body
5   camera on while they're involved with a suspect.
6   When the incident is over, they can turn the body
7   camera off or when they're involved in discussions
8   with their sergeant about what happened.
9       Q.  They're allowed to turn it off?
10      A.  Yes.
11      Q.  Are they allowed to turn -- strike that.
12          Are officers allowed to turn their body
13  camera off when they're having discussions with other
14  officers about what happened?
15      A.  Yes.
16      Q.  Why is that?
17      A.  Because -- do you mean why are they allowed
18  to turn it off?
19      Q.  Right.
20      A.  So the body camera policy, although it was
21  written before I was involved, is meant to capture
22  what happened during that incident and not to
23  infringe on the officer's rights about to discuss why
24  they did what they did.
25      Q.  You're on the use of force board, right?

---

Page 57

1   A.  Yes.
2       Q.  Is that the same thing as a tactical review
3   board?
4       A.  So I'll explain the use of force board.  So
5   there is, the use of force board involves civilians.
6   There's four civilians involved in every use of force
7   board.  And it is their job to determine, along with
8   three members of the department, whether the use of
9   force was justified or not.
10          And there's four dispositions that we use.
11  I guess I could try to remember them if I can.
12      Q.  Sure.
13      A.  Administrative approval, tactics
14  decision-making, policy training failure or
15  administrative disapproval.
16          And so what we're trying to determine is
17  was the use of force justified by law and within
18  policy.  And then after that part's over, that's the
19  use of force board, the tactics decision -- the
20  tactics are then reviewed in the tactics review
21  board.
22      Q.  And is there a disposition from the tactics
23  review board?
24      A.  What happens in the tactics review board is
25  each officer's actions and supervisor's actions are

---

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

17 (Pages 62 to 65)

Page 62

1  board, and then Sheriff Kelly writes a memo to the
2  sheriff.  And so he's more involved in the
3  dispositions of what happens to the people involved.
4  In other words, training or some kind of
5  discipline or for Sergeant Crumrine, he was the
6  non-confirmation recommendation was made to the
7  sheriff.  But that's all done confidentially between
8  Sheriff Kelly and the sheriff.  So I don't get to see
9  that.
10  Q.  So do you know what the dispositions were
11  for those four individuals?
12  A.  I only know that Crumrine was recommended
13  that he be non-confirmed as a probationary sergeant.
14  And I don't know the other ones.  Although we did
15  discuss it.
16  Q.  And are the deliberations recorded?
17  A.  No.
18  Q.  So then going to the tactical review board
19  aspect of it, is CIRT also making a presentation in
20  that setting as well?
21  A.  So what happens is CIRT makes their
22  presentation for the use of force board.  And then we
23  vote on the use of force.  And then they come back
24  and do another presentation related to the tactics,
25  tactical review board.

Page 63

1  So it's separate.
2  Q.  Okay.  Were there any findings that you can
3  recall from the tactical review board that you can
4  share?
5  A.  I don't recall.  I'm sorry.
6  Q.  That's okay.
7  Specifically let me just ask you your
8  opinion.  Did Lopera utilize deescalation techniques?
9  A.  I don't recall any deescalation that I saw
10  him use.
11  Q.  And did he lack deadly force?
12  MR. ANDERSON:  Objection.  Form.
13  MR. MCNUTT:  Objection.  Form.
14  THE WITNESS:  I did not see him use deadly
15  force.
16  BY MR. LAGOMARSINO:
17  Q.  Were there any training issues that you had
18  issues with?
19  A.  I'm sure there were.  I don't recall
20  specifics.  And more concerning Sergeant Crumrine
21  than the officers.
22  Q.  You testified in your prior deposition
23  about Sergeant Crumrine not doing enough to
24  intervene; is that correct?
25  A.  Yes.

Page 64

1  Q.  And is it your opinion that Sergeant
2  Crumrine did not do enough to intervene?
3  A.  It's still my opinion, even though the
4  arbitrator didn't agree with me.
5  Q.  Do you know how the citizens are selected
6  to be on those boards?
7  A.  I don't know how the process works.
8  Q.  Do you recall any of the names of the
9  citizens on the Lopera, Crumrine, Tran, Flores board?
10  A.  I don't recall.  There's been too many
11  boards since then.  I know that it's spelled out in
12  the policy of how long they can be on the board and
13  they do, I think they serve a two-year term or
14  three-year term.  I don't know.
15  Q.  To your knowledge, do they -- do they apply
16  to be on the board?
17  A.  Yes.
18  Q.  And are they compensated?
19  A.  No.
20  Q.  Do they have voting rights?
21  A.  Voting rights?
22  Q.  As to a determination of the disposition in
23  the --
24  A.  Yes.  That's the whole purpose.  There's
25  more citizens voting than department members.  So

Page 65

1  they have four votes and we have three.
2  But generally, the votes are pretty
3  unanimous.  Not always, but I run the use of force
4  board just -- it's kind of the way the policy works.
5  The assistant sheriff runs the board, but when it
6  comes to the deliberations, he doesn't vote and I run
7  the board and explain the dispositions to everyone on
8  the board before we vote.
9  And we discuss and deliberate just like any
10  other group.
11  Q.  Do you recall whether or not the duty to
12  intervene was evaluated with respect to Tran and
13  Flores?
14  A.  It was evaluated -- this is all part of the
15  tactics review board not the use of force
16  disposition -- use of force board.  Yes, it certainly
17  was discussed.
18  Q.  And did the review board, the tactics
19  review board, determine that Tran and Flores
20  satisfied their duty to intervene?
21  A.  I don't know exactly what the disposition
22  was for Tran and Flores.  That was -- so it's not
23  100 percent one way or the other.  But that would be
24  written by Sheriff Kelly.
25  I can expand on that if you would like.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1  Q.  Yes, please.
2  A.  So it was our opinion that Tran and Flores
3  are dealing with Farmer, and the duty to intervene
4  would be more on Sergeant Crumrine because he was
5  standing up overlooking the whole scene.  Because if
6  you're trying to handcuff someone, your focus is on
7  that.  And one who is standing above that would have
8  a better view of who is doing what and how or to what
9  to do to intervene.
10     In other words, Sergeant -- and that's what
11  I meant earlier when I said that Sergeant Crumrine
12  didn't understand his role in overseeing this use of
13  force.
14  Q.  We've had a number of witnesses address the
15  duty to intervene so I'm going to go through it
16  pretty quickly here.
17  A.  Okay.
18  Q.  The duty to intervene isn't just saying
19  "stop."  It doesn't end there, correct?
20     MR. ANDERSON:  Objection.  Form.
21     THE WITNESS:  I agree with you.  It's more
22  than just saying "that's enough" or "stop."
23  BY MR. LAGOMARSINO:
24  Q.  In other words, if the duty to intervene
25  requires the use of a physical act such as,

Page 67

1  hypothetically, removing somebody's hand from an
2  LVNR, that could be required in any given situation?
3     MR. ANDERSON:  Objection.  Form.
4     MR. LAGOMARSINO:  That is a bad question.
5  BY MR. LAGOMARSINO:
6  Q.  Talk to me about your understanding of how
7  the duty to intervene can be satisfied by using
8  physical acts.
9     MR. ANDERSON:  Objection.  Form.
10     THE WITNESS:  Sure.  I think that a duty to
11  intervene is more than just saying "stop."  It may
12  mean using hands, your hands, or directing someone to
13  stop the action that's inappropriate.
14  BY MR. LAGOMARSINO:
15  Q.  In terms of training Metro officers, are
16  they trained that a citizen has the right to use
17  reasonable force in self-defense against an officer
18  who is using excessive force against that citizen?
19     MR. ANDERSON:  Objection.  Form.
20     MR. MCNUTT:  Join.
21     THE WITNESS:  I don't believe that we train
22  that.
23  BY MR. LAGOMARSINO:
24  Q.  Is your understanding that if a citizen is
25  having excessive force used against them or him or

Page 68

1  her by a police officer who is trying to effect a
2  lawful arrest, that the citizen has a right to use
3  force against the officer to defend themselves?
4     MR. ANDERSON:  Objection.  Form.
5     THE WITNESS:  I'm not sure if you're asking
6  me is it my opinion or do we train that way.
7  BY MR. LAGOMARSINO:
8  Q.  Do you train on that?
9  A.  I don't believe we train on what citizens
10  can or can't do when officers are using inappropriate
11  or excessive force.  No, we don't train that.
12  Q.  Does Metro utilize POST training, Peace
13  Officer Standards and Training?
14  A.  Yes.  Since you brought that up, I'm on the
15  state POST board appointed by the governor.  So
16  that's another duty I forgot since you reminded me,
17  though.
18  Q.  Are you familiar with Detective Alsup and
19  Detective Colon?
20  A.  Yes.
21  Q.  They performed the FIT investigation in
22  this case?
23  A.  That's correct.
24  Q.  Have you had experience interacting with
25  them in the past?

Page 69

1  A.  Yes.
2  Q.  Also did you have experience interacting
3  with Sergeant McDonald?
4  A.  Yes.
5  Q.  Did Sergeant McDonald oversee -- strike
6  that.
7     Did Sergeant McDonald oversee Detective
8  Alsup and Detective Colon?
9  A.  Yes.
10  Q.  Do you have any criticism of their
11  investigation in this case?
12  A.  No.
13  Q.  Have you ever had any criticism of them?
14  A.  I think I answered this before in the last
15  deposition.  That I don't know about criticism,
16  because criticism is kind of a broad term.
17     So, yes, I've given them feedback on their
18  performance and things that they could do better.
19  But I think they're excellent detectives.  And
20  Sergeant McDonald has worked for me here and also
21  worked for me in convention center.  He's a good
22  sergeant.
23  Q.  Did you have any criticism or feedback for
24  them in this particular case?
25  A.  I don't recall any.

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

19  (Pages  70  to  73)

Page 70

1    Q.  You were asked the following question in
2  your last deposition so I want to see if you still
3  have the same position.
4        Hypothetically, a sergeant of an officer
5  tells his officer to release a hold twice, does that
6  sergeant have a duty thereafter, having asked him
7  twice to release the hold, to check and make sure
8  that he's released the hold?
9        MR. ANDERSON:  Objection.  Form.
10        THE WITNESS:  Yes.  I think he should.
11  BY MR. LAGOMARSINO:
12    Q.  Did you have an opinion as to whether
13  Lopera's use of the Taser was excessive on
14  Mr. Farmer?
15        MR. MCNUTT:  Objection.  Form.
16        THE WITNESS:  It was excessive.
17  BY MR. LAGOMARSINO:
18    Q.  And did you have an opinion as to whether
19  Lopera striking Mr. Farmer was excessive?
20        MR. MCNUTT:  Objection.  Form.
21        THE WITNESS:  That was a little bit harder
22  to determine because I think that the use of the word
23  "strike" is something that's hard to determine
24  because they said 10 to 12 strikes, and it was hard
25  to say whether, how many times Officer Lopera struck

Page 71

1  Mr. Farmer.  He certainly threw a lot of punches, but
2  I don't know how many actually struck him.
3  BY MR. LAGOMARSINO:
4    Q.  Can you talk in general, as you did at the
5  last deposition, about how Metro changes policies
6  specifically with respect to the use of force?
7    A.  Sure.  We're always trying to get better
8  with our policies and make them simple and easy for
9  officers to understand.  And usually use of force
10  policies are changed by IOCP as part of their job.
11  In other words, they're the ones that oversee use of
12  force for the agency.  But they're not always the
13  ones that have ideas about changing the policy.
14        But it would flow through them.  And in
15  general, use of force policies changed as a result of
16  a critical incident.
17        Policies in general are -- the wording has
18  changed.  The recommendation has changed to make it
19  better either through OIO or through the use of force
20  committee.  The policy has changed.  It goes out for
21  review.  The people give feedback on what the
22  policy -- if it's better or more effective.  And then
23  that feedback is taken in and the policy goes back
24  out for a chain of command review through OIO or
25  IOCP.

Page 72

1        And then through that chain of command all
2  the way up to the under sheriff and then it would be
3  approved.
4    Q.  What was your opinion on the use of force
5  policy that was in effect at the time of the Tashii
6  Farmer incident?
7        MR. ANDERSON:  Objection.  Form.
8  BY MR. LAGOMARSINO:
9    Q.  In terms of being simple or hard to
10  understand or somewhere in between?
11    A.  So I didn't have a problem with the policy
12  at the time.  But during the review when they made --
13  recommended changes, I agreed with those changes that
14  it was simpler and easier to understand for the
15  officers and it was probably a better policy.
16        But it's my opinion on all the times we
17  make changes, we make changes to make the policy
18  better and to make it easier to understand.
19        MR. LAGOMARSINO:  Do you want to take
20  another five-minute break?  Normally we take a lunch,
21  but I'm only going to have about probably another
22  half hour left.  So do you want to just power through
23  instead of taking a long lunch?  It's up to you.
24        MR. ANDERSON:  It's up to you.
25        THE WITNESS:  It's up to me?

Page 73

1        MR. MCNUTT:  I'm going to have an hour
2  after he's done.  I mean, it may not take an hour,
3  but I mean, I want you to -- let's budget an hour, so
4  to factor in your decision.
5        THE WITNESS:  Well, I would rather have
6  lunch than go another hour and a half, two hours,
7  whatever.
8        MR. LAGOMARSINO:  Why don't we take an
9  early lunch.  That will give me a chance to pare down
10  my questions even more.
11        THE WITNESS:  Okay.
12        MR. LAGOMARSINO:  What time do you want to
13  come back?  It's 11:30.  Do you want to say 12:45?
14        MR. ANDERSON:  That's good.
15        THE VIDEOGRAPHER:  The time is
16  approximately 11:33 a.m.  We are going off the
17  record.
18        (A recess was taken from 11:33 a.m.
19        to 12:54 p.m.)
20        THE VIDEOGRAPHER:  The time is
21  approximately 12:54 p.m.  We are back on the record.
22  BY MR. LAGOMARSINO:
23    Q.  I had an opportunity to pare down a lot of
24  my questions so it will be fairly brief --
25    A.  Thank you.  I meant that as a compliment.

Deputy Chief John McGrath  ~  July 31, 2019
\* \* \* Videotaped Deposition \* \* \*

Page 74

1    Craig is going to -- go ahead.
2        Q.  All right.  In this case, are you aware
3    that Brian Yant was the union representative for
4    Kenneth Lopera?
5        A.  Yes.
6        Q.  Based on your employment with the
7    Department since 1992, were you aware of Brian Yant's
8    involvement in three controversial officer-involved
9    shootings?
10        MR. ANDERSON:  Objection.  Form.
11        THE WITNESS:  No.  I was aware of one of
12    them.  I don't know -- I might -- if I was reminded I
13    would probably know the other ones.  But I know the
14    main one.
15    BY MR. LAGOMARSINO:
16        Q.  Okay.  Well, I'll ask and I'll rephrase the
17    question because I think the counsel probably had an
18    issue with the word "controversial."  So I'll
19    rephrase.
20        Were you aware that Brian Yant was involved
21    in three officer-involved shootings?
22        A.  No.
23        Q.  You had referenced in answer to your
24    earlier question about a shooting.  Did that shooting
25    involve Trevon Cole?

Page 75

1        A.  Yes.
2        Q.  And that was the gentleman who was flushing
3    marijuana down the toilet, and Brian Yant shot him
4    with an AR15 and killed him, correct?
5        A.  Yes.
6        Q.  Did you have any involvement at all in that
7    investigation, administratively or otherwise?
8        A.  No.  Nothing.
9        Q.  And was it your understanding that Trevon
10    Cole was unarmed?
11        A.  Yes.
12        Q.  Were you -- if -- I'll try to remind you
13    and see if you can recall.  There was an incident
14    with an individual who they referred to as the candy
15    bar robber.  And it was alleged that he had stolen
16    some candy from a convenience store.  Brian Yant was
17    chasing him and shot him in the back.
18        Were you aware of that particular incident?
19        A.  No.  I wasn't.
20        Q.  And then there was another incident before
21    that where there was an individual some distance
22    away, 20 yards or so, who had a baseball bat in his
23    hand, and Brian Yant shot him.
24        Were you aware of that one?
25        A.  No, I'm not.

Page 76

1        Q.  You had no involvement of that from an HR
2    perspective or any other perspective?
3        A.  No.
4        Q.  I asked you earlier in the deposition about
5    whether your opinion was that the use of the Taser
6    was excessive and whether the striking was excessive,
7    so I'm not going to reask you those questions.
8        Do you have an opinion as to whether the
9    use of the neck restraint by Officer Lopera was
10    excessive in this case?
11        MR. MCNUTT:  Objection.  Form.
12        THE WITNESS:  I think the use of the
13    LVNR -- so I'm sorry, can you just rephrase the
14    question?
15    BY MR. LAGOMARSINO:
16        Q.  So I'm going to generally use the term
17    "neck restraint" as opposed to "LVNR" or "rear-naked
18    choke."
19        Regardless of which of those it was, do you
20    believe that Officer Lopera's use of that restraint
21    for the period of time that he utilized it was
22    excessive in this situation?
23        A.  Yes.
24            (Exhibit 9 was marked for
25            identification.)

Page 77

1    BY MR. LAGOMARSINO:
2        Q.  Earlier in the deposition, I asked you some
3    questions about whether a citizen has a right to use
4    force against an officer to defend him or herself.
5    And I believe it was your testimony that you said
6    that Metro doesn't train on it.  So I want to ask you
7    a follow-up to that question.
8        So I've placed in front of you a document
9    that's been produced in this case by Metro, Crumrine,
10    Tran and Flores in the fifth supplement to their
11    initial Rule 26(A)(1)(A) disclosure of witnesses and
12    exhibits.
13        We've produced a number of documents, but
14    I've only handed you the one that I have questions on
15    here.
16        So if you turn to page 14 of the document.
17    Under number 8, it's been identified, some documents
18    produced as LVMPD, Ethical Use of Force Course, LVMPD
19    420 through 719.
20        A.  I see that.
21        Q.  So we've attached some of those pages here.
22        MR. ANDERSON:  Just for the record, Andre,
23    I would say this was produced in our initial
24    disclosures, not the fifth.  I don't care but...
25        MR. LAGOMARSINO:  No, thank you.  Sorry.

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

21 (Pages 78 to 81)

---

**Page 78**

BY MR. LAGOMARSINO:

Q. In the attachment, do you see the bottom has something called Bates numbers where it says --

A. Yep, I see it.

Q. So if you go to LVMPD 420, 0420.

A. Okay.

Q. It appears to be a cover page. And it says: "POST Commission, Peace Officers' Standards and Training, Ethical Use of Force."

Do you have that in front of you?

A. Yes.

Q. And it says that 2015 on the bottom left-hand corner.

Does this appear to be a cover page that's commonly used in training for Metro?

A. No.

Q. Have you ever seen this before?

A. I don't recall ever seeing it.

Q. All right. And then are you aware if Metro has a course called POST ethical use of force?

A. I don't believe we do. But that doesn't mean we do or don't. I've never heard of it, but it could be called something slightly different. When POST has these courses, we generally meet their criteria, but we could call it a different name.

---

**Page 79**

Q. Okay. All right.

A. And it might be just included with our use of force training, and ethical use of force might be a section. I'm more than guessing but I don't know for sure.

Q. No, I understand. And just for the record, we still have a deposition ahead of us where we're going to have Metro designate certain individuals on certain training. So my understanding, this is just based on your personal knowledge.

A. Right.

Q. So going to LVMPD 433. And under number 14, it says: "A person has a right to use self-defense against an officer's excessive force. A person has the right to use reasonable force only in self-defense against an officer who is using excessive force during a lawful arrest."

Is it your understanding still after reading that that based on your own personal knowledge, Metro does not train on this?

A. I'm not aware of any training that we use for that that contains that language.

Q. Okay. All right.

MR. LAGOMARSINO: I have no further questions.

---

**Page 80**

EXAMINATION

BY MR. MCNUTT:

Q. Sheriff McGrath, my name is Dan McNutt. We met earlier. I represent Ken Lopera. I've got a few questions for you.

A. Thanks. Chief McGrath.

Q. I sorry, Chief McGrath.

A. I just didn't want you to keep going with the sheriff for your questions.

Q. I don't -- even if I did, I don't think we could write you in on the ballot.

A. No.

Q. Is being under the influence of a controlled substance a crime in the state of Nevada?

A. Yes.

Q. Is carjacking a crime in the state of Nevada?

A. Yes.

Q. Is trespassing a crime in the state of Nevada?

A. Yes.

Q. Striking a police officer a crime in the state of Nevada?

A. Yes.

Q. If so, then why did Kelly McMahill say that

---

**Page 81**

had Tashii Farmer survived this event, that he would not have faced any criminal charges?

A. I think I would rather have her answer. If that's a hypothetical, I guess I could answer because I don't know her exact reasons for saying that.

Q. Fair enough.

MR. ANDERSON: Just for the record, it was Kevin McMahill.

BY MR. MCNUTT:

Q. My apologies, Kevin McMahill.

Does that change your answer?

A. No, it doesn't.

Q. Other than from her to him?

A. No. It doesn't change my answer.

Q. Is it fair to say that since those are crimes, Officer Lopera, had Tashii Farmer survived, could have, in fact, charged Tashii Farmer with a crime?

MR. LAGOMARSINO: Form.

THE WITNESS: That would be up to him to articulate. And if he could do that, then yes.

You named a lot of things, a lot of possible crimes, some of which are easier to articulate based on what I know of the case than others.

---

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 82

1    Certainly -- well, I'll just leave it at
2  that.
3  BY MR. MCNUTT:
4    Q.  In your role -- in your employment with
5  Metro, have you reviewed Officer Lopera's CIRT
6  statement?
7    A.  Yes.
8    Q.  And are you aware that Officer Lopera
9  stated myriad times through the CIRT statement that
10  his impression or belief was that Tashii Farmer was
11  under the influence of a controlled substance?
12    A.  Yes.
13    Q.  So if that was his perspective, would that
14  provide reasonable suspicion to detain Tashii Farmer?
15    MR. LAGOMARSINO:  Form.
16  BY MR. MCNUTT:
17    Q.  You can answer.
18    A.  Yes.
19    Q.  And from that point on, are you aware at
20  any point since the event to now that Tashii Farmer
21  was, in fact, under the influence of illegal
22  methamphetamines?
23    MR. LAGOMARSINO:  Form.
24    THE WITNESS:  Yes.  It was in the
25  autopsy.

Page 83

1  BY MR. MCNUTT:
2    Q.  So, in fact, Ken Lopera's perception was
3  correct, that Tashii Farmer was under the influence
4  of a controlled substance, correct?
5    A.  Yes.
6    Q.  And that would have justified arresting
7  Tashii Farmer and taking him to jail; isn't that
8  true?
9    A.  As long as he could articulate it and get a
10  search warrant for his blood for being under the
11  influence of a controlled substance, yes.
12    So it's not quite as simple as it used to
13  be to arrest someone for being under the influence of
14  a drug.  When I was an officer, I could just arrest
15  you and articulate it and that would be it.
16    Now you have to get a blood draw, and then
17  the DA won't call in the charges until the blood
18  comes back.
19    So yes, it's all possible.  I'm not sure if
20  he has the ability to do a telephonic search warrant.
21  Not every officer does.  It takes some training.
22    Q.  But it's true that Tashii Farmer could have
23  been detained for that entire period of time in
24  handcuffs at least awaiting that search warrant for
25  his blood, correct?

Page 84

1    A.  Yes.  More likely he would arrest him for
2  trespassing if he could get that on, and then wait on
3  the blood later on.
4    Q.  We'll get to the trespass in a minute.
5    A.  Sorry.
6    Q.  Are you aware that in Ken Lopera's CIRT
7  statement that he testified that he believed that
8  Tashii Farmer was going to carjack a vehicle outside
9  the Venetian?
10    A.  Yes.
11    Q.  And irrespective of 20/20 hindsight, is it
12  reasonable to accept Ken Lopera's perception of those
13  events happening very quickly to justify detaining
14  Tashii Farmer at that point?
15    MR. LAGOMARSINO:  Objection.  Form.
16    THE WITNESS:  Yes.  For questioning under
17  reasonable suspicion manner, yes.
18  BY MR. MCNUTT:
19    Q.  What are examples of deescalation
20  techniques?
21    A.  The first one would be getting more
22  resources there.  In other words, if you're by
23  yourself, getting more officers there.  Because
24  someone would probably fight with you one on one
25  versus you see two or three officers.  So we found if

Page 85

1  we get more officers there, that helps to deescalate.
2    Talking is deescalation.  Backing off from
3  using force until you get more officers there is
4  another form of deescalation.  And deescalation could
5  also be using tools so you don't have to use deadly
6  force.
7    Now, in this case there was no weapons
8  involved in Tashii Farmer, but what generally we talk
9  about with deescalation is using less lethal tools so
10  we don't have to use lethal force.  So the Taser, the
11  bean bag, 40-millimeter cap stun.  All those things
12  are deescalation if you're trying to prevent the use
13  of lethal force.
14    Q.  When an officer broadcasts a Code Red, does
15  that indicate to other officers that they should
16  respond to that, or is that merely a communications
17  technique to open up the channel?
18    A.  Well, so there's no yes or no answer to
19  that.  It's both.  It does shut the channel down so
20  that everyone knows there's an emergency there.  And
21  automatically officers would go to that call.
22    Q.  Are you aware that Officer Lopera did, in
23  fact, call for a Code Red over the radio?
24    A.  Yes.  And a foot pursuit.
25    Q.  So that would constitute one mechanism of

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

23 (Pages 86 to 89)

Page 86

1   deescalation technique, correct?
2       A.  Yes.
3       Q.  He's seeking to have other officers there,
4   correct?
5       A.  He would have to answer that for me.  But
6   it's certainly a way to clear the channel and let
7   people know that there was something going on where
8   he needed help.
9       Q.  Do you recall Officer Lopera giving verbal
10  commands to Tashii Farmer?
11      A.  Yes.
12      Q.  Do you recall at any point that Tashii
13  Farmer complied with those verbal commands?
14      A.  I didn't see any, that he complied.
15      Q.  You said in a question, in response to a
16  question from Mr. Lagomarsino, that the use of the
17  LVNR or neck restraint, whatever the exact question
18  was, he asked you if it was excessive in your opinion
19  and you said yes.
20          Do you recall that?
21      A.  Yes.
22      Q.  Why do you think it was excessive?
23      A.  So his question also included based on the
24  length of time that the LVNR or whatever neck
25  restraint was applied was on there, and that's what I

Page 87

1   thought was excessive.  On the video it appears like
2   after he was unconscious, the LVNR or whatever
3   restraint hold, was still on there too long.
4       Q.  Can you tell from the video how long Ken
5   Lopera had pressure applied to Tashii Farmer's neck?
6       A.  No.  You can't tell.
7       Q.  Can you tell from the video how long -- or
8   excuse me, what angle or application the LVNR 1, 2,
9   or 3 Ken Lopera was attempting to utilize?
10      A.  You can't tell because they're both moving
11  around, and the camera angle doesn't show you that.
12      Q.  Is it fair to say that at various points
13  when Ken's encircling arm is around Tashii Farmer's
14  neck that no pressure was applied because you simply
15  don't know, correct?
16      A.  You can't -- you're right.  You can't tell
17  how much pressure was applied throughout the time.
18      Q.  So do you think it would be accurate to say
19  that a neck restraint or an LVNR or a rear-naked
20  choke was applied to Tashii Farmer for the entirety
21  of the time that his encircling arm was around Tashii
22  Farmer?
23      A.  Definitely not.
24      Q.  Because you cannot tell whether any
25  pressure was applied, correct?

Page 88

1       A.  You're right.  And for how long it was
2   applied.
3       Q.  And do you know what caused Tashii Farmer
4   to go unconscious, i.e., whether it was from the neck
5   restraint or whether it was from exhaustion or
6   whether it was from the use of illegal narcotics?
7       A.  No.  I don't know.
8       Q.  Is it possible that Tashii Farmer went
9   unconscious because he was under the influence of
10  illegal methamphetamine?
11          MR. LAGOMARSINO:  Form.  Foundation.
12          THE WITNESS:  I would say I don't know
13  that.  I've never seen anyone go unconscious from
14  using meth.
15  BY MR. MCNUTT:
16      Q.  You said that the use of the Taser was
17  excessive.
18      A.  Yes.
19      Q.  Is that because Officer Lopera used it more
20  than three times?
21      A.  Yes.  Outside of policy.
22      Q.  Right.  And so Metro policy -- just correct
23  me if I'm wrong.  Metro policy is that an officer can
24  use an ECD device up to three times, correct?
25      A.  That's correct.

Page 89

1       Q.  And then at that point they should use some
2   other control technique, correct?
3       A.  They should determine that the use of Taser
4   is ineffective and switch to another.
5       Q.  Isn't it also true that Metro policy allows
6   an officer to deviate from that policy if certain
7   circumstances exist such as the officer is undersized
8   compared to the suspect or the officer is alone?
9       A.  Deviate from the policy of?
10      Q.  That you cannot use the ECD more than three
11  times?
12      A.  I would have to review the policy.  I can't
13  remember if it says that.
14      Q.  So you testified earlier that you know who
15  Sergeant Bland is, and he's been identified --
16      A.  Yes.
17      Q.  -- in the estate case as a subject matter
18  expert?
19      A.  Yes.
20      Q.  He testified to that fact.  He testified
21  that an officer alone could absolutely use an ECD
22  device more than three times if that was the best
23  opportunity, especially if the officer was undersized
24  compared to the suspect.
25          MR. LAGOMARSINO:  Objection.  Misstates.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~   July 31, 2019
\* \* \* Videotaped Deposition \* \* \*

24  (Pages 90 to 93)

Page 90

BY MR. MCNUTT:

1. Q.   Do you disagree with his opinion?
2. A.   No.  Here's what I would say.  That officer, every officer that uses force, has to justify the force they use.  So if they go outside of policy, they have to explain that and that may or may not be justified.
3. Q.   And so had Ken Lopera explained that to you, you may have said something different, then okay, that use of the ECD device was okay or within policy?
4. A.   Well, I guess it's a little different in this case because there was punches, there was Taser and there was LVNR.  So you can't just take one part of that and say that's excessive or this is not within policy or that.

It's a use of force that in that incident all is included together.

So he would have to articulate I did this and this wasn't effective, so I moved to this.  And then this wasn't effective, I went to that.  And if he did that correctly, even though some of the things might be outside of policy, doesn't say how many times you can strike someone.  Because how many strikes you did, you can't really tell.  But we all

Page 91

1. know if you -- if he was to connect with all those punches to Tashii Farmer's head that would have been excessive.

But we didn't say that was excessive because we couldn't tell how many punches actually hit him and what kind of damage or reaction it had to change Tashii Farmer's behavior.  His behavior didn't change.

2. Q.   So on the strikes, Metro has no opinion as to whether those were excessive because of that fact that you don't know how many connected?
3. A.   Well --

MR. LAGOMARSINO:  Objection.  Hold on.  Sorry.

Objection to the extent you're asking for Metro's opinion.  It's not a 30(b)(6) witness.

You can answer.

THE WITNESS:  And I guess my opinion, not Metro's opinion, which I'm a little bit -- I mean, I know I'm here to testify for that, but I believe that when someone is on the ground, we shouldn't be striking them at all.  That's my opinion because you -- it looks worse than it's effective.

So my problem is more with effectiveness than excessive use of force.  And especially with

Page 92

1. this all being videotaped, it looks terrible.

And so that to me, I believe CIRT said it was excessive.  But, you know, to me I'm more concerned with the Taser use and the LVNR than I am with the strikes because I know some of the strikes did not hit him.

BY MR. MCNUTT:

2. Q.   Now, let's go back to the chain of command.  The CIRT, the Critical Incident Review Team, do they report to you?
3. A.   No.
4. Q.   Who do they report to?
5. A.   The captain of IOCP, which at the time was Kevin McMahill.
6. Q.   Now, you sat on Officer Lopera's use of force board, correct?
7. A.   Yes.
8. Q.   Let's go back to the ECD for a minute with respect to it can be used three times and then the officer should look to some other use of force.

If you pull the ECD trigger a fourth time, but it has no connection and does not complete the circuit, so, therefore, transfers no energy to the suspect, is that a violation of policy because you pulled the trigger on the ECD but it didn't transfer

Page 93

1. any energy?
2. A.   So here's what I would say.  Yes, it's a violation of policy, but that doesn't mean that person did something wrong.

So in other words, if you do it more than three times, a supervisor has to investigate why did you do it more, and was it -- was it actually attached, was it effective.  And so that's part of the investigation the supervisor would do.

3. Q.   Are you aware of whether or not all of the cyclings of the ECD in this case were -- had complete circuit closure such that the device could transfer energy to Tashii Farmer?
4. A.   I am not aware of that.  I just don't know.
5. Q.   Okay.  If Sergeant Bland is designated as a subject matter expert on defensive tactics, neck restraint and things of that nature in this case, would you defer to his opinion regarding some of these questions that I asked you on those topics?

MR. LAGOMARSINO:  Objection.  Form.

THE WITNESS:  Yes.

BY MR. MCNUTT:

6. Q.   You said earlier that you didn't have an opportunity to get this info from Officer Lopera.

Do you recall that, generally?

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

25  (Pages 94 to 97)

Page 94

1    A.  Yes.
2    Q.  When Mr. Lagomarsino was questioning you
3  about the use of force board, you said it wasn't much
4  of a board because Officer Lopera did not show up and
5  testify.
6    A.  Right.
7    Q.  As per his right, correct?
8    A.  Well, not per department policy.  But
9  that's his -- I guess his right.
10    Q.  It's his option?
11    A.  Yes.
12    Q.  There's consequences to that option?
13    A.  Yes.
14    Q.  But you have, in fact, received some of
15  this information about Officer Lopera's perceptions
16  and beliefs and actions and the justification for his
17  conduct because you've read his CIRT report, correct?
18    A.  Yes.  You're right.
19    Q.  Okay.  So does that inform you that -- did
20  you find his CIRT report to be unavailing, or did you
21  want to hear it from him personally as -- what's the
22  disjunct there?
23    A.  Yes.  You're right.  And that's what I was
24  trying to get at.  And I did read his statement and
25  read the CIRT report.  But that did still lead me to

Page 95

1  questions I wanted to ask the use of force board.
2  Like I could do to Sergeant Crumrine whose answers
3  were probably the reasons why he was recommended for
4  a non-confirmation.
5    So in that board, the answers you give and
6  your attitude and the way you answer the questions
7  does have a play in your credibility.
8    Q.  So if Officer Lopera had testified at the
9  use of force board, is there a chance in your mind
10  that you would have found his actions to be
11  justified?
12    A.  Is there a chance?
13    Q.  Yes.
14    A.  I don't think so.
15    Q.  Why?
16    A.  Because I thought the CIRT report and his
17  answers, he didn't justify his actions.
18    Q.  Is that the purpose of a CIRT report?
19    A.  CIRT report, you mean --
20    MR. LAGOMARSINO:  Sorry, let me interrupt
21  you, sir.
22    When you say a CIRT report, there's a
23  report issued by Metro and the statement.  So I just
24  want to make sure the record is clear.
25    MR. MCNUTT:  The statement.

Page 96

1    THE WITNESS:  Well, the statement is to
2  find out from the officer why he used force and for
3  him to justify it.  And part of that is to determine
4  what kind of follow-up we as an agency need to do.
5    Now, in the majority of cases, officers
6  need some sort of training to fix any deficiencies we
7  find or any issues in his statements that don't match
8  what he should be saying per policy.
9    In other words, people who make mistakes
10  don't understand our use of force policy.  People
11  that understand our use of force policy make the
12  better decisions and we very rarely see them making
13  bad decisions.
14    So I would say that based on the decisions
15  Officer Lopera made, it would be very difficult for
16  him to convince me that he was justified in his
17  actions.
18  BY MR. MCNUTT:
19    Q.  So you testified earlier that you believe
20  most officers encountering Tashii Farmer, watching
21  him flee into what I'll call the back of the house or
22  an employee area only of the casino, would pursue
23  Tashii Farmer, correct?
24    A.  Yes.
25    Q.  And do you think that officers have at that

Page 97

1  point probable cause to detain that suspect?
2    A.  So reasonable suspicion?
3    Q.  Yes.  I'm sorry.
4    A.  Yes.
5    Q.  Okay.  Now, at what point did Ken Lopera
6  know Tashii Farmer had no weapons on him?
7    A.  I don't know because I don't think he ever
8  got to the point where he patted him down.  So I
9  don't think he ever knew for sure until after he was
10  handcuffed and someone else probably checked him for
11  weapons, I believe.
12    Q.  Right.  So inside the casino, we know from
13  Ken Lopera's CIRT transcript that he believed that
14  Tashii Farmer was under the influence of a controlled
15  substance, correct?
16    A.  I think he said or mentally ill.
17    Q.  Actually, so he actually said that he was
18  under the influence of a controlled substance on
19  seven occasions.  And he mentioned mentally ill on
20  one occasion.
21    MR. LAGOMARSINO:  Objection.  Form.
22    THE WITNESS:  Okay.  I --
23    MR. LAGOMARSINO:  Misstates.
24    THE WITNESS:  I remember something about
25  mentally ill.

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

26  (Pages 98 to 101)

Page 98

BY MR. MCNUTT:
1
2      Q.  And so we have -- from his perception, we
3  have Tashii Farmer, he believes he's under the
4  influence of a controlled substance and he's now fled
5  into a restricted area of the casino, correct?
6      A.  Yes.
7      Q.  He pursues and you don't have any problem
8  with the pursuit, correct?
9      A.  No.
10      Q.  And if he would have caught up to him at
11  that point and Tashii Farmer would have complied,
12  would you have had any problem with Ken Lopera
13  putting him in handcuffs?
14      A.  He would have to articulate why he's
15  putting him in handcuffs, but it's certainly enough
16  to stop him -- yes.  I would prefer that he stopped
17  him and tried to pat him down and talked to him.
18  Now, if he runs like that, generally we put them in
19  handcuffs right away.
20      Q.  Once they get outside, do you recall
21  hearing on the video Ken Lopera giving verbal
22  commands to -- asking Tashii Farmer to stop?
23      A.  Yes.
24      Q.  And is that a lawful command?
25      A.  Yes.

Page 99

1      Q.  And did Tashii Farmer comply with that?
2      A.  No.
3      Q.  And Ken Lopera articulated in his CIRT
4  statement that he believed that Tashii Farmer was
5  going to carjack a white Toyota pickup truck outside
6  the Venetian.
7         Do you recall that?
8      A.  Yes.
9      Q.  At that point, that's not a misdemeanor,
10  correct?  Carjacking an occupied vehicle is a felony,
11  correct?
12      A.  Yes.
13      Q.  Is Ken Lopera justified in using a Taser at
14  that point?
15      A.  Well, his -- so you're putting me in the
16  position to justify his actions, which when I watch
17  the video, I don't see an attempted carjacking.  Now,
18  he sees it differently than me.  He was there, I
19  wasn't there.
20         So and I didn't feel like his answers in
21  the CIRT interview articulated a carjacking either.
22         Now, I don't know -- I now have hindsight
23  to know that the victim didn't feel like he was going
24  to be carjacked.  So that -- it kind of undermines
25  what, you know, what Lopera said.

Page 100

1      Q.  If the victim didn't feel like he was going
2  to be carjacked, why did he say he locked his car
3  doors out of fear?
4         MR. LAGOMARSINO:  Objection.  Form.  Calls
5  for speculation.
6         THE WITNESS:  I don't know.
7  BY MR. MCNUTT:
8      Q.  That's a quote.  And that was a quote given
9  to Metro.  He told Metro in a recorded interview
10  later on, once they tracked down the license plate
11  and found him, he said that he locked his doors,
12  quote, out of fear, I guess.
13         Does that corroborate Ken Lopera's
14  perception of what was going on, or does that
15  undercut it?
16         MR. LAGOMARSINO:  Form.  Misstates.
17  Argumentative.  Calls for hearsay.
18         THE WITNESS:  So to me all it means is he
19  was scared of Tashii Farmer.  It doesn't articulate
20  that Tashii Farmer was going to steal his vehicle.
21         So I understand what you're saying that the
22  guy was scared of him, and I think Tashii Farmer
23  running and acting the way he was probably was scary.
24         But that doesn't -- to me, I'm looking for
25  probable cause to say carjacking.  I'm looking for

Page 101

1  him taking him, moving him out of the way, going into
2  the car, taking his keys, using a weapon, threatening
3  him.  Those are the carjacking cases I'm familiar
4  with.
5  BY MR. MCNUTT:
6      Q.  So -- I'm sorry, go ahead.
7      A.  So I understand what he said.  But I don't
8  see it when I look at the video.  I wasn't there.  I
9  just don't see it.
10      Q.  You would agree with me these events
11  happened pretty quick, correct?
12      A.  Yes.
13      Q.  And is it your opinion that Ken Lopera
14  should have waited until Tashii Farmer committed some
15  further act against the occupant of the vehicle
16  before he took action?
17         MR. LAGOMARSINO:  Objection.  Form.
18  Vague.
19  BY MR. MCNUTT:
20      Q.  Meaning at what point should Ken Lopera
21  have used that ounce of prevention versus the pound
22  of cure?
23         MR. LAGOMARSINO:  Objection.  Form.
24         THE WITNESS:  It's hard for me to go back
25  and say what he should have done.

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 102

1    BY MR. MCNUTT:
2        Q.  But it's subjective, isn't it?
3        A.  Yes.  I guess that's what I'm trying to
4    say, subjective.
5        Q.  So two reasonable officers could come to a
6    different conclusion about how to act in that
7    circumstance?
8        MR. LAGOMARSINO:  Objection.  Form.
9        THE WITNESS:  I guess two reasonable
10   officers could disagree on what Tashii Farmer was
11   doing.
12   BY MR. MCNUTT:
13       Q.  And based on that disagreement, of course,
14   taking different actions towards Tashii Farmer,
15   correct?
16       MR. LAGOMARSINO:  Objection.  Form.
17       THE WITNESS:  Yes, I mean, like I said, we
18   rely on officers to justify their use of force.  And
19   if it's not justified, then it's wrong.
20   BY MR. MCNUTT:
21       Q.  In this case it wasn't justified because
22   Ken Lopera did not testify at the use of force board?
23       MR. LAGOMARSINO:  Objection.  Form.
24       THE WITNESS:  That's only part of it.  He
25   did give a CIRT statement, and he did say that he

Page 103

1    thought the subject was trying to carjack whatever
2    his name was.
3    BY MR. MCNUTT:
4        Q.  Did the use --
5        A.  When we looked at it, we just didn't see
6    that part, and I didn't see it when I watched the
7    video or read it.
8        Q.  Okay.  Did the use of force board consider
9    the CIRT statement?
10       A.  Yes.
11       Q.  Why?
12       A.  Well, we consider the whole case.
13       Q.  Okay.  So the CIRT statement --
14       A.  You couldn't do the case against everyone
15   else without considering Lopera's statement and what
16   he did.
17       Q.  Okay.  And the reason I ask -- it's not a
18   trick question.  I think I didn't understand
19   something.
20       I thought the CIRT statement stayed purely
21   on the policy side, and it seems the use of force
22   board is -- I guess maybe it's more on the policy
23   side, but it is also on the policy side?
24       A.  Right.  So you're getting into a little
25   area that one of the dispositions on the use of force

Page 104

1    site is tactics decision-making.  And so sometimes in
2    that disposition, there is some bleed-over.
3        In other words, did the tactics employed,
4    because they were so bad, cause the use of force?
5        Now, in this case, this wasn't -- that
6    wasn't an option so we didn't have to consider that.
7        But there was no one else we were looking
8    at during the use of force board other than Lopera.
9    Because he's the one that used force.  The other
10   officers and all the other statements are using the
11   tactical review board side.
12       So although it's one case, they are
13   separate.
14       Q.  Okay.  Now, at the time of this event, May
15   of 2017, the LVNR was authorized to be used in a low
16   level of force situation, correct?
17       A.  Yes.
18       Q.  So the LVNR was a tool that Ken Lopera
19   could have used in this circumstance, correct?
20       A.  Yes.
21       Q.  And shortly thereafter, there was a policy
22   change to where it was only allowed to be used in
23   intermediate levels or higher, correct?
24       A.  You're correct.
25       Q.  And Mr. Lagomarsino got into that a little

Page 105

1    bit earlier.  In a nutshell, why was that?
2        A.  In a nutshell, we didn't want officers to
3    go to LVNR and low level usage.  And then secondly,
4    we wanted to simplify the policy to ensure that
5    everyone understood when they could and couldn't use
6    the LVNR.
7        Q.  And when you say simplify the policy,
8    exactly what has been simplified?
9        A.  Well, when you have a technique that can be
10   used over low level, intermediate and deadly force,
11   then it was too broad for that technique.
12       Q.  So give me an example of low level versus
13   intermediate force.
14       A.  Low level is verbal resistance.  Not
15   following commands.
16       Q.  So previously, prior to 2017, you could use
17   LVNR for things like -- for misdemeanors, correct?
18       A.  Yes.
19       Q.  Such as selling water?
20       A.  Yes.
21       Q.  And just recently in the example that you
22   testified about a little bit earlier where the
23   officer was showing -- was employing -- we'll mark
24   that exhibit...
25       (Exhibit A was marked for

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 106

```
1              identification.)
2    BY MR. MCNUTT:
3         Q.  Take a minute and look at that article.
4         Have you seen that screenshot before?
5         A.  Have I seen it before?
6         Q.  Today.
7         A.  Monday?  Yes.
8         Q.  And so this is an article -- we printed
9    this off yesterday from the Las Vegas Review-Journal.
10   And what's interesting to me is that Metro, in their
11   statement, the LVMPD PIO -- do you see at the bottom
12   of the first page?  What is PIO?
13        A.  Public information officer.
14        Q.  "The LVMPD PIO has received a number of
15   requests reference a video circulating on social
16   media of a water seller being taken into custody,
17   said a statement released Monday by Metro."
18        And then quote, "The video is from an
19   incident in July 2013 which was fully investigated by
20   LVMPD Internal Affairs.  The investigation showed no
21   policy violations occurred.  In addition, a lawsuit
22   filed by the individual in the video was dismissed by
23   the courts."
24        And that comports with your testimony
25   earlier, correct?
```

Page 107

```
1         A.  Good.
2         Q.  And then Metro says, in the statement,
3    quote, "Please note per Clark County code 6.04.130 it
4    is illegal to sell any merchandise, goods, items,
5    wares or services on any portion of public
6    right-of-way."
7         A.  Right.
8         Q.  Did you read that or do you just take my
9    word for it that I read it accurately?
10        A.  I read it quickly.
11        Q.  So per Metro policy, it's okay to employ
12   the LVNR, lateral vascular neck restraint, on
13   somebody allegedly committing the misdemeanor crime
14   of selling water in the desert, and but yet Metro on
15   the other hand has held that someone that is believed
16   to be under the influence of a controlled substance
17   and, in fact, was under the influence of a controlled
18   substance, fled irrationally into an employee area
19   only, and was believed to be carjacking someone, that
20   that use of force with the LVNR was excessive?
21        MR. LAGOMARSINO:  Objection.  Form.
22   BY MR. MCNUTT:
23        Q.  Is that the position?
24        A.  The position I've had and I've tried to
25   make it clear is the individual techniques used may
```

Page 108

```
1    or may not be excessive but certainly all of the
2    techniques used to me were combined to make it
3    excessive use of force.
4         Q.  So if Tashii Farmer had, as Ken Lopera
5    hoped for, proned out -- that's what he said in his
6    CIRT statement -- that after he achieved
7    neuromuscular incapacitation with the first Taser
8    strike, he expected Tashii Farmer to prone out and he
9    was going to wait for his captain to show up is what
10   he said.
11        Do you recall that?
12        A.  I don't remember the part about the
13   captain.  But I do remember saying he was hoping the
14   Taser would work and he would be proned out and that
15   would be the end of it.
16        Q.  Had that occurred, had Tashii Farmer
17   complied with his commands to not move after he had
18   been tased, what would have happened at that point,
19   do you have any idea?
20        A.  No.  I mean, Officer Lopera would have
21   completed an arrest report, use of force
22   documentation.  That would have been reviewed by a
23   supervisor.  And I assume if that's all that
24   happened, that that would be fine.
25        Q.  And Officer Lopera would not have been
```

Page 109

```
1    penalized in any way by Metro?
2         A.  Right.
3         Q.  But Tashii Farmer didn't comply and didn't
4    stay prone on the ground, correct?
5         MR. LAGOMARSINO:  Form.
6         THE WITNESS:  Correct.
7    BY MR. MCNUTT:
8         Q.  And so additional uses of force were
9    warranted, correct?
10        A.  Yes.
11        Q.  Because when a suspect doesn't comply with
12   lawful commands and some force has already been used,
13   additional force is warranted, correct?
14        MR. LAGOMARSINO:  Form.
15        THE WITNESS:  Yes.  And different
16   techniques.
17   BY MR. MCNUTT:
18        Q.  And different techniques.
19        Officer Lif said after one or two Taser
20   strikes, she would have went hands on with Tashii
21   Farmer.  Is that a reasonable alternative?
22        A.  Yes.
23        Q.  She also said she would have used her baton
24   on Tashii Farmer.  Is that a reasonable alternative?
25        A.  Yeah.  That's another tool.
```

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

## Page 114

1  seconds to comply, is that long enough to determine
2  whether or not they're going to comply?
3        A.  I think that's actually longer than I would
4  wait before I would start giving more or different
5  verbal commands.  You're just giving commands until
6  it's clear that -- in other words, until that person
7  stood up, if they're just going from laying to
8  sitting up, I'm not as concerned if they go from
9  laying to sitting up because someone either way is
10  not a danger to me.
11        Q.  Of course it depends how quickly they're
12  doing it because you don't know how quickly --
13        A.  You're right.
14        Q.  -- the movement between --
15        A.  Yes.  It can happen quickly, but I'm just
16  trying to go with your scenario.  And, you know,
17  there's no set time or, you know, number of seconds.
18  Every situation is different.
19        Q.  Let's look at page 7 of 8 or P002374,
20  whichever one you prefer to look at.
21        And I'm going to start with the second
22  paragraph from the bottom that starts:  "After
23  cycling the ECD seven times."
24        Do you see that, sir?
25        A.  Yes.

## Page 115

1        Q.  So it says:  "Officer Lopera holstered his
2  ECD with Farmer lying on his stomach.  Officer Lopera
3  straddled Farmer's back and struck him approximately
4  10 to 12 times in the head while giving Farmer verbal
5  commands."
6        Do you see that?
7        A.  Yes.
8        Q.  So it says that Lopera struck Farmer 10 to
9  12 times in the head, correct?
10        A.  Yes.
11        Q.  And you testified today that it's unclear
12  whether any -- how many of the punches connected with
13  Tashii Farmer, correct?
14        A.  Yes.
15        Q.  So do you think that should be worded a
16  little more carefully to make clear to the reader
17  that's unclear how many punches struck Tashii Farmer?
18        A.  Yes.
19        Q.  So if you go to the fourth paragraph up,
20  that starts:  "Officer Lopera began issuing verbal
21  commands."
22        Do you see that?
23        A.  Yes.
24        Q.  "Officer Lopera began issuing verbal
25  commands to Farmer.  However, the longest time

## Page 116

1  between cycles of the ECD was six seconds.  Officer
2  Lopera told Farmer to get on his stomach but never
3  gave Farmer a reasonable opportunity to comply with
4  commands."
5        Do you see that?
6        A.  Yes.
7        Q.  Now, do you agree with that statement that
8  six seconds is not enough time for Tashii Farmer to
9  comply?
10        A.  Well, like I said before, every situation
11  is different.  And he was not complying.  However, he
12  was not actively resisting or aggressively resisting,
13  I guess is my point.
14        And people who are either drunk or under
15  the influence of narcotics do not immediately comply,
16  rarely do they comply at all.
17        Q.  Okay.  But that's a little -- I appreciate
18  that answer.  But that's a little different than my
19  question.
20        A.  Okay.  Sorry.
21        Q.  You've testified a couple of times now that
22  five or six seconds, in one answer, you said would be
23  longer than you would give somebody to comply.  And
24  I'm simply asking you whether you agree with this
25  statement that Lopera giving Farmer six seconds was

## Page 117

1  not a, quote, "Reasonable opportunity to comply with
2  commands."
3        Do you agree with that statement?
4        MR. LAGOMARSINO:  Objection.  Asked and
5  answered.
6        THE WITNESS:  So there's no way to answer
7  that without watching the video.
8  BY MR. MCNUTT:
9        Q.  We're going to.
10        A.  Because giving someone -- I never timed --
11  I just watched the video.  I didn't count the number
12  of seconds in between.  And when you watch the video,
13  and he -- you have to give clear direction of what
14  you want.  And it appeared like -- and I'm going off
15  some memory here, but there was some conflicting
16  directions given while you're tasing someone, and
17  which led to the confusion of him not complying.
18        So it's really hard to justify now.
19        Q.  Do you know who wrote this arrest report?
20        A.  Yeah.  I'm sure it was either Alsup -- I
21  think it was Alsup.
22        Q.  It was Detective Alsup.  He testified that
23  he wrote every word of it.
24        A.  Yeah.
25        Q.  And even though Mr. Colon, or I think it's

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

31 (Pages 118 to 121)

Page 118

Mark Colon is on here, he testified that Alsup --
A. He's a lead detective.
Q. Right. And you said he's a good detective and does good work, correct?
A. Yes.
Q. Now, do you think that this at a minimum should have been reworded to be a little more accurate that six seconds could, in fact, be enough time to gain compliance or shouldn't be enough time to gain compliance?
MR. LAGOMARSINO: Objection. Form.
THE WITNESS: Yes.
BY MR. MCNUTT:
Q. So it could have been written a little better, correct?
A. Yes.
Q. Because in your opinion, six seconds, situation dependent, is more than enough time for compliance, correct?
MR. LAGOMARSINO: Misstates.
BY MR. MCNUTT:
Q. Yes or no?
A. Yes.
Q. So let's go to the fifth paragraph up. And this is where we're getting into the carjacking. And

Page 119

the middle of the paragraph there's a statement that says -- or a sentence that says: "The driver of the white truck stated he did not believe Farmer was a threat."
Do you see that?
A. Yes.
Q. Now, the driver in the same interview, the driver of the white truck, Jonathan Pierce, told Metro officers, members of the FIT team, that he locked his doors out of fear of Tashii Farmer.
MR. LAGOMARSINO: Objection. Misstates.
BY MR. MCNUTT:
Q. We talked about that earlier, correct?
A. Yes.
Q. I mean, is that not probative information regarding what was going on at that moment?
A. Yes.
Q. Okay. And so the reader of this report could get two different opinions about what was going on if they only read that the driver of the white truck stated he did not believe Farmer was a threat, period. Versus the driver of the white truck stated he did not believe Farmer was a threat, comma, but he locked his doors out of fear.
Two different interpretations, correct?

Page 120

A. Yes.
Q. Should that other quote from Jonathan Pierce have been included in this arrest report?
A. Yes.
Q. Why was it not?
A. I don't know.
Q. So knowing now, if you were the supervisor of Detective Alsup and we're sitting here going through this, would you kick this arrest report back to him and make him correct those three errors we've gone over?
MR. LAGOMARSINO: Objection to the extent he caught the errors.
THE WITNESS: If I knew about the errors, then they would be sent back for correction.
BY MR. MCNUTT:
Q. Of course.
A. Normally that would be the sergeant's job or the lieutenant's job before it got to anywhere else.
So yes, that's a review that supervisors should be doing of these reports.
Q. And either that didn't happen or it was missed, correct?
A. Yes.

Page 121

Q. It starts with Detective Alsup inasmuch as he missed getting this completely accurate, correct?
MR. LAGOMARSINO: Objection. Form.
THE WITNESS: Yes.
BY MR. MCNUTT:
Q. Because he testified that he had access to all of his team's information, which included Jonathan Pierce's statement about locking his doors out of fear.
Now, Mr. Lagomarsino asked you earlier a few questions about body-worn camera policy. And if I recall your testimony correctly, you said that the officers involved in the use of force needed to have their -- per policy had to have their cameras running. They couldn't turn them off until the use of force was over; is that accurate?
A. Yes.
Q. And so in this case, would an acceptable time to turn the cameras off been when Tashii Farmer was in handcuffs, or is it before that or is it after that?
A. Usually when the subject is placed in handcuffs is what we would consider the end of that use of force incident.
Q. Okay. And obviously we have plenty of

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

33  (Pages 126 to 129)

Page 126

1      A.  No.
2      Q.  -- the exhibit we looked at earlier where
3  it's a direct front-on, correct?
4      A.  Right.
5      Q.  So Ken Lopera in his CIRT statement said:
6  "While I had the LVNR applied, I was attempting to,
7  due to the fact that he was on his side, his
8  movement, I had full encirclement but I wasn't able
9  to get the full grip.  I was still trying to embrace
10  that neck brace principle."
11          Do you understand what the neck brace principle
12  is?
13      A.  That's you're head to head.
14      Q.  It's where you're controlling the suspect's
15  neck to protect their airway?
16      A.  Okay.
17      Q.  I mean, that's a phrase out of Metro's
18  training: "While applying pressure to his carotid
19  artery."
20          Sounds like an LVNR, correct?
21      A.  Yes.
22      Q.  "Due to the way my body was positioned to
23  my right side," and then another sentence, "I did not
24  have that luxury due to him already being on my
25  back."

Page 127

1          So he articulates that he couldn't apply
2  the LVNR properly.  And yet Detective Alsup found
3  that he absolutely did not use an LVNR.
4          Do you think that's accurate?
5      A.  Well, Detective Alsup didn't have his
6  statement.
7      Q.  But do you think -- that's a fair point.
8  And because we've used -- talked about the statement
9  on both sides, and I'm glad to hear you say that
10  actually.  It affirms somewhat my belief in the
11  system.
12          So do you think anybody watching the video
13  could definitively tell that Ken Lopera was not
14  applying the LVNR accurately or was intentionally
15  using a non-approved technique?
16      A.  You couldn't tell and our experts couldn't
17  tell either.
18      Q.  So do you think it's fair for
19  Detective Alsup to come to that definitive
20  conclusion?
21      A.  I think it's a little too definitive.  But
22  it's not wrong 100 percent.  I don't know how to --
23  he could have worded it better.
24      Q.  You talked about levels of resistance just
25  in passing in one of your answers.  This is not a

Page 128

1  test, but do you know the different levels of
2  resistance that Metro teaches that suspects undergo
3  or utilize?  We have compliant.
4      A.  Compliant.
5      Q.  Passive resistance.
6      A.  Passive and active resistant, aggressive --
7      Q.  Resistance, and aggravated aggressive
8  resistance.
9      A.  Yeah.
10      Q.  Do you have an opinion as to -- and if you
11  don't, that's fine -- what Tashii Farmer was
12  demonstrating in this incident?
13      A.  I thought it was active resistance.  It
14  looked to me like he didn't want to be handcuffed.
15      Q.  And I'll read active resistance, and this
16  is from LVMPD 0007:  "The subject's verbal or
17  physical actions are intended to prevent an officer
18  from placing the suspect in custody and taking
19  control, but are not directed at harming the officer.
20  Examples, walking or running away, breaking the
21  officer's grip."
22          Does that comport with your memory?
23      A.  Yes.
24      Q.  And then aggressive resistance so we know
25  what the distinction is:  "The subject displays the

Page 129

1  intent to harm the officer, themselves or another
2  person" -- let me know if you're going too fast -- "and
3  prevent an officer from placing the subject in
4  custody and taking control.  The aggression may
5  manifest itself through a subject taking a fighting
6  stance, punching, kicking, striking, attacks with
7  weapons or other actions which present an imminent
8  threat of physical harm to the officer or another."
9          Comport with your --
10      A.  Yes.
11      Q.  And then obviously aggravated aggressive is
12  actions significant resulting in death or serious
13  bodily harm.
14          If I reach for your sidearm or if you're
15  carrying one on the other side, your Taser, is
16  that -- what level of resistance is that?
17      A.  That's aggravated -- not aggravated.
18      Q.  Is it aggressive resistance?
19      A.  Aggressive resistance, I'm sorry.
20      Q.  So your choices are active or aggressive
21  resistance?
22      A.  Yes.
23      Q.  Yes?  I said your choices are active
24  resistance or aggressive resistance.
25      A.  It depends how you articulated that I

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

37 (Pages 142 to 145)

Page 142

1    Q.  So, in fact, Ken Lopera did give Tashii
2  Farmer enough time to comply with his lawful command,
3  correct?
4    A.  Well, you have to watch the whole video.
5    Q.  We're going to.  But just this part.
6    A.  I'm saying when you stop it like that and
7  do each time it's different than -- like, even one of
8  the commands was to the guy in the truck.
9    Q.  So should Detective Alsup not have done
10  that in the arrest report?
11    A.  Yes, I already --
12    Q.  Because that's what he did in the arrest
13  report.
14    A.  I already agreed that he should have worded
15  it better in the arrest report.
16    Q.  I didn't even ask you those questions.
17  That's exactly what Alsup did.  Alsup broke this down
18  just like I'm breaking it down.  So should he not
19  have done that?
20    MR. LAGOMARSINO:  Objection.  Form.
21    THE WITNESS:  Everybody that looks at video
22  looks at the whole thing, and then they break it down
23  by seconds.
24  BY MR. MCNUTT:
25    Q.  That's what we're going to do here.

Page 143

1    From this 1:40 to 1:44, Ken Lopera gave a
2  lawful command, and Tashii Farmer did not comply with
3  it, correct?
4    A.  Yes.
5    Q.  And in your opinion, was that four seconds
6  reasonable for Ken Lopera to have given?
7    A.  Yes.
8    Q.  Okay.  Thank you.
9    (Playing Video)
10  BY MR. MCNUTT:
11    Q.  So because there was no compliance, Ken
12  Lopera gave him another cycle of the ECD, correct?
13    A.  Yes.
14    Q.  And Tashii Farmer goes to his back,
15  correct?
16    A.  Yes.
17    Q.  Was that use of the Taser authorized per
18  Metro policy?
19    A.  Yes.  But he also said, "Get on your
20  stomach," at the same time he tased him.  Which is
21  not possible to do.
22    Q.  Okay.  Sure.  And sometimes --
23    A.  Earlier that's what I said.  Some of the
24  commands were conflicting.  And so you can't say,
25  okay, he told him not to move five times and that's

Page 144

1  enough.
2    Q.  True.  And so after, you know, running for
3  60 seconds, chasing the suspect, Ken Lopera did not
4  say everything perfectly like we would have liked him
5  to, correct?
6    A.  Right.
7    Q.  Is that a violation of policy?
8    A.  Not a violation.  And not unusual.
9    Q.  It's just a mistake?
10    A.  Yes.
11    (Playing Video)
12  BY MR. MCNUTT:
13    Q.  So we're now at 1:52 after the second ECD
14  strike.  Ken Lopera said don't move, correct?
15    A.  Yes.
16    Q.  And Tashii Farmer then drew his knees up to
17  his waist, correct?
18    A.  Yes.
19    Q.  Is that not moving?
20    A.  That's moving.
21    Q.  Is that complying with his lawful
22  command?
23    A.  Yes.  I mean, no, it's not complying.
24  Sorry.
25    (Playing Video)

Page 145

1  BY MR. MCNUTT:
2    Q.  So he then -- so we're now at 1:56.  Ken
3  Lopera says, "Get on your stomach," correct?  And
4  cycled the ECD?
5    A.  Yes.
6    Q.  Now, do you have a problem with that?
7    A.  I would have preferred the time between the
8  commands and the cycling to be longer apart.
9    Q.  In this instance?
10    A.  Yes, in this instance.
11    Q.  Okay.
12    A.  So that's what you're asking me, I thought.
13    Q.  Yes.
14    A.  Yes.  I would prefer that there's some time
15  between the commands and the Taser cycling.
16    Q.  So it is appropriate to break this down,
17  because in the first three commands, we saw that Ken
18  Lopera did give a reasonable time for compliance and
19  Tashii Farmer did not comply, but you're saying in
20  this one instance that he did not?
21    MR. LAGOMARSINO:  Objection.  Misstates.
22  BY MR. MCNUTT:
23    Q.  Is that fair?
24    A.  Yes.
25    (Playing video)

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

---

Page 150

1    A. No. There's other options.
2    Q. Such as?
3    A. Cap stun, baton. None of these are going
4  to look good, but there's other options.
5    Q. But, now, cap stun is not an option now, is
6  it? Because you cannot per policy use cap stun and
7  ECD on the same suspect, can you?
8    A. Well, you shouldn't.
9    Q. Well, are we going to say that you are
10  going to recommend to this officer that he should?
11    A. Well, I can't stop looking at his hand on
12  his wrist where he has his Taser in his other hand --
13    Q. Okay.
14    A. So that's not how we teach people.
15    Q. Okay. So if Ken did this and it wasn't
16  perfect, but it wasn't out of policy, would you have
17  preferred he did this or would you have preferred he
18  pull out his baton and start baton strikes?
19    A. But the mistakes that Officer Lopera made
20  earlier led to this. Now, by that I mean he didn't
21  let his partner know where he was going. He didn't
22  get on the radio until he was already on the ground
23  and already had tased him and asked for a Code Red.
24    So what I would prefer to see him do would
25  be to call out he was in a foot pursuit on the radio

---

Page 151

1  and ask for a Code Red. I don't know how much time
2  it took for him to catch up to him, but that could be
3  the 30 seconds we're looking for to get another
4  officer there.
5    So each mistake could be small, but when it
6  adds up it could be this is a better way to do this?
7  Is he outside of policy? No.
8    Q. These are the types of things that you hot
9  wash after the fact to make your officers better,
10  correct?
11    A. Yes. Exactly.
12    MR. LAGOMARSINO: Form.
13    BY MR. MCNUTT:
14    Q. But it doesn't mean they're liable for the
15  mistake, correct?
16    MR. LAGOMARSINO: Form.
17    THE WITNESS: Well, we don't determine
18  liability.
19    BY MR. MCNUTT:
20    Q. But in this case, he's not -- up to this
21  point, 2:05, he's not even out of policy, correct?
22    MR. LAGOMARSINO: Form.
23    THE WITNESS: I haven't seen anything right
24  there. He says that there was an attempted
25  carjacking. The video certainly doesn't show that

---

Page 152

1  because to even see any interaction you have to see
2  the Venetian video with the truck and Tashii Farmer
3  and the driver.
4    So this catches up while he's already
5  backed away from the truck, Tashii Farmer. Correct?
6  BY MR. MCNUTT:
7    Q. I think -- we're a slightly different
8  interpretation, but I don't want to argue that
9  point.
10    A. But my issue is the use of the Taser. His
11  justification is an attempted carjacking, and I don't
12  see that.
13    Q. Okay.
14    A. So after that, if that is justified, based
15  on there is an attempted carjacking, then I have no
16  problems right now.
17    Q. And Ken Lopera did see that. Can you give
18  the benefit of the doubt to your officer?
19    MR. LAGOMARSINO: Form.
20    THE WITNESS: That's not what we do.
21  BY MR. MCNUTT:
22    Q. Okay. That's unfortunate.
23    MR. LAGOMARSINO: Move to strike.
24    (Playing video.)
25

---

Page 153

1  BY MR. MCNUTT:
2    Q. Do you hear that, "Okay. Okay, sir"?
3    A. Yes.
4    Q. Okay. Does that sound like Ken Lopera or
5  Tashii Farmer?
6    A. I can't tell.
7    (Playing Video)
8    THE WITNESS: I think he said "I will."
9  BY MR. MCNUTT:
10    Q. I was just going to ask you about that.
11    So he said get on your stomach, and then
12  Tashii Farmer clearly said, "I will."
13    Going back to that, "Okay. Okay, sir." Do
14  you think that was Tashii?
15    A. I think that was Tashii Farmer now.
16    Q. You do? Okay. I'm going to play that
17  again because I don't think it is but you're
18  answering the question.
19    (Playing Video)
20    THE WITNESS: He said, "I will. I will."
21  BY MR. MCNUTT:
22    Q. Is that "Okay, sir" --
23    A. I think that's him.
24    Q. Okay. Fair enough.
25    (Playing Video)

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

40 (Pages 154 to 157)

Page 154

BY MR. MCNUTT:
1
2   Q. Now, let's play it a little bit more.
3       Now, you hear the tick, tick, tick, tick,
4   tick of the Taser, correct?  And the various phrases,
5   you understand it to be drive stun or is he still
6   cycling it?  What would you call that?
7   A. I think it sounds like he's cycling it
8   again.
9   Q. Now, did Tashii Farmer prone out in NMI,
10  neuromuscular incapacitation?
11  A. He didn't prone out, but it looked like he
12  was shaking.
13  Q. It looked like Tashii Farmer was shaking?
14  A. Yeah. That's what it looked like to me.
15  Q. I'm not following you in terms of he was
16  shaking. What does that...
17  A. When I watch the video --
18  Q. The whole thing is shaking.
19  A. When he was cycling it, he did not go to
20  the --
21  Q. The NMI?
22  A. The NMI that we're looking for, but it
23  looked like it was affecting him somewhat is my
24  point.
25  Q. I understand your answer now.  I didn't

Page 155

1   understand it prior to that.
2           (Playing Video)
3   BY MR. MCNUTT:
4   Q. So did you hear the "help me out" that Ken
5   said?
6   A. Yes.
7   Q. And then we're going to start to see, see
8   the legs in the left side of the screen here?
9   A. Yes.
10  Q. And then you'll see other -- these officers
11  have testified that they're Venetian officers that
12  approach --
13  A. Venetian security?
14  Q. Yes, sir. So we still don't have any Metro
15  officers.
16  A. Right.
17  Q. And Ken calls out for them to help.
18      Do you think, is it common for law
19  enforcement officers to ask civilian security guards
20  for assistance?
21  A. Sure.
22  Q. In this circumstance where they're coming
23  from the Venetian?
24  A. Yes.
25  Q. So it was okay for Ken to ask for their

Page 156

1   assistance?
2   A. Sure.
3   Q. Now, is Ken on the hook for any of the
4   commands that they, the security guards, gave Tashii
5   that conflicted with his commands?
6       MR. LAGOMARSINO: Form.
7       THE WITNESS: Is he responsible for what
8   they say?
9       MR. LAGOMARSINO: Form.
10  BY MR. MCNUTT:
11  Q. Yes.
12  A. Well, he asked them for help, okay? If you
13  ask someone for help, you need to tell them exactly
14  what you want them to do. Which he didn't, that I
15  remember, communicate very well.
16      And so that led to the conflicting
17  commands.
18  Q. So in the middle --
19  A. I think we're going to hear.
20  Q. In the middle of the fight, Ken didn't
21  supervise the Venetian security guards very well.
22  A. Well, "Help me. Can you give me a hand?
23  Can you give me some help?" Right?
24  Q. I think he said give me a hand here or
25  something like that.

Page 157

1   A. Whatever he said, you know, obviously,
2   we're looking back now, but I would prefer, hey, we
3   need to get cuffs on this guy. Something to give
4   some kind of direction.
5   Q. But nothing he did was out of policy at
6   this point?
7   A. No.
8           (Playing Video)
9   BY MR. MCNUTT:
10  Q. Now, at this point Ken Lopera is not in
11  physical contact, but one of the officers, the
12  security officers were, correct?
13      MR. LAGOMARSINO: Objection. Form.
14      THE WITNESS: Correct.
15  BY MR. MCNUTT:
16  Q. And we're at 2:23?
17      MR. LAGOMARSINO: Form.
18      THE WITNESS: It sounds like he's cycling
19  again.
20  BY MR. MCNUTT:
21  Q. Can you tell from that -- and I can back it
22  up at any point and watch --
23  A. It doesn't look like the probes are working
24  like they were earlier.
25      MR. LAGOMARSINO: I'm just going to make an

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

41 (Pages 158 to 161)

---

Page 158

1  objection that at the point where it stopped, there's
2  no depiction of physical contact between the security
3  officer and Tashii Farmer.
4       MR. ANDERSON:  That's correct.  At the
5  point where it was stopped.  The question was just
6  prior to that.
7            (Playing Video)
8  BY MR. MCNUTT:
9       Q.  Do you hear that, "Okay, sir.  Okay, sir"?
10      A.  Yes.
11      Q.  Who is that from?
12      A.  I thought that was Tashii Farmer again.
13      Q.  Okay.
14           (Playing Video)
15  BY MR. MCNUTT:
16      Q.  So we're at 2:32.
17           And this is about the point where we
18  know -- well, according to Detective Alsup, this is
19  where he's holstering up the ECD.  So I'm going to
20  back it up so you can see.
21           Let me ask you if you can see that.  We're
22  at 2:24.
23           Tell me when he holsters up the ECD.
24           (Playing Video)
25

---

Page 159

1  BY MR. MCNUTT:
2       Q.  So I just stopped it at 2:31.  Can you see
3  Tashii Farmer's hands?
4       A.  Yes.
5       Q.  What are his hands doing?
6       A.  They're moving around behind his back.
7       Q.  Are his hands being restrained?
8       A.  No.
9       Q.  And is that -- are they behind his back or
10  in front of him?
11      A.  I don't know.  It's kind of blurry right
12  there, but it looks like they were behind his back
13  and they've moved now to the side.  I don't know.
14      Q.  Now, tell me if at any point -- how would
15  you describe this resistance?
16      A.  To me that's still active because this is
17  common for people that don't want to be handcuffed.
18  He just doesn't want to get the handcuffs on, and
19  he's moving his hands so you can't handcuff him.
20           (Playing Video)
21  BY MR. MCNUTT:
22      Q.  Do you see Tashii Farmer's hand in the
23  video?
24      A.  No.  Right now where you've got it stopped
25  I don't see it.

---

Page 160

1       Q.  It's 2:33, and I'm going to point it over
2  Ken Lopera's collar.
3       A.  Okay.
4       Q.  Do you see that?  And do you see his thumb?
5  So this is clearly his right hand, correct?
6       A.  Okay.
7           (Playing Video)
8  BY MR. MCNUTT:
9       Q.  Did you hear that strike?
10           MR. LAGOMARSINO:  Objection.  Form.
11           THE WITNESS:  I heard something that
12  sounded like a strike, but I didn't see it on the
13  video.
14  BY MR. MCNUTT:
15      Q.  What do you think it was?
16           MR. LAGOMARSINO:  Objection.  Form.
17           THE WITNESS:  I don't know.
18  BY MR. MCNUTT:
19      Q.  What do you think could have made that
20  sound?
21           MR. LAGOMARSINO:  Same objection.
22           THE WITNESS:  I don't know.  I'm guessing.
23  BY MR. MCNUTT:
24      Q.  Do you know who Detective Casey Kirkegard
25  is?

---

Page 161

1       A.  Yes.  From CIRT.
2       Q.  Yeah.  I asked her that question.  She said
3  it was the wind.  That's what she said.
4       A.  Well, I don't think it was the wind.
5       Q.  Do you think it would have been Tashii
6  Farmer punching Ken Lopera?
7           MR. LAGOMARSINO:  Form.
8           THE WITNESS:  It could have been.  But it
9  could have been Ken Lopera or one of the security
10  guards punching someone.
11  BY MR. MCNUTT:
12      Q.  Okay.
13      A.  It sounds like something hitting clothing.
14      Q.  And something hitting clothing that the
15  body-worn cam mic picked up, correct?
16      A.  Yes.
17      Q.  So were you ever a detective?
18      A.  Yes.
19      Q.  So would that imply to you that the strike
20  landed near the body-worn cam mic?
21           MR. LAGOMARSINO:  Form.
22           THE WITNESS:  No, you can't tell.
23  BY MR. MCNUTT:
24      Q.  But we know Tashii Farmer's right hand was
25  free in those seconds.

---

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

42  (Pages 162 to 165)

Page 162

1          MR. LAGOMARSINO.  Objection.  Form.
2   BY MR. MCNUTT:
3          Q.  Isn't that true?
4          A.  Well, we saw it on video that it was free,
5   but it doesn't show it coming towards Lopera or
6   any -- I mean, I can't evaluate just the noise.
7          Q.  But don't we always evaluate partial
8   evidence?  Isn't that what we call circumstantial
9   evidence?
10          MR. LAGOMARSINO:  Form.
11   BY MR. MCNUTT:
12          Q.  I grant you that we don't have a freeze
13   frame of Tashii Farmer punching Ken Lopera, but we
14   see his hand free and then we hear a strike hit Ken
15   Lopera's body-worn cam.
16          A.  I can't go that far and guess that.
17              (Playing Video)
18   BY MR. MCNUTT:
19          Q.  So do you see how the body -- the camera is
20   very shaky and moving around?
21          A.  Yes.
22          Q.  Does that imply to you that Tashii Farmer
23   is complying with Ken Lopera's commands to get on his
24   stomach and stay still?
25          A.  The only thing it implies to me is Ken

Page 163

1   Lopera is moving his arm.
2          Q.  Okay.  Why his arm?  What do you mean?
3          A.  Because his body camera is attached to his
4   lapel on his shoulder.
5          Q.  How many officers participated in
6   handcuffing Tashii Farmer?
7          A.  I believe four.
8          Q.  Based upon that fact alone, do you think
9   Tashii Farmer was resisting throughout the
10   handcuffing process?
11          A.  Was he resisting being handcuffed?  Yes.
12          Q.  Is it possible that what we saw at around
13   2:34 was a strike by Tashii Farmer?
14          A.  Is it possible?
15          Q.  Yes.
16          A.  Yes.
17          Q.  And if so, wouldn't that mean that it
18   was aggravated aggressive resistance, per the
19   definition?
20          A.  Yeah.  I guess if that is what he's
21   saying.
22          Q.  And coupled with the fact that Ken Lopera
23   said in his CIRT statement that Tashii Farmer was
24   reaching to grab his Taser out of his holster?
25          A.  Well, I definitely can't see that.

Page 164

1          Q.  I didn't ask you if you could see it.  I
2   just said coupled with the fact that that's what Ken
3   said in his CIRT statement.
4          A.  Yeah.  I can only go by what I see.  And
5   that was, you know, this is all things that we looked
6   at and talked about.
7              You know, the officer has a perception and
8   he reports what he saw and what he did for use of
9   force and it has to be justified.
10              Now, what I see is someone that doesn't
11   want to be handcuffed.  He may or may not have thrown
12   one punch, but he still is resisting his hands being
13   placed behind his back, which is not to me aggressive
14   resistance.  It's someone who doesn't want to be
15   handcuffed, which we see almost all the time.
16          Q.  So let's go with one hypothetical that
17   there was no aggressive resistance whatsoever.
18   There's just active resistance, correct?
19          A.  Right.
20          Q.  Was -- all of Ken's use of force up to this
21   point was within policy, correct?
22          MR. LAGOMARSINO:  Objection.  Form.
23          THE WITNESS:  If you also agree that the
24   Taser was justified -- first of all, no.  Because the
25   Taser cycles were too many compared to the three it

Page 165

1   should have been.  He should have holstered his Taser
2   and went completely hands-on with both hands.
3   BY MR. MCNUTT:
4          Q.  But --
5          A.  Instead of continued to use the Taser,
6   which for the most part the extra cycles appeared
7   like it didn't work like the first three.
8              So why would he keep doing it?
9          Q.  He was in the heat of the moment and --
10          A.  Right.
11          Q.  -- and sympathetic response --
12          A.  Right.  If that was all that happened, then
13   he would get some retraining.
14          Q.  So assuming we're just in active resistance
15   here, and Ken Lopera is about to employ the LVNR or
16   some form of a neck restraint, correct?  The LVNR is
17   authorized in this low level use of force for active
18   resistance, correct?  At that time?
19          A.  At that time, yes.
20          Q.  Do you know the policy, if it's per Metro
21   policy, for the officer employing the LVNR to keep
22   the encircling arm in place until the suspect is
23   handcuffed?
24          A.  Yes.
25          Q.  So if Ken Lopera in the video has his

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

43  (Pages 166 to 169)

Page 166

1  encircling arm around Tashii Farmer's neck, and as
2  you testified earlier, we don't know how much, if
3  any, pressure was being applied, but he's authorized
4  and per Metro policy to keep that in place until
5  Tashii Farmer is in handcuffs, correct?
6      A.  That's what policy says.
7      Q.  Okay.  And do you know if he did that in
8  this case?
9      A.  Did he do that or did he get handcuffed?
10     Q.  No.  Did Ken Lopera keep his encircling arm
11 in place until Tashii Farmer was handcuffed?
12     A.  Yes.
13         MR. MCNUTT:  Andre, let me look at my
14 notes, but I'll turn you over to him for any
15 follow-up, and then I may have one or two to finish
16 out.
17         MR. ANDERSON:  I have about ten minutes.
18 I'll go before Andre.
19         MR. MCNUTT:  Thank you for your time.
20         THE WITNESS:  No problem.
21         THE VIDEOGRAPHER:  The time is
22 approximately 2:48 p.m.  We are going off the
23 record.
24             (A recess was taken from 2:48 p.m.
25              to 2:50 p.m.)

Page 167

1          THE VIDEOGRAPHER:  The time is
2  approximately 2:50 p.m.  We're back on the record.
3
4          EXAMINATION
5  BY MR. ANDERSON:
6      Q.  Chief McGrath, I just want to follow up on
7  some testimony that you just gave to Mr. McNutt.
8          You stated that it's policy that when an
9  LVNR or neck restraint is being performed that it's
10 policy to keep the encircling arm in place until
11 handcuffing is complete, correct?
12     A.  Yes.
13     Q.  You also testified earlier that from your
14 watching of the video, you could not tell at any time
15 how much pressure, if any, Lopera was applying to
16 Mr. Farmer's neck; is that correct?
17     A.  Correct.
18     Q.  Based upon your training and experience and
19 your review of this case, when Officer Crumrine first
20 arrived, would he have been able to tell how much
21 pressure, if any, Officer Lopera was applying to
22 Mr. Farmer's neck?
23         MR. LAGOMARSINO:  Form.
24         THE WITNESS:  No.  He could not.  I could
25 not tell.

Page 168

1  BY MR. ANDERSON:
2      Q.  In your experience as an officer, should
3  Crumrine have been able to tell how much pressure was
4  being applied to the neck?
5      A.  If it was applied correctly, he should be
6  able to tell.
7      Q.  Is it possible that the encircling arm was
8  just in the area of the neck and not applying any
9  pressure?
10     A.  Yes.
11     Q.  When Sergeant Crumrine arrived, what should
12 have been his initial focus?  What should have been
13 his first goal with respect to Mr. Farmer?
14     A.  The -- he should be ensuring the tactics
15 used by the officers are effective.  And if not,
16 change tactics.
17     Q.  And you've talked about Metro has a policy
18 with respect to duty to intervene, correct?
19     A.  Yes.
20     Q.  Is giving verbal commands a form of
21 intervention?
22     A.  Yes.
23     Q.  Is going hands-on to assist with
24 handcuffing a form of intervention?
25     A.  Yes.

Page 169

1      Q.  Did Sergeant Crumrine give verbal commands?
2      A.  I'm sorry, I was moving.
3      Q.  You're fine.  Did Sergeant Crumrine give
4  verbal commands to Officer Lopera?
5      A.  Yes.
6      Q.  Did Sergeant Crumrine go hands-on and
7  attempt to facilitate handcuffing?
8      A.  Yes.
9      Q.  Do you agree in this case that Sergeant
10 Crumrine actually intervened?
11     A.  He did some intervention.  I wish he would
12 have done more.
13     Q.  Why do you wish he would have done more?
14     A.  Because we expect more of our supervisors.
15     Q.  Were you holding Sergeant Crumrine to a
16 higher standard than, say, Officer Tran and Flores?
17     A.  Yes.
18     Q.  And is that based upon Las Vegas
19 Metropolitan Police Department's policies?
20     A.  Well, it's based on several things.  First
21 of all, Officer Tran and Flores were on different
22 parts of Officer Farmer (sic), and they're focused
23 on what they're doing to get him in custody.  And
24 Officer -- Sergeant Crumrine is seeing the overall
25 use of force, and so he should take charge of

Deputy Chief John McGrath ~ July 31, 2019
* * * Videotaped Deposition * * *

---

Page 170

1  that scene and start directing people of what to
2  do.
3      Q.  So your criticisms of Sergeant Crumrine are
4  based upon his actions as a supervisor and not as a
5  regular officer?
6      A.  That's correct.
7      Q.  If you were evaluating him as a regular
8  officer, would you believe that he intervened in this
9  case?
10     A.  Yes.
11     Q.  And did you believe that Tran and Flores
12 intervened by facilitating handcuffing?
13     A.  Yes.
14     Q.  Then you were asked a question earlier by
15 Mr. Lagomarsino where you said at some point you
16 would like to -- you would like to see an officer
17 physically pry the arms off the neck of the suspect;
18 is that fair?
19     A.  Okay.
20     Q.  Okay.  Would an officer ever pry the arms
21 off the neck of a suspect before handcuffing was
22 complete?
23     A.  On an LVNR?
24     Q.  On an LVNR, yes.
25     A.  Probably not.

---

Page 171

1      Q.  Would you want the suspect to be handcuffed
2  before you took any physical intervention against
3  another officer?
4      A.  Yes.
5      Q.  In your review of the evidence in this case
6  in your role in the use of force or in tactical
7  board, when Sergeant Crumrine arrived, did he have
8  any information that would have led him to believe
9  that excessive force was being used based upon what
10 he perceived?
11     A.  No.
12     Q.  When Sergeant Crumrine and Officers Flores
13 and Tran arrived, would they have been justified in
14 believing that Ken Lopera was using reasonable
15 force?
16     A.  Yes.
17     Q.  So it's reasonable for an officer to assume
18 that other officers have acted reasonably prior to
19 their arrival?
20     A.  Yes.
21     MR. ANDERSON:  I have nothing further.
22     THE WITNESS:  Very efficient.
23     MR. ANDERSON:  Thank you.
24     (Exhibit 10 was marked for
25     identification.)

---

Page 172

1      FURTHER EXAMINATION
2  BY MR. LAGOMARSINO:
3      Q.  These are crime scene photos that were
4  taken by Metro after the fact, starting with LVMPD
5  2254 and going all the way through and inclusive of
6  2273.
7          These pictures appear to be mostly from the
8  back of the house but around the Coffee Bean & Tea
9  Leaf where the initial interaction occurred; is that
10 correct?
11     A.  Yes.
12     Q.  Do you see anywhere in these almost 20
13 pictures where it says that that's a restricted area
14 or that it's employee only?
15     A.  No.
16     (Exhibit 11 was marked for
17     identification.)
18 BY MR. LAGOMARSINO:
19     Q.  I'm handing you some photos that were taken
20 after the fact of Officer Lopera's Taser.  They're
21 Bates for the record 2309, 2310 and 2311.
22         I'll have you look at 2310.  What does 2310
23 depict?
24     A.  The sticker that's on the Taser.
25     Q.  And it has a warning in capital letters

---

Page 173

1  with an exclamation point in orange and yellow,
2  correct?
3      A.  Yes.
4      Q.  And is one of the warnings that the Taser
5  can cause death or serious injury?
6      A.  No.  Unless I'm missing it.
7      Q.  Go to the second bullet down.  So I'll
8  reask the question.
9      A.  Under warning?
10     Q.  Under warning does it say that --
11     A.  Oh, there it is.
12     Q.  -- it can cause death --
13     A.  It can cause death or serious injury.
14     Q.  It says that on the warning, correct?
15     A.  Yes.
16     Q.  Do you believe that warning to be false?
17     MR. ANDERSON:  Objection.  Form.
18     THE WITNESS:  Do I believe it to be false?
19 No.
20 BY MR. LAGOMARSINO:
21     Q.  So in certain situations, the use of a
22 Taser apparently can be considered deadly force?  Let
23 me rephrase.
24         I'm not saying how Metro characterizes or
25 classifies deadly force.  I'm just saying in everyday

---

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

Page 178

BY MR. LAGOMARSINO:
Q.  Just so we get our bearings, if somebody has a beer and alcohol is in their system, do you consider them to be under the influence?
A.  They're yes, under the influence, but there's nothing that you could say -- in other words, you're under the influence but you haven't reached the illegal point for your driving.
Q.  Now, there was some testimony about Officer Lopera talking to CIRT and giving a statement and then not speaking at the use of force board.
Did Officer Lopera, to your understanding, invoke his Fifth Amendment right against self-incrimination by not testifying at the use of force board?
A.  I don't know his reason for not testifying. And I wasn't involved in those discussions.  But I assume that's it because the criminal case was still ongoing.
Q.  Okay.  Officer Lopera and his lawyers have hired an expert that characterized Officer Lopera's conduct as compassionate.
Do you characterize Officer Lopera's conduct as compassionate?
MR. MCNUTT:  Objection.  Form.

Page 179

THE WITNESS:  No.
BY MR. LAGOMARSINO:
Q.  Now, you've heard a number of questions about was there a right to detain him and did he comply and could he have chased him.  I'm not going to ask about that.  I'm going to ask you some very simple questions.
Does the right to detain a suspect equate to the right to inflict excessive force on that suspect?
MR. MCNUTT:  Objection.  Form.
THE WITNESS:  There's no right to inflict excessive force for any reason.
BY MR. LAGOMARSINO:
Q.  There were some questions before you watched the video earlier in Mr. McNutt's questioning where it was asked of you on the body cam video did Lopera say "stop."  I just want to make sure we're clear for the record.  And you said yes.  I just want to make sure you're talking about he used the word "stop" out in the driving area, not in the stairwell or in the Venetian, that we can tell?
A.  Yes.  You're right.  I didn't see it anywhere until he got through -- out of the Venetian building.

Page 180

Q.  Based probably -- well, based on the evidence that we have in front of us, you've never heard any testimony or seen any evidence that Officer Lopera said stop to Tashii Farmer before they got to the driving area; is that correct?
A.  That's correct.
Q.  And the mere fact that a suspect may not be complying with a command does not necessarily equate to a use of force greater than what's allowed under the use of force continuum; is that correct?
A.  That's correct.
Q.  Does a suspect who is being tased who is saying, "okay, I will," and "okay, sir," indicate compliance to you?
A.  Well, verbally he's saying that he's going to comply.  And I believe that's what CIRT meant when they said they didn't give him enough opportunity to comply.
Q.  Because I think your testimony was Lopera's commands taken as a whole and not in two-second clips were very confusing, correct?
MR. MCNUTT:  Objection.  Form.
THE WITNESS:  So there were some confusing commands and there was some quick cycles of the ECD that not only I thought, but the rest of the board

Page 181

who reviewed the case thought was excessive.
BY MR. LAGOMARSINO:
Q.  I wanted to clarify on the issue of the strikes.  Were you saying that it was unclear that the 10 to 12 strikes completely missed Farmer, or that you're just not clear on where they hit Farmer?
A.  I'm not clear the definition of a strike. Is a strike a punch thrown or a punch connecting?  So if you're saying there was 10 to 12 punches thrown, I agree.  If you're saying 10 to 12 strikes, I don't see it on the video.  I can't tell how many hit and how many missed.
Q.  Have you -- strike that.
Detective Alsup testified that he did a frame-by-frame review of the video to assess the number of strikes.  Did you do a frame-by-frame review of the video?
A.  I did not, but CIRT presented it frame by frame.  But when I watched the video realtime, I don't see that many strikes hitting him.
Q.  Okay.  Did you, as part of your review, assess the autopsy photos that would show bruising on different parts of Tashii Farmer's body?
A.  Yes.
Q.  I'll give you a hypothetical, all right?

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

47  (Pages 182 to 185)

---

Page 182

1   If you have a suspect who is observed to be
2   unconscious after a period of time in the LVNR, and
3   the officer is not releasing the LVNR despite being
4   told to do so, does it satisfy the duty to intervene
5   by simply saying "stop" and not doing anything else?
6   MR. MCNUTT:  Objection.  Form.
7   MR. ANDERSON:  Objection.  Form.
8   THE WITNESS:  So we would prefer that
9   officers stopped when they were told to.  And if they
10   don't stop and the use of force is excessive, we
11   expect officers to intervene physically to stop them.
12   And not just on the LVNR.  If someone was punching
13   someone and they didn't stop, you wouldn't just let
14   them keep punching them.  You would grab them.
15   BY MR. LAGOMARSINO:
16   Q.  Now, there was some testimony about whether
17   you could tell if Lopera was rear-naked choking or
18   LVNRing.  Okay?
19   However, on the body-worn camera, Lopera
20   used both terms.  He said that he choked him out,
21   correct?
22   A.  Yes.
23   Q.  And he also said that, "I rear-naked his
24   ass," correct?
25   A.  Yes.

---

Page 183

1   Q.  And that's part of all the evidence that
2   you have to consider, correct?
3   A.  Yes.
4   Q.  And if a suspect is passed out or
5   unconscious, does that indicate that there was
6   pressure being applied to his neck?
7   MR. ANDERSON:  Objection.  Form.
8   BY MR. LAGOMARSINO:
9   Q.  To you?
10   A.  While someone's applying the LVNR?
11   Q.  Or the restraint, either one, yeah.
12   A.  Yes.
13   MR. LAGOMARSINO:  No further questions.
14   MR. MCNUTT:  I just have a couple of
15   questions.
16
17   FURTHER EXAMINATION
18   BY MR. MCNUTT:
19   Q.  You gave another deposition about these
20   same events in the case we referred to as the
21   Estate of Tashii Farmer versus Las Vegas Metro,
22   correct?
23   A.  Yes.
24   Q.  And that deposition was December 27th,
25   2017, correct?

---

Page 184

1   A.  Yes.
2   Q.  Did you have a chance to review the
3   transcript of that deposition after you gave the
4   deposition?
5   A.  Yes.  This morning.
6   Q.  You reviewed it again this morning?
7   A.  Yes.
8   Q.  Do you have any changes that you would make
9   to that deposition transcript?
10   A.  Nothing other than what I talked about
11   today, which was I don't have a bureau that was
12   assigned to me that was assigned then.
13   Q.  Understood.
14   Do you have any data which indicates that
15   civilians are confused that officers that wear the
16   green uniforms don't recognize those individuals to
17   be law enforcement officers?
18   A.  No.
19   Q.  When you watched Ken Lopera's body-worn cam
20   at any time and after Tashii Farmer fled down the
21   employee-area hallway, did you see any other patrons
22   in those hallways?
23   A.  No.
24   Q.  Was Tashii Farmer in view when Ken Lopera
25   was running through the hallways and the stairwells?

---

Page 185

1   A.  No.  He lost view of him.
2   Q.  Right.  So there was a question about did
3   Ken Lopera give a command for Tashii Farmer to stop.
4   Do you typically yell for someone to stop when you
5   can't see them?
6   A.  Not typically.
7   Q.  With respect to a suspect's hands versus
8   what they're saying, which matters more to you, what
9   they're doing with their hands or what they're saying
10   with their mouth in terms of compliance?
11   A.  What they're doing.
12   Q.  With their hands, correct?
13   A.  Yes.
14   Q.  What's the definition of "excessive force"?
15   MR. ANDERSON:  Objection.  Form.
16   BY MR. MCNUTT:
17   Q.  Roughly.  Paraphrasing.
18   A.  Excessive force is the force applied that
19   is outside of policy in excess of what is required
20   to gain compliance.  That's off the top of my head.
21   Q.  Sounds good.  At what point in these
22   events did Las Vegas Metro gain compliance of
23   Tashii Farmer?
24   A.  At what point did we gain compliance?
25   Q.  From Tashii Farmer.

---

Deputy Chief John McGrath  ~   July 31, 2019
* * * Videotaped Deposition * * *

48  (Pages 186 to 189)

---

Page 186

1      A.  At some point when he was on the ground
2  being LVNR'd.
3      Q.  Okay.  I don't know that we marked it, but
4  it was the arrest report.  Is that Exhibit B?  Could
5  you please -- and turn to page 5 of 8.
6      A.  Yes.
7      Q.  Do you see where, what you recognize the
8  numbers along the side to be the timestamp from the
9  body-worn cam.  That's what Detective Alsup testified
10  to, correct?  Or do you know that?
11      A.  I'm sorry, can you --
12      Q.  Detective Alsup said --
13      A.  I was reading your --
14      Q.  That's okay.  Detective Alsup put the
15  timestamps from the body-worn cam down the left side
16  in the column.
17      A.  I see it.
18      Q.  So if you go down to three minutes and one
19  second, Sergeant Crumrine arrived and said, "Put your
20  hands behind your back."
21      Do you see that?
22      A.  Yes.
23      Q.  3:13 Officer Lopera says, "Is he out yet?"
24  3:15 Farmer gasps.  3:18 Lopera asked, "Is he out
25  yet?"  3:19 Officer Lopera asked, "Is he out yet?"

---

Page 187

1      At any point up to 3:19, and take a minute
2  and review the prior pages if you want, has Officer
3  Lopera been told by any other Metro officer to
4  release the hold or do anything different to
5  Tashii Farmer?
6      A.  No.
7      Q.  Where is the first time Ken Lopera is given
8  a command to do something different?
9      A.  Well, at 3:25 Officer Tran says, "Let him
10  go."
11      Q.  And we now understand that that actually
12  wasn't Officer Tran, that was Officer Crumrine.
13  That's been their testimony.
14      And then one second later Lopera says,
15  "Are you sure?"  And Tran or Crumrine replies,
16  "Yeah."
17      Do you see that?
18      A.  Yes.
19      Q.  Do you think that one second, assuming
20  that's accurate, is too long of a delay for Ken
21  Lopera to respond to the command to let him go?
22      A.  Do I think one second is too long?  No.
23      MR. MCNUTT:  No further questions.
24      MR. ANDERSON:  I just have about three.
25  I'll be quick.

---

Page 188

1      FURTHER EXAMINATION
2  BY MR. ANDERSON:
3      Q.  Chief McGrath, do you agree that once
4  handcuffing was completed, all force stopped by all
5  the officers?
6      A.  Yes.
7      Q.  So if an officer during the handcuffing
8  process were to issue a command to loosen up or to
9  let him go to Officer Lopera, you would expect -- or
10  you would hope Officer Lopera would follow that
11  command, correct?
12      A.  Yes.
13      Q.  Would it be reasonable for that officer to
14  assume while they're still intending to handcuff the
15  suspect that Officer Lopera did hear the command and
16  did, quote, loosen up or, quote, let him go by
17  releasing the pressure but not releasing the
18  encircling arm?
19      A.  Yes.
20      Q.  In fact, it would be policy that he would
21  keep the encircling arm around the neck, correct?
22      A.  Yes.
23      Q.  So it's justifiable for an officer who
24  gives such a command to loosen up or let go to
25  assume that Officer Lopera followed that command,

---

Page 189

1  despite the fact his encircling arm was still on the
2  neck?
3      A.  Yes.
4      MR. ANDERSON:  Okay.  Thank you.  No
5  further questions.
6
7      FURTHER EXAMINATION
8  BY MR. LAGOMARSINO:
9      Q.  Just a couple more.
10      The question was asked did Officer Lopera
11  see Farmer in the context of calling out for him to
12  stop.
13      Do you remember that?
14      A.  Yes.
15      MR. MCNUTT:  In the hallway.
16      MR. LAGOMARSINO:  In the hallway.
17  BY MR. LAGOMARSINO:
18      Q.  Did you -- did you see Officer Lif present
19  in the hallway --
20      A.  No.
21      Q.  -- when he yelled out for Officer Lif?
22      A.  No.  Officer Lif didn't follow him in the
23  hallway.
24      Q.  In terms of what's written here on the page
25  about who said what --

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

49  (Pages 190 to 193)

## Page 190

1     A.  Yes.
2     Q.  -- would you defer to the video, an
3  analysis of the video, or would you defer to the
4  page?
5     A.  Well, I would hope that this page reflects
6  what's in the video.
7     Q.  But if the video depicts other statements
8  that are made, and they happened not to be here,
9  would you defer to the video?
10     MR. MCNUTT:  Objection.  Form.
11     THE WITNESS:  Yes.
12  BY MR. LAGOMARSINO:
13     Q.  If somebody has been placed in an LVNR or
14  neck restraint and they're released, and they're
15  unconscious, and they're not reviving, would you
16  expect your officers to immediately start providing
17  medical attention?
18     MR. MCNUTT:  Objection.  Form.
19     MR. ANDERSON:  Join.
20     THE WITNESS:  They should attempt to render
21  medical aid.  But they are required to call for
22  medical.
23     MR. LAGOMARSINO:  No further questions.
24     THE VIDEOGRAPHER:  This concludes the video
25  deposition of Deputy Chief John McGrath.

## Page 191

1     The original media of today's testimony
2  will remain in the custody of Las Vegas Legal
3  Video.
4     The time is approximately 3:21 p.m. and we
5  are going off the record.
6         - - -
7     (The videotaped deposition was
8  concluded at 3:21 p.m.)
9         - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 192

1     CERTIFICATE OF DEPONENT
2  PAGE  LINE   CHANGE    REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17
18     * * * * *
19     I, DEPUTY CHIEF JOHN MCGRATH, deponent herein,
20  do hereby certify and declare under penalty of
    perjury the within and foregoing transcription to be
    my deposition in said action; that I have read,
21  corrected and do hereby affix my signature to said
    deposition.
22
23     _____
    DEPUTY CHIEF JOHN MCGRATH
24     Deponent
25

## Page 193

1     CERTIFICATE OF REPORTER
2     I, the undersigned, a Certified Shorthand
3  Reporter of the State of Nevada, do hereby certify:
4     That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given to the best of my
12  ability.
13     Further, that before completion of the
14  proceedings, review of the transcript [X] was
15  [ ] was not requested pursuant to NRCP 30(e).
16     I further certify I am neither financially
17  interested in the action, nor a relative or employee
18  of any attorney or party to this action.
19     IN WITNESS WHEREOF, I have this date
20  subscribed my name.
21
22  Dated:  August 13, 2019
23
24     _____
25     GALE SALERNO, RMR, CCR #542

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Deputy Chief John McGrath  ~  July 31, 2019
* * * Videotaped Deposition * * *

```
 1              CERTIFICATE OF REPORTER

 2              I, the undersigned, a Certified Shorthand

 3   Reporter of the State of Nevada, do hereby certify:

 4              That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6   that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a record

 8   of the proceedings was made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given to the best of my

12   ability.

13              Further, that before completion of the

14   proceedings, review of the transcript [X] was

15   [  ] was not requested pursuant to NRCP 30(e).

16              I further certify I am neither financially

17   interested in the action, nor a relative or employee

18   of any attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated:  August 13, 2019

23

24                     _____

25                     GALE SALERNO, RMR, CCR #542
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com