# EXHIBIT 8
# Excerpts from Michael Tran Deposition, Vol. II, 12/18/18

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,  )
                                     )
7         Plaintiff,                 )
                                     ) Case No.
8         vs.                        ) 2:18-cv-00860-GMN-VCF
                                     )
9    LAS VEGAS METROPOLITAN POLICE   )
     DEPARTMENT, a political         )
10   subdivision of the State of     )      CONDENSED
     Nevada; KENNETH LOPERA,         )
11   individually; TRAVIS CRUMRINE,  )     TRANSCRIPT
     individually; MICHAEL TRAN,     )
12   individually; MICHAEL FLORES,   )
     individually,                   )
13                                   )
          Defendants.                )
14   _____  )

15

16

17

18        VIDEOTAPED DEPOSITION OF OFFICER MICHAEL TRAN

19           Taken on Tuesday, December 18, 2018

20                    At 10:07 a.m.

21              Held at Lagomarsino Law

22      3005 West Horizon Ridge Parkway, Suite 241

23              Henderson, Nevada  89052

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

5 (Pages 14 to 17)

Page 14

1   A. Did I say the physical?
2   Q. Yes.
3   A. That's all I can remember for now.
4   Q. In terms of the -- do you know how close
5   you were to passing in 2012, or did they just tell
6   you pass or fail?
7   A. I think I was a couple of points away.
8   Q. And did you pass all the other areas, to
9   your knowledge, in 2012?
10  A. No. Because I didn't pass the written and
11  I didn't move to the next step.
12  Q. The written was the first step?
13  A. First step.
14  Q. Okay. When did you next apply with Metro?
15  A. Somewhere around 2013 or 2014.
16  Q. And you passed the written at that point?
17  A. Correct.
18  Q. What was done for you in terms of the
19  psychological evaluation, do you recall?
20  A. There was a psych test or multiple choice
21  questionnaire, and you met with the psychologist and
22  he just went over it.
23  Q. Do you recall how long the multiple choice
24  questionnaire was?
25  A. It was pretty lengthy, but I don't know.

Page 15

1   Q. Were you ever provided with any written
2   records pertaining to your psych test?
3   A. No.
4   Q. Do you believe they're in your file at
5   Metro?
6   A. I assume so. I don't know.
7   Q. What's your current classification?
8   A. Police officer.
9   Q. Is it PO II?
10  A. PO II, correct.
11  Q. How long have you been a PO II?
12  A. At least two years.
13  Q. What are your duties as a PO II?
14  A. Respond to calls for service. Proactive
15  stops. Daily duties of a police officer. I don't
16  know.
17  Q. Did your duties change when you went from
18  PO I to PO II?
19  A. No.
20  Q. Is it basically just a difference in pay?
21  A. Correct. I'm off probation from PO I to
22  PO II.
23  Q. When was your first date of service with
24  Metro?
25  A. You're referring to the Academy date or

Page 16

1   commission patrol date?
2   Q. Thank you for clarifying. First let's
3   start with the Academy.
4   A. It was April 16th, 2015.
5   Q. Okay. And when was your service date --
6   commission date? Sorry.
7   A. October 22nd, 2015.
8   Q. What command are you presently stationed
9   with?
10  A. Convention Center Area Command.
11  Q. How long have you been there?
12  A. Two years.
13  Q. Prior to Convention Center Area Command,
14  where were you?
15  A. I was in field training, but I was
16  stationed at Northwest Area Command.
17  Q. When did you stop field training?
18  A. February 2016.
19  Q. You understand the incident that we're here
20  for today involves Tashi Farmer?
21  A. Yes.
22  Q. Sometimes you may hear me to refer to
23  Tashi Farmer, Tashi Brown.
24      Do you know what the date of the incident
25  was with Tashi?

Page 17

1   A. I don't.
2   Q. Does May 14th, 2017 sound about right?
3   A. Yes.
4   Q. Mother's Day?
5   A. Yes.
6   Q. What time did you start working that night?
7   A. On that night I would have started at 2000
8   hours.
9   Q. 8:00 o'clock?
10  A. Correct.
11  Q. And at the time, again, you were with the
12  Convention Center Area Command?
13  A. Correct.
14  Q. Who was your lieutenant that night?
15  A. Lieutenant Summers.
16  Q. Who was your acting sergeant that night?
17  A. Officer Wandick.
18  Q. Where was Sergeant Crumrine in your chain
19  of command?
20  A. He's my sister squad sergeant.
21  Q. Did he have authority over you that night?
22  A. Yes. He's the sergeant.
23  Q. So can you briefly tell me what the
24  procedure is when you start your shift? Is there
25  roll call?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

7 (Pages 22 to 25)

---

Page 22

1　vehicle. And when we heard the Code Red, we heard
2　Venetian 1. And as I said earlier, officers are
3　assigned to -- call signed to their property.
4　Venetian was just north of us. So we got in our
5　vehicle and started driving over to the Venetian
6　property.
7　　　Q. So you get the call. When you get the
8　call, are you in the car at that time? Or are you
9　out of the car?
10　　　A. We were inside the car still.
11　　　Q. And do you recall where you were when you
12　were inside the car? Were you like in the parking
13　garage?
14　　　A. I was in the parking garage, correct.
15　　　Q. So what do you do next?
16　　　A. When I -- where am I starting from?
17　　　Q. Yeah. So you're in the car in the parking
18　garage. You hear the call come through. What do you
19　do next?
20　　　A. We exit the parking garage, lights and
21　sirens. And we -- there's a back alley that connects
22　the Venetian and the Link, and we drive towards the
23　Venetian.
24　　　Q. Okay. How long does it take you to get
25　to -- strike that.

---

Page 23

1　　　Can you estimate how long it takes you to
2　get to the scene?
3　　　A. Thirty seconds. It's right next door.
4　　　Q. Where do you park your vehicle?
5　　　A. As I'm pulling up into their loading dock
6　area, I see a patrol car, and I park right north of
7　that, and I exit.
8　　　Q. Can I just have you draw a diagram of just
9　where you parked. I would like you to indicate the
10　barrier, your vehicle, I believe Sergeant Crumrine's
11　vehicle, and where Tashi was with Sergeant Crumrine
12　and Kenneth Lopera.
13　　　A. Okay. So I'm not quite an artist.
14　　　So this would be the -- Sergeant Crumrine's
15　vehicle, the "X." And then the "O" would be where I
16　parked my car.
17　　　This is the -- they're back of the house
18　that leads to the valet up front here. And they're
19　right here by this pony wall.
20　　　Q. Okay. All right. I'm sorry, you said a
21　pony wall?
22　　　A. Yeah. I don't know what they're called.
23　　　Q. Like a barrier?
24　　　A. Yeah.
25　　　Q. It could be called pony wall?

---

Page 24

1　　　A. Yeah. It's a big piece of concrete you can
2　move around. I don't know what they're called.
3　　　Q. Okay. And were you parked on the same side
4　as Sergeant Crumrine? Like, was the barrier
5　separating your vehicles, or were you on the same
6　side of the barrier?
7　　　A. We were on the same side.
8　　　Q. How far did you park away from where
9　Crumrine, Lopera and Tashi were?
10　　　A. I don't know, 10 yards.
11　　　Q. About 20 feet-ish?
12　　　A. Yeah, 20, 30 feet.
13　　　Q. And what vehicle were you driving that day?
14　　　A. A Ford Explorer.
15　　　Q. Were you driving or was Officer Flores
16　driving?
17　　　A. I was driving.
18　　　Q. So you park your vehicle. What do you do
19　as soon as you park your vehicle?
20　　　A. I exit the vehicle. I remember trying to
21　get on the radio to give out our location, and I run
22　straight towards the officers that I saw by the
23　barrier wall.
24　　　Q. All right. So when you first run up,
25　Crumrine was on Tashi's legs and feet, correct?

---

Page 25

1　　　A. He was near the legs and feet, correct.
2　　　Q. When you say "near," I mean, he had his
3　hands around Tashi's legs and feet, correct?
4　　　A. Well, I mean, he was near -- at the time
5　when I got out of the vehicle and ran up, he was near
6　the legs. I don't know if he was on top or if he was
7　holding, but he was near the legs and feet, correct.
8　　　Q. Okay. All right. Can you just please
9　write your name there.
10　　　A. Anywhere?
11　　　Q. Yeah, anywhere.
12　　　A. Okay.
13　　　(Exhibit 19 was marked for
14　　　identification.)
15　　　MR. LAGOMARSINO: I'll get you guys a copy
16　on the break.
17　　　MR. MCNUTT: One of us can get a copy when
18　we get the transcript. That's fine.
19　　　MR. LAGOMARSINO: All right.
20　　　(Exhibit 1 was marked for
21　　　identification.)
22　BY MR. LAGOMARSINO:
23　　　Q. You had your deposition taken in a
24　different case involving Tashi Farmer; is that
25　correct?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

8 (Pages 26 to 29)

Page 26

1    A.  Yes.
2    Q.  And you said you reviewed that before
3  today's deposition?
4    A.  Yes.
5    Q.  Going to page 26 -- well, this is a mini
6  deposition, so there's four pages on one page.  But
7  if you go to the page on the bottom that says 26 to
8  29.  So at line 17 of page 26, at the top left-hand
9  corner.
10    A.  17?
11    Q.  Yeah.  So, sorry, so you'll see pages.
12  They go kind of horizontal.
13    A.  Okay.
14    Q.  The question was at line 17:  "Did you
15  recognize the two officers?"
16     And what was your answer at lines 18 to 20?
17    A.  "I recognized one" -- do you want me to
18  read it?  Is that what you're asking me?
19    Q.  Yes, please.
20    A.  "I recognized one officer that was on the
21  unknown subject's feet, feet area, but I did not -- I
22  could not see the other officer."
23    Q.  So when you say he was on his feet area,
24  what did you mean by that?
25    A.  He was near the unknown subject's feet.

Page 27

1    Q.  Was he just --
2    A.  Or legs area.
3    Q.  Was he just standing there, or was he in
4  physical contact with them?
5    A.  He was crouched down.
6    Q.  Did it appear to you that he was holding
7  his legs down?
8    A.  At the time, I just knew he was by his
9  feet.  I don't know what force he was using, or if
10  any physical force.
11    Q.  What was Lopera doing when you first ran
12  up?
13    A.  They were laying on the ground.
14    Q.  On his side?
15    A.  Yes.
16    Q.  And Lopera was where?  That's a vague
17  question.  I'll rephrase.
18     Lopera was behind Tashi, correct?
19    A.  I'm sorry, because I've seen the videos and
20  I'm trying to -- I'm trying to recall from what I
21  specifically saw that night.
22    Q.  Well, and I may differentiate that, but
23  what I'm asking you right now is based on you watched
24  Lopera's body cam.  You were there, and you've seen
25  some Venetian footage.

Page 28

1     So I'm just asking you the facts right now,
2  not necessarily what you recall from that night or
3  what you watched on video.  Okay?
4     So when you first ran up, where was
5  Officer Lopera?
6    A.  He was on his side.
7    Q.  And was he behind Tashi?
8    A.  They were -- yes.  They were both on their
9  side.  He was behind.
10    Q.  And at that time, Lopera was holding onto
11  Tashi, correct?
12    A.  Correct.
13    Q.  And how was he holding onto him?
14    A.  He was holding him.
15    Q.  Did he have his arm around his neck?
16    A.  At the time, I didn't observe that.
17    Q.  Okay.  All right.  Let's get Exhibit 2.
18       (Exhibit 2 was marked for
19        identification.)
20  BY MR. LAGOMARSINO:
21    Q.  What is Exhibit 2?
22    A.  It's my FIT statement.
23    Q.  And go ahead and flip through it.
24     So there are page numbers on the bottom.
25  This is produced by Metro.  It says LVMPD 1587

Page 29

1  through 1593.  Is that what you have in front of you?
2    A.  Yes.
3    Q.  Okay.  All right.  It looks like there's --
4  is that the last page you have, or is there a page
5  behind that?
6    A.  No.  It's the last page.
7    Q.  All right.  So does this appear to be a
8  true and correct copy of your FIT statement?
9    A.  Yes.
10    Q.  And when did you give your FIT statement?
11    A.  The night of the incident.
12    Q.  And do you believe that your recollection
13  was better the night of the incident or today?
14    A.  As in, do I believe I know the facts more
15  today or the night of?
16    Q.  Well, not -- I'll differentiate.  Based on
17  your independent recollection of the incident, not
18  counting the video surveillance that you watched or
19  video camera footage, would your memory be better
20  today or the night of the incident?
21    MR. ANDERSON:  Objection.  Form.
22     Go ahead.
23    THE WITNESS:  Probably today.  I mean...
24  BY MR. LAGOMARSINO:
25    Q.  Well, when you gave your FIT statement, you

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

9 (Pages 30 to 33)

Page 30

1 were asked at 1590 -- so JL stands for Detective J.
2 Leavitt.  Do you know who that is?
3     A.  I do not.
4     Q.  And MT is Michael Tran, I'll represent.
5     So you state, "But as I turned I saw the
6 patrol vehicle parked right before the entrance --
7 right before the entrance of the, uh, Venetian."
8     And then Detective Leavitt says, "Okay,
9 perfect.  Yeah, if you'll go on to what you saw and
10 what you do from that point then."
11     What was your answer on the night of the
12 incident?  You can just read the whole thing into the
13 record.
14     A.  "Okay.  So as I pulled up, I saw the
15 vehicle.  I saw a green uniformed officer.  I didn't
16 know who it was so I jumped out.  As I ran up to the
17 uniformed officer, I saw another officer, uh, holding
18 a suspect on the ground in what appeared to be an
19 LVNR.  I went to grab the suspect's hands to cuff
20 him, and there was a cuff on one of the wrists -- I
21 want to say the left one.  So we're trying to pull
22 his arm out to get him cuffed, but it seemed like it
23 was wedged between either the officer and the LVNR
24 and the suspect's own back.  So I was trying to
25 pretty much pull it out and couldn't.  So I looked at

Page 31

1 the suspect, and he appeared to be out, like
2 unconscious.  So I told the officer, hey, I think
3 he's out, you can loosen up a little.  So as he
4 loosened up, we were able to pull his right arm back,
5 and my partner put a second cuff on his right arm and
6 cuffed it to..."
7     Q.  And then, interrupted, said "It's all
8 right," and then can you continue, please.
9     A.  Cuffed it to the -- "cuff that was already
10 on his left wrist.  After that we rolled him up or
11 rolled him on his back.  I attempted to do sternal
12 rubs and see if he would wake up.  I tried looking
13 for a pulse, but I couldn't find one.  I didn't know
14 if it was just -- if my adrenaline was flying or
15 what, but I couldn't find one when I was trying to do
16 that.  I sat him up, gave him some lower back taps to
17 see if that would wake him up.  I wasn't getting
18 anything out of him so I called -- well, I called for
19 medical.  After that, I think somebody else already
20 called for him, but I called for medical, cleared the
21 red, and waited for medical.  While we were waiting,
22 another couple units -- I know an FTO and his trainee
23 showed up, and while they were there they checked for
24 a pulse and they couldn't find one either.  So that's
25 when we uncuffed him and he started doing chest

Page 32

1 compressions on the suspect and medical showed up
2 shortly after."
3     Q.  So going back a little bit in time.  You
4 did handcuff Tashi; is that correct?
5     A.  Correct.
6     Q.  And do you have any recollection of Tashi
7 struggling at all?
8     A.  No.
9     Q.  Tashi did not struggle when you put the
10 handcuffs on him; is that correct?
11     A.  Not to my recollection.
12     Q.  And let me just get a clearer record
13 because it was kind of a double negative question.
14     Did Tashi struggle when you put the
15 handcuffs on him?
16     MR. MCNUTT:  Objection.  Form.
17     THE WITNESS:  No.
18 BY MR. LAGOMARSINO:
19     Q.  How much time can you estimate elapsed from
20 the time that you exited your vehicle when you first
21 got there to the time that you said loosen up?
22     A.  40 seconds.
23     Q.  And you said loosen up because he appeared
24 to be out, correct?
25     A.  Correct.

Page 33

1     Q.  And by "out," what do you mean?
2     A.  He was unconscious.
3     Q.  How long did it take you to handcuff him?
4     A.  40 seconds.
5     Q.  And during that entire time, you did not
6 observe whether he was conscious, correct?
7     MR. ANDERSON:  Objection.  Form.
8     THE WITNESS:  While I was attempting to
9 handcuff him, no.
10 BY MR. LAGOMARSINO:
11     Q.  Did you check to see if he was conscious
12 while you were attempting to handcuff him?
13     A.  On that night, my recollection is still --
14 from that night, what I remember was we couldn't get
15 his arm free to handcuff him.  And I looked down and
16 saw he was unconscious, and I told him loosen up.
17 That's when he loosened up, and we were able to get
18 his arm free to handcuff him.
19     Q.  When you say loosen up or he loosened up,
20 "he" is Lopera, correct?
21     A.  Correct.
22     Q.  Did you ever have a conversation with
23 Flores that night about the incident?
24     A.  I don't recall.
25     Q.  Eventually you were separated as partners,

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

Page 34

1 correct?
2     A. Yes.
3     Q. Why were you separated as partners?
4     A. We weren't -- I transferred off the squad.
5     Q. Why did you transfer off the squad?
6     A. June.
7     Q. But why?
8     A. Oh, it was a better shift. I got off
9 graveyard.
10     Q. And you say "better shift," how many shifts
11 are there?
12     A. At least three.
13     Q. And is graveyard viewed as the worst shift?
14     A. For me it is.
15     Q. At the Academy, or at any training since
16 you graduated the Academy, were you ever taught what
17 a rear naked choke is?
18     A. Never taught that.
19     Q. So is it fair to say that since you did
20 not -- strike that.
21         Since you were not taught what a rear naked
22 choke is, you're not able to tell the difference
23 between a rear naked choke and an LVNR?
24     MR. ANDERSON: Objection. Form.
25     MR. MCNUTT: Join.

Page 35

1     THE WITNESS: I know what both look
2 like.
3 BY MR. LAGOMARSINO:
4     Q. And how do you know what both look like?
5     A. When I see on -- when I'm watching UFC or
6 any fights, and what I've learned in the Academy.
7     Q. So your knowledge in terms of a rear naked
8 choke comes from UFC?
9         Let me rephrase the question.
10         So your knowledge about what a rear naked
11 choke is comes from UFC, correct?
12     A. Yes.
13     Q. Sorry. And based on your observation of
14 Lopera that evening, he appeared to you to be in an
15 LVNR, correct?
16     A. Yes.
17     Q. Having watched the Lopera video, is it your
18 understanding that Lopera tased Tashi more than three
19 times?
20     A. Yes.
21     Q. And that would violate Metro's policy; is
22 that correct?
23     MR. MCNUTT: Objection. Form.
24     THE WITNESS: Yes.
25

Page 36

1 BY MR. LAGOMARSINO:
2     Q. Now, is it fair to say that you're only
3 allowed to use the five-second cycle when you tase a
4 person?
5     A. Yes.
6     MR. MCNUTT: Objection. Form.
7 BY MR. LAGOMARSINO:
8     Q. And if Lopera used his taser for nine
9 seconds, that would violate Metro's policy; is that
10 correct?
11     MR. MCNUTT: Objection. Form.
12     THE WITNESS: Yes.
13 BY MR. LAGOMARSINO:
14     Q. In watching Lopera's video, did you see
15 Lopera striking Tashi 10 to 12 times?
16     MR. MCNUTT: Objection. Form.
17     THE WITNESS: I saw the strikes. I don't
18 know how many there were.
19 BY MR. LAGOMARSINO:
20     Q. Based on what you saw in the video, would
21 Lopera's use of strikes violate Metro's policy?
22     MR. ANDERSON: Objection. Form.
23     Go ahead.
24     THE WITNESS: Depending on the suspect's
25 level of resistance.

Page 37

1 BY MR. LAGOMARSINO:
2     Q. So let's clarify that. If a suspect is
3 demonstrating aggressive resistance, strikes are
4 allowed, correct?
5     A. Correct.
6     Q. Was Tashi showing the level of resistance
7 that would allow strikes based on your review of the
8 video?
9     A. Are you referring to Officer Lopera's
10 video?
11     Q. Yes.
12     A. I mean, I haven't seen it in so long, but I
13 wasn't there, but based on the video, no.
14     Q. "No" what?
15     A. No, the strikes were not necessary.
16     Q. Okay. An officer striking somebody on the
17 head could be potentially deadly force; is that
18 correct?
19     MR. ANDERSON: Objection. Form.
20     THE WITNESS: Potentially cause injury.
21 BY MR. LAGOMARSINO:
22     Q. When is striking a suspect allowed, in a
23 general sense? Let's not talk about Tashi just for
24 this question. In a general sense, when does Metro
25 policy allow an officer to strike a suspect?

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

11 (Pages 38 to 41)

Page 38

1    A.  During aggressive resistance of the
2  suspect.  If he shows an intent to do harm to the
3  officer or others.
4    Q.  Have you seen anything in this case that
5  indicates that Tashi was trying to do harm to the
6  officer or to another person?
7    A.  Are you asking, reference the video again?
8    Q.  Yes.
9    A.  I mean, hindsight is 20/20, but not in the
10  video I saw.
11    Q.  Are you able to estimate how much training
12  you received on the LVNR in the Academy?
13    A.  I would estimate 40 hours.
14    Q.  And then since October 22nd of '15, how
15  many hours would you estimate you've received of
16  training on the LVNR?
17    A.  We do quarterly defensive tactics, but ten
18  hours.  I'm estimating right now.
19    Q.  Okay.  When you do the quarterly defensive
20  tactics training, does it include -- it only LVNR
21  that you're receiving?
22    A.  No, it's not.
23    Q.  So did you receive LVNR training every time
24  you received defensive tactics training since October
25  of '15?

Page 39

1    A.  Are you asking if I've done it every time?
2    Q.  Right.  Have you received LVNR training
3  every quarter since October of '15?
4    A.  Not every quarter.
5    Q.  How many hours of LVNR training would you
6  estimate you've received -- and maybe I asked you
7  this already, so let me just ask it again for
8  context, and I'll start over.
9    How many hours of LVNR training do you
10  estimate you've received since October of 2015?
11    A.  Ten hours.
12    Q.  Is it your understanding, based on your
13  training with Metro, that once a person is rendered
14  unconscious by any type of a neck restraint,
15  including the LVNR, that the person using the
16  restraint must release the hold?
17    MR. MCNUTT:  Objection.  Form.
18    THE WITNESS:  Yes.
19  BY MR. LAGOMARSINO:
20    Q.  Is it your understanding that the failure
21  to discontinue a hold in that situation constitutes
22  excessive force, as you were trained?
23    MR. MCNUTT:  Objection.  Form.
24    MR. ANDERSON:  Objection.  Form.
25    THE WITNESS:  Yes.

Page 40

1  BY MR. LAGOMARSINO:
2    Q.  I'm not talking about the night of the
3  evening, but in a general sense, an officer like
4  yourself who may see a person unconscious and still
5  in the LVNR is required by training to intervene; is
6  that correct?
7    A.  Yes.
8    Q.  Based on your training, what does intervene
9  mean to you?  Intervene or intercede, we'll use those
10  interchangeably.
11    A.  If the officer observes a reasonable force,
12  when it's safe to do so, they will verbal or physical
13  intervention.
14    Q.  During the time that you were handcuffing
15  Tashi, was Crumrine still by his feet?
16    A.  Yes.
17    Q.  Based on your recollection, when is the
18  first time that Crumrine left the feet area of
19  Tashi?
20    A.  I don't know.
21    Q.  Did you ever see him, in relation to Tashi,
22  anywhere else on Tashi's body?
23    A.  No.
24    Q.  So you said loosen up, and then Lopera
25  released the hold, right?

Page 41

1    A.  Yes.
2    Q.  What did you do next?
3    A.  We -- I checked to see if he had a pulse.
4  He didn't.  I conducted some sternal rubs to see if I
5  could get any reaction out of him.  Did some lower
6  back taps.  I called for medical immediately.
7    Q.  When you did that, was it clear to you that
8  he wasn't breathing?
9    A.  Was it clear?
10    Q.  Yeah.
11    A.  He didn't have a pulse, but I don't have a
12  medical background, but I wouldn't say it was clearly
13  apparent that he wasn't breathing.  I couldn't find a
14  pulse, but I don't know.
15    Q.  Well, it was clear to you that he didn't
16  have a pulse and he was unconscious, correct?
17    A.  Correct.
18    Q.  What's the purpose of doing pump strikes on
19  the lower back?
20    A.  We were taught in the Academy it helps, I
21  guess, wake the person up if they're unconscious.
22    Q.  And if they're not reviving as a result of
23  those maneuvers, what's the next required step?
24    A.  Request medical.
25    Q.  Were you trained in your LVNR training that

# Officer Michael Tran ~ December 18, 2018
## * * * Videotaped Deposition * * *

Page 42

1  you're supposed to constantly monitor somebody who
2  has had LVNR applied to them if they've gone
3  unconscious?
4      A.  Can you clarify "constantly monitor"?
5      Q.  Well, what is your -- let me restate the
6  question.
7          What is your understanding of your
8  obligation pursuant to your training when somebody
9  has had an LVNR applied to them and they're not
10  reviving?
11     A.  Request medical.
12     Q.  At Metro, were you trained on chest
13  compressions?
14     A.  Yes.
15     Q.  Were you trained that chest compressions or
16  CPR should be used immediately if somebody is not
17  reviving after an LVNR?
18     A.  I don't recall that.
19     Q.  Are you saying you weren't trained that
20  way, or you just don't recall?
21         MR. ANDERSON:  Objection.  Form.
22         THE WITNESS:  I don't recall that being
23  said or -- or one of the trainings on the LVNR.
24  BY MR. LAGOMARSINO:
25     Q.  Did Lopera check to see if Tashi was

Page 43

1  conscious, based on your recollection?
2          MR. ANDERSON:  Objection.  Form.
3          THE WITNESS:  Did Lopera check?
4  BY MR. LAGOMARSINO:
5      Q.  Yeah.
6      A.  No.
7      Q.  Did you have a recollection of ever seeing
8  Lopera check to see if he had a pulse?
9      A.  Physically check?
10     Q.  Correct.
11     A.  No.
12     Q.  Who sat Tashi up and tapped him on his back
13  along with yourself?
14     A.  I don't recall that actually.
15         MR. LAGOMARSINO:  Let's take a quick
16  five-minute break.
17         THE VIDEOGRAPHER:  We're going off the
18  record at approximately 10:59 a.m.
19         (Ms. Farmer and Ms. Day left the
20          room.)
21         (A recess was taken from 10:59 a.m.
22          to 11:18 a.m.)
23         THE VIDEOGRAPHER:  We're going back on the
24  record.  The time is approximately 11:18 a.m.
25

Page 44

1  BY MR. LAGOMARSINO:
2      Q.  Officer Tran, do you understand you're
3  still under oath?
4      A.  Yes.
5      Q.  All right.  Did you ever see Crumrine take
6  a pulse?
7      A.  No.
8      Q.  Did you ever see Crumrine tap Tashi's back?
9      A.  No.
10     Q.  Did you ever see Crumrine do a sternal rub?
11     A.  No.
12     Q.  And to be clear, you didn't see Lopera do
13  any of those things either; is that correct?
14     A.  Correct.
15     Q.  After you determined that Tashi was
16  unresponsive, how long did it take you to call
17  medical?
18     A.  Immediately.
19     Q.  And how did you go about calling medical?
20     A.  Using my radio.
21     Q.  And where were you when you called medical?
22     A.  Still at the scene, or right next to Tashi.
23     Q.  If you could please turn to Exhibit -- go
24  to Exhibit 1, page 58.
25         MR. MCNUTT:  58?

Page 45

1          MR. LAGOMARSINO:  Yes.
2  BY MR. LAGOMARSINO:
3      Q.  So on the top of page 58, line 2, question:
4  "All right.  How long did it take to get an ambulance
5  there?"
6          Answer:  "I don't recall."
7          Question:  "Estimate."
8          Answer:  "Three minutes."
9          Question:  "Pretty fast."
10         Answer:  "Three to five.  I don't know."
11         Is it about three to five minutes it took
12  the ambulance to get there, based on an estimate?
13     A.  I believe so.
14     Q.  During the time that you were waiting for
15  the ambulance -- strike that.
16         Is it fair to say that after you did the
17  sternal rub, the taps on the back and checking for a
18  pulse and calling medical, that you didn't do
19  anything else with respect to Tashi?
20     A.  Correct.
21     Q.  Now, at some point after you called medical
22  and the time that medical arrived, another field
23  training officer arrived at the scene, correct?
24     A.  Correct.
25     Q.  And he performed chest compressions; is

Officer Michael Tran ~ December 18, 2018
*** Videotaped Deposition ***

Page 46

1  that correct?
2      A.  Correct.
3      Q.  How long between the time you called
4  medical and the time that that field training officer
5  arrived?
6      A.  A minute.
7      Q.  Just estimating?
8      A.  I'm just estimating.  I don't know.
9      Q.  Do you understand that to be Amburgey?
10     A.  Correct.
11     Q.  Do you know him personally?
12     A.  He was working out of my station.
13 Acquaintance, coworkers.
14     Q.  Did you ever talk to him about this
15 incident --
16     A.  No.
17     Q.  -- after the incident?
18     A.  I'm sorry.
19     Q.  The answer is no?
20     A.  No.
21     Q.  Watching the video from Lopera's body cam,
22 did you see any attempt made by Tashi to hijack the
23 truck?
24         MR. ANDERSON:  Objection.  Form.
25         THE WITNESS:  Based off the video, no.

Page 47

1  BY MR. LAGOMARSINO:
2      Q.  You've been asked in your other deposition
3  whether you've said the words, "Let him go, Ken."  Do
4  you recall that question?
5      A.  Yes.
6      Q.  And your answer is that that was not you,
7  correct?
8      A.  Correct.
9      Q.  Do you believe that to be Crumrine as you
10 sit here today?
11     A.  Yes.
12     Q.  Now, when that statement was said, you were
13 on the scene, correct?
14     A.  Are you referring to the video again?
15     Q.  Yeah.
16     A.  On the video I was not on scene.
17     Q.  Okay.  All right.  Did you ever talk to
18 Officer Flores about having heard on the tape
19 Officer Crumrine saying "Let him go"?
20     A.  No, I don't recall it.
21     Q.  How does the video differ from your memory?
22     A.  You're referring to Lopera's body-worn
23 camera?
24     Q.  Well, the video that you watched, correct,
25 the body-worn camera.

Page 48

1      A.  All the statements that were said, I was
2  not present during the -- when they were said.
3      Q.  Okay.
4      A.  I'm sorry, what's -- can you repeat the
5  question?
6      Q.  Sure.  So let's break it down a little bit.
7  So you watched two videos, right?
8      A.  The Venetian camera one, and Lopera's
9  body-worn camera, correct.
10     Q.  So the Venetian, just for the record, is
11 the overhead surveillance, correct?
12     A.  Yes.
13     Q.  And the Lopera body cam is his body camera?
14     A.  Yes.
15     Q.  Let's break it down a little bit.  How does
16 your memory of the events differ, if at all, from the
17 Venetian surveillance?
18     A.  In my FIT statement, I stated that I
19 couldn't get his arm free, and I looked down at
20 Lopera and Tashi, and I observed Farmer unconscious.
21 And I said, hey, let him go, he's -- or loosen up,
22 he's out, loosen up.
23         Now that I -- the night of, I recall -- I'm
24 sorry.  Let me step back.
25     Q.  As compared to the surveillance camera?

Page 49

1      A.  Yeah.  Now I know the surveillance camera.
2  I handcuffed him first, and then looked down and saw
3  that Tashi Farmer was unconscious.  And I stated
4  loosen up, loosen up, he's out.
5         So those are the two differences.
6      Q.  Between what you remember and the Venetian
7  surveillance?
8      A.  Correct.
9      Q.  Now, you've alluded to it before, but just
10 so we have a clear record for the Court, what's your
11 difference in memory from the body cam footage and
12 your -- strike that.
13         What's the difference between your memory
14 of the incident and the body cam footage from Lopera?
15     A.  The same as the Venetian one.
16     Q.  Okay.  Based on your recollection and
17 review of the video surveillance and the body cam,
18 after Officer Lopera released the hold on Tashi,
19 Officer Lopera didn't do anything else with respect
20 to Tashi; is that correct?
21     A.  What do you mean?  Physically?
22     Q.  Correct.
23     A.  Physically, no.
24     Q.  From the time that you got to the scene
25 with -- strike that.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

Page 50

1        You got to the scene with Officer Flores,
2    correct?
3        A.  Yes.
4        Q.  You both exited the car at the same time.
5        A.  Yes.
6        Q.  From the time that you got to the scene
7    until the time that Lopera released the hold, did
8    Flores do anything whatsoever to intervene?
9        A.  We were both focused on taking Farmer into
10   custody.
11       Q.  So the answer is no?
12           MR. ANDERSON:  Objection.  Form.
13   BY MR. LAGOMARSINO:
14       Q.  Let me rephrase.
15       So turn to page 77 in your deposition.
16   It's in the bottom right-hand corner.
17       And the question was, in line 17: "From
18   the time that you got there until the time that
19   Officer Lopera released the hold, did Flores do
20   anything whatsoever to intervene?"
21       And what was your answer at lines 20 and
22   21?
23       A.  "No.  We were trying to take him into
24   custody."
25       Q.  Is that accurate?

Page 51

1        A.  Yes.
2        Q.  Now, going to the next page, from the time
3    that you got to the scene to the time that Lopera
4    released the hold, did you see Sergeant Crumrine do
5    anything to intervene in terms of getting Lopera to
6    release the LVNR?
7        A.  From the time I got to the scene?
8        Q.  To the time the hold was released.
9        A.  Did Sergeant Crumrine ask to intervene?
10       Q.  Yeah.
11       A.  No.
12       Q.  Can you please turn to page 82 of your
13   deposition.  There is a question at line 4.  It says,
14   "Okay.  Did you ever have a conversation with Officer
15   Flores about whether or not the hold that Officer
16   Lopera had around the neck of Mr. Farmer-Brown was a
17   lateral vascular neck restraint or a rear naked choke
18   hold?"
19       And the answer, "We both agreed that we
20   didn't know what it was."
21       Where do you -- can you expand on that?
22   What are you trying to say there?
23       A.  I forgot the lawyer's name, but he asked if
24   we discussed whether or not we knew it was an LVNR
25   rear naked choke, and we both, through our

Page 52

1    recollection, we couldn't determine if it was a rear
2    naked or LVNR.  We saw encircling arm.
3        Q.  When did you have that conversation with
4    Officer Flores?
5        A.  I don't know.
6        Q.  Can you estimate?  Within a month after the
7    incident?  Three months?
8        A.  Just definitely it was after our CIRT
9    review.
10       Q.  Okay.  And at the time that you gave your
11   FIT statement, you did believe that it was an LVNR,
12   correct?
13       A.  It appeared to be an LVNR.
14       Q.  Have you ever had the LVNR applied to you?
15       A.  Yes.
16       Q.  In training?
17       A.  Yes.
18       Q.  At the Academy?
19       A.  Yes.
20       Q.  Post Academy, have you ever had it applied
21   to you?
22       A.  Yes.  During our quarterly.
23       Q.  And as part of the training, does Metro
24   allow you guys to be rendered unconscious?
25       A.  No.

Page 53

1        Q.  And why?
2        A.  I don't know how to answer that question.
3        Q.  Do you believe because it's too dangerous?
4            MR. MCNUTT:  Objection to form.
5            MR. ANDERSON:  Join.
6            THE WITNESS:  You're asking my opinion on
7    it?
8    BY MR. LAGOMARSINO:
9        Q.  Just your opinion.
10       A.  I don't believe it's too dangerous, no.
11       Q.  Then why doesn't Metro allow you guys to be
12   rendered unconscious?
13       A.  I don't believe it serves the purpose of
14   training.
15       Q.  How long did you have it applied to you
16   for?
17       A.  Like?
18       Q.  You had the LVNR applied to you.  Would it
19   be ten seconds?  Five seconds?  Twenty seconds?
20       A.  However long it takes my partner to learn
21   the training movement.
22       Q.  And what level of LVNR did you have applied
23   to you?
24       A.  All three levels.
25       Q.  And since this incident, there's been a

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

Page 54

1    change in the policy regarding the use of the LVNR;
2    is that correct?
3        A.  Yes.
4        Q.  What's the change?
5        A.  They moved the LVNR level one from low
6    level control to intermediate force.
7        Q.  And were you trained as to why?
8        A.  Why the policy changed?
9        Q.  Right.
10       A.  No.
11       Q.  How were you notified that the policy
12   changed?
13       A.  We have -- I don't know how to describe it.
14   We have online policy releases that we have to review
15   that are mandatory quarterly.
16       Q.  Did you agree with the change?
17       A.  Yes.
18       Q.  Do you receive a certification as part of
19   your LVNR training?
20       A.  I do not.
21       Q.  Is there a certification available for
22   LVNR, to your knowledge?
23       A.  I don't know.
24       Q.  Fair to say you're not LVNR certified; is
25   that correct?

Page 55

1        A.  I'm certified in LVNR through the Academy.
2    I didn't receive -- are you saying receive a physical
3    certification handed to me?  I mean, I'm certified in
4    driving the SUV, but I didn't receive a certified
5    physical certification, if you will.
6        Q.  Okay.  That's fair.
7            Obviously, when you pass all your classes
8    at the Academy you're approved to be a police
9    officer, right?
10       A.  Correct.
11       Q.  Were there separate individual
12   certifications that you've received since the
13   Academy?  Like are you crisis intervention trained
14   certified, CIT?
15       A.  Yes.  CIT certified.
16       Q.  That's a special certification, right?
17       A.  Yes.
18       Q.  Do you have a special certification for the
19   LVNR like you have for CIT?
20       A.  I'm LVNR certified.
21       Q.  Okay.  Is there a certificate that you get?
22       A.  I didn't receive a certificate.
23       Q.  How do you know you're LVNR certified?
24       A.  Because we trained the LVNR in the Academy,
25   and we took a written exam on the LVNR, and I passed

Page 56

1    the exams.
2        Q.  Under your training, when a subject is not
3    resisting, regardless of whether he's unconscious, an
4    LVNR should not be applied, correct?  Do you want me
5    to rephrase it?
6        A.  Are you referring to this specific?  Or
7    I'm -- can you rephrase it?  I'm sorry.
8        Q.  Yeah, let's talk in general.  In general,
9    if a suspect is not resisting after the LVNR has been
10   applied --
11       A.  After, okay.
12       Q.  Okay?  Regardless of whether he's conscious
13   or not, the LVNR has to be stopped, correct?
14       A.  No.
15       Q.  All right.  Can you please turn to page 89
16   of your deposition.
17       A.  80 what?  I'm sorry.
18       Q.  I apologize.  89.
19           So at line 13, it says, "What training have
20   you received as to when to stop compression on a
21   subject's neck?
22           What did you say?
23       A.  "When the subject's resistance is over and
24   if he's unconscious."
25       Q.  And then the next question was, "Okay.  So

Page 57

1    either he's not resisting or he's unconscious, in
2    which case he's not resisting."
3            And what was your answer?
4        A.  "Can be the same."
5        Q.  What training had you received prior to May
6    of 2017 as to how to determine if a subject is
7    unconscious?
8        A.  LVNR training.
9        Q.  Okay.  So if the subject's eyes are closed,
10   that's an indicator, correct?
11       A.  Correct.
12       Q.  What are some other indicators that the
13   person is unconscious?
14       A.  He's not responding to verbal commands.
15   Resistance levels.
16       Q.  Have you ever sued somebody before?
17       A.  I have not.
18       Q.  Have you ever been sued besides this case?
19       A.  I have not.
20       Q.  Are you aware of what your -- what facts
21   you're admitting, denying with respect to Plaintiff's
22   first amended complaint in the case?
23       A.  I'm not -- I don't understand the question.
24   I'm sorry.
25       Q.  Do you know what an affirmative defense is?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 58

1    A.  No, I don't.
2    Q.  So fair to say you don't know what your
3    affirmative defenses are in this case?  If you don't
4    know what --
5    A.  I don't know what the term means, no.
6    Q.  Okay.  In watching Lopera's tape, did you
7    hear him say the phrase or question, "Is he out yet?
8    Is he out yet?"
9    A.  In watching the video?
10   Q.  Yes.
11   A.  Yes, I heard it.
12   Q.  As an officer, what do you understand he's
13   trying to say?
14          MR. ANDERSON:  Objection.  Form.
15          THE WITNESS:  If he put the -- if the
16   subject was unconscious.
17   BY MR. LAGOMARSINO:
18   Q.  Since Tashi wasn't resisting when he was
19   being handcuffed, he should not have had a neck
20   restraint on him; is that correct?
21          MR. MCNUTT:  Objection.  Form.
22          THE WITNESS:  Can you repeat that?
23   BY MR. LAGOMARSINO:
24   Q.  Sure.  Can you please turn to page 90 of
25   your deposition.  So you were asked the question at

Page 59

1    line 21, "So" -- we'll start back at line 18 on
2    page 90: "Now, Mr. Farmer" --
3          MR. MCNUTT:  90 or 91?  I'm sorry.
4          MR. LAGOMARSINO:  Starting at page 90,
5    line 18.
6    BY MR. LAGOMARSINO:
7    Q.  The question was, "Now, Mr. Farmer wasn't
8    resisting during any time that you were handcuffing
9    him, right?"
10         And your answer?
11   A.  "No."
12   Q.  Meaning that he was not resisting, correct?
13   A.  I didn't feel any resistance, no.
14   Q.  And at line 21, "So during the time you
15   were handcuffing him, he should not have been having
16   a neck restraint placed on his neck, right?"
17         And what was your answer to that question?
18   A.  "I wasn't there.  I don't know what
19   transpired prior to my arrival.  But based on the
20   video, I believe -- I guess not."
21   Q.  Based on your training at Metro, did you
22   know as of May 14 of 2017, that if the LVNR was not
23   properly applied, the risk of severe injury
24   increases?
25         MR. ANDERSON:  Objection.  Form.

Page 60

1          MR. MCNUTT:  Join.
2          THE WITNESS:  Yes.
3    BY MR. LAGOMARSINO:
4    Q.  Do you agree that maintaining the hold,
5    meaning the LVNR, beyond the time the subject of the
6    LVNR loses consciousness can lead to physical
7    complications?  For example, the person can die?
8          MR. ANDERSON:  Objection.  Form.
9          THE WITNESS:  Yes.
10         (Exhibit 3 was marked for
11         identification.)
12   BY MR. LAGOMARSINO:
13   Q.  I've handed you what's been marked as
14   Exhibit 3.  It looks like it's one, two, three --
15   five photos.
16         Do you have those in front of you?
17   A.  Yes.
18   Q.  And who is depicted in the first photo?
19   A.  Officer Lopera.
20   Q.  Does that appear to truly and accurately
21   depict him from the night of the incident to you?
22   A.  Yes.
23   Q.  The second photo, does that also appear to
24   be Officer Lopera from the night of the incident?
25   A.  Yes.

Page 61

1    Q.  Truly and accurately depicts him?
2    A.  Yes.
3    Q.  Third photo, does that truly and accurately
4    depict Officer Lopera from the night of the incident?
5    A.  Yes.
6    Q.  Fourth photo, does that truly and
7    accurately depict Officer Lopera from the night of
8    the incident?
9    A.  Yes.
10   Q.  Going to the fifth photo, what's depicted
11   in the fifth photo?
12   A.  The scene.
13   Q.  Is that your vehicle in the right of the
14   photo?
15   A.  This SUV to the right of it?  No.
16   Q.  Do you know whose that was?
17   A.  I do not.
18   Q.  And does that appear to be Sergeant
19   Crumrine's vehicle in the middle?
20         MR. ANDERSON:  Objection.  Form.
21         THE WITNESS:  It was a vehicle -- it was a
22   vehicle that was there when I pulled up.  I believe
23   it was Crumrine's, yes.
24   BY MR. LAGOMARSINO:
25   Q.  Okay.  Without respect -- strike that.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1  activate his body camera?
2       MR. ANDERSON: Objection. Form.
3       THE WITNESS: He's never expressed -- we've
4  never discussed that.
5  BY MR. LAGOMARSINO:
6       Q.  It's never come up one way or the other,
7  correct?
8       A.  Yes, correct. It's never come up.
9       Q.  What's the protocol on when you could turn
10 off your body camera?
11      A.  When the scene is static, we can -- or if
12 we're discussing with the other officers, we can
13 deactivate the camera.
14      Q.  Why are you allowed to deactivate the
15 camera when you're discussing a matter with the other
16 officers?
17      A.  We're discussing police procedures that
18 sometimes we don't -- we don't want the public to
19 know, I suppose.
20      Q.  All right. We'll go to Exhibit 4.
21          (Exhibit 4 was marked for
22          identification.)
23 BY MR. LAGOMARSINO:
24      Q.  Go ahead and just flip through Exhibit 4.
25 My copy starts at 1937 and ends at 2006. Is that

Page 67

1  what you have in front of you?
2       A.  Yes.
3       Q.  Does this appear to be a true and correct
4  copy of your CIRT statement?
5       A.  Yes.
6       Q.  It was alleged -- strike that.
7           Was it alleged against you that you failed
8  to intervene properly in Tashi's case?
9       A.  Yes.
10      Q.  And who alleged that?
11      A.  CIRT.
12      Q.  It was also alleged that you failed to
13 activate your body-worn camera, correct?
14      A.  Yes.
15      Q.  Do you know who was on the CIRT team that
16 was investigating you?
17      A.  The officers on this statement.
18      Q.  Okay. So Hughes, Bledsoe, Ward and Hamm?
19      A.  Hamm was my representative. Kirkegard was
20 the interviewing officer.
21      Q.  Okay. Do you remember who was on your
22 Use of Force Board?
23      A.  I do not.
24      Q.  Do you remember -- maybe you don't remember
25 by name, but do you remember by rank or title who was

Page 68

1  on your Use of Force Board?
2       A.  Captain Pelletier, Assistant Sheriff Kelly.
3  It was a lot of people there.
4       Q.  Okay. And the -- how long did your Use of
5  Force Board last?
6       A.  Two hours, three hours.
7       Q.  Were you in the room with everybody for
8  about two or three hours?
9       A.  Yes.
10      Q.  After you were in the room, did the Board
11 go to deliberate, to your knowledge?
12      A.  Did they leave?
13      Q.  To go meet about your case.
14      A.  I don't recall.
15      Q.  How were you presented with the Board's
16 findings?
17      A.  PowerPoint.
18      Q.  So just to be clear, was it CIRT that
19 presented the PowerPoint?
20      A.  Yes.
21      Q.  And who was presenting for CIRT?
22      A.  Kasey Kirkegard.
23      Q.  And who was sitting with you at the Board?
24      A.  My union rep.
25      Q.  Did you also have an attorney?

Page 69

1       A.  No.
2       Q.  At the Board, was your union rep Hamm?
3       A.  It was not.
4       Q.  Who was it?
5       A.  I can't remember his name.
6       Q.  Brian Yant?
7       A.  Yes. Yes, Brian Yant.
8       Q.  And did he make statements on your behalf?
9       A.  I don't believe so. I don't recall.
10      Q.  Now, in this statement it says you waived
11 48 hours notice. What's 48 hour notice, to your
12 knowledge?
13      A.  I believe it's a time frame to allow me to
14 speak with a rep or a lawyer.
15      Q.  And you attempted to be truthful in this
16 interview; is that correct?
17      A.  Yes.
18      Q.  Did you talk to anybody else involved in
19 the Tashi incident after the incident about the
20 incident?
21      A.  I don't recall.
22      Q.  Are you on any social media applications?
23      A.  Yes.
24      Q.  Which social media applications have you
25 been on since May 14th of 2017?

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

19 (Pages 70 to 73)

Page 70

1    A.  Facebook, Instagram.
2    Q.  Snapchat?
3    A.  Yeah.  I have it.
4    Q.  WhatsApp?
5    A.  No.
6    Q.  The date of your CIRT statement was
7   5/19/17, which is about five days after the incident,
8   correct?
9    A.  Yes.
10   Q.  All right.  Now, going to page 12 of your
11  CIRT statement, at lines 13 through 21, did you
12  describe to CIRT that you saw the officer laying on
13  top of the suspect, which is Tashi Farmer?
14       MR. MCNUTT:  Objection.  Form.
15       THE WITNESS:  Yes.
16  BY MR. LAGOMARSINO:
17   Q.  And going to page 13, you were asked did it
18  appear as though they were taking the subject into
19  custody.  And your answer was no, correct?
20   A.  Yes.
21   Q.  Starting at the end of page 12, last line,
22  starts with "While you were running."  It says, "When
23  you noticed that he was laying on top of the suspect,
24  was there any verbal commands being given?"  And what
25  was your answer?

Page 71

1    A.  "I don't recall."
2    Q.  As you sit here today, do you recall verbal
3   commands being given to Tashi after you arrived?
4    A.  No.
5    Q.  As a police officer, if you were trying to
6   get a suspect to do something, are verbal commands
7   the proper way to do that?
8    A.  Yes.
9    Q.  Was any kind of in-custody plan
10  communicated to you when you arrived on the scene by
11  Crumrine or Lopera or Flores?
12   A.  No.  It was too dynamic of a scene to
13  formulate a plan.
14   Q.  Now, there's been some discussion about
15  Tashi's arm being wedged between his body and Lopera.
16  I just want to make it clear, did it appear that he
17  was intentionally wedging his arm between him and
18  Lopera?
19   A.  When you say "he," Farmer?
20   Q.  Yeah.
21   A.  Intentionally?  I know it was wedged
22  between, I don't know if it was him wedging it.
23   Q.  Okay.  All right.  Going to page 18.  So
24  the question at line 6 from Kirkegard:  "Okay, and I
25  don't mean to -- we're gonna really break -- break

Page 72

1   this down.  So I apologize if we're taking baby
2   steps.  Um, when you first run up, where do you stand
3   compared to the officer, subject to the sergeant?"
4       What is your answer at line 9?
5    A.  "So they're laying against, like a -- like
6   a -- like a wall, a barrier wall."
7    Q.  So were they physically up against the wall
8   or near it?
9    A.  Both.  They were pretty close to it.
10   Q.  Okay.  So you went towards Tashi's torso,
11  correct?
12   A.  Correct.
13   Q.  Why did you go towards his torso?
14   A.  Because Sergeant Crumrine was by his feet
15  and Mr. Farmer's arms are mid torso.  It's where I
16  want to be to take him into custody.
17   Q.  Okay.  And you were asked at line -- at
18  page 19 of your CIRT statement.  It says, line 4,
19  "Um, did it appear as though the LVNR was around the
20  throat, as you're saying, was applied properly?"
21       And what was your answer?
22   A.  "I don't know."
23   Q.  At the time, did you assess whether he was
24  properly applying the LVNR?
25   A.  At the time I was on scene?

Page 73

1    Q.  Correct.
2    A.  No.
3    Q.  Have you ever gone back and looked at the
4   video to make an assessment as to whether he was
5   properly applying the LVNR?
6    A.  I was shown the video, but I wasn't -- no.
7    Q.  At any time after you got to the scene, do
8   you have any recollection of Tashi being conscious?
9    A.  No.
10   Q.  Did you observe Lopera make any adjustments
11  to his LVNR other than releasing the LVNR after you
12  said loosen up?
13   A.  No.
14   Q.  At page 22 you were asked, it says, "Um,
15  also into the body-worn camera of Lopera at the
16  timestamp of 4:08."  Sorry, I'll start over.
17       At line 14.
18   A.  Okay.
19   Q.  "Officer Flores?  Um, also into the
20  body-worn camera of Lopera at the timestamp of 4:08,
21  someone is heard saying 'Loosen up.  Loosen up.'
22  Was that you?"
23       And what was your answer?
24   A.  "Yes."
25   Q.  And you were asking to loosen up because

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

Page 74

1    you observed him to be out, correct?
2        A.  Yes.
3        Q.  And then did you say "somebody grab his
4    left arm" or "grab his left arm"?
5        A.  Is that on a page you're asking me to refer
6    to?
7        Q.  Well, my notes say it is.  Let me see here.
8        All right.  I'm sorry.  So at line 9, it
9    says, "And also, then, review of Officer Lopera's
10   body-worn camera, it's also -- we can hear someone
11   state 'grab his left arm' giving direction.  Is that
12   you?"
13       And what was your answer?
14       A.  "Yes."
15       Q.  Who were you directing to grab his left
16   arm?
17       A.  Officer Flores.
18       Q.  Did Flores follow your direction?
19       A.  Yes.
20       Q.  After Farmer was cuffed, was he placed in a
21   face-down position?
22       A.  No.
23       Q.  Did he end up in a face-down position?
24       A.  I don't recall.
25       Q.  Do you recall somebody -- strike that.

Page 75

1        At any time do you recall Farmer being on
2    his stomach while in handcuffs?
3        A.  No, I don't recall.
4        Q.  Would it be proper if a suspect or a
5    subject was face down or stomach down in handcuffs
6    behind him to then push his legs up to where his
7    heels are going to hit near his buttocks?
8        MR. ANDERSON:  Objection.  Form.
9        THE WITNESS:  I'm sorry, if he's on his
10   stomach?
11   BY MR. LAGOMARSINO:
12       Q.  Right.
13       A.  In handcuffs, would it be reasonable to
14   push his legs to his buttocks?
15       Q.  Right.
16       A.  For what reason?
17       Q.  For any reason.
18       A.  If the subject is still resisting, we could
19   cross his legs and restrain him from fighting us.
20       Q.  And do you understand that that could
21   present a risk of positional affixation?
22       MR. ANDERSON:  Objection.  Form.
23       THE WITNESS:  I believe if there's officers
24   on top of his -- on top of the subject, correct.  But
25   if we're just restraining his legs and nothing else,

Page 76

1    then I don't believe so.
2    BY MR. LAGOMARSINO:
3        Q.  Okay.  You called for medical, correct?
4        A.  Yes.
5        Q.  But you did not expedite medical, correct?
6        MR. ANDERSON:  Objection.  Form.
7        THE WITNESS:  I believe I called for
8    medical, and when I realized the severity of the
9    incident, I had medical expedite.
10   BY MR. LAGOMARSINO:
11       Q.  All right.  Can you please turn to page 26
12   of your CIRT statement.
13       All right.  So we'll start at line 1.  I'll
14   do the KK and then you can be MT.
15       So "Did you call for medical over the
16   radio?"
17       A.  "I did."
18       Q.  "Do you recall if you asked for them to
19   expedite?"
20       A.  "Um, no, I don't -- I don't recall, but
21   I -- I didn't -- I don't think I did, no."
22       Q.  "Didn't?"
23       A.  "I did not."
24       Q.  "Ask for ex-"?
25       A.  "I did not ask for expedite, no."

Page 77

1        Q.  "Okay.  But you did ask for medical, just
2    not to expedite?"
3        A.  "Yes."
4        Q.  Do you recall anywhere else in your CIRT
5    statement where you said, as you just testified, that
6    you later asked to expedite?
7        MR. ANDERSON:  Objection.  Form.  Misstates
8    testimony.
9        Go ahead.
10       THE WITNESS:  I don't recall in this
11   statement.
12   BY MR. LAGOMARSINO:
13       Q.  To you, is there a difference between CPR
14   and chest compressions?
15       A.  To me?  No.
16       Q.  After you determined that Tashi didn't have
17   a pulse, did you observe others try to take his
18   pulse?
19       A.  Yes.
20       Q.  And did you ask Officer Rybacki if Tashi
21   had a pulse?
22       A.  Yes.
23       Q.  And what did Officer Rybacki tell you?
24       A.  He shook his head no.
25       Q.  As part of your kinesiology degree, did you

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

21 (Pages 78 to 81)

Page 78

1  receive any medical training at all?
2      A.  Nothing formal, no.
3      Q.  Did you ever take a class involving trauma
4  and illness?
5      A.  I believe so, yeah.
6      Q.  Is that Kinesiology 150 at UNLV?
7      A.  You had to be a sports injury or a basic
8  EMT.
9      Q.  What triggered you to turn your body cam
10  on?
11      A.  Since the scene was static, the first thing
12  I remembered was I needed to turn my body camera on.
13      Q.  When did the scene become static to you?
14      A.  After Mr. Farmer was placed into handcuffs.
15      Q.  How long have you been using a body cam?
16  Let me strike that.
17          Before May of 2017, how long had you been
18  using a body cam?
19      A.  Since November of 2014.
20      Q.  Can you give an estimate as to the total
21  amount of hours you've had training on body cam?
22      A.  I mean, since November until May.  I mean,
23  I don't know how many months that is.  Six months --
24  six months.
25      Q.  Okay.  Six months' worth of training on the

Page 79

1  body cam?
2      A.  Of using the body cam.
3      Q.  Prior to May of '17 you had used your
4  body cam in stressful situations before; is that
5  correct?
6      A.  Yes.
7      Q.  And you were trained on the policy to turn
8  on your body cam while you were driving code; is that
9  correct?
10      A.  Yes.
11      Q.  And I don't mean this to be offensive, I've
12  asked this of the other witness:  Have you ever been
13  diagnosed with a hearing problem?
14      A.  No.
15      Q.  That night or morning with Tashi, did you
16  do anything by accident?
17      A.  Accident?
18      Q.  Let me rephrase.
19          Do you believe you knew what you were doing
20  at all times?
21      MR. ANDERSON:  Objection.  Form.
22      THE WITNESS:  Maybe not -- I mean, checking
23  for a pulse, I don't believe I was an expert at
24  finding a pulse.  I didn't know if it was adrenaline
25  or...

Page 80

1  BY MR. LAGOMARSINO:
2      Q.  Did you take a pulse by accident?  Like you
3  knew when you were placing your hand on his neck that
4  you were checking his pulse, correct?
5      A.  Correct.
6      Q.  Was there anything else that you did that
7  night by accident, or did you just act according to
8  your training?
9      A.  It was according to training.
10      Q.  Had you ever socialized with Lopera before
11  this incident?
12      A.  No.
13      Q.  When you got to the scene, it did not
14  appear to you that the officers were struggling; is
15  that correct?
16      MR. MCNUTT:  Objection.  Form.
17      THE WITNESS:  No.
18  BY MR. LAGOMARSINO:
19      Q.  It's not correct?
20      A.  No, they were not -- no, there was no
21  struggle.
22      Q.  Are you familiar with the phrase "shrimping
23  out"?
24      A.  Yes.
25      Q.  What does "shrimping out" mean?

Page 81

1      A.  We were taught that in the Academy,
2  defensive tactics, that if there's a subject or
3  suspect on top of you, to scoot away or frame the
4  suspect away from you and scoot your hips out to
5  escape.
6      Q.  Did you see anybody shrimping out that
7  night?
8      A.  No.
9      Q.  Are you able to give an estimate as to how
10  many seconds passed from the time you started
11  interacting with Tashi until the time you saw his
12  right arm?
13      A.  So the time I arrived until I got his right
14  arm?
15      Q.  Yeah.
16      A.  15, 20 seconds.
17      Q.  As an officer, is there a policy, to your
18  knowledge, one way or the other of officers cursing
19  at suspects?
20      A.  I know we're not supposed to.  I don't know
21  if there's a specific policy.
22      Q.  Why are you not supposed to?
23      A.  Just not polite.
24      Q.  Do you know what the word "animus" means?
25      A.  No, I do not.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

22  (Pages 82 to 85)

Page 82

1    Q.  Had you ever trained with Lopera before?
2    A.  No.
3    Q.  All right.  Going to page 66 of your CIRT
4  statement.  So question at line 14: "Okay, looking
5  back on this incident, is there anything you would
6  have done differently?"  And what was your answer at
7  line 16?
8    A.  "I should've started a CPR."
9    Q.  And why did you say that?
10   A.  In hindsight, when I realized Farmer passed
11  away, I should have started CPR.
12   Q.  And was that right when you determined that
13  he had no pulse?
14   A.  Yes.
15       MR. LAGOMARSINO:  All right.  Take our
16  lunch break.  We'll go off the record.
17       THE VIDEOGRAPHER:  We're going off the
18  record at approximately 12:17 p.m.
19       (A recess was taken from 12:17 p.m.
20       to 1:18 p.m.)
21       THE VIDEOGRAPHER:  We're going back on the
22  record.  The time is approximately 1:18 p.m.
23  BY MR. LAGOMARSINO:
24   Q.  Do you understand you're still under oath?
25   A.  Yes.

Page 83

1    Q.  Before May 14 of 2017, you had been trained
2  on the duty to intervene, correct?
3    A.  Yes.
4    Q.  And you knew that if another officer was
5  violating the constitutional rights of a citizen,
6  that you had to intervene to stop that, correct?
7    A.  Yes.
8    Q.  And that would include even if there was an
9  officer that was senior in rank to you, you would
10  have a duty to intervene, correct?
11   A.  Yes.
12   Q.  Now, at the point that you observed Tashi
13  to be in LVNR, you did not know why Lopera put him in
14  an LVNR, correct?
15   A.  Correct.
16   Q.  Based on your knowledge, what level of
17  resistance would Tashi have had to have exhibited in
18  order to allow Officer Lopera to use the LVNR on him?
19   A.  Aggressive.
20   Q.  There are how many levels of the LVNR?
21   A.  Three.
22   Q.  Could you tell at that time what level
23  Lopera was using?
24   A.  No.
25   Q.  Even after watching the video, could you

Page 84

1  tell?
2    A.  No.
3    Q.  And you did not ask Lopera what level of
4  LVNR Tashi was in, correct?
5    A.  No.
6    Q.  That's correct, right?
7    A.  Correct.  I did not.
8    Q.  Sorry.
9    A.  Sorry.
10   Q.  How many times have you personally used the
11  LVNR in the field?
12   A.  I've never used it.
13   Q.  Have you had the opportunity to use it and
14  chose not to?
15   A.  No.
16   Q.  You're post certified, correct?
17   A.  Yes.
18   Q.  What was the outcome of your review board?
19   A.  I was sustained for not having -- turning
20  on my body camera.
21   Q.  And on the charge for failure to intervene,
22  what happened with that?
23   A.  They didn't find any violation of the duty
24  to intervene.
25   Q.  The board excused your conduct with respect

Page 85

1  to the intervening, correct?
2    A.  Correct.
3    Q.  How did you find out about the decision?
4    A.  At the review board.
5    Q.  Did they announce it verbally?
6    A.  I believe so, yeah.
7    Q.  Did anybody testify at the proceeding?
8    A.  As in answer questions?
9    Q.  Yes.
10   A.  I did.  Officer Crumrine, Officer Flores,
11  Officer Lift.
12   Q.  What's Lift's first name?
13   A.  Ashley.
14   Q.  Are there two Lifts, to your knowledge?
15   A.  I don't know.  No.
16   Q.  Do you know what documents were introduced
17  at the review board?
18   A.  I can't remember.  I don't recall.
19   Q.  There was a PowerPoint?
20   A.  Yes.
21   Q.  What were the consequences for the body
22  camera issue for you?
23   A.  Contact -- a written contact.
24   Q.  What does that mean?
25   A.  That your sergeant spoke to you about

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

Page 86

1  operating your body camera, or -- the policy I
2  violated basically.
3      Q.  And does that -- is that in writing or a
4  verbal?
5      A.  It's in writing.
6      Q.  And does that get removed from your file
7  after a certain amount of time?
8      A.  A year.
9      Q.  One year?
10         Do you wear corrective lenses?
11     A.  Correct, yes.
12     Q.  Were you wearing them that night?
13     A.  Yes.
14         (Exhibit 5 was marked for
15         identification.)
16  BY MR. LAGOMARSINO:
17     Q.  I'm handing you Exhibit 5, which is marked
18  P000052.  It's a page from the autopsy report,
19  Alane M. Olson, M.D.
20         It says, "Cause of death:  It is my opinion
21  that this 40-year-old black male, Tashii S. Brown,
22  died as a result of asphyxia due to police restraint
23  procedures."
24         Do you know of any reason -- strike that.
25         Do you disagree with that opinion?

Page 87

1      MR. ANDERSON:  Objection.  Form.
2      THE WITNESS:  I don't know enough to agree
3  or disagree.
4         (Exhibit 6 was marked for
5         identification.)
6  BY MR. LAGOMARSINO:
7      Q.  Have you ever seen Exhibit 6 before?
8      A.  No.
9      Q.  This is the force investigation team
10  report.  It is 35 pages.
11         I'm sorry, you said you may have?
12     A.  I have never seen this, no.
13     Q.  So I'll just ask a couple of questions
14  here.
15         Going to page 4 of 35.  You list persons
16  involved here:  Kenneth Lopera, Travis Crumrine,
17  Tashi Farmer.
18         You were also involved, correct?
19     A.  Correct.
20     Q.  Going to the next page, page 5 of 35.  I
21  see where it says Collective Bargaining Associations.
22     A.  Yes.
23     Q.  So it shows Officer Bryan Yant, correct?
24     A.  Yes.
25     Q.  As you mentioned before, he was your union

Page 88

1  rep with respect to this incident?
2      A.  He was at my Use of Force Board.  This
3  attorney was there the night of the incident.
4      Q.  Okay.  Did you talk to Bryan Yant before
5  the Use of Force Board?
6      A.  No.
7      Q.  Did you talk to him after?
8      A.  After the Use of Force, yes.
9      Q.  Okay.  Did he advise you on certain things?
10     A.  No.
11     Q.  What did you talk to him about?
12     A.  I don't recall.  I mean, we talked
13  afterwards.
14     Q.  And I don't want to misstate your
15  testimony, but did you state earlier that he spoke on
16  your behalf at the Use of Force Board?
17     A.  He spoke for me, no.
18     Q.  Did he speak about you?
19     A.  I don't recall.  I mean, he was my union
20  rep at the time.
21     Q.  Do you recall him speaking at all?
22     A.  Yes.
23     Q.  And do you recall what he spoke about?
24     A.  I don't, no.
25     Q.  Did he speak to the Board in your presence?

Page 89

1      A.  Yes.
2         (Exhibit 7 was marked for
3         identification.)
4  BY MR. LAGOMARSINO:
5      Q.  Did you know Bryan Yant's history with
6  officer-involved shootings?
7      A.  Yes.
8      Q.  I've handed you what's been marked as
9  Exhibit 7.  It's an article from the Las Vegas
10  Review-Journal, September 21st, 2014, titled
11  Las Vegas Cop Behind Controversial Killing Now
12  Influential Union Leader.
13         The first sentences reads:  "Detective
14  Bryan Yant was the face of incompetence at the
15  Metropolitan Police Department, a poster child for
16  wrongful shooting deaths and million-dollar payouts,
17  a driving force behind sweeping reforms to the
18  agency's deadly force policies."
19         Did you view him in that way?
20     A.  No.
21     MR. ANDERSON:  Object to the form.
22  BY MR. LAGOMARSINO:
23     Q.  Then it says:  "In other cities, an officer
24  who kills an unarmed man under suspicious
25  circumstances and is accused of lying to cover his

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

25 (Pages 94 to 97)

Page 94

1   do you know if you were there when it was said?
2       A.  I don't recall hearing any of this
3   conversation when I arrived, so I don't believe I was
4   there.
5       Q.  Now, two seconds later, it says, "Officer
6   Lopera stated, 'Roll him to -- hold on.  Don't grab
7   my fucking legs.'"
8           You do have a recollection of that,
9   correct?
10      A.  Correct.  That I remember.
11      Q.  So at least as of two seconds after the
12  "Let him go, Ken," you were there, correct?
13      A.  I do recall him say, "Don't grab my fucking
14  legs."  So you're asking me, I was there at that
15  moment?
16      Q.  You were there when he said, "Don't grab my
17  fucking legs," right?
18      A.  Correct.
19      Q.  And then it says, "Officer Tran stated
20  'We're on top of him.'"
21          Did you say that, or do you know?
22      A.  I don't recall saying that.
23      Q.  And not to suggest -- I'm just trying to
24  make a clear record.  You don't recall saying it, or
25  you don't know if you said it, or you just deny

Page 95

1   saying it?
2       A.  More -- I'm leaning more towards I don't
3   recall, and I deny saying it as well.
4       Q.  Okay.  Can you please turn to page 25 of
5   35.  Go ahead and -- do you have a pen there still?
6       A.  Yes.
7       Q.  So there's a summary written by whoever
8   wrote this document of what you said in a recorded
9   statement.  We can probably go to the recorded
10  statement to verify, but what I would like to have
11  you do is read this to yourself, and then underline
12  anything that you feel is inaccurate under your name.
13      A.  So this paragraph?
14      Q.  Yes, sir.
15      A.  This appears accurate.
16      MR. ANDERSON:  Could I just clarify, Andre.
17  Are you asking him whether this is accurate as to
18  what he told FIT, or whether it's accurate as to his
19  memory today?  Does that make sense?
20      MR. LAGOMARSINO:  Correct.  Okay.  So let
21  me rephrase.
22  BY MR. LAGOMARSINO:
23      Q.  Is there anything inaccurate in this
24  paragraph as you recall the incident today?  Either
25  through your personal being there or through

Page 96

1   reviewing video footage?
2       A.  Well, the line, "When Officer Lopera
3   loosened up on the LVNR, Farmer was able to be placed
4   in handcuffs," to this day now, I realize he was
5   placed in handcuffs, and then I said loosen up.  And
6   I observed Farmer unconscious, and I said loosen up.
7       Q.  So when you placed him in the handcuffs, he
8   was still in the LVNR, and that's when you said
9   loosen up?
10      A.  Correct.  After I had the -- I placed the
11  handcuffs on Mr. Farmer.  I looked down and observed
12  he was unconscious.  I told Officer Lopera to loosen
13  up, and he released the hold.
14      Q.  Are you familiar with the term "rescue
15  breathing"?
16      A.  I'm not.
17          (Exhibit 8 was marked for
18          identification.)
19  BY MR. LAGOMARSINO:
20      Q.  Exhibit 8 is just an article that we
21  printed from online.  It looks like it's written by
22  somebody who says they're an EMT.
23          But I want to go ahead and ask you if you
24  agree or disagree with some of the statements in
25  here, okay?

Page 97

1           So it says:  "A study of CPR patients in
2   Arizona found that gasping breaths (often called
3   agonal respirations) are common soon after cardiac
4   arrest."
5           Do you know what gasping breaths are in
6   relation to agonal respirations?
7       A.  I'm assuming somebody struggling to
8   breathe, but I don't know the term.
9       Q.  So next thing it says, "When it doubt do
10  CPR."
11          It says, "If you're looking at a person who
12  can't wake up and aren't sure if he is breathing, he
13  probably isn't."
14          Do you agree with that?
15      MR. ANDERSON:  Objection.  Form.
16      THE WITNESS:  I'm not an EMT, but I'm not
17  sure if I agree or disagree.  I don't know.
18  BY MR. LAGOMARSINO:
19      Q.  It says, "When the heart stops pumping hard
20  enough to get blood all the way from the lungs to the
21  brain and back, we call it cardiac arrest."
22          Is that your understanding?
23      MR. ANDERSON:  Objection.  Form.
24      THE WITNESS:  Yes.
25

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

26 (Pages 98 to 101)

Page 98

1 BY MR. LAGOMARSINO:
2     Q. "Trained rescuers recognize cardiac arrest
3 by feeling the patient's carotid pulse (located on
4 the side of the neck.)"
5        Do you agree with that?
6        MR. ANDERSON: Objection. Form.
7        THE WITNESS: Yes.
8 BY MR. LAGOMARSINO:
9     Q. Are you a trained rescuer by Metro?
10     A. I'm CPR certified, and I don't know the
11 definition of trained rescuer.
12     Q. You are CPR certified, correct?
13     A. In the Academy I was, yes.
14     Q. It says, "If there's enough blood flowing
15 by on the way to the brain, there will be a pulse."
16        Is that your understanding?
17     A. Yes.
18     Q. Do you recall seeing Tashi gasping?
19     A. I do not.
20     Q. Are you able to recite the standard under
21 the Fourth Amendment to the United States
22 Constitution with respect to how much force a police
23 officer can use in making an arrest?
24     A. How much force?
25     Q. Yes.

Page 99

1     A. Objectively reasonable to the police
2 officer.
3     Q. At Metro, you were trained on how not to
4 violate a suspect's constitutional rights, correct?
5        MR. ANDERSON: Objection. Form.
6        THE WITNESS: Correct.
7 BY MR. LAGOMARSINO:
8     Q. As a police officer at the time, did you
9 believe that a police officer could use the LVNR to
10 kill somebody?
11        MR. ANDERSON: Objection. Form.
12        THE WITNESS: Could you repeat the
13 question? I'm sorry.
14 BY MR. LAGOMARSINO:
15     Q. Sure. Did you believe that, in general, a
16 police officer can use the LVNR to kill somebody?
17     A. The LVNR does fall under deadly force.
18 Aggravated aggressive resistance.
19     Q. So yes?
20     A. Yes.
21     Q. Did you believe at the time that Lopera was
22 allowed to use the LVNR to kill Tashi?
23        MR. ANDERSON: Objection. Form.
24        THE WITNESS: Did I believe at the time
25 Lopera had reasonable -- an objectively reasonable

Page 100

1 decision to use the LVNR?
2 BY MR. LAGOMARSINO:
3     Q. To kill Tashi?
4        MR. ANDERSON: Objection. Form.
5        THE WITNESS: I don't understand the
6 question.
7 BY MR. LAGOMARSINO:
8     Q. What don't you understand about the
9 question?
10     A. You're asking me if I thought Lopera should
11 have used LVNR to kill the person?
12     Q. Right.
13     A. I wasn't there at the time the force was
14 used. I'm not sure what you're...
15     Q. Yes or no?
16        MR. ANDERSON: Objection. Form.
17        MR. MCNUTT: Same.
18        THE WITNESS: I don't know how to answer
19 the question. Can you repeat the question one more
20 time, please?
21 BY MR. LAGOMARSINO:
22     Q. Sure. No problem.
23        At the time, as an officer arriving on the
24 scene, did you believe at that time that Lopera was
25 authorized to use the LVNR for purposes of deadly

Page 101

1 force on Tashi?
2        MR. ANDERSON: Objection. Form.
3        THE WITNESS: I didn't know enough facts or
4 circumstances at the time to determine that.
5 BY MR. LAGOMARSINO:
6     Q. You never criticized Officer Lopera,
7 correct?
8        MR. ANDERSON: Objection. Form.
9        MR. LAGOMARSINO: Strike that.
10 BY MR. LAGOMARSINO:
11     Q. You never criticized Officer Lopera's
12 conduct at the scene, correct?
13     A. No.
14     Q. Let me give you a hypothetical question.
15 So if you're on patrol and -- let me start over.
16        I'm just giving you these facts. If you
17 want more clarification feel free to ask.
18        So you're on patrol. A person approaches
19 you and says where's a drinking fountain, and then
20 starts running away from you. Are you allowed to
21 arrest the person based on those facts?
22        MR. ANDERSON: Objection. Form.
23        THE WITNESS: Arrest?
24 BY MR. LAGOMARSINO:
25     Q. Right.

Page 102

1    A.  I don't believe there's enough for an
2  arrest.  I believe there's enough -- I mean, I would
3  have to see more, you know, what the body language,
4  what he was -- why he needed the water.  I mean,
5  people ask for me directions all the time, and before
6  I say anything they just start walking away.  I don't
7  think that's enough.  But body language, sweating,
8  bloodshot eyes, there's a lot more.
9    Q.  There's a lot of people with bloodshot eyes
10  on the Strip on the weekend, right?
11    A.  Yep, that's too.
12    Q.  And unless you see more, you're not
13  arresting them, correct?
14    A.  No.
15    Q.  Now, when you told Ken Lopera to stop, did
16  you tell him to stop because you believed that he was
17  violating Tashi's constitutional rights?
18    MR. MCNUTT:  Objection.  Form.
19    MR. ANDERSON:  Join.
20    THE WITNESS:  I told him loosen up because
21  I observed Mr. Farmer unconscious and he was already
22  in custody, so there was no -- there's no need to
23  have the restraint on him.
24  BY MR. LAGOMARSINO:
25    Q.  Did you, I guess my question is -- I'll

Page 103

1  withdraw the question.
2    (Exhibit 9 was marked for
3    identification.)
4  BY MR. LAGOMARSINO:
5    Q.  So Exhibit 9 is an LVNR test.  The second
6  page is the answers.
7    Don't look at the answers.
8    MR. MCNUTT:  Do you want to make that 10?
9    MR. LAGOMARSINO:  We'll get to that.
10  BY MR. LAGOMARSINO:
11    Q.  So what I would ask you is to grab your
12  pen, and can you go ahead and write in what are the
13  four physiological factors that establish control for
14  the LVNR.
15    MR. MCNUTT:  I'll just object to this line
16  of questioning.  Depositions are not tests for
17  witnesses, but...
18    MR. ANDERSON:  Join.
19  BY MR. LAGOMARSINO:
20    Q.  You can go ahead and write it down.
21    MR. ANDERSON:  If he gets it right, he
22  better get a T-shirt.
23    THE WITNESS:  I don't know.
24  BY MR. LAGOMARSINO:
25    Q.  All right.  Going to number 2, what are the

Page 104

1  three levels of control for the LVNR?
2    Going to number 3, the use of the LVNR
3  impedes flood flow to and from the brain, true or
4  false?
5    Number 4, if rendered unconscious, then
6  subject is generally -- sorry.  If rendered
7  unconscious, the subjects generally revive in 5 to
8  20 seconds, true or false.
9    5, true or false, the neck brace principle
10  refers to the fact that the subject's neck is
11  prevented from moving forward or laterally when being
12  restrained by the LVNR, true or false?
13    And 6, the hand of the encircling arm must
14  be palm down, true or false.
15    Go ahead and just finish 7, 8, 9 and 10.
16    All right.  And then just under name, can
17  you write your name, please, at the top.
18    (Exhibit 10 was marked for
19    identification.)
20  BY MR. LAGOMARSINO:
21    Q.  So Exhibit 10 are going to be screenshots
22  from Lopera's body cam.  I'm going to just ask just a
23  couple of questions on whether you can identify
24  people in certain pictures.
25    So on the first page, are you able to --

Page 105

1    MR. MCNUTT:  Andre, just for clarification,
2  have these been produced, or are these screenshots
3  that you printed from the videos?
4    MR. LAGOMARSINO:  These are videos that
5  have been produced by Metro, and these are
6  screenshots printed from video.
7    MR. MCNUTT:  Okay.
8  BY MR. LAGOMARSINO:
9    Q.  All right.  Are you able to identify
10  anybody on the first page?
11    MR. MCNUTT:  Are these -- I have another
12  question.  Are these all from one body-worn camera,
13  or are they from various officers' body-worn cameras?
14    MR. LAGOMARSINO:  These are all from the
15  same body camera.  You'll see 468(35).
16    MR. MCNUTT:  So this whole exhibit is from
17  one body-worn camera, one officer's body-worn camera?
18    MR. LAGOMARSINO:  It's from Officer
19  Lopera's body-worn camera.
20    MR. MCNUTT:  Okay.
21    THE WITNESS:  I'm sorry, what am I doing
22  now?
23  BY MR. LAGOMARSINO:
24    Q.  We're going to go through and see if you
25  can identify some of these people for us.

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

Page 114

1          (A recess was taken from 2:05 p.m.
2          to 2:13 p.m.)
3          THE VIDEOGRAPHER: We're going back on the
4    record at approximately 2:13 p.m.
5    BY MR. LAGOMARSINO:
6          Q.  Do you understand you're still under oath?
7          A.  Yes.
8          Q.  Can I ask you some questions about some of
9    these videos.  You may or may not have seen portions,
10   as you've already testified to, but I'm going to see
11   if some of this refreshes your recollection, or if
12   you have any personal knowledge based on what's
13   represented there.  Okay?
14         So the first video record is 468(35).  And
15   I'll represent this is Lopera's body cam footage.  So
16   we're at 3:06 on the timestamp, so we'll go ahead and
17   press play.
18         (Playing video.)
19   BY MR. LAGOMARSINO:
20         Q.  So as we discussed already, there's
21   somebody that says, "Let him go, Ken." He says, "Are
22   you sure," and then he says "Yeah."
23         And it's your testimony that's not you,
24   correct?
25         A.  Correct.

Page 115

1          MR. LAGOMARSINO: All right.  Let's press
2    play.
3          (Playing video.)
4    BY MR. LAGOMARSINO:
5          Q.  So you were present for that, correct?
6          A.  Yes.
7          Q.  Having now watched the video, do you
8    believe you were present when he said, "Let him go,
9    Ken," two seconds earlier?
10         A.  So if you play it back, and you hear the
11   car radio say, "The rear of the Venetian," that's us
12   exiting the vehicle saying we're in the rear of the
13   Venetian.
14         Q.  Okay.
15         A.  So it happens simultaneous, so I don't
16   know.
17         Q.  Okay.  That's helpful.
18         All right.  So let's go back to 3:20.  So
19   before we press play, that siren and the car coming
20   and then the siren getting shut off is your car or
21   your vehicle, correct?
22         A.  Correct.
23         Q.  And then you said there was something about
24   being at the rear of the Venetian.  Is that your
25   voice or Flores?

Page 116

1          A.  I was trying to key up at the same time,
2    but that was Flores' traffic.
3          Q.  All right.  Let's go through it.
4          (Playing video.)
5          MR. LAGOMARSINO: Let's go back to 3:10.
6          (Playing video.)
7          MR. LAGOMARSINO: Press pause.
8    BY MR. LAGOMARSINO:
9          Q.  So the siren ends at about 3:14, correct?
10   On the timestamp?
11         A.  Correct.
12         (Playing video.)
13   BY MR. LAGOMARSINO:
14         Q.  Based on the time that the sirens stopped
15   at about 3:13, I'm assuming you then just got out of
16   the vehicle and went to the scene.  Do you believe
17   that you were able to get to the scene within
18   10 seconds?
19         A.  Yes.
20         Q.  Okay.
21         (Playing video.)
22   BY MR. LAGOMARSINO:
23         Q.  We're at 4:14 for the record.
24         What's going on just before 4:14 that we
25   just watched?

Page 117

1          A.  It looks like we were putting handcuffs on
2    him.
3          Q.  Okay.
4          (Playing video.)
5    BY MR. LAGOMARSINO:
6          Q.  All right.  When he says, "Move, move,
7    thank you," what was going on there?  It appears,
8    just for the record, that it's at this point just
9    before 4:21 that Lopera disengages; is that correct?
10         A.  Correct.
11         Q.  So Lopera has released him at this point;
12   is that your understanding?
13         A.  Yes.
14         Q.  And then he steps away?
15         Q.  And then he what?
16         Q.  And then he steps away, correct?
17         A.  Yes.
18         Q.  Is that the barrier you're talking about?
19         A.  Yes.
20         Q.  At 4:22.  Okay.
21         (Playing video.)
22   BY MR. LAGOMARSINO:
23         Q.  At 4:36, we looked at some stills that may
24   resemble this.  Is that Flores there in the green?
25         A.  Yes.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

32 (Pages 122 to 125)

Page 122

1     A.  It was before this.
2     Q.  Oh, okay.  You can't hear it on the video,
3  correct?
4     A.  Correct.
5     Q.  All right.
6        (Playing video.)
7  BY MR. LAGOMARSINO:
8     Q.  Who is saying "block that street?"  Is that
9  you?
10    A.  No.  That's Officer Young.
11    Q.  Then why do you go back to your car or your
12  vehicle?
13    A.  Because my vehicle is blocking an ingress
14  for FT.
15       (Playing video.)
16  BY MR. LAGOMARSINO:
17    Q.  So here at 1:55, there's just a search
18  going on, correct?
19    A.  Correct.
20       (Playing video.)
21  BY MR. LAGOMARSINO:
22    Q.  And it's at this point I think in the
23  screen at 2:04 you've got the anti-bacterials,
24  correct?
25    A.  Correct.

Page 123

1        (Playing video.)
2  BY MR. LAGOMARSINO:
3     Q.  Who is the individual in the green in
4  between the two officers?
5        MR. ANDERSON:  Officer Crevettes
6  (phonetic).
7  BY MR. LAGOMARSINO:
8     Q.  Do you know who the other two officers
9  are?
10    A.  The male officer is Officer Amburgey.  I
11  don't know the -- that's his field training trainee.
12       (Playing video.)
13  BY MR. LAGOMARSINO:
14    Q.  Do you know why it was the field training
15  officer that was the one to do the chest
16  compressions?
17    A.  I don't know.
18    Q.  Did you ever hear if he was using it as a
19  training exercise for the trainee?
20       MR. ANDERSON:  Object to the form.
21       THE WITNESS:  I don't know.  No.
22       (Playing video.)
23  BY MR. LAGOMARSINO:
24    Q.  So at least on your camera, over two
25  minutes passed after you said you don't feel

Page 124

1  anything, and still no chest compressions, correct?
2        MR. MCNUTT:  Objection.  Form.
3        MR. ANDERSON:  Join.
4        THE WITNESS:  Correct.  But I asked Officer
5  Crevettes if he found the pulse, and he nodded in the
6  camera, in the video.
7  BY MR. LAGOMARSINO:
8     Q.  Okay.  All right.  And based on your
9  training, you think just the pulse is enough to not
10  do any chest compressions or resuscitation, correct?
11       MR. ANDERSON:  Objection.  Form.
12       THE WITNESS:  Based on my training, I
13  believe so.
14       MR. LAGOMARSINO:  All right.  That was
15  Exhibit 12.  So just for the record, I know you guys
16  have these, but it's Exhibit 12 that has those two
17  videos.
18       (Exhibit 12 was marked for
19        identification.)
20       MR. LAGOMARSINO:  Let's go to Exhibit 13,
21  which is 468(13).
22       MR. MCNUTT:  And we don't know who this
23  is?
24       MR. LAGOMARSINO:  Just again, Counsel,
25  Metro produced this body camera footage videos.  They

Page 125

1  didn't identify which officer was which, but they
2  individually identified by number.  And so we're
3  going to be sending an interrogatory to Metro, and
4  they'll tell us whose this camera is.
5        (Playing video.)
6  BY MR. LAGOMARSINO:
7     Q.  I just want to be clear on something,
8  Mr. Tran.  Is it your testimony that Metro does not
9  train you to perform CPR on an individual who has an
10  LVNR applied to him if he's unresponsive?
11       MR. ANDERSON:  Objection.  Form.
12       THE WITNESS:  We're trained in the LVNR.
13  We're trained in CPR in the Academy.
14  BY MR. LAGOMARSINO:
15    Q.  Okay.
16    A.  If the subject is rendered unconscious, we
17  call for medical.
18    Q.  Okay.  So if the LVNR goes bad, you have to
19  wait until whenever medical comes to figure out
20  what's going to happen?
21       MR. ANDERSON:  Objection.  Form.
22       THE WITNESS:  I mean, there's no policy
23  that says we have to wait or we have to start
24  compressions.  I don't know.
25       (Playing video.)

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

33  (Pages 126 to 129)

Page 126

1  BY MR. LAGOMARSINO:
2     Q.  So let's back it up five seconds.  So
3  there's a few conversations here.  I want to ask you
4  who's talking right now right there.
5        So pause at 4:07.  Who is that in the
6  screen?
7     A.  Right there, right in front?
8     Q.  Yes, sir.
9     A.  Officer Serrano.
10    Q.  Okay.
11       (Playing video.)
12  BY MR. LAGOMARSINO:
13    Q.  Who is talking right now at 4:14?
14    A.  Officer Flores.
15    Q.  Okay.  When he said, "Lopera, got him in a
16  lock," that's who you're saying is Flores?
17    A.  Yes.
18    Q.  All right.  So let's go back again to like
19  4:09.
20       (Playing video.)
21  BY MR. LAGOMARSINO:
22    Q.  I'll represent coming up somebody is going
23  to say -- it doesn't appear to be Flores, but it
24  could be -- "he was out when we got here."  Okay?  So
25  I want to see if you recognize that voice.

Page 127

1       (Playing video.)
2  BY MR. LAGOMARSINO:
3     Q.  Did you hear somebody say he was already
4  out?
5     A.  I didn't, no.
6     Q.  Okay.  Let's play is again.
7       (Playing video.)
8       THE WITNESS:  I heard something in the
9  background.  I don't know what was said.
10       (Playing video.)
11  BY MR. LAGOMARSINO:
12    Q.  So he says "He was out, he was already
13  out."  Who said that?
14    A.  I don't know.
15    Q.  Okay.
16       (Playing video.)
17       MR. LAGOMARSINO:  So that was Exhibit 13.
18       (Exhibit 13 was marked for
19       identification.)
20  BY MR. LAGOMARSINO:
21    Q.  Going to Exhibit 14, 468(20), two minutes.
22       (Exhibit 14 was marked for
23       identification.)
24  BY MR. LAGOMARSINO:
25    Q.  There's a female at the end who is talking

Page 128

1  to somebody, and she says, "Turn your camera off."  I
2  want to ask you if you recognize the voices at the
3  end of the video.  So you can kind of go to the last
4  30 seconds.
5       (Playing video.)
6  BY MR. LAGOMARSINO:
7     Q.  Who is that officer in the screen?
8     A.  This officer in the screen?
9     Q.  To the right, yeah.
10    A.  That's Officer Stutzman.
11    Q.  And do you know who is speaking when she
12  said "turn your camera off"?
13    A.  I heard her say "we were inside," so if I
14  had to guess it would be Officer Lift.
15       (Playing video.)
16       MR. LAGOMARSINO:  All right.  So that was
17  15?  Was that 15?
18       MS. VALDIVIA:  That was 14.
19       MR. LAGOMARSINO:  14?  Okay.
20       MR. MCNUTT:  So we're marking this as 15 or
21  we're marking this as 16?
22       MR. LAGOMARSINO:  16.  We're skipping 15.
23  15 is quite long.  We can put it in if you would like
24  me to do that.
25       (Exhibit 16 was marked for

Page 129

1       identification.)
2       MR. LAGOMARSINO:  So press play.
3       (Playing video.)
4       MR. LAGOMARSINO:  Okay.  At this point
5  pause it.
6  BY MR. LAGOMARSINO:
7     Q.  This is the part where you're trying to get
8  Tashi to sit up, correct?
9     A.  You would have to keep playing.  I don't
10  know what we're doing here.
11       MR. LAGOMARSINO:  All right.
12       So press play from the beginning.
13       (Playing video.)
14  BY MR. LAGOMARSINO:
15    Q.  Do you see at, it looks like 10 seconds,
16  Tashi's feet are crossed and placed behind him?
17    A.  Yes.
18    Q.  Do you know why that is?
19    A.  It's a tactic that we're taught to control
20  the subject from fighting or moving.
21    Q.  Okay.  All right.
22       (Playing video.)
23  BY MR. LAGOMARSINO:
24    Q.  Is that you right there?
25    A.  Yes.

Officer Michael Tran ~ December 18, 2018
* * * Videotaped Deposition * * *

35 (Pages 134 to 137)

Page 134

1  A. No.
2  Q. Again, did you have any facts that led you
3  to believe that Officer Lopera was using unreasonable
4  force?
5  A. No.
6  Q. Do you believe that by attempting to
7  handcuff Farmer, that would be a form of
8  intervention?
9  A. Yes.
10  Q. And then as soon as the handcuffing was
11  complete, that's when you noticed that Farmer was
12  unconscious?
13  A. Correct.
14  Q. And what did you do when you noticed
15  that?
16  A. I told Officer Lopera, "Loosen up, loosen
17  up, he's out."
18  Q. There's been some testimony today about
19  when you called medical; is that correct?
20  A. Correct.
21  Q. Have you listened to the radio dispatch in
22  this case?
23  A. Yes.
24  Q. Okay. On that dispatch, did you recognize
25  your voice?

Page 135

1  A. Yes.
2  Q. When did you request medical?
3  A. As soon as Mr. Farmer was placed in
4  handcuffs, I said: "Venetian 1, we're Code 4. Clear
5  the red, roll medical."
6  Q. And did that occur before you turned on
7  your body cam?
8  A. Yes.
9  MR. ANDERSON: That is all I have.
10  MR. LAGOMARSINO: Dan, let me just follow
11  up on a couple of them, if that's okay?
12
13  FURTHER EXAMINATION
14  BY MR. LAGOMARSINO:
15  Q. The question was asked is there any way you
16  could have found out what level of LVNR Lopera had
17  him in. Do you remember that question just a second
18  ago?
19  A. Yes.
20  Q. You could have asked him what level he was
21  in, correct?
22  A. I could have, but that's -- this struggle,
23  the dynamic scene, I wouldn't -- it wouldn't have
24  been reasonable for me to pause to ask him what the
25  subject has done prior to my arrival.

Page 136

1  Q. Well, no, but you could have said what
2  level LVNR are you in. It takes about a second,
3  right?
4  A. Correct. But there was a supervisor on
5  scene, and we were there to assist in taking the
6  subject into custody.
7  Q. Okay. And there was a question that
8  Mr. Anderson asked you about when you called medical,
9  and I was looking at something when you said it. So
10  was it right when you arrived on scene you said call
11  medical?
12  A. No. It was after we placed him into
13  handcuffs. I got on the radio and said clear the
14  red, the Code Red, that was asked. He's in custody.
15  Code 4. Roll medical.
16  Q. What's Code 4 mean?
17  A. It means where everyone is okay.
18  Q. And why did you feel it was necessary to
19  call medical at that time?
20  A. Because after we placed him in handcuffs,
21  and I looked down and I saw Mr. Farmer was
22  unconscious, and the encircling arm on Mr. Farmer, it
23  was -- it's policy that we roll medical for use of
24  LVNR.
25  Q. You knew he needed medical, right?

Page 137

1  MR. ANDERSON: Objection.
2  MR. MCNUTT: Objection. Form.
3  THE WITNESS: I didn't know if he needed
4  medical, but I wanted medical to come in case he did
5  need medical.
6  MR. LAGOMARSINO: Okay. I have no further
7  questions.
8
9  EXAMINATION
10  BY MR. MCNUTT:
11  Q. Officer Tran, my name is Dan McNutt. I
12  represent Mr. Lopera.
13  Is being under the influence of a
14  controlled substance a crime in the state of Nevada?
15  A. Yes.
16  Q. Is trespassing a crime in the state of
17  Nevada?
18  A. Yes.
19  Q. Is resisting arrest a crime in the state of
20  Nevada?
21  A. Yes.
22  Q. Is carjacking a crime in the state of
23  Nevada?
24  A. Yes.
25  Q. Are you aware whether or not Mr. Farmer was

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

39 (Pages 150 to 153)

Page 150

1  a competitive jutsitsu fighter?
2          MR. MCNUTT: Objection. Form.
3          THE WITNESS: At the night prior to that
4  incident, no.
5  BY MR. LAGOMARSINO:
6      Q.  When did you learn that he fought
7  competitively as a jutsitsu fighter?
8          MR. MCNUTT: Objection. Form. Foundation.
9          THE WITNESS: A couple of months later.
10 BY MR. LAGOMARSINO:
11     Q.  How did you learn that?
12     A.  At the station through coworkers.
13     Q.  You were asked a series of questions
14 about -- in the beginning of the video about Tashi
15 running through what's been referred to as the back
16 of the house, and then some questions about
17 trespassing.
18         Did you see any signs that said "back of
19 the house" in that video?
20     A.  No.
21     Q.  Did you see any "no trespassing" signs?
22     A.  I mean, based on the video, no. But there
23 could have been "employees only" signs off to the
24 side.
25     Q.  There could have been, there could not have

Page 151

1  been, right?
2      A.  But there was a chain-link, and then there
3  was the doors itself that leads -- doesn't say it
4  leads to any business that I know of.
5          To me, a reasonable person wouldn't go to
6  the back house, go down a bunch of stairs and run out
7  to the loading docks.
8      Q.  Right. The little chain thing with the
9  cone, that could have just as easily been something
10 that was roped off for a wet floor, correct?
11     A.  Correct.
12     Q.  And then you were asked about whether there
13 was restricted access. I mean, I didn't see any
14 signs that said "restricted access," did you?
15     A.  Not on the video, no.
16     Q.  You're crisis intervention certified,
17 correct?
18     A.  Correct.
19     Q.  Did you hear in any of the videos
20 Officer Lopera admit that he believed he saw the
21 early signs of ED on Lopera?
22     A.  On Lopera's body camera video did I hear
23 him say ED?
24     Q.  Yeah.
25     A.  I did not.

Page 152

1      Q.  What does ED mean?
2      A.  Excited delirium.
3      Q.  And did you see signs of excited delirium
4  in the videos that you watched?
5      A.  I mean, he's acting pretty erratic.
6      Q.  And how does excited delirium factor into a
7  use of force analysis?
8      A.  I know in the Academy, they said excited
9  delirium, the ECD would be the best option to control
10 a person with ED.
11     Q.  When you saw -- strike that.
12         When you took the pulse of Tashi and noted
13 that he was unresponsive, did you believe that he had
14 serious medical needs at that point?
15     A.  At the time, I couldn't find a pulse. I
16 didn't know if I was doing it wrong, if my adrenaline
17 was too high. I don't -- I can't say that Mr. Farmer
18 needed serious medical need at the moment. I didn't
19 even know if I did the pulse wrong.
20         But when I asked Officer Crevettes
21 (phonetic) if he found a pulse, he said he did, so...
22     Q.  Okay. So let's break it down. So Tashi's
23 unconscious, not moving, and you can't find a pulse,
24 and you're saying that he did not need serious
25 medical attention?

Page 153

1          MR. ANDERSON: Objection. Form.
2          THE WITNESS: I asked for medical.
3  BY MR. LAGOMARSINO:
4      Q.  Did you ask for medical because you
5  believed he needed -- because he had serious medical
6  attention?
7      A.  I asked for medical because Mr. Farmer was
8  placed in LVNR, and if we place somebody in LVNR,
9  we're supposed to ask for medical.
10     Q.  Would you have called medical if you didn't
11 think he needed medical?
12     A.  If he was placed in LVNR, I would have
13 called medical.
14     Q.  Looking now at the body cam footage and
15 knowing what you know now, did Tashi have serious
16 medical needs?
17         MR. ANDERSON: Objection. Form.
18         THE WITNESS: In hindsight, yes. Because
19 Mr. Farmer is deceased now. Yes, he had medical
20 needs.
21 BY MR. LAGOMARSINO:
22     Q.  And then when you tested his pulse and saw
23 that he was unconscious, you laid him back down and
24 walked away, right?
25         MR. ANDERSON: Objection. Form.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Tran  ~  December 18, 2018
* * * Videotaped Deposition * * *

Page 157

```
 1              CERTIFICATE OF REPORTER
 2         I, the undersigned, a Certified Shorthand
 3    Reporter of the State of Nevada, do hereby certify:
 4         That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were duly sworn; that a record
 8    of the proceedings was made by me using machine
 9    shorthand which was thereafter transcribed under my
10    direction; that the foregoing transcript is a true
11    record of the testimony given to the best of my
12    ability.
13         Further, that before completion of the
14    proceedings, review of the transcript [ X ] was
15    [  ] was not requested pursuant to NRCP 30(e).
16         I further certify I am neither financially
17    interested in the action, nor a relative or employee
18    of any attorney or party to this action.
19         IN WITNESS WHEREOF, I have this date
20    subscribed my name.
21
22    Dated: December 27, 2018
23
24    _____
          GALE SALERNO, RMR, CCR No. 542
25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com