# EXHIBIT 10
# Excerpts from John McGrath Deposition, Vol. I, 12/27/17

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * * *

ESTATE OF TASHI S. FARMER
a/k/a TASHII FARMER a/k/a
TASHII BROWN, by and through
its Special Administrator,
Elia Del Carmen
Solano-Patricio; TAMARA
BAYLEE KUUMEALI'MAKAMAE
FARMER DUARTE, a minor,
individually and as
Successor-in-Interest, by and
through her legal guardian,
Stevandra Lk Kuanoni; ELIAS
BAY KAIMIPONO DUARTE, a
minor, individually and as
Successor-in-Interest, by and
through his legal guardian,
Stevandra Lk Kuanoni,

      Plaintiffs,

  vs.

Case No. 2:17-CV-01946-JCM-PAL

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, a political
subdivision of the State of
Nevada; OFFICER KENNETH
LOPERA, individually and in
his Official Capacity; and
Does 1 through 50, inclusive,

      Defendants.

---

VIDEOTAPED DEPOSITION OF CHIEF JOHN MCGRATH

Las Vegas, Nevada

December 27, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

CHIEF JOHN MCGRATH
December 27, 2017

Page 10

1  Q. If you don't understand a question that
2  I've asked you, please don't answer it. Ask me to
3  repeat it or rephrase it or in some way indicate
4  it wasn't understood, and I'll do my best to
5  rephrase it. If you answer a question, I'm going
6  to assume that you've understood it.
7       Is that fair enough?
8  A. Sure.
9  Q. Please wait until I finish my question
10 before you start your answer, and I'll give you
11 the same courtesy. I'll wait until you've
12 finished your answer before I start my next
13 question.
14      Other than simply being courteous, it's
15 difficult for the court reporter to take down two
16 people who are speaking at the same time.
17      Do you understand?
18 A. Yes.
19 Q. During the course of the deposition,
20 please continue to answer out loud as you've been
21 doing up until now. Such common expressions as
22 "uh-huh," "huh-uh," nods of the head or shakes of
23 the head are too difficult to interpret for the
24 court reporter.
25      Will you do that, please?

Page 11

1  A. Yes.
2  Q. Are you under any kind of medication
3  that would prevent you from giving your best
4  response here today, either by way of affecting
5  your memory or your ability to articulate?
6  A. No medication.
7  Q. Okay. You may or may not have answers
8  to some of the questions that I ask having to do
9  with time or distance, but you may have an
10 estimate. And I'm entitled to your best estimate.
11      Do you understand that?
12 A. Sure.
13 Q. But not a guess. If it's a guess, I'm
14 not entitled to that.
15      The difference between a guess and an
16 estimate is not always clear. But if I asked you
17 to estimate the length of this table, given your
18 life experience with feet and inches or meters and
19 centimeters and the fact that you can see the
20 table, you could give me a reasonable estimate of
21 the length of the table.
22      If I asked you to estimate the length of
23 my dining room table in Irvine, California, it
24 would have to be a pure guess because you've never
25 been there.

Page 12

1       Do you understand?
2  A. Yes.
3  Q. All right.
4       Okay. Chief -- is "Chief" the proper --
5  A. Sure.
6  Q. All right. Okay. Can you tell us,
7  please, about the various level of policing that
8  you've come through since you've been a member of
9  the Las Vegas Metropolitan Police Department.
10 A. Sure. I worked as a patrol officer, as
11 a field training officer, as a sergeant in patrol,
12 in problem-solving unit, in property crimes, and
13 in auto theft, and in Viper, which is an auto
14 theft task force.
15      As a lieutenant, I worked, again, in
16 patrol and in field training and in the gang unit.
17 As a captain, I worked at Northwest Area Command,
18 internal affairs, organizational -- excuse me --
19 Organized Crime Bureau and Office of Internal
20 Oversight. Then I was promoted to deputy chief in
21 March of 2017.
22 Q. What is internal oversight?
23 A. Internal Oversight and Constitutional
24 Policing is a bureau that investigates officer's
25 use of force in critical incidents.

Page 13

1  Q. Is that -- is FIT under that?
2  A. Yes.
3  Q. What was your -- what were your
4  responsibilities in charge of internal oversight?
5  A. I was there for three months before I
6  got promoted. The captain of that bureau was
7  responsible for the reports that are generated to
8  review them, either by the CIRT detectives or the
9  FIT detectives.
10      When an incident happens, you respond to
11 the scene, get a general overview of what
12 happened, and usually give both a public
13 information statement to the media and an internal
14 statement for the department.
15 Q. You said that while you were in patrol
16 as a sergeant, you were involved with problem
17 solving.
18      What did that mean?
19 A. That's a plainclothes assignment of
20 detectives basically assigned to patrol who
21 respond to whatever the captain asked them to do
22 is a problem at that time.
23 Q. Okay. What are your responsibilities as
24 deputy chief?
25 A. So I supervise three bureaus and the

Page 14

1  bureau commanders that are under them, and I have
2  a responsibility for each of those sections. So
3  Organizational Development Bureau includes the
4  academy, field training, CIT, which is Critical
5  Intervention Team. And the other part of training
6  is firearms, drivers training, reality-based
7  training, advanced officer skill training. And I
8  might be forgetting something, but that's
9  organizational development.
10       Secondly, I have human resources, which
11  includes the hiring of people and the background
12  investigations and the -- we also do the
13  terminations or the out-processing of employees.
14       Lastly, I have project management in
15  Video Bureau. That includes quality assurance,
16  video. Body cameras, we call it. We call it
17  Video Bureau, but it's really just body cameras.
18  Policy and research and project management.
19     Q.  What is intervention -- what does the
20  interventional team do?
21     A.  Those are officers that train the rest
22  of the department in dealing with mentally
23  challenged persons or emotionally disturbed
24  persons. They also, at times, respond to
25  residences to check on people that we've come into

Page 15

1  contact with to try to get them assistance.
2     Q.  There was a deponent before you today,
3  Officer Crumrine, who went through -- I guess it's
4  a -- you call it a review board. I presume --
5     A.  Yes.
6     Q.  -- it is a board of rights.
7          Is that something that is under your
8  jurisdiction?
9     A.  So, yes, I'm on the -- I'm on the use of
10  force board --
11     Q.  Okay.
12     A.  -- which includes use of force and the
13  tactical review board. I actually had one this
14  morning.
15     Q.  Okay.
16     A.  But I was also on Lopera board, which
17  included then Sergeant Crumrine.
18     Q.  Okay. When you say "Lopera board," you
19  mean -- is that a generic statement about the
20  incident?
21     A.  That's just the -- the use of force
22  board, although it's called an -- it has an event
23  number to it. Usually we commonly refer to it by
24  the name of the officer who is going in front of
25  the board.

Page 16

1     Q.  Did Lopera go through a -- some type of
2  administrative review?
3     A.  No. Wait. I guess. He showed up at
4  the board and then refused to talk. So I don't
5  know what you would call that.
6     Q.  Did you enter any kind of findings
7  regarding Officer Lopera as a board?
8     A.  I didn't come to a finding, but there
9  was a finding. He was sustained for refusing to
10  cooperate. I'm not sure the exact wording for --
11  I don't know. I think it was insubordination.
12  I'm not sure. But he didn't cooperate with the
13  board, which is a violation of policy. He's
14  required, in an administrative hearing, to
15  cooperate.
16     Q.  Notwithstanding his Fifth Amendment
17  privileges in an administrative --
18     A.  Well, the criminal charges were still
19  pending, which is why, on the basis of his legal
20  team, told him don't talk to us.
21     Q.  Okay. What charges were levied against
22  Officer Lopera as a part of the administrative
23  review?
24     A.  I'm not sure.
25     Q.  Okay. Who would have a copy or a

Page 17

1  listing of the charges that were levied against
2  him for the administrative?
3     A.  I would say that labor relations would
4  have that.
5     Q.  Labor relations?
6     A.  It's another section within the
7  department.
8     Q.  Is there a custodian of labor relations?
9     A.  There's a director.
10     Q.  Director. Okay.
11     A.  Jamie Frost.
12     Q.  Say the name again, please.
13     A.  Jamie, J-A-M-I-E, Frost.
14     Q.  F-R-O-S-T?
15     A.  Yes.
16     Q.  Okay.
17     A.  I'm sure she'll be happy I brought her
18  name up.
19     Q.  I'm sure she will. And when I subpoena
20  here, I'll tell her this is from Chief McGrath.
21     A.  No, no, no. Please don't.
22     Q.  No. I just want to get the --
23     A.  No, I understand. I'm just kidding.
24     Q.  All right. Now, there was also an
25  administrative review for Officer -- or I guess

Page 18

1  then Sergeant, Crumrine?
2      A.  Uh-huh.  I'm sorry.  Yes.
3      Q.  And you sat on that board?
4      A.  Yes.
5      Q.  Okay.  Who else was on the board?
6      A.  I know assistant sheriff -- no.  Well, I
7  can't remember.  Because I'm on all the boards,
8  but sometimes the assistant sheriffs are on some
9  and not other ones.  I think it was Tim Kelly, but
10 I'm not a hundred percent.
11     Q.  Okay.  Where would I find a listing of
12 the officers or participants in the review board
13 for Officer Crumrine?
14     A.  I'm not sure.  I know that Assistant
15 Sheriff Kelly, whoever the board chairman was,
16 does a memo to the Sheriff, saying what happened
17 at the board.  And then if there is -- if there --
18 it involves discipline, that will be included on
19 an adjudication of complaint, which labor
20 relations will have.
21     Q.  All right.  Was Assistant Sheriff Kelly
22 the board chairman of that board?
23     A.  I think so, but I've had a lot of boards
24 since then.
25     Q.  Yeah.  You were not?

Page 19

1      A.  Oh, I was on the board.
2      Q.  No, but you were not the board chairman?
3      A.  No, I was not the chairman, no.
4      Q.  All right.  Who would have -- where
5  would there be a depository that would have a
6  listing of his memo or whatever the findings were?
7      A.  I guess either he would have it or he
8  would go to the office of the Sheriff.
9          Now, I guess that when you're talking
10 about Crumrine, it probably is a memo for
11 non-confirmation because he was on probation.  So
12 it's not actually discipline.  We just, while he's
13 on probation as a sergeant, recommended that he
14 doesn't continue as a supervisor.  Doesn't have to
15 be actual suspension or hours or anything like
16 that.
17     Q.  No, I understand.  But the very fact
18 that he was not confirmed is, in itself, a
19 demotion of sorts.
20     A.  Yes, but --
21     Q.  I understand.
22     A.  Okay.
23     Q.  He was on probation?
24     A.  Yes.
25     Q.  He was still in his probationary period

Page 20

1  as a sergeant?
2      A.  Right.
3      Q.  There was a -- there was a determination
4  of non -- noncompliance -- whatever the word is.
5      A.  Yes.  Nonconfirmation.
6      Q.  Nonconfirmation.
7      A.  Right.
8      Q.  So he no longer continued as --
9      A.  He goes back as an officer.
10     Q.  So now he's a patrolman; correct?
11     A.  Correct.
12     Q.  Do you remember the charges that were
13 levied against him?
14     A.  I don't know that there was any charges.
15 There was some findings.  I just can't recall what
16 exactly the findings were.
17     Q.  Okay.  Now, again, the findings would be
18 with Assistant Sheriff Kelly?
19     A.  Well, the findings would be in OIO.
20 It's -- it's a whole administrative report that
21 they would do, and the findings are in there.
22     Q.  What does "OIO" mean?
23     A.  Office of Internal Oversight.
24     Q.  Okay.  Which is -- was under your
25 supervision?

Page 21

1      A.  Yes.
2          MR. DARWISH:  Someone is trying to come
3  in.
4          MS. SOLANO-PATRICIO:  Sorry.  Hi, guys.
5  I'm sorry to interrupt.  Sorry I'm late.
6          THE VIDEOGRAPHER:  Oh, you're -- okay.
7          MS. SOLANO-PATRICIO:  Plaintiff.
8          THE VIDEOGRAPHER:  Could you state your
9  name for the record.
10         MS. SOLANO-PATRICIO:  I'll spell it for
11 you.  It's very long.  Elia Del Carmen
12 Solano-Patricio.
13         MR. ANDERSON:  You weren't kidding.
14         MR. SAYRE:  Okay.  Are we set?
15 BY MR. SAYRE:
16     Q.  Okay.  So you said that the findings
17 would be with the Office of Internal Oversight.
18         What I'm trying to do is figure out who
19 I need to subpoena in order to produce the
20 findings.  In most organizations or departments,
21 it would be a custodian of record, but if not, is
22 it some other person?
23     A.  We don't -- we don't have a custodian of
24 record for the department.
25     Q.  Okay.

Page 22

1   A.  Usually the subpoenas would go directly
2  to legal, and they would usually get that for you.
3   Q.  That young lady over there; right?
4   A.  Yes.
5   Q.  All right.  So who is in charge of the
6  Office of Internal Oversight?
7   A.  It was Kelly McMahill.  And now, two
8  weeks ago, she was transferred out and a new
9  captain is there.  His name is Chris Little.
10   Q.  Captain Chris Little.
11        And Kelly -- could you spell her last
12  name, please.
13   A.  McMahill, M-C-M-A-H-I-L-L.
14   Q.  And what was her rank?
15   A.  Captain.
16   Q.  Okay.  But currently, it would be
17  Captain Little?
18   A.  Yes.
19   Q.  Okay.  I'll tell him the subpoena came
20  from you also.
21   A.  That's okay.  I don't care if he's mad
22  at me.
23   Q.  Okay.  All right, then.
24        You don't recall what determination was
25  made in the administrative review of

Page 23

1  Officer Crumrine other than non --
2  nonconfirmation?
3   A.  Yeah.  No, I don't -- I don't recall the
4  exact findings.  I mean, the binder for that case
5  was a few hundred pages long.
6   Q.  Okay.  Was there an administrative
7  review for Officer Tran?
8   A.  I -- I can't recall who was part of the
9  tactical review board.  So how it works is the
10  officer who has the use of force, which was Lopera
11  in this case --
12   Q.  Yeah.
13   A.  -- only participates in the use of force
14  board.  Then we -- we have a -- basically, a vote
15  of whether -- whether the use of force was
16  justified or not.
17        Then we move into the tactical review
18  board.  And everybody who was part of that
19  incident that they have findings about are
20  included in the tactical review board.  And I -- I
21  think there was a couple of other officers there.
22  I can't recall their names.
23   Q.  All right.  Well, there were two
24  other -- two other officers that, at least, I'm
25  aware of were involved.

Page 24

1   A.  Uh-huh.  Tran.
2   Q.  Officer Tran and Officer Flores.
3   A.  Okay.
4   Q.  Do you recall if there was a review of
5  their actions?
6   A.  Well, there was a review.  I just don't
7  recall what the review was.
8   Q.  Did the board make a determination as to
9  whether or not the force utilized by
10  Officer Lopera was justified?
11   A.  See, I'm not -- I don't know what the
12  memo that the Sheriff -- Sheriff Kelly, who I
13  believe is -- wrote it, I don't know what that
14  said, and I can't recall.  I wish I would have
15  reviewed this case.
16   Q.  Sure.
17        Has Officer Lopera been separated from
18  the department?
19   A.  Oh, yes.
20   Q.  When did that occur?
21   A.  I don't recall the date.
22   Q.  Was he separated because of this
23  incident?
24   A.  Yes.
25   Q.  Because of his use of force?

Page 25

1   A.  And noncooperation with the board.
2   Q.  Metropolitan Police Department teaches
3  and instructs its officers that they have a duty
4  to intervene when another officer is engaged in
5  excessive force; is that true?
6   A.  Yes.
7   Q.  And what is the intervention supposed to
8  consist of?
9   A.  Stopping inappropriate use of force
10  by -- actually, verbally or physically, if it
11  needs be.
12   Q.  Okay.  Let me show you the police
13  report.
14        Have you reviewed the police report of
15  this incident?  It was actually called an arrest
16  report.
17   A.  No, I have not.
18   Q.  Okay. Let me draw your attention over
19  to page 5 of 8.  You're welcome to look at the
20  rest of it, too, but I'm only right now going to
21  ask you about 5 of -- 5 of 8.
22        Look at 2:58.  And I'll represent to you
23  that that means 2 minutes and 58 seconds after
24  Officer Lopera's body camera was turned on.
25        Do you have that in mind?

Page 26

1  A. Yes.
2  Q. Okay. It says, "Officer Lopera appeared
3  to put Farmer in some type of neck restraint."
4     Now, let me further represent to you
5  that this is a timeline and report that was
6  created by the officers listed in the arrest
7  report. You can look at their names at the
8  beginning of the arrest report. It's apparently
9  Detective Alsup and Detective Colon.
10  A. Right. From FIT.
11  Q. Yes. Do you know those gentlemen?
12  A. Yes.
13  Q. All right. And have you interacted with
14  them in the past?
15  A. Yes.
16  Q. It also says that this was approved by
17  Sergeant McDonald.
18  A. Yes.
19  Q. Also of FIT?
20  A. A FIT sergeant.
21  Q. Right. And have you had experience of
22  working with Sergeant McDonald?
23  A. Yes.
24  Q. And have you found the work of these
25  detectives and Sergeant McDonald to be excellent

Page 27

1  in the past?
2  A. Yes.
3  Q. Have you ever had any criticism of them?
4  A. Well, "criticism" is kind of broad.
5     So occasionally there have been reports
6  that I've reviewed that have been sent back for
7  revisions, but I -- I wouldn't call that a real
8  criticism, where it was affecting their job
9  performance.
10  Q. I understand. All right. Look at 2:58
11  again. It says, "Lopera appeared to put Farmer in
12  some type of neck restraint."
13     Okay. Then at 3:01, three seconds
14  later, "Sergeant Crumrine arrived and stated, 'Put
15  your fucking hands behind your back.'"
16     Okay. You see that? Is that a "yes"?
17  A. Yes. I'm sorry.
18  Q. No problem.
19     All right. Then look at 3:25. It says,
20  "Officer Tran arrived and said, 'Let him go,
21  Ken.'"
22     You see that?
23  A. Yes.
24  Q. All right. Now, let me represent to you
25  that Officer Crumrine has indicated that that was

Page 28

1  actually him that said, "Let him go, Ken." It was
2  not Officer Tran.
3     Do you have that in mind?
4  A. Yes, I have it in mind.
5  Q. Okay. Now, Officer Crumrine also stated
6  that sometime before that, between 2:58 and 3:25,
7  he had previously stated to Officer Lopera, "Let
8  him go, Ken."
9     So this would have been the second time
10  he told him, "Let him go, Ken."
11  A. Okay.
12  Q. Okay?
13     Now, following the timeline, after 3:25,
14  Officer Lopera continued to maintain the hold and
15  didn't release it until 4:11, which is another 46
16  seconds.
17     Do you see that?
18  A. Yes.
19  Q. All right. Now, after 3:25, I'm going
20  to ask -- give you essentially a hypothetical.
21     A sergeant of an officer tells his
22  officer to release a hold, twice. Does that
23  sergeant have a duty thereafter, having asked him
24  twice to release the hold, to check and make sure
25  he's released the hold?

Page 29

1     MR. ANDERSON: Objection. Form.
2     Go ahead. Go ahead and answer.
3     THE WITNESS: Yes. That's what a duty
4  to intervene is.
5  BY MR. SAYRE:
6  Q. Right. And if he fails to intervene, to
7  check to see if he's released the hold after he's
8  told him twice to release the hold, is that a
9  violation of Metropolitan policy?
10     MR. ANDERSON: Objection. Form.
11     Answer.
12     THE WITNESS: Yes.
13  BY MR. SAYRE:
14  Q. And as you understand it, is it also a
15  violation of the Fourth Amendment of the
16  Constitution of the United States?
17     MR. ANDERSON: Objection. Form.
18     MR. McNUTT: Objection. Form.
19  BY MR. SAYRE:
20  Q. Failing to intervene when there's
21  excessive force.
22  A. Well, it's -- it's hard to say whether
23  there is excessive force. I know now that there
24  was excessive force, but I don't think Sergeant
25  Crumrine believed at the time there was excessive

Page 30

1  force.
2      Q.  Well, I'll tell you that what
3  Officer Crumrine testified to is he never again,
4  until 4:11, looked to see if the hold had been
5  released, having told him twice.
6          MR. McNUTT:  Objection.  Form.
7  Misstates testimony.
8          MR. ANDERSON:  Join.
9  BY MR. SAYRE:
10     Q.  I'm representing to you that's what he
11 testified, that he did not look to see if the hold
12 had been released after he had told him twice to
13 release it, because he trusted that he would
14 release the hold.
15         MR. McNUTT:  Same objection.
16         THE WITNESS:  So if you're saying to me
17 that he asked him to release the hold and he
18 didn't do it and he didn't follow through on that?
19 BY MR. SAYRE:
20     Q.  That's right.
21     A.  That's -- that's -- he should have
22 followed through.
23     Q.  And following through -- failing to
24 follow through is a failure to intervene?
25     A.  Yes.

Page 31

1      Q.  And failure to intervene, besides being
2  a violation of Metropolitan policy, is a violation
3  of the Fourth Amendment of the Constitution?
4          MR. ANDERSON:  Objection.  Form.
5          MR. McNUTT:  Objection.  Form.
6          THE WITNESS:  So I -- I think that
7  you're -- I -- he would have to know that the
8  force was excessive and then not intervene and
9  allow it to happen.
10 BY MR. SAYRE:
11     Q.  All right.
12     A.  I -- I don't think that's what he did.
13 I know that's what he -- he didn't intervene, but
14 I don't think it was because -- he just didn't
15 know that that's what he was supposed to do.
16     Q.  Okay.  He didn't know that's what he was
17 supposed to do because he hadn't been trained to
18 do that?
19         MR. McNUTT:  Objection to form.
20         MR. ANDERSON:  Objection.
21         THE WITNESS:  Okay.  I -- no, I don't
22 think that's why.  I think he didn't understand
23 his job as a supervisor.
24 BY MR. SAYRE:
25     Q.  Okay.  And he didn't understand his job

Page 32

1  as a -- why do you say that?
2      A.  Because he's the one that should have
3  the most experience and be the most objective in
4  that situation and should have -- if he didn't
5  make sure something happened, then he should have
6  made sure someone else made it happen.
7      Q.  Okay.  What do you mean, make sure
8  someone else made it happen?
9      A.  Tell someone else to pull him off.
10     Q.  Right.  Physically pull his hands away
11 from the neck?
12     A.  Or direct somebody else to pull his
13 hands off.
14     Q.  All right.  And why didn't he understand
15 that that was his duty?
16         MR. ANDERSON:  Objection.  Form.
17         THE WITNESS:  Because he didn't
18 understand his role as a supervisor.
19 BY MR. SAYRE:
20     Q.  And why didn't he understand his role as
21 a supervisor?
22     A.  Well, I think that being a supervisor
23 isn't for everybody.  You have to remove yourself
24 as your previous role as an officer and be able to
25 go to the next role, and it's not an easy

Page 33

1  transition and not everyone can do it.  And he was
2  acting as one of the guys instead of being a
3  sergeant.
4      Q.  All right.  By that, you mean he wanted
5  to get along with his men, so he didn't intervene?
6          MR. ANDERSON:  Objection.  Form.
7          THE WITNESS:  And sometimes that's --
8  that could be the problem --
9  BY MR. SAYRE:
10     Q.  Right.
11     A.  -- that he was trying to get along with
12 his guys.
13     Q.  Right.
14     A.  Or sometimes he just doesn't understand
15 that is his job.
16     Q.  All right.  He failed in his duty as a
17 supervising officer that -- that day; correct?
18         MR. ANDERSON:  Objection.  Form.
19         THE WITNESS:  Yes.
20 BY MR. SAYRE:
21     Q.  Okay.  He failed to prevent
22 Officer Lopera from exercising excessive force on
23 Mr. Farmer; correct?
24         MR. McNUTT:  Objection.  Form.
25         MR. ANDERSON:  Join.

Page 34

1    THE WITNESS: So I think the -- a lot of
2 the use of the force was started well before
3 Officer Crumrine got there.
4 BY MR. SAYRE:
5    Q.  Right.
6    A.  So he got there in the middle. I'm just
7 estimating there, but all I can say is he should
8 have done more.
9    Q.  All right. You've seen the video;
10 correct?
11   A.  Yes.
12   Q.  Both the body camera of Lopera, as well
13 as the Venetian security film?
14   A.  That's correct.
15   Q.  And are you aware that Officer Lopera
16 tased Mr. Farmer seven times?
17   A.  Yes.
18   Q.  And that's outside of policy; correct?
19      MR. McNUTT: Objection. Form.
20      THE WITNESS: Policy states, I believe,
21 you can only tase someone three times.
22 BY MR. SAYRE:
23   Q.  Right. So it would be a violation of
24 policy?
25   A.  Yes.

Page 35

1    Q.  Which means it's unreasonable behavior?
2    A.  Yes.
3    Q.  Okay. Now, did you see Officer Lopera
4 strike Mr. Farmer on the head 10 to 12 times?
5    A.  I saw the video, and it was difficult to
6 tell how many times he struck him, but he
7 definitely struck him a lot.
8    Q.  Was it outside of policy to strike
9 Mr. Farmer on the head or about the head?
10   A.  It's not outside of policy to strike
11 someone on the head. It's -- what was outside of
12 policy is the combination of tasing, striking in
13 the head, LVNR.
14   Q.  Okay. So the entire administration of
15 force as a whole, including taser, striking, and
16 the lateral vascular neck restraint, were
17 excessive force?
18   A.  Based on the reason for the stop, which
19 was not justified.
20   Q.  Right. In fact, the stop was a
21 consensual stop, wasn't it?
22   A.  We all know that it was a consensual
23 stop, but Officer Lopera didn't think it was a
24 consensual stop.
25   Q.  And why do you say that?

Page 36

1    A.  Because he didn't have a reason to stop
2 him.
3    Q.  Right. He had no reason to pursue him
4 and start tasing him; correct?
5    A.  Well, pursuing him is not a stop or
6 unreasonable. What happens when you catch someone
7 is what force can you use based on what crime they
8 committed.
9       He didn't know what he had. I
10 understand someone runs from the police, most
11 police officers chase them.
12   Q.  When someone is stopped pursuant to a
13 consensual stop, they're stopped without probable
14 cause for an arrest; correct?
15   A.  That's correct.
16   Q.  That's the nature of a consensual stop?
17   A.  Right.
18   Q.  And in a consensual stop, a civilian who
19 is stopped has a right to not talk to the officer?
20   A.  That's correct.
21   Q.  And, in fact, he has a right to just
22 walk away from the officer?
23   A.  That's correct.
24   Q.  And by walking away, it does not raise
25 the stop to a suspicion that should cause him to

Page 37

1 be arrested?
2    A.  That's correct.
3    Q.  So in this situation, is it true that
4 there was nothing that you saw on the tape that
5 should have caused Officer Lopera to apprehend
6 Mr. Farmer?
7       MR. McNUTT: Objection. Form.
8       THE WITNESS: I didn't see anything, if
9 I was him, that I would stop him for.
10 BY MR. SAYRE:
11   Q.  Right. And you didn't see any reason as
12 to why he should tase him seven times?
13   A.  So now we're getting a little bit into
14 after you make the decision to use force, which I
15 don't agree with, but he uses force, obviously,
16 some of the tasers were -- strikes were
17 ineffective.
18   Q.  Right.
19   A.  So at what point does it become
20 excessive? You know, depending on whether or not
21 the strikes are actually having an effect on him.
22   Q.  Well, isn't it correct the department
23 teaches that after three cycles, you discontinue
24 the use of a taser?
25   A.  And go to a different tool or way to

CHIEF JOHN MCGRATH
December 27, 2017

Page 38

1  apprehend the subject, yes.
2     Q.  Right.  So to cycle seven times,
3  including the last time for nine seconds, would be
4  excessive force?
5     A.  Well, I think it was excessive, yes.
6     Q.  Did each of the officers, Tran and
7  Flores, also have a duty to intervene to prevent
8  Officer Lopera from engaging in excessive force?
9     A.  If they thought there was excessive
10 force, yes.
11    Q.  If Sergeant -- then-Sergeant Crumrine
12 had to tell Officer Lopera twice to "Let him go,
13 Ken," let him go, release the hold, would
14 Officer Crumrine have been justified in not
15 checking thereafter as to whether he had actually
16 released the hold?
17       MR. ANDERSON:  Objection.  Form.
18       THE WITNESS:  I think I already answered
19 that, but I think that he should have done more
20 than just talk to him about it.
21 BY MR. SAYRE:
22    Q.  Right.  He should have actually either
23 himself physically intervened or had someone else
24 physically intervene to release the hold?
25    A.  That's correct.

Page 39

1     Q.  Okay.  Is it correct that the
2  Metropolitan Police Department teaches that it
3  generally takes 7 to 14 seconds to render a
4  subject unconscious with the use of a lateral
5  vascular neck restraint?
6     A.  I'm not -- I'm not familiar with how
7  many seconds it takes.  I think it's a lot less
8  than that.
9     Q.  Okay.  Is it correct that one of the
10 biggest dangers in administering a lateral
11 vascular neck restraint is to continue the hold
12 after the subject falls unconscious?
13       MR. McNUTT:  I'm sorry.  Could you
14 restate the question, please.
15       MR. SAYRE:  Sure.
16       THE WITNESS:  Thank you.
17       MR. SAYRE:  One of the -- it was my
18 English.  I'm still working on it.
19    Q.  One of the dangers in administering a
20 lateral vascular neck restraint is to continue the
21 hold after the subject falls unconscious?
22    A.  So I'm not familiar with what the
23 dangers are, like, by definition, but I know that
24 we train that when subjects are rendered
25 unconscious, that you don't continue to hold.

Page 40

1  BY MR. SAYRE:
2     Q.  Okay.  Have you read any documents from
3  Jim -- James Lindell?
4     A.  Possibly.  Who's James Lindell?
5     Q.  Do you know -- okay.
6        James Lindell is the father of the
7  lateral vascular neck restraint, out of the Kansas
8  City Police.
9     A.  Okay.  So, no, I didn't read his --
10 whatever he put out, but I am familiar with the
11 department purchased that from him.
12    Q.  Okay.  Take a look at what I've marked
13 here as --
14       MR. ANDERSON:  I'm just going to put an
15 objection that these were topics that
16 Michael Bland was prepared to talk about.  I did
17 not produce this witness to talk about these
18 topics.
19       MR. SAYRE:  Okay.  Some of these were
20 crossovers.  I'm not --
21       MR. ANDERSON:  You're fine.
22       MR. SAYRE:  All right.  Okay.
23       THE WITNESS:  People do a much better
24 than me.
25

Page 41

1  BY MR. SAYRE:
2     Q.  Okay.  All right.  Would you take a
3  look, please, down at the bottom of 0615.
4     A.  Yep.
5     Q.  That's the -- it says, "There are,
6  however, three main dangers of neck restraint
7  based upon the above experiments."
8        Look at number 3 on the next page.  "To
9  continue the hold after the subject falls
10 unconscious."
11    A.  Yes, I see it.
12    Q.  Okay.  And then down below, on 0616,
13 "The two greatest problems with police neck
14 restraint" -- it's about a third of the way down
15 the page.
16       "The two greatest problems with police
17 neck restraints are that officers are often not
18 taught how to regulate control of the subject by
19 the neck and when to stop compression on a
20 subject's neck."
21       Do you see those two?
22    A.  Yes.
23    Q.  What is the training of the Metropolitan
24 Police Department regarding how to regulate
25 control of a subject by the neck?

Page 42

1   A.   I'm not exactly sure how -- what the
2   training is now.
3   Q.   Okay.  And what is the training
4   regarding when to stop compression on a subject's
5   neck?
6   A.   When the subject is rendered unconscious
7   or compliance.
8   Q.   Okay.  I'm going to ask you to assume
9   that for much of the hold, Mr. Farmer had his face
10  away from Officer Lopera, meaning Officer Lopera
11  was on his back, face up.  Mr. Farmer was on his,
12  back face, up on top of Officer Lopera.  In other
13  words, it was a backward hold.
14  A.   Back-lying, we call it.
15  Q.   Back-lying hold.
16       How -- what training does the department
17  give to its officers to determine if a person in
18  that position has gone unconscious?
19  A.   Yeah, I can't actually answer the exact
20  training that we have.  I'm sorry.
21  Q.   All right.
22  A.   I got promoted too high.  We don't have
23  to do the LVNR.
24  Q.   Now, take a look at 0617.  Do you have
25  that?

Page 43

1   A.   No.
2   Q.   I'll give that to you.
3   A.   I only have 5 and 6.
4       MR. McNUTT:  Are we going to make these
5   exhibits or --
6       MR. SAYRE:  We can if you'd like.
7       MR. McNUTT:  I'm just asking.
8       MR. SAYRE:  I wasn't planning to, but we
9   can.  It's material that's been produced from me
10  and Bates stamped.
11      MR. McNUTT:  No, I understand.
12  BY MR. SAYRE:
13  Q.   All right.  Take a look at the next to
14  the last paragraph.
15      MR. McNUTT:  On 17; right?
16      MR. SAYRE:  On 617, correct.
17  BY MR. SAYRE:
18  Q.   "It has been determined by means of
19  extensive training in neck restraint field reports
20  that recruit officers require a minimum of 12
21  hours instruction, plus controlled competition to
22  make them confident and proficient in applying the
23  LVNR effectively and safely on subjects."
24      Is that provided by the Metropolitan
25  Police Department?

Page 44

1   A.   I believe so.  And I read forward.  I
2   think these are the requirements we have for the
3   department, but I can't testify for sure.
4   Q.   Okay.  By reading forward, you meant --
5   it next says, "The POST academy officer" --
6   A.   Yes.
7   Q.   -- "requires eight hours of training to
8   accomplish the same goals, and in-service training
9   should be mandated for four hours annually in
10  order for officers to retain the necessary skill
11  and agility to remain proficient in its use"?
12  A.   I believe that's the standard, but, you
13  know, Officer Bland would be better to answer that
14  than me.
15  Q.   Okay.  Now, Officer Bland testified that
16  only two hours of training are provided on an
17  annual basis.
18      Did you know that?
19  A.   I thought it was four hours, but --
20  Q.   Should it be four hours?
21  A.   I'm fine with two hours, but I would --
22  if we would make a change like that, it wouldn't
23  be my decision.  It would be a group like this
24  deciding what -- how many hours training we need
25  and why we needed to change it from two to four or

Page 45

1   from four to two.
2   Q.   Do you know why James Lindell's
3   recommendations of four hours on an annual basis
4   have been cut in half by the Metropolitan Police
5   Department --
6   A.   No, I don't.
7   Q.   -- for several years?
8   A.   No, I don't know why.
9   Q.   Okay.  Now, there has been a change in
10  policy involving the use of a lateral vascular
11  neck restraint by the Metropolitan Police
12  Department; correct?
13  A.   Yes.
14  Q.   All right.  And when did that change
15  take place?
16  A.   I believe the -- the change took place
17  in September of 2017.
18  Q.   Sure.  And why did it take place?
19  A.   In the course of reviewing this
20  incident, the Office of Internal Oversight thought
21  that the use of force policy was not as easy to
22  understand for officers, and they wanted to
23  simplify it.
24  Q.   Was that done by a board, or was it done
25  by an individual?

Page 46

1   A.   So I can talk in general how we change
2   policies and then specifically to the use of
3   force.
4   Q.   Sure.
5   A.   Most of the use of the force changes
6   are -- are based on review of critical incidents
7   or recommendations from other parts of the
8   department that want to change the use of force
9   policy.
10       They have a group that meets of training
11  experts and the detectives from OIO to discuss
12  what the problems are, what they want to -- what
13  they think the changes should be.  And then
14  they -- they make those changes.  And then it goes
15  out for a few different kinds of review.
16       Do you want me to keep going --
17  Q.   Yes, please.
18  A.   -- and talk about how we change policy?
19  Q.   Yes, please.
20  A.   Okay.  So this is more what I can talk
21  about versus the LVNR actual training.
22       So we have a system where, when you
23  recommend a policy change -- and it's a little
24  different for OIO because they do it so often, but
25  we make a lot of policy changes on the department.

Page 47

1   But as you -- a bureau commander tries to change
2   policy, they write that up.  It goes to policy and
3   research.  They make the changes.  They ask for
4   feedback.
5        So that goes out to all the bureau
6   commanders and their assistants, the chain of
7   command that recommended it, and they get feedback
8   on the changes.  And that's a two-week review.
9        Then it goes back to that bureau
10  commander.  He looks at the review, the feedback,
11  rather, of what everyone says about the policy
12  changes, and takes that into consideration before
13  the actual policy is changed.
14       And then it goes out for another review,
15  when the policy is done, to all the way up to the
16  undersheriff.
17  Q.   Is this compiled in some type of
18  findings?
19  A.   I'm not sure I understand what you mean.
20  Q.   Sure.
21       This change presumably is a change that
22  would be embodied in writing?
23  A.   Yes.
24  Q.   All right.  That's what I meant by
25  findings.  Was there -- is there some type of a

Page 48

1   writing that discusses the change and the reasons
2   for it?
3   A.   Well, sometimes there isn't the reason,
4   and sometimes there is.  But, at minimum, the
5   wording is struck out.  So you would get the
6   policy draft.  The line would be struck out of
7   what they're changing.  And then the new wording
8   would be there, highlighted.
9   Q.   What was the impetus for this particular
10  policy change?
11  A.   The Sashi Farmer/Lopera [sic] case.
12  Q.   Okay.  His death?
13  A.   Yes.
14  Q.   Okay.  Are you aware that the Henderson
15  Police Department doesn't permit any kind of neck
16  restraint?
17  A.   I was not aware of that.  But in the
18  process of changing this policy, we looked at
19  departments all across the country, who has
20  used -- who uses LVNR, who doesn't; if they
21  dropped it, why did they -- why did they stop
22  using it, before we decided to keep it in policy.
23  Q.   Did -- were you aware or were you made
24  aware that the North Las Vegas Police Department
25  does not permit any -- allow any compressions in

Page 49

1   the neck?
2   A.   I don't recall that.
3   Q.   Okay.  Did you investigate why they
4   don't permit; that is, they being Henderson and
5   North Las Vegas?
6   A.   No, I didn't.  And I don't recall any
7   conversations about Henderson or North Las Vegas.
8   Q.   Okay.  Are you -- are you -- are you
9   aware that Henderson doesn't permit neck
10  restraints?
11  A.   No, I was not aware of that.
12  Q.   These are the records that have been
13  provided to me about the courses taken by Officer
14  Kenneth Lopera while he was a police officer.
15  Could you take a look at these.
16       There are -- now, first of all, the
17  training and education of officers was something
18  that you were in charge of at one time; correct?
19  A.   Yes.
20  Q.   Okay.  And you were -- would have been
21  in charge of their curriculum?
22  A.   Curriculum?  I guess you could say I'm
23  in charge of it, but it's been set for several
24  years.
25  Q.   Could you take a look at these.  These

CHIEF JOHN MCGRATH
December 27, 2017

Page 50

are all -- it was 200-and-something courses that are listed for Officer Lopera. And can you tell me which, if any, of these provide -- I'm sorry. I'm missing a page. I think this one goes with it.
    Which, if any, of these provide training in lateral vascular neck restraint?
    MR. ANDERSON: Before you answer that, an objection that this was a topic that we prepared Officer Michael Bland to talk about and to testify on this issue.
    MR. SAYRE: Okay.
    MR. ANDERSON: You can go ahead and answer.
    THE WITNESS: I'm not -- I mean, do you want me to go through here and find the LVNR training?
BY MR. SAYRE:
    Q. If there is any. I can't find any.
    A. Well, I think it would be under defensive tactics.
    Q. Okay.
    A. So, I mean, I'm just -- I'm looking at this one page. It says "Defensive" -- I don't know what page it is, but "Defensive Tactics

Page 51

Fourth Quarter" --
    Q. What number is it?
    A. It's on the back of 118.
    Q. It should have a number of the class.
    A. I'm sorry.
    MR. ANDERSON: The number of the class.
    THE WITNESS: Oh, the number of the class. Number 19.
BY MR. SAYRE:
    Q. Okay. And how long is that hour-wise?
    A. Two hours.
    So what happens is they have defensive tactics, and then the -- what they're supposed to cover in that time is sent out by training, and one of them will be LVNR. Another one is something else.
    Q. Okay.
    A. And I wouldn't -- this doesn't tell you what specifically he was doing within that defensive tactics training.
    Q. Right.
    A. Which is good because then I won't have to try to look through all these.
    Q. That was the only thing you were able to identify?

Page 52

    A. Well, I'm sure it's all over these. Defensive tactics is four times a year, two hours a quarter, but -- so I would have to know when they did LVNR training, what quarter to look for, which I don't know.
    Q. Was it because of the death of Tashi Farmer that you started the process of reconsidering whether or not you would use the LVNR in the future and in what fashion?
    A. Yes.
    Q. All right. In 2003, a French national by the name of Philippe LeMenn was asphyxiated resulting from a neck restraint while being subdued at the Clark County jail.
    Do you recall that?
    A. Vaguely.
    Q. Why wasn't there initiated a change at the time of the lateral vascular neck restraint?
    MR. ANDERSON: Objection. Form.
    THE WITNESS: Yeah, I don't -- I'm not familiar enough with that case. I know that there was other issues besides a neck restraint that was applied to him.
BY MR. SAYRE:
    Q. Okay. In 2006, robbery suspect

Page 53

James Lewis, 37, died while police were attempting a chokehold on Lewis while he was resisting arrest.
    Do you recall that incident?
    A. No.
    Q. 2009, Dustin James "DG" -- "DJ" Boone died after three Las Vegas police officers took him into custody using a neck restraint to subdue him.
    Do you remember that incident?
    A. No.
    Q. Do you know why something wasn't started after those deaths to determine why a lateral vascular neck restraint should be used or not?
    A. I -- I don't know. Obviously, you know, I wasn't in a position that I am now. But all I know is when this was briefed, the Sheriff said, we need to look into LVNR, and that's what we did.
    Q. When you say "briefed," what do you mean by that?
    A. OIO gives a 72-hour brief to all command staff on use of force incidents. And based on that brief and the video, the Sheriff ordered a review of the LVNR.
    Q. Okay. What is meant by a "72-hour

Page 54

1 brief"?
2    A.  72 hours after the incident, the
3 assigned FIT detectives come in and give a brief
4 of what they've determined, even though it was
5 only 72 hours.  And then they leave, and then CIRT
6 does a brief of what they found, because both
7 investigations are kept separate.
8        And then after that, they leave and the
9 Sheriff and staff discuss if there's any issues
10 that we need to look at.
11    Q.  Okay.  Is that brief in writing?
12    A.  There's a --
13    Q.  The 72-hour brief.
14    A.  No, there's no writing.  It was quickly
15 after it happened and not enough time to do
16 reports.
17    Q.  So it's a presentation?
18    A.  It's -- yes.  It's more of a
19 presentation.
20    Q.  And did these two arresting officers,
21 were they the ones that put on the presentation?
22    A.  I don't recall.  But they would be --
23 there would be a lead FIT detective that would do
24 that part and a lead CIRT detective that would
25 present that part for the CIRT.

Page 55

1    Q.  Okay.  And then it went through the
2 process that you described, about whether there
3 was going to be -- what is the change?
4    A.  What is the change in policy?
5    Q.  Yeah.
6    A.  LVNR was moved from low-level use of
7 force to intermediate and -- whatever the next
8 highest one is, deadly force.
9    Q.  Deadly force?
10    A.  And we had different levels of the LVNR,
11 1, 2, and 3, and we took that out and just put all
12 levels.  You can move through the levels pretty
13 quickly.  So we wanted to make it easy for the
14 officers to understand.
15        And then the threshold for using the
16 LVNR was moved up to the aggressive level.  And
17 that's the suspects had to have aggressive
18 actions.
19    Q.  So all three levels of LVNR can be used
20 either at the intermediate level or at the deadly
21 force level?
22    A.  That's correct.
23    Q.  But not at the low level?
24    A.  Right.
25    Q.  Did you look at other police departments

Page 56

1 that have that same policy, the change?
2    A.  I don't recall if they looked at the
3 specific changes in the levels or the change --
4 moving the -- where it is on the use of force
5 chart.  I would assume so, but I don't know for
6 sure.  That was the recommendation from OIO and
7 from the trainers, and everyone basically agreed
8 to it.
9    Q.  You are a Deputy Chief.
10       How many Deputy Chiefs are there?
11    A.  I'd have to count them.  Two in patrol.
12 There's five police and one jail, corrections
13 officer.
14    Q.  Okay.  And then the next step up is the
15 chief?
16    A.  Assistant Sheriff.
17    Q.  Assistant Sheriff.  Okay.
18    A.  There's three Assistant Sheriffs.
19    Q.  You told me about Kelly; right?
20    A.  The other -- do you want the other two?
21    Q.  Please.
22    A.  Okay.  Todd Fisulo, until New Year's,
23 then he's retiring.  And then it will be
24 Charles Hank.  And then the other one is
25 Tom Roberts.  And I don't know when he's leaving,

Page 57

1 but he's leaving in two weeks.
2    Q.  All right.  So then above Assistant
3 Sheriff is the Sheriff; is that it?
4    A.  Undersheriff.
5    Q.  Undersheriff.
6    A.  And then the Sheriff.
7    Q.  Okay.  Who is the Undersheriff?
8    A.  Kevin McMahill.
9    Q.  Another Irish guy.  I was just wondering
10 how many upper level guys were Irish.
11       Okay.  And then the Sheriff?
12    A.  And then the Sheriff.
13    Q.  What's his name?
14    A.  Joe Lombardo.
15       MR. SAYRE:  Okay.  All right.  Let's
16 take a break.  I may be done.  I know Dan will
17 have two more hours of questioning.
18       THE VIDEOGRAPHER:  We are off the record
19 at 2:01 p.m.
20       (Whereupon, a recess was taken.)
21       THE VIDEOGRAPHER:  Back on the record.
22 The time is 2:06 p.m.
23 BY MR. SAYRE:
24    Q.  Did you ever make a determination, in
25 reviewing the evidence -- by "you" I mean the

Page 58

1  board, investigative body -- whether or not
2  Officer Lopera was using a rear naked choke or
3  lateral vascular neck restraint?
4     A.  That's not part of what the board would
5  determine.  I think that that is what it appeared
6  on video, but it was hard to tell for sure.
7     Q.  I'm sorry.  What is -- what appeared --
8     A.  It was hard -- it was hard to tell if he
9  had a rear naked -- rear naked choke or an LVNR,
10 to me, but I'm not an expert on that.  I think we
11 had people say that it was not per policy.
12        MR. SAYRE:  Okay.  I have nothing
13 further.  Thanks.  This gentleman is going to
14 start yelling at you now.
15        MR. McNUTT:  Depends on your answers.
16            EXAMINATION
17 BY MR. McNUTT:
18    Q.  Chief, we met earlier.  My name is
19 Dan McNutt.  I represent Ken Lopera.
20    A.  Uh-huh.
21    Q.  I just have a couple quick questions for
22 you.
23        With respect to your testimony versus
24 Officer Bland's, or Sergeant Bland's -- first off,
25 do you know Sergeant Bland?

Page 59

1     A.  Yes.
2     Q.  And what do you -- do you know that he
3  has been designated as one of the individuals most
4  knowledgeable or a 30(b)(6) witness on certain
5  topics regarding use of force policy for Las Vegas
6  Metropolitan Police Department?
7     A.  Yes.  And he was the actual subject
8  matter expert that we -- that I talked to to learn
9  more about LVNR as it relates to use of force
10 policy.
11    Q.  So would his testimony or your testimony
12 about the actual technique that was employed in
13 this incident, who would have the better, more
14 technically correct answer?
15    A.  Sergeant Bland.
16    Q.  When you watched the video, you
17 talked -- there was some discussion about the fist
18 strikes that Mr. Lopera allegedly threw.
19        Could you tell or do you know where they
20 landed on Mr. Farmer?
21    A.  No.  And that's sort of what I referred
22 to, was the report said 10 to 12 strikes.  And to
23 me, "strike" infers hitting, not just throwing a
24 punch.  So it was difficult to determine exactly
25 how many struck Mr. Farmer.

Page 60

1     Q.  Additionally, you don't know where they
2  struck, if they struck; correct?
3     A.  No.  A lot of the strikes were -- were
4  obscured by the body movement and the angle of the
5  camera.
6     Q.  You talked a little earlier about, you
7  know, the fact -- concept of a consensual stop or
8  reasonable suspicion.
9         Do you remember that testimony?
10    A.  Yes.
11    Q.  Do you know the circumstances under
12 which Officers Lopera and Lif first encountered
13 Mr. Farmer?
14    A.  Yes.
15    Q.  And what do you know about that
16 circumstance?
17    A.  Mr. Farmer was acting suspicious.
18 Officer Lopera tried to approach him.  Mr. Farmer
19 turned and fled out over a -- I don't know what it
20 was, some kind of a barrier or something, through
21 some doors, into the underneath part of the
22 casino.
23    Q.  Were you aware that there's testimony
24 that Mr. Farmer was sweating profusely?
25    A.  Yes.

Page 61

1     Q.  Were you aware that there was testimony
2  that it appeared that maybe he was under the
3  influence of drugs or alcohol?
4     A.  I was aware that that was what some
5  people said.  It was very difficult to say that it
6  was true or not.
7     Q.  Were you aware that Mr. Farmer allegedly
8  said that he had been chased by someone across the
9  Strip?
10    A.  Yes.
11    Q.  And were you aware that the place in
12 which Mr. Farmer ran was off limits to casino
13 customers?
14    A.  Yes.
15    Q.  And all those facts, do you believe that
16 there was reasonable suspicion to pursue
17 Mr. Farmer?
18    A.  I -- yes, there's reasonable suspicion
19 to -- to pursue him, to find out what he was
20 doing, to make sure he was okay.  I didn't have a
21 problem with that.
22    Q.  And are you aware that after the two
23 individuals got outside, that there was also
24 testimony that there was a belief that Mr. Farmer
25 intended to carjack a vehicle?

Page 62

1    A.  That was part of what was stated by
2  Officer Lopera; however, I didn't think that that
3  was accurate.
4    Q.  Based on what?
5    A.  The video.
6    Q.  What specific video?
7    A.  The video that showed the truck that
8  Officer -- I mean Mr. Farmer approached, that
9  Officer Lopera said he thought he was going to
10 carjack someone from the truck.  It didn't appear
11 like that was what was happening to me.
12   Q.  Was that the body cam video from
13 Officer Lopera, or was that the Venetian
14 looking-down camera?
15   A.  I can't -- I can't remember since I saw
16 both videos.
17   Q.  Would Mr. -- would Officer Lopera's
18 perception of those fast-moving events be better
19 than yours?
20   A.  Well, Officer Lopera's perception is his
21 perception.  I'm obviously looking at it just from
22 the video, with not being involved in a foot
23 pursuit or anything else.  So that's my opinion
24 based on what I saw on the video.
25   Q.  When -- and you watched -- is it correct

Page 63

1  that you've seen both videos, though?
2    A.  Yes.
3    Q.  Excuse me, the body cam video and the
4  Venetian video?
5    A.  Yes.
6    Q.  Can you tell -- I know you're not the
7  person most knowledgeable on this, but can you
8  tell whether Mr. Ken Lopera employed an LVNR 1, 2,
9  or 3?
10   A.  I can't tell.
11   Q.  Can you tell for certain whether it was
12 an LVNR or a rear naked choke?
13   A.  Well, it certainly looked like it wasn't
14 a properly applied LVNR.  Now, that might be just
15 from the suspect moving.  In other words, someone
16 moves their neck, it's going to change whether
17 you're in a properly applied LVNR.
18   Q.  Because it's difficult, when someone is
19 resisting, to put any restraint on them?
20   A.  That's correct.
21   Q.  Can you tell by any information that
22 you've seen, whether it was video or other things,
23 how long Officer Lopera actually compressed
24 Mr. Farmer?
25   A.  It was very difficult to say he did it

Page 64

1  for this many seconds because you can't tell how
2  good it was applied.
3    Q.  From video?
4    A.  From video.
5    Q.  Is there -- do you have any knowledge
6  that Officer Lopera did not release the hold when
7  it was necessary or when it was reasonable to
8  release the hold?
9    A.  I'm sorry.  Can you --
10   Q.  So -- and by the way, when I say
11 "release the hold," what I mean is release the
12 pressure on the neck as opposed to take all of his
13 hands off of Mr. Farmer.
14       Do you have any information or facts
15 regarding the idea that Mr. Lopera did not release
16 the hold when it was reasonable to do so?
17   A.  Well, so it's difficult to say when he
18 should have released the hold because only he can
19 say how much pressure he had applied.  The video
20 doesn't really explain that to you.  However, we
21 know he applied a certain amount of pressure
22 because Mr. Farmer went unconscious.
23       So somewhere in between there, you know,
24 I can't tell, you know, how much pressure was
25 applied or when he should have stopped.

Page 65

1    Q.  Of course, you don't know whether
2  Mr. Farmer went unconscious because of the hold or
3  something else?
4    A.  I don't know why he went unconscious.
5  But if you watch the video, it appears like he's
6  unconscious at some point.
7    Q.  Do you believe that Mr. -- I'm sorry.
8    A.  At some point, it appears he's
9  unconscious.
10   Q.  Do you believe that Mr. Farmer, based
11 upon the video, was actively resisting your
12 officers?
13   A.  At -- at some point, he was actively
14 resisting; however, he had a difficult time
15 complying with some of the orders because I don't
16 think they were -- he was given enough time to
17 comply.
18   Q.  Do you know how many officers it took to
19 ultimately handcuff Mr. Farmer?
20   A.  I want to say three, but it could have
21 been four.
22   Q.  It was four.
23       MR. SAYRE:  That's not a fact.
24 BY MR. McNUTT:
25   Q.  Does it typically take four officers to

Page 66

1 restrain someone if they aren't aggressively
2 resisting?
3  A. The more resistance a person -- it's
4 based on size. There's a lot of factors. But if
5 someone takes four officers to be put into
6 handcuffs, then they have to be resisting.
7  MR. McNUTT: I have no other questions.
8  MR. ANDERSON: No questions.
9  CONTINUED EXAMINATION
10 BY MR. SAYRE:
11  Q. What is the definition in the
12 Metropolitan Police Department of what is "active
13 resistance"?
14  A. I don't -- I don't recall the exact
15 definition. I mean --
16  Q. Well, is active resistance "the
17 subject's verbal or physical actions are intended
18 to prevent an officer from placing the subject in
19 custody and taking control, but are not directed
20 at harming the officer"? Let me show you the
21 document. This is 1132.
22  A. So, I'm sorry, what did you ask me?
23  Q. Okay. Active resistance means that he's
24 not -- there's no evidence he's intending to harm
25 the officer?

Page 67

1  A. Right.
2  Q. Right.
3  A. Aggressive resistance.
4  Q. And that can include breaking the
5 officer's grip?
6  A. Not wanting to be handcuffed, we
7 usually --
8  Q. Right. Aggressive resistance is on the
9 next page.
10  A. Right.
11  Q. And that's 1133. "The subject displays
12 the intent to harm the officer, themselves, or
13 another person, and prevent an officer from
14 placing the subject in custody and taking control.
15 The aggression may manifest itself through a
16 subject taking a fighting stance, punching,
17 kicking, striking, attacks with weapons or other
18 actions which present an imminent threat of
19 physical harm to the officer or another."
20  You didn't see any evidence of
21 aggressive resistance by Mr. Farmer?
22  A. I didn't -- I don't recall seeing that
23 on the video.
24  Q. And lateral vascular neck restraint is
25 something that should be applied only for

Page 68

1 aggressive resistance; correct?
2  A. That's the policy now.
3  Q. Okay. And was it then?
4  A. Well, I believe you could have used it
5 at a low level, but I don't recall what level it
6 was.
7  Q. All right. Can you -- could you have --
8  A. Restraint and control, I believe.
9  Q. All right. Could you use it sufficient
10 to cause somebody to go unconscious, where someone
11 is simply actively resisting by breaking holds?
12  A. You shouldn't.
13  Q. Right. Shouldn't have done that?
14  A. Shouldn't have.
15  MR. SAYRE: All right. I have nothing
16 further.
17  MR. ANDERSON: Nothing further.
18  THE VIDEOGRAPHER: This concludes
19 today's deposition of John McGrath. The number of
20 media used was one, and we are off the record at
21 2:18 p.m.
22  (Whereupon, the deposition concluded
23  at 2:18 p.m.)
24
25

Page 69

1  CERTIFICATE OF DEPONENT
2 PAGE    LINE    CHANGE            REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13      *  *  *  *  *
14  I, CHIEF JOHN MCGRATH, deponent herein,
do hereby certify and declare the within and
15 foregoing transcription to be my deposition in said
action; that I have read, corrected, and do hereby
16 affix my signature to said deposition under penalty
of perjury.
17
18  _____
19      CHIEF JOHN MCGRATH, Deponent
20
21
22
23
24
25

```
 1              CERTIFICATE OF COURT REPORTER
 2
     STATE OF NEVADA    )
 3                      ) ss:
     COUNTY OF CLARK    )
 4
 5        I, Kimberly A. Farkas, Certified Court
 6   Reporter licensed by the State of Nevada, do
 7   hereby certify that I reported the deposition of
 8   CHIEF JOHN McGRATH, commencing on December 27,
 9   2017, at 1:01 p.m.
10        Prior to being deposed, the witness was duly
11   sworn by me to testify to the truth.  I thereafter
12   transcribed my said stenographic notes, and that
13   the transcript is a complete, true, and accurate
14   transcription, and that a request was made for a
15   review of the transcript.
16        I further certify that I am not a relative,
17   employee, or independent contractor of counsel,
18   nor a person financially interested in the
19   proceeding.
20        IN WITNESS WHEREOF, I have set my hand in my
21   office in the County of Clark, State of Nevada,
22   this January 8th, 2018.
23
24        _____
          Kimberly A. Farkas, CCR No. 741
25
26
```