# EXHIBIT 11
# Excerpts from Michael Bland Deposition, Vol. I, 12/21/17

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

ESTATE OF TASHI S. FARMER a/k/a TASHII FARMER a/k/a TASHII BROWN, by and through its Special Administrator, Elia Del Carmen Solano-Patricio; TAMARA BAYLEE KUUMEALI'MAKAMAE FARMER DUARTE, a minor, individually and as Successor-in-Interest, by and through her legal guardian, Stevandra Lk Kuanoni; ELIAS BAY KAIMIPONO DUARTE, a minor, individually and as Successor-in-Interest, by and through his legal guardian, Stevandra Lk Kuanoni,

      Plaintiffs,

    vs.

Case No. 2:17-CV-01946-JCM-PAL

LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; OFFICER KENNETH LOPERA, individually and in his Official Capacity; and Does 1 through 50, inclusive,

      Defendants.

_____

VIDEOTAPED DEPOSITION OF SERGEANT MICHAEL BLAND

Las Vegas, Nevada

December 21, 2017

Reported by: Kimberly A. Farkas, RPR, CCR #741

Job: 23499

SERGEANT MICHAEL BLAND

December 21, 2017

Page 22

1  A. Same. I've heard of him. There's a
2  good chance that they know me. And if I see them,
3  I would know them. But as far as name to face,
4  no.
5  Q. Okay. First of all, let's do this. Let
6  me ask you to turn over to page 7 of 8. Let's
7  start with paragraph 2. Read that to yourselves
8  just for a moment. It begins, "According to her
9  statement, Officer Lif."
10     Okay. Now, a consensual encounter is an
11 encounter where an officer attempts to interact or
12 communicate with a citizen without any probable
13 cause or suspicion of wrongdoing; correct?
14  A. Yes.
15  Q. And a citizen, upon a consensual
16 encounter, is free to talk to or not talk to an
17 officer; correct?
18  A. Yes.
19  Q. In fact, a citizen can walk away from a
20 consensual encounter without elevating the
21 consensual encounter by the act of him walking
22 away to reasonable suspicion of wrongdoing just by
23 them walking away?
24  A. Say that one more time. Just the last
25 little bit was --

Page 23

1  Q. Sure.
2     A consensual encounter is based upon,
3  among other things, a lack of reasonable suspicion
4  of wrongdoing?
5  A. Yes.
6  Q. Or any probable cause; correct?
7  A. Yes.
8  Q. And if a person chooses to walk away
9  from a consensual encounter, or run away, for that
10 matter, that act does not raise the consensual
11 encounter to a level of reasonable suspicion, just
12 the act of leaving?
13  A. Walking away, yes, it does not.
14  Q. Right.
15  A. They are free to walk -- a consensual
16 encounter, they are free to walk away.
17  Q. Okay. What about running away?
18  A. Illinois versus Wardlow. If somebody
19 flees from police presence, depending on those
20 circumstances, there can be reasonable suspicion
21 of criminal activity.
22  Q. Okay. What -- what other -- what about
23 walking fast away?
24  A. If they're just leaving the consensual
25 encounter, you can -- if it was consensual

Page 24

1  encounter, they can choose not to answer questions
2  and be there.
3  Q. Now, look at the next paragraph, please.
4     "LVMPD policy states an officer may
5  initiate a foot pursuit of any individual the
6  officer reasonably believes is about to engage in,
7  is engaging in, or has engaged in criminal
8  activity. As Officer Lopera began to chase" --
9     (Interruption by telephone.)
10     MR. McNUTT: We're five for five, Fred.
11     MR. SAYRE: I don't know why that keeps
12 doing that.
13     MR. McNUTT: I think it was Darren
14 calling him.
15     MR. SAYRE: It's a consensual. There's
16 no reasonable suspicion it was going to go off
17 again.
18  Q. Let me repeat.
19     "LVMPD policy states that an officer may
20 initiate a foot pursuit of any individual the
21 officer reasonably believes is about to engage in,
22 is engaging in or has engaged in criminal
23 activity. As Officer Lopera began to chase
24 Farmer, he had no reasonable suspicion or probable
25 cause to believe that Farmer had been involved in

Page 25

1  any criminal conduct."
2     Do you agree with that statement?
3  A. Do I agree that -- whether he had
4  reasonable suspicion, or do I agree with if there
5  is no reasonable suspicion, that you can't pursue?
6  Q. The way I read the paragraph, the
7  officer who's writing it says that Officer Lopera
8  had no reasonable suspicion or probable cause to
9  believe that Farmer had been involved in any
10 criminal conduct.
11     My question is do you agree with that?
12     MR. McNUTT: Objection. Form.
13     MR. ANDERSON: Objection. Form as well.
14 BY MR. SAYRE:
15  Q. You can answer.
16  A. Just so I understand, do I agree with --
17 if you're asking do I think Officer Lopera had
18 reasonable suspicion or --
19  Q. Do I agree -- I'm asking you if you
20 agree with the statement by this officer who wrote
21 that.
22  A. From what I see, I could see -- I see
23 enough to do a foot pursuit.
24  Q. Okay. So you believe that there was
25 something -- there was something that caused

SERGEANT MICHAEL BLAND
December 21, 2017

Page 26

1 Officer Lopera to have reasonable suspicion?
2   A.  I don't know what Officer Lopera because
3 I never heard a statement from him.  But looking
4 at -- looking at the video, if I was that officer
5 and I see a subject, you know, going into an
6 employee-access-only area, then I would have
7 enough suspicion to chase that guy.
8   Q.  So you do not agree with the statement
9 in this arrest report, the one I just asked you to
10 read, that paragraph; is that correct?
11   A.  I wouldn't say I don't agree because I
12 don't know what Officer Lopera was -- was thinking
13 and why he went after him.
14   Q.  So -- all right.
15   A.  I would have to hear what --
16 Officer Lopera's reasoning for why he was chasing
17 him.  Did he think that going through an employee
18 area only was, you know, suspicious.
19   Q.  I'm going to ask you to assume that this
20 officer who was writing this never talked to
21 Officer Lopera about why he did whatever he did,
22 meaning that once there was a criminal charge in
23 place, Officer Lopera would have exercised his
24 Fifth Amendment privilege, and there would be no
25 discussing it with this arresting officer.

Page 27

1   A.  Yes.
2   Q.  So his statement here is based upon his
3 examination of the videos and whatever other
4 material that he's examined.
5       Do you have any way to agree or disagree
6 with his statement that -- that Officer Lopera had
7 no reasonable suspicion or probable cause to
8 believe that Farmer had been involved in any
9 criminal conduct?
10       MR. McNUTT:  Objection.  Form.
11       MR. ANDERSON:  Objection form, too.
12       THE WITNESS:  I was -- involved in
13 criminal conduct or about to be involved in
14 criminal conduct?  You asked -- you asked whether
15 he had any reasonable suspicion.  I don't have all
16 the facts that this investigator had, but I would
17 disagree and say that based on what -- based on
18 the information I have, that him running into an
19 employee-access-only area and with his -- you
20 know, the behavior you're seeing on the video, I
21 would have reasonable suspicion to chase that
22 person.
23 BY MR. SAYRE:
24   Q.  Okay.  Because he was -- primarily
25 because he was running in an employee-only-access

Page 28

1 area?
2   A.  That would be -- that would be my main
3 concern.
4   Q.  Okay.  And what would that crime be?
5   A.  Well, my main concern would be is he
6 goes through that door and he stabs somebody, and
7 I just pick up my coffee and I leave.  Or he runs
8 up to the 21st floor and starts firing a gun
9 through a hotel window, and I just grab my coffee
10 and I leave.
11   Q.  What crime would be involved in him
12 running through an employee-access area?
13   A.  Well, if he was fleeing, you know.
14 If -- once again, I don't know what the officer
15 was necessarily trying to talk to him in the first
16 place about, but it could be as simple as
17 obstruction charge.
18   Q.  Obstruction of what?
19   A.  Well, if he's trying to, you know, talk
20 to him.  I don't know if he was under the
21 influence of drugs.  I don't know what the officer
22 was thinking at that time.
23   Q.  Okay.  Well, the information that is in
24 this arrest report and that has been testified to
25 by Officer Lif -- by the way, do you know Officer

Page 29

1 Lif?
2   A.  Yes.
3   Q.  Okay.  She says that Mr. Farmer
4 approached them, sweating profusely, and said, "Do
5 you know where a water fountain is?"
6       And they said, Well, walk around; you
7 can probably find one.  And they asked him, Why
8 are you perspiring, and he said some people were
9 following him or chasing him.  And he asked if he
10 could be escorted down to the valet, and they
11 agreed.
12       And, at that point, he started running
13 or walking fast through the -- into the
14 employee-only-access area.  That's the information
15 I'm going to ask you to assume.
16   A.  Okay.
17   Q.  All right.  Based upon that information,
18 did Officer Lopera have reasonable suspicion to
19 chase and arrest Mr. Farmer?
20   A.  Based on that information, no.
21   Q.  Now, Officer Lopera -- take a look at
22 the next-to-last paragraph on the page.
23   A.  The ECD one?
24   Q.  Yes, sir.  "After cycling ECD seven
25 times."  Read that to yourselves, please.

Page 30

1    Okay. "After cycling the ECD seven
2  times." We'll stop there.
3    Does Metropolitan Police policy allow an
4  officer to cycle an ECD seven times?
5    A. Yes. However, the policy says after
6  three cycles of ECD, the device will be deemed
7  ineffective unless other specific circumstances
8  deem otherwise. Meaning, I go ahead and I
9  utilized the ECD three times. If -- if I still
10 haven't been able to take this person into
11 custody, typically, you're looking at, well, it's
12 something to do with the probe spread, the device
13 isn't working effectively. But -- do you want a
14 scenario?
15    Q. Go ahead.
16    A. Okay. An example -- a hypothetical
17 example of where I would be perfectly fine using
18 an ECD more than three times and still be within
19 policy was, let's say, I'm a 110-pound officer. I
20 have a 400-pound, you know, subject I'm trying to
21 take into custody. The person is coming at me,
22 trying to -- you know, trying to hit me. I
23 utilized my ECD. It's effective. The person goes
24 down. Okay. I'm by myself, so I can't handcuff,
25 you know, by myself in the situation.

Page 31

1    The five seconds ends. The guy stands
2  back up. He starts to do the exact same thing. I
3  hit him again with the ECD. I'm still waiting for
4  my backup. He goes down.
5    Five seconds goes. He gets back up.
6  Guy coming at me again. I hit him. I'm still
7  waiting for my backup. Now I've been at it three
8  times. I've used three cycles of the ECD. Person
9  goes down. And now he gets up a fourth time.
10 There's no expectation that now I have to go put
11 my taser away and deal with this person hands-on.
12    So that would be a specific situation
13 where I could go ahead and I could tase him a
14 fourth time if I'm waiting for my backup and his
15 behavior hasn't changed each time he gets up.
16    The policy -- what policy says is after
17 three times it will be deemed ineffective
18 unless -- I have to look exactly how it was
19 worded, but it basically says after three times,
20 it will be deemed ineffective unless there's
21 specific circumstances that we articulate.
22    Q. Do you recall what the specific
23 circumstances are that the policy says will allow
24 you to go past three times?
25    A. It doesn't say what they are. I think

Page 32

1  the way I'm wording it is probably pretty close.
2    Q. Okay. Did you see some reason in
3  this -- looking at the two videos, some reason why
4  Officer Lopera should have recycled seven times?
5    A. No.
6    Q. Was his -- was his recycling of the ECD
7  seven times, in your opinion, outside of policy?
8    A. Yes.
9    Q. And the last time he recycled was nine
10 seconds in length. Is it correct that the
11 Metropolitan Police Department does not allow you
12 to cycle for more than five seconds each time?
13    A. Yes and no. No -- I -- we deploy a
14 taser, one cycle is five seconds. At that point,
15 you need to reassess. There are specific
16 situations where I can hold that trigger and go
17 longer than five seconds.
18    You want another example?
19    Q. Sure.
20    A. Okay. I have somebody who has a knife.
21    Q. Yeah.
22    A. They have -- they have a knife. I go
23 ahead and I utilize the taser. They -- my partner
24 is there. I want my partner to go and cuff them
25 under power and basically take them into custody,

Page 33

1  but my partner is running up there.
2    My concern is as my partner gets up
3  there to start handcuffing, the five seconds ends,
4  and now my partner is in close proximity of that
5  knife. So in that situation, I would hold that
6  trigger down. If I knew my partner was going in
7  there, the knife is still either in close
8  proximity or in hand, my partner is going into a
9  handcuff, I'm going to hold that trigger down
10 until that knife is away. And then I'll go in.
11    So it might go 6, might go 7 seconds.
12 It's a fairly rare situation, but there are
13 situations where you could articulate and justify
14 doing longer than five seconds.
15    Q. Did you see any reason why Mr. --
16 Officer Lopera would be justified in using his ECD
17 on the last -- ECW on the last occasion for nine
18 seconds?
19    A. I do not.
20    Q. Do you believe that was out of policy?
21    A. Yes, I do.
22    Q. Take a look at this book, if you would.
23 Page 162. And, I'm sorry, it's a little bit
24 confusing, but if you look, there's Bates stamps.
25 And the last Bates stamp before 162 is 155. And

Page 34

1  before that is LVMPD0267.
2  A. Oh, sorry. I was way too far deep.
3  Q. No. That's okay.
4  A. I'm sorry. You said 162?
5  Q. Okay. 162.
6  A. I'm on 162.
7  Q. Okay. It says, "Personnel should use an
8  ECW for one standard cycle of five seconds and
9  then evaluate the situation to determine if
10 subsequent cycles are necessary."
11     You agree with that?
12 A. Yes.
13 Q. "Personnel should consider that
14 exposures to ECW for longer than 15 seconds,
15 whether due to multiple applications or continuous
16 cycling, may increase the risk of death or serious
17 injury."
18     Do you agree with that?
19 A. I'm not a doctor, but I've seen this
20 statement before.
21 Q. Is that the policy of the Metropolitan
22 Police Department?
23 A. Is this our policy right here we're
24 looking at?
25 Q. In part.

Page 35

1     MR. ANDERSON: I'd object. It's not --
2  I think it's POST.
3     MR. SAYRE: It's POST. Yeah. Sorry.
4     MR. ANDERSON: This is not the LVMPD
5  policy.
6  BY MR. SAYRE:
7  Q. Is POST a --
8  A. Oh, this is our lesson plan?
9  Q. Yeah. Is POST recognized as
10 authoritative by the Metropolitan Police
11 Department?
12 A. Yes. I believe this is -- I believe
13 this is our --
14    MR. ANDERSON: Part of it. It was a
15 whole bunch of different documents put together.
16    THE WITNESS: Okay. I know this is --
17 this is our lesson plan right here, but this --
18 this page just looks --
19    MR. ANDERSON: Just so we're clear, what
20 he's looking at is California POST; correct?
21    MR. SAYRE: Actually, he's looking at
22 whatever you produced to me. This is not the
23 California POST.
24    MR. ANDERSON: Okay. This is what I
25 produced?

Page 36

1     MR. SAYRE: Yes.
2     MR. ANDERSON: Okay. Then go ahead.
3     MR. SAYRE: I'll sing out when we get to
4  the California POST.
5     MR. McNUTT: It's got your Bates label
6  on it.
7  BY MR. SAYRE:
8  Q. It says, at the bottom, "POST Ethical
9  Use of Force 2015." It also says "2011 Electronic
10 Control Weapon Guidelines."
11 A. Yeah, this right here isn't from our --
12 I've seen the statement, though, as far as "may
13 increase risk of the death or serious injury."
14 Q. Right.
15 A. And that is what we -- that is what we
16 teach.
17 Q. Right. Any subsequent application
18 should be independently justified; correct?
19 A. Yes.
20 Q. In fact, after the first five seconds of
21 application, each five seconds thereafter has to
22 be independently justified?
23 A. Yes.
24 Q. Do you believe that any of the
25 applications of the ECW by Officer Lopera were

Page 37

1  justified?
2  A. I could see the first one.
3  Q. Okay. After that?
4  A. Not that I see.
5  Q. Okay. So the subsequent applications
6  would be out of policy?
7  A. In my opinion, yes.
8  Q. Right. And "out of policy" means
9  unreasonable?
10 A. Yes.
11    MR. McNUTT: Objection. Form.
12 BY MR. SAYRE:
13 Q. Now, take a look, if you would, please,
14 at 0616. It's two or three pages over.
15 A. I'm there.
16 Q. Okay. This is from a book or treatise
17 by James W. Lindell.
18    Do you know who that is?
19 A. Yes.
20 Q. Okay. He's one of the two principal
21 authors of the -- the NVRD, right, the --
22 A. LVNR.
23 Q. LVNR. Sorry.
24    Now, it says here, if you look about --
25 down about, say, the third paragraph, small

SERGEANT MICHAEL BLAND
December 21, 2017

Page 38

paragraph. "The two greatest problems with police neck restraint are that officers often" -- "are often not taught how to regulate control of a subject by the neck and when to stop compression on a subject's neck."
   Do you agree with that?
A. I would say the biggest problem with neck restraints are if they're wrongly applied.
Q. Okay. Let's take a look at what I now am going to refer to as POST -- California POST documents. And they're near the end of the booklet.
   Take a look at -- it says "Basic Course Workbook Series Learning Domain 20, Use Of Force."
   Do you see that?
A. Do you have a page?
Q. It doesn't have a page.
A. Oh, I'm sorry. That's it?
Q. That's it. And then turn over -- the next page is 6-4, Learning Domain 20, Chapter 6-4.
   Do you have that?
A. I'm sorry. One more time.
Q. Sure. It's Learning Domain -- down at the bottom, it says, "LD 20, Chapter 6, Consequences of Unreasonable Force." It's the

Page 39

very next page. Yeah. You've got it right there.
A. This says 4-8.
Q. 6-4.
A. Maybe I'm completely on the --
Q. Maybe I've done something wrong.
   MR. ANDERSON: No. We have 4-8.
   MR. SAYRE: Oh, yeah, the previous one.
   THE WITNESS: Okay. Here we go.
BY MR. SAYRE:
Q. Okay. All right. It says, "Unreasonable force occurs when the type, degree, and duration of force employed was not necessary or appropriate."
   Do you agree with that?
A. I'd agree with that.
Q. Okay. Is that -- do you teach that?
A. Not that specific verbiage.
Q. Okay.
A. But same concepts.
Q. Look at the next page, please, which is 6-7. It's titled "Failure to Intervene."
   It says, "Intervention is the act of attempting to prevent or attempting to stop the inappropriate or unlawful behavior of another."
   Do you see that?

Page 40

A. Yes.
Q. Do you agree with that?
A. "Intervention" can mean a lot of things beyond that. But as far as within police work and duty to intervene, yes.
Q. All right. Do you teach, at the Metropolitan Police Department, that if somebody is engaged in unreasonable or unnecessary force, that it is a duty of another officer to intervene?
A. Yes. If it was reasonably -- they're reasonably able to.
Q. All right. And what does that mean, "reasonably able to"?
A. There's no expectation that you get in a physical fight with an officer to stop them from doing what they're doing. But if you're in a position -- you're in a position where you can stop somebody who is using unreasonable force, then you're supposed to do it.
Q. Okay. Now, suppose that somebody has put a hold on the neck of an individual. Could be either an LVNR or it could be a rear naked choke. And after 27 seconds, it's recognized by an officer who is close by that the subject has gone unconscious. Right? Got that so far?

Page 41

A. Yes.
Q. All right. And the officer that has got the chokehold on him, whether it was an LVNR or a rear naked choke or whatever, continues to apply that same choke on the individual for another 47 seconds. Okay?
A. Yes.
Q. Is that unreasonable force by the officer that's applying the choke after he's been told to let go?
A. If the officer -- if the officer knows that that person is unconscious and, he continues to hold, yes, that would be unreasonable.
Q. Okay. Now, if the officer tells him, the attending officer, the close by, says, "Let him go," and the officer refuses and continues to apply the hold for another 47 seconds, does the officer who has seen that the guy has gone unconscious, subject, does he have a duty to further intervene besides simply saying, "Let him go"?
A. Yes. If he's recognizing that the person is unconscious, and he -- he's telling him to let him go because he is unconscious, and he's not letting go, he's going to have to take some

SERGEANT MICHAEL BLAND

December 21, 2017

Page 42

1  type of further effort, tell him again or start
2  to -- you know, grabbing his arm, say, "Hey, let
3  go, let go."
4      Q.  Okay.  So if he's told him once after 27
5  seconds, does there begin to develop a danger of
6  serious injury or death if the man is unconscious,
7  the subject?
8          MR. ANDERSON:  Objection.  Form.
9          Go ahead.
10         THE WITNESS:  Once again, not a doctor.
11 I would say it was unreasonable to continue
12 holding it.
13 BY MR. SAYRE:
14     Q.  All right.
15     A.  As far as if it's a -- if he's
16 continuing to squeeze for another 20 seconds.
17     Q.  Another 47 seconds.
18     A.  -- oh, sorry, 47 seconds, obviously,
19 there's going to be an increased risk of some type
20 of injury occurring.
21     Q.  Such as death?
22     A.  I'm not a doctor.  I mean, could be.
23 I've seen people held in neck restraints, you
24 know, in -- in training and fights for long
25 periods of time.  But if he is unconscious,

Page 43

1  obviously it's a -- I'm sure -- I would assume
2  that that would be a potential.
3      Q.  Have you seen people held in neck
4  restraints for a long period of time after they've
5  been rendered unconscious?
6      A.  I have not seen -- I've read a report
7  once, when first doing studies on neck restraints,
8  and they put basically inflated -- almost like an
9  inflated pillow that would basically render
10 somebody unconscious very, very quick, just
11 basically to study the effects.  And people were
12 held in those for, you know, up to -- up to a
13 minute, and there wasn't any -- according to the
14 report I read, there wasn't any -- they didn't
15 die.
16     Q.  Does the Metropolitan Police Department
17 teach that you can hold somebody up to a minute in
18 a neck restraint if they have gone unconscious?
19     A.  No.  Absolutely not.
20     Q.  Does the Metropolitan Police Department
21 teach that you can hold somebody in a neck
22 restraint for any length of time after he's gone
23 unconscious?
24     A.  No.  With the exception of just person
25 goes unconscious, they're still on top of me, and

Page 44

1  roll them over.
2          But as soon as I'm no longer in a
3  position of disadvantage, then I would let go.
4  We're talking very -- very, very, you know,
5  short -- short timeframe.
6      Q.  How short?
7      A.  Couple seconds.
8      Q.  All right.  Beyond that, is that
9  unreasonable force?
10     A.  The -- yes.
11     Q.  Continuing to hold a subject in a neck
12 restraint when they have gone unconscious.
13     A.  Yes.  Unless there's, you know,
14 specific -- once again, the guy's on top of me on
15 my back.  It could take, two, three, four seconds
16 for me to roll him over, but just continuing to
17 arbitrarily hold onto the neck restraint, yes --
18     Q.  Once the subject has gone unconscious,
19 is it unreasonable force to continue to apply the
20 neck restraint for another 47 seconds?
21     A.  Yes.
22     Q.  And does that put the subject in danger
23 of death?
24         MR. ANDERSON:  Objection.  Form.
25         THE WITNESS:  Once again, goes back to

Page 45

1  the same thing.  I'm not a medical doctor.  But we
2  would teach -- we would teach that per training
3  material, yes.
4  BY MR. SAYRE:
5      Q.  If an officer tells a person that's
6  applying a neck hold, compression hold, whether it
7  be a lateral vascular neck restraint or a rear
8  naked choke, that a person has gone unconscious
9  and to let him go, and the officer continues to
10 maintain that hold unabated, does the officer have
11 a responsibility to go in and pull the person's
12 hands off of the neck of the subject?
13     A.  Yes.  If he's recognizing that he's
14 still applying it, if he -- he says, "Hey, let go
15 of the neck restraint."  He sees the guy is
16 unconscious, and he's recognizing that he is
17 actually still doing -- not, you know, grabbing
18 legs or doing whatever else, but he recognizes
19 that he's still doing it, then, yes, he has a duty
20 to take further efforts to stop that neck
21 restraint.
22     Q.  And if that officer, the one who has the
23 duty to intervene, fails to intervene, is that a
24 violation of the Fourth Amendment federal civil
25 right?

SERGEANT MICHAEL BLAND
December 21, 2017

Page 46

1  MR. McNUTT: Objection. Form.
2  MR. ANDERSON: Objection. Form.
3  THE WITNESS: That I don't -- I don't
4  know. I can tell you the answer to policy.
5  BY MR. SAYRE:
6  Q. Take a look at page 6-8, where it says,
7  "Fifth Amendment Protection."
8  A. Yes.
9  Q. "The United States Constitution protects
10 individuals from unlawful actions of peace
11 officers."
12     Now, you're trained in the Fourth
13 Amendment; right?
14 A. Yes.
15 Q. "Note: The officer who fails to
16 intervene for whatever reason is also held
17 accountable by the United States Code."
18     Do you agree with that?
19 A. If that's what it says in -- where in
20 the Fourth Amendment does it actually say that
21 phrase?
22 Q. To the left of the phrase, it says
23 "Fourth Amendment Protection."
24 A. No, no. I understand -- I understand
25 that. But is that phrase in the actually in the

Page 47

1  Fifth Amendment?
2  Q. No. This is a statement.
3  A. Oh, okay.
4  Q. Fourth Amendment doesn't say if you're
5  holding a person in a compression neck hold past
6  the time that they become unconscious, that it
7  becomes a violation of the Fourth Amendment.
8  A. No. I'm just saying --
9  Q. This is -- this is a book which is part
10 of the basic course material of the California
11 Commission on Peace Officers Standards and
12 Training. California POST.
13 A. Yes.
14 Q. Do you know California POST to be
15 different from Nevada POST?
16 A. I don't know what's in California POST.
17 Q. Okay. Well, does Nevada POST teach that
18 it's a Fourth Amendment violation to fail to
19 intervene if a person is engaged in unlawful
20 action, a peace officer?
21 A. I don't know. What we teach as far as
22 policy -- as far as policy, that we have a duty to
23 intervene. But as far as being a Fourth Amendment
24 violation for that officer who doesn't intervene,
25 I haven't taught that.

Page 48

1  Q. Okay. So is it fair to say, then, that
2  the Las Vegas Metropolitan Police Department does
3  not teach its officers that to fail to intervene
4  when a person is engaged in an unlawful action of
5  unreasonable force on an individual is a violation
6  of the Fourth Amendment to the United States
7  Constitution?
8  MR. McNUTT: Objection to form.
9  MR. ANDERSON: Objection. Form.
10 THE WITNESS: Yeah, I don't know. I
11 don't know if that's something that's -- that's
12 covered. Like I say, we cover it as far as -- as
13 far as an aspect of policy. That's how we --
14 BY MR. SAYRE:
15 Q. Okay. Do you agree that the
16 Metropolitan Police Department teaches that
17 unreasonable force is a violation of the Fourth
18 Amendment --
19 A. Yes.
20 Q. -- of the United States Constitution?
21 A. Yes.
22 Q. What you don't know is whether the
23 failure to intervene when someone is engaged in
24 unreasonable force is taught by the Metropolitan
25 Police Department to be also a violation of the

Page 49

1  Fourth Amendment?
2  A. Yes.
3  Q. Okay. How long have you -- how long did
4  you teach issues of Fourth Amendment protection
5  for the Nevada Metropolitan Police Department?
6  A. I've taught use of force for 10 years.
7  Q. Okay. And you do -- as you sit here,
8  you do not remember whether the Metropolitan
9  Police Department has ever taught, in those 10
10 years that you're aware of, that the failure to
11 intervene when a person is engaged in unreasonable
12 force against a subject is a violation of the
13 federal -- of Fourth Amendment civil rights?
14 MR. ANDERSON: Objection. Form.
15 THE WITNESS: Reword.
16 BY MR. SAYRE:
17 Q. I'll try.
18    Is it your testimony that you cannot
19 remember in those 10 years whether the
20 Metropolitan Police Department has taught that it
21 is a violation of the Fourth Amendment rights of
22 an individual for an officer to fail to intervene
23 when the first officer is engaged in unreasonable,
24 unnecessary force?
25 A. Yes, we haven't -- we haven't taught the

Page 50

1 duty to intervene as a Fourth Amendment -- as a
2 Fourth Amendment standard.
3   Q. Okay. Take a look at page -- look at --
4 this would be Learning Domain 20, Chapter 4-10.
5   A. I'm there.
6   Q. Okay. It says, "The potential hazards
7 of improperly applied hold."
8       Do you see that up in the left margin?
9   A. Yes.
10  Q. It says, "If the carotid restraint hold
11 is not properly applied, the risk of injury to the
12 subject increases."
13      Do you agree with that?
14  A. Yes.
15  Q. "The following charts illustrate some of
16 the possible dangers of an improperly applied
17 hold." It says, "Improper action. Maintaining
18 compression after subject has been rendered
19 unconscious."
20      Do you agree that that is a potential
21 danger of an improperly applied carotid restraint
22 hold?
23  A. Holding onto a neck restraint too long?
24  Q. Yes.
25  A. As far as being a danger?

Page 51

1   Q. Yes.
2   A. Yes.
3   Q. Look at the next page, which is 4-11.
4 It says, "Police officers must take appropriate
5 precautions to ensure the subject's recovery." It
6 says, "Action. Release the hold. Maintaining the
7 hold beyond the time the subject loses
8 consciousness can lead to physical complications
9 for the subject."
10      Do you agree with that?
11  A. What -- I mean, what physical
12 complications specifically?
13  Q. Well, brain damage or death.
14  A. And, once again, not a medical doctor.
15 We should be -- we should be letting go once they
16 go unconscious.
17  Q. And why should you be letting go once
18 they go unconscious?
19  A. Because you can't really resist at that
20 point. And, obviously, something can -- you know,
21 it's not healthy.
22  Q. Well, like what is not healthy about it?
23  A. To hold somebody in a neck restraint for
24 too long. It can lead to physical complications.
25  Q. All right.

Page 52

1   A. I'm making that assumption.
2   Q. Okay. All right.
3       All right. Let's go back to the -- the
4 arrest report, please.
5   A. Okay.
6   Q. Take a look at page 5 of 8. And look
7 where it says 2:58.
8       Do you find that?
9   A. Yes.
10  Q. Okay. Now, just for the purposes of
11 understanding, this means 2 minutes and 58 seconds
12 from the time that the body camera was turned on.
13  A. Yes.
14  Q. Okay. It says, "Officer Lopera appeared
15 to put Farmer in some type of neck restraint."
16      Now, let me stop there.
17      Did you see in either of the videos
18 Officer Lopera putting Mr. Farmer into some type
19 of neck restraint?
20  A. The video -- the best video that can
21 kind of show that is the security camera. I'm
22 making estimations. Couple hundred feet away.
23 Maybe hundred feet away. I don't know.
24  Q. It was farther away than --
25  A. Okay. It's fairly -- at a fair

Page 53

1 distance. You can see an arm. You can make out
2 what arm goes around his neck. Can't really see
3 any -- looks like another arm is on top of his
4 head. It appears that he's putting him in a neck
5 restraint.
6   Q. Okay. You've been trained in how to
7 apply a lateral vascular neck restraint?
8   A. Yes.
9   Q. Okay. And what was the length of your
10 initial training, how many hours?
11  A. 12 hours.
12  Q. And then you're required to be retrained
13 every year for four hours?
14  A. We do two hour -- we do two-hour
15 quarterly.
16  Q. "Two-hour quarterly," what does that
17 mean?
18  A. We have quarterly defensive tactics, so
19 each quarter we have defensive tactics we put out
20 that our defensive tactics instructors, they teach
21 their squad. So we have one quarter that's
22 devoted to LVNR each year.
23  Q. Okay. So that means two hours a year?
24  A. Yes.
25  Q. Okay. Why two as opposed to four?

Page 54

1  A. That's a decision made by the
2  department.
3  Q. Okay. Do you know that four is the
4  recommended time for retraining each year by
5  Mr. Lindell?
6  A. Yes.
7  Q. Okay. Why is that not followed?
8  A. Once again, it's a -- the department.
9  That's a department decision. Above my pay grade.
10  Q. Okay. Did they specifically and
11  intentionally decide not to do four hours per
12  year?
13  A. We used to do -- we used to do four
14  hours, and then I'm guessing four or five -- four
15  or five years ago, maybe, they switched back down
16  to two hours. Or not switch it back. They made
17  it two hours.
18     We do eight hours of quarterly training
19  a year, and I believe the thought process was half
20  of that time is devoted to LVNR doesn't give
21  enough time to devote to other areas of defensive
22  tactics.
23  Q. All right. So they lessened up on the
24  amount of retraining training each year for LVNR
25  approximately four or five years ago?

Page 55

1  A. It might be longer ago than that. I
2  don't -- that information I don't have in front of
3  me. But we used to teach for four hours. We used
4  to do research for four hours. Now we do two
5  hours.
6  Q. Have you applied a lateral vascular neck
7  restraint hold?
8  A. Yes.
9  Q. Against a subject?
10  A. Yes.
11  Q. All right. How many times?
12  A. Against a suspect? Maybe twice. Long
13  time ago.
14  Q. Can you tell by looking in the video
15  whether Officer Lopera is applying a lateral
16  vascular neck restraint?
17  A. From what I can see in the video, I
18  don't see an LVNR being applied.
19  Q. Okay. What do you see?
20  A. It's hard to -- it's hard to tell
21  because I can't see every aspect of the arms. But
22  I can see an arm encircles his neck. And I can
23  see a hand or an arm that looks like it's on the
24  top of his head or on some portion of the top
25  portion of his head. Somewhere from the nose up,

Page 56

1  ears up, I see an arm or a hand. That's the best
2  I can make out.
3  Q. All right.
4  A. And if it was an LVNR, I wouldn't see
5  the hand there.
6  Q. If it was a rear naked choke, you
7  wouldn't see the hand there either; correct?
8  A. No. I could.
9  Q. All right. You're saying a rear naked
10  choke would have a hand on top of the head?
11  A. Sometimes.
12  Q. Tell me about your training in applying
13  a rear naked choke.
14  A. I'm a third-degree black belt in
15  Brazilian jujitsu. Been doing Brazilian jujitsu
16  since 1996. I've -- I've coached everybody from
17  kids to, you know, recreational, people doing
18  classes, to professional fighters. So, you know,
19  I've cornered fighters. I'm a judge for -- I'm a
20  sanctioned judge for mixed martial arts, so I have
21  a bit of experience with rear naked chokes.
22  Q. Have you ever applied a rear naked choke
23  to a suspect?
24  A. No.
25  Q. Can you say conclusively that the hold

Page 57

1  that you see in this distant video is a rear naked
2  choke as opposed to simply a poorly applied
3  lateral vascular neck restraint?
4  A. Can -- I'm sorry. Rephrase that.
5  Q. Sure.
6     Can you say conclusively that the hold
7  that you see at some distance in the video is a
8  rear naked choke as opposed to a poorly applied
9  lateral vascular neck restraint?
10  A. No, I could not say conclusively that
11  it's a rear naked choke.
12  Q. Okay. It could be a poorly applied
13  lateral vascular neck restraint?
14  A. Yes.
15  Q. Let's go back to the paper again.
16     You see it says that Officer -- at 2:58,
17  "Officer Lopera appeared to put Farmer in some
18  type of a neck restraint."
19     At 3:13, it says, "Officer Lopera asked,
20  'Is he out yet?'"
21     How is an officer trained by the
22  Metropolitan Police Department to determine
23  whether or not a subject has been rendered
24  unconscious by a lateral vascular neck restraint?
25  A. How is the department trained --

Page 58

1  Q. What is the training? What is the
2  procedure the department teaches to officers of
3  how to determine whether a person has gone
4  unconscious from the application of a lateral
5  vascular neck restraint?
6  A. For the most part, we teach -- if they
7  cease to resist, meaning there's no more -- their
8  body's -- their body's relaxed, their body has
9  become relaxed, you can feel that they're -- you
10 know, if somebody is here, and now they're out,
11 and they're no longer using, you know, muscle or
12 physical resistance, to go ahead and -- whether to
13 hold himself up or whether to resist.
14 Q. How are you able to be sure that a
15 person has gone unconscious simply because they're
16 not actively resisting?
17 A. I mean, from where you're at, you
18 would -- you may not know.
19 Q. Okay. Is it appropriate for
20 Officer Lopera to be asking "is he out yet" at
21 3:13?
22 A. Yeah, if he wants to know if he's out,
23 that would be --
24 Q. Right.
25 A. If his intention -- by him saying is his

Page 59

1  intention -- I don't know if his intention was to
2  put him out or not. But if he's trying to get
3  confirmation on whether he's unconscious, then,
4  yeah, there would be nothing wrong with asking
5  that.
6  Q. All right. Who would he be asking, do
7  you know?
8  A. I would assume he'd be asking a partner
9  or if somebody else there was helping.
10 Q. Well, it says at 3:01, "Sergeant
11 Crumrine arrived and stated, 'Put your fucking
12 hands behind your back.'"
13    Presumably Officer Crumrine would have
14 been there for about 12 seconds when Lopera says,
15 "Is he out yet?"
16 A. Yes. So I would assume he'd be asking
17 him.
18 Q. Okay. And then it says, "Farmer gasps."
19    What does the Metropolitan Police
20 Department teach with regard to a subject gasping,
21 if anything?
22 A. We don't have a particular training
23 protocol for gasps.
24 Q. Does that mean that a person is
25 conscious or unconscious?

Page 60

1  A. Neither. It could be both.
2  Q. They could be unconscious or they could
3  be conscious?
4  A. Yes.
5  Q. So the Metropolitan Police Department
6  doesn't teach what to do if a subject gasps while
7  a lateral vascular neck restraint is being
8  applied?
9  A. No. We don't specifically, when you
10 hear a gasp, you do this. A gasp could be just
11 somebody breathing. It could be somebody
12 struggling.
13 Q. Sure. Or it could be somebody dying.
14 A. It could be somebody who's having a hard
15 time breathing.
16 Q. Have you ever heard of an agonal breath?
17 A. I've heard that term before.
18 Q. Do you know what it means?
19 A. Isn't that like the last breath?
20 Q. Last breath, yeah.
21    Does the department have any teaching
22 with regard to agonal breaths?
23 A. I don't know. I mean, I've heard that
24 term before, so maybe it was brought up in some
25 type of class. But it's not something we teach

Page 61

1  within defensive tactics.
2  Q. Okay. At 3:18, "Officer Lopera asks,
3  'Is he out yet?'"
4     Appropriate for him to be asking that?
5  A. Yeah. If he's trying to get -- if his
6  intention, he's trying to put him out --
7  Q. Right.
8  A. -- and he's trying to get
9  confirmation --
10 Q. Right.
11 A. -- there's nothing wrong with him asking
12 that question.
13 Q. Does the department teach this as a way
14 of determining whether somebody has been rendered
15 unconscious by the application of a lateral
16 vascular neck restraint?
17 A. We don't teach -- as far as -- we don't
18 teach a methodology saying officers will ask their
19 partner if they are out.
20 Q. What is the methodology that's taught by
21 the Metropolitan Police Department for an officer
22 to determine, while he's applying a lateral
23 vascular neck restraint, whether the person, the
24 subject, has gone unconscious?
25 A. That we cease -- we cease applying

SERGEANT MICHAEL BLAND
December 21, 2017

Page 62

1  compression once we either gain compliance or
2  there's no further resistance.
3     Q. Okay. At 3:19, "Officer Lopera asks,
4  'Is he out yet?'" again.
5     A. Same answer.
6     Q. Right. 3:25, it says, "Officer Tran
7  arrived and said, 'Let him go, Ken.'"
8        Now, I've been told that that probably
9  was actually Sergeant Crumrine. Either way, it's
10 appropriate for either Crumrine or Tran to tell
11 him to let him go if he's unconscious?
12    A. Yes.
13    Q. All right. At 3:26, "Lopera asks, 'Are
14 you sure?" And it says, "Officer Tran replied,
15 'Yeah.'"
16       So now he's got double confirmation that
17 he's unconscious and should let go; right?
18    A. Yes.
19    Q. All right. Then if you look down at
20 4:11, which is 46 seconds later, "Officer Lopera
21 released the hold on Farmer."
22       Do you see that?
23    A. Yes.
24    Q. Would you agree that that was
25 unreasonable force being exerted by Officer Lopera

Page 63

1  for those 46 seconds if, in fact, Mr. Farmer was
2  unconscious at 3:25?
3        MR. McNUTT: Objection to form.
4        THE WITNESS: If he was still applying
5  compression, yes.
6  BY MR. SAYRE:
7     Q. Okay. Would you agree that whether it
8  was Officer Tran or Sergeant Crumrine who stated,
9  "Let him go, Ken," that that officer would have
10 been obligated to intervene to prevent Mr. Lopera
11 from continuing to compress his neck for the next
12 46 or 47 seconds?
13       MR. ANDERSON: Objection. Form.
14       THE WITNESS: Yes. If he's -- if the
15 officer believes that he is still applying
16 compression.
17 BY MR. SAYRE:
18    Q. Right.
19    A. If the officer believes he's still
20 applying compression and -- he has a duty to
21 intervene.
22    Q. And if he didn't intervene, that would
23 be a violation of policy of the Metropolitan
24 Police Department?
25    A. Yes.

Page 64

1     Q. What you don't know is whether that
2  would also be a violation of the Fourth Amendment
3  because the Metropolitan Police Department doesn't
4  teach that?
5        MR. ANDERSON: Objection. Form.
6        THE WITNESS: Yeah, going back to that,
7  it's just not a specific thing, we say, "You're
8  violating the Fourth Amendment by not
9  intervening." So we don't -- that's not something
10 we have been teaching.
11       MR. SAYRE: Okay. Could we take a short
12 break, please?
13       MR. ANDERSON: Absolutely.
14       THE VIDEOGRAPHER: We are off the record
15 at 3:06 p.m.
16       (Whereupon, a recess was taken.)
17       THE VIDEOGRAPHER: Back on the record.
18 The time is 3:11 p.m.
19 BY MR. SAYRE:
20    Q. All right. Take a look at paragraph
21 number 4 on page 7 of 8.
22    A. It starts "Officer Lopera continued"?
23    Q. Yes, sir. Just read that paragraph to
24 yourselves, yeah.
25    A. I've read it.

Page 65

1     Q. All right. In assessing whether or not
2  there was an attempted carjacking, is it important
3  to know whether or not the driver of the vehicle
4  felt threatened by Mr. Farmer?
5     A. You would have no way of knowing --
6  well, not in every case, I guess you would have no
7  way of knowing. It wouldn't necessarily be a
8  consideration.
9     Q. Would it be evidentiary as to whether or
10 not a crime had been committed? Do you understand
11 what I mean by "evidentiary"?
12    A. Yes. But as far as the rest, it was
13 just the way you formed the question in the first
14 place.
15    Q. Yeah.
16    A. Can you --
17    Q. Well, would it be evidence tending to
18 indicate that there was no carjacking?
19    A. Are you saying whether the officer
20 believed that he was getting ready to carjack, or
21 are you saying after the fact, after all is said
22 and done?
23    Q. Both.
24    A. Would I -- if somebody came out and
25 said, "Yes, I thought he was going to carjack me,"

SERGEANT MICHAEL BLAND
December 21, 2017

Page 66

1  I would use that as evidence.
2     Q.  In looking at the videotape, did you see
3  any efforts by Mr. Farmer to attempt to carjack
4  the white truck that is in the video at the
5  beginning?
6     A.  From the two-dimensional visual
7  depiction I get from the -- from the body camera,
8  I don't see that.
9     Q.  Right.  Does the Metropolitan Police
10 Department teach the rear naked choke?
11    A.  No.
12    Q.  Does it teach any aspect of the rear
13 naked choke?
14    A.  It teaches a defense to the rear naked
15 choke.
16    Q.  How to get out of it?
17    A.  Yes.
18    Q.  Okay.  So every officer who's been
19 properly trained should know how to exit a rear
20 naked choke?
21    A.  Well, he should.
22    Q.  Right.  You say that with a smile on
23 your face.
24    A.  Some people are better at defensive
25 tactics than others.

Page 67

1     Q.  Okay.  And some people pay more
2  attention than others, I suppose, when they're
3  being instructed.
4     A.  Human nature.
5     Q.  Yeah.  All right.
6        Take a look at page 7 of 8 again.
7     A.  I'm there.
8     Q.  Okay.  The next to the last paragraph,
9  please read that to yourself.  And I apologize if
10 we've gone over this.  It will be brief, if I am
11 repeating it.
12    A.  I read it.
13    Q.  Okay.  It says that "Officer Lopera,
14 while straddling Farmer's back, struck him
15 approximately 10 to 12 times in the head while
16 giving Farmer commands to 'get on your stomach.'"
17       Did you see him in the video, your
18 review of the video, strike Mr. Farmer in the head
19 10 to 12 times?
20    A.  I didn't count the strikes, but I saw
21 numerous strikes.  That sounds right.  10 to 12
22 sounds in the ballpark of what I saw.
23    Q.  Now, according -- going on in this
24 paragraph, "According to LVMPD policy, officers
25 should only use hand strikes when a subject is

Page 68

1  displaying aggressive resistance.  'Aggressive
2  resistance' is defined as that which has the
3  potential to cause injury or substantial pain.
4  Based upon Officer Lopera's BWC and surveillance
5  obtained by the Venetian hotel, Farmer was lying
6  on his stomach, attempting to keep from being
7  handcuffed.  As Officer Lopera began to strike
8  him, Farmer appeared to be protecting his face
9  from being hit.  Farmer did not appear to be
10 displaying aggressive resistance."
11       Do you agree with that statement?
12    A.  I --
13       MR. McNUTT:  Objection.  Form.
14       THE WITNESS:  I agree with he's not --
15 to what I see, to what I see, I don't see -- from
16 my vantage point, I don't see aggressive
17 resistance.  But the mid-paragraph, where it says
18 "aggressive resistance is defined," that's
19 actually intermediate -- that's the definition for
20 intermediate force.
21 BY MR. SAYRE:
22    Q.  Okay.  Had would you define "aggressive
23 resistance"?
24    A.  "Aggressive resistance" in policy, I'd
25 have to look at policy to word it exactly how it

Page 69

1  was defined there.  But it's basically a threat to
2  harm against an officer, himself, or another
3  party.  It could include the use of a weapon.
4        So to get the exact definition, just --
5  it's just right there.  It says -- it says -- here
6  it says, "'Aggressive resistance' is defined."
7  This definition they're giving is actually the
8  definition of intermediate level of control.
9     Q.  Okay.  Let me see if I can find the
10 definitions.
11    A.  The beginning of the policy, you'll have
12 definitions, and you'll see your -- your levels of
13 control will be there, but the resistance levels
14 are actually defined later.
15    Q.  Right.  This is -- take a look at
16 page 0007.  That would be the first page of the
17 book.
18    A.  I'm there.
19    Q.  It has levels of resistance.  And it
20 starts with compliant and goes through number 5,
21 which is aggravated aggressive resistance.  Okay?
22    A.  Yes.
23    Q.  And it says, "Aggressive resistance.
24 The subject displays the intent to harm the
25 officer, themselves, or another person and prevent

Page 86

1  Q. Well, but you can use it in response to
2  deadly force?
3  A. Yeah. I can use empty hands as a
4  response to deadly force also.
5  Q. Yeah, but I'm only talking about lateral
6  vascular neck restraint.
7  A. I understand that, too.
8  Q. You can also use a gun in response to
9  deadly force.
10  A. That's the only place I can use it.
11  Q. Okay. Now -- so assuming that
12  Mr. Farmer was no more than actively resistant, no
13  level of LVNR could have been used against him;
14  correct?
15     MR. McNUTT: Objection. Form.
16     THE WITNESS: In May?
17  BY MR. SAYRE:
18  Q. Yeah. Well, assuming the policy was in
19  effect in May. Today.
20  A. Oh, assuming today's policy?
21  Q. Right.
22  A. Oh, yeah. Today's policy --
23     MR. McNUTT: I think we need a temporal
24  restriction there.
25     THE WITNESS: If today's policy was in

Page 87

1  effect in May --
2  BY MR. SAYRE:
3  Q. Yes.
4  A. -- and we make the assumption that he
5  was an active resistant subject, then, no, you
6  could not use the LVNR.
7  Q. Okay. In May, assuming he was actively
8  resistant, you could have not used either level 2
9  or level 3 LVNR; correct?
10  A. Using the assumption that he was an
11  active resistant subject, we could not use level 2
12  or level 3.
13  Q. Now, does each of the levels of LVNR 2
14  and 3 cause increasing danger or possibility of
15  injury to the neck?
16  A. The technique is not designed to cause
17  injury.
18  Q. I understand. But the technique can
19  cause injury, can't it?
20  A. If it was applied incorrectly.
21  Q. Okay. But officers can and do apply it
22  incorrectly; right?
23  A. Officers have.
24  Q. Right.
25  A. They're not trained to apply it

Page 88

1  incorrectly.
2  Q. No. I understand. But it is a danger
3  in applying a neck restraint that an officer can
4  and in some cases has applied it incorrectly?
5  A. Yes, that's a -- that's a danger.
6  There's a potential to apply it incorrectly.
7  Q. Okay. In fact, there have been three
8  deaths in the past of people who have had the
9  lateral vascular neck restraint applied by
10  Metropolitan police officers; correct?
11  A. I don't know.
12  Q. Do you have any knowledge of past deaths
13  from the application of lateral vascular neck
14  restraints?
15  A. I remember one from way back. I
16  couldn't even tell you what it was, and I couldn't
17  tell you if there was other force that was applied
18  or anything else specific to it.
19  Q. 2001, Phillip Lemure, lateral vascular
20  neck restraint was applied and he died.
21     Are you aware of that?
22  A. No.
23  Q. 2006, James Livins, lateral vascular
24  neck restraint was applied and he died.
25     Are you aware of that?

Page 89

1  A. I'm not aware of any specifics.
2  Q. 2009 Dustin Boone, also known as DJ, had
3  a lateral vascular neck restraint applied and he
4  died.
5     You're not aware of that?
6  A. I don't know any of the specifics on any
7  of those three.
8  Q. Who is the most knowledgeable about past
9  deaths caused by the lateral vascular neck
10  restraint?
11  A. Probably internal affairs. CIRT,
12  Critical Incident Review Team.
13  Q. Who would be knowledgeable as to whether
14  any officers have been disciplined in the past for
15  an improper application of the lateral vascular
16  neck restraint?
17  A. Internal affairs.
18  Q. Who made the decision to change the
19  policy regarding the neck -- lateral vascular neck
20  restraint in September of this year?
21  A. I do not know. I know there's -- I know
22  there was a collaborative effort, but I don't know
23  who specifically made those decisions, whether it
24  was CIRT, whether it was deputy chiefs and higher,
25  whether it was the captain of training. I know

Page 126

```
 1              CERTIFICATE OF DEPONENT
 2   PAGE    LINE    CHANGE              REASON
 3   _____
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13              *    *    *    *    *
14         I, SERGEANT MICHAEL BLAND, deponent
     herein, do hereby certify and declare the within
15   and foregoing transcription to be my deposition in
     said action; that I have read, corrected, and do
16   hereby affix my signature to said deposition under
     penalty of perjury.
17
18         _____
                     SERGEANT MICHAEL BLAND,
19                            Deponent
20
21
22
23
24
25
```

Page 127

```
 1              CERTIFICATE OF COURT REPORTER
 2
     STATE OF NEVADA       )
 3                         ) ss:
     COUNTY OF CLARK       )
 4
 5         I, Kimberly A. Farkas, Certified Court
 6   Reporter licensed by the State of Nevada, do
 7   hereby certify that I reported the deposition of
 8   SERGEANT MICHAEL BLAND, commencing on December 21,
 9   2017, at 2:01 p.m.
10         Prior to being deposed, the witness was duly
11   sworn by me to testify to the truth.  I thereafter
12   transcribed my said stenographic notes, and that
13   the transcript is a complete, true, and accurate
14   transcription, and that a request was not made for
15   a review of the transcript.
16         I further certify that I am not a relative,
17   employee, or independent contractor of counsel,
18   nor a person financially interested in the
19   proceeding.
20         IN WITNESS WHEREOF, I have set my hand in my
21   office in the County of Clark, State of Nevada,
22   this January 8th, 2018.
23
24
25         _____
26         Kimberly A. Farkas, CCR No. 741
```