# EXHIBIT 12
# Excerpts from Travis Crumrine Deposition, Vol. II, 12/10/18

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3                        * * * * *

4

5       TRINITA FARMER,                )
        individually,                  )
6                                      )
                 Plaintiff,            ) Case No.
7                                      ) 2:18-cv-00860-GMN-VCF
           vs.                         )
8                                      )
        LAS VEGAS METROPOLITAN         )     **CONDENSED**
9       POLICE DEPARTMENT, a           )
        political subdivision of       )     **TRANSCRIPT**
10      the State of Nevada;           )
        KENNETH LOPERA,                )
11      individually; TRAVIS           )
        CRUMRINE, individually;        )
12      MICHAEL TRAN, individually;    )
        MICHAEL FLORES,                )
13      individually,                  )
                                       )
14               Defendants.           )
        _____)

15

16

17        VIDEOTAPED DEPOSITION OF OFFICER TRAVIS CRUMRINE

18             Taken on Monday, December 10, 2018

19                   At 10:09 a.m.

20             Taken at Lagomarsino Law

21           3005 West Horizon Ridge Parkway

22                   Suite 241

23             Henderson, Nevada 89052

24

25      Reported by:  Sarah Safier, CCR No. 808

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

| Page 22 |
|---|

1   12 were there that night.  The other squad sergeant
2   was off, and he had -- I believe he had 16 officers
3   assigned to him, but I want to say that there were
4   five or six off.
5       So roughly 23 from those two squads, and
6   then there may have been some overtime folks, four or
7   five, six maybe.  So possibly up to 30.
8    Q   All right.  Was Officer Lopera under your
9   supervision that night?
10   A   Yes.
11   Q   And what about Officer Tran?
12   A   Yes.
13   Q   Was Officer Tran normally on your squad?
14   A   No.  He was on the other squad.  His
15   sergeant was off.
16   Q   And was Officer Flores usually on your
17   squad?
18   A   No.
19   Q   Was that the first time you had supervised
20   those individuals that night?
21   A   No.
22   Q   How many times did you supervise those
23   individuals?
24   A   That would be hard to say.  I mean, I think
25   we worked -- our quads worked together two nights a

| Page 23 |
|---|

1   week, and their sergeant was far more senior to me.
2   So it's quite likely he took more nights off where I
3   would have covered.
4   Q   Why did more senior sergeants take more
5   nights off?
6   A   They accrue more time as you get more time
7   on the job.
8   Q   Okay.  Officer, is it -- how do you
9   pronounce her name, Lif?
10   A   Lif.
11   Q   Was she under your supervision and control
12   as well?
13   A   Yes.
14   Q   Do you remember getting a call from the
15   Venetian in reference to this incident?
16   A   We did not get a call from the Venetian.
17   Q   Do you remember doing a call referencing
18   the Venetian pertaining to this incident?
19   A   The first anyone ever heard of the call was
20   garbled radio traffic.
21   Q   So were there problems with the radios at
22   that time?
23   A   Not particularly.  There are issues with the
24   radios when you get deep into the hotels that -- with
25   signal penetration.  But with this current radio

| Page 24 |
|---|

1   system, it's leaps and bounds better than the -- the
2   one before.
3   Q   And so at some point, you were drawn to the
4   Venetian, correct?
5   A   Yes.
6   Q   And how were you drawn to the Venetian?
7   A   So I heard the garbled radio traffic.  I was
8   in my car.  I was roughly at Sands and Howard Hughes
9   or between Howard Hughes and Koval.  The dispatcher
10   can tell when you key your radio what unit's keying
11   their radio.  So I don't know if the dispatcher heard
12   him -- heard or to make out what he said or could
13   tell by the radio ID, but she knew it was Venetian
14   1's call sign, so she gave a code red to Venetian 1.
15   Q   And what does code red stand for?
16   A   A code red means that an emergency exists on
17   the channel and whoever the code red is for, the
18   radio channel is theirs to broadcast traffic.
19   Everyone else stays off the radio so they can get out
20   their emergency traffic.
21   Q   As part of your job patrolling the Strip, do
22   you have to sometimes deal with intoxicated
23   individuals?
24   A   Yes.
25   Q   Do you sometimes have to deal with

| Page 25 |
|---|

1   individuals who you believe to be high on narcotics?
2   A   Yes.
3   Q   Are you a drug recognition expert?
4   A   No.
5   Q   Have you ever had in your career, before May
6   of 2017, had individuals run from you that are
7   intoxicated?
8   A   Yes.
9   Q   Does Metro have policies on pedestrian
10   pursuits?
11   A   Yes.
12   Q   If an individual starts running from you for
13   no reason, do you start chasing that individual?
14   A   I believe the policy says when running is
15   the sole justification for the pursuit that we do
16   not --
17   Q   Okay.
18   A   -- or should not.
19   Q   So that evening did you conduct a Safe Strip
20   briefing?
21   A   Yes.
22   Q   Tell me about what a Safe Strip briefing is
23   like.
24   A   Mostly in a Safe Strip briefing, especially
25   with the squad being specifically assigned to do

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

Page 26

1  it -- back in the day when we used to bring in two
2  officers from every -- like Noah's Ark, we had to
3  give people more instruction on, this is what you
4  need to do, don't be hiding in the back of the
5  casino, don't take three lunch breaks.  But officers
6  that are specifically working this, they know most of
7  the rules, so it's really just assigning people
8  properties, anything from our normal briefing, like
9  be on the look out for so-and-so, or, you know,
10  Bellagio is having a problem with homeless guys
11  swimming in the fountain or something, just general
12  information.  It's mostly just assigning officers to
13  properties.
14      Q   How long does that usually take, that
15  briefing?
16      A   10 to 15 minutes.
17      Q   And did the lieutenant help you with that
18  briefing that night?
19      A   Yes.
20      Q   And who is that?
21      A   Steve Summers.
22      Q   Was there also a sergeant working overtime
23  that night?
24      A   Yes.
25      Q   And was that Bill Jones?

Page 27

1      A   I believe so.
2      Q   So Mr. Summers would have -- or Lieutenant
3  Summers would have been your supervisor?
4      A   Yes.
5      Q   Did he arrive at the scene at the Venetian?
6      A   Yes.
7      Q   When did he arrive?
8      A   It was pretty quick, because I know he was
9  on -- we had a fatal wreck in front of the Flamingo.
10  A guy had a heart attack while driving his car and
11  crashed into the sidewalk on the Flamingo side of --
12  or, sorry, on the Flamingo side of Cromwell, and he
13  was on scene on that when this happened.  I called
14  him on the phone within a couple of minutes, and I
15  said, "Hey, I'm pretty sure I'm an involved officer,
16  so I need you over here."
17      Q   Did he come over?
18      A   Yes.
19      Q   How long did he stay at the scene?
20      A   Hours.
21      Q   Okay.  Did you receive a specific assignment
22  that evening?
23      A   My specific assignment is to supervise all
24  those officers on Safe Strip.  So basically I just
25  bounce around from one pair to the next on their foot

Page 28

1  posts and check on them.  If they're on a stop, back
2  them up, stuff like that.
3      Q   From time to time, would you go to the
4  Venetian?
5      A   Yes.
6      Q   That evening, Officer Lopera and Officer
7  Lif, I understand, were getting coffee.
8      A   Uh-huh.
9      Q   Does the Venetian provide free coffee to the
10  officers?
11      A   If they went to the EDR, yes.
12      Q   Anywhere else in the Venetian where you get
13  free coffee?
14      A   Not as a rule.  I mean, when you go get
15  coffee at places, it's kind of hit-and-miss.
16  Sometimes people give you free coffee.
17      Q   All right.  In terms of the squads you were
18  supervising that evening, which properties did your
19  squad have responsibility for that evening?
20      A   My recollection was probably better a year
21  ago when we went over it, but -- so all in all
22  between my squad and my sister sergeant's squad,
23  we've got everything from Tropicana, New York New
24  York, I believe MGM, it would be CityCenter, Cosmo,
25  Bellagio, Paris, Bally's, there's a Hawaiian

Page 29

1  Marketplace.
2      Q   Treasure Island?
3      A   Treasure Island, Mirage, Harrah's, Flamingo,
4  all the way up -- you've got Venetian, Palazzo, Wynn,
5  Encore.  I think that was about where it ends.
6      Q   How many officers are assigned per property?
7      A   Two.
8      Q   And where are they usually working?
9      A   Most of their time is going to be spent out
10  on the sidewalk on the boulevard in front of that
11  property.
12      Q   Why is that?
13      A   Because that's where we see most of our
14  disturbances, your intoxicated individuals, your
15  homeless folks, prostitutes.  If security has someone
16  in custody, then they're going to go ahead and call
17  311 and probably a normal patrol officer is going to
18  respond if it's static.  If security has something
19  more dynamic going on and the person is not in
20  custody, then they might call the officers into the
21  hotel to -- to handle it.
22      Q   As part of your job, do you tend to see
23  individuals who appear to be intoxicated --
24      A   Yes.
25      Q   -- on the Strip?

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

9  (Pages 30 to 33)

Page 30

1   A   Oh, yes.
2   Q   And do you typically arrest individuals who
3   appear intoxicated on the Strip?
4   A   No.
5   Q   Why is that?
6   A   Because mere intoxication is not a crime for
7   us.
8   Q   All right.  It's my understanding that
9   initially, Officer Lif and Officer Lopera were
10   assigned to the Hawaiian Marketplace; is that
11   correct?
12   A   Correct.
13   Q   And then at the last minute, you texted them
14   and told them to move to the Venetian?
15   A   Yes.
16   Q   Why did you move them to the Venetian?
17   A   Because the other squad that had 16 officers
18   on paper, they had five or six off, and I was just
19   shuffling people around, no real rhyme or reason for
20   it.  But I put -- I think I put one of -- so I think
21   I had an odd number that night, and I put my odd man
22   out with an overtime guy who was at the Marketplace
23   and then moved them to the Venetian.  Not really any
24   specific rhyme or reason.
25   Q   Did Officer Lopera typically patrol the

Page 31

1   Venetian?
2   A   No.
3   Q   Do you know if he had ever patrolled the
4   Venetian before that night?
5   A   I don't know.
6   Q   If I represent to you that in your previous
7   deposition you testified that you were pretty sure
8   that he had not patrolled the Venetian before that
9   evening, would you rely on that representation?
10   A   Yeah.  I guess specifically, I'm pretty sure
11   that I hadn't assigned him to a Safe Strip spot at
12   the Venetian.  I'm not sure.  He had never gone on a
13   call there.
14   Q   Okay.  Thanks for that clarification.
15       Was it your understanding that he would not
16   be knowledgeable about the different aspects of the
17   Venetian?
18   A   Yeah.  I mean, he had only been assigned to
19   that area command for roughly two months at that
20   point.
21   Q   Had you ever had any interaction with
22   Officer Lopera before you became his sergeant?
23   A   Other than calling him to ask him if he
24   wanted to come to that squad, no.
25   Q   Were you aware that he'd competed

Page 32

1   competitively in jujitsu?
2   A   No.
3   Q   Did you learn that subsequent to this
4   incident?
5       MR. MCNUTT:  Objection.  Form.
6       THE WITNESS:  I knew that he did, like,
7   jujitsu training.  This is the first I've heard that
8   he ever competed competitively in jujitsu.
9   BY MR. LAGOMARSINO:
10   Q   Did you know that he had jujitsu training
11   prior to the night of the incident?
12   A   No.
13   Q   Had you ever socialized with him at any
14   point before the night of the incident?
15   A   No.
16   Q   When somebody calls a code red out, does
17   that mean that there's an emergency on that channel?
18   A   Yes.
19   Q   Does that mean that people should try to
20   avoid being on that channel if at all possible?
21   A   Yes.  Do you want a clarification?
22   Q   Sure.
23   A   The only reason to break that code red if
24   you're not the person who the code red is for is if
25   you have direct information about whatever that code

Page 33

1   red is for.
2   Q   Thank you.
3       So you started heading for the Venetian.
4   Why?
5   A   Well, since the dispatcher called out that
6   it was a code red for Venetian 1, I can assume that
7   they're on the Venetian property.  So we weren't
8   getting any response from them when she's calling out
9   for them for a better location, so I needed to start
10   heading to the property, like every one of the
11   officers who would be responding would, to start
12   searching for him.
13   Q   What are some examples of code red
14   emergencies?
15   A   Generally, it's officer's in a fight,
16   officer's in a foot pursuit, officer's got somebody
17   not complying with their orders.
18   Q   Is that what you took it to mean?
19   A   Yes.
20   Q   One of those options?
21   A   Yes.
22   Q   Did you know where to go in the Venetian
23   property?
24   A   No.
25   Q   So how did you happen upon Officer Lopera?

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

10  (Pages 34 to 37)

Page 34

1       A   So when she called out that code red and
2   she's asking for location, I was sitting, I think,
3   with my lights on in the intersection of Sands and
4   Koval.  And correct me if I'm wrong, it's about five
5   minutes to 1:00 in the morning on a Saturday night,
6   so Las Vegas Boulevard is generally pretty packed
7   with pedestrian and vehicle traffic.  So generally I
8   would assume that they're going to be out on the
9   sidewalk on the boulevard.  However, to come out and
10  try to make a left to go south on the boulevard to
11  then make another left to get in front of the
12  Venetian is going to take some time, even rolling
13  code, because you may just get stuck.
14          So I made a decision to go through the back,
15  which is usually faster.  So as I came up the
16  east/west service drive, that's where I found them.
17      Q   At some point, you stopped your car,
18  correct?
19      A   Yes.
20      Q   Were you by yourself?
21      A   Yes.
22      Q   And were you communicating with anybody
23  regarding this incident on your way there?
24      A   No.
25      Q   When you stopped your car, approximately how

Page 35

1   far were you from Officer Lopera?
2       A   Three or four blocks.
3       Q   Okay.  Well, when you got to the Venetian, I
4   guess, and you saw Officer Lopera, you parked your
5   car, correct?
6       A   Yes.
7       Q   How far away did you park your car from
8   Officer Lopera?
9       A   30 to 50 feet probably.
10      Q   And did you park in the drive?
11      A   Right in the middle of the road, yeah.
12      Q   Okay.  Did you have your lights on?
13      A   Yes.
14      Q   As you're driving up, did you see Officer
15  Lopera and Tashii on the ground?
16      A   Yes.
17      Q   And what did you see?
18      A   As I drove up, what I could see was Officer
19  Lopera on the ground with his feet, butt, back to me
20  and then Farmer was either below or in front of him,
21  behind.  I couldn't really see.  I mean, I knew there
22  was a person there, but I couldn't really see him
23  because mostly what I'm seeing is the back of
24  Lopera's body.  I remember that his butt and the back
25  of his thighs were wet, and I remember thinking

Page 36

1   that -- did he soil himself in a fight.
2       Q   Did you later learn that he fell in some
3   water or soap?
4       A   Yes.
5       Q   So you parked the car?
6       A   Yes.
7       Q   You get out of the car?
8       A   (Witness nods head.)
9       Q   What do you do next?
10      A   Immediately jumped out, ran up, and as I'm
11  running up, Lopera is putting Farmer into a neck
12  restraint, back lying.  And as I ran up, they were on
13  kind of their right-hand sides facing the little
14  Jersey wall, and I grabbed Farmer's left arm.
15      Q   And why did you grab his left arm?
16      A   To put a handcuff on him.
17      Q   And did you get the handcuff on him?
18      A   Not immediately.
19      Q   How long did it take you to get the handcuff
20  on him?
21      A   My best estimate, five or ten seconds, I
22  think.
23      Q   When you were approaching Officer Lopera and
24  Tashii, could you see what Tashii was doing?
25      A   No.

Page 37

1       Q   And when you drove up, could you see what
2   Officer Lopera was doing?
3       A   No.
4       Q   Did you ever see Officer Lopera strike
5   Tashii?
6       A   No.
7       Q   Did you learn later that Officer Lopera
8   struck Tashii with his fist?
9       A   Yes.
10      Q   And did you ever see Officer Lopera tase
11  Tashii?
12      A   No.
13      Q   Did you later learn that he did tase Tashii
14  several times?
15      A   Yes.
16      Q   When you came up to the scene and up to
17  Lopera, was his taser holstered?
18      A   I don't remember.
19      Q   It wasn't being used at that time, correct?
20      A   Correct.
21      Q   Did you notice any evidence of tasering when
22  you approached the scene?
23      A   No.
24      Q   And what would be some evidence of tasering?
25      A   When you deploy a taser, there's like

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

Page 38

1 confetti that comes out of the cartridge and also the
2 wires, the barbs.
3 Q   After Tashii was released from the neck
4 restraint, did you notice evidence -- is it tasing or
5 tasering?
6 A   Tasing.
7 Q   Did you notice evidence of tasing after he
8 released him?
9 A   Yes.
10 Q   And what did you notice?
11 A   I'm not sure if it was before or after he
12 told me that he tased him.
13 Q   Did you actually see the evidence of tasing?
14 A   I do remember seeing one of the barbs in
15 his -- was it in his back or his front?
16 Q   How far away were you approximately when you
17 saw Lopera apply the neck restraint?
18 A   Like I said, 30 to 50 feet.
19 Q   Was there anybody else nearby?
20 A   There were two Venetian security guards.
21 Q   What were they doing?
22 A   As I ran up, they were near Lopera and
23 Farmer.  And as I recall, as I approached, they kind
24 of backed away.
25 Q   At that point in time, were there any other

Page 39

1 police officers present --
2 A   No.
3 Q   -- besides Lopera?  Sorry.
4 A   No.
5 Q   When you approached Officer Lopera and
6 Tashii, did you believe that Lopera had Tashii in an
7 illegal or out-of-policy choke hold?
8 A   No.
9 Q   You have been trained on the LVNR, correct?
10 A   Correct.
11 Q   What does LVNR stand for, for the record?
12 A   Lateral vascular neck restraint.
13 Q   If you had seen Lopera putting Tashii in an
14 illegal or out-of-policy choke hold, would you have
15 intervened?
16 A   Possibly.
17 Q   LVNR can be applied with either arm,
18 correct?
19 A   Correct.
20 Q   Now, when you saw Officer Lopera restraining
21 Tashii, did it look like to you that the front arm
22 looked like it would be in the position it would be
23 in if it was applying an LVNR?
24 A   Yes.
25 Q   So you assumed he was applying an LVNR?

Page 40

1 A   Correct.
2 Q   Now, when you came up on the scene, you said
3 to Tashii, "Put your fucking hands behind your back,"
4 correct?
5 A   Correct.
6 Q   Is it within policy at Metro to curse at
7 suspects?
8 A   It is, of course, discouraged, but
9 oftentimes using strong language with people gains
10 compliance where -- and prevents us from having to
11 use actual physical force.
12 Q   Do you feel like that that agitated Officer
13 Lopera?
14      MR. ANDERSON:  Objection to form.
15      THE WITNESS:  No.
16 BY MR. LAGOMARSINO:
17 Q   Once you arrived where Tashii and Officer
18 Lopera were, that's within three seconds or so,
19 that's when you saw Officer Lopera start applying the
20 neck restraint, correct?
21 A   Roughly.
22 Q   In your prior deposition, you stated -- let
23 me have the Exhibit 1.
24      (Plaintiff's Exhibit No. 1 was marked
25       for identification.)

Page 41

1 BY MR. LAGOMARSINO:
2 Q   You mentioned earlier that your memory --
3 strike that.
4      You had your deposition taken about a year
5 ago, correct?
6 A   Yes.
7 Q   All right.  And you mentioned earlier that
8 your memory is probably better a year ago than it is
9 today, correct?
10 A   Yes.
11 Q   Would having your deposition here from a
12 year ago help to refresh your recollection?
13 A   Yes.
14 Q   Okay.  All right.  I'm going to try not to
15 make it an onerous task to keep referring to the depo
16 today, but from time to time I will.
17 A   Sure.
18 Q   If you could please turn to Page 34 of the
19 deposition.
20 A   Okay.
21 Q   So at the top of that page, going back to
22 the page before -- so I'm sorry, for the record,
23 Page 33 -- you state that you made the comment about
24 putting his hands behind his back, and then you said
25 that you made several other statements and that the

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

12 (Pages 42 to 45)

Page 42

1  timeline, I think, that you were referring to was
2  wrong.  We do have a timeline, so we will get into
3  that a little bit.
4       But going to the next page, it says:
5  "What's the next thing you did besides making the
6  statement that we just talked about?  What else did
7  you do next?"
8       It says:  "Chronologically, I'm not totally
9  sure, but I grabbed Farmer's left wrist --
10  "Okay.
11  "-- to put it in a -- to handcuff.
12  "Right.
13  "He pulled it away.  He broke my grip.  I
14  grabbed it again.  Got the handcuff on."
15       So the first time you grabbed his hand, he
16  pulled it away, correct?
17   A   Correct.
18   Q   The second time you grabbed it, you were
19  able to get his handcuff on?
20   A   Correct.
21   Q   Okay.  And you were trying to get them both
22  to roll over to accomplish the handcuffing?
23   A   Yes.
24   Q   Why?
25   A   Well, handcuffs have to go behind Farmer's

Page 43

1  back, and Lopera is covering Farmer's back by being
2  behind him.  So we have to separate the two.  And the
3  way that we train is we don't disengage.
4       I'll give you a pretty long explanation
5  here, but when you do LVNR, we train to do it by
6  yourself.  So you would have the person, and when you
7  go to handcuff them, you're going to roll them over
8  onto their stomach.  You're going to decide which
9  direction you need to go.  You have got your legs
10  around the subject.
11       So if I went to turn to the left, I'm going
12  to keep my left leg around the subject to maintain
13  control and not roll over on your own leg.  You're
14  going to kick the other leg out to push both of you
15  over to turn the person onto their stomach, and then
16  bring their hands behind their back.  Now you have
17  broken away from them and handcuffed them.
18   Q   Okay.  Have you ever been diagnosed as
19  having -- being hard of hearing or being deaf or
20  anything like that?
21   A   No.
22   Q   Do you recall Officer Lopera asking a few
23  times whether Tashii was out?
24   A   I don't.
25   Q   Later when you watched the video, did you

Page 44

1  hear him say that, I think at least twice, "Is he out
2  yet?"
3   A   Yes.
4   Q   And then a couple of times in the timeline
5  there was references to Tashii gasping.  Did you ever
6  hear that?
7   A   No.
8   Q   All right.  There was some discussion in
9  your prior deposition and your CIRT statement that
10  you were the one who said, "Let him go, Ken."
11   A   Yes.
12   Q   And were you saying let him go because you
13  were seeing Tashii's constitutional rights get
14  violated, or were you simply saying let him go
15  because you wanted to handcuff him?
16       MR. MCNUTT:  Objection.  Form.
17       MR. ANDERSON:  Objection.
18       THE WITNESS:  I was saying let go because I
19  wanted to handcuff him.
20  BY MR. LAGOMARSINO:
21   Q   When was the first time you checked to see
22  if Tashii was conscious?
23   A   When we rolled him back over face up after
24  he was handcuffed.
25   Q   Do you remember Officer Lopera saying

Page 45

1  something like, "Don't grab my fucking legs"?
2   A   Yes.
3   Q   Do you know why he was saying that?
4   A   I don't know specifically.  I can give you
5  my best guess.
6   Q   Well, I don't want you to guess.
7   A   Okay.
8   Q   After watching the video, are you able to
9  make an estimate as to why he said that?
10   A   Yes.
11   Q   Okay.  And what's that?
12   A   Because it's hard to roll yourself over with
13  another person and easy to hurt yourself.  And you
14  also have -- you're kind of like a turtle when you
15  have your vest on and all your gear on your belt, and
16  so it's not exactly easy to do and needs to be slow
17  and methodical to prevent injury to everybody.
18   Q   Was somebody on his legs at the time, or was
19  he just kind of giving a warning?
20   A   Officers Tran and Flores were down towards
21  the legs at that time.
22   Q   Now, at the time you rolled him over, Tran
23  and Flores had already arrived, correct?
24   A   Yes.
25   Q   And they were assisting with restraining

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

13  (Pages 46 to 49)

Page 46

1  Tashii?
2      A   Correct.
3      Q   At some point, were you holding on to
4  Tashii's legs?
5      A   Not that I recall specifically.
6      Q   At some point, did either Officer Tran or
7  Flores hold on to or put pressure on Tashii's legs?
8      A   I don't remember.
9      Q   Lopera was doing what's known as a back
10  lying neck restraint, correct?
11      A   Correct.
12      Q   And his legs were wrapped around Tashii,
13  correct?
14      A   Correct.
15      Q   Where were they wrapped around him?
16      A   I mean, it would be, like, between the waist
17  and the knees.
18      Q   As part of applying the LVNR, is it
19  important to position the subject's head properly?
20      A   Yes.
21      Q   Why is that?
22      A   To get the proper compression on the sides
23  of the neck.
24      Q   Based on your training with the LVNR, is it
25  appropriate to place your hand on the subject's head,

Page 47

1  either front, back, sides in an effort to position it
2  properly?
3      A   Possibly.
4      Q   I want to kind of take you to the scene
5  before you rolled Tashii over but when Officers Tran
6  and Flores are there along with yourself and Lopera.
7  Lopera's got him in a rear restraint, correct?
8      A   (Witness nods head.)
9      Q   Yes?
10      A   Correct.
11      Q   And where are you?
12      A   On the side.
13      Q   Where -- and what are you doing?
14      A   Holding onto that handcuffed arm.
15      Q   Are you trying to grab the other arm too?
16      A   I need to roll them over before -- I need to
17  separate before we can get the handcuffs on him.
18      Q   Thanks for clarifying.
19          So then where are Officers Tran and Flores
20  when you have got his arm and Lopera has got him from
21  the back?
22      A   As I recall, they were both down at the
23  feet, legs, but I'm not totally sure.
24      Q   Feet and legs?
25      A   I -- that area.

Page 48

1      Q   Okay.  And they're putting pressure on the
2  legs to keep him stable?
3      A   I wouldn't say pressure.  They're probably
4  holding his legs to turn the both of them over.
5      Q   Well, to hold him, they have got to put some
6  pressure on him, correct?
7      A   Like I said, they're not -- they're probably
8  not segmenting his legs where we would, like, pin
9  someone's leg down to the ground to prevent their
10  movement.  They're probably holding the leg to turn
11  him over.
12      Q   Okay.
13      A   Sorry.  Body language.
14      Q   That's all right.  Now, at that point,
15  you're focused on his arms, correct?
16      A   Correct.
17      Q   I believe in your -- if you turn to Page 42,
18  Lines -- between Lines 15 to 21, you stated, at this
19  point you, quote, weren't really busy -- strike that.
20  I'll just read the record.
21          So question at Line 15:  "Well, can you see
22  if he is conscious or not?
23          "ANSWER:  No.  I wasn't -- I wasn't -- how
24  do I explain?  I wasn't really busying myself with
25  whether or not he was conscious.  I was trying to get

Page 49

1  them rolled over so I could get him in the
2  handcuffs."
3          Is that correct?
4      A   Correct.
5      Q   Now, at the scene, you are required to
6  supervise Lopera, correct?
7      A   Correct.
8      Q   And you are required to supervise Flores and
9  Tran?
10      A   Correct.
11      Q   When you supervise officers, you're supposed
12  to advise them, correct?
13      A   Correct.
14      Q   And fair to say that Metro teaches that a
15  properly applied carotid hold or LVNR restraint
16  should make a person unconscious in about 7 to
17  14 seconds?
18      A   That's what they say.
19      Q   So is that -- have you ever applied an LVNR
20  before to a subject?
21      A   No.
22      Q   Had you ever seen anybody in the field apply
23  an LVNR?
24      A   No.
25      Q   With Tashii and Officer Lopera -- strike

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

Page 50

1  that.
2       Had you ever supervised Lopera before this
3  incident in a use-of-force situation?
4       A   No.
5       Q   Have you ever been a field training officer?
6       A   No.
7       Q   Did you ever have any responsibility for
8  training Officer Lopera?
9       A   No.
10      Q   So did you expect, as a supervisor, that --
11  strike that.
12      I'll just take a quick break.
13      THE VIDEOGRAPHER:  The time is approximately
14  11:08 a.m.  We are going off the record.
15      (Off the record.)
16      THE VIDEOGRAPHER:  The time is approximately
17  11:18 am.  We are back on the record.
18  BY MR. LAGOMARSINO:
19      Q   All right.  So kind of getting back to the
20  scene here, you had mentioned that you had told
21  Lopera to let him go, words to that effect, correct?
22      A   Correct.
23      Q   Did you ever physically check to see if
24  Lopera had relaxed his hold?
25      A   No.

Page 51

1       Q   Did you ask Lopera if he had relaxed his
2  hold?
3       A   No.
4       MR. LAGOMARSINO:  Let's go off the record.
5       THE VIDEOGRAPHER:  We are going off the
6  record.  The time is approximately 11:19 a.m.
7       (Off the record.)
8       THE VIDEOGRAPHER:  The time is approximately
9  11:20 a.m.  We are back on the record.
10  BY MR. LAGOMARSINO:
11      Q   So we're going to go into a little more
12  detail on the incident a little later today, but I
13  want to talk about what happens after you roll Tashii
14  over.  Okay?
15      A   Okay.
16      Q   So you roll him over.  What happens next?
17      A   I called for medical.
18      Q   How much time elapsed between the time you
19  called for medical and the time you rolled over --
20  rolled him over?
21      A   Seconds.  It was before I even stood up off
22  the ground.
23      Q   Okay.  How much time elapsed between -- and
24  just an estimate -- between the time you rolled him
25  over and the time somebody started giving him means

Page 52

1  of artificial resuscitation?
2       A   I'm not totally sure.  Short.
3       Q   Do you know the actual time?
4       A   No.
5       Q   And when you say "short," more or less than
6  a minute?
7       A   I'm not sure.
8       Q   Did you personally ever check to see if
9  Tashii had a pulse?
10      A   No.  I had officers there with him checking.
11      Q   Who was checking?
12      A   I believe -- well, what happened initially
13  was they actually tried to stand him up.  I guess it
14  wasn't clear to them that he was unconscious.  But I
15  said, "No, no, no, no, no, sit him down, sit him up,
16  pat him on the back."
17      So they did that for a short period of time
18  and said that they had -- that he was breathing and
19  that he had a pulse.  And then they updated to me
20  that they couldn't find a pulse.  And I said, "Take
21  him out of handcuffs and start chest compressions."
22      Q   When you say "they," who are you talking
23  about?
24      A   So we had -- I mean, the officers that I
25  know were there were Tran, Flores, Kravetz, Amburgey

Page 53

1  and Vontagen.
2       Q   And it was Amburgey that was the one who was
3  applying medical, correct?
4       A   I believe it was Amburgey and Kravetz.
5       Q   So nobody was applying medical before they
6  got there, correct?
7       A   They were just monitoring him.
8       Q   But nobody was applying CPR or compressions
9  to him before they got there, right?
10      A   Before we took him out of handcuffs and
11  started it, correct.
12      Q   Okay.  And I may have asked you this.  I
13  apologize.  Did you see if Lopera checked to see if
14  Tashii had a pulse?
15      A   No.  Lopera immediately disengaged and
16  walked away to check his own equipment, catch his
17  breath.
18      Q   Okay.  Would you agree that it's important
19  at all times to make sure that Tashii was breathing?
20      A   Maybe not at all times.  They can't do two
21  things at once, but --
22      Q   Okay.  All right.  Can you please turn to
23  Page 48?
24      A   Sure.
25      Q   So the question at Line 6, it says: "And

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

15 (Pages 54 to 57)

Page 54

1  would it be important at all times for you to make
2  sure that Mr. Farmer was breathing?
3      "ANSWER: Yes."
4      A   Sure. Yes.
5      Q   Do you agree with that?
6      A   Yes.
7      Q   And as a supervisor, were you required to
8  make sure all the officers were performing within
9  Metro policies?
10     A   Yes.
11     Q   And was it also your responsibility to
12 supervise and make sure that deadly force was not
13 applied to Tashii?
14         MR. ANDERSON: Objection. Form.
15         THE WITNESS: It would be my job to make
16 sure that excessive force wasn't applied.
17 BY MR. LAGOMARSINO:
18     Q   All right. In your view, was this excessive
19 force?
20         MR. ANDERSON: Objection. Form.
21         MR. MCNUTT: Objection. Form.
22 BY MR. LAGOMARSINO:
23     Q   Let me rephrase. Having reviewed the video
24 and the evidence in the case, do you believe it was
25 excessive force?

Page 55

1      A   I have concerns about it. I don't know that
2  I would necessarily categorize it as excessive force.
3      Q   What concerns do you have?
4      A   Well, I haven't been able to interview the
5  officer to get his perception of what he was dealing
6  with at the time, so --
7      Q   Is it --
8      A   -- there's a lot of unanswered questions.
9      Q   Is his subjective view important, or is it
10 more of an objective test?
11         MR. ANDERSON: Objection to form.
12         THE WITNESS: I'm not sure I understand the
13 question.
14 BY MR. LAGOMARSINO:
15     Q   Do you ever as a sergeant have an
16 opportunity to assess whether somebody has used
17 excessive force?
18     A   I guess are you asking me, in the moment
19 while the force is being used versus after the fact
20 or --
21     Q   Well, yeah. Let me -- thanks for asking me
22 to clarify, and I will clarify it.
23         As a sergeant, had you ever assessed in any
24 situation whether somebody was using excessive force?
25     A   Yes.

Page 56

1      Q   On how many occasions?
2      A   A handful maybe.
3      Q   And what's your method of assessing whether
4  somebody was using excessive force?
5      A   Based on the -- based on my perception. If
6  it's in the moment, then it's based on my perception
7  of what crime is being committed, what type of
8  resistance the subject is offering.
9      Q   And do you know the difference between a
10 subjective assessment and an objective assessment?
11     A   Not necessarily. Go ahead and clarify for
12 me, please.
13     Q   That's all right. I'll come back to that.
14     A   Okay.
15     Q   Are you trained to not assume the negative
16 about a subject or suspect?
17         MR. ANDERSON: Objection. Form.
18         THE WITNESS: I'm not exactly sure what
19 you're asking.
20 BY MR. LAGOMARSINO:
21     Q   In other words, did you assume that Tashii
22 had committed a crime?
23     A   Yes.
24     Q   And you didn't ask Ken if he had committed a
25 crime, correct?

Page 57

1      A   No.
2      Q   Not correct or correct?
3      A   It's correct that I did not ask him if he
4  committed a crime.
5      Q   Those -- those are always my fault when I
6  ask those questions, the double-negatives.
7          As a supervisor, would it be your
8  responsibility to make sure that Officer Lopera did
9  not choke Tashii to death?
10         MR. ANDERSON: Objection. Form.
11 BY MR. LAGOMARSINO:
12     Q   I'll rephrase.
13     A   Okay.
14     Q   At Page 49.
15     A   Yeah.
16     Q   You were asked: "Would it be your
17 responsibility at that time to make sure that Officer
18 Lopera did not choke Mr. Farmer to death?"
19         And your answer was "Yes," correct?
20     A   It was.
21     Q   After this incident, you were not confirmed
22 from your probationary status as a sergeant; is that
23 correct?
24     A   Correct.
25     Q   Tell me about what the probationary status

Officer Travis Crumrine ~   December 10, 2018
* * * Videotaped Deposition * * *

16  (Pages 58 to 61)

Page 58

1  is and how that works.
2      A   So when you first get promoted to sergeant,
3  you have a 12-month probationary period where you're
4  supposed to be given constant evaluation and feedback
5  as to your performance.  And then at the end of the
6  12 months, you're confirmed in your position.
7      Q   When you're on probationary status, though,
8  you're getting a higher rate of pay, correct?
9      A   Correct.
10     Q   And you have a higher rank?
11     A   Correct.
12     Q   And you take all the responsibilities of a
13  sergeant?
14     A   Yes.
15     Q   Later in the deposition, there was some
16  discussion about which violations were sustained
17  against you?
18     A   Uh-huh.
19     Q   Do you recall those topics?
20     A   Yes.
21     Q   What were the -- let me build some
22  foundation here.  You went through a review board,
23  correct?
24     A   Correct.
25     Q   What is a review board?

Page 59

1      A   There's a tactical review board and a
2  use-of-force review board.  They're usually held the
3  same day.  First, you have the use-of-force review
4  board going over the actual force that was used, and
5  then you have the tactical review board reviewing the
6  tactics that were employed during the incident.
7      Q   Did you go through both of those?
8      A   Yes.
9      Q   And is that automatic, or is that something
10  that you have to request?
11     A   No.  It's something that's automatic on an
12  officer-involved shooting, in-custody death, any
13  major incident.  The officer of internal oversight
14  will initiate that investigation.
15     Q   And this was an in-custody death, correct?
16     A   Correct.
17     Q   Why is it an in-custody death?
18     A   Because Tashii Farmer died while he was in
19  our custody or during our interaction with him.
20     Q   Who is on the use-of-force board?  Let me
21  rephrase that.  For you, who was on the use-of-force
22  board?
23     A   I -- to the best of my recollection, I was
24  not a subject of the use-of-force board.  I was a
25  witness on the use-of-force board.  On the

Page 60

1  use-of-force board, you have an assistant sheriff is
2  the chairman, a deputy chief, two captains, I think,
3  and then you have three civilians on the use-of-force
4  board.
5      Q   And then on the tactical board -- tactical
6  review board you said?
7      A   Yes.
8      Q   Who's on that?
9      A   That, the civilians go away, and it's just
10  the rest of that board that I named off.
11     Q   And just for the record, who was that again
12  for the tactical review?
13     A   Assistant sheriff, deputy chief, and I think
14  two captains.  There's also, you have a peer sergeant
15  and a peer officer.  Well, in this case, you had a
16  peer sergeant and a peer officer, because I was
17  involved, so there's a peer on the board for each
18  rank that's involved.
19     Q   And by name, who are the individuals that
20  were on your tactical review board?
21     A   My recollection, it's Assistant Sheriff Tim
22  Kelly, Deputy Chief, is it John McGrath?  John
23  McGrath, Captain John Pelletier, P-E-L-L-E-T-I-E-R
24  [sic].  And the peer sergeant was Ryan Evans, and the
25  peer officer, I believe, was Travis Ivie, I think.

Page 61

1      Q   And tell me about that process.  I just
2  don't know much about it, so...
3      A   So the Critical Incident Review Team does
4  their review of the critical incident, puts together
5  a presentation, presents it to the board.  The board
6  asks questions of the detective presenting the
7  presentation, of the officers that were involved in
8  the incident, and we also have representatives there
9  to also ask questions, clarify, and then they
10  convene, deliberate, whatever you want to call it,
11  and then they come back and issue their findings.
12     Q   So in this case, who was the detective that
13  was presenting the case on behalf of CIRT?
14     A   It was Kasey Kirkegard, K-I-R-K-E-G-A-R-D, I
15  think.
16     Q   And was it -- is that a male or female?
17     A   Female.
18     Q   Was it her position that you failed to
19  intercede?
20     A   No.
21     Q   What was her position?
22     A   She informed me upon reviewing the case that
23  it was not CIRT's determination that I failed to
24  intervene.
25     Q   Did you have any questions at your tactical

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

17 (Pages 62 to 65)

Page 62

1  review board about the subject of intervening?
2      A   Yes.
3      Q   And who was in the room with you when those
4  questions were asked?
5      A   All of those people.  There's a little bit
6  of an audience.  There's a person taking down the
7  note-- the minutes.  My lieutenant was there.  And,
8  of course, I had two representatives from the PMSA.
9  The officers that were involved, they each had a
10  representative.
11      Q   When you say there was somebody taking down
12  the minutes, like a court reporter?
13      A   I believe it's one of our people, like an
14  administrative assistant.
15      Q   And do they have a machine like we see here
16  today or --
17      A   I don't remember.
18      Q   Is it recorded?
19      A   Yes.
20      Q   How is it recorded?
21      A   I believe it was audio and transcribed.
22      MR. LAGOMARSINO:  Are we going to -- are you
23  going to produce those?
24      MR. ANDERSON:  I'm not sure it's accurate,
25  but I'll look and see what...

Page 63

1      MR. LAGOMARSINO:  Yeah.  We just want all
2  the -- I don't have anything from the review board.
3      MR. ANDERSON:  All right.
4  BY MR. LAGOMARSINO:
5      Q   So who asked you personally about the
6  subject of intervening?
7      A   Gosh, Captain Pelletier definitely did.  I'm
8  not sure who else.
9      Q   On the board itself, who are the policy
10  makers on that board?
11      MR. ANDERSON:  Objection.  Form.
12      THE WITNESS:  I mean, can you clarify what
13  you mean by a policy maker?
14  BY MR. LAGOMARSINO:
15      Q   Yeah.  How are policies arrived at at Metro?
16  Do you know?
17      A   Well, actually, it's -- the entire chain is
18  involved in policies.  As a sergeant, we would get
19  e-mailed lists of potential new policies, and we're
20  allowed to give feedback up the chain so they can
21  tweak policies and point out what -- if we think
22  there's a problem with the policy or whatnot.  But
23  actual policies get signed all the way up through at
24  least the undersheriff, if not the sheriff.
25      Q   And which alleged charges -- sorry.  Maybe

Page 64

1  I'm using the wrong terminology.  Were there charges
2  that were presented at the review board?
3      A   It's all pretty convoluted, to be honest
4  with you.
5      Q   Okay.
6      A   Yes, there are policy violations.
7      Q   And which policy violations were presented
8  to the review board from CIRT pertaining to you?
9      A   That would be neglect of duty, major
10  incident and all-hazard plan and body-worn camera.
11      Q   And which charges were sustained?
12      A   Major incident, all-hazard plan and
13  body-worn camera.
14      Q   And were you told why neglect of duty was
15  not sustained?
16      A   No.
17      Q   Are you informed of -- is it like a majority
18  vote from the board, or how does it work?  Do you
19  know?
20      A   I have no idea.  Ultimately the -- I'll take
21  that back.  Ultimately the decision rests with the
22  chairman of that board, which is the assistant
23  sheriff.  There is a vote, there is deliberation, but
24  that's the way it was explained to me.
25      Q   And at least with respect to neglect of

Page 65

1  duty, would that encompass intervening?
2      A   Yes.
3      Q   And basically the review board ratified your
4  conduct and said that you did not fail to intervene,
5  correct?
6      A   Correct.
7      Q   When you said that there's an audience, is
8  it open to the public?
9      A   No.
10      Q   Do you recall who was there in the audience?
11      A   No.
12      Q   When you were in there, where are you?  Are
13  you in, like, some kind of courtroom or a --
14      A   No.  It's a big -- big conference room at
15  Metro and headquarters.
16      Q   Over at MLK?
17      A   Yes.
18      Q   And what records have you seen from the
19  review board process?
20      A   I mean, I saw the PowerPoint.
21      Q   Provided the PowerPoint?
22      A   Yes.
23      Q   Okay.  Did you see, was there like a report
24  or recommendation or something like that issued
25  after?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1    A   I mean, my -- when I was not confirmed, that
2    included -- I don't know what you would call it, the
3    conclusions or the findings.
4        Q   Are you eligible to -- well, sorry.  What's
5    your current rank?
6        A   Police officer.
7        Q   Are you eligible to move up to sergeant?
8        A   They say I am.
9        Q   Does Metro have a policy that if you see a
10   fellow officer engaged in excessive force, that you
11   have a duty to intervene?
12       A   Yes.
13       Q   And does that apply to all officers across
14   the board or only to supervisors?
15       A   All officers across the board.
16       Q   When -- is it Detective Kirkegard?
17       A   Yes.
18       Q   When Detective Kirkegard presented the
19   neglect of duty allegation, did she say that you
20   failed to intervene?
21       A   I'm not sure I understand.
22       Q   What was the -- sorry.  What was the basis
23   of the neglect of duty allegation?
24       A   So initially it was listed -- when I was
25   first interviewed by CIRT, it was listed as duty to

Page 67

1    intervene.  When it went to the tactical review
2    board, it had been changed to neglect of duty with
3    the recommendation to sustain me for it.
4        Q   Okay.  So when you say "sustain," they
5    didn't try to make a case that you neglected duty,
6    correct?
7        A   They did.
8        Q   Oh, they did.  Okay.  Oh, actually when you
9    say "sustain," a charge.  All right.
10           So what was the basis for the neglect of
11   duty charge?
12       A   That I failed to intervene.
13       Q   And was the allegation that you failed to
14   intervene based on the fact that Lopera was using
15   excessive force?
16       A   I don't recall specifically.
17       Q   Was the basis of the failure to intervene
18   that Lopera excessively applied the neck restraint?
19       A   I don't recall.  I think we'd have to look
20   at their report.
21       Q   Did you have a -- are you a member of the
22   PPA?
23       A   Currently, yes.
24       Q   Now, there's a different organization for
25   higher ranks, correct?

Page 68

1        A   Correct.
2        Q   And who is that for a sergeant?
3        A   PMSA, the Police Managers and Supervisors
4    Association.
5        Q   Who was there from the PMSA on your behalf?
6        A   It was Sergeant Russ Wood and Lieutenant
7    Kurt, K-U-R-T, McKenzie, M-A-C-K-E-N-Z-I-E (sic).
8        Q   I saw in some of the statements that Bryan
9    Yant had participated in some of these statements.
10   Do you know who he is?
11       A   Yes.
12       Q   What do you know about Bryan Yant?
13       A   He is a representative with the PPA.
14       Q   Were you aware that he had personally shot
15   three individuals when he was an officer?
16       A   Yes.
17       Q   Were you ever present when he was -- were
18   you ever present at any officer statements besides
19   your own?
20       A   No.
21       Q   Okay.
22       A   I'm sorry, you mean when they gave their
23   initial statement?
24       Q   I apologize.  So many people gave several
25   statements, correct?

Page 69

1        A   When they made a statement at the tactical
2    review board or an initial statement?
3        Q   So there's a voluntary statement, right?
4        A   Yes.
5        Q   And that's pretty short.  That's at the
6    scene?
7        A   Potentially, yes.
8        Q   Then you have the FIT statement, correct?
9        A   Correct.
10       Q   What does FIT stand for?
11       A   Force Investigation Team.
12       Q   Then there's a CIRT statement, correct?
13       A   Correct.
14       Q   So you've given all three of those, correct?
15       A   It would just be -- we wouldn't do a
16   voluntary statement.  I gave a statement to FIT at
17   the scene, and then roughly 48 hour- -- two days
18   later I gave a statement to CIRT.
19       Q   Have you given any other statements in this
20   case?
21       A   The deposition, grand jury.
22       Q   Who represented you at the review board?
23       A   That was Russ Wood and Kurt McKenzie.
24       Q   There are three different levels of the
25   LVNR, correct?

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

19 (Pages 70 to 73)

Page 70

1    A   Correct.
2    Q   Can you describe those?
3    A   Level 1 would be when you have just the hold
4  in place and you're not applying any pressure.  It's
5  also called zero degrees.
6        Level 2, I believe, is 20 degrees when
7  you're applying medium pressure to the chest and to
8  the sides of the neck.
9        And then 45 is 45 degrees and maximum
10 pressure.
11   Q   If you don't mind, please turn to Page 53.
12   A   Okay.
13       MR. MCNUTT:  5-0?
14       MR. LAGOMARSINO:  53.
15 BY MR. LAGOMARSINO:
16   Q   Question at Line 14, it says:  "Had you --
17 can you determine whether an officer is using Level
18 1, Level 2 or Level 3?"
19       And your answer was:  "I mean, other than
20 sticking your hand in between their arm and the
21 person's neck or verbally confirming with them what
22 level they're in."
23       Is that the only way to determine whether
24 they're using Level 1, Level 2 or Level 3?
25   A   Yes.

Page 71

1    Q   Is it hard to determine what angle a
2  restraint is being applied at when it's being applied
3  from the back?
4    A   Yes.
5    Q   Why is that?
6    A   If you're doing a standing or maybe a
7  kneeling LVNR, then you see the back arm.  And as you
8  apply more pressure, theoretically your back elbow
9  goes up higher.  When you're back lying LVNR, your
10 arm is against the ground if you put it back, so
11 you're trained to tuck it under and have your forearm
12 flat against the subject's back.
13   Q   When you first noticed that Tashii was
14 unconscious, was it because his eyes were closed that
15 you believed he was unconscious?
16       Let's take you to Page 61.
17   A   Okay.
18   Q   And when there's a pause, I'm skipping
19 questions, so...
20   A   Okay.
21   Q   So going to Line 17:  "Well, was it the fact
22 that his eyes were closed?  Is that what caused you
23 to believe that he was unconscious?"
24       And what was your answer?
25   A   "Yes, sir.  Initially."

Page 72

1    Q   When you turned him over, did you put him
2  face down on the pavement?
3    A   So to get the handcuffs on, he has to go
4  face down on the payment, handcuffs go on, he
5  immediately got turned back over face up.
6    Q   Okay.  And did all three of you -- strike
7  that.
8        Did all four of you turn him over on his
9  stomach and then roll him back, Flores, Tran,
10 yourself and Lopera?
11   A   Roughly, at least two or more of us.
12   Q   Who is handcuffing Tashii after you rolled
13 him over, principally?
14   A   I had the left handcuff, and I don't
15 remember who put on the right handcuff, and we joined
16 them together.
17   Q   I'll refresh your recollection here at
18 Page 64.
19       It says:  "All right.  And then the other
20 handcuff, do you know who attached that to the other
21 arm?
22       "ANSWER:  No."
23       And then it says:  "And then he was -- were
24 both handcuffs attached to both of his arms before he
25 was placed face down?"

Page 73

1        And I think the answer was:  "I'm not sure
2  if the other one was."
3        Then answer -- or "QUESTION:  Okay.  So he
4  was placed face down, one arm was pulled over to the
5  back, the other arm was pulled over next to it, and
6  the two handcuffs were cuffed together and attached?"
7        And what was your answer?
8    A   "Correct."
9    Q   And then:  "So then you believe that took
10 five to ten seconds?"
11       And what was your answer?
12   A   "I believe so."
13   Q   And then:  "QUESTION:  Who was principally
14 doing the handcuffing?"
15       What was your answer?
16   A   "Officers Flores and Tran."
17   Q   Then the next question, it says:  "So is it
18 fair to say during the time he was being handcuffed,
19 you don't know if he was -- there was any sign of
20 resistance?"
21       Is it correct that you didn't know if he was
22 resisting at that time?
23   A   Correct.
24   Q   Is CIRT internal affairs?
25   A   No.

## Officer Travis Crumrine ~ December 10, 2018
### * * * Videotaped Deposition * * *

Page 74

1    Q   So maybe you can help me clarify this. So
2  at Line -- at Page 66, Line 2, by Mr. Sayre: "Now,
3  so somebody levied the charge at you initially. Was
4  that internal affairs?"
5        And your answer was, "Yes."
6        Is that correct or incorrect?
7    A   It's incorrect.
8    Q   Okay. And then you clarified: "It was our
9  Critical Incident Review Team."
10       Correct?
11   A   Correct.
12   Q   And the head of that was Kelly McMahill?
13   A   Yes.
14   Q   And that's a female, correct?
15   A   Yes.
16   Q   Did Tran and Flores also testify at the
17 tactical board?
18   A   Yes.
19   Q   Do you know what they were charged with?
20   A   Body-worn camera, I believe.
21   Q   Okay. So then the next question was: "What
22 other charges were levied against you besides that
23 one?"
24       "ANSWER: Major incident and all-hazard
25 plan, sometimes more commonly known as ICS or

Page 75

1  incident command system."
2        What does that mean?
3    A   It means the care and control of the
4  incident after the fact, setting up a command post,
5  setting up a perimeter, gathering your witnesses,
6  calling all the necessary resources in, specialized
7  units.
8    Q   Was that sustained against you?
9    A   It was.
10   Q   How was that sustained if -- I mean, well,
11 at that point, I guess you didn't know there was a
12 death, correct?
13   A   Correct.
14   Q   If you knew that there was a death, you
15 would not be responsible for that, correct?
16   A   Depends on who you ask.
17   Q   It's unclear?
18   A   It's unclear.
19   Q   All right. So going to Page 68, Line 13:
20 "QUESTION: To your observation, at any time did
21 Officer Tran attempt to intervene to get Officer
22 Lopera to remove his hands from the neck of
23 Mr. Farmer?"
24       After an objection to form, your answer was
25 what?

Page 76

1    A   "No, I didn't observe anything."
2    Q   Did you ever see Officer Flores attempt to
3  intervene to remove his hands from the neck of
4  Mr. Farmer?
5    A   No.
6    Q   You're wearing glasses today, correct?
7    A   Yes.
8    Q   For the record, were you wearing glasses
9  that day?
10   A   Yes.
11   Q   So there are different levels of resistance,
12 correct --
13   A   Correct.
14   Q   -- that you're trained on, correct?
15       What are the different levels that you're
16 trained on?
17   A   You have compliance, passive resistance,
18 active resistance, aggressive and aggravated
19 aggressive.
20   Q   Based on your review of the video, did you
21 see Mr. Farmer actively resisting?
22   A   Passive to active, yes.
23   Q   All right. So we can go to Page 72, Line 3:
24 "Okay. Now, you've looked at the video more than one
25 time?"

Page 77

1        "Yes."
2        What were you -- when -- just for our record
3  here, what video are you talking about?
4    A   Lopera's body-worn camera and the
5  surveillance video from the Venetian.
6    Q   Okay. And "QUESTION: Have you, at any time
7  in looking at the body camera video, seen Mr. Farmer
8  actively resisting?"
9        What was your answer then?
10   A   "No."
11   Q   Little different question: I think I saw in
12 CIRT they had -- they reference it anywhere from
13 passive to active and back and forth.
14   A   Uh-huh.
15   Q   Regardless of whether it was active
16 resistance or passive resistance, did you ever see
17 anything in the video that would justify him being
18 tased?
19   A   Not --
20       MR. MCNUTT: Objection. Form.
21       THE WITNESS: Not necessarily.
22 BY MR. LAGOMARSINO:
23   Q   Did you ever see anything in the video that
24 would justify Tashii being hit on the head 10 to 12
25 times?

# Officer Travis Crumrine ~ December 10, 2018
## * * * Videotaped Deposition * * *

### Page 78

1    MR. MCNUTT: Objection. Form.
2    THE WITNESS: No.
3  BY MR. LAGOMARSINO:
4    Q   Did you see anything in the video that would
5  justify a lateral vascular neck restraint?
6    MR. MCNUTT: Same objection.
7    THE WITNESS: No.
8  BY MR. LAGOMARSINO:
9    Q   Now, you were talking to the fire department
10 when they arrived, correct?
11   A   Yes.
12   Q   And you, I believe you used the word "choke"
13 or "choke hold," something along those lines,
14 correct?
15   A   I did.
16   Q   And did you do that because it wasn't, in
17 your view, an LVNR, or were you just trying to make
18 the translation better for the fire department?
19   A   I was trying to translate for the fire
20 department.
21   Q   Okay.  Do -- are you a UFC fan?
22   A   No.
23   Q   How many times, to your knowledge, did
24 Lopera cycle his taser?
25   A   To my knowledge, I believe it was seven.

### Page 79

1    Q   And did you believe that to be out of
2  policy?
3    A   Pol-- --
4    MR. MCNUTT: Objection. Form.
5    THE WITNESS: Sorry.
6    Policy says that after three cycles the
7  officer should consider another force option.
8  BY MR. LAGOMARSINO:
9    Q   Have you reviewed the coroner's report in
10 this case?
11   A   No.
12   Q   Are you aware of what the coroner determined
13 to be the cause of death?
14   A   Vaguely.
15   Q   Are you aware that it was determined to be
16 asphyxiation?
17   A   Yes.
18   Q   Do you have any reason, to your knowledge,
19 to disagree with that?
20   MR. ANDERSON: Objection. Form.
21   THE WITNESS: I know that there were other
22 arguments made about it, just from what I read.
23 BY MR. LAGOMARSINO:
24   Q   What did you read?
25   A   Just about --

### Page 80

1    Q   Well, let me rephrase.
2    A   Sorry.
3    Q   You just said you read from something.  What
4  did you read, what document?
5    A   The news or the paper that some doctors
6  had -- other doctors had testified.
7    Q   Officer Lopera retained, I think, Force
8  Science, have you heard of them?
9    A   I've heard of them, yes.
10   Q   What have you heard about Force Science?
11   A   That they study police use of force.
12   Q   Have you ever heard of whether Force Science
13 has ever found that a police officer was not
14 justified?
15   A   I have not.
16   Q   In any event, you've heard that from other
17 sources, correct?
18   A   Yes.
19   MR. LAGOMARSINO: All right.  I think it's a
20 good time to go to lunch.
21   THE VIDEOGRAPHER: We are going off the
22 record.  The time is approximately 12:02 p.m.
23   (Lunch recess.)
24   THE VIDEOGRAPHER: The time is approximately
25 1:16 p.m.  We are back on the record.

### Page 81

1    (Plaintiff's Exhibit No. 2 was marked
2    for identification.)
3  BY MR. LAGOMARSINO:
4    Q   Mr. Crumrine, did you give a statement to
5  the Critical Incident Review Team?
6    A   Yes.
7    Q   It's also known as CIRT, correct?
8    A   Yes.
9    Q   What is your understanding of CIRT's
10 function?
11   A   CIRT's function is to investigate the
12 tactics and policies as they apply to critical
13 incidents that occurred on the department and make
14 recommendations for policy changes, discipline.
15   Q   Have you ever reviewed your statement from
16 CIRT?
17   A   Yes.
18   Q   Have you ever reviewed anybody else's
19 statement from CIRT?
20   A   No.
21   Q   Have you reviewed the CIRT report that was
22 issued with recommendations out of this incident?
23   A   Yes.
24   Q   And when did you do that?
25   A   Roughly -- it was two days, I think two

Officer Travis Crumrine  ~   December 10, 2018
\* \* \* Videotaped Deposition \* \* \*

Page 82

1   days, or the day before the tactical review report.
2       Q   When you gave your statement, where were
3   you?
4       A   In the CIRT office at headquarters.
5       Q   And who was present?
6       A   Myself, Detective Pat Hughes, Detective
7   Kasey Kirkegard, Sergeant Kyle Ward, Lieutenant Dan
8   Bledsoe, Russ Wood, Jay Roberts and Kurt McKenzie.
9       Q   And did you understand that the conversation
10  was being recorded?
11      A   Yes.
12      Q   And was there a person there that was also
13  transcribing similar to what you described earlier
14  today?
15      A   I believe it was just recorded.
16      Q   Did you understand that you had an
17  obligation to be truthful?
18      A   Yes.
19      Q   And on Page 3 of the statement, there's an
20  instruction from Kasey Kirkegard regarding
21  self-incrimination?
22      A   Yes.
23      Q   It says: "Self-incrimination. Because you
24  are being compelled to answer questions in an
25  employee -- I'm sorry -- as an employee under the

Page 83

1   threat of termination, your statements, any
2   information or evidence which is gained through such
3   questioning cannot be used against you in any
4   criminal proceeding. Do you understand this right?"
5       And what did you say?
6       A   "Yes."
7       Q   Did you understand that your CIRT statement,
8   however, could be used in a civil proceeding?
9       A   Yes.
10      Q   Please go to Page 4. Line 9 says: "All
11  right. Travis, you just stated your name and
12  P-number, but there's quite a few other people in
13  this room for the investigation. I'd like to have
14  everybody identify themselves to help the
15  transcriptionist. My name is Patrick Hughes. My
16  P-number is 9084. And we'll just move to the left."
17      And then a series of people were introducing
18  themselves, correct?
19      A   Correct.
20      Q   There's a question on Page 5 at Line 4, it
21  says: "Prior to this interview starting, did you --
22  were you able to re-review all the video that we
23  talked about?"
24      And your answer was, "Yes."
25      What video did you review before the CIRT

Page 84

1   statement?
2       A   I believe it was my body-worn camera.
3       Q   And then it says: "Were you able to listen
4   to the audio as well?"
5       What audio did you listen to?
6       A   Audio from the body-worn camera.
7       Q   Your CIRT statement was quite long, correct?
8       A   Yes.
9       Q   And you have reviewed it before?
10      A   Yes.
11      Q   If, at any time that we go through this, it
12  doesn't appear to be a true and correct copy of your
13  statement, please let us know. Okay?
14      A   Okay.
15      Q   All right. Going to Page 8, the question
16  was: "Were you wearing body armor that night?"
17      You were, correct?
18      A   Yes.
19      Q   Was Officer Lopera wearing body armor?
20      A   To the best of my knowledge, yes.
21      Q   Okay. And you were wearing a body camera
22  that night, correct?
23      A   Correct.
24      Q   And so I will kind of ask you the questions.
25  If it's changed, let us know. But where did you

Page 85

1   position your body camera at that time?
2       A   On my right epaulette on my -- top of my
3   shoulder.
4       Q   And: "QUESTION: And is that normally where
5   you pushin' it -- position it?"
6       And the answer was, "Yes."
7       Correct?
8       A   Yes.
9       Q   And where is the activation button kept?
10      A   On my vest underneath my shirt.
11      Q   Is it fairly easy to activate your camera?
12      A   Yes.
13      Q   And is there a wire that runs from the
14  camera?
15      A   Yes.
16      Q   Can you explain where it runs?
17      A   Basically, so the battery pack is here on my
18  vest under my shirt, and the wire runs out between
19  the buttons on my shirt, around my neck to the
20  camera.
21      Q   So next question is: "Are you CIT
22  certified?"
23      What does CIT stand for?
24      A   Crisis Intervention Team.
25      Q   And it says: "Are you instructor

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

23  (Pages  86 to 89)

Page 86

1  development certified?"
2      What is instructor development?
3      A   It means you're certified to teach classes.
4      Q   Which classes were you certified to teach?
5      A   None specifically.  I had just taken the
6  class that makes you certified to teach classes.
7      Q   To teach classes.  Okay.  And then you'd
8  have to be certified to teach a specific class?
9      A   Yes.
10     Q   Okay.  Were there any crisis intervention
11  team elements that were present in this case?
12     A   Can you be more specific?
13     Q   Sure.  Was there anything in your mind that
14  would implicate crisis intervention in Tashii's case?
15     A   It could have.  It certainly could have had
16  the potential to have those elements.
17     Q   Did it cross your mind when you first
18  arrived at the scene that maybe Tashii was in crisis?
19     A   Yes.
20     Q   And based on what?
21     A   Based on that he's in a physical
22  confrontation with my officer.
23     Q   Okay.  Next question was:  "Are you
24  certified in defensive tactics?"
25      What was your answer?

Page 87

1      A   "No."
2      Q   Are you certified today?
3      A   No.
4      Q   Were you required to be certified in
5  defensive tactics?
6      A   No.
7      Q   Is there a separate certification for the
8  LVNR, or does that fall under the umbrella of
9  defensive tactics?
10     A   It falls under the umbrella of defensive
11  tactics.
12     Q   So you're not a firearms instructor,
13  correct?
14     A   Correct.
15     Q   And then it says:  "Are you HGN certified?"
16      What is that, horizontal gaze nystagmus?
17     A   Correct.
18     Q   And what is that?
19     A   That's the -- to detect impairment by
20  watching a subject's pupils, their eyes.
21     Q   And we asked you this earlier, you're not
22  drug and recognition -- strike that.
23      You're not DRE certified, correct?
24     A   Correct.
25     Q   And what is that?

Page 88

1      A   Drug recognition expert has gone through
2  more extensive training to identify physical signs of
3  impairment.
4      Q   And that evening, you were riding in the
5  Crown Victoria?
6      A   Correct.
7      Q   Going to Page 12.  So I touched on this
8  earlier, but just so we can kind of get some context
9  here, it says:  "How long have you been a supervisor
10  for Lopera?"  7 and 8?
11      And you said:  "About March 11th."
12      Correct?
13     A   Correct.
14     Q   And the next question was:  "Okay.  Have you
15  ever supervised him outside of the flex squad?"
16      What does -- what does that mean?
17     A   Had he ever been on another squad that I
18  supervised, I believe is what he was asking.
19     Q   All right.  And your answer was "No"?
20     A   Correct.
21     Q   I believe I asked you this earlier, you had
22  never supervised over a use of force where he was the
23  subject of a pursuit, correct?
24     A   Correct.
25     Q   Okay.  And what is a citizen contact report?

Page 89

1      A   A citizen contact would be where a citizen
2  is complaining about an officer's actions.  And it
3  doesn't rise to the level of maybe a formal
4  complaint, but we still formalize it in a citizen
5  contact, which is still under the umbrella of our use
6  of force policy, that we just document what the
7  citizen's complaints were, what our investigation was
8  and what steps we took to prove, disprove, whatever.
9      Q   Do you know if Officer Lopera ever had a
10  citizen contact report?
11     A   I don't.
12     Q   But in any event, you didn't supervise him
13  on a citizen contact report, correct?
14     A   No, sir.
15     Q   And then are citizen contact reports, to
16  your knowledge, kept in your employment file?
17     A   No, I don't believe so.
18     Q   Okay.  And does Metro have a policy of
19  removing personnel actions from your employment file
20  after a certain amount of time?
21     A   Yes.
22     Q   What is that policy?
23     A   I'm not sure.  But there's purge dates after
24  a certain amount of time.
25     Q   The file is purged at some point, correct?

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

24 (Pages 90 to 93)

---

Page 90

1    A   Yes.
2    Q   Next question at Line 17: "And anything
3  that didn't involve a formal investigation could have
4  been cleared out just in CAD."
5        What is that?
6    A   CAD is the computer-aided dispatch system.
7    Q   Okay.  Sorry.  That was a bad question.
8  What would anything that didn't involve a formal
9  investigation that could have been cleared out mean?
10   A   Oh, God.  I mean, if you just had someone
11 complaining, you know, the officers were
12 disrespectful to me or, I mean, probably the most
13 common complaint is that they didn't -- the person
14 didn't break the law or that the officers don't have
15 probable cause to arrest the person.
16   Q   Had you ever witnessed Officer Lopera arrest
17 anybody before this incident?
18   A   I'm sure I did.
19   Q   Do you have a specific recollection of it?
20   A   No.
21   Q   Other than giving him the midnight briefing
22 or the roll call, do you have a specific recollection
23 as you sit here today of observing Officer Lopera or
24 supervising him?
25   A   Yes.

---

Page 91

1    Q   And what is your specific recollection?
2    A   Just in the times that you first asked the
3  question the first time sort of, he made a stop over
4  by Top Golf, if you know where that is on Koval and
5  Trop, of a guy who was carrying a firearm, concealed.
6        He made a stop on Flamingo and Paradise with
7  a subject who was carrying a firearm illegally; I
8  believe it was stolen.  So yes.
9    Q   Okay.  So you have those two recollections,
10 is what you remember?
11   A   At least, yes.
12   Q   As you sit here today, can you remember any
13 others?
14   A   Not off --
15   Q   Okay.  There was some discussion at -- on
16 Line 14 -- or excuse me, Page 14, about the uniforms
17 you guys were wearing.
18   A   Yes.
19   Q   What was Officer Lopera wearing that
20 evening?
21   A   He was wearing our green BDU type uniform.
22   Q   What is that?
23   A   It's one of the uniforms that specialized
24 units on the department sometimes wear.
25   Q   Was he in a specialized unit?

---

Page 92

1    A   The flex teams are not exactly a specialized
2  unit, but at the station level, it's kind of
3  considered a -- I don't know if I want to say special
4  squad, but it's not doing the normal patrol function.
5  And it's at the captain's discretion that -- what the
6  flex teams to be.  Sometime -- some places flex
7  squads are in tan uniforms, some places they wear
8  green, some places they are in plain clothes.
9    Q   Are you able to estimate what percentage of
10 Metro officers that the public deals with wear tan
11 uniforms?
12   A   It's hard to say.
13   Q   Would you say, like, the overwhelming
14 majority of officers wear tan uniforms?
15   A   Tan uniforms or maybe plain clothes even.
16   Q   How unique is that BDU uniform?
17   A   For -- at Convention Center specifically,
18 you have got roughly probably at the moment, even
19 presently, about 28 officers that are on flex squads.
20 So out of something like 235 officers assigned to
21 Convention Center, just over 10 percent of them are
22 in green uniforms.
23   Q   They look like army uniforms?
24   A   I mean, they're not camouflage.  They're
25 just plain green BDUs.  Honestly, we should probably

---

Page 93

1  switch to them for everybody because they're much
2  less expensive than the tan ones.
3    Q   Do you recall having pictures taken of you
4  that evening?
5    A   I don't.
6    Q   Do you know if Officer Lopera had pictures
7  taken of him in what he was wearing?
8    A   Yes.
9        MR. LAGOMARSINO:  And, again, I'm not sure
10 if we have it or not, but I'd just request that we
11 get those.
12       MR. ANDERSON:  Yeah.  Okay.
13 BY MR. LAGOMARSINO:
14   Q   Okay.  Going to Page 16, actually starting
15 at 15, going on to 16, there were some questions
16 about do you know -- I guess you said you were
17 already headed to the Venetian for something?
18   A   Yeah.
19   Q   Now, to this day, can you remember --
20   A   I still don't.  I still think about it from
21 time to time.  I still don't remember what it was I
22 was going there for.
23   Q   Was that a place where you would get coffee
24 regularly?
25   A   Yeah.  Maybe once a week or so.

---

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

25 (Pages 94 to 97)

Page 94

1    Q  Okay.  And then you would talk to security
2   managers there?
3    A  Yes.
4    Q  And what would you talk to those security
5   managers about?
6    A  Just any issues that they were having.  I
7   basically -- understand that I spent of my 13-odd
8   years on the department, I spent 12-odd of them on
9   graveyard on the Strip in one capacity or another.
10  So when I was in vice, I was dealing with security on
11  the Strip.  It's kind of what I'm most comfortable
12  with.  So some of these people I've known for a long
13  time.
14      I remember Venetian did have a brand new
15  security supervisor on graveyard.  That might have
16  been why I was going to meet that person.
17    Q  I think this is going to be a slightly
18  different question than what I asked you:  When you
19  heard the radio traffic about the call at the
20  Venetian, did you understand any of it?
21    A  No.
22    Q  And you were not sure who was broadcasting
23  the traffic, correct?
24    A  Correct.
25    Q  To you, did it sound like a fight or a foot

Page 95

1   pursuit?
2    A  Yeah.  Yes.
3    Q  On the way to the Venetian, do you have a
4   recollection of using your mobile data terminal or
5   MDT?  Did I say that right?
6    A  Yeah.
7       No.
8    Q  All right.  Are you able to run or do you
9   know if Metro is able to see if you did use your MDT?
10   A  Possibly.
11   Q  Prior to arriving, did you know where
12  Officer Lopera was?
13   A  No.
14   Q  At any time, did you ever see Tashii punch
15  or strike Officer Lopera?
16   A  At any time when I was on scene?
17   Q  Right.
18   A  No.
19   Q  Going to Page 20, please.
20      MR. MCNUTT:  2-0?
21      MR. LAGOMARSINO:  Yeah, 20.
22  BY MR. LAGOMARSINO:
23   Q  So the question at Line 20, "They're both on
24  the ground.  I was asking you what level of
25  resistance do you think the officer was showing to

Page 96

1   Officer Lopera?"
2       And then it appears that your answer was:
3   "Okay.  Um, I would say he's in active for the most
4   part.  He is definitely not trying to get away.  He
5   is providing resistance to Officer Lopera."
6       So at any time, did you see Tashii trying to
7   get away?
8    A  No.
9    Q  What is the difference between active
10  resistance and aggressive resistance?
11   A  Actions taken to -- with the intent of
12  harming the officer.
13   Q  Did you ever see any actions taken by Tashii
14  that indicated to you he was trying to harm the
15  officer?
16   A  No.
17   Q  Are citizens allowed to resist an officer
18  who is using excessive force on them?
19      MR. ANDERSON:  Objection.  Form.
20      THE WITNESS:  Yes, I think if that's
21  evident, yeah.
22  BY MR. LAGOMARSINO:
23   Q  All right.  Next Line 21, or excuse me,
24  Page 21, 2-1, Line 9, so it looks like they're
25  reciting something that you may have said in your FIT

Page 97

1   statement.  It says:  "I saw them on the ground.  And
2   as I got out of the car, I already knew he had him in
3   an LVNR."
4       And then the question, just for
5   clarification:  "Did you see Officer Lopera apply the
6   LVNR, or was the LVNR already applied?"
7       And your answer was:  "I saw him apply the
8   LVNR."
9       Correct?
10   A  Correct.
11   Q  So as you're approaching him, he is going
12  into the LVNR, correct?
13   A  Correct.
14   Q  And what training had you received regarding
15  the LVNR?
16   A  Training in the academy, and then it's a
17  part of quarterly defensive tactics training at least
18  once a year, sometimes more often.
19   Q  Had you ever watched a video on LVNRs?
20   A  Maybe.
21   Q  Okay.  I think we -- if we have one later,
22  maybe it will refresh your recollection, or maybe
23  not, but --
24   A  Oh, I have watched that video, yes.  Not in
25  my training had I watched the video.

# Officer Travis Crumrine ~ December 10, 2018
## * * * Videotaped Deposition * * *

26  (Pages 98 to 101)

---

### Page 98

1  Q  Okay.  Do you know, was that video created
2  before this incident or after?
3  A  To the best of my knowledge, it was created
4  after.
5  Q  The -- was it -- had you ever received any
6  other LVNR training before joining Metro?
7  A  No.
8  Q  So was it based on your training with Metro
9  that you believed that Officer Lopera had Tashii in
10  an LVNR?
11  A  Yes.
12  Q  At all times did you believe at the scene
13  that -- well, strike that.
14     24, please.  Was it your understanding that
15  Lopera was trying to apply a back lying LVNR?
16  A  Yes.
17  Q  All right.  25, please.  So you used the
18  phrase in your CIRT statement that Lopera was
19  fighting.  Were you using it in the sense of, like,
20  he was boxing, or was it like he just wasn't -- or
21  that he was just resisting?
22     MR. MCNUTT:  Objection.  Form.
23     MR. LAGOMARSINO:  Yeah.  That is a terrible
24  question.  I'll rephrase.
25     ///

---

### Page 99

1  BY MR. LAGOMARSINO:
2  Q  You already testified that he wasn't trying
3  to harm Officer Lopera, correct?
4  A  Correct.
5  Q  And are you using the word "fighting" to
6  mean resisting?
7  A  Yes.
8  Q  All right.  Going to Page 26.  There's been
9  some reference to Tashii being on top of Officer
10  Lopera, and so you were asked in the CIRT statement
11  about whether that could be potentially misconstrued
12  to imply that Tashii was in a dominant position.  Did
13  you ever see Tashii in a dominant position?
14  A  No.
15  Q  And when Officer Lopera had him in the LVNR,
16  did Officer Lopera have a certain amount of control
17  over Tashii?
18  A  Do you want me to put a percentage to the
19  amount of control I think he had or --
20  Q  Well, you said he had a certain level of
21  control, correct?
22  A  Right.
23  Q  And he had that level of control over
24  Tashii, correct?
25  A  Yes.

---

### Page 100

1  Q  Okay.  Then you were asked:  "Did you ever
2  observe Officer Lopera remove either hand or arm away
3  from the suspect while he applied the LVNR?"
4     What was your answer?
5  A  Where are we at?
6  Q  Oh, I apologize.
7  A  I think it was "No."
8  Q  So it's 26 at the bottom and then going to
9  27.
10  A  Yeah.  "No."
11  Q  Okay.  Same answer today?
12  A  Correct.
13  Q  Did you personally ever advise Tashii to
14  stop resisting?
15  A  Other than, "Put your fucking hands behind
16  your back," that's all I ever said to him.
17  Q  Going to Page 29, please.  So Line 1, it
18  says:  "On Page 4 of your FIT statement, you stated
19  you were able to place a cuff on the subject's left
20  arm.  Why weren't you able to place the subject's --
21  a cuff on the subject's right arm?"
22     And you said:  "I couldn't get to it."
23     Why couldn't you get to it?
24  A  Like I explained before, when they're -- we
25  had to bring the cuffs behind Farmer's back and

---

### Page 101

1  Lopera's chest is against Farmer's back, they need to
2  separate.
3  Q  Okay.  So it was based on Officer Lopera's
4  position on Tashii that you couldn't get to his right
5  arm, correct?
6  A  I could get to his right arm.  I just
7  couldn't bring the two together to handcuff.
8  Q  Based on Officer Lopera's position, correct?
9  A  Sure.
10  Q  After Tashii was placed in handcuffs, was he
11  resisting?
12  A  No.
13  Q  At some point after you turned Tashii over,
14  you went to your car, correct?
15  A  Yes.
16  Q  You didn't know anything about Tashii before
17  you went to go to your car to check him out, correct?
18  A  Correct.
19  Q  How long did it take you to run him at the
20  car?
21  A  I don't know, a minute or so.
22  Q  Okay.  How long did it take you to get to
23  the car?
24  A  Not very long.  The car was pretty close.
25  Q  Another 30 seconds or a minute?

---

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

27 (Pages 102 to 105)

Page 102

1    A   Maybe.
2    Q   After you had turned him over, did you run
3  to the car, did you jog, did you walk fast?
4    A   Oh, it was probably several minutes before I
5  went to the car. I was calling for medical. I mean,
6  all the other -- I think a bunch of that stuff
7  happened before I ever went to the car.
8    Q   Okay. When you ran him, you received some
9  information that he had a prior DUI, correct?
10    A   Correct.
11    Q   Was that relevant to what had happened
12  before you ran him?
13    A   No.
14    Q   Have you since learned that Tashii had a
15  record in Hawaii?
16    A   Yes.
17    Q   Was that relevant to you before you learned
18  that?
19    A   No.
20    Q   Strike that.
21        Was that relevant to you before the incident
22  or during the incident?
23    A   I don't think I understand the question.
24    Q   That's like a dumb lawyer question.
25        You didn't know about it, right?

Page 103

1    A   Correct.
2    Q   So it couldn't be relevant to you?
3    A   Correct.
4    Q   Did you ever ask Lopera what crime Tashii
5  had committed?
6    A   I may have asked him what happened, but not
7  specifically what crime was committed, no.
8    Q   But you asked him what happened after the
9  fact, correct?
10    A   Correct.
11    Q   When you arrived, did you see any injuries
12  on Officer Lopera?
13    A   No.
14    Q   When Officers Tran and Flores arrived, did
15  they conduct themselves in accordance with their
16  training?
17    A   Yes.
18    Q   At the time that you first told Tashii (sic)
19  to release the LVNR, did you believe that Lopera had
20  control of Tashii?
21        MR. ANDERSON: Objection. Form. I think
22  you have the wrong names there.
23        MR. LAGOMARSINO: Oh, I'm sorry. I'll
24  rephrase it.
25        ///

Page 104

1  BY MR. LAGOMARSINO:
2    Q   At the time that you told Lopera to release
3  Tashii, did you feel that Lopera had control of
4  Tashii?
5    A   No.
6    Q   Okay. All right. Let's turn to 44.
7    A   Sure.
8    Q   At Line 3, you said: "All right. So at the
9  time -- so at the time you told him to release the
10  LVNR, it was still just you and the subject officer?"
11        And what was your answer?
12    A   "Correct."
13    Q   "And the purpose of releasing the LVNR was
14  to facilitate handcuffing?"
15        And what was your answer?
16    A   "Correct."
17    Q   "And you felt that you and the subject
18  officer had control of the subject?"
19    A   "Correct."
20    Q   All right. Please turn to 46. We talked
21  earlier about that you used the word "choked" with
22  the fire department, at the bottom of 46 and 47 where
23  you were talking about that with CIRT.
24    A   Yes.
25    Q   Is a choke hold slang for an LVNR at Metro?

Page 105

1    A   Yes.
2    Q   Okay. Did you ever submit a use-of-force
3  report regarding the use of the LVNR?
4    A   No.
5    Q   All right. Going to Page 84, please. So
6  there's a series of questions on here about whether
7  you could have interceded or whether you should have
8  interceded. So I will ask the first question: As we
9  sit here today, do you feel at any time that Officer
10  Lopera was applying the LVNR that you could have
11  interceded to stop the application of the LVNR?
12    A   Yes.
13    Q   And then when -- the next question kind of
14  at Line 17, it says: "So now we have got Tran and
15  Flores there. Do you think if you, as a supervisor,
16  can step back and assess it, could you have
17  interceded?"
18        And what was your answer?
19    A   "I could have."
20    Q   What's a debrief of an incident?
21    A   A debrief, the way it's being used here, is
22  just an informal discussion between the people
23  involved in the incident about the tactics that were
24  employed during the incident. And basically we go
25  over everything from the very beginning of the call,

Officer Travis Crumrine ~   December 10, 2018
* * * Videotaped Deposition * * *

28  (Pages 106 to 109)

Page 106

1   who was the first to respond, who was the first to
2   arrive, what tactics did we employ, how well did we
3   communicate, what levels of force were we in, what
4   was the crime, what -- all that kind of stuff.
5       Q   And no debrief was conducted here, correct?
6       A   No.
7       Q   And is that because he passed away?
8       A   That is because I was noticed by CIRT that I
9   was not allowed to speak about the incident while I
10   was under investigation.
11      Q   Did you, yourself, provide any medical
12   treatment to Tashii?
13      A   No.
14      Q   So you were asked the question --
15          MR. MCNUTT:  90?
16          MR. LAGOMARSINO:  I'm sorry, 95.  I'm sorry,
17   96.
18   BY MR. LAGOMARSINO:
19      Q   You asked:  "Well, I'm -- my -- the Officer
20   Lopera could have more appropriately chosen his force
21   options."
22          As you sit here today, do you believe that
23   he could have appropriately chosen his force options
24   better?
25      A   Yes.

Page 107

1       Q   How could he have done it better?
2       A   I mean, I can't give you any -- any
3   different way to do it that would guarantee a
4   different outcome, by any means.
5       Q   There's no guarantees, right?
6       A   Right.  And I can -- I could sit here for
7   hours and play devil's advocate about all of it.  If
8   you were talking about the taser, you know, policy,
9   it says you should consider another force option
10   after three cycles.  But there's a lot that depends
11   on that.
12          Lopera was alone.  You know, I mean, officer
13   presence is a force option.  Had his partner not lost
14   track of him, I believe less force would have been
15   used.  So many, I'm not sure where to start with you.
16   There's a lot of variables here.
17      Q   Well, I'll go through them with you.  Let me
18   ask about the taser.  What does neuromuscular
19   incapacitation mean?
20      A   Commonly referred to as "lock up," when the
21   person is basically -- the person goes stiff and
22   doesn't have control over their movement.
23      Q   Is a person's ability to respond to commands
24   in a physical way impaired by being tased repeatedly,
25   based on your training?

Page 108

1       A   It depends on the person.  I've seen people,
2   watched people get tased with one cycle or less, and
3   as soon as that cycle ended, they immediately
4   complied and put their hands behind their back.  I've
5   always observed that people are able to talk while
6   being tased, because I remember -- now this is going
7   back 11 years probably, but I was present when an
8   officer tased a guy.  And the officer is saying, "Put
9   your hands behind your back," and the kid is saying,
10   "I can't right now," while he's being tased.  But as
11   soon as that cycle ended, the gentleman put his hands
12   right behind his back.
13      Q   Complied.  Okay.
14          So then Page 97, you were asked:  "Based on
15   the training that you have received during your time
16   on the department, do you think you were adequately
17   prepared to handle this incident?"
18          And what was your answer?
19      A   I said:  "No, not entirely.  Um, I'm not
20   sure how I could be.  I'm not -- I -- I can't give
21   you a recommendation on how to better train other
22   than to experience it."
23      Q   Okay.  Next question at Page 98, JR says:
24   "Okay" -- excuse me, at Line 10:  "Okay.  So critical
25   training is a perishable skill?"

Page 109

1          What does that mean to you?
2       A   Basically -- well, what they were asking me
3   earlier was, is there any type of a scenario that we
4   could put new sergeants, continuing sergeants or
5   supervisors through that would better train you on
6   how to handle this.  And we -- we do great training
7   at Metro, but what I was conveying is that you just
8   can't train for the actual real thing.  Again, too
9   many variables.  It's just not the same as -- as
10   close as you can get in training.  Not that the
11   training is bad.
12          And what he is saying as far as it's a
13   perishable skill is that the more often you go out
14   and do the job of being a supervisor or being an
15   officer or whatever, the better you're going to be at
16   it.  If we take a sergeant who's been a detective
17   sergeant for ten years, an inside cat, if you will,
18   and put him out on the street, it's going to take him
19   some time to get back up to speed.
20      Q   You had mentioned here, the only type -- the
21   only kind of training you could do to them would be
22   RBT.  What does RBT stand for?
23      A   Reality-based training.
24      Q   What is that?  Is that what you just
25   described?

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

| Page 110 |
| --- |

1     A   Pretty much.  We try to have role players
2  and set up a critical incident.
3     Q   And was there any training for this scenario
4  in the reality-based training context?
5     A   No.
6     Q   Based on your review of the document today,
7  does that appear to be a true and correct copy of
8  your CIRT statement?
9     A   Yes.
10     (Plaintiff's Exhibit No. 3 was marked
11      for identification.)
12  BY MR. LAGOMARSINO:
13     Q   What is Exhibit 3?
14     A   This is my statement to FIT.
15     Q   How many pages is it?
16     A   They're not numbered.  Hang on.  Oh, there
17  at the top, sorry.  Seven.
18     Q   Does this appear to be a true and correct
19  copy of your FIT statement?
20     A   Yes.
21     (Plaintiff's Exhibit No. 4 was marked
22      for identification.)
23  BY MR. LAGOMARSINO:
24     Q   I'm handing you what's been marked as
25  Exhibit 4.  What does Exhibit 4 appear to be to you?

| Page 111 |
| --- |

1     A   Force investigation team report.
2     Q   Have you reviewed this report before?
3     A   Maybe.  There's so many reports.
4     Q   So I would like you to take a look at -- you
5  can take a couple of minutes or take a break if you
6  need to, but -- well, let me -- have you ever watched
7  Officer Lopera's body camera footage?
8     A   I have watched -- the longest version of the
9  body camera footage that I have seen was the one that
10  was presented at the police fatality public
11  fact-finding review.  I watched that after it got
12  posted up on the internet.  That's the longest
13  version I've ever seen.
14     MR. MCNUTT:  Andre, can I just ask him?
15     MR. LAGOMARSINO:  Yeah.
16     MR. MCNUTT:  Where did that video start?  Do
17  you recall?  On that -- the version that you saw,
18  what was the first portion that you saw?
19     THE WITNESS:  Inside the Venetian, I
20  believe.
21     MR. MCNUTT:  Okay.  It started -- okay.
22  Before the foot pursuit?
23     THE WITNESS:  Correct.
24     MR. MCNUTT:  Okay.  I didn't know which
25  version that was.

| Page 112 |
| --- |

1     MR. LAGOMARSINO:  No, that's fine.
2  BY MR. LAGOMARSINO:
3     Q   Going to Page 10 of the report, which is
4  LVMPD 2067 at the bottom, it mentions it at 5:03, but
5  did Officer Lopera state to you that, quote, I choked
6  him out, referring to Tashii Farmer?
7     A   Yes.
8     Q   And then there's an entry at 6:38 where it
9  says: "Officer Lopera told Officer Flores and
10  Rybacki what happened.  And during the conversation,
11  he stated, 'I started whaling on the dude, and then I
12  rear-mounted and choked him out.'"
13     Were you present for that conversation?
14     A   No.
15     Q   Do you know where you were at the time?
16     A   No.
17     Q   A rear-mounting can be accomplished by -- in
18  an LVNR, correct?
19     A   I don't know.
20     Q   On Page 11, Lopera says: "Sarge, is he
21  okay?  He's breathing?  Officer Lopera then gives the
22  thumbs-up sign and says 'Thank you.'"
23     Did you tell Officer Lopera that he was
24  breathing?
25     A   Yes.

| Page 113 |
| --- |

1     Q   Then it says: "Officer Lopera asked if he
2  should expedite medical."
3     Do you recall him asking that?
4     A   I don't.
5     Q   Was medical expedited?
6     A   Medical had been expedited long before that.
7     Q   At 11:25 it says: "Officer Rybacki
8  approached Officers Flores and Tran.  One of the
9  officers said he was out when we got here.  Officer
10  Rybacki responded, 'He was definitely on something.'"
11     Do you know which officer, Flores or Tran,
12  said that he was out when you guys got -- when they
13  got there?
14     A   I don't know.
15     Q   Then there's a reference at 4:09 with
16  Officer Stutzman.  It says: "Officer Stutzman began
17  talking to Officer Flores.  Officer Flores stated,
18  quote, By the time we got here, Sarge, and what's
19  that guy?  Lopera were wrestling around with that
20  guy.  Had him in a lock.  I grabbed the guy's feet,
21  but he was already out."
22     Were you present for that conversation?
23     A   No.
24     Q   Please turn to Page 16.  This is LVMPD 2073.
25  "Numerous yellow/pink AFID tags bearing serial number

All-American Court Reporters (702) 240-4393
www.aacrlv.com

## Officer Travis Crumrine  ~   December 10, 2018
## * * * Videotaped Deposition * * *

### Page 114

1  TSC C31040 were located on the roadway."
2      What is that?
3      A   So those are the confetti that I was talking
4  about that comes out of the taser cartridge.  And the
5  area that they're talking about -- I'm probably
6  jumping ahead, but I think what you're asking is the
7  area where that confetti is and the location where
8  Farmer was placed in handcuffs, however many lanes
9  wide that road is between the Jersey barrier and the
10  curb, that's the distance between.
11      Q   Could you please turn to Page 2089.  So it's
12  not the best copy here, but what is that graphic?
13      A   It's our use-of-force model.
14      Q   Are you able to read the text in there?
15      A   Vaguely.  Probably from memory, I can
16  probably tell you what it says.
17      Q   Okay.  So it says:  "It's important for
18  officers to bear in mind" -- strike that.  At the
19  very bottom here.
20      A   Yes.
21      Q   It says, "LVMPD policy and levels of
22  resistance states, quote, It is important for
23  officers to bear in mind that there are many reasons
24  a suspect may be resisting arrest or may be
25  unresponsive.  The person in question may not be

### Page 115

1  capable of understanding the gravity of the
2  situation.  Officers must consider several factors
3  when dealing with a noncompliant subject.  Subject
4  may be noncompliant due to a medical condition,
5  mental, physical or hearing impairment, language
6  barrier, drug interaction or emotional crisis and
7  have no criminal intent."
8      Do you agree with that sentence?
9      A   Yes.
10      Q   It says:  "This may not make the subject any
11  less dangerous, but it may require a change in
12  tactics that will be more effective while maintaining
13  officer safety once these circumstances are known to
14  the officer."
15      Is officer safety recognized as a reason to
16  deprive an individual of their constitutional rights?
17      MR. MCNUTT:  Objection, form.
18      THE WITNESS:  No.
19  BY MR. LAGOMARSINO:
20      Q   Going to 33, Page 33, are you familiar with
21  the Graham v. Connor factors?
22      A   Yes.
23      Q   So there's a discussion here about the
24  severity of the crime at issue.  In your view, how
25  severe was the crime at issue?

### Page 116

1      A   The moment that I arrived?
2      Q   Yes.
3      A   It was -- all I knew was obstructing or
4  resisting, because Farmer was resisting arrest.
5      Q   Okay.  Was that a severe crime?
6      MR. MCNUTT:  Objection.  Form.
7      THE WITNESS:  If it's just a resisting of a
8  public officer, it's a misdemeanor.  If it's
9  resisting a public officer with a weapon, it's a
10  felony.  It depends on the factors, I suppose.
11  BY MR. LAGOMARSINO:
12      Q   At the onset of the incident, there's a
13  reference here, Number 2, that Farmer was not posing
14  a threat to anyone at the onset of the incident.  Do
15  you agree with that, having reviewed the video?
16      A   Yes.
17      Q   It says:  "During the subsequent ECD cycles,
18  Farmer was displaying passive and active resistance."
19      Do you agree with that?
20      A   Yes.
21      Q   It says:  "Prior to and during the repeated
22  strikes to Farmer's head, Farmer was displaying
23  passive and active resistance."
24      Do you agree with that?
25      A   Yes.

### Page 117

1      Q   And then "When Officer Lopera placed Farmer
2  in what he called the 'rear naked choke,' Farmer was
3  displaying passive and active resistance."
4      Do you agree with that?
5      A   Which part of it?
6      Q   Well, feel free to break it up.
7      A   Well, I suppose he did call it a "rear naked
8  choke," so I guess I can agree that he called it a
9  rear naked choke.  And I agree it was passive and
10  active resistance.
11      Q   Do you believe it was a rear naked choke?
12      MR. MCNUTT:  Objection.  Form.
13      THE WITNESS:  No.
14  BY MR. LAGOMARSINO:
15      Q   When an officer is dealing with a dynamic
16  situation, what does -- let's start with, what is a
17  dynamic situation by definition, or fluid or...
18      A   It can be a lot of different things.  It
19  could be a pursuit, a vehicle pursuit, a foot
20  pursuit, a fight, a shooting.
21      Q   It's changing events, correct?
22      A   Yes.
23      Q   So is an officer allowed to -- let's say --
24  strike that.
25      Let's say a subject or a suspect decides to

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

31 (Pages 118 to 121)

Page 118

1  surrender.  Is the officer allowed to punish that
2  suspect or use force against them once they've
3  surrendered?
4        MR. ANDERSON:  Objection to form.
5        THE WITNESS:  No.
6  BY MR. LAGOMARSINO:
7     Q   Now, the next factor here, it says:  Number
8  3, "Whether the subject is actively resisting or
9  attempting to evade the arrest by flight."
10        Now, do you agree that Tashii ran for an
11  unknown reason?
12     A   Can you be more specif- -- based on the
13  video that I saw?
14     Q   Yeah.
15     A   That he ran for an unknown reason?
16  Certainly.  I don't know his reason.
17     Q   Based on your review of the video, did
18  Lopera try to grab Tashii?
19     A   At the beginning of that video?
20     Q   Yeah.
21     A   I think so, yeah.
22     Q   Okay.  What justification would Lopera have
23  had to try to grab him at that point?
24     A   Without reviewing the video, I can't
25  remember exactly where they were at the time.  If

Page 119

1  Lopera believed that Farmer has been, is committing
2  or is about to commit a crime, then he's got
3  reasonable suspicion to detain him.
4     Q   Okay.  Now, the day of this report, on the
5  first page is 8/1 of '17.
6     A   Okay.
7     Q   Are you aware of whether the drug test
8  results were back at the time of the incident?
9     A   On 8/1?
10     Q   Yeah.
11     A   I don't know.
12     Q   Now, it says on the influence of drugs or
13  alcohol, it just says:  "Due to the fact that Officer
14  Lopera did not provide a statement, this cannot be
15  answered."
16        I guess I'm supposing if they were back,
17  then, at least, that could be answered, correct?
18     A   No.  I believe that is based on the fact
19  that without a statement from Lopera, they weren't
20  willing to -- how do I put -- I don't know.
21     Q   What I'm trying to assess, what Lopera was
22  thinking, right?
23     A   Right.
24     Q   And so that's why they were unable to answer
25  that.

Page 120

1        So taking it down to the bottom of Page 34,
2  it says:  "LVMPD policy states an officer may
3  initiate a foot pursuit of any individual if the
4  officer reasonably believes he is about to engage in,
5  is engaging in or has engaged in criminal activity.
6  As Officer Lopera began to chase Farmer, he had no
7  reasonable suspicion or probable cause to believe
8  that Farmer was going to engage in or was involved in
9  any criminal conduct."
10        Do you agree with that?
11     A   No.
12     Q   And why do you disagree with that?
13     A   Well, a couple reasons.  On the video, I
14  believe, Farmer states to officers that he -- someone
15  was chasing him.  So he may be a victim of a crime,
16  he may be a suspect in the crime if he's being
17  chased.  And I believe he says that he ran across the
18  street, jaywalking, so, yes, he is admitting to a
19  very minor, admittedly, misdemeanor.
20        And then I would expect any of my officers
21  to detain someone who flees through the back of the
22  house of a hotel, casino.
23     Q   Okay.  Did Tashii say he was jaywalking?
24     A   If he ran across the street on Las Vegas
25  Boulevard where we have bridges that have been built

Page 121

1  for millions of dollars, then he jaywalked, because
2  we don't have crosswalks on the ground.  So I think
3  that's what they assumed.
4     Q   There's some crosswalks over by the
5  Venetian, correct?
6     A   There are.  I believe he said "I almost got
7  hit by a car," which maybe would lead someone to
8  believe he was jaywalking.
9     Q   Going to Page 35.  It says:  "Officer Lopera
10  told Farmer" -- sorry.  Second full paragraph.  It
11  said:  "Officer Lopera told Farmer to get on his
12  stomach several times but never gave Farmer a
13  reasonable opportunity to comply with commands before
14  cycling the ECD again."
15        Do you agree with that?
16     A   I'm sorry, I'm trying to find the line --
17  these don't have line numbers.
18     Q   I apologize.  Right there, the second
19  sentence there.  It says:  "Officer Lopera told
20  Farmer to get on his stomach several times but never
21  gave Farmer a reasonable opportunity to comply with
22  commands before cycling the ECD again."
23        Do you agree with that?
24     A   No.
25     Q   And why do you disagree with that?

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

32 (Pages 122 to 125)

Page 122

1    A   Like I testified a little bit ago, I've seen
2  multiple subjects comply immediately.  And watching
3  that video, I hear, the what is it, "I will," but
4  people who are compliant move much faster.  I mean,
5  probably no one in this room has ever been tased, and
6  hope you never are, but if you do, it's motivating to
7  comply for most people.
8    Q   And then it says:  "Officer Lopera's verbal
9  commands also contradicted each other, telling
10 Farmer, quote, Don't move, quote, follow by a command
11 to get on your stomach, quote."
12       Do you agree with that?
13   A   It's possible, yes.
14   Q   The taser policy for the ECD is recited in
15 the next paragraph.  Did Officer Lopera violate that
16 policy?
17   A   The policy itself is a little bit
18 contradictory because it says at the end there,
19 "shall be deemed ineffective and another force option
20 will be considered," which kind of contradicts the
21 "shall."  Because if you're considering another force
22 option, then you could consider to remain with the
23 force option you're using.
24       And I maybe touched on it a little bit
25 earlier, when you're alone, if you're getting some

Page 123

1  level of control or compliance from the force option
2  you're using, then it might be reasonable to stick
3  with that one, because you don't necessarily want to
4  give up something that's partially working to move to
5  another force option that might not work at all.
6    Q   Okay.  Next paragraph, it says:  "After
7  cycling the ECD seven times, Officer Lopera holstered
8  his ECD.  With Farmer lying on his stomach, Officer
9  Lopera straddled Farmer's back and struck him
10 approximately 10 to 12 times in the head while giving
11 Farmer verbal commands to get on your stomach.
12 According to LVMPD policy, officers should only use
13 hand strikes when a subject is displaying aggressive
14 or aggravated aggressive resistance."
15       So did Officer Lopera violate the policy on
16 hand strikes?
17       MR. MCNUTT:  Objection.  Form.
18       THE WITNESS:  Potentially, there -- if you
19 look in the tactical review board transcript, there
20 was quite a bit of back-and-forth over how many
21 strikes were thrown, how many strikes landed, but,
22 yes, potentially.
23       MR. LAGOMARSINO:  Okay.  Let's take a
24 five-minute break.
25       MR. MCNUTT:  Reading my mind.

Page 124

1        THE VIDEOGRAPHER:  We are going off the
2  record.  The time is approximately 2:19 p.m.
3        (Off the record, after which Ms. Farmer
4         and Ms. Day did not return to the room.)
5        THE VIDEOGRAPHER:  The time is approximately
6  2:29 p.m.  We are back on the record.
7  BY MR. LAGOMARSINO:
8    Q   What's the standard under the Fourth
9  Amendment with respect to how much force a police
10 officer can use when they're making an arrest?
11       MR. ANDERSON:  Objection.  Form.
12       THE WITNESS:  To overcome resistance,
13 prevent escape and take into custody.
14 BY MR. LAGOMARSINO:
15   Q   Fair to say that you can only use so much
16 force in making an arrest as is objectively
17 reasonable?
18   A   Correct.
19       MR. LAGOMARSINO:  Okay.  All right.  Exhibit
20 5, please.
21       (Plaintiff's Exhibit No. 5 was marked
22        for identification.)
23 BY MR. LAGOMARSINO:
24   Q   Exhibit 5 is a printout of the New York
25 Times article about this case, dated May 17, 2017.

Page 125

1  It talks about a press conference put on by Kevin
2  McMahill.  Who's Kevin McMahill?
3    A   He is the undersheriff of Las Vegas
4  Metropolitan Police Department.
5    Q   Did you watch that press conference?
6    A   Parts of it, at least.
7    Q   Undersheriff McMahill stated that had he
8  survived, Tashii Farmer would have faced no charges.
9  Do you agree with Undersheriff McMahill?
10   A   I disagree.
11   Q   On what basis?
12   A   Due to the fact that Tashii Farmer went
13 through the back of the house of the Venetian,
14 probably, if I had to put my best guess to it, 50 or
15 100 times a year we would detain someone who would be
16 found in the back of the house, generally by
17 security.  We're not necessarily patrolling the back
18 of the house.
19   Q   Right.
20   A   And that person could definitely face a
21 charge of trespassing at a minimum.
22   Q   Okay.  In order to charge someone with
23 trespassing, don't you have to read them a warning
24 first?
25   A   That's trespass on land after warning.  You

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

33  (Pages 126 to 129)

## Page 126

1  also have trespass signs posted, and you have
2  trespass, like, fenced area, where if the owner of
3  the property is taking reasonable steps to keep
4  people off a certain part of the property, then it's
5  reasonable to believe that the general public
6  shouldn't be on the property.
7      Q  Okay.  So let's say Tashii would have
8  survived and then you would have had a chance to
9  review all the video from the incident, would you
10  have recommended charges?
11     A  Yes.
12     Q  For trespassing?
13     A  Yes.
14     Q  Is trespassing a severe crime?
15     A  No.
16     Q  Tashii was unarmed, correct?
17     A  Correct.
18     Q  By the time you got to the scene, Tashii
19  posed no threat to your safety, correct?
20     A  I wouldn't say no.  He did pull his arm away
21  from me, and it was my perception that he was
22  struggling the entire time we were trying to put him
23  in handcuffs.  So I wouldn't say zero.
24     Q  On a scale of 1-to-100 or 0-to-100, what
25  would you say he would -- 100 being the maximum

## Page 127

1  threat?
2      A  I mean, based on that I knew that Lopera had
3  been in a foot pursuit, struggle with Farmer for at
4  least a minute, maybe closer to two minutes by the
5  time I got there, coupled with him pulling away, I'd
6  put it at 30.
7      Q  When Tashii was on his back with his hands
8  raised, was he a threat at that point?
9      A  No.
10     Q  Now, as a police officer, you're supposed to
11  know the law, correct?
12     A  Yes.
13         MR. MCNUTT:  Objection.  Form.
14     BY MR. LAGOMARSINO:
15     Q  And you're supposed to be trained on how not
16  to violate a suspect's constitutional rights,
17  correct?
18     A  Yes.
19     Q  Is the LVNR an acceptable means of deadly
20  force?
21         MR. ANDERSON:  Objection.  Form.  Will you
22  rephrase that?
23         THE WITNESS:  No.
24         MR. LAGOMARSINO:  Sure.
25         ///

## Page 128

1  BY MR. LAGOMARSINO:
2      Q  Can the LVNR be used to kill somebody?
3         MR. MCNUTT:  Objection.  Form.
4         THE WITNESS:  Not from the way we're
5  trained.
6  BY MR. LAGOMARSINO.
7      Q  Okay.  If it's incorrectly used, can it kill
8  somebody?
9      A  I don't know.
10     Q  Were you trained that if it was incorrectly
11  applied that it could kill somebody?
12     A  Not that I recall.
13     Q  If you wanted to, you could have put your
14  hands on Ken and attempted to remove his arms from
15  Tashii's neck; is that correct?
16         MR. MCNUTT:  Objection.  Form.
17         THE WITNESS:  Yes.
18  BY MR. LAGOMARSINO:
19     Q  Okay.  Did you do anything by accident that
20  day?
21     A  Yeah.  When I got out of my car, I shot off
22  my siren and I accidentally hit the buttons for the
23  radio and the PA on my control, which caused -- when
24  I keyed my microphone, it broadcast whatever was
25  coming over the radio over the PA speakers on the

## Page 129

1  front of the car.  It was pretty loud.
2      Q  Besides that, did you do anything by
3  accident?
4      A  Not that I remember.
5      Q  Was everything that you did with respect to
6  Tashii intentional?
7      A  Yes.
8      Q  When you were assisting Lopera, you were
9  assisting him to help subdue Tashii; is that correct?
10     A  I was assisting him to take Tashii into
11  custody.
12     Q  And did you criticize Officer Lopera in any
13  way at the scene?
14     A  I don't think so.
15     Q  Now, Tashii was being held in a neck
16  restraint against his will, correct?
17         MR. ANDERSON:  Objection.  Form.
18         THE WITNESS:  I don't think he was -- I
19  don't think he asked to be put in a neck restraint,
20  no.
21  BY MR. LAGOMARSINO:
22     Q  He did not consent to it, correct?
23     A  I don't think so.
24     Q  When you have an individual in custody --
25  sorry.

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

34  (Pages 130 to 133)

## Page 130

1  When you have an individual in custody, as
2  an officer, do you have a duty to protect them from
3  harm?
4  A  Yes.
5  Q  And you have a duty to protect them from
6  harm regardless of whether that harm comes from
7  another officer or a third party, correct?
8  A  Correct.
9  Q  Did Tashii have a right to be free from
10  cruel punishment?
11  A  Yes.
12  Q  Did Tashii have a right to be free from
13  inhumane treatment?
14  A  Yes.
15  Q  When Tashii was in the neck restraint, he
16  was helpless, correct?
17  MR. ANDERSON:  Objection to form.
18  THE WITNESS:  No.
19  BY MR. LAGOMARSINO:
20  Q  How was he not helpless?
21  A  At the very minimum, he was still able to
22  pull his arm away from me.
23  Q  Besides that, how was he not helpless?
24  A  Can you describe "helpless" more, I guess?
25  Q  Besides being able to move his arm, Tashii

## Page 131

1  was not independently able to get away from Officer
2  Lopera, correct?
3  MR. ANDERSON:  Objection.  Form.
4  THE WITNESS:  Well, he was under arrest.  He
5  wasn't free to go.
6  BY MR. LAGOMARSINO:
7  Q  Well, once he was in the neck restraint, he
8  was never able to get out of it until he was let go,
9  correct?
10  A  Correct.
11  Q  Did you, as a sergeant on the scene, have a
12  duty to protect him from any harm once he was in the
13  choke hold?
14  MR. ANDERSON:  Objection.  Form.
15  BY MR. LAGOMARSINO:
16  Q  Strike that.
17  Did you as a police officer have a duty to
18  protect Tashii from any harm once he was in the neck
19  restraint?
20  MR. ANDERSON:  Objection.  Form.
21  THE WITNESS:  Duty to protect him once he is
22  in -- if that neck restraint were to be deemed by me
23  to be inappropriate, sure.
24  MR. LAGOMARSINO:  Okay.  Exhibit 6.
25  (Plaintiff's Exhibit No. 6 was marked

## Page 132

1  for identification.)
2  BY MR. LAGOMARSINO:
3  Q  I'm showing you what's been marked as
4  Exhibit 6, the case of United States v. Mendenhall.
5  Have you ever heard of this case?
6  A  Maybe.
7  Q  Okay.  I just want to ask you some questions
8  from the case to see if you agree with the United
9  States Supreme Court in this decision.  See the
10  bottom right-hand corner there, some faint numbers?
11  A  Yes.
12  Q  Will you please turn to Page 5.  The bottom
13  under A, it says: "The Fourth Amendment's
14  requirement that searches and seizures be founded
15  upon an objective justification governs all seizures
16  of the person, including seizures that involve only a
17  brief detention short of traditional arrest."
18  Do you agree with that?
19  A  Yes.
20  Q  And going to the top of the next column, it
21  says: "Only when the officer, by means of physical
22  force or show of authority, has in some way
23  restrained the liberty of a citizen may we conclude
24  that a seizure has occurred."
25  Do you agree with that?

## Page 133

1  A  Yes.
2  Q  When by means of physical force -- strike
3  that.
4  When by means of physical force or show of
5  authority was Tashii Farmer seized?
6  MR. ANDERSON:  Are you asking based upon the
7  video?
8  MR. LAGOMARSINO:  Yeah, based on the video.
9  Thanks.
10  THE WITNESS:  Well, the first show of
11  authority, I suppose, probably would have been when
12  Lopera is still inside the Venetian in the -- the
13  food court says stop or whatever he says to him.
14  BY MR. LAGOMARSINO:
15  Q  When an officer grabs somebody, is that
16  considered a seizure?
17  A  Maybe I'm overthinking this here, but isn't
18  there also -- don't we have to have a sign that the
19  person is complying for then an arrest to take place?
20  I'm sorry.  Maybe I'm getting too far ahead of you.
21  Q  That's okay.  Let me rephrase.  Can you
22  please turn to Page 6.
23  A  Sure.
24  Q  See on the top right --
25  A  I can't --

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

35 (Pages 134 to 137)

Page 134

1    Q   Sorry.  The right-hand column, end of the
2  first paragraph up top where it says: "Plainly, in
3  the latter event, there was no seizure until the
4  police officer in some way demonstrably curtailed
5  Sibron's liberty."
6        So with respect to Tashii, there's no
7  seizure until somebody demonstrably curtails their
8  liberty, correct?
9    A   Okay.  Yes.
10   Q   And for you, you think that starts when --
11 when?
12   A   Demonstrably curtailed liberty, I would say
13 it's more like the first tasing probably.
14   Q   Okay.  His freedom of movement was
15 restrained at the first tasing, correct?
16   A   Yes.
17   Q   Did you use physical force on Tashii?
18   A   Handcuffing, yes.
19   Q   And, obviously, Lopera did as well, correct?
20   A   Yes.
21   Q   Who else used physical force on Tashii?
22   A   Officers Tran and Flores assisted with
23 handcuffing.
24   Q   Okay.  You were wearing a badge that night,
25 or were you plain clothes?

Page 135

1    A   I had a patch.
2    Q   Okay.  If somebody looked at you, would you
3  expect them to know that you're a police officer?
4    A   Yes.
5    Q   Okay.  Do you agree that once a neck
6  restraint has been applied to a suspect that there's
7  a need to closely monitor the suspect?
8    A   Yes.
9    Q   Prior to this incident -- strike that.
10       At the time of the incident, was the LVNR
11 allowed to be used in circumstances where officers or
12 third parties were not at risk of physical injury?
13   A   It was in a lower level of the use-of-force
14 policy, yes.
15       MR. LAGOMARSINO:  Exhibit 7.
16       (Plaintiff's Exhibit No. 7 was marked
17        for identification.)
18 BY MR. LAGOMARSINO:
19   Q   I handed you what's been marked as
20 Exhibit 7.  It's Barnard v. Theobald, Clark,
21 Radmanovich and Metro.  Did you ever hear about this
22 particular case?
23   A   Maybe.  I'm trying to --
24   Q   Do you know Greg Theobald?
25   A   I know who he is.

Page 136

1    Q   Does he still work for Metro?
2    A   I think so.
3    Q   And do you know who Gary Clark is?
4    A   No.  I don't think the other two work for
5  Metro anymore.
6    Q   Do you know Radmanovich?
7    A   No.
8    Q   What's the case where Metro was sued for
9  using a choke hold and other force against Barnard?
10 Have you ever been trained about this case?
11   A   I have heard -- I think I have heard about
12 this case.  Was this in, like, a motel?
13   Q   It looks like they went to Barnard's house,
14 execute an arrest warrant.
15   A   I think I've heard of it, yes, I think so.
16   Q   So it's -- go to the bottom of Page 2 on the
17 right.  It says: "Clark came over to Charles, who
18 was still laying on top of Theobald, and put Charles
19 in a choke hold.  Clark then tried to lift Charles up
20 by his neck.  Theobald, however, still had ahold of
21 the handcuff around Charles' right wrist."
22       Is it ever appropriate to try to lift
23 somebody up by their neck?
24   A   If you were in deadly force maybe.
25   Q   Okay.  "Here Officers Theobald and

Page 137

1  Radmanovich ordered the plaintiff to give them,
2  quote, his motherfucking, quote, arms."
3        Does Metro train on use of profanity on
4  citizens when they're taking them into custody?
5    A   Like I testified to earlier, it's
6  discouraged generally.  It could be construed as
7  discourteous, but sometimes strong language is
8  appropriate to potentially prevent use of actual
9  physical force.
10   Q   Okay.  Then going to Page 4, referencing
11 decisions, it says: "We explained that the officers
12 were not entitled to qualified immunity, because
13 construing the evidence in the light most favorable
14 to the plaintiff at the time of the incident at issue
15 here, a reasonable officer would have known it
16 violated clearly established law to use a choke hold
17 on a non-arresting -- non-resisting arrestee who had
18 surrendered, pepper spray him and apply such knee
19 pressure on his back and -- on his neck and back that
20 it would cause a collapse of five vertebrae in his
21 cervical spine."
22       Do you agree with that statement?
23   A   Yeah.
24   Q   Do you agree that a reasonable officer would
25 know at the time of the incident with -- well, strike

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

36  (Pages 138 to 141)

Page 138

1  that.
2      At the time of the incident with Tashii, did
3  you know that it would have violated a clearly
4  established law to use a choke hold on a
5  non-resisting arrestee?
6      MR. ANDERSON: Objection. Form.
7      MR. MCNUTT:  And incomplete hypothetical.
8      THE WITNESS: Can you -- I'm sorry.  Can you
9  say it one more time?
10 BY MR. LAGOMARSINO:
11     Q   I know you've said that Tashii was resisting
12 either passively or actively.  I'm just asking if
13 you -- of your state of mind as to the state of the
14 law at the time, okay, on May 14th of 2017, did you
15 know that it would violate clearly established law to
16 use a choke hold on a non-resisting arrestee?
17     A   Yes.
18     Q   If -- if a citizen is resisting you and
19 doesn't stop resisting, are you as an officer still
20 allowed to use any amount of force you deem fit?
21     MR. ANDERSON: Objection. Form.
22     THE WITNESS:  I think you're allowed to use
23 force to overcome the resist- -- the minimal amount
24 of force necessary to overcome resistance.
25     ///

Page 139

1  BY MR. LAGOMARSINO:
2      Q   Okay.  Okay.  So, I guess, stated
3  differently, just because somebody's resisting you
4  without a weapon and doesn't present the threat of
5  physical harm to you doesn't mean that you can use
6  deadly force, correct?
7      A   Right.  It's the totality of the
8  circumstances.  You would have to articulate why you
9  had to use deadly force.
10     Q   Are you aware that even when some force is
11 justified, the amount actually used can still be
12 considered excessive?
13     A   Yes.
14     MR. LAGOMARSINO:  All right.  Exhibit 8.
15     (Plaintiff's Exhibit No. 8 was marked
16     for identification.)
17 BY MR. LAGOMARSINO:
18     Q   All right.  Exhibit 8 is an article.  It
19 says: "Metro police pay $1 million to family of
20 choke hold victim," Joe Schoenmann, May 23, 2011.
21     Were you aware of this case?
22     A   Oh, is this not the same one we were just
23 going over?  No.
24     Q   It says: "Metro physical officers -- sorry,
25 the second paragraph.  I'll start over.

Page 140

1      "Metro's Fiscal Affairs Committee approved a
2  $1 million settlement for James, Dorothy and Michelle
3  Boone, relatives of Dustin Boone, a 29-year-old who
4  died in November of 2009 after an officer put him in
5  a lateral vascular neck restraint.  The restraint
6  cuts blood flow to the brain."
7      Had you ever been trained on this case?
8      A   No.
9      Q   Did you ever hear of this case?
10     A   I don't think so.
11     Q   Had you ever heard of any cases where --
12 strike that.
13     I'm not talking about civil cases.  Have you
14 ever heard of any incidents in your capacity as an
15 officer, sergeant at Metro where somebody was
16 seriously injured when an LVNR was applied to them
17 improperly?
18     A   No.
19     Q   Are you aware that many police departments
20 around the country have banned the use of the LVNR?
21     MR. ANDERSON:  Objection.  Form.
22     THE WITNESS:  I think there's a lot of
23 police departments that never even employed the LVNR,
24 but, yeah, I'm aware that many don't use it.
25     ///

Page 141

1  BY MR. LAGOMARSINO:
2      Q   Okay.  And do you know why?
3      A   I think for one, to actually use the LVNR, I
4  think you have to pay the guy who invented it, like,
5  royalties.
6      Q   Oh, really?
7      A   So that's probably part of it.
8      Q   Maybe we should contact him and let him
9  know.  I'm just joking.
10     MR. MCNUTT:  You should depose Lindell.
11 BY MR. LAGOMARSINO:
12     Q   Yeah.  It says here: "Some of Metro's
13 largest settlements have come after the death of
14 someone put into the lateral vascular neck restraint,
15 a move that Los Angeles Police discontinued after
16 several deaths in the 1980s.  The estate of Charles
17 Bush settled with Metro for $1.1 million after Bush
18 died in 1991."
19     Is that the case you're thinking about that
20 happened in the motel?
21     A   Maybe.
22     Q   Did you ever hear about that case?
23     A   I thought I heard about one that happened in
24 a motel with, like, undercover officers or something,
25 but it was -- it had to have been a long time ago, so

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

37 (Pages 142 to 145)

Page 142

1  it could be that.
2      Q   And had you heard of the case of the family
3  of French citizen Philippe LeMenn who died in the
4  Clark County Detention Center in 2001 and settled for
5  $500,00 in 2003?
6      A   Not specifically, no.
7      Q   Were you able to tell one way or the other
8  whether Officer Lopera placed his forearm over
9  Tashii's carotid artery?
10     A   I remember seeing that Tashii's chin was in
11  line with his elbow when I glanced up just
12  momentarily, which would mean that it's properly
13  placed.
14     Q   Does the LVNR constrict blood flow?
15     A   Yes.
16     Q   Does unconsciousness occur from the LVNR or
17  can it?
18     A   Yes.
19     Q   Okay.  At the time of the incident, when was
20  an LVNR allowed to be used?
21     A   I believe it started in active resistance
22  level of the police force policy.
23         MR. LAGOMARSINO:  Exhibit 9.
24         (Plaintiff's Exhibit No. 9 was marked
25           for identification.)

Page 143

1  BY MR. LAGOMARSINO:
2      Q   What is Exhibit 9?
3      A   This is my notice relieving me of duty.
4      Q   How were you given that?
5      A   I arrived -- well, I was on my way to work
6  on whatever date this was, September 27th, and my
7  lieutenant at the time texted me and said, "See me in
8  my office before briefing."
9          I actually got to work a little bit early,
10  put on my uniform, walked into his office, and he
11  said, "Oh, you got dressed."
12         And I said, "Oh, are you relieving me of
13  duty?"
14         He said, "Yes."
15     Q   Did he secure your rifle?
16     A   Yes.
17     Q   Does this appear to be a true and correct
18  copy of the relief-of-duty document?
19     A   Yes.
20     Q   It says here in the bottom:  "I acknowledge
21  that I have been admonished regarding the SOC or
22  alleged policy violation that has led to my being
23  relieved of duty."
24         What's SOC?
25     A   Statement of complaint.

Page 144

1      Q   And how were you advised of the statement of
2  the complaint?
3      A   I think they're probably saying -- the
4  statement of complaint -- sorry.  Just to get into
5  the minutia of Metro, statement of complaint
6  generally refers to something that IEB is
7  investigating.  So they're talking about -- or
8  alleged policy violation.  We're going with or
9  alleged policy violation.  So this is from the
10  tactical review board.  It sustained me for the major
11  incident, all-hazard plan and body camera, so that's
12  what they're talking about.  Does that answer your
13  question?
14     Q   Yes.  When you were relieved of duty, how
15  long were you relieved of duty for?
16     A   Until, I think, technically November 1st.
17         (Plaintiff's Exhibit No. 10 was
18           marked for identification.)
19  BY MR. LAGOMARSINO:
20     Q   What is Exhibit 10?
21     A   It looks like the top got cut off, but it's
22  probably a return to duty form.
23     Q   It looks like you have the fax cover part
24  there?
25     A   Yeah.  It looks like it got off, but I think

Page 145

1  it -- LVMPD 117 is the form number.  And from what
2  I'm reading, it's a return-to-duty form.
3      Q   Between the date of the incident with Tashii
4  and September 27th, did you still remain a sergeant?
5      A   Yes.
6      Q   And when you were placed -- when you were
7  relieved of duty between September 27th and, it says
8  here --
9      A   That's when they returned me to duty.  I was
10  non-confirmed on November 1st.
11     Q   So between November 1st and September 27th,
12  were you relieved of duty with pay or without pay?
13     A   With pay.
14     Q   Okay.  Did you go out of town at all during
15  that time?
16     A   No.
17     Q   When you returned to duty, what position
18  were you placed in?
19     A   Police off- -- patrol officer.
20     Q   2?
21     A   Yes.
22     Q   There's PO1, PO2.  Is there a PO3?
23     A   No.
24     Q   Next step up is a sergeant, correct?
25     A   Yes.

Officer Travis Crumrine ~ December 10, 2018
* * * Videotaped Deposition * * *

39 (Pages 150 to 153)

## Page 150

1    Q  All right.  You're subject, as an officer,
2 to discipline if a suspect gets away after you have
3 tried to arrest them?
4    A  Was the question -- I'm sorry.
5    Q  Sorry.
6    A  I think I heard it.
7    Q  If you're trying to arrest a suspect and he
8 gets away, are you subject to discipline?
9    A  No.  If he was in handcuffs and got away,
10 maybe, because you lost the handcuffs.
11    Q  Page 2124, 2/12/2008, there's a line 560.
12    A  Yes.
13    Q  It says, "Use-of-force issues and
14 documentation, no-show, not attempted."  Do you
15 recall why you didn't show up?
16    MR. MCNUTT:  What line was that?
17    MR. LAGOMARSINO:  Sorry.  560.
18    MR. MCNUTT:  560.  Thanks.
19 BY MR. LAGOMARSINO:
20    Q  Do you know why you no-showed that one?
21    A  I do not recall ten years ago whether I was
22 a no-show.  I'm sure that that was required, so
23 there's no way that I would still have been allowed
24 to keep working had it not been done, because there's
25 no way that wasn't a required class.

## Page 151

1    And I do remember, now that you mention it,
2 so right around the first of each year, POST checks
3 and makes sure you've done all your required
4 training.  And I remember right after the first in
5 2009, I got a letter from POST that said that I was
6 deficient in my training.  And I knew that I wasn't.
7 And I called my sergeant at the time, and he said,
8 "Yeah, I just got the same letter.  It's not
9 correct."
10    And there was a bunch of errors.  And it
11 got -- it all got worked out.  So if that was during
12 2008, it's possible that was a part of it.
13    Q  All right.  Have you ever been disciplined
14 by Metro?
15    A  In my opinion or Metro's opinion?
16    Q  Let's go with same thing every lawyer says,
17 both.
18    A  Okay.  Well, in this incident, Metro's
19 opinion is that they did not discipline me.  In my
20 opinion, I believe that they did discipline me.
21 Previous to this --
22    Q  Well, let me stop you there.  What do you
23 base that on that Metro said they did not discipline
24 you?
25    A  They sustained me for -- they alleged that I

## Page 152

1 committed policy violations, they sustained me for
2 those policy violations, and then they removed me
3 from my position.
4    Q  And so --
5    A  As a result, which should normally be
6 discipline, they contend that it was not discipline.
7    Q  Why do they contend it's not discipline?
8    A  My -- my theory?
9    Q  Yeah.
10    A  My estimation?  Because if you -- if they
11 give me discipline, then I am allowed to grieve and
12 arbitrate that discipline by contract.  And if they
13 non-confirm me from my position, then it's their
14 position that I have no standing to flex that
15 position.
16    Q  I see.  You considered it a demotion,
17 correct?
18    A  Yes, sir.
19    Q  So you consider it discipline?
20    A  I do.
21    Q  Any other time when you've received a
22 written reprimand?
23    A  No.
24    Q  Have you ever received a verbal reprimand?
25    A  I'm sure I have.

## Page 153

1    Q  Have you ever been accused by a citizen of
2 excessive force?
3    A  No.
4    Q  Did you take any steps to assess the scene
5 between the time you parked and the time you started
6 physical contact with Tashii?
7    A  No.
8    Q  I may not have to show you the video, but --
9 so we referenced a video that Metro put out about the
10 LVNR.
11    A  Yes.
12    Q  And when is the last time you saw that
13 roughly?
14    A  A year and a half ago.
15    Q  Do you remember the video, who put out --
16 who was in the video?
17    A  Vaguely.
18    Q  All right.  Maybe we should show it, well,
19 on the next break.  We're pretty much close to being
20 done.  I just have...
21    Here it says that officers can only use hand
22 strikes when a suspect is displaying aggressive
23 resistance.
24    A  I remember reading that, yes.
25    Q  Did you watch the video of Officer Lopera

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

40  (Pages 154 to 157)

Page 154

1  striking Farmer?
2      A   Yes.
3      Q   Did you see Farmer trying to protect his
4  face from being hit?
5      A   I remember seeing him with his hands up.
6      Q   By his face?
7      A   Yes.
8      Q   When you watched the video, did you see
9  Tashii running from Lopera from inside the hotel to
10  outside the hotel and to the white truck?
11      A   Yes.  I mean, there's a period of time where
12  you don't see Farmer.
13      Q   Right.  Did you see Farmer by the white
14  truck?
15      A   Yes.
16      Q   When you watched it, did you believe he was
17  trying to highjack or strike -- carjack the truck?
18          MR. MCNUTT:  Objection.
19          MR. ANDERSON:  Form.
20          THE WITNESS:  From my perception?
21  BY MR. LAGOMARSINO:
22      Q   Right.
23      A   I can tell you that when you watch Lopera's
24  body camera, I can understand why he thought that
25  that was what Farmer was trying to do.  And then when

Page 155

1  you take the high-level view from the Venetian
2  security camera on the corner, from there, I can tell
3  that really Farmer touches that truck as he's looking
4  around to decide where he's going to run next or if
5  he can run somewhere next.  He is trying to make a
6  plan.
7      Q   Okay.
8      A   So I don't know if that could have been part
9  of his plan, but I can tell a little better from that
10  level that he is trying to make a plan.
11      Q   Sure.  And -- but based on watching Lopera's
12  camera, did you feel, wow, looks like he is trying to
13  carjack that vehicle?
14          MR. ANDERSON:  Objection.  Form.
15          THE WITNESS:  It would raise my suspicions
16  if I was the officer in that position, yes, that that
17  might be a possibility.
18  BY MR. LAGOMARSINO:
19      Q   Okay.  In viewing all the videos, did you
20  ever come to a conclusion that Lopera was acting in
21  self-defense?
22      A   No, not definitively, no.
23      Q   Why is it important to activate your body
24  camera?
25      A   Because it's policy.  Honestly, that's the

Page 156

1  most important reason.
2      Q   What are the four physiological factors that
3  establish control for the LVNR?
4      A   Four physiologic- -- are you talking about,
5  like, the Valsalva maneuver, carotid restraint --
6      Q   Yeah.
7      A   -- vascular -- what is it, vascular
8  compression, then head placement.
9      Q   Carotid compression?
10      A   Carotid compression, vagus --
11      Q   Yeah.
12      A   -- is that what that is?
13      Q   Yeah.
14      A   And venus compression.
15      Q   Okay.  When somebody is rendered unconscious
16  by the LVNR, when does the subject generally revive?
17      A   I think it's within like 30 seconds or
18  something, a minute.
19          MR. LAGOMARSINO:  Let's just take a break.
20  We're just going to show him the video, and then we
21  don't have a lot of questions.
22          THE VIDEOGRAPHER:  We are going off the
23  record.  The time is approximately 3:23 p.m.
24          (Off the record.)
25          (Playing video.)

Page 157

1          THE VIDEOGRAPHER:  Standby, please.  The
2  time is approximately 3:32 p.m.  We are back on the
3  record.
4  BY MR. LAGOMARSINO:
5      Q   Officer Crumrine, during the break we were
6  playing this LVNR restraint video.  Didn't --
7  admittedly doesn't have any sound really playing.
8  Have you seen this before?
9      A   Yes.
10      Q   Do you know who that is?
11      A   That is Mike Bland.
12      Q   Okay.
13      A   B-L-A-N-D.
14      Q   He is the instructing on the LVNR?
15      A   Correct.
16      Q   Do you know if this video was produced
17  before or after the Tashii incident?
18      A   I believe it was produced after.
19      Q   And how do you know that?
20      A   I believe it was produced so that at the
21  tactical review board we could demonstrate for the
22  citizens on the review board who are not familiar
23  with -- or maybe not familiar with the LVNR what that
24  looks like.
25          MR. LAGOMARSINO:  Okay.  Then we will just

Officer Travis Crumrine  ~   December 10, 2018
* * * Videotaped Deposition * * *

41 (Pages 158 to 161)

Page 158

1  introduce it as Exhibit 12.
2      (Plaintiff's Exhibit No. 12 was
3      marked for identification.)
4      MR. LAGOMARSINO:  I have no further
5  questions.
6      MR. MCNUTT:  At all or just on the video?
7      MR. LAGOMARSINO:  On the video.  But I'll
8  probably have a couple follow-ups when you're done,
9  but just to save some time.
10     MR. MCNUTT:  Sure.
11     MR. ANDERSON:  Do you want to go, or do you
12 want me to go?
13     MR. MCNUTT:  Go ahead.
14         EXAMINATION
15 BY MR. ANDERSON:
16     Q   Officer Crumrine, when you arrived on the
17 scene, what information did you have about what had
18 occurred prior to arrival?
19     A   I had zero information.
20     Q   When you arrive on a scene to a dynamic
21 situation that is still active, such as the one you
22 encountered with Mr. Farmer and Officer Lopera, what
23 is your first priority?
24     A   First priority is always life safety, which
25 in this instance would be take him into custody.

Page 159

1      Q   So your first priority upon arriving would
2  be to do what?
3      A   Place Tashii Farmer in handcuffs.
4      Q   When you arrive on a scene such as this,
5  would you ever stop and ask the officer questions or
6  find out why he had ended up on the ground at that
7  point?
8      A   No.
9      Q   When would you ask those questions?
10     A   After the scene was static, safe.
11     Q   Is that pursuant to your training and LVMPD
12 policies?
13     A   Yes.
14     Q   In your opinion, is it a legitimate law
15 enforcement task to effectuate handcuffing before you
16 investigate what happened?
17     A   Yes.
18     Q   Are you trained by the Las Vegas
19 Metropolitan Police Department in the duty to
20 intervene?
21     A   Yes.
22     Q   What does that mean to you, duty to
23 intervene?
24     A   That means -- I'm going to wind up
25 paraphrasing the policy, because I've read it a ton

Page 160

1  of times at this point -- but if an officer observed
2  another officer using force that's clearly beyond
3  objectively reasonable, egregious, outlandish, an
4  officer must, when safe to do so, intervene to stop
5  that force being used and immediately report that to
6  a supervisor.
7      Q   Upon your arrival, did you believe that
8  Officer Lopera was using unconstitutional force?
9      A   No.
10     Q   Did you have any idea as to why he was even
11 using force?
12     A   No.
13     Q   As a police officer, are you allowed to
14 assume that an officer has acted pursuant to policy
15 in the constitution prior to your arrival?
16     A   Yes.
17     Q   And did you do so in this case?
18     A   Yes.
19     Q   Hypothetically, if you do see someone where
20 you believe intervention is necessary, how can an
21 officer intervene?
22     A   You can intervene by -- verbally or with
23 physical actions or both.
24     Q   So is giving orders a form of intervention?
25     A   Yes.

Page 161

1      Q   When you arrived in this case, did you give
2  orders to Officer Lopera?
3      A   I did.
4      Q   And what were those orders?
5      A   "Let go.  Let him go."
6      Q   And what did you mean by that?
7      A   I wanted him to relax the hold and help roll
8  him over to effectuate handcuffing.
9      Q   And so did you give Officer Lopera orders to
10 reduce the amount of pressure he was applying to
11 Mr. Farmer's neck, if he was applying any?
12     A   Yes.
13     Q   Could you tell from where you were at if any
14 pressure was being applied to Mr. Farmer's neck?
15     A   No.
16     Q   Would you ever be able to tell that during
17 the dynamic situation?
18     A   No.
19     Q   So when you told Officer Lopera to let go,
20 what would you want him to do at that point?
21     A   I would want him to maintain control over
22 the -- help me maintain control over Farmer and roll
23 over as we're all trained to do, roll him over so we
24 can get the handcuffs on.
25     Q   Would Officer Lopera keep his arms in a

Officer Travis Crumrine ~  December 10, 2018
* * * Videotaped Deposition * * *

Page 185

```
 1                  CERTIFICATE OF REPORTER

 2
      STATE OF NEVADA )
 3                    ) ss:
      COUNTY OF CLARK )

 4

 5           I, Sarah Safier, CCR No. 808, do thereby
      certify:  That I reported the deposition of OFFICER
 6    TRAVIS CRUMRINE, commencing on Monday,
      December 10, 2018, at 10:09 a.m.
 7           That prior to being deposed, the witness was
      duly sworn by me to testify to the truth.  That I
 8    thereafter transcribed my said shorthand notes into
      typewriting and that the typewritten transcript is a
 9    complete, true, and accurate transcription of my said
      shorthand notes.  That prior to the conclusion of the
10    proceedings, pursuant to NRCP 30(e), the reading and
      signing of the transcript was requested by the
11    witness or a party.
             I further certify that I am not a relative
12    or employee of counsel of any of the parties, nor a
      relative or employee of the parties involved in said
13    action, nor a person financially interested in the
      action.
14           IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Clark, State of Nevada, this
15    24th day of December, 2018.

16

17

18          _____
            Sarah Safier, CCR No. 808

19

20

21

22

23

24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com