# EXHIBIT 13
# Excerpts from Tim Kelly Deposition, Vol. I, 10/25/18

```
 1                  UNITED STATES DISTRICT COURT
 2                      DISTRICT OF NEVADA
 3
 4        _____
          ESTATE OF TASHI S. FARMER a/k/a    )
 5        TASHII FARMER a/k/a TASHII BROWN,   )
          by and through its Special         )
 6        Administrator, Lorin Michelle      )
          Taylor; TAMARA BAYLEE              )
 7        KUUMEALIMAKAMAE FARMER DUARTE, a)
          minor, individually and as         )
 8        Successor-in-Interest, by and      )
          through her legal guardian,        )
 9        Stevandra Lk Kuanoni; ELIAS BAY    )
          KAIMIPONO DUARTE, a minor,         )
10        individually and as Successor-in-)
          Interest, by and through his       )
11        legal guardian, Stevandra Lk       )
          Kuanoni,                           )
12                                           )
                    Plaintiffs,              )
13           vs.                             )   Case No.
                                             )   2:17-cv-01946-JCM-PAL
14        LAS VEGAS METROPOLITAN POLICE      )
          DEPARTMENT, a political            )
15        _____)
          (Caption continued on page 2.)    )
16        _____)
17
18         VIDEOTAPED DEPOSITION OF ASSISTANT SHERIFF TIM KELLY
19                        Las Vegas, Nevada
20                   Thursday, October 25, 2018
21                          Volume I
22
          Reported By:
23        BARBARA R. JUSTL
          CCR No. 878
24        Job No. 3058586A
25        PAGES 1 - 132
```

                                                    Page 1

**Page 10**

1     Sometimes that doesn't work out, and if I should

2 transgress, I will apologize.  But it's easier to move

3 forward if we each speak independently of the other,

4 partly because of courtesy and partly because it's

5 difficult for the court reporter to take down two people

6 who are speaking at the same time.

7     Do you understand?

8   A  Yes.

9   Q  Just as you've been doing nicely up to now, please

10 continue to answer out loud.  Such common expressions as   10:07:57

11 "huh-uh" or "uh-huh" or shakes of the head or nods of the

12 head are too difficult to interpret by the court

13 reporter, so they would lead me to have to ask questions

14 like, "Do you mean yes," "Do you mean no."  So to avoid

15 that, please continue to answer out loud.

16     Will you do that?

17   A  Understood.

18   Q  Have you taken any kind of medication or any kind

19 of substance that would affect your ability to give your

20 best response here today?

21   A  No.

22   Q  Is there any kind of life stress that you're

23 under, other than taking a deposition, that would affect   10:08:27

24 your ability to give your best response here today?

25   A  No.

**Page 11**

1   Q  In the course of the deposition, I may ask you

2 questions that have to do with time, distance, that sort

3 of thing.  You may or may not have an exact answer to the

4 question that I've asked you.  If you don't have an exact

5 answer, I'm entitled to your best estimate.

6     Do you understand that?

7   A  Yes.

8   Q  But if it is simply a guess, I'm not entitled to   10:08:56

9 have you guess.

10     Do you understand that?

11   A  Absolutely.

12   Q  The difference between a guess and an estimate is

13 not always clear, but to use a very simple simplistic

14 example, if I asked you to estimate the length of the

15 table that is before us, you can see it, you have a life

16 experience with feet and inches or meters and

17 centimeters.  You can probably give a reasonable estimate

18 of the length of the table.

19     If I asked you to estimate the length of my dining

20 room table in my home in Irvine, California, it would   10:09:26

21 have to be a guess because you've never been there.

22     You understand?

23   A  Never seen it, yes.

24   Q  That's right.  All right.

25     Do you have any questions before we commence?

**Page 12**

1   A  No, sir.

2   Q  As I said at the outset, I don't expect this to be

3 a lengthy deposition.  However, if at any time you wish

4 to take a break, use the facilities, talk to your lawyer,

5 whatever you want to do, stretch your legs, just let me

6 know and your request will be honored.

7     The only thing I'd ask is if there is a question   10:09:58

8 pending, please answer the question before we take the

9 break.  Will you do that, please?

10   A  Yes, sir.

11   Q  All right.  What is your present profession or

12 occupation?

13   A  I'm assistant sheriff, and I run the law

14 enforcement operations group for the Las Vegas

15 Metropolitan Police Department.

16   Q  What is the law enforcement group?

17   A  So in a nutshell, I'm responsible for all crime in

18 the valley.  I have nine substations and three support

19 bureaus.   10:10:28

20   Q  All right.  Where I come from, we have a sheriff's

21 department and we have a police department, and what I've

22 learned here is that you basically have unity.  You have

23 unification between the sheriff and the police   10:11:00

24 department, correct?

25   A  Yes, sir.

**Page 13**

1   Q  So as I understand it, Sheriff Lombardo is the

2 sheriff?

3   A  Yes, sir.

4   Q  And I assume assistant sheriff would be one step

5 down from him?

6   A  One step down is the under sheriff, and by rank

7 I'm the number three.

8   Q  Who is the under sheriff, please?

9   A  Kevin McMahill.

10   Q  Now, are there more than one assistant sheriffs?   10:11:29

11   A  Yes, sir, there's a total of three of us.

12   Q  And who are the other two ladies or gentlemen?

13   A  The two gentlemen are Assistant Sheriff Charles

14 Hank and Assistant Sheriff Brett Zimmerman.

15   Q  Can you tell me what are the responsibilities of

16 Charles Hank?

17   A  Charles Hank is the assistant sheriff over the

18 jail, and Brett Zimmerman runs investigations.   10:11:59

19   Q  Could you tell me about your educational

20 background, beginning with college?

21   A  So I'm currently enrolled at Columbia Southern

22 working on my Bachelor's in criminal justice, and I

23 graduated from high school in Las Vegas here in 1985.

24   Q  When did you go to work for the Metropolitan   10:12:26

25 Police Department?

4 (Pages 10 - 13)

1   A  In 1989.

2   Q  I assume your initial role was as a patrolman?

3   A  Yes, sir.

4   Q  And you went through the normal academy?

5   A  Yes.

6   Q  Tell me, please, about how long first you remained

7  as a patrolman before you got a promotion.

8   A  I was a patrolman from 1989 to 1998 when I was

9  promoted to sergeant, and then in 2007 I was promoted to

10  lieutenant.  In 2013 I was promoted to captain.  2015 I   10:13:00

11  was promoted to deputy chief, and a year later I was

12  promoted to assistant sheriff in 2016.

13   Q  A meteoric rise, I would say.  Very impressive.

14  Now, is part of your responsibility the Tactical Review

15  Board?

16   A  Not currently, but at that time of this incident,   10:13:28

17  yes.

18   Q  I'm going to show you a document which I'll mark

19  as Plaintiff's 1 for identification.  It is a memorandum

20  to Sheriff Joseph Lombardo.  I have -- you have one,

21  okay, good.  I have two more for the next two deponents,   10:13:56

22  so --

23       MR. McNUTT:  I've got it.

24       MR. SAYRE:  Okay, good.

25       MR. McNUTT:  Did you say we're marking this as

Page 14

1  Exhibit 1?

2       MR. SAYRE:  I did.

3       (Deposition Exhibit 1 marked.)

4  BY MR. SAYRE:

5   Q  Have you seen this document before?

6   A  Yes, sir.

7   Q  Looking toward the back, on the last page, if you

8  look down at the lower right-hand corner, there is a

9  Bates stamp that says LVMPD 3782.  Do you see that?   10:14:26

10   A  Yes.

11   Q  Looking at that page, there is a signature that

12  seems to be your signature, but I need you to identify

13  it.  Is that your signature?

14   A  That's my signature.

15   Q  And it says, "Assistant Sheriff Tim Kelly, Chair,

16  LVMPD Tactical Review Board," correct?   10:14:58

17   A  Yes, sir.

18   Q  What does that mean?

19   A  That I chair the review of the tactics used in

20  the -- whatever particular use of force that we may be

21  reviewing that particular day.

22   Q  Now, you said you don't do that now?

23   A  No, sir.

24   Q  How long were you the chair of the Tactical Review

25  Board?

Page 15

1   A  Let's see.  I got promoted in '16.  Maybe a year   10:15:34

2  or so, year-and-a-half.

3   Q  Now, this particular memorandum is dated August

4  24th, 2017, and it's regarding the incident dated May

5  14th, 2017.

6       Approximately when did you start as the chair of

7  the Tactical Review Board?   10:16:00

8   A  I believe it was in '16 when I got promoted to

9  assistant sheriff.  I don't have the exact date.

10   Q  Did you become the chairman of the Tactical Review

11  Board as a result of being promoted to assistant

12  sheriff?

13   A  Yes.  I took over the role as the chair.

14   Q  Had you ever served on the Tactical Review Board

15  prior to becoming assistant sheriff?

16   A  Yes.

17   Q  Tell me when you first began to serve on the   10:16:29

18  Tactical Review Board.

19   A  That was probably in 2014, '15, when I was the

20  bureau commander as a captain in the academy.

21   Q  What is meant by being a bureau commander?

22   A  That is the rank of captain.

23   Q  And you were connected with the academy?   10:16:58

24   A  Yes, sir.

25   Q  And what did you do with regard to the academy?

Page 16

1   A  I just oversaw the training aspects for the

2  organization.

3   Q  You were in charge?

4   A  Yes, sir.

5   Q  So -- but bureau commander is the equivalent of

6  captain?

7   A  Captain or director, sir.

8   Q  Okay.

9   A  Civilian version director.

10   Q  All right.  How long were you the captain or

11  bureau commander of the academy?

12   A  So I got promoted to chief in '15, so it was   10:17:28

13  probably a year or less than a year, somewhere along in

14  there.

15   Q  What is the role of the Tactical Review Board?

16  What do they do?

17   A  Is to evaluate the tactics that are rendered --

18  basically the findings from the CIRT process, and we have

19  the ability to validate, overturn or modify those   10:17:54

20  conclusions presented by the CIRT board.

21   Q  Okay.  Who is the CIRT board?

22   A  So CIRT is the Critical Incident Review Team.  For

23  lack of better words I use "board," but it's the Critical

24  Incident Review Team, and they review all of the tactics

25  and training associated with a use of force.

Page 17

5 (Pages 14 - 17)

1  Q   Okay.  So please correct me if I'm wrong, but the
2  CIRT team does the initial review of a use of force?
3  A   So we have a FIT team, Force Investigative Team.
4  Q   F-I-T?
5  A   F-I-T, that reviews the force, and then the deadly  10:18:28
6  force aspects of it from the criminal side, and then
7  internally CIRT reviews the tactics, training, policies
8  and procedures associated with the use of force.
9  Q   So CIRT would review tactics, training, policies
10 and procedures, whether deadly force was used or not?
11 A   Yes, sir.  If it's an incident that rises to that  10:19:00
12 level, then CIRT would investigate those four categories.
13 Q   The Force Investigation Team or FIT team reviews
14 the use of deadly force?
15 A   Yes, sir.
16 Q   And then the Tactical Review Board reviews both
17 the CIRT report and the FIT report, no?
18 A   No, sir.
19 Q   Please explain.
20 A   So the Tactical Review Board is what it says, it's  10:19:27
21 tactical.  So within that is whether the tactics in
22 the -- that were used out by the officer fall within the
23 parameters of policy and procedure.
24 Q   Okay.  Now, isn't that the same thing the CIRT
25 team does?

Page 18

1  A   That is --
2  Q   That is the same?
3  A   So the CIRT renders the findings.
4  Q   Okay.
5  A   So basically they say -- they investigate and
6  determine whether or not the officer was within the
7  parameters of policy.  And then they present those  10:19:56
8  findings, conclusions, to the Tactical Review Board, and
9  then we validate, modify or overturn those conclusions
10 that were rendered --
11 Q   Okay.  I understand.
12 A   -- by the Tactical Review Board.
13 Q   So you basically -- when I say "you," I mean the
14 Tactical Review Board, reviews the findings of the CIRT
15 team concerning tactics, policies and procedures?
16 A   Associated with the event.
17 Q   And the FIT report, which considers issues of
18 deadly force, who, if anybody, reviews that?          10:20:30
19 A   Use of Force Board.
20 Q   Now, does the Use of Force Board produce a report
21 like the Tactical Review Board?
22 A   Yes, sir.
23    MR. SAYRE:  Craig, have I received a Use of Force  10:20:57
24 Board report?  I don't think I've seen that.
25    MR. ANDERSON:  I'll check.  Is that the same as

Page 19

1  the FIT statement?
2     THE WITNESS:  No, sir.
3  BY MR. SAYRE:
4  Q   So let me just say, I've got this Tactical Review
5  Board.  I've got the CIRT, but I've never seen the Use of
6  Force Board report.
7     Now this document here, which is -- appears to be
8  a memorandum to Joseph Lombardo, the sheriff, this takes  10:21:27
9  into account things that were -- findings that were made
10 by CIRT?
11 A   Yes, sir.
12 Q   And findings that were made by the Tactical Review
13 Board?
14 A   No.  That is not correct.  So the -- all of the
15 findings are presented by CIRT.  What we do is we either
16 validate, modify or overturn those findings/conclusions  10:21:57
17 that are presented by CIRT.
18    So, for example, if there is a use of force and
19 handcuffing technique, okay, CIRT will come back and say
20 that that was within policy.  And as they explain it, we
21 will either validate, yes, it is within policy; modify
22 it, maybe change it; or overturn it and say it is not
23 within policy, if what I'm saying makes sense.          10:22:26
24 Q   Yes, it does.  And the force investigation team,
25 or FIT, they look at the issues of deadly force.  Do they

Page 20

1  make determinations about whether the use of force was
2  within or not within policy?
3  A   So as those were presented in the Use of Force
4  Board, then the determination is whether or not they fell
5  within the parameters, and then you have four conclusions
6  for that as well.
7  Q   Four conclusions, which are?
8  A   Administrative approval, administrative
9  disapproval, tactics and training -- excuse me, tactics  10:23:00
10 and decision-making, and the third is policy failure.
11 Q   So I understand approval or disapproval.  Then the
12 next one was tactics --
13 A   And decision-making.
14 Q   What does that mean?
15 A   Meaning that the tactics and decision-making that
16 you made up to the use of force were flawed, which led to
17 you having to use deadly force.
18 Q   So it's a form of disapproval but of the tactics?
19 A   Yes, sir.
20 Q   And then the last one, please?               10:23:29
21 A   Policy failure.
22 Q   Policy failure.  And that was that there was a
23 failure of policy?
24 A   Yes, sir.
25 Q   Now that -- that report, did you -- have you

Page 21

6 (Pages 18 - 21)

1 reviewed that report?
2   A   I draft that report.
3   Q   The FIT report?
4   A   No, not the FIT report, but the Use of Force.
5   Q   So essentially the Use of Force report is kind          10:24:00
6 of -- is in the same position relative to the FIT report
7 as the Tactical Review Board is to the CIRT report?
8   A   I don't understand.  Say that --
9   Q   I'm sorry, I'm being inarticulate.
10      As I understand it, the Tactical Review Board
11 reviews the CIRT report and either accepts, rejects or          10:24:26
12 modifies findings of the CIRT report?
13   A   Correct.
14   Q   The Use of Force, is it a board?
15   A   Yes, sir.
16   Q   It -- it reviews the FIT report?
17   A   So the same type of process that's related to the
18 Tactical Review Board is the same type of process that's
19 basically from the Use of Force Board, except for the
20 civilians have the ability to basically, for lack of          10:24:59
21 better words, out-vote the commission.
22      So as we go through what occurred on the use of
23 force from the deadly force perspective, they actually
24 walk through what exactly occurred.  They have the
25 ability to ask the officer questions associated with the

Page 22

1   A   The content, there are parts of the report that          10:26:30
2 are drafted as kind of a boilerplate of the incident and
3 the occurrence of what happened out there, and then I add
4 comments.
5   Q   In the Use of Force report?
6   A   Yes, sir.  That goes to the sheriff.
7      MR. SAYRE:  I guess, Craig, what I need is I need
8 the Use of Force report.
9      MR. ANDERSON:  I'll look at it.
10      MR. SAYRE:  And we'll see if it's available, and
11 then I may need to see the exceptional assistant sheriff          10:26:56
12 again to review that perhaps.
13      MR. ANDERSON:  I'll look at it.
14      MR. SAYRE:  Okay.  Right.
15 BY MR. SAYRE:
16   Q   Okay.  Now, is it correct that once the sheriff
17 receives the Tactical Review Board report, which is the
18 document we have here before us, he can accept, reject or
19 modify it as he sees fit?
20   A   Yes, sir.
21   Q   Does he do that in a written form?          10:27:28
22   A   That I'm not aware of.
23   Q   How would you know that he had accepted, rejected
24 or modified the Tactical Review Board?
25   A   I would have known because he would have said

Page 24

1 use of force, and then we deliberate and come back with
2 one of those four findings.
3   Q   Okay.  So it is in a similar position --
4   A   Yes, sir.  My fault.          10:25:29
5   Q   That's all right.
6      It is in a similar position as the Tactical Review
7 Board is to CIRT, the Use of Force Board is to FIT?
8   A   Yes, sir.
9   Q   I understood it before, but I was not very
10 articulate in expressing it.
11      Is the Use of Force report presented to the
12 sheriff also?
13   A   Yes, sir.
14   Q   And you authored the Use of Force report
15 concerning the Tashi Farmer case?          10:25:59
16   A   Yes, sir.
17   Q   So ultimately the sheriff receives a memorandum
18 from the Tactical Review Board, which we have here before
19 us, correct?
20   A   Uh-huh, yes.
21   Q   And he receives a memorandum also from the Use of
22 Force Board?
23   A   Yes, sir.
24   Q   Which you also authored but we don't have before
25 us?

Page 23

1 something to me.
2   Q   He would say it to you.          10:27:53
3      Do you recall whether or not he said anything to
4 you about accepting, rejecting or modifying the Tactical
5 Review Board memorandum?
6   A   No, sir.
7   Q   So he has not said one way or the other?
8   A   No, sir.
9   Q   Did you take that to mean that he had accepted it?
10   A   Yes, sir, because his signature is on it.
11   Q   Now, it's not on this document.
12   A   It is.
13   Q   It's on this document?  Okay.
14   A   Front page.
15   Q   I see.  What's up here, okay, right at the top, it          10:28:26
16 says, "To:  Joseph Lombardo, Sheriff," and then
17 there's -- it looks like a doctor's signature because I
18 can't read it, but that is actually Sheriff Lombardo's
19 signature?
20   A   Yes, sir.
21   Q   And it has a date 9/18/17, which would be
22 September 18, 2017, and this indicates his acceptance
23 of --
24   A   The document.
25   Q   -- the document.  Got it.  All right.

Page 25

7 (Pages 22 - 25)

1   Now, does he similarly have the right to accept,   10:28:57
2 reject or modify the Use of Force memorandum?
3   A  Yes, sir.
4   Q  And does he do it in a similar way, meaning if he
5 accepts it, he signs his name to it?
6   A  I would assume because his signature usually goes
7 at the top.
8   Q  Do you remember if he accepted, rejected or
9 modified the Use of Force report?
10   A  He accepted.
11   Q  Who would maintain the Use of Force report   10:29:37
12 concerning this incident?  Do you understand what I mean?
13 In other words --
14   A  Yeah, I understand what you're saying.  That would
15 be -- you know what, I'm not going to guess, so no, I
16 don't know exactly.
17   Q  Do you maintain a copy of the Use of Force
18 memorandum that you prepared and gave to Sheriff   10:29:59
19 Lombardo?
20   A  No.
21   Q  Is there a filing system in your department that
22 somebody maintains that report?
23   A  Yes.
24   Q  And who is the person within your department, if
25 you know, that maintains that -- those reports?

Page 26

1 housed in CIRT and FIT.
2   Q  Okay.  You mean specifically in files that pertain
3 to CIRT and FIT?
4   A  Yes, sir.
5   Q  Do you know if the sheriff maintains copies of
6 these memoranda that he signs off on?
7   A  No.  I don't know.
8   Q  You don't know?
9   A  I don't know.   10:31:59
10   Q  So it would be Sheriff Zimmerman that would be in
11 charge of these memoranda?
12   A  CIRT and FIT.
13   Q  CIRT and FIT.
14   And what's Sheriff Zimmerman's first name?
15   A  Brett.
16   Q  You mentioned that you're no longer in charge of
17 the Tactical Review Board.  Is Sheriff Zimmerman still in   10:32:27
18 charge of CIRT and FIT as of today?
19   A  Yes, sir.
20   Q  And was he in charge of CIRT and FIT at the time
21 of this memorandum?
22   A  No.
23   Q  Who was in charge then?
24   A  Assistant Sheriff Tom Roberts.  He's retired.
25   Q  But Assistant Sheriff Zimmerman, I guess, has

Page 28

1   A  I do not know.
2   Q  Is there an office manager or administrative   10:30:26
3 person in your department that would do filing?
4   A  Yes.
5   Q  And who would that be?
6   A  For our section -- can you rephrase the question,
7 me or the sheriff's office, what -- I don't --
8   Q  Fair enough.  Your department, I'm thinking of you
9 as the assistant sheriff.
10   A  So this would work out of the other side of the
11 house, which would be the CIRT/FIT side of the house,
12 which falls under Assistant Sheriff Brett Zimmerman.   10:31:00
13 CIRT and FIT do not fall under my purview.
14   Q  They did not at the time?
15   A  No, sir.
16   Q  And they still don't, I guess?
17   A  No, sir.
18   Q  So CIRT and FIT are Zimmerman.
19   When you say "the other side of the house," it's
20 just a way of saying it belongs to Assistant Sheriff
21 Zimmerman's area?
22   A  Yes, sir.
23   Q  And do you know who his administrative person is   10:31:29
24 that --
25   A  No, sir, because those documents would probably be

Page 27

1 become an assistant sheriff since that time?   10:32:59
2   A  Yes, sir.
3   Q  So now he has basically come to be responsible for
4 CIRT and FIT in his new role?
5   A  Yes, sir.
6   Q  Do you remember, since you prepared the report,
7 what the report said?  And this may be an unfair question
8 because it may be too much to remember at one time, but
9 do you remember any aspects of the report, the Use of   10:33:27
10 Force report?
11   A  The Use of Force report?
12   Q  Yes, sir.
13   A  No, sir, I did not review the Use of Force
14 reports.
15   Q  I'm sorry, I thought you authored the Use of Force
16 reports.
17   A  No, you're saying from a year-and-a-half ago.  So
18 no, I don't remember it, meaning that I haven't reviewed
19 it in a year-and-a-half.
20   Q  Oh, yeah.  No, I understand, and I acknowledge
21 that it might not be a fair question.
22   But you did prepare the Use of Force report
23 specific to the Tashi Farmer case?
24   A  Yes, sir.
25   Q  You just -- it's been awhile?   10:34:00

Page 29

8 (Pages 26 - 29)

1   A   Okay.

2   Q   Have you reviewed the Force Investigation Team

3   report?

4   A   I've seen this report.

5   Q   Okay.  Now, that's a careful answer to a specific

6   question.

7       The question was, have you read this report?

8   A   Oh, geez, this has been about -- I've read it, but

9   it's been maybe a year.                                10:44:59

10  Q   That's fine.  Okay.  I'm not asking you to have

11  total recall of everything you read.  I just wanted to

12  know whether you had at some point.

13  A   Yes, I read it.

14      MR. McNUTT:  Are we marking this 2?

15      MR. SAYRE:  2 for identification.

16      (Deposition Exhibit 2 marked.)

17  BY MR. SAYRE:

18  Q   In this report, you basically have the work

19  product of Detective Trever Alsup, correct?  If you look

20  at the first page.

21  A   Yeah, I see it.

22  Q   Is that correct?

23      And did Trever Alsup have any input into the        10:45:30

24  proceedings of the Tactical Review Board?

25  A   No.

                                                        Page 38

1   Q   Did Trever Alsup have any input into any of the

2   proceedings of the force investigation report?

3   A   That I'm not aware of.  In all actuality, I don't

4   know.

5   Q   Okay.  But I would assume -- and please correct me

6   if I'm wrong -- I would assume that his work product,     10:46:00

7   meaning the Force Investigation Team report, would have

8   been utilized by the Tactical Review Board?

9   A   No.

10  Q   No?  Okay.

11      Would the Force Investigation Team report have

12  been utilized by the Use of Force review?

13  A   Board?

14  Q   Yes.

15  A   No.

16  Q   Okay.  Why not?

17  A   Because the Use of Force Board reviews the -- just   10:46:27

18  basically the conclusions or the -- basically the what

19  led up to the use of force and whether or not it fell

20  within the parameters of policy.

21  Q   Okay.

22  A   So that's what we look at initially.

23      We don't go through these entire reports

24  because -- I'm not sure, but I think these are associated

25  with potentially whether or not there's going to be

                                                        Page 39

1   prosecution on the back end.

2       So we're looking at whether or not it was within   10:46:59

3   policy, procedures, that when the initial use of force

4   was used in the Use of Force Board.

5   Q   Okay.  Take a look at page 3, LVMPD 3771.  Second  10:47:27

6   paragraph.  It says, "Sergeant Crumrine was the only

7   supervisor on scene for approximately 12 minutes.  During

8   that time, Sergeant Crumrine failed to start any ICS

9   duties or delegate any tasks to the numerous officers on

10  scene."                                                10:47:59

11      Who wrote that, if you know?

12  A   This was authored by CIRT, the initial --

13  basically the -- an overview synopsis of what occurred.

14  Q   Okay.  Do you know who authored the CIRT report?

15  A   No, sir.

16  Q   Is this something that was accepted by you in

17  preparing your memorandum to Chief Lombardo?

18  A   Yes, sir.

19  Q   Okay.  Continuing to read, "Sergeant Crumrine       10:48:33

20  realized the severity of the incident 7 minutes after

21  Farmer was taken into custody and officers had performed

22  CPR.  During that window of time, Officer Lopera told

23  several officers on scene he had 'choked him' (Farmer)

24  out' (four times) and placed him (Farmer) in a 'rear

25  naked' (one time), all of which was captured on his body 10:48:56

                                                        Page 40

1   worn camera."

2       Did that information come from CIRT?  I'm talking

3   about the statements made by Officer Lopera.

4   A   That I do not know.

5   Q   Is that information that you accepted as being

6   true?

7   A   Yes.

8   Q   Now, down below the blanked out -- by the way, do

9   you know why that area is blanked out that proceeds

10  thereafter?

11  A   I'm assuming because it may be related to Lopera.  10:49:30

12  Q   But you don't really recall?

13  A   No.

14  Q   It says, "camera showed" -- if you look below the

15  block down there, "camera showed Officer Lopera

16  immediately placed his right hand on top of Farmer's

17  head, similar to the hand placement of a rear naked

18  choke.  There appeared to be no attempt to obtain the

19  proper grip for the LVNR, as taught by LVMPD."            10:50:00

20      Whose conclusion is that, those two sentences?

21  A   So I would assume that that's based on the review

22  of the entirety of the incident being body worn camera,

23  witnesses, other videos associated with Venetian that

24  that conclusion was made.

25  Q   I agree, but that wasn't my question.

                                                        Page 41

11 (Pages 38 - 41)

1      Whose conclusion was it?
2   A  I'm assuming that it would be CIRT.          10:50:29
3   Q  So CIRT said that Officer Lopera immediately
4   placed his right hand on top of Farmer's head similar to
5   the hand placement of a rear naked choke?
6   A  If it was CIRT, then they must have gained this
7   through the investigation.
8   Q  Do you know who wrote the CIRT report?
9   A  No, sir.  I don't recall.                    10:50:58
10  Q  Do you know who the chair of the CIRT team was at
11  the time?
12  A  So the captain was Kelly McMahill, and the
13  lieutenant was Dan Bledsoe.
14  Q  All right.  And then it said, "There appeared to
15  be no attempt to obtain the proper grip for the LVNR, as   10:51:27
16  taught by LVMPD."
17     Is that a conclusion from CIRT?
18  A  I do not know, but I would assume that it said
19  "CIRT's review showed," so --
20  Q  It doesn't say.
21  A  At the top right there it says, "CIRT's review,"
22  so I'm assuming CIRT would be the one that's reviewing --
23  Q  I'm sorry, where at the top?
24  A  Right after that statement it says, "CIRT's
25  review."
                                              Page 42

1   seconds had elapsed from the time Officer Lopera
2   initiated the neck restraint and the time Farmer was
3   released from the neck restraint.  Farmer's behavior of
4   resistance level never appeared to be aggressive as    10:53:58
5   described by Officer Lopera."
6      Is it your belief that this information came from
7   CIRT?
8   A  Yes.
9   Q  And you accepted it to be true?
10  A  Yes.
11  Q  And the sheriff accepted it to be true by
12  accepting the report?
13  A  I would assume.
14  Q  Well, it would have to be?
15  A  Well, yes, because he signed it.
16     MR. SAYRE:  Can we take a short break, please?
17     MR. ANDERSON:  Yes.
18     VIDEOGRAPHER:  We are now going off the record.
19     The time is approximately 10:54a.m.         10:54:28
20     (Recess.)                                   10:59:02
21     VIDEOGRAPHER:  We are back on the record.
22     The time is approximately 10:59 a.m.
23  BY MR. SAYRE:
24  Q  Okay, let's go over to page 4, please.  All right.
25     It would be under "Summary of Findings," it says,
                                              Page 44

1   Q  Oh, after the statement.                     10:51:59
2   A  Yes.  So I'm assuming that CIRT is the one that is
3   making these statements.
4   Q  Did you accept these two statements:  One, that
5   Lopera immediately placed his right hand on top of
6   Farmer's head similar to the hand placement of a rear
7   naked choke; and two, there appeared to be no attempt to
8   obtain the proper grip for the LVNR, as taught by the
9   LVMPD?  Did you accept those both to be true?    10:52:28
10  A  Yes.
11  Q  And, of course, is it fair to say that the sheriff
12  accepted these statements to be true because he accepted
13  the report?
14  A  Fair to say.
15  Q  All right.  And then the next thing is, as you
16  say, "CIRT's review showed that Officer Lopera had tased   10:53:00
17  Farmer 7 times for a total duration of 39 seconds.  He
18  struck Farmer in the face 13 times.  Review of the camera
19  showed Farmer had his hands up in a protective manner
20  around his face, while Officer Lopera maintained a
21  dominant position over Farmer.  Officer Lopera instructed
22  Farmer 'to get on his stomach' numerous times without     10:53:30
23  realizing Farmer was on his stomach.  Officer Lopera was
24  also told several times to let go, however the Venetian
25  Surveillance Video showed more than one minute and 12
                                              Page 43

1   "CIRT presented," and I assume that's meant to be    10:59:27
2   "several conclusions" as opposed to "severe
3   conclusions" --
4   A  Yes, sir.
5   Q  -- "reference Officer Lopera; six were validated
6   and one was modified, additional conclusion was added.
7   Due to the circumstances of this Tactical Review Board, a
8   summary conclusion was added under Threat Assessment."
9      Do you understand that to mean that the additional
10  conclusion was actually placed under threat assessment?
11  A  Yes, sir.                                    10:59:59
12  Q  It says, "When Officer Lopera made the decision to
13  conduct a Person Stop on Farmer, per policy he was
14  required to communicate his intentions to make contact
15  via the radio.  Officer Lopera failed to comply with
16  policy.
17     "CIRT concluded Officer Lopera's failure to
18  communicate the person stop was not within the
19  standardized LVMPD tactics, training and policy."       11:00:27
20     And what is your understanding of that finding?
21     MR. ANDERSON:  Objection.
22     MR. McNUTT:  Objection, form.
23     THE WITNESS:  So my understanding is that he
24  didn't communicate the person stop to dispatch.
25  BY MR. SAYRE:
                                              Page 45

12 (Pages 42 - 45)

1    MR. McNUTT:  Objection, form.
2    THE WITNESS:  It doesn't say that.  It just says
3 cascade of events.
4 BY MR. SAYRE:
5    Q  No, but I'm trying to understand what you    11:05:29
6 understood about -- I mean, you accepted the CIRT
7 conclusion, right?
8    A  Correct.
9    Q  Did you know what CIRT was saying when they said
10 that it ultimately led to a cascade of events?
11    A  Well, at the time of this board, I'm sure we had
12 clarification, but I don't recall what that clarification
13 was.  It's been a significant amount of time.
14    Q  Sorry.  Did -- well, did the cascade of events
15 include the death of Mr. Farmer?
16    MR. McNUTT:  Objection, form.    11:05:59
17    THE WITNESS:  I don't recall that that was said.
18 And as a matter of fact, I don't think that that was
19 said.
20 BY MR. SAYRE:
21    Q  Did the cascade of events include the application
22 of a neck restraint?
23    MR. McNUTT:  Objection, form.
24    THE WITNESS:  I don't recall.  It's been a
25 year-and-a-half, so --

Page 50

1 BY MR. SAYRE:
2    Q  Well, I mean, I understand.  But -- this is a
3 rather important document, don't you agree?
4    A  Yes.
5    MR. McNUTT:  Objection, form.
6 BY MR. SAYRE:
7    Q  And the CIRT conclusion here, you accepted that to
8 be true, correct?
9    A  Yes.
10    Q  You agreed that -- you agreed with their    11:06:29
11 conclusion that the inability to formulate a plan
12 ultimately led to a cascade of events that were not
13 within standardized LVMPD tactics?
14    A  True.
15    Q  Was it within LVMPD tactics to apply a neck
16 restraint?
17    A  The -- what exactly do you mean by the question?
18    Q  Pretty straightforward.  Was it within LVMPD    11:06:59
19 tactics to apply a neck restraint on Mr. Farmer?
20    A  No, it was outside of policy.
21    Q  And did it constitute excessive force?
22    MR. McNUTT:  Objection, form.
23    MR. ANDERSON:  Objection, form.
24    THE WITNESS:  In the Tactical Review Board, we
25 don't determine excessive force.  What we determine is

Page 51

1 whether or not the individual officer's actions were
2 within policy, procedures, training and tactics.  The    11:07:26
3 courts determine that stuff.
4    MR. SAYRE:  Actually, juries do.
5    MR. McNUTT:  I'm sorry, what was the last part of
6 the answer?
7    MR. SAYRE:  Courts determine that stuff.
8 Actually, juries do.
9    MR. ANDERSON:  Objection, misstates procedure.
10 Courts can't determine that.
11    MR. SAYRE:  Well, Mr. Anderson will determine
12 that.
13 BY MR. SAYRE:
14    Q  All right.  Was it outside of policy to strike
15 Mr. Farmer on the head 10 to 12 times?
16    MR. McNUTT:  Objection, form.
17    THE WITNESS:  Based on the investigation, it was    11:07:59
18 determined that it was outside of policy.
19 BY MR. SAYRE:
20    Q  Was it outside of policy to tase Mr. Farmer seven
21 times?
22    MR. McNUTT:  Objection, form.
23    THE WITNESS:  The initial tase we determined was
24 within policy.  All subsequent tases were outside
25 policy.

Page 52

1 BY MR. SAYRE:
2    Q  And they were outside of policy because no attempt
3 was made to make an assessment of the use of force?
4    A  Correct.    11:08:23
5    Q  Mr. or -- we'll call him Mr. Lopera was fired from
6 the Metropolitan Police Department, correct?
7    MR. ANDERSON:  Objection, form.
8    THE WITNESS:  He was recommended for termination,
9 and I remember -- if I recall, I think he retired prior
10 to the termination or somewhere along those lines.    11:08:54
11 BY MR. SAYRE:
12    Q  Recommended for termination by whom?
13    A  That recommendation would come from me.
14    Q  And why did you recommend Officer Lopera for
15 termination?
16    A  That would have come from the use of force side,
17 and I can't remember the details of the -- of why, but he
18 didn't say anything during the Use of Force Board so --
19    Q  Was he terminated or was he recommended for    11:09:29
20 termination because of insubordination or because of his
21 behavior in this incident or both?
22    A  I don't recall.
23    Q  We would have to look at the Use of Force report
24 to see what they said; is that correct?
25    A  Yes.    11:09:51

Page 53

14 (Pages 50 - 53)

1   Q   You said that you were the person that recommended
2  his termination because that was your role within the
3  department?
4      A   So there's a role where I discuss that with his
5  bureau commanders.  I also discuss it with labor
6  relations.  And then I make a determination based on
7  those conversations what direction.
8      Q   All right.  When you discussed it with his bureau
9  commanders, who would that have been?            11:10:29
10     A   That would have been Captain Pelletier, and it
11 might have been Captain McDaris, who was his -- he had
12 changed stations, so I believe it was Captain McDaris.
13     Q   Could you please spell that name?
14     A   M-c-D-a-r-i-s.  No, it's Burke now, B-u-r-k-e.   11:10:55
15     Q   It's Burke now?
16     A   Yeah.
17     Q   Is that a married name?
18     A   Yes.
19     Q   So Captain Burke?
20     A   Uh-huh.
21     Q   Is that a "yes"?
22     A   Yes, sir.
23     Q   All right.  So you discussed it with them, and you
24 discussed it with labor relations.  Is that something
25 like a human resources person?

Page 54

1      A   So labor relations is the component of the agency
2  that handles discipline for the organization.          11:11:27
3      Q   Is there a person in labor relations that you
4  discussed it with specifically?
5      A   I can't remember who I spoke with.
6      Q   Did you discuss it with a representative of
7  Officer Lopera?
8      A   No.
9      Q   Now, when was Officer Lopera -- you said you
10 recommended termination.  That sounds like it's someone   11:11:59
11 else's decision to actually terminate.
12     A   The sheriff.
13     Q   The sheriff.  So the sheriff did accept your
14 recommendation and terminated him?
15     A   I don't know whether or not he was terminated or
16 he retired, but the sheriff accepted my recommendation.
17     Q   And when would that have been, do you know?
18     A   No, sir.
19     Q   Would it have been sometime after this report, the
20 Exhibit 1?                              11:12:29
21     A   Both of those reports, the Use of Force Board
22 report, along with that report, both go to the sheriff.
23     Q   All right.  Now, is it correct that Officer Lopera
24 has now sued the department because of his -- for some
25 reason?

Page 55

1      A   That I'm not aware of.
2      Q   You have not been sued?
3      A   No, sir.
4          MR. McNUTT:  Are you representing him, Fred?      11:12:57
5          MR. SAYRE:  I'd love -- this is a very fine man.
6  I'd love to represent him.  As opposed to I would not
7  like to represent you.  All right.  That's another
8  matter.
9  BY MR. SAYRE:
10     Q   Now, looking at page 5, there are a number of
11 tactical assessments made in which CIRT found Officer     11:13:25
12 Lopera made -- failed to follow policy.  Looks like
13 there's four of them, correct?
14     A   Yes, sir.
15     Q   And you accepted all of these conclusions from
16 CIRT?
17     A   Yes, sir.
18     Q   And that's why you included them in your report to
19 Sheriff Lombardo, correct?
20     A   Yes, sir.
21     Q   All right.  It says, "CIRT concluded Officer       11:13:59
22 Lopera's tactics during the foot pursuit were not within
23 standardized LVMPD tactics, training and policy," and
24 that you found to be an appropriate determination by
25 CIRT?

Page 56

1      A   Yes.
2      Q   Next page says, "CIRT concluded the use of strikes  11:14:33
3  by Officer Lopera was not within standardized LVMPD
4  tactics, training and policy."
5          You agreed with that assessment?
6      A   Yes, sir.
7      Q   And that's why it's included in the report to
8  Sheriff Lombardo?
9      A   Yes, sir.
10     Q   And he agreed with that, too, because he signed
11 off on the report?                       11:14:59
12     A   Correct.
13     Q   "The autopsy of Farmer showed evidence of
14 hemorrhages to his neck.  If the LVNR is applied
15 correctly, this type of injury should not occur."
16         Who stated that?
17     A   That would be CIRT stated that.
18     Q   Now, you've been trained in the use of the LVNR,
19 correct, once?                           11:15:28
20     A   Yes.
21     Q   It's been awhile?
22     A   It's been awhile.
23     Q   And it's been awhile since you were in a position
24 where you might be called upon to use it?
25     A   Correct.

Page 57

15 (Pages 54 - 57)

1   Q   But I'm sure you have reviewed the behavior of
2   officers under your supervision and control who have used
3   the LVNR?
4   A   Yes, sir.
5   Q   All right.  Do you believe this to be a true
6   statement, that the evidence of hemorrhages to the neck
7   if the LVNR is applied correctly, that type of injury   11:15:57
8   should not occur?
9       MR. McNUTT:  Objection, form, calls for a medical
10  opinion.
11      MR. ANDERSON:  Join.
12      THE WITNESS:  I don't have the ability to answer
13  that question.
14  BY MR. SAYRE:
15  Q   That's fine.
16      It says, "Officer Lopera's body worn camera
17  depicts Sergeant Crumrine arriving and telling Officer
18  Lopera to 'let go' of the neck restraint he had on
19  Farmer.  Officer Lopera responded by asking Sergeant   11:16:26
20  Crumrine three separate times, "Is he out?"
21      This is information that came from CIRT.
22  A   During the investigation.
23  Q   In addition on his body worn camera, Officer
24  Lopera can be heard five separate times referencing the
25  application of the LVNR in his interview as a rear naked

Page 58

1   and/or choking him out.  This is information that came
2   from the investigation also?
3   A   Yes, sir.
4   Q   Did the Tactical Review Board come to a conclusion   11:17:02
5   that Officer Lopera had utilized a rear naked choke and
6   not a lateral vascular neck restraint?
7   A   No, we did not.
8   Q   Did CIRT come to a conclusion that Officer Lopera
9   had used a rear naked choke rather than a lateral
10  vascular neck restraint?
11  A   Not that I'm aware of.
12  Q   It says CIRT concluded Officer Lopera's use of the   11:17:27
13  neck restraint, whatever it was, was not within
14  standardized LVMPD tactics, training and policy, and you
15  agree with that?
16  A   Yes.
17  Q   Why?
18  A   Well, when you look at the video, it isn't an
19  LVNR, but we don't know pretty much what it is.  But what
20  I know is what he used was not within the policy that we
21  teach.
22  Q   Okay.  Then it says, "The Tactical Review Board
23  concluded that as a result of the above conclusions in   11:18:00
24  relation to Threat Assessment, Officer Lopera's actions
25  during this incident amounted to a gross inappropriate

Page 59

1   use of force."
2       Is that the conclusion that was added on by the --
3   by your board?
4   A   Yes.
5   Q   And is gross inappropriate use of force the
6   equivalent of excessive force?
7       MR. ANDERSON:  Objection, form.
8       THE WITNESS:  Gross inappropriate use of force   11:18:28
9   means that the force used was outside of policy,
10  procedure, training and tactics.
11  BY MR. SAYRE:
12  Q   Why the word "gross"?
13  A   Because of the combination of the taser, the
14  strikes and the LVNR.
15  Q   Do you have a belief, you personally, as Assistant   11:18:54
16  Sheriff Tim Kelly, that the combination of taser, strikes
17  and LVNR constituted a Fourth Amendment violation of
18  Mr. Farmer's rights --
19      MR. ANDERSON:  Objection, form.
20  BY MR. SAYRE:
21  Q   -- as used by Officer Lopera?
22      MR. McNUTT:  Objection, form.
23      MR. ANDERSON:  Objection, form.
24      THE WITNESS:  We don't make that determination at
25  the Tactical Review Board.  What we make is a

Page 60

1   determination of whether or not the officer's use of
2   tactics, the officer's use of force out there in the   11:19:28
3   field, fell within the confines of policy.  We don't step
4   into that arena.
5   BY MR. SAYRE:
6   Q   Who decided to use the word "gross," "gross
7   inappropriate use of force"?
8   A   So gross inappropriate use of force was determined
9   after consultation with labor relations.
10  Q   I'm sorry, what does that mean?
11  A   The verbiage was basically it was along the lines   11:19:57
12  of, hey, because of the succession of use of force, it
13  was determined to be gross and inappropriate use of
14  force.  And if I remember correctly, that was in
15  consultation with labor relations.
16  Q   No, I understand you answered that question, but
17  why did labor relations consult with you?
18  A   I -- because that's what we do.  I mean as it
19  pertains to the discipline and all the things associated   11:20:28
20  with the report.
21  Q   Okay.  The use of force could have been determined
22  to have been inappropriate, just inappropriate, but here
23  the word that was added was "gross."  And that must have
24  had some meaning to use the word "gross."
25  A   Actually, I can't -- I mean, I can just go off of

Page 61

16 (Pages 58 - 61)

1  what my assumption is. But in all actuality, I can't      11:20:57
2  remember exactly what the conversation was about, but we
3  did have a conversation about that.
4     Q   Who came up with the word "gross" to describe the
5  inappropriate use of force by Officer Lopera?
6     A   I'm pretty sure it was labor relations.
7     Q   And any particular person in labor relations?
8     A   I can't recall.
9     Q   Did they tell you that gross would indicate that
10 the level of force that was being used was beyond what      11:21:25
11 you would anticipate or expect to be used by a police
12 officer?
13     MR. ANDERSON: Objection, form.
14     THE WITNESS: Not -- I can't recall whether or not
15 those specific words were used because it's been awhile.
16 BY MR. SAYRE:
17     Q   But did the person indicate the use of gross was
18 going to be used to show it wasn't just simply an
19 inappropriate use of force but was more egregious than
20 that?                                          11:21:59
21     MR. McNUTT: Objection, form.
22     THE WITNESS: I don't recall.
23 BY MR. SAYRE:
24     Q   All right. The next paragraph on that page, "CIRT
25 determined based on video evidence and witness statements

Page 62

---

1  changes in policy, LVNR was in low level.               11:23:57
2  BY MR. SAYRE:
3     Q   So it could have been applied even without
4  aggressive resistance?
5     A   In low level, yes.
6     Q   But that would be one, not two or three?
7     A   I can't remember exactly what the policy said back
8  then.
9     Q   We're going to just hop over the gross
10 insubordination. Nothing there for me.
11     Looking at page 8, which is LVMPD 3776, "A board
12 member said, each force application that LVMPD department
13 member uses should be assessed between each use of force.
14     "A board member said, there was over 20
15 applications of force, did anyone else see any
16 assessment?
17     "SME Bland stated there were opportunities to
18 assess but no assessment made."
19     Okay. Now, SME, I don't know what those initials
20 stand for.
21     A   Subject matter expert.
22     Q   So that's Michael Bland, right?
23     A   Yes, sir.
24     Q   All right. I've deposed him and he's a use of
25 force expert, so he said there were no assessments

Page 64

---

1  that at the time Officer Lopera struck Farmer multiple
2  times in his head, Farmer was only in a level of active      11:22:27
3  resistance. Officer Lopera's actions are not supported
4  by LVMPD training and policy."
5     Does that mean he was not aggressively resisting?
6     A   So active resistance is basically the suspect or
7  subject is either using, through verbal or potentially      11:22:58
8  physical, to resist taking the officer into custody, but
9  there's no intent -- and I'm going off of memory here --
10 there's no intent to harm the officer.
11     Q   Right, there's no punches or kicks?
12     A   There's no attempt to harm the officer in active
13 resistance. So if Lopera felt that the subject was in
14 aggressive resistance, then this determination was based
15 on what they observed through the video.               11:23:28
16     Q   Right. So it indicates that if Lopera thought he
17 was being aggressively resistant, he was incorrect based
18 upon the video?
19     A   Yes, sir.
20     Q   And aggressive resistance would have been what
21 would be necessary in order to have applied a lateral
22 vascular neck restraint?
23     A   Well, at that particular time -- I'm sorry.
24     MR. ANDERSON: Go ahead.
25     THE WITNESS: At that particular time before our

Page 63

---

1  made?
2     A   Yes, sir.
3     Q   What board member, if you can recall, said that
4  the -- there should be assessment made between each use      11:25:25
5  of force?
6     A   I can't recall who said any of this, so --
7     Q   Okay. And so you don't recall who said there was
8  over 20 applications of force. Did anyone else see any
9  assessment?
10     A   No, sir.
11     Q   Why was the name of the board member or these
12 board members not attached to the statements?
13     A   Because that's the way that the report has been
14 drafted is that it's board member comments. So -- so we      11:25:58
15 just use this is just a format that we use.
16     Q   Okay. That's -- you do that typically of all of
17 these Tactical Review Boards?
18     A   For the most part. I mean, there may be some
19 variations here and there as different iterations of the
20 report has evolved over the many, many years since, I
21 want to say, 2000 maybe '11. 2010, '11, '12.            11:26:28
22     There's some where there isn't hardly any
23 information, and they've just evolved so -- and it
24 depends on what preference that particular assistant
25 sheriff had as they were drafting this particular

Page 65

17 (Pages 62 - 65)

1 report.

2   Q   Okay.  Then in the next section under "LVNR" it

3 says, "Per, SME Mike Bland, from the videos seen Officer

4 Lopera is not doing the LVNR consistent with training,   11:26:57

5 can't say it is a rear naked choke either, but it is not

6 consistent with LVNR."

7       Was that the conclusion of the Tactical Review

8 Board?

9   A   These are comments that are made within the board.

10 It isn't -- this section right here isn't necessarily a

11 conclusion.  These are just comments that are made as

12 we're deliberating during the information that was

13 presented during the Tactical Review Board.

14   Q   Up above here, I skipped over this.  "A Board   11:27:30

15 member asked, is there a policy in place in regards to

16 intervening on a scene?"

17       And the answer was, "Yes, Duty to Intervene."

18       What is meant by the duty to intervene?

19   A   So under duty to intervene, if an officer observes

20 an individual that's using significant force on an

21 individual, it's his or her responsibility to intervene

22 within that incident.                            11:27:58

23   Q   And that would include Sergeant Crumrine?

24   A   Yes.

25   Q   Officer Flores?

Page 66

1 Lopera's hands away from the neck of Mr. Farmer, correct? 11:29:28

2   A   That is correct.

3   Q   Officer Crumrine told Officer Lopera to release

4 Mr. Farmer twice.  Do you recall that?

5       MR. McNUTT:  Objection, form.

6       THE WITNESS:  Actually, it was three times.

7 BY MR. SAYRE:

8   Q   Okay, three times.  And after he had told him to   11:29:55

9 intervene the three times, he never checked to see if he

10 had actually released the hold?

11       MR. McNUTT:  Objection, vague.

12 BY MR. SAYRE:

13   Q   Do you recall that?

14       MR. ANDERSON:  Objection, form.

15       THE WITNESS:  No, I'm trying to remember the

16 video.  No, I can't remember.

17 BY MR. SAYRE:

18   Q   Okay.  Did -- after telling -- after Sergeant   11:30:21

19 Crumrine told Officer Lopera to release the hold multiple

20 times, did he have a duty to intervene to get him to, if

21 necessary, to physically release the hold?

22       MR. McNUTT:  Objection, form.

23       MR. ANDERSON:  Objection.

24       You can answer.

25       THE WITNESS:  So you don't know what you don't

Page 68

1   A   Yes.

2   Q   Officer Tran?

3   A   Yes.

4   Q   And significant force, that could include a gross

5 inappropriate force?

6       MR. ANDERSON:  Objection, form.

7       THE WITNESS:  It could.                        11:28:23

8 BY MR. SAYRE:

9   Q   If an officer like Crumrine, Flores and Tran

10 believed that Officer Lopera was engaged in an

11 unconstitutional application of force, would they have a

12 duty to interview (sic) and -- to intervene and even

13 physically take his hands away from the neck of

14 Mr. Farmer?

15       MR. ANDERSON:  Objection, incomplete hypothetical.

16       Go ahead and answer.

17       THE WITNESS:  So they did intervene, and if they

18 didn't -- had not intervened, then they would have been

19 in violation of duty to intervene policy, and we would

20 have added that here.

21       But since the officers did intervene in that

22 particular incident, but our concern was that potentially

23 Sergeant Crumrine could have did more.

24 BY MR. SAYRE:

25   Q   You say they intervened but nobody took Officer

Page 67

1 know, and what I mean by that is that Officer Lopera is

2 having a tussle with this -- with Mr. Farmer, so we don't 11:30:56

3 know whether there's weapons or anything associated with

4 Mr. Farmer.  Those officers arriving on scene don't know,

5 so the key is to get the individual in custody and to

6 make sure that the individual is handcuffed.  And as soon

7 as the individual is handcuffed is when you release the

8 hold because the only person that knows whether or not he

9 loosened up the hold is Officer Lopera.

10       So the issue is that as an officer and a sergeant  11:31:26

11 on the scene, you're constantly assessing on whether or

12 not you have the correct holds to be able to take the

13 individual in custody.

14 BY MR. SAYRE:

15   Q   Wasn't Mr. Farmer rendered unconscious?

16       MR. McNUTT:  Objection, form.

17       MR. ANDERSON:  Okay.

18       THE WITNESS:  That -- so during the initial throes

19 of the event, I don't believe Mr. Farmer was unconscious.

20 And then as the event continued on, potentially he was

21 unconscious.  I don't know exactly within the time frame

22 of when he -- they first went hands-on to when they       11:31:59

23 released when Mr. Farmer went unconscious.

24 BY MR. SAYRE:

25   Q   Do you recall that Officer Flores told Officer

Page 69

18 (Pages 66 - 69)

1  Rybacki that "he was out as soon as we got there,"
2  meaning when he and Tran got there?
3    A   No, sir, I don't recall.
4    Q   If Farmer was unconscious at the time that Tran
5  and Flores got there, do you remember when that was?
6    A   No, sir.                              11:32:31
7    Q   Okay.  Why don't you take a look at that.  Do you
8  have the -- it's in this FIT report.        11:32:56
9    A   I'm going.  I'm just waiting on the page.
10   Q   I'm sorry, I'll get that to you.  Take a look at
11 LVMPD 3792?
12   A   3792.
13   Q   Actually, 3791.
14   A   3791.  Okay.                          11:33:30
15   Q   All right.  At 2:58 it says, "Officer Lopera
16 appeared to put Farmer in some type of neck restraint,"
17 okay?
18     All right, now look at 3792.
19     MR. McNUTT:  Fred, I'm sorry.  What was that time
20 stamp on 3791?
21     MR. ANDERSON:  2:58.
22     MR. McNUTT:  2:58, okay.                 11:33:58
23 BY MR. SAYRE:
24   Q   Then look at 3792.  It says at 3:25, "Officer Tran
25 arrived and said, 'Let him go, Ken.'"

Page 70

1    A   Yes, sir.
2    Q   If Farmer was out -- and I'll represent to you
3  that Officer Flores has acknowledged he told Officer
4  Rybacki that Farmer was out when they arrived.  If he was
5  out at no later than 3:27, would you agree that there   11:35:59
6  should continue to be no compression on the neck by
7  Officer Lopera after 3:27?
8      MR. McNUTT:  Objection, form, misstates the
9  document, misstates the facts in evidence.
10     MR. ANDERSON:  Join.
11 BY MR. SAYRE:
12   Q   You can answer the question.
13   A   So if this is correct along those lines, then the  11:36:24
14 pressure should have been released.
15   Q   And failing to release the pressure under the
16 facts that I asked you to assume would be a violation of
17 Mr. Farmer's civil rights?
18     MR. McNUTT:  Objection, form.
19     MR. ANDERSON:  Objection, form.
20     THE WITNESS:  Once again, we don't evaluate that
21 in the Tactical Review Board.  What we evaluate is
22 whether or not the officer's actions were within policy
23 and training.  And as I stated before, the only person
24 that knows the question to this answer -- or the answer
25 to this question is Officer Lopera.        11:36:59

Page 72

1      MR. ANDERSON:  I've got an objection. The evidence
2  during discovery showed that was not Officer Tran that
3  said that.
4      MR. SAYRE:  If you'll let me finish my question,
5  I'll clarify it for you.
6      MR. ANDERSON:  I'm sorry.
7  BY MR. SAYRE:
8    Q   As Mr. Anderson said, the evidence has shown that  11:34:29
9  the person who said "Let him go, Ken" was not Officer
10 Tran but Officer Crumrine.  However, it appears that
11 Officer Tran did arrive at 3:25, and at 3:27, Officer
12 Tran has acknowledged that Officer Lopera -- he heard
13 Officer Lopera say, "Roll him...don't grab my fucking
14 legs."
15     So it's within that time frame of 3:25 to 3:27   11:34:59
16 that Officer Tran and Mr. Flores arrived.
17     MR. McNUTT:  Objection, form, misstates the
18 document.
19 BY MR. SAYRE:
20   Q   I'm going to ask you to assume that for the
21 purposes of this question.
22   A   Okay.
23   Q   Now, it says that at 4:11, "Officer Lopera
24 released the hold on Farmer."               11:35:29
25     Do you see that?

Page 71

1      So -- but I'll stand by what I said.
2  BY MR. SAYRE:
3    Q   Okay.  But -- I understand what you said.
4      But you also have been trained regarding the case
5  of Graham versus Connors.  Are you familiar with that
6  case?
7    A   Yes.
8    Q   And that talks about the violation of federal
9  civil rights under color of law, correct?
10   A   True.
11   Q   Fourth Amendment rights?
12   A   Uh-huh.
13   Q   You agree?  Is that a "yes"?
14   A   Yes.
15   Q   And part of the protection of the Fourth Amendment  11:37:29
16 rights of a civilian is to not allow him to suffer
17 excessive force, correct?
18     MR. ANDERSON:  Objection, form.
19     THE WITNESS:  Based on Fourth Amendment Graham
20 versus Connor, yes.
21 BY MR. SAYRE:
22   Q   So if Lopera, under the facts that I asked you to
23 assume, had to release the hold at 3:27, at that point
24 on, the other officers that were within three feet of
25 him, Crumrine, Tran and Flores, had a duty to physically  11:37:59

Page 73

19 (Pages 70 - 73)

1    MR. ANDERSON: Objection to form.

2    Go ahead.

3    THE WITNESS: Yes.

4 BY MR. SAYRE:

5    Q   Take a look at page 11, please.

6        Now, it says here under "Summary of Findings"

7 regarding Sergeant Travis Crumrine, that "CIRT presented   11:43:29

8 three conclusions." One conclusion was modified and one

9 was overturned and one was validated. What conclusion

10 was overturned, if you know?

11   A   Actually, I don't recall. I don't remember.

12 Those were -- that's -- it's -- it's --        11:44:00

13       MR. SAYRE: If you're going to give him the

14 answer, give him the right one.

15       THE WITNESS: No, no, it is, and that jogged my

16 memory. It was combined so -- yeah, thank you.

17       MR. ANDERSON: Sorry.

18       THE WITNESS: I'm like overturned. But no, yes,

19 now I do. It was brought into the same category.

20 BY MR. SAYRE:

21   Q   I'm sorry, what was brought into the same

22 category?

23   A   The incident management.       11:44:28

24   Q   I'm sorry, what was that, please?

25   A   That's on the next page.

                                        Page 78

---

1    Q   Next page, all right.

2        Okay. Under "Incident Management" where all these

3 things are crossed out, what specifically are you

4 referring to?

5    A   So under "02. Incident Management 5.2," it was

6 overturned and combined with 5.1.

7    Q   Okay. All right. So what -- it was included in   11:44:59

8 5.1?

9    A   Yes.

10   Q   And 5.1 said -- it says here under 01 in the last

11 sentence of the first paragraph, "Due to Sergeant

12 Crumrine failing to follow through on the order given to

13 Officer Lopera, 50 seconds elapsed before Officer Lopera   11:45:30

14 released the neck restraint."

15       That was a conclusion of CIRT?

16   A   Yes, sir.

17   Q   Do you agree with that?

18   A   Yes.

19   Q   And the sheriff agreed with that?

20   A   Yes.

21   Q   Now, there's a series of things that says that

22 Crumrine failed to do in the next paragraph, starting   11:45:53

23 with accurately assess the situation, include life

24 safety, incident stabilization, property preservation and

25 so on. All these are failings of Sergeant Crumrine

                                        Page 79

---

1 pursuant to the policy of the Metropolitan Police

2 Department.

3    A   True.

4    Q   And you agree with these determinations by CIRT?

5    A   Yes, sir.

6    Q   And Sheriff Lombardo agrees as well?

7    A   Yes, sir.

8    Q   Now, are these failings by Sergeant Crumrine not

9 just under the policies of the Metropolitan Police        11:46:29

10 Department, but in general in his performance as a

11 sergeant?

12   A   So under this particular incident, we don't bring

13 all other incidents into the -- into the determination of

14 what particularly goes into these categories. On this

15 particular event, these are the shortcomings or the

16 failures from a policy and procedure perspective that     11:46:57

17 fell upon Sergeant Crumrine.

18   Q   The next page, please.

19   A   Sure.

20   Q   "CIRT concluded by failing to ensure Officer

21 Lopera released the neck restraint after being ordered to

22 do so, Sergeant Crumrine was in neglect of duty as a

23 supervisor. In addition, in reviewing supervisory

24 response, CIRT concluded Sergeant Crumrine's response

25 was not within standardized LVMPD tactics, training and

                                        Page 80

---

1 policy."                              11:47:29

2        You agree with that?

3    A   Yes, sir.

4    Q   And the sheriff agreed with that?

5    A   Yes, sir.

6    Q   It says here that, "A Board member said, he is a

7 weak sergeant, he performed weakly and his officer didn't

8 listen to him."

9        Do you remember who said that?

10   A   No, sir.

11   Q   It would have been a sworn officer?

12   A   It would have been a member of the Tactical Review

13 Board.

14   Q   And all the members of the board, except for the

15 administrative person, would have been -- are sworn      11:47:59

16 officers?

17   A   Yes.

18   Q   They're not civilians on the Tactical Review

19 Board, correct?

20   A   Yes, sir.

21   Q   And the administrative person doesn't make

22 comments in the deliberation?

23   A   No, sir.

24   Q   "A Board member said, part of his job is to look

25 out for his people. He should have taken care of his

                                        Page 81

21 (Pages 78 - 81)

1 officer. He didn't understand his job as a sergeant."
2     I take it you don't remember who said that?
3   A  No, sir.
4   Q  Okay. But it was a sworn officer that said that,   11:48:30
5 member of the board, correct?
6   A  He made that comment.
7   Q  Right. "A Board member said, due to Sergeant
8 Crumrine's inaction, his troop ended up killing someone
9 and still did not admit he could have done more."
10     You don't remember who said that?
11   A  No, sir.
12   Q  But it was a sworn officer?
13   A  It was one of the members from the Tactical Review
14 Board.
15   Q  "A Board member said, Sergeant Crumrine could have
16 stopped it. It could have been stopped the first time he   11:48:59
17 said let go. It could have possibly saved Farmer's
18 life."
19     That was said by a sworn officer member of the
20 Tactical Review Board?
21   A  Those are comments, yes.
22   Q  But you don't remember who said it?
23   A  No.
24   Q  Take a look at the next to the last paragraph   11:49:26
25 before "Recommended Action." It says in the last

Page 82

1 sentence, last two sentences, "Sergeant Crumrine was also
2 asked, 'So when you asked Officer Lopera to stop and he
3 didn't (sic) listen to you, did you feel you had a duty
4 to intervene?' Sergeant Crumrine's response was,
5 'no.'"?
6     And the next paragraph, this next paragraph, did   11:49:59
7 you write this?
8   A  Yes.
9   Q  "Almost three months after this tragic event,
10 Sergeant Crumrine still does not understand it was his
11 responsibility to prevent Officer Lopera from continuing
12 to apply a neck restraint once he gave direction for
13 Officer Lopera to release the restraint. Instead of
14 exerting his authority and demanding Officer Lopera
15 release the hold, he allowed Officer Lopera to maintain   11:50:30
16 the neck restraint for an additional 50 seconds. As a
17 Sergeant it is critical to understand your role and
18 responsibilities as a first-line supervisor; the men and
19 women we lead and the officers (sic) we serve in the
20 community deserve it. Based on the entirety of what
21 occurred in this incident, it appears that Sergeant
22 Crumrine does not understand his role and
23 responsibilities as a first-line supervisor."
24     And that was your assessment?
25   A  That was my assessment.

Page 83

1   Q  And that was accepted by the sheriff?
2   A  Yes.
3   Q  "I recommend that Sergeant Crumrine be
4 non-confirmed as Sergeant and returned to the rank of
5 Police Officer," and that was done?
6   A  Yes, sir.
7     MR. SAYRE: I have nothing further.
8     Could we take a short break before you have at it?
9     MR. McNUTT: Sure.
10     VIDEOGRAPHER: We are now off the record at
11 11:51 a.m.                         11:51:26
12     (Recess.)
13     VIDEOGRAPHER: We are back on the record.
14     The time is approximately 11:58 a.m.         11:58:27
15
16           EXAMINATION
17 BY MR. ANDERSON:
18   Q  Sheriff Kelly, you understand that you're still
19 under oath?
20   A  Yes.
21   Q  Real quick, you've already testified to a lot of
22 these facts, so just tell me if you agree with this.
23     Officers Crumrine, Tran and Flores arrived on
24 scene after Farmer and Lopera were already on the ground
25 in some form of neck restraint; is that correct?

Page 84

1   A  Yes, sir.
2   Q  Upon their arrival pursuant to Metro's policies
3 and procedures, what should have been the focus of their   11:58:58
4 actions upon arrival?
5   A  Getting him in handcuffs and into custody.
6   Q  And you would agree that at times an officer may
7 have a duty to physically intervene someone from using
8 excessive force that they know to be excessive --
9   A  Correct.
10   Q  -- outside of policy?
11   A  (Witness nodding head up and down.)
12   Q  Is that a "yes"?
13   A  Yes.
14   Q  When would these officers have ever been required
15 to use physical force to remove Lopera's arms?         11:59:26
16   A  After the individual was in handcuffs.
17   Q  And then towards the end of your questioning, you
18 went through several criticisms of Sergeant Crumrine. Do
19 you remember that?
20   A  Along those lines.
21   Q  For purposes of your role in this incident, was
22 Sergeant Crumrine evaluated as a supervisor in his role
23 as a sergeant?
24   A  Yes.
25   Q  So the criticisms of him were based upon the fact

Page 85

22 (Pages 82 - 85)

1    MR. McNUTT:  Yes, there is.
2    MR. SAYRE:  When are we going to get to it?
3    MR. McNUTT:  When I get to it.
4    MR. SAYRE:  Okay.  None of these are questions.
5    MR. McNUTT:  I didn't interrupt you like that,
6  Fred.
7    MR. SAYRE:  Yes, you did.
8    MR. McNUTT:  No, I did not.
9    MR. SAYRE:  Thank you.
10 BY MR. McNUTT:
11   Q  So on page 92, he reiterated the fact that it took  12:16:28
12 four officers to handcuff Tashi Farmer, and that Tashi
13 Farmer was not passive.
14      In your opinion, would it take four Metro officers
15 to handcuff a suspect if he was not resisting?
16   A  If a suspect was not resisting --
17   Q  Would it take four officers to handcuff him?
18   A  Depends on under what circumstances, and I guess
19 it just kind of depends on what type of event is  12:16:56
20 occurring.  Is the individual, you know, under the
21 influence of narcotics and has the potential to fly off
22 the handle and go crazy?  I don't know.  So it just kind
23 of depends on the circumstances that you're presented
24 with.
25   Q  Okay.  Do you believe Sergeant Crumrine when he

Page 98

1 says that Tashi Farmer resisted throughout the
2 handcuffing process?
3   A  The video, if I recall correctly, doesn't show
4 that.
5   Q  What video have you watched?  12:17:27
6   A  From a year-and-a-half ago, which would have been
7 the body worn camera video, and I think there's some
8 video from the Venetian, but it's been a minute.
9   Q  You didn't watch any video in the last month to
10 prepare for your deposition?
11   A  No.
12   Q  So look back to page 11.
13   A  Yes, sir.
14   Q  So in that same middle paragraph it says, "Due to  12:17:58
15 Sergeant Crumrine failing to follow through on the order
16 given to Officer Lopera, 50 seconds elapsed before
17 Officer Lopera released the neck restraint."
18      Do you see that?
19   A  Yes, sir.
20   Q  And that comes from CIRT, correct?
21   A  Yes.
22   Q  So it's incorporated in this, and you signed off
23 on it because you had trust and confidence that CIRT did
24 the investigation, correct?
25   A  Correct.

Page 99

1   Q  I asked Detective Kirk- -- you've got me doing it,
2 Fred.
3      I asked Detective Kirkegard when in the arrest  12:18:30
4 report -- we'll look at that in a minute -- where it says
5 Ken Lopera, Officer Lopera, released the hold, I asked
6 her whether or not that was releasing pressure on the
7 neck or whether that was Officer Lopera removing his
8 encircling arm from Tashi Farmer's neck.
9      And she said it was the latter; that when it says
10 in the arrest report that at this time stamp that that's
11 when the hold was released, that that was when the  12:18:59
12 encircling arm was removed from Tashi Farmer.
13      Do you understand that?
14   A  Yes.
15   Q  Or did you understand that before today?
16   A  No, you're explaining it -- I don't recall all of
17 the things associated with this particular board a
18 year-and-a-half ago, but I understand exactly what you
19 just said.
20   Q  Would you have any reason to disbelieve Detective  12:19:26
21 Kirkegard's testimony under oath in this deposition?
22   A  Well, if she's under oath, I wouldn't -- I would
23 think that she would come in here and be truthful.
24   Q  Back to the question about LVMPD policy, because I
25 asked her that, too, and she said it was LVMPD's policy

Page 100

1 to keep the encircling arm in place until the suspect is
2 in handcuffs.  12:19:59
3      Would you disagree with her testimony?
4   A  Well, that's their job to know policy and
5 procedure, so I would not disagree with that.
6   Q  That's what CIRT's looking at is policy and
7 procedure, right?
8   A  Correct.
9   Q  Are you aware that Metro's policy and procedure
10 expert also testified -- so this is Mr. Anderson and your
11 expert -- also testified that that is LVMPD's policy,
12 specifically to keep the encircling arm of an LVNR in  12:20:27
13 place until the suspect is in handcuffs?
14   A  Yes, I agree with what you're saying.  I thought
15 you were just making a statement.
16      MR. McNUTT:  Go to -- we'll mark this as Exhibit  12:20:48
17 3.
18      (Deposition Exhibit 3 marked.)
19      MR. McNUTT:  Would you pass one of them down to
20 the court reporter, Fred.
21 BY MR. McNUTT:
22   Q  Sheriff Kelly, have you seen this document before?
23   A  No.
24   Q  Would you go to page 3 of the document?
25   A  Okay.  12:21:30

Page 101

26 (Pages 98 - 101)

1   A   Yes.
2   Q   Are you aware of the fact that Tashi Farmer did,
3   in fact, have illegal methamphetamines in his system at
4   this time?
5   A   At that time?
6   Q   At the time of these events.
7   A   After the fact.
8   Q   Everything we know is after the fact.
9   A   I'm just saying after the fact.  What are we
10  getting clarification for?  Are you talking about at this
11  particular moment in time or after?
12  Q   I'm not asking about Ken Lopera.  I'm asking about
13  you.  Are you aware that it's been shown that Tashi
14  Farmer was, in fact, under the influence of illegal     12:28:00
15  methamphetamines?
16  A   So I do recall -- well, obviously I can't remember
17  a year-and-a-half ago what was come up in those
18  particular boards, but -- I just can't remember at that
19  time.
20  Q   Okay.
21  A   Because I haven't reviewed these documents,
22  obviously.
23  Q   And that's just fine.
24      My question is, at any point up to and including
25  today, have you become aware of the fact that Tashi
                                                Page 106

1   inside the stairwell of a casino?
2   A   No.
3   Q   Do you know if the radios can get a signal out of
4   the inside of a concrete and steel stairwell at the
5   casino?
6   A   No, that's something the radio guys would know,     12:30:30
7   though.
8   Q   So can anybody say for sure that Ken Lopera did
9   not transmit his location?
10  A   Well, the technology piece I'm not sure on, but
11  there are some things that -- there are things that
12  trigger through dispatch when you key the mic.
13  Q   Do you have an opinion as to why Officer Lopera --  12:30:54
14  excuse me, Officer Lif is not right on Officer Lopera's
15  hip at this point?
16  A   No.
17  Q   The testimony she gave was that she set the coffee
18  down.  Isn't it normal procedure that if you and I are
19  working as partners and that you contact a suspect, that
20  I'm your cover?
21  A   Correct.
22  Q   You don't have to tell me that, right?
23  A   You shouldn't.
24  Q   Should she have been right on Officer Lopera's hip  12:31:30
25  right there?
                                                Page 108

1   Farmer was under the influence of a controlled         12:28:28
2   substance?
3   A   I'm assuming that today, yes, I'm aware of it.
4   Q   Fair enough.  And being under the influence of
5   illegal methamphetamines is, in fact, a crime, right?
6   A   Correct.
7   Q   We're going to let this play for a minute.
8       Oh, one question.  You don't wear a body worn
9   camera, do you?
10  A   No.
11  Q   Maybe you should have for today's depo, right?      12:28:57
12  A   No, I'm fine.
13  Q   So there's no -- from what I understand, there's
14  no sound for the first approximate 20 or 30 seconds.
15  A   Somewhere along there.
16  Q   Is that consistent with your knowledge?
17  A   Yes, sir.
18  Q   So that's why we don't have sound?
19  A   It's true.
20  Q   It's not while we're on mute, correct?
21  A   No.
22  Q   We're going to hear some sound come up at some
23  point, but I do not need you to record the words that are
24  stated on the recording.                               12:29:22
25      Do you know how effective the officers' radios are
                                                Page 107

1   A   In my opinion, yes.
2   Q   So you recognize this as being outside the casino
3   at this point?
4   A   Yes, sir.
5   Q   And you don't have any problem with Officer Lopera
6   pursuing Tashi Farmer, correct?                        12:32:00
7   A   No.
8   Q   It's a crime to trespass in Nevada, right?
9   A   True.
10  Q   And would that have been what Tashi Farmer was
11  doing when he ran into the, quote, back of the house in
12  the casino in that restricted area?
13  A   Just kind of depends.
14  Q   On whether he had permission?
15  A   Or at that particular point the officer doesn't
16  even know if he works there or not.  Just -- the
17  assumption part is where you come into play.           12:32:30
18  Q   If an officer believes that a suspect is under the
19  influence of a controlled substance and then that person
20  flees into an employee area only, should he pursue?
21  A   I would agree, yes.
22  Q   I mean, you're in charge of all -- I think, as you
23  said, you're responsible for all crime in the valley.
24  A   That is true.
25  Q   Which is an interesting way of saying it.  I mean,
                                                Page 109

28 (Pages 106 - 109)

1 you're at least allowed to use the taser three times
2 before you're supposed to think about an alternative
3 means of force.
4     Does that refresh your recollection of policy?
5   A  Not on the amount of uses.  But before you
6 transition, that part rings a bell.          12:37:29
7   Q  If you were using a taser and after three times it
8 doesn't work, what would you recommend transitioning to
9 if the suspect is still resisting?
10   A  CAP-STUN.
11   Q  What does that mean?
12   A  I would pull out my CAP-STUN, which is chemical
13 spray, and spray it in their face.
14   Q  And do you think that would gain compliance?
15   A  Most of the time it does, in my opinion.     12:37:59
16   Q  That's the next use of force?
17   A  That's just -- you asked me my opinion on what I
18 would use, so that's something that I would do.
19   Q  Okay, got you.  So can Officer Lopera, is it
20 reasonable for him -- I know you might do something
21 else -- is it reasonable for him to give a second tase
22 charge to Tashi Farmer at this point?
23   A  So it depends on what level of resistance that the
24 individual is in, so because that's where the assessment
25 comes into play.          12:38:30

Page 114

1   Q  Could reasonable people differ on that answer?
2   A  That's -- you're asking me my opinion, correct?
3   Q  No, that's correct, but I'm just saying could
4 another officer come to a different conclusion?
5   A  Yes.
6   Q  Do we generally give the benefit of the doubt to
7 the officer in the fight?
8   A  After the fact.
9   Q  In terms of what he's sensing the proceeding?
10   A  The officer's perception.
11   Q  And the speed of the fight?
12   A  True.
13   Q  So there's the second taser strike, right?  So in  12:38:59
14 that window, do you think there was enough time for
15 Officer Lopera, he assessed that Tashi Farmer was not
16 complying with his verbal commands; he assessed that
17 Tashi Farmer was not lying still as he had directed him;
18 he assessed that had Tashi Farmer was, at a minimum,
19 trying to get up off of the ground.
20     What -- do you agree with those things that I just
21 said?  Do you think there's anything different than the
22 video we just watched?          12:39:30
23   A  Like I said, when you look at it, you don't give
24 the individual an opportunity.  Obviously, you can see
25 that there's something going on based on the officer's

Page 115

1 observations, correct?
2     So is the individual being aggressive towards the
3 officer at that point where you need to administer that
4 second tase?
5   Q  If you direct me to lay on the ground, and I don't
6 do it and I get up moving towards you, are you going to
7 assume that I have good intent?          12:39:58
8   A  Here's the thing.  There was no opportunity.  The
9 guy reached over to look at his shoe or grab his shoe.
10 If you're really getting up and getting ready to
11 attack -- this is just my opinion -- you're not going to
12 do what that guy did.
13   Q  And we have the calm light of detached reflection
14 to hit pause on this --
15   A  True.
16   Q  -- video, right?
17   A  You're correct.
18   Q  Do you think it's reasonable to hold Ken Lopera to  12:40:26
19 this standard that we're looking at here?
20   A  Well, as you said earlier, it's the officer's
21 perception, so -- but when you evaluate the totality of
22 the circumstances and the parameters from when you
23 operate within policy, we determined that he was outside
24 of policy.
25   Q  Isn't it true that Graham v. Connor --

Page 116

1     MR. SAYRE:  I think you're interrupting him.  He
2 was not finished with his answer.
3 BY MR. McNUTT:
4   Q  Were you done?
5   A  It's fine.  Go ahead.
6   Q  I didn't mean to interrupt you.
7   A  No, you're good.
8   Q  Isn't it true that Graham v. Connor says that     12:40:59
9 that's exactly what we're not supposed to do is to sit
10 here with 20/20 hindsight and --
11   A  You're correct.
12   Q  So do you give some deference to what officer
13 Lopera is doing and seeing here?  Isn't it true that
14 there could have been a knife or something in Tashi
15 Farmer's shoe that he was reaching for?
16   A  So those are the reasons why we have an
17 administrative process, and he chose not to answer any
18 questions associated with this administrative review.     12:41:29
19     Now, had Officer Lopera came in and explained
20 things the way that you're explaining them, that would
21 have been a -- potentially had a different opinion of the
22 board.
23     But Officer Lopera, during this administrative
24 proceeding, failed to say anything.  So that's the part
25 that I'm getting at.  That's the reason why we have this

Page 117

30 (Pages 114 - 117)

1 so that the officer can come in and explain what you're
2 talking about.
3    Q  I understand that, and I can't change that.    12:41:59
4    A  No, no, you can't.
5    Q  So we are here today, so that's where I'm asking
6 you questions that I have as I watched the video.
7       When I read the CIRT report that says -- and the
8 arrest report from Alsup -- that says there was no
9 assessment, and I see a good seven seconds where he, in
10 fact, assessed, he's at three feet away, the suspect is
11 not complying with the commands, that brings to mind a    12:42:28
12 question to me, and you're the guy that I have sitting
13 here to answer them.
14       So the question remains, is it reasonable for Ken
15 Lopera to trigger -- to cycle the ECD again.
16    A  Based on his perception, correct?  Because --
17    Q  Yes, based on his perception.
18    A  Me myself personally looking at it, the answer is
19 no.
20    Q  Okay.
21    A  But if we're referring to his perception, the only
22 one that can answer that question is him because as you    12:43:00
23 said, 20/20 hindsight which is exactly what we're doing
24 here together, he's the only one that can say yeah, I did
25 do this or I did do that and I thought he had this or I

Page 118

1 thought he had that.
2    Q  So if Officer Lopera had participated in the
3 administrative process like you're talking about and said
4 the things that I just said, would you have found that
5 the second cycling of the taser was within Metro policy?    12:43:26
6    A  It depends on the individual officer's ability to
7 articulate the reasons why they did what they did.
8    Q  What if he said it a little bit better than what I
9 said today?  Let's assume that I wasn't very articulate.
10    A  But see, there you go.  It's just that's -- it all
11 depends on -- we're walking ourselves through this video.
12 Officer Lopera is articulating the reasons why he did
13 what he did because that's what we need to do to justify
14 the reasons why we employ the use of force, correct?    12:43:57
15    Q  I'm not an investigator, I'm just a lawyer.  But
16 if I was investigating this as a member of the CIRT team,
17 my analysis would have included the time between the
18 taser strikes as well as the conduct of the suspect.
19       Would that have been reasonable to include?
20    A  Yes.
21    Q  Did it include that?
22    A  I can't -- from the totality of the entire
23 investigation?
24    Q  Yes.
25    A  I can't remember exactly what was said.

Page 119

1    Q  And that's fair, but I'll just tell you that    12:44:29
2 there's nowhere in the CIRT report where it goes in
3 detail like this.  Nowhere.
4    A  Well, then, that's something that probably needs
5 to be corrected.
6    Q  That's deficient, right?
7    A  If it's not there.
8    Q  So based upon what you've seen here right now, is
9 Sergeant -- or excuse me -- Officer Lopera authorized to
10 cycle his taser the second time?
11    A  No, I didn't say that.
12    Q  I'm asking you that.
13    A  No, because we determined all subsequent tasers    12:44:59
14 were outside policies.
15    Q  No, I know that was the determination when you had
16 the Tactical Review Board.  That was then, but now this
17 is now.
18       And as you and I are sitting here looking at it,
19 I'm asking you with these additional questions and facts
20 as you see them, is he authorized to cycle that taser a
21 second time?
22    A  I would say no.
23    Q  Why?
24    A  Because you -- as an individual is getting ready
25 to -- as you've said as we slow it down -- getting ready    12:45:28

Page 120

1 to turn over or roll over or grab his shoe, do we really
2 know exactly what the suspect is trying to do?  Because
3 in my opinion, if the suspect was violent towards the
4 officer, he wouldn't be doing what he's doing, taking his
5 time, you know, you'd be a little bit more aggressive.
6 My opinion.
7    Q  I'm sorry.
8    A  My opinion.
9    Q  Aren't we using -- "we" being Officer Lopera --
10 aren't we using nonlethal force at this stage?    12:45:55
11    A  True.
12    Q  So nonlethal force is authorized when the suspect
13 isn't necessarily being violent, correct?
14    A  Correct.
15    Q  I mean LVNR is authorized when a suspect is not
16 being violent.  It's a compliance control technique?
17    A  True, at that time it was.
18    Q  So is a Taser, right?
19    A  Yes.
20    Q  So Tashi Farmer doesn't have to be acting
21 violently towards Ken Lopera.  He's not complying with
22 his verbal commands, correct?
23    A  So it depends, once again, what level they    12:46:28
24 determined his resistance was in at this particular
25 moment because you have -- and don't quote me here

Page 121

31 (Pages 118 - 121)

1 because I'm going off the top of my head.  You have
2 compliance, you have active resistance, you have
3 aggressive resistance, and aggravated aggressive
4 resistance.
5   Q   So -- I'm sorry.
6   A   So as you assess what state is Mr. Farmer in, is
7 he being compliant?  Obviously not.  Is he active       12:46:56
8 resistance?  Because the next category is aggressive
9 resistance, which is fists, punches and all these types
10 of things.
11       So at what point or what level is he in at that
12 particular moment after he deploys his initial taser, and
13 this is just from me looking at it from my perspective,
14 not Officer Lopera's perspective.
15   Q   And I understand that and I appreciate that, and I
16 did almost interrupt you.       12:47:29
17   A   Go ahead.
18   Q   You asked yourself the same questions I wanted to
19 ask, so would you agree with me that Tashi Farmer is not
20 compliant in this video?
21   A   No, he's not compliant.
22   Q   Now, the next level up is active resistance,
23 correct?
24   A   If I remember correctly, yes.
25   Q   And the CIRT report said that he was actively
                                                    Page 122

1 resisting.  Do you agree with that?
2   A   Yes.
3   Q   That's what the Tactical Review Board found, that
4 Tashi Farmer was, in fact, actively resistant, right?       12:47:56
5   A   True.
6   Q   So under active resistance, Ken Lopera is
7 authorized to use a taser, correct?
8   A   So I can't recall exactly what the force continuum
9 on the wheel says or what it says at that particular
10 point, so I can't really answer.  Those are questions
11 that Bland and those guys, because it's just -- that's
12 something that I'm not -- that I don't keep up on like,
13 you know, I did a couple years ago.
14   Q   Understood.
15       Now let's talk about the next level up, aggressive  12:48:29
16 resistance, right?  That's the next level up?
17   A   Yes.
18   Q   Is there any doubt in your mind that at aggressive
19 resistance, that Officer Lopera is allowed to use
20 additional taser strikes?
21   A   Aggressive resistance?  That means that the
22 subject is actively trying to harm the officer.
23   Q   With a punch or a kick?
24   A   A punch or a kick or something along those lines.
25 So a taser would be authorized.       12:48:56
                                                    Page 123

1   Q   Would hand strikes be authorized in an active
2 resistance stage -- or excuse me, aggressive resistance
3 stage?
4   A   Aggressive, yes.
5   Q   Let's watch a little further.       12:49:04
6       I'm going to try to get this to you.  We're at
7 2:25 on the tape, and on the arrest report at 2:27 it
8 says, "Farmer replied, 'OK, sir.'"
9       Now you've heard Farmer's voice a few times on the
10 tape, right?
11   A   Yeah.
12   Q   So let's listen to the next voice.       12:49:53
13       So let's watch right around 2:27 and listen for
14 the words, "Okay, sir."  Did you hear, "Okay, sir"?
15   A   Yes.
16   Q   Do you want me to replay it?
17   A   No, I heard it.
18   Q   Is that Tashi Farmer?       12:50:28
19   A   I can't tell who that is.
20   Q   That's a security guard named Mr. Infantino, but
21 on the arrest report it attributes those compliant words
22 to Mr. Farmer.  Okay.  Do you understand that?
23   A   Uh-huh.
24   Q   So that's an error in the arrest report, right?
25   A   Well, I would assume if you are saying that that
                                                    Page 124

1 was the security guard.
2   Q   Right.       12:50:58
3       MR. SAYRE:  Could we take a break?  We've been at
4 it for an hour now.
5       MR. McNUTT:  We're almost done.
6       MR. SAYRE:  Oh, okay.
7 BY MR. McNUTT:
8   Q   We're at 2:23 of the video.  I don't need you to
9 look at that.  I'm just marking it for the court
10 reporter.       12:51:39
11       Did you see a strike?
12   A   No.
13   Q   Let's back it up.  I want you to watch for Tashi
14 Farmer striking Ken Lopera.  Did you see it there?       12:51:45
15   A   No, actually.  Did you?
16   Q   Yes.
17   A   Okay, because --
18   Q   Even Scott Devoe, which is plaintiff's expert,
19 agreed --
20   A   Maybe I'm just not looking hard enough because --
21   Q   You can hear it, too.  Listen to it.  You didn't   12:52:13
22 hear contact with Officer Lopera's body?
23   A   I heard something, and here's the thing.  Here's
24 the thing.  I'm looking at it just like you are, and if I
25 see the -- slow it -- go back just a tad.  Okay.
                                                    Page 125

32 (Pages 122 - 125)

Page 126

1  Q  It's unfortunately not that precise.  I can replay
2  it.                              12:52:52
3  A  Okay.  I saw something, but -- did we -- go
4  ahead.
5  Q  In the frame before Tashi Farmer's hand, you saw
6  his right hand come loose up at the top of the frame,
7  right?
8  A  Uh-huh.
9  Q  And you just heard something hit right near the
10 mic on Officer Lopera's body worn cam, right?
11 A  I heard something.
12 Q  And we saw a flash come towards him, yes?
13 A  I saw a flash.                  12:53:29
14 Q  So if you're watching this video, would you agree
15 with me that Tashi Farmer is not compliant with all of
16 the officers that are there at this point, their
17 commands?  Just not compliant.
18 A  At that point, he's not compliant.
19 Q  Would you agree that at a minimum, he is actively
20 resisting?
21 A  Actively resisting.
22 Q  Now, now that you've seen the punch and heard the  12:53:57
23 punch, would you agree that he's aggressively
24 resisting?
25 A  So that's where we differ because I can't tell if

Page 127

1  that's him punching, or even whether or not that is a
2  punch.  And I'm looking at the same thing you're looking
3  at, but I just -- it's really fast.
4  Q  Who else could have punched Officer Lopera
5  there?
6  A  Are you assuming that's a punch?  That's what I'm
7  saying.  Did any of the individuals there that witnessed
8  this say that a punch was thrown by Mr. Farmer?  12:54:27
9  Q  Well, I don't know that --
10 MR. SAYRE:  No.
11 BY MR. McNUTT:
12 Q  -- the other officers --
13 MR. McNUTT:  Fred, that would be called coaching a
14 witness.
15 MR. SAYRE:  He asked you a question.  We're going
16 to answer it.
17 MR. McNUTT:  You're going to answer the question?
18 MR. SAYRE:  I did.  I answered it because you
19 won't.  You're making up this thing about a punch, and
20 there is no such thing.
21 MR. McNUTT:  Fred, are you going to disqualify or
22 withdraw your own expert who said on video under oath
23 that that was a strike by Tashi Farmer against Officer  12:54:56
24 Lopera?  That's your expert, Fred.
25 MR. SAYRE:  Are you going to ask questions or are

Page 128

1  you going to make speeches?
2  MR. McNUTT:  Are you going to withdraw him?
3  MR. SAYRE:  Are you going to ask questions or are
4  you going to make speeches?
5  MR. McNUTT:  Well, since you brought these issues
6  up --
7  MR. SAYRE:  I didn't bring it up.
8  MR. McNUTT:  Sure you did.
9  MR. SAYRE:  You're the one that brought it up.
10 MR. McNUTT:  Would you like to take a break?  Is
11 that what this is really about?
12 MR. SAYRE:  I asked for it, but you said we're
13 almost done.
14 MR. McNUTT:  You're under physical duress.  I
15 understand.  We'll take a break, five-minute break.
16 VIDEOGRAPHER:  We're going off the record.
17 The time is approximately 12:55 p.m.
18 (Discussion off the record.)          12:57:32
19 VIDEOGRAPHER:  We are now back on the record.
20 The time is approximately 12:57 p.m.
21 BY MR. McNUTT:
22 Q  We're back on the record, Sheriff Kelly.
23 Appreciate your time this morning.
24 So just a final follow-up question or two.
25 At the juncture that we're watching the video

Page 129

1  where we were discussing whether or not there was a  12:57:57
2  strike against Officer Lopera, do you know from your
3  recollection or the investigation whether the other Metro
4  officers were present at that point when -- before the
5  neck restraint was applied?
6  A  I don't believe so.
7  Q  Do you know who the other officer -- or excuse me,
8  who the other individuals were that appear to be around
9  Officer Lopera in the frame of the video?
10 A  I believe that they're security guards associated
11 with the Venetian.                  12:58:30
12 MR. McNUTT:  I don't have any further questions.
13 MR. ANDERSON:  I don't have any further questions.
14
15 FURTHER EXAMINATION
16 BY MR. SAYRE:
17 Q  I just have a couple.  If an officer engages in
18 burglary while he's on the job, is that outside of
19 policy?
20 A  Yes.
21 Q  It's also a crime, correct?
22 A  Yes.
23 Q  If an officer engages in excessive force such that
24 it violates the Fourth Amendment rights of an individual,  12:58:58
25 that's outside of policy, correct?

33 (Pages 126 - 129)

1   A   From an agency perspective, it is.

2   Q   It's also a crime, correct?

3   MR. ANDERSON:  Objection to form.

4   MR. McNUTT:  Form.

5   THE WITNESS:  That would be up to the courts,

6   obviously, to make that determination as in the case of

7   the burglary.

8   BY MR. SAYRE:

9   Q   In other words, something that is outside of

10   policy could be in the right circumstances a crime,

11   depending on the circumstances and facts?

12   A   Yes.

13   Q   And it could be a violation of the Fourth

14   Amendment, depending on the circumstances and the facts?

15   A   As the courts make that determination, yes.   12:59:29

16   MR. SAYRE:  I have nothing further, thank you.

17   MR. McNUTT:  Thank you for your time.

18   VIDEOGRAPHER:  We are off the record at 12:59 p.m.

19   This concludes today's testimony given by Tim

20   Kelly.                          12:59:52

21

22

23

24

25

Page 130

---

1   I, the undersigned, a Certified Court Reporter of

2   the State of Nevada, do hereby certify:

3   That the foregoing proceedings were taken before

4   me at the time and place herein set forth; that any

5   witnesses in the foregoing proceedings, prior to

testifying, were duly sworn; that a record of the

6   proceedings was made by me using machine shorthand which

7   was thereafter transcribed under my direction; that the

8   foregoing transcript is a true record of the testimony

9   given.

10   Further, that before completion of the

proceedings, review of the transcript [XX] was [ ] was

11   not requested.

12   I further certify I am neither financially

13   interested in the action nor a relative or employee of

14   any attorney or party to this action.

15   IN WITNESS WHEREOF, I have this date

16   subscribed my name.

17

18   Dated: November 8, 2018

19

20

21

22

23   *Barbara K. Justi*

24   BARBARA K. JUSTI, RPR

25   CCR No. 878

Page 132

---

1

2   I, ASSISTANT SHERIFF TIM KELLY, do hereby declare

3   under penalty of perjury that I have read the foregoing

4   transcript; that I have made any corrections as appear

5   noted, in ink, initialed by me, or attached hereto; that

6   my testimony as contained herein, as corrected, is true

7   and correct.

8   EXECUTED this _____ day of _____,

9   2018, at _____, _____.

10        (City)        (State)

11

12

13

14

15   _____

16   ASSISTANT SHERIFF TIM KELLY

17        VOLUME I

18

19

20

21

22

23

24

25

Page 131

34 (Pages 130 - 132)