# EXHIBIT 15
# Excerpts from Trevor Alsup Deposition, Vol. III, 7/1/19

Detective Trever Alsup · Vol. II · July 1, 2019
\* \* \* Videotaped Deposition \* \* \*

Page 183

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4

 5   TRINITA FARMER, individually,  )
                                    )
 6              Plaintiff,          )
                                    ) Case No.
 7        vs.                       ) 2:18-cv-00860-GMN-VCF
                                    )
 8   LAS VEGAS METROPOLITAN POLICE  )
     DEPARTMENT, a subdivision of   )
 9   the STATE OF NEVADA; KENNETH   )
     LOPERA, individually; TRAVIS   )
10   CRUMRINE, individually;        )
     MICHAEL TRAN, individually;    )
11   MICHAEL FLORES, individually,  )
                                    )
12              Defendants.         )
     _____)
13

14

15

16      VIDEOTAPED DEPOSITION OF DETECTIVE TREVER ALSUP

17                        VOLUME II

18            Taken on Monday, July 1, 2019

19                    At 11:04 a.m.

20           3005 West Horizon Ridge Parkway

21                      Suite 241

22                   Henderson, Nevada

23

24

25   Reported by:  Cynthia K. DuRivage, CCR No. 451
```

**CONDENSED TRANSCRIPT**

Detective Trever Alsup - Vol. II - July 1, 2019
\* \* \* Videotaped Deposition \* \* \*

7 (Pages 204 to 207)

Page 204

1  third trigger pull.
2      Q.  Were the first four trigger pulls
3  successful?  Strike that.
4          Did the first four trigger pulls connect?
5          MR. McNUTT:  Objection, form.
6          THE WITNESS:  By the download of the TASER
7  that would we got, you could tell that a circuit was
8  completed on several of the TASERs or of the
9  utilizations of the TASER.  However, several were
10 intermittent.
11         But then, comparing that to body cam
12 footage, you could tell that, at certain points,
13 there was neuromuscular incapacitation.
14 BY MR. LAGOMARSINO:
15     Q.  What is neuromuscular incapacitation?
16     A.  It's when the circuit through the TASER
17 connects or travels through the body, and it just
18 basically, the easiest way to explain it is it locks
19 the body up to where you're not able to control your
20 muscle actions.
21     Q.  How long did that last with Tashii Farmer
22 each time NMI was achieved?
23     A.  Well, a cycle on the TASER when you pull it
24 is five seconds.  So for me to be able to say that it
25 lasted for the full five seconds, according to a

Page 205

1  couple graphs, I think that happened twice.  But
2  there are other ones that showed that it was
3  intermittent.
4      Q.  In your police report, did you address your
5  belief as to whether Officer Lopera gave Farmer a
6  reasonable amount of time to comply with commands
7  before cycling the ECD again?
8      A.  Yes.
9      Q.  And what was your finding?
10     A.  That he did not.
11     Q.  Was it your belief that the verbal commands
12 that Officer Lopera gave Farmer, such as "Don't move"
13 and "Get on your stomach" were contradictory?
14     A.  Yes.
15     Q.  Did you believe it was unreasonable for
16 Officer Lopera to expect compliance when he told
17 Farmer to, "Don't move" but also to get on his
18 stomach while cycling through the ECD?
19     A.  Yes.
20         MR. McNUTT:  Objection, form.
21 BY MR. LAGOMARSINO:
22     Q.  Going to page 7 of your report.
23         On the second highlighted paragraph -- do
24 you have a highlighted copy there?
25     A.  I do.

Page 206

1      Q.  Did you write:
2          "LVMPD policy states, after the
3          initial five-second cycle, the
4          officer will evaluate the need to
5          apply an additional five-second
6          cycle after providing the subject a
7          reasonable opportunity to comply"?
8      A.  Yes.
9      Q.  "Policy further states, after
10         The subject has been exposed to
11         three cycles, the ECD shall be
12         deemed ineffective and another force
13         option will be considered."
14         Did you write that?
15     A.  Yes.
16     Q.  So according to LVMPD policy, the officer
17 needs time to evaluate whether to apply an additional
18 five-second cycle, correct?
19     A.  Correct.
20     Q.  Other than the highlights that are present
21 on this exhibit, does this exhibit appear to be a
22 true and accurate copy of your report?
23     A.  Yes.
24         MR. ANDERSON:  In addition to the
25 highlights, there's some handwritten stuff.  You

Page 207

1  included that as not part of his report too, right?
2  BY MR. LAGOMARSINO:
3      Q.  Okay.  I do note there's a handwritten copy
4  on my copy -- a handwritten note on my copy.  That is
5  not yours?
6      A.  That is not mine.
7      Q.  All right.  Under Metro policy, when is an
8  officer allowed to deliver strikes to an individual's
9  head?
10     A.  Basically, the easiest way to explain it is
11 when the officer is in fear of harm to himself.
12     Q.  You wrote on page 7 that:
13         "Farmer did not appear to be
14         displaying aggressive resistance."
15         At any time during your evaluation of this
16 incident, did Farmer appear to be displaying
17 aggressive resistance?
18     A.  Not in my opinion.
19     Q.  Did you assess that, basically, Farmer was
20 trying to protect his face from being hit when
21 Officer Lopera began to strike him?
22         MR. McNUTT:  Objection, form.
23         THE WITNESS:  I would say that's fair.
24 BY MR. LAGOMARSINO:
25     Q.  And did you believe it was unreasonable for

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Trever Alsup - Vol. II - July 1, 2019
\*\*\* Videotaped Deposition \*\*\*

8 (Pages 208 to 211)

Page 208

1  Officer Lopera to strike Mr. Farmer 10 to 12 times?
2       A. Yes.
3          MR. McNUTT: Objection, form.
4  BY MR. LAGOMARSINO:
5       Q. Going to page 8, you wrote:
6             "Due to the fact that
7          Officer Lopera, who was on duty and
8          acting in the official capacity of a
9          police officer, attempted to detain
10         Farmer inside the Venetian Hotel
11         without sufficient legal authority
12         for the detention."
13      What did you mean by saying that?
14      A. Basically that he was on duty, he was
15 performing his job as a police officer, and that the
16 initial encounter didn't rise to the level of
17 reasonable suspicion or probable cause to make a stop
18 or the arrest.
19      Q. Irrespective of whether the hold that
20 Lopera applied, it was a LVNR or a rear naked choke,
21 do you believe that either one would have been
22 excessive in this circumstance?
23      A. I do.
24         MR. McNUTT: Objection, form.
25

Page 209

1  BY MR. LAGOMARSINO:
2       Q. Did you see any justification for applying
3  a lateral vascular neck restraint?
4       A. No.
5       Q. Or a rear naked choke?
6       A. No.
7       Q. Now, just to clarify a little bit, if
8  Lopera believed that he was in fear for his life,
9  would he have been justified in using -- strike that.
10         If Lopera was in fear for his life, would
11 he have been justified in using a rear naked choke?
12         MR. ANDERSON: Objection, form.
13         MR. McNUTT: Objection.
14         THE WITNESS: Not according to department
15 policy. Per department policy, the only neck
16 restraint that's allowed is the LVNR.
17 BY MR. LAGOMARSINO:
18      Q. How does active resistance differ from
19 passive resistance?
20      A. An attempt to harm the officer.
21      Q. Did you see any intent on the video, or any
22 video, to harm the officer on Farmer's part?
23      A. I did not.
24      Q. And how do people demonstrate intent?
25      A. Well, if you are throwing strikes or trying

Page 210

1  to hit the officer or kick the officer, use a weapon
2  against the officer, that demonstrates the intent to
3  harm the officer.
4          MR. LAGOMARSINO: Dan, did you introduce
5  the FIT report last time?
6          MR. McNUTT: No.
7          MR. LAGOMARSINO: 11.
8          (Exhibit 11 was marked for
9          identification by the reporter.)
10 BY MR. LAGOMARSINO:
11      Q. Did you author the FIT report in this
12 matter?
13      A. I did.
14      Q. Other than some redaction that's in there,
15 can you take a look at this and tell us if this
16 appears to be a true and accurate copy of the FIT
17 report that you authored?
18      A. It does.
19      Q. Now, obviously, you authored that pursuant
20 to your job duties?
21      A. Correct.
22      Q. All right. Can you please turn to page 33.
23         Does the section in the first half of the
24 page accurately describe what passive resistance is
25 as opposed to active and aggressive resistance?

Page 211

1       A. According to our policy at the time, yes.
2       Q. Has it since changed?
3       A. Use of force policy has changed.
4       Q. Has it changed with respect to passive,
5  active, and aggressive resistance?
6       A. I do not believe so.
7       Q. Now, in item No. 2, you wrote:
8             "During the subsequent ACD cycles,
9          Farmer was displaying passive and
10         active resistance. Prior to and
11         during the repeated strikes to
12         Farmer's head, Farmer was displaying
13         passive and active resistance."
14         MR. McNUTT: Andre, where are you reading
15 that from?
16         MR. LAGOMARSINO: Sorry, No. 2.
17         MR. McNUTT: But you switched pages?
18         MR. LAGOMARSINO: No. Page 33.
19         MR. McNUTT: Oh, 2 at the bottom, sorry.
20 Gotcha.
21 BY MR. LAGOMARSINO:
22      Q. All right. We'll start the question again.
23         So under No. 2 on page 33, did you write
24 that:
25            "During the subsequent ACD cycles,

Page 212

1 Farmer was displaying passive and
2 active resistance"?
3    A. Yes.
4    Q. How was he displaying passive and active
5 resistance?
6    A. He was actively trying to keep
7 Officer Lopera from taking him into custody.
8    Q. By doing what?
9    A. Either put his hands underneath him,
10 running away, actions where there didn't appear to be
11 a display to intent to harm the officer but prevent
12 being taken into custody.
13    Q. Would trying to remove the probes be active
14 resistance?
15    A. Yes.
16    Q. And would you defer to the video -- strike
17 that.
18       After the first TASER strike, did Farmer
19 attempt to run away?
20    A. After the first one?
21    Q. Right.
22    A. He was on the ground and sat up.
23    Q. So he sat up, that's the --
24    A. Well, without watching the video again, I
25 know that after the first one, he was on the ground.

Page 213

1 I believe that's when he tried to remove the probe
2 and I think put his shoe back on.
3       I don't remember if he actually made it to
4 a full sitting position or not.
5    Q. After the very first TASER strike, did
6 Tashii go to the ground?
7    A. Yes.
8    Q. Did he ever get up off the ground again?
9       MR. McNUTT: Objection, form.
10       THE WITNESS: Standing to his feet?
11 BY MR. LAGOMARSINO:
12    Q. Correct.
13    A. No.
14       MR. LAGOMARSINO: 12.
15       (Exhibit 12 was marked for
16       identification by the reporter.)
17 BY MR. LAGOMARSINO:
18    Q. I've handed you what has been marked as
19 Exhibit 12. Go ahead and flip through that, and let
20 us know if you've ever seen this before.
21    A. I have seen it before. It's not a document
22 that I've read cover to cover or in its entirety.
23    Q. Okay. At least in terms of having seen it
24 before, does it appear to be a true and accurate copy
25 of the BDT01 introduction to DTs, basic ready, lag

Page 214

1 time pat-downs?
2       MR. ANDERSON: Objection, form.
3       THE WITNESS: Yes.
4       MR. ANDERSON: Go ahead.
5 BY MR. LAGOMARSINO:
6    Q. If an officer believes that a subject is
7 resisting attempts to handcuff him, what options does
8 the officer have to use in terms of force to attempt
9 to handcuff him?
10    A. Well, basically, at that point, any of the
11 tools that are available on the officer's belt. He
12 could use the baton to assist in handcuffing.
13       The pepper spray. It just kind of depends
14 on how things -- in the officer's mind how things are
15 escalating and where he's at.
16    Q. What are weaponless defense techniques?
17    A. Oh, there's arm bars, there's distract
18 methods. There's a lot.
19    Q. Wrist locks?
20    A. I'm sorry?
21    Q. Wrist locks?
22    A. Correct.
23    Q. Is one method to disengage by pushing the
24 suspect forward?
25    A. Yes.

Page 215

1    Q. Is another method to step back and create
2 distance?
3    A. Yes.
4    Q. What is objectively reasonable force?
5    A. What another officer -- basically, the
6 simple term is what another officer would believe to
7 be reasonable.
8    Q. Okay. And what is subject of reasonable
9 force?
10    A. I'm sorry?
11    Q. What is subject of reasonable force?
12       MR. ANDERSON: Objection, form.
13       THE WITNESS: I'm not exactly -- it's not a
14 term that I've ever heard.
15 BY MR. LAGOMARSINO:
16    Q. Okay. Do officers have to receive training
17 on resistance handcuffing?
18    A. You mean handcuffing when a subject is
19 resisting them?
20    Q. Yes.
21    A. Yes.
22    Q. And do officers have to take tests in that
23 regard?
24    A. We have tests on defensive tactics.
25 Without knowing the exact training manual, how it's

Page 216

1 written, I would say that it's covered in DTs. I
2 don't know if it's something that is tested on.
3    Q. Is it pass-fail or an honor system, or how
4 does it work?
5    A. You conduct your quarterly DT training with
6 an instructor, and he monitors the progress
7 throughout the class.
8    Q. Is there an actual test?
9    A. Like a written test?
10    Q. Right.
11    A. We have tests on the use of force policy.
12    Q. How about for DTs?
13    A. That would be incorporated into the use of
14 force policy.
15    Q. What are -- strikes that.
16       How would you define the term
17 "de-escalation techniques"?
18    A. My own personal term would be it's to try
19 to find a way to slow the momentum, calm things down,
20 and find a peaceful resolution to a problem.
21    Q. Did you observe Officer Lopera perform any
22 de-escalation techniques?
23    A. I honestly can't answer that because he did
24 not give us a statement.
25       Uses of force can be a form of

Page 217

1 de-escalation, but without him giving me a statement,
2 I don't know what his opinion on that was.
3    Q. So you're saying in terms of his intent,
4 it's hard to discern his intent if he hasn't spoken
5 to you; is that correct?
6    A. Correct.
7    Q. In terms of his actions, did you observe
8 de-escalation techniques?
9    A. Not in my opinion.
10    Q. Now, in this investigation --
11    A. Let me -- can I --
12    Q. Sure.
13    A. -- clarify one thing real quick.
14    Q. Sure.
15    A. In the very limited walk-through that he
16 did give us, he stated that he thought that
17 Mr. Lopera was attempting to carjack the vehicle, at
18 which point he deployed his TASER.
19       At that point, you could argue that that
20 was a form of de-escalation.
21       Again, without a statement and what was
22 going through his mind, I have no idea.
23    Q. You have previously testified whether you
24 believed that Farmer was attempting to carjack,
25 correct?

Page 218

1    A. I'm sorry?
2    Q. You've previously answered the question as
3 to whether you believe that Farmer was attempting to
4 carjack?
5    A. Right.
6    Q. And in this case, do you believe that
7 Farmer was attempting to carjack the vehicle?
8    A. I do not.
9    Q. Did Jonathan Pearce, the driver, believe
10 that he was trying to carjack the vehicle?
11    A. Not in his statement.
12    Q. Did Officer Colon -- am I pronouncing that
13 correct?
14    A. Colon.
15    Q. Colon. Did he assist you in this
16 investigation?
17    A. He did.
18    Q. What was his role?
19    A. He basically was with me for the
20 documentation of the scene and performing any tasks
21 that I might need to be done.
22    Q. How long have you worked with
23 Officer Colon -- or, strike that -- Detective Colon?
24    A. Since approximately 2006.
25    Q. What is his first name?

Page 219

1    A. Marc, with a C.
2    Q. How many investigators did you have working
3 with you regarding this incident? Let me rephrase
4 the question.
5       Oh, go ahead. Strike that.
6       Let me restate the question.
7       How many investigators did you have working
8 with you on this investigation?
9    A. For the Force Investigation Team?
10    Q. Yes, sir.
11    A. Five. And a supervisor.
12    Q. Is the supervisor the sergeant?
13    A. Yes.
14    Q. Is the case agent the same as the primary
15 investigator?
16    A. Yes.
17    Q. And that was you?
18    A. Yes.
19    Q. And you were assigned to that position?
20    A. Yes.
21    Q. Did Sergeant McDonald supervise everything
22 that you did?
23    A. He was aware of what was going on
24 throughout the investigation. To say that he was
25 standing over me the whole time, no.

## Page 236

1  just stay in the photos, it says:
2      "On the proximal right cheek
3      junction of the lower eyelid are
4      three generally horizontal
5      superficial abrasions and
6      lacerations. These are no more than
7      8 millimeters each."
8      Are you able to circle those?
9  A. (The witness complied.)
10     MR. McNUTT: Detective Alsup, if you're
11 able to circle, would you identify -- I mean, I know
12 you just did, so would you identify the page that
13 you're marking.
14     MR. LAGOMARSINO: Or just write your
15 initials, I guess, because I don't think there's a
16 Bates number on there, but for the record, I guess
17 describe what's in the picture is what you're saying?
18     MR. McNUTT: Well, give us some
19 identification, I mean, the number of pictures you're
20 in or something because some of these are a little
21 similar.
22     MR. LAGOMARSINO: Okay. I know after the
23 fact, we'll be able to look at the exhibit but just
24 for Mr. --
25     MR. McNUTT: So there's no Bates number

## Page 237

1  on --
2      MR. LAGOMARSINO: The photos.
3      MR. McNUTT: Okay.
4      THE WITNESS: Would it be easier to go 1,
5  2, 3, 4, as according to how she has them in her
6  report or?
7      MR. McNUTT: Whatever. I guess we'll get
8  that copy afterwards.
9  BY MR. LAGOMARSINO:
10 Q. Did I lose you?
11 A. No, I'm going...
12 Q. Okay. Have you circled those?
13 A. Um-hum.
14 Q. It states:
15     "There appears to be a spectacle
16     hemorrhage on the right lower
17     eyelid, though this is difficult to
18     discern incident to dark
19     pigmentation of the skin."
20     Are you able to circle that?
21 A. No.
22 Q. "On the left upper cheek at its
23     Junction with the left lower eyelid
24     is an obliquely oriented
25     1 centimeter superficial abrasion

## Page 238

1  laceration."
2      Are you able to discern that?
3      MR. McNUTT: Objection, form.
4      THE WITNESS: This pen isn't working.
5  BY MR. LAGOMARSINO:
6  Q. Okay. And then, there are some other
7  injuries. The remaining are the section that are
8  indicated.
9      Is it your understanding and opinion that
10 the injuries noted in the head and neck section are
11 as a result of the alteration with Ken Lopera?
12     MR. McNUTT: Objection, form.
13     MR. ANDERSON: Join.
14     THE WITNESS: I believe so.
15 BY MR. LAGOMARSINO:
16 Q. All right. Now going to page 1414.
17     I'm going to be referring to some of the
18 medical illustrations as well. It says:
19     "Layer-wise, in --" I don't know
20     how to pronounce this word "-- situ
21     dissection of the neck reveals
22     hemorrhage as follows. Superficial
23     subcutaneous within the right and
24     left lower neck."
25     And then, it states:

## Page 239

1      "The right mid sternomastoid
2      muscle with anterior hemorrhage."
3      What does anterior mean, front or back?
4  A. Behind.
5  Q. Behind?
6  A. Um-hum.
7  Q. Are you sure, or is posterior better?
8  A. If I remember correctly.
9  Q. Okay.
10 A. It's 26 years ago, so...
11 Q. Do you feel comfortable going through these
12 medical illustrations, or would you leave that to the
13 doctors?
14 A. I would leave that to the doctors.
15 Q. All right. Now, we've heard testimony
16 about methamphetamine being in Tashii Farmer's
17 system.
18     Is it your understanding based on the
19 toxicology reports that there was methamphetamine in
20 Tashii Farmer's system?
21 A. Based on the toxicology reports, yes.
22 Q. Now, having a drug in one's system is
23 different than being -- or, strike that -- can be
24 different than being under the influence, correct?
25     MR. McNUTT: Objection, form.

Detective Trever Alsup - Vol. II - July 1, 2019
\* \* \* Videotaped Deposition \* \* \*

16 (Pages 240 to 243)

Page 240

1  THE WITNESS: Correct.
2  BY MR. LAGOMARSINO:
3  Q. Is there anything in the police report that
4  you've authored, either the police report or the FIT
5  report, that is of the opinion that Tashii Farmer was
6  under the influence?
7  A. No.
8  Q. Okay. Going to the next page, so it would
9  be after the autopsy report that's typed but the
10 autopsy report form here.
11    MR. McNUTT: So Bates?
12    MR. LAGOMARSINO: Thank you. LVMPD 1419.
13 BY MR. LAGOMARSINO:
14 Q. In terms of clothing, it says:
15    "He was wrapped in a white sheet."
16    Was he wrapped in a white sheet, to your
17 recollection?
18 A. That was, he was wrapped in a sheet for
19 transport to the Coroner's office.
20 Q. Okay. Did you see him in the sheet?
21 A. Yes.
22 Q. It says:
23    "Hospital blankets and a blue
24    fitted sheet."
25    Did you also see that?

Page 241

1  A. Yes.
2  Q.  "He was wearing white socks and
3    Black shoes."
4    Did you see that?
5  A. Yes.
6  Q.  "He was lying atop a black short
7    Sleeve T-shirt, black boxer briefs,
8    and a pair of blue and camouflage
9    patch jeans."
10   Did you see that?
11 A. Yes.
12 Q.  "His hands were bagged with
13   Evidence preservation bags."
14   What does that mean?
15 A. They are bags that cover the hands and then
16 are tied around the wrist to preserve any evidence,
17 trace evidence, which could be fingernail scrapings.
18 Q. It says:
19   "A TASER probe was stuck in the
20   back of the waistband of the
21   decedent's boxer briefs."
22   Did you see that?
23 A. Yes.
24 Q.  "A piece of TASER wire was amongst
25   His clothing."

Page 242

1    Did you see that?
2  A. Yes.
3  Q. It also states, going in specific
4  photography, it says, "injuries, x-rays, personal
5  property," correct? Is that correct?
6  A. Yes.
7  Q. It says:
8    "He had a TASER probe lodged in
9    the back of his upper back and an
10   apparent probe-like puncture in his
11   lower back slightly left of the
12   midline."
13 A. Correct.
14 Q. So is it your understanding that --
15   MR. McNUTT: Hang on. I've got to ask,
16 Craig's objection.
17   Are you answering correct that that's what
18 this says, or are you answering correct, you remember
19 these things?
20   THE WITNESS: That that's what this is
21 saying.
22   MR. McNUTT: Okay.
23 BY MR. LAGOMARSINO:
24 Q. Based on what this states here, is it your
25 understanding that the puncture in the lower back

Page 243

1  would be from the probe that was stuck in the back of
2  the waistband of the decedent's boxer briefs?
3    MR. McNUTT: Objection, form.
4    MR. ANDERSON: Objection, form.
5    THE WITNESS: Yes.
6  BY MR. LAGOMARSINO:
7  Q. How many probes does that particular TASER
8  have?
9  A. Two.
10 Q. And one was still stuck in his back,
11 correct?
12 A. Correct.
13 Q. It says here -- I'm going to ask you what
14 it says, but then, I'm going to ask you if you
15 remember it. It says:
16    "He had lacerations to his
17    exterior upper lip, multiple
18    lacerations and swelling around his
19    right eye, a laceration on the
20    bridge of his nose, a laceration
21    under his left eye and swelling
22    around his left eye and an abrasion
23    under his right ear."
24    Do you recall those injuries?
25 A. I do remember multiple lacerations and

Page 252

1  BY MR. LAGOMARSINO:
2      Q.  Do you have any evidence in your
3  investigation that would indicate that these injuries
4  described here are from anything other than the
5  altercation with Officer Lopera?
6          MR. McNUTT: Objection, form.
7          THE WITNESS: I don't.
8  BY MR. LAGOMARSINO:
9      Q.  Going back to the scene for a moment,
10 Lopera did a walk-through with an attorney; is that
11 correct?
12     A.  That's correct.
13     Q.  Was it John Aldrich?
14     A.  Yes.
15     Q.  And did Aldrich stop Lopera from continuing
16 to say what happened?
17     A.  They came to a point where they said that
18 that was all that they would be talking about.
19     Q.  And so, you were never able to get his
20 statement as to why he tased Tashii seven times?
21         MR. McNUTT: Objection, form.
22         THE WITNESS: Correct.
23 BY MR. LAGOMARSINO:
24     Q.  And you were never able to get his
25 statement about why he struck him on the face or head

Page 253

1  or upper body 10 to 12 times?
2      A.  Correct.
3          MR. McNUTT: Objection, form.
4  BY MR. LAGOMARSINO:
5      Q.  And you were never able to get his
6  statement about why he applied whatever neck hold or
7  neck restraint he applied?
8      A.  Correct.
9      Q.  In your report, did you conclude that if
10 Farmer had lived, he would not have been charged with
11 carjacking?
12     A.  Correct.
13     Q.  Did you watch a press briefing regarding
14 this incident given by McMahill?
15     A.  Depending on which one it was, I could have
16 been present at that press conference.
17     Q.  Have you ever heard anybody from Metro
18 saying that Farmer would not have been charged with a
19 crime?
20     A.  Yes.
21     Q.  Who did you hear say that?
22     A.  I'm pretty sure I heard the undersheriff,
23 Kevin McMahill, say that.
24     Q.  Now, it was Farmer that initiated the first
25 contact with Lopera and Lif, correct?

Page 254

1      A.  Correct.
2      Q.  Do you have any evidence, to your
3  knowledge, that after Farmer started walking,
4  running, or jogging away from Lopera that Lopera told
5  him to stop?
6          Let me make it more specific as to time.
7          The body cam doesn't record sound for the
8  first around 30 seconds, correct?
9      A.  Correct.
10     Q.  So from the time that Lopera -- strike
11 that.
12         From the time that Farmer starts to walk
13 away or leave the area where Lopera is, for the next
14 15 or 20 or 30 seconds, do you have any evidence
15 affirmatively to demonstrate that Lopera told Farmer
16 to stop?
17     A.  No.
18     Q.  And unless a citizen is being detained or
19 arrested, that citizen is free to leave the presence
20 of an officer if they wish, correct?
21     A.  Correct.
22     Q.  Have you been trained on excessive force
23 under the Fourth Amendment? Strike that.
24         Have you been trained on what is excessive
25 force under the Fourth Amendment or what the standard

Page 255

1  is?
2      A.  To say that something is definitively
3  excessive force, it would depend a lot on the
4  circumstances, but trained as far in the -- where you
5  could get to excessive force, yes.
6      Q.  Okay. You were asked by Sayre in your
7  deposition in the estate case certain questions about
8  the Fourth Amendment.
9          Do you recall?
10     A.  Not specifically.
11     Q.  Okay. Do you recall generally?
12     A.  Yes.
13     Q.  In your view, was the use of a lateral
14 vascular neck restraint or a rear naked choke
15 excessive force under the Fourteenth Amendment -- or,
16 under the Fourth Amendment?
17         MR. ANDERSON: Objection, form.
18         THE WITNESS: I believe so.
19 BY MR. LAGOMARSINO:
20     Q.  Do you believe that the chokehold was
21 excessive force under the Fourth Amendment?
22         MR. ANDERSON: Objection, form.
23         THE WITNESS: I believe so.
24         MR. McNUTT: Join.
25

Detective Trever Alsup - Vol. II - July 1, 2019
\* \* \* Videotaped Deposition \* \* \*

22 (Pages 264 to 267)

Page 264

1  A. Correct.
2  Q. Do know the name of that security guard
3  offhand as you sit here?
4  A. I'd have to look back through.
5  Q. There were a few of them, correct?
6  A. Yes.
7  Q. Okay. So at 2:58 -- at 2:58, Lopera says,
8  "Stop, don't move," correct?
9  A. Correct.
10 Q. Then he says, "You're going to get tased,"
11 correct?
12 A. Correct.
13 Q. And after that, he tases Tashii and then
14 yells, "TASER, TASER, TASER," correct?
15 A. Correct.
16 Q. And Tashii falls to the ground?
17 A. Correct.
18 Q. At 3:03, Tashii's both hands are up,
19 correct?
20 A. Correct.
21 Q. And there appears to be a cellphone in his
22 hand?
23 A. Correct.
24 Q. So Lopera says, "Don't move," and Tashii
25 says, "Okay," correct?

Page 265

1  A. Correct.
2  Q. He says, "Don't move," and Tashii says
3  "Okay" again, correct?
4  A. Correct.
5  Q. And then, we'll play it, but Lopera says,
6  "Stop right there," and is it your understanding that
7  he was talking to the driver of the truck, Pearce?
8  A. Correct.
9  Q. So just before Lopera says, "Stop right
10 there, get on your stomach," Farmer appears to be
11 trying to get something out of his shoe, correct?
12 A. Umm --
13 Q. Or, strike that. What does Farmer appear
14 to be doing?
15 A. The way that I interpreted it was it had
16 slipped off his heel, and he was putting it back on.
17 Q. At about 3:10, Lopera appears to achieve
18 NMI; is that correct?
19 A. Correct.
20     MR. McNUTT: Objection, form.
21 BY MR. LAGOMARSINO:
22 Q. And do you hear Tashii apparently screaming
23 in pain?
24 A. Yes.
25     MR. McNUTT: Objection, form.

Page 266

1  BY MR. LAGOMARSINO:
2  Q. As we're going through this, if you see any
3  subtitles that you believe are inaccurate, please let
4  us know. Okay?
5  A. (No audible response.)
6  Q. At about just before 3:35, does Lopera
7  appear to use the TASER in stun mode, or do you know?
8  A. At this point, I don't know. Watching this
9  camera, I don't know.
10 Q. Okay. I'm just going to go back a little
11 bit to about 3:30. And it appears that Tashii
12 screams out in pain. I'm just trying to figure out
13 if you're able to discern from this camera what you
14 believe it is.
15     Are you able to tell why Tashii Farmer is
16 screaming out?
17 A. The way it sounds on the video to me is he
18 screamed out, and then, you can hear the TASER
19 cycling. So I'm not sure if the cycling started
20 before that or after.
21 Q. Now we're at 4:05. Have you seen Lopera
22 deliver strikes to Tashii Farmer?
23 A. It appears so, yes.
24 Q. So Crumrine arrives at the scene first,
25 correct?

Page 267

1  A. Correct.
2  Q. The question I'm going to ask you is: Does
3  it appear, based on your review of the video that
4  Lopera goes into a chokehold in front of Crumrine,
5  correct?
6     MR. ANDERSON: Objection, form.
7  BY MR. LAGOMARSINO:
8  Q. I'll be asking that question.
9     So going to 4:11.
10    So we've paused at 4:22. Does it appear
11 that Lopera goes into the chokehold or neck restraint
12 just as Crumrine arrives?
13 A. Yes.
14 Q. Crumrine told Farmer to get his hands
15 behind his back, correct?
16 A. Correct.
17 Q. Or get his fucking hands behind his back is
18 what he said, correct?
19 A. Correct.
20 Q. Based on your assessment, was it hard for
21 Farmer to get his hands behind his back because
22 Lopera was on his back?
23    MR. McNUTT: Objection, form.
24    THE WITNESS: It probably would have been.
25

Page 272

1    A. It does not appear.
2    Q. Later on his body cam, Lopera says, "I
3  choked him out," correct?
4    A. Correct.
5    Q. Does it have any significance to you in
6  your investigation?
7    A. It's just not a term that we use.
8    Q. What term would you use if you were going
9  to put somebody in neck restraint, a proper neck
10 restraint?
11   A. You would say that you applied the LVNR or
12 make reference to the LVNR.
13   Q. Does choking somebody out have a legitimate
14 law enforcement objective?
15      MR. McNUTT: Objection, form.
16      MR. ANDERSON: Objection, form.
17      THE WITNESS: Well --
18 BY MR. LAGOMARSINO:
19   Q. Let me rephrase.
20      In this situation, does choking Tashii
21 Farmer out have a legitimate law enforcement
22 objective?
23      MR. McNUTT: Same objection.
24      MR. ANDERSON: Objection, form.
25      THE WITNESS: I don't believe so.

Page 273

1  BY MR. LAGOMARSINO:
2    Q. And later, Lopera says, "I started wailing
3  on the dude and then I rear-mounted and choked him
4  out."
5       Did he say that?
6    A. According to the body cam, yes.
7    Q. Would wailing on Tashii Farmer then rear
8  mounting and choking him out have a legitimate law
9  enforcement objective?
10      MR. McNUTT: Objection, form.
11 BY MR. LAGOMARSINO:
12   Q. In this case.
13   A. I don't believe so.
14   Q. Have you ever witnessed anybody apply an
15 LVNR outside of training?
16   A. Yes.
17   Q. And when did you witness that?
18      MR. McNUTT: I'm sorry, would you repeat
19 that.
20      MR. LAGOMARSINO: Sure.
21 BY MR. LAGOMARSINO:
22   Q. Outside of training, had you ever watched
23 somebody apply an LVNR?
24   A. Yes.
25   Q. Approximately when did you see that?

Page 274

1    A. Early 2000s.
2    Q. And who was that?
3    A. Just a suspect on a call.
4    Q. And who applied the LVNR?
5    A. One of the officers.
6    Q. Were you one of the officers present at the
7  scene?
8    A. I was.
9    Q. Was it you?
10   A. No.
11   Q. What happened with that suspect?
12   A. He -- both him and the officer went down to
13 a kneeling position, and he was taken into custody.
14   Q. Any other occasions?
15   A. Not that I can remember.
16   Q. In training, have you witnessed videos of
17 officers applying LVNRs, either in this department or
18 others, to suspects?
19   A. Yes.
20   Q. Approximately how many?
21   A. Over the course of 21 years, I couldn't
22 even give you a number.
23   Q. More than a hundred?
24   A. Between 50 and a hundred.
25   Q. Okay. Was this the worst application of a

Page 275

1  neck restraint you've ever seen, either on video or
2  live?
3       MR. McNUTT: Objection, form.
4       MR. ANDERSON: Objection, form.
5       THE WITNESS: In my opinion, it was not a
6  good application of force.
7  BY MR. LAGOMARSINO:
8    Q. Have you ever seen one that was worse?
9       MR. McNUTT: Objection, form.
10      MR. LAGOMARSINO: Strike that.
11 BY MR. LAGOMARSINO:
12   Q. As you sit here today, can you recall one
13 that was worse?
14   A. No.
15   Q. Did you believe that Lopera was giving
16 conflicting commands to Farmer?
17   A. Yes.
18   Q. Throughout, did you believe that his
19 commands made it impossible for Farmer to
20 appropriately respond to the commands?
21      MR. ANDERSON: Objection, form.
22      MR. McNUTT: Join.
23      THE WITNESS: Yes.
24 BY MR. LAGOMARSINO:
25   Q. Were you tasked as part of the FIT

Page 276

1  investigation to evaluate Crumrine, Tran, or Flores'
2  conduct?
3      A.  No.
4      Q.  How many times have you watched the video
5  of the incident?
6      A.  A lot.
7      Q.  Have you played and paused in the
8  frame-by-frame style many times?
9      A.  Yes.
10     Q.  And did you review the statements from the
11 involved officers in this case?
12     A.  I did.
13     Q.  Did you also review the SOPs, certain SOPs?
14     A.  Certain policies, yes.
15     Q.  Which policies did you review?
16     A.  Mainly use of force.
17     Q.  Even though you were not provided with
18 Lopera's statement, did you try to understand the
19 environment that he was facing during this event?
20     A.  Yes.
21     Q.  Did you believe that Lopera's actions were
22 appropriate in this case?
23     A.  No.
24         MR. McNUTT:  Objection, form.
25

Page 277

1  BY MR. LAGOMARSINO:
2      Q.  Do you believe that his actions were
3  judicious?
4      A.  No.
5      Q.  Do you believe that Lopera engaged in a
6  thoughtful and a well-reasoned response?
7          MR. McNUTT:  Objection, form.
8          MR. ANDERSON:  Objection to form.
9          THE WITNESS:  No.
10 BY MR. LAGOMARSINO:
11     Q.  Does Metro train that placing somebody in a
12 neck restraint for longer than 10 or 20 seconds can
13 cause death potentially?
14     A.  Well, Metro doesn't teach a neck restraint
15 besides the LVNR, and with the LVNR, it's that you
16 apply the LVNR until you gain compliance.
17     Q.  Metro teaches that if it's applied
18 improperly, it could cause death, correct?
19     A.  Correct.
20     Q.  Did you consider the use of the neck
21 restraint that was used in this case deadly force?
22         MR. McNUTT:  Objection, form.
23         MR. LAGOMARSINO:  Let me rephrase.
24         THE WITNESS:  I believe that the amount of
25 time that the neck restraint was held was excessive.

Page 278

1  BY MR. LAGOMARSINO:
2      Q.  Did you ever assess, based on your review
3  of the video, that Lopera was ever in any danger of
4  losing his life?
5      A.  Not in my opinion.
6      Q.  Based on your review of the video of both
7  today and then the other times, did you ever believe
8  that Tashii Farmer posed a threat to the general
9  public, based on what you've seen?
10     A.  No.
11         MR. LAGOMARSINO:  All right.  I'm going to
12 just take five minutes, a restroom break, and then,
13 we'll be done by like 2:30, or at least my questions
14 will be done.
15         THE VIDEOGRAPHER:  The time is
16 approximately 1:45 p.m.  We are going off the record.
17         (A recess was taken.)
18         THE VIDEOGRAPHER:  The time is
19 approximately 1:54 p.m.  We are back on the record.
20 BY MR. LAGOMARSINO:
21     Q.  You understand, Detective, that you're
22 still under oath?
23     A.  I do.
24     Q.  Now, when Farmer ran away from Lopera, he
25 ran through a door that was clearly marked as an

Page 279

1  exit; is that correct?
2          MR. McNUTT:  Objection, form.
3          THE WITNESS:  Yes.
4  BY MR. LAGOMARSINO:
5      Q.  Does a tourist who appears -- strike that.
6          Does a sweating tourist who runs through an
7  exit door compel a police pursuit?
8      A.  It could.  In this case, I don't believe
9  so.
10     Q.  I believe in your prior deposition, you --
11 I'm not sure which one, but you testified that you
12 would have taken a different tact than Lopera?
13     A.  Correct.
14     Q.  Maybe more of a contain strategy; is that
15 correct?
16     A.  Correct.
17     Q.  How would you have done that?
18     A.  Utilize the police radio to try to gain
19 containment around the area where the person ran.
20     Q.  Is somebody saying they're being followed a
21 reason to detain that person?
22     A.  No.
23     Q.  Did Lopera's partner, Lif, feel that Farmer
24 should have been detained?
25         MR. ANDERSON:  Objection, form.

Detective Trever Alsup - Vol. II - July 1, 2019
\*\*\* Videotaped Deposition \*\*\*

27 (Pages 284 to 287)

Page 284

1  remained at the proper level of force with Tashii
2  Farmer?
3      A. No.
4      Q. Are you of the opinion that Officer Lopera
5  showed compassion and care about Farmer's well-being?
6          MR. ANDERSON: Objection, form.
7          MR. McNUTT: Objection, form.
8          THE WITNESS: No.
9  BY MR. LAGOMARSINO:
10     Q. Did you ever assess how long it took for
11 the officers to start chest compressions on Farmer?
12     A. I did initially at the time of the call. I
13 don't remember exactly what it was.
14     Q. Minutes, correct?
15     A. No. Once officers -- do you want me to
16 finish?
17     Q. Yes.
18     A. Once officers arrived, he was checked for a
19 pulse several times. As soon as an officer noticed
20 that he had no pulse and wasn't breathing, that's
21 when CPR was begun.
22     Q. Was it Tran or Flores, or do you know
23 which, that said that Farmer appeared to be
24 unconscious when they arrived at the scene?
25     A. I'd have to go back through and look to

Page 285

1  remember.
2      Q. One of them said that, correct?
3      A. Something to that effect, yes.
4      Q. When an officer uses an LVNR to the point
5  of making a subject pass out, is that low level of
6  force or intermediate level of force at that time?
7      A. Intermediate.
8      Q. When Tashii was on the ground with his
9  hands up, did you consider that substantial
10 resistance?
11     A. No.
12     Q. When a subject says, "Yes, sir" and "I
13 will" in response to commands, is that a sign of
14 compliance?
15         MR. ANDERSON: Objection, form.
16         THE WITNESS: It can be.
17 BY MR. LAGOMARSINO:
18     Q. Going back to the TASER for a second, was
19 there evidence confirming that there was a
20 connection -- strike that.
21         Going back to the TASER, was there evidence
22 confirming that there was a solid and consistent
23 connection through probe placement?
24         MR. McNUTT: Compound.
25         THE WITNESS: There was a download of the

Page 286

1  TASER, which showed whether or not the circuit was
2  completed.
3  BY MR. LAGOMARSINO:
4      Q. And was it completed to a consistent
5  connection?
6      A. It was either two or three times that it
7  showed that it was a completed circuit, and the other
8  ones were intermittent.
9      Q. Is NMI evidence of a consistent connection
10 to the probes?
11     A. Yes.
12     Q. Do you believe that Tashii Farmer would
13 have spontaneously died had he not had any
14 interaction with Ken Lopera?
15         MR. McNUTT: Objection, form.
16         MR. ANDERSON: Join.
17         THE WITNESS: I don't think there's any way
18 that I can answer that.
19 BY MR. LAGOMARSINO:
20     Q. Based on your review of the video, did
21 Tashii Farmer exhibit superhuman strength?
22     A. No.
23     Q. Did you undertake to download Tashii
24 Farmer's text messages?
25     A. We did.

Page 287

1      Q. Was there any relevance of those text
2  messages to your investigation?
3      A. Nothing significant that I remember.
4          There may have been references to drugs but
5  nothing that stood out.
6      Q. Did -- strike that.
7          If Tashii Farmer had a long history of drug
8  use, would that be relevant to your investigation of
9  Lopera's conduct?
10     A. No.
11     Q. As you sit here today, do you recall any
12 text messages from Tashii's phone that indicate that
13 he actually received drugs the night of the incident?
14     A. Not off the top of my head.
15     Q. Did you ever see any evidence that
16 Officer Lif actually slipped and fell?
17     A. No.
18     Q. Did you put together a PowerPoint for the
19 fact-finding review?
20     A. I did.
21         (Exhibit 17 was marked for
22         identification by the reporter.)
23         MR. LAGOMARSINO: Which exhibit is this?
24         THE REPORTER: 17.
25

1          CERTIFICATE OF REPORTER
2          I, Cynthia K. DuRivage, a Certified Court
3   Reporter of the State of Nevada, do hereby certify:
4          That the foregoing proceedings were taken
5   before me at the time and place herein set forth;
6   that any witnesses in the foregoing proceedings,
7   prior to testifying, were duly sworn; that a record
8   of the proceedings was made by me using machine
9   shorthand which was thereafter transcribed under my
10  direction; that the foregoing transcript is a true
11  record of the testimony given.
12         I further certify I am neither financially
13  interested in the action nor a relative or employee
14  of any attorney or party to this action.
15         Reading and signing by the witness was
16  requested.
17         IN WITNESS WHEREOF, I have this date
18  subscribed my name.
19  Dated: July 16, 2019
20
21
22                    _____
                      CYNTHIA K. DuRIVAGE
                      CCR No. 451
23
24
25