# EXHIBIT 17
# Excerpts from Jonathan Pierce Deposition, Vol. I, 4/26/18

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

ESTATE OF TASHI S. FARMER a/k/a        )
TASHII FARMER a/k/a TASHII             )
BROWN, by and through its              )
Special Administrator, Elia Del        )
Carmen Solano-Patricio; TAMARA         )
BAY LEE KUUMEALI'MAKAMAE FARMER        )
DUARTE, a minor, individually          )
and as Successor-in-Interest,          )
by and through her legal               )
guardian, Stevandra Lk Kuanoni;        )
ELIAS BAY KAIMIPONO DUARTE, a          )
minor, individually and as             )
Successor-in-Interest, by and          )
through his legal guardian,            )
Stevandra Lk Kuanoni,                  )
                                       )
            Plaintiffs,                )
                                       )
    vs.                                )  No. 2:17-cv-01946-
                                       )       JCM-PAL
LAS VEGAS METROPOLITAN POLICE          )
DEPARTMENT, a political                )
subdivision of the State of            )
Nevada; OFFICER KENNETH LOPERA,        )
individually and in his                )
Official Capacity; and                 )
Does 1 through 50, inclusive,          )
                                       )
            Defendants.                )
_____ )

DEPOSITION OF JONATHAN JODIE PIERCE

April 26, 2018

Flagstaff, Arizona

By:  Michelle K. Seymour, RPR, CSR, CCR
     Arizona Certified Reporter #50710

Job: 26055

JONATHAN JODIE PIERCE

April 26, 2018

**Page 2**

```
 1              INDEX TO EXAMINATION
 2
    WITNESS:                              PAGE:
 3
 4    JONATHAN JODIE PIERCE
 5         Examination by Mr. Sayre          4
 6         Examination by Mr. McNutt        31
 7         Further Examination by Mr. Anderson  71
 8         Further Examination by Mr. Sayre    74
 9
10
11
12              INDEX TO EXHIBITS
13    NUMBER:        DESCRIPTION:        MARKED:
14    Exhibit 1      Arrest Report          24
15    Exhibit 2      Voluntary Statement    24
16                    * * * * *
```

**Page 3**

```
 1          Pursuant to Notice and Rules of Civil
 2  Procedure, the deposition of JONATHAN JODIE PIERCE,
 3  called by Plaintiffs, was taken on Thursday,
 4  April 26, 2018, commencing at 2:03 p.m., at
 5  Performance Reporters, 201 East Birch Avenue,
 6  Suite 9, Flagstaff, Arizona, before MICHELLE K.
 7  SEYMOUR, RPR, CSR, an Arizona CCR, Certificate
 8  No. 50710.
 9
10  APPEARANCES:
11              Federico C. Sayre, Esq.
                ABIR COHEN TREYZON SALO, LLP
12              2600 Michelson Drive, Suite 1700
                Irvine, California 92612
13              (949) 852-3570
                Appearing on behalf of Plaintiffs
14
15              Daniel R. McNutt, Esq.
                MCNUTT LAW FIRM, P.C.
16              625 South Eighth Street
                Las Vegas, Nevada 89101
17              (702) 384-1117
                Appearing on behalf of Defendant
18              Officer Kenneth Lopera
19
                Craig R. Anderson, Esq.
20              MARQUIS AURBACH COFFING
                10001 Park Run Drive
21              Las Vegas, Nevada 89145
                (702) 382-0711
22              Appearing on behalf of Defendant Las
                Vegas Metropolitan Police Department
23              (Telephonically)
24
25
```

**Page 4**

```
 1           JONATHAN JODIE PIERCE,
 2  called as a witness herein, having first been duly
 3  sworn, was examined and testified as follows:
 4               * * * * *
 5           E X A M I N A T I O N
 6               2:03 p.m.
 7               * * * * *
 8  BY MR. SAYRE:
 9     Q.  Good afternoon.  Mr. Pierce, again, thank
10  you very much for coming down on short notice for
11  the deposition.  My name is Fred Sayre.  And I've
12  introduced myself previously over the phone on one
13  occasion, or two occasions, and then here in person.
14  I represent the children, two children of Tashi
15  Farmer Brown.  Sometimes each name is used,
16  sometimes both together.  And we are -- I am
17  prosecuting a lawsuit against the Metropolitan
18  Police Department of Las Vegas and Officer Lopera.
19  Okay?
20         And, Mr. McNutt might want to introduce
21  himself.
22         MR. MCNUTT:  I represent Officer Ken
23  Lopera.
24         MR. SAYRE:  And then, Craig Anderson,
25  would you please introduced yourself.
```

**Page 5**

```
 1         MR. ANDERSON:  Craig Anderson, on
 2  behalf of Las Vegas Metropolitan Police Department,
 3  Officers Crumrine, Flores and Tran.
 4  BY MR. SAYRE:
 5     Q.  Now, you've been sworn to tell the truth by
 6  the court reporter, and she is authorized by the
 7  court to administer that oath.  And although we're
 8  sitting here somewhat informally in this conference
 9  room, do you understand that it is both as binding
10  on you here as we were in a courtroom of law?
11     A.  Yes, I do.
12     Q.  Everything that is said here today will be
13  taken down by the court reporter, and in a couple of
14  weeks she'll have it typed up into a booklet form
15  and it will be sent to you for your review.  And at
16  that time, as you review it, if you wish, you can
17  either change or correct anything that you said here
18  today, if you wish.
19     A.  Okay.
20     Q.  You don't have to, but you are given that
21  opportunity to do that.
22         Do you understand?
23     A.  I understand.
24     Q.  After you've reviewed it, there will be a
25  place where you sign under penalty of perjury that
```

JONATHAN JODIE PIERCE

April 26, 2018

1  what is in the booklet is true and correct.  Okay?
2      A.   Okay.
3      Q.   And then there will be a stamped envelope,
4  and you just put it in there and send it back, I
5  guess to me, it will have my address.
6      A.   Sounds good.
7      Q.   Now, if you don't understand a question
8  that I ask you, or anyone else asks you, please
9  don't answer it.  Ask me to repeat it or rephrase
10  it, or some other way to indicate that it was not
11  understood.
12      A.   Okay.
13      Q.   And I'll do my best to repeat it or
14  rephrase it or do something to make it
15  understandable.
16      A.   Yeah, I can do that.
17      Q.   Please wait until I finish my question
18  before you start your answer.  And I'll give you the
19  same courtesy; I'll wait until you finish your
20  answer before I start the next question.  Besides it
21  being courteous, it's difficult for the court
22  reporter to take down two people who are speaking at
23  the same time.
24          Do you understand?
25      A.   I understand.

1      Q.   Okay.  I don't expect this to be a very
2  lengthy deposition, but if at any time you wish to
3  take a break, just indicate that you want to take a
4  break and your request will be honored.  There's
5  water and coffee, and there's a bathroom close by.
6          Do you understand that?
7      A.   I understand that.
8      Q.   During the course of the deposition, I may
9  ask you questions that have to do with distance or
10  dates or time, and you may or may not have an exact
11  answer to my question but you may have a reasonable
12  estimate.  If you don't have an exact answer, that's
13  fine.  I would just like to have your best estimate.
14          Do you understand that?
15      A.   I understand.
16      Q.   And just as you've been doing very nicely
17  up till now, please continue to answer out loud.
18  Such common expressions as uh-huh or huh-uh are too
19  difficult to interpret.  Similarly, nods of the head
20  either as attempting to show affirmation or shakes
21  of the head suggesting no aren't always able to be
22  interpreted.  So, again, if you would, just please
23  continue to answer out loud as you've been doing
24  nicely up till now.  Will you do that, please?
25      A.   Yes, I can do that.

1      Q.   Have you taken any kind of medication or
2  anything that would cause you to have inability to
3  recollect or to state your best responses here
4  today?
5      A.   No, I have not.
6      Q.   I told you about the idea of an estimate.
7  While estimates are fine, and welcome, guesses are
8  not.  And if it is a guess, then you should not do
9  so.  It's not always clear what the difference is
10  between a guess and an estimate, but to use an
11  example:
12          You can see the length of this table.  You
13  may not have an exact ability, by your eyes, to
14  measure the exact length of the table, but you could
15  probably give a reasonable estimate of the length of
16  the table.  However, if I asked you to estimate the
17  length of my dining room table in Irvine,
18  California, it would have to be a pure guess because
19  you have never been there.
20          Do you understand that?
21      A.   Yes, I understand.
22      Q.   All right.  Mr. Pierce, would you please
23  state your full name for the record.
24      A.   My full name is Jonathan Jodie Pierce.
25      Q.   Are you currently employed?

1      A.   No.
2      Q.   What are you doing right now in terms of --
3  are you studying?
4      A.   I'm studying.  I'm at university.
5      Q.   Is that Northern Arizona University?
6      A.   It is.
7      Q.   And what are you studying, please?
8      A.   Forestry.
9      Q.   Now, at the time of this incident, which
10  was in July of 2015, I believe -- maybe I have it
11  wrong.  No.  I'm sorry.  Different case.  It was in
12  May of 2016.  '17.  Sorry.  You indicated you were
13  working for the Forestry Service at that time?
14      A.   Yes.  And I will be returning to that same
15  job the Monday school is out.
16      Q.   Okay.  So you'll be working this summer for
17  the Forestry Service?
18      A.   Yes.  I've already signed aboard.  I'm not
19  working yet.
20      Q.   How long have you worked for the Forestry
21  Service?
22      A.   Last summer was my first season.  So I
23  continued that until November, starting in May.
24      Q.   And what do you do for the Forestry
25  Service?

JONATHAN JODIE PIERCE

April 26, 2018

1    A.  I'm a Forestry technician.
2    Q.  What does that do?
3    A.  So, my title is Timber Sales Preparation.
4  So, we prepare land and timber to be sold to a
5  private contractor.
6    Q.  How far along are you in your college
7  education?
8    A.  I will be finishing my junior semester next
9  month.
10   Q.  And does that mean you'd have one more
11  year?
12   A.  Correct.  And I am on track to graduate.
13   Q.  And then you will be full-time Forest
14  Service?
15   A.  Not immediately.
16   Q.  What are you intending to do?
17   A.  I'm intending to hike the Pacific Crest
18  Trail, upon graduation, because it's a good
19  interlude between university and a career.
20   Q.  I got it.  So, but you are ultimately
21  planning to be in the Forestry Service, I take it?
22   A.  It's between the Forestry Service and
23  further education.
24   Q.  Okay.  You might go to graduate school, for
25  example?

1    A.  In California, yes.
2    Q.  Do you have an intended field, possible?
3    A.  Forestry.
4    Q.  Same thing?
5    A.  Same thing.
6    Q.  What's a good school in California for
7  Forestry?
8    A.  Cal Poly Slo or Humboldt.  But probably
9  Slo.  It's closer to --
10   Q.  Slo is San Luis Obispo?
11   A.  Yes.
12   Q.  Thank you.
13       Let me take you back in time to June of
14  2000-- -- May of 2017.  You were, on that evening,
15  located in Las Vegas, Nevada; correct?
16   A.  Correct.
17   Q.  And when did you get to Las Vegas, before
18  that evening?
19   A.  I'm not sure.  I would have to give an
20  estimate.  But it had been a few days.
21   Q.  And as I understand it, had you come from
22  Flagstaff to Las Vegas?
23   A.  Correct.
24   Q.  And did you come with a friend, or you met
25  a friend there?

1    A.  I came with a friend from Flagstaff.
2    Q.  And at the time of the events in question,
3  your friend, I take it, was with you?
4    A.  Yes.
5    Q.  What is her name?
6    A.  Joann Rodriguez.
7    Q.  And does she live in Flagstaff?
8    A.  She currently does, yes, live in Flagstaff.
9    Q.  It sounds like she may be moving or she
10  just moved to Flagstaff?
11   A.  No, she lived -- she came here for school.
12  So she lives here now, and she lived here at the
13  time of this case.
14   Q.  So, did you come to Las Vegas as a kind of
15  just a diversion, something to do for fun?
16   A.  Joann's parents live in Las Vegas, so we
17  were visiting them.  And they just happened to live
18  close to the strip.
19   Q.  Okay.  So you had already seen her parents,
20  I guess, before this events in question occurred?
21   A.  Correct.  We were staying with them.
22   Q.  Did they like you?
23   A.  Yeah, they liked me okay.  They're very
24  nice.
25   Q.  Okay.  So, at a certain time of night you

1  drove near the Venetian and you saw something going
2  on?
3    A.  Correct.
4    Q.  So, tell me -- I've got a statement by you
5  that you prepared for the police.  And there's also
6  some wording in the arrest record that refers to a
7  statement that you made.
8        Why don't we look at the arrest record
9  first.  Take a look at page 2 of 8.
10   A.  2 of 8, yes.
11   Q.  At the top of the page, the first paragraph
12  says:
13       "During the walkthrough, which was started
14  at the point when he exited the hotel, Officer
15  Lopera stated he had observed a security officer and
16  asked if the officer if he had seen anyone running.
17  The security officer pointed to the south and
18  Officer Lopera observed Farmer running south in the
19  middle of the street.  Farmer approached a white
20  truck that was traveling west."
21       Now, do I understand correctly that that
22  was your truck?
23   A.  I own a white truck.  I don't know if I was
24  traveling west.  But yes, that was me.
25   Q.  Then, it says:

JONATHAN JODIE PIERCE

April 26, 2018

Page 14

1    "Farmer attempted to open the tailgate of
2  the truck and Officer Lopera believed that Farmer
3  was going to attempt to take the vehicle by force.
4  Officer Lopera deployed and discharged the ECD" --
5  that's a Taser -- "resulting in Farmer falling to
6  the ground.  The walkthrough was then stopped as
7  advised by LVPPA attorney John Aldrich."
8        That's the attorney for the Police
9  Department in that situation.
10        Now, as I understand from your statement,
11  you never saw Mr. Farmer attempt to get in your
12  vehicle?
13    A.   That is correct.  I never felt like he was
14  trying to open the tailgate, that's for sure.
15    Q.   You never felt he was trying to open the
16  door of your vehicle?
17    A.   Correct.
18    Q.   So the statement that he was attempting to
19  open the tailgate of the truck is incorrect?
20    A.   In my opinion, yes, that would have been
21  incorrect.
22    Q.   Next paragraph:
23        "After viewing surveillance footage from
24  the Venetian Hotel, detectives were able to retrieve
25  the numbers and letters of the license plate for the

Page 15

1  white truck which Farmer approached.  An interview
2  was conducted with the registered owner of the
3  vehicle.  The following is a summary of the
4  interview and is not verbatim."
5        It blanks out your name, I think -- "was
6  stopped in traffic as he approached the parking
7  garage to the Venetian.  His friend who was in the
8  passenger seat and drew attention to an officer
9  running alongside (sic) his truck on the rear
10  passenger side.  Then noticed a black male, Farmer,
11  near the rear driver's side of his truck who blank
12  believed Officer Lopera was chasing."
13        Now, is that you that they're referring to
14  in that paragraph?
15    A.   The driver, yes.
16    Q.   Okay.  And then the friend is your friend,
17  Joann Rodriguez, who was in the passenger's seat?
18    A.   Correct.
19    Q.   Then it says:
20        "Officer Lopera told Farmer to 'Stop' and
21  'I'm going to tase you.'  Blank saw Officer Lopera
22  tase Farmer, who fell near the rear tire of blank's
23  truck.  Blank saw and heard Officer Lopera tase
24  Farmer several times.  During this time, Farmer was
25  not complying and appeared to be trying to get away.

Page 16

1  Officer Lopera and Farmer moved away from blank's
2  truck and began to drive away."
3        Is that essentially accurate?
4    A.   Yes.
5    Q.   Now, the next paragraph says:
6        "As blank drove away, he continued to watch
7  Officer Lopera and Farmer in his mirror.  Farmer was
8  on the ground and Officer Lopera 'mounted' Farmer
9  and aggressively" --
10        I think that means struck.  It says
11  "stuck" --
12        -- "struck Farmer in the face.  Prior to
13  pulling into the garage, blank saw that an officer
14  had Farmer in a rear naked choke.  Blank was unsure
15  if Officer Lopera was the officer who was applying
16  the rear naked choke but he believed it was.  Blank
17  stated Farmer did not attempt to open the tailgate
18  of his truck or get into the truck bed.  Blank also
19  stated Farmer did not attempt to open his driver's
20  door, however blank said Farmer's erratic behavior
21  made him nervous so he locked the doors prior to
22  observing Farmer being tased by Officer Lopera."
23        Is that correct?
24    A.   That is.
25        MR. MCNUTT:  Object to the form.

Page 17

1        There may come a time when I make an
2  objection.  Just let me make it for the record and
3  then you're free to answer.
4        THE WITNESS:  Okay.
5  BY MR. SAYRE:
6    Q.   Now, if I understand the sequence, you
7  actually saw the officer -- you didn't know his
8  name, I suppose, at that time -- tasing Mr. Farmer,
9  correct?  That was the first thing you saw
10  happening?
11    A.   First I saw the officer chasing Mr. --
12  yeah.
13    Q.   Right.  Fair enough.  And then the first
14  time there was an interaction, you saw the officer
15  tasing Mr. Farmer?
16    A.   Correct.
17    Q.   Did you note how many times that he tased
18  him?  Were you able to determine that?
19        MR. MCNUTT:  Objection.  Form.
20        THE WITNESS:  At the time, maybe.  Now
21  I would give you an estimate.
22  BY MR. SAYRE:
23    Q.   What is your estimate now?
24    A.   It would be between five and seven.
25    Q.   How did you develop that estimate, if you

JONATHAN JODIE PIERCE

April 26, 2018

1 know it now and you didn't know it at the time?

2      Let me say a better question.

3      Have you looked at the video on YouTube

4 that shows Mr. Farmer and Officer Lopera involved?

5   A.  Yeah, I've seen a few different videos.

6   Q.  There's a video from the officer's camera.

7   A.  Only.

8   Q.  And then there's a second video that's from

9 the Venetian's security cameras which show the

10 participants further away.

11      Have you seen both of those?

12   A.  I've seen more than one, and I've seen

13 videos from the perspective of the officer's body

14 camera and the Venetian's security cameras.

15   Q.  Okay.  Your estimate of five to seven, does

16 that come from looking at the videos?

17   A.  No, that comes from hearing the

18 discharging, when I was in the truck on the night of

19 the event.

20   Q.  All right.  Then you indicate that you saw

21 Officer Lopera mount Mr. Farmer and aggressively

22 struck Farmer in the face.

23      What do you mean by "mount" him?

24   A.  As I was driving away is when I saw that.

25 Mr. Farmer was on the ground.  Officer Lopera was on

1 top of him, holding him down and striking him in the

2 face.

3   Q.  Okay.  When you say "on top of him," was

4 there some reason you used the word "mount"?

5   A.  At the time, I believed he would have had

6 his leg -- he would have been straddling, for lack

7 of a better word, Mr. Farmer.

8   Q.  Straddling and facing him face to face, or

9 straddling him from the rear, or if either?

10   A.  At that time, I believe more straddling him

11 on his side.  But I was driving away and looking in

12 a mirror, so --

13   Q.  Now, could you estimate how many times that

14 you saw him strike Mr. Farmer in the face?

15      MR. MCNUTT:  Objection.  Form.

16      THE WITNESS:  No, I believe, at this

17 point, I could not do that.

18 BY MR. SAYRE:

19   Q.  Okay.  Was it more than once?

20   A.  Yes.

21   Q.  Now, you use the word in your interview

22 "rear naked choke."

23   A.  Yes.

24   Q.  What is a rear naked choke, from your

25 experience?

1      MR. MCNUTT:  Objection.  Form.

2      THE WITNESS:  From my experience, it's

3 a very specific chokehold in which one person is

4 behind the other and they bring their arm around and

5 put the elbow under the chin and have complete

6 control of the individual getting choked.

7 BY MR. SAYRE:

8   Q.  Now, how do you know about rear naked

9 chokes?

10   A.  I've been practicing jiu-jitsu for three

11 years in June.  So, five days a week, very

12 regularly.  It's something that I see and do five

13 days a week.

14   Q.  Were you trained in applying a rear naked

15 choke?

16   A.  In jiu-jitsu, yes.

17   Q.  Do you use a rear naked choke in the

18 jiu-jitsu sort of combat that is part of, I guess,

19 jiu-jitsu performance?

20   A.  Correct; very regularly.

21   Q.  And is that -- is it your understanding

22 that it is not an air choke, that you don't put

23 pressure on the trachea, in front of the neck?

24      MR. MCNUTT:  Objection.  Form.

25 Leading.

1      THE WITNESS:  If you properly apply

2 the choke, it's a blood choke, because the pressure

3 is on the arteries.

4 BY MR. SAYRE:

5   Q.  Okay.  In your experience, how long does it

6 take for a person to go unconscious from the

7 application of a rear naked choke?

8   A.  If it's properly applied, it can be five to

9 ten seconds.

10   Q.  Now, you were looking back towards the

11 officer and Mr. Farmer when you saw the chokehold

12 applied?

13   A.  Correct, in my mirror.

14   Q.  And was it, in your estimation and from

15 your experience, in fact, a rear naked choke?

16      MR. MCNUTT:  Objection.  Form.

17      THE WITNESS:  I believe it was, yes.

18 BY MR. SAYRE:

19   Q.  All right.  Now, did you become concerned

20 at all as you were watching this choke applied that

21 it was being applied too long?

22   A.  Yes.

23   Q.  Excessively?

24   A.  Yes.  I remember mentioning to Joann, the

25 passenger, that this is too long.  I even slowed

JONATHAN JODIE PIERCE

April 26, 2018

1 down and was watching for a while, believing if this
2 choke is "in," or applied correctly, it's far too
3 long.
4     Q.   And did you stop for a while to observe
5 that, or were you driving as you observed it?
6     A.   A little bit of both.  Stop and go.  My
7 passenger, Joann, was very upset, so eventually
8 she -- we left.  But yes, I did stop.
9     Q.   All right.  From the time that you first
10 saw the choke around Mr. Farmer's neck, until you
11 left and were no longer able to see what was going
12 on with Mr. Farmer, about what period of time
13 transpired?
14     A.   The question was, from the time I saw the
15 choke until I left, how long was that?
16     Q.   Yes, sir.
17     A.   An estimate would be 30 to 45 seconds.
18     Q.   And it was your opinion, based upon your
19 knowledge, training and experience in this area,
20 that that was an excessive length of time?
21         MR. MCNUTT:  Objection.  Form.
22         THE WITNESS:  Far too long, yes.
23 BY MR. SAYRE:
24     Q.   I'm going to then turn to your statement.
25         This statement was taken by an Officer

1 Penny.  Did you know his name at the time of the
2 interview?
3     A.   He gave it to me at the very start of the
4 interview.
5     Q.   And he had actually spoken to you before
6 this recorded interview; is that true?
7     A.   I'm not -- I believe he did, so that we
8 could set a time to take an interview, yes.
9     Q.   Sure.  Now, this, was this interview
10 conducted by phone?
11     A.   Correct.  Yes.
12     Q.   And he told you that it was recorded?
13     A.   Yes.
14     Q.   And you told him, if I understand
15 correctly, that you observed the officer, you
16 weren't sure what the name of the officer was, but
17 you observed the officer applying a rear naked
18 choke?
19     A.   Yes, I told Officer Penny that.
20     Q.   Basically, what you have told us today is
21 what you told Officer Penny?
22     A.   Correct.
23     Q.   Page 1702.  If you look at the lower
24 right-hand corner.
25         MR. MCNUTT:  Did we mark that as an

1 exhibit?
2         MR. SAYRE:  No, but I will.  Thank you
3 for reminding me.
4         I'll mark the arrest report as Exhibit 1
5 for identification, and I'll mark this Exhibit 2 for
6 identification.
7         (Exhibit Nos. 1 and 2 marked for
8         Identification.)
9 BY MR. SAYRE:
10     Q.   So, looking at 1702.  There's a question by
11 Officer Penny:
12         "Okay, um, and then while he was, like, you
13 know, towards the back of your truck, did you ever
14 see him try to get into the bed of your truck or --
15 or a -- anything?
16         JP, which would be you, I assume:
17         "No, uh, no, I never felt like he tried to
18 get into the bed."
19         That is correct?
20     A.   That is correct.
21     Q.   Then, on 1704, you stated, at the bottom of
22 the page:
23         "I believe that once he touched him there's
24 no more tasing."
25         By that you mean once the officer touched

1 Mr. Farmer?
2     A.   Correct.  Once there was physical contact
3 between the two, outside of the Taser contact.
4     Q.   Okay.  Next page, please, 1705.  At the top
5 of the page:
6         "BP:  Okay.  And then you said as you were
7 driving away, um, 'cause you felt it was okay to do
8 so once they were away from your truck, um, you were
9 still watching in your mirror and you saw the
10 officer standing, like, above the -- the subject
11 who -- he was on the ground.  And you said you saw
12 the officer start to -- to -- to punch him."
13         Is that correct?
14     A.   Yeah.  Correct.
15     Q.   And you correct him, and you said:
16         "He wasn't standing.  He was mounted on top
17 of him."
18         That's the next answer that follows?
19     A.   Correct.
20     Q.   You've already told us what you mean by
21 "mounted."  And you said you thought it was a closed
22 fist he was using to strike him.  Is that correct?
23     A.   I believe -- yes.
24     Q.   Down about two-thirds down, you have an
25 answer:  "I think it was closed fist."

JONATHAN JODIE PIERCE

April 26, 2018

1    A.  Correct.
2    Q.  And you said:  "I remember thinking it was
3  violent."
4        That's the next answer down.
5    A.  I did say that.
6    Q.  You never saw Mr. Farmer attempting to
7  strike or kick Officer Lopera?
8    A.  Correct.
9        MR. MCNUTT:  Objection.  Form.
10       THE WITNESS:  Correct.
11  BY MR. SAYRE:
12   Q.  And then, on 1706, right in the middle of
13  the page, BP says:
14       "As they're pulling -- pulling up, um,
15  prior to you going into the garage you see what
16  appears to be three other officers that are standing
17  above, um, the subject.  And then there's an officer
18  on the ground, uh, doing, uh, rear naked choke."
19       And your answer:
20       "Yes, at this point I missed -- yeah, at
21  this point they are -- the suspect is on his
22  probably right side and the officer's also on his
23  side mirroring him, uh, you know, matching him chest
24  to back with a choke put in."
25       That's what you saw at the time?

1    A.  Yes.
2    Q.  Do you remember whether he had his legs
3  around Mr. Farmer's waist, or lower abdomen?
4        MR. MCNUTT: Objection.  Form.
5        THE WITNESS: I don't remember.
6  BY MR. SAYRE:
7    Q.  Now, down at the bottom of this page, you
8  said, the other three officers, you said:  "I think
9  two of them probably were, like, knee -- knee to
10  belly or, like, knee to suspect."
11       What do you mean by that?
12   A.  So, the other officers were gathered around
13  Mr. Farmer very closely.  And knee to belly is when
14  someone is on the ground and you are holding them
15  down with your knee.
16   Q.  And then, on the top of the next page, you
17  say:
18       "I think control of the arms."
19       That's a continuation of the answer from
20  the previous page.
21       "Then the whole time it looked like someone
22  was, uh, someone was definitely choking him."
23   A.  Correct.
24   Q.  You didn't know if that was the same
25  officer who had tased him, but you felt like it was?

1    A.  Correct.
2    Q.  Down at about 50 percent down the page, BP
3  asks:
4        "Okay, so with your experience in -- in,
5  uh, jiu-jitsu, um, you know different fighting
6  techniques.  You can identify what would be, you
7  know, a rear naked choke, the effects of it, how
8  long it would take, and, you know, the adverse
9  effects of it?"
10       And your answer is:
11       "Yeah, but now from the angle -- from the
12  distance I was at at this point I couldn't -- I felt
13  like his elbow was under the chin which is how you
14  apply that.  I felt like it was but at that distance
15  in the mirror, you know, I can't be positive.  Um,
16  if that was the case then yeah, I know -- I remember
17  thinking that night this is -- this is -- that is
18  too -- this is too long."
19   A.  Correct.
20   Q.  And you say, the end of the page:
21       "You can't choke someone that long."
22   A.  Correct.
23   Q.  Why is that?
24   A.  Because they would pass out.  And if you
25  keep choking them, they will die.

1    Q.  Okay.  Please look at 1710.  And it's the
2  one that I told you was out of order.
3    A.  16?
4    Q.  Page 16, correct.  It says -- the officer
5  asked you:
6        "Okay, um, did he ever grab your door
7  handle and try to get into your truck?"
8        Your answer:
9        "No, he never grabbed the door handle."
10       That's correct?
11   A.  That is correct.
12   Q.  "Okay, and then you said that he never, you
13  know, tried to jump into the bed of your truck or
14  grab or -- or open your truck bed at all?"
15       And your answer was:
16       "Um, no, not that I felt.  I feel like I
17  would, um, be able to tell that.  I mean, nothing's
18  wrong with the tailgate.  It opens but, um, I didn't
19  feel anyone touch the truck."
20       And that was your best recollection at the
21  time?
22   A.  Correct.
23   Q.  And this was just a few days within the
24  incident?
25   A.  Correct.

JONATHAN JODIE PIERCE

April 26, 2018

Page 30

1    Q.  And then he asked you:
2         "Okay, and then, uh, did you see him with
3    any weapons at all?"
4         And your answer:
5         "No -- no, I didn't see anything on him."
6    A.  Also correct.
7    Q.  "Or with anything, no."
8         Correct?
9    A.  Correct.  No weapons.
10   Q.  Have you and -- may I call her your
11   girlfriend, Joann?
12   A.  That would be appropriate.
13   Q.  Okay.  Have you and she talked about what
14   happened?  After it happened, did you talk together?
15   A.  Yes.
16   Q.  And you discussed your observations and she
17   gave you her observations?
18   A.  Correct.
19   Q.  Do you recall her saying anything different
20   than you thought you saw?
21   A.  No.
22   Q.  I have nothing further.  Thank you.  And
23   these gentlemen will have some questions.
24   A.  Okay.
25        MR. MCNUTT:  Craig, do you want to go,

Page 31

1    or do you want me to start?
2         MR. ANDERSON:  You can go ahead, Dan.
3    I'll go after you.
4
5              EXAMINATION
6    BY MR. MCNUTT:
7    Q.  Mr. Pierce, I'm Dan McNutt.  I represent
8    Officer Lopera.  Thanks for coming down here today.
9    Appreciate your time.  I've got a couple of
10   questions.  I'll try to be as expeditious as
11   Mr. Sayre.
12        Before we got started today, Mr. Sayre
13   handed you your witness fee check and said, I wish
14   it could be bigger but this is what the rules
15   require.  Something like that.  Do you remember
16   that?
17   A.  Yes.
18   Q.  And you made the comment that the one you
19   got when you went to Las Vegas was much larger than
20   you expected.
21   A.  Yes.
22   Q.  What check was that?
23   A.  That was the witness fee check and the gas
24   to get out there.
25   Q.  And who provided that to you?

Page 32

1    A.  I am not sure.  The court, I want to say.
2    I'm not sure.
3    Q.  For what purpose did you go to Las Vegas?
4    A.  To provide a witness -- or to provide a
5    deposition in front of a grand jury.
6    Q.  Before your testimony today, or, excuse me,
7    your deposition today, what did you do to prepare
8    for today's deposition?
9    A.  For today's deposition, I did not prepare,
10   because I was not aware of the deposition was
11   happening.
12   Q.  That was the call that Mr. Sayre made to
13   you?
14   A.  Yes.
15   Q.  But since the time of the accident, how
16   many times would you say you've watched the videos
17   online?
18   A.  An estimate would be about seven to ten.
19   Q.  When was the last time you watched the
20   video?
21   A.  The last time I watched the video was prior
22   to going to Las Vegas to appear in front of the
23   Grand Jury.  And I believe that was during spring
24   break.  So maybe five or six weeks ago.
25   Q.  Okay.  Mr. Sayre, during the discussion

Page 33

1    about mailing you the Notice of Deposition and
2    things like that, there was also some comments off
3    the record.  I think he said he mailed you the
4    witness statement that we looked at here as Exhibit
5    2.  Is that right?
6    A.  Yes.
7    Q.  Did you read this before today's
8    deposition?
9    A.  I read it when he sent it to me, which was
10   a while ago.  I did not read it close to today.  But
11   yes, I have read it before.
12   Q.  How many times have you spoken to Mr. Sayre
13   or anyone from his office?
14   A.  I've spoken to Mr. Sayre maybe two or three
15   times, trying to set a date in order to do this
16   deposition.
17   Q.  Did you discuss the testimony he was going
18   to ask you to give today?
19   A.  No.
20   Q.  Did you discuss any aspect of the -- any of
21   the questions that we discussed today?
22   A.  No.
23   Q.  Did you talk to anybody else from
24   Mr. Sayre's office, other than him?
25   A.  Not about the deposition.

JONATHAN JODIE PIERCE

April 26, 2018

Page 34

1    Q.  So is that a yes?
2    A.  I talked to maybe a secretary about getting
3  ahold of Mr. Sayre.
4    Q.  Just scheduling?
5    A.  Yeah.  Getting her transferring me to him.
6    Q.  Things of that nature?
7    A.  Yeah.
8    Q.  Have you been asked to come to trial in
9  this matter?
10    A.  To come to trial, no.  The Grand Jury and
11  this deposition.
12    Q.  This deposition is a different case than
13  the Grand Jury.
14    A.  Okay.  For this --
15    Q.  Mr. Sayre is not -- same subject matter.
16    A.  Yes, I understand.
17    Q.  But in this case, Mr. Sayre, let's just
18  make or anyone from his office asked you to come to
19  trial if this case goes to trial?
20    A.  I'm not sure.
21    Q.  Meaning would you come to Las Vegas to give
22  testimony?
23    A.  I'm not sure if I've been asked to do that.
24    Q.  Okay.  Fair enough.
25        So, let's -- during the testimony that you

Page 35

1  gave here earlier, you referenced -- and you held
2  out your hand, pointing at what I would -- your
3  driver's side mirror.  Is it correct that it's your
4  driver's side mirror on your Toyota Tacoma pickup
5  truck that you witnessed these events, through which
6  you witnessed these events?
7    A.  Correct.
8    Q.  Did you ever look in the windshield
9  rearview mirror, or was it strictly out of the
10  side-view mirror?
11    A.  I'm sure I did glance at it in the moment,
12  but the moment was very hectic with what was
13  happening behind me, with what was happening with my
14  passenger, Joann.  I primarily watched it in the
15  driver's side mirror to my left.
16    Q.  Thank you.  Do you have -- how long have
17  you had that truck?
18    A.  An estimate, maybe six years, seven years.
19    Q.  So you're pretty familiar with the truck?
20    A.  Familiar with the truck.
21    Q.  How large is that mirror?
22    A.  How large is that mirror.  An estimate
23  would be six inches wide, five inches, four inches
24  tall.
25    Q.  Okay.  Do you know if objects in the mirror

Page 36

1  appear closer or further away?
2    A.  I believe they appear further away than
3  they are.  It says it in the mirror.  I'm not sure.
4    Q.  I think the mirrors usually say that
5  objects appear closer than they actually are.
6    A.  Okay.
7    Q.  Things look -- I may have said that
8  incorrectly.  Strike that.
9        Things look -- is it fair to say things
10  look further away in the mirror?
11    A.  I'm not sure if it's fair to say that.  I
12  know they look one way or the other, though, closer
13  or further.
14    Q.  Do you wear any glasses?
15    A.  No.
16    Q.  Ever, I mean.
17    A.  No, I've never had to have corrective
18  anything.
19    Q.  No contacts?
20    A.  No.
21    Q.  You were in Las Vegas visiting Joann's
22  parents?
23    A.  Correct.
24    Q.  It was a recreational trip?
25    A.  Correct.

Page 37

1    Q.  What had you been doing that night, the
2  night of the events that we're discussing, what were
3  you doing prior to these events?  Where were you
4  coming from?  Where were you going to?
5    A.  We were coming from Joann's parent house.
6  I remember it.  We were waiting for Joann to get
7  ready for about four hours.  We were going to a
8  piano bar.  That's why we were at the Venetian.
9  Joann took a very long time getting ready, so I was
10  waiting in her house for her to get ready.
11    Q.  And so, did you have anything to drink
12  prior to going out?
13    A.  No.  I didn't have anything to drink after
14  going out.  While out or after or before.
15    Q.  Is that because -- do you drink at all?
16    A.  I do drink.
17    Q.  But you just weren't drinking that night?
18    A.  Correct.  Joann does not drink, so --
19    Q.  And you were -- and so this was -- where --
20  was the piano bar at the Venetian?
21    A.  No, it was somewhere else.
22    Q.  What were you doing at the Venetian?
23    A.  The Venetian had free parking at the time.
24    Q.  Gotcha.  So you were going to park in
25  self-parking at the Venetian?

JONATHAN JODIE PIERCE

April 26, 2018

Page 38

1    A.  Correct.
2    Q.  Where was the piano bar?
3    A.  I'm not sure.  I don't know.
4    Q.  How many times have you been to Las Vegas?
5    A.  An estimate, 15.
6    Q.  So you're familiar with the town,
7  generally?
8    A.  Yeah.  I don't go to the strip every time
9  I'm there.  In fact, now that I go with Joann, I
10 rarely go to the strip.
11   Q.  Have you had contact with anybody else
12 in -- not talking about anything related to the
13 Grand Jury, but have any family members or anybody
14 else approached you to discuss this case, this case
15 being the civil case that Fred noticed you?
16   A.  My family members?
17   Q.  No, no.  Any family members from the
18 plaintiff.
19   A.  No.
20   Q.  Who have you spoken to about the testimony
21 you're giving here today?
22   A.  Mr. Sayre.  And Joann, obviously, knows I'm
23 here.
24   Q.  Let's talk about your jiu-jitsu.  There
25 is -- is there a belt rating system for proficiency

Page 39

1  in jiu-jitsu?
2    A.  Correct.
3    Q.  Is it Brazilian jiu-jitsu?
4    A.  Correct.
5    Q.  What degree or belt are you?
6    A.  Purple, out of a white, blue, purple,
7  brown, black, in ascending order.
8    Q.  So white being the entry level, black being
9  expert?
10   A.  Yes.
11   Q.  For lack of a better term.
12   A.  Yes.
13   Q.  And you said you're purple?
14   A.  Yes.
15   Q.  You've been doing it three years, several
16 times a week?
17   A.  Yes.  At the time of the event, I was a
18 blue belt, if that matters.
19   Q.  Fair enough.  In Brazilian jiu-jitsu, is
20 there a chokehold referred to as the lateral
21 vascular neck restraint?
22   A.  No.
23   Q.  Do you know what a lateral vascular neck
24 restraint is?
25   A.  In the context of this case, I would make a

Page 40

1  guess, but no.
2    Q.  I don't want you to guess, but I want to
3  know what you understand in the context of this
4  case.  What is a lateral -- or may I say -- LVNR?
5    A.  Since what I believe I saw was a rear naked
6  choke, and that is what we've been talking about,
7  that would be my guess of what that is.
8    Q.  Do you believe -- I'm sorry.
9    A.  Sorry.
10   Q.  No, no, I didn't mean to cut you off.
11   A.  That would be a complete guess though.
12   Q.  Do you believe there is a difference
13 between a rear naked choke and a lateral vascular
14 neck restraint?
15   A.  If someone told me and showed me what that
16 was, I could answer that question.
17   Q.  But that's not the question.  So, do you,
18 sitting here today, know if there is a difference
19 between those two chokeholds?
20   A.  Do I know if there is a difference?  No, I
21 don't, because I don't know what that chokehold is.
22   Q.  Thank you.
23        So, if I remember your testimony correct,
24 and from both your prior recorded statement as well
25 as today, the events, when they first took place,

Page 41

1  were pretty much right next to your truck.  Is that
2  correct?
3    A.  Initially, yes, very close.
4    Q.  So, and then, at some point in here, you
5  mentioned that you started driving away when you
6  thought it was safe to do so.  Is that right?
7    A.  Correct.
8    Q.  Did you hear Officer Lopera say anything
9  audibly to Mr. Farmer?
10   A.  Throughout the extent of the whole thing?
11   Q.  Yes.  From the beginning, did you hear, you
12 know, anything happen?
13   A.  Yes.  Officer Lopera initially was telling
14 him to stop and was telling him he would tase him.
15 And then did tase him.  And throughout the events,
16 was saying things to the effect of "Stop" and --
17   Q.  So when Officer Lopera first said to
18 Mr. Farmer to stop, did Mr. Farmer comply?
19   A.  No.
20   Q.  At any point -- well, excuse me.  When
21 Mr. Farmer said, "Stop, or I'll tase you" --
22       MR. SAYRE:  You mean Lopera.  You said
23 "Mr. Farmer."
24 BY MR. MCNUTT:
25   Q.  Yes.  Thank you.

JONATHAN JODIE PIERCE

April 26, 2018

Page 42

1    When Officer Lopera said, "Stop, or I'll
2  tase you," did Mr. Farmer comply?
3    A.  No.
4    Q.  At any point, did Mr. Farmer comply with
5  the verbal directions Officer Lopera was giving?
6    A.  No, I don't believe so.
7    Q.  Was Mr. Farmer resisting Officer Lopera?
8    A.  To the extent that he was not letting
9  Officer Lopera hold him down or stopping, yes, he
10  did.
11    Q.  At what point -- what was happening between
12  Officer Lopera and Mr. Farmer when you started to
13  drive away?
14    A.  I believe at that point Lopera had made
15  physical contact, where his hands were touching him.
16  But I'm not quite clear on that.
17    Q.  Can you estimate --
18    A.  I'm not clear.
19    Q.  Can you estimate how far away your truck
20  was from Mr. Farmer and Officer Lopera when Officer
21  Lopera went and became in physical contact with
22  Mr. Farmer?
23    A.  So, initially, when Officer Lopera tased
24  him, I thought Mr. Farmer had fallen under my truck.
25  Which is why I didn't drive away.  When I drove

Page 43

1  away, they were further away, and I could tell that.
2  And I believe they were -- there was physical
3  contact at that point.  And I drove away.  Joann was
4  upset, so I was not looking back for a while.  When
5  I looked back for the first time after getting away
6  from them, an estimate would be 40 feet.  That's an
7  estimate.
8    Q.  And so your estimate is that you're 40 feet
9  away, and what is happening between Mr. Farmer and
10  Mr. Lopera at that point?
11    A.  At this point, I believe the first time I
12  looked back after driving away, Officer Lopera was
13  striking him.  I believe that was my first image
14  upon leaving, after looking back.
15    Q.  How far away were you when Officer Lopera
16  applied the chokehold?
17    A.  Again, it would be an estimate.  And I was
18  looking back, trying to calm her and looking back
19  and trying to calm her, stop-go, stop-go.  So that
20  could have started at 40 feet, but then would have
21  progressively gotten further, until out of view.  So
22  maybe 40 feet to -- yeah, it would be a guess at
23  this point.  I'd have to go back and look.
24    Q.  So your attention is going from your left
25  driver's mirror over to trying to calm down your

Page 44

1  girlfriend or talk to your girlfriend; correct?
2    A.  Correct.
3    Q.  You were driving forward, and when
4  Mr. Farmer and Officer Lopera are in physical
5  contact, you think it starts at 40 feet.  And where
6  are you when Officer Lopera puts a chokehold of some
7  sort on Mr. Farmer?
8    A.  I understand the question.  That would be a
9  guess at this point.  It could have started at 40
10  feet, but would have progressively gotten further.
11  That would be a guess though.
12    Q.  Have you reviewed anyone else's testimony
13  in this case?
14    A.  I don't believe so.  I don't know where I
15  would find that.
16    Q.  So, as you might have surmised from the
17  questions, there is a difference between a rear
18  naked choke and a lateral vascular neck restraint.
19  Do you understand that, sitting here now?
20    MR. SAYRE:  Well, objection as to
21  form.  You're telling him that that's so.
22    MR. MCNUTT:  I am telling you that.
23    MR. SAYRE:  If he can understand your
24  words.
25    THE WITNESS:  Someone would have to

Page 45

1  show me that choke.  There are different names,
2  sure, I get that.  But things can be called
3  different names.  I don't know what that choke is.
4    MR. MCNUTT:  Fair enough.
5    THE WITNESS:  So I do not know if
6  there's a difference.
7  BY MR. MCNUTT:
8    Q.  I will represent to you that in this case
9  one of the issues is whether the choke that was
10  applied was a lateral vascular neck restraint, which
11  is a neck chokehold, or a rear naked choke.  I will
12  represent to you -- and I don't think Mr. Sayre will
13  dispute -- that they are two distinct techniques.
14    A.  Okay.
15    MR. SAYRE:  Well, I do dispute that.
16  One is -- they are different, but I don't think
17  distinct.  They both are blood chokes.  They're not
18  distinct.  One cuts off 80 to 85 percent of the
19  blood to the brain, the other cuts off a hundred
20  percent of the blood supply to the brain.
21    MR. MCNUTT:  But they are distinct.
22  Or different.
23    MR. SAYRE:  Different.  I would agree
24  they're different.
25  BY MR. MCNUTT:

JONATHAN JODIE PIERCE

April 26, 2018

Page 46

1    Q.  In any event, with that muddled
2  explanation, so you don't have any idea whether the
3  choke that Officer Lopera employed was a lateral
4  vascular neck restraint or a rear naked choke.
5  Isn't that right?
6    A.  Well, let me put it this way:  Depending on
7  how similar that choke is to a rear naked choke,
8  maybe I can't tell.  But there are a lot of
9  different types of chokes and I could tell you it
10  wasn't X, Y and Z.  So if I knew what that choke
11  was, I could tell you for sure it was not that
12  choke, possibly.
13    Q.  What chokes could you tell me that this was
14  not?
15    A.  Cross-collar choke, a baseball bat choke, a
16  guillotine.  Any of these.  A D'Arce and Anaconda, a
17  loop choke.
18    Q.  How is it that you're certain the choke
19  that was employed was not any of those chokes?
20    A.  Because this choke involved Officer Lopera
21  on his back with his arm wrapped around him near his
22  throat, and I believe his other arm was behind him
23  holding his hand.  So none of those chokes are close
24  to that.
25    Q.  And how would you see Officer Lopera's arms

Page 47

1  if his back was to you?
2    A.  His back was not to me.  They were on their
3  side.  And I believe their heads were towards me.
4    Q.  Okay.  There were other officers -- well,
5  did you see other officers other than Officer Lopera
6  come to the scene?
7    A.  At the end, yes.
8    Q.  And were they actively participating in the
9  arrest?
10    A.  They were.  They were, yes, what I believe
11  participating actively around him and attempting to
12  to gain control of Mr. Farmer.
13    Q.  And they were literally right there at
14  Mr. Farmer?
15    A.  Yes.  They were involved.
16    Q.  Who would have a better view of the choke
17  being employed, you or those officers right there on
18  the scene?
19    A.  Those officers.
20    Q.  Where did you -- so you were -- you pulled
21  straight, away, once it was clear to do so.  Where
22  did you go at that point?
23    A.  We went straight and then turned right into
24  the parking garage.
25    Q.  And then once you -- and then you parked?

Page 48

1    A.  Yeah, and then we looked for parking.
2  Tried to calm her down.
3    Q.  Was that the end -- when you turned into
4  the parking lot, was that the end of the observation
5  of these events?
6    A.  Until an hour or so later, when I came
7  back, there was still an ambulance.  Or maybe it
8  wasn't an ambulance.  There was still remnants,
9  either medical or police.
10    Q.  Let me ask a better question.
11       The last time you saw Mr. Farmer or
12  Mr. Lopera was when you turned, I think you said
13  right, into self-parking?
14    A.  That is correct.
15    Q.  Isn't it true that you locked your doors on
16  your truck when the events started?
17    A.  Correct.
18    Q.  Isn't it true you did that out of fear?
19    A.  Yes.  Mr. Farmer was acting very
20  erratically.  And I lock my doors at the stoplights.
21  So I definitely wasn't going to take any chances
22  that time.
23    Q.  When you say he was acting erratically,
24  what do you mean?  Please explain that.
25    A.  He was running from an officer yelling

Page 49

1  "Stop, I'm going to tase you," and he was not
2  stopping, and was running.  So that's what I mean by
3  erratic.
4    Q.  On the bottom of your voluntary statement,
5  which we've marked Exhibit 2, in the bottom
6  right-hand corner, it's page 1696.
7    A.  96.
8    Q.  Second-to-the-last line, it says:
9       "I don't know if he was tying to get in or
10  what he was -- if he was just running but, um, I
11  locked my door out of I guess fear of the guy trying
12  to come in because of all the excitement."
13       Do you see that?
14    A.  Yes.
15    Q.  And do you recall that you were scared at
16  that point about the events?
17    A.  Yeah.  There was a lot of commotion.
18    Q.  So, on the bottom of page 1697, the last
19  line says:  Back up one.
20       "And I think I remember three officers
21  above the man and then one officer on the ground
22  with him."
23       Those three officers above the man, those
24  are the ones we just talked about that you saw come
25  to assist Officer Lopera with the arrest; correct?

JONATHAN JODIE PIERCE

April 26, 2018

Page 50

1    A.  Correct.  It would depend where we are on
2  the statement.  Because initially I believe there
3  was hotel employees involved.
4    Q.  So why don't you take a minute, let's look
5  at this statement and you tell me whether "I think
6  three officers above the man and one officer on the
7  ground," are those police officers.  Or are those
8  hotel security?
9    A.  Okay.  Give me one moment, please.
10       Okay.  At that point, the sentence you
11  pointed out, those were officers, yes.  I assume Las
12  Vegas P.D.  I wouldn't be able to tell the
13  difference.
14    Q.  But the distinction is they are police
15  officers, not hotel security?
16    A.  Yes.  They had the cars, squad cars.
17    Q.  And then this sentence goes on.  The next
18  sentence:
19       "And I've been doing jiu-jitsu, like, five
20  days a week for about two years now and it
21  definitely looks like what we call a rear naked
22  choke which, um, if you have it -- so if you have
23  it -- if you have a choke applied properly and
24  you're underneath the chin, it takes about from my
25  experience about two seconds to" -- and you go on.

Page 51

1       And you said, today, it takes approximately
2  five to ten seconds, in your experience, to choke
3  someone out with a rear naked choke?
4    A.  Correct.
5    Q.  What if it's not properly applied, how long
6  would it take?
7    A.  So, if it's not properly applied, it
8  depends on how it's not properly applied, but it can
9  go anywhere to you cannot choke someone out, to a
10  lot longer, depending on how it's not properly
11  applied.
12    Q.  If somebody is actively resisting, could it
13  take longer to get the choke?
14    A.  Not if it's properly applied.
15    Q.  So if the choke's properly applied, but
16  what I'm saying is if someone is resisting, can that
17  cause a delay in getting the proper application of
18  the choke?
19    A.  Yes.
20    Q.  If you lose the proper application of the
21  choke, do you, in effect, have to start all over
22  again?
23       So, for example, if you were choking
24  someone with that and they worked free, got more
25  air, got more blood flow, what have you, would you

Page 52

1  then have to start all over again?
2       MR. SAYRE:  Incomplete hypothetical.
3  Vague and ambiguous.  And objection as to form.
4  BY MR. MCNUTT:
5    Q.  Do you understand the question?
6    A.  I understand the question.  And there's a
7  lot of variables with that.  So yes and no.  You're
8  probably not going to have to start all over again.
9    Q.  Why not?
10    A.  There is a lot of variables.  Depends on
11  how they've gotten out of, maybe, the application of
12  that.  Maybe they've taken your arm off only an inch
13  or two and then they slip off your arm.  Your arm is
14  already right in the place.
15    Q.  You mentioned, in response to Mr. Sayre's
16  questioning, how long did you think the choke was in
17  place.  Let me ask -- strike that.
18       How long did Officer Lopera have his arms
19  around Mr. Farmer's neck?
20    A.  An estimation would be anywhere from 30 to
21  45 seconds.
22    Q.  And was that the total time that you were
23  able to observe it?
24    A.  Correct.  I did drive, I turned right, was
25  not able to see anymore, and I believe it was still

Page 53

1  applied.
2    Q.  Do you know how much pressure, if any,
3  Officer Lopera was applying to Mr. Farmer's neck?
4    A.  I would have no way to know that.
5    Q.  So it's possible he could have had his arms
6  around Mr. Farmer's neck and not have applied any
7  compression; isn't that true?
8       MR. SAYRE:  Objection.  Speculation.
9       THE WITNESS:  From my vantage point,
10  yes, I would have no way to know.
11  BY MR. MCNUTT:
12    Q.  So he could have had a lot of pressure or
13  he could have had no pressure; right?
14    A.  For as far as I know, yes.
15    Q.  There has been testimony in this case by
16  the use-of-force expert from Las Vegas Metropolitan
17  Police Department, named Sergeant Bland.  Do you
18  know him, by any chance?
19    A.  Never -- never heard of him.
20    Q.  He is a third degree Brazilian jiu-jitsu
21  black belt.  Is that -- is he better at jiu-jitsu
22  than you?
23    A.  Yes.
24    Q.  Does he know more than you?
25    A.  I would imagine so.

1    Q.    Would you defer to his opinion as to what
2 choke was or was not applied?
3    A.    Based on third degree black belt, I would.
4 Of course, I'd have to meet him and talk with him.
5    Q.    If he said there was no way to tell how
6 much compression was applied, would you agree with
7 that?
8    A.    Again, based on the description you've
9 given me, yes.  But I do not know him.
10    Q.    Look at the bottom of page 1702, please, of
11 Exhibit 2.  This is your statement.  And see your
12 initials there at the bottom, JP.  That's you?
13    A.    Yes.
14    Q.    "I remember the man not staying, you know,
15 he -- at no point did it seem like he was staying
16 down.  He always seemed to be trying to get away."
17       Do you see that?
18    A.    Yes.
19    Q.    Do you remember that to be the case?
20    A.    Yes.
21    Q.    And so this is what you were discussing
22 when we earlier talked about Mr. Farmer was actively
23 resisting arrest?
24    A.    He was, yes.
25    Q.    Anything else you remember about Mr. Farmer

1 actively resisting?
2    A.    No.  He was actively resisting arrest, and
3 at no point did I feel like he was complying.
4    Q.    On page 1705, do you see your initials?
5 The first time you see your initials, JP.  So, the
6 question is -- we'll back up to where the question.
7       "You were still watching in your mirror and
8 you saw the officer standing, like, above the
9 subject who -- he was on the ground.  And you said
10 you saw the officer start to -- to -- to punch him."
11       So, and your answer is:
12       "So almost, yeah, we -- as we were driving
13 away I'm switching between them and trying to, um,
14 communicate with my friend.  But I look back and the
15 officer was punching him.  He wasn't standing.  He
16 was mounted on top of him."
17       And you've already explained what "mounted"
18 means; right?
19    A.    Correct.
20    Q.    Did you ever see Mr. Farmer striking back
21 at the officer?
22    A.    No, at no point did I see Mr. Farmer
23 attempting to hurt Officer Lopera.
24    Q.    But it's true that you weren't watching the
25 whole time, because, based upon this, your attention

1 was switching back from driving forward, as well as
2 to Joann, your girlfriend, who was on your right,
3 and to the rearview mirrors, so you didn't see all
4 the action?
5       MR. SAYRE:  Objection.  Compound.
6 Complex.  Speculation.
7 BY MR. MCNUTT:
8    Q.    Do you understand the question?
9    A.    I understand the question.  Correct.
10    Q.    Over on 1706, the first spot where you see
11 your initials.
12       "But again, uh, the -- I have a feeling,
13 like, the whole time this was guy was trying to get
14 away -- "
15       Questioner:  "Okay."
16       " -- and never really settled down."
17       Does that refresh your recollection about
18 any other active resistance that Mr. Farmer was
19 employing?
20    A.    No, not that we haven't already discussed.
21    Q.    Okay.  Let's go to 1707.  So, about
22 two-thirds of the way down the page -- let's see.
23       "BP:  Okay, so with your experience in
24 jiu-jitsu, you know different fighting techniques.
25 You can identify what would be, you know, a rear

1 naked choke, the effects of it, how long it would
2 take, and, you know, the adverse effects of it."
3       Right?  Do you see that?
4    A.    Yeah, I see that.
5    Q.    Did, at any point, any of the officers that
6 questioned you ask you about the questions I asked
7 you about whether you understood what a lateral
8 vascular neck restraint was?
9    A.    No, I don't believe so.
10    Q.    Your response is:
11       "Yeah, but now from the angle -- from the
12 distance I was at at this point I couldn't -- I felt
13 like his elbow was under the chin which is how you
14 apply that."
15       Do you see that?
16    A.    I see.
17    Q.    Do you know if you do that, if you have the
18 elbow under the chin for a lateral vascular neck
19 restraint as well?
20    A.    I don't know what that choke is.
21    Q.    "I felt like it" -- this is back to quoting
22 you.
23       "I felt like it was but at that distance in
24 the mirror, you know, I can't be positive."
25       Do you see that?

Page 58

1    A.  Yes.
2    Q.  So, you, then and now, you acknowledge that
3  from the distance you were at driving away looking
4  into a side mirror from a Toyota Tacoma, that it's
5  impossible to tell exactly what kind of choke was on
6  Mr. Farmer.  Is that right?
7    A.  Correct.
8    Q.  It's also impossible to tell how much, if
9  any, compression Officer Lopera was employing in the
10  choke?
11    A.  Correct.
12    Q.  Did you ever make it to the piano club?
13    A.  No.  They were closed when we got there.
14    Q.  What did you end up doing?
15    A.  We ended up walking around a little bit
16  more and then going back home.
17    Q.  Can you describe to me, in your statement
18  you had talked about you were pulling into, I think,
19  Venetian parking, and you discussed it being a
20  security checkpoint.  Do you remember that?
21    A.  Yeah.  It was either a valet checkpoint --
22  I don't know if it was a security checkpoint.  I
23  believe there was a stoplight and maybe a valet
24  checkpoint.
25    Q.  Okay.  Can you describe what that looked

Page 59

1  like?
2    A.  Yeah.  So, I believe I was pulling in.  I
3  think I was the third car in line, maybe.  There was
4  a stop sign to the left, and maybe a bellman valet
5  booth to the right.  Other than that, there's just a
6  lot of lanes and, maybe, cars.
7    Q.  Were there any speed bumps?
8    A.  I don't recall.
9    Q.  Were there any concrete barriers to keep
10  you from going the right way?
11    A.  I believe there is a concrete barrier to
12  the left.
13    Q.  There's concrete barriers to your left?
14    A.  To my left.
15    Q.  As you're driving?
16    A.  I believe.
17    Q.  So if you were going west, it would have
18  been on your left side, to the south?
19    A.  I'm not sure which direction is west in
20  this situation.  There's a building to my right, and
21  I believe a street to my left.  So that is where the
22  concrete barriers would have been, if they were
23  there.
24    Q.  Have you ever heard the phrase, a "Jersey
25  barrier"?

Page 60

1    A.  No, not familiar.
2    Q.  What did the concrete barriers look like?
3    A.  They would have been the concrete barriers
4  you typically see with road construction, where
5  they're wider at the base and then just have maybe
6  like an angle going up and thin out.
7    Q.  And the purpose of the concrete barrier was
8  to keep, I guess, your lanes from going over into
9  the other street.  Is that correct?
10    A.  Yeah.  I believe they're to separate the
11  Venetian traffic, in that kind of porte cochere
12  area, from the street.
13    MR. MCNUTT:  Craig, I'm going -- you
14  want to take a minute?
15    I'm going to fire up the video, and I would
16  like to show you the video and ask you just a few
17  more questions.  Why don't we go off the record.
18  And if you want to use the restroom or grab a drink.
19    (There was a break taken at 3:06 p.m.
20    until 3:10 p.m.)
21  BY MR. MCNUTT:
22    Q.  We're back on the record.
23    Mr. Pierce, what I'm going to do is I'm
24  going to start the video that you've seen.  This is
25  going to have a merge.  It's called a merged video.

Page 61

1  That's been produced in this case.  So you're going
2  to see different viewpoints on the screen.  It will
3  become readily apparent what I want you to do.
4    I want you to -- ultimately, you're going
5  to see from the Venetian's security camera looking
6  back towards the front of your truck.  And it takes
7  maybe a few seconds for the truck to start moving,
8  then we can identify it's your truck and I'll just
9  ask you to identify it's your truck and verify that
10  we're all looking at the same thing.
11    A.  Okay.
12    (Whereupon, Mr. McNutt played a
13    video on his computer.)
14  BY MR. MCNUTT:
15    Q.  Is that your truck?
16    A.  Yes.  And that is how you can tell.
17  There's a sticker that's still on the truck.  Very
18  distinctive.
19    Q.  Okay.  So, I fast-forwarded it just a
20  little bit.  And now you see on the left-hand side
21  of the screen, we at least see vehicles with lights
22  coming towards us.  What I want you to do is
23  identify if and when you can identify your truck.
24    That's a white car coming towards us.
25  That's not you; correct?

JONATHAN JODIE PIERCE

April 26, 2018

1    A.   That's correct.
2    Q.   So let me ask you, do you recognize, is
3  this the podium that you were talking about that you
4  referenced as a bell podium or as a --
5    A.   This one?
6    Q.   Yes.
7    A.   No.
8      That's -- I can -- that's most likely my
9  truck.
10     Now you can tell for sure, because of the
11  front license plate.
12   Q.   Okay.  So you're in the right-hand lane.
13  There's two lanes.  And we see the officer -- well,
14  we see people behind.  Do you believe that to be Ken
15  Lopera -- excuse me -- Officer Lopera and
16  Mr. Farmer?
17   A.   Yes.
18   Q.   Do you see that, there, at the end of the
19  what I call the Jersey barriers, is this the
20  concrete barriers that you were discussing earlier?
21   A.   Yes.
22   Q.   Do you see on the lines behind your truck
23  those reflector that are often in the street, kind
24  of speed bumps, reflector bumps?
25   A.   Uh-huh.

1    Q.   Will you agree with me that at this point,
2  as you're pulling away, Officer Lopera and
3  Mr. Farmer are at what would be, if you are
4  traveling west -- and I know we haven't established
5  definitively that you're traveling west -- that they
6  are at the east end of the concrete barriers?
7    A.   Yes, it would appear so, from this footage.
8    Q.   Okay.  So at this point your truck is
9  almost parallel to this little podium, and there's a
10  speed bump.  Did you see the speed bump that it was
11  about go to over?
12   A.   Yeah, in the footage earlier.
13   Q.   Do you know -- at this point, can you tell
14  from the video what Officer Lopera and Mr. Farmer
15  are doing?  Do you know if they're -- if he's going
16  hands-on, if he's still tasing?
17   A.   From this point in the video, no.
18   Q.   Do you know how far away the distance is
19  between your truck and the east end of those
20  concrete barriers?
21   A.   No.
22   Q.   Tell me when you think you see Officer
23  Lopera put a chokehold on.
24     Okay.  I'm going to stop it right here.
25     Is there a chokehold on Mr. Farmer at this

1  point?  Can you tell?
2    A.   No.
3    Q.   Can you see Officer Lopera in this video?
4    A.   No.
5    Q.   Do you -- is the gentleman on the left with
6  the white shirt on, do you understand him to be Las
7  Vegas Metro or who he is?  Hotel security?
8    A.   I wouldn't know who that individual is.
9    Q.   Can you identify any of those folks that
10  we're looking at right now?
11   A.   From this angle, no.
12   Q.   So, I want you to continue to watch the
13  action, and I want you to tell me if at any point
14  you can see Officer Lopera, or an officer attempt to
15  put a chokehold on.
16   A.   Okay.
17   Q.   And at this point, I'll note it looks like
18  your truck is now past that podium that was right by
19  the speed bump.  Right?
20   A.   I agree.
21   Q.   Any idea how far that is, you're looking in
22  your rearview mirror?
23   A.   No.
24   Q.   So, again, you tell me when you think you
25  see any sort of chokehold.

1    A.   Right there.  Not in, but this is -- that
2  right there was at the classic beginnings to a rear
3  naked -- to a chokehold.
4    Q.   So at this time your truck is completely
5  past the standing podium?
6    A.   Yes.
7    Q.   And we don't know if that's a security
8  podium or a valet podium?  I think you said a bell
9  podium?
10   A.   Yeah.  But that's not what I believed to be
11  a bell podium.  That would have been on this side.
12   Q.   Okay.
13     MR. SAYRE:  Before you move.  Is there
14  any way for you to identify, by number, where that
15  is?
16     MR. MCNUTT:  Yeah, I'm going to -- I
17  think we're going to -- let me finish the line of
18  questions, because that is a technical piece that
19  we're going to have to come back to.  But yeah, I
20  should be able to.  When I rehearsed this, I found a
21  timestamp.
22  BY MR. MCNUTT:
23   Q.   So let's get back to that spot.
24     So, right here is when -- what do you see
25  happening there?

JONATHAN JODIE PIERCE

April 26, 2018

1    A.  I see another person on the back, so I
2  would assume -- I see an officer on the back, I
3  assume to be Mr. Farmer, and they've just pulled him
4  to the ground, in a classic rear naked choke
5  position.
6    Q.  As you understand it?
7    A.  As I understand a rear naked choke.
8    Q.  Now, is your truck anywhere in this screen
9  at this point?
10    A.  No.
11    Q.  From your recollection, where would your
12  truck be -- you continued to drive straight and out
13  of view of this camera; correct?
14    A.  Out of view of that camera, yes.
15    Q.  Okay.  Tell me when the last thing you
16  remember seeing is.  Do you remember seeing --
17        So we've got two vehicles, one just went
18  behind you.  Did that impede your view at some
19  point?
20    A.  I don't remember a vehicle impeding my
21  view.  But from this security footage, which I don't
22  believe I've ever seen this, I would not be able to
23  tell you when my truck left.  Looking at this
24  footage, I would not know when I pulled away.
25    Q.  I'm sorry.  What do you mean, when you

1  pulled away?  We saw your truck.
2    A.  When I went out of view.
3    Q.  Okay.  Gotcha.
4    A.  On the night of.
5    Q.  So if we -- is it fair to say that we would
6  know how far you were away because we could measure
7  from where the officers are at the east end of the
8  concrete barriers and measure up to where this
9  podium is?  Correct?
10    A.  Yeah, I would hope so.
11    Q.  So that's 93 feet.
12    A.  Okay.
13    Q.  That's 31 yards.  So that's where your
14  truck was at the first point.
15        So let's back it up.
16        So here's your truck before, and there's no
17  chokehold.  This is before this speed bump.  See
18  that?  Before this podium.  See that?
19    A.  (Nods head.)
20    Q.  Now.  No chokehold.  No chokehold.  Watch
21  your truck.  Tell me when you go over the speed
22  bump.
23    A.  There it was.
24    Q.  So, any chokehold?
25    A.  No.

1    Q.  Any chokehold now?  You're past the speed
2  bump.  How far are you past the speed bump?
3    A.  It looks like both sets of tires have
4  cleared the speed bump.
5    Q.  How long is your truck?
6    A.  I don't know.
7    Q.  15, 20 feet?
8    A.  I wouldn't say 20.  But, yeah.  I don't
9  know.
10    Q.  So you're at least 20 feet past the podium,
11  and there's no chokehold; right?
12    A.  Yes.
13    Q.  Your truck is now completely out of view.
14  There's still no chokehold; correct?
15    A.  I would say correct, yeah.
16    Q.  And, now.
17    A.  Yeah.
18    Q.  Right.  And we'll get the time hack for
19  what part of the video that is.
20    A.  Yeah.
21    Q.  So, from this, do you think it's safe to
22  say, based on my representation of that measurement,
23  that you're at least beyond 31 yards, the first time
24  you see any sort of choke maneuver go?
25    A.  If 31 yards is the distance from here to

1  here, then yes.
2    Q.  It's a long way?
3    A.  Yeah.  Yeah, relative.
4    Q.  Right.  Long away to view things in your
5  rearview mirror; right?
6    A.  Yes, I could tell a choking going on, but
7  yes.
8    Q.  But you don't know what kind of choke;
9  correct?
10    A.  Correct.
11    Q.  Thank you.
12        So, Fred, I figured out the time hack.  So
13  let me get it there and so that we can get the
14  appropriate timestamp.
15        So tell me when your rear tires are over
16  the speed bump.
17    A.  That was -- is that the rear?  Yeah.  I
18  didn't see the front go.
19    Q.  So, 1 minute 13 seconds on the merged
20  video, Mr. Pierce's rear tires cross the speed bump
21  passing the security podium.  And is there any choke
22  being applied at this point?
23    A.  No.
24    Q.  Your truck continues to drive west.  At 1
25  minute 19 seconds, your truck is completely out of

JONATHAN JODIE PIERCE

April 26, 2018

1 view, having driven further west, past the security
2 podium; right?
3     A.   Correct.
4     Q.   Is there any -- any choke at all being
5 applied at this point?
6     A.   No.
7     Q.   Tell me now when you first see the choke.
8     A.   There.
9     Q.   So the first that he sees the choke on the
10 video is 1 minute 23 seconds.
11         And how many vehicles are coming behind you
12 at this point?
13     A.   At this point, there's three, if you count
14 the one off in the distance, the one with the
15 headlight.
16     Q.   So three vehicles coming behind you with
17 their lights on; correct?
18     A.   Correct.
19     Q.   Do you remember their lights shining in
20 your mirror at all?
21     A.   Maybe one set.  Not three.  But that would
22 be a complete guess.
23         MR. MCNUTT:  I have no further
24 questions at this time.
25         MR. SAYRE:  He's going to ask you some

1 questions now.  And I just have a few more.
2         MR. ANDERSON:  Are you guys ready for
3 me?
4         MR. SAYRE:  Yeah.
5         MR. ANDERSON:  Okay.  Can you hear me
6 okay?
7         MR. SAYRE:  Yes.
8
9         EXAMINATION
10 BY MR. ANDERSON:
11     Q.   Mr. Pierce, I just want to draw your
12 attention to the three officers that you saw later,
13 not Officer Lopera.  Do you understand that?
14     A.   Correct.  Yes, I do.
15     Q.   Okay.  When did you become aware of their
16 arrival?  When did you see other officers?
17     A.   If I understand your question, when during
18 the events did I notice they were there?
19     Q.   Yeah.  When did you see other police
20 officers, not Officer Lopera?
21     A.   After I had started to drive away from
22 initially being stopped next to the -- next to
23 Officer Lopera and Mr. Farmer.
24     Q.   Okay.  Had Officer Lopera begun to use a
25 chokehold yet, or had he still not begun the

1 chokehold when you saw the other officers?
2     A.   He had not begun the chokehold, I believe.
3     Q.   Now, when you saw the other officers -- and
4 Mr. McNutt just went through your distances -- how
5 far away were you from the action that was going on?
6     A.   Well, according to Mr. McNutt, over 92
7 feet.
8     Q.   Okay.  And did you -- what was your
9 perception as to what the other three officers were
10 doing?
11     A.   They appeared to be trying to restrain
12 Mr. Farmer.
13     Q.   Were they hands-on with Mr. Farmer?  Were
14 they touching him?
15     A.   Yeah, they appeared to be, yes.
16     Q.   Okay.  Where were they located with respect
17 to his body?  Were they scattered around his body in
18 the same location?
19     A.   They were clustered around him.
20     Q.   And they appeared to be doing what?
21     A.   Trying to restrain him.  Some of them were
22 completely standing with their hands involved, other
23 ones seem to be applying some knees.  Not -- not
24 striking, but pushing down with pressure.
25     Q.   Okay.  So, but they were all hands-on with

1 Mr. Farmer; is that fair?
2     A.   Definitely, majority of them, yes.
3     Q.   And did it appear that they were trying to
4 handcuff him?
5     A.   I wouldn't be able to tell if they were
6 trying to handcuff him, you know.  Because officers
7 were involved and a man is struggling, I assume that
8 they were trying to restrain him.
9     Q.   Did you see any of the three officers kick
10 or punch Mr. Farmer?
11     A.   Other than the initial strikes, which might
12 have been prior -- other than the initial strikes
13 that I believed were Mr. Lopera, no.
14     Q.   Okay.  Were you close enough and able to
15 hear any commands or statements made by the other
16 three officers?
17     A.   By the other three, I do not remember
18 hearing commands or statements from them.
19     Q.   Okay.  Before you lost vision on the
20 activity, what's the last thing you remember seeing
21 with respect to the officers?
22     A.   I remember seeing those officers clustered
23 around and Mr. Farmer on the ground being choked, or
24 trying to be choked, I guess.
25     Q.   Were any of those officers near

JONATHAN JODIE PIERCE

April 26, 2018

1  Mr. Farmer's head area?
2      A.  I'm not sure.  They were clustered around,
3  and moving.
4      Q.  Did it appear to you that Mr. Farmer was
5  still resisting?
6      A.  At that point, I believe so.
7      Q.  So you believe it appeared to you that he
8  might still be resisting?
9      A.  At that point, yes.  I did not know that
10  Mr. Farmer died until I was contacted by Officer
11  Penny, I believe.
12      Q.  Did you ever see -- was there ever a time
13  when you believed that Mr. Farmer was unconscious?
14      A.  No.  I remember thinking he would go
15  unconscious, but I don't know --
16      Q.  The entire time that you had a visual, he
17  appeared to be resisting?
18      A.  I thought he was, yes.
19          MR. ANDERSON:  Okay.  I have no
20  further questions.
21          MR. SAYRE:  Okay.  I have a few.
22
23          FURTHER EXAMINATION
24  BY MR. SAYRE:
25      Q.  Would you take a look at the arrest report,

1  please.
2      A.  Yes.
3      Q.  Take a look at page 4 of 8, down at the
4  bottom right-hand corner.
5      A.  Thank you.  4 of 8.
6      Q.  Right.  Now, take a look at 2:40.  2
7  minutes and 40 seconds.  Do you see that?
8      A.  Yes.
9      Q.  "Officer Lopera told Farmer, 'Get on your
10  stomach.'  Farmer was observed lying on his
11  stomach."
12          This is what one of the investigator
13  officers wrote down after he looked at the film.
14          Did you see that occur; that is, Farmer
15  lying on his stomach?
16      A.  I don't remember that.
17      Q.  2:42, which is two seconds later:
18  "Officer Lopera told Farmer, "Get on your
19  stomach.  Farmer was observed lying on his stomach
20  again."  Or still.
21          Do you see that?
22      A.  Yeah, I see that.
23      Q.  2:45:  "Security was observed grabbing
24  Farmer's arms."
25          Did you see security grabbing his arms?

1      A.  Security not being the police officers?
2      Q.  Right.
3      A.  I remember security guards, or someone,
4  hotel staff, involved, and it looked like maybe one
5  was involved in the action.  If he was grabbing his
6  arms, I'm not sure.
7      Q.  Next page.  2:47:  "Officer Lopera told
8  Farmer, 'Get on your stomach.'  Farmer was observed
9  lying on his stomach."
10          Did you see that?
11      A.  I do not remember observing Mr. Farmer on
12  his stomach.
13      Q.  2:50:  "Officer Lopera told Farmer, 'Get on
14  your stomach.'  Farmer was observed lying on his
15  stomach."
16          Now, you didn't see that, but you heard
17  Lopera telling him to get on his stomach; right?
18          MR. MCNUTT:  Objection.  Form.
19          THE WITNESS:  I'm not sure I heard
20  Officer Lopera saying that.
21          MR. SAYRE:  Okay.  Could we use the
22  tape?
23  BY MR. SAYRE:
24      Q.  I want you to listen to the tape and see if
25  you hear Officer Lopera telling Mr. Farmer to "Get

1  on your stomach."
2      A.  Yes.
3      Q.  And a little while later, I want you to
4  hear whether or not one of the officers says, "Put
5  your fucking hands behind your back," very loudly.
6      A.  Yes.
7          MR. SAYRE:  You're waiting for it to
8  warm up?
9          MR. MCNUTT:  It's a converted.  I've
10  had problems with it because it's a conversion on
11  Apple.  And it's not reading.
12  BY MR. SAYRE:
13      Q.  While we're waiting, let me ask you some
14  questions.
15          Assuming for a moment that Officer Lopera
16  told Mr. Farmer, several times, "Get on your
17  stomach," okay?  From 2:40, 2 minutes and 40
18  seconds, until 2 minutes and 52 seconds, is a period
19  of 12 seconds.  The observations of the
20  investigating officer are that Mr. Farmer was on his
21  stomach for those 12 seconds.  Would you agree that
22  that would indicate that he was complying with
23  Officer Lopera commanding to "Get on your stomach"?
24          MR. MCNUTT:  Objection.  Form.
25          THE WITNESS:  I would agree.  And in

JONATHAN JODIE PIERCE

April 26, 2018

1  the video that Mr. McNutt showed earlier, I remember
2  you can clearly hear Mr. Farmer saying "I will," in
3  response to something Mr. Officer Lopera was saying.
4  BY MR. SAYRE:
5      Q.  Now, let me ask you to assume that you can
6  hear on the tape -- well, actually, I can do it on
7  my iPhone.
8      A.  Am I allowed to look at this?
9      Q.  Sure.
10     A.  Because 9:34, does not look good, from
11 Officer Lopera.
12     Q.  This is a briefing by Undersheriff Kevin
13 McMahill --
14         (Whereupon, Mr. Sayre played a video
15          on his iPhone.)
16 BY MR. SAYRE:
17     Q.  Well, we didn't get to it.  But let me ask
18 you this.  Since Counsel isn't able to, apparently,
19 able to get his machine working now, unfortunately.
20 You'll be able to look at --
21         (Whereupon, video resumed playing on
22          iPhone.)
23 BY MR. SAYRE:
24     Q.  You heard that statement.  All right.  Take
25 a look at the -- if you'll look at, and you'll see

1  at the 2:58, Officer Lopera appeared to put Farmer
2  in some type of a neck restraint.
3         This is from the observations of the
4  investigating officers.
5         Before that, for about 12 seconds, from
6  2:40 to 2:52, Officer Lopera is telling Farmer, "Get
7  on your stomach."  And, each time, the investigating
8  officer says, "Farmer was observed lying on his
9  stomach."  He was still getting tased.
10        Then, at 2:58:  "Officer Lopera appeared to
11 put Farmer in some type of a neck restraint."
12        Three seconds later:  "Sergeant Crumrine
13 arrives and stated, "Put your fucking hands behind
14 your back."
15        He was the superior to Officer Lopera at
16 the scene.
17        So, from that point on you saw Lopera
18 putting on a neck restraint, for the time that you
19 could see it?
20     A.  Correct.
21     Q.  -- until -- all right.
22        Now, during that time, there were three
23 officers, including Sergeant Crumrine, that were
24 clustered about Mr. Farmer, by your observation;
25 right?

1      A.  Correct.
2      Q.  And you could see that clearly?
3      A.  Correct.
4      Q.  Were all of them within such a close
5  proximity to Officer Lopera that they could have
6  reached over and pulled his hands away from
7  Mr. Farmer's throat?
8      A.  Yes.
9         MR. ANDERSON:  Objection.  Form.
10 BY MR. SAYRE:
11     Q.  Now, I'll just tell you that the rear naked
12 chokehold is prohibited by the Las Vegas
13 Metropolitan Police Department.
14        And I'll tell you, further, that each of
15 these officers had an independent duty to intervene
16 if a rear naked choke was being applied.
17        During the time from the time that you
18 could see the hold applied until it went out of the
19 distance, did you ever see any of those three
20 officers reach over and pull Officer Lopera's hands
21 away from Mr. Farmer's neck?
22     A.  No.
23     Q.  Now, you said, on page 1707 -- I'm back to
24 your interview.  Mr. McNutt left off this portion of
25 your answer.

1         "Um, if that was the case" --
2         And this is down at the bottom, next to the
3  last answer.
4         "I know I -- I remember thinking that night
5  this is -- this is -- that is too -- this is too
6  long.  You can't choke someone that long."
7         That was your observation; right?
8      A.  Correct.
9      Q.  Now, if you notice, at 3:25, it says
10 Officer Tran -- actually, it turns out that was
11 Officer Crumrine.  It says:
12        "Officer Tran arrived and said, 'Let him go
13 Ken.'"
14        Do you see that?
15     A.  I see that.
16     Q.  And, "Officer Lopera asked, 'Are you sure?'
17 Officer Tran replied, 'Yeah.'"
18        And from that point, at 3 minutes and 26
19 seconds, that hold was left on, until 4 minutes and
20 11 seconds.
21     A.  I see that.
22     Q.  From your experience, a rear naked choke,
23 if it was a rear naked choke as described by Officer
24 Lopera, a rear naked choke should have put him
25 unconscious during that period of time?

JONATHAN JODIE PIERCE

April 26, 2018

Page 82

1      A.  Yes.
2            MR. MCNUTT:  Objection.  Form.
3   BY MR. SAYRE:
4      Q.  In fact, if a rear naked choke is kept on
5   too long, it can kill somebody?
6            MR. MCNUTT:  Objection.  Form.
7            THE WITNESS:  Yes.
8   BY MR. SAYRE:
9      Q.  Do you know that Officer Lopera was
10  recommended by the police department to be charged
11  with manslaughter?
12           MR. MCNUTT:  Objection.  Form.
13  BY MR. SAYRE:
14     Q.  Did you know that?
15     A.  I was not aware of that.  I figured it was
16  serious.
17     Q.  And Officer Lopera is currently being
18  charged with manslaughter.
19     A.  Okay.
20     Q.  Did you know that Officer Lopera told
21  approximately seven different times to various
22  officers that he had rear naked choked Mr. Farmer?
23           MR. MCNUTT:  Objection.  Form.
24           THE WITNESS:  Until I read Exhibit 1,
25  I was not aware of that.

Page 83

1   BY MR. SAYRE:
2      Q.  Now you've seen that in print?
3      A.  Yes, I've seen that.  "Rear nakeded his
4   ass."
5      Q.  That's what he said.
6      I have nothing further.
7            MR. MCNUTT:  Craig?
8            MR. ANDERSON:  I have nothing further.
9            MR. MCNUTT:  Thank you for your time.
10           MR. SAYRE:  Thank you, sir.
11           THE WITNESS:  Thank you.
12           (Discussion off the record.)
13           MR. ANDERSON:  This is Craig.  I'll
14  take a copy.  I want to order a copy.
15           MR. SAYRE:  I'll offer to stipulate
16  that the court reporter be relieved of her statutory
17  obligation, which may not be true in Arizona, as far
18  as I know, but that the deposition will be prepared
19  and sent directly to Mr. Pierce.
20      If he'll kindly provide her with an
21  address.
22      She'll send it to you in about two weeks.
23  And at that time you will be given 30 days to read
24  and review it and, if you wish, make any changes or
25  corrections, if you want to.  And then after you

Page 84

1   finish reviewing it, and made any corrections or
2   not, sign it under penalty of perjury, put it into
3   the envelope that she'll supply, which will be
4   already stamped and already to go, and just put it
5   in the mail.
6            THE WITNESS:  Okay.
7            MR. SAYRE:  And, if not signed,
8   corrections provided, a certified copy may be used
9   as if it were the original for all purposes.  I will
10  maintain the original until the time of trial and
11  will produce it at the time of trial.
12      Is that okay?
13           MR. MCNUTT:  It's the same stipulation
14  you and Craig already entered into, so I presumed
15  you were talking to Craig again.
16           MR. SAYRE:  Craig, is that all right
17  with you?
18           MR. ANDERSON:  Fine with me.
19           (Deposition concluded at 3:50 p.m.)
20
21
22
23
24
25

Page 85

1
2            I have read the foregoing deposition
3   transcript and by signing hereafter, approve same.
4   Dated _____.
5
6
7
8
9
10
11      _____
12            JONATHAN JODIE PIERCE
13
14
15
16
17
18
19
20
21
22
23
24
25

JONATHAN JODIE PIERCE

April 26, 2018

Page 86

```
 1   STATE OF ARIZONA      )
                           )  ss.  REPORTER'S CERTIFICATE
 2   COUNTY OF COCONINO    )

 3

 4        I, MICHELLE K. SEYMOUR, RPR, CSR, CCR, do
 5   hereby certify that I am an Arizona Certified
 6   Reporter, Certificate No. 50710; that previous to
 7   the commencement of the examination, the witness was
 8   duly sworn by me to testify to the truth.
 9        I further certify that this deposition was
10   taken in shorthand by me at the time and place
11   herein set forth, and was thereafter reduced to
12   typewritten form, and that the foregoing 84 pages
13   constitutes a true and accurate transcript, all done
14   to the best of my skill and ability.
15        I further certify that I am not related to,
16   employed by, nor of counsel for any of the parties
17   herein, nor otherwise interested in the result of
18   the within action.
19        DATED at Flagstaff, Arizona, this 3rd day
20   of May, 2018.
21
22           Michelle K. Seymour
23   _____
          Michelle K. Seymour, RPR, CCR, CSR
24            Arizona Certified Reporter
                Certificate No. 50710
25
```

Page 87

```
 1   Errata Sheet

 2

 3   NAME OF CASE: ESTATE OF TASHI S. FARMER vs LAS VEGAS METRO P.D.

 4   DATE OF DEPOSITION: 04/26/2018

 5   NAME OF WITNESS: Jonathan Jodie Pierce

 6   Reason Codes:

 7        1. To clarify the record.

 8        2. To conform to the facts.

 9        3. To correct transcription errors.

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25            _____
```