# EXHIBIT 18
# Excerpts from Kasey Kirkegard Deposition, Vol. II, 2/6/19

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 1

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,   )
                                     )
7         Plaintiff,                 )
                                     ) Case No.
8            vs.                     ) 2:18-cv-00860-GMN-VCF
                                     )
9    LAS VEGAS METROPOLITAN POLICE   )
     DEPARTMENT, a political         )
10   subdivision of the State of     )     **CONDENSED**
     Nevada; KENNETH LOPERA,         )
11   individually; TRAVIS CRUMRINE,  )     **TRANSCRIPT**
     individually; MICHAEL TRAN,     )
12   individually; MICHAEL FLORES,   )
     individually,                   )
13                                   )
          Defendants.                )
14   _____)

15

16

17      VIDEOTAPED DEPOSITION OF DETECTIVE KASEY KIRKEGARD

18            Taken on Wednesday, February 6, 2019

19                     At 10:13 a.m.

20               Held at Lagomarsino Law

21        3005 West Horizon Ridge Parkway, Suite 241

22               Henderson, Nevada  89052

23

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

6 (Pages 18 to 21)

Page 18

1    A.  Yeah.  The -- excuse me -- the TDY up there
2  was 90 days.
3    Q.  And then you went back to Bolden?
4    A.  Yes, sir.
5    Q.  How long were you there?
6    A.  Until I got pulled up to Office of Internal
7  Oversight in 2014.
8    Q.  Did you apply for that position in the
9  Office of Internal Oversight?
10   A.  Yes.  How it came about was we were putting
11 together a class for the whole department.  It was
12 part of the recommendations from DOJ and the CNA
13 report.  With that, because I had -- one of my old
14 sergeants was up there, she asked for me to come up
15 and help with this class, which I did.  And after
16 that, they asked if I could come up and continue the
17 same work that I was doing with the CNA process.
18   Q.  Okay.
19   A.  So I put an informal letter of interest in.
20   Q.  Did somebody approach you first or did you
21 approach somebody first?
22   A.  I actually had approached and then went to
23 inquire what it was all about.
24   Q.  Who did you approach?
25   A.  I was approached by two officers I used to

Page 19

1  work with at Bolden Area Command about this class.
2    Q.  Who were they?
3    A.  It was Patrick Bert and Patrick Hughes.
4    Q.  And which class?
5    A.  It was a class called fair and impartial
6  policing and procedural justice.
7    Q.  Who taught that class or those classes?
8    A.  I did, along with a pool of instructors.
9  We had about 30 instructors.  And I'm not going to be
10 able to name them all.
11   Q.  You referred to DOJ or CNA report.
12   A.  Yes, sir.
13   Q.  Can you expand on that for the record what
14 that is?
15   A.  So in 2010, we had our highest number of
16 officer-involved shootings, which was 25 for the
17 year.  We knew the DOJ was coming down on our
18 department and so Sheriff Gillespie at the time went
19 to the DOJ and said, "Look, I know you guys are
20 looking at our department.  What is it that I can do
21 to help reduce the number of officer-involved
22 shootings?"
23      So they came up with this collaborative
24 reform called the CNA process.  And together they
25 sent down some members of the DOJ that came and took

Page 20

1  a look at our department to change procedures,
2  policies and training.
3    Q.  And then after they looked at the policies,
4  procedures and training, a report was issued;
5  correct?
6    A.  Yes.  There was several reports.  There was
7  a six-month report, a yearly report and then after
8  that I believe every five years we do a public report
9  that shows what our policies and procedures are.
10   Q.  So just for information-gathering purposes,
11 you turn in the initial report.  And then the report
12 makes some recommendations and some findings.  Six
13 months later an evaluation is done to see what the
14 progress is.  And then after five years from that six
15 months, another report is issued by Metro; is that
16 correct?
17   A.  Yeah.  We do -- I don't know -- the
18 five-year report, I -- I don't author it.  I don't
19 know much about it, I'll be honest with you, but I
20 know we had the six-month report with the CNA process
21 and the year report for the CNA process, and I was
22 heavily involved in both those two reports.
23   Q.  Have you ever actually seen the five-year
24 report that was done?
25   A.  It's public information, I believe, on our

Page 21

1  public website.
2    Q.  Do you know if it was issued?
3    A.  I do not.
4    Q.  Do you know who was supposed to issue it?
5    A.  I do not know.
6    Q.  How long were you with the Office of
7  Internal Oversight?
8    A.  I was with them for approximately a year
9  and a half to two years.
10   Q.  And what were all your titles with that
11 office?
12   A.  Titles or?
13   Q.  I guess roles.
14   A.  Roles?  So we had a lot of roles.  We were
15 kind of -- with the CNA report, we had to follow up
16 on the recommendations, make sure those
17 recommendations were being done.  If not, we would
18 have to type up a memo that would go up our chain of
19 command as to why it wasn't feasible for our
20 department to do it, and there was two
21 recommendations that we did not do.
22      At the completion of the CNA report we
23 continued to oversee these policies and procedures
24 and training to make sure they are still being
25 followed properly.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 22

1 We also worked with our CIRT team and our
2 FIT team. Any recommendations that came out of the
3 tactical review board after a certain investigation,
4 we had to ensure that those policies, training,
5 procedures were all implemented as recommendations
6 from the chairperson.
7 Any training issues that we saw on the
8 onset of an OIS, or officer-involved shooting, or
9 critical incident, we were responsible for pushing
10 the training in a memo form. We pushed out any
11 search and seizure recommendations, any use of forces
12 that we saw that we could always get better on our
13 training.
14 We read all use of force reports. We did a
15 lot of training within the department, getting fair
16 and impartial policing, procedural justice. Make
17 sure the whole department was trained up on that
18 including our corrections officers and all of our
19 civilians, including the academy, so any new officers
20 that were hired.
21 And there's a lot more.
22 Q. If I wanted to request a document or
23 information from the department about what your roles
24 were during that time, what would I ask for?
25 A. I believe we have like an internal manual.

Page 23

1 Q. You had mentioned that the -- there were
2 two recommendations that you could not implement from
3 the CNA?
4 A. Uh-huh.
5 Q. Which were those?
6 A. The first of which was during
7 officer-involved shootings and we would take an
8 audio-recorded statement. They also wanted a
9 videotape, but we said we were not going to do that.
10 And another one had something to do with
11 body cameras, and I don't recall the specifics of it.
12 Q. Do you know why the decision was made not
13 to video?
14 A. I do not.
15 Q. I may have asked you this so I apologize.
16 Do you know who writes that five-year report?
17 A. It's going to fall under the Office of
18 Constitutional Policing. And I don't know who would
19 write it. I know when they did the one year, it was
20 kind of farmed out to someone from training would
21 write on there and search and seizure would write up
22 on their end and we would put it together.
23 But it also included any use of forces from
24 the different types of use of forces that officers
25 were involved in. Also did a quick of all of our

Page 24

1 critical incidents with use of deadly force. So that
2 includes a low lethality shotgun within five yards;
3 PIT, which is the vehicle under the speeds of
4 40 miles an hour; any intentional discharge or
5 accidental; and then officer-involved shootings.
6 Q. Do you know what incident caused the
7 shotgun policy to be revised?
8 A. Which policy? Because it's changed a
9 couple of times.
10 Q. Well, do you remember the Stanley Gibson
11 case?
12 A. Yes.
13 Q. Did that case have anything to do with that
14 policy being changed?
15 A. I don't know. I wasn't up there at that
16 time.
17 Q. And I think you referenced the pin
18 maneuvers?
19 A. PIT, P-I-T.
20 Q. P-I-T, I apologize. How did the policy
21 change there?
22 A. I believe the speeds had changed from 45 to
23 40. And there was different times when you could use
24 it and couldn't use it, depending on the crime.
25 Q. Are there any types of use of force at all

Page 25

1 that have been banned by Metro, to your knowledge?
2 A. I don't want to say banned, but they've
3 been modified.
4 Q. And which ones have been modified?
5 A. Our low lethality shotgun was modified.
6 LVNR has changed.
7 Our use of force policy has changed, I
8 guess, in total. K-9, and that includes K-9 bites
9 have changed. And that's all I can think of right
10 now.
11 Q. Did the LVNR policy change after the Tashi
12 Farmer incident?
13 A. Yes.
14 Q. Do you know of any other changes that were
15 made to the LVNR policy prior to the Tashi Farmer
16 incident?
17 A. Yes. But I don't -- so we have a use of
18 force model that we abide by that's within policy,
19 and that has changed a number of times since I've
20 been with Metro.
21 Q. I understand that the use of force model
22 has changed for a variety of reasons. And so that
23 may have some application to the LVNR. But I'm
24 asking a little bit more of a specific question.
25 Do you know if the LVNR policy itself had

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 34

1  prior to the Tashi Farmer case?
2      A.  Let's see.  He was May of 2017?
3      Q.  Yes.
4      A.  Probably four -- between three and five, I
5  want to say.
6      Q.  Okay.  In the -- I'll say Farmer or Brown
7  or use them interchangeably today, but what was your
8  role in that case?
9      A.  For the Lopera case?
10     Q.  Yes.
11     A.  I was the CIRT case agent for that.
12     Q.  How many case agents were there for that?
13     A.  I was the main case agent.  And then I had
14  a partner who would help me write -- excuse me, not
15  write, but help me with PowerPoint.
16     Q.  Who was your partner?
17     A.  Greg Watkins.
18     Q.  Prior to the Lopera case, how many times
19  had you been the main case agent in a CIRT case?
20     A.  The three to four times -- three to five
21  times that I previously told you.
22     Q.  Do you remember which officers those cases
23  involved?
24     A.  Yes.
25     Q.  Who are they?

Page 35

1      A.  The first case I had was McGill and Moore.
2      Q.  McGill and Moore?
3      A.  Yes.  Two different officers.
4      Q.  What were their first names?
5      A.  Solomon McGill and I believe it's Brian
6  Moore, but I'm not 100 percent on that.
7      Q.  How about the next ones?
8      A.  Sergeant William Matchko.
9         Pete Biesanszky.
10     Q.  Okay.
11     A.  I don't know -- Hatten.  I don't know if he
12  was before or after.  And then Spiotto, I don't know
13  if he was before or after.  I think he was after.
14     Q.  What was Hatten's first name?
15     A.  Mark Hatten.
16     Q.  And then can you spell the name of the
17  last -- last name of the person?  Spiotto you said?
18     A.  Yes, Lance Spiotto.
19     Q.  Can you spell his last name?
20     A.  S-p-i-o-t-t-o.
21     Q.  What did the McGill and Moore case involve
22  generally?
23     A.  They were doing a followup on a -- I
24  believe it was a robbery that occurred down the
25  street.  And they drove by the residence and saw the

Page 36

1  vehicle parked in the driveway.  As -- as they came
2  by the residence, their intention was to do a
3  drive-by and get resources to the area.
4         However, as they drove by, three people got
5  out of the vehicle.  They challenged the vehicle,
6  challenged the people.  They all were proned out and
7  the father who was inside the residence came out with
8  a gun to see what was going on.
9         And with the gun in his hand, officers gave
10  him verbal commands to drop the gun.  He raised the
11  gun in their direction and Officer McGill fired I
12  believe four to five times, but I'm not 100 percent
13  on that.
14         Father goes back inside.  There was small
15  children so I had to end up calling 911 saying that
16  their dad had just been shot.  Two and two together,
17  realized it was the police that were outside.  They
18  make entry, go in and find, I believe, the father was
19  deceased.
20     Q.  Were the Officers McGill and Moore who did
21  the drive-by, were they uniformed?
22     A.  Yes, they were.
23     Q.  And were they in a black-and-white vehicle?
24     A.  Yes, they were.
25     Q.  And was there any discipline that was

Page 37

1  levied as a result of that incident?
2      A.  That I don't know.  We don't handle
3  discipline on the CIRT side.
4      Q.  Did you make any recommendations for
5  discipline?
6      A.  We don't make recommendations for
7  discipline at all.  We have nothing to do with
8  discipline.
9      Q.  You're just looking at policies and
10  training?
11     A.  We're looking at the facts, yeah.
12     Q.  Did you ever hear if there was any
13  discipline that arose out of that?
14     A.  We're not privy to that.  And the reason
15  being is they don't want us to have a biased opinion
16  when it comes to recommendations.
17     Q.  In that CIRT process, is discipline usually
18  levied first, or -- is it usually levied before the
19  CIRT report is issued or after?
20     A.  After.  Because it's the recommendations
21  from the chairperson and the sheriff when they talk.
22     Q.  So does discipline come out of the Use of
23  Force Board?
24     A.  So how it works is when we do the Use of
25  Force Board, they roll right into our tactical

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 42

1    And there was an overall question about the
2  use of force. At that time Officer Hatten had
3  articulated his use of force. And then -- but prior
4  to his interview, there was some concern about his
5  use of force.
6    Q. Why?
7    A. Because at the time that he fired, the
8  subject was not armed with the handgun. Had not
9  picked up the firearm.
10   Q. Do you know if Mr. -- or Officer Hatten is
11 still on the force today?
12   A. Yes, he is.
13   Q. And the last case was Spiotto?
14   A. I believe that happened after Lopera.
15   Q. Generally, what did that involve?
16   A. Off-duty officer was at an animal shelter
17 when a subject came in to rob -- came in to rob that
18 front desk and he was armed with a handgun and
19 Officer Spiotto stepped in.
20   Q. And what did he do?
21   A. He pulled out his personal firearm.
22 Confronted the subject. They got into a wrestling
23 match over the gun and the gun went off twice inside
24 the animal shelter before the subject ran off and was
25 taken into custody at a later date at a later

Page 43

1  location -- or a different location.
2    Q. Were there any policy violations in that
3  case?
4    A. Yeah.
5    Q. What were they?
6    A. Detective Spiotto was under the influence
7  of alcohol at the time.
8    Q. Any others?
9    A. CIRT had decided that based upon his
10 intoxication level, that he should not have
11 intervened. He should not have been armed with a
12 firearm.
13   Q. What was his intoxication level?
14   A. At the time six hours later that we got his
15 blood drawn, it was still at a .17.
16   Q. Is Spiotto still on the force?
17   A. No.
18     MR. LAGOMARSINO: I usually go longer than
19 an hour but I think we're at a good time to take a
20 quick break.
21     THE VIDEOGRAPHER: The time is
22 approximately 11:02 a.m. We are going off the
23 record.
24       (A recess was taken from 11:02 a.m.
25       to 11:14 a.m.)

Page 44

1      THE VIDEOGRAPHER: The time is
2  approximately 11:14 a.m. We are back on the record.
3  BY MR. LAGOMARSINO:
4    Q. Okay. You understand you're still under
5  oath?
6    A. I'm sorry, what?
7    Q. You're still under oath?
8    A. Yes.
9    Q. You're aware that there was an incident on
10 May 14th of 2017 in which Tashi Farmer was killed?
11   A. Yes.
12   Q. And you were the case agent on that?
13   A. Yes.
14   Q. Did you interview witnesses as part of your
15 role in that investigation?
16   A. Yes, I did.
17   Q. Which witnesses did you interview?
18   A. We had Officer Tran, Flores, Officer Lif,
19 Sergeant Crumrine.
20   Q. Lopera?
21   A. Yes. He would be considered involved in
22 the CIRT world. Not necessarily a witness.
23   Q. Okay.
24   A. We had also Officer Amburgey and I believe
25 Officer Kravetz.

Page 45

1    Q. When did you start conducting interviews in
2  that case?
3    A. Officer Lopera was the first interview that
4  we conducted, and I believe his was within 48 hours
5  of the incident.
6    Q. Where did that take place?
7    A. In our CIRT conference room at
8  headquarters.
9    Q. Who was present?
10   A. Myself, my partner Patrick Hughes. Kyle
11 Ward, Sergeant Kyle Ward. Lieutenant Dan Bledsoe and
12 then Officer Kenneth Lopera, and his representative
13 from PPA, Bryan Yant.
14   Q. Bryan Yant, Y-a-n-t?
15   A. Yes.
16   Q. Did Officer Lopera have any counsel there?
17 Any attorneys?
18   A. No.
19   Q. Did Officer Lopera waive his Fifth
20 Amendment right in that interview?
21   A. He has to. He's under Garity. He would
22 have to talk with us.
23   Q. And just for the record, explain what
24 Garity is.
25   A. It's an admonishment we read our officers

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 46

1   in an internal investigation that more or less reads
2   that they have to cooperate with the investigation or
3   they will face discipline.
4       Q.  How long did that interview take?
5       A.  I believe on record it was -- on tape,
6   because it was tape recorded, I believe about four
7   hours.  But all in all I believe it was about six
8   hours.  We took a break with lunch.
9       Q.  Did you have any conversations with Officer
10  Lopera about the incident off the record?
11      A.  No.
12      Q.  Did anybody have any conversations with him
13  off the record?
14      A.  I don't know.
15      Q.  And why did you do an interview of Officer
16  Lopera?
17      A.  Because he was an involved officer.
18      Q.  And maybe I asked you this, but
19  approximately how long after the incident did the
20  interview take place?
21      A.  We have within 48 hours by NRS 289.
22      Q.  Why is it important to interview within
23  48 hours?
24      A.  Well, we have to abide by the NRS Chapter
25  289, which is the rights of peace officers in

Page 47

1   internal investigation.
2       Q.  During your interview of Officer Lopera,
3   are you making credibility assessments?
4       A.  There's a fine line, I think, between
5   credibility and truthfulness.  We're asking questions
6   about the incident and his perceptions of the
7   incident.  We go through all of our grand recon and
8   our elements of deadly force.
9           And with that we take what he says and go
10  through what is determined to be truthful and not
11  truthful.
12      Q.  And did you make any determinations as to
13  what you believe was truthful or not truthful?
14      A.  Yes.
15      Q.  And what determinations did you make that
16  he was truthful?
17      A.  One of the conclusions that we had in our
18  report was that he was being untruthful when -- for
19  the head strikes and the LVNR, or the use of the
20  LVNR.
21      Q.  Which determinations did you make that he
22  was being truthful?
23      A.  That he was being truthful?
24      Q.  Yeah.
25      A.  About the incident, his initial contact

Page 48

1   with the decedent, his reasons for foot pursuit.  His
2   perception of an attempt carjacking.  The use -- the
3   first use of the ECD, electronic control device.
4       Q.  Did you make a determination that he was
5   being untruthful as to the remainder of the use of
6   the electronic control device?
7       A.  It was not necessarily a truthfulness.  It
8   was just outside the policy, his use of the ECD.
9       Q.  And what about what he said caused you to
10  believe that he was being untruthful about the head
11  strikes?
12      A.  The fact that he doesn't remember the
13  amount of strikes.
14      Q.  And what about the use of the LVNR causes
15  you to believe that he was being untruthful?
16      A.  Parts of his interview he started out by
17  saying he never meant to render the decedent
18  unconscious.  However, as the interview progressed,
19  he later stated that the use of the LVNR is to
20  incapacitate a subject.
21      Q.  As you sit here today, can you recall
22  anything else about his interview that you perceived
23  to be untruthful?
24      A.  Not without looking at it.
25      Q.  What is the difference between a

Page 49

1   credibility assessment and a truthfulness assessment?
2       A.  Well, with credibility we take the
3   officer's perception and we can't necessarily take
4   away an officer's perception to say I don't believe
5   you because I see it differently.  Whereas
6   truthfulness if we can -- it's almost like caught in
7   a lie or something that's factual that we can prove
8   that did not happen or did happen.
9           So credibility falls, for me falls more on
10  the perception of things.  I can't take away an
11  officer's perception of what they saw.
12      Q.  In your CIRT investigations, do you ever
13  call into question when an officer says they
14  perceived?
15      A.  We take a -- we take a look at it.  But
16  we've never taken away an officer's perception.
17      Q.  In other words, if an officer says to you I
18  perceived X, you always take that as true if they say
19  that's what they perceived, correct?
20      A.  Yes.
21      Q.  So with respect to Officers Tran -- strike
22  that.
23          With respect to Officers Tran, Flores and
24  Sergeant Crumrine at the time, you did not discount
25  anything that they said in terms of if they said that

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

14 (Pages 50 to 53)

Page 50

1 they perceived it? That's a terrible question. Let
2 me rephrase.
3        If Officers Tran, Flores and Sergeant
4 Crumrine stated that they perceived certain acts of
5 the individuals involved, did you ever discount their
6 credibility?
7    A. No.
8    Q. Is that just as a matter of policy?
9    A. That is not necessarily written in policy.
10 But we ask these officers these questions, again, to
11 get their perception of what they saw, what they
12 observed and why they reacted the way they did.
13    Q. So it may not be a policy but it's a
14 practice or a custom?
15    A. Sure.
16    Q. Is the investigation that you're conducting
17 focused on whether an officer is being credible?
18    A. No. It's based on the facts.
19    Q. And a better way maybe to say it from my
20 questioning standpoint is you're assuming everything
21 the officer is saying is true if they're saying it's
22 based on their perception?
23    A. Correct.
24    Q. Prior to investigating this incident, had
25 you ever been trained on the LVNR?

Page 51

1    A. Yes.
2    Q. Prior to investigating this incident, had
3 you ever investigated another incident from an
4 internal standpoint involving the use of the LVNR?
5    A. No.
6    Q. When you started investigating this
7 incident -- strike that.
8        After you started investigating this
9 incident, did you have to brush up on your training
10 on the LVNR?
11    A. What do you mean by "brush up"?
12    Q. Well, I think you were asked questions in
13 the other deposition about whether -- when somebody
14 is supposed to become unconscious and when you're
15 supposed to release the hold in terms of time.
16        Would you have known that when you were
17 conducting this investigation?
18    A. Yes. Because we would have the policies in
19 front of us.
20    Q. But if you didn't have the policy in front
21 of you, would you have known that?
22    A. Yes.
23    Q. Did the other officers know those policies
24 completely offhand when you interviewed them?
25    A. My partner, Patrick Hughes, yes.

Page 52

1    Q. And that's a vague question.
2        Did the officers that you interviewed that
3 were involved in the incident know the LVNR policies
4 offhand?
5    A. I don't know.
6    Q. Did you ask them?
7    A. I believe we went through the LVNR policy
8 with them.
9    Q. And did you receive any indication that
10 they didn't know it without looking at the policy?
11    A. I don't recall. I don't think so.
12    Q. Were you able to tell by looking at the
13 videotape if the LVNR was properly applied?
14    A. I don't know.
15    Q. You don't know if you were able to tell?
16    A. I wouldn't be able to -- I don't know if
17 the placement of the LVNR was proper.
18    Q. So as you sit here today, you don't know if
19 it was proper?
20    A. I don't know.
21    Q. What policies did Lopera violate in this
22 incident?
23    A. The electronic -- the ECD, the electronic
24 control device was a policy violation. And that
25 being that after three times it's deemed ineffective.

Page 53

1 However, Officer Lopera from the download of his
2 Taser had used it seven times, pulled the trigger
3 seven times.
4    Q. Okay.
5    A. The head strikes, the threat assessment and
6 the LVNR, which was a -- a truthfulness.
7    Q. So was Lopera -- strike that.
8        Did you find the policy violation against
9 Lopera for the actual use of the LVNR or the lying
10 about the LVNR?
11    A. For -- I think it was -- it was a
12 truthfulness --
13        MR. McNUTT: Objection. Form.
14        THE WITNESS: It was a truthfulness for the
15 LVNR.
16 BY MR. LAGOMARSINO:
17    Q. Okay.
18    A. About the use of the LVNR.
19    Q. Okay. So standing alone, his use of the
20 LVNR did not violate policy in your view; is that
21 correct?
22    A. I believe it had his threat perception
23 about the application of the LVNR and then the
24 truthfulness leading up to the LVNR is what the
25 conclusion was based on, but I don't remember

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 54

1 verbatim how I worded it in the report.
2     Q. Okay. What report are you talking about?
3     A. We, at the conclusion of our investigation,
4 we put all our facts together in an AR, or admin
5 report.
6     Q. And where does that go?
7     A. That is -- it goes to our people who sit on
8 the board. And when we present the facts through a
9 PowerPoint, they're able to read along in that report
10 with our PowerPoint. If they have any questions or
11 concerns, they can direct them at me. Or if they
12 have questions for Officer Lopera or any of the
13 involved officers or witness officers, they can
14 answer them as well.
15     Q. And as I understand your testimony, you
16 find the policy violation for the necessity or the
17 use of the LVNR, correct?
18     A. Not necessarily the necessity. We look at
19 the assessment of the use of force. And with that,
20 because of the types of use of force that Officer
21 Lopera used, we questioned him on those as to why he
22 used those or why he decided to use those.
23     Q. Did you find a policy violation in the
24 actual application of the restraint/LVNR?
25     A. Based on the perception on the threat

Page 55

1 perception, yes.
2     Q. And I think maybe I'm asking a different
3 question than you're answering. And it's probably
4 the question's -- probably the questioner's fault.
5         Let's assume that the threat hypothetically
6 justified the use of an LVNR. Okay?
7         If he used the LVNR that was depicted on
8 the tape, did you find any violation in the way he
9 actually applied the LVNR?
10     A. There was some question about the hand. I
11 believe it was his right hand, where the hand
12 placement of that was, because that was not what
13 was trained with the use of the LVNR with our
14 department.
15     Q. And I understand there was a question about
16 it. But was there a finding or conclusion made that
17 he misapplied the LVNR?
18     A. That was based and kind of rolled into the
19 truthfulness conclusion.
20     Q. The best way to probably get the exact
21 conclusion would be to review the report, correct?
22     A. Yes, sir.
23     Q. Okay. What about the threat assessment was
24 a violation of policy?
25     A. The strikes -- Officer Lopera in his

Page 56

1 statement to us had stated that the decedent was
2 fighting him. In review of --
3     MR. McNUTT: Objection. Form. I will
4 instruct the witness not to repeat anything that
5 Officer Lopera told you during this process.
6     MR. ANDERSON: Join. Anything that he told
7 you.
8     THE WITNESS: Okay.
9     MR. LAGOMARSINO: What's the basis for
10 that? Just so we have a record.
11     MR. ANDERSON: We have a pending motion --
12 you filed a motion to compel in these issues on his
13 statement. So once that's decided, we will let the
14 judge decide whether Lopera's statement is relevant
15 or can be used in this case.
16     MR. LAGOMARSINO: Okay.
17 BY MR. LAGOMARSINO:
18     Q. So was Tashi Farmer fighting back?
19     A. From what we could see on the video
20 surveillance and a little bit of Officer Lopera's
21 body camera, it did not look to be what Officer
22 Lopera had articulated to us.
23     Q. What about the use of the head strikes was
24 a violation of policy?
25     A. It would have been excessive use of force

Page 57

1 based on the threat perception.
2     MR. LAGOMARSINO: All right. I'll reserve
3 the right to come back with the witness based on the
4 court's ruling on anything with respect to what
5 Officer Lopera described to her in the CIRT
6 statement.
7     MR. ANDERSON: Understood.
8 BY MR. LAGOMARSINO:
9     Q. Do you use LVNR and chokehold
10 interchangeably?
11     A. No.
12     Q. I think you were asked in the other
13 deposition whether -- a slightly different question.
14 Let me rephrase.
15         In the other deposition you were asked is
16 an LVNR and a rear naked choke the same?
17     A. I was asked that in the deposition?
18     Q. Yeah.
19     A. Is that your question, are they the same?
20     Q. Yes.
21     A. No.
22     MR. ANDERSON: Okay, that got confusing.
23 Was the question, were you asked that question in a
24 prior deposition, or is there a difference between an
25 LVNR and a chokehold?

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

16 (Pages 58 to 61)

Page 58

1    MR. LAGOMARSINO: Okay. I'll refine the
2 question.
3 BY MR. LAGOMARSINO:
4    Q.   Rather than go off my notes, what I'll do
5 is I'll bring the transcript back for the next
6 session.
7        Is the rear naked choke the same as the
8 LVNR?
9    A.   No.
10   Q.   In the rear naked choke, the encircling arm
11 is used the same way as you would have in an LVNR,
12 correct?
13   A.   I'm sorry, could you say that again?
14   Q.   Sure.  When you compare the rear naked
15 choke and the LVNR, the encircling arm is the same?
16   A.   I believe so, yes.
17   Q.   And it's in the same position, correct?
18   A.   Yes.
19   Q.   What's the difference, as you sit here
20 today, between the LVNR and a rear naked choke?
21   A.   I believe it's the hand placement of the
22 non-encircling arm.
23   Q.   And in the LVNR, the hand placement is
24 permitted on the back of the head, correct?
25   A.   I'm sorry, say that one more time.

Page 59

1    Q.   In which hold is the hand placement on the
2 back of the neck applied, the rear naked choke or the
3 LVNR?
4    A.   Rear naked choke.
5    Q.   And why is the hand placed in the back of
6 the head?
7    A.   I believe it's to apply pressure to the
8 back of the head forward into the encircling arm, but
9 I'm not 100 percent sure.
10   Q.   And is that to avoid the person backing
11 their head into --
12   A.   I don't know.
13   Q.   I've seen a training video in this case.
14 Do you know why that training video on the LVNR was
15 created?
16   A.   If you're referencing the one to the
17 department?
18   Q.   Yes.
19   A.   I believe it was to talk about the
20 differences between the LVNR and the chokehold or the
21 rear naked choke.
22   Q.   Have you ever seen any training videos on
23 the LVNR besides that one?
24   A.   I believe when we first got trained on in
25 the academy, they had a video, but I'm not -- I don't

Page 60

1 remember.
2    Q.   Okay.  Do you know if that video was shown
3 to all the officers in Metro?
4    A.   I don't know.
5    Q.   Does Metro train you in how long it takes
6 to render somebody unconscious when you impose the
7 LVNR?
8    A.   Yes, they do.
9    Q.   And how long is that?
10   A.   I believe it's four to seven seconds.
11   Q.   Four to seven seconds?
12   A.   I believe so.
13   Q.   Are you sure?
14   A.   No.
15   Q.   Would you have to see the policy?
16   A.   I would have to see the lesson plan, yes,
17 sir.
18   Q.   To your knowledge, was Officer Lopera ever
19 interviewed by anyone at Metro besides in the CIRT
20 statement?
21   A.   Not -- I believe his -- his interview with
22 us was the only interview that was conducted in
23 reference to this investigation.
24   Q.   Reference to the CIRT investigation?
25   A.   Correct.

Page 61

1    Q.   Do you know of any other interviews he's
2 given?
3    A.   Oh, I don't know.
4    Q.   Did he give a public safety statement?
5    A.   He started to, and then it was stopped.
6    Q.   Who stopped it?
7    A.   His attorney John Eldridge I believe is who
8 arrived on scene.  Or the PPA attorney, not his
9 attorney.  I apologize.
10   Q.   When you're going to present your findings
11 to a board, is that the CIRT board?
12   A.   Yes.  We have two boards.  Well, it's a
13 CIRP process.  The first board is the Use of Force
14 Review Board, and then we roll right into what's
15 called the TRB or Tactical Review Board.  And the
16 conclusions are presented at the Tactical Review
17 Board.
18   Q.   So we've got two boards; Use of Force and
19 Tactical Review.  Is there an actual -- what is the
20 CIRP proceeding where you go in and present your
21 case?
22   A.   It's the CIRP process, the critical
23 incident review process, and that's the two boards
24 that run.
25   Q.   So are the two boards part of the CIRP

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 62

1  process?
2      A.  Yes.
3      Q.  Who was on that board for this case?
4      A.  Our chairperson was Sheriff Tim Kelly,
5  Assistant Sheriff Tim Kelly.  Followed by Deputy
6  Chief John McGrath.
7          Bureau Commander for Lopera, Lif, Tran,
8  Flores was Captain Pelletier.
9          For Sergeant Crumrine, because at the time
10 of the board he was over in Enterprise Area Command,
11 I believe it would have been Captain Roxanne McDaris.
12 It's Burke now.  I apologize.
13         Moving into our tactical expert which would
14 have been Ryan Evans, Sergeant Ryan Evans.  We had a
15 peer officer who was Travis -- what's his name?  I
16 can't remember his name.
17         And then we had a peer sergeant, which I
18 believe was Noe Esparza, but I'm not a hundred
19 percent sure on the two peer officers.  It's
20 Travis -- I can't remember his name.
21     Q.  Okay.
22     A.  And then we had four citizens that sat on
23 the board.
24     Q.  So four citizens and how many Metro
25 officers, six or seven?

Page 63

1      A.  For -- we have one peer officer for all
2  officers and one peer sergeant for Sergeant Crumrine.
3  And then everyone that was on the board was Officer
4  Lopera, Officer Lif, Tran, Flores, Sergeant Crumrine,
5  and I believe that's all that was invited to the
6  board.
7      Q.  Were all the peer officers the same for all
8  the officers involved?
9      A.  Yes.
10     Q.  So on the -- and then a vote is taken,
11 correct?
12     A.  On the use of force, yes.
13     Q.  How many votes are there?
14     A.  So all -- everyone on the Use of Force
15 votes, including the citizens, except for the
16 chairperson.  He is not a voting member on the Use of
17 Force Board.
18     Q.  Okay.  So what's the number?  How many
19 votes are there?
20     A.  Total, I don't remember who -- I don't
21 remember how many votes.  Everyone that I said except
22 for the chairperson votes, but I don't remember how
23 many votes -- how many voting sheets are actually
24 there.
25     Q.  Are there more Metro votes than citizen

Page 64

1  votes?
2      A.  Citizens will actually outvote us on the
3  Use of Force Board.
4      Q.  What about with respect to whether policy
5  violations occurred?
6      A.  That happens in the Tactical Review Board
7  and our citizens do not vote on that.  And the reason
8  being is because they're not privy to our tactics and
9  training, but they're welcome to stay for the board.
10     Q.  And then with respect to policy
11 recommendations that come out of this process, who
12 makes those?
13     A.  That would be a meeting between the
14 chairperson and the sheriff.  But they are discussed
15 in what we call deliberations which are not video or
16 audio recorded and there's no notes taken.
17     Q.  So who participates in the discussion as to
18 whether policy is going to change as a result of this
19 process?
20     A.  Everyone on the board can participate and
21 that's again in deliberations.  But any formal
22 recommendations is going to be a memo between the
23 sheriff and the chairperson.
24     Q.  Who makes the recommendations to the
25 sheriff or the chairperson?

Page 65

1      A.  So it's a board that convenes during the
2  deliberations.  They talk about -- they talk about it
3  and then whatever -- the chairperson will present the
4  concerns to the sheriff.  In between those two, they
5  came up with discipline, policy changes or any other
6  recommendations that could help the department.
7      Q.  And are citizens a part of that process
8  with respect to policy changes?
9      A.  Yes.  They can voice concerns but they're
10 not voting on the board.
11     Q.  Do you know which citizens were on the
12 board?
13     A.  I don't.
14     Q.  Do you know how they're selected?
15     A.  It's a process that they -- I believe we
16 have like advertisements in like the newspaper.  Word
17 of mouth.  They just can't have any affiliation to
18 the department.  Can't be married to anyone in the
19 department.  Can't be a former officer.  And so
20 they -- they come through a training of just what the
21 process is, what's expected of them.
22         And I believe that class is -- it might be
23 like a -- I don't know how long the class is but they
24 come to a class and we get an opportunity to meet
25 them as well as because we have conversations with

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

18  (Pages  66 to  69)

Page 66

1  them.
2     Q.  Okay.  So they go through either some kind
3  of PowerPoint or written training on how to be on
4  that board?
5     A.  Yes.
6     Q.  Have you seen those training materials
7  before?
8     A.  Yes.
9     Q.  Have you instructed?
10     A.  No.
11     Q.  So if we wanted to request those, we could
12  get those?
13     A.  Yeah.
14        MR. ANDERSON:  Objection.  Form.
15        MR. LAGOMARSINO:  Assuming there was no
16  objection to producing those, correct?
17  BY MR. LAGOMARSINO:
18     Q.  But if the judge ordered those produced, we
19  could get those produced, right?
20     A.  I'm sure you could.
21     Q.  And so on the Lopera, Crumrine, Flores and
22  Tran case, that occurred September '17?
23     A.  I believe so.
24     Q.  And you were present?
25     A.  Yes, I was.

Page 67

1     Q.  What portion of that process were you
2  present for?
3     A.  The entire thing.
4     Q.  Were you present during deliberations?
5     A.  No.
6     Q.  Where does the board deliberate?
7     A.  There's a couple of different locations on
8  this particular board.  I don't recall where they
9  went but there's a conference room on the second and
10  third floor that they all go into and convene.  And
11  again, on this particular board, I don't recall where
12  they went.
13     Q.  And who presented the incident to the
14  board?
15     A.  I did.
16     Q.  Did anybody else help you?
17     A.  No.
18     Q.  What did your presentation consist of?
19     A.  It was a PowerPoint that over -- that went
20  through several sections which included persons
21  involved, chronology, incident documentation, the
22  medical response to include a new supervisor
23  response, and any training policies and procedures.
24     Q.  How long was your presentation?
25     A.  It was long.  I believe the Use of Force

Page 68

1  Board presentation was just under maybe two and a
2  half, three hours.
3     Q.  And was the presentation divided up into
4  segments per officer or was it just all together?
5     A.  All together.
6     Q.  Okay.  And it's my understanding that that
7  presentation is audio recorded?
8     A.  Yes, it is.
9     Q.  And is your presentation factual?
10     A.  Yes.
11     Q.  Does your presentation consist of policy
12  recommendations for changes?
13     A.  It's going to be in the TRB.  But for the
14  use of force, it's just the facts.
15     Q.  So the answer was "no"?
16     A.  No.
17     Q.  Was there testimony presented at that
18  board?
19     A.  As far as?
20     Q.  Witness testimony or did independent
21  witnesses testify about the incident?
22     A.  It's not really -- they don't really
23  testify.  I apologize if I'm getting confused.  But
24  during the board we have clips from the officers'
25  statements that we will actually put into the board.

Page 69

1     Q.  Okay.
2     A.  Into the PowerPoint so they can read along
3  and they can also hear it.  If that's what you're
4  talking about, then yes, we do have that.
5     Q.  All right.
6     A.  But the officers do have a chance to talk
7  after the presentation.  At the conclusion of the
8  presentation they have an opportunity to answer
9  questions or add any additional comments.
10     Q.  Was that video of the difference between a
11  rear naked choke and an LVNR played during your
12  presentation?
13     A.  It was.  And it wasn't the video in the
14  academy.  It was one that was put together for the
15  purposes of the board.
16     Q.  Thank you for clarifying that.
17        Do you know if the citizens are paid?
18     A.  It's all volunteer.
19     Q.  Do you know with respect to the vote, is it
20  a majority vote that determines or is it 60 percent
21  or...
22     A.  That's a good question.  I think it's a
23  majority vote.  About 90 percent of our boards have
24  been unanimous but I believe there has been like, for
25  instance, a six to one vote.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 74

1 Office of Internal Oversight, you don't know if there
2 were one or more?
3     A.  Correct.  I have no idea what were the
4 recommendations.
5     Q.  Where were those memos being maintained?
6     A.  Sergeant Boveda would maintain those.
7     Q.  And would you use an Excel spreadsheet to
8 track when the recommendations were being implemented
9 and so forth?
10    A.  Yes.  And for the Lopera case, I'm not sure
11 if they used the matrix or not.
12    Q.  If we wanted to find out the names of the
13 citizens on the board, I'm assuming Metro keeps a
14 record of their names?
15    A.  Yes, they do.
16    Q.  Did you watch the press conference of
17 Captain McMahill regarding this incident?
18    A.  Which one?
19    Q.  Any of them.
20    A.  Yes.
21    Q.  Did you see the one where he said that
22 Tashi Farmer would not have been charged with a
23 crime?
24    A.  I don't recall.
25    Q.  Does Metro, to your knowledge, maintain

Page 75

1 news clips or media records about stories involving
2 its officers?
3     A.  I don't know.  I'm assuming they would, but
4 I don't know.
5     Q.  Does the sheriff receive regular reports
6 regarding media on Metro?
7     A.  I don't know.
8     Q.  I guess I would have to ask the sheriff,
9 right?  Okay.  Or whoever is presenting with those,
10 correct?
11    A.  Yeah.  Public information officer, PIO
12 might know.
13    Q.  Do you know why the body cameras don't have
14 sound for the first 30 seconds?
15    A.  I don't.  I believe it's a mechanism,
16 something to do with the actual internal workings of
17 the body camera, and I don't know.
18    Q.  Have you ever heard of body cameras that do
19 record sound for all the time that they're activated?
20    A.  I haven't, no.  Do you mean from the time
21 it's turned on?
22    Q.  Yes.
23    A.  No.  I don't know.
24    Q.  Do you know if Officer Tran received
25 discipline for failure to use a body cam?

Page 76

1     A.  I don't know.
2     Q.  Did he violate a policy with respect to the
3 body cam?
4     A.  Yes, he did.
5     Q.  What did he violate?
6     A.  The fact that the policy states that the
7 body camera is to be turned on as soon as possible
8 once initiated on a call or dispatched to a call or
9 self-initiated.
10    Q.  Tell me a little bit about the process of
11 determining what potential policy violations you were
12 going to be investigating at the outset of the
13 investigation?
14    A.  We look at the overall incident.  We sit
15 down in roundtable.  Things that we see that can be,
16 again, it can be a body-worn camera; rolling code
17 three, which is lights and sirens, to an incident.
18 Officers approach, their tactical decision-making.
19 So we kind of look at everything.
20        And then go over the policies to make sure,
21 okay, for instance, Officer Tran, he didn't have it
22 on.  The policy states this.  Okay, that's going to
23 be a policy violation that will be introduced to the
24 Tactical Review Board.
25    Q.  When you started interviewing Officer Tran,

Page 77

1 Officer Flores, and I believe Sergeant Crumrine, you
2 had made a statement that it's being alleged or that
3 they've failed to intervene.
4        What information did you utilize to
5 investigate that potential policy violation?
6     A.  When we looked -- because of the amount of
7 time Officer Lopera had the decedent in the LVNR or
8 chokehold, at that time, what we knew was that was an
9 extended amount of time beyond policy.  And so we
10 threw in there the duty to intervene and asked them
11 specifically about that policy.
12    Q.  Let me just ask a general question about
13 the duty to intervene.
14        If -- and again, I'm talking generally.
15 I'm not talking necessarily about this specific
16 incident.
17    A.  Okay.
18    Q.  Okay?  Let's say an officer -- there are
19 two officers on the scene.  The first officer places
20 an individual in the LVNR for an extended period of
21 time.  The second officer arrives on the scene and
22 observes the first officer applying the LVNR for a
23 period of time longer than policy.
24        The second officer says, hey, stop, hey,
25 release.  Verbal commands.  And the first officer

Page 78

1  doesn't release the LVNR.  Has the second officer
2  complied with the policy to intervene?
3      MR. ANDERSON:  Objection.  Form.
4      THE WITNESS:  It depends on what the
5  subject's actions are at the time.  The officers are
6  trained to make the situation safe.  That was --
7  that's what we're trained to do first, is to make
8  that safe.  Once that scene is safe, then an officer
9  is expected to intervene if that hold is held for
10  longer.
11  BY MR. LAGOMARSINO:
12      Q.  So I'll add those additional facts just so
13  we have a cleaner record.
14      Same hypothetical situation but we're going
15  to add facts, okay?
16      First officer places subject into LVNR for
17  an extended period of time.
18      Second officer arrives.  Observes first
19  officer placing subject -- or keeping subject in
20  LVNR.  Subject is not a threat, is not punching, and
21  second officer says verbally release LVNR.
22      First officer doesn't release LVNR.
23      Does the second officer have a duty then,
24  at that point, to physically intervene and remove the
25  LVNR hold or attempt to remove the LVNR hold from the

Page 79

1  subject?
2      MR. ANDERSON:  Objection.  Form.
3      MR. McNUTT:  Join.
4      THE WITNESS:  Again, it depends on the
5  perception of that officer.  We're trained to take
6  that person into custody, put him in handcuffs, make
7  that situation, that scene safe before the LVNR would
8  be released.
9  BY MR. LAGOMARSINO:
10      Q.  If the situation was safe, would the
11  second officer have a duty to physically remove the
12  hold?
13      MR. ANDERSON:  What do you mean by "safe"?
14  Objection.  Form.
15      MR. LAGOMARSINO:  Well, I'm just using her
16  word.
17  BY MR. LAGOMARSINO:
18      Q.  So if it's safe?
19      A.  If it's deemed safe by the officer, if that
20  person is in handcuffs, is no longer a threat to any
21  officer on scene, not just the perceiving officer who
22  is perceiving that there's no movement, once that --
23  again, once it is safe by all officers, then yes, the
24  officer would have a duty to intervene.
25      Q.  Does the subject have to be in handcuffs to

Page 80

1  physically intervene?
2      A.  I'm sorry, say that again.
3      Q.  In your last answer you said -- you added
4  that the subject would have to be in handcuffs.  So I
5  want to ask a new question.
6      There's different types of interventions so
7  let me kind of back it up a little bit and then we'll
8  go to lunch, but not together.
9      So you can verbally intervene, correct?
10      A.  Yes.
11      Q.  But if the situation requires physical
12  intervention, then physical intervention is required,
13  correct?
14      A.  Yes.
15      MR. ANDERSON:  Objection.  Form.
16  BY MR. LAGOMARSINO:
17      Q.  If the situation requires physical
18  intervention, then verbal intervention is not enough
19  to satisfy the duty to intervene, correct?
20      MR. ANDERSON:  Objection.  Form.
21      THE WITNESS:  It could, yeah.
22  BY MR. LAGOMARSINO:
23      Q.  I just need a slightly clearer record, so
24  I'll ask the same question.
25      If a situation requires physical

Page 81

1  intervention, then verbal intervention is not enough,
2  correct?
3      MR. ANDERSON:  Objection.  Form.
4      THE WITNESS:  It depends, yeah.  I mean, if
5  an officer would have to go -- if he's not -- I don't
6  know.  I don't know how to answer that.
7      MR. LAGOMARSINO:  Okay.  All right.  Take a
8  lunch break.
9      I don't know if you want to come back like
10  1:15?
11      MR. ANDERSON:  You have a phone call?
12      MR. LAGOMARSINO:  Yeah, but it should start
13  at 1:00.
14      MR. ANDERSON:  Okay.
15      THE VIDEOGRAPHER:  The time is
16  approximately 12:04 p.m.  We are going off the
17  record.
18      (A recess was taken from 12:04 p.m.
19       to 1:29 p.m.)
20      THE VIDEOGRAPHER:  The time is
21  approximately 1:29 p.m.  We are back on the record.
22  BY MR. LAGOMARSINO:
23      Q.  You understand you're still under oath?
24      A.  Yes, I do.
25      Q.  All right.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 82

1    (Exhibit 1 was marked for
2    identification.)
3  BY MR. LAGOMARSINO:
4    Q.  Exhibit 1 are excerpts from the CIRT
5  statements that were provided by Metro in this case.
6    A.  Okay.
7    Q.  They're not the complete statements.  Just
8  parts.
9    A.  Okay.
10    Q.  We'll be identifying the documents by Bates
11  number, which is on the bottom right-hand side.
12    MR. McNUTT:  More maintenance on the
13  building?
14    MR. LAGOMARSINO:  No.  They're totally
15  remodeling.
16  BY MR. LAGOMARSINO:
17    Q.  So you were present at this statement,
18  correct?
19    A.  Yes, I was.
20    Q.  All right.  And PH is indicated here as --
21  is that Patrick Hughes?
22    A.  Yes, it is.
23    Q.  Okay.  Who is Patrick Hughes?
24    A.  He was a detective with me in CIRT.
25    Q.  Did Patrick Hughes say to Michael Tran,

Page 83

1  prior to your arrival you failed to activate your
2  body-worn camera and also you failed to intervene
3  while the application of the LVNR was applied on the
4  subject?
5    A.  Yes, he did.
6    Q.  Going to the next page, which is jumping
7  ahead to 1956, you asked at line 6:  "Okay.  There
8  was no resistance from the subject when you arrived?"
9    Were you basically saying -- asking there
10  was no resistance from Tashi Farmer when Michael Tran
11  arrived on the scene?
12    A.  Yes.
13    Q.  And what did Michael Tran say?
14    A.  On line 7 he says "Nope."
15    Q.  Do you take that to mean that there was no
16  resistance when Michael Tran arrived?
17    A.  From Michael Tran's perception, yeah, he
18  did not see resistance.
19    Q.  Did anybody tell you that Tashi Farmer was
20  resisting when Michael Tran arrived on the scene?
21    A.  I believe in another statement from Officer
22  Flores and Sergeant Crumrine, when they arrived there
23  was resistance.
24    Q.  Going to 1961, the question at line 3 is
25  from you:  "Did Officer Lopera ever tell you he tased

Page 84

1  the subject," and Michael Tran's answer was "No."
2  Correct?
3    A.  Yes.
4    Q.  Did Officer Lopera have a recollection
5  during his interview of the number of times that he
6  tased Tashi Farmer?
7    A.  No.  He did not.  He did not know how many
8  times he pulled the trigger.
9    Q.  Going at line 8, you're asking about,
10  during that section, palm reviving techniques.  Were
11  you trained on reviving techniques at the Academy?
12    A.  Yes, I was.
13    Q.  And did you examine in this case or
14  investigate whether proper CPR was given by Tran,
15  Flores or Crumrine after the incident?
16    MR. ANDERSON:  Objection.  Form.
17    THE WITNESS:  CPR, no.
18  BY MR. LAGOMARSINO:
19    Q.  Why didn't you investigate that?
20    A.  That's not one of the things that we look
21  at or examine.  What we look at is medical attention
22  and whether medical -- whether or not they had asked
23  for medical, paramedics or AMR or FD to arrive on the
24  scene to do their medical training -- or to do their
25  medical techniques.

Page 85

1    Q.  So if a subject is not reviving after 10,
2  20 seconds of being let go of the LVNR, and after
3  palm reviving techniques and other techniques are
4  used, is it department policy to utilize CPR from the
5  officers to try to revive that subject?
6    A.  Not in policy, no.
7    Q.  How about in training?
8    A.  Not in training either, no.
9    Q.  Did you examine in your investigation all
10  the training regarding reviving an individual who had
11  an LVNR applied to them?
12    A.  I don't understand the question.
13    Q.  Okay.  Did you look at training in your
14  investigation to see if the officers at the scene
15  complied with their training in reviving the
16  individual?
17    A.  Yes.
18    Q.  And you looked at all the training,
19  correct?
20    A.  Yes.
21    Q.  Going to the last page, LVMPD2002, you
22  asked --
23    MR. McNUTT:  I'm sorry, did you say the
24  last page?
25    MR. LAGOMARSINO:  2002, the last page.

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

23 (Pages 86 to 89)

Page 86

1  BY MR. LAGOMARSINO:
2      Q.  "Looking back on this incident, is there
3  anything else you would have done differently" is
4  what you asked Officer Tran, correct?
5      A.  Yes.
6      Q.  And what was his response?
7      A.  On line 16 he says, "Um, I should have
8  started CPR."
9      Q.  Did you agree with him?
10     A.  So these are the questions that we ask at
11  the end of interview and they are kind of hindsight
12  questions.  And it's kind of reflections on the
13  officers as far as what they would do differently,
14  nothing that we would necessarily hold for a CIRT
15  board.
16         (Exhibit 2 was marked for
17          identification.)
18  BY MR. LAGOMARSINO:
19     Q.  Exhibit 2 are excerpts from the CIRT
20  statement of Officer Michael Flores.
21         Do you have that in front of you?
22     A.  Yes, I do.
23     Q.  And I'm sorry, just to go back to Exhibit 1
24  for a moment.
25     A.  Okay.

Page 87

1      Q.  Do the pages that I've shown you appear to
2  you to be a true and correct copy of the pages from
3  the CIRT statement?
4      A.  Yes.
5      Q.  So going to Exhibit 2, the Flores excerpt.
6  So who is GW?
7      A.  That is Greg Watkins or Gregory Watkins.
8      Q.  He's on the CIRT team?
9      A.  Yes, sir.
10     Q.  Did Gregory Watkins say to Officer Michael
11  Flores, number one, "Prior to your arrival you failed
12  to activate your body-worn camera," and number two,
13  "You failed to intervene while the application of the
14  LVNR was applied to the subject"?
15     A.  Yes.
16     Q.  Going to page 1874 from the statement at
17  line 5, it says, "Did you and Officer Tran conduct
18  any preplanning of any incident rehearsal while en
19  route to the location?"
20         You answered that question, correct?
21     A.  Yes, I did.
22     Q.  And Mr. Flores's answer was "no," correct?
23     A.  Yes.
24     Q.  Is preplanning on the way to an incident
25  part of Metro policy and training?

Page 88

1      A.  It's not necessarily policy, but it's
2  trainings and tactics and part of decision making.
3      Q.  And the next question, although it's not
4  highlighted, is at line 8.  It says, "En route to
5  Venetian, any reason why you did not activate your
6  body camera while rolling code?"
7         I would ask you is it policy and training
8  of Metro to activate body cameras while rolling code?
9      A.  Yes, it is.
10     Q.  Do you have an understanding of what the
11  punishment or discipline is for not activating body
12  camera?
13     A.  I don't.  I don't know what the discipline
14  matrix would be on this.  Or what would fall within
15  the matrix, I should say.
16     Q.  And going to LVMPD1886, which is page 28 of
17  the CIRT statement, the question -- it says at line
18  5, middle, it says, "And you said you folded his legs
19  to gain compliance.  Is there a technique that's
20  taught in the Academy?"
21         Is it your understanding that if the
22  subject has their torso down on the pavement, that
23  it's within Metro policy and training to fold an
24  individual's legs back up to their buttocks?
25     A.  It is an option that officers have.

Page 89

1      Q.  So yes?
2      A.  Yes.  But it depends on the scenario as
3  well.  It's not something you have to use.  It's not
4  a policy that you must use.  It's an option for
5  officers to use.
6      Q.  Was Tashi Farmer resisting when they folded
7  his legs up to gain compliance?
8      A.  I would have to read his whole statement to
9  recall.
10     Q.  Fair enough.
11         Was Tashi Farmer in medical crisis after he
12  was released from the LVNR?
13     A.  I don't know.
14     Q.  Do you have an opinion or an estimate as to
15  when Sergeant Crumrine took charge of the scene, if
16  at all?
17     A.  I believe in the CIRT report we came up
18  with, I believe it was about ten minutes after the
19  decedent was taken into custody.
20     Q.  Going to the last page, 1934, which is
21  page 76 of the statement, asking the question I
22  believe about what could have been done.  There's a
23  statement, line 8, it says, "But I feel as if the
24  communication could have been better."
25         Did you make any conclusions in your

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

26 (Pages 98 to 101)

Page 98

1  physically check out a binder or a case file.
2      Q. And then how do you verify that they've
3  actually read it? I mean to me -- let me withdraw
4  that question.
5      This is a big CIRT file, right?
6      A. It's -- I believe I have three binders for
7  this case, yes.
8      Q. How do you verify that they've actually
9  read that file?
10      A. I mean, we don't do pop quizzes or anything
11  with them. But when they come to the board, they're
12  expected to have read the material so we're not
13  asking the same questions over and over again.
14      Q. All right. Going to 403.
15      A. Okay.
16      Q. States "The CIRP chairperson will," and
17  then it lists some items there 1 through 6.
18      Going to the 4B, it says, "The TRB will
19  vote on CIRT conclusions based on the majority vote,
20  either validating, overturning, modifying each of the
21  conclusions presented by CIRT."
22      So you present conclusions, correct?
23      A. Yes.
24      Q. Did you present approximately 20?
25      A. Yeah. There's quite a few, yes, sir.

Page 99

1      Q. Do you remember many of them as you sit
2  here today?
3      A. Probably the majority of them, I would say.
4      Q. Can you take us through the conclusions. I
5  understand, but just for the record, that you're not
6  expected to recite them word by word.
7      A. Okay.
8      Q. But just generally can you tell us what
9  they are?
10      A. Uh-huh. The first one would have been
11  radio traffic communication. And there was two
12  negatives, one for Officer Lopera and one for
13  Officer Lif. And it was both the fact that they did
14  not utilize their radio and provide radio traffic.
15      The third conclusion would have been for
16  communications bureau which encompasses our call
17  takers and dispatchers, and that was a positive
18  conclusion saying that they acted in accordance with
19  their policies and training.
20      The next conclusion -- sorry, format has
21  changed. Our next one would have been the foot
22  pursuit policy which Officer Lopera violated.
23      Q. How did he violate that?
24      A. There's eight indicators in policy for when
25  a foot pursuit should be continued and that was to

Page 100

1  include that he did not have -- his radio traffic he
2  didn't provide. He lost sight of the subject. He
3  was by himself.
4      And there's a fourth one there I can't
5  recall off the top of my head, but that all
6  encompassed into one conclusion of the violation of
7  the foot pursuit policy.
8      Q. Was a determination made that he would have
9  probable cause to --
10      A. Yeah. He had -- when we spoke with our
11  SMEs, he had reasonable suspicion.
12      Q. All right. So we have the radio traffic,
13  two findings. Dispatcher, conclusion. The foot
14  pursuit. What's the next one?
15      A. The next one would have been the use of the
16  ECD, electronic control device. After the first use,
17  it was -- it should have been deemed ineffective.
18  However, he continued to use it and that was a
19  violation of our policy. And the duration of each
20  trigger pull.
21      MR. McNUTT: I'm sorry, did you say after
22  the first use?
23      THE WITNESS: Correct.
24  BY MR. LAGOMARSINO:
25      Q. And then the duration, how did he violate

Page 101

1  the duration?
2      A. By policy it's when you pull the trigger
3  it's got a five-second spark display. However, I
4  believe in the last trigger pull, he held it down for
5  approximately nine seconds.
6      Q. Okay. What was the next one?
7      A. I believe it was empty hand strikes.
8      Q. And that was for Lopera?
9      A. Yes.
10      Q. Also negative conclusion?
11      A. Negative conclusion.
12      Q. And why was it negative?
13      A. It was excessive.
14      Q. Okay.
15      A. Next one was LVNR, which we previously
16  stated had --
17      Q. Let me interrupt you. Sorry.
18      How many strikes did he use, approximately?
19      A. Approximately, I believe it was -- in the
20  report I put 13, 12 or 13 strikes, approximately.
21      Q. And were they all excessive or were they
22  excessive only after a certain number?
23      A. All excessive.
24      Q. Okay. All right. So I'm sorry, the next
25  one was LVNR?

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

Page 102

1  A.  LVNR, and that was rolled into a
2  truthfulness.  So it was a completely separate
3  conclusion.  So it was the excessive hand strikes,
4  and then LVNR and hand strikes moved into a
5  truthfulness conclusion.
6  Q.  Okay.
7  A.  Next one would have been medical
8  intervention which was positive for the officers who
9  arrived on the scene.  And that was to include the
10  request to expedite medical several times.
11  We had two negative conclusions for
12  supervision and that would be for Sergeant Crumrine.
13  Q.  Okay.  And can you tell me about those?
14  A.  Neglect of duty.  And that was for failure
15  to take command and control of a critical incident.
16  Q.  And what else?
17  A.  And this one they rolled -- this is the one
18  that they modified, I think, in the voting and I
19  can't remember how it was modified.  There was two.
20  Q.  So there were two supervision-based
21  conclusions.  One was a neglect of duty for failure
22  to establish command and control at the scene?
23  A.  Yes.
24  Q.  And what was the other?
25  A.  I can't remember what it was.

Page 103

1  Q.  Okay.  Probably look at the documentation
2  to find out, right?
3  A.  Yeah.  I would have to.
4  Q.  Okay.  What's the next one?
5  A.  Did we get medical intervention already?
6  Q.  We do.  Because they expedited.
7  A.  There's a negative for body-worn cameras.
8  Q.  Is it like multiple negatives for each
9  officer or --
10  A.  Yeah.  This one, what we did was put it
11  under a general conclusion and stated that multiple
12  officers failed to activate their body camera.  And
13  that would have encompassed Tran, Flores, Crumrine,
14  and I believe Officer Lif was in that as well because
15  she didn't activate hers.
16  Q.  Okay.
17  A.  There were no negative for policy failures.
18  No negative for training.
19  Q.  One moment, please.
20  A.  Yep.
21  Q.  So since there was no negative for policy
22  failures, what policies does that cover?
23  A.  So what that means for us is that there
24  were no policies that failed the officers, I guess is
25  the best way to say it.  The best way I can explain

Page 104

1  it is when we had that resident officer that violated
2  the policy for low lethal, in that conclusion we said
3  that there was a policy failure on the department
4  because it failed our resident officer from utilizing
5  a low lethal option instead of going right to
6  handgun.  So in this case there were no policies that
7  were restrictive on the officers.
8  Q.  So is it fair to say, and please don't
9  hesitate to disagree with me, but unless you
10  otherwise noted that a policy was violated,
11  everything else was according to policy, correct?
12  A.  No.  Yeah, this is kind of a tough one to
13  explain.  It's -- we look at our policies.  Do we
14  need to change any of our policies because they were
15  too restrictive on an officer.
16  So it's not necessarily were any policies
17  violated because obviously we have negative
18  conclusions that policies were violated.  This is
19  looking at do we need to change a policy altogether
20  to make our department better.
21  Q.  Okay.  So no negative policy.  I get that
22  with the explanation.  So what was the next one?
23  A.  It would have been training.  And this is
24  where we see all of our involved officers and witness
25  officers were within their compliance of our

Page 105

1  training.  So did they attend AOST, advanced officer
2  safety training; RBT, reality-based training; were
3  they qualified on their firearms.
4  So with that there was no negative.
5  Everyone was compliant with their training.
6  Q.  So on that particular one, it's not an
7  assessment whether they acted within their training,
8  it's more were they current on their training on the
9  day of the incident?
10  A.  Correct.
11  Q.  Okay.  So far I've got roughly 13.
12  A.  There might have been two actually for
13  medical, because the request for -- to expedite
14  medical.  And then we had two officers, I believe
15  it's Kravetz and Amburgey, that performed CPR.  We
16  gave them a positive conclusion for jumping in and
17  doing that.
18  Q.  If they're not required to do CPR, then why
19  would it be part of the assessment?
20  A.  Because they went above and beyond.
21  Q.  There was no finding of above and beyond
22  for Tran, Flores or Crumrine, correct?
23  A.  Correct.
24  Q.  All right.
25  A.  We said body cam, right?

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

31 (Pages 118 to 121)

## Page 118

1  custody we don't leave them either on their back or
2  on their stomach because of the face asphyxiation
3  position."
4       What is he referring to there?  Is he
5  saying when somebody is on their back or their
6  stomach, it's the asphyxiation position?
7       A.  What he's -- it's called the recovery
8  position.  It's what we're taught along with the palm
9  reviving strikes, is not to leave someone on their
10  chest but to prop them up on the side to help that
11  airway, help that breathing.
12       Q.  And was Farmer in the asphyxiation position
13  before Amburgey arrived at the scene?
14       MR. ANDERSON:  Object to the form.
15       THE WITNESS:  I don't recall.
16  BY MR. LAGOMARSINO:
17       Q.  Next one.
18            (Exhibit 6 was marked for
19            identification.)
20  BY MR. LAGOMARSINO:
21       Q.  So this is excerpts from the statement of
22  Sergeant Crumrine.
23       A.  Okay.
24       Q.  Before we get to this, were you able to
25  remember during the break or any other time today

## Page 119

1  what the last name was of the other Travis?
2       A.  No.
3       Q.  All right.  So at 1620, KK is you, correct?
4       A.  Yes.
5       Q.  And you said to Sergeant Crumrine at lines
6  28 through 31, "Prior to your arrival, you failed to
7  activate your body-worn camera.  You failed to
8  intervene while the application of the LVNR was
9  applied on the subject and you failed to take command
10  and control of the scene and ensure medical was
11  expedited in an appropriate amount of time."
12       A.  I don't have that page.
13       Q.  Oh.  I gave you a different one.
14            So I'll just repeat the question for the
15  record.
16            So apparently we've got page 1620, correct?
17       A.  Yes, I've got it now.
18       Q.  And did you say the words to Sergeant
19  Crumrine prior to your arrival, "You failed to
20  activate your body-worn camera.  You failed to
21  intervene while the application of the LVNR was
22  applied on the subject, and you failed to take
23  command and control of the scene and ensure medical
24  was expedited in an appropriate amount of time"?
25       A.  Yes.

## Page 120

1       Q.  Going to 1636.  There's a question about
2  using the MDT, so I think that's -- was it mobile
3  data terminal?
4       A.  Yes.
5       Q.  Is it policy to use mobile -- a mobile data
6  terminal on the way to an incident to try to gather
7  information about the incident?
8       A.  Is it a policy?
9       Q.  Yeah.
10       A.  I think it's more of a training and tactic.
11  I don't know if it's necessarily a policy.
12       Q.  Going all the way back to 1647.
13       A.  Okay.
14       Q.  At lines 6 through 7, I think you're
15  referring to Crumrine saying "Get your..." -- strike
16  that.
17            PH is Patrick Hughes, correct?
18       A.  Yes, it is.
19       Q.  So Patrick Hughes is quoting Crumrine
20  saying, quote, "Get your fucking hands behind your
21  back."
22            Is it policy to curse at subjects?
23       MR. McNUTT:  Objection.  Form.
24       THE WITNESS:  There's no policy against
25  cursing.

## Page 121

1  BY MR. LAGOMARSINO:
2       Q.  Is -- does cursing and yelling at a subject
3  escalate the situation?
4       MR. ANDERSON:  Objection.  Form.
5       THE WITNESS:  Or it can de-escalate the
6  situation.
7  BY MR. LAGOMARSINO:
8       Q.  It can be either/or?
9       A.  Yes, sir.
10       Q.  Was there any discussion regarding the use
11  of profanity during your investigation?
12       A.  No, there was not.
13       Q.  I'm going back to 1655, please.  So there's
14  a question from Patrick Hughes.  It says, "As a
15  sergeant on a dynamic scene where officers are doing
16  potentially CPR or managing that subject that's in
17  custody, why would you take the initiative to go to
18  your car to use the MDT to run the subject?"
19            Why was that question asked?
20       A.  The reason being is because this had fallen
21  in line with the fact that Sergeant Crumrine had
22  failed to act and take control of a dynamic scene.
23  He took it upon himself to go take the decedent's ID
24  and go run him, which he could have easily passed off
25  to another officer and continue to focus on his

Page 122

1  responsibilities as a supervisor.
2      Q.  And was that a conscious decision by
3  Crumrine to do that?
4          MR. ANDERSON:  Objection.  Form.
5          THE WITNESS:  Yeah.  Apparently.
6  BY MR. LAGOMARSINO:
7      Q.  And he admitted there were enough officers
8  there that he could have given -- passed the ID off,
9  correct?
10     A.  Yes.
11     Q.  There's some discussion at page 1656 about
12 the crime of resisting a police officer, lines 18
13 through 22.
14         Do you see that?
15     A.  Yes.
16     Q.  Is it a crime to resist a police officer if
17 a subject's constitutional rights are being violated?
18         MR. ANDERSON:  Objection.  Form.
19         THE WITNESS:  In this case, Sergeant
20 Crumrine perceived that the decedent was resisting
21 Officer Lopera.
22 BY MR. LAGOMARSINO:
23     Q.  Let me ask the question just in general.
24     A.  Okay.
25     Q.  Is it a crime of resisting a police officer

Page 123

1  if -- strike that.
2          Is it a crime for somebody to resist a
3  police officer if their constitutional rights are
4  being violated?
5          MR. ANDERSON:  Objection.  Form.
6          THE WITNESS:  Again, it depends on --
7  generally speaking, it would depend on the totality
8  of the circumstances.
9  BY MR. LAGOMARSINO:
10     Q.  So if somebody's constitutional rights are
11 being violated, it still could be a crime to resist a
12 police officer?
13         MR. ANDERSON:  Objection.  Form.
14         THE WITNESS:  Again, without knowing all
15 the facts.
16 BY MR. LAGOMARSINO:
17     Q.  1683, please.  There's a question from
18 Patrick Hughes.  It says, "Did you start to think his
19 LV application of the LVNR is what caused the subject
20 to be rendered unconscious?"
21         And Crumrine said "yes," correct?
22     A.  Yes.
23     Q.  Do you agree with Sergeant Crumrine's
24 perception, that the LVNR is what caused Tashi Farmer
25 to be rendered unconscious?

Page 124

1          MR. ANDERSON:  Objection.  Form.
2          THE WITNESS:  I believe with the perception
3  that he saw, that could have possibly been the reason
4  why Tashi Farmer was rendered unconscious.
5  BY MR. LAGOMARSINO:
6      Q.  In watching all the body cams, I noticed
7  that there were a number of officers who would tell
8  other officers to shut their body cams off when they
9  were talking about the incident.
10         Is that within policy to shut your body
11 camera off when you're talking about the incident?
12     A.  I believe that policy was changed.  At the
13 time I believe the policy stated when the scene is
14 static or if you're going to have a debrief of the
15 incident, that you are to turn off your body camera.
16         In this particular instance, I believe it
17 was Officer Lif that had turned her body camera off
18 and on several times.  And when asked about it, she
19 had stated that it was -- that she was talking to
20 Officer Lopera and Sergeant Crumrine about what was
21 going on and what her perception was of everything,
22 so she turned off her body camera.
23     Q.  Was it within policy to do that?
24     A.  At the time, yes.
25     Q.  Has it changed since that time?

Page 125

1      A.  Yes, it has.
2      Q.  Has it changed because of this case?
3      A.  I don't know if it's because of this case
4  or just in general.
5      Q.  Is it fair to say that having somebody's
6  recorded recollection of an incident literally at the
7  time of the incident can be evidence of what occurred
8  in an incident?
9          MR. ANDERSON:  Objection.  Form.
10         MR. McNUTT:  Form.
11         THE WITNESS:  Yes.
12 BY MR. LAGOMARSINO:
13     Q.  If you're shutting off the camera, then
14 you're potentially suppressing valuable evidence?
15         MR. ANDERSON:  Objection.  Form.
16         MR. McNUTT:  Objection.  Form.
17         THE WITNESS:  It could be seen that way,
18 yes.
19 BY MR. LAGOMARSINO:
20     Q.  Going to 1703.  Patrick Hughes asked Travis
21 Crumrine, "Do you feel any time that he's applying
22 the LVNR you could have interceded to stop Officer
23 Lopera's application?"
24         Crumrine said, "I could have, yes."
25         Next question, "Do you believe you should

Detective Kasey Kirkegard ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 126

1  have?"
2      Crumrine, "No."
3      So based on your investigation, could
4  Crumrine have interceded to stop the application of
5  the LVNR?
6      A.  In our investigation, he did.
7      Q.  And based on what?
8      A.  The fact that he gave verbal commands.  He
9  attempted to help Officer Lopera, Lif and Flores take
10 the decedent into custody at the time.
11     Q.  Did any officer ever try to remove Officer
12 Lopera's arms from Tashi Farmer's neck?
13     A.  Physically, no.  I don't think so.
14     Q.  There's a question -- there's a question on
15 page 95 that says, "Okay.  In hindsight, do you think
16 the incident could have been approached in a way that
17 presented less risk to yourself or others?"
18     Answer, "Yes."
19     Going to the next page at 1715, line 2,
20 Crumrine says, "Well, I -- my -- the Officer Lopera
21 could have -- could have more appropriately chosen
22 his force options."
23     Do you agree as an investigator Lopera
24 could have more appropriately chosen his force
25 options?

Page 127

1      MR. ANDERSON:  Objection.  Form.
2      THE WITNESS:  Yes.  We had a conclusion of
3  excessive use of force.
4  BY MR. LAGOMARSINO:
5      Q.  Which options should he have chosen?
6      MR. ANDERSON:  Objection.  Form.
7      THE WITNESS:  Ones that fall within the --
8  his threat assessment.
9  BY MR. LAGOMARSINO:
10     Q.  Which ones would those have been?
11     A.  He could have used empty hand tactics to
12 take him into custody.
13     Q.  Any others?
14     A.  I would have to look at the model to take a
15 look at what all options were available at the time.
16     Q.  Did you write in the report what
17 alternative force options he could have used?
18     A.  No.
19     Q.  Do you have knowledge of Officer Lif asking
20 officers other than Lopera to shut off their body
21 cameras?
22     MR. McNUTT:  I'm sorry, other than --
23 actually, just repeat it -- or read it back, please.
24     MR. LAGOMARSINO:  I am -- I can rephrase
25 it.

Page 128

1  BY MR. LAGOMARSINO:
2      Q.  Officer Lif asked certain officers to turn
3  off their body cameras, correct?
4      A.  Yes.
5      Q.  Which officers do you have knowledge of
6  Officer Lif asking to shut off their body cameras?
7      A.  I know it was -- I don't recall.  It was
8  either -- I don't recall.  There was another officer.
9      Q.  Okay.
10     To your knowledge, who are all the
11 individuals that received your CIRT report?
12     A.  If you mean received, they've never -- they
13 got an opportunity to read it while they were in the
14 office but they never were allowed to leave with it.
15 The only person that would have a copy would be
16 Assistant Chief Tim Kelly because he is a chairperson
17 of the board.
18     Q.  Did you send the report through your chain
19 of command?
20     A.  Yes, I did.
21     Q.  Did you send it to a sergeant?
22     A.  Yes, I did.
23     Q.  Who was that?
24     A.  That would be Sergeant Kyle Ward.
25     Q.  Did you send it to your lieutenant?

Page 129

1      A.  Yes.
2      Q.  Who was that?
3      A.  Lieutenant Dan Bledsoe.
4      Q.  And to your knowledge, was that sent to the
5  sheriff?
6      A.  I don't know.
7      Q.  And do you still have a copy of that
8  report?
9      A.  It is housed in what we call an IPRO, which
10 is our internal organization for reports and CIRT
11 case files.
12     Q.  Did you draw a conclusion as to whether or
13 not Lopera used the LVNR or a rear naked choke?
14     A.  I believe in the conclusion, if I remember,
15 he referred to it as a chokehold.  I can't remember
16 the verbiage I used in the report.
17     Q.  Well, LVNR is authorized, correct?
18     A.  LVNR is authorized by the department.
19     Q.  And rear naked is not, right?
20     A.  Yes.
21     Q.  Did you draw a conclusion as to whether he
22 used an authorized chokehold or not authorized
23 chokehold?
24     A.  I don't remember verbatim what was in the
25 report.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

Page 130

1     Q. Would you have presented to the board on
2 that issue?
3     A. Yes. I believe it was an improper hand
4 placement. I can't remember.
5     Q. Were your conclusions on whether Crumrine,
6 Tran or Flores failed to intervene based on -- strike
7 that.
8     Was your conclusion that Tran, Flores and
9 Crumrine failed -- it's getting late for me, too.
10 I'm getting tired.
11     You came to the conclusion that Crumrine,
12 Tran and Flores intervened, correct?
13     A. Yes.
14     Q. And you came to that conclusion based on
15 their statement of what they perceived, correct?
16     A. Perceived, and the actions that they took
17 during.
18     Q. Okay. Now, if excessive force is being
19 used by an officer, in general, surrounding officers
20 have a duty to intervene, correct?
21     MR. ANDERSON: Objection. Form.
22     THE WITNESS: In theory, yes.
23 BY MR. LAGOMARSINO:
24     Q. So if a rear naked choke was being applied,
25 which is an unauthorized technique, then Tran, Flores

Page 131

1 and Crumrine should have intervened, correct?
2     MR. ANDERSON: Objection. Form.
3     THE WITNESS: In this scenario, we asked
4 about the hand placement. And because they were
5 taking action, taking Farmer into custody, they
6 cannot recall the hand placement. And so to the best
7 of their knowledge they knew Officer Lopera was using
8 an LVNR.
9 BY MR. LAGOMARSINO:
10     Q. That's fair. I'll give you a hypothetical
11 situation.
12     If they determined that a rear naked choke
13 was being used as opposed to LVNR, they would have
14 had a duty to intervene?
15     MR. ANDERSON: Objection. Form.
16     THE WITNESS: Hypothetically, once the
17 decedent was taken into custody, hypothetically, yes,
18 they would have a duty to intervene if that LVNR or
19 chokehold was being -- continued being used.
20 BY MR. LAGOMARSINO:
21     Q. So you define custody as two handcuffs on
22 both wrists?
23     A. Yes.
24     Q. So in your view, that if a rear naked choke
25 was being applied before the handcuffs were being

Page 132

1 used, there would be no duty to intervene, correct?
2     A. At that point, the officers would make the
3 scene safe, which would be taking the decedent into
4 custody with two handcuffs around the wrists.
5     Q. So if there were no handcuffs, there would
6 be no duty to intervene?
7     A. Depending on their perception and what they
8 saw at the time.
9     Q. Okay. So let's assume that they saw that
10 he wasn't handcuffed with both wrists and he was in a
11 rear naked choke, assuming they saw that, that's a
12 hypothetical, they would have had a duty to
13 intervene?
14     MR. ANDERSON: Objection. Form.
15     THE WITNESS: They would have a duty to
16 take the decedent into custody and ensure that the
17 rear naked choke was released.
18 BY MR. LAGOMARSINO:
19     Q. You were asked the question in your prior
20 deposition, "Okay. And if there was a rear naked
21 choke, he should have stopped it?"
22     And your answer was, "Had he recognized
23 there was a rear naked choke or an LV, had he
24 recognized the rear naked choke, yes."
25     Do you agree with that?

Page 133

1     A. Once the scene was safe and the decedent
2 was taken into custody, yes.
3     Q. You didn't say that in your prior
4 deposition; is that correct?
5     A. I don't have it in front of me.
6     (Exhibit 7 was marked for
7     identification.)
8 BY MR. LAGOMARSINO:
9     Q. So going to page 58, line 18. The question
10 is, "Okay. And if there was a rear naked choke, he
11 should have stopped it. Objection. Form.
12 Objection. Form. Go ahead."
13     And then the witness says: "Had he
14 recognized there was a rear naked choke or an LV, had
15 he recognized the rear naked choke, yes."
16     Did you testify that way in your prior
17 deposition?
18     A. I believe it was, yeah, by policy. He
19 should have stopped it.
20     Q. And then going to page 59, you were asked,
21 "And if Officer Tran had known there was a rear naked
22 choke being applied, he should have stopped it,
23 intervened. Objection. Form."
24     And then what was your answer?
25     A. "Yes."

## Detective Kasey Kirkegard ~ February 6, 2019
## * * * Videotaped Deposition * * *

Page 134

1    Q.  And then the next question says, "And if
2  Officer Flores knew a rear naked choke was being
3  applied, he should have intervened.  Same objection."
4        And then what was your answer?
5    A.  "Yes."
6    Q.  Now, we've talked a little bit about just
7  accepting an officer's statement as true when they
8  say it's based on their perception.
9        Do you recall that testimony?
10   A.  Yes, I do.
11   Q.  And I'm assuming they don't provide mind
12 reading training at Metro yet, correct?
13       MR. ANDERSON:  Objection.  Form.
14       THE WITNESS:  No.
15 BY MR. LAGOMARSINO:
16   Q.  So if an officer is telling you that
17 something was done based on their perception but
18 they're lying, and you don't know they're lying, then
19 you just have to accept it as the truth, correct?
20   A.  Yes.
21   Q.  And that's pursuant to policy, correct?
22       MR. ANDERSON:  Objection.  Form.
23       THE WITNESS:  Yeah.
24 BY MR. LAGOMARSINO:
25   Q.  Going to page 69.  I apologize, going to

Page 135

1  page 68.  It says -- line 6, it says, "Okay.  Turn
2  over to the next page, please.  It says Officer
3  Lopera told Officer Flores in the ride back what
4  happened.  During the conversation he stated I
5  started wailing on the dude, then I rear mounted and
6  choked him out."
7        And do you take that as it could be either
8  LVNR or a rear naked choke, that particular quote?
9    A.  Yes.
10   Q.  When Lopera said apparently at 9:34 the
11 body camera and it's referred to here in the
12 transcript, that "I started punching him rear
13 naked -- rear naked at his ass.  He went out."
14       Do you take that to mean a rear naked
15 choke?
16   A.  Yes.
17   Q.  Who helped you formulate your conclusions
18 in your report?
19   A.  We -- the CIRT team, and then our meeting
20 with SMEs.
21   Q.  Did you initially ever have a conclusion
22 that Crumrine, Tran or Flores did not properly
23 intervene?
24   A.  No.
25   Q.  Did anybody tell you to make that

Page 136

1  conclusion?
2    A.  No.
3    Q.  Did Officer Bland ever tell you whether he
4  had the opinion that an LVNR was used or a rear naked
5  choke?
6    A.  Based on the hand placement, I believe it
7  was a -- he believed it to be a rear naked choke of
8  that non-encircling arm.
9    Q.  He told you that?
10   A.  It was, yeah, part of the discussion that
11 we had with everyone.
12   Q.  Do witnesses on an incident change their
13 story from time to time?  Let me rephrase.
14       Did witnesses in this case change their
15 story about what happened?
16   A.  No.
17   Q.  Did you ever undertake an assessment to
18 determine whether people were giving inconsistent
19 statements?
20   A.  No.  I don't know how I would do that.
21   Q.  Or did you compare prior statements to
22 current statements?
23   A.  Some of the witness officers had gave FIT
24 statements which we reviewed.
25   Q.  Did you make any comparisons between what

Page 137

1  they were telling you in the FIT and what they were
2  telling you in the CIRT?
3    A.  We looked over their FIT report.  And if we
4  had questions, we would clarify in our interview.
5    Q.  And after that interview did you compare
6  the statements of both?  Or let me ask a better
7  question.
8        Did you comment on any inconsistent
9  statements in the report that you submitted to CIRT?
10   A.  One we had with Officer Lif, I believe in
11 her FIT statement she had said something in reference
12 of foot pursuit, and then we clarified that in CIRT.
13 And that's when she stated she did not perceive a
14 foot pursuit had occurred.
15   Q.  If a subject is in a LVNR not handcuffed
16 but they're not moving or resisting, are you supposed
17 to release the LVNR?
18   A.  You can release it, but it's a controlling
19 technique to leave the arm encircling.  That will
20 assist with your arriving officer to help take that
21 person into custody or put two cuffs around their
22 wrists.
23   Q.  Did Tran ever see Farmer move or resist?
24   A.  In his statement he provided to us, I don't
25 believe he did.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

38  (Pages 146 to 149)

Page 146

1     Q.  And did you make any recommendation in the
2  CIRT report as to what internal rules or practices
3  would be required?
4     A.  No.  I'm sorry, I don't know if I fully
5  understand that question.
6     Q.  I'll skip it.
7     A.  Okay.
8     Q.  Lopera, did he give a FIT statement?
9     A.  He did not.
10    Q.  Does CIRT share their witness statements
11  with FIT?
12    A.  No, unless they're requested through the
13  District Attorney's office.
14    Q.  So if the DA asks for the CIRT statements,
15  they are provided to the DA?
16    A.  Yeah.  There's a process they go through,
17  but in the long run, yes.
18    Q.  Were you ever guaranteed by anybody that
19  the CIRT report would not be disseminated?
20    A.  No.
21    Q.  I'm assuming you've been, based on your
22  testimony today, you've been trained on various
23  constitutional amendments, correct?
24    A.  Yeah.
25    Q.  Have you ever been trained on the 14th

Page 147

1  Amendment, due process right to familial relations?
2     A.  No.
3     Q.  Have you ever been trained on supervisor
4  liability in the constitutional rights context?
5     A.  Not in constitutional, no.
6     Q.  Have you ever heard of a Monell claim?
7     A.  No.
8     Q.  Is it your understanding that Lopera was
9  allowed to retire?
10    MR. McNUTT:  Objection.  Form.
11    THE WITNESS:  It was my understanding it
12  was a medical retirement.
13  BY MR. LAGOMARSINO:
14    Q.  And do you have an understanding of what
15  his medical condition was that he was allowed to
16  retire from?
17    A.  I do not.
18    Q.  Is it fair to say that the deliberations
19  arising out of this incident took place after you
20  issued the CIRT report?
21    A.  Yes.
22    Q.  Do you know whether this CIRT report has
23  been released in this case?
24    A.  I don't believe it has, but I don't know.
25    Q.  Okay.  If it ultimately gets approved to be

Page 148

1  released by the judge, would you continue to be
2  honest and independent in your discussion in future
3  cases if you're the subject of a CIRT investigation?
4     A.  Yes.
5     Q.  If you later, through some unfortunate
6  event become the subject of a CIRT team
7  investigation, would you be irreparably damaged by
8  releasing the report in this case?
9     MR. ANDERSON:  Objection.  Form.
10    THE WITNESS:  No.
11    MR. LAGOMARSINO:  All right.  I think I'm
12  going to have about another half hour.  Why don't we
13  take a quick break and it will help me go through
14  some of my questions and eliminate them.  So let's
15  take ten minutes or five minutes.
16    THE VIDEOGRAPHER:  The time is
17  approximately 3:14 p.m.  We're going off the record.
18    (A recess was taken from 3:14 to
19         3:20 p.m.)
20    THE VIDEOGRAPHER:  The time is
21  approximately 3:20 p.m.  We are back on the record.
22  BY MR. LAGOMARSINO:
23    Q.  All right.  Did Lopera ever express, to
24  your knowledge, that he was scared of Tashi Farmer?
25    MR. McNUTT:  Objection.  Form.  If that was

Page 149

1  a statement made during the CIRT process, I'll
2  instruct the witness not to answer.
3     THE WITNESS:  It was.
4     MR. LAGOMARSINO:  Okay.  Did -- so we'll
5  follow the same procedure.  I'm assuming if the judge
6  orders the transcript to be produced, that will
7  probably answer itself.
8     MR. ANDERSON:  You don't need to ask her
9  yet.  You'll have the answer.
10    MR. McNUTT:  You don't need to ask her.
11  BY MR. LAGOMARSINO:
12    Q.  Did Flores ever express that he was scared
13  of Tashi Farmer?
14    A.  I don't think so, but I don't recall.  It
15  was in his statement.
16    Q.  Did Tran ever express that he was scared of
17  Tashi Farmer?
18    A.  I don't believe so.
19    Q.  Did Crumrine ever express that he was
20  scared of Tashi Farmer?
21    A.  Again, with Officer Flores, I don't recall.
22    Q.  Other than what's contained in the reports,
23  do you have any independent recollection of them
24  expressing that they were scared of Tashi Farmer?
25    A.  No.

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

40 (Pages 154 to 157)

Page 154

1      Q.   And how so?
2      A.   I think there was a question about him
3  being chased across the boulevard.
4      Q.   Besides that?
5      A.   No.
6      Q.   Do the victims have any say in your
7  investigation?
8      A.   "Victims" meaning?
9      Q.   Tashi's relatives.
10     A.   No.
11     Q.   Do they have any say in the FIT
12 investigation?
13     A.   No.
14     Q.   Are either the FIT or the CIRT
15 investigations, to your knowledge, conducted for the
16 purpose of delivering justice to the family members?
17         MR. ANDERSON:  Objection.  Form.
18         THE WITNESS:  I'm sorry, can you say that
19 one more time?
20 BY MR. LAGOMARSINO:
21     Q.   Sure.  Was your investigation conducted for
22 the purpose of delivering justice to the family
23 members?
24     A.   My -- no.  My investigation was not.
25

Page 155

1      Q.   Your investigation was conducted for the
2  purpose of Metro's interests, correct?
3      A.   Betterment of the department, yes.
4      Q.   Did CIRT ever do an investigation of the
5  psychological profiles generated during the hiring
6  process of the officers involved?
7      A.   Do they do a psych -- psych eval on the
8  officers?
9      Q.   No.  When you're hired, does a psych eval
10 happen?
11     A.   I believe so.  It still does, yeah.
12     Q.   And did you look at the psych evals of the
13 officers?
14     A.   No.
15     Q.   And CIRT doesn't do a psych eval, correct?
16     A.   No.  We do not.
17     Q.   Did you become aware during your
18 investigation that Lopera was a competitive jiu jitsu
19 fighter?
20         MR. McNUTT:  Objection.  Form.
21         THE WITNESS:  Yes, in my investigation I
22 did learn that.
23 BY MR. LAGOMARSINO:
24     Q.   How did you learn that?
25     A.   It was when we interviewed him.

Page 156

1      Q.   Okay.  Do you have any role in the hiring
2  process?
3      A.   No.
4      Q.   Have you ever had any role?
5      A.   No.
6      Q.   Were there standard safety practices that
7  were not applied in this case?
8      A.   I don't recall.
9      Q.   Was Lopera attempting to arrest Farmer?
10     A.   In his statement to us?
11         MR. McNUTT:  I'm sorry, say again.  Are you
12 asking about Lopera's statement?
13         MR. LAGOMARSINO:  I said, "Was Lopera
14 attempting to arrest Farmer?"
15         THE WITNESS:  And that was something that
16 was based off of his statement.
17         MR. McNUTT:  In her opinion or --
18 BY MR. LAGOMARSINO:
19     Q.   Did you draw a conclusion that Lopera was
20 trying to arrest Farmer?
21     A.   Yes.
22     Q.   And did you draw a conclusion as to what
23 Lopera was trying to arrest Farmer for?
24     A.   Again, that was in his statement.
25     Q.   So was the only basis for any conclusion

Page 157

1  you might have based on his statement?
2      A.   On his perception.
3          MR. McNUTT:  And if the answer is yes, then
4  I'll instruct you not to answer.
5          But just to be clear, if you have other
6  information, I have no objection.
7          THE WITNESS:  It was all based off of
8  Officer Lopera's statement to CIRT.
9  BY MR. LAGOMARSINO:
10     Q.   Did Officer Lopera make any statements
11 other than CIRT as to why he was trying to apprehend
12 Farmer?
13     A.   I believe in one body camera clip from
14 Officer Lopera he is explaining to someone.
15     Q.   Would you agree that Farmer was essentially
16 unarmed?
17     A.   Yes.
18     Q.   And that Farmer was basically powerless in
19 this situation?
20         MR. ANDERSON:  Objection.  Form.
21         MR. McNUTT:  Form.
22         THE WITNESS:  Do I believe that he was
23 powerless in this situation?
24 BY MR. LAGOMARSINO:
25     Q.   Yeah.  Well, after he was placed in the

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

41 (Pages 158 to 161)

Page 158

1  LVNR, was Farmer powerless?
2       MR. McNUTT: Objection. Form.
3       THE WITNESS: I think to the point he was
4  rendered unconscious, he was powerless.
5  BY MR. LAGOMARSINO:
6       Q. What power did he have?
7       A. Well, again not being there, based on the
8  officer's perception that he was -- Sergeant Crumrine
9  had tried to put his arm in a handcuff but he pulled
10 away. Again, some of this is captured on video
11 surveillance, some on body camera, but I was not
12 there.
13      Q. So basically the power to pull away?
14      A. Pull away. Fight. Again, I wasn't there.
15      Q. Was he fighting?
16      A. I don't know.
17      Q. Did you draw a conclusion as to whether
18 Farmer's constitutional rights were violated?
19      A. No.
20      Q. You made a conclusion that they weren't or
21 that you just didn't make any conclusion?
22      A. There's no conclusion on his constitutional
23 rights.
24      Q. Did you undertake any investigation to
25 determine whether LVNRs -- strike that.

Page 159

1       Did you make any assessment as to whether
2  Metro's LVNR policy is constitutional?
3       A. Did I make the assessment, no.
4       Q. Have you heard if an assessment has been
5  made?
6       A. As a result of this case, I believe they
7  went back and reviewed some of the tactics and
8  policies on it, but I don't know.
9       Q. Were you aware of other cases before this
10 case where people were injured after having LVNR
11 applied to them?
12      A. Yes, but I don't remember specifically
13 which cases.
14      Q. Lopera didn't have a warrant to arrest
15 Farmer, correct?
16      A. No.
17      Q. A training could be implemented to prevent
18 this from happening again?
19      MR. ANDERSON: Objection. Form.
20      MR. McNUTT: Form.
21      THE WITNESS: Could a training be
22 implemented?
23 BY MR. LAGOMARSINO:
24      Q. Yeah.
25      A. Yeah. There was some training that was put

Page 160

1  out across the department in reference the use of
2  LVNR.
3       Q. Anything else?
4       A. For defense tactics, which we go through
5  every quarter, it was a refresher on the LVNR. And
6  it was very specific on the use of the LVNR, the
7  application of the LVNR and reviving techniques.
8       Q. And what reviving techniques were
9  implemented as a result?
10      A. The palm strikes, and then placing the
11 subject in a seated position or on a side position,
12 recovery position so that they're able to breathe.
13      Q. Did that exist before this incident?
14      A. It did, yes.
15      Q. Were there any new --
16      A. Oh, no. Just the policy of the LVNR have
17 now been moved into our use of force model.
18      Q. Do you have any other suggestions on
19 training that's not currently in place?
20      A. No.
21      Q. Are you familiar with the concept of
22 education enforcement to prevent wrongdoing?
23      A. I'm not familiar with that, no.
24      Q. How many times was Tashi tasered?
25      A. Officer Lopera's countdown revealed seven

Page 161

1  times the trigger was pulled.
2       Q. And how many times was he struck in the
3  head?
4       A. Struck in the head?
5       Q. Yes.
6       A. Talking about hand strikes?
7       Q. Yes.
8       A. I believe it was approximately 12 to 15
9  times.
10      Q. And after that, Lopera put him in an LVNR,
11 correct?
12      A. Yes.
13      Q. Or some kind of neck restraint, correct?
14      A. Correct.
15      Q. How long was he in that hold?
16      A. I believe it was a minute and 14 seconds.
17      Q. After he was released from the LVNR, did
18 you witness officers walking around and not showing
19 any concern about Tashi?
20      MR. ANDERSON: Objection. Form.
21      THE WITNESS: No. There was officers who
22 were on the scene trying to set up ingress and egress
23 for medical. I had officers start with CPR
24 immediately. They went to the scene of security and
25 they asked for a defibrillator knowing that there's

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

42 (Pages 162 to 165)

Page 162

1  one on property. And they started to get the scene
2  shut down.
3  BY MR. LAGOMARSINO:
4  Q. How do you define "immediately"?
5  A. As soon as officers got up on scene, Tran,
6  Officer Tran, once he was taken into custody,
7  immediately sets up Farmer, does reviving palm
8  strikes, checks his pulse several times. They take
9  him out of handcuffs to help with breathing. And
10  that's when I believe CPR was started, when Officer
11  Kravetz, Amburgey and Vontagen...
12  Q. When you say immediately, are you saying
13  like within five seconds?
14  A. For Officer Tran, when he set up Farmer, it
15  was almost immediate. They saw that he was at that
16  time -- I believe his statement says that his eyes
17  were closed and they sat him up in a seated position
18  and delivered palm strikes.
19  Q. Did you witness police officers on the
20  scene in the body cam footage making jokes?
21  A. No jokes.
22  Q. Did you witness officers in the body cam
23  footage laughing?
24  A. No, not laughing.
25  Q. Would laughing and joking around the scene

Page 163

1  of an incident like this be proper police routine?
2  MR. ANDERSON: Objection. Form.
3  THE WITNESS: No.
4  BY MR. LAGOMARSINO:
5  Q. Did Crumrine, Tran or Flores in their
6  statements express remorse?
7  MR. ANDERSON: Objection. Form.
8  THE WITNESS: I don't recall.
9  BY MR. LAGOMARSINO:
10  Q. Did Lopera express remorse?
11  MR. McNUTT: Objection. Instruct the
12  witness not to answer if it came from the CIRT
13  process.
14  BY MR. LAGOMARSINO:
15  Q. Have you seen anything from any officer in
16  this case expressing even a twinge of guilt about
17  what happened?
18  MR. ANDERSON: Objection. Form.
19  THE WITNESS: Yes.
20  BY MR. LAGOMARSINO:
21  Q. Who?
22  A. All the officers involved.
23  Q. And are you saying that's in their
24  statements?
25  A. No. Just the questions that they had after

Page 164

1  the fact. Off record conversations with the -- with
2  the witness officers.
3  Q. Do you recall specifically what they said?
4  A. They asked about how he -- how Tashi had
5  died. They asked about the process of CIRT, and we
6  told them that we're going -- obviously we're going
7  to break down everything critically and look at this.
8  They wanted to know -- I think one actually
9  asked if he had kids. I don't remember which one. I
10  think it was Tran, I believe, that actually asked
11  that. But it was not recorded in their statements.
12  This is all offline conversations.
13  Q. Okay. Has, to your knowledge, any single
14  person from Metro offered as much as an apology to
15  anybody from Tashi's family?
16  A. I don't know. I believe FIT had a very
17  close -- was in contact with, I believe, his wife or
18  his mother, I want to say, after the incident. And I
19  know they did some interviews with the family,
20  reference their part of the investigation. And
21  that's normally where they get their kind of idea of
22  who Tashi Farmer is.
23  Q. But you don't know if they offered an
24  apology?
25  A. I don't know.

Page 165

1  Q. To your knowledge, was Tran, Crumrine or
2  Flores disciplined?
3  A. I don't know. I'm not privy to the
4  discipline process.
5  I take that back. I know Crumrine was
6  because I'm going through a separate...
7  Q. How do you know Crumrine was?
8  A. Because I have been called as a witness in
9  a separate civil investigation.
10  Q. Have you ever heard of any Metro officer
11  in any situation ever being punished for lying in
12  court?
13  A. For lying in court?
14  Q. Yes.
15  A. Yes.
16  Q. Who was that?
17  A. I can't -- I can't remember the officer. I
18  believe it was Officer George Smith, I want to say.
19  Q. Okay. And what was that situation?
20  A. I don't know -- I don't know the ins and
21  outs or the details of the case, just that he had
22  lied on the stand and he was placed on some -- I
23  believe it's called a Brady list.
24  Q. Was he fired?
25  A. No.

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

43 (Pages 166 to 169)

Page 166

1    Q. Have you ever heard of the word
2  "test-a-lying"?
3    A. No.
4    Q. In your opinion, based on all the evidence
5  you've reviewed, whose life did Tashi Farmer threaten
6  in this entire situation?
7    A. I don't know.
8    Q. In your view, is there any injustice in the
9  killing of Tashi Farmer?
10     MR. ANDERSON: Objection. Form.
11     THE WITNESS: Is there any justice?
12  BY MR. LAGOMARSINO:
13    Q. Injustice.
14    A. We have the conclusion of excessive use of
15  force.
16    Q. Personally, was Lopera's conduct shocking
17  to you personally?
18     MR. ANDERSON: Objection. Form.
19     MR. McNUTT: Join.
20     MR. ANDERSON: Go ahead.
21     THE WITNESS: In the form of shock of
22  conscience?
23  BY MR. LAGOMARSINO:
24    Q. Yeah.
25    A. No, but it was egregious.

Page 167

1    Q. So you're not shocked?
2    A. I mean, I deal with officer-involved
3  shootings.
4    Q. Is that because you're desensitized?
5    A. Probably.
6    Q. What happens with respect to discipline at
7  Metro when the police restrain an unarmed man so
8  another officer can choke him to death?
9     MR. ANDERSON: Objection. Form.
10     THE WITNESS: What's --
11  BY MR. LAGOMARSINO:
12    Q. Well, let's rephrase.
13     Tashi was unarmed.
14    A. Uh-huh.
15    Q. And he was restrained by Lopera -- or
16  strike that.
17     Tashi was restrained by Crumrine, Tran and
18  Flores, correct?
19     MR. ANDERSON: Objection. Form.
20     THE WITNESS: Yes.
21  BY MR. LAGOMARSINO:
22    Q. And he was choked to death, right?
23     MR. ANDERSON: Objection. Form.
24     THE WITNESS: Actually, as far as I know,
25  there's been four coroners ruling and two have said

Page 168

1  that he died of asphyxia and two have said that he
2  died of a heart attack.
3  BY MR. LAGOMARSINO:
4    Q. How is a heart attack caused, in your view?
5    A. I have no idea. I'm sorry. One said
6  asphyxia, three said heart attack, I believe.
7    Q. And that was the coroner, in your view?
8    A. The -- our Clark County coroner ruled Tashi
9  had died of police asphyxia and then three separate
10  coroners did investigations.
11    Q. And who were those coroners?
12    A. I don't know.
13    Q. Are you talking about Force Science?
14    A. No.
15    Q. Okay. Where did you learn that?
16    A. Through the FIT investigation and then kind
17  of through this process as well.
18    Q. Were they Nevada coroners?
19    A. I don't know. Or the Clark County was the
20  Nevada one, but the other three I don't know.
21    Q. Did Crumrine, Tran or Flores ever provide
22  to you any kind of moral justification for their
23  conduct?
24     MR. ANDERSON: Objection. Form.
25     THE WITNESS: I believe Sergeant

Page 169

1  Crumrine -- actually he might --
2     In their after-action questions that we
3  asked, Sergeant Crumrine, I believe, had made a
4  statement that he essentially kept saying, "I messed
5  up, I messed up."
6  BY MR. LAGOMARSINO:
7    Q. But did he justify his conduct morally?
8    A. I don't recall.
9    Q. Have you ever heard at Metro -- I'm just
10  talking in general and talking about some culture
11  here now -- any officers in your entire history with
12  Metro say, well, if he wasn't guilty of doing this
13  crime, he was guilty of doing something else?
14    A. No.
15    Q. Have you ever heard Metro officers refer to
16  it being a war out there?
17    A. Yes. And that was during the 1 October
18  when we had to do our investigation into that.
19    Q. Any other incidences?
20    A. No. If you're talking in general working
21  day to day, no.
22    Q. In your experience with the Justice
23  Department and cops, is it fair to say that Metro has
24  a history of killing unarmed citizens?
25     MR. ANDERSON: Objection. Form.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

44 (Pages 170 to 173)

Page 170

1    THE WITNESS:  Actually, from the years 2011
2 through 2014, we had no mistake of fact shootings,
3 every subject was armed.
4 BY MR. LAGOMARSINO:
5    Q.  I'm not talking about just shootings.
6 Killings?
7    A.  I don't know.
8    Q.  Has a Metro officer ever killed anybody in
9 jail since 2010?
10    A.  Yes.
11    Q.  How many do you know about?
12    A.  I know about three or four of them.
13    Q.  And were any of those choke cases?
14    A.  I believe two of them were, yes.
15    Q.  And who did those involve?
16    A.  I don't know.
17    Q.  And just for foundational purposes, Metro
18 officers are employed in jails, correct?
19    A.  Yes.
20    Q.  At the CCSD?
21    A.  Metro employees encompasses corrections
22 officers and patrol officers.
23    Q.  Are Metro officers trained that everybody
24 could be a potential threat?
25    A.  Part of our fair and impartial policing

Page 171

1 course that we put together, officers are taught to
2 approach every incident with an open mind.
3    Q.  And in that open mind, could every person
4 be a potential threat?
5    A.  Potential.
6    Q.  And that would include potentially a little
7 old lady knitting a scarf on a bench, she could
8 potentially have a gun underneath that scarf?
9    A.  She could very well.
10    Q.  Is it important in general when policing to
11 have a people-friendly culture?
12    A.  Yes.
13    Q.  What aggression did Tashi Farmer display,
14 if any?
15    A.  Resistance being taken into custody.
16    Q.  What actions could Lopera have taken to
17 de-escalate the situation?
18    MR. ANDERSON:  Objection.  Form.
19    THE WITNESS:  He could have got on the
20 radio, got more resources to his location.  He could
21 have attempted verbally to de-escalate the situation.
22 Could have recognized the fact -- I mean, again,
23 based on what he had told us, he could have
24 recognized some Fourth Amendment.
25

Page 172

1 BY MR. LAGOMARSINO:
2    Q.  In your training, does Metro ever use
3 psychodrama or role-playing?
4    A.  We do scenario-based training, if that's
5 the same.
6    Q.  Is that role reversal training, or do you
7 know?
8    A.  I don't think it's role reversal, no.
9    Q.  Did you conclude in your evaluation that
10 Lopera was prone to aggression?
11    A.  No.
12    MR. LAGOMARSINO:  I don't have any other
13 questions.
14    MR. ANDERSON:  Do you want me to go?
15    MR. McNUTT:  Doesn't matter.
16    MR. ANDERSON:  I'll be quick.
17
18    EXAMINATION
19 BY MR. ANDERSON:
20    Q.  Hi, Detective Kirkegard.  Does CIRT
21 investigate whether Las Vegas Metropolitan Police
22 Department policy and training was breached?
23    A.  Yes.
24    Q.  It does not make any opinions on whether --
25 any legal conclusions; is that fair?

Page 173

1    A.  Yes.
2    Q.  So any conclusions or findings you may have
3 are based solely upon the police department's policy
4 and training?
5    A.  Correct.
6    Q.  Now, you testified earlier and established
7 that an LVNR is the only neck restraint taught by the
8 police department, correct?
9    A.  Yes.
10    Q.  So if a neck restraint is used that is not
11 the LVNR, that would be outside of policy?
12    A.  Yes.
13    Q.  And an officer could be disciplined for
14 that action?
15    A.  Yes.
16    Q.  Is it possible that if someone used a neck
17 restraint that was not an LVNR, it could still be
18 reasonable under the circumstances?
19    A.  Yes.  By policy.
20    Q.  So it could be reasonable under the law but
21 violating policy?
22    A.  Right.
23    Q.  Is that what you were kind of explaining
24 with Biesanszky, that he acted reasonably but that it
25 was outside the policy?

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

45 (Pages 174 to 177)

Page 174

1      A.  Correct.
2      Q.  Now, you were given a hypothetical in the
3   morning session of this deposition about the duty to
4   intervene.
5         When the officers arrived, did Sergeant
6   Crumrine give an order to Lopera to let him go?
7      A.  Yes.
8      Q.  In your training and experience, was
9   Officer Crumrine -- would it be reasonable for
10  Officer Crumrine to believe that Lopera had followed
11  that command, his order?
12     A.  I don't know.
13     Q.  Okay.  Is there any way that Crumrine could
14  tell, based upon your training and experience,
15  whether Lopera released pressure while keeping the
16  encircling arm around the neck?
17     A.  I don't know.
18     Q.  Have you ever been witness to an LVNR?
19     A.  Yes.
20     Q.  Can you tell how much pressure is being
21  applied?
22     A.  No.
23     Q.  If an officer ceases using an LVNR, is it
24  policy that they maintain the encircling arm until
25  handcuffing is effectuated?

Page 175

1      A.  It's a control technique that's used.
2      Q.  And it's your understanding or based upon
3   your investigation of this incident, that while
4   Officer Lopera had Mr. Farmer in some form of neck
5   restraint or his arms around the neck, that the other
6   three officers, Crumrine, Tran and Flores were
7   attempting to handcuff Farmer; is that correct?
8      A.  Yes.
9      Q.  And you've been asked questions about
10  whether the officers could have or should have
11  physically pried Lopera's arms off Farmer's neck,
12  correct?
13     A.  Yes.
14     Q.  Can you think of any scenario where an
15  officer would stop handcuffing an individual before
16  they're handcuffed to physically pull the arms off
17  someone's neck?
18     A.  No.  It's not what's trained.
19     Q.  They're trained that they would not
20  physically intervene until the handcuffing is
21  complete?
22     A.  Correct.
23     Q.  But despite that understanding, the
24  officers were giving Lopera verbal commands about his
25  use of the neck restraint?

Page 176

1      A.  Yes.
2      Q.  Are verbal commands a form of intervention?
3      A.  Yes.
4      Q.  And are officers entitled to believe that
5   other officers will follow their commands?
6      A.  I'm sorry, are they entitled?
7      Q.  Is it reasonable for an officer to assume
8   that their command is being followed?
9      A.  Yes.
10     Q.  Now, you -- there was a question posed to
11  you that the three -- this is just barely -- that the
12  three officers were restraining Farmer while Lopera
13  choked him out.
14        Do you remember that question?
15     A.  Yes.
16     Q.  For purposes of police work, when is
17  someone restrained?
18     A.  When they're placed in handcuffs.
19     Q.  Okay.  So would it be more accurate to say
20  that Tran, Crumrine and Flores were attempting to
21  restrain Farmer while the neck restraint was being
22  applied?
23     A.  Yes.
24     Q.  And again, you would not physically
25  intervene in a neck restraint until handcuffing was

Page 177

1   complete; is that fair?
2      A.  Correct.
3      Q.  Now, Crumrine, Tran and Flores were
4   investigated for failing to intervene?
5      A.  Yes, they were.
6      Q.  Okay.  And they were -- it was found that
7   they did, in fact, intervene?
8      A.  Yes.
9      Q.  And is that verbally and physically?
10     A.  Yes.
11     Q.  Attempting to handcuff a suspect, is that a
12  form of intervention of forces being used?
13     A.  Yes.
14     Q.  Okay.  Because the first thing you would
15  want to do is get the suspect handcuffed upon
16  arrival?
17     A.  Yes.
18     Q.  And that's basic police training?
19     A.  Yes.
20     Q.  Now, you were read into the -- into the
21  record the CIRT statement introductions of Crumrine,
22  Flores, Tran -- and Crumrine.  Crumrine, Flores,
23  Tran, their CIRT statement introductions were read,
24  correct?
25     A.  Yes.

Detective Kasey Kirkegard  ~   February 6, 2019
* * * Videotaped Deposition * * *

Page 186

1   strikes, the amount of hand strikes that you were
2   discussing with Mr. Lagomarsino, how did you come to
3   the conclusion about how many hand strikes?
4       A.  It was review off both the surveillance
5   video of Venetian and then Officer Lopera's body
6   camera, and that was intermittent body camera.
7       Q.  And that was you personally and you counted
8   them?
9       A.  Correct.  It was me, and then we had --
10  that video was shown to our discussion of SMEs when
11  we had roundtabled the incident.
12      Q.  So assuming for a minute that the -- the
13  count of the hand strikes were accurate, do you know
14  whether -- with how much force any of them landed on
15  Mr. Farmer?
16      A.  No.
17      Q.  Do you know if they landed at all on
18  Mr. Farmer?
19      A.  Looking through the video, it appeared he
20  made contact.  But whether, like you're saying, the
21  pressure where the actual target was, I don't know.
22      Q.  Did Mr. Farmer cease resisting when the
23  hand strikes were thrown?
24      A.  In some portions of Officer Lopera's
25  body-worn camera, it appears as though Farmer's hands

Page 187

1   are up in a defensive deflecting.
2       Q.  Have you reviewed the deposition testimony
3   or did you interview as part of your investigation
4   the security guard from the Venetian's testimony or
5   did you interview them directly?
6       A.  Yes.  Both I reviewed their statements that
7   they provided to FIT, and then we actually went back
8   out a few weeks later and conducted our own
9   investigation -- or interview.
10      Q.  Do you recall a gentleman named -- Security
11  Guard Infantino?
12      A.  Yes.
13      Q.  And do you recall his testimony being that
14  Tashi Farmer was demonstrating extraordinary strength
15  in resisting Officer Lopera?
16      A.  Yes.
17      Q.  And in fact, that he tried to grab Officer
18  Lopera -- excuse me.  The fact that Infantino tried
19  to grab Tashi Farmer's arm, and he felt personally
20  the significant strength Tashi Farmer exhibited?
21      A.  Yes.
22      Q.  Do you also remember the part of his
23  testimony where he talked about the fact that the
24  punches were having no effect on Tashi Farmer?
25      A.  I don't recall that specifically, but I

Page 188

1   remember we talked about the strikes.
2       Q.  You were asked a question, what could have
3   been done to deescalate this situation.  Do you
4   recall that?
5       A.  Yes, I do.
6       Q.  What could Tashi Farmer have done to
7   deescalate the situation?
8       A.  Well, looking at it, cameras and
9   everything, he could have listened to Officer Lopera.
10      Q.  So he could have followed the verbal
11  commands of a Metropolitan police officer?
12      A.  Yes.
13      Q.  If he would have followed the verbal
14  commands of Officer Lopera, what would have happened?
15      A.  I don't know.
16      Q.  If Officer Lopera said stop, don't move,
17  what would have happened?
18      A.  I don't know.
19      Q.  Would there have been the chance for
20  further inquiry with Tashi Farmer?
21      A.  I don't know.  Probably not.
22      Q.  With respect to the communications and some
23  of the policy violations that were discussed and you
24  were talking about covering contact, in this scenario
25  with respect to Officer Lopera and Officer Lif, who

Page 189

1   was covering whose contact in the interaction with
2   Tashi Farmer?
3       A.  In Officer Lif's statement, it would have
4   been Officer Lopera who was the contact, and she
5   would have been the cover officer.  And then Officer
6   Lopera had also told us something similar in his
7   statement.
8       Q.  And I'm not asking you about Officer
9   Lopera.
10          So with respect to making the verbal
11  communications over the radio -- because you were
12  testifying regarding Metro's policies regarding foot
13  pursuits and making communications over the radio, do
14  you remember that?
15      A.  Yes.
16      Q.  Whose obligation would that have been?
17  Would that have been Officer Lopera or Officer Lif's
18  as the contact?
19      A.  First on -- the first initial when Officer
20  Lopera approached the decedent, Officer Lif could
21  have gotten on the radio and stated their location,
22  the stop, for a person stop.
23          However, when Officer Lopera engaged in a
24  foot pursuit, it's incumbent upon that officer to
25  provide that radio traffic and his actions to include

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

49 (Pages 190 to 193)

Page 190

1  that he is in a foot pursuit.
2      Q.  And again, I'm never going to ask you about
3  Officer Lopera's statements in this.
4      A.  Okay.
5      Q.  So don't take it that way.
6          But do you know whether or not Officer
7  Lopera did -- attempted to make those communications
8  or not?
9      A.  He did not.
10     Q.  Because part of the pursuit was through the
11 back of the house of the casino and then through a
12 concrete stairwell and things of that nature, right?
13     A.  Yes.
14     Q.  I think we've all probably been in a
15 parking garage or one of those areas and we don't
16 have much cell phone service.  So is there a way that
17 you can tell by radio transmissions or can you tell
18 that his mic was keyed or not keyed?
19     A.  Right.  So we did.  We did a radio analysis
20 on both him and Officer Lif.  And we even utilized
21 our radios that are assigned to us and went through
22 and checked to see if you were able to communicate.
23         We did a test run with our dispatcher and
24 then, like I said, we did an analysis on Lif and
25 Lopera's radio.

Page 191

1      Q.  Okay.  And you did have signal, is what
2  you're saying.
3      A.  Yes.
4      Q.  In the stairwell and everything else?
5      A.  Yes.
6      Q.  You made a statement that Officer Lopera
7  could have used empty hand tactics to take Tashi
8  Farmer into custody; do you remember that?
9      A.  Yes, I do.
10     Q.  Isn't that what he did?
11     A.  Well, hand strikes are not considered empty
12 hand tactics.
13     Q.  What are considered empty hand tactics?
14     A.  Those are going to be certain takedowns
15 that we use; reverse wrist lock, arm bar takedowns,
16 things that have -- that will less likely result in
17 injury.
18     Q.  Do you think given the circumstances once
19 the ECD was ineffective, and once Tashi Farmer was
20 resisting in personal contact with Officer Lopera,
21 that those techniques would have been effective?
22     A.  Given the body position of the two,
23 probably not, but...
24     Q.  Is that a judgment call the officer has to
25 make on the scene?

Page 192

1      A.  Yes, it is.
2      Q.  Would you defer to the officer on the scene
3  in that regard?
4      A.  For their perception, yes.
5      Q.  And what they believe is reasonable,
6  and isn't it true -- I'm sorry, go ahead and answer
7  that.
8      A.  Yes.
9      Q.  And isn't it true that each officer, some
10 have more skills in one technique than other
11 techniques and it's a little bit dependent upon what
12 they're best suited to deploy?
13     A.  Yes.
14     Q.  What is the policy regarding when you can
15 turn off a body-worn camera after an event?
16     A.  I believe it's at the debrief once the
17 scene is considered static.  And when, again, when
18 they're starting to debrief within, and that's to
19 protect any policies and procedures, things of that
20 nature.
21     Q.  Can you identify any point in this event
22 when you know this situation was deemed static and it
23 would have been okay for the officers to turn off
24 their body-worn camera?
25     A.  Probably at the point where they have the

Page 193

1  scene secure, medical has arrived and now it's just
2  waiting on what's next.
3      Q.  Do they -- do officers have to receive an
4  approval or an order from their superior, their
5  sergeant or commanding officer to turn off their
6  body-worn camera?
7      A.  No.
8      Q.  So they can do it on their own?
9      A.  Correct.
10     Q.  It's true that Officer Lopera properly
11 turned on his body-worn cam, right?
12     A.  Yes.
13     Q.  And he never turned off his body-worn cam
14 until after it was static, correct?
15     A.  Correct.
16     Q.  So he was in complete compliance with the
17 body-worn cam policy of Metro, right?
18     A.  I wouldn't say complete.  There's a policy
19 for officers that were involved in a critical
20 incident that as soon as they're removed from the
21 scene, they are to turn off their body camera.  But
22 in this particular incident, Sergeant Crumrine failed
23 at removing Officer Lopera from the crime scene and
24 having him deactivate his body cam.
25     Q.  So in effect, if there was any policy

Page 194

1  violation, he was over-inclusive in the evidence
2  preserved on his body-worn camera?
3      A.  Right.
4      Q.  There was some discussion about what you
5  termed -- or what the term was in -- strike that.
6          Are you familiar with Operation Safe Strip?
7      A.  Yes.
8      Q.  Or is it Project Safe Strip?
9      A.  It's -- I believe -- I just know it as
10 Safe Strip.
11     Q.  I've heard of it as -- different officers
12 have said different things.
13     A.  Right.  I know Safe Strip.
14     Q.  What is it?
15     A.  It's -- well, actually, I don't know what
16 it is anymore.  It used to be we have a proactive
17 squad that would go around to the hot spots around in
18 Convention Center Area Command, which is essentially
19 the Strip, Las Vegas Boulevard, and they would
20 address certain issues.
21     Q.  And are you aware that Officer Lopera was
22 assigned to Safe Strip the night of this incident?
23     A.  Yes.
24     Q.  And is the -- would someone approaching an
25 officer on Operation Safe Strip that was under the

Page 195

1  influence of a controlled substance, would that be
2  someone that the officer should investigate?
3          MR. LAGOMARSINO:  Objection.  Form.
4  Foundation.  Incomplete hypothetical.
5          THE WITNESS:  It depends.  And this is --
6  Safe Strip officers probably deal with that on a
7  99 percent basis.  But yes.
8  BY MR. McNUTT:
9      Q.  What about when someone that they believe
10 is under the influence of a controlled substance runs
11 into a restricted area of a casino; is that something
12 that would require investigation?
13     A.  Yes.
14     Q.  Is that reasonable suspicion to stop
15 someone?
16     A.  Yes.
17     Q.  Is that probable cause to pursue someone?
18     A.  Reasonable suspicion.
19     Q.  Do you think Officer Lopera had reasonable
20 suspicion and was justified in following Tashi
21 Farmer?
22     A.  Yes.
23     Q.  Under the policies in effect at the time of
24 this event, isn't it true that Officer Lopera's use
25 of the LVNR was authorized under the former use of

Page 196

1  force structure?
2      A.  Level I was, yes.
3      Q.  Correct.  And there's never been a
4  determination by you or anyone else that Officer
5  Lopera used any specific level of LVNR, correct?
6      A.  Yeah, he did.  Yes.
7      Q.  I'm correct?
8      A.  You're correct, yes.  Without going into a
9  statement, yes.
10     Q.  Well, Sergeant Bland testified that no one
11 could tell by reviewing the video whether or not
12 there was LVNR 1, 2 or 3, whether there was any
13 pressure applied at any point or for how long.  Are
14 you -- are you aware of that?
15     A.  Yes.
16     Q.  Do you agree with Sergeant Bland's
17 testimony in that regard?
18     A.  I do.
19     Q.  You testified that there was a lawyer that
20 stopped the walk-through and you referred to that
21 lawyer by name.  Do you recall that individual?
22     A.  John Eldridge.
23     Q.  John Eldridge?
24     A.  I believe it was.
25     Q.  And who was he the lawyer for?

Page 197

1      A.  So he's one of the -- he's either PPA or
2  PMSA reps, lawyers that come out along with David
3  Roger and Jay Roberts who would come out and -- out
4  on scene whenever a critical incident happens to
5  represent involved officers or witness officers.
6      Q.  Were you present when he was there?
7      A.  No, I was not.
8      Q.  Were you present at any point at this scene
9  or you -- CIRT comes in, like, sometime later?
10     A.  Right.  I was at the office.  My partner
11 actually went down to the scene, but I did not go
12 down.
13     Q.  And what was your understanding about the
14 lawyers stopping the walk-through?
15     A.  I believe they got through the first four
16 questions up until the -- I believe it was the foot
17 pursuit and the perceived carjacking.  And then at
18 that point, when it went into the actual use of force
19 used by Lopera, all questions stopped.
20     Q.  And who stopped it?
21     A.  The -- I believe Eldridge.
22     Q.  So you're not aware of the fact that
23 Mr. Eldridge's statement is he never stopped the
24 walk-through?
25     A.  I -- I believe he physically said, "We're

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

55 (Pages 214 to 217)

---

Page 214

1     A.  Not complying, no.
2          (Playing video.)
3   BY MR. McNUTT:
4     Q.  So at this point we're at 2:08, but about
5   two seconds ago, you saw Officer Lopera hand contact
6   Tashi Farmer's hand, correct?
7     A.  Yes.
8     Q.  Do you want me to back it up?
9     A.  No.  You're good.
10    Q.  So Officer Lopera is in physical contact
11  with Tashi Farmer at this point, correct?
12    A.  Yes.
13         (Playing video.)
14  BY MR. McNUTT:
15    Q.  Okay.  So I want to ask you questions about
16  the amount of movement you're seeing here on the body
17  cam and whether or not you believe Tashi Farmer is
18  resisting being taken into custody.
19         (Playing video.)
20  BY MR. McNUTT:
21    Q.  So did you hear the "help me out"?
22    A.  Yes.
23    Q.  Is that Officer Lopera?
24    A.  Yes.
25    Q.  And do you know who he's asking help from?

---

Page 215

1     A.  I believe he's asking for help from the
2   security, the Venetian security officers.
3     Q.  Is it your opinion that officer -- Metro
4   officers ask for help from civilians when they don't
5   actually need it?
6          MR. LAGOMARSINO:  Objection.  Form.
7          THE WITNESS:  It depends.  I personally
8   wouldn't.
9   BY MR. McNUTT:
10    Q.  Ever?
11    A.  It would really just depend.  It would have
12  to be a very dire situation to involve a citizen into
13  a use of force for me, but that's me.
14    Q.  Sure.  So if it's a dire situation, you
15  would ask for help?
16    A.  Very dire, yes.
17    Q.  And whether it's dire to one person versus
18  another person is a matter of opinion, correct?
19    A.  Yes, it is.
20    Q.  Okay.  There's at least three people around
21  him at this point, right?
22    A.  Yes.
23    Q.  The man at the top, we see a white shirt,
24  and do you recognize that as being a Venetian
25  security guard?

---

Page 216

1     A.  Yes.
2          (Playing video.)
3   BY MR. McNUTT:
4     Q.  So we've got multiple commands being given
5   here, but not all of them by Officer Lopera, correct?
6     A.  Correct.
7     Q.  You've got "turn around," "give me your
8   arm," things of that nature, correct?
9     A.  Yes.
10    Q.  And so can you delineate or have you ever
11  delineated whether all of those were from Officer
12  Lopera?
13    A.  We did ask him and we were able to --
14    Q.  Don't tell me what Officer Lopera said, but
15  I'm asking your perception as listening to the
16  different voices.
17    A.  Yes.
18    Q.  It's clear to you that there are different
19  voices, correct?
20    A.  Yes.
21    Q.  I mean, some of us listening to Officer
22  Lopera for a couple -- for a few seconds can tell
23  different pitch of a voice, right?
24    A.  Yes.
25         (Playing video.)

---

Page 217

1   BY MR. McNUTT:
2     Q.  Did you hear that "okay, sir"?
3     A.  Yes.
4     Q.  Do you think that was from Officer Lopera?
5     A.  No.
6     Q.  Do you think that was from Tashi Farmer?
7     A.  Yes.
8          (Playing video.)
9   BY MR. McNUTT:
10    Q.  Did you hear that?
11    A.  "On your stomach"?
12    Q.  No.
13         MR. LAGOMARSINO:  Form.
14  BY MR. McNUTT:
15    Q.  The punch that hit Officer Lopera's
16  body-worn camera?
17         MR. LAGOMARSINO:  Form.
18         (Playing video.)
19  BY MR. McNUTT:
20    Q.  Right there.
21    A.  I don't know what that is.  That could be
22  the wind or the force of Officer Lopera coming down.
23  I don't know.
24    Q.  The wind?
25    A.  Yeah.  Coming from -- coming in, yes.

---

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

58 (Pages 226 to 229)

Page 226

1 FURTHER EXAMINATION
2 BY MR. LAGOMARSINO:
3    Q.  So you heard --
4       MR. McNUTT: I'll make note that you
5 watched the entire video.
6 BY MR. LAGOMARSINO:
7    Q.  You heard various questions about whether
8 Tashi was compliant or not, correct?
9    A.  Yes.
10    Q.  And in answer to a lot of those questions,
11 you stated that he wasn't compliant, correct?
12    A.  Yes.
13    Q.  Are you aware of police reports that
14 indicate that after review of the video and the
15 evidence, that in many instances, Tashi was not given
16 enough time to comply?
17    A.  Am I aware?
18    Q.  Yeah.
19    A.  I'm sorry, can you rephrase that?  Sorry.
20    Q.  Are you aware of other police reports in
21 this case, either from FIT or other officers, that
22 indicate after review of the timeline, that Tashi was
23 not given enough time to comply with Officer Lopera's
24 commands?
25    A.  I'm not aware.

Page 227

1    Q.  Are you aware of police reports that
2 indicate that Tashi was given confusing commands by
3 Officer Lopera?
4       MR. McNUTT: Objection. Form.
5       THE WITNESS:  And are you asking other than
6 my report or other reports?
7 BY MR. LAGOMARSINO:
8    Q.  Yes, other than your report.
9    A.  I don't know.
10    Q.  After three rounds of tases were given,
11 what were options that -- what were all the options
12 that were available to Officer Lopera?
13    A.  What were all the options available?
14    Q.  Yes, since he was supposed to stop tasing
15 after three rounds.
16    A.  Well, he's supposed to deem the ECD
17 ineffective and re-holster and transition to another
18 tool that he could use based on his perception.
19    Q.  You're trained on the ECD, correct?
20    A.  Yes.
21    Q.  And you're trained that the ECD is painful
22 to people who receive those probes, correct?
23    A.  Yes.
24    Q.  And you heard, in fact, Tashi screaming or
25 wailing in the video after being struck with those

Page 228

1 ECDs, correct?
2       MR. McNUTT: Objection. Form.
3       THE WITNESS: Yes.
4 BY MR. LAGOMARSINO:
5    Q.  And you're trained that a natural reaction
6 from being tased with probes is to try to remove
7 those probes, correct?
8    A.  I don't know if it's a natural reaction.
9    Q.  Are you trained that it's a common reaction
10 that people try to remove those probes?
11    A.  Yes.
12    Q.  If you were tased with probes, would you
13 attempt to remove those from your body?
14       MR. ANDERSON: Objection. Form.
15       THE WITNESS:  I would probably just stay
16 still.
17 BY MR. LAGOMARSINO:
18    Q.  But you've never been tased, correct?
19    A.  Correct.
20    Q.  Now, in the beginning of the video, you
21 were asked about whether there were certain
22 indicators as to whether Tashi was going into a
23 restricted area, correct?
24    A.  Yes.
25    Q.  And those were slip and fall cones,

Page 229

1 correct?
2    A.  Yes.  The yellow cones, yeah, yellow cones.
3    Q.  And that was -- anything on the yellow
4 cones or the yellow tape indicate that it was a,
5 quote, unquote, restricted area?
6    A.  No.
7    Q.  And then Mr. McNutt made reference to some
8 chains that Tashi ran through.
9       Did you see any chains in the video?
10    A.  Yes.  They connected the yellow cones in
11 front of the door.
12    Q.  And they were actual metal chains?
13    A.  No, they were just plastic chains.
14    Q.  Have you reviewed -- Mr. McNutt made
15 reference to alleged opinions and testimony from
16 different experts in a different case.  And then you
17 answered some of those questions.
18       Have you ever used the testimony or
19 opinions from the experts in the other case?
20    A.  No.
21    Q.  So you're relying on what those experts
22 said based on what Mr. McNutt said they said,
23 correct?
24    A.  Yes.
25    Q.  You heard some questions about whether

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

59 (Pages 230 to 233)

Page 230

1  Tashi should have deescalated.
2      Do you remember that question?
3      A. Yes.
4      Q. Was Lopera, to your knowledge, in the
5  department long enough to be trained about
6  deescalation?
7      A. Yes.
8      Q. In your experience with regular citizens,
9  are they trained to deescalate?
10     A. Are citizens trained to deescalate?
11     Q. Right.
12     A. No. Not that I know of.
13     Q. In reviewing the beginning of the video,
14  Tashi starts running from Lopera, correct?
15     A. Yes.
16     Q. And that's because Lopera reaches out to
17  grab Tashi, correct?
18     A. I don't know why Tashi ran from Officer
19  Lopera.
20     Q. Did you see Lopera reach out to grab Tashi
21  before Tashi started running?
22     A. Yes.
23     Q. Are officers permitted -- strike that.
24     At the point where Officer Lopera went to
25  grab Tashi, was there anything that you saw on the

Page 231

1  video, at least without the benefit of sound, that
2  indicated that Lopera had the right to grab Tashi?
3      MR. McNUTT: Objection. Form.
4      THE WITNESS: I don't know. And that's
5  what -- some of the questions we had for
6  Officer Lopera.
7  BY MR. LAGOMARSINO:
8      Q. Are you aware -- I asked this before but
9  it's been a long day.
10     So were you part of the process of pulling
11  Tashi's cell records?
12     A. No, I was not.
13     Q. Okay. Did anyone pull Officer Lopera's
14  cell records, to your knowledge?
15     A. I believe so. But I don't know. I believe
16  it's the FIT team.
17     Q. Do you know if they downloaded Officer
18  Lopera's data from his cell phone?
19     A. I have no idea.
20     Q. Lopera turned off his camera while being
21  questioned about the incident, correct?
22     MR. McNUTT: Objection. Form.
23     THE WITNESS: Later on in the incident,
24  yes.
25

Page 232

1  BY MR. LAGOMARSINO:
2      Q. Does the sole fact of a citizen running
3  away from an officer mean that the citizen is on
4  drugs?
5      A. No.
6      Q. You made a comment, I think, in response to
7  a misleading question, in my view, as to whether
8  Tashi could have been arrested for carjacking.
9      Do you believe that based on your review of
10  the video of the overhead surveillance and the body
11  cam footage, that Tashi should have been arrested for
12  carjacking?
13     A. In my belief, what I put in the report was
14  the two views and what they depicted, along with
15  Officer Lopera's perception. And that's what I put
16  in my report.
17     Q. And did you believe that he could have been
18  arrested for carjacking based on all that?
19     A. I would leave that up to the FIT team to
20  make that determination.
21     Q. Sitting here today, do you believe --
22  strike that.
23     Sitting here today, would you have arrested
24  him for carjacking?
25     A. Would I?

Page 233

1      Q. Right.
2      A. No.
3      Q. You made a comment regarding 99 percent of
4  citizens and I didn't get the whole thing. You used
5  the word -- the number 99 percent. What was that in
6  reference to?
7      A. I believe the -- it was just an estimate,
8  but on the weekends, the officers will come in
9  contact with someone who is under the influence of
10  alcohol, narcotics here in Vegas.
11     Q. And maybe it was like a little bit of
12  hyperbole, but a lot of people --
13     A. A lot of people.
14     Q. -- are under the influence, right?
15     A. Yes.
16     Q. And was Lopera a drug recognition expert?
17     A. I would have to look at his training
18  records, but I don't believe so.
19     Q. And does the simple fact that somebody is
20  sweating on a May night mean that they're under the
21  influence and can be arrested for being under the
22  influence?
23     A. No.
24     Q. And if somebody has some glassy eyes and is
25  approaching an officer about possibly being chased by

Detective Kasey Kirkegard ~ February 6, 2019
* * * Videotaped Deposition * * *

60  (Pages 234 to 237)

Page 234

1  somebody mean that the officer can detain that
2  person?
3       A.  No.
4       Q.  If officers arrested everybody that
5  appeared to be under the influence on the Strip,
6  there wouldn't be a lot of tourists coming to Vegas
7  anymore, correct?
8       A.  I don't know.  Probably not.
9       Q.  Now, you were asked some questions about
10  whether and when Officer Lopera loosened his grip on
11  Tashi.
12       And I want to kind of get a definition of
13  "loosened."  Are you defining loosen as releasing the
14  grip?
15       A.  Releasing the pressure.
16       Q.  Okay.  And that's releasing his arm
17  completely?
18       A.  No.  It's releasing the pressure that's
19  between his bicep and forearm, the pressure that goes
20  along the carotid artery.
21       Q.  And when did that take place in the
22  timeline that Lopera released or loosened his grip on
23  Tashi in that manner?
24       A.  I don't know when.
25       Q.  For the crime of resisting a police

Page 235

1  officer, you have to have what's known as a predicate
2  crime, correct?
3       A.  You know, that's a good question.  I don't
4  know, actually.
5       Q.  In other words, if -- can a police officer
6  with no basis walk up to a citizen, arrest the
7  citizen, and then charges -- if the citizen resists,
8  charge that citizen with resisting?
9       A.  No.
10       Q.  You heard questions from Mr. McNutt about
11  Tashi not being hit that hard kind of in the
12  beginning of his questioning.
13       Do you remember those -- that line of
14  questioning?
15       A.  Yes.
16       Q.  Was Tashi being caressed?
17       MR. McNUTT:  Objection.  Form.
18       THE WITNESS:  I don't know.
19  BY MR. LAGOMARSINO:
20       Q.  By Lopera in the video?
21       A.  Was he being caressed?
22       Q.  If it wasn't hard, was it soft?
23       A.  I don't know.
24       Q.  Was Lopera softly tapping him?
25       A.  I wouldn't call it tapping.

Page 236

1       Q.  Was Lopera being soft and gentle with
2  Tashi?
3       A.  No.
4       Q.  Is it a natural reaction based on your
5  training of somebody who is getting punched in the
6  face and the head to lift their hands if they're
7  getting hit?
8       A.  Yes.
9       Q.  Do you expect citizens to comply with
10  officers if they're getting hit in the face for no
11  reason?
12       A.  No.
13       MR. LAGOMARSINO:  I have to go pull the
14  record that -- I don't know if the witness can
15  remember.  I want to try to refresh her recollection
16  so it will just take me two minutes about the
17  confusing and inconsistent command line of
18  questioning.  Just take a quick break.
19       THE VIDEOGRAPHER:  The time is
20  approximately 5:08 p.m.  We are going off the record.
21       (A recess was taken from 5:08 p.m.
22       to 5:20 p.m.)
23       THE VIDEOGRAPHER:  The time is
24  approximately 5:20 p.m.  We are back on the record.
25

Page 237

1  BY MR. LAGOMARSINO:
2       Q.  So we're placing in front of you a document
3  that just for the record is online at the Las Vegas
4  Review-Journal's website through Scribd, S-c-r-i-b-d,
5  after the incident.
6       And it's redacted.  It's my understanding
7  that Mr. Anderson will produce this document.
8       Have you ever seen this document before?
9       A.  I don't believe I have.
10       Q.  Let's go through it briefly.
11       A.  Okay.
12       Q.  Have you seen the timeline on page 3
13  before?
14       A.  Yes.
15       Q.  Where have you seen this timeline before?
16       A.  So this timeline may have came from the FIT
17  report that's produced.
18       Q.  So at 1:39, Officer Lopera yelled, "Don't
19  move."  And Farmer replied, "Okay."
20       Does that -- somebody saying "okay" to a
21  command indicate to you that they're complying?
22       A.  It doesn't necessarily mean they're
23  complying.  I think they're acknowledging the verbal
24  command.
25       Q.  At 1:45 it says, "Officer Lopera yelled get

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

61  (Pages 238 to 241)

| Page 238 | Page 240 |
|---|---|

Page 238

1  on your stomach.  Farmer replied I will, I will,
2  please.  And then Farmer fell backward to the
3  ground."
4        Does somebody saying, "I will, I will,
5  please" indicate to you that somebody is complying
6  with an order?
7     A.  Again, I don't know if he's complying, but
8  it sounds like he's acknowledging the verbal command.
9     Q.  Okay.  It says here at 1:57, Officer
10  Lopera, so this is one minute and 57 seconds into the
11  body cam.  Officer Lopera yelled, "Get on your
12  stomach."  And then at two minutes Farmer rolled onto
13  his stomach, then to his back.
14        Does that indicate to you that he was
15  trying to comply?
16     A.  That he was trying to comply?
17     Q.  Yes.
18     A.  He rolled on his stomach and rolled back
19  on -- then rolled to his back.
20     Q.  He had Taser probes on him, right?
21     A.  Yes.
22     Q.  So does that indicate to you he's
23  complying, not complying or indeterminate?
24     MR. McNUTT:  Object to this line of
25  questioning inasmuch as you're asking the witness to

Page 239

1  interpret someone's interpretation of the actual
2  video.
3  BY MR. LAGOMARSINO:
4     Q.  All right.  So let's do some foundational
5  questions.
6        You're the lead investigator on the case,
7  right?
8     A.  Yes.
9     Q.  And you're reviewing all the
10  interpretations from all the witnesses, correct?
11     A.  Yes.
12     Q.  That's part of your job, right?
13     A.  Yes.
14     Q.  So as part of your job, you make
15  recommendations based on what people have interpreted
16  from the videos, correct?
17     A.  If you're referencing FIT being a witness,
18  I don't consider them a witness.  They did an
19  independent investigation.
20     Q.  Was this timeline used in the CIRT report?
21     A.  No.  We have our own timeline.
22     Q.  Was the FIT report provided to the CIRT
23  board?
24     A.  The FIT report was -- yes, it was.
25     Q.  So basically at 1:57, again Lopera says,

Page 240

1  "Get on your stomach."  At 2:04, seven seconds later,
2  Farmer rolls to his stomach, right?
3     A.  Yes.  Per this timeline, yes.
4     Q.  And does that indicate compliance to you?
5     A.  Yes.
6     Q.  And three seconds later, Farmer says,
7  "Okay, okay, okay, sir."
8        Does that indicate compliance to you?
9     A.  Again, I don't know what his actions are at
10  this time.
11     Q.  Okay.  Then at 2:20 it says security
12  arrived.  They give Farmer verbal commands and a
13  guard grabbed onto Farmer's arms.  Farmer said, "I
14  will."
15        Do you believe it could be confusing to
16  somebody who is getting multiple commands from
17  multiple people?
18     A.  Yes.
19     Q.  Now, security is giving commands to say
20  stop, turn around, correct?  At 2:22?
21     A.  Per this timeline, that's what it says,
22  yeah.
23     Q.  And that command was not given to Farmer
24  from Lopera, correct?
25     A.  According to this timeline, it says

Page 241

1  security gave that.
2     Q.  But prior to this, according to the
3  timeline, Lopera didn't say, "Stop, turn around,"
4  correct?
5     A.  No.
6     Q.  That's incorrect?
7     A.  No.  Yeah.  Officer Lopera did not say,
8  "Stop, turn around."
9     Q.  So that's a different command, correct?
10     A.  Yes.
11     Q.  Okay.  So then at 2:33, Lopera holsters his
12  ECD and says, "Hands behind your back."
13        Farmer replied, "I'm trying to."  Right?
14  Does that indicate compliance?
15     A.  Possible indication.
16     Q.  You reviewed the videos probably multiple
17  times, correct?
18     A.  Yes.
19     Q.  How many times would you say you reviewed
20  Lopera's body cam video by way of an estimate?
21     A.  Probably 40 times, 50 times.
22     Q.  And you never came to the conclusion that
23  Farmer struck Lopera, correct?
24     A.  Correct.
25     Q.  And there's nothing -- there's no

Detective Kasey Kirkegard  ~  February 6, 2019
* * * Videotaped Deposition * * *

Page 247

```
 1                    CERTIFICATE OF REPORTER

 2            I, the undersigned, a Certified Shorthand

 3   Reporter of the State of Nevada, do hereby certify:

 4            That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6   that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a record

 8   of the proceedings was made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given to the best of my

12   ability.

13            Further, that before completion of the

14   proceedings, review of the transcript [ X ] was

15   [  ] was not requested pursuant to NRCP 30(e).

16            I further certify I am neither financially

17   interested in the action, nor a relative or employee

18   of any attorney or party to this action.

19            IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: February 12, 2019

23

24   _____
     GALE SALERNO, RMR, CCR #542
25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com