# EXHIBIT 21
# Excerpts from Ryan Evans Deposition, Vol. I, 10/25/18

```
                UNITED STATES DISTRICT COURT
                     DISTRICT OF NEVADA


ESTATE OF TASHI S. FARMER a/k/a    )
TASHII FARMER a/k/a TASHII BROWN,  )
by and through its Special         )
Administrator, Lorin Michelle      )
Taylor; TAMARA BAYLEE              )
KUUMEALIMAKAMAE FARMER DUARTE, a   )
minor, individually and as         )
Successor-in-Interest, by and      )
through her legal guardian,        )
Stevandra Lk Kuanoni; ELIAS BAY    )
KAIMIPONO DUARTE, a minor,         )
individually and as Successor-in-  )
Interest, by and through his       )
legal guardian, Stevandra Lk       )
Kuanoni,                           )
                                   )
           Plaintiffs,             )
  vs.                              )  Case No.
                                   )  2:17-cv-01946-JCM-PAL
LAS VEGAS METROPOLITAN POLICE      )
DEPARTMENT, a political            )
_____)
(Caption continued on page 2.)     )
_____)


      VIDEOTAPED DEPOSITION OF SERGEANT RYAN EVANS
                    Las Vegas, Nevada
                Thursday, October 25, 2018
                        Volume I


Reported By:
BARBARA R. JUSTL
CCR No. 878
Job No. 3058586B
PAGES 1 - 53
```

Page 1

**Page 14**

1   We do the refreshers for defensive tactics for the
2 instructors throughout the year, and we also put on three
3 defensive tactic schools per year to certify officers to
4 be defensive tactics teachers. So I usually supervise
5 those sometimes if I'm available. If I'm not available,   15:33:27
6 I'm present at those. But normally it's my staff that
7 does the teaching.
8   Q   And do you train with your staff on applying a
9 lateral vascular neck restraint?
10   A   When I have the time.
11   Q   What does that mean?
12   A   Just depends. A lot of times I have to go to SME
13 briefs for officer-involved shootings. I have to sit on
14 the Use of Force review boards as a tactical expert. So
15 just depends on if I'm available at the time. That's
16 really it. Just depends on what my schedule looks like   15:33:59
17 throughout the week, the month, the year.
18   Q   Do you train with your officers on how to escape
19 from a rear naked choke?
20   A   We do teach how to escape from one. Actually, we
21 do.
22   Q   Would you take a look at the document that's
23 before you.
24   A   Uh-huh.
25   Q   That document has been previously marked as

**Page 15**

1 Exhibit 1 to the deposition of Assistant Sheriff Kelly --   15:34:29
2   A   Okay.
3   Q   -- earlier today.
4       Have you ever seen this document?
5   A   I have.
6   Q   When did you last see it?
7   A   Yesterday.
8   Q   And yesterday did you read it through?
9   A   Not in its entirety. I skimmed through it.
10   Q   Prior to yesterday, had you ever seen this
11 document before?
12   A   I have not.
13   Q   Do you recall being assigned to this Tactical   15:35:00
14 Review Board?
15   A   Yes, I do.
16   Q   Who assigned you?
17   A   I couldn't say exactly who assigned me. I know
18 that I get an email when my presence is needed at a
19 review board.
20   Q   I take it that you are frequently assigned to
21 review boards?
22   A   I am, yes, sir.
23   Q   Before this review board, do you have an estimate
24 of how many review boards you had been assigned to?
25   A   I would say over the last two years, probably

**Page 16**

1 90 percent of them, as an estimate.   15:35:30
2   Q   When you say 90 percent, do you have a -- can you
3 give me an actual number?
4   A   15, 20.
5   Q   That's the 90 percent?
6   A   Yeah, I would say that I've been involved in.
7 Could be higher, could be lower. I've never kept track.
8   Q   And is your role always as a tactical expert?
9   A   Yes, sir.
10   Q   In this situation, one of the officers that was   15:35:59
11 being examined was a sergeant, Sergeant Crumrine. Do you
12 serve as a -- besides a tactical expert, do you serve as
13 a peer member?
14   A   No, I do not.
15   Q   So your role in this Tactical Review Board was
16 limited strictly to being a tactical expert?
17   A   Correct.
18   Q   Could you tell us, please, how you went about   15:36:28
19 considering the evidence or information in this case,
20 what was provided to you, what did you read, that sort of
21 thing?
22   A   Prior to what?
23   Q   Well, okay, that's a good question.
24       Did you have a meeting together with the other
25 members of the Tactical Review Board on at least one

**Page 17**

1 occasion?
2   A   We have a meeting reference every review board.
3 It's called an SME brief. But I can't tell you if there   15:36:59
4 was members there or not, because I don't remember who
5 was there.
6   Q   Okay. SME stands for subject matter --
7   A   Subject matter expert. Sorry, I didn't mean to
8 talk over you.
9   Q   That's all right. It's easy to do, I'm short.
10 So -- so you participated in SME brief discussion?
11   A   For the Lopera case, yes.
12   Q   For the Lopera. Did you address the tactics of   15:37:28
13 Ken Lopera?
14   A   Yes, we did.
15   Q   Did you address the tactics of Sergeant Crumrine?
16   A   Yes, we did.
17   Q   And did you discuss the tactics of Officers Tran,
18 Flores and Lif?
19   A   Yes, we did.
20   Q   Now, before you had this meeting where you
21 discussed things, were you given anything to read and
22 review?
23   A   Before the SME briefs, no.
24   Q   After the SME briefs, were you given any   15:37:58
25 information to read?

| | |
|---|---|
| 1  from the whole call. | 1  A  It says, "CIRT's review showed," so I'd have to |
| 2      It's not one specific area. It would start from  15:42:58 | 2  assume. |
| 3  the beginning, like preplanning and stuff like that, | 3  Q  Are you able to agree or disagree or have no   15:45:58 |
| 4  depending on the type of incident. | 4  comment on any aspect of this paragraph? |
| 5  Q  Who made the presentation on behalf of -- the | 5  A  What would you specifically like to know? |
| 6  PowerPoint presentation? | 6  Q  Let's start he tased him seven times for a total |
| 7  A  I don't recall that. | 7  duration of 39 seconds. |
| 8  Q  Was it a female officer? | 8  A  The video showed that. |
| 9  A  I don't recall. | 9  Q  You saw? |
| 10  Q  Take a look at page 3 of that document. And in   15:43:26 | 10  A  Correct. |
| 11  the lower right-hand corner there's a Bates stamp | 11  Q  He struck Farmer in the face 13 times. |
| 12  LVMPD 3771. | 12  A  That he struck him several times. I don't |
| 13  A  Okay. | 13  remember if that's the exact count, but you can ascertain |
| 14  Q  Beneath the blackened area, it says, "camera | 14  from the video that he struck him. |
| 15  showed Officer Lopera immediately placed his right hand | 15  Q  Review of the camera showed Farmer had his hands   15:46:27 |
| 16  on top of Farmer's head, similar to the hand placement of | 16  up in a protective manner around his face. |
| 17  a rear naked choke. There appeared to be no attempt to   15:43:57 | 17  A  Don't recall. |
| 18  obtain the proper grip for the LVNR, as taught by LVMPD." | 18  Q  Officer Lopera instructed Farmer to get on his |
| 19      And you've already told us about the grip. The | 19  stomach numerous times without realizing Farmer was on |
| 20  hands were not married. Do you have any way to agree or | 20  his stomach. |
| 21  disagree that the right hand on the top of the head was | 21      Do you remember that or no? |
| 22  similar to the hand placement of a rear naked choke? | 22  A  I remember him telling him several times, but I |
| 23  A  I'm going to have to disagree on the fact that I | 23  don't remember what the video actually showed. |
| 24  only train on department tactics. I don't train outside | 24  Q  "Officer Lopera was also told several times to let |
| 25  the department. So other than the LVNR and just grabbing  15:44:27 | 25  go, however, the Venetian Surveillance Video showed more |
| Page 22 | Page 24 |
| 1  somebody and choking them by the neck, I wouldn't have | 1  than one minute and 12 seconds had elapsed from the time  15:46:59 |
| 2  any outside training or knowledge on how to properly do | 2  Officer Lopera initiated the neck restraint and the time |
| 3  any other techniques. | 3  Farmer was released from the neck restraint." |
| 4  Q  Okay. So it's not that you disagree; you don't | 4      Do you remember that? |
| 5  know? | 5  A  Yes. |
| 6  A  Correct. | 6  Q  "Farmer's behavior or resistance level never |
| 7  Q  Okay, I got you. | 7  appeared to be aggressive as described to Officer |
| 8      It says, "CIRT's review showed" -- next | 8  Lopera." |
| 9  paragraph -- "CIRT's review showed Officer Lopera had | 9      The question is, do you know the difference |
| 10  tased Farmer 7 times for a total duration of 39 seconds. | 10  between active resistance and aggressive resistance? |
| 11  He struck Farmer in the face 13 times. Review of the | 11  A  Absolutely. |
| 12  camera showed Farmer had his hands up in a protective   15:45:00 | 12  Q  Do you agree with that sentence that his behavior   15:47:28 |
| 13  manner around his face, while Lopera" -- "Officer Lopera | 13  never appeared to be aggressive? |
| 14  maintained a dominant position over Farmer. Officer | 14  A  I agree with that statement. |
| 15  Lopera instructed Farmer 'to get on his stomach' numerous | 15  Q  Take a look at page 6, please, the top of the |
| 16  times without realizing Farmer was on his stomach. | 16  page. "CIRT concluded the use of strikes by Officer |
| 17  Officer Lopera was also told several times to let go, | 17  Lopera was not within standardized LVMPD tactics, |
| 18  however, the Venetian Surveillance Video showed more than   15:45:26 | 18  training and policy."                               15:47:59 |
| 19  one minute and 12 seconds had elapsed from the time | 19      Do you agree with that? |
| 20  Officer Lopera initiated the neck restraint and the time | 20  A  The fact that he wasn't in an aggressive manner, |
| 21  Farmer was released from the neck restraint. Farmer's | 21  yes. |
| 22  behavior or resistance level never appeared to be | 22  Q  "The autopsy of Farmer showed evidence of |
| 23  aggressive as described by Officer Lopera." | 23  hemorrhages in his neck. If the LVNR is applied |
| 24      Now this information I assume came from the CIRT | 24  correctly, this type of injury should not occur." |
| 25  report, if you know? | 25      MR. McNUTT: Objection, form, calls for medical |
| Page 23 | Page 25 |

7 (Pages 22 - 25)

**Page 26**

1  testimony.
2         THE WITNESS: I couldn't attest to medical
3  examinations.
4  BY MR. SAYRE:
5     Q  Okay, that's fine. Down -- further down, it's the  15:48:23
6  third paragraph from the bottom, "CIRT concluded Officer
7  Lopera's use of the neck restraint was not within
8  standardized LVMPD tactics, training and policy."
9         Do you agree or disagree?
10    A  I agree based off what the video showed.
11    Q  "The Tactical Review Board concluded that as a
12  result of the above conclusions in relation to the Threat
13  Assessment, Officer Lopera's actions during this incident
14  amount to a gross inappropriate use of force."
15        Do you agree?
16    A  I do.
17    Q  Is that the same thing as excessive force?
18        MR. ANDERSON: Objection, form.
19        You can go ahead and answer.
20        THE WITNESS: I'd have to ask the person who wrote
21  that. I've never seen that terminology.
22  BY MR. SAYRE:
23    Q  You haven't seen gross and inappropriate use of  15:49:29
24  force?
25    A  No.

**Page 27**

1     Q  So you don't know if that's the equivalent of
2  excessive force?
3     A  Right.
4     Q  You would agree that it's more than simply
5  inappropriate force?
6     A  Yeah, based off that word.
7     Q  The use of the word "gross"?
8     A  And inappropriate.
9     Q  Right. Take a look at page 8, please. It says,  15:49:52
10  "A Board member said, each force application that an
11  LVMPD department member uses should be assessed between
12  each use of force."
13        You agree with that?
14    A  Correct.
15    Q  "A Board member said, there were over 20
16  applications of force. Did anyone else see any
17  assessment?
18        "SME Bland stated there were opportunities to
19  assess, but no assessment was made."
20        Do you agree?
21    A  I do.
22    Q  Those would be -- that would be outside of policy,  15:50:25
23  failing to assess?
24    A  We teach it. I wouldn't say it's outside of
25  policy, but it's what we do teach and we prefer.

**Page 28**

1     Q  Why isn't it outside of policy if there's no
2  assessment made?
3     A  I'm sorry, what was that?
4     Q  Why is it not outside of policy if there's no
5  assessment made between uses of force?
6     A  I know we teach it. I would have to look at the
7  policy to see if the wording is actually in there, but I
8  just know it's something that we consistently teach as  15:50:59
9  far as when you do use force to assess.
10        You know, if the suspect's willing to comply, then
11  we stop. So I know it's something we train. I would
12  actually have to look through the policy manual to tell
13  you if it was actually in there or not.
14    Q  Is one of the reasons that you're required to
15  assess the use of force involved is to avoid excessive
16  force on the subject?
17        MR. McNUTT: Objection, form.
18        MR. ANDERSON: Go ahead.                   15:51:29
19        THE WITNESS: That, yes. Not so much -- well,
20  excessive force, but also just if somebody is going to
21  end up complying after some type of force, at some point
22  you have to assess, giving commands in between.
23  BY MR. SAYRE:
24    Q  Because if a person is complying -- well, strike
25  that.

**Page 29**

1         If a person is either complying or has gone
2  unconscious, you have to relieve the force that you were
3  using on a person's neck, right?
4     A  Yes. If you know they have gone unconscious, then  15:51:57
5  you would relieve the pressure. Doesn't mean you relieve
6  the LVNR completely, but you at least release the
7  pressure.
8     Q  If a person, subject, is not supplying any
9  resistance, and I'm going to represent to you that's what
10  Officer Tran said, do you have to relieve the LVNR?
11    A  No. You would relieve the pressure if you applied
12  the pressure, but you do not have to release the LVNR in  15:52:27
13  and of itself.
14    Q  Officer Crumrine told Officer Lopera two or three
15  times to let go. Did Officer Crumrine have a duty to
16  check and make sure that he had let go?
17    A  No.
18    Q  Why not?
19    A  We do not teach that. So I don't know what he
20  meant by let go. I've never spoken to him on it, so I
21  don't know if he meant to let go or release pressure. I
22  don't know what he meant by that. But we do not teach to  15:52:58
23  let go until they're in custody.
24    Q  Okay. But if a person is unconscious, are you
25  required to let go?

```
 1   A   No, you're required to release pressure.
 2   Q   If a person is not expressing any resistance, is
 3  that the same as being unconscious?
 4   A   No.
 5       MR. ANDERSON: Objection to form.
 6       Go ahead.
 7       THE WITNESS: It's not.
 8  BY MR. SAYRE:
 9   Q   So you keep the LVNR compressing if a person is
10  not expressing any resistance?
11   A   No. So when you encircle somebody sometimes --    15:53:30
12  our goal to use LVNR is to gain compliance and control
13  from a subject who isn't being compliant and is most
14  likely aggressive.
15       At the time it was an active, so a subject that's
16  being active, we would have a right to go and encircle
17  them. Just encircling somebody and using the proper
18  placement can gain compliance and control. So you can
19  use that without any pressure.
20       Now, if you decide to use pressure and they're    15:53:58
21  like, okay, okay, okay, then you would relieve pressure,
22  but I still would not get rid of the control part of it,
23  the encircle of it.
24   Q   If a person like Officer Lopera is using a rear
25  naked choke --
                                                          Page 30
```

```
 1       MR. McNUTT: Objection, form.
 2       THE WITNESS: I can't --
 3       MR. SAYRE: I haven't finished my question.
 4       THE WITNESS: Sorry.
 5  BY MR. SAYRE:
 6   Q   If a person like Officer Lopera is using a rear
 7  naked choke, is that hold prohibited by the Metropolitan
 8  Police Department?
 9       MR. McNUTT: Objection, form.
10       THE WITNESS: A individual who used one is         15:54:29
11  prohibited except for a deadly force situation.
12  BY MR. SAYRE:
13   Q   Okay. All right. If the officers who were
14  surrounding Officer Lopera were aware that he was using a
15  rear naked choke -- I'm talking about Sergeant Crumrine,
16  Officer Tran, Officer Flores -- do they have a duty to
17  intervene to basically stop the application of the rear
18  naked choke?
19       MR. ANDERSON: Objection, incomplete hypothetical.
20       Go ahead and answer.
21       THE WITNESS: Okay. No, they don't, because they
22  don't know what led up to that. They don't know if that  15:54:58
23  individual had pulled a knife on him, if that individual
24  pulled a gun on him.
25       At the point in time when they arrived, all they
                                                          Page 31
```

```
 1  know is that there's an officer who's on the ground who's
 2  in what is perceived to be a struggle with an individual.
 3  So without them being knowledgeable to what led up to
 4  what they saw when they arrived, I would absolutely say
 5  no.
 6  BY MR. SAYRE:
 7   Q   Do you teach through your program that officers
 8  are permitted to use a rear naked choke?
 9   A   We do not teach that. We teach the escape, and    15:55:28
10  when we teach the escape, we tell them that, hey, this is
11  not an approved technique. But we also teach that when
12  you're in a deadly force situation, you have to do what
13  you have to do to survive.
14   Q   Well, what does that mean? Does that mean that
15  they can use the rear naked choke even though it's
16  prohibited?
17   A   If they're found in a deadly force situation, they
18  could use a pencil, they can use a key, they can use
19  whatever they want. At that point in time, if it's a    15:55:57
20  life or death situation, they have to survive. Everybody
21  in this room has to survive.
22   Q   Right. If the three officers that were
23  surrounding Officer Lopera see him exercising a rear
24  naked choke, and he's told by the sergeant to release it,
25  do they have a duty to intervene to make sure that he
                                                          Page 32
```

```
 1  releases it?
 2   A   Can you repeat that?
 3   Q   Sure. If Officer Lopera is applying a rear naked
 4  choke and he's told by Sergeant Crumrine to release it,   15:56:29
 5  do the officers have a duty to intervene to make sure
 6  that he releases it?
 7       MR. ANDERSON: Objection, form.
 8       Go ahead and answer.
 9       THE WITNESS: If they're aware of the facts and
10  circumstances that led up to that that don't amount to a
11  deadly force situation, then they would.
12  BY MR. SAYRE:
13   Q   Do you see any justification in the video for the
14  use of a rear naked choke in this situation?
15   A   No.
16   Q   Was the application of a rear naked choke,         15:56:59
17  assuming that that's what was applied, excessive force?
18       MR. McNUTT: Objection, form.
19       MR. ANDERSON: Objection, form.
20       THE WITNESS: If that was what was applied, I
21  would say yes.
22  BY MR. SAYRE:
23       And if that was what was applied under the facts
24  of this situation as you've seen in the video, did the
25  three standby or bystander officers, Crumrine, Flores and
                                                          Page 33
```

9 (Pages 30 - 33)

**Page 38**

1 does.
2 Q Right. And the recommendation from the national
3 center is that you supply four hours of yearly training,
4 correct?
5 A I don't recall.
6 Q You don't know. Who decided on two hours?
7 A It's been that way since I've been on the       16:02:01
8 department, so I couldn't tell you.
9 Q Okay. There's some statements, take a look at
10 page 12. Top of the page it says, "CIRT concluded by   16:02:23
11 failing to ensure Officer Lopera released the neck
12 restraint after being ordered to do so, Sergeant Crumrine
13 was in neglect of duty as a supervisor. In addition, in
14 reviewing supervisory tech response, CIRT concluded
15 Sergeant Crumrine's response was not within standardized
16 LVMPD tactics, training and policy."
17     Did you agree with that?
18 A I do agree with it to an extent. I believe that  16:02:58
19 he showed up with the intent to intervene. I believe he
20 could do it a better way. I believe he could have been
21 more direct on how he wanted things.                16:03:28
22 Q What do you mean by "more direct"?
23 A He could have -- there's other things that he
24 could have done as a supervisor, or any officer on scene
25 if they wanted to make themselves more clear on what he

**Page 39**

1 wanted.
2     So I don't know what he wanted, but I believe the
3 statement is vague, so we don't know exactly what he
4 meant by that. I believe as any officer, whether you're
5 a supervisor or not, if you have an intent, you express
6 that intent more clearly than he did.
7 Q He could have directed one of the other officers
8 to physically intervene and remove Officer Lopera's    16:03:58
9 hands?
10 A Anybody can.
11 Q Could he?
12 A Could he?
13 Q Yes.
14 A Yeah.
15 Q Could he himself have intervened and physically
16 removed Officer Lopera's hands?
17 A There's nothing that says nobody -- that he nor
18 any other officer can't. They all have a right to if
19 they choose to, but it's all based on circumstances.
20 Q Down at the bottom of the page it says, "A Board
21 member said, he is a weak sergeant, he performed weakly
22 and his officer didn't listen to him."              16:04:29
23     Do you remember that being spoken?
24 A Not -- I vaguely remember it being said. I mean,
25 yeah.

**Page 40**

1 Q Do you remember who said it?
2 A No, I do not.
3 Q But it was one of the members of the Tactical
4 Review Board?
5 A This statement could have been at the Tactical
6 Review Board, or it could have been at the SME brief. It
7 would have been one of the two.
8 Q What do you think it means when it says, "A Board
9 member said"?                                        16:04:59
10     MR. ANDERSON: Objection, speculation.
11     Go ahead.
12     THE WITNESS: Some of the statements that I've
13 read reference or comments that I've read, some of the
14 ones that you had read before by Mike Bland, it says,
15 "Board member" and it says, "Mike Bland." Well, Mike
16 Bland was the SME brief.
17 BY MR. SAYRE:
18 Q Well, it never referred to Mike Bland as a board
19 member.
20 A No, but it said, "A Board member said," correct?
21 Am I correct?
22 Q I don't think so. It says what Mike Bland said.   16:05:27
23 A What page was that on? It says, "A Board member
24 said, there was over 20 applications of force. Did
25 anyone else see any assessment?

**Page 41**

1     "SME Bland stated that there were opportunities...
2 But no assessments."
3     So to me, he's -- Mike Bland is answering that
4 question, and they're referring, they're using the word
5 "Board member," so I don't know exactly. They're kind of
6 contradicting as far as if it was a Use of Force Board or
7 an SME brief that these statements were made in. So I    16:05:59
8 couldn't tell you that any of these statements were made
9 in either one. Clearly it was either the SME brief or
10 during the review boards.
11 Q Okay. Let's take a look at page 13, please.
12     "A Board member said, part of his job is to look
13 out for his people. He should have taken care of his
14 officer. He didn't understand his job as a sergeant."
15     Do you remember that being said?
16 A I don't remember that being said, and I really
17 don't understand exactly what they mean by that
18 statement.
19 Q "A Board member said, due to Sergeant Crumrine's   16:06:29
20 inaction, his troop ended up killing someone and still
21 did not admit he could have done more."
22     Do you remember that being said?
23 A I remember he admitted he could not have done
24 more.
25 Q I'm asking if you heard this said.

11 (Pages 38 - 41)

1 encircled until the time that the encirclement was
2 released. There's no way you can tell on video if he was
3 applying the pressure for any amount of time via video.
4   Q   So it would be incorrect for anybody to say that
5 pressure was applied for any length of time because no
6 one can tell?
7   A   The only person that would know that would be
8 Lopera himself.                                16:20:00
9       MR. McNUTT: I have no further questions.
10
11              FURTHER EXAMINATION
12 BY MR. SAYRE:
13   Q   You don't know whether pressure was being applied
14 for one minute and 12 second, right?
15   A   No, I do not.
16   Q   And, in fact, we do know that he died?
17   A   That we do know.
18   Q   And that is potentially one of the effects of
19 maintaining pressure around the neck after a person has
20 gone unconscious?
21       MR. McNUTT: Objection, form.
22       THE WITNESS: I don't really know.
23 BY MR. SAYRE:
24   Q   Do you know if that's one of the possible effects
25 of applying a rear naked choke?

Page 50

1       MR. McNUTT: Objection, form.
2       THE WITNESS: That I don't know.        16:20:29
3       MR. SAYRE: I have nothing further.
4       MR. ANDERSON: Thanks. You're done.
5       VIDEOGRAPHER: We are now off the record.
6       The time is 4:20 p.m.
7       This concludes today's testimony given by Ryan
8 Evans.

Page 51

1
2       I, SERGEANT RYAN EVANS, do hereby declare under
3 penalty of perjury that I have read the foregoing
4 transcript; that I have made any corrections as appear
5 noted, in ink, initialed by me, or attached hereto; that
6 my testimony as contained herein, as corrected, is true
7 and correct.
8       EXECUTED this _____ day of _____,
9 2018, at _____, _____.
10         (City)            (State)
11
12
13
14
15      _____
16         SERGEANT RYAN EVANS
17            VOLUME I

Page 52

1       I, the undersigned, a Certified Court Reporter of
2 the State of Nevada, do hereby certify:
3       That the foregoing proceedings were taken before
4 me at the time and place herein set forth; that any
5 witnesses in the foregoing proceedings, prior to
6 testifying, were duly sworn; that a record of the
   proceedings was made by me using machine shorthand which
7 was thereafter transcribed under my direction; that the
8 foregoing transcript is a true record of the testimony
9 given.
10      Further, that before completion of the
11 proceedings, review of the transcript [XX] was [ ] was
   not requested.
12      I further certify I am neither financially
13 interested in the action nor a relative or employee of
14 any attorney or party to this action.
15          IN WITNESS WHEREOF, I have this date
16 subscribed my name.
17
18 Dated: November 8, 2018.
19
20
21
22
23      *signature*
24      BARBARA K. JUSTL, RPR
25      CCR No. 878

Page 53

14 (Pages 50 - 53)