# EXHIBIT 22
# Excerpts from Chad Lyman Deposition, Vol. II, 11/5/19

Case 2:18-cv-00860-GMN-VCF   Document 150-9   Filed 01/13/20   Page 2 of 12

Chad N. Lyman                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2              DISTRICT OF NEVADA
 3
 4   TRINITA FARMER, individually, ) Case No.:
                                   ) 2:18-cv-00860-GMN-VCF
 5        Plaintiff,               )
                                   )
 6   vs.                           )
                                   )
 7   LAS VEGAS METROPOLITAN POLICE )
     DEPARTMENT, a political       )
 8   subdivision of the State of   )
     Nevada; KENNETH LOPERA,       )
 9   individually; TRAVIS CRUMRINE,)
     individually; MICHAEL TRAN,   )
10   individually; MICHAEL FLORES, )
     individually,                 )
11                                 )
          Defendants.              )
12   _____)
13
14
15              DEPOSITION
16                 OF
17            CHAD N. LYMAN
18       Taken on Tuesday, November 5, 2019
19          By a Certified Court Reporter
20              At 9:08 a.m.
21     At 400 South Seventh Street, Suite 400
22              Las Vegas, Nevada
23
24   Reported by: Dawn Bratcher Gustin, CCR 253, RPR, CRR
                       California CSR 7124
25   Job No. 36895
```

**Page 2**

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3       ANDRE LAGOMARSINO, ESQ.
         LAGOMARSINO LAW
 4       3005 West Horizon Ridge Parkway
         Suite 241
 5       Henderson, Nevada  89052
 6
 7   For the Defendants Las Vegas Metropolitan Police
     Department, Travis Crumrine, Michael Tran, and Michael
 8   Flores:
 9       CRAIG R. ANDERSON, ESQ.
         MARQUIS AURBACH COFFING
10       10001 Park Run Drive
         Las Vegas, Nevada  89145
11
12   For the Defendant Kenneth Lopera:
13
         DANIEL R. McNUTT, ESQ.
14       McNUTT LAW FIRM, P.C.
         625 South Eighth Street
15       Las Vegas, Nevada  89101
16
17                * * * * * * * *
```

**Page 3**

```
                    I N D E X
WITNESS                                          PAGE
CHAD N. LYMAN
    Examination by Mr. McNutt                   4, 130
    Examination by Mr. Lagomarsino                92


                    E X H I B I T S
EXHIBIT       DESCRIPTION                       MARKED
Exhibit 1     Document entitled Risks            122
              Associated With the Use of the
              Carotid Restraint by Bill Smock,
              MD (28 pages)
```

**Page 4**

```
                    PROCEEDINGS
           (Counsel stipulated to waive the
     reporter requirements under NRCP Rule
     30(b)(5)(A).)
           CHAD N. LYMAN,
     having been first duly sworn, was
     examined and testified as follows:
                    EXAMINATION
BY MR. McNUTT:
     Q.  Mr. Lyman, my name is Dan McNutt, and I
represent former Metro Officer Ken Lopera.
     A.  Okay.
     Q.  And have you ever had your deposition taken
before?
     A.  Yes.
     Q.  How many times?
     A.  A handful.
     Q.  Okay.  Well, just -- and I will go over the
rules of the deposition fairly quickly.  If you at any
time -- the biggest rule is if you have any questions
ever, ask.  If you want to take a break at any time, as
long as there's no pending question, we'll take a break.
No problem.
           Obviously, we have a court reporter to your
right, and she's taking down everything that's being
```

Case 2:18-cv-00860-GMN-VCF   Document 150-9   Filed 01/13/20   Page 3 of 12

Chad N. Lyman                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 25

1  guys. I would have served in AOST approximately, guys,
2  from sometime in -- in '13 through to about 2016. And
3  that's going to be approximate. It was about a
4  three-year stint, and it could have been as much as
5  three and a half.
6  BY MR. MCNUTT:
7      Q.  Thank you.
8      A.  I don't know about you guys, but this weird
9  thing happened to me. I'm older than yesterday, and it
10 seems to be speeding up, and I don't -- I'm fighting it;
11 so I don't keep track of dates too well.
12     Q.  Well, I will let you know that Craig Anderson
13 when he starts to question you, he has trick questions,
14 and he will -- if your wife is in the room, he will
15 often ask you the date you first met your wife, your
16 anniversary, things of that nature --
17     A.  I will write them down.
18     Q.  -- just to embarrass you.
19     A.  Yeah, that would work for me.
20         (A discussion was held off the
21         record.)
22         THE WITNESS: That AOST stint, though,
23 brother -- or guys, circling back to that, that would
24 have been about a three-and-a-half-year stint.
25 /////

Page 26

1  BY MR. MCNUTT:
2      Q.  Okay.
3      A.  Somewhere in there.
4      Q.  How would you describe Ken Lopera's level of
5  skill -- and I'm not saying you need to put it in some
6  sort of belts or anything else, just low-level skill,
7  average-level skill, however you would describe it.
8         MR. LAGOMARSINO: Objection. Form.
9  Foundation.
10 BY MR. MCNUTT:
11     Q.  So Chad, since we have no judge here, counsel
12 is entitled to make objections on the record, and they
13 will -- the court reporter will write it down, and we'll
14 deal with the judge later, but you are free to answer
15 the question.
16     A.  Okay.
17         The only thing I could really base Kenny's
18 skill or ability on would be a law enforcement setting
19 because that's where I've trained with him, if that
20 makes sense.
21         Well, I'll offer it two ways: In a law
22 enforcement setting, I found Ken to be engaged, wanting
23 to learn, coachable, listening, asking relevant
24 questions. He was that type of a student. He was happy
25 to be there.

Page 27

1  We have students in the room at times that will
2  complain and wonder if we're going to get off early and
3  those kind of things. Ken was not that type of a
4  student. He was engaged and worked hard for the balance
5  of whatever we were doing, and he would do whatever we
6  would ask him to do physically, and he would do it at an
7  appropriate pace and with appropriate -- as we showed
8  him. And so from that standpoint, I think Ken was a
9  very good law enforcement student who showed interest in
10 the things that we were teaching him.
11         If you were to ask me what level of Brazilian
12 jiu-jitsu practitioner he was, he was a beginner. He
13 would be -- if he were to go compete in a tournament, it
14 would be inappropriate for him to compete in any kind of
15 intermediate or advanced division. It would be
16 appropriate for him to compete in a beginning division
17 based upon his overall skill level from the times I've
18 seen him.
19     Q.  Okay. Do you -- does -- when Metro trains in
20 the -- obviously, you're familiar with the lateral
21 vascular neck restraint; correct?
22     A.  Yes, sir.
23     Q.  When an officer trains in the lateral vascular
24 neck restraint -- and for the court reporter, same thing
25 if I say LVNR -- do they give certification like, you

Page 28

1  know, you're an expert in the use of the LVNR, or is it
2  simply you've had the training in the LVNR?
3      A.  You got the training --
4      Q.  Okay.
5      A.  -- would be the appropriate designation.
6      Q.  So because -- so because Ken had the training,
7  that's -- he's sufficient or proficient, according to
8  Metro's standards, to use and deploy the LVNR as a
9  patrol officer?
10     A.  Yes.
11     Q.  So let's talk about your training. Obviously,
12 when you came through -- well, actually, did you go
13 through Metro's academy when you started, or did your
14 academy with Portland -- how did that work for laterals?
15     A.  They didn't care at all about my academy in
16 Portland. I did a six-month military-style academy like
17 everyone else. But actually, that was -- I actually
18 embraced that after initially not being totally
19 thrilled. I thought it was great because I got the same
20 experience as all my brother and sister officers did.
21 So I think it was appropriate.
22     Q.  So you -- obviously, in the academy you were
23 trained in the lateral vascular restraint; correct?
24     A.  Yes, sir.
25     Q.  Okay. And then you as a patrol officer would

Case 2:18-cv-00860-GMN-VCF   Document 150-9   Filed 01/13/20   Page 4 of 12

Chad N. Lyman                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 29

1  have gone through the same types of training, whether
2  the quarterly defensive tactics training or the ten-hour
3  block of AOST training, every year during your time with
4  patrol; correct?
5      A.  That's correct.  AOST was not a unit when I
6  first came on in '04.  I believe they were formed in '08
7  or so.  I'm not certain, but you would have to look.
8  But they were not a unit when I came on.  As soon as --
9  we still had the quarterly trainings, but we did not
10 have an AOST training at that time.
11     Shortly after I began, within my first several
12 years, AOST was launched, and since that time I have --
13 I have attended AOST.
14     Q.  Okay.  And since we're going back to 2004, let
15 me ask this:  Was the lateral vascular neck restraint
16 trained in Metro in 2004 when you came through the
17 academy?
18     A.  Yes, sir.
19     Q.  Okay.  So the lateral vascular neck restraint
20 has been employed by the Metropolitan Police Department
21 since at least 2004?
22     A.  At least, yes.
23     Q.  Were there any times in -- since 2004, to your
24 knowledge, when it was not an authorized technique?
25     A.  No.

Page 30

1      Q.  Okay.  In 2004, or anytime since, were there
2  other neck restraints that were authorized, defensive
3  tactics techniques?
4      A.  No.
5      Q.  So one of the issues in this case is the --
6  whether the technique employed was a lateral vascular
7  neck restraint or something else.  And so I will ask you
8  to describe, if you can, to me the principles of the
9  lateral vascular neck restraint.
10     What is the officer trying to achieve by
11 utilizing an LVNR?
12     A.  Hopefully -- the overall hope is compliance
13 from -- from the suspect.  And so that's what they're
14 trying to achieve.
15     Do you mean physically or --
16     Q.  Yes, physically.
17     A.  If the suspect were to continue to resist?
18     Q.  Correct.
19     A.  Okay.  The -- the LVNR, the principles or the
20 ideas behind it are that if the suspect is resisting,
21 the officer can render that suspect momentarily
22 incapacitated -- or temporarily would be a better word,
23 I guess, incapacitated and overcome their resistance.
24     Now, at times an encirclement and verbal
25 commands is sufficient, and the person begins to comply

Page 31

1  and begins to respond to verbal commands.  If I encircle
2  and secure the LVNR position and the suspect continues
3  to resist, then through an application of the LVNR, I
4  can restrict or slow down blood flow to and from the
5  brain.  And if I maintain that, that could end up with
6  the suspect going unconscious for a momentary period of
7  time, and then I can secure handcuffing at that point.
8      So we try an encirclement, we want to continue
9  to give verbal commands, and apply.  And then through
10 that application, even rolling the guy to his belly,
11 because eventually what I'm working for is custody and
12 control of the individual.  That's the whole reason for
13 me to pick that tactic against a resistive suspect.
14     Q.  And when you say "custody," getting into
15 handcuffs; correct?
16     A.  Yes.
17     Q.  Okay.  So throughout this case, I've learned a
18 little bit more than I ever thought about neck
19 restraints before.  So is it fair to say that with one
20 arm, and it could be either arm, an officer puts an
21 encircling arm around the suspect's neck; correct?
22     A.  That's correct.
23     Q.  And tries to maintain a neck brace principle
24 such that his bicep and forearm are compressing the
25 carotid arteries in the neck?

Page 32

1      A.  Well, in that neck brace is also my head
2  position on back of his head.  And you are correct, what
3  I'd like to get is his chin in the -- above the crook of
4  my elbow.  I want to be under his chin, and then I've
5  got carotid compression on both sides.  And then through
6  head position on the back side of the suspect's head, I
7  can maintain that.
8      Q.  And the idea -- this is a -- to use a very
9  layman's term, this a blood choke, not an air choke;
10 correct?
11     A.  Yes.
12     Q.  So -- and if I get the suspect's chin above the
13 crook of my elbow, I do not -- I'm actually protecting
14 the airway; correct?
15     A.  Yeah.  If you were a high-level guy, you can --
16 you can still achieve a blood choke through someone's
17 chin, but the layman officer I don't think could do
18 that.
19     Q.  Okay.  And then the -- for the rest of the
20 technique, I'm going to get a hand clasp where my hands
21 come together; correct?
22     A.  Yeah.
23     Q.  And the idea of that, based upon my reading of
24 the training manual, is to be able to exert maximum
25 pressure or the appropriate level of pressure that is

Page 49

1  Q. So is it -- when you're rolling or down in a
2  grappling position in defensive tactics, is it harder or
3  easier to employ various techniques when you're wearing
4  your full kit versus wearing gym clothes?
5  A. It's harder, yeah. It's more challenging.
6  Q. Are there some techniques of or some aspects of
7  the lateral vascular neck restraint that cannot be used
8  if you're wearing in certain body positions on the
9  ground rolling around?
10 A. Certain body positions would certainly preempt
11 it, and then add in, like, a full kit, what an officer
12 would typically wear, it would make it challenging.
13 Q. And yet Metro doesn't require that type of
14 training before its officers are allowed to use the LVNR
15 on the street?
16 A. That's correct.
17 Q. Okay.
18 A. Yeah.
19 Q. Have you ever heard the phrase "Train like you
20 fight, because you are going to fight like you train"?
21 A. Yeah.
22 Q. Do you agree with that?
23 A. Yes.
24 Q. So if an officer put an encircling arm around
25 the suspect and did not do with the support side hand,

Page 50

1  put it across his biceps in the rear naked choke, and he
2  also did not get the gable grip for the lateral vascular
3  neck restraint but instead -- and let's just use left
4  and right. If an officer put his -- used his left arm
5  as the encircling arm on a suspect.
6  A. Okay.
7  Q. And with his right arm placed his hand on top
8  of the suspect's head.
9  A. Okay.
10 Q. Is there any way for that officer to achieve
11 carotid compression on the suspect?
12    MR. LAGOMARSINO: Form. Foundation.
13 BY MR. MCNUTT:
14 Q. You can answer.
15 A. Okay. No, not -- the secondary arm would be
16 doing nothing. So if he's going to achieve carotid
17 compression, he's going to have to attach this to
18 something, and that could be way up high on his uniform
19 or he could grab his vest. But it would be -- most guys
20 don't understand how to do one-armed, and certainly no
21 one's been taught that at Metro. And it's extremely
22 challenging. Doing this (demonstrating) would not --
23 would not achieve any reliable carotid incapacitation.
24 Q. And for the record, when you said "doing this,"
25 you put your hands in a situation where you have an

Page 51

1  encircling arm and the other hand on top of the head?
2  A. Yeah, just on top of the head. No connection.
3  That's the reason that they teach the hands to be
4  connected, is through that connection it gives me the
5  ability to finish that compression. So I -- from my
6  experience 20 years in the game, you have to connect
7  this to something (demonstrating) and -- and it's going
8  to be your bicep or your hands.
9  Q. And when you say "this," you demonstrated and
10 you would need to connect this being your encircling
11 arm -- the hand of your encircling arm; correct?
12 A. Correct. Correct. I've often come up behind
13 one of my kids -- I have eight kids -- I've often come
14 up and give them a hug from behind.
15 Q. That's the number "eight," not with "hate";
16 right?
17 A. Yes, number eight. Yeah, number eight.
18    But I have kids of varying ages; right? So I'm
19 an affectionate guy. I like to hug, and that probably
20 comes from my grappling; I don't know. But I'll come up
21 behind my children and just hug them to me with one arm
22 around them. There's no chance I'm going to render them
23 unconscious because I've placed an arm around their neck
24 area from behind. I'm not even concerned about that
25 because that's -- I would need to connect it and begin

Page 52

1  to apply compression.
2     So I'll hug and -- and probably some of that --
3  I had never thought of it until we were just discussing
4  this, but from behind my wife, from behind my kids, I'll
5  often encircle, for lack of a better word, their upper
6  body and just hug them to me. I'm not concerned in the
7  slightest that I'm going to have some kind of
8  compression issue because I'm not connected. It's going
9  to be very hard to finish that.
10 Q. So even -- and you're saying that even at your
11 level -- let's take it away from the familial setting.
12 You're a second-degree Brazilian jiu-jitsu black belt;
13 correct?
14 A. Yes.
15 Q. And you are a certified defensive tactics
16 instructor or advanced officer skills training for
17 Metro; correct?
18 A. Yes, sir.
19 Q. And if you encountered a suspect on the street
20 and you were attempting to employ a neck restraint, what
21 your testimony is is that unless you connected your
22 hands in either case, the rear naked choke technique or
23 the lateral vascular neck restraint, if you only had an
24 encircling arm, it's your opinion that you would not be
25 able to render someone unconscious; correct?

Page 81

1 have audio.
2     MR. MCNUTT: Just so the record is clear.
3 BY MR. MCNUTT:
4   Q. And so -- and Ken's body-worn cam is, as you
5 would know, picking up all the voices from around him.
6   A. Correct.
7   Q. They're not just his.
8   A. Correct.
9   Q. So let's -- tell me when Ken attempts to employ
10 some sort of neck restraint on Tashii Farmer, and we'll
11 get a timestamp on it.
12   A. Now.
13   Q. So 4:22 on this video, describe the position
14 you see with Ken Lopera.
15     MR. LAGOMARSINO: And I'm sorry. Just for the
16 record, when you do that, can you also do the time on
17 the timestamp versus -- like 57:03.
18     THE WITNESS: Over here (indicating).
19     MR. MCNUTT: So the time on the video is 4
20 minutes, 22 seconds. This is the actual time of the day
21 where it says May 14th, 2017, and it's 00:57 minutes past
22 midnight and three seconds.
23     THE WITNESS: Okay.
24     MR. MCNUTT: Andre, did you put that on there?
25     MR. LAGOMARSINO: I don't -- I didn't do the

Page 82

1 video personally.
2     MR. MCNUTT: Well, it's your video company. So
3 did you put that on there?
4     MR. LAGOMARSINO: I did not put that on there.
5     MR. MCNUTT: Well, did your video company put
6 that on there?
7     MR. LAGOMARSINO: I don't know.
8     MR. MCNUTT: The day and date stamp.
9     MR. LAGOMARSINO: I believe that's from the
10 surveillance.
11 BY MR. MCNUTT:
12   Q. So the question was please describe for me the
13 position that Ken Lopera is in with Tashii Farmer.
14   A. So when I called out "stop" and now it's become
15 a little fuzzy, but it was very clear when I called it
16 out, to me. Chest to back, sitting up, left arm -- and
17 I wouldn't call it encirclement because I can't tell if
18 it is, but left arm around the upper -- upper torso
19 and/or neck and/or head. Right hand resting on top of
20 Mr. Farmer's head.
21   Q. Okay. So in this part of the video when we're
22 at 4:22 of the video, 57 minutes and 3 seconds past
23 midnight in actual time, do you see Sergeant Crumrine
24 there?
25   A. Yes. Yes.

Page 83

1   Q. I'll represent to you that that is Sergeant
2 Crumrine that rolled up in the car. So you can see
3 another Metro officer in the video; correct?
4   A. That's correct.
5   Q. Okay. So from this angle, no observer can tell
6 precisely where Ken Lopera's encircling arm is; correct?
7     MR. LAGOMARSINO: Objection. Form.
8 BY MR. MCNUTT:
9   Q. Is that true?
10   A. I believe that's true, yes.
11   Q. All right. Okay.
12   A. I would agree.
13   Q. So you don't know whether he's got encirclement
14 around his neck or whether his -- he's just simply
15 hugging Tashii Farmer's chest; correct?
16   A. I have no idea.
17   Q. Okay. Now, would Sergeant Crumrine have a
18 better view since he's face-to-face with Tashii Farmer
19 as to where Ken Lopera's arm, left arm, is?
20   A. Yes.
21   Q. So we're now at 4:25 in the video, 57 minutes
22 and 6 seconds past midnight. They are both rolling on
23 their right side. So my next question is going to be
24 tell me when you see either of Ken Lopera's hands or
25 arms come away from Tashii Farmer's neck, head, chest

Page 84

1 area.
2   A. It's out.
3   Q. Okay. So we're at 4:58, but I think I was a
4 little slow; so let's watch it.
5   A. Sure.
6     It's out. It's out.
7   Q. Okay. So 4:57, 4:56, somewhere in there,
8 depending on how fast my finger was. That's where Ken
9 Lopera's right arm is away from Tashii Farmer; correct?
10   A. That's correct.
11   Q. And that's the same testimony you gave on the
12 other video; correct?
13   A. It looks very similar to me.
14   Q. Okay. So now they have rolled back over or
15 they have rolled to their left side. Can you tell
16 your -- where Ken Lopera's left or right arm, what's
17 your description?
18   A. The left arm is hard for me to see. It's under
19 the -- under Mr. Farmer somewhere. The right arm is up
20 high and wrapped all the way around what appears like
21 his head, but I can't tell if it's under the chin or the
22 placement of it. I can't tell.
23   Q. Okay.
24   A. Pause. Okay, he's out there.
25   Q. Okay.

Case 2:18-cv-00860-GMN-VCF Document 150-9 Filed 01/13/20 Page 7 of 12

Chad N. Lyman    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 89

1  the lateral vascular neck restraint due to the gear he
2  was wearing?
3       MR. LAGOMARSINO: Form. Foundation.
4       THE WITNESS: No. I think you can do it with
5  the gear he was wearing.
6  BY MR. MCNUTT:
7    Q. Okay. But based on your prior testimony, it's
8  more difficult to do it with your full gun belt and --
9    A. Sure.
10   Q. -- kit; correct?
11   A. If the question is can he do it, yes. If the
12 question is could his gear inhibit his performance in
13 this, that can be true as well.
14   Q. Okay. I think it's pretty clear that your
15 testimony is that his hand was not in the correct
16 position -- the perfectly correct position for an LVNR;
17 correct?
18   A. Correct.
19   Q. And it was not -- nor was it in the correct
20 position for a rear naked choke; correct?
21   A. Correct.
22   Q. Is there -- did he perform some other neck
23 restraint that I'm unaware of there being a name for?
24      MR. LAGOMARSINO: Form. Foundation.
25      THE WITNESS: I don't see any trained neck

Page 90

1  restraint. I see a failure of a trained neck restraint,
2  if that makes sense to you.
3  BY MR. MCNUTT:
4    Q. Okay. It does.
5    A. I don't see any execution of something that I'd
6  say, "Oh, yeah, right there he's shifting his hips.
7  That's" -- I don't see any of that.
8    Q. Okay. Do you teach as part of your defensive
9  tactics -- advanced defensive tactics instructor role,
10 do you teach use of TASER?
11   A. Yes, I'm certified as a TASER instructor.
12   Q. Okay. Are there instances -- are you familiar
13 with what Metro's policy regarding the use of a TASER
14 is?
15   A. Yes. I don't have it in front of me. I'm
16 familiar with it, and I could probably recall questions
17 that you have about it, but, you know...
18   Q. Do you know how many times an officer is
19 authorized to use -- deploy a TASER on a suspect?
20   A. Well, the -- well, first, it depends. But
21 they -- they say three applications and try something
22 else. It's not working. You might not be getting
23 good -- the less applications I can expose him to, the
24 better. I mean, I don't want to just continually zap
25 this guy. And the standard I believe you're referring

Page 91

1  to is if I use it three times and it doesn't work, then
2  I consider it not effective, and I can use another
3  intermediate force means to address this suspect.
4    Q. Sergeant Bland testified that Metro's policy
5  was to utilize -- you could utilize a TASER three times
6  and then you -- the officer was encouraged to look for a
7  different use of force.
8    A. That's accurate.
9    Q. But an officer that was by themselves or in
10 other exigent circumstances, they could certainly use
11 the TASER. In fact, he said there was no expectation
12 that an officer would quit using a TASER to go hands on
13 simply because they used it three times and didn't have
14 any other options.
15   A. I would agree. Yeah, I would agree a hundred
16 percent. And that's why I said there's not a number,
17 per se.
18   Q. Okay. Is -- do you have a definition for what
19 constitutes a dynamic situation in policing?
20   A. Rapidly evolving, tense, uncertain
21 circumstances. Suspect resisting. Dynamic situation.
22      MR. MCNUTT: Andre, I'm going to look through
23 my notes. We can either take a break and I can come
24 back to him and then you can go, or I'm happy to turn
25 the witness with the reservation that I want to look

Page 92

1  through my notes and have a couple questions.
2       MR. LAGOMARSINO: Sure. Do you want to --
3       MR. ANDERSON: Whatever.
4       MR. LAGOMARSINO: Do you have any questions?
5       MR. ANDERSON: No, not right now.
6       MR. LAGOMARSINO: Do you want to take a break?
7       THE WITNESS: I don't need one right now.
8       MR. LAGOMARSINO: Madam Court Reporter?
9       THE COURT REPORTER: I'm fine. Thank you.
10      MR. LAGOMARSINO: Why don't we start.
11      THE WITNESS: And if we need a break --
12      MR. LAGOMARSINO: Yeah.
13           EXAMINATION
14 BY MR. LAGOMARSINO:
15   Q. It's quite easy to apply a one-armed rear naked
16 choke; correct?
17      MR. MCNUTT: Objection. Form.
18      THE WITNESS: Answer?
19 BY MR. LAGOMARSINO:
20   Q. Yes.
21   A. A one arm? No, it's -- I wouldn't say it's
22 quite easy. It's likely to fail.
23   Q. You have an Instagram page; correct?
24   A. I do.
25   Q. And that is C4C underscore operator; correct?

Case 2:18-cv-00860-GMN-VCF Document 150-9 Filed 01/13/20 Page 8 of 12

Chad N. Lyman                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 93

1  A. That's correct.
2  Q. And you posted a video on that page as of
3  October 1st of this year referencing a one-arm rear naked
4  choke; right?
5  A. You can do one.
6  Q. Okay.
7  A. I wouldn't call it quite easy, nor would I call
8  it high percentage.
9  Q. You have a nonblack-belt buddy who has been
10 hitting this choke on folks forever; correct?
11 A. That's correct.
12 Q. And who is "hey B minus"?
13 A. Brian Hartman is -- he was in Special Forces in
14 the military, then he was a SWAT operator and led a
15 tactical team, and he's been training for 20 years. He
16 just doesn't wear a gi, which is g-i. So he doesn't
17 subscribe to any belt system; so he doesn't have a belt.
18 But Bryan trains Navy SEALs. He trains Tier One
19 operators. Full-time trainer at this point. Lots of
20 operational experience.
21 Q. And was Brian Hartman involved in a
22 controversial officer-involved shooting?
23 A. He was.
24     MR. MCNUTT: Objection. Form.
25 /////

Page 94

1 BY MR. LAGOMARSINO:
2  Q. And what was that shooting?
3  A. That, I don't know. I never got briefed on it.
4  I wasn't in a training scenario. It was a shooting --
5  it happened in Southeast Vegas, but I don't know details
6  on it.
7  Q. That was the shooting where he shot an
8  individual in the back with an AR-15 who was handcuffed?
9  A. I didn't -- I don't know that he was
10 handcuffed, and I don't know any of the details in that
11 shooting.
12 Q. Or if he was on his knees? Okay.
13 A. Yeah, I don't know any of those details.
14 Q. Okay. So if you could, please, go to your
15 Instagram page on your phone.
16 A. Sure.
17 Q. Actually, I have it here if you just want to
18 see it.
19 A. I can look at it on yours. That's fine.
20 Q. Yours is probably much bigger than mine.
21    (Video playing on cell phone.)
22    THE WITNESS: So it's great video. This is
23 Keenan Cornelius, and Keenan's a long-time BJJ guy.
24 He's a high-level black belt. He's world renowned. And
25 the reason he would give a tutorial like that is that

Page 95

1 most people, even in his circles, would not know you
2 could do that. That's not common knowledge. That's
3 extremely advanced technique that most people wouldn't
4 know.
5     Keenan also shows the importance of a
6 connection. And so he's using his own neck in the same
7 way you would use this (demonstrating) and the same way
8 you would use this (demonstrating). He's not leaving
9 arms loose. And certainly that would be challenging to
10 do with a kit on. That would be very hard to do.
11 BY MR. LAGOMARSINO:
12 Q. Sure.
13 A. You would have to have long arms.
14 Q. And I think you referenced this earlier. The
15 key is as long as the encircling arm has leverage on
16 something, that's where your pressure is coming from;
17 correct?
18 A. Yes, but typically something with me. So in
19 other words, I couldn't just expect reasonably that I
20 can encircle your arm and grab you --
21 Q. Right.
22 A. -- and create that same leverage. It would
23 have to be to me.
24 Q. Right. So I think you demonstrated earlier.
25 I'll try to demonstrate with this, obviously, too tight

Page 96

1 suit.
2  A. Your suit looks great.
3  Q. So you put the encircling arm around
4  (demonstrating), right --
5  A. Yes, sir.
6  Q. -- and in this situation, I'm encircling with
7  my right arm.
8  A. Yes.
9  Q. And as long as I have a situation where I have
10 pressure around the subject's neck, the right hand can
11 either grab my own shoulder, it can grab my own neck,
12 and in that situation you can achieve a carotid hold
13 with one arm; correct?
14 A. You can do it, certainly.
15 Q. Okay.
16 A. Yeah.
17 Q. All right. And I believe in the testimony
18 earlier when you were watching the video, you had a
19 situation where I think it was a -- I believe it was
20 1:29 in the -- I may be mistaken, for the record -- but
21 it was where you stated that Ken appeared to have one of
22 his hands on Tashii Farmer's arm or hand.
23 A. I couldn't tell what it was. I thought it
24 might be the wrist control. I thought he might, but I
25 didn't know.

Page 117

1 can remember, yeah. I don't remember any.
2   Q.  What years were you on the Portland Police
3 Bureau?
4   A.  Would have been academy in late '97, I believe.
5   Q.  Okay.
6   A.  And then came here in 2004.
7   Q.  When you received training in Portland, do they
8 train on the LVNR as a deadly-force option?
9   A.  They don't train it at all.
10  Q.  And why is that?
11  A.  They say that it's deadly force.
12  Q.  Did they teach you about a case study involving
13 a gentleman named Lloyd Tony Stevenson who died after
14 having the LVNR applied to him?
15  A.  Did who?
16  Q.  Did the Portland Police Bureau train you on an
17 individual case study with a subject named Lloyd Tony
18 Stevenson who died as a result of a carotid restraint
19 being applied to him?
20  A.  Well, they talked about an arm bar, arm-barring
21 wind choke restraint, and said that a guy had died --
22 and please don't quote me because it is quite a long
23 time ago, but I believe there might have even been
24 someone using a baton to try to --
25  Q.  Okay.

Page 118

1   A.  -- render him unconscious.
2   Q.  Do you know Bill Smock is or William Smock?
3   A.  That name is very familiar.
4   Q.  It's a doctor who provides training on LVNR who
5 has been providing training to Metro or will be
6 providing training to Metro soon.
7   A.  Yeah, I don't -- I don't know him, but the name
8 sounds familiar.
9   Q.  Okay.
10  A.  Yeah.
11  Q.  You talked about the importance of giving
12 verbal commands in conjunction with the LVNR. Do you
13 agree that those verbal commands need to be clear to the
14 subject?
15  A.  Yes.
16  Q.  Okay.
17  A.  Yeah.
18  Q.  Do you believe that if improperly applied, the
19 LVNR could be deadly force?
20      MR. MCNUTT:  Objection.  Form.
21      THE WITNESS:  So certainly anything when we're
22 fighting could turn into a lethal thing, but it could
23 be.  It's not probable.  It's probable that it just
24 won't work.
25 /////

Page 119

1 BY MR. LAGOMARSINO:
2   Q.  If you have a subject in an LVNR or a -- well,
3 let's start --
4   A.  Carotid restraint?
5   Q.  Let's start over.  Yeah.
6   A.  Okay.
7   Q.  If you had an individual in an LVNR and you
8 render them unconscious and you can tell they were
9 unconscious, you must immediately release the pressure
10 on the LVNR; right?
11  A.  Yes.
12  Q.  If you don't immediately relieve or release the
13 pressure, there's a risk of death or serious injury to
14 that individual; correct?
15      MR. MCNUTT:  Objection.  Form.
16      THE WITNESS:  Eventual.  I wouldn't say -- if
17 I'm three to seven seconds and you go unconscious at
18 five seconds and I don't immediately release carotid
19 compression, are you going to suddenly die?  I don't
20 think you are.  You can go underwater for far longer
21 than that and be getting no air.
22 BY MR. LAGOMARSINO:
23  Q.  That's a fair distinction.
24  A.  It could lead to death.
25  Q.  Yeah.

Page 120

1   A.  Yes.
2   Q.  You watched the video of the interaction with
3 Tashii Farmer and Ken Lopera twice, one with sound, one
4 without.  Is it your opinion that Ken Lopera's life was
5 in danger?
6       MR. MCNUTT:  Objection.  Form.
7       THE WITNESS:  You know, he's with an
8 aggressive, resistant individual who's fighting.  I
9 don't know what he felt, though, or what he perceived,
10 and I can't gain any of that by watching a video in this
11 office, not in a fight.
12 BY MR. LAGOMARSINO:
13  Q.  Did anybody at Metro tell you why they don't
14 allow the rear naked choke?
15  A.  You know, they've never really asked me.
16 Unofficially, I know there's a lot of -- a lot of
17 ignorance.  I could ask the average administrator in my
18 agency what the difference is; they couldn't tell me.  I
19 could ask them if they're the same; they wouldn't know.
20 And I think people generally are afraid of it despite
21 the fact that -- shoot, we're at 11:45.  It's happening
22 right now in this city repeatedly to people because
23 there's lunchtime jiu-jitsu classes going right now, and
24 people are doing it, and no one's dying.  We don't
25 replace a new member every week.  Man, we lost another

Case 2:18-cv-00860-GMN-VCF   Document 150-9   Filed 01/13/20   Page 10 of 12

Chad N. Lyman                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 121

1 one to a carotid restraint. Holy cow.
2     People just -- so I think there's a lot of
3 ignorance. I think people think, like, if you do this
4 wrong, it's going to, oh, my goodness, cause a death.
5 And the reality is I've been doing it for 20-something
6 years and seeing horrible applications of carotid
7 restraint, and what happens is it just doesn't work.
8 It's actually -- I would prefer someone to render me
9 temporarily incapacitated through a blood choke than
10 beating me any day of the week, any day of the week. It
11 would be a gift; so.
12   Q.  Right.
13     But in that jiu-jitsu training, you usually
14 have somebody monitoring when somebody's unconscious and
15 assuring that pressure is relieved when that person
16 becomes unconscious; right?
17   A.  That's correct. But even with that being said,
18 like, when I compete -- when I compete, what they
19 restrict is based on liability and potential injury.
20 That's how they decide what they're going to restrict
21 and what they're not going to restrict. And what they
22 don't restrict at a beginning level is carotid
23 restraint. Carotid restraint is from kids class all the
24 way up to beginner adults can apply carotid restraint.
25 Why? Because it's not likely anyone's going to get

Page 122

1 hurt. They don't allow simple joint locks because it's
2 very likely people will get hurt without the proper
3 training. So if there was a high incidence of injury or
4 death, you would see a huge restriction on carotid
5 restraint when we compete, and there's none; so.
6   Q.  But when you compete, people aren't holding the
7 carotid restraint for a minute plus after the person has
8 become unconscious; right?
9   A.  That would be -- that would be correct, yeah.
10  Q.  Okay. We'll make this Exhibit 1.
11  A.  Thank you, sir.
12     (Exhibit 1 was marked.)
13 BY MR. LAGOMARSINO:
14  Q.  So this I'll represent to you is a PowerPoint
15 put on by Bill Smock. He is a police surgeon with the
16 Louisville Metro Police Department, and he provides
17 training throughout the country on the issue of the
18 carotid restraint.
19     What I'm going to ask you is if you agree,
20 disagree, or have no opinion on some of the statements
21 made in this PowerPoint, okay.
22  A.  Okay. Thank you, sir.
23  Q.  All right. So on the second page, it says:
24     "Law Enforcement Use of a Neck Restraint/Hold:
25     Sleeper Hold, LVNR, Carotid Restraint."

Page 123

1     What hold is that?
2   A.  That's similar to an LVNR. That's -- Stephan
3 Kesting is your bald guy who's behind the other guy. I
4 don't know who the guy in front is.
5   Q.  Who's Stephan Kesting?
6   A.  He's a Brazilian jiu-jitsu black belt out of
7 Canada. I don't think he's a police officer. I think
8 he's a firefighter. But that's a picture of him, and
9 his rear elbow was down, which would be opposite of what
10 LVNR would teach, but other than that, that's pretty
11 much the grip we would have.
12  Q.  The next page, it says:
13     "The Majority of Law Enforcement Agencies in
14     the U.S. Have Banned or Reserved Use of
15     'Chokeholds' and 'Vascular Restraints' For
16     Deadly Force Encounters."
17     Agree, disagree, or no opinion?
18     MR. MCNUTT: Objection. Form.
19     THE WITNESS: I don't know. I don't know.
20 BY MR. LAGOMARSINO:
21  Q.  Okay.
22  A.  What the majority is, really, I don't know.
23  Q.  Can you please turn to the page, a few pages
24 forward, it says:
25     "In-Custody Death: Positional Asphyxia/Carotid

Page 124

1     Restraint."
2   A.  Um-hum.
3   Q.  So it's the Eric Garner case. Are you familiar
4 with the Eric Garner case somewhat?
5   A.  Yeah.
6     MR. MCNUTT: Objection. Form.
7     THE WITNESS: Oh, I'm sorry.
8     Yes.
9 BY MR. LAGOMARSINO:
10  Q.  What's your understanding of what the Eric
11 Garner case was?
12  A.  Complaint about a guy selling drugs on the
13 sidewalk. They call him -- they contact him. There's
14 an arrest attempt. He doesn't want to be handcuffed.
15 They wrestle him down to the ground. They hold him down
16 and handcuff him, and he later dies.
17  Q.  In this second picture there on the right, what
18 kind of a restraint is placed on Eric Garner?
19  A.  I think there's encirclement with no restraint.
20 I don't think that's a finish of anything. So an arm
21 encirclement for sure, though, left arm.
22  Q.  All right. Skipping head to 9.1.5, Use of
23 Physical Force.
24  A.  Yes, sir.
25     MR. MCNUTT: Hang on, where are you at? 9 --

Case 2:18-cv-00860-GMN-VCF  Document 150-9  Filed 01/13/20  Page 11 of 12

Chad N. Lyman                                    Trinita Farmer v. Las Vegas Metropolitan Police Department, et al.

Page 125

1  MR. LAGOMARSINO: Yeah, just a couple pages
2  forward.
3  MR. MCNUTT: There's a couple of them, though.
4  Next one is 9.1.5 too.
5  THE WITNESS: The one right after --
6  MR. MCNUTT: After Ken's picture?
7  MR. LAGOMARSINO: Right.
8  THE WITNESS: Okay. I'm there.
9  BY MR. LAGOMARSINO:
10  Q. Says: "9.1.5 Use of Physical Force." Says:
11     "Choking techniques, even if applied
12     appropriately" --
13     So I'm talking about the highlighted version --
14  A. Um-hum.
15  Q. "Choking techniques, even if applied
16     appropriately, cause a risk of death or serious
17     physical injury because they may restrict the
18     flow of blood or oxygen to a person's brain."
19     Agree, disagree, or --
20  MR. MCNUTT: Objection to the form of the
21  question on two bases. Is -- do you purport this to be
22  from Metro -- Las Vegas Metropolitan Police Department?
23  MR. LAGOMARSINO: I'm simply asking him if he
24  agrees with the sentence that's highlighted that I just
25  read.

Page 126

1  MR. MCNUTT: Well, objection to the form of the
2  question based upon the source document, and I'll object
3  to the form of the question because this witness is not
4  a medical expert.
5  BY MR. LAGOMARSINO:
6  Q. You can answer.
7  A. I disagree.
8  Q. Why do you disagree?
9  A. Because if applied appropriately, it happens
10 all the time. And even if applied -- if applied
11 inappropriately, you're not going to get any -- any
12 incapacitation or risk of death. Nothing's going to
13 happen. And applied appropriately, you could let it go.
14 And we apply carotid restraint daily.
15  Q. Okay.
16  A. Yeah.
17  Q. Going to the slide that says:
18     "Risks of Carotid Restraints?"
19  MR. MCNUTT: Going to what?
20  MR. LAGOMARSINO: The page that says "Risks of
21 Carotid Restraints."
22  BY MR. LAGOMARSINO:
23  Q. Again, agree, disagree, or I don't know:
24     "Dissection of carotid or vertebral arteries
25     resulting in a stroke or death."

Page 127

1     Is that a risk of a carotid restraint?
2  MR. MCNUTT: Same objection.
3  THE WITNESS: Yeah, I don't -- I don't know
4  what it would be called. I don't know.
5  BY MR. LAGOMARSINO:
6  Q. Is asphyxia death a risk of a carotid
7  restraint?
8  MR. MCNUTT: Same objections.
9  THE WITNESS: Yes.
10 BY MR. LAGOMARSINO:
11  Q. Is anoxic brain damage a risk of a carotid
12 restraint?
13  MR. MCNUTT: Same objections.
14  THE WITNESS: I don't know.
15 BY MR. LAGOMARSINO:
16  Q. Is -- strike that.
17     Are fractures of the laryngeal cartilage a risk
18 of a carotid restraint?
19  MR. MCNUTT: Same objections.
20  THE WITNESS: Agree.
21 BY MR. LAGOMARSINO:
22  Q. All right. Is fracture and collapse of the
23 trachea a risk of a carotid restraint?
24  MR. MCNUTT: Objection. Same objections.
25  THE WITNESS: Not a carotid. More windpipe

Page 128

1  choke which would be like a wind choke.
2  BY MR. LAGOMARSINO:
3  Q. Okay. All right.
4     Going to the page that starts with:
5     "Sean Entin and life after the 'choke.'"
6  A. Okay. Thank you.
7  MR. MCNUTT: Can you say that again.
8  MR. LAGOMARSINO: This page right here
9  (indicating).
10  MR. MCNUTT: Sean Entin.
11 BY MR. LAGOMARSINO:
12  Q. Have you heard of the Sean Entin case?
13  A. I have not.
14  Q. Going to the next page where it says:
15     "Road FC champion suffers stroke, diagnosed as
16     acute cerebral infarction."
17     Have you heard about this case?
18  A. I may have heard about that one on the
19 Internet.
20  Q. And what's your understanding of that case?
21  A. Just heard about it. Didn't understand what
22 actually happened there.
23  Q. The next one is:
24     "Leandro Feijao Souza died from a stroke?"
25     Did you hear about this case?

Page 133

1                    REPORTER'S CERTIFICATE

2

    STATE OF NEVADA     )
3                       ) ss
    COUNTY OF CLARK     )
4

5           I, Dawn Bratcher Gustin, a duly certified court
    reporter licensed in and for the State of Nevada, do
6   hereby certify:

7           That I reported the taking of the deposition of
    the witness, CHAD N. LYMAN, at the time and place
8   aforesaid;

9           That prior to being examined, the witness was by
    me duly sworn to testify to the truth, the whole truth,
10  and nothing but the truth;

11          That I thereafter transcribed my shorthand notes
    into typewriting and that the typewritten transcript of
12  said deposition is a complete, true, and accurate record
    of the proceedings to the best of my ability.
13
            I further certify that (1) I am not a relative,
14  employee, or independent contractor of counsel of any of
    the parties; nor a relative, employee, or independent
15  contractor of the parties involved in said action; nor a
    person financially interested in the action; nor do I
16  have any other relationship with any of the parties or
    with counsel of any of the parties involved in the
17  action that may reasonably cause my impartiality to be
    questioned; and (2) that transcript review pursuant to
18  NRCP 30(e) was waived.

19          IN WITNESS WHEREOF, I have hereunto set my hand
    in the County of Clark, State of Nevada, this 21st day of
20  November 2019.

21

22          _____
            Dawn Bratcher Gustin, CCR 253, RPR, CRR
23

24

25