# EXHIBIT 24
# Excerpts from Michael Flores Deposition, Vol. II, 1/7/19

Officer Michael Flores ~   January 7, 2019
* * * Videotaped Deposition * * *

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4

5

6    TRINITA FARMER, individually,   )
                                     )
7         Plaintiff,                 )
                                     ) Case No.
8            vs.                     ) 2:18-cv-00860-GMN-VCF
                                     )
9    LAS VEGAS METROPOLITAN POLICE   )
     DEPARTMENT, a political         )
10   subdivision of the State of     )
     Nevada; KENNETH LOPERA,         )
11   individually; TRAVIS CRUMRINE,  )
     individually; MICHAEL TRAN,     )   **CONDENSED**
12   individually; MICHAEL FLORES,   )   **TRANSCRIPT**
     individually,                   )
13                                   )
          Defendants.                )
14   _____)

15

16

17

18      VIDEOTAPED DEPOSITION OF OFFICER MICHAEL FLORES

19           Taken on Monday, January 7, 2019

20                  At 10:02 a.m.

21              Held at Lagomarsino Law

22       3005 West Horizon Ridge Parkway, Suite 241

23              Henderson, Nevada   89052

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

4  (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1 Western Illinois University.<br>2 Q. What years did you attend Northern<br>3 Illinois?<br>4 A. 2001 until 2005.<br>5 Q. And what years did you attend Western<br>6 Illinois?<br>7 A. 2005 until 2008.<br>8 Q. Did you ultimately receive your undergrad<br>9 degree?<br>10 A. Yes.<br>11 Q. What year did you receive that?<br>12 A. 2005.<br>13 Q. And what was your degree in?<br>14 A. It was in sociology slash criminal justice.<br>15 Q. And did you receive a master's degree?<br>16 A. Yes.<br>17 Q. And what did you receive your master's in?<br>18 A. Law enforcement and justice administration.<br>19 Q. As part of your undergraduate education,<br>20 did you have to take any classes pertaining to<br>21 constitutional law?<br>22 A. Yes.<br>23 Q. Do you recall the names of those classes?<br>24 A. Not off the top of my head.<br>25 Q. Did you take any classes pertaining to | 1 Police Department?<br>2 A. February of 2012.<br>3 Q. You just worked there for a month?<br>4 A. No. It was approximately a year and a<br>5 half.<br>6 Q. Did you ever receive any sort of discipline<br>7 from the Chicago Police Department?<br>8 A. No.<br>9 Q. Did you ever receive any sort of discipline<br>10 from the Chattanooga Police Department?<br>11 A. No.<br>12 Q. Have you ever received any discipline from<br>13 the Las Vegas Metropolitan Police Department?<br>14 A. No.<br>15 Q. After college, what was your first job?<br>16 A. Let's see. I had a plethora of jobs. Let<br>17 me think. I was a substitute teacher for Chicago.<br>18 Q. Around 2008?<br>19 A. Yes. Yes.<br>20 Q. And how long were you a substitute teacher?<br>21 A. Approximately a year.<br>22 Q. And with which district?<br>23 A. When you're a substitute teacher for<br>24 Chicago, it's not necessarily a district. They send<br>25 you throughout the whole city, depending on where |

| Page 11 | Page 13 |
|---|---|
| 1 constitutional law when you received your master's?<br>2 A. Yes.<br>3 Q. Do you remember the names of those classes?<br>4 A. I cannot recall the names of the classes.<br>5 Q. When were you hired by the Las Vegas<br>6 Metropolitan Police Department?<br>7 A. I believe the exact date is 11 --<br>8 November 3rd, 2014.<br>9 Q. Before November 3rd, 2014 -- we're going to<br>10 go backwards. Tell me about your employment history.<br>11 A. I was a police officer for the Chicago<br>12 Police Department.<br>13 Q. What years were you a Chicago police<br>14 officer?<br>15 A. I got hired on July 13th of 2013.<br>16 Q. And why did you stop being a police officer<br>17 with the Chicago Police Department?<br>18 A. The dream was always to move to Las Vegas.<br>19 Q. Why is that?<br>20 A. Better weather, nice houses, bigger houses,<br>21 cheaper just all around. I like Las Vegas.<br>22 Q. Before working for Chicago PD, where did<br>23 you work?<br>24 A. Chattanooga Police Department.<br>25 Q. What years did you work at the Chattanooga | 1 they need you.<br>2 Q. Were you employed by the City of Chicago?<br>3 A. That is correct.<br>4 Q. After being a substitute teacher with the<br>5 City of Chicago, what was your next job?<br>6 A. A couple of other ones I can recall. I<br>7 worked for a company called CDW.<br>8 Q. What did you do for CDW?<br>9 A. I was an account manager for IT. I was in<br>10 charge of setting up accounts for people's technology<br>11 base with computers, helping out schools, hospitals.<br>12 They would come to me, and I would figure out their<br>13 budget on how they could spend money on computers for<br>14 whatever needs they had.<br>15 Q. You would sell electronics over the phone?<br>16 A. Correct.<br>17 Q. And both of those jobs were in Chicago?<br>18 A. That's correct.<br>19 Q. Did you have any other jobs while you were<br>20 working for CDW or while you were working as a<br>21 substitute teacher?<br>22 A. I worked at Chase Bank.<br>23 Q. Here in Las Vegas or anywhere else?<br>24 A. In Las Vegas and Chicago.<br>25 Q. What years did you work for Chase Bank in |

Officer Michael Flores ~ January 7, 2019
* * * Videotaped Deposition * * *

Page 26

1    couple of these guys' names?
2        Matt. I can't remember the name of the
3    second guy. I can't remember their names.
4        Q. Okay. When you were training with the
5    Chattanooga Police Department, as you said, in
6    Academy, were you told that you were allowed to use
7    choke holds?
8        A. No, not to my recollection.
9        Q. Were you told why you were not allowed to
10   use choke holds?
11       A. I don't remember if they told us. I don't
12   remember them even telling us we can't use a choke
13   hold.
14       Q. How about with Chicago, were you told why
15   you could not use choke holds?
16       A. Not to my recollection, no.
17       Q. Do you have any problems hearing?
18       A. No.
19       Q. Do you have any problems with seeing?
20       A. I wear contacts, but other than that, no.
21       Q. Were you wearing contacts the evening of
22   the incident with Tashi Farmer?
23       A. Yes.
24       Q. And when I ask you if you have any issues
25   with hearing, was that also the case at the time of

Page 27

1    the incident with Tashi Farmer?
2        A. No. I didn't have any issues hearing.
3        Q. Now, you were told here at line 22 that you
4    were being interviewed as part of an administrative
5    investigation. Do you see that?
6        A. Yes. I see it.
7        Q. What does an administrative investigation
8    mean to you?
9        A. The administration that I'm part of, which
10   is Metropolitan Police Department, is investigating
11   me.
12       Q. And you were told a couple of lines down
13   that it was an official investigation, correct?
14       A. Yes. On line 25, I see that.
15       Q. And somebody at Metro alleged that you
16   violated some Metro policies; is that correct?
17       A. Yes.
18       Q. And the first allegation was that you
19   failed to activate your body-worn camera before
20   arriving at the incident, correct?
21       A. Yes.
22       Q. And the second allegation made by somebody
23   at Metro was that you failed to intervene while the
24   application of the LVNR was applied, correct?
25       A. I can't recall who made that allegation.

Page 28

1    The only thing I remember having allegations against
2    me for is failing to activate the body-worn camera.
3        Q. Do you have any reason to dispute the
4    transcript where they told you that it was alleged
5    that you failed to intervene while the application of
6    the LVNR was applied?
7        A. No. Because it's written here. I just
8    can't recall that.
9        Q. So it says that the interview took place at
10   11:27 a.m. on May 30th.
11       A. Yes.
12       Q. Does that fit your recollection?
13       A. Yes.
14       Q. Are you a member of a police union?
15       A. Yes. The FOP.
16       Q. Did you ever talk with Bryan Yant about
17   this incident?
18       A. Bryan Yant? That name does not ring a
19   bell.
20       Q. You understood that the statement was being
21   recorded, correct?
22       A. Yes.
23       Q. So the statement is made on page 2 at
24   line 7, "If at any time during this interview you
25   become culpable to any misconduct as a result of this

Page 29

1    interview, the interview will be stopped and you will
2    retain all rights afforded to you as a subject
3    employee."
4        What does that mean to you?
5        A. Give me one second. I want to re-read it.
6        I guess if you go through the interview
7    with any misconduct -- it's a pretty broad
8    statement -- it will be stopped.
9        Q. Do you know what the word "culpable" means?
10       A. Responsible.
11       Q. Now, you were being compelled to provide
12   information, correct?
13       A. Yes.
14       Q. And you understood that you were required
15   to be truthful, correct?
16       A. Yes.
17       Q. And there's a form there that's referenced
18   on line 14 that says, "Truthfulness: Did you receive
19   and read a copy of the Employee Obligation and
20   Protections in an Internal Investigation Form," and
21   you said yes.
22       A. Yeah, it says, "Yes, I did." As of right
23   now, thinking back two years, I don't remember what
24   those papers were, though.
25       Q. Okay. And you were truthful during that

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

Page 30

1  statement?
2      A.  Yes.
3      Q.  Now, there was an instruction on the bottom
4  of page 2.  It says, "Okay.  Self-incrimination:
5  Because you were being compelled to answer questions
6  as an employee under the threat of termination, your
7  statements, any information or evidence which is
8  gained, uh, through such questioning cannot be used
9  against you in a criminal proceeding.  Do you
10 understand this right?"
11      Do you remember receiving that instruction?
12     A.  Yes.
13     Q.  So you understood that if you were going to
14 be criminally charged, that this statement could not
15 be used against you, correct?
16     A.  Correct.
17     Q.  However, this is a civil case, so you
18 understand that this statement can be used in this
19 case?
20     MR. ANDERSON:  Objection.  Form.
21     Go ahead.
22     THE WITNESS:  What statement are we
23 speaking of again?
24 BY MR. LAGOMARSINO:
25     Q.  This recorded statement that we're going

Page 31

1  over.
2      A.  Yes.
3      Q.  And you understand that it can be used in
4  this case, correct?
5      A.  Yes.
6      Q.  Are you CIT certified?
7      A.  Yes.
8      Q.  When did you first get your CIT
9  certification?
10     A.  It was in the Academy, sometime during the
11 Academy at Metropolitan Police Department.  I can't
12 recall the specific date though.
13     Q.  And then after you graduated the Academy,
14 have you been recertified as a CIT?
15     A.  Yes.  Once.
16     Q.  When was that?
17     A.  I can't recall.
18     Q.  Was that before or after the incident with
19 Mr. Farmer?
20     A.  I can't recall if it was before or after.
21     Q.  At the Academy, were you certified in the
22 LVNR?
23     A.  Yes.
24     Q.  After the Academy, were you recertified in
25 the LVNR?

Page 32

1      A.  Yes.
2      Q.  When was that?
3      A.  I can't recall.
4      Q.  How many times have you been recertified in
5  the LVNR?
6      A.  Several because we have to go through our
7  DTs, defensive tactics.  We have to recertify.  But a
8  specific number, I can't recall.
9      Q.  When you're recertified, do you receive a
10 certificate?  Or how are you notified that you're
11 recertified?
12     A.  The defensive tactics officer says yes, you
13 passed, you did the technique properly.  And then
14 they document it and send it in.
15     Q.  Now, there was a question on the bottom of
16 page 3, line 17.  It says:  Um, do you have any
17 questions about the rights of peace officers or
18 rights pertaining to this interview?
19     Your answer was no.
20     What is your understanding of the rights of
21 peace officers?
22     A.  As police officers slash peace officers, do
23 I have -- do I have any questions about our rights --
24     Q.  And do you know what your rights are?
25     A.  -- to this interview.

Page 33

1      To an extent, yes.
2      Q.  Is it your understanding that Las Vegas
3  Metropolitan Police Department will pay any judgment
4  against you if there's a judgment against you?
5      MR. ANDERSON:  Objection.  Form.
6      Go ahead.
7      THE WITNESS:  Yes.
8  BY MR. LAGOMARSINO:
9      Q.  And did you know that at the time of the
10 incident with Mr. Farmer?
11     A.  Yes.
12     MR. ANDERSON:  Objection.
13 BY MR. LAGOMARSINO:
14     Q.  Are you taught that at some point in your
15 training?
16     A.  That if there's a -- can you repeat it?
17     Q.  If there's an incident involving your
18 conduct or alleged conduct and you're sued for it,
19 Metro will indemnify you?
20     A.  Yes.
21     Q.  And you were aware of that at the time of
22 the incident?
23     A.  Yes.
24     Q.  How did you become aware of that?
25     A.  You're told specifically, you know, if you

Officer Michael Flores ~ January 7, 2019
* * * Videotaped Deposition * * *

---

Page 34

1  do something outside of the boundaries of what we are
2  taught specifically, you can be held liable if it's
3  not within our spectrum of what we're taught.
4      Q.  And in that situation where you do
5  something outside the boundaries of what you're
6  taught, is it your understanding that you'll still be
7  indemnified?
8      A.  Yes.
9      Q.  What was your shift on the date of the
10  Tashi Farmer incident?
11      A.  My shift for that day?
12      Q.  Right.
13      A.  I believe I came in a little later.  It's
14  usually around 8:00 p.m. until 4:00, 4:00 or 5:00
15  a.m.  But I came in a little later because I was
16  purchasing a house.
17      Q.  So what time did you get in?
18      A.  Roughly 10:00, 10:30.
19      Q.  And your days off at the time were Monday,
20  Tuesday, Wednesday?
21      A.  That sounds correct.
22      Q.  So are you right-handed?
23      A.  Yes.
24      Q.  Can you stand up for the camera and just
25  indicate to us what tools you would have had on your

Page 35

1  belt the night of the Tashi Farmer incident?
2      A.  Let's see.  I would have had my magazines,
3  my gun, my two handcuffs in the case, OC spray,
4  radio, and my camera.
5      Q.  All right.  Did you ever carry a med kit
6  with you?
7      A.  Yes.  I did have a med kit as well.  I
8  don't remember if I had it at that time.  But yes, I
9  usually do carry a med kit.
10      Q.  Would it have been your regular practice to
11  carry a med kit at the time of the incident with
12  Tashi Farmer?
13      A.  That would be my regular practice, yes.
14      Q.  And what was in your med kit?
15      A.  It was just a tourniquet.
16      Q.  Did you ever see what was in Kenneth
17  Lopera's med kit?
18      A.  Not that I can recollect.
19      Q.  Did you also carry a Taser?
20      A.  Yes.  Taser, too.
21      Q.  Where would you carry that?
22      A.  Taser would be right here.
23      Q.  Just for the record, left front?
24      A.  Left front.
25      Q.  Okay.  When -- strike that.

---

Page 36

1      Are there guidelines provided to you by
2  Metro as to tips on how to testify in a proceeding?
3      MR. ANDERSON:  Objection.  Form.
4      Go ahead.
5      THE WITNESS:  Not to my recollection.
6  BY MR. LAGOMARSINO:
7      Q.  Or tips on how to dress for a deposition or
8  anything like that?
9      A.  Not to my recollection.
10      Q.  The night of the incident with Mr. Farmer,
11  did you have body armor on?
12      A.  Yes.
13      Q.  And you had your body camera on?
14      A.  Yes.
15      Q.  Are you trained that if you are going to,
16  as they say, roll code, that you're supposed to
17  activate your body camera?
18      A.  Yes.
19      Q.  Tell me about the training you receive in
20  that regard.
21      A.  If you roll code, roll Code 3, you are to
22  activate your body camera.
23      Q.  Why is that?
24      A.  This way it captivates -- captures the
25  incident at hand.

Page 37

1      Q.  Do you know why that's important?  Were you
2  trained?
3      A.  Yes.
4      Q.  Why were you trained that that's important?
5      A.  This way everything can be seen on camera.
6      Q.  So the public can have transparency?
7      MR. ANDERSON:  Objection.  Form.
8      MR. LAGOMARSINO:  Let me rephrase.
9  BY MR. LAGOMARSINO:
10      Q.  Were you trained that one of the reasons
11  for the body cameras is for public transparency?
12      A.  Yes.
13      Q.  Is it pretty easy to activate your body
14  camera?
15      A.  Yes.
16      Q.  How do you do that?
17      A.  You go ahead and hit the battery camera
18  part twice; you give it a tap twice.
19      Q.  Can you go ahead and demonstrate for us how
20  you do that?
21      A.  Sure.  Standing up?
22      Q.  Yes.
23      A.  Okay.
24      Q.  Were you having any problems with your
25  battery that night?

---

Officer Michael Flores ～  January 7, 2019
* * * Videotaped Deposition * * *

11 (Pages 38 to 41)

Page 38

1      A.  Not to my recollection.
2      Q.  Any problems with your camera that you can
3  recall?
4      A.  Not to my recollection.
5      Q.  Are you a defensive tactics instructor?
6      A.  No.
7      Q.  Were you at that time?
8      A.  No.
9      Q.  Can you describe the vehicle that you were
10 assigned that evening?
11     A.  I believe we were in a Ford Explorer SUV.
12     Q.  Did you have any other tools in the Ford
13 Explorer besides those you were carrying with you?
14     A.  Yes.  A shotgun and a low lethal shotgun.
15     Q.  Was there any kind of medical kit in that
16 vehicle?
17     A.  Yes.  It's usually placed in the glove box.
18     Q.  What's in that kit?
19     A.  There's a tourniquet, I believe.  I can't
20 recall everything off the top of my head.  There's
21 gauze, scissors.  I can't recall everything else that
22 would be in there.
23     Q.  As part of your training with Metro, were
24 you required to be CPR certified?
25     A.  Yes.

Page 39

1      Q.  Are you still CPR certified today?
2      A.  Yes.
3      Q.  Were you CPR certified at the time of the
4  incident with Mr. Farmer?
5      A.  Yes.
6      Q.  When we say CPR certified, does that
7  include mouth-to-mouth resuscitation, or simply
8  pushing down on the person's chest?
9      A.  Pushing down on the person's chest, and I
10 believe mouth-to-mouth as well.  I remember in the
11 Academy several times we did mouth-to-mouth.
12     Q.  Who was your acting sergeant the night of
13 the Farmer incident?
14     A.  Sergeant Crumrine.
15     Q.  That was the first time that you had worked
16 with him?
17     A.  As my acting sergeant, yes.
18     Q.  Was that the first time that you had ever
19 been on the Venetian premises in a work capacity?
20     A.  I had calls there before.  Several calls.
21     Q.  What kind of calls had you had there
22 before?
23     A.  Everything from trespassing to petty
24 larceny.  A few calls.  It was just a couple.
25     Q.  And I didn't give you an instruction

Page 40

1  before, but I'm going to give it to you now.  From
2  time to time I'm going to ask you to give me some
3  estimates or approximations.  I don't want you to
4  guess, but you know the difference between a guess
5  and an estimate?
6      A.  Yes.
7      Q.  Can you estimate as to how many times you
8  had been to the Venetian before this incident in a
9  work capacity?
10     A.  Ten.
11     Q.  After this incident, did you at some point
12 stop being a partner with Officer Tran?
13     A.  No.
14     Q.  Are you still a partner with him today?
15     A.  No.
16     Q.  Who is your partner now?
17     A.  I ride solo.
18     Q.  When is the last time you had a partner?
19     A.  Last week.
20     Q.  Was that an exception to the rule or --
21     A.  Yes.  We had -- for New Year's Eve, we had
22 to ride AB roster, meaning 12-hour shifts, and we
23 have a partner for those three days.  And that's
24 usually my partner when I have to ride with someone.
25     Q.  Who was your partner?

Page 41

1      A.  Recently?
2      Q.  Yeah.
3      A.  Sam Guzman.
4      Q.  G-u-z-m-a-n?
5      A.  Correct.
6      Q.  When did you stop being Officer Tran's
7  partner?
8      A.  I transferred to day shifts, and I believe
9  that was in June or July of that year.
10     Q.  '17?
11     A.  Correct.
12     Q.  Did you ever train with Sergeant Crumrine's
13 squad?
14     A.  No.
15     Q.  Prior to the incident with Mr. Farmer, had
16 you ever met Kenneth Lopera before?
17     A.  I've seen him.  Not in conversation or
18 anything.  I knew of him.
19     Q.  And how so?
20     A.  I seen him in briefing the other squad.
21     Q.  Did you ever know anybody who knew him
22 personally?
23     A.  No.
24     Q.  So can you please turn to page 12 of your
25 CIRT statement.  At line 11, Detective Kirkegard

Officer Michael Flores ~   January 7, 2019
* * * Videotaped Deposition * * *

13 (Pages 46 to 49)

Page 46

1     A.  There is a code for that as well.
2     Q.  And what is that?
3     A.  That would be 413B.
4     Q.  Is there a code, person trying to carjack
5  or steal a car?
6     A.  There's a couple different ways you can say
7  that.  But I mean, you wouldn't be wrong to say I
8  have an individual trying to carjack a vehicle.
9     Q.  So the only thing you heard that day was
10  Code Red, correct?
11     A.  Correct.  It was Venetian, give me a Red.
12     Q.  Sorry.  And I misphrased that question.
13     The only thing you heard were words or
14  words to the effect "Venetian, give me a Code Red,"
15  correct?
16     A.  Yes.
17     Q.  And all that means to you is that there's
18  an emergency, correct?
19     A.  Officer needs help, emergency.
20     Q.  What are all the possibilities that can
21  fall under that code?
22     MR. ANDERSON:  Objection.  Form.
23  BY MR. LAGOMARSINO:
24     Q.  Officer needs help is one.
25     A.  What are the possible scenarios that the

Page 47

1  officer would call for a Red?
2     Q.  Yes.  Thanks for clarifying.  Yes.
3     A.  Getting beat up.  Getting shot at.  Getting
4  stabbed at.  Getting a gang of people striking the
5  officer.
6     When I hear a Red, I'm thinking the worst
7  of the worst that can happen to an officer.
8     Q.  Is the Red solely focused on the officer,
9  or could it also be focused on a citizen?
10     A.  To me, how I interpret it, the officer.
11     Q.  Not just to you.  But as how Metro trains
12  you.  If somebody calls out a Code Red over the
13  radio, according to your training, could that also
14  apply to a citizen as having an emergency?
15     A.  Not to my recollection.
16     Q.  Okay.  So can you say those possibilities
17  again.  You said a gang of people?
18     A.  Fights.
19     Are you referring to an officer calling for
20  a Red?
21     Q.  Yes.
22     A.  Any sort of emergency.  Maybe someone is
23  trying to attack him, hurt him, strike him, damaged
24  car.  Anything where the officer is in trouble.
25     Q.  Now, when you arrived, there were no --

Page 48

1  there was not a gang of people involved, correct?
2     A.  No.
3     Q.  And there was -- Tashi Farmer didn't have a
4  knife or a gun that you could see, correct?
5     A.  Not that I could see right there, none.
6     Q.  When you arrived, Lopera had Farmer in what
7  you perceived to be an LVNR, correct?
8     A.  I was only able to see one hand.  But from
9  my perception, yes, LVNR.
10     Q.  And Lopera was behind Farmer when he had
11  that perceived LVNR, correct?
12     A.  Yes.
13     Q.  And Crumrine was on the bottom half of
14  Farmer's body, correct?
15     A.  Yes.
16     Q.  And Crumrine's chest was facing the front
17  of Farmer's legs, correct?
18     A.  Yes.
19     MR. LAGOMARSINO:  All right.  We're going
20  to just take a quick break and then come back.
21     THE VIDEOGRAPHER:  The time is
22  approximately 10:59 a.m.  We are going off the
23  record.
24     (A recess was taken from 10:59 a.m.
25     to 11:12 a.m.)

Page 49

1     THE VIDEOGRAPHER:  The time is
2  approximately 11:12 a.m.  We are back on the record.
3  BY MR. LAGOMARSINO:
4     Q.  Do you understand you're still under oath?
5     A.  Yes.
6     Q.  So who made the decision to roll code, you
7  or Tran or both?
8     A.  Both.
9     Q.  And you made that decision based on what?
10     A.  The fact that all we heard was, over the
11  radio, was "Venetian, give me a Red."
12     And the dispatcher came on the radio and
13  said "Venetian I, what's your location?"  It seemed
14  like an eternity and nobody keyed up.
15     Q.  What's an AM?
16     A.  The dispatcher.  It's a message they send.
17     Q.  Did you send any AM?
18     A.  I can't recall.  I don't believe so.
19     Q.  What is that?  Is that like an instant
20  message?
21     A.  It's a message that you send to a
22  dispatcher.  I guess we can communicate over --
23  almost like a text message for the computers.
24     Q.  When you arrived at the scene, how far away
25  were you, can you estimate, from Lopera?

Officer Michael Flores ~ January 7, 2019
* * * Videotaped Deposition * * *

Page 50

1      A.  Approximately 10, 15 feet.
2      Q.  Were you driving or were you a passenger?
3      A.  I was a passenger.
4      Q.  Did you and Officer Tran do any preplanning
5  on your way there or after you got there?
6      A.  No.
7      Q.  What is preplanning?
8      A.  I guess you could say premeditation of how
9  you would handle a situation.
10     Q.  And you did not activate your body camera
11  on the way to the Venetian, correct?
12     A.  Correct.
13     Q.  When did you activate your body camera?
14     A.  It would have to be sometime when we got
15  there.  I can't approximately remember when it was.
16     Q.  Can you please turn to page 17.  So you
17  were asked during your CIRT statement how long did it
18  take you to get there and you said "no more than 20
19  seconds."
20         Is that 20 seconds in the car?
21     A.  That's correct.
22     Q.  And you were asked again, Do you recall
23  having any communications with Officer Tran on the
24  way to the scene?
25     A.  I cannot recall.

Page 51

1      Q.  And then do you believe you had any
2  communication with Officer Tran as you exited the
3  vehicle?
4      A.  I don't believe so.  All I remember is I
5  said over the radio, I said Link 1, we're in the rear
6  of Venetian.  But no communication with Tran.
7      Q.  Okay.  So it looks like on page 18 of your
8  statement, you're describing at lines 13 through 16
9  in more detail what you were seeing.
10         So I'll ask you here, Lopera's chest was
11  against Farmer's back; is that correct?
12     A.  Yes.
13     Q.  And then you stated he had him in an LVNR?
14     A.  It would appear to be an LVNR, yes.
15     Q.  And then it says had his legs wrapped
16  around him.
17         Where were Lopera's legs on Farmer?
18     A.  From what I can recall, wrapped around his
19  chest -- or I'm sorry, his waist.
20     Q.  His waist?  And then Crumrine, as we
21  discussed before the break, had his chest on Farmer's
22  legs?
23     A.  From what I can recall, yes.
24     Q.  Going to page 19, please.  There's a
25  question at line 13, "Um, was there any communication

Page 52

1  between Sergeant Crumrine and Officer Lopera when you
2  arrived on scene or any verbal commands being given
3  to Farmer?"
4         What was your answer?
5      A.  I can't recall.
6      Q.  Sitting here, does your answer change to
7  that question?
8      A.  I still can't recall, no.
9      Q.  And there were security guards on the
10  scene?
11     A.  Correct.
12     Q.  Do you recall how many?
13     A.  No.  I can't recall.
14     Q.  Going to page 21.  So you -- let me walk
15  you through this, and tell me if I'm stating it
16  incorrectly.
17         So you arrive on the scene.  You get out of
18  the car.  How do you -- what's the pace of you
19  getting to where Lopera was?  Walk?  Run?
20     A.  It was a run.
21     Q.  Then you get to where Lopera is.  Do you
22  pause, or what do you do next?
23     A.  To the best of my recollection, I went
24  towards Tashi Farmer's head because I seen Lopera
25  struggling, Tashi Farmer and Crumrine.

Page 53

1  My partner, Tran, was up by the -- Tashi
2  Farmer's head.  And the first thing I thought was to
3  use our segmenting technique, so I went down to Tashi
4  Farmer's legs.
5      Q.  All right.  So we'll break it down here a
6  little bit.  You get out of the car.  You run to the
7  scene, or you run to where Lopera was.
8         Is it fair to say that between the time you
9  arrived in your car and to the time that you arrived
10  where Lopera was, you did not assess the scene?
11         MR. McNUTT:  Objection.  Form.
12         MR. ANDERSON:  Join.
13         THE WITNESS:  I checked the scene, yes.
14  BY MR. LAGOMARSINO:
15     Q.  So you had time to assess the scene?
16     A.  I take that back.  No.  When we went on
17  there, all I seen was a struggle, a fight.  I could
18  not tell what's going on.  I couldn't see if Tashi
19  Farmer had any weapons, anything to harm any of the
20  officers or people standing by.  No, I did not
21  assess.
22     Q.  So then you get there.  How many seconds go
23  by from the time you get to where Lopera is to the
24  time you try to start segmenting Tashi?
25     A.  From the time I ran out of the car to get

# Officer Michael Flores ~ January 7, 2019
## * * * Videotaped Deposition * * *

15 (Pages 54 to 57)

Page 54

1  to Lopera?
2      Q.  Yeah, we'll ask them both, I guess.  From
3  the time you left the car to the time you started
4  trying to segment, how much time elapsed?
5      A.  Five, ten seconds.
6      Q.  From the time you got to where Lopera was
7  to the time you started segmenting, how much time
8  elapsed?
9      A.  I guess five seconds.
10     Q.  All right.  So we have a doll here we can
11 use as a demonstrative aid.  So let me give you this
12 here.
13         So explain to me what you're trying to do.
14 That can be Tashi Farmer.  What were you trying to do
15 with his legs?
16     A.  Well, to make it more accurate, I would
17 need the other officers to show what was going on.
18         Tashi Farmer was here.  I ran down to his
19 legs.  And as soon as I touched his legs, I heard,
20 "Get off my fucking legs," which I thought at the
21 time was Tashi Farmer stating that in the struggle.
22         So Tashi Farmer bent his legs.  He turned,
23 and I pushed up to gain compliance.
24     Q.  So when you -- at some point Tashi Farmer
25 gets turned on his stomach, correct?

Page 55

1      A.  Correct.
2      Q.  So go ahead and turn him on his stomach.
3         And then you first crossed his legs,
4  correct?
5      A.  Correct.
6      Q.  And then you pushed them up?
7      A.  From to the best of my acknowledgment, yes.
8      Q.  And how far did you push them up?
9      A.  I can't recall.  But it wouldn't be -- it
10 would be just right around there.
11     Q.  All right.  So please turn to page 22.  So
12 it says question from Kirkegard, "Do you -- did you
13 recognize LVNR technique that was being applied?"
14         And what was your answer?
15     A.  It says -- I said here, "Yes.  It's -- as
16 in the technique?"
17     Q.  Can you demonstrate what you saw on the
18 doll.
19     A.  What parts, as in Lopera and Tashi Farmer?
20     Q.  Yeah.
21     A.  I seen Lopera's back on the ground, Tashi
22 Farmer against Lopera's back.  So -- I'm sorry,
23 Lopera's chest.
24         And I seen one hand encircled around Tashi
25 Farmer.  I could not see the other hand, the location

Page 56

1  at all, of what the hand was doing.
2         And Lopera's legs wrapped around Tashi
3  Farmer's waist.
4      Q.  Okay.
5      A.  And Crumrine was down here as well.  So I
6  couldn't see quite what was going on with the legs
7  and Crumrine also.
8      Q.  Okay.  And either on the doll or not on the
9  doll, how do you -- how would you describe Lopera's
10 hold on Tashi in terms of the neck?
11     A.  I couldn't tell.
12     Q.  You just perceived it to be an LVNR?
13     A.  That's correct.
14     Q.  What training did you receive that led you
15 to believe that you're able to fold an individual's
16 legs when he's on his stomach and push them back
17 almost like a hogtie position?
18     A.  It's a segmenting.
19     Q.  And that was at Metro?
20     A.  Yes.
21     Q.  And you did that while you perceived Lopera
22 to have Tashi in a neck hold, correct?
23     A.  I wasn't looking at what -- when I was
24 segmenting his legs, I couldn't see what Lopera was
25 doing with Tashi Farmer.

Page 57

1      Q.  Okay.  Slightly different question.  Just
2  before you started segmenting him, you did perceive
3  what you believed to be Lopera holding him in an
4  LVNR, correct?
5      A.  Yes.
6      Q.  And you did not see anything else that led
7  you to believe at the time that you first started
8  segmenting Tashi that Lopera had released the LVNR,
9  correct?
10     A.  I couldn't tell if he was released in the
11 LVNR.
12     Q.  Have you ever been trained by Metro on the
13 dangers of positional asphyxiation?
14     A.  Yes.
15     Q.  And what have you been trained in that
16 regard?
17     A.  If someone is ED, excited delirium -- and
18 this is being able to assess the situation prior --
19 don't necessarily lay them on their stomach.
20     Q.  Anything else that you were trained on with
21 respect to positional asphyxiation?
22     A.  Not that I can recall.
23     Q.  Going to page -- I don't know if you're
24 still there, page 25.  Bottom there at page -- or at
25 line 20.  It says, "So as in your intention was to

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

16  (Pages  58 to 61)

Page 58

1  take Farmer into custody?"
2      And your answer was, "To just, uh, stop him
3  from, uh, resisting or fighting."
4      So let me clarify.  Was it your intention
5  to take Tashi Farmer into custody?
6      A.  Yes.
7      Q.  Going to page 26.  Is it fair to say that
8  you did not perceive Farmer physically fighting
9  Lopera?
10      MR. McNUTT:  Objection.  Form.
11      THE WITNESS:  No.
12  BY MR. LAGOMARSINO:
13      Q.  Let me rephrase.  Page 26, line 17, you
14  were asked, "Um, was Farmer physically fighting
15  Lopera?"
16      So let me ask you -- and your answer that
17  day was what?
18      A.  It looks like I said no.
19      Q.  Were you telling the truth that day?
20      A.  Yes.
21      Q.  Was Tashi throwing punches?
22      A.  That's why I didn't perceive him to fight
23  him in regards -- when I thought of the question as a
24  fight, I'm thinking fights, punching and kicking.
25  Wrestling on the ground is still fighting, but that's

Page 59

1  how I answered the question when I was asked it that
2  specific day.
3      Q.  Going to page 28.  So line 5, Kirkegard
4  said, "All right.  Choo-choo-choo.  And you said you
5  folded his legs to gain compliance.  Is there a
6  technique that's taught in the Academy?"
7      Is that what you described earlier?
8      A.  Yes.
9      Q.  And what do you mean when you said the
10  other leg pushed forward and layered, like, thigh up
11  tight against him?  What does "thigh up" mean?
12      A.  Can I use this again?
13      Q.  Yes.
14      A.  So turn, one leg is in.  I guess what I
15  meant thigh up right there against the thigh.  So
16  this leg is bent against the knee.
17      Q.  Okay.
18      A.  And you just push up.
19      Q.  And at page 28, line 12, you say, "And, uh,
20  this way you would gain compliance by, you know, it's
21  not the most comfortable technique."
22      What did you mean?
23      A.  When you gain compliance, it's not supposed
24  to be something comfortable.  You're gaining the
25  compliance from pain compliance.

Page 60

1      Q.  So the intention is to inflict pain to gain
2  compliance, correct?
3      A.  Make it not comfortable.
4      Q.  Make it not comfortable by inflicting pain,
5  correct?
6      MR. ANDERSON:  Objection.  Form.
7      THE WITNESS:  If that's how you perceive
8  it.
9  BY MR. LAGOMARSINO:
10      Q.  And you didn't give any verbal commands to
11  Tashi, correct?
12      A.  No.
13      Q.  That's a bad question.  Did you give verbal
14  commands to Tashi?
15      A.  I don't believe so.  I can't recall if I
16  did.
17      Q.  Now, going to page 30.  Question is, "So
18  you can get in?  Okay."  Sorry.  Page 30, line 19,
19  Kirkegard says, "So you can get in?  Okay.  At what
20  point, to you, did, uh, Farmer appear to be
21  unconscious?"
22      And it says, "When -- after everything was,
23  uh -- after two cuffs were on.  Um, Lopera rolled off
24  and kinda got off him.  I looked at him and I seen
25  blood on his nose and a little, um -- what is that?

Page 61

1  Foam was coming out of his mouth right here.  His
2  eyes weren't open so, uh, that's when I noticed he
3  was unconscious."
4      So when you first rolled him over after he
5  was handcuffed you noticed blood on his nose?
6      A.  Yes.
7      Q.  When you say on his nose, was it coming out
8  of his nose, or was it like from lacerations on his
9  nose?
10      A.  I believe coming out of his nose.
11      Q.  And then you said, "Foam was coming out of
12  his mouth."  Can you describe that in more detail?
13      A.  Foam.  I mean, I don't know how else really
14  to describe that, but he had foam outside of his
15  mouth.
16      Q.  Coming out both sides of his mouth?
17      A.  To the best of my recollection, yes.
18      Q.  And his eyes weren't open, correct?
19      A.  Correct.
20      Q.  Have you, since the incident, had a chance
21  to review the video of any body cam footage?
22      A.  I believe when I was going with CIRT and
23  FIT is the only time I remember.
24      Q.  And were you present when Lopera said
25  words, "Is he out, is he out, is he out yet?"

Officer Michael Flores ~   January 7, 2019
* * * Videotaped Deposition * * *

17 (Pages 62 to 65)

Page 62

1      A.  I believe, yes, I was there when he said
2  that.
3      Q.  And that was before he was rolled over,
4  correct?
5      A.  I don't remember.
6      Q.  And when you arrived, there was already a
7  handcuff on Tashi's left wrist, correct?
8      A.  One handcuff.
9      Q.  On his left wrist?
10     A.  I can't recall.
11     Q.  It says -- going to page 36, line 21, it
12  says, "Okay.  And just to confirm, you're the one who
13  placed the handcuff on his right wrist."
14         And you said, "That's correct."
15         Back in May of 2017; is that correct?
16     A.  Yes.  If that's what I said, yes, looking
17  back on it.
18     Q.  When did you first notice that Tashi had
19  been tased?
20     A.  During the incident.  I don't remember -- I
21  didn't notice him being tased at all.
22     Q.  When did you first learn he was tased?
23     A.  After the scene was safe and other officers
24  arrived on the scene.
25     Q.  You didn't check for a pulse, correct?

Page 63

1      A.  My partner did.
2      Q.  And that's Tran?
3      A.  Yes.
4      Q.  And you did not give him a tap on the back,
5  correct?
6      A.  That was also my partner.  I helped sit him
7  up, and Tran gave him a pat on the back.
8      Q.  All right.  And at some point Tran told you
9  that he didn't feel anything with respect to a pulse,
10  correct?
11     A.  Yes.
12     Q.  And he was not responding to you, correct?
13     A.  Correct.
14     Q.  So you guys called for medical at that
15  point?
16     A.  Yes.
17     Q.  Why did you not perform any medical
18  assistance at that point?
19     A.  Because we are -- we called for medical,
20  and the EMTs come out to help with medical.  We
21  assess the situation.  If medical is needed, our
22  specific duty is to call for medical.
23     Q.  Well, aren't you trained on the LVNR that
24  if the person is not reviving, that you're to
25  immediately perform CPR?

Page 64

1      A.  Not necessarily.  You don't have to perform
2  CPR.  We're just to call for medical.
3      Q.  So it's your understanding -- now, let me
4  kind of go through the training with you.  How many
5  hours did you go through LVNR training in the
6  Academy?
7      A.  I can't recall how many hours.
8      Q.  And then how many hours do you have to do
9  to recertify every year?
10     A.  It's through the DT tactics, so it could
11  be -- I don't know a specific number on the hours.
12     Q.  So let me ask you this on the DT tactics:
13  Are you just saying, okay, you're recertified in the
14  LVNR because you go through defensive tactics every
15  quarter?
16         MR. ANDERSON:  Objection.  Form.
17         Go ahead.
18         THE WITNESS:  We go ahead and go through
19  the techniques, the proper techniques of the LVNR.
20  And we go ahead and use our partners, our squad
21  mates, to go ahead and use the proper techniques.
22  And the defensive tactics officer comes to check on
23  the proper techniques.  And if done properly, and up
24  to the standards of LVMPD Metro, then you get your
25  recertification.

Page 65

1  BY MR. LAGOMARSINO:
2      Q.  And as part of that training -- and this
3  is -- we received some documentation on the training,
4  I'm not sure that we've received it all, but maybe
5  you can enlighten us.
6         As part of the training that you've
7  personally been through, were you ever taught that if
8  the person is not reviving, that you're to
9  immediately give them medical assistance in terms of
10  CPR and chest compressions?
11     A.  We are -- the way I'm trained on it and the
12  way that we are trained, if -- LVNR, and if you're
13  not breathing, you sit the person up, give them a
14  couple stern pats on the back to get them to breathe,
15  and if they cannot breathe, call for medical right
16  away.
17         If you have to do CPR, it's not something
18  that's -- you are, you will necessarily have to do.
19         By calling medical, expediting medical, is
20  the necessary steps that you could do to go ahead and
21  get a professional on scene.  That's who knows better
22  about helping someone.
23     Q.  Well, I guess my question is if you're
24  certified in CPR at the time, and you're certified in
25  the LVNR, why aren't you performing CPR on him if he

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

18 (Pages 66 to 69)

Page 66

1   has no pulse and he's not responding?
2        A.   Well, CPR was performed.  Being in a very
3   stressful situation right there and then, me and my
4   partner had the mindset of definitely checking Tashi
5   Farmer once he was rolled over and seeing something
6   wasn't right.  So by checking his pulse, seeing if he
7   was breathing, giving him a stern tap on the back,
8   calling for medical, being absolutely exhausted,
9   other officers did come up and do CPR.
10       Hindsight, looking back and everything, it
11  was a very exhausting situation.
12       So by calling medical, I remember we took a
13  step back and other officers did come.
14       Q.   Are you saying with -- so it's your
15  testimony under oath that within seconds of you
16  walking away from Tashi, the other officers began
17  performing CPR?
18       MR. ANDERSON:  Objection.  Form.  Misstates
19  testimony.
20       THE WITNESS:  I can't recall if it was
21  within seconds.  I don't know the time frame.
22  BY MR. LAGOMARSINO:
23       Q.   You testified that you were exhausted, but
24  you were able to go offer Kenneth Lopera to get him a
25  drink, correct?

Page 67

1        A.   I can't recall it.
2        Q.   You didn't go sit down, correct?
3        A.   I don't recall exactly what I did right
4   after that.  I remember Tran and myself, since we
5   were involved in the incident, were separated, but I
6   can't recall.
7        Q.   If you were trained to immediately give CPR
8   after noticing that somebody who had an LVNR
9   performed on them was unconscious and not breathing,
10  would you have performed CPR --
11       MR. ANDERSON:  Objection.  Form.
12       MR. McNUTT:  Objection.  Form.
13  BY MR. LAGOMARSINO:
14       Q.   -- if you were trained that way?
15       MR. ANDERSON:  Objection.  Form.
16       THE WITNESS:  Not necessarily.  I would
17  call for medics.
18  BY MR. LAGOMARSINO:
19       Q.   So if Metro trained you to do CPR on
20  somebody, if they're not responding immediately, you
21  still would not follow that training and just call
22  medical?
23       MR. ANDERSON:  Objection.  Form.
24       THE WITNESS:  It depends on the
25  situation.  Medical, I would call every time right

Page 68

1   away.
2   BY MR. LAGOMARSINO:
3        Q.   Was it Amburgey that performed CPR?
4        A.   I can't recall the officer.
5        Q.   Do you remember Lopera telling you that he
6   believed that Tashi had excited delirium?
7        A.   What page is that?
8        Q.   Sure.  Page 40.
9        A.   And what line?
10       Q.   Let's see here.  So let's start with 2.  So
11  this is MF, what is your initials, correct?
12       A.   Correct.
13       Q.   It says, "Remember, uh, looking at the
14  video, too, I remember asking, uh, Lopera if he was
15  okay."
16       So after you walked away from Tashi you
17  asked Lopera if he was okay, correct?
18       A.   According to this, yes.
19       Q.   And then after you walked away from Tashi,
20  you asked Lopera if he needed a water?
21       A.   Yes.
22       Q.   So what I want to get some clarification on
23  is here, this statement was taken May 30th.  Let me
24  just double-check.  So it's on the first page.  It
25  says it was taken May 30th, 2017, 11:27.  Just about

Page 69

1   a week after.
2        And going back to page 40, you're saying,
3   "but, uh, on the video again I remember him saying."
4        So had you watched the body cam video
5   before you gave your CIRT statement?
6        A.   I believe it was right before this
7   statement.  I can't recall specifically, but I know
8   it was while I was giving the CIRT statement.
9        Q.   And then it says here, "Then he went to a
10  different move and, uh, I don't know if it -- I don't
11  remember at the time" -- I'm at line 11 -- "if he
12  said it was, uh -- on -- he thought he was on drugs
13  as well or ED, excited delirium."
14       So were you saying that Lopera -- strike
15  that.
16       Were you saying that Lopera said he thought
17  Tashi was on drugs or excited delirium?
18       MR. ANDERSON:  Objection.  Form.
19       THE WITNESS:  I don't remember.
20  BY MR. LAGOMARSINO:
21       Q.   You did not administer CPR, correct?
22       A.   Correct.
23       Q.   You did not administer chest compressions,
24  correct?
25       A.   Correct.

# Officer Michael Flores ~ January 7, 2019
## * * * Videotaped Deposition * * *

## Page 74

1 they're talking about recordings at page 42, line 22.
2 And then it appears that they're playing parts of a
3 recording.
4        And then at line 14, it says, "That's good,
5 Greg. All right. And then it says, "Um, I don't
6 know if you caught it. In the beginning when Officer
7 Rybacki approaches you and Officer Tran, the comment
8 was made, 'He was out when we got here.' Was that
9 you?"
10        And your answer was, "Yes. I seen my,
11 uh -- seen it and said it."
12        When you were about to say "I seen my,"
13 were you talking about you've seen your video?
14    A. I can't recall what I meant at that point.
15    Q. And then, so then you continue and you say,
16 again, on page 43 line 21, "And, uh, after talking
17 to, um, Lopera, you know, that, um, having him in the
18 LVNR. At that time we cuffed him. I didn't know. I
19 thought he was still resisting. We're like, 'Oh,
20 seemed like he wasn't, um, resisting much at all.'"
21        What were you talking about there?
22    A. Well, I remember at the time when Lopera
23 and Crumrine were with Tashi Farmer, I thought he was
24 resisting arrest, fighting with Lopera and Tashi
25 Farmer.

## Page 75

1    Q. But that was based on the actions of
2 Crumrine and Lopera, correct?
3    A. At the time, I didn't know that.
4    Q. Right. But now having viewed the video,
5 that's correct, isn't it?
6        MR. ANDERSON: Objection. Form.
7        THE WITNESS: After reviewing the video, it
8 could have been during -- it's possible.
9 BY MR. LAGOMARSINO:
10    Q. And then going to line 15, you say, "And I
11 think I made the comment, um, referring to him being
12 passed out. Not deceased."
13        So when you say "passed out," you mean
14 unconscious?
15    A. Correct.
16    Q. If you'll look at the end of 47 and just
17 read to yourself line 11 at 47, and then going all
18 the way to 48, line 3. I want to ask you a couple of
19 questions about that.
20    A. What was the first line?
21    Q. Sure. Page 47, line 11, to 48, 3. Just
22 read it to yourself silently, and let me know when
23 you're done.
24    A. Okay. I read it.
25    Q. When you say that's not taught in the

## Page 76

1 Academy -- strike that.
2        At line 3 when you say, "That was not
3 taught in the Academy. I'm sorry," what was not
4 taught in the Academy?
5    A. It's referring to the body camera.
6    Q. So body camera was not taught in the
7 academy?
8    A. Not to my recollection.
9    Q. Going to page 51 -- I'm sorry. Go over to
10 page 50, line 22. There's a question, "Okay. Kinda
11 describe some of those signs of excited delirium."
12 And then at line 6 on page 51 you say: "Um, you hear
13 stories of, uh, breaking out of handcuffs, flipping
14 over cars."
15        Do they train you at the Academy that
16 people who are in a state of excited delirium flip
17 over cars?
18    A. I remember seeing a video in Chattanooga,
19 Tennessee, when I was in the Academy, of an
20 individual flipping over a car that was in excited
21 delirium.
22    Q. And what about breaking out of handcuffs?
23    A. That was in Chattanooga, too. Showed quite
24 a few videos.
25    Q. Is it your understanding that somebody who

## Page 77

1 is in a state of excited delirium is in a state of
2 medical crisis?
3    A. Yes.
4    Q. So go to page 56. At line 14 you were
5 asked, "You mentioned that there's a struggle. What
6 exactly is -- does Farmer -- does he have his, uh,
7 hands clenched?"
8        And you state that you couldn't remember
9 seeing his hands at all.
10        At what point in time are you referring to?
11    A. When we first arrived on scene all the way
12 until he was handcuffed.
13    Q. And it says you "remember seeing Crumrine
14 and there was, uh, speaking."
15        Are you referring to Crumrine saying
16 certain things?
17    A. I can't recall who was speaking.
18    Q. Okay. And so as soon as you get there, you
19 see Lopera, and it kind of looked like Lopera holding
20 Farmer. Is that what you were referring to at line
21 20?
22    A. Yes.
23    Q. And so your train of thought is he's still
24 resisting. That's based on the fact that Lopera is
25 still holding him, correct?

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

21 (Pages 78 to 81)

Page 78

1    A.  And Crumrine looked to be struggling as
2  well.
3    Q.  And so kind of going to the next page, they
4  were asking you -- I think you kind of said that --
5  based on Lopera still holding him and Crumrine was on
6  the bottom of him, but you can't tell what Farmer is
7  doing.  Is that accurate?
8    A.  Correct.
9    Q.  So it was based on what Crumrine and Lopera
10  were doing that caused you to believe that Tashi
11  resisting, you couldn't tell what Farmer was doing,
12  correct?
13    A.  Yes.
14    Q.  When you segmented his legs, Tashi didn't
15  kick back, correct?
16    A.  I felt -- I remember I felt resistance.
17  And when I went towards his legs, that's when I
18  heard -- which I thought Tashi said, "Get off my
19  fucking legs."
20    Q.  You were wrong on that, though, right?
21    A.  After I found everything out...
22    Q.  That was Lopera?
23    A.  Correct.
24    Q.  But when you were trying to segment Tashi,
25  he was not kicking, correct?

Page 79

1    A.  Not like a forced kick, no.
2    Q.  So on page 61 there's some questions about
3  the LVNR, how long it should be applied for.
4       There are three types of LVNR holds; is
5  that correct?
6    A.  Yes.
7    Q.  And the LVNR is applied when the arm is
8  encircled around the subject's neck, correct?
9    A.  Correct.
10    Q.  And then you were asked how long should the
11  LVNR be applied for.  That's at line 12.  Then
12  there's some back and forth.  And then you say, "I
13  would say, um -- I feel no more than 15 seconds."
14       Is that your understanding?
15    A.  Well, I feel it is until you gain
16  compliance.  So I don't know if there's a specific
17  time frame on it.
18       It looks at the time I wrote 15 seconds,
19  but looking back at it, until you're in compliance.
20    Q.  You did say 15 seconds at least the week
21  after the incident, correct?
22    A.  I did say that in this document.
23    Q.  And then the question was, at line 62:
24  "Um, did you feel at any time that it was on too
25  long?"

Page 80

1       And then your answer was, "Yes, I remember
2  when, um, my partner Tran's like loosen up cause we
3  had him cuffed dudes, yes."
4       So is that the point you felt like he was
5  held on too long when Tran said loosen up?
6    A.  Once we had Tashi Farmer cuffed, I believe
7  that's when Tran said loosen up, and Lopera loosened
8  up.
9    Q.  At what point did you feel like it was on
10  too long?
11    A.  I didn't feel as if it was on too long.
12  Once we had him cuffed, Tran said loosen up.  Within
13  those seconds, he loosened up.
14    Q.  So the question was at least a week later,
15  did you feel at any time that it was on too long and
16  your answer was:  "Uh, yes.  Um, I remember when, uh,
17  my partner Tran's like loosen up, cause we had
18  him" --
19       "Okay."
20       And it says -- "cuffed dudes, yes."
21       Is that what you said back then?
22    A.  Yes.  But it doesn't seem like it flows
23  here.  So I can't recollect why it's said like that,
24  "cuffed dudes, yes."
25    Q.  So then you said, "To try to get, uh, him

Page 81

1  to loosen up and saying, hey, we got compliance.  If
2  he's telling him to loosen up, there's no, uh, longer
3  a need to do, uh, anything to try to gain compliance
4  cause he's already, uh, handcuffed."
5       Is that what you said back then?
6    A.  That's what I said back then, correct.
7    Q.  And then it says, at line 13, "When that is
8  said, do you remember if Officer Lopera is listening
9  to those directions?"
10       And you say, "Um, do recall, uh, it took a
11  little bit of time.  Um, he's like, hey, loosen up,
12  man, loosen up.  And uh, it wasn't like right away."
13       So Tran is saying loosen up, and Lopera
14  didn't loosen up right away, correct?
15    A.  I believe he loosened up within a couple of
16  seconds, correct.
17    Q.  I asked you this before --
18       (Hammering on the wall was heard.)
19       MR. LAGOMARSINO:  Let's take a break.
20       THE VIDEOGRAPHER:  The time is
21  approximately 1:19 p.m.  We are going off the record.
22       (A recess was taken from 1:19 p.m.
23       to 1:26 p.m.)
24       THE VIDEOGRAPHER:  The time is
25  approximately 1:26 p.m.  We are back on the record.

Officer Michael Flores ~   January 7, 2019
* * * Videotaped Deposition * * *

22  (Pages  82 to 85)

---

Page 82

1   BY MR. LAGOMARSINO:
2       Q.  All right.  Can you turn to 63, please.  So
3   there was a series of questions, and I think we
4   addressed this earlier, but I just want to make sure
5   the record is clear.
6           The question was at line 1, "Have you ever
7   been on a call with Officer Lopera before?"
8           "No."
9           "This was your first interaction with him?"
10          "On a call.  Correct."
11          So had you ever interacted with him
12  socially or personally outside of your employment?
13      A.  No.
14      Q.  Are you friends on social media with any of
15  the officers who were involved in this incident?
16      A.  Might be Officer Tran.  I barely go on
17  Facebook.  I have no idea.
18      Q.  All right.  So then they ask you a little
19  bit later about command and control.  And so at 63 it
20  says -- page 63, line 15: "Okay.  How long does it
21  take for that sergeant to take charge?  Or does he?"
22          And your answer then was, "I can't remember
23  if him -- I can't remember him taking charge.  I -- I
24  can't remember if he said anything."
25          Are you referring to Sergeant Crumrine?

---

Page 83

1       A.  Yes.
2       Q.  Then at page 64, line 19, it says: "Did
3   you ever feel, um, like anybody had taken control?
4   What -- how long after did somebody actually -- where
5   you felt somebody had control?"
6           And then your answer was, "I would say, uh,
7   feel like another sergeant came on and, uh, seemed
8   like there was, uh, some more control.  So I'd say
9   maybe five minutes."
10          So you're talking five minutes from when
11  the incident started?
12      A.  Looking back at this, I believe that's what
13  I meant.
14      Q.  And when you're saying the other sergeant,
15  who were you referring to?
16      A.  Sergeant Sheck.  Here it says Zach, but I
17  meant Sheck.  He was a newer sergeant.  I didn't have
18  many encounters with him prior to this.
19      Q.  And have you seen this statement before?
20      A.  Which statement?
21      Q.  The CIRT statement that you gave.
22      A.  I can't recall if I seen it before.  I seen
23  it -- I don't remember if I seen this one before.
24      Q.  You knew you were being audio recorded,
25  correct?

---

Page 84

1       A.  Yes.
2       Q.  And at some point there was a Use of Force
3   Board; is that correct?
4       A.  I believe so, yes.
5       Q.  You were there?
6       A.  Yes.  Yes.  Actually, no, I was there.  I'm
7   familiar with it.
8       Q.  And either at the Use of Force Board or
9   just before, did they show you a copy of your
10  statement, your recorded statement?
11      A.  I can't recall.
12      Q.  Can you please turn to page 68.  There's
13  some questions about what a rear-naked choke looks
14  like.  Do you see that?  Line 1?
15      A.  Yes.  I see it.
16      Q.  Back in May of '17, did you know what a
17  rear-naked choke looked like?
18      A.  From -- do I know what it looks like?
19      Q.  So at the time of the incident, did you
20  have the knowledge of what a rear-naked choke looked
21  like?
22      A.  Yes.
23      Q.  And did it appear to you that it was a
24  rear-naked choke or an LVNR?
25      A.  LVNR.

---

Page 85

1       Q.  Rear-naked choke is not approved, correct?
2       A.  That's correct.
3       Q.  Going to line 21 on page 68, it says:
4   "Okay.  Um, from a command control, do you feel that
5   the sergeant failed to take command control of the
6   situation."
7           And what did you say?  Can you just read
8   it.
9       A.  "Right away?  Uh, I don't know if his, uh,
10  emotions were shaken up, but, uh, could've been a
11  little bit.  The control part?  I don't know.  After
12  going through that situation, it could've went
13  smoother.  A little smoother."
14      Q.  And then you were asked "how," and then
15  what did you say?
16      A.  "Um, we went ahead and called for medical
17  and, uh, I guess started acting -- start, uh, saying
18  'Officers come to this location.  Uh, start setting
19  up, uh, tape.  Make sure that, uh, you know, we have
20  a route for the medical to come in.  Um, start
21  statements right away.  Uh, separating all parties.
22  And, uh, making sure that, uh, the subject's, uh,
23  getting the proper necessary medical, um, you know,
24  attention he needs for the specific situation.'"
25      Q.  How could it have gone smoother, in your

---

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

23 (Pages 86 to 89)

Page 86

1  opinion?
2      A.  Looking back at it, it felt like we did
3  everything necessary we needed to do.  And after
4  Tashi Farmer was in custody, I really don't know how
5  it could have gone smoother.  I know I said that
6  here, but in recollection, I can't think of ways it
7  could go smoother.
8      Q.  So going to page 73, so at line 14 the
9  question was, "So the, um, so because when Greg asked
10  you about the -- how long you think I -- Officer
11  Lopera had, uh, Farmer in the LVNR, you said about
12  over a minute."
13          And what was your answer?
14      A.  "Correct.  I -- I -- I -- I would say maybe
15  around this time, approximately."
16      Q.  So you were asked here -- I'll ask you
17  again, have you ever placed anybody in an LVNR when
18  acting as a police officer?
19      A.  No.
20      Q.  Have you ever been placed in an LVNR in
21  training?
22      A.  Yes.
23      Q.  Have you ever passed out during being
24  placed in an LVNR?
25      A.  In training?

Page 87

1      Q.  Yes.
2      A.  No.
3      Q.  Have you seen anybody else pass out in
4  training?
5      A.  No.
6      Q.  Do they stop you in training before
7  somebody passes out?
8      A.  Me personally?
9      Q.  Sorry.  That's a bad question.  Have you
10  seen the training officers stop the application of
11  the LVNR before somebody passes out?
12      A.  No.
13      Q.  So then going to page 75, line 13, it says:
14  "Um, in hindsight, do you think the incident could
15  have been approached in a way that presented less
16  risk to yourself or others?"
17          And what was your answer?
18      A.  "Yes."
19      Q.  And it appears that you had issues with the
20  communication; is that accurate?
21      A.  What line did you read that?
22      Q.  Sure.  Going to 76, line 8, "But I feel the
23  communication could've been better."
24      A.  Well, looking back at it, Officer Lopera
25  was in a fight with Tashi Farmer, and so I don't know

Page 88

1  the placement of his lapel mic.  And that's what I
2  meant by communication.
3          But being in a fight with someone, you're
4  not able to communicate.  So I don't know how the
5  communication could have been better, but that's what
6  I think I was referring to.
7      Q.  Okay.  Now, did you feel confident with the
8  four officers on the scene that you guys would be
9  able to take Farmer into custody?
10      A.  Yes.
11      Q.  Was everything that you saw at the scene
12  done appropriately and pursuant -- strike that.
13          Was everything done -- strike that.  Let me
14  start over.
15          Based on what you observed at the scene,
16  was everything done according to LVNR training?
17          MR. ANDERSON:  Objection.  Form.
18          Go ahead.
19          THE WITNESS:  From what I observed?
20  BY MR. LAGOMARSINO:
21      Q.  Yes.
22      A.  When I first got there, yes.
23      Q.  Now, since then, you've observed certain
24  actions on video, correct?
25      A.  What actions?

Page 89

1      Q.  You saw Lopera's actions on video, correct?
2      A.  Yes.
3      Q.  You saw Lopera from the first time he made
4  contact with Tashi, correct?
5      A.  Yes.
6      Q.  And did everything that you saw Lopera do
7  comply with LVNR training, in your opinion?
8          MR. ANDERSON:  Objection.  Form.
9          Go ahead.
10          THE WITNESS:  From what -- I'll say yes.
11  BY MR. LAGOMARSINO:
12      Q.  Now, just to be clear, you knew at the time
13  that a rear-naked choke was out of Metro policy,
14  correct?
15      A.  Yes.
16      Q.  So if you believed that Tashi was in a
17  rear-naked choke, you would have had a duty to
18  intervene to stop that from being used, correct?
19      A.  Yes.
20      Q.  And you knew that at the time, correct?
21      A.  No.
22      Q.  Well, strike that.
23          I think you thought I meant to say that you
24  knew he was in a rear-naked choke.  That's not what
25  I'm saying.

Officer Michael Flores ~   January 7, 2019
* * * Videotaped Deposition * * *

24  (Pages 90 to 93)

Page 90

1       If -- at the time, were you trained on the
2   duty to intervene?
3       A.  Yes.
4       Q.  And at the time, if you felt like an
5   officer was using excessive force, you would have had
6   a duty to intervene to stop that excessive force from
7   being used, correct?
8       A.  Yes.
9       Q.  And a rear-naked choke is excessive force,
10  correct?
11      MR. ANDERSON:  Objection.  Form.
12      MR. McNUTT:  Join.
13      THE WITNESS:  Yeah, a rear-naked choke,
14  yes.
15  BY MR. LAGOMARSINO:
16      Q.  Now, part of the duty to intervene is to
17  take what actions?  Strike that.
18      What actions are available to you when you
19  have the duty to intervene?
20      A.  Your mouth -- what do you mean "actions"?
21  Like things you can do specifically?
22      Q.  Yeah.
23      A.  You can use your mouth.  You can use your
24  hands.  Go ahead and communicate.  Communication is
25  the best key.

Page 91

1       Q.  You can verbally --
2       A.  Verbally and physically.
3       Q.  And then as part of your duty to intervene,
4   are you required to report any excessive force?
5       A.  Yes.
6       Q.  From the time that -- I'm talking about you
7   personally, okay?  From the time that you got there
8   to the time that you walked away from the situation,
9   did you do anything to stop Lopera from applying a
10  neck restraint?
11      A.  Specifically, I can't recall if I
12  specifically did.  I know once we cuffed him,
13  Officer Tran loosened up, and Officer Lopera loosened
14  up.
15      Q.  But you didn't do anything, correct?
16      A.  After I cuffed him, I don't recall if I
17  said anything specifically.
18      Q.  Even before you cuffed him, you didn't do
19  anything, correct?
20      A.  For Lopera?
21      Q.  Yeah.
22      A.  No.  Tashi Farmer is still resisting.  And
23  that's going to back to, like, when he said "get off
24  my fucking legs."  I had no reason to believe that,
25  you know, Officer Lopera -- I figured they were both

Page 92

1   still in a fight.
2       Q.  Do you recall receiving training either at
3   the Academy or since you became a police officer as
4   to the Shock the Conscience Standard with the 14th
5   Amendment?
6       MR. ANDERSON:  Objection.  Form.
7       THE WITNESS:  I cannot recall it.
8   BY MR. LAGOMARSINO:
9       Q.  If you wanted to intervene at that time,
10  you could have intervened, correct?
11      MR. McNUTT:  Objection.  Form.
12      MR. ANDERSON:  Objection.  Form.
13      THE WITNESS:  If I wanted -- I don't
14  understand.  If I wanted to intervene?
15  BY MR. LAGOMARSINO:
16      Q.  I know your testimony has been you don't
17  feel like anything was done wrong, and I'm not trying
18  to imply that that's any different.  I'm asking a
19  different question.
20      If you felt like something was -- strike
21  that.
22      If you felt that Lopera was doing something
23  wrong, you could have intervened, correct?
24      A.  Yes.
25      Q.  And you did not give any orders, correct?

Page 93

1       A.  Not that I can recall.
2       Q.  Do you understand that the intent of the
3   LVNR is to choke off blood flow to the brain?
4       A.  In regards to the carotid arteries and to
5   stop the supply, yes.
6       Q.  And do you understand that the purpose of
7   the rear-naked choke is also to cut off blood to the
8   brain?
9       A.  My understanding of a rear-naked choke is
10  an actual trachea.
11      Q.  So is it cutting off blood or oxygen or
12  both?
13      A.  I wouldn't know.  I figured it would be
14  oxygen.  I'm not sure.  I don't know much about the
15  rear-naked choke and what it could imply and include.
16      Q.  In your training, is there training as to
17  the difference between the LVNR and a rear-naked
18  choke?
19      A.  Well, I know that rear-naked choke is on
20  the trachea, and LVNR is the carotid arteries.
21      Q.  I understand.  And I'm not trying to
22  insinuate that you're being evasive.  But in your
23  training, are you taught the difference between the
24  LVNR and the rear-naked choke?
25      A.  I believe in the Academy, they do go

Officer Michael Flores ~ January 7, 2019
* * * Videotaped Deposition * * *

25 (Pages 94 to 97)

Page 94

1  through that.
2      Q.  How about a recertification?
3      A.  I can't recall.
4      Q.  Do they train you in recertification as to
5  how to tell how much pressure somebody is using when
6  they're applying the LVNR?
7      A.  I know there's three levels.  But I can't
8  tell from looking at it how much pressure is being
9  applied.
10     Q.  The only way to really tell is if you stick
11 your hand in between the person's arm and the neck,
12 correct?
13     A.  I would assume so, yes.
14     Q.  Or to ask, correct?
15     A.  Yes.
16     Q.  Do you recall who was on your Use of Force
17 Board?
18     A.  Captain Pelletier.  Are you referring to
19 the -- what are you referring to?
20     Q.  Well, let's talk about the CIRT board
21 first.
22     A.  The CIRT board that we just went over this
23 information?
24     Q.  Yeah.
25     A.  I would have to look at the first page.  I

Page 95

1  can't recall the name of the detectives that were on
2  it.  Bledsoe, Sergeant Bledsoe.  But I can't recall
3  off the top of my head the name of the officers.
4      Q.  Do you recall the positions or titles or
5  rank of the officers who were on your Use of Force
6  Board?
7      A.  Yeah.  We had Captain -- one of the -- not
8  the Sheriff.  I recall the captain being there.  I
9  don't recall the whole entire lineup.
10     Q.  And were you subject to another board
11 because of this incident?
12     A.  Not that I can recall.
13     Q.  When you were saying which board, you
14 seemed to indicate that there may have been more than
15 one board that I was asking about.
16     A.  That's what I thought, but not that I can
17 recall.  It was just the one board.
18     Q.  Did you have any discipline as a result of
19 this incident?
20     A.  I think there was the body camera, but I
21 don't recall ever receiving an actual talk with my
22 sergeant.  Verbal, no written.
23     Q.  Okay.  So is it fair to say they found that
24 you violated policy but you don't recall getting any
25 punishment for it?

Page 96

1      A.  That's correct.
2      Q.  Have you ever talked with Sheriff Lombardo
3  about this incident?
4      A.  No.
5      Q.  Are you taught that if a subject is not
6  moving or resisting, that the person applying the
7  LVNR is to immediately let go of it?
8      A.  Yes.
9      Q.  So do you feel that if somebody is applying
10 an LVNR to somebody who is not resisting, that
11 constitutes excessive force?
12         MR. ANDERSON:  Object to the form.
13         MR. McNUTT:  Join.
14         THE WITNESS:  Yes.
15 BY MR. LAGOMARSINO:
16     Q.  Have you ever been trained on any other
17 prior incidents involving officers applying an LVNR
18 appropriately or inappropriately?
19     A.  No.
20     Q.  Now, when you approached the scene, as you
21 got out of your vehicle, you also had a duty to make
22 sure that the scene was safe for Mr. Farmer; is that
23 correct?
24     A.  Yes.  All parties.
25     Q.  And did you know at the time that if an

Page 97

1  LVNR is inappropriately applied -- strike that.
2         Did you know at the time that if an LVNR
3  was incorrectly applied, it has the possibility to
4  kill the person?
5         MR. ANDERSON:  Objection.  Form.
6         MR. McNUTT:  Objection.  Form.
7         THE WITNESS:  Yes.
8  BY MR. LAGOMARSINO:
9      Q.  Are you able to define what unreasonable
10 force is?
11     A.  It would be excessive force that's not
12 needed at the time to get someone in custody.
13 Something along those lines where it's not necessary.
14     Q.  When as an officer are you allowed to use
15 reasonable force?
16         MR. ANDERSON:  Objection.  Form.
17         THE WITNESS:  It depends on the situation.
18 BY MR. LAGOMARSINO:
19     Q.  Can you give me some examples.
20     A.  Well, if you were to put hands on me, I can
21 use force that allows me for that specific situation
22 you're putting your hands on me.
23         If you pull a weapon on me, that's a
24 different reasonable force.
25         If you're just talking to me, that's

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

28  (Pages  106 to 109)

Page 106

1    A.  I mean, you're using your hands physically.
2  I don't know what equipment you would use.
3    Q.  Going to 750, the next page.  It says,
4  "When evaluating a tactic for inclusion in your
5  agency's use of force program and departmental
6  procedures, these are some of the factors to
7  consider."
8    So first bullet point says, "Where does the
9  tactic fit on your agency's use of force response
10  matrix?"
11    Do you know at the time where the LVNR fit
12  on the Metro's use of force response?
13    A.  Aggressive.
14    Q.  And then could it be used on passive
15  resistance?
16    A.  You know, I can't recall exactly, but I
17  believe it was passive resistance.  I can't recall
18  exactly.
19    Q.  Okay.  Going to 764.  All right.  It says
20  here, "Officers also learned to respond to a
21  subject's submission and relax compression as soon as
22  resistance ceases."
23    Is that your understanding that you're
24  supposed to relax compression as soon as resistance
25  ceases?

Page 107

1    A.  Supposed to have them in custody.  That's
2  my understanding of resistance ceases.
3    Q.  So your interpretation is that you have to
4  have them cuffed before you can let the LVNR go,
5  correct?
6    A.  Not -- yes.  I would say the LVNR, correct.
7  Pressure is different, but having the hold, I would
8  have another officer come and have him cuffed.
9    Q.  So then going down a little bit it says,
10  "Post-care handling of subjects begins when a
11  subject ceases resistance, and care extends all the
12  way either to medical or detention facility or both.
13  Further, monitoring is advised for all subjects who
14  are rendered unconscious."
15    Was there a period of time after Tashi was
16  handcuffed that he was not being monitored by
17  anybody?
18    A.  Not to my recollection, no.
19    Q.  And do you see here where it says all
20  the LVNR-trained officers are advised that neck
21  restraint subjects should not be leg restrained and
22  hog-tied?
23    A.  Yes, I see that.
24    Q.  So if you thought that he was in an LVNR,
25  why were you using a leg restraint on him?

Page 108

1    MR. ANDERSON:  Objection.  Form.
2    THE WITNESS:  Because I wasn't looking at
3  Lopera's arms to know at the time when I went to his
4  legs that he was still being held in that LVNR.
5  BY MR. LAGOMARSINO:
6    Q.  All right.  So you understand that now,
7  with the benefit of hindsight, that he was in the leg
8  restraint -- strike that.
9    He was being LVNR'd, and you had put him in
10  a leg restraint, correct?
11    A.  Yes.
12    Q.  Going to 798.  It says under a Maximum
13  Restraint, the average time that somebody is brought
14  under control is four to seven seconds.
15    Was that how you were trained?
16    A.  Where is that at?  Oh, all the way on the
17  bottom.
18    Q.  Yeah.
19    A.  The average time -- yes.
20    Q.  And it says, "If the subject is
21  unconscious, he or she should be gently placed on his
22  or her back with care taken to protect the head."
23    Is that your understanding?
24    A.  Yes.
25    Q.  Now, going to 800, under Medical Attention,

Page 109

1  it says, "If rendered unconscious, the subject should
2  revive in 5 to 20 seconds without any assistance from
3  the officer."
4    Is that how you were trained?
5    A.  Yes.
6    Q.  It says, "In the event the subject does not
7  revive within 30 seconds after being rendered
8  unconscious, standard Red Cross EMT or other approved
9  methods of resuscitation should be implemented
10  immediately as a precaution."
11    Is that how you were trained?
12    A.  Yes.
13    Q.  So Tashi Farmer was rendered unconscious,
14  but yet standard Red Cross EMT-approved methods were
15  not implemented immediately; is that correct?
16    MR. ANDERSON:  Objection.  Form.
17    MR. McNUTT:  Join.
18    THE WITNESS:  We called for medical right
19  away.
20  BY MR. LAGOMARSINO:
21    Q.  Were approved methods of resuscitation
22  implemented immediately after it was learned that he
23  did not revive within 30 seconds?
24    A.  Resuscitation in regards to -- what do you
25  mean?  Doing CPR, or calling for meds?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Flores ~ January 7, 2019
* * * Videotaped Deposition * * *

29 (Pages 110 to 113)

Page 110

1    Q. Doing CPR.
2    A. That's correct.
3    MR. McNUTT: Andre, since Exhibit 3 did not
4 go numbered sequentially on the Bates labels, are all
5 these pages from the document headed -- that is
6 marked LVMPD 0735?
7    MR. LAGOMARSINO: I believe so. I believe
8 so.
9    MR. McNUTT: Okay. You just eliminated
10 pages you weren't going to use from that document?
11    MR. LAGOMARSINO: Correct.
12    MR. McNUTT: That's what I was going to ask
13 you a little earlier. I didn't know if it was my
14 copy.
15    MR. LAGOMARSINO: No. That was it.
16 BY MR. LAGOMARSINO:
17    Q. Do you know why you're trained to handcuff
18 a subject when they are unconscious?
19    A. You have to make the scene safe.
20    Q. Are you familiar with what sudden death
21 syndrome is as it pertains to the LVNR?
22    A. Sudden death syndrome? That does not
23 recollect.
24    Q. Are you aware of any other instances
25 besides this case where an officer was disciplined

Page 111

1 for inappropriately applying an LVNR?
2    A. No.
3    Q. Were you trained on how to apply the
4 correct amount of force in an LVNR to render somebody
5 unconscious?
6    A. Was I trained to apply? Yes.
7    Q. And are you taught the difference between
8 asphyxiating somebody and rendering them unconscious?
9    A. Yes.
10    Q. What's the difference?
11    A. Once again, going back to the trachea,
12 that's asphyxiation. You're cutting off the trachea
13 compared to cutting off their blood supply.
14    MR. LAGOMARSINO: We'll take a break and
15 then we'll do some video.
16    MR. McNUTT: Do you think like another
17 hour?
18    MR. LAGOMARSINO: I think we'll be done by
19 3:30.
20    THE WITNESS: The time is approximately
21 2:16 p.m. We're off the record.
22    (A recess was taken from 2:16 p.m.
23    to 2:28 p.m.)
24    THE VIDEOGRAPHER: The time is
25 approximately 2:28 p.m. We are back on the record.

Page 112

1 BY MR. LAGOMARSINO:
2    Q. Officer Flores, we have some -- numerous
3 body cam footage videos that we received in this
4 case. And some of them -- one of them is from you;
5 some of them are from other people where you're
6 pictured.
7    I'm assuming you've worked with some of
8 these people before, so I'm going to ask you some
9 questions about who says what and what your
10 impressions are.
11    If you don't know, you can tell me if you
12 don't know. If you're able to articulate, just tell
13 me and I'll ask you.
14    It's going to be played up there. So if
15 you feel more comfortable standing, you're fine. If
16 you want to just turn around, that's fine. Whatever
17 is easier for you.
18    I would ask the videographer to capture the
19 video as well. And just for the record, the court
20 reporter won't be transcribing what's being said,
21 with the exception of what we're relaying in
22 questions and answers.
23    MR. McNUTT: Are these all the body cams
24 we're going to watch?
25    MR. LAGOMARSINO: I'll tell you just for

Page 113

1 the record, Metro produced these. It's going to be
2 number 13, number 27.
3    MR. McNUTT: Exhibit 13, 27?
4    MR. LAGOMARSINO: I apologize. So this is
5 going to be Exhibit 6, but Metro produced videos that
6 were numbered. And so the numbers of the video are
7 going to be 13, 27, and then LVNR 1. They're all
8 contained on that disc.
9    MR. McNUTT: And what about 23 up there?
10    MR. LAGOMARSINO: No. Those are just in
11 our folders.
12    MR. McNUTT: Okay.
13    MR. LAGOMARSINO: And we'll start with 13.
14    MR. McNUTT: And Craig hasn't responded to
15 whose those are, right?
16    MR. ANDERSON: We're working on it.
17    MR. McNUTT: Okay.
18    MR. LAGOMARSINO: Still working on it.
19    (Playing video.)
20 BY MR. LAGOMARSINO:
21    Q. So for the record, this video 13, we're
22 going to stop at about 33 seconds.
23    At some point, a paramedic is going to ask
24 will you get an Epi out, is what I hear. So I'm
25 going to ask you about that.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Officer Michael Flores ~  January 7, 2019
* * * Videotaped Deposition * * *

Page 114

1        (Playing video.)
2        MR. McNUTT:  Are we in a period where
3    there's no sound because this body cam is not turned
4    on?
5        MR. LAGOMARSINO:  We'll try again.
6        (Playing video.)
7        MR. LAGOMARSINO:  Pause.
8    BY MR. LAGOMARSINO:
9        Q.  What's an Epi?
10       A.  What is an Epi?
11       Q.  Yeah.
12       A.  I'm not sure of that term.
13       MR. LAGOMARSINO:  Let's take a quick break
14   because we need to fix the volume issues.
15       THE VIDEOGRAPHER:  The time is
16   approximately 2:31 p.m.  We are going off the record.
17       (A recess was taken from 2:31 p.m.
18       to 2:35 p.m.)
19       THE VIDEOGRAPHER:  The time is
20   approximately 2:35 p.m.  We are back on the record.
21       MR. LAGOMARSINO:  Let's go ahead and press
22   play.
23       (Playing video.)
24   BY MR. LAGOMARSINO:
25       Q.  So just for the record, do you know what an

Page 115

1    Epi is?
2        A.  No.
3        Q.  Do you know what an Epi pen is?
4        A.  I'm familiar with the term.
5        Q.  What is an Epi pen?
6        A.  To the best of my knowledge, I believe it's
7    when you have -- I could be wrong on this too -- an
8    allergic reaction.  I'm not sure.  I'm not positive
9    on it.
10       Q.  Okay.  All right.  Let's fast forward to
11   four minutes.
12       (Playing video.)
13   BY MR. LAGOMARSINO:
14       Q.  So had you seen that clip before?
15       A.  Yes, I have.
16       Q.  And who was talking there?
17       A.  That was -- I couldn't see the face, but I
18   think that was me.
19       Q.  So let's just play it again.  It's just for
20   the record going to be between 4:08 and 4:20.
21       (Playing video.)
22       THE WITNESS:  Yeah, that's me.
23   BY MR. LAGOMARSINO:
24       Q.  Did you say the words, or words to the
25   effect, you grabbed his feet but he was already out?

Page 116

1        A.  Yes.
2        Q.  Do you remember who you were talking to?
3        A.  Rybacki.
4        Q.  When you indicated that Farmer was in a
5    lock, you kind of made a gesture with your arms.  Is
6    that what it looked like?
7        A.  The LVNR?
8        Q.  Well, strike that.
9        Did it look like that was a hold that
10   Lopera was placing Farmer in?
11       A.  I couldn't see the other hand, so no.  I
12   couldn't see Lopera's other hand, for the record.
13       Q.  Let's go to video 27.  And this is going to
14   be 1 through 9, so I'm going to ask you if this is
15   you coming to the scene.
16       (Playing video.)
17   BY MR. LAGOMARSINO:
18       Q.  So we've just played from zero to 1:09.
19       Does that appear to be your body cam?
20       A.  Yes.
21       Q.  And then it appeared that Farmer's legs
22   appeared to be crossed and held to his buttocks by
23   your hands; is that correct?
24       A.  Can you play that one again?
25       Q.  Sure.

Page 117

1        Let's start over.
2        (Playing video.)
3        MR. LAGOMARSINO:  Pause.
4        THE WITNESS:  I don't believe that's me to
5    the right.  I seen like, I think, a ring on -- that
6    guy don't have a ring.  Something on his hand.
7    BY MR. LAGOMARSINO:
8        Q.  Okay.
9        (Playing video.)
10       MR. LAGOMARSINO:  Pause.
11   BY MR. LAGOMARSINO:
12       Q.  Does it appear that in this video, again,
13   in the first 10 to 15 seconds that Lopera is
14   releasing the LVNR and rolling out from underneath
15   Farmer?
16       A.  Can I see it again?  I wasn't looking for
17   Lopera.
18       Q.  Of course.
19       (Playing video.)
20   BY MR. LAGOMARSINO:
21       Q.  Can't see that, right?  Go ahead.
22       A.  Yes.
23       Q.  What do you see?
24       A.  Lopera is on his back, getting his radio.
25       Q.  Did somebody tell you to turn your body cam

Officer Michael Flores  ~   January 7, 2019
* * * Videotaped Deposition * * *

31 (Pages 118 to 121)

Page 118

1  on?
2       A.  I can't recall.
3       Q.  Now, we'll watch it again from about 11
4  seconds to 30 seconds.  I want to ask you if it
5  appears that Farmer is unconscious during this time.
6            (Playing video.)
7  BY MR. LAGOMARSINO:
8       Q.  Does it appear that he's unconscious?
9       A.  Yes.
10           MR. LAGOMARSINO:  All right.  Let's go to
11  43.
12  BY MR. LAGOMARSINO:
13       Q.  And what I'll tell you is that at some
14  point Tran says I don't feel anything.  I want to ask
15  you if you recognize that to be Tran's voice.
16            (Playing video.)
17  BY MR. LAGOMARSINO:
18       Q.  Did you hear him say "I don't feel
19  anything?"
20       A.  Yes.
21       Q.  And that's Tran?
22       A.  Yes.
23       Q.  We'll continue to play, but at 1:08 I want
24  to ask you who places Farmer back down on his back.
25            (Playing video.)

Page 119

1  BY MR. LAGOMARSINO:
2       Q.  Was it Tran that placed him on his back?
3       A.  That's what it looks like.
4       Q.  At the same time, Farmer is still
5  handcuffed, correct?
6       A.  Yes.
7       Q.  Let's go -- now, I want to ask you -- we'll
8  play it again.  But from what I could tell, it
9  appears at 1:09 that Tran says, "I don't know, Bro, I
10  don't feel a pulse, anything."
11            Let me ask you if that's what Tran said at
12  1:09.
13            (Playing video.)
14  BY MR. LAGOMARSINO:
15       Q.  Is that Tran?
16       A.  That sounds like Tran's voice.
17       Q.  At any time after this, do you recall
18  Farmer ever regaining consciousness?
19       A.  No.
20       Q.  Now, let's go to LVNR 1 video.
21            At three seconds we'll pause it.  It
22  appears that Lopera is given some kind of a Power Aid
23  or Gatorade from the officers wearing the body cam; I
24  just want to know if that's you or somebody else.
25            (Playing video.)

Page 120

1            THE WITNESS:  I can't recall if they gave
2  him a Gatorade from that one shot.
3  BY MR. LAGOMARSINO:
4       Q.  I'm recalling in my preparation it wasn't
5  you.  It's just for the record.
6            Do you know who gave it to him?
7       A.  I don't know.
8       Q.  Is it normal practice to provide an officer
9  with a rehydration drink after he applies an LVNR
10  that renders a person unconscious?
11       A.  I mean, I would say anytime an officer is
12  in an altercation or a physical fight, he's
13  exhausted, and you would want to attend to the
14  officer.
15       Q.  At eight seconds I want to know if that's
16  you sitting at the front of Crumrine's vehicle
17  pacing.
18            (Playing video.)
19            THE WITNESS:  Yeah, that's me right there.
20  BY MR. LAGOMARSINO:
21       Q.  So we paused it at seven seconds, for the
22  record.  And on the left-hand side of the screen
23  that's you, correct?
24       A.  Correct.
25       Q.  Now, do you see the female officer there

Page 121

1  near Farmer's head?
2       A.  Yes.
3       Q.  Is it your understanding that she was
4  training that day?
5       A.  No.  I did not.
6       Q.  Did you know that -- strike that.
7            Let's go ahead and go to 1:59.
8            So what I'll tell you at two minutes the
9  fire department arrives, and at 2:08 it appears that
10  to me that an officer says, "Kravitz, do you have
11  anything, do you have a pulse on there, I'm picking
12  nothing up."
13            But I want to ask you if you know who is
14  talking and who Kravitz is potentially.  Okay?
15            (Playing video.)
16  BY MR. LAGOMARSINO:
17       Q.  Do you know who is asking?
18       A.  I don't know who's asking.
19       Q.  And do you know who Kravitz is?
20       A.  Actually, I do.  Because he just came on
21  day shift maybe a month ago, but I didn't really know
22  him prior.
23       Q.  Is he in the picture in this scene right
24  now at 2:12?
25       A.  I believe that's him right there at the

Officer Michael Flores ~   January 7, 2019
* * * Videotaped Deposition * * *

```
 1               CERTIFICATE OF REPORTER

 2          I, the undersigned, a Certified Shorthand

 3   Reporter of the State of Nevada, do hereby certify:

 4          That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6   that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a record

 8   of the proceedings was made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given to the best of my

12   ability.

13          Further, that before completion of the

14   proceedings, review of the transcript [ X ] was

15   [  ] was not requested pursuant to NRCP 30(e).

16          I further certify I am neither financially

17   interested in the action, nor a relative or employee

18   of any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: January 11, 2019

23

24                      _____
                        GALE SALERNO, RMR, CCR #542
25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com