# EXHIBIT 27
# Dr. William Smock Expert Report

# THE INSTITUTE OF CLINICAL FORENSIC MEDICINE AND NURSING
## "MEDICINE, LAW AND JUSTICE FOR THE LIVING"
### 4157 GAP HOLLOW ROAD
### NEW ALBANY, INDIANA 47150-9119

PHONE 812-949-4994
www.institute-forensic.com

June 13, 2019

Mr. Andre M. Lagomarsino
3005 West Horizon Ridge Parkway
Suite 241
Henderson, Nevada. 89052

Re: Trinita Farmer v. Las Vegas Metro Police Department

Dear Mr. Lagomarsino:

The above-referenced case involves the death of Mr. Tashi Brown, a 40-year-old African American male, who died of asphyxia due to application of a police neck restraint. Mr. Brown was placed in a vascular neck restraint/chokehold by Las Vegas Metro Police Department Officer Kenneth Lopera. The vascular neck restraint/chokehold was initially described by Officer Lopera on the scene as a rear-naked choke. At your request I have performed the following in regard to this incident:

1. Reviewed the Clark County Coroner's Office autopsy report of Tashi S. Brown performed by Dr. Olson (LVMPD 1410-1419)
2. Reviewed the Nevada Department of Health and Human Services Certificate of Death for Tashi S. Farmer
3. Reviewed the video from Officer Lopera's body camera
4. Reviewed the videos from LVMPD press briefings
5. Reviewed videos and articles from various news organizations
6. Reviewed audio recordings from the LVMPD investigation including ones from: radio traffic, Force Investigation Team (FIT) interviews and several of phone calls
7. Reviewed Tashi S. Brown's medical records from: Health Plan of Nevada, Sunrise Hospital Medical Center and UMC Southern Nevada
8. Reviewed the Kenneth Lopera's arrest report
9. Reviewed Lopera Documents (Lopera 438 – 479)
10. Reviewed the First Amended Complaint
11. Reviewed the documents produced by Las Vegas Metropolitan Police Department:
    a. 1410 - 1419 (Autopsy)
    b. 1420 - 1424 (Crime Scene Investigation Report)
    c. 1425 – 1449 (TASER Download)
    d. 1452 – 1619 (Statements)

      e. 1620 – 2057 (Statements)
      f. 2058 - 2092 (FIT Report)
      g. 2093 – 2099 (Toxicology Report)
      h. 2138 – 2172 (FIT Report)
      i. 2174 - 2924 (Photographs: autopsy, scene, hospital)
      j. 2925 – 2933 (Radiographs)
      k. 3251 – 3290 (Sunrise Hospital and Medical Center)

12. Reviewed the depositions of Officer Michael Flores
13. Reviewed the deposition of Sergeant Michal Bland and exhibit 1
14. Reviewed the depositions of Officer Michael Tran
15. Reviewed the depositions of Sergeant Travis Crumrine
16. Reviewed the deposition of Chief John McGrath
17. Reviewed the deposition of Peter Infantino
18. Reviewed the deposition of Marcelino Vibas
19. Reviewed the depositions of Officer Ashley Lif
20. Reviewed the deposition of Detective Alsup
21. Reviewed the deposition of Adelwisa Lizada, MD
22. Reviewed the deposition of Alane Olson, MD
23. Reviewed the deposition of Detective Kasey Kirkegard
24. Reviewed confidential documents not previously provided (CIRT) LVMPD
25. Reviewed medical, forensic and scientific literature relating to the application of external pressure on the vital structures of the neck and the medical consequences associated with the use of the carotid restraint and the Lateral Vascular Neck Restraint
26. Reviewed prior medical and forensic presentations relating to the medical consequences associated with the use of the carotid restraint and the Lateral Vascular Neck Restraint
27. Reviewed my deposition of October 2018
28. Reviewed material from Case No.: 2:17-cv-01946-JCM-PAL

    The purpose of my review was to examine: the injuries, the injury mechanisms, the forensic and medical issues and the medical facts in order to develop opinions in this case. My opinions will be based upon my education, training in the fields of emergency medicine, forensic medicine, the evaluation of fatal and non-fatal strangulation victims and my experience with in-custody injury and death investigations. My education, experience and training in these fields date back more than 30 years.

**History:**

    Based upon the above-noted information, during the early morning hours of May 14th, 2017 Mr. Tashi Brown sustained multiple injuries during an interaction with Officer Lopera of the LVMPD. Mr. Brown received, in rapid secession, seven electrical discharges from Officer Lopera's Electronic Control Device (ECD), i.e. TASER. The electrical discharges ranged from five to nine seconds in duration. He also received 10 – 12 blows to his face and head from Officer

Lopera. Mr. Brown was then placed in a vascular neck restraint/chokehold by Officer Lopera. Officer Lopera stated "I rear-nakeded his ass".

Review of the above-referenced video tapes, statements and testimony indicated that Mr. Farmer was going unconscious or was unconscious when other officers from LVMPD arrived on the scene. When LVMPD Sergeant Crumrine arrived on the scene he stated to Officer Lopera "Let him go Ken". This request to release the unconscious Mr. Brown from the neck restraint came 27 seconds into the rear-naked chokehold. However, Officer Lopera did not release the vascular neck restraint/chokehold for another 46 seconds. In total, Officer Lopera had Mr. Farmer in a neck restraint/chokehold for approximately 73 seconds. At no time during the 73 seconds of neck compression, did any of the LVMPD officers or supervisors intervene or attempt to stop Officer Lopera from his continued application of the rear-naked choke on an unconscious individual. Twenty-seven seconds after Officer Lopera released the neck restraint/chokehold he requested medical support. As a direct consequence of the neck restraint/chokehold Mr. Farmer is now in cardiac arrest with CPR initiated. Farmer was transported by ambulance to Sunrise Hospital and Medical Center and arrived in the emergency department at 1:23 A.M. Mr. Farmer did not respond to medical treatment and was pronounced deceased at 1:39 A.M.

On May 14th, an autopsy was performed by Dr. Alane Olson of the Clark County Coroner's Office. Dr. Olson documented the following physical findings:

a) The barb of an ECD present within the soft tissues of the back at the T9 level
b) 1 cm stellate laceration on the bridge of the nose
c) 8 mm right upper lip laceration
d) 3 horizontal superficial abrasions/laceration below the right lower eyelid
e) Hemorrhage on the right lower eyelid
f) 1 cm superficial abrasion/laceration below the left eyelid
g) 1 cm abrasion on the inner surface of the right upper lip
h) 7 cm X 7 cm subgaleal hemorrhage in the right frontal region
i) 5 cm X 5 cm subgaleal hemorrhage in the right posterior parietal region
j) 2 cm X 1.5 cm subgaleal hemorrhage in the left occipital region
k) 5 cm X 3 cm subgaleal hemorrhage in the inferior left occipital region
l) 6 cm X 6 cm hemorrhage in the right temporalis muscle
m) 1 cm X 1 cm hemorrhage in the superior left temporalis muscle
n) Superficial subcutaneous hemorrhage within the right and left neck
o) 5 cm X 3 cm hemorrhage within the right mid-sternomastoid muscle
p) Hemorrhage throughout the bilateral sternomastoid muscles
q) Hemorrhage within the right sternohyoid muscle
r) Hemorrhage within the right thyroid capsule
s) 5 cm contusion overlying the left scapula
t) 2 mm abrasion/puncture wound over the right anterior superior iliac crest
u) 9 cm X 7 cm hemorrhage on the lateral chest
v) 7 cm X 5 cm hemorrhage on the right upper chest

w) 1 cm hemorrhages on the right and left medial chest
x) Multiple superficial abrasions on the back, upper and lower extremities
y) 490-gram heart with no more than 20% lumen compromise
z) No facial or intracranial petechial hemorrhages

Blood from the autopsy was submitted to the NMS lab for toxicology analysis. The results are as noted:

**Positive Findings:**

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Atropine | Positive | ng/mL | 001 - Peripheral Blood |
| Lidocaine | Positive | mcg/mL | 001 - Peripheral Blood |
| Monoethylglycinexylidide (MEGX) | Positive | mcg/mL | 001 - Peripheral Blood |
| Nicotine | Positive | ng/mL | 001 - Peripheral Blood |
| Caffeine | Positive | mcg/mL | 001 - Peripheral Blood |
| Cotinine | Positive | ng/mL | 001 - Peripheral Blood |
| Theobromine | Positive | mcg/mL | 001 - Peripheral Blood |
| Quetiapine | 69 | ng/mL | 001 - Peripheral Blood |
| Delta-9 Carboxy THC | 10 | ng/mL | 001 - Peripheral Blood |
| Delta-9 THC | 1.9 | ng/mL | 001 - Peripheral Blood |
| Amphetamine | 51 | ng/mL | 001 - Peripheral Blood |
| Methamphetamine | 950 | ng/mL | 001 - Peripheral Blood |

Dr. Olson reported the following final pathologic findings:

I. Multiple hemorrhages in the neck, status post application of choke hold
II. Methamphetamine intoxication
III. Cardiomegaly (490 grams)
IV. Multiple scalp hemorrhages
V. Contusions and abrasions of the body surfaces
VI. Status post Taser strike (barb punctures of the back), with multiple cycles applied

"**CAUSE OF DEATH:** It is my opinion that this 40-year-old Black male, Tashi S. Brown, died as a result of asphyxia due to police restraint procedures. Other significant conditions include methamphetamine intoxication, cardiomegaly."

"**MANNER OF DEATH: HOMICIDE**"

**Pathophysiology:**

Strangulation, the application of pressure to the neck will impede or prevent the delivery of oxygen to the lungs, the delivery of oxygenated blood to the cells of the brain or both. Four pounds of pressure will occlude the jugular vein, 11 pounds of pressure will occlude the carotid artery and 34 pounds of pressure will collapse the trachea. The application of pressure and/or blunt force trauma to the carotid arteries is well known in the medical and

forensic literature to carry a risk of serious injuries, brain damage and death. The brain ceases to function and the cells of the brain will die when they are deprived of oxygenated blood. The application of a Lateral Vascular Neck Restraint through compression of the carotid arteries will occlude 80-85% of blood flow to the brain. The addition of pressure to the back or sides of the neck through the application of pressure associated with a rear-naked choke, with pressure on the vertebral arteries, can occlude 100% the blood flow to the brain. The lack of petechial hemorrhages in a fatal strangulation is consistent with blockage of 100% of arterial blood flow to the brain and face with the application of a rear-naked choke.

**Opinions:**

Mr. Lagomarsino, I am an emergency medicine and forensic fellowship trained physician with more than 30 years of experience in the forensic evaluation of injuries and the analysis of injury causation. My training, experience and position as a Police Surgeon, a Professor of Emergency Medicine, Medical Advisor to the FBI and an Assistant Medical Examiner includes the emergency treatment, investigation and reconstruction of injuries sustained in traumatic incidents, including the investigation of in-custody deaths and use-of-force claims. I have treated and evaluated hundreds of patients, both fatally and not-fatally injured, who have experienced the physiological consequences strangulation. I have been previously accepted in the United States in both federal and state courts as an expert in forensic medicine, emergency medicine and strangulation. I am also the Medical Director of the San Diego-based Training Institute on Strangulation Prevention and I have written and lectured extensively on the medical risks and consequences of strangulation (see attached CV). Based upon my education, experience, including my experience as a consult to local, state and federal law enforcement agencies, my training and my review of the above-referenced material I can render the following opinions within a reasonable degree of medical and scientific probability or certainty:

1. Mr. Tashi S. Brown died from asphyxia as a direct consequence of the application of a neck restraint/chokehold.
2. Mr. Tashi S. Brown's death was due to the application of a neck restraint/chokehold by Officer Kenneth Lopera of the Las Vegas Metro Police Department.
3. The use and application of neck restraints/chokeholds, including the Lateral Vascular Neck Restraint (LVNR) and the rear-naked choke, is associated with the infliction of serious physical injuries and deaths. These serious injuries, as documented in the medical literature, include: carotid dissections, strokes and brain damage.
4. The absence of cranial petechial hemorrhages is consistent with complete blockage of arterial blood flow to the brain from the application of a rear-naked choke.
5. Mr. Tashi S. Brown would not have died from asphyxia had Officer Kenneth Lopera released the neck restraint/chokehold after Mr. Brown sustained a loss of consciousness.
6. Mr. Tashi S. Brown would not have died from asphyxia had Officer Kenneth Lopera released the neck restraint/chokehold when advised by his fellow officers to release the pressure on Mr. Brown's neck.

7. Mr. Tashi S. Brown experienced multiple episodes of conscious pain and suffering during his interaction with Officer Kenneth Lopera. These interactions included seven: 5 - 9 second rounds, of electrical current from Officer Lopera's Taser X26P, 10-12 blows to his head and face inflicted by Officer Lopera and the application of the neck restraint/chokehold by Officer Lopera.
8. The application of neck restraints/chokeholds by law enforcement officers should be reserved for lethal/deadly force encounters only. The lethal/deadly force encounters only policy is consistent with the use of force policies from the majority of major metropolitan police departments surveyed by the Las Vegas Metropolitan Police Department. This policy is also consistent with my prior recommendations and presentations to the International Association of Chiefs of Police, the San Diego Police Department's Community Review Board on Police Practices and police agencies around the world.
9. I agree with the findings and opinions of Dr. Alane Olson of the Clark County Coroner's Office.

Mr. Lagomarsino, as additional material is made available during the discovery process of this case, I reserve the opportunity to supplement or amend my opinions. Additional opinions may be generated upon review of any supplemental materials. Any additional opinions will be forwarded to you. I anticipate using multiple demonstrative exhibits at trial, including but not limited to, anatomical models and diagrams, a hand dynamometer, photographs and videos. Please contact me if you have any questions or if I can be of additional assistance to you.

Yours sincerely,

William S. Smock, M.S., M.D.