# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| TRINITA FARMER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 2:18-cv-00860-GMN-VCF |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| LAS VEGAS METROPOLITAN POLICE | ) | |
| DEPARTMENT, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

Pending before the Court is Plaintiff Trinita Farmer's ("Plaintiff's") Motion in Limine, (ECF No. 105), seeking to exclude the proposed expert testimony of James Borden.  Defendant Kenneth Lopera ("Officer Lopera") filed a Response, (ECF No. 116).

Also pending before the Court are the Motions for Summary Judgment, (ECF Nos. 125, 128, 129), filed by Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Sergeant Travis Crumrine ("Sergeant Crumrine"), Officer Michael Tran ("Officer Tran"), and Officer Michael Flores ("Officer Flores") (collectively, "LVMPD Defendants"), as well as Officer Lopera (collectively, "Defendants").  Plaintiff Trinita Farmer ("Plaintiff") filed Responses, (ECF Nos. 148, 155), and LVMPD Defendants and Officer Lopera filed Replies, (ECF Nos. 164, 165, 169), to their respective Motions.

For the reasons discussed below, the Court **GRANTS in part** and **DENIES in part** Plaintiff's Motion in Limine, **DENIES** Officer Lopera's Motion for Summary Judgment, and **GRANTS in part** and **DENIES in part** LVMPD Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

Plaintiff is the mother of Tashii Farmer ("Tashii"). (First Am. Compl. ("FAC") ¶ 3, ECF No. 4)  Tashii died on May 14, 2017, while being arrested by officers of the Las Vegas

Metropolitan Police Department. (*Id.* ¶ 5).

Before Tashii's death, Tashii approached Officers Lopera and Ashley Lif in the Venetian Resort Hotel and Casino while they were on duty. (*Id.* ¶ 13). Tashii was sweating, and he asked if they knew where he could find a drinking fountain. (*Id.* ¶ 14). Officer Lopera then asked him several questions, to which Tashii responded that he had run from across the street because he believed people were following him. (*Id.* ¶ 15). Officer Lopera reacted to Tashii's answers by approaching him and reaching to grab him once Tashii had walked into "caution" cones set up for floor cleaning, which caused Tashii to become frightened and run. (*See* Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ, ECF No. 131-2).

Tashii ran to an outside roadway near the Venetian's property, and Officer Lopera caught up with him near a vehicle at valet. (*Id.*). According to Officer Lopera, he believed Tashii was attempting to carjack the vehicle. Officer Lopera told Tashii to stop, then Lopera deployed his taser, causing Tashii to fall to the ground. (*Id.*). Lopera also yelled several commands at Tashii to get on his stomach, and Tashii verbally responded that he would. (*Id.*). When Tashii did not immediately do so, Officer Lopera called in a "Code Red" (officer in trouble) with LVMPD dispatch, then initiated his taser on Tashii again numerous more times. (*Id.*). At that same time, Officer Lopera engaged Tashii on the ground to place Tashii's hands behind his back, and Lopera called over two Venetian security guards nearby for assistance. (*Id.*). As the security guards arrived, Officer Lopera again tased Tashii followed by several hand strikes to Tashii's face and the back of his head. (*Id.*). Officer Lopera soon after initiated a neck restraint on Tashii purportedly resembling the lateral vascular neck restraint maneuver ("LVNR") taught by LVMPD. (*Id.*).

As Officer Lopera initiated the neck restraint, Sergeant Crumrine—Officer Lopera's commanding officer—arrived on scene. (*Id.*); (Dep. Travis Crumrine 36:5–14, Ex. F to LVMPD Defs.' MSJ, ECF No. 125-8). Sergeant Crumrine ordered Tashii to put his hands

behind his back while attempting to apply handcuffs. (Dep. Travis Crumrine 40:2–5, Ex. F to LVMPD Defs.' MSJ).  Sergeant Crumrine also ordered Officer Lopera to release his neck restraint on Tashii several times. (Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ, ECF No. 131-2); (*see* Incident Chronology from LVMPD, Ex. A. to LVMPD Defs' MSJ, ECF No. 125-3).  Officer Lopera continued the restraint, however.  Officers Tran and Flores also arrived at the scene about thirty seconds after Officer Lopera initiated the neck restraint on Tashii. (Dep. Officer Tran 32:19–33: 21, Ex. 8 to Pl.'s Resp., ECF No. 149-8).  About forty seconds after their arrival, and upon eventually completing handcuffing of Tashii, Officer Tran told Officer Lopera to release Tashii, which Officer Lopera finally did. (*Id.*).

When Officer Lopera released his neck restraint, Officers Tran and Flores attempted to pick up Tashii, who at that point was limp and did not react. (Dep. Michael Tran 76:3–77:24, Ex. G to LVMPD Defs.' MSJ, ECF No. 125-9).  The Officers accordingly called for medical assistance and they began performing resuscitative chest compressions. (*Id.*).  Tashii was then taken to a hospital and pronounced deceased. (Clark County Coroner's Report, Ex. 26 to Pl.'s Resp., ECF No. 150-13).

On May 13, 2018, Plaintiff filed her Complaint, (ECF No. 1), against Defendants. Shortly afterward, Plaintiff filed an Amended Complaint, (ECF No. 4), ultimately asserting three causes of action based on violations of her substantive due process right to familial association with her son: (1) violation of civil and constitutional rights of familial association under 42 U.S.C. § 1983 against Officer Lopera, Officer Tran, Officer Flores, and Sergeant Crumrine; (2) violation of civil and constitutional rights of familial association under 42 U.S.C. § 1983 against LVMPD under a theory of municipal liability; and (3) violation of civil and constitutional rights of familial association under 42 U.S.C. § 1983 against Sergeant Crumrine for supervisory liability. (FAC ¶¶ 56–92).

As litigation progressed, Plaintiff filed the pending Motion in Limine, (ECF No. 105), seeking to exclude Officer Lopera's disclosed expert James Borden.  Defendants thereafter filed their pending Motions for Summary Judgment, (ECF Nos. 125, 128, 129).

## II.   LEGAL STANDARD

### A.  Motion in Limine

In general, "[t]he court must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a).  In order to satisfy the burden of proof for Federal Rule of Evidence ("FRE") 104(a), a party must show that the requirements for admissibility are met by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("We have traditionally required that these matters [regarding admissibility determinations that hinge on preliminary factual questions] be established by a preponderance of proof.").

"Although the [FRE] do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984) (citing FRE 103(c)).  In limine rulings "are not binding on the trial judge, and the judge may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *see also Luce*, 469 U.S. at 41.

Judges have broad discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).  However, a motion in limine should not be used to resolve factual disputes or weigh evidence. *C&E Servs., Inc., v. Ashland, Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008).  To exclude evidence on a motion in limine, the evidence must be inadmissible "on all potential grounds." *See, e.g.*, *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004).  "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential

prejudice may be resolved in proper context." *Hawthorne Partners v. AT&T Tech., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993).

### B. Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case

on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

## III.  DISCUSSION

### A.  Motion in Limine

Plaintiff moves to exclude James Borden from serving as a "human factors and use of force expert" for Officer Lopera. (Mot. Limine 1:21–22, 19:26–20:17).  In practical terms, the exclusion would apply to Borden's analysis of "human factors" associated with Officer Lopera's "tactics, mind-set, thought processes, conditions and the environment that [Lopera] faced" during the at-issue incident. (*Id.* 15:10–12) (quoting James Borden's expert report dated July 2, 2018, disclosing what opinions Borden will provide at trial).  Plaintiff similarly seeks to exclude Borden based on his "unprovable, untestable conclusions" about the reasonableness of Officer Lopera's actions and force used. (*Id.* 16:4–10).  These conclusions include Borden's

opinion on whether Lopera correctly believed Tashii was attempting to carjack a vehicle based on Officer Lopera's viewpoint, (*Id.* 16:17–23), how Lopera used the appropriate level of force to subdue Tashii based on that belief and under applicable police customs, policies, and practices, (*id.*), and what Lopera's intentions were. (*Id.* 19:6–20).  Further, Plaintiff contends that Borden's opinions fail to rely on the data here and, thus, are unreliable as well as not based on proper scientific methodologies. (*Id.* 21:9–23:21).

In response, Officer Lopera concedes that Borden "will not mention human factors and behavior, purport to be an expert on them, or offer any opinions on human factors and behavior." (Resp. 3:1–3, ECF No. 116) (offering to stipulate at trial that Borden will not provide opinions on human factors and behavior).  Officer Lopera does, however, argue that Borden should not be wholly excluded as an expert witness.  Officer Lopera claims that Borden provides reliable and relevant expert opinions about Lopera's actions as being consistent with law enforcement policies, customs, practices, and training as well as having legitimate law enforcement reasons for his actions. (*Id.* 8:26–9:27).  Officer Lopera also argues that Borden possesses sufficient credentials to make these expert opinions based on his experience as a police officer and use-of-force instructor, certifications in the field of police use-of-force practices, and involvement in various organizations that review use-of-force policies. (*Id.* 14:15–20:10).

Because Officer Lopera stipulates that Borden will not testify at trial on human factors and behavior, the Court grants Plaintiff's Motion in Limine as to that portion of expected testimony.  But remaining at issue are Plaintiff's other arguments seeking to exclude Borden as being unqualified to render expert testimony.  Plaintiff also argues that Borden should not be able to testify about Officer Lopera's internal thoughts and perceptions during the incident or about how Lopera's actions complied with police department policies, standards, and training. (*Id.* 9:26–10:5) (noting how some federal courts prohibit experts from offering an opinion on

how force used was reasonable by following department standards); (*id.* 16:25–19:24) (arguing that Borden should not be able to testify about what Lopera perceived).  The below discussion addresses these remaining arguments to determine admissibility at trial.

### 1) *Standards Governing Admissibility of Expert Testimony*

The Court's "gatekeeping" obligation concerning admission of expert testimony derives from standards set by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  In broad terms, these standards require that the party intending to offer expert testimony show by a preponderance of the evidence that the expert possesses the qualifications and experience to render the expert opinion, that the opinion offered has adequate support for the conclusions and analysis, and that "the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 588–90; Fed. R. Evid. 702(a).

Contrary to Officer Lopera's contention, the *Daubert* factors concerning reliability of expert opinions apply to Borden's nonscientific testimony even though his testimony arises from experience and knowledge rather than scientific theory and methodology. *See United States v. Valencia-Lopez*, No. 18-10482, 2020 WL 4814139, at *6 (9th Cir. Aug. 19, 2020) (rejecting the general contention that most *Daubert* considerations apply only to the admission of scientific testimony, because *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), "held to the contrary"); (Officer Lopera's Resp. 16:2–17, ECF No. 116).  The Court thus considers, for example, how Borden's experience lends support for the specific conclusions drawn, the methods he used to arrive at the conclusions, whether Borden relied on sufficient data, and objective support for Borden's analysis. *See Kumho Tire Co.*, 526 U.S. at 150; *Valtierra v. City of Los Angeles*, 99 F. Supp. 3d 1190, 1198 (C.D. Cal. 2015).  That said, *Daubert* instructs that the factors used in the Court's gatekeeping inquiry "must be 'tied to the facts' of a particular 'case.'" *Kumho Tire Co.*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591).

### 2) *Testimony on Use of Force and Police Customs and Standards*

After scrutinizing Borden's employment history, experience, knowledge, and education, the Court finds that Borden in general possesses the requisite qualifications to testify as an expert about whether Officer Lopera's actions aligned with police customs, policies, and practices on use of force.  Borden's Curriculum Vitae lists over a decade of service as a law enforcement officer with the Henderson Police Department ("HPD"), his responsibilities of reviewing HPD's use-of-force policies, years of service as an instructor on use of force, and hundreds of hours of study and continuing education on law enforcement policies regarding force. (Decl. James Borden ¶¶ 5–10, Ex. A to Appendix, ECF No. 117-1); (Curriculum Vitae of James Borden, Ex. D to Appendix, ECF No. 117-4)  Moreover, Borden's testimony on police use-of-force standards and practices would be relevant here, because it would offer the jury insight into Officer Lopera's actions as having a basis in training under the circumstances and in compliance with legitimate law enforcement objectives. *See Silva v. Chung*, No. CV 15-00436 HG-KJM, 2019 WL 2195203, at *1 (D. Haw. May 21, 2019) ("Qualified experts . . . may testify about police practices and whether the particular actions of a police officer in a given situation comports with law enforcement's standards.").

Though the Court finds that Borden has the necessary qualifications to serve as an expert on police standards governing the use of force, Officer Lopera still must explain how Borden's opinions and conclusions are reliable, specific to this case, and will assist the jury in its factfinding. *Cf. Valencia-Lopez*, 2020 WL 4814139, at *6 ("[B]y never explaining *how* his expertise lent itself to that conclusion, we cannot sort out what 'reliable principles and methods underlie the particular conclusions offered.'" (emphasis original) (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002))).  Officer Lopera can do so by outlining how Borden's opinions arise from "some objective source" and how Borden's experience and knowledge are directly applicable to the factual circumstances of this case. *Neal-Lomax v. Las*

*Vegas Metro. Police Dep't*, 574 F. Supp. 2d 1193, 1202 (D. Nev. 2008), *aff'd*, 371 F. App'x 752 (9th Cir. 2010) (quoting *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996)).

At this preliminary stage, the Court has some concerns with the reliability of Borden's opinions on Officer Lopera complying with applicable police customs, policies, and practices when using force during Tashii's arrest. The Court's concerns stem from numerous conclusory statements on this subject as stated in Borden's expert reports and Declaration opposing Plaintiff's Motion in Limine. For instance, Borden opines in his Declaration that Officer Lopera's use of empty hand strikes to subdue and control Tashii "was consistent with law enforcement custom, practice, procedure, and training and how a similarly trained officer with similar experience should have responded under the circumstances, and Ofc. Lopera had legitimate law enforcement reasons to use empty hand strikes." (Decl. James Border ¶ 30, ECF No. 117-1). Borden's Declaration also opines that Officer Lopera's "decision to use an LVNR was consistent with law enforcement custom, practice, procedure, and training and how a similarly trained officer with similar experience should have responded under the circumstances, and Ofc. Lopera had legitimate law enforcement reasons to apply an LVNR." (*Id.* ¶¶ 33–34). While these statements by Borden rely on specific facts for support, they do not directly cite the applicable police standards used to reach such conclusions (from LVMPD policies or otherwise), nor do these statements discuss when in Officer Lopera's background he received training on (or knew of) such standards. Moreover, while Borden's expert reports identify several LVMPD policies and standards relevant to use of force, the reports' identified standards are broad, general, and somewhat removed from the specific actions by Officer Lopera that Borden opines were within police standards. (*See* Expert Report at BORDEN025–026, ECF No. 117-2) (discussing LVMPD's Use of Force Policy outlining that an "ECD" will not be used "[w]hen a subject displays solely passive or active resistance," yet opining that

Lopera's deployment of the Taser as well as the number of deployments were "well within the policy of the LVMPD" for "aggressive resistance"); (*id.* at BORDEN027) (outlining LVMPD's policy on giving a subject reasonable time to comply with commands and opining that Lopera's "use of empty hands control is within policy related to the level of resistance being faced by Officer Lopera.").

Nonetheless, Plaintiff has not persuaded the Court to now find that Borden will be unable to reference at trial specific police customs, policies, and procedures applicable to the circumstances here. Nor is it clear that Borden lacks familiarity with the training Officer Lopera received before the subject incident and, thus, would not be able to opine on Lopera's compliance with trained practices. Borden at least references on several occasions in his expert reports standards from LVMPD's "Use of Force Policy." (Expert Report of James Borden at BORDEN016, BORDEN023–26, Ex. B Appendix, ECF No. 117-2).

Consequently, at this early stage the Court does not find that Borden will be unable to provide reliable expert testimony about Officer Lopera's actions complying with specific, known police customs, policies, and practices. *See Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cty.*, No. C18-55 TSZ, 2019 WL 2289681, at *1 (W.D. Wash. May 29, 2019) ("Borden, Harmening, and DeFoe will, however, be permitted to testify about law enforcement practices, tactics, techniques, and training, which are subjects beyond the common knowledge of the average juror."). Plaintiff may, however, renew her request to exclude such testimony before trial if there is support that Borden does not possess sufficient knowledge and familiarity with specific customs, policies, and procedures relevant to Officer Lopera. *See Barnard v. Theobald*, 532 F. App'x 716, 720 (9th Cir. 2013) ("[T]he district court properly excluded the Officers' police practices expert—that 'expert' admittedly did not know what training, if any, the Officers actually received. In any event, the Officers were themselves allowed to testify as to their training."); *Valencia-Lopez*, No. 18-10482, 2020 WL 4814139, at *6 n.8 (explaining

that the district court's role under *Daubert* ensures that expert evidence is sufficiently relevant and reliable before submission to the jury (citing *Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017)).

### 3) *Testimony on Officer Lopera's State of Mind*

Next at issue is Plaintiff's contention to prohibit Borden from providing speculative opinions about Officer Lopera's intentions and motives during Tashii's arrest. (Mot. Limine 15:5–13, 19:2–9, 23:14–17).[1]   Indeed, Borden discloses several opinions about Officer Lopera's state of mind and how that likely contributed to the level of force used: "Lopera was physically fatigued and may or may not have been able to effectively and successfully perform the LVNR"; "the position Officer Lopera held Farmer in was as much to restrain Farmer due to Lopera's level of fatigue after being physically engaged with Farmer for nearly 4 minutes"; "[t]he fact that Officer Lopera was in a fight with a subject, whom was under the influence of a controlled substance and continually and aggressively resisting both verbal and physical attempts to control him (Farmer), in and of itself was a potential life-threatening scenario due to Officer Lopera becoming dangerously fatigued"; "Control and de-escalation of Farmer were the primary goal [sic] of Officer Lopera." (Rebuttal Report of James Borden at BORDEN116, BORDEN127, Ex. C to Appendix, ECF No. 117-3); (Expert Report of James Borden at BORDEN028, ECF No. 117-2).

Testimony on one's state of mind and physical senses most often must come from the specific individual who personally experienced them, especially when that individual is

---

[1]  Plaintiff largely objects to Borden testifying about Officer Lopera's belief that Tashii was attempting to carjack a vehicle before his arrest.  However, Borden's expert report provides numerous cites to Lopera's own statements about this carjacking belief. (Expert Report of James Borden at BORDEN016–BORDEN024, ECF No. 117-2).  Further, Borden explains how he draws his opinion on Lopera's belief about carjacking from video evidence, measured distances, testimony from witnesses, and perspectives according to Lopera's testimony. (*Id.*).  Consequently, Plaintiff has not provided a sufficient basis for the Court to now exclude Borden from testifying as to how Lopera believed a carjacking would occur and then took actions according to police customs, standards, and practices for that circumstance.

available to testify at trial. *See Borja v. Gonzalez*, No. 10CV1379 WMC, 2011 WL 5546874, at *2 (S.D. Cal. Nov. 14, 2011) ("Expert testimony is not required to adequately evaluate evidence of Defendants' state of mind at the time of the incident.").  Concerns thus arise here from the fact that Borden's expert reports do not directly cite the exact evidence which he used to conclude how fatigued Officer Lopera was at specific times during the subject incident or what thoughts crossed Lopera's mind during the struggle with Tashii.  Consequently, during trial Officer Lopera must first establish a sufficient foundation about his fatigue and exhaustion during the incident; Borden cannot provide speculative testimony doing so for him.  It is not clear at this early stage that Officer Lopera will be unable to do so.

In sum, the Court finds that Plaintiff has not met her burden to demonstrate that Borden's testimony regarding Officer Lopera's state of mind and compliance with police customs, policies, and practices on use of force is inadmissible "on all potential grounds." However, based on the evidence presently before the Court, it appears Officer Lopera may not be able to satisfy his burden to show that Borden's opinions have adequate support for their analysis.  The Court will resolve the admissibility of Borden's expert testimony at a pretrial evidentiary hearing.

**B.  Motion for Summary Judgment**

At issue here is Plaintiff's Fourteenth Amendment liberty interest in the "companionship and society" of her child. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Plaintiff's claims on summary judgment concern violations of that Fourteenth Amendment right by Officer Lopera and the Responding Officers as well as municipal liability against LVMPD.  The Court's below discussion first addresses Plaintiff's claims against Officer Lopera and the Responding Officers, then turns to the claim against LVMPD based on municipal liability.

//

1

### 1) *Violation of Fourteenth Amendment*

2       Plaintiff's Fourteenth Amendment claim requires her to prove that the conduct of

3   Officer Lopera and the Responding Officers rises to such a high level of unreasonableness that

4   it "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).  Under that

5   standard, Plaintiff's claims against Officer Lopera and the Responding Officers essentially fall

6   into two categories: (1) failure to intervene by Sergeant Crumrine, Officer Tran, and Officer

7   Flores ("Responding Officers"); and (2) excessive force by Officer Lopera that "shocks the

8   conscience." (First Am. Compl. ¶¶ 56–74, 86–90, ECF No. 4).  With both categories of claims,

9   Officer Lopera and the Responding Officers move for summary judgment based on qualified

10  immunity.

11      "The doctrine of qualified immunity protects government officials 'from liability for

12  civil damages insofar as their conduct does not violate clearly established statutory or

13  constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*,

14  555 U.S. 223, 231 (2009) (citation omitted).  Thus, to overcome the assertion of qualified

15  immunity, Plaintiff must plead facts showing: (1) that Officer Lopera and the Responding

16  Officers violated a statutory or constitutional right of Plaintiff, and (2) that the right was

17  "clearly established" at the time of the challenged conduct. *Ashcroft v. al-Kidd*, 563 U.S. 731,

18  741 (2011); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

19      A right is "clearly established" when "'[t]he contours of [a] right [are] sufficiently clear'

20  that every 'reasonable official would have understood that what he is doing violates that right.'"

21  *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017) (internal

22  modifications original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. at 741).  If Plaintiff cannot point

23  to a case directly on point with the specific facts here to overcome the assertion of qualified

24  immunity, she needs to show that existing precedent at the time of the incident "placed the

25  statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  Absent binding

precedent, the Court considers all relevant decisional law to inform the analysis, including

unpublished circuit and district court decisions. *See Bahrampour v. Lampert*, 356 F.3d 969, 977

(9th Cir. 2004).

### 2)  *Conduct that "Shocks the Conscience" by Officer Lopera*

For purposes of Plaintiff's Fourteenth Amendment claim, the initial issue before the

Court is what standard applies when determining whether Officer Lopera's conduct the night

Tashii died "shocks the conscience."  Such claim can exist under the standard of an official

either acting with "deliberate indifference" or with a "purpose to harm . . . for reasons unrelated

to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137.  To decide which standard

applies, the Court considers the circumstances of the incident.  In fast-paced situations where a

suspect's evasive actions force the officer to make snap judgments and split-second reactions,

the "purpose to harm" standard applies. *Id.*; *Wilkinson*, 610 F.3d at 554.  By contrast, when the

circumstances reveal that actual deliberation by the officer about his actions was practical, then

the "deliberate indifference" standard applies. *See Wilkinson*, 610 F.3d at 554 ("[D]eliberation

should not be interpreted in the narrow, technical sense, reasoning that the Supreme Court had

rejected the deliberate indifference standard even in cases where an officer giving chase could

have deliberated while pursuing the suspect." (quoting *Porter*, 546 F.3d at 1139–40) (internal

quotations omitted)).

Here, there is evidence from which a reasonable jury could find that actual deliberation

by Officer Lopera became practical moments *after* he initiated the neck restraint on Tashii.[2]

---

[2]  Plaintiff contends that Officer Lopera demonstrated deliberate indifference from the moment he administered
the first taser that brought Tashii to the ground, because Lopera testified how he had "deploy[ed] and
assess[ed]." (Pl.'s Resp. 21:19–22:14).  However, *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, (9th
Cir. 2017), is instructive on how an officer's opportunity to assess during repeated uses of a taser still warrants
the "purpose of harm" standard if the circumstances occurred over a short period of time and while the situation
was still rapidly changing. *Id.* at 1127 (applying the purpose to harm standard even though the officer's initial
taser charges caused the affected person to "lock up" and fall to the ground followed by additional taser charges
as the officer waited for backup to arrive for a period of ninety seconds).

The fast-paced pursuit had ended at that point, no facts reveal concern by others or Officer Lopera of additional suspects or a potential change in circumstances, and other nearby security guards already arrived to subdue Tashii with Officer Lopera. (*See* Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ, ECF No. 131-2).  Additional support comes from how Officer Lopera questioned the Responding Officers as they arrived and instructed Lopera to let Tashii go.  For example, Sergeant Crumrine arrived at nearly the same time Officer Lopera initiating the neck restraint, and evidence indicates that Crumrine immediately said, "Let him go, Ken." (Dep. Sergeant Travis Crumrine at 5 of 7, Ex. Y to Def. Lopera's MSJ, ECF No. 131-8).  But Lopera continued to hold while asking multiple times, "is he out?," to which Sergeant Crumrine responded, "Yeah." (Def. Lopera's MSJ 12:1, ECF No. 128) (citing Body Camera footage).  More seconds passed before Crumrine again instructed, "Go ahead and let him go, Ken," yet Lopera continued to administer the neck restraint. (Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ, ECF No. 131-2); (Dep. Sergeant Crumrine at 6 of 7, Ex. Y to Def. Lopera's MSJ).  Around forty-five seconds later, Crumrine again directed Officer Lopera to let go, stating "Bro, stop it," though Lopera continued. (Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ).  Even more, evidence shows that Officers Tran and Flores arrived roughly thirty seconds after Lopera began the neck restraint.  Upon their arrival, evidence indicates that Tashii could have already been "out," though Defendants cite evidence disputing that fact. (*See* Dep. Officer Tran 32:19–33:21, 73:7–24, Ex. 8 to Pl.'s Resp. 149-8); (LVMPD Force Investigation Team Report, Ex. 16 to Pl.'s Resp., ECF No. 152-3).  Still, Lopera continued with the neck restraint until Officer Tran instructed Lopera to "loosen up" after completing handcuffing—over a minute after the restraint began. (Dep. Officer Tran 32:19–33:21, Ex. 8 to Pl.'s Resp. 149-8); (*see* Incident Chronology from LVMPD, Ex. A to LVMPD Defs.' MSJ, ECF No. 125-3).

Accordingly, evidence presented to the Court on summary judgment could support a finding that deliberation by Officer Lopera was practical even though the situation had previously been fast paced with rapid escalation.  Though this is a close question, evidence when viewed in the light most favorable to Plaintiff at least creates a genuine dispute of material facts appropriate for resolution by a jury. *See Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017) ("Here, the officers had time to deliberate while they lay on Greer's back as he struggled to breathe."); *Wroth v. City of Rohnert Park*, No. 17-CV-05339-JST, 2019 WL 1766163, at *9 (N.D. Cal. Apr. 22, 2019) ("[O]nce officers have subdued a suspect to the point that there is no longer a threat, it becomes practical to deliberate about the type and degree of force to use in continuing to restrain the suspect.").

While the evidence could support applying the "deliberate indifference" standard, the facts of this case could also support the "purpose to harm" standard.  The circumstances reveal a brief interaction between Officer Lopera and Tashii rapidly escalating into a foot pursuit where Officer Lopera needed to make snap judgments at times. *Wilkinson*, 610 F.3d at 554 ("[T]he heightened purpose-to-harm standard applies where a suspect's evasive actions force the officers to act quickly." (citing *Porter*, 546 F.3d at 1137–40).

Because the evidence when viewed in the light most favorable to Plaintiff at this stage does not conclusively point to the deliberate indifference or purpose to harm standard as the only one applicable, the Court cannot make a definitive conclusion on summary judgment.   It is for the jury to decide which standard applies after considering and weighing the facts at trial. *Garlick*, 167 F. Supp. 3d at 1165 ("By its nature, though, the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards.") (internal quotations omitted).  The Court's below discussion thus proceeds by addressing whether Officer Lopera's conduct could constitute a violation of Plaintiff's Fourteenth Amendment rights under either standard, and, if

so, whether Officer Lopera is nonetheless entitled to qualified immunity because the law was not "clearly established" at the time.

a)  *Deliberate Indifference*

To overcome Officer Lopera's assertion of qualified immunity under a deliberate indifference standard, Plaintiff must provide evidence that Lopera "acted or failed to act despite his knowledge of a substantial risk of serious harm," which case law at the time made obvious to any reasonable official would violate federal law. *Solis v. Cty. of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008); *Garlick*, 167 F. Supp. 3d at 1168.  Whether Officer Lopera had the requisite knowledge of a substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious." *Garlick v. Cty. of Kern*, 167 F. Supp. at 1168–69 (internal modifications original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).  And here, when viewing the evidence in the light most favorable to Plaintiff, a genuine dispute of material facts exists precluding the Court from entering summary judgment as to whether Officer Lopera's conduct constituted deliberate indifference in violation of Plaintiff's Fourteenth Amendment rights under clearly established law.[3]

As previously discussed in this Order, evidence of deliberate indifference by Officer Lopera largely arises from his repeated questioning of the Responding Officers' commands to

---

[3]  Officer Lopera argues that Plaintiff failed to plead facts which could have supported a deliberate indifference standard and, thus, is improperly invoking a novel theory of liability on summary judgment. (Resp. 21:13–16, ECF No. 128) (arguing that Plaintiff "fail[ed] to allege that Ofc. Lopera had an opportunity to deliberate, that deliberation would have been practical, or mostly, that Ofc. Lopera failed to deliberate.").  However, after reviewing Plaintiff's First Amended Complaint and arguments made throughout this case, the Court disagrees with Officer Lopera.  Plaintiff plainly pleaded a Fourteenth Amendment claim under a theory of deliberate indifference by contending that "Officer Lopera, Officer Tran, Officer Flores, and Sergeant Travis Crumrine acted with deliberate indifference to safety when Officer Lopera killed Tashii." (First Am. Compl. ¶ 70).  Also, Officer Lopera's Answer explicitly denies that he "acted with deliberate indifference." (Answer ¶ 20, ECF No. 99).  Plaintiff has not improperly raised a new theory of liability on summary judgment.

1  let Tashii go.  A jury considering all evidence and making reasonable inferences from it could

2  consider such evidence sufficient to establish Officer Lopera's awareness that Tashii did not

3  pose an imminent threat to safety, Lopera's awareness of dangers associated with the neck

4  restraint, and that it was practical for Lopera to deliberate on his actions.  Yet Officer Lopera

5  continued to apply the neck restraint despite having already deployed his taser numerous times,

6  administered repeated blows to Tashii's head, suspicion of Tashii's drug intoxication, and

7  assistance by the Responding Officers. *See Wroth v. City of Rohnert Park*, No. 17-CV-05339-

8  JST, 2019 WL 1766163, at *12 (N.D. Cal. Apr. 22, 2019).

9         Moreover, Plaintiff's evidence when considered in the light most favorable to her could

10  support Officer Lopera's conduct as being a violation of clearly established law at the time.

11  Precedent in the Ninth Circuit had previously established the objective unreasonableness of an

12  officer continuing to apply a chokehold on a restrained person who does not pose a danger to

13  others. *See, e.g.*, *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) (discussing the

14  long-held standard in the Ninth Circuit and how *Barnard v. Theobald*, 721 F.3d 1069 (9th Cir.

15  2013), "squarely addressed the constitutionality of the use of a chokehold on a non-resisting

16  person").  *Drummond v. City of Anaheim*—decided over a decade before the incident here—

17  provided clear guide to officers about the dangers and excessiveness of continuing to apply

18  asphyxiating pressure to a compliant, prone individual. *See* 343 F.3d 1052, 1059 (9th Cir.

19  2003); *Ericson v. City of Phoenix*, No. CV-14-01942-PHX-JAT, 2016 WL 6522805, at *13 (D.

20  Ariz. Nov. 3, 2016) ("[A] carotid restraint or hold can result in great bodily injury if the hold is

21  in place long enough.").  Other circuits have held similarly. *See Tuuamalemalo*, 946 F.3d at

22  477 (collecting cases).[4]

23  _____

24  [4]  Officer Lopera argues that Plaintiff cannot overcome the presumption of qualified immunity by relying on
cases analyzing excessive force in violation of the Fourth Amendment. (Resp. 25:17–20, ECF No. 128).  This is
25  generally correct. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 n.5 (9th Cir. 2019).  But cases analyzing
violations of clearly established law under the Fourth Amendment are at least relevant to what actions can
constitute objectively excessive force and awareness of obvious associated dangers, and such cases are impactful

Thus, based on precedent from the Ninth Circuit and persuasive decisions from other courts, any reasonable officer in Lopera's position would have had fair notice about the unreasonableness and dangers of continuing to apply a chokehold on Tashii if he was restrained and no longer resisting after Lopera's previous acts of force.  Continuing to administer a chokehold with a practical opportunity to deliberate—and with repeated requests by the Responding Officers to let go, followed by Lopera's active responses—could therefore amount to deliberate indifference by Officer Lopera for purposes of Plaintiff's Fourteenth Amendment claim. *See Garlick v. Cty. of Kern*, 167 F. Supp. 3d 1117, 1170–71 (E.D. Cal. 2016); *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017); *Ayala v. City of S. San Francisco*, No. C06-02061 WHA, 2007 WL 2070236, at *9 (N.D. Cal. July 13, 2007). Although Plaintiff does not point to a previous court decision denying qualified immunity under the exact facts as here, that does not mean Officer Lopera's conduct could not have violated clearly established law at the time. *See Tuuamalemalo*, 946 F.3d at 477 ("To determine whether Officer [Greene] violated clearly established law, we look to cases relevant to the situation [Greene] confronted, mindful that there need not be a case directly on point.").

### b)  *Purpose to Harm*

The "purpose to harm" standard requires Plaintiff to prove that an officer's excessive force was unrelated to any legitimate law enforcement objective. *Lam v. City of Los Banos*, No. 18-17404, 2020 U.S. App. LEXIS 30638, 2020 WL 5742071, at *12–*13 (9th Cir. Sept. 25, 2020); *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).  Legitimate law

within the established contours of the Fourteenth Amendment right asserted here. *See Abuka v. City of El Cajon*, 804 F. App'x 693, 694–95 (9th Cir. 2020) (explaining that cases concerning the Fourth Amendment excessive force analysis suggest facts that might be relevant to showing how an officer acted with a purpose to harm in the Fourteenth Amendment context (citing *Porter*, 546 F.3d at 1140–41)).

Additionally, the Court recognizes Defendants' argument that not all carotid holds are the same. (*See* LVMPD Defs.' Resp. 16:25–17:6, ECF No. 169).  However, a genuine dispute of fact exists here about the mechanics of Officer Lopera's neck restraint and the positioning used, which is appropriate for resolution at trial.

enforcement objectives include, for example, stopping a dangerous suspect and acting in self-defense or defense of others. *Id.* Conversely, illegitimate objectives include, for example, bullying or getting even with a suspect. *Id.*

Here, Plaintiff provided evidence that, when viewing in the light most favorable to her, could support several of Officer Lopera's actions being conducted with a "purpose to harm" without any legitimate law enforcement objective. Evidence indicates that Officer Lopera administered up to seven taser discharges even after Tashii fell to the ground after the first discharge and promptly agreed to comply with orders, followed by repeatedly striking Tashii in the head though other security guards arrived to help, and using the neck restraint for over one minute. (Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ, ECF No. 131-2); (Dep. Travis Crumrine 49:14–18, Ex. F to LVMPD Defs.' MSJ, ECF No. 125-8) (stating LVMPD teaches that a properly applied LVNR should make a person go unconscious within seven to fourteen seconds). Evidence also reveals Officer Lopera's later statements at the scene, such as how he had "rear nakeded his ass." (*Id.*). The multiple orders given by Sergeant Crumrine and the later directive by Officer Tran similarly provide support that Tashii had been subdued to the point that a neck restraint was either unnecessary to achieve a legitimate law enforcement objective or became wholly unnecessary once the Responding Officers first instructed Officer Lopera to let go. (*See* Dep. Chief John McGrath 35:3–24, ECF No. 149-10) (explaining that it was outside of policy for Officer Lopera to administer "the combination of tasing, striking in the head, [and] LVNR" in these circumstances); (Dep. Sergeant Travis Crumrine 121:9–123:22) (noting that, depending on the number of head strikes administered after tasing followed by the neck restraint, Officer Lopera's actions would violate applicable policies on use of force); (Dep. Detective Trever Alsup 273:7–13, Ex. 15 to Pl.'s Resp., ECF No. 150-2) (opining that, in the circumstances here, "wailing [sic] on Tashii Farmer then rear mounting and choking him out" would not have aligned with a "legitimate law enforcement objective").

That said, Officer Lopera highlights opinions in evidence explaining the necessity of his actions when he thought Tashii was attempting to carjack a vehicle and resist arrest. (Officer Lopera's MSJ 7:6–20, ECF No. 128).  But this merely generates a genuine dispute of material fact about the exact circumstances and whether Lopera's actions were to achieve a legitimate law enforcement objective.  Because a reasonable jury could view Officer Lopera's actions as being with a "purpose to harm" unrelated to a legitimate law enforcement objective, the Court denies summary judgment to Officer Lopera. *See Valenzuela v. City of Anaheim*, No. SACV 17-00278-CJC (DFMx), 2019 U.S. Dist. LEXIS 129976, at *21 (C.D. Cal. Feb. 12, 2019) ("Based on this evidence, a reasonable trier of fact could find that when three officers had hands on Valenzuela in the 7-Eleven parking lot, the officers' restraint hold was motivated by a desire to teach Valenzuela a lesson for evading the officers, kicking Wolfe in the chest, and nearly breaking his finger.").

Further, Plaintiff's evidence when viewed in the light most favorable to her could support a violation of clearly established law at the time of the incident under a purpose to harm standard. *See Barnard*, 721 F.3d at 1076; *Abston v. City of Merced*, 506 F. App'x. 650, 652–53 (9th Cir. 2013) ("A reasonable fact-finder could conclude that defendants' use of body compression as a means of restraint was unreasonable and unjustified by any threat of harm or escape when Abston was handcuffed and shackled, in a prone position, and surrounded by numerous officers."); *Koiro v. Las Vegas Metro. Police Dep't*, 671 F. App'x 671, 672 (9th Cir. 2016) (citing *Nelson v. City of Davis*, 685 F.3d 867, 881–82 (9th Cir. 2012), for its position that Ninth Circuit caselaw dating from 2001 has held that the "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force"); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x. 627, 629 (9th Cir. 2012) ("Turning to the clearly established law inquiry, we conclude that existing law recognized a Fourth Amendment violation where two officers use

their body pressure to restrain a delirious, prone, and handcuffed individual who poses no serious safety threat."); *cf. A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013) ("A reasonable police officer in Markgraf's position would have known that acting with a purpose to harm unrelated to a legitimate law enforcement objective (such as arrest, self-defense, or the defense of others) violates due process. Where, as here, a jury has determined that the officer acted with such a purpose, we must conclude that he violated clearly established law and deny him qualified immunity.").

### c)  *Medical Causation*

Officer Lopera argues for summary judgment on medical causation by explaining that medical experts opined Tashii's carbon-dioxide levels were normal and inconsistent with death from asphyxia. (Officer Lopera's MSJ 29:13–17, ECF No. 128).  With causation, the analysis requires the factfinder to "first determine what act or omission constituted the breach of [constitutional] duty, and then ask whether that act or omission was the but-for and proximate cause of the plaintiff's injuries." *Mendez v. Cty. of Los Angeles*, 897 F.3d 1067, 1074 (9th Cir. 2018).

Here, genuine disputes of material fact preclude the Court from granting summary judgment as to medical causation.  In contrast to Officer Lopera's identified evidence, Plaintiff provides support from the Clark County Coroner and a retained expert determining that the cause of death was asphyxia due to police restraint. (Expert Report Dr. William Smock, Ex. 27 to Pl.'s Resp., ECF No. 150-14); (Clark County Coroner's Report, Ex. 26 to Pl.'s Resp., ECF No. 150-13).

### 3)  *Failure to Intervene*

Part of Plaintiff's Fourteenth Amendment claim focuses on the allegation that the Responding Officers knew Officer Lopera was using excessive force against Tashii upon their arrival yet allowed such excessive force to occur without intervening. (Pl.'s Resp. 19:22–22:3,

ECF No. 155).  That failure to intervene, according to Plaintiff, amounts to conduct which "shocks the conscience." (*Id.*).  The Responding Officers, by contrast, contend that they are entitled to qualified immunity at this summary judgment stage because the evidence reveals that they sufficiently intervened and that no "clearly established" standard required them to do more during the subject incident. (LVMPD Defs.' MSJ 2:21–3:9, 15:12–23:5).

The Ninth Circuit has consistently held that an officer who perceives a fellow officer using excessive force is just as responsible as the fellow officer for violating constitutional rights if the officer had a sufficient opportunity to intervene yet failed to do so. *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994), *rev'd on other grounds*, 518 U.S. 81 (1996); *Graham v. Connor*, 490 U.S. 386, 397 (1989).  *Lolli v. Cty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003), is instructive with claims based on a failure to intervene.  In that case, officers assaulted a detainee while in a holding cell after the detainee complained of needing medical assistance or food to improve his blood sugar levels. *Id.* at 412–13.  The assault involved officers taking the detainee to the ground, kicking him, punching him, hitting him with batons, and pepper spraying him, while two supervising sergeants observed at least part of the events. *Id.* at 418.  When analyzing a claim against one of the sergeant officers for failure to intervene, the Ninth Circuit denied qualified immunity to the sergeant because he "admitted that he observed the deputies struggling with Lolli, but he did not become involved or give orders." *Id.* at 418, 422.  Following *Lolli*, courts evaluating failure to intervene claims look to whether an officer perceived excessive force by a fellow officer, had the ability to intervene, yet failed to physically do so or verbally order the offending officer to stop. *See M.H. v. Cty. of Alameda*, 62 F. Supp. 3d 1049, 1093 (N.D. Cal. 2014) (discussing the elements for a failure to intervene claim under *Lolli*); *Hernandez v. Contra Costa Cty.*, No. 20-CV-01183-AGT, 2020 WL 3078119, at *1 (N.D. Cal. June 10, 2020) (finding a failure to intervene claim actionable when the supervising officers "could have physically or verbally intervened" but did not).

Here, unlike the circumstances in *Lolli*, undisputed evidence establishes that the Responding Officers provided repeated instructions for Officer Lopera to release Tashii.  This is evident with Sergeant Crumrine ordering Officer Lopera multiple times to "let him go" while attempting to apply handcuffs to Tashii. (Officer Lopera Body Camera, Ex. S to Def. Lopera's MSJ, ECF No. 131-2); (Dep. Sergeant Crumrine at 6 of 7, Ex. Y to Def. Lopera's MSJ).   Not only that, Officer Tran ordered Officer Lopera to release as he completed handcuffing.  Though the Responding Officers participated in handcuffing Tashii, their orders to remove the neck restraint take this case out of actionable passive acquiescence or contribution to already-occurring excessive force.  Notably, Plaintiff cites no precedent clearly establishing at the time of the incident that verbal directives are insufficient intervention measures and that the Responding Officers needed to physically pry Officer Lopera away from Tashii within a minute of their arrival on scene.  Even when considering Plaintiff's evidence in the light most favorable to her and with all inferences in her favor, the evidence does not reveal a failure to intervene by Responding Officers in violation of clearly established law for purposes of Plaintiff's claim. *See Lolli* 351 F.3d at 418.

### 4) *Supervisory Liability*

Plaintiff's third claim seeks to hold Sergeant Crumrine liable as Officer Lopera's supervisor.  For her claim to survive summary judgment, Plaintiff must show a genuine dispute of material fact about "(1) [Sergeant Crumrine's] personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989)).  "The requisite causal connection can be established . . . by setting in motion a series of acts by others, . . . or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207–08 (quoting *Dubner v.*

*City & Cty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)) (internal quotations and citations omitted).

Plaintiff attempts to sustain her claim for supervisory liability against Sergeant Crumrine by highlighting testimony from several officials, including Sergeant Crumrine, stating that a supervisor under LVMPD's customs and practices should have physically intervened or commanded someone else to break Officer Lopera's hold on Tashii's neck rather than provide only verbal commands for Officer Lopera to do so. (Pl.'s Resp. 26:8–15, ECF No. 155). However, the Court agrees with Defendants that violations of the identified internal policies and practices here would not establish supervisory liability for purposes of Plaintiff's claim, even when considering the evidence presented in the light most favorable to Plaintiff. *See Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 929 (9th Cir. 2001); *McGrath v. Scott*, 250 F. Supp. 2d 1218, 1222 (D. Ariz. 2003). Moreover, undisputed evidence reveals Sergeant Crumrine's repeated orders for Lopera to release the neck restraint. *Cf. Valenzuela v. City of Anaheim*, No. SACV1700278CJCDFMX, 2019 WL 2949035, at *7 (C.D. Cal. Feb. 12, 2019) (permitting a supervisory liability claim to survive summary judgment when there were facts that the supervising officer arrived on scene aware of an officer's applied chokehold, yet the supervisor "twice instructed [the officer] to 'hold that choke'" and did not provide any orders to stop). Plaintiff's cited cases are inapposite. *See Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001) (requiring the supervisor "knowingly refused to terminate a series of acts by others"); *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018) (discussing "inaction" in control over subordinates, "acquiescence," or "reckless or callous indifference").

### 5) *Integral Participation*

Aside from supervisory liability and a failure to intervene, Plaintiff contends that the Responding Officers can be held liable under a theory of "integral participation." (Pl.'s Resp. 22:5–23:4). "Integral participation does not require each officer's actions themselves rise to the

level of a constitutional violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (quoting *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (quotations marks and alteration omitted)).  "But it does require some fundamental involvement in the conduct that allegedly caused the violation." *Id.*

In *Blankenhorn*, integral participation occurred because officers initiated the take down of an individual and helped administer handcuffs, which was "instrumental in . . . [officers] gaining control of Blankenhorn [and] culminated in Ross's application of hobble restraints"— restraints which were later found to constitute excessive force. *Id.* ("It follows that Gray, who ordered Ross to use the hobble restraints, and Nguyen and South, who tackled Blankenhorn, also participated in an integral way in the application of the hobble restraints.").  Further, the Ninth Circuit in *Reynaga Hernandez v. Skinner*, No. 19-35513, 2020 WL 4579494, at *8 (9th Cir. Aug. 10, 2020), recently clarified that *Blankenhorn* established, at a minimum, that but-for causation is required to find integral participation because *Blankenhorn* centered on how "but for the use of handcuffs, the officer would not have been able to apply the hobble restraints."

Here, as discussed previously in this Order, undisputed evidence establishes that the Responding Officers arrived after Officer Lopera had already initiated the neck restraint, that the Responding Officers provided orders for Lopera to let go, and that the Responding Officers had no prior knowledge of Lopera's intention to use the neck restraint or what had occurred previously.  Their actions in attempting to complete handcuffing on Tashii are crucially different from the "instrumental" assistance in *Blankenhorn* and cannot support a theory of liability based on "integral participation."

**6)  *LVMPD Liability***

LVMPD Defendants move for summary judgment on Plaintiff's second claim, which asserts several theories of municipal liability: (1) LVMPD had a formal policy that authorized the use "of the deadly force LVNR in low level force situations"; (2) LVMPD had a *de facto*

policy of inadequately training its officers on proper use of the LVNR; (3) LVMPD erroneously trained its officers that the Fourteenth Amendment's due process clause did not apply to situations involving restraint and use of force prior to arrest; and (4) LVMPD had a formal and *de facto* policy due to inadequately punishing officers for excessive force. (First Am. Compl. ¶¶ 26–55, 75–85, ECF No. 4); (Pl.'s Resp. 27:13–19, ECF No. 155).  For Plaintiff to succeed in her municipal liability claim against LVMPD, she must establish that "the local government had a deliberate policy, custom, or practice that was the moving force behind the constitutional violation [she] suffered." *AE ex rel. Hernandez v. Cty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012) (quoting *Whitaker v. Garcetti*, 486 F.3d 572, 581 (9th Cir. 2007)).  In other words, Plaintiff must show: (1) that she possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference'" to her constitutional right; and (4) that the policy is the "moving force behind the constitutional violation." *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001); *Hollandsworth v. City & Cty. of Honolulu*, 440 F. Supp. 3d 1163, 1173 (D. Haw. 2020).

The below discussion addresses whether summary judgment is appropriate on any of Plaintiff's theories of municipal liability.

a)  *Official Policy*

Beginning with LVMPD's policy authorizing officers' use of LVNRs in low-level force situations, the Court finds that Plaintiff has not created a genuine dispute of material fact for municipal liability based on this official policy alone.  Plaintiff only cites evidence showing that an LVNR can create the potential for serious injury or death if applied *incorrectly*. (Pl.'s Resp. 27:21–24, ECF No. 155) (citing deposition testimony from Deputy Chief John McGrath for the position that, "[i]f the LVNR is held too long, it can be deadly").  This evidence does not support a finding that applying an LVNR is itself so dangerous that authorized use in low-

1    level force situations can support municipal liability.  Standing uncontroverted is LVMPD

2    Defendants' expert reports opining on the safety of a properly applied LVNR under LVMPD's

3    policy and its appropriateness for low-level force situations.

4          Equally unavailing is Plaintiff's citation to *Valenzuela v. City of Anaheim*, 2019 WL

5    2949035 (C.D. Cal 2019).  There, the court found a genuine dispute of material fact as to

6    whether the Anaheim Police Department ("APD") was deliberately indifferent to constitutional

7    rights by having a policy authorizing carotid restraint holds in situations that do not call for

8    deadly force. *Id.* at *10.  Central to that finding was how the APD's own policy indicated its

9    awareness of injury risks associated with a carotid hold, and that the APD's own "Office of

10   Independent Review . . . specifically recommended that the carotid restraint hold be used only

11   when the use of deadly force is objectively reasonable." *Id.*  Yet APD continued to authorize

12   the use of a carotid holds by officers in circumstances where deadly force would not be

13   justified. *Id.* (noting how APD continued with its policy "despite APD's apparent knowledge of

14   the risks associated with the hold").  Here, by contrast, Plaintiff has not cited any evidence in

15   opposition to summary judgment showing that, before Tashii's death, LVMPD calculatedly

16   rejected serious risks and a reviewing commission's recommendation to stop authorizing

17   LVNRs in low-level force situations.  Accordingly, the Court grants summary judgment in

18   favor of LVMPD to the extent Plaintiff argues that its formal policy on LVNRs alone gives rise

19   to municipal liability.

20                                    b)  *Inadequate Training*

21         Though Plaintiff has not provided evidence to create a genuine dispute of material fact

22   as to the official policy permitting LVNRs, there is the separate issue of inadequate training by

23   LVMPD.  To support such a claim, Plaintiff must provide evidence indicating that LVMPD's

24   training of its officers on performing an LVNR amounted to "deliberate indifference to the

25   rights of persons with whom the [untrained employees] come into contact." *Connick v.*

*Thompson*, 563 U.S. 51, 61 (2011) (internal modification original) (internal quotations and citation omitted).  Plaintiff must also prove that "the identified deficiency in [LVMPD's] training program [was] *closely related* to the ultimate injury."  *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (emphasis original) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

For example, the United States Supreme Court in *Connick v. Thompson* addressed a municipal liability claim based on an alleged pattern of "violations by prosecutors in Connick's office." *Connick*, 563 U.S. at 62–63.  The plaintiff pointed to four overturned convictions in the preceding ten years based on failing to comply with disclosure requirements imposed by *Brady v. Maryland*. *Id.* at 62–63.  Nonetheless, the Court found no genuine dispute of material fact to exist as to deliberate indifference based on the prior *Brady* violations for purposes of the case, because none of the cited prior violations involved the same or closely similar forms of *Brady* violations as that suffered by the plaintiff. *Id.* ("Those four reversals could not have put Connick on notice that the office's *Brady* training was inadequate [because] . . . . [n]one of those cases involved failure to disclose blood evidence, a crime lab report, or physical or scientific evidence of any kind.").

Unlike the dissimilar incidents addressed in *Connick*, Plaintiff provides evidence of several instances within a five-year period of Tashii's death involving incorrect applications of an LVNR by LVMPD officials resulting in a finding of unnecessary use of force, and each the instances are sufficiently similar to this case. (Report of Cases Involving the Neck at LVMPD 1386–90, Ex. 43 to Pl.'s Resp., ECF No. 159-8) (showing three previous instances involving an official who attempted to apply an LVNR—two of which rendered the individual unconscious and involved a failure to let go or deescalate when the individual was brought under control— as well as another incident involving an unapproved neck restraint technique).  And in addition to these incidents, Plaintiff provides a report from James Lindell with the National Law

Enforcement Training Center, Inc. ("NLETC") explaining that authorized use of LVNRs should include at least four hours of recertification training per year to ensure safe practices, because less time would be "both irresponsible and reprehensible." (LVNR Training Manual at LVMPD 0755, Ex. BB to Def. Lopera's MSJ, ECF No. 131-11) (stating that training programs of "as little as two to four hours" do not provide sufficient attention to technique, practice, and post-subject care and handling). Despite this, LVMPD reduced its required LVNR training requirements from four hours per year to two hours about five years before Tashii's death. (Dep. Sergeant Michael Bland 53:9–55:5, Ex. 11 to Pl.'s Resp., ECF No. 149-11).

　　　　To refute Plaintiff's evidence, LVMPD provides expert reports opining that NLETC's four-hour recommendation is an overstatement. For example, Captain Lawrence G. Lynch III contends, "[i]t is my opinion, and that of Sergeant Bland, that a 2-hour recertification is adequate if the officers being recertified by the trainers demonstrate acceptable knowledge and proficiency in the LVNR System." (Expert Report at 10, Ex. R to LVMPD Defs.' MSJ, ECF No. 125-20) ("I believe that the 4-hour recertification guideline from the NLETC is the outside parameter of what it may take to ensure that an officer is proficient and knowledgeable in the system after their initial 12 hour certification."). But this evidence merely creates genuine disputes of material fact about whether LVMPD's reduced hourly requirements for LVNR recertification—combined with failing to reimplement the four-hour training period considering later incidents—was "deliberately indifferent." A genuine dispute of material fact also exists as to whether LVMPD's training measures, if deliberately indifferent, are sufficiently related to the injury suffered here for purposes of municipal liability.

　　　　As a result, though the Court recognizes the stringent standards applicable to a claim of deliberate indifference by a municipality based on inadequate training, the conflicting evidence here warrants denial of summary judgment on this issue. *Cf. Connick*, 563 U.S. at 61 ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training

1  program causes city employees to violate citizens' constitutional rights, the city may be deemed

2  deliberately indifferent if the policymakers choose to retain that program.").

3                    c) *Failure to Train on Fourteenth Amendment Rights*

4          Next, with Plaintiff's contention that LVMPD is subject to liability for misstating that

5  the Fourteenth Amendment does not apply to pre-arrest and post-arrests uses of force or

6  restraint, Plaintiff provides no evidence supporting how such misstatement could have been a

7  reason for the constitutional violations at issue here or that proper instruction is so obviously

8  necessary to avoid unlawful uses of force that the failure to do so would be deliberately

9  indifferent. *Cf. City of Canton*, 489 U.S. at 390 n.10 (discussing the "obvious" training needs

10  on the constitutional limitations with use of deadly force).  The Court therefore grants summary

11  judgment in LVMPD's favor on this aspect of Plaintiff's claim.

12                    d) *Failure to Discipline*

13          Plaintiff's last contention for municipal liability concerns LVMPD's policies on

14  discipline after a finding of excessive force.  This claim centers on the "long recognized"

15  principle that "a custom or practice can be inferred from . . . evidence of repeated constitutional

16  violations for which the errant municipal officers were not discharged or reprimanded." *Hunter*

17  *v. Cty. of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011) (internal quotations and citations

18  omitted).  The Ninth Circuit's decision in *Price v. Sery*, 513 F.3d 962 (9th Cir. 2008), provides

19  guidance on what evidence could survive summary judgment for such a claim.  The plaintiff in

20  that case produced testimony and an expert declaration stating, "no Portland police officer has

21  'ever' been 'successfully disciplined' for shooting at an unarmed citizen 'in the last twenty

22  years.'" *Id.* at 965.  The district court granted summary judgment against the plaintiff, however,

23  explaining that the expert declaration could not survive summary judgment because it held

24  erroneous legal distinctions, and testimony that no discipline had occurred appeared false based

25  on evidence of the municipality disciplining officers (though sometimes unsuccessfully). *Id.*

But the Circuit reversed, recognizing that the contradicting evidence about no successful discipline merely created a genuine dispute of material fact appropriate for trial. *Id.* at 972–73.

Here, Plaintiff contends that LVMPD's disciplinary record supports municipal liability by essentially ratifying excessive force by officers.  Plaintiff first argues that LVMPD has an official policy which imposes only a written reprimand for an officer's first instance of excessive force, and that written reprimand would routinely be purged from the officer's file after eighteen months. (Pl.'s Resp. 29:10–11).  Plaintiff also claims to have "adduced evidence of fifteen (15) specific cases of LVNRs used by officer [sic] that cause injury," and that all have resulted in nothing more than a "metaphorical slap on the wrist." (*Id.* 29:16–22).

After reviewing the evidence cited by Plaintiff in support of her claim, the Court finds that Plaintiff has not shown a genuine dispute of material fact about LVMPD operating an official or *de facto* policy by failing to discharge or reprimand officers who used excessive force through neck restraints.  Unlike in *Price*, Plaintiff provides no testimony, declarations, or other evidence showing that LVMPD wholly fails to investigate or initiate discipline for officers that inappropriately used an LVNR or similar forms of neck restraint.[5]  While Plaintiff cites testimony from Jamie Frost (LVMPD's 30(b)(6) witness) for the position that only a written reprimand occurs for the first finding of excessive force (which would be purged after eighteen months), Mr. Frost actually testified to the opposite effect. (Dep. Jamie Frost 23:7–20, Ex. 28 to Pl.'s Resp., ECF No. 15-15) (explaining that some violations, such as gross inappropriate use of force, require immediate termination not subject to discretion).  Also,

---

[5]  Also unlike in *Price*, where the Circuit considered for summary judgment purposes the complaint's allegation that no successful discipline had occurred with any Portland police officer for shooting an unarmed suspect, here Plaintiff only alleges that LVMPD "rarely issues disciplinary or corrective action." *Compare Price*, 513 F.3d at 965, *with* (First Am. Compl. ¶ 55, ECF No. 4).  Consequently, Plaintiff's allegations do not provide support for her claim that a rational trier of fact could find LVMPD subject to municipal liability based on longstanding practices constituting a lack of discipline for inappropriate uses of neck restraints.

Plaintiff's cite to "fifteen . . . specific cases of LVNRs causing injury"[6] actually reveals at most five incidents involving neck restraints resembling an LVNR. (Report of Cases Involving the Neck at LVMPD 1386–90, Ex. 43 to Pl.'s Resp., ECF No. 159-8).  However, LVMPD disciplined the officers involved in each incident, with one incident resulting in termination and others amounting to suspensions. (*Id.*).  Lastly, concerning Plaintiff's cite to testimony of Deputy Chief John McGrath stating he has not heard of an officer being terminated for improper LVNR application since starting with LVMPD in 1992, one person's lack of knowledge about prior terminations does not equate with LVMPD never taking such action. (Dep. Deputy Chief John McGrath, Ex. 10 to Pl.'s Resp., ECF No. 149-10) (with the question, "Have you ever heard of an officer being terminated for improperly using an LVNR?," responding, "I don't think so.").  LVMPD's evidence stands uncontroverted that it has previously imposed termination for an officer's inappropriate use of force with an LVNR, though an arbitrator later overturned that termination.

　　　　Altogether, Plaintiff's evidence does not support nor create a genuine dispute of material fact about her contentions of actionable municipal liability based on LVMPD operating under a *de facto* or official policy by failing to discipline officers for using excessive force involving neck restraints.  The Court thus grants summary judgment in favor of LVMPD on this aspect of Plaintiff's second claim for relief.

//

//

---

[6]  For several of Plaintiff's examples on excessive force using an LVNR, Plaintiff cites to deposition testimony where counsel asks questions about prior incidents.  However, each witness responded that they either did not recall the incident or were not familiar with what disciplinary procedures occurred, and Plaintiff has provided no basis for the Court to take notice of these prior acts and related disciplinary measures. (*See* Dep. Travis Crumrine 135:9–142:6, Ex. 12 to Pl.'s Resp., ECF No. 149-12); (Dep. Deputy Chief John McGrath at 22:4–14, Ex. 7 to Pl.'s Resp., ECF No. 149-7); (Dep. Deputy Chief John McGrath 52:6–53:18, Ex. 10 to Pl.'s Resp., ECF No. 149-10); (Dep. Sergeant Michael Bland, 88:12–89:17, Ex. 11 to Pl.'s Resp., ECF No. 149-12).  Counsel's denied questions cannot create a genuine dispute of material fact for summary judgment.

## IV.   CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff's Motion in Limine, (ECF No. 105), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that LVMPD Defendants' Motion for Summary Judgment, (ECF No. 125), is **GRANTED in part** and **DENIED in part**.

**IT IS FURTHER ORDERED** that Officer Lopera's Motion for Summary Judgment, (ECF Nos. 128, 129), is **DENIED**.

**IT IS FURTHER ORDERED** that the parties have thirty days from the date of this Order to jointly file a proposed joint pretrial order.

**DATED** this __28__ day of September, 2020.

_____
Gloria M. Navarro, District Judge
United States District Court